# EXHIBIT M



THE CITY OF NEW YORK

**LAW DEPARTMENT**

MICHAEL A. CARDOZO
*Corporation Counsel*

100 CHURCH STREET
NEW YORK, NY 10007

EDWARD L. SAMPLE, II.
Phone: 212-788-0903
Fax: 212-788-0877
E-mail: esample@law.nyc.gov

February 27, 2008

<u>Via Regular Mail and Electronic PDF Transmission</u>
Sharon Seeley, Esq. (sharon.seeley@usdoj.gov)
U. S. Department of Justice
Civil Rights Division, PHB 4031
601 D Street, NW
Washington, DC 20004

> Re:  <u>USA v. City</u>
> Civil Action No.: 07 CV 2067 (NGG)(RLM)
> Law Dept. No.: 2007-017441

Dear Ms. Seeley:

Firefighter Michael Carlin has proposed Monday, March 3rd as a potential deposition date. Mr. Carlin indicates that, consistent with his work commitments, a "morning deposition" (e.g. 9:30AM) is best. Please let us know if this date is amenable to your schedule.

As was the case with firefighters Steven Baretta and Naim Vata and as may prove evident at these future depositions, these former linking panel members have little, if any, recollection of being involved in the linking panel almost ten years ago. Of particular note is firefighter Robert Blair. Mr. Blair is 70 years old, in failing health and presently resides more than 60 miles from the city. Mr. Blair is also responsible for caring for the welfare of his other senior family members. Mr. Blair retired from the FDNY in 1999 and has absolutely no recollection of serving on a linking panel in connection with the development of the test plan for Exam 7029.

We do not believe it appropriate to drag a 70 year old man some 60 plus miles from his home in order to give testimony which consists of repeated recitations of "I don't know" and "I can't remember." Thus, we question the appropriateness of proceeding with this deposition and request you reconsider putting him through this ordeal. In the alternative, we ask you to put off the deposition of Mr. Blair until other linking panel members have been deposed.

Consistent with the written agreement between the United States and the City, "all materials received, produced, reviewed, consulted or referred to by the City's expert witnesses in connection with this case" were produced to the United States. Some of these materials were produced in the investigation stages.

These materials are:

- USA v. City complaint
- Vulcan Society et al v. City et al complaint
- Notices for Exams 7029 and 2043
- Firefighter Exam No. 7029 Test Development Report
- DCAS 004505-004546 notes documenting setting of the 7029 Written Exam cutoff score at 84.705
- Five data CDs with various Excel files. The CDs included: 7029 Corrected Application Data, 2043 Corrected Application Data, 7029 Appt Dates, 2043 Appointment Dates, and a single CD with CID disposition data for both Exams.
- Certification / Disposition Turnaround document defining the Disposition Codes in the Correct Application Data
- CID Investigation Status Codes document defining same Firefighter Exam 7029 Explanation of Test Scores (as provided to applicants)
- Firefighter Exam 7029 Explanation of Test Scores (as provided to applicants)
- Firefighter Exam 2043 Explanation of Test Scores (as provided to applicants)
- FDNY Memos 001595-001514 describing lengthening of the Probationary Firefighter School
- Probationary Firefighter Manual (FDNY 001615-002406)
- Conditions for Completion of Probationary Firefighter Training (FDNY 002407-002408)
- Probationary Evaluation (FDNY 002409-002418)
- Completed Probationary Evaluation (FDNY 002419-002422)
- Current Probationary Firefighter Training Manual – 2 Vols. (FDNY 000001-000902)
- 14 CDs containing Fire Academy lesson plans and presentations
- Copies of all formats of written Exam 7029 (as well as the EMT "promotional" version labeled 7514), and the final answer key (C001308-001589)
- Item Records for Exam 7029 (C000029-000595)
- Copies of all formats of written Exam 2043 (as well as the EMT "promotional" version labeled 0532), and the final answer key (C001590-001867)
- Item Records for Exam 2043 (C000596-001307)
- Various copies of Justice Department letters to the City and associated documents including Interrogatory requests, Requests for Production of Documents, and Requests for Admission
- PDF files with Analyses of Exam 0084 List Utilization and Exam Results (#Legal 1849700 and #1849698)
- Copy of Expert Report by Dr. Bernard Siskin
- Copy of Expert Report by Dr. Joel Wiessen and a corresponding follow-up Errata Sheet
- Transcript copies the depositions of Dr. Siskin and Dr. Wiessen
- Copy of the SHL document "Physical Ability Examination for the City of New York Firefighter Exam No 0084: Final Report Part II

2

- Copy of Draft Report (dated December 18, 1992) "Job Analysis and Written Examination Development for the City of New York Firefighter Examination No. 0084: Final Report Part I
- A copy of NY Civil Service Law 50-a

Your recitation of events in the first full paragraph of page 2 of your February 26th letter is factually incorrect.

It is the City's position that persons called by an opposing party as witnesses concerning events occurring with regard to their official duties are entitled to representation by this office. This applies to current and former employees. Thus, unless you are otherwise informed, the linking panel members are represented by this office.

It is less than rational to expect that the City would have the contact information of former employees instantly available. It is also less than rational to expect that former employees sit by their telephones waiting to learn that the United States wishes to drag them to a deposition concerning eight hours of work completed in one day nearly a decade ago. When the retired linking panel members return our entreaties, we will inform you of their availability. If they fail to respond to us by next Friday, March 7th, we will provide their last known contact information to you, subject to the Protective Order.

Exam 6019 is not the subject of the present litigation. Whether or not Exam 6019 has a disparate impact on any protected group is also not the subject of this litigation. Information concerning the current duties of firefighters as reflected in the materials used to develop Exam 6019 as required by Magistrate Judge Mann's ruling has been provided. The United States is not entitled to additional information.

To the extent the United States' 6019 requests seek data "disclos[ing] [whether] individuals who failed Written Exam 7029 or 2043 passed Written Exam 6019 and are considered by the City to be qualified for the FDNY firefighter position," such information can be obtained by comparing the eligibility lists for those exams. Thus, your attempt to obtain information beyond the eligibility list for Exam 6019 is merely a subterfuge. Additionally, materials related to the job relatedness of Written Exam 6019 and/or the extent of any disparate impact upon black and Hispanic applicants resulting from Written Exam 6019 are not relevant to the issue of alternative employment practices. The existence of an alternative employment practice in 2007 does not confirm the existence of an alternative employment practice in 1999 and 2002.

The City will not allow Dr. Cline to testify regarding the pass rates of whites, blacks and Hispanics on Written Exam 6019 and the existence and extent of any disparities between white and black and well as white and Hispanic pass rates. The City will not produce all of the materials relating to Exam 6019 referred to by Dr. Cline in her deposition save the final Test Development Report for Exam 6019. As noted at the Dr. Cline's deposition, this test development report has yet to completed and while we do not believe it is covered by Magistrate Judge Mann's ruling, it will be provided as soon as it is available. Finally, contrary to Dr. Cline's testimony, Dr. Bobko was not "involved in developing" Exam 6019.

Your attention to this matter is appreciated.

Very truly yours,

Edward L. Sample, II.
Special Assistant Corporation Counsel

Cc:    <u>Via Electronic PDF Transmission Only</u>
       Darius Charney, Esq. (dcharney@ccrjustice.org)
       Richard Levy, Esq. (rlevy@lrbpc.com)
       Dana Lossia, Esq. (dlossia@lrbpc.com)
       David Reese, Esq. (david.reese@usdoj.gov)
       Elliot Schachner, Esq. (elliot.schachner@usdoj.gov)
       Judith S. Scolnick, Esq. (jscolnick@scott-scott.com)

# EXHIBIT N

1

1
2   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
3   Civil Action No. 07-CV-2067
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
4   THE UNITED STATES OF AMERICA,
                Plaintiff,
5   and
    VULCAN SOCIETY, INC., for itself and on
6   behalf of its members, CANDIDO NUNEZ,
    MARCUS HAYWOOD and on behalf of a Class
7   of All Others Similarly Situated,
                Plaintiff-Intervenors
8
                -against-
9
    CITY OF NEW YORK, FIRE DEPARTMENT OF THE
10  CITY OF NEW YORK, NEW YORK CITY
    DEPARTMENT OF CITYWIDE ADMINISTRATIVE
11  SERVICES, MAYOR MICHAEL BLOOMBERG and
    NEW YORK CITY FIRE COMMISSIONER NICHOLAS
12  SCOPETTA, in their Individual and
    Official capacities,
13                Defendants.
    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
14                February 21, 2008
                  10:01 a.m.
15
16          Deposition of CATHERINE S. CLINE, taken
17      by the Plaintiff, pursuant to Notice, at the
18      offices of the United States Attorney for the
19      Eastern District of New York, 271 Cadman Plaza
20      East, New York, New York, before David Levy,
21      CSR, a Notary Public of the State of New York.
22
23
24
25

**VERITEXT/NEW YORK REPORTING COMPANY**
    212-267-6868                              516-608-2400

**2**

A P P E A R A N C E S:

UNITED STATES DEPARTMENT OF JUSTICE
Civil Rights Division,
Employment Litigation Section
    950 Pennsylvania Avenue, N.W.
    Washington, D.C. 20530
BY: SHARON A. SEELEY, ESQ.
        Special Litigation Counsel
    CLARE GELLER, ESQ.
        Trial Attorney
    DAVID REESE, ESQ.
        Trial Attorney

HON. BENTON J. CAMPBELL
United States Attorney, EDNY
    271 Cadman Plaza East
    Brooklyn, New York 11201
BY: ELLIOT M. SCHACHNER, ESQ.
        Assistant United States Attorney

**3**

A P P E A R A N C E S (Cont'd.):

LEVY RATNER, P.C.
Attorneys for Plaintiff-Intervenors
    80 Eighth Avenue
    New York, New York 10011-5126
BY: RICHARD A. LEVY, ESQ.
        -and-
    DANA E. LOSSIA, ESQ.

HON. MICHAEL CARDOZO
Corporation Counsel
    100 Church Street
    New York, New York 10007-2601
BY: EDWARD SAMPLE, ESQ.
        Assistant Corporation Counsel

DEPARTMENT OF CITYWIDE
ADMINISTRATIVE SERVICES
    One Centre Street, 16th Floor
    New York, New York 10007
    (NOT PRESENT)

**4**

1
2          (Plaintiff Exhibit 161, two-page
3     document entitled, "Definitions For
4     Purposes of Deposition of Catherine
5     Cline", marked for identification, as of
6     this date.)
7          (Plaintiff Exhibit 162, document
8     entitled, "PRO to Firefighter Exam Number
9     0532, Final Task List For Test Plan."
10    Bates numbered NYC93939 through 939944,
11    marked for identification, as of this
12    date.)
13         (Plaintiff Exhibit 163, document
14    entitled, "Test Specifications," Bates
15    numbered NYC104704 through 10479, marked
16    for identification, as of this date.)
17         (Plaintiff Exhibit 164, document
18    bearing footer, "Newest Testplan," Bates
19    numbered NYC123187, marked for
20    identification, as of this date.)
21         (Plaintiff Exhibit 165, document
22    bearing footer, "Test Plan," Bates
23    numbered NYC123189, marked for
24    identification, as of this date.)
25         (Continued on following page.)

**5**

1                     Cline
2          (Plaintiff Exhibit 166, document
3     bearing footer, "Overview," Bates numbered
4     NYC123188, marked for identification, as
5     of this date.)
6     C A T H E R I N E  S.  C L I N E, having been
7     duly sworn by the Notary Public, was examined
8     and testified as follows:
9          MS. GELLER:  For the record, this is
10    a deposition of Catherine S. Cline in the
11    case of United States versus City of New
12    York, in the U.S. District Court for the
13    Eastern District of New York.  This
14    deposition is being taken pursuant to the
15    Federal Rules of Civil Procedure.  All
16    objections except as to form and privilege
17    are reserved.
18         Counsel, are you reserving signature?
19    MR. SAMPLE:  Correct.
20         THE WITNESS:  Could I just -- I just
21    didn't understand what he told me when I
22    came in.  So --
23         MS. GELLER:  All right.
24         (Witness confers with counsel.)
25         THE WITNESS:  Okay.

2   (Pages 2 to 5)

**14**

Cline

1       Cline
2  looked at?
3      A.  In re -- talking with -- in reviewing
4  documents prior to this deposition, I was made
5  aware of some documents by the attorneys that I
6  was not aware of previously.
7      Q.  Now, so on your own, to prepare for
8  today's deposition, you looked, just looked back
9  at job analysis 6019, is that correct?
10     A.  That's correct.
11     Q.  And other than counsel, did you speak
12  with anyone to prepare for the deposition?
13     A.  No.
14     Q.  Now, you mentioned speaking with
15  counsel and being given documents to review.  How
16  many times did you meet with counsel in
17  preparation for this deposition today?
18     A.  Once.
19     Q.  And when you're talking about
20  counsel, are you speaking only of Mr. Sample?
21     A.  Mr. Sample and Mr. Frankel.
22     Q.  Was anyone else present at the
23  meeting?
24     A.  No.
25     Q.  When did it occur?

