**EXHIBIT B**

```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------
UNITED STATES OF AMERICA,

            Plaintiff,
                                    Civil Action No.
    - and -                           07-CV-2067
                                      (NGG)(RLM)
VULCAN SOCIETY, INC., for itself
and on behalf of its members,
MARCUS HAYWOOD, CANDIDA NUNEZ
and ROGER GREGG, individually and
on behalf of a class of all
others similarly situated,

            Plaintiff's-Intervenors,

    -against-

THE CITY OF NEW YORK, THE FIRE
DEPARTMENT OF THE CITY OF NEW YORK,
NEW YORK CITY DEPARTMENT OF CITYWIDE
ADMINISTRATIVE SERVICES, MAYOR
MICHAEL BLOOMBERG and NEW YORK CITY
FIRE COMMISSIONER NICHOLAS
SCOPPETTA, in their individual
and official capacities,

            Defendants.
---------------------------------
```

CONTINUED DEPOSITION OF SHERRY KAVALER, taken by Plaintiff, at the offices of Levy Ratner, PC, 80 Eighth Avenue, New York, New York, on Friday, February 22, 2008, at 10:00 a.m., before ROBERT BLOOM, a Shorthand Reporter and notary public, within and for the State of New York.

Page 361

1           S. Kavaler
2    investigation by his other uniformed agency.
3           So if we hired him, I think he would
4    have had to have been cleared.
5        Q. Do you recall what the discussion was
6    at the PRB about him?
7        A. Oh, God, no. I would never remember
8    that.
9        Q. Did favoritism -- well, is there ever
10   a case before the PRB where somebody advocated
11   for the candidate based on family relationship
12   or friendship?
13       A. I don't recall.
14          MS. SCOLNICK: Let me take a
15   five-minute break.
16          (Recess.)
17       Q. You attended many PRB sessions, is
18   that correct?
19       A. Yes.
20       Q. Could you tell me what the procedure
21   was for discussing a candidate at the PRB
22   sessions?
23       A. Okay.
24          Prior to the session, all the
25   applications and background investigations for

Page 362

1           S. Kavaler
2    all the candidates were sent around to the
3    people who attended the sessions.
4           When they came to a meeting, what we
5    would do is basically take a simple vote,
6    maintain the chart and we said do you want to
7    appoint this person.
8           Because most of us, what we wanted to
9    do is for all of us to come there with our own
10   opinion without being influenced by the other
11   people at the committee. We would take the
12   stuff, look at it and read it and we'd come
13   back with an opinion whether we think they
14   should be appointed or not appointed, et
15   cetera.
16          And what I would do is I would just
17   call one candidate's name after another, and
18   say Joe Smith. I would go around the room,
19   "appoint," "not appoint," "appoint," "not
20   appoint" and take a vote.
21          The majority said appointed, we would
22   say appoint.
23          If someone had a problem with
24   appointing or wanted to discuss it, we would
25   discuss the person's background to convince

Page 363

1           S. Kavaler
2    someone one way or another if they wanted to
3    really talk about it more or if they saw
4    something that maybe someone else didn't
5    notice or they found out something, et cetera.
6           The commissioner had the power to
7    overrule everything, so if everyone said no
8    and the commissioner said yes the person was
9    appointed.
10          That is basically it.
11       Q. Did the commissioner's power to
12   overrule work both ways? If everyone said no
13   and the commissioner said yes, he was
14   appointed? And if everybody said yes and the
15   commissioner said no, the person was not
16   appointed?
17       A. Yes.
18       Q. How frequently was that used?
19       A. That I don't remember.
20       Q. Was it used at least once?
21       A. I'm sure probably every meeting there
22   was something that the commissioner felt
23   strongly one way or the other. But I really
24   don't recall.
25          You're talking about 11 years, having

