# EXHIBIT A

RUN DATE: 04/01/05
RUN TIME: 14:01:24
FY2005 Q3

NEW YORK CITY DEPARTMENT OF PERSONNEL
C E E D S S Y S T E M
WORK FORCE COMPARED WITH INTERNAL & EXTERNAL POOLS
AT THE AGENCY/JOBGROUP LEVEL

PAGE: 188
PROGRAM: EBPPP961
EXTRACT DATE: 03/31/05

AGENCY: 057 FIRE DEPARTMENT
JOB GROUP: 017 FIREFIGHTER

PERSONS WITH MISSING EEO DATA INCLUDED IN CNTS
PROBABILITY CUT-OFF FOR IMBALANCE: 0.05

USING BINOMIAL TEST

| EEO VAR | EEO VAL | FOCAL GROUP | OTHER THAN FOCAL GROUP | TOTAL | AVAIL % | EXPECTED # | DIFFERENCE | Z-SCORE | PROBABILITY | IMBAL |
|---|---|---|---|---|---|---|---|---|---|---|
| ETH | WHITE | 8028 | 932 | 8960 | .9214 | 8255.7 | -228 | -8.94 | <.01 | N-05%RUL |
| ETH | BLACK | 331 | 8629 | 8960 | .0297 | 266.11 | 64.89 | 4.04 | <.01 | N-05%RUL |
| ETH | HISPANIC | 503 | 8457 | 8960 | .0300 | 268.80 | 234.2 | 14.50 | <.01 | N-05%RUL |
| ETH | ASIAN / PAC ISL | 80 | 8880 | 8960 | .0065 | 58.24 | 21.76 | 2.86 | <.01 | N-05%RUL |
| ETH | NATIVE AMERICAN | 10 | 8950 | 8960 | .0039 | 34.94 | -24.9 | -4.23 | <.01 | N-05%RUL |
| ETH | ETH UNKNOWN | 8 | 8952 | 8960 | .0083 | 74.37 | -66.4 | -7.73 | <.01 | N-05%RUL |
| GEN | MALE | 8924 | 36 | 8960 | .9901 | 8871.3 | 52.70 | 5.62 | <.01 | N-05%RUL |
| GEN | FEMALE | 34 | 8926 | 8960 | .0044 | 39.42 | -5.42 | -0.87 | 0.193 | |
| GEN | GENDER UNKNOWN | 2 | 8958 | 8960 | .0056 | 50.18 | -48.2 | -6.82 | <.01 | N-05%RUL |

**EXHIBIT B**

U.S. Census Bureau
State & County QuickFacts

# New York (city), New York

| People QuickFacts | New York | New York |
|---|---|---|
| Population, 2006 estimate | 8,214,426 | 19,306,183 |
| Population, percent change, April 1, 2000 to July 1, 2006 | 2.6% | 1.7% |
| Population, 2000 | 8,008,278 | 18,976,457 |
| Persons under 5 years old, percent, 2000 | 6.8% | 6.5% |
| Persons under 18 years old, percent, 2000 | 24.2% | 24.7% |
| Persons 65 years old and over, percent, 2000 | 11.7% | 12.9% |
| Female persons, percent, 2000 | 52.6% | 51.8% |
| White persons, percent, 2000 (a) | 44.7% | 67.9% |
| Black persons, percent, 2000 (a) | 26.6% | 15.9% |
| American Indian and Alaska Native persons, percent, 2000 (a) | 0.5% | 0.4% |
| Asian persons, percent, 2000 (a) | 9.8% | 5.5% |
| Native Hawaiian and Other Pacific Islander, percent, 2000 (a) | 0.1% | Z |
| Persons reporting two or more races, percent, 2000 | 4.9% | 3.1% |
| Persons of Hispanic or Latino origin, percent, 2000 (b) | 27.0% | 15.1% |
| Living in same house in 1995 and 2000, pct 5 yrs old & over | 61.0% | 61.8% |
| Foreign born persons, percent, 2000 | 35.9% | 20.4% |
| Language other than English spoken at home, pct age 5+, 2000 | 47.6% | 28.0% |
| High school graduates, percent of persons age 25+, 2000 | 72.3% | 79.1% |
| Bachelor's degree or higher, pct of persons age 25+, 2000 | 27.4% | 27.4% |
| Mean travel time to work (minutes), workers age 16+, 2000 | 40.0 | 31.7 |
| Housing units, 2000 | 3,200,912 | 7,679,307 |
| Homeownership rate, 2000 | 30.2% | 53.0% |
| Median value of owner-occupied housing units, 2000 | $211,900 | $148,700 |
| Households, 2000 | 3,021,588 | 7,056,860 |
| Persons per household, 2000 | 2.59 | 2.61 |
| Median household income, 1999 | $38,293 | $43,393 |
| Per capita money income, 1999 | $22,402 | $23,389 |
| Persons below poverty, percent, 1999 | 21.2% | 14.6% |

| Business QuickFacts | New York | New York |
|---|---|---|
| Wholesale trade sales, 2002 ($1000) | 173,539,688 | 343,663,041 |
| Retail sales, 2002 ($1000) | 55,518,491 | 178,067,530 |
| Retail sales per capita, 2002 | $6,848 | $9,291 |
| Accommodation and foodservices sales, 2002 ($1000) | 14,280,485 | 27,835,952 |
| Total number of firms, 2002 | 789,313 | 1,707,168 |
| Black-owned firms, percent, 2002 | 12.4% | 7.6% |

# EXHIBIT C












**FIRE DEPARTMENT**
**9 METROTECH CENTER**
**BROOKLYN, NEW YORK**

## ETHNICITY DISTRIBUTION OF PROBATIONARY FIREFIGHTERS

| List # | Class # | Date | Females | Total | Black | Hispanic | Asian | Native American | Minority Total | Percent Minority |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 05/25/04 | Numbers | 1 | 184 | 13 | 15 | 1 | 0 | 29 | 15.76% |
| 2043 | 1 | 05/25/04 | 0 | 21 | 0 | 1 | 0 | 0 | 1 | 4.76% |
| 7029 | 13 | 05/25/04 | 1 | 154 | 11 | 14 | 1 | 0 | 26 | 16.88% |
| 0532 | 4 | 05/25/04 | 0 | 8 | 1 | 0 | 0 | 0 | 1 | 12.5% |
| 7514 | 3 | 05/25/04 | 0 | 1 | 1 | 0 | 0 | 0 | 1 | 100.0% |
| Total | 03/07/04 | Numbers | 1 | 243 | 7 | 17 | 0 | 0 | 24 | 9.88% |
| 7029 | 12 | 03/07/04 | 1 | 236 | 5 | 15 | 0 | 0 | 20 | 8.47% |
| 0532 | 3 | 03/07/04 | 0 | 7 | 2 | 2 | 0 | 0 | 4 | 57.14% |
| Total | 12/10/03 | Numbers | 1 | 303 | 13 | 31 | 3 | 0 | 47 | 15.51% |
| 7029 | 11 | 12/10/03 | 0 | 283 | 7 | 25 | 2 | 0 | 34 | 12.01% |
| 0532 | 2 | 12/10/03 | 1 | 20 | 6 | 6 | 1 | 0 | 13 | 65.00% |
| Total | 9/14/03 | Numbers | 4 | 305 | 26 | 38 | 6 | 0 | 70 | 22.95% |
| 7029 | 10 | 09/14/03 | 0 | 238 | 11 | 27 | 4 | 0 | 42 | 17.64% |
| 0532 | 1 | 09/14/03 | 4 | 66 | 15 | 11 | 1 | 0 | 27 | 40.90% |
| 7514 | 2 | 09/14/03 | 0 | 1 | 0 | 0 | 1 | 0 | 1 | 100.0% |
| 7029 | 9 | 05/04/03 | 0 | 361 | 10 | 25 | 4 | 0 | 39 | 10.80% |
| 7029 | 8 | 02/02/03 | 0 | 269 | 6 | 21 | 5 | 0 | 32 | 11.89% |
| 7029 | 7 | 07/28/02 | 0 | 301 | 14 | 31 | 1 | 0 | 46 | 15.28% |
| 7029 | 6 | 05/05/02 | 0 | 316 | 11 | 30 | 2 | 0 | 43 | 13.61% |
| 7029 | 5 | 01/27/02 | 1 | 307 | 11 | 28 | 4 | 0 | 43 | 14.33% |
| 7029 | 4 | 10/28/01 | 0 | 313 | 11 | 23 | 3 | 0 | 36 | 11.82% |
| 7029 | 3 | 07/15/01 | 0 | 152 | 1 | 11 | 1 | 0 | 13 | 8.56% |
| 7029 | 2 | 05/06/01 | 1 | 100 | 1 | 7 | 0 | 0 | 8 | 8.00% |
| 7029 | 1 | 02/04/01 | 0 | 154 | 5 | 13 | 2 | 0 | 20 | 12.98% |
| 7514 | 1 | 10/02/00 | 2 | 141 | 14 | 20 | 4 | 0 | 38 | 26.95% |
| 0084 | 1-17 | 7/95-2/00 | 3 | 2692 | 53 | 133 | 7 | 2 | 195 | 7.24% |
| 7022 | 1-16 | 6/90-2/95 | 2 | 2256 | 29 | 43 | 3 | 1 | 76 | 3.37% |

**EXHIBIT D**

Appendix III

## Minority and Women Firefighters in Major American Cities Expressed as Percentage of Total Firefighters 1999

| City | African-Americans | Hispanics | Women |
|---|---|---|---|
| New York, NY | 2.90% | 2.8% | 0.33% |
| Los Angeles, CA | 14.0% | 30.0% | 2.94% |
| Chicago, IL | 20.4% | 8.6% | 2.29% |
| Houston, TX | 17.1% | 13.9% | 2.50% |
| Philadelphia, PA | 26.3% | 3.2% | 0.39% |
| San Diego, CA | 7.7% | 15.7% | 7.31% |
| Dallas, TX | 18.1% | 10.0% | 3.91% |
| San Antonio, TX | 7.0% | 43.0% | 1.53% |
| San Jose, CA | 7.1% | 24.9% | 5.14% |

Source for Minorities: Individual City Fire Departments

Source for Women: Women in the Fire Service (National Organization)

**EXHIBIT E**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

Plaintiff,

- and -

Civil Action No. 07-CV-20676 (NGG)(RLM)

VULCAN SOCIETY, INC., for itself and on behalf of its members MARCUS HAYWOOD, CANDIDA NUNEZ and ROGER GREGG, individually and on behalf of a class of all others similarly situated,

Plaintiffs-Intervenors

-against-

THE CITY OF NEW YORK, THE FIRE DEPARTMENT OF THE CITY OF NEW YORK NEW YORK CITY DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES, MAYOR MICHAEL BLOOMBERG and NEW YORK CITY FIRE COMMISSIONER NICHOLAS SCOPPETTA, in their individual and official capacities,

Defendants.

---

DEPOSITION OF ABRAHAM MAY, JR., a witness herein, at the offices of Levy Ratner, PC, 80 Eighth Avenue, New York, New York, on Wednesday, April 9, 2008, at 10:00 a.m., before Helene Gruber, CSR, a Shorthand Reporter and notary public for the State of New York.

recruitment program for firefighter exam number 0084.

Q. Did you see PI 31 prior to the time that Mr. Hughes, the chairman of the EEPC, signed it?

A. Yes.

Q. Did you actually prepare this document for his signature?

A. Probably not, but I probably reviewed it. It was probably prepared by the deputy director counsel, and I am sure I reviewed it prior to it being executed.

In fact, I executed it so, yes. I executed it for the Chair.

Q. That is your signature?

A. Yes, ma'am.

Q. To the best of your recollection sitting here today, is the contents of Plaintiff-Intervenor 31 an accurate description of what the EEPC found?

A. Yes.

Q. Directing your attention to the second page or EEPC 0468 under background -- I am sorry -- under testimony of Carlos Rivera at the bottom of the page where he said that as of 1992,

92 percent of the force of firefighters were Caucasian males and 7.05 percent were African-American, is that correct?

A. African-American, Asian-American and female. That 7.05 relates to everybody else.

Q. I see. So the African-American was actually smaller than 7.05?

A. Yes.

Q. Was that an accurate statement at the time it was made?

A. I am sorry. You are asking me if Mr. Rivera's statement was an actual statement?

Q. Is this an accurate statement?

A. Yes. We accepted it as an accurate statement.

Q. And you said that you have never seen any similar instance of such underrepresentation of such magnitude?

MR. SAMPLE: Objection. Repetitive.

Q. Is that correct?

MR. SAMPLE: Objection.

A. Yes, I did say that.

Q. To the best of your recollection, what was the next worst underrepresentation that

you remember?

A. I can't guess at that. The firefighter group was definitely the worst.

Q. Is the firefighter group still the worst?

A. Yes.

Q. What was the situation with the Police Department demographics back when you did the recruitment in '93, '94, approximately?

A. I am sorry. When we did the recruitment?

Q. Not the recruitment. When you had the open hearings.

A. '94 hearings, I can't recall what the numbers were. I can definitely say they were not as bad as the Fire Department.

Q. And that is the numbers for the Police Department, the police officers?

A. Yes. In terms of the police officers job group, I cannot recall what the percentage of minority and women were. I am absolutely certain that they were not as bad as the percentages for the Fire Department.

Q. Do you know whether the percentages have increased, the percentages of

**EXHIBIT F**





EQUAL EMPLOYMENT PRACTICES COMMISSION
City of New York
253 Broadway, Suite 301 New York, New York 10007
Telephone: (212) 788-8646 Fax: (212) 788-8652

Frank R. Nicolazzi
*Vice-Chairman*

Angela Cabrera
Manuel A. Méndez
C. Catherine Rimokh, Esq.
*Commissioners*

Abraham May, Jr.
*Executive Director*

Eric Matusewitch, PHR, CAAP
*Deputy Director*




April 8, 2003

Honorable Michael R. Bloomberg
Mayor, City of New York
City Hall
New York, NY 10007

Re: Report To The Mayor

Dear Mayor Bloomberg:

Pursuant to Section 832 of the New York City Charter, the Equal Employment Practices Commission respectfully submits the enclosed Report pursuant to the failure of the New York Fire Department to implement certain corrective actions as recommended in this Commission's Follow-up Audit of the Fire Department's Recruitment Program for Firefighter Exam # 7029 (1999). A copy of this Report is also being forwarded to the New York Fire Department.

We respectfully request that you direct Fire Commissioner Nicholas Scoppetta to implement the following corrective actions:

- Conduct an adverse impact study on the 60 college credit requirement for firefighter applicants, and
- Conduct an adverse impact study on the written examination.

Section 832 of the New York City Charter requires the New York Fire Department to submit a written response to you and this Commission in thirty days.

Sincerely,

Frank R. Nicolazzi
Vice-Chairman

c: Deputy Mayor Carol Robles-Roman
Commissioner Nicholas Scoppetta, FDNY
David Clinton, Esq., Deputy Commissioner, Legal, FDNY

AMJr./ms

# EQUAL EMPLOYMENT PRACTICES COMMISSION
# CITY OF NEW YORK

48

# REPORT TO THE MAYOR

PURSUANT TO THE FAILURE OF THE NEW YORK CITY FIRE DEPARTMENT TO COMPLY WITH CERTAIN EQUAL EMPLOYMENT OPPORTUNITY REQUIREMENTS OF CHAPTER 36 OF THE NEW YORK CITY CHARTER

## INTRODUCTION

Pursuant to Chapter 36, Section 832 of the New York City Charter, the Equal Employment Practices Commission hereby submits to the Mayor of the City of New York, the Honorable Michael R. Bloomberg, a report detailing the lengthy, unsuccessful efforts of this Commission to obtain compliance with certain recommended corrective actions pursuant to the Follow-up Audit of the New York City Fire Department's Recruitment Program for Exam No. 7029 (February 27, 1999). Specifically, the Fire Department has failed to implement two critically important recommended corrective actions.

#10: The Department should conduct an adverse impact study to determine if the new educational requirement (30 college credits for firefighter applicants) disproportionately screens out members of historically under-represented groups. If the study reveals such disparate impact, the Department should conduct a validation study in accordance with the federal government's "Uniform Guidelines on Employment Selection Procedures"; and

#13: The Fire Department should conduct an adverse impact study based on the results of the written examination. If the Department's study reveals that the test disproportionately screens out minority or female candidates, FDNY should conduct a validation study in accordance with the federal government's "Uniform Guidelines on Employment Selection Procedures".

