# EXHIBIT T

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Civil Action No. 07-CV-2067

-----------------------------------------------X
THE UNITED STATES OF AMERICA,

                    Plaintiff,
        and
VULCAN SOCIETY, INC., for itself and on
behalf of its members, CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,
                    Plaintiff-Intervenors


        - against -

CITY OF NEW YORK, FIRE DEPARTMENT OF THE
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPETTA, in their Individual and
Official capacities,

                    Defendants.
-----------------------------------------------X

                271 Cadman Plaza East
                Brooklyn, New York

                July 1, 2008
                9:39 a.m.


        DEPOSITION of Non-Party Witness,

PHILIP BOBKO, pursuant to Federal Rules of

Civil Procedure, held at the above place,

date and time, before Alice Schulman, a

Notary Public of the State of New York.

1          P. Bobko

2  Bobko, Schemmer report that is, and we

3  certainly used it, at least I did as

4  context for the statement about job

5  relatedness.

6          It's my understanding that the

7  Morrongiello report refers to earlier work

8  by Landy, Jacobs and whoever it is

9  partner-wise.  And so it formed some basis

10  for the job relatedness statement.

11          Q.     Did you do any comparison of the

12  Landy, Jacobs test plan for exam 0084 to

13  the Morrongiello test plan for exam 7029?

14          A.     No.

15          Q.     Is it correct that Landy, Jacobs

16  never completed the job they planned

17  because they didn't have the cooperation

18  of the union?

19          A.     I don't know.

20          Q.     Do you know whether they ever

21  completed the job analysis they planned?

22          A.     No, I don't.

23          Q.     What's your opinion of the

24  transportability study that Landy, Jacobs

25  did as reported in this document?

                    P. Bobko

1

2        A.    I know there was a

3   transportability study, or I believe there

4   was some use of transportability from one

5   city to another, but I haven't formed an

6   opinion about that aspect of it.  I wasn't

7   asked to.

8        Q.    So do you have an opinion as to

9   whether it was a sufficient basis to

10  establish the validity of the written and

11  physical exam established by Landy for New

12  York?

13       A.    I don't have an opinion.

14       Q.    Back in your report, Exhibit

15  601, the next document listed is

16  Probationary Firefighter's Manual, Fire

17  Department of the City of New York.

18            For what purpose did you rely on

19  this document in forming your opinions and

20  conclusions?

21       A.    Two purposes.  One, it was just

22  a quick scan was a helpful way to

23  understand yet again the job of

24  firefighter and get a sense of the context

25  of the selection process.

P. Bobko

1

2    Q.    So you talked about those things

3    as positives and negatives, is that what

4    you're saying?

5    A.    I don't remember who said what.

6    I know those things were discussed, and I

7    know I was at that meeting or those series

8    of meetings.

9    Q.    Let me ask this then:  Did you

10   provide any input or did you just sit back

11   and listen to the discussion going on?

12   A.    I'm sure I said something.  I

13   don't know what it was.

14   Q.    Do you recall any discussion

15   about the possibility of using the CPAT

16   competitively, in other words, not scoring

17   it pass/fail, but scoring it in a way that

18   would allow the City to combine the score

19   on the CPAT, if we can call it that, and

20   the written exam?

21   A.    I don't recall any specific

22   discussion about how one might score the

23   CPAT other than dichotomously.

24   Q.    What is the relative importance

25   of physical abilities, cognitive abilities

P. Bobko

1
2    and personal attributes to the successful
3    performance of the FDNY entry level
4    firefighter job?
5        A.    I don't know.  I can tell you
6    they are all important based on the job
7    analysis, but that's all I can tell you.
8        Q.    When you say "based on the job
9    analysis," what job analysis are you
10   referring to?
11       A.    Well again, that would be the
12   Morrongiello job analysis, the job
13   analysis that was done for 6019, and I
14   guess to some extent the job analysis that
15   was done for what I'll call the Landy exam
16   0084 whatever that number is.
17       Q.    0084.
18            Let me show you what's been
19   marked as Exhibit 242, and for the record
20   this is a document that is Bates numbered
21   DCAS 0016940 to DCAS 0016945, and on the
22   top of the first page it says Physical and
23   Cognitive Contributions to Task Area
24   Performance.  Dr. Bobko, have you ever
25   seen this document before?

P. Bobko

1

2     a minute to check my report?

3          Q.     Please go ahead.

4          A.     Thank you.  Could you please

5     state the question again, but I think I'm

6     getting there.

7          Q.     My question was: In your

8     opinion, did the City's use of exam 7029

9     as a pass/fail screening device with a

10    cutoff score of 84.705 result in a

11    disparate impact on black candidates?

12         A.     Yes.

13         Q.     In your opinion, did the City's

14    use of written exam 7029 as a pass/fail

15    screening device with a cutoff score of

16    84.705 result in a disparate impact upon

17    Hispanic candidates?

18         A.     No.

19         Q.     In your opinion, did the City's

20    use of written exam 2043 as a pass/fail

21    screening device with a cutoff score of 70

22    result in a disparate impact upon black

23    candidates?

24         A.     If I may, you asked me to try to

25    answer your questions yes and no.  I am

P. Bobko

trying to do that.

Q.    Okay.

A.    So on the Hispanics when I said
no, I know there are, understand there are
people who would claim otherwise.  I'm
trying to give you the best answer I can
between yes and no.  Is that okay?

Q.    Let me clarify then just to make
sure I don't misinterpret your answers.

A.    Sure.

Q.    If you have an opinion that is
yes or no, it either does or doesn't, in
your opinion have a disparate impact on
whatever group I'm asking you, then yes,
please answer yes or no.

        If you don't have an opinion
that it does and you don't have an opinion
that it doesn't have an opinion that it
has a disparate impact, please tell me
that, and I'm not asking you for other
opinions others may have at this point.
Does that help?

A.    No, I have an opinion about what
opinion others have.

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

1                    P. Bobko

2          MR. FRAENKEL:  If your opinion

3      is not yes or no but is something

4      other than that, give your opinion as

5      to what the other is.  You do not have

6      to answer yes or no unless that answer

7      is your answer.

8          Q.    Tell me if you can't answer yes

9   or no, and I'll follow up and try to

10  figure out.

11         A.    I can't answer yes or no on the

12  answer on Hispanic.

13         Q.    Would you need some additional

14  information to be able to answer yes or

15  no?

16         A.    I would need some additional

17  clarification.

18         Q.    What clarification would you

19  need?

20         A.    How one defines adverse impact.

21         Q.    Okay, then let's go to the next

22  question now that we cleared that up.

23              In your opinion, did the City's

24  use of exam 2043 as a pass/fail screening

25  device with a cutoff score of 70 result in

P. Bobko

a disparate impact upon black candidates?

A.    I can't answer that question either.

Q.    And is that for the same reason as with regard to the previous question?

A.    Yes.

Q.    In your opinion, did the City's use of written exam 2043 as a pass/fail screening device with a cutoff score of 70 result in a disparate impact upon Hispanic candidates?

A.    I can't answer that question either.

Q.    And, again, is that because you'd have to know how one defines disparate impact?

A.    Correct.  I would not need to know how one defines it, I would need to know how you define it or the person asking the question would define it.

Q.    Is there any other information you would need to know in order to give a yes or no answer?

A.    No.

P. Bobko

1

2   Q.    In your opinion, did the City's

3   rank/order/processing and selection from

4   the exam 7029 eligibility list result in a

5   disparate impact upon black candidates?

6   A.    Could you repeat the question,

7   please.

8   Q.    In your opinion, did the City's

9   rank/order/processing and selection from

10  the exam 7029 eligibility list result in a

11  disparate impact upon black candidates?

12  A.    Generally, yes.

13  Q.    What do you mean when you say

14  "generally, yes"?

15  A.    Generally, is because I don't

16  have in front of me the exact, I do, but I

17  don't recall the exact numbers that

18  plaintiffs' expert's report provide for

19  the situation you outlined, and I think

20  there is a leap in your question between

21  having an adverse impact, once again, I'm

22  not quite sure I understand fully the

23  concept of adverse impact as defined in

24  your situation of rank/order/processing.

25  Q.    Okay.  Let me ask this, I may

1              P. Bobko

2     well get the same answer. In your opinion,

3     did the City's rank/order/processing and

4     selection from the exam 7029 eligibility

5     list result in a disparate impact on

6     Hispanic candidates?

7          A.    That one I can't answer.

8          Q.    Why can't you answer?

9          A.    For the same reason when you ask

10    about the pass/fail.

11         Q.    In your opinion, did the City's

12    rank/order/processing and selection from

13    the exam 2043 eligibility list result in a

14    disparate impact upon black candidates?

15         A.    I can't answer.

16         Q.    Is that for the same reason as

17    you can't answer the previous question?

18         A.    Correct.

19         Q.    In your opinion, did the City's

20    rank/order/processing and selection from

21    the exam 2043 eligibility list result in a

22    disparate impact upon Hispanic candidates?

23         A.    I can't answer it.

24         Q.    For the same reason?

25         A.    Same reason.

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

P. Bobko

1

2     adverse impact, but the practice really

3     does not have adverse impact; is that

4     right?

5         A.    Correct.

6         Q.    I'm handing you what's been

7     marked as Exhibit 614, and this document

8     at the top has a title Modeling the

9     Behavior of the 4/5ths Rule for

10    Determining Adverse Impact:  Reasons for

11    Caution.  Do you recognize this document?

12        A.    Yes.

13        Q.    Exhibit 614 is a copy of an

14    article that was written by you and two

15    others published in 2006 in the Journal of

16    Applied Psychology, correct?

17        A.    Correct.

18        Q.    In your 2006 article, Exhibit

19    614, you talk about false positives and

20    false negatives.  And if you want to take

21    a look, an example of that is on page 509

22    the top left column.

23             Do you see what I'm talking

24    about in that first paragraph on the page?

25        A.    Yes.

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

1                        P. Bobko

2          Q.      And what I want to do is just

3    clarify for myself what a false positive

4    and a false negative is as you use the

5    terms in this article.  I know they may

6    have other meanings elsewhere.

7                What you call a false negative

8    in this article is the situation where a

9    practice does have an adverse impact, but

10   the 80 percent rule does not indicate

11   adverse impact; is that right?

12         A.      Correct.

13         Q.      And the situation in which a

14   practice does not have an adverse impact

15   but the 80 percent rule indicates that it

16   does is what you call a false positive in

17   this article, correct?

18         A.      What Greenberg called a false

19   positive.

20         Q.      And you use the term throughout?

21         A.      That's correct.

22         Q.      And it has the same meaning

23   throughout the article?

24         A.      Correct.

25         Q.      Do you agree that a test of

P. Bobko

alpha, A-L-P-H-A, level of .05 or .01. I don't read any link to controlling false positives in that sentence.

Q.    That particular sentence?

A.    Yes.

Q.    Type I errors, those are false positives, right?

A.    Correct.

Q.    And what you call false negatives in your 2006 article, Exhibit 614, that's also what you sometimes call Type II errors, correct?

A.    Correct.

Q.    In your opinion, if you have a large sample, which is better at controlling false negatives or Type II errors, a statistical significance test or the 80 percent rule of thumb?

A.    Just bear with me because of the Type I and Type II. Your question was about Type II, correct?

Q.    Right.

A.    Can you repeat your question, please?

P. Bobko

1
2  Q.   Sure.  My question was: In your
3  opinion, if you have a large sample, which
4  is better at controlling false negatives,
5  a statistical significance test or the 80
6  percent rule of thumb.
7  A.   One more time, repeat the
8  question and then I'll give you your
9  answer.
10  Q.   In your opinion, if you have a
11  large sample, which is better at
12  controlling false negatives, a statistical
13  significance test or the 80 percent rule?
14  A.   In general, a statistical
15  significance test with large samples.
16  Q.   Do you agree with this
17  statement, with a statistical significance
18  test all elements equal, the power to
19  detect differences in selection rates and
20  avoid Type II errors increases with
21  increasing sample size?
22  A.   That's correct.
23  Q.   If you would look at Exhibit
24  614, page 514.  Are you there?
25  A.   Yes.

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

                    P. Bobko

1

2        Q.    On page 19 at the bottom you

3    have some bullet points carried over to

4    the next page that state the basis for

5    your opinion that exactly no difference is

6    an unrealistic standard here, right?

7        A.    Correct.

8        Q.    So the literature and other

9    things you mention in these bullets, as

10   you said, lead you to expect that blacks

11   and Hispanics will score lower than whites

12   on traditional paper and pencil cognitive

13   tests, right?

14            MR. FRAENKEL:  Objection as to

15       form.  You can answer.

16       A.    I disagree.

17       Q.    Why?

18       A.    Because you use the word paper

19   and pencil.

20       Q.    I wasn't limiting it to paper

21   and pencil.  I was saying if it is a paper

22   and pencil test.

23       A.    But so which question do you

24   want me to answer?

25       Q.    I want you to answer this

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

P. Bobko

1

2    question, the literature and the other

3    things that you list in the bullets here

4    lead you to expect that blacks and

5    Hispanics will score lower than whites on

6    a traditional paper and pencil cognitive

7    test; is that correct?

8              MR. FRAENKEL:   Objection as to

9         form, but you can answer.

10    A.      That's correct.

11    Q.      And both the written exams at

12    issue in this case, written exam 7029 and

13    written exam 2043 are paper and pencil

14    tests that, in your opinion, each assess

15    cognitive ability, right?

16    A.      Yes, fashion sets of cognitive

17    ability, yes.

18    Q.      So you would expect that black

19    FDNY firefighter candidates would score

20    lower on written exam 7029 than white

21    candidates, right?

22    A.      On average, yes.

23    Q.      And would you expect that black

24    candidates would score lower on written

25    exam 2043 on average than white

P. Bobko

1

2    been hired.  These estimates are

3    overstated and conceptually flawed."

4              So my first question is this

5    criticism, this section is a criticism of

6    Dr. Siskin's and Dr. Wiesen's statements

7    of hiring shortfalls, right?

8         A.    Yes.

9         Q.    There's nowhere in your report

10   where you criticize Dr. Siskin's

11   calculations of the shortfall in test

12   passers, correct?

13        A.    There's no -- could you say your

14   sentence again, please, the question.