**15**

Cline

1       Cline
2     A.  Tuesday.
3     Q.  Last Tuesday?
4     A.  Two days ago.  Today is Thursday,
5  right?
6     Q.  Right.
7     A.  Tuesday.  The day before yesterday.
8     Q.  How long was the meeting?
9     A.  Two hours.
10     Q.  And you said that you were given
11  documents that you had never seen before?
12     A.  I was shown documents that I had
13  never -- never seen before.  I wasn't given them.
14     Q.  I see.  Were you shown any documents
15  that you were familiar with?
16     A.  One I was shown, which was the job
17  analysis report that was written by Matt
18  Morrongiello for one of the previous exams, I had
19  looked at before.
20     Q.  Any other documents that you had seen
21  before?
22     A.  No.
23     Q.  What documents were you shown that
24  you were not familiar with?
25     A.  I had never seen the document that

**16**

Cline

1       Cline
2  was prepared by Alberto Johnston with regard to
3  one of the exams.
4     Q.  And what document was that?
5     A.  It was simply a little memo saying
6  that certain subject matter experts had reviewed
7  the task list or the exam or something to that
8  effect, and who they were.
9     Q.  It was a document that listed subject
10  matter experts?
11     A.  I'm -- think so.  I'm pretty --
12     Q.  They had reviewed what?  I'm sorry.
13     A.  Either the test list or the exam.
14  I'm not sure which.  I didn't read it carefully.
15     Q.  Were there any other documents?
16     A.  No.
17     Q.  Now, there has been testimony that
18  you were one of the individuals who developed
19  exam 6019; is that correct?
20     A.  Yes.
21     Q.  Was there any individual within DCAS
22  who had primary responsibility for exam 6019?
23     A.  Well, hierarchically, I suppose it
24  would be William Klimowicz and Tom Patitucci.
25     Q.  Did you work with anyone else from

**17**

Cline

1       Cline
2  DCAS in developing 6019?
3     A.  I worked with Rob Alexander.
4     Q.  Okay.
5     A.  And I worked with Barbara Krooss,
6  Dr. Barbara Krooss.
7     Q.  Okay.  Just so I'm clear, the people
8  that you worked with within DCAS for exam 6019
9  were William Klimowicz, Tom Patitucci, Robert
10  Alexander and Barbara Krooss.
11     A.  Right.
12     Q.  Now, what documents exist reflecting
13  the development, the results, the validation
14  efforts and the disparate impact of exam 6019?
15     A.  I am working on a test development
16  report.
17     Q.  So is that an ongoing project?
18     A.  It's not quite finished.
19     Q.  Okay.
20     A.  I'm waiting for some information.
21     Q.  What do you need to finish the test
22  development report?
23     A.  Um -- I need some ethnic breakdowns
24  for different people who, for example,
25  participated in a pretest that we did of the

5  (Pages 14 to 17)

18

Cline

1
2  exam.
3        Q. Why do you need this information?
4        A. Just to describe the sample.
5        Q. What do you mean by a pretest?
6        A. A pretest is, we have -- there were
7  speeded portions of the test and there were
8  different questions that had not been used before
9  in -- at DCAS. And we wanted to do a pretest in
10 order to establish the time limits and to
11 establish whether the directions were clear and
12 whether the items were clear.
13       Q. Can I ask what you mean by "speeded
14 test"?
15       A. A speeded test is one which is given
16 under time limits.
17       Q. Now, is there any other information
18 that you need to finish the test development
19 report?
20       A. I can't recall right now. But that's
21 the main thing that I need. I also needed some
22 documents that the item writers used to construct
23 the test, but I've gotten those. I just haven't
24 finished it.
25       Q. Presently, how many chapters is the

19

Cline

1
2  test development report?
3        A. My guess would be five or six.
4        Q. And are those chapters in final
5  version or they are still in draft form?
6        A. They are still in draft form.
7        Q. What has to happen for them to become
8  final?
9        A. Attorneys have to look at them and
10 they have to also be approved by people at DCAS.
11       Q. So basically, they would have to
12 be -- there's a review process before the draft
13 becomes final.
14       A. Yes.
15       Q. Is anyone else working on the test
16 development report with you?
17       A. No.
18       Q. Now, I'm going to go back through the
19 questions. I realize I packed a lot into it. So
20 my first part of it, I asked what documents exist
21 reflecting the development of 6019.
22          Are there any other documents, other
23 than the test development report?
24       A. There are a large number of computer
25 analyses that I ran.

20

Cline

1
2        Q. Okay. Upon what topics were these
3  analyses?
4        A. On everything from the reliability of
5  the test --
6        Q. Okay.
7        A. -- to the factor structure of the
8  test, to impact on various different classes of
9  the test.
10       Q. Okay. Do you have copies of all
11 these documents?
12       A. I believe I gave most of these
13 documents in when I -- when I provided -- I
14 provided DCAS with -- I believe I was providing
15 it to the Law Department with everything on my
16 computer. It would have been among those.
17       Q. Okay. So you provided all this
18 information to DCAS.
19       A. I believe I have. I've provided it
20 all to DCAS.
21          (Witness confers with counsel.)
22       A. I wanted to say that Dr. Philip Bobko
23 has reviewed the different reports that I've
24 written and, based on his comments, I have
25 sometimes made additions or modifications.

21

Cline

1
2        Q. You're talking to these, specifically
3  to the test development report?
4        A. And also to the job analysis report.
5        Q. Okay. Now, when did you provide the
6  various computer analyses you've just described
7  to DCAS?
8        A. Several months ago.
9        Q. So is it fair to say, the only
10 documents that you have regarding 6019, that only
11 you would possess, would be the test development
12 report chapters that are ongoing that you're
13 still working on?
14       A. I have copies of everything, 'cause I
15 wrote it. I mean, I have copies of everything.
16       Q. Okay. So you keep a copy on your own
17 personal computer and then you gave also to DCAS?
18       A. Exactly.
19       Q. In terms of these chapters and the
20 draft chapters for the test development report,
21 have you given these to DCAS as well?
22       A. I have given them to the lawyers
23 involved in this case, to Georgia --
24       THE WITNESS: -- Georgia's last name
25 is --

6  (Pages 18 to 21)

# EXHIBIT O

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA    *    Case No. 07-CV-2067(NGG)
                      *
                      *    Brooklyn, New York
                      *    March 7, 2008
                      *
     v.                  *
                      *
CITY OF NEW YORK,           *
                      *
         Defendant.      *
                      *

* * * * * * * * * * * * * * * *

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
BEFORE THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:              ELLIOT M. SCHACHNER, ESQ.
                               Asst. United States Attorney
                               United States Attorney's Office
                               271 Cadman Plaza
                               Brooklyn, NY 11201

                               SHARON SEELEY, ESQ.
                               DAVID NATHAN REESE, ESQ.
                               U.S. Department of Justice
                               Civil Rights Division
                               950 Pennsylvania Ave., NW
                               PHB 4031
                               Washington, DC 20530

For the Intervenor Plaintiff,    JUDITH S. SCOLNICK, ESQ.
  Vulcan Society:                     Scott & Scott, LLP
                               29 West 57th Street
                               New York, NY 10019

                               DANA E. LOSSIA, ESQ.
                               Levy Ratner, PC
                               80 Eighth Avenue
                               New York, NY 10011

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Transcription Service, Inc.**
**67Elaine Drive**
**Shelton, Connecticut 06484 (203)929-9992**

APPEARANCES: (Cont'd.)

For the Defendant,                WILLIAM S.J. FRAENKEL, ESQ.
 The City of New York:            EDWARD SAMPLE, ESQ.
                                  Corporation Counsel of the
                                   City of New York
                                  100 Church Street
                                  New York, NY  10007

3

1          (Proceedings commenced at 2:00 p.m.)

2              THE COURT:  This is Judge Mann on the line.  I'm

3      conducting a telephone conference in United States of

4      America vs. City of New York, 07-CV-2067.

5              Do I have all counsel on the line?

6              ALL COUNSEL:  Yes, Your Honor.

7              THE COURT:  All right.  Would you each state your

8      appearance?

9              MR. SCHACHNER:  Elliot Schachner, Assistant

10     United States Attorney, for the United States.

11             MS. SEELEY:  And this is Sharon Seeley from the

12     Department of Justice for the United States.

13             MR. REESE:  This is David Reese for the

14     Department of Justice for the United States.

15             MS. SCOLNICK:  This is Judy Scolnick with Scott

16     and Scott for plaintiff intervenors.

17             MS. LOSSIA:  This is Dana Lossia with Levy Ratner

18     also for the plaintiff intervenors.

19             THE COURT: You know what?  You're going so fast

20     that I haven't gotten all your appearances.  I got up to

21     David Reese.

22             Can you then repeat who I have on the line?

23             MS. SCOLNICK:  Yes.  This is Judy Scolnick. I'm

24     with the firm Scott and Scott and we represent the

25     plaintiff intervenors.

4

1        THE COURT:  All right.  Anyone else for

2   plaintiffs or intervenors. I think we had one more.

3        MS. LOSSIA:  Yes.  Dana Lossia from Levy Ratner.

4        THE COURT:  Can you spell your last name, please?

5        MS. LOSSIA:  It's L-O-S-S-I-A.

6        THE COURT:  I'm sorry.  L-O-S?

7        MS. LOSSIA:  S-S, as in Sarah.

8        THE COURT:  All right.

9        MR. FRAENKEL:  Assistant Corporation Counsel

10  William Fraenkel, F-R-A-E-N-K-E-L, for the defendant.

11        MR. SAMPLE: And also Edward Sample, Special

12  Assistant Corporation Counsel, also for the City.

13        THE COURT:  Could you spell your last name?

14        MR. SAMPLE: S-A-M-P-L-E.

15        THE COURT:  All right.  And we have a defendant

16  intervenor as well, correct?

17        MS. SEELEY:  No, Your Honor.

18        MR. SCHACHNER:  I believe, Your Honor, that the

19  Firefighters Union was given a certain degree of intervenor

20  status in the case, but they have been monitoring it and

21  not so much participating.

22        MS. SEELEY:  I think they were given amicus

23  status, if I'm not mistaken.

24        THE COURT:  All right.  Let me first say, as I

25  think at least some of you may be aware, I've been on

5

1    arraignment duty this week and the last few days have been

2    quite busy, so I have not had a chance to get through all

3    the attachments.

4            I've read the letters and portions of the

5    attachments, but I have not had an opportunity to

6    thoroughly immerse myself in all the underlying facts

7    pertaining to this dispute.

8            But I at least wanted to get back to the parties

9    because I know that there are timing issues.  Just remind

10   me; when were the City's responses to the document demands

11   served?

12           MS. SEELEY:  They were served on -- just a

13   minute, Your Honor. I have to look it up.

14           THE COURT:  Who's speaking now, by the way?

15           MS. SEELEY:  I'm sorry, Your Honor.  This is

16   Sharon Seeley for the United States.

17           THE COURT:  All right.

18           MR. SCHACHNER:  The most recent -- well, the

19   responses -- the most recent responses to the request for

20   admission and interrogatory request for production of

21   documents, those were served -- let me see here. I have

22   them in front of me.  I guess it was February 27th.

23           THE COURT:  February 27th of this year?

24           MR. SCHACHNER:  Well, those were the responses to

25   our request for admission, second set of interrogatories

6

1    and request for production of documents.

2              MS. SEELEY:  But, Your Honor, maybe what you're

3    referring to is request 96 --

4              THE COURT:  Yes.

5              MS. SEELEY:  Which was our first request.  Those

6    answers were served on October 15th, 2007.

7              THE COURT:  And why -- I appreciate the fact that

8    you have -- you've conferred in an attempt to resolve this

9    without the court's involvement, which you're required to

10   do, but why is this brought to my attention the week before

11   the deposition and just several weeks before the deadline

12   for serving expert disclosure?

13             MS. SEELEY:  Well, Your Honor, there a couple of

14   reasons for that. One is, as you know, we did earlier come

15   to the court and request some documents related to exam

16   6019 and the court, in fact, ordered some of them produced

17   and we did receive those.

18             And at the time, Your Honor stated that we would

19   do this in a step-by-step fashion.

20             THE COURT:  Well, that was back on November 9th.

21             MS. SEELEY:  I know, Your Honor.

22             What we did, knowing that Dr. Bobco had been

23   involved in the development of exam 6019, in order to have

24   all our facts in a row, we waited until the City designated

25   Dr. Bobco as one of its expert witnesses in this case on

7

January 21st.

On January 25th, I believe, we wrote to the City and told the City that we wanted the 6019 documents. Since then, we have been attempting to get those documents from the City over the last six weeks and one of our problems has been that we are aiming at a moving target.

On February 21st, counsel for the City, during Dr. Klein's deposition, stated that the 6019 documents had been produced or would immediately be produced.

A week later we got a letter in which the City changed force and now said that the documents would not be produced stating that contrary to Dr. Klein's direct testimony, Dr. Bobco wasn't even involved in developing 6019.

And then on March 4th, the City wrote a letter to the court again reversing course and saying that we could ask Dr. Bobco deposition questions "concerning his involvement in the development of exam 6019 to the same extent that he could be questioned about any other exam he help develop."

So we've been trying to get these documents for over six weeks and the City has delayed, it has flip flopped and that's why we ended up where we are.

MR. FRAENKEL: Your Honor, this is William Fraenkel for the City.