Page 364

1           S. Kavaler
2    PRB meetings for 4 classes being put in the
3    year. Of maybe at least two to three PRBs
4    for each class of somewhere between 25 to 50
5    packages per class.
6           There is no way that I'm going to
7    remember the people, the individuals. It's
8    an impossibility.
9           But I'm sure on more than one
10   occasion the commissioner would override us
11   either way.
12       Q. Was the vote an open vote? Everybody
13   could see everyone else's vote?
14       A. Yes.
15          I would go down the line. What do
16   you have to say, Clinton. What do you have to
17   say, Ganci. Whatever.
18       Q. And if the majority said "appoint"
19   and nobody asked for a discussion, would that
20   be the end of that?
21       A. Yes.
22       Q. Was there a different rule if the
23   majority said do not appoint?
24       A. No. Unless the person who strongly
25   -- if 7 people or 8 people said do not appoint

Page 365

```
 1           S. Kavaler
 2   and one person said no, appoint.
 3       And I said okay, do not appoint and
 4   one person said no, we have to appoint this
 5   person, we would listen to what this person
 6   had to say.
 7       Q.  It was a majority rule without
 8   discussion unless the minority wanted a
 9   discussion?
10       A.  Right.
11       Q.  And that worked for the majority
12   ruling for appointment as well as the majority
13   ruling for non-appointment?
14       A.  Right.  People always had the
15   courtesy if they wanted to be heard on their
16   position and we were very courteous to each
17   other.
18       Q.  I think you said somebody might have
19   found out something.
20       A.  I'm not sure what you mean.
21       Q.  In your earlier answer you said you
22   would discuss it, maybe somebody found out
23   something and wanted to discuss it.
24           Were people supposed to look just at
25   the application package or were they free to
```

Page 366

```
 1           S. Kavaler
 2   go and do some outside research?
 3       A.  They were free, if they wanted to do
 4   outside research and make some calls by
 5   reading the package and they wanted to do
 6   research to bring more information to the PRB
 7   they could do that.
 8       Q.  How frequently did that occur?
 9       A.  That I don't remember.
10       Q.  Was there any procedure in place for
11   somebody recusing themselves if they knew the
12   candidate or knew a relative of the candidate?
13       A.  No.  They didn't want to be there --
14   Commissioner Feehan would recuse himself when
15   his son came up with the PRB.  He said I
16   don't want to be around when you're talking
17   about my son.  I'm walking out the door.
18       Q.  Was there any inquiry made whether
19   anyone at the PRB panel knew the candidate?
20       A.  If they knew the candidate that would
21   be a positive thing because they would bring
22   insight into what was just on paper.
23       Q.  So it did happen that people knew the
24   candidate?
25       A.  Yes.
```

Page 367

```
 1           S. Kavaler
 2       Q.  How frequently did that happen?
 3       A.  I'm sure probably at every one or
 4   every other meeting there is some candidate
 5   that is known.
 6       Q.  And did it ever happen that someone
 7   was a relative of someone on the PRB?
 8       A.  Not so much the relative of the PRB
 9   but maybe a relative of someone within the
10   Fire Department that the PRB people knew.
11       Q.  Were those people given extra
12   consideration?
13       A.  Yes.
14       Q.  And they were more likely to be
15   passed?
16       A.  Yes.
17       Q.  Were those people usually white?
18       A.  Oh, that I wouldn't remember.
19       Q.  Do you remember any black candidate
20   being given extra consideration because they
21   were known?
22       A.  I'm going to be very honest with you,
23   I think there were more white candidates
24   before the PRB than black candidates, and I
25   honestly do not remember specifics.
```