Consequently, the Equal Employment Practices Commission respectfully requests that, in accordance with Chapter 36, Section 832(c) of the New York City Charter, the Mayor direct the New York City Fire Department to adopt the aforementioned recommended corrective actions pursuant to the requirements of the City's Equal Employment Opportunity Policy.

## RATIONALE

Section 6(A)(2) of the City's Equal Employment Opportunity Policy states: "Agencies will examine all devices used to select candidates for employment to determine whether these devices adversely impact any particular racial, ethnic, disability, or gender group. To the extent that adverse impact is discovered, agency heads will determine whether the device is job-related. If the device is not job-related the agency will discontinue using that device."

Selection devices include pre-employment educational requirements as well as written examinations. In addition, the federal government's *Uniform Guidelines on Employee Selection Procedures*, 29 C.F.R. sec. 1607, require that employers maintain documentation on the adverse impact of selection procedures for each job and, where it is determined a selection process has an adverse impact, evidence of validity (job-relatedness).

It is critical that the FDNY conduct these adverse impact studies for several other compelling reasons. According to December 31, 2001 workforce statistics generated by DCAS, white males constituted 91.8% of all firefighters (non-supervisors and supervisors). In addition, a survey conducted by the EEPC in 1999 found that the FDNY had the lowest percentage of

minority and female firefighters compared to the following major American cities: Los Angeles, Chicago, Houston, Philadelphia, San Diego, Dallas, San Antonio, and San Jose.

## AUDIT AND COMPLIANCE HISTORY

Pursuant to Chapter 36, Section 831(d)(2) and (5) of the New York City Charter, the Equal Employment Practices Commission (EEPC) initiated an audit of the Fire Department's Recruitment Program for Firefighter Exam No. 0084 (1992) in 1994. In recognition of the institutional resistance within the Fire Department (FDNY) to the recruitment of minorities and women as firefighters, the Commission established an Advisory Committee to participate in the development of recommendations to improve the recruitment of women and minority candidates. The "Advisory Committee to Recommend Improvements in the Fire Department Recruitment Program" consisted of the leaders of twelve fraternal organizations within the FDNY (including the Vulcan Society, and the Hispanic Society) the United Women Firefighters Association, and the Uniformed Firefighter's Association (represented by then president, Thomas Von Essen).. Then Fire Commissioner Howard Safir was an ex officio member of the Advisory Committee.

**On October 18, 1994,** this Commission issued fourteen recommendations for improving the Fire Department Recruitment Program. Eleven of those recommendations were developed by the Advisory Committee and approved by this Commission. Despite the fact that the leaders of twelve fraternal (and one female) organizations in the FDNY developed the overwhelming majority of these recommendations, a number of the Advisory Committee recommendations were not implemented by the Fire Department.

**On August 12, 1999,** a follow-up audit of the Fire Department's Recruitment Program for Firefighter Examination No. 7029 (February 27, 1999) was initiated. After completing the audit, EEPC issued a draft Preliminary Determination Letter (audit report), which contained sixteen recommended corrective actions to bring the Fire Department in compliance with the City's Equal Employment Opportunity Policy and the Commission's audit recommendations of October 18, 1994.

**On March 10, 2000,** EEPC senior staff and Commissioner Manuel Mendez met with Fire Commissioner Thomas Von Essen and his senior staff to discuss the audit findings and recommendations. During this audit exit meeting, Commissioner Von Essen and his staff challenged all or part of eight recommended corrective actions. At the conclusion of the meeting, EEPC staff informed Commission Von Essen that a formal Letter of Preliminary Determination would be forwarded to him after the next Commission meeting and his response would be due thirty days after receipt of that Letter.

**On May 25, 2000,** EEPC Vice Chairman Frank R. Nicolazzi forwarded to Commissioner Von Essen a Preliminary Determination Letter pursuant to the aforementioned audit. The Preliminary Determination contained the same 16 recommended corrective actions. All of the Commission's recommendations for corrective actions were consistent with the Equal Employment Opportunity Policy issued by the Department of Citywide Administrative Services in 1996 (still in force) and the Commission's audit recommendations of October 18, 1994.

On July 14, 2000, Commissioner Von Essen submitted the Fire Department's response to the Commission's Preliminary Determination.

On August 21, 2000, Vice Chairman Nicolazzi replied to Commissioner Von Essen's letter, noting that he (Von Essen) reneged on pledges made on March 10, 2000 to implement certain Commission recommendations. Vice Chairman Nicolazzi also stated that the July 14, letter totally ignored one of the Commission's recommendations and only partially addressed many of the others. Given these facts, the Commission found the response letter to be inadequate and unacceptable and requested a more detailed response to the EEPC's recommendations.

On September 14, 2000, Commissioner Von Essen submitted a second response letter.

On October 31, 2000, Vice Chairman Nicolazzi notified Commissioner Von Essen that his second response letter contained a number of discrepancies that needed to be resolved before the audit could be concluded. Consequently, the members of the Commission requested a meeting with Commissioner Von Essen to clarify the discrepancies.

On December 19, 2000, Commissioner Von Essen met with the EEPC members. Significantly, Commissioner Von Essen agreed at that meeting to implement the Commission's audit recommendation to conduct an adverse impact study of the college credit requirement for firefighter applicants.

On January 29, 2001, the EEPC notified the Fire Commissioner of its intent to initiate audit compliance.

On March 8, 2001, EEPC representatives met with the Fire Department's newly-appointed EEO Officer and her associates to formally initiate audit compliance. (The New York City Charter provides that the audit compliance period, during which the audited agency provides monthly reports on its efforts to implement the Commission's recommendations, may last up to six months). At that time, an additional required action was included—the dissemination of a memorandum by the Commissioner informing all staff of the improvements in the FDNY Recruitment Program resulting from the audit recommendations. (#17)

On May 9, 2001, the Fire Department submitted its first monthly compliance report (for April 2001). In that report, the Department once again agreed to conduct an adverse impact study to determine if the new educational requirement (60 college credits for firefighter applicants) disproportionately screens out members of historically under represented groups. The Department's compliance report also stated that DCAS was responsible for conducting an adverse impact study based on the results of the written examination.

On October 18, 2001, in response to the World Trade Center Attack the Commission voted unanimously to suspend audit compliance until further notice. At that time, the FDNY had submitted four out of six Monthly Compliance Reports.

On June 20, 2002, nine months after the World Trade Center Attack, the Commission voted unanimously to resume audit compliance.

On September 13, 2002, the FDNY submitted its sixth Monthly Compliance Report. In that Report, the Department changed its positions on the two recommended corrective actions at issue: it stated that it is "unwilling to remove" the college credit requirement, and it would take "under advisement" the Commission's recommendation that the FDNY should conduct an adverse impact study based on the results of the written examination.

On September 20, 2002, the FDNY requested a one-month extension of the compliance period to address the outstanding corrective actions. The Commission granted the extension.

On October 25, 2002, the FDNY submitted its seventh and final Monthly Compliance Report. In this document, the Department stated "[w]hile the Fire Department believes that the college requirement is relevant, we are giving the recommendation of conducting an adverse impact study ongoing consideration."

On December 11, 2002, the Commission issued its Final Determination Letter, identifying those EEPC recommendations accepted and rejected by the Department. The Commission also requested the FDNY's response to the Final Letter of Determination within thirty days.

On January 14, 2003, the FDNY submitted its response to the EEPC's Final Determination Letter. In this document, the Department agreed to implement all but two of the Commission's recommended corrective actions: the FDNY took the position that it "has not yet made a final determination" concerning the adverse impact studies for the new college credit requirement and the written examination.

## CONCLUSION

As of April 3, 2003, more than two years after the Commission initiated the compliance process, and more than three years after the Commission issued its audit recommendations, the Department has still not committed to implementing two critical audit recommendations: conducting adverse impact studies of its new educational requirement (60 college credits), and the written examination.

## RECOMMENDATION

The Equal Employment Practices Commission hereby recommends that the Mayor direct Commissioner Nicholas Scopetta to comply with the requirements of Chapter 36 of the New York City Charter and the City's Equal Employment Opportunity Policy and:

- Conduct an adverse impact study to determine if the new educational requirement (~~60~~ 30 college credits for firefighter applicants) disproportionately screens out

members of historically under-represented groups. If the study reveals such disparate impact, the Department should conduct a validation study in accordance with the federal government's "Uniform Guidelines on Employment Selection Procedures"; and

- Conduct an adverse impact study based on the results of the written examination. If the Department's study reveals that the test disproportionately screens out minority or female candidates, FDNY should conduct a validation study in accordance with the federal government's "Uniform Guidelines on Employment Selection Procedures".

Respectfully Submitted,

Frank R. Nicolazzi
Vice Chairman

Attachments: Audit Correspondence






THE CITY OF NEW YORK
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

October 23, 2003

RECEIVED
NOV 05 2003
0784(a)

Mr. Manuel Mendez
Vice-Chair
New York City Equal Employment Practices Commission
253 Broadway, Suite 301
New York, NY 10007

Dear Mr. Mendez:



I am in receipt of your letter, dated April 8, 2003, enclosing a copy of the Equal Employment Practices Commission's Report, issued pursuant to Section 832 of the New York City Charter, recommending that the Fire Department implement certain actions, and Commissioner Nicholas Scoppetta's response thereto, dated May 7, 2003.

The report has been reviewed with Carol Robles-Román, the Deputy Mayor for Legal Affairs, and with Commissioner Scoppetta. I am satisfied that the Fire Department has adequately addressed the points raised in the EEPC's report. Also, as you know, the Fire Department has undertaken a wide-ranging recruitment campaign to attract women and minorities to its ranks, including various methods in which to recruit and retain candidates of color.

I would like to take this opportunity to thank the Commission for its input and recommendation on this most important endeavor.

Very truly yours,

Michael R. Bloomberg
Mayor

cc: Carol Robles-Román
Nicholas Scoppetta

**EXHIBIT G**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA<br>[X] EEOC | 160-A2-01828 |

_______________ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | | HOME TELEPHONE (Include Area Code) |
|---|---|---|
| Vulcan Society, Inc. of the Fire Department of N.Y. | | 718-778-7978 |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
| Vulcan Hall 739 Eastern Parkway, Brooklyn, New York, 11213 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| New York City Fire Department | more than 15 employees | 718-999-0439 |
| STREET ADDRESS / CITY, STATE AND ZIP CODE | | COUNTY |
| 9 Metro Tech Center, Brooklyn, N.Y. 11201-3857 | | Kings |
| NAME | | TELEPHONE NUMBER (Include Area Code) |
| | | |
| STREET ADDRESS / CITY, STATE AND ZIP CODE | | COUNTY |
| | | |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

[X] RACE [X] COLOR [ ] SEX [ ] RELIGION [ ] AGE
[ ] RETALIATION [ ] NATIONAL ORIGIN [ ] DISABILITY [X] OTHER (Specify) arrest record

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA) LATEST (ALL)

[X] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See Attached sheets.

NANCY CHANG
Notary Public, State of New York
No. 02CH4687840
Qualified in New York County
Commission Expires Oct. 31, 2005

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their proceedures.

NOTARY - (When necessary for State and Local Requirements) 8/9/02

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

8/9/02 Paul Washington, President Vulcan Society

Date Charging Party (Signature)

SIGNATURE OF COMPLAINANT Paul Washington

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

EEOC FORM 5 (Test 10/94)



USA000006

**EEOC Charge--Vulcan Society Inc. of NYFD v. Fire Department of New York**

August 9, 2002

PARTIES

The Vulcan Society Inc. is a fraternal organization of the New York City Fire Department ("NYFD"), whose purpose is to promote the interests, social and cultural affairs of Black and African American firefighters.

The Vulcan Society Inc. represents Black and African American firefighters in the NYFD. They also represent the Black and African American people in the area who, but for the policies, practices and intentional acts of the New York City Fire Department, would apply for and succeed in being hired as firefighters in New York City.

The New York City Fire Department is the New York City Department charged with protecting the lives and property of the people of New York City through prevention, education, fire suppression, medical services and other related emergency and non-emergency activities.

The New York City Fire Department is part of the City of New York.

The New York City Fire Department employs approximately 12,000 firefighters, as well as many civilian employees.

FACTS

Of the 12,000 New York City Fire Department firefighters, only 2.87% (approximately 300 individuals) are Black or African-American. This is too great a disparity to be the result of chance.

The other races represented in the NYFD are represented in the following percentages:

White .................................. 92.11%
Hispanic ............................... 4.42%
Asian/Pacific Islander .......... 0.33%
Other .................................... 0.27%

The hiring process from the last few lists of the New York City Fire Department is as follows:

A written application
A written test, which results in a score
A physical test, which results in a score





USA000007

(The written test score and the physical test score are combined with possible military, residency and legacy points, resulting in a score which determines where the candidate will be placed on the list. People are called in for the next steps in the order in which their names appear on the list.)
An interview and background check
A medical and psychological test
After an applicant passes all the stages, he or she is appointed to the NYFD and enrolled in the probationary school.

In the past, there were extremely few Black and African American people hired by the NYFD. In 1973, to remedy this discrimination, the Vulcan Society Inc. mounted a challenge based upon a violation of the Equal Protection Clause against the Civil Service Commission of the City of New York. This led to a judicial consent order covering appointments. The order dictated a hiring ratio of 3 majority candidates to 1 minority candidate as a method for providing appropriate relief to the plaintiffs during the years of 1973 through 1977.

Obviously, this remedy was not enough. The court decree was only in place for one list, and as a result, the percentages of Black and African Americans in the New York City Fire Department have been steadily decreasing, resulting in the whitest fire fighting force in a large urban area.

TESTING

In the last test cycle leading to the 2000 list:

- The recruitment efforts of the New York City Fire Department were ineffective leading to Blacks and African Americans accounting for only 10% of test-takers, though approximately 27% of the population and approximately 25% of qualified people in the relevant area.
- The recruitment efforts aimed at Blacks and African Americans were not designed to maximize impact among them.
- Of the written test-takers, Blacks and African Americans comprised only approximately 10% of test takers and 7% of test passers, compared to whites who were 75% of test takers and 78% of test passers. On information and belief, the percentage of eligible Black and African American people in the relevant labor pool exceed the percentages of both test takers and test passers for those groups. These results are too large a discrepancy to be the result of chance.
- There were other requirements for becoming a New York City firefighter: these included holding a first responder certificate, obtaining 30 college credits and holding a drivers license by the





USA000008

date of appointment. These requirements are all likely to have had an adverse impact on the urban poor population of Black and African Americans applicants.

- There were substantial application fees, background investigation fees and medical fees associated with the hiring process. These fees are all likely to have had an adverse impact on the urban poor population of Black and African Americans applicants.

All these acts and practices led to a list that had only 5.8% Black and African American applicants, many of whom were and are unlikely to be reached, interviewed and hired, because of an invalid test and subjective barriers that are discriminatorily applied, resulting in a denial of employment opportunities on the basis of race and/or color in violation of Title VII of the Civil Rights Act of 1964, as amended.

RECRUITMENT

Recruitment efforts begin the Fire Department of New York hiring process. NYFD recruitment policies and practices for recruiting Black and African American applicants have been historically abysmal, with abysmal results, in Black and African American communities. These ineffective recruitment policies and practices have also had a discriminatory impact, reducing the number of Black and African American firefighters in the Department.

There have been decades of neglect of the Black and African American community as recruitment grounds by the NYFD. These policies and practices have been coupled with the decades of entrenched informal, but officially endorsed and encouraged, recruitment among other communities, where active firefighters serve as role models and recruiters for their families, friends, neighbors, and their communities at large. These circumstances have resulted in barriers to hiring qualified Black and African American firefighters, as compared with white applicants. The Fire Department of New York's recruitment policies and practices have not focused on or resulted in the same message being delivered effectively to eligible Black and African American applicants, in their schools, churches, homes, community centers, streets, public spaces and festivals, as those delivered to white potential applicants.

SUBJECTIVE FACTORS

The interview/background check perpetuated a policy and practice of indulging white people with blemishes or problems in their records and being overly strict with Black and African Americans.





USA000009

It has been a policy and practice to unjustly rely on arrest records without convictions as a barrier for appointment of Black and African Americans to the department, to the detriment of Black and African American applicants as compared with white applicants.