15        Q.    My question is, is it correct

16   that there's nowhere in your report where

17   you criticize Dr. Siskin's calculation of

18   the shortfall in test passers as opposed

19   to hiring shortfalls?

20        A.    That's correct.

21        Q.    I want to go basically through

22   your specific complaints or criticisms

23   that you do make in your report and

24   beginning on page 20, the first one is

25   that you state that, in your opinion,

Page 142

P. Bobko

1

2  shortfalls have not been discussed in any

3  type of case law?

4       A.    No.

5       Q.    Is that because you're not

6  familiar with Title VII case law?

7       A.    Correct.

8       Q.    Your next complaint about Dr.

9  Siskin's shortfall estimates has to do

10  with variability, right?

11       A.    Yes.

12       Q.    And your complaint is that the

13  estimated hiring shortfalls have

14  associated margins of error that Dr.

15  Siskin didn't report; is that right?

16       A.    That's what we are pointing out,

17  yes.

18       Q.    So as you say in the last

19  sentence of this section labeled

20  variability on page 21, although the

21  underlying, actual shortfalls might, in

22  fact, be higher, they might also be lower,

23  right?

24       A.    Correct.

25       Q.    So your criticism essentially is

1               P. Bobko

2      that Dr. Siskin didn't give us in his

3      report any probabilities related to how

4      much lower or higher the actual shortfalls

5      might have been; is that right?

6          A.     Correct.

7          Q.     But the probabilities would be

8      symmetrical, wouldn't they?

9          A.     Technically I could imagine that

10     they may not be, but my guess is

11     practically speaking they would be very

12     similar and therefore functionally

13     symmetrical.

14         Q.     If you had to give a point value

15     estimate, Dr. Siskin's is in the middle,

16     it's the best estimate, right?

17         A.     To you.

18         Q.     Is it not the best estimate if

19     you had to give a point value estimate?

20         A.     I can't answer that question yes

21     or no.

22         Q.     Why not?

23         A.     It depends on what you define as

24     best.

25         Q.     Okay.  If you had to give a

1                           P. Bobko
2        remember, also you don't want to estimate
3        things by using the middle.
4            Q.    So you didn't state any opinion
5        that Dr. Siskin's use of the middle, as
6        we've been calling it, is not the best
7        estimate in this situation, correct?
8            A.    Correct.
9            Q.    Now, you agree, don't you, that
10       we can't know what you call the actual
11       shortfalls because people who failed or
12       scored too low on the City's test weren't
13       allowed to go on and process, right?
14           A.    That makes sense, I don't
15       remember saying that.
16           Q.    But it's true, correct?
17           A.    It sounds correct to me, yes.
18           Q.    Is there something that leads
19       you to be unsure as to whether that's
20       uncorrect or not?
21           A.    No.
22           Q.    And then still on page 21, your
23       last criticism on this page about the
24       hiring shortfalls is as a measure of
25       practical significance is they ignore

P. Bobko

1

2    A.        Correct.

3    Q.        Your next criticism of Dr.

4    Siskin's delay analysis is that the delay

5    statistics in Dr. Siskin's report is

6    singled value estimates that are

7    associated with margins of error that are

8    not reported, correct?

9    A.        Correct.

10   Q.        So essentially is this the same

11   complaint you stated about Dr. Siskin's

12   shortfalls?

13   A.        It's the same type of complaint,

14   yes.

15   Q.        Now, just to make sure I

16   understand what you mean with the

17   complaint in this context, I wanted to ask

18   you to look at Exhibit 611 which was Dr.

19   Siskin's report, and go back to the tables

20   which are at the end of the report.  Well,

21   they're before all the appendices, so it

22   will be more like the middle of the

23   report.  I can give you a Bates number,

24   USAEXP00039, which is table 3, Part A, and

25   then it's followed by table 3, Part B, and

1          P. Bobko

2     these tables deal with his delay

3     statistics for blacks for exam 7029.

4              First, I want to look at table

5     3, Part A and in particular the column

6     labeled Actual.  The numbers in the Actual

7     column are not estimates; is that correct?

8          A.     That's my understanding,

9     correct.

10         Q.     Looking at the column labeled

11    Expected.  Are the numbers in the Expected

12    column the statistics that you are

13    referring to in your report?

14         A.     Yes.

15         Q.     To make sure I'm clear, those

16    numbers are the results of a calculation

17    of how many blacks would have been

18    appointed in each class if the

19    distribution of appointment dates were the

20    same for blacks as for whites; is that

21    your understanding?

22         A.     Yes.

23         Q.     And the numbers in the shortfall

24    column in Table 3, Part A are just what

25    you would get by subtracting the numbers

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

1                    P. Bobko

2      in the Actual column from the numbers in

3      the Expected column, right?

4          A.     Yes.

5          Q.     So that's not another estimate,

6      that's just arithmetic?

7          A.     Correct.

8          Q.     So exactly what is your

9      criticism as it relates to Table 3A?

10         A.     The criticism in respect to what

11     page on our report, please.

12         Q.     Page 22, I'm sorry, it's 23 in

13     your report and it's the subheading

14     Variability.

15         A.     The criticism about no

16     variability, the criticism about no

17     variability is exactly that, that as you

18     point out, the second and, the last column

19     and next to last column are statistically

20     calculated values from Dr. Siskin's report

21     because he calculates the expected values

22     and takes those numbers and changes them

23     into collated arithmetic shortfall

24     values.  Because they are statistical

25     estimates, they do, or they can be

P. Bobko

associated with variability sampling,
variability as is typically the case in
any statistical hypothesis.  And yet they
are reported here in Table 3 as single
valued numbers without any indication of
how much variability there is around
those.

So the first number, shortfall
number is three.  Who knows what the
variability, statistical variability
around that number 3 is, it could be
large, it could be small.  That is what we
were trying to say in the first paragraph
of the variability statement.

Q.    So it's the same conclusion,
that Dr. Siskin gives you estimates, but
the actual numbers could be higher, could
be lower?

A.    Correct.

Q.    Let's look at Table 3B just to
make sure I am completely clear.  Now,
these numbers, Table 3B of Dr. Siskin's
report which is the Bates number
USAEXP00040, the numbers on this table are

Page 179

P. Bobko

1
2   job relatedness and business necessity?
3            MR. FRAENKEL:  Objection to
4       form.  You can answer.
5       A.     Let me make sure I get the
6   question right because it had a long
7   preface.  You're asking if the
8   documentation in the Bobko, Schemmer
9   report is sufficient to establish job
10  relatedness?
11      Q.     Let me say it again.
12      A.     Please.
13      Q.     Is what's in this report, the
14  Bobko, Schemmer report, sufficient to
15  establish that the City's use of exam 7029
16  as a pass/fail screening device with a
17  cutoff point of 84.705 is consistent with
18  job relatedness and business necessity?
19      A.     No.
20      Q.     Is it your opinion it is
21  sufficient to establish that the City's
22  use of written exam 2043 as a pass/fail
23  screening device with a cutoff score of 70
24  is job related and consistent with
25  business necessity?

1          P. Bobko

2          A.      No.

3          Q.      Is it your opinion that what is

4    in this report is sufficient to establish

5    that the City's rank/order/processing and

6    selection of candidates from the exam 7029

7    eligibility list is job related and

8    consistent with business necessity?

9          A.      No.

10         Q.      Is it your opinion that what is

11   in this report is sufficient to establish

12   that the City's rank/order/processing and

13   selection of candidates from the exam 2043

14   eligibility list is job related and

15   consistent with business necessity?

16         A.      No.

17         Q.      Why did you focus so much on

18   disparate impact in your report and so

19   little on job relatedness and business

20   necessity?

21         A.      Why is a difficult question to

22   ask -- answer.  I don't know completely

23   why.  I know that when we started writing

24   this report, we thought, at least I

25   thought the purpose of the report was a

P. Bobko

2    that you mean their answers to the items?

3         A.    Their answers to the items.

4         Q.    Go on.

5         A.    They were responding an as if

6    they were or they were applicants.  And

7    I've now lost track of your question.

8         Q.    The question was, now I know

9    what data you were talking about.  What

10   would you be correlating with what?

11        A.    I would be correlating scores,

12   people's scores on each item with their

13   scores on other items to find what's the

14   relationship between item 17 and item 22,

15   what's the relationship between item 17

16   and item 23, et cetera.

17        Q.    And what would you be looking

18   for, particular pattern of correlations or

19   what?

20        A.    That's a tough one and that's

21   why there's nothing definitive in the

22   suggestion that I offered to you as what I

23   might do.  It would be useful if all of

24   the math questions, well, all the written

25   comprehension questions, let's say the

P. Bobko

1
2  first ability listed there, if they all
3  tended to correlate more highly among
4  themselves than they correlated with items
5  measuring memorization.  That would give
6  me some further evidence that oh, yeah,
7  this was a reasonable set of questions
8  having to do with written comprehension
9  because every time I came up with a
10 question it seemed to correlate pretty
11 highly with another question.
12          The caveat being, as you pointed
13 out this morning, this is this notion of
14 gee, it's hard to discern those kinds of
15 patterns because very often the subfacets
16 are correlated very highly with the other
17 subfacets, so it's hard to tease all of it
18 out.
19     Q.    You didn't do an analysis of
20 what you were just talking about; is that
21 right?
22     A.    Correct.
23     Q.    But the data was available to do
24 that, correct?
25     A.    Yes.

P. Bobko

there was more than one form of validity
generalization, you thought the answer was
yes.  Why is that?

A.     My guess is if we had ten
researchers in a room and we asked them to
do a validity generalization statement,
they would all do something different.

Q.     Let me ask this, do you agree
that what Dr. Landy did in doing a
transportability study to determine
whether the job of firefighter in D.C. was
similar enough to a job of firefighter in
New York is something different than what
you're relying on in this case which does
not involve any transportability study?

MR. FRAENKEL:  Objection as to
form.

A.     I can't begin to answer your
question.

Q.     Let me ask a simpler question.
In your report, you don't rely on any
transportability study, do you?

A.     No.

Q.     In your report, you rely on

1                           P. Bobko

2    validity generalization based on

3    meta-analysis, right?

4        A.      Only in an extremely limited

5    sense.

6        Q.      What do you mean by that?

7        A.      The only place I recall in our

8    report that we were relying on validity

9    generalization is to point out that, well,

10   actually two places.  One, that cognitive

11   ability tests generally have validity

12   across most jobs and two, when we cite, I

13   think it's Barrett, Barrett et al 1999

14   paper in footnote 35.

15       Q.      Well, you don't cite any other

16   evidence of criterion-related validity for

17   firefighter exams, right?

18       A.      Correct.

19       Q.      The only criterion-related

20   evidence you talk about for firefighters

21   is that Barrett article, right?

22       A.      Correct.

23       Q.      And that's the article that's

24   cited in footnote 35 of your report,

25   correct?

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

P. Bobko

1

2   A.    Yes.

3   Q.    I'm handing you what's been

4   marked Exhibit 620.  Dr. Bobko, is this

5   the Barrett meta-analysis that you cite in

6   your report?

7   A.    I believe so, yes.

8   Q.    This article was published in

9   the Journal of Business and Psychology,

10  correct?

11  A.    Correct.

12  Q.    Are you familiar with that

13  journal?

14  A.    I know it exists.

15  Q.    Is it a peer review journal?

16  A.    I don't know.

17  Q.    Have you published in that

18  journal?

19  A.    I don't think so.

20  Q.    Do you know the quality or

21  reputation of that journal?

22  A.    No.

23  Q.    Now, the Barrett article was

24  published in 1999, right?

25  A.    Correct.

1                    P. Bobko

2        Q.    So when the authors say, I

3    believe it's on page 509 of this article,

4    yes, it's the first sentence.  "The data

5    used in this study was compiled from

6    criterion-related studies of cognitive

7    ability and mechanical/spatial tests

8    conducted over the past two decades." Do

9    you understand the past two decades to

10   mean from 1979 to 1999?

11       A.    Yes.

12       Q.    Did you review any of the

13   studies used by Dr. Barrett for

14   meta-analysis?

15       A.    I don't think so.

16       Q.    Do you know what measure of job

17   performance was used as criterion in any

18   of the studies of the meta-analysis?

19       A.    Measures of job performance?

20       Q.    Yes.

21       A.    No.

22       Q.    Now --

23       A.    Other than he clearly says, or

24   they clearly say criteria consisted of

25   supervisory ratings, so I assume it

P. Bobko

consisted of repeat.

Q.    That's all you know?

A.    That's all I know.

Q.    On your report on page 27, why do you say there were more than 100 samples in the Barrett study?

A.    I'm looking at the same page 509 of the Barrett et al cite, the second paragraph.  He, they talk about 73 samples for that, this performance criteria and 28 for training.  I'm wondering if we added those two together, 73 and 28 and got a number greater than 100.  Although, as I sit here today, I don't think I could tell you whether there might have been some overlap between the 73 samples and the 23 samples.

Q.    Would you look at the last page of this Exhibit 620 and see Appendix B at the bottom of that page.  Do you see that?

A.    Yes.

Q.    How many samples does this indicate the authors used?

A.    25.  I count 25.

3935e4eb-2c85-4a5e-bf90-e41eddb0b8e4

P. Bobko

1

2     Q.     So it wasn't over 100, right?

3     A.     25 is certainly less than 100.

4     Q.     But there are more r's used than

5     that according to this?

6     A.     Yes.

7     Q.     For the record, what is r in

8     this context?

9     A.     The correlation coefficient

10    between the test score and the performance

11    measure.

12    Q.     If we look at page 510 of this

13    exhibit, and if we count up the r's in

14    Table 1 and Table 2, in Table 1 there are

15    73 r's and in Table 2 there are 28, right?

16    A.     Yes.

17    Q.     So those numbers that they were

18    adding up, those were r's, not samples,

19    right?

20    A.     Apparently.

21    Q.     If we look again at Appendix B,

22    the second column that's labeled N of r's,

23    when you add up all the r's there, there

24    are 105 of them and you can either add

25    them or take my word for it.  Do you know

P. Bobko

1

2      A.     I don't think so.

3      Q.     Are you at all familiar with any

4  of the studies that were used in this

5  meta-analysis?

6      A.     No.

7      Q.     Now, the studies listed are from

8  between 1958 and 1986; is that right?