8

1          THE COURT:  Yes.

2          MR. FRAENKEL:  Pursuant to Your Honor's order, we

3    provided the plaintiff, the United States, with the

4    documents relating to 609, as it related to -- they claimed

5    that they needed the information regarding this exam which

6    is not part of this litigation, to gauge whether the

7    present duties of a firefighter are similar to those that

8    existed when the prior exams in 2002, in 1999, were

9    designed and administered.

10          This included the job analysis, which was

11   provided, and the test development for it.  We provided one

12   chapter for the test development report.  The rest of the

13   test development report is not yet completed. And when that

14   is completed it will be produced.

15          Dr. Bobco was not involved in the development of

16   the exam in the sense of being the primary developer of it.

17   He was hired as a consultant by the City to work with the

18   law department which anticipated litigation; not litigation

19   of this nature, but litigation that very often comes up

20   challenging new civil service exams.

21          We don't believe that his role in the

22   development, or contribution I should say, to this exam is

23   relevant to this litigation.

24          To the degree that he could be questioned about -

25   - as an expert witness about exams that he worked on for

9

1     any entity, be it the City of New York, the City of Boston,

2     or some large corporation, we agree that he could be

3     allowed to be questioned about that.

4          But the documents that the plaintiff is asking

5     for go far beyond that and we don't believe, and we've been

6     consistent, despite the assertions that the City has flip

7     flopped in saying that we will provide what -- obviously,

8     what Your Honor ordered and those documents, the test

9     development for it, which we don't believe necessarily is

10    encompassed by Your Honor's prior order, but we're prepared

11    to provide that.

12         As I said, we provided one chapter and when the

13    rest is completed it would be provided.

14         THE COURT:  When is that expected to happen?

15         MR. FRAENKEL:  Dr. Klein is still working on it,

16    Your Honor.

17         THE COURT:  Well, is there a timetable, because

18    we have depositions coming up?

19         MS. SEELEY:  Your Honor, this is Sharon Seeley

20    again. Dr. Klein testified that she was awaiting some

21    information regarding ethnicity of some individuals

22    involved in the test development.  So it's within the

23    City's control.

24    This test development report, as we've been told, has been

25    in the works for a very long time and it is very near

10

1    completion and it is contingent upon the City providing

2    some information to Dr. Klein.

3              MR. FRAENKEL:  It is important to remember, Your

4    Honor, that 6019 is not part of this case and nor has Dr.

5    Bobco's report or Dr. Shimmer's report about which these

6    depositions next week are supposed to take place, relate to

7    alternate methods.  They relate to their response to the

8    plaintiffs and plaintiffs as intervenors statistical

9    analysis of alleged desperate impact.

10             So alternate methods of testing, which allegedly

11   is what the plaintiff is interested in with regards to 6019

12   has not yet been an issue.

13             They will have another opportunity to broach

14   those topics with Dr. Bobco when he prepares his response

15   to the plaintiff's report on alternate testing methods.

16             THE COURT:  I don't follow your argument.  Why do

17   these materials not relate to alternate methods of testing?

18             MR. FRAENKEL:  The question concerning alternate

19   methods, Your Honor, would have to do with what alternate

20   testing methods existed in 1999 and 2002 when the exams at

21   issue in this litigation were created, not what alternate

22   testing methods might exist in 2006, 2007 and 2008.

23             THE COURT:  Well, as I understand it from the

24   government's letter, one of the witnesses -- I believe it

25   was Dr. Klein, has testified that these methods were -- the

1    methods used with 6019 were feasible at the time the other

2    tests were developed.

3          MR. FRAENKEL:  I believe, Your Honor, with no

4    disrespect to the plaintiff's counsel, that is a

5    overstatement of Dr. Klein's testimony.  Dr. Klein's

6    testimony was -- and I don't have it in front of me.  I was

7    ill and I'm not in the office today -- her testimony was

8    that these methods were in development at that time.  That

9    they -- not to say that they were necessarily feasible for

10   a municipality the size of the City of New York to

11   implement them, but that their beginnings existed back

12   then.

13         MS. SEELEY:  Your Honor, this is Sharon Seeley.

14   We disagree with that characterization, but I think it's a

15   little bit beside the point what Dr. Klein said.  She, in

16   fact, did say that these things were available ten to 15

17   years ago.

18         But the City's position isn't the fact that the

19   City develops its own exams and it didn't develop anything

20   other than the challenge exams gives it a pass on

21   alternatives.  And that's just not the case.

22         If the City could have developed these exams

23   earlier, then there are potential alternatives.  An

24   alternative employment practice is one that would serve the

25   City's legitimate purposes, inflecting the most qualified

12

1    candidates and have less disparate impact.

2          If a test like exam 6019 could have been

3    developed earlier and it's as or more valid than exam 7029

4    and 2043, the challenge exams, and it has less disparate

5    impact, then it is an alternative.  So all the documents

6    that are relevant to the validity or job relatedness, the

7    disparate impact of exam 6019 are crucial in this case.

8          And with regard to timing, I think the City

9    misunderstands our position.  We're not concerned about

10   asking Dr. Bobco questions about his opinions as to what is

11   or is not an alternative.

12         Our expert reports on the issue of alternatives

13   are due on March 28th and that's the urgency here.  If we

14   want to ask Dr. Bobco questions about exam 6019, so that

15   our experts will have that information and the time to

16   decide whether they will offer an opinion that an exam like

17   exam 6019 is an alternative.

18         THE COURT:  And, Ms. Seeley, is it the position

19   of the United States that this evidence would be

20   admissible?

21         MS. SEELEY: Yes, Your Honor. Absolutely.

22         THE COURT:  And Mr. Fraenkel, why wouldn't it be

23   admissible?

24         MR. FRAENKEL:  Again, Your Honor, it's not the

25   subject of this litigation.  And the issue is what was

13

1    available in 2002 and 1999.  6019 was just developed in the

2    past --

3              THE COURT:  Well, but in terms of feasibility,

4    just because it had not -- those questions hadn't been

5    formulated, that can't mean that you can't look to

6    alternatives that were later implemented where obviously

7    the United States would have to prove that there's no

8    reason why this couldn't have been implemented earlier.

9              But we're not talking about computer science and

10   alternatives that assumes certain developments of computers

11   that didn't exist ten or 20 years ago. I mean, you're

12   talking about developing questions.

13             MR. FRAENKEL:  Methodologies, Your Honor. The

14   question is whether or not these new methodologies of

15   testing were sufficiently accepted in the field to be

16   considered reliable enough to be used as a method of

17   examining 15,000 people for the position of a New York City

18   Firefighter when the exam will not be given again for

19   several number of years.

20             So there was concern that you need to see what

21   works before you can simply implement it because it will

22   lock the municipality in for some time.  So the question is

23   not what we can do now, but what could be done then.

24             6019 clearly was not developed back when the

25   exams at issue in this litigation were. And --

14

1          THE COURT:  Well, let's put aside 601 and the

2     precise questions.  You have another concern which is that

3     you don't want to disclose the precise questions in an exam

4     that's still being used.

5          So let's put aside the exam itself. You're

6     talking about the methodology.

7          Have you provided information to the plaintiffs

8     about the methodology?

9          MR. FRAENKEL:  Dr. Klein was available.  She

10    developed the exam to testify concerning the methodologies

11    and as we said, we have no objection to Dr. Bobco

12    testifying concerning methodologies of the type used for

13    6019.

14         THE COURT:  But they're asking for the documents

15    relating to that methodology and you're objecting to it.

16         MR. FRAENKEL:  Your Honor, they do have the test

17    development report, or at least one chapter of it, and the

18    job analysis for that. That would be the basis for someone

19    to be able to question the experts concerning it.

20         MS. SEELEY:  Your Honor, that's incorrect.  We

21    don't have a chapter of the test development report, and

22    even if we did, one out of six chapters is not sufficient.

23         THE COURT:  Well, I agree and if -- since

24    apparently the timing of the completion of this report is

25    within the City's control, it may suggest that the existing

'15

1    draft ought to be turned over, if they're entitled to this

2    document, but it just hasn't been completed because there's

3    information within the City's control that has not yet been

4    provided to the person finalizing the exam, then maybe the

5    draft has to be turned over.

6         MS. SEELEY:  Exactly, Your Honor. That's the

7    United States' position.

8         THE COURT:  How much longer is this test going to

9    be -- 6019, the actual questions on that exam.  How long is

10   that going to be used?

11        MR. FRAENKEL:  It will be used so long as there

12   are individuals on military leave who make applications to

13   take the examination.  So it could be an extensive amount

14   of time, Your Honor.

15        MS. SEELEY:  Your Honor, may I address that

16   issue?  That is the same -- exact same situation that we

17   had with regard to exam 2043 when earlier on in this case

18   we negotiated with the City the protective order that the

19   court later entered.

20        2043 was still being given to those small groups

21   of people, so we put a provision into the protective order

22   after negotiating it with the City that protects the exam

23   questions and, in fact, it was so specifically designed for

24   exactly this situation that it says this particular

25   provision of the protective order will no longer be in

1   effect once the City stops using exam 2043.

2          We've offered to modify the protective order to

3   change that provision to cover the exam questions for 6019.

4          THE COURT:  And if I recall correctly, was that

5   an attorneys eyes only provision?

6          MS. SEELEY:  It's attorneys and our experts and

7   others working with us, but essentially that, Your Honor.

8          THE COURT:  But not in the case -- because we

9   have the intervenors now.  Would that be -- I assume that

10  that information could not be conveyed to the intervenors

11  themselves, as opposed to their counsel.

12         MR. FRAENKEL:  Correct, Your Honor.  That would

13  be one of the City's concerns.

14         MS. SEELEY:  They also have a protective order,

15  Your Honor.

16         THE COURT:  But we would need it limited, in this

17  instance, as Your Honor pointed out, to experts and

18  attorneys eyes only.

19         MS. SCOLNICK:  This is Judy Scolnick for the

20  plaintiff intervenors.  We would agree to keep it to

21  attorneys and experts eyes only and to not share it with

22  our client.

23         THE COURT:  Well, based on what I've heard, if

24  the information concerning the methodology -- if that is

25  relevant and the City is conceding that their witnesses can

1    be questioned about it, then the plaintiffs and plaintiff

2    intervenors should not have to examine these witnesses with

3    one hand tied behind their back in that they don't have the

4    documentation that they need to properly examine them.

5              And while I -- both sides concede that there is

6    an issue about what alternative methods were reasonably

7    available at the time, there may be a dispute about whether

8    or not the methods that were used in connection with 6019

9    were reasonably available, but it seems to me that is not a

10   basis for upholding an objection to that information.  That

11   is an issue that could be litigated in terms of what is

12   admissible at trial or on a motion.

13             So based on everything I've heard, I don't

14   believe that it would be appropriate for me to sustain the

15   City's objection.

16             Now, I don't know in terms of this -- the test

17   development report, I don't know how you want to handle

18   that, whether you want to -- whether that report can be

19   quickly finalized -- I mean, I'm concerned about the timing

20   in all this, since the deadlines in this case were either

21   set by or with the concurrence of Judge Garaufis.

22             I don't -- I think he had set forth general

23   guidelines and then I worked with the parties and we came

24   up with the specific dates.

25             But he made clear that he wanted this -- he

18

1    wanted the discovery completed by this summer. And I know

2    that what's being sought is only a two, two and a half week

3    extension, but I don't have the complete scheduling order

4    in front of me, so I don't know how this is going to impact

5    some of the other things that follow those dates.

6          What is the date that we have for the settlement

7    conference in this case?

8          MS. SEELEY:  It is July 16th, Your Honor.

9          THE COURT:  If I were to grant the extension

10   requested, would that have to be adjusted?

11         MS. SEELEY:  Well, Your Honor, the United States

12   doesn't believe so.  Without adjusting anything else, just

13   adjusting the dates that we asked for and the other parties

14   agreed to, it would take the time that we've lost out of

15   the time that the City has for its next set of expert

16   reports, which we think is appropriate, given that it's the

17   City's delay that has caused this.

18         If the City wanted to request that the court push

19   its days back, then essentially, yes, it would be pushing

20   the following dates after our April 14th date that we've

21   requested for our expert reports back by two weeks as well.

22         MR. FRAENKEL:  Your Honor, the City, first of

23   all, doesn't exactly agree with that characterization.  The

24   City has responded to discovery.  There's a dispute

25   concerning 6019, which I think is a very legitimate and

1    valid dispute concerning -- considering that at the very

2    beginning of this case it was pointed out over and over

3    again by all the parties that 6019 was not at issue and

4    that seems to be changing.

5           The City has not delayed -- the City is just

6    trying to defend the rights of its clients.

7           We don't think it's appropriate to cut into the

8    City's time to put forward a report concerning

9    alternatives.  However, that said, I also don't think it

10   would necessarily require any change of the date for the

11   settlement conference.

12          THE COURT:  Well, I have a couple of other days -

13   - a few other dates in July when I could -- in the later

14   part of July when I could conduct the settlement

15   conference, but I would not be prepared to adjourn the

16   conference beyond July, because I'm on arraignment duty in

17   August and I leave for vacation.

18          And I want this to be -- we need to know in July

19   whether or not this case is going to be going to trial.