Page 368

```
 1           S. Kavaler
 2       I can tell you, I would like to
 3   apologize for being difficult earlier about
 4   the PRB and the other day, I truly believed I
 5   was not allowed to disclose anything about the
 6   PRB and I wanted to be loyal to the FDNY as
 7   well as complying with the legal requirements
 8   I thought was imposed upon me as being a
 9   member of the PRB.
10           Now that that is off my chest and I
11   don't have to do that, I would have no problem
12   telling you how it worked.
13           But honestly, I don't remember.  The
14   first name MacMillan, I thought that sounded
15   familiar, but I didn't associate that with the
16   Amadu Diallo case.  I'm very bad with names, I
17   don't remember any names that went through the
18   PRB, but I can give you a picture of things
19   that went on.  But I don't know specifics.
20   I'm not trying to hide or be evasive.
21       Q.  I appreciate that.  I don't want
22   specifics.
23           What would be the nature of the
24   conversations?
25       A.  Somehow or other, although I was very
```

Page 369

```
 1            S. Kavaler
 2   upset with my staff, it appears people knew
 3   who was going to PRB.  It got leaked out of
 4   my CID area.  No one would ever tell me who
 5   did or what.  People knew what was going on
 6   and who was going to the PRB.
 7        You would have lieutenants and
 8   captains, whatever, posting chief of
 9   department:  This is the son of so and so,
10   this is the son of so and so.  I lived next
11   door to him for years, he's a good guy, he
12   just had a fight in a disco, he got drunk,
13   someone made a pass at his girlfriend, he
14   socked him, he did community service.
15        Something like that.  Whatever it
16   was.  He beat his wife but his wife took him
17   back so he shouldn't be considered a wife
18   beater.  He still could be a good
19   firefighter.
20        These types of things.  That would be
21   brought to the table.  And people would say I
22   know this guy, he's a good guy, his son has
23   got to come on the job, I will vouch for him.
24   I will bring him into my office tomorrow, I'll
25   read him the riot act, say he's getting the
```

Page 370

```
 1            S. Kavaler
 2   chance of a lifetime and he better own up to
 3   it and make us proud and we would hire him.
 4       Q.  Were there certain topics that would
 5   come up routinely?  Was there a sort of
 6   checklist at the PRB, what to look for?
 7       A.  No, it wasn't a checklist or anything
 8   like that.
 9        You're dealing with a lot of Irishmen
10   who are drunks and they get into bar fights
11   and they get arrested and they get arrested
12   again.  They fight, they sock their
13   girlfriends, this is the things that cause
14   their records to pop up to us because they get
15   arrested because they fought with the police
16   when they got arrested.
17        This is -- boys being boys.  That
18   type of thing.
19       Q.  What about were people treated
20   differently, would you say, more harshly if
21   they had a question of an arrest record versus
22   a question of something that didn't match up
23   in employment?
24       A.  I don't think so.  Unless you looked
25   at the -- I guess you have to look at the
```

Page 371

```
 1            S. Kavaler
 2   arrest record.
 3        I didn't know -- I was not
 4   privileged, I did not understand certain types
 5   of arrests.  We would have a legal person
 6   there saying this was something -- a
 7   misdemeanor, this was nothing.  Where you
 8   would think it was a big deal and he would say
 9   this a misdemeanor, it's not a big deal, that
10   arrest was not disclosed or he might have
11   forgotten it because you get something like --
12   you would get arrested and it goes off your
13   record in six months, and the guy thought it
14   was off his record and it was still on his
15   record.
16        So our legal person would be able to
17   explain certain things that I did not
18   understand and some other people did not
19   understand about certain arrests.
20        Whatever the flag was it was
21   discussed.
22       Q.  Was that the general role of the
23   legal person, to explain?
24       A.  No, but he went out of his way to
25   look up more things that maybe some of us did
```

Page 372

```
 1            S. Kavaler
 2   in terms of certain arrests, where it was,
 3   when it was adjudicated.  I would just read
 4   it as an arrest and he would have more
 5   information about the arrest because he knew
 6   it.
 7       Q.  Was there a certain order around the
 8   table, were votes always taken in the same
 9   order?
10       A.  No, just a matter of how I happened
11   to check my list, whoever sat down, we were
12   having a conversation, it was very informal.
13       Q.  And you say sometimes people did come
14   up more than once?
15       A.  Yes.  If you couldn't get
16   information on an arrest or we needed more
17   information about this person's background, we
18   would just hold it and not make a decision.
19       Q.  And would somebody be tasked with
20   trying to find out more information?
21       A.  Yes.
22       Q.  Would the candidate be called at that
23   point?
24       A.  Probably because they might even call
25   the candidate in for further questioning.
```