There are other factors where the Fire Department of New York exercises discretion to qualify applicants that amount to subjectively applied barriers to Black and African Americans employment with the NYFD, that are not equally applied to white applicants

IMPACTS

The New York City Fire Department's testing, recruitment and entry requirements have a greater exclusionary effect on potential Black and African American applicants than on white potential applicants.

The Black and African American people in the labor pool who, but for the policies, practices and intentional acts of the New York City Fire Department, would apply for and succeed in being hired as firefighters in New York City have suffered harm in that they have been discriminatorily excluded from recruitment and selection as firefighters.

The Black and African American people in the area who, but for the policies, practices and intentional acts of the New York City Fire Department, would apply for and succeed in being hired as firefighters in New York City have suffered economic harm in that they have been denied the opportunity to earn a salary that would enable them to stimulate the Black and African American economy and build and stabilize their communities.

The Vulcan Society Inc. members and other Black and African American firefighters have suffered the severe adverse consequences of the weakening and undermining of their society as a result of the artificially depressed numbers of Black and African American firefighters in the NYFD. They have been deprived of their rightful prestige and power as an organization that represents their interests, because of the artificially depressed numbers of Black and African American firefighters in the NYFD.

As a result of the artificially depressed numbers of Black and African American firefighters in the NYFD, the Vulcan Society Inc. members and other Black and African American firefighters have suffered the adverse consequences of working in a racially discriminatory atmosphere.

The Vulcan Society Inc. has repeatedly and continuously pointed out dire discrepancies between Black and African American hires and white hires. They





USA000010

have put the City on notice that the New York City Fire Department's recruitment, testing and screening processes are discriminatory.

The City knows of its policies, patterns and practices that result in discrimination, and are the result of discriminatory intent, yet it continues those discriminatory policies and practices.

The New York City Fire Department currently has a recruitment period, from June 28, 2002 to September 30, 2002. Rather than employing effective methods of recruitment, the New York City Fire Department is following its same policies, patterns and practices that have led to discrimination in the past. This perpetuation of past practices is not likely to increase the number of Black and African Americans in the New York City Fire Department proportionally as compared with white firefighters, or as compared with potential and actual applicants.

The New York City Fire Department designs and builds its own test, based upon questions formulated by active firefighters. On information and belief, it has not been independently validated on any theory of validation, and it likely would not be found to have criterion-related validity, content validity or construct validity. In this current testing cycle, the New York City Fire Department intends to use the same testing methods that have led in the past to the wide discrepancy in passing rates between whites and Black and African Americans, and are likely to do so again.

The New York City Fire Department has taken no steps to monitor or rein in the discretion that result in discrimination during the screening process to the detriment of Black and African Americans.

The New York City Fire Department's acts will lead to another list that will be effective from its date of promulgation to the 4th anniversary thereof, or to the exhaustion of the list, whichever comes first. This new list will contain only a scant number of Black and African American people, as compared with white people and in comparison with the numbers of Black and African American potential and actual applicants.

CONCLUSION

The New York City Fire Department is engaging in intentional discriminatory acts, policies and practices against Black and African Americans on the basis of race and/or color in its recruitment and hiring processes, including examinations, scoring, ranking, selection of classes off of the list, selection for participation in Firefighter school, and selection for appointment to the Department, in violation of Title VII of the Civil Rights Act of 1964, as amended.





USA000011

The New York City Fire Department employs policies and practices that are discriminatory in their impact upon Black and African American potential and actual applicants on the basis of race and/or color, as compared with white potential and actual applicants, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Paul Washington
President, Vulcan Society Inc.

Sworn to before me on this
9th day of August 2002

Notary Public

NANCY CHANG
Notary Public, State of New York
No. 02CH4687840
Qualified in New York County
Commission Expires Oct. 31, 2005

**EXHIBIT H**



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

**33 Whitehall Street, 5th Floor**
**New York, NY 10004-2112**
**Phone: (212) 336-3620**
**General Fax: (212) 336-3625**
**TTY: (212) 336-3622**

**Charge # 160 2002-01828**

Vulcan Society Inc.
c/o Center for Constitutional Rights
Attn: Shayana Kadidal Esq.
666 Broadway
New York, NY 10012

**Charging Party**

Fire Department of New York City
c/o City of New York Law Department
Attn: Georgia Pestana Esq.
100 Church St.
New York, NY 10007

**Respondent**

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended.

Respondent is an employer within the meaning of Title VII; all requirements for coverage have been met.

The Vulcan Society alleges that it is a fraternal organization that represents Black and African American firefighters of the New York City Fire Department. The Society also alleges to represent Black and African American people in the area who, but for the acts of the Respondent, would be hired and employed as firefighters. The charge generally alleges that Blacks are underrepresented, in comparison with their availability, in the Fire Department and that this underrepresentation stems from discriminatory actions on the part of the Department and New York City. The charge is dated August 9, 2002. It was supplemented by two additional statements, in the form of declarations by Paul

Washington, President of the Vulcan Society, Inc. The first is dated October 22, 2002, the second February 28, 2003. Both include numerous attachments.

The participation of Blacks in the Fire Department has been an issue over a period of many years and much of the present charge is a recapitulation of the Vulcan Society's and others' pressure on the agency and the City to take affirmative steps to increase what all parties agree is the inadequate percentage of Black New York City firefighters.

As background, the charge cites a consent order, arising out of the Vulcan Society's 1973 lawsuit, mandating a three-for-one hiring ratio for minorities from 1973 through 1977. According to the charge, this order was only in place for one selection cycle, so gains were minimal. The charge alleges that, of the approximately 12,000 New York City firefighters in 2002, only 2.87% are Black.

According to EEO-4 reports for 2001, Black participation in the fire departments of certain major cities is as follows:

| City | Black % | Black new hires |
|---|---|---|
| Baltimore | 31.1% | 20% |
| Chicago | 23.0% | 14.6% |
| Bridgeport | 16.6% | no new hires |
| Rochester | 5.8% | 12.5% |
| Los Angeles | 15.8% | 2.3% |

In New York City, the selection of firefighters starts with public recruitment for a test administered every few years to applicants who meet the initial qualifications. Many of the charge's allegations address activities prior to the test; other allegations assert that the conduct and scoring of the test discriminates against Blacks. More specifically, it is alleged that Blacks' scores, as a group, are not as high as whites' scores, that the test is not validated, and that this adverse impact is not justified by business necessity.

Reasons why the recruitment, testing, and evaluation of Black candidates are inadequate or exclusionary are cited in the charge and its supplements as follows:

1. Recruitment is focused on those able to pass the physical test, but Blacks are adversely affected by the written, not the physical test.

2. There are no tutoring programs specifically directed at minority neighborhoods.

3. Notification of tests is mainly in the media and by mail, whereas individual recruitment should be conducted in Black neighborhoods.

4. The time period between tests is too long, as is the time between taking the test and selection.

5. The college credit requirement is not validated, and the requirement to hold a first responder's certificate and a driver's license discriminates against Blacks.

6. Credit for residency in New York City should be increased.

7. Insufficient resources are allocated for recruitment in terms of budget, staff, and incentives.

8. The written test yields a disparate pass rate for Blacks.

9. Tutoring sessions provided by the Fire Department are substandard and the pre-test physical training sites are predominantly located in Manhattan.

10. The overall scoring for the entire process gives excessive weight to the written exam.

11. Medical, application, and background investigation fees discriminate against poorer candidates and there is disparate use of arrest records to disqualify Black candidates.

12. The cadet program, which can lead more directly to entry into the Department, is not large enough and should be targeted to Blacks.

13. The City's uniformed services eligibility lists should be merged.

In approaching this investigation, the Commission observed that, other than the allegedly unlawful written test, many of the issues point to a lack of affirmative action rather than the existence of verifiable discrimination or exclusion. The charge hypothesizes that certain additional recruitment activities, or changes in standards and criteria, would produce a higher Black applicant rate and a higher overall qualification percentage. While some or all these theories may some day prove true, we cannot conclude that failure to enact them is discriminatory. The Respondent need only show that its actions, from recruitment through final selection, were open to all and equally applied.

For jurisdictional and practical reasons, the Commission chooses to focus its investigation on the written test administered on December 14, 2002 and events leading up to it.

The Charging Party alleges that the Fire Department conducted an inadequate

recruitment program for potential Black candidates, as enumerated in the list of deficiencies above. The Respondent asserts that it conducted an extensive recruitment program, in which the Charging Party itself fully participated and that, in addition, the filing period was postponed from September 30 to October 31, 2002. The Respondent's position statement identifies several hundred recruitment sites visited during July, August, and September as part of its program to recruit minorities and women. The position statement also asserts that it spent some $120,000 in overtime pay to firefighters, including Vulcan Society members, to participate in recruitment activities.

A database of nearly 20,000 was assembled from the recruitment program, of which nearly 40% identified themselves as Black, about 22% as Hispanic, and 16% as white; 21% did not self-identify as to race or national origin. The Vulcan Society was provided with individual contact information for all candidates who agreed to release their names and addresses.

Thus the targeted recruitment program identified some 8000 Blacks with sufficient interest to respond, and the Society was in a position to do individualized followup with them to be sure that they completed the enrollment process and were advised of pre-test training opportunities. The percentage of Blacks in the relevant labor market in 2000 was 21.3%.

Present for the test were 17,803 candidates, of which 1376 (7.7%) were Black.

The Commission cannot conclude that the relatively small number of Blacks who appeared for the test was the result of an unlawfully exclusionary recruitment program.

Open Competitive Exam No. 7029 was administered on December 14, 2002. Of the 1376 Blacks who took the test, 198 failed (14.4%). Of the 13,805 whites who took the test, 377 failed (2.7%).

The Commission's analysis shows that the passing rate of this test for blacks and whites was quite high (97.3% for whites and 85.6% for blacks). Due to the high pass rates, the ratio of failing rates was used as a measure of the differential rate of screening applicants out. The ratio of the white failure rate to the black failure rate was 0.19, i.e., black applicants failed the exam at more than five times the rate of white applicants. The difference in pass/fail rates is highly statistically significant (Fisher exact test, one-tail, $p=2.89 \times 10^{-67}$).

This analysis also includes test results for cumulative bands of test scores; the Commission concludes that these ratios also indicate a high degree of adverse impact against African-American applicants, and all the differences in percentages between blacks and whites are highly statistically significant.

The Commission also reviewed the document "Firefighter Exam No. 7029, Test Development Report," submitted by the City and prepared by Matthew Morrongiello, Tests and Measurement Specialist, NYC Department of Administrative Services. We find that this report contains sections which could be considered part of "test development" and sections which are important components of a validation study. These sections include a job analysis, a linking of abilities with tasks, a test plan, and a discussion of item writing and a review of the items by panels. No claim is made by the author of this report that it is a complete validation study. No validation strategy is mentioned by the author of this report. The content of the items is not described, so no claim for content validity could be made using only the material in this report. This document can not be considered a complete validation report and the documentation provided by the Respondent does not satisfy the requirements of the *Uniform Guidelines on Employee Selection Procedures.*

Based upon the above, the Commission finds that Black test-takers were discriminated against when the City, relying upon a pre-employment test that Blacks disproportionately failed and that was not validated according to professional standards, excluded them from further consideration because they failed the test.

The Charging Party asserts that there are barriers for Blacks who do pass the test. In the post-test phase, there are further requirements, as enumerated above, including standards that (arguably) disparately affect Blacks. These standards and requirements include: 30 college credits, a driver's license, other license and fee requirements, the length of time between test and selection, and a background review that allegedly disparately relies on arrest records to disqualify Blacks.

No evidence was provided that these or other requirements and qualifications in fact had an adverse impact on Black applicants. Respondent points out that 30 college credits must be earned and the driver's license obtained before hire, and there is ample time - years, in fact - to do so between placement on the qualified list and actual selection.

Charging Party did not submit data in support of its assertion that post-test criteria are discriminatory and the Commission's investigation does not conclude that Blacks who passed the test were discriminated against in this phase of the process.

Upon finding that there is reason to believe that violations have occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of the matter.

If the Respondent declines to conciliate or when, for any other reason, a resolution acceptable to the Office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives.

The Respondent is requested to contact Electra Yourke, Enforcement Supervisor, at (212) 336-3751 on or before Thursday, July 8, 2004, to discuss specific terms of remedy for the resolution of this matter. If Ms. Yourke does not receive a response by that date, the effort to conciliate this finding will be considered to have concluded without success.

On behalf of the Commission:

6/24/04
Date

Spencer H. Lewis Jr.
District Director

**EXHIBIT I**

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

AGENCY

[ ] FEPA
[X] EEOC

CHARGE NUMBER

160-2005-01289

NEW YORK STATE DIVISION OF HUMAN RIGHTS and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. ROGER GREGG | (917)405-1818 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1075 UNIVERSITY AVENUE APT. #13-H | BRONX, NEW YORK 10452 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| NYC Fire Department | 100+ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 9 METRO TECH CENTER | BROOKLYN, NY 11201 | |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[ ] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST: 12-14-02 LATEST:
[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Date Charging Party *(Signature)*

EEOC FORM 5 (REV. 3/01)

USA000718

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA | |
| [X] EEOC | 160-2005-01291 |

NEW YORK STATE DIVISION OF HUMAN RIGHTS and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| MR. MARCUS HAYWOOD | (718)827-1370 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2652 PITKIN AVENUE, APT. #1 | Brooklyn, NY 11208 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| NYC Fire Department | 100+ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 9 METRO TECH CENTER | BROOKLYN, NY 11201 | |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[ ] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST: 12-14-02 LATEST:
[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Date Charging Party *(Signature)*

EEOC FORM 5 (REV. 3/01)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| [ ] FEPA | 160-2005-01288 |
| [X] EEOC | |

NEW YORK STATE DIVISION OF HUMAN RIGHTS and EEOC

*State or local Agency, if any*

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. CANDIDO NUNEZ | (718)239-1270 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1565 ODELL STREET APT. #4-D | BRONX, NY 10462 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| NYC Fire Department | 100+ | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 9 METRO TECH CENTER | BROOKLYN, NY 11201 | |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

[X] RACE [ ] COLOR [ ] SEX [ ] RELIGION [ ] NATIONAL ORIGIN
[ ] RETALIATION [ ] AGE [ ] DISABILITY [ ] OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST: 12-14-02 LATEST
[X] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

SEE ATTACHED

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Date Charging Party *(Signature)*

EEOC FORM 5 (REV. 3/01)

**Charge of Discrimination**
**Equal Employment Opportunity Commission**
New York District Office

**Charging parties:**

**Candido Nuñez** - 160 - 2005 - 01288
1565 Odell St., Apt. 4D
Bronx NY 10462
(718) 239-1270

**Roger Gregg** - 160 - 2005 - 01289
1075 University Ave., Apt. 13H
Bronx NY 10452
(917) 405-1818

**Marcus Haywood** - 160 - 2005 - 01291
2652 Pitkin Ave., Apt. 1
Brooklyn NY 11208
(718) 827-1370

*on behalf of themselves and all others similarly situated.*

**Respondents:**

**New York City Fire Department** ("FDNY")
9 MetroTech Center
Brooklyn NY 11201

**The City of New York**
**Michael R. Bloomberg, Mayor**
City Hall
New York NY 10007

**NYC Department of Citywide Administrative Services** ("DCAS")
One Centre Street, 17th Floor South
New York NY 10007

## INTRODUCTION

The charging parties are individual African-American applicants for the position of firefighter with the New York City Fire Department (hereinafter "Fire Department," "Department" or "FDNY"). Charging parties took the written examination required of applicants for this position and obtained passing scores. They also passed the physical examination and have been informed of their positions on the list from which individuals are appointed to the position of firefighter. However, their positions are low enough that they are unlikely to be hired within the four-year expected lifetime of this list, and (with the exception of Mr. Haywood) will be too old to qualify for appointment during the next list cycle.

Charging parties allege that Respondents employ policies and practices that are discriminatory in their impact upon African-American potential and actual applicants on the basis of race and/or color, as compared with white potential and actual applicants, and that Respondents engage in intentional discriminatory acts, policies and practices against African-Americans on the basis of race and/or color in its recruitment and hiring processes, including examinations, scoring, ranking, requirements for appointment, selection of classes off of the list, selection for participation in the probationary firefighter school, and selection for appointment to the Fire Department, in violation of Title VII of the Civil Rights Act of 1964, as amended, the New York State Human Rights Law,[1] and the New York City Human Rights Law.[2] (No proceedings have been commenced before any state or local agency.) They bring this charge of discrimination on behalf of themselves and the class of all others similarly situated.