9      A.     I'm sure you're right.  I'm just

10  perusing, I didn't see the 1950's one, but

11  it's probably accurate.

12      Q.     If that's accurate, then the

13  authors present, right, when they said the

14  studies were from the past two decades,

15  right?

16      A.     I don't know if most of the

17  studies were from the past two decades.

18      Q.     Does it say that most of the

19  studies were from the past two decades?

20      A.     No.

21      Q.     In fact, it looks like the date

22  of the Barrett meta-analysis in 1999, less

23  than half of the studies were within the

24  past 20 years and now less than none of

25  them are less than 20 years old?

1                     P. Bobko

2        A.      Right.

3        Q.      You don't know anything other

4    than the dates listed in here?

5        A.      That's correct.

6        Q.      Did the Barrett meta-analysis

7    include all the criterion-related studies

8    for cognitive firefighter exams that had

9    been conducted prior to 1999 by Dr.

10   Barrett or either of his co-authors?

11       A.      Let me make sure I follow your

12   question.  You're asking me does this

13   meta-analysis include studies by Gerry

14   Barrett?

15       Q.      Gerry Barrett or either of his

16   two co-authors had done up to that point

17   in time?

18       A.      I have no clue.

19       Q.      Do you know of any that were not

20   included?

21       A.      No.

22       Q.      Were there other

23   criterion-related studies for firefighter

24   tests for firefighters that were available

25   in 1999 but weren't included in this

P. Bobko

1
2    the number of r's is seven.  It could be

3    that there were subsamples in those two

4    samples and that each of those subsamples

5    included different people, and so the

6    seven r's come from truly seven

7    independent subsamples.

8         Q.     But you don't know that, right?

9         A.     But I don't know that, but it's

10   why I can't agree with your question.

11        Q.     Let me ask it this way.  We

12   don't know from this article how many

13   independent samples there were; is that

14   right?

15        A.     We know what they say, that's

16   all we know.

17        Q.     We don't know how many

18   independent samples there were?

19        A.     I can't answer that question.

20        Q.     Do you know how many independent

21   samples there were?

22        A.     No.

23        Q.     Now, if you look back at

24   Appendix B, for one of the studies the

25   authors say, and I believe this is the

1          P. Bobko

2     Kriska & Hines, there were 19 r's from one

3     sample, right, do you see that?

4          A.     Yes, I do.

5          Q.     So for all we know, the 24 r's

6     listed in Table 1 for cognitive tests all

7     came from no more than a handful of

8     independent samples, right?

9          A.     Again, I can't answer that

10    question if there were independent

11    subsamples.

12         Q.     Does it say that anywhere in the

13    report?

14         A.     It doesn't say that anywhere.

15         Q.     The issue of independent samples

16    is pretty important for meta-analysis,

17    right?

18         A.     I think so.

19         Q.     Now, you agree, don't you, that

20    the formulas used to compute percent

21    sampling variance, in effect error

22    confidence intervals, et cetera, typically

23    assume that samples are independent?

24         A.     It's my understanding.

25         Q.     Do you agree that it is very

1  P. Bobko

2  Q.    Let me make sure of one thing.

3  In your report, you didn't cite any other

4  criterion study on firefighters; is that

5  right?

6  A.    That's correct.

7  Q.    Now, back in your report on page

8  27, you say that Barrett and his

9  co-authors found that cognitive and

10  mechanical comprehension tests were

11  consistent and substantial predictors of

12  firefighter job performance.

13          Now, in the Barrett study, the

14  authors talk about cognitive tests and

15  mechanical tests and composites of

16  cognitive and mechanical.  What I just

17  read from, mechanical and comprehension,

18  do you mean composites of cognitive and

19  mechanical tests?

20  A.    I was referring, I can't speak

21  for Mark Schemmer, but when we wrote this

22  sentence, I am comfortable with that

23  statement as applying to either one or

24  both of the, either cognitive or

25  mechanical or the composite of cognitive

1                    P. Bobko
2       best I can remember, someone on that
3       project was developing situational
4       judgment test items to predict second tour
5       performance.
6            Q.    When was this that someone was
7       developing situational judgment items?
8            A.    I don't know exactly.
9            Q.    Can you give me an
10      approximation?
11           A.    The project took place between
12      1981 and 1991, so it would have been
13      sometime in that period.
14           Q.    And do you recall who was
15      developing situational judgment items?
16           A.    The person I think who was in
17      charge maybe of that project was a
18      gentleman named Wally Borman, B-O-R-M-A-N,
19      I think, that's a guess.
20           Q.    Were you involved at all in the
21      development of the situational judgment
22      items?
23           A.    No.
24           Q.    Was any validation study done on
25      the situational judgment device that was

P. Bobko

1    any tests that didn't have cognitive

2    components in them.

3        Q.    Do you remember recommending any

4    tests that weren't purely cognitive?

5        A.    I can't answer your question

6    because I don't know what purely cognitive

7    means.

8        Q.    Okay.  Did you recommend the

9    development of any selection devices that

10   measured abilities, knowledge, skills,

11   other than cognitive?

12       A.    I don't remember recommending

13   any such.

14       Q.    Do you know whether any such

15   devices were developed for the air traffic

16   controller's position or any of them?

17       A.    No, I don't.

18       Q.    How many written selection

19   devices have you developed for any

20   position?

21       A.    I would probably say zero.  I've

22   had a hand in the strategy of a variety,

23   but actually developing them, none.

24       Q.    How many content validity

P. Bobko

1    studies have you been involved in
2
3    conducting?
4        A.    Other than watching 6019 get
5    developed, none.  Sorry, I was just
6    tracing through my memory.
7        Q.    That's okay.  I know it's been a
8    pretty long career.  How many articles
9    have you published that discussed the
10   requirements or procedures for content
11   validation?
12       A.    I can't answer that question.  I
13   think a lot of my work has to do with
14   validation strategies in general, some may
15   touch on them and some may not.  I really
16   couldn't estimate.
17       Q.    Is content validation the main
18   focus of your work?
19       A.    No.
20       Q.    Have you published any books
21   that involve discussions of the
22   requirements or procedures for content
23   validation?
24       A.    No.
25       Q.    How many construct validity

                    P. Bobko

1

2     Q.     How about job analysis?

3     A.     Same answer, a little less so

4  than adverse effect.

5     Q.     Do you consider yourself an

6  expert in employment test development?

7     A.     Somewhat, somewhat is my

8  shortcut for saying the same thing that I

9  said for job analysis, if you don't mind.

10    Q.     Do you consider yourself an

11 expert in firefighter job tasks or duties?

12    A.     No.

13    Q.     Do you consider yourself an

14 expert in firefighter or public safety

15 selection devices?

16    A.     No.

17    Q.     Do you consider yourself an

18 expert in content validation?

19    A.     Again, to some extent in the

20 whole arena of validation and how

21 different methods might relate, but

22 content validity per se, no.

23    Q.     Do you consider yourself an

24 expert in criterion-related validation?

25    A.     Yes, or I think other people

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Civil Action No. 07-CV-2067
----------------------------------------------X
THE UNITED STATES OF AMERICA,

                    Plaintiff,
        and
VULCAN SOCIETY, INC., for itself and on
behalf of its members, CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,
                    Plaintiff-Intervenors,

          - against -

CITY OF NEW YORK, FIRE DEPARTMENT OF THE
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPETTA, in their Individual and
Official capacities,

                    Defendants.
----------------------------------------------X

                    271 Cadman Plaza East
                    Brooklyn, New York

                    July 2, 2008
                    9:39 a.m.


          CONTINUED DEPOSITION of

Non-Party Witness, PHILIP BOBKO, pursuant

to Federal Rules of Civil Procedure, held

at the above place, date and time, before

Alice Schulman, a Notary Public of the

State of New York.

P. Bobko

1

2      MR. FRAENKEL:  She's asking you

3  to compare, let's say the first one

4  with the remaining six, and the second

5  one with the remaining six, how they

6  rate compared to each other.

7      MS. SEELEY:  Exactly, thank you,

8  Mr. Fraenkel.

9      A.     So if I could rephrase for my

10  own understanding, you're asking me within

11  this list of seven tasks, do some rely or

12  are some more invoking of cognitive

13  processes than others within this list of

14  seven, is that your question?

15      Q.     That's it.

16      A.     Thank you.  I can't find a way

17  to indicate that, any comparative level of

18  cognition across these seven tasks.

19      Q.     On page 28 of your report you

20  refer to the DCAS report.  When you refer

21  to the DCAS report, you mean what we call

22  the Morrongiello report, Exhibit 54, is

23  that correct, Exhibit 54 should be in

24  the --

25      A.     These are your definitions.

P. Bobko

1

2  Q.    I can show you a copy of it.

3  A.    Yes.

4  Q.    And you say that DCAS took the

5  steps that you list in your report to

6  develop the 1999 written exam.  And just

7  to be clear, when you refer to the 1999

8  written exam, that's written exam 7029,

9  correct?

10  A.    That's my understanding, yes.

11  Q.    In the part of your report that

12  discusses job relatedness and business

13  necessity, you don't talk about the later

14  exam, written exam 2043, correct?

15  A.    Correct.

16  Q.    Why didn't you talk about

17  written exam 2043 in the job relatedness

18  and business necessity section of your

19  report?

20  A.    It was represented to me that,

21  and I believe Mark Schemmer, that the

22  exams were very similar in their content,

23  very similar for their content validity

24  and how they were constructed.

25  My review of, I remember my

P. Bobko

1
2    review of those exams seemed to confirm
3    that they were very similar.  So the
4    report just focussed on one exam because
5    of the assumption of similarity.
6        Q.    Who represented to you that the
7    two written exams were very similar?
8        A.    The best I can remember, it
9    would have been Ms. Pestana.
10        Q.    Are written exam 7029 and
11   written exam 2043 alternate forms?
12        A.    I don't know.
13        Q.    Are they parallel forms?
14        A.    I don't know.
15        Q.    Are they equivalent forms?
16        A.    I don't know.
17        Q.    In your opinion, does the
18   Morrongiello report, what we marked as
19   Exhibit 54, comply with the requirements
20   in the SIOP principals for the
21   documentation of validity information for
22   use of an employment test?
23        A.    I couldn't specifically answer
24   your question in the sense that I don't
25   and can't recall every line and Section 15

                              P. Bobko

1  seem to be fairly standard.

2       Q.    Would you say that they used the

3  best practices in the field in all the

4  details of what they did?

5       A.    I can't answer that question.

6       Q.    Why can't you answer that

7  question?

8       A.    Because I don't know what best

9  practice is.  I don't believe the field

10 knows what best practice is.

11      Q.    Still on page 28, it's up there

12 among the bullet points in the middle, you

13 have a sentence that begins "The DCAS

14 report also notes that they," and in the

15 bullets following that you say DCAS used

16 nine of the abilities in the Fleishman

17 taxonomy to write items for the written

18 exam.

19           In your opinion, of all the

20 abilities that are required by or that are

21 important to the entry level firefighter

22 job, what percentage do those nine

23 abilities represent?

24      A.    I don't know.

P. Bobko

1

2     Q.    Can you give me an estimate?

3     A.    No.

4     Q.    Why not?

5     A.    It's very difficult to give an

6  estimate because I don't have a

7  recollection of all of the other abilities

8  that were used at some point in any of the

9  job analyses that the DCAS individuals

10  were invoking.

11     Q.    Well, according to Mr.

12  Morrongiello's report, they found that 18

13  cognitive abilities on Fleishman's

14  taxonomy were important to the job and

15  they choose to measure only nine of those

16  18.  So does that help you at all in

17  determining how many of the important

18  abilities the nine that they tried to

19  measure represent?

20     A.    I need -- I think I'm beginning

21  to understand your question, but I need

22  more specification if that's okay.

23     Q.    What more do you need?

24     A.    If you could reask the question

25  or tell me, you're asking for a percentage

                    P. Bobko

Q.    Have you ever given testimony to
that effect?

A.    Not to that specific statement
that I recall.

Q.    Let me ask a hypothetical.  If
there are ten KSAs that are important for
the performance of the job, all other
things being equal, if a test that
measures five of them will have less
content validity than a test that measures
those same five plus three more; isn't
that right?

A.    Yes.

Q.    Do you agree with the following,
the content validity of an exam will be
weakened if it doesn't measure as many
important KSAs as possible?

A.    Yes.

Q.    Do you agree with the following,
if you use a content validity approach to
develop a test for use as a pass/fail
screening device, then you would want the
test to represent as many of the important
KSAOs as possible?

1                        P. Bobko

2       excluded from the exam, you would have to

3       question the content validity of the exam?

4            A.    No.

5            Q.    Have you ever given that

6       testimony?

7            A.    Not that I can tell you.

8            Q.    In the parts of your report

9       where you talk about job relatedness and

10      business necessity, you didn't discuss the

11      pass/fail cutoff scores the City used on

12      written exam 7029 and 2043, correct?

13           A.    Correct.

14           Q.    Do you agree with the following

15      statement, the inferences drawn from test

16      scores should be limited to those for

17      which validity evidence is available?

18           A.    I can't agree with that.  I

19      don't understand that sentence.

20           Q.    Okay, do you agree with the

21      following definition of validity, validity

22      is the extent to which inference is based

23      on test scores are justified by the

24      evidence?

25           A.    Sure.

P. Bobko

1   test was used in a rank ordered way when

2   combined with the physical ability test,

3   and therefore, and the section on business

4   necessity speaks to the content validity

5   of the written exam portion of that

6   composite and, therefore, the entire

7   section in some sense relates to the issue

8   that you raised.

9        Q.    As we established yesterday,

10  that section doesn't talk at all about the

11  PPT, does it?

12       A.    That's correct.

13       Q.    And you don't say anything in

14  your report about whether the method the

15  City used to combine the written exam

16  scores and PPT scores was appropriate,

17  correct?

18       A.    Correct.

19       Q.    Looking at page 29 of your

20  report, the part where you talk about

21  feasibility and business necessity, the

22  first two points, bullet points on this

23  page talk about the job relatedness of

24  cognitive tests, right?

P. Bobko

A.    Yes.

Q.    There's nothing specific in those about the tests at issue here the way they were used, right?

A.    That's correct.

Q.    In the third bullet point, you suggested that efficiency and feasibility with respect to the costs and processing of large numbers of applicants might be one of the reasons the City used an assessment of cognitive aptitude.