20          So the parties can go back and come up with a

21   proposed modified schedule that would adjourn the

22   settlement conference one or two weeks in July.  I'll

23   provide the date after I review the proposed order and I

24   will then sign it.

25          But I do want the documents to be turned over --

1    Mr. Fraenkel -- I'm sorry -- yes.

2           Mr. Fraenkel, how soon can you get the documents

3    to plaintiff and plaintiff intervenors?

4           MR. FRAENKEL:  I don't know, Your Honor. I will

5    ask Mr. Sample, since he's in the office to -- when this

6    conference is over to contact Dr. Klein and find out from

7    her and convey that information to plaintiffs and

8    plaintiff's intervenors.

9           THE COURT:  My recollection is -- and part of her

10   deposition testimony that I reviewed, that she said she

11   provided the information I think on a zip disk, if I'm not

12   mistaken.

13          MS. SEELEY:  Exactly, Your Honor.

14          MR. FRAENKEL:  Yes.  We're trying to locate that

15   zip disk, Your Honor. It's somewhere at (indiscernible).

16   We don't know.  We've asked her to duplicate the

17   information that was contained on it and one of our

18   information technology people is attempting to work with

19   her to accomplish that.

20          She said yesterday she was very close to

21   completing that. I do not know, as I wasn't in the office

22   today, whether or not information technology was able to

23   walk her through that process, but that's something that

24   Mr. Sample can look into as well.

25          THE COURT:  All right. I'd like that production

21

1    to be made by Tuesday.  As far as the test development

2    report, counsel should confer. I want that turned over

3    right away as well, because I don't want a situation where

4    the witnesses are deposed and then there's an application

5    made to re-depose them because further information has been

6    produced.

7            MR. FRAENKEL:  Concerning the depositions, Your

8    Honor, we learned this morning that while Dr. Shimmer can

9    be rescheduled on a week's notice, Dr. Bobco has explained

10   that he has a number of issues concerning the rescheduling.

11

12           We were wondering if we could at least commence

13   his deposition next week --

14           MS. SEELEY:  No, Your Honor. From the United

15   States's point of view, no we can't.  We don't have the

16   documents.  It's unfair to make us commence his deposition

17   and then call him back later.

18           MR. FRAENKEL:  The main purpose of the

19   deposition, Your Honor, is the expert reports that have

20   already been served quite a while ago concerning the

21   response to the plaintiff's expert reports regarding

22   statistical analysis of potential disparate impact.

23           THE COURT:  Well, when you say can he be produced

24   for the first part of his deposition next week, when next

25   week do you have in mind?

22

1          MR. FRAENKEL:  He was previously scheduled, Your

2     Honor, for I believe Thursday.  Wednesday and Thursday.

3          MS. SEELEY:  Your Honor, this is Sharon Seeley.

4     These documents that we are expecting are very technical

5     documents. It's not something that I, not being a

6     statistician, can question Dr. Bobco about on a moment's

7     notice.  We need to provide these to our experts. I need to

8     talk to them about what questions to ask.

9          It's going to take time and it's not fair and, in

10    fact, I believe it would be prejudicial to the United

11    States to make us begin Dr. Bobco's deposition and then

12    bring him back, after he has had a chance to think about

13    all the questions we've already asked and come up with

14    better answers.

15          THE COURT:  And how much time was set aside for

16    his deposition this week?

17          MS. SEELEY:  We set aside three days for the two

18    experts.

19          MR. FRAENKEL:  And again, Your Honor, the main

20    issue at this stage is not alternative methods, but the

21    statistical analysis of disparate impact in Dr. Bobco's

22    report -- in Dr. Shimmer's report, has been in the hands of

23    the government and the intervenors for quite a while.

24          THE COURT:  Well, that doesn't mean that their

25    examination would not be shaped by information that they

1   have about 6019, particularly where he was involved in --

2   he had in a consulting capacity, with respect to the

3   development of that exam.

4           So under the circumstances, I don't think it

5   makes any sense to require the United States to go forward.

6   You said he's not available to reschedule on a week's

7   notice. I believe the United States has been asking for a

8   two-week adjournment, which would mean three weeks from

9   now.

10          So hopefully, with that much advance notice,

11  there's a date that -- you know, mutually convenient dates

12  that can be selected for the  -- later in March.

13          MS. SEELEY:  Your Honor, may I also bring up

14  another issue with regard to scheduling, and that is that

15  we purposely scheduled Dr. Shemmer and Dr. Bobco to be

16  deposed back to back.

17          That's because these two experts submitted --

18          THE COURT:  Well, then try -- then please try to

19  schedule them back to back.

20          MS. SEELEY:  Thank you, Your Honor.

21          THE COURT:  That is not something that I need to

22  be involved in. I've got a courtroom full of people waiting

23  on criminal matters. I assume you can work that out with

24  counsel.

25          MS. SEELEY:  I understand.  Thank you, Your

24

1    Honor.

2              THE COURT:  Okay.  Thank you very much.  Good

3    bye.

4         (Proceedings concluded at 2:33 p.m.)

5         I, CHRISTINE FIORE, court-approved transcriber and

6    certified electronic reporter and transcriber, certify that

7    the foregoing is a correct transcript from the official

8    electronic sound recording of the proceedings in the above-

9    entitled matter.

10

11        *Christine Fiore*

12   _____        March 24, 2008

13        Christine Fiore, CERT

14             Transcriber

15

16

17

18

19

20

21

22

23

24

# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        PLAINTIFF,

    v.

THE CITY OF NEW YORK,

        DEFENDANT.

CIVIL ACTION NO. 07-CV-2067
(GARAUFIS, J.)(MANN, M.J.)

### PLAINTIFF UNITED STATES' FIRST SET OF
### REQUESTS FOR PRODUCTION OF DOCUMENTS
### (NOS. 1-97)

TO:    Defendant, City of New York, through its attorney of record, Georgia Pestana, Esq., Chief, Labor and Employment Law, City of New York Law Department, 100 Church Street, New York, New York 10007

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff United States requests that defendant City of New York (the "City") produce the documents described below by making them available for inspection and copying no later than thirty (30) days after service of these Requests for Production at the offices of the undersigned counsel for the United States or at another place agreed upon in writing by counsel for the parties.

These Requests for Production are subject to and should be interpreted consistent with the agreements of the parties set forth in III-V of the Attachment to Initial Conference Questionnaire filed on July 20, 2007.

To the extent that any documents responsive to these requests are electronically stored, all information necessary to understand or use the computerized data, including code definitions, a printout of the program which created the computer-readable document, and the format and file layout for the document should be produced with the documents.

To the extent that bates numbered documents responsive to these requests have been produced by the City during the United States' pre-suit investigation, it is sufficient to identify the documents by bates number.

These discovery requests are continuing; subsequent to service of responses to these requests, defendant shall provide to the United States as amended or supplemental responses any information or documents required to be provided by way of amendment pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

**DEFINITIONS:**

The "Uniform Definitions" provided in Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York apply to these Requests for Production. In addition, unless a contrary meaning clearly appears in the context of a specific Request, the following definitions shall apply:

1.  "Applicant" refers to any individual who applied for employment as an entry-level firefighter in the FDNY through an open competitive examination process.

2.  "DCAS" means the City's Department of Citywide Administrative Services.

3.  "EEPC" means the City's Equal Employment Practice's Commission.

2

4.   "Entry-level Firefighter" means any person in an entry-level sworn firefighter position within the FDNY or in basic training for, and expected to be placed into, such a position following successful completion of training and any required certifications, regardless whether the individual holds a job title of "cadet," "trainee" or other similar title.

5.   "Exam 7029" means the open competitive process for appointment to the rank of entry-level firefighter in the FDNY which included the written examination administered by the City in February 1999 and referred to in the Notice of Examination attached to these Requests for Production as Exhibit A.  "Written Exam 7029" means the written examination administered by the City as part of Exam 7029, regardless of the form of the written examination (i.e., am, pm, Sabbath, Special Military, etc.).

6.   "Exam 2043" means the open competitive examination process for appointment to the rank of entry-level firefighter in the FDNY which included the written examination administered by the City in December 2002 and referred to in the Notice of Examination attached to these Requests for Production as Exhibit B.  "Written Exam 2043" means the written examination administered by the City as part of Exam 2043, regardless of the form of the written examination (i.e., am, pm, Sabbath, Special Military, etc.).

7.   "FDNY" means Fire Department of the City of New York and any agent, official, employee, office, department or division of the FDNY.

8.   "Incumbent" refers to any individual who is or was a sworn employee in the FDNY.

9.   "PPT" means the physical performance test administered by the City as part of Exam 7029 and/or Exam 2043.

10.  "Selection device" refers to any examination, test, requirement or criterion used to

3

evaluate a candidate's qualifications.  Selection devices include, but are not limited to: educational, residency or citizenship requirements; written, physical, medical or psychological test; background investigation; and interviews.

11. "Selection procedure" refers to any one or a combination of selection device(s) used to evaluate a candidate's qualifications.

12. "Sworn" refers to all classified or non-civilian employees in the FDNY.

These requests relate to the period from January 1992 to the present unless otherwise specified.

## REQUESTS FOR PRODUCTION

Please provide any and all:

1.  Organizational charts showing the organizational structure of FDNY, and each component thereof.

2.  Organizational charts showing the organizational structure of DCAS, and each component thereof that is involved in the development, evaluation, selection, administration or use of selection devices for the position of entry-level firefighter in the FDNY or in recruitment of applicants for that position.

3.  Union contracts or collective bargaining agreements between the City and any group(s) of sworn employees within the FDNY.

4.  Statutes, rules, regulations, policies or procedures relating to the selection of candidates for appointment as entry-level firefighters in the FDNY.

5.  Job postings, announcements, notices of examination and advertisements for the position of entry-level firefighter in the FDNY and documents describing when and where each was published or distributed.

6.  Documents which identify the minimum qualifications or requirements for taking Written Exam 7029 or Written Exam 2043.

7.  Job descriptions, duty manuals and other documents that describe minimum qualifications, eligibility requirements, salaries, benefits, duties and responsibilities of the position of entry-level firefighter in the FDNY.

8.  Documents that identify and describe any minority recruitment initiatives or efforts to recruit black or Hispanic applicants, and the open competitive selection process/Exam number(s) to which each recruitment initiative or effort related.

9.  All test preparation materials distributed or made available to applicants for use in preparing for the written examination portion of an open competitive selection process for the entry-level firefighter position in the FDNY and documents indicating when and how each was distributed or made available.

10. For each administration of Written Exam 7029, a copy of the examination form(s) administered, the corresponding answer key(s) and documents indicating the date of the administration.

firefighters in the FDNY or the knowledges, skills, abilities or other characteristics needed to perform the tasks and duties.

48.  Documents that relate to the decision to discontinue the use of the written examination component of Examination No. 0084 as a part of the selection process for entry-level firefighter in the FDNY including any documents indicating the reason(s) for the decision.

49.  Documents relating to any complaint(s) or dissatisfaction by the City or any of its officials, employees or agent with the written examination component of Examination No. 0084.

50.  Documents relating to any complaint(s) or dissatisfaction by the City or any of its officials, employees or agents regarding the firm (or personnel of or work done by the firm) that developed the written examination referred to in the preceding Request.

51.  Documents relating to the City's decision that the written examination used as part of Exam 7029 or Exam 2043 would be developed in-house by DCAS, any discussion of retaining an outside consultant or entity to develop the written examination or the reason(s) the written examination was developed in-house by DCAS.

52.  Documents relating to the Firefighter Exam No. 7029 Test Development Report by Matthew Morrongiello (the "Morrongiello Report"), including any correspondence, communications or materials exchanged between the FDNY or its officials or representatives and Morrongiello or any individual working for or with him on the matters that are the subject of the Morrongiello Report and any reports, memoranda, notes and any other documents consulted, generated or reviewed or used in connection with the preparation of the Morrongiello Report or the analyses reported therein.

53.  Documents that describe or were consulted, generated, reviewed, produced, collected or used in connection with the development of Written Exam 7029.

54.  Documents that describe or were consulted, generated, reviewed, produced, collected or used in connection with the development of Written Exam 2043.

55.  Reports and other documents that describe or were consulted, generated, reviewed, collected or used in connection with any validation study or other analysis relating to the job relatedness of Written Exam 7029 for the position of entry-level firefighter in the FDNY.

56.  Reports and other documents that describe or were consulted, generated, reviewed, collected or used in connection with any validation study or other analysis relating to the

10

job relatedness of Written Exam 2043 for the position of entry-level firefighter in the FDNY.

57.    Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the cutoff score the City used on Written Exam 7029 or the City's decision to use that cutoff score, including any analysis of whether use of the cutoff score is job related and/or consistent with business necessity.

58.    Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the cutoff score the City used on Written Exam 2043 or the City's decision to use that cutoff score, including any analysis of whether use of the cutoff score is job related and/or consistent with business necessity.

59.    Documents that describe or were consulted, generated, reviewed, produced, collected or used in connection with the development of the PPT used for Exam 7029.

60.    Documents that describe or were consulted, generated, reviewed, produced, collected or used in connection with the development of the PPT used for Exam 2043.

61..    Reports and other documents that describe or were consulted, generated, reviewed, collected or used in connection with any validation study or other analysis relating to the job relatedness of the PPT or the manner in which the City scored the PPT used for Exam 7029 for the position of entry-level firefighter in the FDNY.