Page 373

1        S. Kavaler
2    Q. But not before the PRB?
3    A. No.  Singularly.  Like a chief
4  would say I'm going to call this candidate up,
5  get some information and bring it up to the
6  next board or talk to you about it.
7    Q. What was your role at the PRB?
8    A. A liaison, coordinator, chair,
9  collecting the information and making sure it
10 got back to CID.  That's about it.
11   Q. You say there were per class two or
12 three PRB hearings, approximately?
13   A. Well, you're looking -- if you're
14 looking to put a class in of 200 people, maybe
15 there were -- there might be 25 to 50 people
16 that are flagged that you're looking at.
17       And maybe another 50 -- sometimes you
18 just have a PRB even while the classes are not
19 being put in, just getting the cases ready to
20 go depending on when they're done with their
21 medicals.
22       You don't want to waste time getting
23 too close to a class to make decisions and if
24 you can get everybody together when you have
25 enough packages you just call a meeting and we

Page 374

1        S. Kavaler
2  would go through it.
3    Q. Do you remember any discussions of
4  turnstile jumping, was -- would that be
5  something, an arrest for turnstile jumping
6  that would go before the PRB?
7    A. I believe there were some cases where
8  young kids would jump turnstiles.  It sounds
9  like something familiar.
10   Q. Were arrests treated differently than
11 other arrests?
12   A. That I don't recall.
13   Q. But certain people were treated
14 differently than others?
15       MR. SAMPLE: Objection, repetitive.
16   A. There were people who would have
17 people write letters in support for them and
18 some people did not get letters of support, if
19 that's what you mean.
20   Q. Yes, and if the PRB next knew the
21 candidate or knew someone who knew the
22 candidate, they would have a better chance?
23   A. They would get a better picture of
24 the person, either positive or negative.
25 Some people at the PRB would also say don't

Page 375

1        S. Kavaler
2  dare hire this person.  It wasn't all someone
3  saying you should always hire.
4    Q. Was it predominantly advocating for
5  them?
6    A. More than not advocating, but you did
7  have some people not advocating for somebody.
8    Q. I will just introduce a few more
9  exhibits, this won't take very long at all and
10 then take a short break to see if there are
11 more questions.
12       I want to show you something that was
13 not marked before.
14   A. I would like to get some lunch
15 because I am feeling like I'm getting a
16 headache.  If we are going to go on, can we
17 take a lunch break?
18       MR. SAMPLE:  We can take a break
19 now.
20       MS. SCOLNICK:  It's 12:20.
21       THE WITNESS:  I have to have
22 something before one o'clock.
23       MS. SCOLNICK:  It will end before,
24 but do you want it now?
25       THE WITNESS:  No, it's all right.

Page 376

1        S. Kavaler
2  I have a headache --
3        MR. SAMPLE:  I have to make one phone
4  call.
5        MS. SCOLNICK:  You want to break to
6  eat?
7        THE WITNESS:  No, go ahead.
8    Q. Let me show you a document
9  DCAS-AJ-00013.
10       MS. SCOLNICK:  Let's mark this as
11 Plaintiffs-Intervenors 30.
12       (Plaintiffs-Intervenors Exhibit 30,
13 Letter, marked for identification, as of
14 this date.)
15   Q. Do you recognize the signature on
16 Plaintiffs-Intervenors 30?
17   A. This is my signature.
18   Q. Do you remember the letter that you
19 wrote to Mr. DeMarco?
20   A. 6 years ago, no.  Let me finish
21 reading it.  I would not remember it.  There
22 are a lot of letters I have written in my life
23 time.
24       Let me just read it.
25       (Pause).