## I. GENERAL ALLEGATIONS AGAINST THE FIRE DEPARTMENT

### Background and History

Extensive background information concerning the instant charge is contained in the charge brought by the Vulcan Society (the fraternal organization of African-American firefighters) on August 9, 2002 (EEOC charge no. 160 2002-01828 (investigator: Electra Yourke)), and that charge, the supplements thereto, and their attachments are appended to this charge as Exhibit A.

The New York City Fire Department is a department of the City of New York charged with protecting the lives and property of the people of New York City through fire prevention and suppression, education, medical services and other related emergency and non-emergency activities. The Fire Department employs approximately 11,400 fire officers and firefighters, as well as many civilian employees. The Department of Citywide Administrative Services (DCAS) carries out certain administrative tasks for the City government, and has a role in administering civil service and licensing exams for the Fire Department. The Fire Department and DCAS are under the control and supervision of the Mayor of the City of New York.[3]

Approximately 2.9% of the Department's firefighters are African-American. Every professional fire department in every major city in America is more diverse than New York's. Over 50% of Los Angeles' firefighters are minorities and 40% of Boston's. The departments are 31% African-American in Baltimore and 23% African-American in Chicago. The New York City Fire Department's 2.9% figure is easily the worst in the nation among major cities with professional fire departments.

A lawsuit in the early 1970s challenging previous testing requirements resulted in a court order that mandated that one minority be hired for every three non-minorities hired.[4] This order

---

1 N.Y. Exec. Law § 296.

2 8 Admin. Code of the City of New York § 8-107.17.

3 *See* http://www.nyc.gov/html/om/pdf/org_chart_citywide.pdf (city government and administration organizational chart). The official abbreviation of the department was changed from N.Y.F.D. to F.D.N.Y. with the Tweed Charter of 1870, passing all control over the department from Albany to the City.

4 *See Vulcan Soc. Of N.Y. City Fire Dept., Inc. v. Civil Service Com'n*, 490 F.2d 387, 391 (2d Cir. 1973) (Friendly, J.), *aff'g* 360 F. Supp. 1265 (S.D.N.Y. 1973), 353 F. Supp. 1092 (S.D.N.Y. 1973).



USA000473

was in effect from 1973 through 1977. However, the number of African-Americans in the Department has actually decreased, in both absolute and percentage terms, since shortly after the termination of the hiring preference system resulting from that litigation.

**Hiring practices**

The Department hires firefighters off a list on which applicants are ranked based on a combination of their scores on a written test and a physical test. The major barrier to entry for most African-American aspirants has been the written examination, an exam which has a disparate impact on African-American applicants not justified by job-relatedness or business necessity. This exam is composed not by outside testing professionals but rather by DCAS with the assistance of panels of firefighters, and is intended for use only by the New York City Fire Department. The written examination has never been validated (that is, studied to establish a relationship with job skills or business necessity) by the Department or any other government agency.

Applicants enter the process by registering for the written examination. After taking the test, those applicants who achieve a passing adjusted score (the figure that constitutes a passing score has varied over the years and appears to be set arbitrarily) are invited to take a physical agility test. Those who pass both the written and physical tests have their scores combined and adjusted based on factors such as New York City residence (which adds five points to one's score). The candidates are then placed on the appointment list in a rank order based on their final combined score. Applicants are called off the list in rank order by list number and, after meeting several other requirements (citizenship, residence in New York City or one of several surrounding counties, being at least 21 years old, 30 college credits (or, as a substitute, two years of military service), possession of a driver's license, passing a medical exam and background investigation) are appointed to the FDNY and enrolled in the probationary school ("Fire Academy"). Graduates of the Academy (which has a negligible attrition rate) become probationary firefighters, and, after a year of successful service, lose their probationary status and become firefighters.

These requirements for appointment, or ones like them, have been applied for many years and have caused the large disparity seen between the percentage of African-Americans in the qualified labor pool within New York City, approximately 25.5%, and the actual percentage of African-American firefighters within the New York City Fire Department, which is 2.98%. The requirements that cause the disparity include the use of an unvalidated written exam, substandard minority recruitment practices, and the extremely lengthy overall application process.

**Written Examination**

The written exam requirement of the Fire Department causes a tremendous disparate impact on minority applicants for the position of firefighter, particularly African-Americans, as the EEOC confirmed and formally determined during its investigation of the Vulcan Society charge. The EEOC's conclusion was unsurprising, as the federal courts that considered the issue in the 1973 litigation came to the same conclusion, and the majority of the test appears to be little

changed from the test that was ruled illegal in 1973.[5] The impact of the test is evidenced by the general banding information divided by race:

**Table 1: Percentage of each scoring band comprised of given racial group**[6]
Open Competitive Exam no. 2043 (administered on December 14, 2002)

| | Caucasian (13,805) | African-American (1,376) |
|---|---|---|
| Failed test | 38.4 | 20.2 |
| Score between 70-74 | 54.9 | 20.9 |
| Score between 75-79 | 63.0 | 17.4 |
| Score between 80-84 | 67.2 | 14.6 |
| Score between 85-89 | 75.4 | 9.0 |
| Score between 90-94 | 80.4 | 5.5 |
| Score between 95-100 | 86.7 | 2.6 |

Thus, the highest band—those with scores of 95 and higher, most of whom can expect to be hired during a four-year list cycle—is only 2.6% African-American, closely paralleling the 2.9% of African-Americans in the Department as a whole. African-Americans fail at five times the rate of Caucasians (14.4% against 2.7%), and Caucasians are more than three times as likely to score in the 95-and-up scoring range which all but assures hiring during a four-year list cycle (34.2% of all Caucasian test takers (4,719 of 13,805) scored 95 or above, while only 10.3% (142 of 1,376) of African-Americans test takers did).

The results of this written examination, the subsequent physical agility testing, and various bonus adjustments (for New York City residency, for example) are combined into a final score which is used to rank candidates on the list used to determine the order of individual appointments to the Fire Academy, from which candidates graduate to the rank of probationary firefighter. The list reflects the disparate impact created by the written examination results. On information and belief, the first probationary firefighter class drawing members from the new list contained no African-Americans from the new list;[7] the second probationary firefighter class

---

[5] The test at issue in the 1973 federal court litigation included a substantial number of current events questions, comprising 20% of the total number of questions. The district court based its finding on the lack of job-relatedness of this portion of the test. However, as the Court of Appeals noted, the district court also found no indication that the remainder of the test had been shown to be job-related, and in the absence of a prior "professional job analysis" to show a "demonstrable relationship to successful performance of the job[]" (quoting *Griggs*), the defendants had failed to prove the job-relatedness of even that part of the test outside of the current events section. 490 F.2d at 394.

During the course of the investigation of the Vulcan Society charge, respondents disclosed no clear evidence showing any major test redesign in the intervening years since 1977.

[6] Note that the above banding data, initially provided to EEOC by the Fire Department in the investigation of the Vulcan Society's charge, mistakenly excluded all (fractional decimal) scores falling between 74 and 75, 79 and 80, 84 and 85, etc. such that the data exclude these narrow bands of scores falling between the bands described in Table 1. Eventually, respondents to that charge provided corrected, complete banding data to the EEOC. The full banding data has not been released by EEOC or respondents, however, so Charging Parties lack access to these revised, complete statistics. Nonetheless, the above data show a consistent pattern whereby African-Americans comprise a smaller percentage of each successively higher scoring range, and clearly support the notion that the use of the written examination discriminates against African-Americans.

[7] That class contained approximately 10 African-Americans, but all of them were drawn from the previous list, based on the 1999 exam.



USA000475

drawing members from the new list, scheduled to graduate in February 2005, contains 160 individuals, of whom two (2) are African-American.

The EEOC determined that the written examination had a disparate impact on black applicants. Determination of June 24, 2004, at 4. After review of the alleged test validation report submitted by Respondents, the EEOC determined the following:

> No claim is made by the author of this report that it is a complete validation study. No validation strategy is mentioned.... The content of the items is not described, so no claim for content validity could be made using only the material in this report. This document cannot be considered a complete validation report and the documentation provided by the Respondent does not satisfy the requirements of the Uniform Guidelines on Employee Selection Procedures.
>
> Based upon the above, the Commission finds that Black test-takers were discriminated against when the City, relying on a pre-employment test that Blacks disproportionately failed and that was not validated according to professional standards, excluded them from further consideration because they failed the test.

Determination of June 24, 2004, at 5. The same reasoning supports the conclusion that ordering the hiring of applicants by scores based on the results of the written test is discriminatory.

The Commission concluded that "there is reason to believe that violations have occurred," *id.*, and invited the parties to conciliate the matter. However, Respondents refused to negotiate and the matter was referred to the Department of Justice for consideration on August 16, 2004. As of the date of this charge, the Justice Department is still considering whether to sue on its own behalf or simply issue a Right to Sue letter to the Vulcan Society.

**Recruitment**

Additional causes of disparity within the Fire Department are the poor recruitment strategies used to attract African-Americans initially (especially given the low percentages of African-Americans already in the department) and to encourage African-Americans to start their preparation for the challenges posed by the hiring process, the Department's failure to distribute assistance in preparing for these challenges fairly, and ineffective strategies to ensure African-American applicant retention through the lengthy application process.

The Fire Department's Recruitment Programs have been deficient in that:

- There are insufficient resources allocated for recruitment in terms of budget, staff, and incentives. (Respondents' position statement in response to the Vulcan Society charge—*see* Determination at 4—asserts that they spent $120,000 in overtime pay, out of a $1,130,000,000 budget, on minority recruitment. That equates to 0.01% of the total budget of the Department.)

- Advertising is mainly in the media and by mail, instead of individualized, face-to-face recruitment targeted at African-American neighborhoods. Former Commissioner of the Department Thomas Von Essen freely acknowledged before the City Council that such media advertising is generally ineffective, and personal, face-to-face recruiting was responsible for much of the diversity that does exist within the Department.[8]

- Preparation courses for the written and physical exams are primarily held in areas that are difficult to travel to from neighborhoods inhabited by large numbers of minorities.

Inadequate recruiting efforts mean that many minorities are not recruited until a short time before the written test is given; these candidates then have little time to prepare adequately for the written exam.

The inadequacy of the Department's recruitment and minority applicant retention practices is evidenced by the statistics documenting the percentage of African-Americans among all candidates who sat for the December 2002 written exam. 23,932 individuals registered for the exam, of which 2,159, or 9.02%, were African-American. Of the 17,803 candidates who sat for Exam No. 2043, only 1,376 or 7.7% were African-American, so a substantial attrition occurs for African-Americans between registration and administration of the test, with 14.4% of African-Americans candidates lost during that period.[9] (Of the 16,823 who passed the exam, only 1,178 or 7.0% were African-American, and, as the banding data shows, the true impact of the test is greater since a much-higher-than-passing score is required to be hired during the lifetime of an ordinary list.) By comparison, the 2000 Census data indicates that of the New York City population between ages 16 and 29, 25.5% was African-American.

There is a sharp dropout rate for minority candidates in each step of the hiring process, and attrition is highest when minority candidates are waiting to be hired off the list.[10] Many candidates are only able to maintain interest during the four or five year hiring process due to family support—because they have an uncle, father, or some other close relative who guides them through the process.[11] Due to the historically low number of minorities in the Fire Department, members of these groups are less likely to benefit from a mentor of this nature.

---

[8] *See* Commissioner Thomas Von Essen, *Testimony before City Council Committee on Fire and Criminal Justice Services* (Sep. 28, 1999) at 4-5 ("many of the minority firefighters who now serve throughout the Department came from Firefighting families or were introduced to the job by a minority recruiter who spent time with them. Unless you see first hand that this profession has tremendous rewards and you see how members balance the risks with the rewards, it isn't easy to grasp why you would want such a physical demanding, dangerous job. ... You can't just put an ad on TV or a sign on the subway and convince people it's ok to run into fire. It takes personal hands on mentoring and dialogue.")

[9] EEOC Determination at 4.

[10] Committee on Fire & Criminal Justice Services, *Oversight: FDNY Female and Minority Recruitment* (http://webdocs.nyccouncil.info/attachments/60231.htm), Appx. B § 5.1 ("According to the FDNY, there is approximately a 50% fall off rate for candidates in each step of the hiring process, and attrition is highest when women and minority candidates are waiting to be hired off the list.").

[11] *Id.*

As a general matter, Respondents have failed to take affirmative steps to overcome the negative impression of the Fire Department among African-Americans. The Charging Parties believe that the Department currently relies on word of mouth recruiting as its *de facto* official recruitment strategy, and that this has the effect of perpetuating the current racial composition of the department, which itself is a consequence of past discrimination.

The Supreme Court has noted that an employer can convey the message that minorities are unwelcome by "consistent discriminatory treatment of actual applicants, by the manner in which [the employer] publicizes vacancies, [its] recruitment techniques, [its] responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of [the] work force from which [it] has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is...a victim of discrimination." *Teamsters v. United States*, 431 U.S. 324, 365-66 (1977).

**Other requirements**

Several other prerequisites have a disparate impact on African-American applicants. The Department requires that all eligibles complete 30 hours of college credit before they can be hired off of the list. The credits need not be in any particular area of study.[12] Although an eligible may earn these credits while he or she is waiting to be appointed, the additional burdens and costs of going to college, and having to work while attending college have a disproportionate impact on African-American candidates. The FDNY requires all new appointees to attend the probationary firefighter school ("Fire Academy"), a 13-week job training program containing many specialty courses to train firefighters on relevant topics.[13] The fact that the Department offers ample on the job training and specialty courses and that the required 30 college credits need not be in any particular subject are ample evidence that the college credit requirement is not job related.

Prior to appointment, applicants are encouraged to have completed, at their own expense, a first responder's emergency medical treatment course. If they have not done so, the Department will make training available during the yearlong probationary period, but the candidate will still have to bear the cost of the training. This training was once provided in the Fire Academy, at the Department's expense, and the cost of the training has discouraged African-Americans from entering the applicant pool. The EEPC has acknowledged that this current requirement might disproportionately screen out minority candidates and cannot be justified by business necessity.[14]

The FDNY requires eligibles to obtain a driver's license before being appointed. Many minority eligibles are raised in poor urban areas and have had neither the necessity nor economic ability to purchase a car, and thus have never obtained a driver's license. Although an eligible

---

[12] http://www.nyc.gov/html/fdny/html/community/firefighter_faq.shtml#collcredit (indicating that courses in "fire science" and "cooking" are equally acceptable). Two years of military service may also substitute for the requisite college credits, raising further questions as to what characteristic the Department seeks to select for by utilizing this alternative requirement.

[13] http://www.nyc.gov/html/fdny/html/units/fire_academy/fa_proby.shtml

[14] Letter from EEPC to FDNY regarding EEPC Audit of FDNY Recruitment Program (May 25, 2000) at 7.



USA000478

may get a driver's license while waiting to be appointed, the additional costs of driving lessons, lack of access to a car, and the expense of actually getting a driver's license[15] create an additional barrier to employment for African-American eligibles.

Additionally, this requirement is extraneous given that most firefighters are not required to drive on the job. In order to drive FDNY emergency vehicles, firefighters must complete an 80 hour course at the FDNY chauffeurs' school.[16] A comparatively small number of firefighters receive this certification.[17] Ultimately the driver's license requirement is not job related and disproportionately screens out African-American eligibles.

The Department awards a five point residence bonus (added to the final score) to New York City residents. The manner in which the Department conducts checks to ensure that applicants claiming the residence bonus are bona fide city residents has an unlawful disparate impact on African-Americans. Residence checks are conducted in such a manner that apartment dwellers, who tend to move often and are disproportionately African-American, are disproportionately audited and removed from eligibility for the residence credit if they have moved and are audited before informing the Department of their new address.

Finally, the background check process appears to routinely reject candidates who have been arrested without charge. Such arrests—often occurring in cases of "mistaken identity"—are an unfortunate and unavoidable fact of life for many young male African-American residents of the City, and often appear to lead to rejections even where legitimate explanations exist for individual arrests or the pattern of arrests.