That consideration regarding cost and processing of large numbers would also support the use of written exam 6019, wouldn't it?

A.    Yes.

Q.    In fact, that consideration would support the use of any objective scored written exam, not just written exam 7029 or 2043, right?

A.    No.

Q.    How is that not right?

A.    One could construct written exams that were allegedly objectively

1                     P. Bobko

2    scored that I could imagine are quite

3    onerous to administer and score and report

4    the results back to applicants.

5         Q.    Can you give me an example of

6    such a test?

7         A.    A written exam that takes 84

8    days to give and has 84 times 5,000

9    questions.

10        Q.    Have you ever seen an exam like

11   that?

12        A.    No.

13        Q.    Can you give me an example of an

14   exam that you've seen?

15        A.    That?

16        Q.    That would not fulfill this

17   consideration regarding cost and

18   processing of large numbers of applicants

19   on an objectively scored written exam.

20        A.    No.

21        Q.    Looking at the fourth bullet

22   point here at the top of page 29, you

23   suggest here that consistency in the

24   methods and processes used to evaluate

25   applicants might be one of the reasons the

P. Bobko

1
2  City used an assessment of cognitive

3  aptitude.  That consideration regarding

4  consistency would equally support the use

5  of written exam 6019, wouldn't it?

6      A.    Yes.

7      Q.    I would like to hand you Exhibit

8  -- let me find it first.

9          MS. SEELEY:  Why don't we take a

10  ten-minute break.

11          (A recess was taken.)

12      Q.    Dr. Bobko, I found the exhibit I

13  was looking for.  It's this one that was

14  previously marked Exhibit 200, and for the

15  record, it is Bates numbered DCAS 0015229

16  through 15246, and on the front cover has

17  the title Test Development Report for 6019

18  Firefighter FDNY.

19          Dr. Bobko, have you seen this

20  document before?

21      A.    In its entirety, no.

22      Q.    You did see drafts of the Test

23  Development Report for 6019, didn't you?

24      A.    I saw drafts of part of the Test

25  Development Report, yes.

1                          P. Bobko

2    that's been marked Exhibit 65.  I'm sorry,

3    66.  Is that marked 66, what's the mark on

4    that?

5        A.    66.

6             MR. LEVY:  Are we okay on that?

7    I just misspoke.

8        Q.    Do you recognize this document?

9        A.    No.

10       Q.    Is this a company you worked

11   for?

12       A.    It's a company whose Scientific

13   Advisory Committee I sit on, yes.

14       Q.    I'd like you to read this over

15   and tell me if this is a summary of some

16   of the services that this company whose

17   advisory committee you sit on provides.

18       A.    Sure, it describes some of the

19   activities that I think that company

20   engages in.

21       Q.    Does this company know what its

22   doing?

23             MR. FRAENKEL:  Objection as to

24       form.

25             MR. LEVY:  Never mind,

1                          P. Bobko

2          withdrawn.

3              Q.     Here's the question.  The

4    company whose board you sit on or what's

5    the committee you sit on, say it again,

6    what is your exact connection again to the

7    company?

8              A.     It's called a Technical Advisory

9    Committee, I think, something like that.

10             Q.     And you are a committee member?

11             A.     That's correct.

12             Q.     Are the members called

13   consultants or are they called committee

14   members?

15             A.     Committee.

16             Q.     How many people sit on the

17   committee?

18             A.     About ten.

19             Q.     And are they all doctorate level

20   people?

21             A.     I think all but one.

22             Q.     And do they give advice to the

23   company on testing issues?

24             A.     Strategic advice, yes.

25             Q.     According to this the company

439eb014-9232-483d-a564-c3b0dad61d2b

P. Bobko

1
2   you have an opportunity to ask questions,
3   to ask the teacher, to ask your
4   colleagues, you have time to look things
5   up generally like studying in any
6   educational forum, but on the job you have
7   to read something immediately?
8       A.    I don't know if that distinction
9   carries, I don't know if that distinction
10  is accurate, I just don't know.
11      Q.    Are you aware that a lot of
12  linking panel folks testified that they
13  understood written comprehension on the
14  test to refer to the written comprehension
15  you need to, in the Academy basically or
16  to study materials, but not actually the
17  reading level you need on the job?
18      A.    No, I didn't know that.
19      Q.    You didn't do any kind of a
20  check yourself of the reading level when
21  you determined, I'm sorry, when you wrote
22  your report for 7029 and 2043?
23      A.    That's correct.
24      Q.    Do you know if, do you know what
25  SMOG is, do you know what SMOG is

**EXHIBIT U**

# Expert Report
## of
## David P. Jones, Ph.D. & Leaetta M. Hough, Ph.D.

### Prepared in the Matter of
### United States v. City of New York
### (Civil Action No.  07-CV-2067 E.D.N.Y)

Prepared Jointly
By

**David P. Jones, Ph.D.**

Growth Ventures, Inc.
P. O. Box 299
East Jordan, MI 49727
231.536.0111
djones@talenttechnologycorp.com

and

**Leaetta M. Hough, Ph.D.**

The Dunnette Group, Ltd.
370 Summit Avenue
St. Paul, MN 55102
651.227.4888
leaetta@msn.com

July 31, 2008

importance, compared to the importance of the physical or cognitive requirements of the position.

93. In effect, the job analysis study that served as the foundation for Written Exam 7029 explored <u>only</u> the cognitive abilities associated with the job. This limitation in scope is not discussed in the City's job analysis report, but it severely limits the conclusions that can be drawn with respect to the requirements underlying success in the firefighter job.

94. The implications of this shortcoming are many. Collectively, they result in the City's job analysis study providing:

    a) No basis for determining the relative importance of the qualifications addressed by Written Exam 7029, as compared to the job's other physical and non-cognitive requirements;

    b) No basis for determining the relative weight to be accorded to Written Exam 7029, as compared to other components of the selection process;

    c) No basis for evaluating whether any disparate impact produced by Written Exam 7029 might be defensible based upon arguing that the requirements it measures are the job's most important requirements;

    d) No basis for establishing a cut-off or qualifying score on Written Exam 7029; and

    e) No basis for arguing that Written Exam 7029 meets the standards of content validity, because the prerequisite definition of job content was not accomplished.

95. By analogy, the City's job analysis study is akin to exploring the pilot's job by examining only those skills involved in the take-off of the aircraft; thereby recommending that a pilot selection test only involve an assessment of take-off proficiency. In such a test, requirements associated with flight planning, pre-flight inspection, navigation, systems monitoring, communications, weather tracking, safety monitoring, execution of emergency procedures and, yes, landing would go unaddressed, because the job analyst explored only those requirements associated with developing a test of take-off proficiency.

**XII.** **The flaws in the job analysis underlying Written Exam 7029 resulted in obtaining only limited information, all of which focused on the job's cognitive ability requirements. Many abilities or personal attributes that enable one to perform the work of a firefighter successfully were completely ignored.**

18

96. Other job analysis studies known to the authors, and cited below, show that the firefighter position involves a host of requirements other than cognitive abilities. All were ignored in the City's job analysis study.

97. For example, less than ten years after the job analysis study underlying Written Exam 7029, Dr. Catherine Cline's (Cline, 2007) job analysis of the New York City firefighter job revealed eight non-cognitive attributes to be highly important for performing New York City firefighter tasks. The eight (as defined in Dr. Cline's job analysis study) included:

- **Tolerance for Stress** – the degree to which one can maintain stability of performance under pressure and/or opposition. (For example: Assist someone in cardiac arrest).

- **Adaptability** – the ability to maintain effectiveness in varying environments, with various tasks, responsibilities, or people. (For example: Interact with other agencies such as the Police Department or Consolidated Edison. Interact with emotionally disturbed persons).

- **Tenacity** – the ability to stay with a position or plan of action until the desired objective is achieved or is no longer reasonably attainable. (For Example: Stay at a fire scene until the fire is out, or with a medical victim until relieved).

- **Integrity** – the degree to which one can maintain social, ethical and organizational norms in job-related activities. (For example: Enter an apartment and respect the belongings of others).

- **Work Standards** – the ability to set high goals or standards of performance for self, subordinates, others and organization. Dissatisfied with average performance. (For example: Seek out constructive criticism. A new Firefighter asks questions on what to do next).

- **Resilience** – the degree to which one can handle disappointment and/or rejection while maintaining effectiveness. (For example: Accept criticism and learn from mistakes. Even when faced with fatalities, learn to keep going and doing what still needs to be done).

- **Coordination** – the ability to adjust actions in relation to others' actions. (For example: Inside team forcing door has to coordinate actions with one holding the Halligan tool and the other hitting it with an axe. If one person on a team is occupied with a rescue, another person on the team may have

19

    to take over that person's responsibilities as well as his or her own.  In administering CPR, one person may provide chest compressions, while the other person supplies oxygen).

    •  **Establishing and Maintaining Interpersonal Relationships** – the degree to which one can develop constructive and cooperative working relationships with others, and maintain them over time. (For example:  Learn to receive constructive criticism. Your life depends on the other members of your unit performing their jobs properly; you have to learn to trust them.  Shared communal activities, such as cooking and eating, help to establish and maintain good interpersonal relationships in the fire house).

98.  In Dr. Cline's study, all of these attributes were rated 4.0 or higher on an "importance scale" where *3 = Important, 4 = Very Important,* and *5 = Critical* to the performance of the firefighter job.  Yet, none of these personal attributes were explored in the job analysis, let alone the test design plan, the City used to support Written Exam 7029.

99.  According to Dr. Cline, she specifically sought to determine whether the FDNY firefighter job had changed and concluded that it had not changed between the 1998 and 2007 job analyses.  (Cline Deposition, p. 73 – 74).

100. Shown below in Exhibit 1 are the firefighter task clusters that were identified in the job analysis underlying Written Exam 7029 and that of Dr. Cline:

20

**Exhibit 1**

**Task Clusters Composing the Job Analysis Questionnaires
Used in Developing Written Exams 7029 and 6019**

| Firefighter Job Analysis Questionnaire Task Clusters | |
| --- | --- |
| **1998 Morrongiello Job Analysis (Exam 7029)** | **2007 Cline Job Analysis (Exam 6019)** |
| Initial Response to Incidents/Driving | Initial Response to Incident |
| Size-up | Size-up and Initial Actions |
| Climbing and Portable Ladder Activities | Climbing and Ladder Activities |
| Building Entry | Building Entry |
| Search | Search |
| Rescue | Rescue |
| Ventilation | Ventilation |
| Supplies Water for Hose Operation | Preliminary Actions Needed for Hose Operation |
| Hose Operations During Extinguishment | Hose Operations During Extinguishment |
| Overhaul | Overhaul |
| Salvage | |
| Clean Up/Pick Up | |
| Equipment Maintenance | Station and Equipment Maintenance/Chores |
| Station Duties and Chores | |
| Inspection of Buildings/Hydrants | Inspection of Buildings/Hydrants/Alarm Boxes |
| Extrication | Extrication |
| Providing Medical Assistance | Providing Medical Assistance |
| Elevator-Related Tasks | |
| Training | Training |
| Watch Duties | Watch Duties |
| Miscellaneous | |

101. Inspection of the task clusters for the two job analyses reveals that the overall makeup of the firefighter job was essentially unchanged. In fact, the four task areas identified in the job analysis for Examination No. 7029, but not in that for Examination No. 6019, were task clusters with so few defining tasks that Dr. Cline assigned their individual tasks to other, equally sensible task clusters, thereby eliminating these categories. Thus, the absence of the task clusters Salvage, Clean Up/Pick Up, Elevator-Related Tasks, and Miscellaneous in Dr. Cline's results did not reflect changes in the job, but only a more parsimonious presentation of findings.

102. As a result, the 2007 job analysis revealed a job made up of tasks essentially similar to those on which Written Exam 7029 was based. Yet, the Cline job analysis identified eight additional attributes important for effective performance. All of these additional attributes were non-cognitive in nature. All were missing from the 1998 job

analysis results, because the City never explored anything beyond the cognitive abilities that had been analyzed in developing its most recent predecessor examination, that produced by Landy et al. in 1992.

103. In summary, the 1998 job analysis that formed the foundation for Written Exam 7029 was fundamentally flawed by its extremely narrow coverage of the job requirements used as a basis for developing a content valid written examination. Thus, the written examination produced from the analysis also was fundamentally flawed.

XIII.    Job analyses of firefighter positions in other cities, both large and small, offer compelling evidence that attributes other than cognitive abilities are important to successful performance of firefighter work. As early as the 1970s, job analyses of firefighter jobs indicated that such attributes are important to the work of firefighters. As discussed above, these areas were not even investigated in the City's job analysis for Written Exam 7029.

104. For example, a chapter in the *Job Analysis Handbook for Business, Industry, and Government* published in 1988 described a nationwide job analysis of firefighter jobs. The project, performed in 1975 and 1976, concluded that non-cognitive attributes are important for successful performance of firefighters. Eleven of the 20 "required firefighter abilities and characteristics" reported in this nationwide study were non-cognitive in nature, as compared to only four that were cognitive, and five that were physical.

105. This work was performed "...under a contract from the U.S. Office of Personnel Management (OPM) with two functions. First, OPM wanted the study to serve as a model procedure, illustrating professional job analysis methods for personnel selection purposes, satisfying all legal requirements of the employee selection guidelines then in effect (1976). Second, it was to provide job information that local fire departments could use in developing their own firefighter selection procedures." (Bownas, 1988, p. 1255).

106. The non-cognitive attributes identified by this nationwide study were: Courage, Resistance to Stress, Teamwork, Activity, Responsibility, Desire to Learn, Getting Along with People, Honesty, Cleanliness, Medical Interests, and Construction Trade Interest. Though differing in labels, many of these are the same as those identified by Dr. Cline in her 2007 job analysis for the City of New York, as illustrated, for example, in Exhibit 2.