62.    Reports and other documents that describe or were consulted, generated, reviewed, collected or used in connection with any validation study or other analysis relating to the job relatedness of the PPT or the manner in which the City scored the PPT used for Exam 2043 for the position of entry-level firefighter in the FDNY.

63.    Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the cutoff score or passing standard the City used on the PPT for Exam 7029 or the City's decision to use that cutoff score or passing standard, including any analysis of whether use of the cutoff score or passing standard is job related and/or consistent with business necessity.

64.    Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the cutoff score or passing standard the City used on the PPT for Exam 2043 or the City's decision to use that cutoff score or passing standard, including any analysis of whether use of the cutoff score or passing standard is job related and/or consistent with business necessity.

65.    Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the manner in which the City combined scores on Written Exam 7029 and the PPT for purposes of ranking applicants or the City's decision to

11

combine the written examination and PPT scores in that manner.   For purposes of this request, "the manner in which the City combined scores" includes, but is not limited to, the formulas the City used to standardize and/or weight scores on Written Exam 7029 and the PPT, the development of the formulas and the reason(s) for the decision to use the formulas, and the reason(s) for any such decision.

66.   Documents that describe or were consulted, generated, reviewed, collected or used in connection with any analysis of the manner in which the City combined scores on Written Exam 2043 and the PPT for purposes of ranking applicants or the City's decision to combine the written examination and PPT scores in that manner.   For purposes of this request, "the manner in which the City combined scores" includes, but is not limited to, the formulas the City used to standardize and/or weight  scores on Written Exam 2043 and the PPT, the development of the formulas and the reason(s) for the decision to use the formulas, and the reason(s) for any such decision.

67.   Documents that describe or relate to consideration by the City of the use of any written examination other than Written Exam 7029 as part of Exam 7029, including, but not limited to, any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration.

68.   Documents that describe or relate to consideration by the City of the use of any written examination other than Written Exam 2043 as part of Exam 2043, including, but not limited to, any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration.

69.   Documents that describe or relate to consideration by the City of the use of any cutoff score other than the cutoff score used on Written Exam 7029, or any weights or formulas for combining scores on Written Exam 7029 with PPT score other than those used by the City, including, but not limited to, any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration.

70.   Documents that describe or relate to consideration by the City of the use of any cutoff score other than the cutoff score used on Written Exam 2043, or any weights or formulas for combining scores on Written Exam 2043 with PPT score other than those used by the City, including, but not limited to, any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration.

71.   Documents that describe or relate to the City's decision to process/select applicants who passed Written Exam 7029 and the PPT in descending rank order, based on a combination of applicants' scores on Written Exam 7029 and the PPT (plus bonus points), including any documents that were consulted, generated, reviewed, collected or used in connection with the City's decision.

12

72.   Documents that describe or relate to the City's decision to process/select applicants who passed Written Exam 2043 and the PPT in descending rank order, based on a combination of applicants' scores on Written Exam 2043 and the PPT (plus bonus points), including any documents that were consulted, generated, reviewed, collected or used in connection with the City's decision.

73.   Documents that describe or relate to any method of processing/selection of applicants who passed Written Exam 7029 and the PPT considered by the City other than descending rank order based on a combination of applicants' scores on Written Exam 7029 and the PPT (plus bonus points), including any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration and documents reflecting the reasons the City did not use the other method(s) considered.

74.   Documents that describe or relate to any method of processing/selection of applicants who passed Written Exam 2043 and the PPT considered by the City other than descending rank order based on a combination of applicants' scores on Written Exam 2043 and the PPT (plus bonus points), including any documents that were consulted, generated, reviewed, collected or used in connection with the City's consideration and documents reflecting the reasons the City did not use the other method(s) considered.

75.   Documents relating to the City's contention that its use of Written Exam 7029 with a cutoff score of 84.705 as a pass/fail screening device as a part of the selection process for entry-level firefighter in the FDNY was/is job-related and consistent with business necessity within the meaning of 42 U.S.C. § 2000e-2(k)(1)(A)(i).

76.   Documents relating to the City's contention that its use of Written Exam 2043 with a cutoff score of 70 as a pass/fail screening device as part of the selection process for entry-level firefighter in the FDNY was/is job-related and consistent with business necessity within the meaning of 42 U.S.C. § 2000e-2(k)(1)(A)(i).

77.   Documents relating to the City's contention that processing/selection of applicants who passed Written Exam 7029 and the PPT in descending rank order, based on the combination of applicants' scores on Written Exam 7029 and the PPT used by the City (plus bonus points), was/is job-related and consistent with business necessity within the meaning of 42 U.S.C. § 2000e-2(k)(1)(A)(i).

78.   Documents relating to the City's contention that processing/selection of applicants who passed Written Exam 2043 and the PPT in descending rank order, based on the combination of applicants' scores on Written Exam 2043 and the PPT used by the City (plus bonus points), was/is job-related and consistent with business necessity within the meaning of 42 U.S.C. § 2000e-2(k)(1)(A)(i).

13

79.   Documents that relate to the decision to discontinue the use of the written examination used as part of Exam 7029 and/or Exam 2043 or the reason(s) for that decision.

80.   Documents that relate to the decision to extend the time period for the basic academy training given to entry-level firefighters in the FDNY or the reason(s) for that decision.

81.   Statutes, rules, regulations, policies or other documents which identify and describe the authority, duties, responsibilities or requirements of the training academy(ies) attended by entry-level FDNY firefighters for their basic training.

82.   For each academy class, documents that describe or are/were used in the basic academy training provided to persons hired as entry-level FDNY firefighters, including training curricula, outlines, syllabuses, summaries, manuals, texts, lists of reading materials and tests.

83.   Documents that describe or are used in in-service training provided to entry-level FDNY firefighters after the completion of basic academy training, including, but not limited to, training curricula, outlines, syllabuses, summaries, manuals, texts, lists of reading materials and tests.

84.   Documents that describe any certification requirements for entry-level FDNY firefighters and the authority under which each certification is required.

85.   Documents identifying persons who entered basic academy training, and did not successfully complete the required training to become entry-level FDNY firefighters, including, but not limited to, documents indicating the reason(s) each such person did not successfully complete the required training and documents relating to any scores, grades, ranks or evaluations received by each such person during basic academy training.

86.   Documents identifying persons who entered basic academy training and did not meet any certification requirements for entry-level FDNY firefighters, including, but not limited to, documents indicating the reason(s) each such person did not meet the certification requirement(s).

87.   Documents relating to all formal or informal complaints or allegations of discrimination on the basis of race or national origin in any aspect of the recruitment, selection or appointment of entry-level firefighters in the FDNY or in basic academy training for entry-level firefighters. Such documents include, but are not limited to, documents relating to the investigation of such complaints or allegations, any conclusions reached regarding the merits of such complaints or allegations and any actions taken as a result of such complaints or allegations.

14

96.    Documents reviewed, generated, consulted, relied upon or received by any expert witness
       retained by the City, or any person under the direction or control of such expert witness,
       relating to any claim(s) or defense(s) in this  case or any open competitive examination
       process since January 1, 1994.

97.    All documents identified in Defendant's Initial Disclosures under the Heading
       "Defendant's Response to Rule 26(a)(1)(B)."

Date: August 9, 2007                        WAN J. KIM
                                            Assistant Attorney General

                                    By:     _Sharon G. Seeley_____
                                            Sharon A. Seeley
                                            Clare Geller
                                            David Reese
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Civil Rights Division
                                            Employment Litigation Section
                                            950 Pennsylvania Avenue, N.W.
                                            Patrick Henry Building, Room 4908
                                            Washington, D.C.  20530
                                            Telephone:  (202) 514-4761
                                            Facsimile:  (202) 514-1005

                                            ROSLYNN R. MAUSKOPF
                                            United States Attorney

                                    By:     CAS By CG_____
                                            Elliot M. Schachner
                                            Kenneth Stahl
                                            Assistant United States Attorneys
                                            Eastern District of New York
                                            147 Pierrepont Street
                                            Brooklyn, New York  11201
                                            Telephone:  (718) 254-7000
                                            Facsimile:  (718) 254-6479

16

# EXHIBIT Q



**U.S. Department of Justice**

Civil Rights Division

*Employment Litigation Section – PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC  20530*
*www.usdoj.gov/crt/emp*

DJP:JMG:SAS:CG:DNR:es
DJ 170-51-358
170-52-78 through
170-52-80

October 10, 2007

Via facsimile and First Class U.S. Mail

Georgia Pestana
William S.J. Fraenkel
City of New York Law Department
100 Church Street
New York, NY  10007

      Re:    *United States, et al. v. City of New York, et al.*, Civil Action No. 07-2067
             (E.D.N.Y.)

Dear Counsel:

      This responds to Mr. Fraenkel's letter of October 8, 2007, which we received this morning upon returning to the office following our Rule 30(b)(6) deposition of the City in New York.  In addition, this letter addresses issues that arose yesterday during the deposition.

      First and most urgently, as we have indicated previously, some of the information we sought through the deposition is needed by the United States' expert on the issue of disparate impact, whose report is due on November 9, 2007.  In particular, the City has never provided a description of each step in the selection process for Exams 7029 and 2043.  As you know, the United States requested such information in our First Set of Interrogatories, responses to which were due nearly a month ago, and the United States took the Rule 30(b)(6) deposition because the City refused to answer the relevant interrogatories.  Yet, nearly a month after the interrogatory response were due, the City's Rule 30(b)(6) designee, Thomas Patitucci, testified that he was unable to respond to questions regarding stages of the entry-level firefighter selection process subsequent to the establishment of an eligibility list.  The first of the Matters stated in the United States' Rule 30(b)(6) Notice clearly required that the City produce a designee able to testify about all steps in the selection process "from application to appointment," including "[t]he criteria used to select candidates for hire from among those who successfully completed all stages of the selection process."

      In addition, Mr. Patitucci was able to provide only limited testimony regarding Exam 0084.  In the past, you have indicated that the City may have no information relating to Exam

0084 other than what is contained in documents already produced to the United States, but was attempting to locate someone with additional knowledge. If the City has no information other than that in the documents already produced and in Mr. Patitucci's testimony, please so inform us.

Also, you agreed during our telephone conference on October 3 (memorialized in David Reese's letter of October 4, 2007) that you would not object to the City's designee testifying regarding the Matters stated in the Rule 30(b)(6) Notice as they relate to Exam 6019. Indeed, during the deposition yesterday, Mr. Patitucci responded – without objection by the City – to questions relating to the job analysis conducted in connection with Exam 6019 as well as other matters relating to Exam 6019. Our recollections and notes reflect that during our telephone conference you also agreed to provide the job analysis conducted in connection with Exam 6019 and related documents. That agreement would, of course, be completely consistent with allowing Mr. Patitucci to testify regarding the same matters. Nonetheless, yesterday while we were in New York for the deposition, Mr. Fraenkel stated that the City would not provide such documents because in our June 13, 2007, letter to Judge Garaufis, we stated "that the Complaint does not alleges [sic] any violation of Title VII on account of Exam 6019 and that the Court is not being asked to rule on the legality of the City's use of Exam 6019." The statements in our June 13 letter were and continue to be true. However, as we explained at some length three weeks ago in our letter to Ms. Pestana dated September 20, 2007, information relating to Exam 6019 and the job analysis conducted in connection with Exam 6019 is highly relevant to the claims alleged in the United States' complaint:

> [T]he "job analysis" described in the Morrongiello Report was conducted internally by the City and was extremely limited in that it sought no information regarding physical or other non-cognitive requirements of the job. Information regarding any more recent job analyses, including any done in connection with Exam 6019, must be produced. Such job analyses likely were conducted by or with the assistance of outside consultant(s). In addition, such job analyses likely are more complete than that discussed in the Morrongiello Report because Written Exam 6019 purports to measure non-cognitive abilities or characteristics and the City changed its method of ranking applicants for Exam 6019 to eliminate any reliance on a physical ability test in assigning the applicants' ranks. The extent to which various physical or other non-cognitive abilities and characteristics are required by the job is highly relevant to at least the following issues: (1) whether the City's elimination of applicants from the selection process based solely on their written examination scores is job related and consistent with business necessity; (2) whether the City's ranking of applicants based on a final score which does not include any measure of non-cognitive, non-physical abilities or characteristics (i.e., which is based solely on a combination of scores on a cognitive test and a physical test) is job related and consistent with business necessity; and (3) whether the weights the City gave to written examination scores and PPT scores in calculating applicants' ranks on the Exam 7029 and 2043 eligibility list are job related.

The City has never in any of our discussions or exchanges of letters offered any argument that the new job analysis is not relevant to the United States' claims. Indeed, Mr. Patitucci's testimony as the City's designee confirmed what the United States suspected as of the September 20 letter. Specifically, he testified for the City that the job analysis was conducted by an outside consultant, Dr. Cline, and that the job analysis was more complete in considering non-cognitive abilities and characteristics than the job analysis work done in connection with Exam 7029 (and Exam 2043). Please inform us whether the City will provide the requested documents related to Exam 6019.