## II. INDIVIDUAL ALLEGATIONS OF THE CHARGING PARTIES

### Candido Nuñez

Mr. Nuñez is a 28-year old African-American and Latino man. He was born in Honduras, emigrated to the United States in 1998 and has lived in New York City since that time. He was naturalized as a United States citizen on April 25, 2004. He is married with a small child and currently works in the New York City Housing Department.

Mr. Nuñez, who is fluent in English but speaks Spanish at home, first learned about the exam from ads placed by the Department on Spanish language television. He was initially reluctant to apply due to his knowledge of the history and reputation of the Department in regard to African-American hiring. However, he learned via the internet of test preparation classes offered by the Vulcan Society, and attended these classes as part of his preparation for the written exam, which lasted for approximately 5-6 months. His scores on practice tests improved during this time. He also attended approximately 3-4 classes with the FDNY held at 9 Metrotech Center on Saturdays, and used a test prep book he purchased at Barnes and Noble.

---

15 The cost for a first time driver's license is $50. http://www.nysdmv.com/licefee.htm

16 Requirements obtained from http://www.ci.nyc.ny.us/html/fdny/html/community/firefighter_requirements.shtml

17 EEOC Determination page 4.

Mr. Nuñez registered and sat for the December 2002 open competitive written examination, receiving a passing raw score of 81.176[18] and an adjusted score on the examination of 83.529.[19] He subsequently took the physical agility test, scoring a perfect 100. His combined written examination and agility test scores, with an added 5 point New York City residency bonus, gave him an adjusted overall score of 94.199. Mr. Nuñez is currently on the list of eligibles at list number 5003.

Mr. Nuñez has earned over 30 college credits from Bronx Community College. He has a drivers' license.

Mr. Nuñez has not taken the required certified first responders course. He called the FDNY recruitment center phone line and was told that it was not recommended that he take the training course because his list position was too low to anticipate being hired.

**Roger Gregg**

Mr. Gregg is a 29-year old African-American man. He is a United States citizen by birth and was raised and currently lives in the Bronx. He is a graduate of William Howard Taft High School in the Bronx. He is single, with no children, and currently works at the Municipal Credit Union.

Mr. Gregg registered and sat for the December 2002 open competitive written examination, receiving a passing raw score, and his adjusted score on the examination was 78.823. (He attended the Vulcan Society's written test preparation classes given Thursdays in Harlem, which he found to be extremely helpful, as his scores on practice exams improved as the sessions progressed.) He subsequently took the physical agility test, scoring a perfect 100. His combined written examination and agility test scores, with an added 5 point New York City residency bonus, gave him an adjusted overall score of 91.107. Mr. Gregg is currently on the list of eligibles at list number 6017.

Mr. Gregg attended Kingsboro Community College where he earned approximately 60 credits in physical therapy.

Mr. Gregg does not have driver's license and does not own a car. Like many minority eligibles, Mr. Gregg was raised in a less affluent urban area (the Bronx) and never found it necessary to obtain a driver's license or purchase a car.

Mr. Gregg took a First Responder's course as part of his physical trainer curriculum, however, the course was not certified. The FDNY requires that candidates take and pass a Certified First Responder with Defibrillation (CFR-D) course at their own expense before the end of their probationary periods (and in fact "prefers that new probationary firefighters have the CFR-D upon appointment").[20]

---

18 Mr. Nuñez received notice of his passing raw score in a notice postmarked Mar. 27, 2003.

19 Mr. Nuñez' raw score on the written examination was 81.176.

20 http://www.nyc.gov/html/fdny/html/community/firefighter_faq.shtml#cfrd

**Marcus Haywood**

Mr. Haywood is a 23-year old African-American man. He is a United States citizen by birth and was born, raised and currently lives in Brooklyn. He is a graduate of Paul Robeson High School. He is married with four children, and currently works part time for UPS while attending school full time at TCI (Technical Career Institute) where he is studying electronic engineering.

Mr. Haywood learned about the firefighter exam when he was approached by a member of the Vulcan Society in Prospect Park, from whom he received an application form. He did not become aware of the possibility of applying to the Department from any advertisements or outreach by the Department, and had no encounters with any non-Vulcan Society face to face recruiters before signing up for the written exam.

Mr. Haywood received his registration form shortly before taking the written test, and therefore did not have time to engage in any organized preparation courses for the written test. He was not aware that the Fire Department offered any test preparation courses prior to taking the written test. He prepared by going to a library and looking over several books about the exam.

He did train in a systematic way for the physical test, via programs offered by the FDNY at Randall's Island, which he learned of through mailings sent by the Department. One such program was apparently co-sponsored by the Vulcan Society, largely attended by African-Americans, and featured lectures about the history of African-Americans in the Department.

Mr. Haywood registered and sat for the December 2002 open competitive written examination, receiving an adjusted score on the examination of 70.588. He subsequently took the physical agility test, scoring a perfect 100. His combined written examination and agility test scores, with an added 5 point New York City residency bonus, gave him an adjusted overall score of 85.713. Mr. Haywood is currently on the list of eligibles at list number 6990.

Mr. Haywood has earned, to date, 27 college credits from Kingsboro Community College, and is enrolled in 16 credits worth of courses this semester at TCI.

Mr. Haywood does not have driver's license and does not own a car. Mr. Haywood's family does not own a car. He does have a learner's permit and is taking driving lessons.

Mr. Haywood has not taken the required certified first responders course.

**Timeliness**

The Charging Parties all received notice of their placements on the list shortly after May 5, 2004, when the current Firefighter List (List No. 2043) was established. On information and belief, the FDNY commenced selecting individuals from this list for appointment to the Fire Academy on or around the middle of May of 2004, and intends to use and is using the list to make future selections for such appointments. In any event, it is clearly established in this Circuit



USA000481

that each discriminatory hiring from a list assembled with the use of invalid or discriminatory employment practices (including the written examination here) constitutes a new violation.[21]

**Injury**

The Charging Parties have been injured in that others have been or will be appointed to the Fire Academy and the position of firefighter in preference to the Charging Parties because of the use of the discriminatory hiring practices described above. Given their position on the current list, the Charging Parties are unlikely to ever be appointed before this list expires,[22] and if they are appointed, they will have waited much longer than can be justified, due to the discriminatory practices described above.

Charging Parties will suffer economic injury as a result of these discriminatory hiring practices. They have also suffered psychological injuries as a result of this discrimination, and, if they are hired, will be deprived of a working environment free from discrimination and of the associational benefits of diversity in the workforce once hired.

**Class allegations**

On information and belief, a class of similarly situated potential and actual applicants exists who have suffered injury from Respondents' discriminatory policies and practices. The class includes, without limitation, all African-Americans and other minorities whose hiring has been or will be delayed because of the use of the written examination or the other factors listed herein. This class includes, without limitation, individuals who have passed the written examination but have not scored highly enough to be reasonably expected to be hired within the expected four-year life of the current list, individuals who have failed the written examination, and those who have been discouraged from applying. Failure to adequately recruit and hire African-Americans and other minorities creates an environment in the Department that stigmatizes and thereby aggrieves all members of the class, even those who are hired. No purpose would be served by requiring the members of this class to file individual charges.

**CONCLUSION**

The Charging Parties ask the EEOC to determine that Respondents employ policies and practices that are discriminatory in their impact upon African-American potential and actual applicants on the basis of race and/or color, as compared with white potential and actual

---

[21] *See Guardians Ass'n v. Civil Serv. Comm'n*, 633 F.2d 232, 249 (2d Cir. 1980) ("the results of the tests were in effect being 'used to discriminate' ... each time a member of the plaintiff class was denied a chance to fill a vacancy"), *aff'd in part*, 463 U.S. 582 (1983), *cert. denied in part*, 463 U.S. 1228 (1983); *see also Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (per curiam) (In *Guardians*, "[w]e concluded that a new violation accrued each time the list was used to make an employment determination, even though the order of the list had been determined at an earlier date.); *Association against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 273 (2d Cir. 1981).

[22] While the Department claims to have exhausted the entire preceding list (open competitive list no. 7029), the duration of that list was extended due to special circumstances resulting from the terrorist acts of September 11, 2001, and the number of firefighters hired during the time that list was in use was increased due to the need to replace the terrible losses the Department suffered on that day.



USA000482

applicants, and that Respondents engage in intentional discriminatory acts, policies and practices against African-Americans on the basis of race and/or color in its recruitment and hiring processes, in violation of law.

The Department of Justice is currently considering whether to bring suit against the FDNY based on the results of the EEOC investigation into the Vulcan Society's charge of August 2002. The charge and determination were forwarded to the Justice Department in August 2004. The Justice Department has informed Respondents that it is conducting a formal investigation into issues raised by the Vulcan Society charge and other issues beyond the scope of that charge, including discrimination against Latino candidates. Charging parties request that, to the extent possible, the EEOC expedite its investigation so that any lawsuit brought by the Charging Parties may move forward in coordination with litigation based on the Vulcan Society charge.

The undersigned Charging Parties affirm that to the best of their knowledge, the foregoing is true.

Candido Nuñez

Sworn to before me on this 22 day of February, 2005

Notary Public

NANCY CHANG
Notary Public, State of New York
No. 02CH4687840
Qualified in New York County
Commission Expires Oct. 31, 2005

Roger Gregg

Sworn to before me on this 22 day of February 2005

Notary Public

NANCY CHANG
Notary Public, State of New York
No. 02CH4687840
Qualified in New York County
Commission Expires Oct. 31, 2005

Marcus Haywood

Sworn to before me on this 23 day of February ___, 2005

Notary Public

BARBARA J. OLSHANSKY
Notary Public, State of New York
No. 02OL5063740
Qualified in New York County
Commission Expires July 29, 2007

**APPENDIX**

Notice of Result (combined scores and list position)—Candido Nuñez
Reverse of Notice of Result (combined scores and list position), with guide to codes
Notice of Result (raw written examination score)—Candido Nuñez

Notice of Result (combined scores and list position)—Roger Gregg

Notice of Result (combined scores and list position)—Marcus Haywood



NYC DEPT. OF CITYWIDE ADMINISTRATIVE SERVICES
1 CENTRE ST, 14 FL.
NEW YORK, N.Y. 10007

NOTICE OF RESULT

EXAM NO. 2043 TITLE: FIREFIGHTER GRP NO 000

THE SCORES YOU RECEIVED IN THIS EXAMINATION ARE SHOWN BELOW

| PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H | 83.529 | 50 | U | 100.000 | 50 | R | 5.000 | | | | |

FAILURE CODE:

LIST NUMBER: 5003

VETERANS PREFERENCE:

CANDIDO I NUNEZ 2043 000
1565 ODELL STREET, #4P
BRONX NY 10462

ADJUSTED FINAL AVERAGE: 94.199

SOCIAL SECURITY NUMBER: 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

KEEP THIS NOTICE AND THE POSTMARKED ENVELOPE INTACT
SEE OTHER SIDE

**IF YOU FAILED THE EXAMINATION**

**"FAILURE" CODES:** 11. You did not obtain the minimum ratings required for placement on the eligible list.
12. You did not rank high enough to be placed on the eligible list.

**IF YOU PASSED THE EXAMINATION**

| **"PART" CODES:** | | | |
|---|---|---|---|
| E. Written Test-Part 1 | J. Practical Test | L. Education &/or Experience Test | R. Residency Credit |
| G. Written Test-Part 2 | K. Oral Test | N. Seniority Rating | S. Seniority & Awards Rating |
| H. Written Test-Final Average | | | U. Physical Test |

**VETERANS'/DISABLED VETERANS' PREFERENCE CODES:** (For open competitive exams, Veterans' credits are subject to investigation)
D. Disabled Veteran: 10 points for open competitive exam or 5 points for promotion exam are included in your adjusted final average.
V. Veteran: 5 points for open competitive exam or 2.5 points for promotion exam are included in your adjusted final average.

**APPEALS:** If you believe your exam was rated incorrectly, you may submit a written appeal of your score to DCAS, Committee on Manifest Errors, at the address shown on the front of this card. With respect to appeals of essay, oral, and practical test scores, written requests for a breakdown of your scores and an appointment to review your test must be received within one week of the date of this notice. All other appeals must be received within 30 days of the date of this notice. All appeals must give specific reasons why your score should be higher. Multiple choice test appeals will result only in your test paper being re-scored; you may not dispute the final answer key. Any appeal may result in a higher OR lower rating.

**CHANGE OF NAME OR ADDRESS:** Changes should be sent to DCAS-DCPS, Certification Division, 1 Centre Street, 21st floor, NY, NY 10007. Include your old and new name and/or address. *You may miss a chance for appointment if we do not have your correct name and address.*

**ALL CORRESPONDENCE SHOULD INCLUDE YOUR NAME, ADDRESS, SOCIAL SECURITY NUMBER, EXAM TITLE AND NUMBER, AND YOUR LIST NUMBER AND AGENCY, IF ANY. KEEP THIS NOTICE FOR YOUR RECORDS AND HAVE IT WITH YOU WHEN REQUESTING INFORMATION. THE ELIGIBLE LIST WILL REMAIN IN EXISTENCE FOR AT LEAST ONE YEAR.**



TO OPEN - TEAR ALONG PERFORATION
USE THUMB NOTCH TO SNAP OUT CONTENTS

1 CENTRE ST, 14 FLOOR
NEW YORK, N.Y. 10007

NOTICE OF RESULT

X 2043 (EXAM NO.) TITLE: FIREFIGHTER GRP NO 000

THE SCORES YOU RECEIVED IN THIS EXAMINATION ARE SHOWN BELOW

PASS MARK EQUALS 70.000. ONLY PASSERS WILL BE CALLED TO PHYSICAL

| PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| E | 81.176 | 100 | | | | | | | | | |

FAILURE CODE

CANDIDO I NUNEZ 2043 000
678 ST ANNS AVENUE APT#2
BRONX NY 10455

ADJUSTED FINAL AVERAGE

LIST NUMBER

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
SOCIAL SECURITY NUMBER

VETERANS PREFERENCE

KEEP THIS NOTICE AND THE POSTMARKED ENVELOPE INTACT
SEE OTHER SIDE



NYC DEPT. OF CITYWIDE ADMINISTRATIVE SERVICES
1 CENTRE ST, 14 FL.
NEW YORK, N.Y. 10007

NOTICE OF RESULT

EXAM NO.: 2043 TITLE: FIREFIGHTER GRP NO 000

THE SCORES YOU RECEIVED IN THIS EXAMINATION ARE SHOWN BELOW

| PART | TEST SCORE | WEIGHT |
| --- | --- | --- |
| H | 78.823 | 50 |
| U | 100.000 | 50 |
| R | 5.000 | |
| | | |

FAILURE CODE:

LIST NUMBER: 6017

VETERANS PREFERENCE

ROGER R GREGG 2043 000
1075 UNIVERSITY AVE APT #13H
BRONX NY 10452

ADJUSTED FINAL AVERAGE: 91.107

SOCIAL SECURITY NUMBER: 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

KEEP THIS NOTICE AND THE POSTMARKED ENVELOPE INTACT
SEE OTHER SIDE



NYC DEPT. OF CITYWIDE ADMINISTRATIVE SERVICES
1 CENTRE ST, 14 FL.
NEW YORK, N.Y. 10007

NOTICE OF RESULT

2043 EXAM NO.

TITLE: FIREFIGHTER

GRP NO 000

THE SCORES YOU RECEIVED IN THIS EXAMINATION ARE SHOWN BELOW

| PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT | PART | TEST SCORE | WEIGHT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H | 70.588 | 50 | U | 100.000 | 50 | R | 5.000 | | | | |

FAILURE CODE

6990 LIST NUMBER

VETERANS PREFERENCE

MARCUS B HAYWOOD 2043 000
45 OCEAN AVENUE APT#2J
BROOKLYN NY 11225

85.713 ADJUSTED FINAL AVERAGE

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 SOCIAL SECURITY NUMBER

KEEP THIS NOTICE AND THE POSTMARKED ENVELOPE INTACT
SEE OTHER SIDE

**EXHIBIT J**



U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Phone: (212) 336-3620
General Fax: (212) 336-3625
TTY: (212) 336-3622

**Charge # 160 2005-01289**

Roger Gregg
1075 University Ave., Apt 13-H
Bronx, NY 10452

**Charging Party**

Center for Constitutional Rights
Attn: Shayana Kadidal Esq.
666 Broadway
New York, NY 10012

**Charging Party's Attorney**

Fire Department of New York City
c/o City of New York Law Department
Attn: Georgia Pestana Esq.
100 Church St.
New York, NY 10007

**Respondent**

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended.