22

**Exhibit 2**

**Non-Cognitive Attributes Identified in Both a 1975-76
Nationwide Study and 2007 City of New York Job Analysis**

| 1975-76 Nationwide Job Analysis | 2007 Cline New York City Job Analysis |
|---|---|
| Resistance to Stress | Tolerance for Stress |
| Honesty | Integrity |
| Responsibility | Work Standards |
| Getting Along with People, Teamwork | Establishing & Maintaining Interpersonal Relationships |

107. The Department of Labor's O*NET (Occupational Information Network) provides another important source of information about work in hundreds of jobs and occupations in the U.S. workforce, including firefighters. O*NET, developed in the early and mid-1990s, was developed as the replacement for the Department of Labor's Dictionary of Occupational Titles (DOT) (Peterson, Mumford, Borman, Jeanneret, & Fleishman, 1995, 1996, 1999; Peterson et al., 2001). O*NET provides comprehensive job descriptive information including information about knowledge, skills, abilities, and work styles. The on-line summary report for municipal firefighters found in O*Net includes the non-cognitive skills, abilities, and work styles shown in Exhibit 3 (http://online.onetcenter.org/link/summary/33-2011.01).

**Exhibit 3**

**Examples of O*NET On-line Summary of
Non-cognitive Skills, Abilities, and Work Styles for Fire Fighters**

| | |
|---|---|
| Dependability | Being reliable, responsible, and dependable, and fulfilling obligations. |
| Cooperation | Being pleasant with others on the job and displaying a good-natured, cooperative attitude. |
| Coordination | Adjusting actions in relation to others' actions. |
| Concern for Others | Being sensitive to others' needs and feelings and being understanding and helpful on the job. |
| Service Orientation | Actively looking for ways to help people. |
| Social Orientation | Preferring to work with others rather than alone, and being personally connected with others on the job. |
| Initiative | Willingness to take on responsibilities and challenges. |
| Persistence | Persistence in the face of obstacles. |
| Attention to Detail | Being careful about detail and thorough in completing work tasks. |
| Self Control | Maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations. |
| Stress Tolerance | Accepting criticism and dealing calmly and effectively with high stress situations. |
| Active Listening | Giving full attention to what other people are saying, taking time to understand the points being made, asking questions as appropriate, and not interrupting at inappropriate times. |

108. These significant, nationwide, government-funded projects provide a long established history of the importance of several non-cognitive characteristics needed for effective performance of firefighter tasks. They illustrate the results to be expected in any comprehensive job analysis of the firefighter position.

109. Even the City's expert, Dr. Schemmer, acknowledged in his deposition testimony the importance of several of these characteristics for firefighters, and the possibility that the City could have administered a paper-and-pencil personality measure, available at the time and with small mean score differences between blacks and whites, to measure

24

such characteristics, increment validity, and reduce adverse impact (Schemmer Deposition, p. 280-306).

110. Most, if not all, of this job analytic information was available prior to the job analysis underlying the development of Written Exam 7029. Yet, the City's job analysis failed to explore either the physical or non-cognitive requirements of the firefighter job, a fatal flaw corrected at least to some extent in the more recent Cline (2007) job analysis.

111. Appendix D shows examples of firefighter examinations resulting from more comprehensive studies; examinations that incorporate non-cognitive elements. Most of the examinations were developed prior to 1999. The citations shown demonstrate the feasibility of measuring the broad range of job requirements associated with the firefighter job, not just those associated with cognitive demands.

XIV.    **The manner in which the job analysis underlying Written Exam 7029 was executed produced several additional flaws, all limiting the range of conclusions that can be drawn from the study.**

112. Using a series of numerical decision rules, those tasks identified by the City's Examination No. 7029 job analysis sample as composing the most important duties of the job, and those cognitive abilities rated as the cognitive abilities most important to effective performance were identified. Eighteen cognitive abilities and 111 tasks met the criteria set.

113. Here, though, information required to actually interpret the job analysis results is not provided. The study failed to answer any of the following questions:

   a) Were there any systematic differences in firefighter job duties or cognitive ability requirements as a function of duty assignment, location, participant tenure on the job, etc.? If so, what were they?

   b) To what extent did the nearly 200 firefighters agree on the profile of job duties and cognitive ability requirements they produced in completing the survey? Were the resulting data internally consistent and statistically reliable?

   c) When reviewed from a statistical analysis point of view, did the assignment of job tasks to task clusters "hold together," or should some of the tasks have been assigned to clusters with which they shared more commonality in importance or frequency of performance?

d) Were any of the 111 tasks and 18 cognitive abilities identified as important to the firefighter job <u>universally important</u>, or did certain groups of firefighters (locations, assignments, experience levels, etc.) rate them as critically important, whereas other groups of firefighters rated them as less important, resulting in average importance ratings sufficiently high so as to misleadingly label the tasks or abilities as "generally important?"

e) Were all of the cognitive abilities identified as important to the job actually important on "Day 1;" that is, were all of the abilities those that a new recruit must be capable of demonstrating in a fully effective fashion on their first day of employment, as opposed to acquiring them through training, experience, and practice?

114. The data necessary to answer many of these questions were collected and available for review. As executed, though, the job analysis study offered none of these reviews. Nor did the City's experts offer any such reviews. Analyses as fundamental as those needed to be confident in the basic statistical reliability of the job analysis data were not reported.

XV.   **"Linking judgments" provided by the City's panel of 12 firefighters were used, along with information obtained from the job analysis survey, to determine how many exam questions should be included in Written Exam 7029 for each of the nine cognitive abilities. Troubling in this stage of the project is information regarding the degree to which the 12 firefighters involved in producing the final written examination specification did not understand and perform their assignment.**

115. After administering the job analysis questionnaire, City staff asked a group of 12 firefighters to review the list of 111 "important tasks," grouped into 21 task categories (or "clusters"), and to judge the extent to which each of the 18 "important abilities" was required to perform each of the 21 "important task clusters."

116. At a minimum, this activity called for each of the 12 participating firefighters to make 378 judgments regarding the importance of each task category-to-ability relationship. Maximally, it required them to consider nearly two thousand (111 multiplied by 18) combinations of important tasks and important abilities. In either case, the 12 firefighters were asked to perform a task that would be highly demanding, even for individuals trained in job analysis, test design, psychological measurement, or human performance assessment. The group of 12 firefighters possessed no such training.

26

117. For example, the 12 firefighters were asked individually to judge the degree to which each of the 21 important task clusters required:

   *Flexibility of Closure: The ability to identify or detect a known pattern (like a figure, word or object) that is hidden in other material.*

118. This activity requires a noteworthy degree of knowledge regarding the underlying determinants of human performance, knowledge unlikely to fall within the training or experience of a firefighter or one who supervises firefighters. As a general rule, individuals asked to provide such judgments are trained in industrial psychology, tests and measurements, developmental psychology, or related fields.

119. In asking the linking panel to make these judgments, the City also counted on their results to accomplish a step critical to arguing the content validity of Written Exam 7029 – it used the linking panel judgments (along with ratings from the job analysis survey) to determine the number of questions that should be written for each of the nine cognitive abilities.

120. While this step might not have been a central job-relatedness issue if the City had undertaken a criterion-related validation of Written Exam 7029, it was critical if any argument of content validity is to be made. As executed, it is a key link in any argument that the content of the examination parallels the content of the job in a meaningful way.

121. There is ample evidence that those performing the linking analysis did not all understand, or follow, their assignment. First, for example, five of the 12 firefighters who were linking panel members linked virtually every job task cluster with every one of the 18 cognitive abilities. Although some of the five used the lowest, *"1 – Somewhat Important"* judgment in making these linkages, it strains reason, for example, that:

   * *Climbing and Portable Ladder Tasks* require *Written Expression Ability,*

   * *Clean Up/Pick Up Tasks* require *Oral Expression Ability,*

   * *Watch Duty Tasks* require *Spatial Orientation Ability, or*

   * *Salvage Tasks* require *Fluency of Ideas.*

122. In addition, review of the deposition transcripts for linking panel members provides further information concerning their lack of understanding of the task with which they were presented. For example, the deposition transcript of the individual coded as Rater #1, one of the linking panel members indicates that this individual:

27

- Did not understand the definition of the ability Problem Sensitivity (Rater #1 Deposition, p. 57).

- Did not understand the definition of the ability Inductive Reasoning (Rater #1 Deposition, p. 58).

- Did not understand the definition of the ability Visualization (Rater #1 Deposition, p. 61-62).

- Did not understand the definition of the ability Time Sharing (Rater #1 Deposition, p. 62).

- Disagreed with her own linkage of the ability Written Comprehension for seven of the eight task clusters on which she was questioned during deposition. "Because, again, it has nothing to do with the written word to perform these tasks." (Rater #1 Deposition, p. 69).

123. During deposition, the linking panel member coded as Rater #3:

- Regarding his ratings of the importance of the ability Inductive Reasoning, stated, "I probably didn't know what it meant, so I gave it a two since I didn't know what it was, quite frankly." (Rater #3 Deposition, p. 67).

- Regarding his ratings of the importance of the ability Deductive Reasoning, stated, "I don't believe I really knew what deductive reasoning was at the time of the examination." (Rater #3 Deposition, p. 72).

- Regarding his rating of the link between the ability Memorization and the task cluster Salvage, stated, "I can't give you an honest answer as to why I gave it a three." (Rater #3 Deposition, p. 81 – 82).

- Regarding his rating of the link between the ability Written Expression and the task cluster Providing Medical Assistance, stated, "So written expression I guess would be, there's no written expression. I guess it would be irrelevant to the situation of medical...I was looking at the wrong one. I would change the answer to zero." (Rater #3 Deposition, p. 91 – 92).

- Regarding his rating of the ability Deductive Reasoning to the task cluster Training, stated, "I didn't have an explanation of what deductive reasoning was, so to answer it I was just guessing." (Rater #3 Deposition, p. 93 – 95).

28

124. During deposition, the linking panel member coded as Rater #10:

- In discussing the importance of the ability Inductive Reasoning, responded, "I'm not sure. It's almost the opposite of deductive, right? Can somebody explain that to me, inductive, deductive?" (Rater #10 Deposition, p. 47 – 49).

- Again, "I really wasn't sure what they're trying to say by inductive reasoning to begin with." (Rater #10 Deposition, p. 49).

- In discussing the importance of the ability Spatial Orientation, responded, "This sounds like a – it's more of a physical thing, like I mean is it saying that is it important that firefighters wear their glasses? Is that what it's saying?" (Rater #10 Deposition, p. 51 – 52).

- Regarding his rating of the linkage between the ability Visualization and the task cluster Watch Duties, stated, "It's really not that important. Like I said, I put somewhat because I don't like zero." (Rater #10 Deposition, p. 94 – 95).

125. These, and many other comments gleaned from the linking panel members' deposition transcripts, suggest that the panel members were not equipped or assisted in gaining the understanding needed to perform their assignment.

126. Notably, the linking panel with which Dr. Cline worked in 2007, appears to have been conducted with a greater degree of oversight, explanation of the task to the panel members, quality control, and structure.

127. In summary, though linking panel members appear to have experienced problems in performing the task they were presented, their judgments were used to determine the number of questions that would be used to assess each of the cognitive abilities measured by the new written examination. In our professional opinion, this represents a fatal flaw in the information used to determine the test development plan for Written Exam 7029.

128. Further, if the linking panel members did not understand the definitions and meanings of the cognitive abilities with which they worked in executing their assignments, another question is raised: Did the sample of firefighters who completed the initial job analysis questionnaire have the same difficulty in understanding the cognitive abilities they rated with respect to importance in performing the firefighter job?

29

129. The answer to this question is unknowable, but the linking panel deposition transcripts raise serious questions in this regard. If the answer is "no," then the veracity of the overall job analysis data base on which Written Exam 7029 was based comes into question.

XVI. **The approach followed in developing Written Exam 7029 produced an examination that bore little relation to the range of abilities a) required by the job and b) amenable to paper-and-pencil testing. Not only did it fail to address any of the job's non-cognitive requirements, it failed to measure important cognitive abilities that could have been addressed by a paper-and-pencil examination.**

130. Using the results of the job analysis, the City determined that only nine of the 18 abilities identified as important to the job could be assessed by Written Exam 7029, leaving the other one-half to go unaddressed.

131. The result of this decision was to reduce further the overlap between Written Exam 7029 and the overall range of requirements important to success as an FDNY firefighter — even when considering only its cognitive ability requirements.

132. Those cognitive requirements retained for consideration in designing the exam included only: *Written Comprehension, Written Expression, Memorization, Problem Sensitivity, Deductive Reasoning, Inductive Reasoning, Information Ordering, Spatial Orientation, and Visualization.*

XVII. **In developing the City's 2007 written examination, Dr. Cline undertook development of a means to measure 20 of the cognitive and personal attribute requirements her job analysis had identified as important to performance of the FDNY firefighter job; 18 directly, and two (Written Comprehension and Time Sharing) indirectly. Abilities cited by the City as not amenable to paper-and-pencil measurement when it designed Written Exam 7029 were addressed in the Cline exam.**

133. Dr. Cline (2007) determined that, of the nine cognitive abilities eliminated from the design of Written Exam 7029, three could be measured directly and one could be measured indirectly through a written test. One of the nine cognitive abilities (Written Expression) the City set out to measure in Written Exam 7029 was determined by Cline as not sufficiently important to the job to be included in the new examination.

134. This, of course, does not take into account the additional non-cognitive abilities that Dr. Cline also added to her test development plan in order to better cover the broad range of the job's requirements.

30

135. Exhibit 4 below contrasts the test design decisions made by the City for Written Exam 7029 with those of Dr. Cline in creating the new Written Exam 6019. The left column of the exhibit shows the nine cognitive abilities addressed by Written Exam 7029, as well as the nine abilities (shown in italics) excluded from its exam development efforts. The right column shows the cognitive abilities included by Dr. Cline in developing the new Written Exam 6019.

**Exhibit 4**

**The Examination Development Plans Associated with Written Exams 7029 and 6019**

| Morrongiello Test Development Plan (1999) | Cline Test Development Plan (2007) |
|---|---|
| **Cognitive Abilities Selected for Written Testing** | **Cognitive Abilities Selected for Written Testing** |
| Written Comprehension | Written Comprehension (Indirectly) |
| Written Expression | |
| Memorization | Memorization |
| Problem Sensitivity | Problem Sensitivity |
| Deductive Reasoning | Deductive Reasoning |
| Inductive Reasoning | Inductive Reasoning |
| Information Ordering | Information Ordering |
| Spatial Orientation | Spatial Orientation |
| Visualization | Visualization |
| | Number Facility |
| *Not Selected for Written Testing* | |
| *Oral Comprehension* | |
| *Oral Expression* | |
| *Fluency of Ideas* | |
| *Originality* | |
| *Speed of Closure* | Speed of Closure |
| *Flexibility of Closure* | Flexibility of Closure |
| *Perceptual Speed* | Perceptual Speed |
| *Selective Attention* | |
| *Time Sharing* | Time Sharing (Indirectly) |

136. Counting the number of cognitive abilities addressed in common by both examinations (8), versus the number of cognitive abilities unique to one examination or the other (6), yields an index of the two examinations' overlap; that is, there is only approximately 57 percent ( 8 / 8 + 6 = .57) overlap in the cognitive abilities the two test developers set out to measure.