Finally, the following documents were mentioned by Mr. Patitucci yesterday during the deposition and, we believe, are responsive to the United States discovery requests and have not been produced by the City:

1. Copies of the original Notice of Examination for Exam 7029, the (first) Amended Notice for Exam 7029, and the Second Amended Notice for Exam 7029;

2. Copies of the (first) Amended Notice of Examination for Exam 2043, along with any other prior Notices of Examination for Exam 2043;

3. Any amended notice(s) of examination for Exam 2043 subsequent to the Second Amended Notice;

4. Any amended notice(s) of Examination for Exam 6019 subsequent to the Second Amended Notice of Examination for Exam 6019;

5. The form used by entry-level firefighter candidates to request attendance at a "protest session."

6. Any DCAS Commissioner's "calendar items" relating to the setting of passing grades/cutoff scores for Written Exams 0084, 7029, 2043 and 6019;

7. Any documents (including, but not limited to, notes of interviews, emails, memoranda, reports, analyses and questionnaires) relating to or reflecting the review by subject matter experts of the job analysis conducted by Matthew Morrongiello in connection with the Development of Written Exam 7029;

8. Any documents (including, but not limited to, emails or other electronically stored materials) reflecting communications to/from Thomas Patitucci or Joseph DeMarco relating to the decision to "broaden" the education and experience requirement for Exam 6019;

9. Sample admission cards for Written Exams 7029, 2043 and 6019; and

10.   Documents relating to the item analyses conducted for Written Exam 0084, 7029, 2043 or 6019, which Mr. Patitucci indicated are produced when the written examinations are scored.

Mr. Fraenkel indicated that some of the documents may be among those the City already has produced or has gathered and intends to produce. Please produce these documents to the extent that they exist within the City's possession or control and have not yet been produced. To the extent that the City believes that it has produced any or all of the documents listed above, please provide the bates numbers of such documents.

You may contact me at (202) 514-4761 with any questions. We will call you tomorrow to discuss these matters and to arrange a date next week when we can continue the Rule 30(b)(6) deposition with a designee who is prepared to testify regarding the post-eligibility list steps in the Exam 7029 and 2043 selection processes.

Sincerely,

David J. Palmer
Chief
Employment Litigation Section

By:   Sharon Seeley

Sharon Seeley
Senior Trial Attorney
Employment Litigation Section

cc:   E. Schachner
R. Levy
S. Kadidal

4

# EXHIBIT R



**U.S. Department of Justice**

Civil Rights Division

JMG:SAS:CG:ES:DNR:CW:es
DJ 170-51-358

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*www.usdoj.gov/crt/emp*

January 25, 2008

<u>Via Email and First Class U.S. Mail</u>

William S.J. Fraenkel
City of New York Law Department
100 Church Street
New York, NY 10007

  Re: *United States, et al. v. City of New York, et al.*, Civil Action No. 07-2067
    (E.D.N.Y.)

Dear Counsel:

  This is in response to the City's January 21, 2008 expert report regarding the issues of disparate impact and job-relatedness. On page 4 of the City's expert report, under the heading, "Information Relied Upon," the City's experts state that they relied upon the list of materials set forth on pp. 4-5 of the City's expert report, along with "information in the applied literature (articles, Uniform Guidelines on Employee Selection Procedures, etc.)." As you know, Rule 26(a)(2)(B)(ii) requires that expert reports set forth, among other things, the data or other information considered by expert witnesses in forming their opinions. Accordingly, please state with greater specificity the "information in the applied literature" the City's experts relied upon when preparing their report, to the extent that these sources are not subsequently set forth or cited in the City's expert report. Also, to the extent that the City's experts considered, but did not rely upon, data, documents, articles, or other information in forming their opinions, please list this information.

  Further, in Request #96 of the United States' initial written discovery requests, the United States sought "[d]ocuments reviewed, generated, consulted, relied upon or received by any expert witness retained by the City, or any person under the direction or control of such expert witness, relating to any claim(s) or defense(s) in this case or any open competitive examination process since January 1, 1994." To the extent that Dr. Bobko or Dr. Schemmer, or any person under their direction or control, reviewed, generated, consulted, relied upon or received any documents relating to any claims or defenses in this case, or relating to Exam 7029, Exam 2043 or Exam 6019, please produce the requested documents.

  Additionally, we have received with the City's letter of January 11, 2008 one chapter of the Test Development Report for Exam 6019, which the City provided in response to the United

2

States' letter of January 7, 2008. While we appreciate the City's provision of the responsive chapter, since the City has now identified Dr. Bobko as an expert witness, the entire Test Development Report for Exam 6019 will be relevant to the United States' deposition of Dr. Bobko given Dr. Bobko's involvement in at least some aspects of the examination. Accordingly, please provide a complete copy of the Test Development Report for Exam 6019.

Finally, during the United States' January 14, 2008 deposition of Matthew Morrongiello, Mr. Morrongiello indicated that DCAS may have retained, and may currently possess, the Scantron response booklets for the job analysis questionnaire for Exam 7029 ("response booklets"). Mr. Morrongiello also stated that, after the response booklets were scanned, the scan results were stored in electronic form on a disk. To the extent that the response booklets and the disk mentioned by Mr. Morrongiello are available, please produce them.

As always, if you have any questions, please feel free to contact me at (202) 514-3851, or Elliot Schachner at (718) 254-6053. Thank you for your prompt attention to this matter.

Sincerely,

John M. Gadzichoswki
Acting Chief
Employment Litigation Section

By:

David N. Reese
Trial Attorney
Employment Litigation Section

cc:    E. Schachner
       R. Levy, D. Lossia
       J. Scolnick

# EXHIBIT S



**U.S. Department of Justice**

Civil Rights Division

JMG:SAS:CG:ES:DNR:CW:es
DJ 170-51-358

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*www.usdoj.gov/crt/emp*

February 12, 2008

Via Email and First Class U.S. Mail

William S.J. Fraenkel
City of New York Law Department
100 Church Street
New York, NY 10007

Re:    *United States, et al. v. City of New York, et al.*, Civil Action No. 07-2067
(E.D.N.Y.)

Dear Counsel:

Enclosed are Notices of Deposition for the depositions we have scheduled for the next
several weeks. We understand that the specific dates and times of the depositions of the twelve
members of the Linking Panel used by Mr. Morrongiello may be changed, but the City has
agreed that they all will be taken during the three day period from February 26 to February 28,
2008. Similarly, the time at which we begin Dr. Bobko's deposition may change depending on
when Dr. Schemmer's deposition is completed, but both will be taken during the period from
March 11 to March 13, 2008. We have not issued subpoenas for any of the depositions because
we understand, based on our previous discussions, that you represent each of the deponents for
purposes of the deposition and will produce them on the dates agreed upon by the parties. If this
understanding is incorrect, please inform me immediately.

As you know, on February 21, 2008, we will be taking the deposition of Dr. Catherine
Cline, who, with one of the City's experts, Dr. Bobko, conducted a job analysis for the City's
new firefighter examination and developed the new written examination. Two weeks ago, on
January 25, 2008, in a letter from David Reese, we requested that you produce the test
development report for that written examination, Written Exam 6019. In addition, we requested
that you supplement the City's responses to prior discovery requests with respect to Exam 6019.
As I am sure you understand, given the depositions already noticed and the deadline for the
report(s) of the United States' expert(s) with respect to job-relatedness/business necessity and
alternative employment practices, it is important that the United States receive the requested
materials and responses well in advance of Dr. Cline's deposition on February 21, and no later
than February 15, 2008, so that it is not necessary to complete the deposition on a later date.
Please inform me of the date on which the City will provide the requested materials. To the
extent that the City will assert any claim of privilege, work product protection or confidentiality

2

with respect to any of the requested materials or information, in the spirit of the parties' written agreement to give prompt notice of such objections, please inform me immediately.

Also, please provide a copy of Dr. Cline's resumé. Our hope is that we can save deposition time that otherwise will be needed to question Dr. Cline regarding her education and professional experience by simply asking Dr. Cline if her resumé is accurate and up-to-date if we are able to review it prior to the deposition.

In addition, please provide as soon as possible copies of the transcripts of any deposition or trial testimony given by Dr. Bobko in connection with the cases listed on page 2 of the City's experts' report that involve the City of New York as a party. We also request that you provide copies of any reports prepared in whole or in part by Dr. Bobko in connection with those cases. These materials are particularly important to our preparation for Dr. Bobko's deposition given that all but one of the cases in which Dr. Bobko provided testimony during the past four years apparently involve testimony on behalf of the City of New York. In addition, please provide Bates numbers, deposition exhibit numbers or other descriptions sufficient to allow the United States to identify the "various pages of draft items and development notes" referred to in the experts' report as materials upon which they relied.

Finally, please provide a sample of the evaluation form(s) used by the City since 1997 to evaluate the performance of firefighters after they have completed their probationary period. As you know, during his deposition, Chief Nigro testified that firefighters are evaluated in writing annually. We have reviewed the sample personnel files previously produced by the City and have been unable to locate any sample of an evaluation form other than the one used to evaluate probationary firefighters.

If you have any questions, please feel free to contact me at (202) 514-4761, or Elliot Schachner at (718) 254-6053. Thank you for your prompt attention to this matter.

Sincerely,

John M. Gadzichoswki
Acting Chief
Employment Litigation Section

By: *Sharon A Seeley*
Sharon A. Seeley
Special Litigation Counsel
Employment Litigation Section

cc:     E. Schachner
        R. Levy, D. Lossia
        J. Scolnick

# EXHIBIT T



**U.S. Department of Justice**

Civil Rights Division

---

DJP:JMG:CG:DNR:SAS:es
DJ 170-51-358

*Employment Litigation Section - PHB*
*950 Pennsylvania Avenue, NW*
*Washington, DC 20530*
*www.usdoj.gov/crt/emp*

February 28, 2008

<u>Via e-mail and First Class U.S. Mail</u>

William S.J. Fraenkel
City of New York Law Department
100 Church Street
New York, NY 10007

Re:   *United States, et al. v. City of New York, et al.*, Civil Action No. 07-2067
(E.D.N.Y.)

Dear Counsel:

This follows up on our telephone conference of earlier today. As you requested during that call, we have set forth in writing below the City's discovery responses that we believe are inadequate. As I emphasized during our telephone call, much of the material discussed is crucial to our depositions of the City's experts, Dr. Philip Bobko and Dr. F. Mark Schemmer, which are scheduled to take place during the week of March 10. In addition, all of the material is relevant to the analyses and reports of the United States' experts with respect to the issues of job relatedness/business necessity and alternative employment practices. It is, therefore, extremely important that the City inform us immediately whether it will provide the documents and responses we request so that, if the City will not, we can seek relief from the Court.

As I stated during our telephone conference, the following issues must be addressed: (1) the City's responses to the United States' First Set of Requests for Admission and the related Interrogatory No. 33; and (2) supplementation of the City's responses to the United States' written discovery requests other than those the City supplemented yesterday in Defendant's Supplemental Responses and Objections to Plaintiff United States' Interrogatories (Nos. 29-31).[1] Those issues are separately described in more detail below.

---

[1] As you know, during the call, we also raised the issues of the City's position with respect to documents related to Exam 6019, and its position with respect to providing contact information for the members of the Exam 7029 Linking Panel who are no longer employed by the City. In the interim, we have received Mr. Sample's letter of today's date addressing those matters and, therefore, do not address them in this letter.

2

1.    **The City's Responses to the United States' First Set of Requests for Admission and
      Interrogatory No. 33**

Please inform us immediately whether the City will provide additional responses to
Request Nos. 1-17 of the United States' First Set of Requests for Admission and Interrogatory
No. 33 of the United States' Second Set of Interrogatories. In Request Nos. 1-4, 6, 8, 10 and 12,
the United States requested that the City admit that certain disparities in the pass rates of whites
vs. blacks and whites vs. Hispanics are equivalent to at least three units of standard deviation.
Interrogatory No. 33 requested that, for each Request for Admission the City denied, it "state all
facts and identify all documents on which the City's denial is based or otherwise relating to the
City's denial and identify all persons with knowledge of the facts stated." The City "denied"
Request for Admission Nos. 1-4, 6, 8, 10 and 12. However, in response to Interrogatory No. 33,
with respect to each of these Requests, the City stated no facts, identified no documents and
identified no persons with knowledge. Instead, the City stated that: (1) "the term 'disparity' is
not one commonly used in the field of statistics and reflects, or suggests, a legal conclusion as
opposed to a statistical reality"; and (2) "the appropriate measure of difference in pass rate would
be 'units of standard error,' which although being a subset of 'standard deviation' is not
synonymous with the term 'standard error.'" In essence, these are objections to the United
States' Requests, rather than factual bases for the City's denial of the Requests. Moreover, they
are meritless objections. As to the first objection, "disparity" is a common English word
meaning difference. As to the second, the City's own experts discussed "standard deviations" in
their expert report. For example, on pages 11-12 of the report of Drs. Bobko and Schemmer, the
City's experts state: "[M]ethodologists convert the actual difference between two subgroups into
the 'number of standard deviations' of difference between the two groups. Differences of two or
three of these standard deviations correspond (approximately) to the 5% and 1% values . . . .
Hence, as noted in the Siskin (p. 15) and Wiesen (p. 15) reports, social scientists and the courts
sometimes refer to these statistical tests as the two (or three) standard deviation analyses. That
is, if the subgroup difference is more than two standard deviations, the difference is said to be
statistically significant (i.e., not likely due to chance)."