Respondent is an employer within the meaning of Title VII; all requirements for coverage have been met.

The Charging Party alleges that he was discriminated against by Respondent on account of his race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. In support of his claim, he cites the determination of EEOC charge #160-2002-01828, in which it was determined that Respondent agency discriminated against Black applicants as a class because the written test (test number 2043) used to evaluate and rank applicants produced a "high degree of adverse impact against African-American

applicants" and was "not validated according to professional standards." Although Charging Party passed the test and became number 6017 on the eligibles list, he alleges that his number would have been higher, and his opportunity to be selected greater, had the test not been discriminatory. It is noted that certain other eligibility factors, including the physical test, veteran status, residency, and legacy credits affect candidates' final average and resulting position on the eligibility list. Neither party asserts that any of these factors materially affected Charging Party's relative standing.

Respondent asserts that both the physical and the written tests have been properly validated, citing in support of its position the observation in EEOC's determination that the document relied upon does include "important elements of a validation study." Respondent also states that the Charging Party's belief that the list will be terminated before his number is reached is "pure conjecture" and "recent practice does not support such an assumption."

Blacks were less than 9% of those who passed the test (scoring higher than 70). Analysis by race of the test's impact on those who passed shows that the distribution of Blacks by scoring band is the opposite of the distribution of whites, i.e., the higher the score, the smaller the proportion of Blacks. For example, while 35.1% of whites who passed the test achieved the top band (95-100%), only 12.1% of Blacks who passed the test were in the top band. The lowest passing band (70-75%) included 7.3% of Black test-passers but only 1.9% of whites.

Comparison of the participation rates of whites and blacks in each scoring band reveals that 2.6% of the top scoring range was Black, while 86.5% of it was white (the remainder were Hispanic, Asian, and other). As scores descend, white participation drops from 86.5% to 56.7%, while Black participation increases from 2.6% to 19.1%.

In its earlier determination regarding pass/fail rates of the test, the Commission concluded that the ratios indicated "a high degree of adverse impact against African-American applicants, and all the differences in percentages between blacks and whites are highly statistically significant." The present charge, addressing comparative scores of those who passed, confirms the earlier determination, i.e., the test also adversely impacted those who passed and is not validated.

Based on the above, the Commission determines that there is cause to believe that the Charging Party has been the victim of unlawful discrimination on account of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Upon finding that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of the

matter. If the Respondent declines to conciliate or when, for any other reason, a resolution acceptable to the Office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives.

The Respondent is requested to contact Electra Yourke, Enforcement Supervisor, at (212) 336-3751 on or before Tuesday, December 13, 2005 to discuss specific terms of remedy for the resolution of this matter. If Ms. Yourke does not receive a response by that date, the effort to conciliate this finding will be considered to have concluded without success.

On behalf of the Commission:

11/29/05
Date

Spencer H. Lewis Jr.
District Director



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**GEORGIA PESTANA**
*Chief, Labor and Employment Law*
*(212) 788-0862*

December 27, 2005

Electra Yourke
U.S. Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

Re: Gregg, Nunez, & Haywood v. New York City Fire Department
Charge Nos. 160-2005-01289, 160-2005-01288, 160-200501291

Dear Ms. Yourke:

I write to confirm our telephone conversation earlier this month when I advised you that respondent in the above-referenced proceedings declines to conciliate.

Very truly yours,

Georgia Pestana
Assistant Corporation Counsel



U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
New York District Office

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
Phone: (212) 336-3620
General Fax: (212) 336-3625
TTY: (212) 336-3622

**Charge # 160 2005-01291**

Marcus Haywood
2652 Pitkin Ave., Apt #1
Brooklyn, NY 11208

**Charging Party**

Center for Constitutional Rights
Attn: Shayana Kadidal Esq.
666 Broadway
New York, NY 10012

**Charging Party's Attorney**

Fire Department of New York City
c/o City of New York Law Department
Attn: Georgia Pestana Esq.
100 Church St.
New York, NY 10007

**Respondent**

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended.

Respondent is an employer within the meaning of Title VII; all requirements for coverage have been met.

The Charging Party alleges that he was discriminated against by Respondent on account of his race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. In support of his claim, he cites the determination of EEOC charge #160-2002-01828, in which it was determined that Respondent agency discriminated against Black applicants as a class because the written test (test number 2043) used to evaluate and rank applicants produced a "high degree of adverse impact against African-American

applicants" and was "not validated according to professional standards." Although Charging Party passed the test and became number 6990 on the eligibles list, he alleges that his number would have been higher, and his opportunity to be selected greater, had the test not been discriminatory. It is noted that certain other eligibility factors, including the physical test, veteran status, residency, and legacy credits affect candidates' final average and resulting position on the eligibility list. Neither party asserts that any of these factors materially affected Charging Party's relative standing.

Respondent asserts that both the physical and the written tests have been properly validated, citing in support of its position the observation in EEOC's determination that the document relied upon does include "important elements of a validation study." Respondent also states that the Charging Party's belief that the list will be terminated before his number is reached is "pure conjecture" and "recent practice does not support such an assumption."

Blacks were less than 9% of those who passed the test (scoring higher than 70). Analysis by race of the test's impact on those who passed shows that the distribution of Blacks by scoring band is the opposite of the distribution of whites, i.e., the higher the score, the smaller the proportion of Blacks. For example, while 35.1% of whites who passed the test achieved the top band (95-100%), only 12.1% of Blacks who passed the test were in the top band. The lowest passing band (70-75%) included 7.3% of Black test-passers but only 1.9% of whites.

Comparison of the participation rates of whites and blacks in each scoring band reveals that 2.6% of the top scoring range was Black, while 86.5% of it was white (the remainder were Hispanic, Asian, and other). As scores descend, white participation drops from 86.5% to 56.7%, while Black participation increases from 2.6% to 19.1%.

In its earlier determination regarding pass/fail rates of the test, the Commission concluded that the ratios indicated "a high degree of adverse impact against African-American applicants, and all the differences in percentages between blacks and whites are highly statistically significant." The present charge, addressing comparative scores of those who passed, confirms the earlier determination, i.e., the test also adversely impacted those who passed and is not validated.

Based on the above, the Commission determines that there is cause to believe that the Charging Party has been the victim of unlawful discrimination on account of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Upon finding that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of the



USA000756

matter. If the Respondent declines to conciliate or when, for any other reason, a resolution acceptable to the Office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives.

The Respondent is requested to contact Electra Yourke, Enforcement Supervisor, at (212) 336-3751 on or before Tuesday, December 13, 2005 to discuss specific terms of remedy for the resolution of this matter. If Ms. Yourke does not receive a response by that date, the effort to conciliate this finding will be considered to have concluded without success.

On behalf of the Commission:

11/29/05
Date

Spencer H. Lewis Jr.
District Director



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

**33 Whitehall Street, 5th Floor**
**New York, NY 10004-2112**
**Phone: (212) 336-3620**
**General Fax: (212) 336-3625**
**TTY: (212) 336-3622**

**Charge # 160 2005-01288**

Candido Nunez
1565 Odell St., Apt. 4-D
Bronx, NY 10462

**Charging Party**

Center for Constitutional Rights
Attn: Shayana Kadidal Esq.
666 Broadway
New York, NY 10012

**Charging Party's Attorney**

Fire Department of New York City
c/o City of New York Law Department
Attn: Georgia Pestana Esq.
100 Church St.
New York, NY 10007

**Respondent**

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission the following determination on the merits of the subject charge filed under Title VII of the Civil Rights Act of 1964, as amended.

Respondent is an employer within the meaning of Title VII; all requirements for coverage have been met.

The Charging Party alleges that he was discriminated against by Respondent on account of his race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended. In support of his claim, he cites the determination of EEOC charge #160-2002-01828, in which it was determined that Respondent agency discriminated against Black applicants as a class because the written test (test number 2043) used to evaluate and rank applicants produced a "high degree of adverse impact against African-American

applicants" and was "not validated according to professional standards." Although Charging Party passed the test and became number 5003 on the eligibles list, he alleges that his number would have been higher, and his opportunity to be selected greater, had the test not been discriminatory. It is noted that certain other eligibility factors, including the physical test, veteran status, residency, and legacy credits affect candidates' final average and resulting position on the eligibility list. Neither party asserts that any of these factors materially affected Charging Party's relative standing.

Respondent asserts that both the physical and the written tests have been properly validated, citing in support of its position the observation in EEOC's determination that the document relied upon does include "important elements of a validation study." Respondent also states that the Charging Party's belief that the list will be terminated before his number is reached is "pure conjecture" and "recent practice does not support such an assumption."

Blacks were less than 9% of those who passed the test (scoring higher than 70). Analysis by race of the test's impact on those who passed shows that the distribution of Blacks by scoring band is the opposite of the distribution of whites, i.e., the higher the score, the smaller the proportion of Blacks. For example, while 35.1% of whites who passed the test achieved the top band (95-100%), only 12.1% of Blacks who passed the test were in the top band. The lowest passing band (70-75%) included 7.3% of Black test-passers but only 1.9% of whites.

Comparison of the participation rates of whites and blacks in each scoring band reveals that 2.6% of the top scoring range was Black, while 86.5% of it was white (the remainder were Hispanic, Asian, and other). As scores descend, white participation drops from 86.5% to 56.7%, while Black participation increases from 2.6% to 19.1%.

In its earlier determination regarding pass/fail rates of the test, the Commission concluded that the ratios indicated "a high degree of adverse impact against African-American applicants, and all the differences in percentages between blacks and whites are highly statistically significant." The present charge, addressing comparative scores of those who passed, confirms the earlier determination, i.e., the test also adversely impacted those who passed and is not validated.

Based on the above, the Commission determines that there is cause to believe that the Charging Party has been the victim of unlawful discrimination on account of his race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Upon finding that a violation has occurred, the Commission attempts to eliminate the alleged unlawful practices by informal methods of conciliation. Therefore, the Commission now invites the parties to join with it in reaching a just resolution of the

matter. If the Respondent declines to conciliate or when, for any other reason, a resolution acceptable to the Office Director is not obtained, the Director will inform the parties and advise them of the court enforcement alternatives.

The Respondent is requested to contact Electra Yourke, Enforcement Supervisor, at (212) 336-3751 on or before Tuesday, December 13, 2005 to discuss specific terms of remedy for the resolution of this matter. If Ms. Yourke does not receive a response by that date, the effort to conciliate this finding will be considered to have concluded without success.

On behalf of the Commission:

11/29/05
Date

Spencer H. Lewis Jr.
District Director

**EXHIBIT K**



THE CITY OF NEW YORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**MICHAEL A. CARDOZO**
*Corporation Counsel*

**GEORGIA PESTANA**
*Chief, Labor and Employment Law*
*(212) 788-0862*

December 27, 2005

Electra Yourke
U.S. Equal Employment Opportunity Commission
33 Whitehall Street, 5th Floor
New York, New York 10004-2112

Re: Gregg, Nunez, & Haywood v. New York City Fire Department
Charge Nos. 160-2005-01289, 160-2005-01288, 160-200501291

Dear Ms. Yourke:

I write to confirm our telephone conversation earlier this month when I advised you that respondent in the above-referenced proceedings declines to conciliate.

Very truly yours,

Georgia Pestana
Assistant Corporation Counsel

USA000758

**EXHIBIT L**



THE CITY OF NEW YORK
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES
APPLICATIONS SECTION
18 WASHINGTON STREET
NEW YORK, NY 10004

RUDOLPH W. GIULIANI
Mayor

WILLIAM J. DIAMOND
Commissioner

| REQUIRED FORMS |
| --- |
| APPLICATION FORM |

# NOTICE OF EXAMINATION

**FIREFIGHTER**
**Exam. No. 7029**
**Third Amended Notice (October 17, 2001)**

PENGAD-Bayonne, N.J.
PLAINTIFF'S EXHIBIT
2
10/9/07 AS

**WHEN TO APPLY:** From: September 2, 1998 To: October 16, 1998

**APPLICATION FEE:** $35.00 *Payable only by money order to D.C.A.S. (DOP)*

**THE TEST DATE:** Multiple-choice test expected to be held on Saturday, February 27, 1999.

The Notice of Examination is amended to revise the information regarding the qualifications for college credits and Certified First Responder Certification with Defibrillation under the How To Qualify section.

**HAT THE JOB INVOLVES:** Under supervision, Firefighters assist in the control and extinguishment of fires, in providing pre-hospital emergency medical care, and in the enforcement of laws, ordinances, rules and regulations regarding the prevention, control and extinguishment of fires; as well as perform Fire Safety Education activities; and perform related work.

Some of the physical activities performed by Firefighters and environmental conditions experienced are: wearing protective clothing, such as bunker suit, helmet, boots and breathing apparatus; crawling, crouching and standing, often for prolonged periods, while extinguishing fires; driving fire apparatus; climbing stairs, ladders and fire escapes; raising portable ladders; using forcible entry tools, such as axes, sledge hammers, power saws and hydraulic tools; searching for victims in smoke-filled hostile environments; carrying or dragging victims from dangerous locations; connecting, stretching and operating hose lines; locating hidden fire by feel and smell; providing medical assistance to injured or ill citizens; and providing control and mitigation of hazardous materials incidents while wearing chemical protective clothing.

(This is a brief description of what you might do in this position and does not include all the duties of this position.)

**IE SALARY:** The current minimum salary is $30,872 per annum. This rate is subject to change. In addition, employees will receive holiday pay and night differential.

**OW TO APPLY:** If you believe you meet the requirements in the "How to Qualify" section, refer to the "Required Forms" section below for the form(s) that you must fill out. Return all completed form(s) and the application fee to the above address by mail only. Applications will not be accepted in person.

**OW TO QUALIFY:**
**Education and Experience Requirements:** Except as noted below, by the date of appointment, you must have

1) successfully completed 30 semester credits from an accredited college or university, or

2) a four year high school diploma or its educational equivalent and have completed two years of honorable full-time U.S. military service.

For appointments between October 15, 2001 and December 31, 2002: For appointments made between October 15, 2001, and December 31, 2002, where qualification for Education and Experience Requirements is based upon the successful completion of semester credits, you must have, by the time of appointment, successfully completed a minimum of 15 semester credits from an accredited college or university. However, in order to successfully complete your probationary period, you must, no later than 30 days prior to the completion of your probationary period, have completed a minimum of 30 semester credits, in total, from an accredited college or university. A failure to possess a minimum of 30 semester credits no later than 30 days prior to the completion of your probationary period will result in termination.

**READ CAREFULLY AND SAVE FOR FUTURE REFERENCE**

- **Certification Requirement:** Except as noted below, by the date of appointment, you must have a minimum of a Certified First Responder Certification with Defibrillation. This certification must be maintained for the duration of your employment.

  For appointments between October 15, 2001 and December 31, 2002: For appointments made between October 15, 2001, and December 31, 2002, a minimum of a Certified First Responder Certification with Defibrillation must be obtained no later than 30 days prior to the completion of your probationary period. A failure to obtain such Certification no later than 30 days prior to the completion of your probationary period will result in termination.

**Age Requirement:** Pursuant to Section 54 of the New York Civil Service Law and Section 15-103 of the Administrative Code, you must be at least 17 ½ years of age by the end of the application period and you must not have reached your twenty-ninth birthday by the beginning of the application period to be eligible to take this examination. However, you must have reached your twenty-first birthday to be eligible for appointment.

**Exception to the Age Requirement:** All persons who were engaged in military duty as defined in Section 243 of the New York State Military Law may deduct from their actual age the length of time spent in such military duty provided the total deduction for military duty does not exceed six years.

**Driver's License Requirement:** At the time of appointment, you must possess a motor vehicle driver's license valid in the State of New York. This license must be maintained for the duration of your employment.

**Medical and Psychological Requirements:** You must take medical and psychological tests.

**Drug/alcohol Screening Requirement:** You must pass a drug/alcohol screening in order to be appointed. Drug/alcohol tests will also be administered to all probationary Firefighters as part of the medical examination prior to the completion of probation.