31

137. Adding to these values the seven personal abilities that Dr. Cline
included in her test design plan – *Adaptability, Tenacity, Integrity,
Work Standards, Resilience, Coordination*, and *Establishing and
Maintaining Interpersonal Relationships* – results in an overlap
between the two written exams of only about 38 percent (8 / 8 + 13 =
.38) in the abilities the two test developers set out to measure.

138. The narrowness in covering the firefighter job's most important abilities
inherent in Written Exam 7029 is underscored even further in Exhibit 5
below. Here, the cognitive and personal abilities deemed sufficiently
important to be included in the linking panel processes for Written
Exams 7029 and 6019 are presented.

139. The list of abilities is rank-ordered according to the average importance
rating awarded in the Cline (2007) job analysis sample. Where the
average importance ratings are the same to the first decimal place, they
are listed alphabetically within that value. Abilities targeted in
designing Written Exam 7029 are noted, as are those targeted in
developing Written Exam 6019. The two areas cited by Cline (2007) as
being measured indirectly by Written Exam 6019 are so labeled, as well.

140. Of note, the abilities identified by Cline (2007) as the focus for
examination development efforts differed little from one another in the
average ratings they received from the job analysis survey sample on the
five-point "importance" scale. Average values ranged from the highest
at 4.37 for Coordination, to the lowest at 4.00 for Resilience; virtually
equal in importance.

32

**Exhibit 5**

**The Abilities Addressed in Developing Written Exam 7029 and 6019**

| Ability | Type of Ability | Targeted In Developing Exam 7029 | Targeted In Developing Exam 6019 |
|---|---|---|---|
| Oral Comprehension | Cognitive | | |
| Coordination | Personal | | Yes |
| Oral Expression | Cognitive | | |
| Spatial Orientation | Cognitive | Yes | Yes |
| Tenacity | Personal | | Yes |
| Tolerance for Stress | Personal | | |
| Written Comprehension | Cognitive | Yes | Yes (Indirect) |
| Deductive Reasoning | Cognitive | Yes | Yes |
| Inductive Reasoning | Cognitive | Yes | Yes |
| Information Ordering | Cognitive | Yes | Yes |
| Integrity | Personal | | Yes |
| Interpersonal Relationships | Personal | | Yes |
| Problem Sensitivity | Cognitive | Yes | Yes |
| Speed of Closure | Cognitive | | Yes |
| Time Sharing | Cognitive | | Yes (Indirect) |
| Flexibility of Closure | Cognitive | | Yes |
| Memorization | Cognitive | Yes | Yes |
| Perceptual Speed | Cognitive | | Yes |
| Visualization | Cognitive | Yes | Yes |
| Work Standards | Personal | | Yes |
| Adaptability | Personal | | Yes |
| Fluency of Ideas | Cognitive | | |
| Number Facility | Cognitive | n/a | Yes |
| Resilience | Personal | | Yes |
| Written Expression | Cognitive | Yes | |

141. The exhibit underscores the relative importance of the non-cognitive areas addressed by Written Exam 6019. These attributes, part of the "content domain" of the firefighter job, go unaddressed in Written Exam 7029, as do cognitive abilities that were rated equivalent in importance to those addressed by the examination.

142. Demonstrably, Dr. Cline's experience also indicates that the City could have addressed (but did not) a broader range of the job's cognitive and non-cognitive ability requirements. The result: Written Exam 7029 offered content that overlapped only to a relatively minor degree with the full range of cognitive abilities required by the job; and even less with the combined cognitive and non-cognitive abilities addressed by Dr. Cline in Written Exam 6019.

33

143. In attempting to support Written Exams 7029 and 2043, the City's experts, Drs. Bobko and Schemmer, opine that:

> "It . . . also is clear that many cognitive demands are placed upon a firefighter. For example, mis-evaluation of priorities at a fire scene, or inappropriately carrying out fire suppression and extinguishing activities, can lead to extraordinary costs..." (Bobko & Schemmer, 2008, p. 27).

144. They go on to opine that:

> "The content of [certain] firefighter job tasks (e.g., use of information to determine, communicate, evaluate, and select things) clearly invoke cognitive processes." (Bobko & Schemmer, 2008, p. 28).

145. We agree with Drs. Bobko and Schemmer that cognitive abilities play a role in performing the firefighter job. However, Drs. Bobko and Schemmer admit they did no systematic analysis to determine whether Written Exams 7029 and 2043 measure the nine specific abilities the City set out to measure. In fact, in his deposition, Dr. Bobko indicated that the Bobko and Schemmer (2008) report was not addressing the nine cognitive abilities the written examinations set out to measure (Bobko Deposition, p. 293-294) when the authors concluded:

> "In sum, the cognitively-based written exams were developed following standard job analytic and test development procedures – thus speaking to their job relatedness." (Bobko & Schemmer, 2008, p. 28).

146. The admonition of testing expert Dr. Robert Guion (1998) bears repetition in the context of evaluating the opinions of Drs. Bobko and Schemmer, and in reaching conclusions regarding the content validity of Written Exam 7029. As Guion indicates:

> "Part of the argument of job-relatedness is that nothing substantial has been overlooked." (Guion, 1998, p. 61).

147. In our professional opinion, the Written Exam 7029 test development study "overlooked substantial things;" including cognitive abilities both relevant and amenable to measurement in an entry-level firefighter examination, as shown by Dr. Cline in the City's most recent test development effort for Written Exam 6019.

148. Moreover, the expert report of Drs. Bobko and Schemmer (2008) is silent regarding the job-relatedness of non-cognitive factors in performing the firefighter tasks they cite. For example, the City's experts gave no consideration to the fact that non-cognitive abilities,

34

such as Dr. Cline's *Adaptability, Resilience,* and *Coordination,* play a role in performing firefighter tasks, including the tasks Drs. Bobko and Schemmer (2008) cite in their expert report.

149. In his deposition, however, Dr. Bobko acknowledged that factors other than cognitive abilities are important to the firefighter job:

> Q:  What is the relative importance of physical abilities, cognitive abilities and personal attributes to the successful performance of the FDNY entry level firefighter job?
>
> A:  I don't know.  I can tell you they are all important based on the job analysis [done for Examination No. 6019], but that's all I can tell you. (Bobko Deposition, p. 45-46.)

150. In alluding to the feasibility of addressing the non-cognitive requirements of the firefighter job, Bobko and Schemmer state:

> "Particularly given the large numbers of applicants in New York City, the cost of administering and objectively scoring other types of exams at this stage appears to have been prohibitive and not feasible (e.g., structured interviews or work sample examples would be difficult to develop, administer, score and keep secure and equivalent across all applicants)." (Drs. Bobko & Schemmer, 2008, p. 29).

151. Again, however, in developing Written Exam 6019, Dr. Cline (2007) demonstrated that easily administered, objectively scored, secure approaches to measuring the job's most important cognitive and non-cognitive requirements are available and, in fact, were available at the time Written Exams 7029 and 2043 were developed.  Indeed, in his deposition, Dr. Bobko agreed that Written Exam 6019 met each of the administrative, scoring, and security objectives cited.   (Bobko Deposition, p. 329 – 332.)

152. It is our understanding based upon the transcript of Dr. Cline's deposition that Dr. Bobko participated in her job analysis and examination development work for Written Examination 6019 coincident with his involvement as an expert in this matter.

153. It is our professional opinion that the job analysis and test development work underlying Written Exam 7029 fails to meet the requirements of sound, professional practice.   It provides no convincing basis to conclude that the content of Written Exam 7029 rests on a thorough analysis and understanding of the variety of abilities and attributes important to performance of the FDNY firefighter job.  The linking

panel judgments on which its examination development plan was based appear to have been done without sufficient understanding on the part of the linking panel members. The job analysis work reported in the Morrongiello report offers insufficient evidence to establish content validity.

154. We have reviewed the plaintiff United States' expert report of Dr. Irwin Goldstein, also concluding that there is insufficient evidence of content validity to support the City's procedures, and we agree with the conclusions reached by Dr. Goldstein.

XVIII. **The "job analysis" work underlying development of Written Exam 2043 was executed even less effectively than that for Written Exam 7029. The minimal work performed here produced a self-fulfilling conclusion that earlier job analysis findings should be taken at face value in designing Written Exam 2043. It provides no basis for reaching a conclusion of content validity for the resulting written examination.**

155. The 2002 project undertaken to develop Written Exam 2043 did not involve a job analysis study, even one as narrowly focused as that conducted by the City in 1997-1998 to develop Written Exam 7029.

156. Instead, the project undertaken by the City to develop Written Exam 2043 can be characterized best as a "test item writing project." It offers no evidence of content validity.

157. As a result, the examination suffered the same shortcomings as Written Exam 7029 with respect to addressing only nine cognitive ability areas. Thus, Written Exam 2043 also fails the same comparisons reported above with respect to the most recent written examination, Written Exam 6019, designed by Dr. Cline.

XIX. **In fact, analysis of psychometric data produced by the administration of Written Exams 7029, 2043 and 6019 demonstrates that the more comprehensive job analysis and examination design work performed by Dr. Cline resulted in an examination fundamentally different from its two predecessors.**

158. As noted, Written Exam 6019 was based upon a much broader analysis of the firefighter job than were Written Exams 7029 and 2043. Design of Written Exam 6019 also was based upon Dr. Cline's conclusions that areas considered not amenable to paper-and-pencil assessment in the earlier examinations were, indeed, so measureable.

159. Psychometric analysis of data produced through administration of the three written examinations demonstrates that the decisions made by Dr. Cline resulted in a test that not only looked different than its predecessors; it produced different results.

examinations either can be considered to measure different attributes, or some other influence is affecting the scores of candidates on one test or the other.

171. The extent to which an expectation of similar rank ordering among candidates holds can be assessed statistically by computing the correlation between scores attained by a group of candidates completing multiple examinations. The magnitude of this correlation can be used to express the strength of the relationship – the similarity in candidate rank orders – between the examinations being compared.

172. In the current matter, review of the data bases provided to us for the three firefighter examinations showed that 2,667 of the candidates who completed Written Exam 7029 also sat, approximately three years later, for Written Exam 2043. A total of 479 who sat for Written Exam 7029 also sat for Written Exam 6019 in 2007. Exhibit 7 below shows the number of candidates who sat for other possible combinations of examinations.

### Exhibit 7

### Candidates Sitting for Written Exams 7029, 2043, and 6019

| Examination No. | Total No. Taking Exam at Left | No. Taking Exam at Left and 2043 | No. Taking Exam at Left and 6019 |
|---|---|---|---|
| 7029 | 17,145 | 2,667 | 479 |
| 2043 | 17,817 | n/a | 2,240 |
| 6019 | 22,056 | 2,240 | n/a |

173. According to Nunnally (1978), the correlation between two forms of a test should be no more than .20 smaller than the value of the test's internal consistency reliability coefficient in order for the two tests to be considered alternate forms of the same content. In other words, if a given test shows an internal consistency reliability of .80 and correlates with another test at a value of .65, then the two tests can be considered alternate forms under Nunnally's (1978) definition; .65 is within .20 of .80 (i.e., .80 - .65 = .15). If the two tests had correlated only .55 with one another, the decision would be different; .55 is not within .20 of .80.

174. In this case, the item analysis computer printouts provided by the City for the AM and PM administration sessions of Written Exams 7029 and 2043 provided information concerning the internal consistency reliability (KR-20) of the two exams. For the AM and PM administration sessions of Written Exam 7029, the candidate groups both produced internal consistency reliability (KR-20) values of .91.

39

187. In our professional opinion, the more comprehensive job analysis and examination design work undertaken by Dr. Cline in developing Written Exam 6019 shows the lack of job content coverage in the two predecessor examinations. This further supports a conclusion that Written Exams 7029 and 2043 do not demonstrate content validity for screening entry-level firefighters.

**D. In turning its attention to evidence of criterion-related validity, the report of the City's experts proposes that other jurisdictions' firefighter test validation studies support the use of written cognitive ability tests by the City under a "validity generalization" argument. The single validity generalization research study for firefighters that the City's experts cite actually shows contrary findings.**

XX.       In their report, defendant's experts appear to propose that "validity generalization" supports the City's use of Written Exams 7029 and 2043. They apparently argue that meta-analysis, a quantitative approach to summarizing the results of multiple criterion-related validity studies, supports a criterion-related validity argument for the two written examinations. They are incorrect.

188. Meta-analysis is a set of methodologies that researchers use to explore and summarize results across many research studies. The method seeks to identify the overall conclusions that can be said to emerge from a cumulative body of research reflected in individual studies.

189. Validity generalization is a specific form of meta-analysis. In validity generalization, correlations between predictor (selection procedure) scores and criteria (job performance measures) assembled from multiple criterion-related validity studies are summarized in an attempt to learn whether the individual studies' patterns of results can be said to "generalize" across the studies reviewed and, potentially, to situations where no specific study has been conducted; e.g., to the City's use of a written cognitive ability test in screening firefighter candidates when no local criterion-related validity study has been completed.

190. In their expert report, Drs. Bobko and Schemmer reference a meta-analysis of entry-level firefighter validation studies prepared by Barrett, Polomsky, and McDaniel (1999). The study purports to summarize correlations (criterion-related validity coefficients) between cognitive ability tests and measures of job performance of firefighters.

191. In fact, the Barrett et al. (1999) study is the only criterion-related validity information that Dr. Bobko reported considering in forming his

conclusions about Written Exam 7029 and 2043, as indicated during his deposition:

> Q: The only criterion-related evidence you talk about for firefighters is that Barrett article, right?
>
> A: Correct. (Bobko Deposition, p. 201 – 202).