Similarly, Request for Admission Nos. 5, 7, 9, 11, 16 and 17 ask the City to admit that
various differences are "statistically significant" and define that term, "[f]or purposes of [each]
Request," to mean "that there is a 5% or lower likelihood that so large a disparity would occur by
chance." The City denied each of these Requests for Admission. In its response to Interrogatory
No. 33, however, the City once again identified no factual bases for its denials. Instead the City
stated that the Requests were denied because the United States' definition of the term
"statistically significant" "assumes that any difference is by chance." Again, this is not a factual
basis for a denial. It is an objection to (or refusal to accept) the United States' definition of
"statistically significant." The City's position is particularly inappropriate in light of the fact that
the report of the City's own experts defines "statistical significance" in the same manner as the
United States' Requests for Admission. Thus, page 11 of the City's experts' report states,
"Research methodologists have generally adopted the following dichotomous decision rule in

3

statistical significance testing: if the difference between two subgroups is less than 5% (or 1%) likely to have occurred by chance, then the difference is said to be 'statistically significant.'"

Request for Admission Nos. 13-16 each ask the City to admit that the "ratio" of a black pass rate to a white pass rate is "less than 80%." The City denies each Request. (For Request Nos. 14 and 15 the denial is in the response to Interrogatory No. 33.) In its response to Interrogatory No. 33 with respect to each of these Requests, the City explains that the Request is denied "because the request refers to a 'ratio' but then presents a percentage. Thus the request is employing unlike terms incapable of comparison." Again, this is an objection, not a factual basis for a denial. Further, the City's own expert report demonstrates that the objection is meritless. On page 9 of their report, Drs. Bobko and Schemmer have no difficulty comparing "ratios" of pass rates to the "80% standard." Arithmetically, 80% = .80.

In addition to the objections to Request Nos. 14 and 15 discussed above, the City also objected to each of these Requests "on the ground that it appears that the request may be seeking an admission concerning a hypothetical situation as opposed to a fact or an opinion concerning a fact." This is incorrect. The Requests clearly seek admissions regarding an opinion concerning a fact – specifically, an opinion regarding the results of a calculation related to "effectively passing" Written Exam 2043 that was performed by Dr. Siskin and presented in his expert report. On page 17 of the report of the City's experts, Drs. Bobko and Schemmer present a "re-computation" using Dr. Siskin's definition of "effectively passing" Written Examination 2043.

Similarly, in addition to the objections to Request Nos. 16 and 17 discussed above, the City also stated in its response to Interrogatory No. 33 that it denied Request Nos. 16 and 17 because "the request refers to candidates passing what appears to be a statistical test as opposed to the firefighter examination administered by the City." This appears to be an objection on grounds of relevancy. As the City is well aware, however, the City's rank-order processing/ selection of candidates from the eligibility lists is challenged by the United States. Thus, Request Nos. 16 and 17, which concern the impact of ranking, clearly are relevant. Moreover, while we disagree with the City's characterization of the Requests as seeking admissions regarding a "statistical test," there is no prohibition in the Federal Rules of Civil Procedure against seeking an admission regarding the results of a statistical test.

Finally, Request for Admission Nos. 19 and 22 seek an admission that "[t]o the City's knowledge, no construct validation study or analysis has been conducted for," respectively, Written Exam 7029 and Written Exam 2043. The City denied Request Nos. 19 and 22 "[t]o the extent the request seeks and [sic] admission that construct validity methodology, as that term is used in the EEOC Guidelines, was absent from the validation study for exam 7029." However,

4

the City did not respond at all to Interrogatory No. 33 with respect to either Request No. 19 or Request No. 22.

**2.     Supplementation of the City's Responses to the United States' Written Discovery Requests Other than Interrogatory Nos. 29-31**

We also asked that you inform us whether the City intends to further supplement its responses to the United States' written discovery requests. As I stated during our telephone call, we believe that supplementation of responses to discovery requests other than Interrogatory Nos. 29-31 is necessary. Under Rule 26 of the Federal Rules of Civil Procedure, the United States need not specifically request supplementation of particular responses. To the extent that the City's position is that there is no additional responsive information/documents, please so inform us immediately.

However, in this regard, we note that, in our letter of December 14, 2007, we requested that the City supplement its responses to Interrogatory Nos. 1 and 16 with respect to Exam 6019. Among other things, Interrogatory No. 1 requested, for Exam 6019 (as well as Exams 7029 and 2043), that the City identify "any methods or formulas used to combine scores or measures, as well as any methods or formulas used to convert or standardize scores." In your January 3, 2008 letter in response, you stated that "[i]nformation concerning the weights of the cognitive, timed, and judgment portions of the written portion of Exam 6019" are set forth in the Exam 6019 Test Development Report, which you promised to produce to the United States "as soon as practicable." To date, the City has not provided the Test Development Report, and, even though the requested information clearly is within the City's possession, the City has not otherwise supplemented its responses to Interrogatory Nos. 1 and 16.

We further note that, during the February 20 and 22 deposition of Sherry Kavaler, Ms. Kavaler spoke of the existence of files, maintained in her office, with respect to Exams 7029 and 2043. Based upon Ms. Kavaler's testimony, it is our understanding that these files include, among other things, correspondence between Ms. Kavaler and FDNY and DCAS personnel regarding the setting of the cutoff scores for Written Exam 7029 and Written Exam 2043. In Document Request Nos. 43 and 44 of the United States' First Set of Requests for Production of Documents, we sought "[d]ocuments relating to the development of, adoption of or changes to" Written Exams 7029 and 2043, or the manner in which the City used Written Exams 7029 and 2043, "including, but not limited to, cutoff or passing scores used . . . ." The files described by Ms. Kavaler clearly are responsive to Document Request Nos. 43 and 44, but have neither been produced by the City nor identified in the City's responses to the United States' written discovery requests.

If you have any questions, please feel free to contact me by telephone at (202) 514-4761, or Elliot Schachner at (718) 254-6053. Thank you for your prompt attention to this matter.

5

Sincerely,

John M. Gadzichowski
Acting Chief
Employment Litigation Section

By:

Sharon A. Seeley
Special Litigation Counsel
Employment Litigation Section

cc:    E. Schachner
R. Levy, D. Lossia
J. Scolnick

# EXHIBIT U

MEMORANDUM

TO:        File
FROM:      Catherine S. Cline, Ph.D.
RE:        Combination of Written and Physical Scores on Firefighter Examination
DATE:      5/19/05

I reviewed the score files from the last Firefighter examination, including the z score transformations and the combined weighted z scores which served as the basis for the final combined (total) score. I also looked at the explanation given the candidates, concerning their final scores.

Looking at the original score distributions of the physical test and the written test, it is apparent to me that the physical test is on a much coarser (or cruder) scale than the written test, and does not differentiate among candidates as well as the written test does. The written test consisted of 85 items; the physical test consisted of eight "events." The reliability of the written test was calculated at .about .91, there is no calculation of reliability for the physical test.[1] Passing scores on the written test ranged from 70 to 100 percent, comprising 26 distinct scale points. Passing scores on the physical test ranged from 70 to 100 percent, but comprised only 3 distinct scale points.

Complicating this matter is the history of the firefighter examination, where "banding" has sometimes been introduced on both the written and the physical test. "Banding" is a mechanism where scores are grouped into categories or "bands" based on the standard error of measurement for the test. Usually, a band consists of 1.96 standard errors of measurement; within this range of scores there is about a 95 percent probability that the highest score is not statistically significantly different from the lowest score. The idea is that by reporting scores within a band, unnecessarily fine differences among the candidates are not being made. In essence, what banding does is report scores on a cruder score scale than would have been the case if the original score scale had been used. In some sense, it would be possible to say that the physical test (as currently formulated) is already banded, since although the events were scored pass/fail, there were probably some people who barely passed an event, while others might have aced it. Thus, a score of 8 (100%) probably includes people who barely scraped through all eight events, as well as those people who performed really well on all eight events.

It seems to me looking at the score distributions, that there is really no "right" way to combine the scores. The z transformation assumes some sort of quasi-normality, which I don't think we have with the physical test, and is difficult to explain. Also, it makes it look like we have much more exactitude than actually exists using this score scale.

---

[1] Actually, the physical test reliability could be calculated as an eight-item test, but such a calculation should probably also be supplemented with some sort of calculation using inter-rater agreement as well. As an eight item test, the reliability of the physical test will almost certainly be less than that of the written test.

However, in some ways it is not a bad way to combine the test data, since it is at least trying to put them on some sort of comparable basis.

What I did to try and illuminate this matter a little further was to try out a few different ways of combining the data, to see how they compared and what might be easiest to justify. The different method of combining the data I tried were:
- combining the raw percentage scores directly without any transformation
- banding the written score and combining it simply with the already "banded" physical score
- combining the z scores as was originally done.

<u>Combining the Raw Percentage Scores Directly</u>

Combining the raw percentage scores directly has the advantage of being simple to understand and calculate. It has the disadvantage that the physical test score appears to have a larger standard deviation and may be weighted a little more heavily than the written score.

The standard deviation given for the physical test on the score handout is given as about 14.85, while the standard deviation for the written is given as about 9.70. The means are very close. However, these descriptive statistics are not from comparable samples, since the physical test was given to only those who passed the written test. The good news is that these two tests are not highly correlated (about .08 based on the smaller data set supplied to me.) Consequently, the restriction due to the written test will not be large, though it might mean that the actual standard deviation for this physical (had it been given to everyone) might have been even a little larger.

I am a little curious about what the actual distribution of physical test scores looks like even in the population that took it. It could be that the larger standard deviation is due to some bi-modality in the distribution (e.g., a fair clump of people who failed all or most events) which could be making the standard deviation larger than would be expected. If this is the case, it means standardization probably is not a good method at all. Given the relatively high mean, and the relatively large standard deviation, I am guessing that something funny may be going on in the physical test score distribution. (Of course, this is something I could look at, but it would mean another data set.)

I still thought it would be a good idea to compare the simple combination with the z-score transformation, just to see how things would work out. So I computed a straight sum divided by two and correlated it with the z score transformation. (Variable labeled "Trans" in the score file.) The Spearman correlation for these two variables was about .98, while Kendall's Tau, more sensitive to score reversals in rank order, was about .95. This shows, of course, that theoretically there is not much difference between the two variables, and the differences that exist are probably at the chance level, and not worth talking about.

However, pragmatically, I know that reversals can mean a great deal when we are talking about a high stakes test like Firefighter. So, I did a spread sheet based on crosstabs table to see what we were talking about. Most of the reversals are quite small, but they do exist. I also tried rounding to the nearest whole number for both the transformed scale and the "simple" scale. Rounding to the nearest whole number has a couple of advantages. One, people do understand the concept of rounding. Two, we are not reporting scores to such fine numbers that people think that we have more exactitude in measurement than we do. Three, we might eliminate some of the minor score reversals based on the method of score calculation, when there really is not an optimal method in this situation. Unfortunately, when I tried this, there are still reversals. Though, if we are only concerned about the top 2000 or so, it might still work out.

I have a nice little excel table attached to this memo, which shows what is happening to the rounded simple scores vis a vis the rounded transformed scales. (The non-rounded excel table stretched to 36 pages and I thought it was too cumbersome to look at. The rounded version shows pretty well exactly what is happening and I can make it fit in one page.)

<u>Banding the raw scores on the written and considering the physical test as already banded</u>

This sometimes has the advantage of reducing impact on protected classes, and also grouping individuals into cadres of people who are probably not too dissimilar in terms of their chances of success on the job. It has the disadvantage of having to explain it, and especially explain how people at the bottom of one band are different from those at the top of the next one.

I thought this would be good to compare with the z-transformation as well, so I calculated bands for the written which were 5 points in breadth; e.g. band 1= 95.001-100.00, band 2=90.001 to 95.000, etc. (You could make an argument for 6 points or somewhere in between, but I thought for the purposes of this exercise, 5 points was probably good enough.) I also assigned the physical test scores band numbers of 1 for 100 percent, 3 for 87.500, and 5 for 75.000. (These are the comparable band numbers in terms of falling into the score ranges on the written.)

I then calculated the correlation between the banded score sum and the z-score transformation. Again, the correlation was quite high, about .98, showing little theoretical difference between these two methods of scaling. As usual, pragmatically, I am sure that there will be some score reversals or something that people could get upset about.

<u>Combining the Z-scores as was originally done</u>

Well, this is the " tried and true" method of combining scores from different tests which are on different scales and have different means and standard deviations. Psychometrically, I don't have a real problem with it, but do wonder about what the physical test looks like on a distribution basis. As I mentioned above, I think the large

standard deviation could be due to some piling up of scores on the bottom end of the distribution, and I would expect there would be a higher proportion of zero scores on this test than on the written which could be skewing the standard deviation quite a bit. (A chance score on the written would be 25 percent after all, and while a few zero scores might occur, I don't think there would be nearly as many as you would get on the physical.)