**Character and Background:** Proof of good character and satisfactory background will be an absolute prerequisite to appointment. In accordance with provisions of law, persons convicted of a felony or who have received a dishonorable discharge from the Armed Forces are not eligible for appointment to this position.

**Residency Requirement:** The New York Public Officers Law requires that any person employed as a Firefighter in the Fire Department of New York be a resident of the City of New York or of Nassau, Westchester, Suffolk, Orange, Rockland or Putnam Counties.

**English Requirement:** Candidates must be able to understand and be understood in English.

**Proof of Identity:** Under the Immigration Reform and Control Act of 1986, you must be able to prove your identity and your right to obtain employment in the United States prior to employment with the City of New York.

**Citizenship Requirement:** United States citizenship is required at the time of appointment.

**:EQUIRED FORM(S):**

**Application for Examination:** Make sure that you follow all instructions included with your application form, including payment of fee. Save the instructions for future reference.

**.DMISSION CARD:** You should receive an Admission Card in the mail about 10 days before the date of the test. If you do not receive an Admission Card at least 4 days before the test date, you must go to the Examining Service Section, 2 Washington Street, 17th floor, Manhattan, to obtain a duplicate card.

**:HE TEST:** There will be a written multiple-choice test, weight 50, and a physical test, weight 50. The pass mark for the written test will be determined after an analysis of the test results.

The written test is designed to test the candidate's ability to learn and to perform the work of a Firefighter. It may include questions involving the understanding of written language and information, using language to communicate information or ideas to other people, memorizing information, recognizing or identifying the existence of problems, applying general rules to specific situations, applying prioritized rules to specific situations, determining position or spatial orientation within a larger area, visualizing how objects or structures might appear from different perspectives or after changes, finding a rule or concept which fits or describes a situation, and other related areas.

The physical test will consist of a series of events designed to test the candidate's capacity to perform the physical aspects of a Firefighter's job. A more detailed description of the physical test will be made available at a later date. Candidates called to participate in the physical test will be required to pay an additional fee prior to taking the physical test and will be notified of the method of payment prior to the physical test. Failure to pay the additional application fee, in a timely manner, will result in disqualification from further participation in the examination. The additional application fee for the physical test will be waived for a New York City resident receiving public assistance who submits a clear photocopy of a current Benefit Card at the time of the physical test.

..dates must pass the written test to be summoned for the physical test. Medical evidence to allow participation in the ..ical test may be required. Candidates will be required to undergo a drug screening on the day of the physical test. ..r candidates who pass both the written and physical tests, scores on the written and physical tests will be converted to ..andard scores. The standard score on each test will then be multiplied by the weight of that test, and these products will ..e added resulting in a combined weighted standardized score. Ranking of candidates will be based on this combined ..eighted standardized score. This combined weighted standardized score will then be transformed to scores between 70 ..nd 100. Only those candidates who receive a score between 70 and 100 will be credited with Veterans' credit, if ..pplicable, and New York City Residency credit, if applicable.

..New York City Residency Credit: Five points will be added to the final exam score of those candidates who qualify for ..New York City Residency Credit. To be eligible for the residency credit, a candidate must achieve a passing score on both ..he written test and the physical test, and must maintain a continuous period of residency in New York City from August .., 1999 through August 1, 2000. Candidates interested in seeking the residency credit will be given an opportunity to ..equest the credit at the written examination. Candidates who pass the written test will also be provided with an opportunity ..o request the credit at the time of the physical test. In any event, all requests for the residency credit must be received by ..he Department of Citywide Administrative Services, Bureau of Examinations, 2 Washington Street, New York, NY 10004, ..n writing, prior to the establishment of the list.

Eligibility for the residency credit will be investigated by the Fire Department of New York. Candidates will be required ..o produce written verification of the candidate's New York City residency from August 1, 1999 through August 1, 2000. The documents presented must represent the period of time for which you are claiming City residency. Inability to produce the required verification of residence documents for the continuous period of residency will result in the forfeiture of the New York City Residency Credit and an adjustment in the final score. Documents that will be investigated to prove New York City residency will include, but are not limited to, a copy of a lease or mortgage in the candidate's name plus one of the following (also in the candidate's name): telephone bills; gas, electric or water utility bills; checking or savings account statements; cable TV bills; or credit card statements. The Fire Department of New York reserves the right to accept other documents, in lieu of the above, under special circumstances which validate various living arrangements, such as residing with parents, etc., as determined by the Department. As in the case of any intentional misrepresentation of a material fact on an employment application, candidates who claim New York City residency credit and who are determined to have intentionally misrepresented facts concerning New York City residency shall be disqualified and their names shall be removed from the eligible list, and they may be subject to criminal sanctions.

Legacy Credit: Five points will be added to the final score of those candidates who qualify for the "Legacy Credit". A candidate shall qualify for the "Legacy Credit" if his or her parent has died while engaged in the discharge of his or her duties as a uniformed member of the New York City Fire Department, New York City Police Department, NYC Transit Police Department or NYC Housing Authority Police Department.

To be eligible for this credit, a candidate must achieve a passing score on both the written and the physical tests.

Candidates who pass the written test and are summoned to the physical test will be able to claim legacy credit at the physical test site. All such claims will be investigated.

..IE TEST RESULTS: If you pass both the multiple-choice test and physical test, your name will be placed in score order on an eligible list and you will be given a list number. You will be notified by mail of your test results. If you meet all requirements and conditions, you will be considered for appointment when your name is reached on the eligible list.

..DDITIONAL INFORMATION:

Investigation: This position is subject to investigation before appointment. At the time of investigation, eligibles will be required to pay a $50.00 fee for fingerprint screening.

At the time of investigation and at the time of appointment, eligibles must present originals or certified copies of all required documents and proof, including, but not limited to, proof of date and place of birth by transcript of record of the Bureau of Vital Statistics or other satisfactory evidence, naturalization papers if necessary, proof of any military service, and proof of meeting educational requirements.

Any willful misstatement or failure to present any documents required for investigation will be cause for disqualification.

Probationary Period: The probationary period is 12 months. As part of the probationary period, probationers will be required to successfully complete a prescribed training course. Probationers who fail to complete successfully such training course, at the close of such training course, may be terminated by the agency head.

List Termination: The eligible list resulting from this examination will be terminated one year from the date it is established, unless extended by the Commissioner.

**'ECIAL TEST ACCOMMODATIONS:** If you plan to request special testing accommodations due to disability or an alternate test date due to your religious belief, follow the instructions included with the "Application for Examination."

The General Examination Regulations of the Department of Citywide Administrative Services apply to this examination and are part of this Notice of Examination. They are posted and copies are available in the Applications Section of the Division of Citywide Personnel Services, 18 Washington Street, NY, NY.

The City of New York is an Equal Opportunity Employer.

Title Code No. 70310; Fire Service.

For [illegible] Other City Jobs, Call 212-487-JOBS



THE CITY OF NEW YORK
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES
APPLICATIONS CENTER
18 WASHINGTON STREET
NEW YORK, NY 10004

MICHAEL R. BLOOMBERG
Mayor

MARTHA K. HIRST
Commissioner

| REQUIRED FORMS |
|---|
| APPLICATION FORM |

# NOTICE OF EXAMINATION




## FIREFIGHTER

Exam. No. 2043
Second Amended Notice (September 25, 2002)

**WHEN TO APPLY:** From: June 28, 2002 To: October 31, 2002 **APPLICATION FEE:** $35.00

**THE TEST DATE:** Multiple-choice test expected to be held on Saturday, December 14, 2002.

The Notice of Examination is amended to:

1. extend the end of the filing period from September 30, 2002 to October 31, 2002;
2. change the test date from November 23, 2002 to December 14, 2002; and
3. add references to online filing to the **"HOW TO APPLY"** and **"SPECIAL TEST ACCOMMODATIONS"** sections.

**WHAT THE JOB INVOLVES:** Under supervision, Firefighters assist in the control and extinguishment of fires, in providing pre-hospital emergency medical care, and in the enforcement of laws, ordinances, rules and regulations regarding the prevention, control and extinguishment of fires, as well as perform Fire Safety Education activities; perform inspections and related enforcement duties to assure compliance with provision of Fire Prevention Code and applicable section of Building Code, multiple Dwelling Code, Housing Maintenance Code, Labor Law and other laws, rules, regulations, within enforcement purviews of Fire Department; perform inspection of equipment and schedule as necessary the maintenance of various tools and equipment, including but not limited to S.C.B.A. power tools, company apparatus, and personal safety equipment; and perform related work.

Some of the physical activities performed by Firefighters and environmental conditions experienced are: wearing protective clothing, such as bunker suit, helmet, boots and breathing apparatus; crawling, crouching and standing, often for prolonged periods, while extinguishing fires; driving fire apparatus and other Department vehicles; climbing stairs, ladders and fire escapes; raising portable ladders; using forcible entry tools, such as axes, sledge hammers, power saws and hydraulic tools; searching for victims in smoke-filled hostile environments; carrying or dragging victims from dangerous locations; connecting, stretching and operating hose lines; locating hidden fire by feel and smell; providing medical assistance to injured or ill citizens; and providing control and mitigation of hazardous materials incidents while wearing chemical protective clothing.

(This is a brief description of what you might do in this position and does not include all the duties of this position.)

**THE SALARY:** The current minimum salary is $32,724 per annum. This rate is subject to change. In addition, employees will receive holiday pay and night differential.

**HOW TO APPLY:** There are two ways to apply for this exam:

1. **Online at the DCAS Website: If you wish to apply online, browse to Online-Apps at http://nyc.gov/applyforexams, and follow the on-screen application instructions for filling out any required forms and electronically submitting your application. Fees for applications submitted online are payable only with a valid credit card.**

**READ CAREFULLY AND SAVE FOR FUTURE REFERENCE**

2. By mail: If you believe you meet the requirements in the "How to Qualify" section, refer to the "Required Forms" section below for the form (s) that you must fill out. Return all completed form (s) and the application fee to DCAS Applications Section, 1 Centre Street, 14th floor, New York, NY 10007. Fees for applications submitted by mail are payable only by money order to D.C.A.S. (EXAMS).

Applications will not be accepted in person.

**CFR-D REQUIREMENT:** You will be required to possess Certified First Responder Certification with Defibrillation (CFR-D) by the end of your probationary period. This certification must be maintained for the duration of employment.

**Note:** If you do not possess a CFR-D at the time of appointment, you will be required to obtain CFR-D training at your own expense, either at a training program of your own choosing or a training program provided by FDNY. The training course provided by FDNY will cost $775, although that cost is subject to change based upon the latest collective bargaining agreements regarding uniformed services salaries and the number of training hours in effect at the time of training. Upon successful completion of FDNY's CFR-D course and receipt of your CFR-D certificate, payroll deductions will commence at a rate of $30 per pay period until the total cost is recouped by FDNY.

**HOW TO QUALIFY:**

**Education and Experience Requirements:** By the date of appointment, you must have

(1) successfully completed 30 semester credits from an accredited college or university, or

(2) a four year high school diploma or its educational equivalent and have completed two years of honorable full-time U.S. military service.

You may be given the test before we check your qualifications.

**Driver License Requirement:** By the time you are appointed to this position, you must have a motor vehicle driver license valid in the State of New York. This license must be maintained for the duration of your employment.

**Medical and Psychological Requirements:** Medical and psychological guidelines have been established for the position of Firefighter. Candidates will be examined to determine whether they can perform the essential functions of the position of Firefighter. Additionally, employees will be expected to continue to perform the essential functions of the position of Firefighter throughout their careers, and may, therefore, be medically tested periodically throughout their careers. Where appropriate, a reasonable accommodation will be provided for a person with a disability to enable him or her to take these medical and psychological examinations, and/or to perform the essential functions of the job.

**Drug Screening Requirement:** You must pass a drug screening in order to be appointed. Drug tests will also be administered to all probationary Firefighters as part of the medical examination prior to the completion of probation.

**Residency Requirement:** The New York Public Officers Law requires that any person employed as a Firefighter in the Fire Department of New York be a resident of the City of New York or of Nassau, Westchester, Suffolk, Orange, Rockland or Putnam Counties.

**English Requirement:** Candidates must be able to understand and be understood in English.

**Proof of Identity:** Under the Immigration Reform and Control Act of 1986, you must be able to prove your identity and your right to obtain employment in the United States prior to employment with the City of New York.

**Citizenship Requirement:** United States citizenship is required at the time of appointment.

**Age Requirement:** Pursuant to Section 54 of the New York Civil Service Law and Section 15-103 of the Administrative Code, you must be at least 17½ years of age by the end of the application period and you must not have reached your twenty-ninth birthday by the beginning of the application period to be eligible to take this examination. However, you must have reached your twenty-first birthday to be eligible for appointment.

**Exception to the Age Requirement:** All persons who were engaged in military duty as defined in Section 243 of the New York State Military Law may deduct from their actual age the length of time spent in such military duty provided the total deduction for military duty does not exceed six years.

**Character and Background:** Proof of good character and satisfactory background will be an absolute prerequisite to appointment. In accordance with provisions of law, persons convicted of a felony or who have received a dishonorable discharge from the Armed Forces are not eligible for appointment to this position.

**AED FORM(S):**

**Application for Examination:** Make sure that you follow all instructions included with your application form, including payment of fee. Save a copy of the instructions for future reference.

**THE TEST:** There will be a written multiple-choice test, weight 50, and a physical test, weight 50. The pass mark for the written test will be determined after an analysis of the test results.

The written test is designed to test the candidate's ability to learn and to perform the work of a Firefighter. It may include questions involving the understanding of written language and information, using language to communicate information or ideas to other people, memorizing information, recognizing or identifying the existence of problems, applying general rules to specific situations, applying prioritized rules to specific situations, determining position or spatial orientation within a larger area, visualizing how objects or structures might appear from different perspectives or after changes, finding a rule or concept which fits or describes a situation, and other related areas.

The physical test will consist of a series of events designed to test the candidate's capacity to perform the physical aspects of a Firefighter's job. A more detailed description of the physical test will be made available at a later date. Candidates called to participate in the physical test will be required to pay an additional fee prior to taking the physical test and will be notified of the method of payment prior to the physical test. Failure to pay the additional application fee, in a timely manner, will result in disqualification from further participation in the examination. The additional application fee for the physical test will be waived for a New York City resident receiving public assistance who submits a clear photocopy of a current Benefit Card at the time of the physical test.

Candidates must pass the written test to be summoned for the physical test. Medical evidence to allow participation in the physical test may be required.

For candidates who pass both the written and physical tests, scores on the written and physical tests will be converted to standard scores. The standard score on each test will then be multiplied by the weight of that test, and these products will be added resulting in a combined weighted standardized score. Ranking of candidates will be based on this combined weighted standardized score. This combined weighted standardized score will then be transformed to scores between 70 and 100. Only those candidates who receive a score between 70 and 100 will be credited with Veterans' credit, if applicable, and New York City Residency credit, if applicable.

New York City Residency Credit: Five points will be added to the final exam score of those candidates who qualify for New York City Residency Credit. To be eligible for the residency credit, a candidate must achieve a passing score on both the written test and the physical test, and must maintain a continuous period of residency in New York City from March 1, 2003 through March 1, 2004. Candidates interested in seeking the residency credit will be given an opportunity to request the credit at the written examination. Candidates who pass the written test will also be provided with an opportunity to request the credit at the time of the physical test. In any event, all requests for the residency credit must be received by the Department of Citywide Administrative Services, Bureau of Examinations, 1 Centre Street, 14th floor, New York, NY 10007, in writing, prior to the establishment of the list.

Eligibility for the residency credit will be investigated by the Fire Department of New York. Candidates will be required to produce written verification of the candidate's New York City residency from March 1, 2003 through March 1, 2004. The documents presented must represent the period of time for which you are claiming City residency. Inability to produce the required verification of residence documents for the continuous period of residency will result in the forfeiture of the New York City Residency Credit and an adjustment in the final score. Documents that will be investigated to prove New York City residency will include, but are not limited to, a copy of a lease or mortgage in the candidate's name plus one of the following (also in the candidate's name): telephone bills; gas, electric or water utility bills; checking or savings account statements; cable TV bills; or credit card statements. The Fire Department of New York reserves the right to accept other documents, in lieu of the above, under special circumstances which validate various living arrangements, such as residing with parents, etc., as determined by the Department. As in the case of any intentional misrepresentation of a material fact on an employment application, candidates who claim New York City residency credit and who are determined to have intentionally misrepresented facts concerning New York City residency shall be disqualified and their names shall be removed from the eligible list, and they may be subject to criminal sanctions.