192. When questioned again:

> Q: Let me make sure of one thing. In your report, you didn't cite any other criterion study on firefighters; is that right?
>
> A: That's correct. (Bobko Deposition, p. 215).

193. Drs. Bobko and Schemmer conclude that the Barrett et al. (1999) study provides evidence of validity generalization (job-relatedness) for written cognitive ability examinations. In essence, Drs. Bobko and Schemmer argue that positive findings of criterion-related validity studies for other tests should be considered to "generalize" to the City's use of Written Exams 7029 and 2043.

194. In considering the expert report of Drs. Bobko and Schemmer, it is important to understand how meta-analysis actually works. The procedure involves computing an average criterion-related correlation coefficient, based upon the individual validity coefficients reported across all the studies a researcher, such as Barrett et al. (1999), has collected.

195. In each of the individual validity studies included in such a meta-analysis, test developers have determined whether scores attained on their tests correlate with measures of actual on-the-job performance. They use correlation coefficients – sometimes referred to as "validity coefficients" – which are computed to express the direction and strength of this relationship. Correlation coefficients range between -1.00 and +1.00.

196. For example, a correlation (validity) coefficient with a value of .00 (zero) between candidates' test scores and subsequent measures of on-the-job performance indicates that there is no relationship between scores on the test and on-the-job performance. In this case, the test would be said to show no (zero) evidence of criterion-related validity. It would be said to have no value as a tool for predicting candidates' subsequent on-the-job performance.

197. A correlation (validity) coefficient greater than zero between test scores and, for example, supervisory ratings of performance effectiveness would indicate that there is a positive relationship between scores on the test and subsequent on-the-job performance.

198. Correlation (validity) coefficients also may be less than zero. A negative correlation between test scores and, for example, the number of disciplinary actions in which an employee has been involved actually reflects positively on the test. The higher the test score, the fewer disciplinary actions. Of course, observing a correlation (validity) coefficient of less than zero when a positive one is logically expected would raise questions about the criterion-related validity of a test.

199. In conducting criterion-related validity studies it is essential to determine whether the correlation (validity) coefficient for a given set of data is sufficiently different from zero to conclude that use of the test is "valid." To this end, researchers generally adopt statistical standards for determining whether a given correlation (validity) coefficient, computed for a given set of data, can be viewed as "statistically significant." These standards actually amount to determining whether the correlation (validity) coefficient may be considered "significantly different from zero."

200. Meta-analysis moves beyond this study-by-study review of validity (correlation) coefficients, and seeks to identify overall patterns that apply across a large number of studies. The meta-analysis model assumes that any variation around the average correlation computed across many individual studies is due to a) the fact that the various research study samples come from different settings with different types of measurement errors that affect the predictor and criterion measures on which the studies' validities are computed, or b) real differences (in the predictor, the job the applicants, etc.) that lead the validities to actually be different in different settings. Meta-analysis tries to explain the variance as due to sample differences and typical measurement errors.

201. Thus, the smaller the variation around the average correlation, and the larger the size of the average correlation computed in a meta-analysis study, the greater the probability that one can conclude that "validity generalizes" across all the studies summarized and, by inference, to other similar settings.

202. If the average validity is small or the variation is great and cannot be explained by typical measurement error or sample size differences, then the meta-analysis must conclude that "validity does not generalize" across the studies summarized, much less to other similar settings.

XXI.    **As in any analysis, the confidence placed in the findings of a given meta-analysis study is a function of the comprehensiveness and objectivity with which it seeks out and assembles the individual studies on which it is based. No bias can be present in the choice of studies that are selected for the analysis, lest the study's overall conclusions be similarly biased. The Barrett, Polomsky, and McDaniel (1999) study fails in this regard.**

45

203. Meta-analysis serves to summarize as many appropriate, independent research studies as its author can collect. While conditions (the size of the studies, their dates of execution, the metrics involved, etc.) can be set on the specific studies entered into a given meta-analysis, little pre-selection typically takes place, lest such selectivity bias the conclusions of the overall analysis. This, of course, means that studies of widely differing magnitude, quality, and impact on a given area of inquiry are treated as "equals" in such an analysis. Poorly done research is not differentiated from research done well in aggregating meta-analysis data bases.

204. It is well known, too, that research which produces findings of little note (e.g., criterion-related validation studies failing to find evidence of statistically significant validity) often is not published and, hence, does not come to the attention of researchers conducting meta-analysis studies. In the professional literature, this eventuality is referred to as "the file drawer phenomenon." (See, for example, Rosenthal, 1979; Roth, Bevier, Bobko, Switzer, and Tyler, 2001)) with the label illustrating the fact that studies with non-consequential findings often "disappear into the file drawer," rather than being published for others to find in the course of a meta-analysis review.

205. Any bias toward only those studies that show statistically significant results being published (and located by a meta-analysis researcher) would be expected to bias meta-analyses of criterion-related validity research, leading them to show greater evidence of "validity generalization" than might actually be true.

206. Hence, meta-analysis researchers are admonished to search diligently, and to include all research studies possible in their reviews. In meta-analysis, professional practice calls for locating as many individual studies as possible, whether their individual findings have been supportive of validity for a given type of selection procedure or not.

207. In this regard, even casual inspection of the Barrett et al. (1999) study reveals a number of criterion-related validity studies missing from what is represented as a "comprehensive review and meta-analysis" (Barrett et al., 1999, p. 507).

208. Without undertaking a comprehensive search for validity studies of selection tests for firefighters, the authors were easily able to locate studies predating, yet missing from, the Barrett et al. (1999) meta-analysis, including:

- Morris & McDaniel (1989). *Report on the Validation Study for the IPMA National Firefighter Examination.* Alexandria, VA: International Personnel Management Association.

- Bownas, D. A., Rosse, R. L., & Dunnette, M. D. (1977). *Construct Validation of a Selection Battery for the Entry Level Firefighter Position*. Personnel Decisions Research Institute Report 15. Washington, DC: U.S. Civil Service Commission.

- Heckman, R. W. (1973). *Saint Paul Firefighter Validation Study*. (Report Submitted to The City of Saint Paul). Minneapolis, MN: Personnel Decisions, Inc.

- Arvey, R. (1971). *Report on Test Validation Study: Minneapolis Civil Service Firefighter Jobs*. Minneapolis, MN: Personnel Decisions, Inc.

209. Further, on review, all four of these studies included cognitive ability tests and mechanical ability tests, just as those Barrett et al. (1999) set out to analyze. Importantly, in all four studies the criterion-related validities reported were lower than the average validities reported by Barrett et al. (1999). In several instances, the validities were dramatically lower. The "comprehensive review" reported by Barrett et al. (1999) did not incorporate these findings.

210. Further, in their study summary (abstract), Barrett et al. (1999) claim their analyses were based on data from 101 samples (Barrett et al., 1999, p. 507). A review of their Appendix B (Barrett et al., 1999, p. 513) reveals that the data actually came from a total of 25 samples; correctly stated, the 25 samples produced 101 validity coefficients.

211. Drs. Bobko and Schemmer similarly report the number of samples as "more than 100 samples" (Bobko & Schemmer, 2008, p. 27), again overstating the size and scope, and thus the significance, of the Barrett et al. (1999) study.

212. In addition, Barrett et al. (1999) report: "For job performance criteria, data from 73 independent samples comprising 9,515 individuals were obtained." (Barrett et al, 1999, p. 509).

213. Again, Barrett et al.'s (1999) representation of their meta-analysis sample is misleading. For example, reference to the report's Appendix B shows that, in truth, there were no more than 25 independent samples in the entire study.

214. Dr. Bobko appeared to recognize the mischaracterization of the Barrett et al. (1999) study when a copy of the Barrett et al. (1999) publication was presented to him as Exhibit 620 during his deposition. For example:

47

> Q:   Would you look at the last page of this Exhibit 620 and
>      see Appendix B at the bottom of that page. Do you see
>      that?
>
> A:   Yes.
>
> Q:   How many samples does this indicate the author used?
>
> A:   25. I count 25.
>
> Q:   So it wasn't over 100, right?
>
> A:   25 is certainly less than 100.  (Bobko Deposition, p.
>      204 – 205).

215. Further, nineteen of the study's 101 correlation coefficients were drawn
     from one sample; a criterion-related validation study executed in
     Columbus, OH (Kriska & Hines, 1984). Hence nearly twenty percent of
     the data base summarized by Barrett et al. came from a single study.
     Another approximately 20 percent was drawn from only two additional
     samples (Murdy & Norton, 1972; Psychological Services, Inc, 1983).
     During his deposition, Dr. Bobko acknowledged this additional
     shortcoming:

> Q:   Now, if you look back at Appendix B, for one of the
>      studies the authors say, and I believe this is the Kriska
>      & Hines, there were 19 r's from one sample, right, do
>      you see that?
>
> A:   Yes, I do.
>
> Q:   So for all we know, the 24 r's listed in Table 1 for
>      cognitive tests all came from no more than a handful of
>      independent samples, right?
>
> A:   Again, I can't answer that question if there were
>      independent subsamples.
>
> Q:   Does it say that anywhere in the report?
>
> A:   It doesn't say that anywhere.
>
> Q:   The issue of independent samples is pretty important
>      for meta-analysis, right?
>
> A:   I think so.  (Bobko Deposition, p. 210 – 211).

216. Barrett et al. (1999) describe the studies as having been "conducted over
     the past two decades" (Barrett et al., 1999, p. 509), which would include
     1979 to 1999. Dr. Bobko agreed during his deposition that "the last two
     decades" would be considered to include 1979 to 1999.  (See Bobko
     Deposition, p. 202 – 203).

217. Yet an examination of Barrett et al.'s Appendix B reveals that the
     studies were conducted between 1958 and 1986. None of the studies

48

was conducted in the 1990s; the majority of the studies were conducted prior to 1979. Hence, most are today over 30 years old.

XXII.    **The Barrett et al. (1999) meta-analysis study summarized criterion-related validities separately for cognitive tests, mechanical comprehension tests, and tests that combined both cognitive and mechanical components. The City's written examinations do not include a mechanical comprehension component. They are tests of cognitive ability, as the City's experts indicated. Contrary to the report of Drs. Bobko and Schemmer, the Barrett et al. (1999) study reveals that such tests do not show evidence of validity generalization in predicting firefighter job performance.**

218.    Meta-analysis is used inferentially to accept or reject the hypothesis that there is no relationship between the variables (e.g., between tests scores and measures of performance) being studied. In the Barrett et al. (1999) study, meta-analysis was used to accept, or reject, the hypothesis that cognitive ability tests are correlated with the job performance of firefighters.

219.    The statistic that is computed through meta-analysis techniques to guide this decision is referred to as a "credibility value" (CV). The CV traditionally is determined by computing the "90 percent CV". The simple interpretation of the 90 percent CV is that, based upon all the studies summarized in the meta-analysis, one can conclude with 90 percent certainty that the "true validity" of the selection procedure the researcher is investigating (here, cognitive examinations) falls at or above the 90 percent CV value.

220.    Since the task of a meta-analysis is to determine whether the true validity is greater than zero, researchers frequently refer to "90 percent credibility" that the true validity is greater than zero.

221.    Barrett et al. (1999) found the 90 percent CV for the validity of cognitive ability tests in predicting the job performance of firefighters was -.03. Thus, the estimated population distribution of validity coefficients was so large ($\sigma_p = .35$) that the 90 percent CV was below zero.

222.    During his deposition, Dr. Bobko acknowledged this finding:

Q:    Based on that negative -.03, wouldn't it be fair to say one cannot have 90 percent confidence that the true validity is different from zero?

A:    Sure, for cognitive ability tests. (Bobko Deposition, p. 214).

49

223. In short, the validity of cognitive ability tests for predicting firefighter job performance, as reflected in the Barrett et al. collection of studies, does not generalize – it could not be stated with 90 percent confidence that the true validity was greater than zero.

224. Although, in his deposition Dr. Bobko attempted to argue that Written Exams 7029 and 2043 could possibly be characterized as measuring a combination of cognitive and mechanical abilities, rather than as cognitive ability tests, his assertion was based on an apparent misreading of one sentence in the Barrett et al. (1999) report stating that combinations of spatial and mechanical tests were considered mechanical for purposes of the meta-analysis. (Bobko Deposition, p. 215 – 219).

225. Dr. Schemmer, who had drafted the section of the City's expert report addressing the Barrett et al. (1999) study, correctly admitted that Written Exams 7029 and 2043 do not include mechanical ability items. (See Bobko Deposition, p. 215 – 219 and Schemmer Deposition, p. 236 – 237). They are cognitive tests.

226. Moreover, even use of the 90 percent CV may result in unacceptably high error rates; in other words, it might be an overly lenient basis for concluding validity generalization. For example, Kemery, Mossholder, and Dunlap (1989) investigated the use of the 90 percent CV that Pearlman, Schmidt and Hunter (1980) advocated and that, as noted above, has become a standard practice by other Industrial/Organizational psychologists. They concluded that "...the 90% CV consistently provided evidence of transportability when approximately 30 percent of the correlations came from a *rho* of zero..." (Kemery et al., 1989, p. 170).

227. In other words, Kemery et al. (1989) found that the typical 90 percent CV approach to determining evidence of validity generalization actually may lead 30 percent of the time to concluding that validity <u>does</u> generalize when the true validity <u>is no different than zero</u>.

228. In effect, the Barrett et al. (1999) study failed to support validity generalization for cognitive ability tests in predicting the job performance of firefighters, even though the standard Barrett et al. applied was even more lenient than one might think without reviewing the Kemery et al. (1989) research.

229. In our professional opinion, the Barrett et al. (1999) meta-analysis study cited by Drs. Bobko and Schemmer in their expert report does not provide evidence that Written Exams 7029 and 2043 are valid (job related) based on a conclusion of "validity generalization" from

criterion-related validation studies done for other cognitive firefighter tests.

230. After considering the issues discussed above and raised in his deposition, Dr. Bobko's opinion of the Barrett et al. study appears to be less than strong, as well. During his deposition:

> Q:   In your opinion, what is the quality of this Barrett article?
>
> A:   It was higher before an hour ago. (Bobko Deposition, p. 214.)