Conclusions and Recommendations

I think we really need to look at the physical score distribution to see how "abnormal" it is. Especially if it is bimodal, we really might consider doing a simple combination of the scores. If it is simply extremely skewed, we might consider curtailing the distribution at the low end to account for the fact that chance scores do not exist on the physical, recalculating the standard deviation, and taking another look at the correlation between the transformed scores and the simple combined score distribution. If I can make an argument that in fact the standard deviations are in fact comparable, or close enough to comparable, I think we are better off not going through the transformations. I think that the transformations make it look like we have a lot more exactitude than we have and that small differences in the "transformed" score (used here almost synonymously with "standardized") do not really translate into differences in prediction of performance as a firefighter.[2]

What I need to do next

1. Look at the entire physical distribution.
2. Calculate the physical test reliability
3. Possibly recalculate the physical test standard deviation.
4. Compare recalculated physical test standard deviation with written test standard deviation.
5. Make a final recommendation concerning what I think is best way to combine these scores.

---

[2] My memory is that the transformed score is a linear translation of the standardized score combination.

## Cognitive Ability Tests

During the selection process, organizations attempt to predict future job performance, often using cognitive ability testing. Many have argued that general cognitive ability is the single best predictor of job performance across a wide range of occupational settings. There are, however, potential draw-backs to using cognitive ability tests as predictors. The most obvious negative consequence of cognitive ability testing is that it is likely to result in substantial adverse impact against protected racial and ethnic groups (Murphy, 2002; Outtz, 2002). Murphy (2002) and Outtz (2002) noted substantial differences between scores for Hispanics and Whites on cognitive ability tests, although the differences are not as great as those between White and African American Scores. Typically African Americans score one standard deviation lower than Whites on tests of cognitive ability. A subgroup difference of this magnitude would result in a selection ration for African Americans that is approximately one-tenth of the selection ration for Whites (Sackett & Ellingson, 1997). Put another way, if the employer hired 10 of every 100 White applicants, only one of every 100 African American applicants would be hired.

In the past few years considerable thought has been given to the effects of various strategies of weighing predictor information on adverse impact, minority hiring and quality of selected workforce. This interest is motivated by the dilemma that employers face when wanting to achieve productivity gains through the use of a selection device, but at the same time wanting to reduce or eliminate adverse impact against any group (Sackett & Wilk, 1994). As many selection decisions involve more than one performance predictor, and these predictors typically differ in their level of adverse impact, judicious weighing of the predictors to a predictor composite may offer a valuable approach to solving the above dilemma. To address the weighing issue, this article shows how constrained nonlinear programming can be used to combine job performance predictors into a predictor composite such that the average quality of the composite selected employees is maximized, the intended overall selection rate is achieved, and the adverse impact ration remains within acceptable bounds (De Corte, 1999).

## Validity and Utility of Selection Methods in Personnel Selection

The majority of the 22 cognitive ability testing cases in appellate and district courts from 1992 to 2004 involved class action plaintiffs and civil service jobs. Organizations that used professionally developed tests that were validated and then set cutoff scores supported by the validity study faired well in court. The validation study must be conducted according to professional standards, and the results should be used properly when setting cutoff scores (Shoenfelt & Pedigo, 2005).

Substantial evidence now indicates that the two most valid predictors of job performance are cognitive ability tests and biodata instruments. The quantitative review of the literature by Hunter and Hunter (1984) has estimated the average validity of tests of

DCAS-0011447

general cognitive ability against supervisory ratings of overall job performance as .47, whereas the average (cross-validated) biodata validity against the same criterion was estimated as .37. Other review authors have obtained similar estimates of average (cross-validated) biodata validity. Reilly and Chao (1982) found a mean validity of .35, and Asher (1972) reported that 90% of biodata validities in his review were above .30. Thus, both general cognitive ability and biodata instruments have substantial validity (Rothstein, Schmidt, Erwin, Owens & Sparks,1990).

On the basis of meta-analytic findings, this article presents the validity of 19 selection procedures for predicting job performance and training performance and the validity of paired combinations of general mental ability (GMA)and the 18 other selection procedures. Overall, the 3 combinations with the highest multivariate validity and utility for job performance were GMA plus a work sample test (mean validity of .63), GMA plus an integrity test (mean validity of .65), and GMA plus a structured interview (mean validity of .63). A further advantage of the later 2 combinations is that they can be used for both entry level selection and selection of experienced employees (Schmidt & Hunter, 1998).

### Biographical Data

Biographical data measures contain questions about past life experiences, such as early life experiences in one's family, in high school, and in hobbies and other pursuits. For example, there may be questions on offices held in student organizations, on sports one participated in, and on disciplinary practices of one's parents. Each question has been chosen for inclusion in the measure because in the initial developmental sample it correlated with a criterion of job performance, performance in training, or some other criterion. That is, biographical data measures are empirically developed. However, they are usually not completely actuarial, because some hypotheses are invoked in choosing the beginning set of items. However, choice of the final questions to retain for the scale is mostly actuarial. Today antidiscrimination laws prevent certain questions from being used, such as sex, marital status, and age, and such items are not included. Biographical data measures have been used to predict performance on a wide variety of jobs, ranging in level from blue collar unskilled jobs to scientific and managerial jobs. These measures are also used to predict job tenure (turnover) and absenteeism, but we do not consider these usages in this article.

Table 1 shows that biographical data measures have substantial zero-order validity (.35) for predicting job performance but produce an increment in validity over GMA of only .01 on average (a 2% increase). The reason that the increment in validity is so small is that biographical data correlates substantially with GMA (.50; Schmidt, 1988). This suggests that in addition to whatever other traits they measure, biographical data measures are also in part indirect reflections of mental ability.

As shown in Table 2 , biographical data measures predict performance in training programs with a mean validity of .30. However, because of their relatively high correlation with GMA, they produce no increment in validity for performance in training.

DCAS-0011448

Biographical data measures are technically difficult and time consuming to construct (although they are easy to use once constructed). Considerable statistical sophistication is required to develop them. However, some commercial firms offer validated biographical data measures for particular jobs (e.g., first line supervisors, managers, clerical workers, and law enforcement personnel). These firms maintain control of the proprietary scoring keys and the scoring of applicant responses (Schmidt & Hunter, 1998).

### References

Asher, J. J. (1972). The biographical item: Can it be improved? Personnel Psychology, 25, 251-269.

De Corte, W. (1999). Weighing job performance predictors to both maximize the quality of the selected workforce and control the level of adverse impact. Journal of Applied Psychology, 84, 695-702.

Hunter, J. E. & Hunter, R. F. (1984).

DCAS-0011449

# EXHIBIT V

## FIREFIGHTER ALTERNATIVE TESTING METHODOLOGY

### INTRODUCTION

DCAS is looking to assess Firefighter candidates by utilizing the physical test (CPAT) that was developed by the International Association of Firefighters (IAFF), validated and weighted to reflect the standards of the New York City Firefighter population. DCAS also plans to assess the cognitive abilities and other attributes of Firefighter candidates utilizing methods that are currently being used by Fire Departments in other major cities around the U.S.

### HISTORY

DCAS has utilized the current Firefighter Physical Test for the past three examinations. DCAS has utilized a written, multiple-choice examination to assess cognitive abilities for past examinations.

### CURRENT PROCEDURE

The Bureau of Examinations has surveyed several cities around the US who utilize methods of assessing cognitive ability other than the scored, multiple-choice test. Some alternative assessment methods include bio-data, structured interviews and personality/intelligence assessments.

Structured interviews are utilized by several cities across the US, including Springfield Il, Lincoln, NE, San Francisco and Los Angeles, CA. Although structured interviews are a good assessment tool for predicting communication skills and behavioral response to job situations. However, structured interviews are subjective assessments based on the interviewer. This makes them subject to protest. Structured interviews have also statistically shown to have higher rates of adverse impact against minority groups. They are also very time consuming to administer and rate; considering the number of candidates who take the NYC Firefighter exam, it would not be practical to administer and rate thousands of interviews.

Personality assessments and intelligence assessments are used by some smaller towns and cities. Personality assessments are currently utilized by the Fire Department in making selections for candidates, after the testing process has concluded. It would not help diversify the Fire Department to utilize personality assessments at the beginning of the testing process- there is no evidence that personality assessments contribute to diversity. There is no evidence that administering intelligence tests in a large group setting is a better indicator of job performance than ability testing.

DCAS-0011413

Bio-data is another form of assessment that involves obtaining information about a person's work experience, education and work ethic. Bio-data can be collected through background information checks, structured interviews, and education and experience tests and can also be included in scored multiple-choice tests. Some cities that utilize bio-data are Houston, TX, Lincoln, NE and Chicago IL. This type of data is easy to obtain for large candidate populations (usually paper-and-pencil methods of obtaining information). However, this type of data has not shown a reduction in adverse impact against minority groups.

Some cities opt to utilize the multiple-choice (written) examination as a pass/fail examination. These cities do not use the score received on this exam in determining the list placement or ranking of the candidates. Scoring the exam as pass/fail may assist in adverse impact on the written examination, but utilizing a pass/fail method at the beginning of testing as opposed to the end of testing will not improve diversity.

On April 13th, Dr. Chris Hornick, President of CWH Management Solutions, was contacted via conference call by William Klimowicz and Barbara Carnival. CWH Management Solutions has developed Firefighter examinations for the Baltimore County Fire Department in Maryland, and Los Angeles County Fire Department, the second largest in the country. His examination has shown to have little or no adverse impact in the cities that have utilized it. The CWH exam consists of four components- a cognitive section, a common sense section, interpersonal skills section and positive attitude section. A job analysis is conducted to determine the weighting of each of the four components. The four components are then combined to produce one composite score.

Using an outside consulting firm can be advantageous when looking for a higher level of testing expertise in developing high profile examinations. These consulting firms usually have their own legal experts to assist in any court challenges and teams of psychometricians to develop comprehensive statistical data. However, these consulting firms are cost prohibitive. There may also be a problem with our protest procedure- these consulting firms do not release their examinations or exam keys. These exams are not open to protest and review or possible change in key answer. This may be an issue with our civil service law providing for the ability of a candidate to protest exam questions/answers.

## RESULTS FROM SURVEY

DCAS Exams will determine the weight of cognitive abilities vs. physical abilities in the job of Firefighter. The survey was administered to 205 Firefighters on 9/1/2005 and 9/27/2005 and the results are attached.

Representatives from the Uniformed Examining Unit, Thomas J. Patitucci, Assistant Commissioner for Examinations, William Klimowicz, Director of Uniformed Exams, and Barbara Carnival, Supervisor for Uniformed Exams; viewed the administration of the CPAT at the Connecticut Fire Academy in Meriden, CT on April 19th.. Mark

Lewandowski, Deputy Director of Training for the Connecticut Fire Academy, reviewed the administration of the CPAT and equipment specifications with the group.

DCAS will hire a consultant to validate the pass mark of the IAFF physical test for the City of New York, and to establish several passing scores to determine differing levels of physical ability. These consultants will be utilized for their expertise in this area.

DCAS will develop and/or purchase alternate means of assessing cognitive function.

DCAS will look into band scoring the examinations. Band scoring is a method of scoring that covers a range of scores. Typically, a band score covers a range of scores and bands are reported in five point increments. To determine band scores, first, the raw score is determined, which is generally the number of questions the candidate answers correctly. After the results are analyzed, a band score table is constructed for the test. The band score table is then applied to the raw score to determine the final score.

Band scoring can provide a more realistic assessment of a candidate's performance on written tests than point-by-point scoring. Band scoring takes into account that no test can measure a candidate's abilities with perfect confidence or assess all the abilities relevant to a given job. Also, increasing the use of band scoring on civil service tests considerably opens the field of candidates who can be considered for appointment.

## RECCOMENDATIONS

1. Competitive multiple-choice test. Incorporate more graphics and visual questions into the examination. Competitive form of the CPAT.
2. Competitive multiple-choice test. Competitive bio-data exam (Education and Experience test). Personality profile. Competitive form of the CPAT.
3. Pass/Fail multiple-choice test. Competitive bio-data exam (Education and Experience test). Personality profile. Competitive form of the CPAT.

DCAS-0011415

# EXHIBIT W

## Seeley, Sharon (CRT)

| | |
|---|---|
| **From:** | Schachner, Elliot (USANYE) [Elliot.Schachner@usdoj.gov] |
| **Sent:** | Thursday, March 20, 2008 7:18 PM |
| **To:** | Pestana, Georgia |
| **Cc:** | Fraenkel, William; Sample, Edward; Seeley, Sharon (CRT); Reese, David (CRT); Geller, Clare (CRT); rlevy@lrbpc.com; Dana Lossia; Judy Scolnick; dcharney@ccrjustice.org |
| **Subject:** | Depositions of Bobko and Schemmer |

Ms. Pestana:

I am writing to confirm that, in a telephone conversation a few minutes ago, the City and the United States agreed that:

1.    The depositions of Dr. Bobko and Dr. Schemmer will not take place next week.

2.    The City will inform the United States of the days on and after March 31, 2008 on which Dr. Bobko and Dr. Schemmer are available for depositions.

3.    Once the City informs the United States of those dates, the parties will confer to set the dates for the depositions of Dr. Bobko and Dr. Schemmer.

4.    The continued deposition of Dr. Cline will proceed as scheduled on Monday, March 24 at 9:30 a.m. at this office.

Elliot M. Schachner

Assistant U.S. Attorney

Eastern District of New York

271 Cadman Plaza East

Brooklyn, New York 11201

voice (718)254-6053

fax    (718)254-7489

3/30/2008