Legacy Credit: Five points will be added to the final score of those candidates who qualify for the "Legacy Credit." A candidate shall qualify for the "Legacy Credit" if his or her parent has died while engaged in the discharge of his or her duties as a uniformed member of the New York City Fire Department, New York City Police Department, New York City Transit Police Department, New York City Housing Authority Police Department, or New York City Department of Correction.

To be eligible for this credit, a candidate must achieve a passing score on both the written and the physical tests.

Candidates who pass the written test and are summoned to the physical test will be able to claim legacy credit at the physical test site. Candidates who become qualified for "Legacy Credit" after taking the physical test, but before the date the eligible list is established, can apply by writing to DCAS, Examining Service Section, 1 Centre Street, 14th floor, New York, NY 10007. Claims for "Legacy Credit" cannot be made once the eligible list is established. All such claims will be investigated.

**ADMISSION CARD:** You should receive an Admission Card in the mail about 10 days before the date of the written test. If you do not receive an Admission Card at least 4 days before the test date, you must go to the Examining Service Section, 1 Centre Street, 14th floor, Manhattan, to obtain a duplicate card.

**THE TEST RESULTS:** If you pass the multiple-choice test and physical test, your name will be placed in score order on an eligible list and you will be given a list number. You will be notified by mail of your test results. If you meet all requirements and conditions, you will be considered for appointment when your name is reached on the eligible list.

**ADDITIONAL INFORMATION:**

**Investigation:** This position is subject to investigation before appointment. At the time of investigation, eligibles will be required to pay a $50.00 fee for fingerprint screening.

At the time of investigation and at the time of appointment, eligibles must present originals or certified copies of all required documents and proof, including, but not limited to, proof of date and place of birth by transcript of record of the Bureau of Vital Statistics or other satisfactory evidence, naturalization papers if necessary, proof of any military service, and proof of meeting educational requirements.

Any willful misstatement or failure to present any documents required for investigation will be cause for disqualification.

**Probationary Period:** The probationary period is 12 months. As part of the probationary period, probationers will be required to successfully complete a prescribed training course. Probationers who fail to complete successfully such training course, at the close of such training course, may be terminated by the agency head.

**List Termination:** The eligible list resulting from this examination will be terminated one year from the date it is established, unless extended by the Commissioner.

**Promotion Test:** A promotion examination for this title is being held for eligible City employees. The names appearing on the promotion list will be considered first in filling vacancies.

**SPECIAL TEST ACCOMMODATIONS:** If you plan to request special testing accommodations due to disability or an alternate test date due to your religious belief, and

1. you are filing an application online, follow the on-screen instructions, or
2. you are filing an application by mail, follow the instructions included with the "Application for Examination."

The General Examination Regulations of the Department of Citywide Administrative Services apply to this examination and are part of this Notice of Examination. They are posted and copies are available in the Applications Center of the Division of Citywide Personnel Services, 18 Washington Street, NY, NY.

The City of New York is an Equal Opportunity Employer.

Title Code No. 70310; Fire Service.

For Information About Other Exams and Your Exam or List Status, Call 212-669-1357
Internet: nyc.gov/html/dcas

A - 00016

THE CITY OF NEW YORK
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES
APPLICATIONS CENTER
18 WASHINGTON STREET
NEW YORK, NY 10004

MICHAEL R. BLOOMBERG
Mayor

MARTHA K. HIRST
Commissioner

| REQUIRED FORMS |
|---|
| APPLICATION FORM |

# NOTICE OF EXAMINATION

PLAINTIFF'S EXHIBIT
5
10/9/07 SAS

**FIREFIGHTER**
**Exam No. 6019**

**Second Amended Notice 11/1/06**

**WHEN TO APPLY:** From: August 7, 2006 To: November 3, 2006

**APPLICATION FEE: $30.00**
*Payable only by money order to D.C.A.S. (EXAMS)*

**THE TEST DATE:** The multiple-choice test is expected to be held on **Saturday, January 20, 2007.**

**The Notice of Examination is amended to change the scheduling of the physical ability test.**

READ THIS NOTICE IN ITS ENTIRETY BEFORE YOU SUBMIT YOUR APPLICATION

WHAT THE JOB INVOLVES: Under supervision, Firefighters assist in the control and extinguishment of fires, in providing pre-hospital emergency medical care, and in the enforcement of laws, ordinances, rules and regulations regarding the prevention, control and extinguishment of fires, as well as perform Fire Safety Education activities; perform inspections and related enforcement duties to assure compliance with provisions of the Fire Prevention Code and applicable sections of the Building Code, Multiple Dwelling Code, Housing Maintenance Code, Labor Law and other laws, rules and regulations, within enforcement purviews of the New York City Fire Department; perform inspections of equipment and schedule as necessary the maintenance of various tools and equipment, including but not limited to power tools, company apparatus, Self-Contained Breathing Apparatus (S.C.B.A.) and other personal safety equipment; and perform related work.

Some of the physical activities performed by Firefighters and environmental conditions experienced are: wearing protective clothing, such as bunker suit, helmet, boots and breathing apparatus; crawling, crouching and standing, often for prolonged periods, while extinguishing fires; driving fire apparatus and other Department vehicles; climbing stairs, ladders and fire escapes; raising portable ladders; using forcible entry tools, such as axes, sledge hammers, power saws and hydraulic tools; searching for victims in smoke-filled environments; carrying or dragging victims from dangerous locations; connecting, stretching and operating hose lines; locating hidden fire by feel and smell; providing medical assistance to injured or ill citizens; and providing control and mitigation of hazardous materials incidents while wearing chemical protective clothing.

(This is a brief description of what you might do in this position and does not include all the duties.)

THE SALARY: The current minimum salary is $25,100 per annum. Upon completion of 13 weeks employment, the salary will rise to $32,700. Incumbents will receive salary increments reaching $63,309 per annum at the completion of five and one half years employment. All rates are subject to change. In addition, employees receive holiday, night shift and overtime pay.

HOW TO APPLY: If you believe that you meet the requirements in the "How to Qualify" section, refer to the "Required Form" section below for the form that you must fill out. Return the completed form and the $30.00 application fee, payable only by money order to D.C.A.S. (EXAMS), to DCAS Applications Section, 1 Centre Street, 14th floor, New York, NY 10007 by mail only. DCAS will not accept applications in person from candidates.

HOW TO QUALIFY TO TAKE THE TEST:

**Age Requirement:** Pursuant to Section 54 of the New York Civil Service Law and Section 15-103 of the Administrative Code, you must be at least 17½ years of age by the end of the application period and you must not have reached your 29th birthday by the beginning of the application period to be eligible to take this examination. However, you must have reached your 21st birthday to be eligible for appointment.

**Exception to the Age Requirement:** All persons who were engaged in military duty as defined in Section 243 of the New York State Military Law may deduct from their actual age the length of time spent in such military duty up to a maximum deduction of six years.

REQUIRED FORM:

**Application for Examination:** Make sure that you follow all instructions included with your Application for Examination form, including payment of fee. Save a copy of the instructions for future reference.

**READ CAREFULLY AND SAVE FOR FUTURE REFERENCE**

**THE EXAMINATION:** There will be a written multiple-choice test and a qualifying physical ability test, as described below. You must achieve a score of at least 70% to pass the written test, and you must satisfactorily complete all events of the physical ability test within a prescribed time frame to pass the physical ability test. Your score on the written test will be used to determine your place on an eligible list.

**THE WRITTEN TEST:** The written test is designed to assess your ability to learn and to perform the work of a Firefighter. It will include multiple-choice questions which may assess the following abilities: Written Comprehension, Memorization, Problem Sensitivity, Number Facility, Deductive Reasoning, Inductive Reasoning, Information Ordering, Spatial Orientation, Visualization, Perceptual Speed, Adaptability, Tenacity, Integrity, Work Standards, Resilience, Coordination, Establishing and Maintaining Interpersonal Relationships, and other abilities.

**THE PHYSICAL ABILITY TEST:** Candidates who pass the written test will be scheduled to take the physical ability test in score order prior to admission to the Fire Academy as vacancies occur. The physical ability test used will be the Candidate Physical Ability Test (CPAT), which is scored on a pass/fail basis. This test consists of a series of 8 events designed to assess your capacity to perform the physical aspects of the job of a Firefighter. The test events are: stair climb, hose drag, equipment carry, ladder raise and extension, forcible entry, search, rescue, and ceiling breach and pull. A more detailed description of the physical test will be mailed to candidates before they are scheduled for the physical ability test.

**You will be required to pay an additional fee of $25.00 prior to taking the physical ability test.** Failure to pay the additional fee on the date you are scheduled to take the physical ability test will result in disqualification from further participation in the examination. The additional fee for the physical ability test will be waived for a New York City resident receiving public assistance who submits a clear photocopy of a current Benefit Card at the time of the physical ability test. Medical evidence to allow participation in the physical ability test may be required and the Department of Citywide Administrative Services reserves the right to exclude from the physical ability test any candidates who are medically unfit.

**NEW YORK CITY RESIDENCY CREDIT:** Five points will be added to the final exam score of those candidates who qualify for New York City Residency Credit. To be eligible for the residency credit, a candidate must achieve a passing score on the examination, and must maintain a continuous period of residency in New York City from March 1, 2007 through March 1, 2008. Candidates interested in seeking the residency credit must apply by following the instructions which will be provided on the date of the written test. **Merely supplying a New York City address on the application form for this examination <u>does not</u> serve as a request for the residency credit. Requests for residency credit must be received by DCAS before the eligible list is established.**

Eligibility for the residency credit will be investigated by the Fire Department of New York. Candidates will be required to produce written verification of the candidate's New York City residency from March 1, 2007 through March 1, 2008. The documents presented must represent the period of time for which you are claiming City residency. Inability to produce the required verification of residence documents for the continuous period of residency will result in the forfeiture of the New York City Residency Credit and an adjustment in the final score. Documents that will be investigated to prove New York City residency will include, but are not limited to, an "<u>original</u>" lease or mortgage in the candidate's name plus one of the following (also in the candidate's name): telephone bills; gas, electric or water utility bills; checking or savings account statements; cable TV bills; or credit card statements. The Fire Department of New York reserves the right to accept other documents, in lieu of the above, under special circumstances which validate various living arrangements, as determined by the Department. **As in the case of any intentional misrepresentation of a material fact on an employment application, candidates who claim New York City residency credit and who are determined to have intentionally misrepresented facts concerning New York City residency shall be disqualified and their names shall be removed from the eligible list, and they may be subject to criminal sanctions.**

**VETERAN'S PREFERENCE CREDITS AND LEGACY CREDITS:** The New York State Civil Service Law provides that additional points can be added to the final score of a candidate who is, or by the date of appointment expects to be, an honorably discharged veteran or disabled veteran of the Armed Forces of the United States who has served during a time of war, as specified in New York State law; a candidate whose parent has died while engaged in the discharge of his or her duties as a Police Officer or Firefighter; or a candidate who is the sibling of a Police Officer or Firefighter who was killed in the service of New York City as a result of the World Trade Center attack on September 11, 2001. To be eligible for any of these credits, a candidate must achieve a passing score on the examination. **<u>This is only an overview</u>**; specific conditions and instructions for requesting Veteran Preference Credits and/or Legacy Credits and additional information are indicated in the Special Circumstances Sheet included in the Application Package.

**ADMISSION CARD:** You should receive an Admission Card in the mail about 10 days before the date of the test. If you do not receive an Admission Card at least 4 days before the test date, you must go to the Examining Service Section, 1 Centre Street, 14th floor, Manhattan, to obtain a duplicate card.

**THE TEST RESULTS:** If you pass the written test, your name will be placed in final score order on an eligible list and you will be given a list number. You will be notified by mail of your test results. If you pass the physical ability test and meet all requirements and conditions, you will be considered for appointment when your name is reached on the eligible list.

**HOW TO QUALIFY FOR APPOINTMENT:**

**Education and Experience Requirements:** By the **date of appointment**, you must have a four-year high school diploma or its educational equivalent, and:

1. 15 college semester credits earned as a result of satisfactory completion of course work at a college or university accredited by an accrediting body recognized by the U.S. Secretary of Education and the Council for Higher Education Accreditation ("CHEA"); or
2. full-time U.S. military service with an honorable discharge; or
3. 6 months of full-time, satisfactory paid work experience.

You may be given the exam before we verify your qualifications. You are responsible for determining whether or not you meet the qualification requirements for this examination prior to submitting your application. If you are found to be "Not Qualified," your application fee will not be refunded and you will not receive a score.

**Driver License Requirement:** You must have a motor vehicle driver license valid in the State of New York at the time of appointment. This license must be maintained for the duration of your employment.

**Medical and Psychological Requirements:** Medical and psychological guidelines have been established for the position of Firefighter. You will be examined to determine whether you can perform the essential functions of the position of Firefighter. Additionally, since employees are expected to continue to perform the essential functions of the position of Firefighter throughout their careers, you may be medically tested periodically throughout your career. Where appropriate, a reasonable accommodation will be provided for a person with a disability to enable him or her to take these medical and psychological examinations, and/or to perform the essential functions of the job.

**Drug Screening Requirement:** You must pass a drug screening in order to be appointed. Drug tests will also be administered to all probationary Firefighters as part of the medical examination prior to the completion of probation. Additionally, Firefighters will be subject to periodic random drug testing throughout their careers.

**Residency Requirement:** The New York Public Officers Law requires that any person employed as a Firefighter in the Fire Department of New York be a resident of the City of New York or of Nassau, Westchester, Suffolk, Orange, Rockland or Putnam Counties.

**English Language Requirement:** You must be able to understand and be understood in English.

**Proof of Identity:** Under the Immigration Reform and Control Act of 1986, you must be able to prove your identity and your right to obtain employment in the United States prior to employment with the City of New York.

**Citizenship Requirement:** United States citizenship is required at the time of appointment.

**Character and Background:** Proof of good character and satisfactory background will be an absolute prerequisite to appointment. Persons convicted of a felony or who have received a dishonorable discharge from the Armed Forces are not eligible for appointment to this position.

CFR-D REQUIREMENT: You will be required to possess Certified First Responder Certification with Defibrillation (CFR-D) by the end of your probationary period. This certification must be maintained for the duration of employment.

If you do not possess a CFR-D certificate at the time of appointment, you will be required to obtain the CFR-D certificate by the end of your probationary period. FDNY provides a CFR-D training program during the probationary Firefighter training course at a cost of $775. Upon successful completion of FDNY's CFR-D course and receipt of your CFR-D certificate, payroll deductions will commence at a rate of $30 per pay period until the total cost is recouped by FDNY.

Probationary Firefighters who fail to obtain a CFR-D certificate by the end of their probationary period will be terminated.

ADDITIONAL INFORMATION:

**Investigation:** This position is subject to investigation before appointment. At the time of investigation, you will be required to pay a $75.00 fee for fingerprint screening.

At the time of investigation and at the time of appointment, you must present originals or certified copies of all required documents and proof, including, but not limited to: proof of date and place of birth, such as an official Birth Certificate or other satisfactory evidence, naturalization papers if necessary, proof of any military service, and proof of meeting educational requirements.

Any willful misstatement or failure to present any documents required for investigation will be cause for disqualification.

**Probationary Period:** The probationary period is 12 months. As part of the probationary period, probationers will be required to successfully complete a prescribed training course. Probationers who fail to complete successfully such training course may be terminated by the agency head.

**Promotion Test:** A promotion examination for this title is being held for eligible City employees. The names appearing on the promotion list will be considered first in filling vacancies.

SPECIAL TEST ACCOMMODATIONS: If you plan to request special testing accommodations due to disability or an alternate test date due to your religious belief, follow the instructions included with the "Application for Examination."

---

**The General Examination Regulations of the Department of Citywide Administrative Services apply to this examination and are part of this Notice of Examination. They are posted and copies are available in the Applications Center of the Division of Citywide Personnel Services, 18 Washington Street, NY, NY.**

The City of New York is an Equal Opportunity Employer.

Title Code No. 70310; Fire Service.

For information about other exams, and your exam or list status, call 212-669-1357.
Internet: nyc.gov/dcas