231. Further, the reference in the report of Drs. Bobko and Schemmer to the earlier Landy et al. (1992) study as "invoking validity generalization" is unsubstantiated. In fact, both admitted during their depositions that they undertook no work to compare the test development plan followed by Landy et al. (1992) with that followed by the City in developing Written Exam 7029 and 2043. (See Bobko Deposition, p. 31; Schemmer Deposition, p. 156).

232. Yet, Drs. Bobko and Schemmer (2007) report that Landy et al. (1992) "invoked validity generalization" from results of a Washington D.C. criterion-related validation study, also executed by Landy Jacobs and Associates, in developing their items for New York City. (Bobko & Schemmer, 2008, p. 27, footnote 34).

233. Drs. Bobko and Schemmer neither present nor discuss any of the earlier study findings on which this "invocation" might be based. Indeed, no document produced by the City provides any information regarding the Landy et al. Washington, D.C. criterion-related validity study.

234. On further exploration, though, Dr. Bobko appears to attach little weight to this "invocation" of validity generalization. In his deposition:

> Q:   What's your opinion of the transportability study that Landy, Jacobs did as reported in this document?
>
> A:   I know there was a transportability study, or I believe there was some use of transportability from one city to another, but I haven't formed an opinion about that aspect of it. I wasn't asked to.
>
> Q:   So do you have an opinion as to whether it was a sufficient basis to establish the validity of the written and physical exam established by Landy for New York?
>
> A:   I don't have an opinion. (Bobko Deposition, p. 31 – 32).

51

235. In addition, it is unclear how a single criterion-related validation study such as that of Landy et al. (1992) can be used to posit "validity generalization," a concept typically based upon the meta-analysis of many independent validation studies, as discussed above. The techniques of meta-analysis do not apply to a single study.

236. Landy et al. (1992) might have argued "validity transportability" for the Washington, D.C. criterion-related validation study findings, had they "transported" the same test developed in Washington, D.C. to the City of New York. They did not do this. Instead, they relied upon a showing that the tasks performed by FDNY firefighters were similar to those performed by firefighters in Washington, D.C. to draw two inferences:

- Firefighter ability requirements in the two locations are the same.

- A new test, designed for the City to measure the same cognitive abilities measured in Washington, D.C., would show the same validity findings noted in Washington, D.C.

237. It is impossible to evaluate these inferences, as the City has produced no information regarding the Landy et al. criterion-related validity study executed in Washington, D.C.

238. The fact that neither of the written examinations now at issue, Written Exams 7029 and 2043, is the examination developed by Landy et al. for Washington, D.C. – or even the one developed by Landy for the FDNY - obviates any argument of validity transportability. The argument is without merit.

239. In our professional opinion, by alluding to the Landy et al. criterion-related validity study conducted in Washington, D.C. as "invoking validity generalization," Drs. Bobko and Schemmer are grasping at straws, reaching for evidence of job-relatedness in an area not supported by any of the information provided by the City.


**E. The cut-off score used to determine pass versus fail status on Written Exam 7029 bears no demonstrated relationship to identifying those candidates minimally qualified to perform the firefighter job.**

XXIII.    The City's job analysis and test development materials provide no explanation of the process followed to arrive at the qualifying (i.e., cut-off) score for Written Exam 7029 – 84.705. No information is provided regarding this score's relationship with expected job performance, its linkage with any aspect of the job analysis process, or its statistical

**connection with factors such as test reliability, standard error of measurement, etc.**

240. Before addressing the cut-off score issue, we emphasize again that our discussion assumes (contrary to our actual opinion, detailed above) that Written Exams 7029 and 2043 are valid. Because we conclude that the written examinations are not valid, the test should not be used at all and no qualifying, or cut-off, score would be appropriate.

241. We also note again that, as explained earlier, validity does not reside only in a selection procedure itself, but also in how the scores produced by the procedure are used. As one of the City's experts stated in deposition:

"[B]ecause validity is as much a function of the process and application of the test as [of] the test itself, . . . certainly validity can be affected by an improper application or inference as validity doesn't follow the test around." (Schemmer Deposition, p. 244).

242. For example, as Dr. Schemmer admitted during his deposition, no matter how valid the exam, it is the cut-off score that determines who passes and fails a given examination, and a cutoff score unrelated to job performance may well lead to the rejection of applicants who are fully capable of performing the job. (Schemmer Deposition, p. 244).

243. The City does not contend that the cut-off score corresponds to the level necessary to ensure the minimum level of skill needed to perform the job. (See, for example, Defendant's Supplemental Response and Objections to Plaintiff United States' Interrogatories (Nos. 29 – 31), Responses to Interrogatory Nos. 29 and 30).

244. In our opinion, even if we were to assume that Written Exam 7029 were valid, the cut-off score of 84.705 would be above the minimum qualifications necessary to perform the job and thus excluded candidates likely to be successful job performers. During deposition, current and former City representatives agreed. (See, for example, Wachter Deposition, p. 85 – 86 and 179 – 180; Patitucci Deposition, p. 41 – 44).

245. The City, in setting the cut-off score on Written Exam 7029, did not follow professional practice. The result was a cut-off score unrelated to actual performance requirements.

246. In their 1988 publication, Drs. Wayne Cascio, Ralph Alexander, and Gerald Barrett describe methods by which pass versus fail qualifying, or cut-off, scores are set appropriately. The authors describe norm-referenced methods, content-related methods, and criterion-related methods (Cascio, Alexander, & Barrett, 1988).

259. The same criticisms presented above apply with respect to the City's establishment of its qualifying standard for Written Exam 2043.

260. Again, as shown by plaintiff expert Dr. Siskin (2007), this cut-off score resulted in a statistically significant disparate impact upon African-American and Hispanic test takers. Hence, a cut-off score with no demonstrated, or even alleged, relationship with job performance was used in a manner that produced disparate impact.

261. In our professional opinion, the qualifying standard established for Written Exam 2043 is not job-related or consistent with business necessity.

F. The City's rank-order processing/selection of candidates based on the City's combination of written examination and physical performance test (PPT) scores fails to satisfy either job-relatedness or business necessity.

XXV.    The City combined candidate scores on Written Exam 7029 and the PPT by: a) computing the candidate's standardized written exam score; b) computing the candidate's standardized PPT score; and c) adding the weighted standard scores, each multiplied by .50. This score was then multiplied by 18.472906403940886699, and the value 83.74384236453 was added to produce a final score.[1] There is no evidence that the resulting score is related to the performance of a New York City firefighter.

262. As explained earlier, validity does not reside only in a selection procedure itself, but also in how the scores produced by the procedure are used. Thus, as Dr. Schemmer admitted during his deposition, when composite scores are used, the supporting evidence must pertain directly to the specific score or score combination used. (Schemmer Deposition, p. 244 – 247).

263. For Examination No. 7029, candidates were processed and selected in rank order of their combined written examination and PPT scores (plus bonus points). Based upon a variety of flaws discussed below, it is our professional opinion that use of the rank-ordered list of candidates was not justified.

264. The City offers no justification for the procedure used to compute overall examination scores. In fact, the report of the City's experts, Bobko & Schemmer (2008), offers no support for the process followed

---

[1] Applicable bonus points (i.e., Residency Credit, Legacy Credit, and Veterans Preference points) were added to arrive at a final score for the candidate.

in combining the written and PPT scores, other than to acknowledge that it takes place:

> "Exam scores for the written exam and the physical exam were then standardized, and a composite was formed where each of these two components was weighted 50%." (Bobko & Schemmer, 2008, p. 28, footnote 36).

265. During his deposition, Dr. Bobko admitted having provided no opinion regarding the method used to combine candidate scores on the written exam and PPT:

> Q: And you don't say anything in your report about whether the method the City used to combine the written exam scores and PPT scores was appropriate, correct?
>
> A: Correct. (Bobko Deposition, p. 329).

266. However, the City's most recent test developer, Dr. Cline, in a May 19, 2005 memorandum to file, stated:

> "It seems to me looking at the score distributions, that there is really no "right" way to combine the scores." (Cline Memorandum, 2005, p. 1).
>
> "... I am guessing that something funny may be going on in the physical test score distribution." (Cline Memorandum, 2005, p. 2).
>
> "I think we really need to look at the physical score distribution to see how "abnormal" it is." (Cline Memorandum, 2005, p. 4).

267. We believe Dr. Cline was correct in her concern about the score distribution for the PPT. The City standardized the PPT scores before they were combined with standardized scores on the written examination to generate a rank-ordered list of candidates.

268. The process of standardizing scores (computing z-scores) is based on an assumption of a normal (bell-shaped) distribution of scores. The PPT score distribution was strikingly non-normal. Instead of a smooth bell-shaped curve, a full 69.5 percent of the candidates who passed the PPT and were listed on the final eligibility list received a perfect score on the PPT.

269. This represents a major violation of the assumptions underlying the use of standardized scores. As Dr. Cline admits:

57

"The z transformation assumes some sort of quasi-normality…" (Cline, 2005, p. 1).

270. During his deposition, the City's expert Dr. Schemmer agreed that the distribution of PPT scores was non-normal. He indicated that scores on the written examination were non-normal, as well. (Schemmer Deposition, p. 215 – 218).

XXVI. **Because the distribution of non-standardized PPT scores is strikingly different from a normal bell-shaped distribution, the resulting standard scores are not useful for rank-ordering candidates. Similarly, when standard scores for the PPT and standard scores for the written examination are combined, the overall scores are, again, not useful for rank-ordering candidates.**

271. The City's PPT consisted of eight parts or "events," each of which asked candidates to perform a specific, physically-focused activity that was scored pass-fail, based upon the amount of time the candidate spent performing the event. No differentiation was made among candidates based upon the actual amount of time required for them to complete each event; only upon their ability to complete the event within the allotted time.

272. The City required that candidates pass six of the exam's eight events in order to be eligible for placement on the final rank-ordered eligibility list. As a result, only three possible "raw" passing scores existed for candidates whose PPT results would be combined with their written exam scores: 75 percent, 87.5 percent, and 100 percent, corresponding to passing six, seven, or all eight events. The City provides no justification for this scoring procedure. The City's experts do not even mention it in their report.

273. As Dr. Siskin points out in his July 2008 report, the manner in which the City scored the PPT means that extremely small differences in performance on the PPT could produce unjustifiably large differences in candidates' PPT scores; e.g., failing one event by just one second costs a candidate 12.5 points on the zero to 100 scale used to award PPT points. (Siskin Report, July 2008, p. 22 – 25).

274. Further, a candidate who passed seven of the eight PPT events with exceptional performance on the seven events, but failed the cut-off score on one event by only one second, still would receive a score of 87.5. Yet, another candidate who barely passed all 8 events would receive a score of 100. This aspect of the individual PPT event cut-off scores results in a person who might be <u>less</u> physically capable receiving a <u>higher score</u> than one who is more physically capable, thereby producing

58

a significant reversal in their final rank order due to the crude and imprecise scoring method applied to the PPT.

275. Dr. Cline, in her memo to file dated May 19, 2005, also commented on the lack of precision in the PPT scores. She stated:

"…it is apparent to me that the physical test is on a much coarser (or cruder) scale than the written test, and does not differentiate among candidates as well as the written test does." (Cline Memorandum, 2005, p. 1).

276. Dr. Cline went on to say:

"Thus, a score of 8 (100%) probably includes people who barely scraped through all eight events, as well as those people who performed really well on all eight events." (Cline Memorandum, 2005, p. 1).

277. In our professional opinion, the City's method of scoring the PPT is not useful for differentiating between and among candidates. Differences in candidates' physical abilities can be exaggerated in many instances, and masked in others. Any rank ordering of candidates that is based, even in part, on such a scoring method is flawed.

278. Moreover, the City has not justified the cut-off scores/times on each of the eight PPT events. The report of the City's experts, Drs. Bobko and Schemmer, does not mention the PPT cut-offs. Notably, the physical test the City adopted for use as part of Examination No. 6019 (the CPAT), which consists of eight events much like those included in the PPT, does not have individual event cut-offs and is scored based on the candidate's overall performance on all eight events.

279. According to the report of Dr. Landy (1999), the expert who originally implemented the PPT for the City in 1992, the:

"…cut scores for each event were calculated at a raw score corresponding to the 16th percentile of incumbent performance for each event." (Landy, 1999, p. 15).

280. However, the incumbent firefighters Landy (1999) used to establish these cut-off scores for each event were both probationary firefighters who had just completed academy training, and non-probationary firefighters. Landy (1999) did not report the number of probationary versus non-probationary firefighters who were in the sample, nor did he report the percent of the sample that consisted of probationary firefighters.

59

281. Dr. Landy (1999) acknowledged that:

> "[n]ormally, the incumbent sample would only include a representative sample of the fire department's working firefighters. However, due to a lack of union support, the participation of probationary firefighters was needed as well." (Landy, 1999, p. 14).

The result is that the cut-off score for each of the eight events would be expected to fail 16 percent of newly hired firefighters who, as a group, were very likely to perform better on the PPT events than is typical for a "representative sample of the fire department's working firefighters."

282. Hence, even if the standardization process were a reasonable procedure for the data set (which it was not), the raw, non-standardized PPT score with which the process commences lacks justification.

283. Written Exam 7029 also has imprecision in its measurement of cognitive abilities. As described in earlier sections of our report, Written Exam 7029 does not include measures of many skills and abilities important to effective performance in the job of firefighter. As a result, the final rank ordering of candidates on Examination No. 7029 is devoid of important information about candidate skills and abilities that are required in order to perform the job.

XXVII. **The illusion of precision in computing candidates' scores to more than ten decimal places is contradicted by the fact that the City does not even posit an estimate of the reliability associated with candidates' combined written examination and PPT scores. In fact, the reliability of the combined score appears to be unknown.**

284. In spite of all the problems discussed above, and the resulting lack of accuracy in measuring needed skills and abilities, the City, in calculating each candidate's final score for Examination No. 7029, multiplied each candidate's combined score on the written examination and PPT by 18.472906403940886699 and then added 83.74384236453.

285. The resulting appearance of accuracy is an illusion. In truth, candidates on the final eligibility list received one of only 42 different possible scores; one of only 14 possible passing scores on the written exam (72 through 85 items answered correctly) and one of only three possible passing scores on the PPT (six, seven, or eight exercises passed).

286. Although the illusion is less egregious for Examination No. 2043, the numbers (i.e., 12.7226 and 88.4606) still suggest a much greater accuracy of measurement than is present.

60