**EXHIBIT V**

# REPORT

in the matter of

## United States of America v. City of New York

by

*Bernard R. Siskin*

---

**Bernard R. Siskin, Ph.D.**
**Director and Head of Labor Practice Group**

**LECG**
**Philadelphia PA**

**July 2008**

-5-

Exams 7029 or 2043 measure different, distinguishable abilities as the City intended, then items that measure the same ability (*e.g.*, the 12 items that measure Problem Sensitivity) should relate more closely to each other than to items measuring different abilities.  To the extent that items may measure a common construct (*e.g.*, general intelligence), items also will be correlated across abilities to some degree but, since the items are purportedly designed to measure specific, discrete abilities, they should be much more highly correlated with other items measuring the same ability.  That is, one would expect the items intended to measure the same ability to be more highly correlated with each other than with items intended to measure other abilities.[2]

8.    The average correlations between items intended to measure the same ability and items intended to measure different abilities are presented in Tables 1 and 2 (for Written Exams 7029 and 2043, respectively).  In this context, the correlation coefficient is a measure of the relationship between test items.  Correlation values range from 0 (indicating no relationship) to 1 (indicating perfect relationship).  Items that measure the same ability should be highly correlated.  Items that measure different abilities should be correlated only to the extent that they are both affected by some common factor, such as general intelligence, and, thus, should have a lower correlation.  Tables 1 and 2 show the correlations for each of the item sets representing the nine cognitive abilities.  Looking at any column in these tables, the first value reported is the average correlation between items intended to measure the same cognitive ability.  For example, on Table

---

[2] *See* Nunnally, J. C., (1978). *Psychometric Theory*, pp.103-05.  New York: McGraw-Hill; Guion, R. M., (1998). *Assessment, Measurement, and Prediction for Personnel Decisions*, p. 185.  Mahwah, NJ: Erlbaum.  Dr. Catherine Cline, who (with one of the City's expert witnesses, Dr. Bobko) developed Written Exam 6019, agrees.  *See* Dep. Test. of Catherine Cline, March 24, 2008, p. 322; Dep. Test. of Philip Bobko, July 1, 2008, pp. 188-89 (saying that to determine whether the written exams succeeded in measuring each of the nine abilities, Dr. Bobko would see whether items measuring the same ability correlated with one another).

-6-

1, we see that the set of items intended to measure Deductive Reasoning on Written Exam 7029

had an average correlation to each other (*i.e.*, a within-ability correlation) of 0.139. Table 1

further shows that those same Deductive Reasoning items correlated 0.136, on average, with the

items intended to measure Inductive Reasoning, and correlated 0.135, on average, with the items

intended to measure Information Ordering. Looking at all the values in the Deductive Reasoning

column of Table 1, we see a higher average correlation between the items intended to measure

Deductive Reasoning and those intended to measure Written Expression (0.153), Written

Comprehension (0.148) and Spatial Orientation (0.147) than was found between the items

intended to measure Deductive Reasoning itself (0.139). In other words, for Deductive

Reasoning, there are higher average across-ability correlations than average within-ability

correlations.

     9.     Inspection of Table 1 shows that this sort of pattern seems to be common. That is,

items intended to measure an individual cognitive ability actually tend to correlate as or more

highly with items intended to measure different cognitive abilities than they do with items

intended to measure the same cognitive ability. Looking at Table 1, everything except the items

intended to measure Spatial Orientation correlate most highly with Written Expression. For

Table 2, the pattern is similar but not so stark. Four of the nine abilities have items that correlate

on average more highly with items intended to measure different abilities than with items

intended to measure the same ability. The average within-ability correlations are just barely

higher than the average across-ability correlations for the other five abilities.[3] For example, the

---

[3] That is, the five abilities that actually have higher within-ability correlations than the
across-ability correlations.

-7-

average correlation between Inductive Reasoning items is .222, but the average correlation between Inductive Reasoning items and Information Ordering items is .215. Likewise, the correlation for Memorization items to other Memorization items is .087, but the correlation for Memorization items to Visualization items is .080. In both cases there is a difference in correlation of only .007.

10.    This pattern clearly demonstrates that the items on Written Exams 7029 and 2043 do not measure nine distinct abilities, as they were designed to do. Thus, statistical evidence shows that the written examinations fail to measure and weight the nine ability constructs consistent with what the test developers' job analysis deemed to be relevant to performance.

11.    Another, more formalized approach to inspecting the patterns of relationships between items relative to the test plan is the statistical method known as factor analysis. Factor analysis is a statistical methodology that, based on the empirical data, defines an underlying structure which can explain the correlations among the items. Specifically, factor analysis (i) identifies unique, independent factors (defined by weighted combinations of the examination items) which explain the observed pattern of correlation among the items, and (ii) calculates the percent of the shared variance among the items (*i.e.*, common variance) that can be explained by each factor. In the context of examining the relationship between the items on Written Exams 7029 and 2043, the factors refer to the different groupings of items based on their interrelationships. Weights (or "loadings") are assigned to each item, indicating the correlation between that item and the factor.

12.    For the results of factor analysis to confirm the test plan, the analysis should find

-8-

that items group together to comprise nine or 10 factors in a manner consistent with the test plan,[4] such that the Deductive Reasoning items group together to form one factor and the items intended to measure Inductive Reasoning group together to form a second factor, and so forth. The factor analyses for Written Exams 7029 and 2043 show no such result.

13.    The results of the factor analyses are reported on Tables 3 and 4 (for Written Exams 7029 and 2043, respectively).[5] The analysis revealed a large primary factor and a smaller secondary factor for both Written Exams 7029 and 2043.[6] For Written Exam 7029, the primary factor accounted for 80 percent of the common variance; a secondary factor added 10 percent for a total percentage of common variance accounted for by the two factors of 90 percent. For Written Exam 2043, the primary factor accounted for 73 percent of the common variance and a secondary factor added 15 percent for a total percentage of common variance accounted for by the two factor solution of 88 percent. Hence, the two empirically determined factors (*i.e.*, ability domains) explain approximately 90 percent of the pattern of the correlation among the items. The remaining 10 percent is "explained" by the unique measurement characteristics of the individual items, and not by some constructed cognitive ability domain.

14.    Tables 3 and 4 show (i) the item number from the A.M. administration for both

---

[4] In addition to nine factors corresponding to the nine discrete abilities, a single common factor may also be expected to measure a general cognitive ability (*i.e.*, general intelligence) that would influence all the nine discrete abilities.

[5] The method used was the most commonly accepted method – principal components factor analysis with orthogonal varimax rotation.

[6] The conventional requirement of minimum Eigen-value of 1 for factor retention was employed.

-9-

written examinations, (ii) the intended cognitive ability or factor for the item, and (iii) the factor

loading of the items on the primary and the secondary factors.

15.    While factors are empirically determined, the interpretation of what a factor

represents is subjective.[7] The factor analysis results summarized in Tables 3 and 4 show that the

written examinations seem to primarily measure a general cognitive ability (except, perhaps,

Memorization), and to a much lesser extent, a second specific cognitive ability (which is

different from any defined by the test developers).  The factor analysis clearly does not

demonstrate that the goal of the test developers was met.  The data does not factor into nine

distinct factors or ability domains.  This result demonstrates that the purported intent of the test

design (to measure and weight nine distinct cognitive ability domains) was not successful.[8]

16.    Considering both the correlations describing the relationship patterns between the

items and the factor analyses, one finds no support for the claim that Written Exams 7029 and

2043 measure nine different cognitive ability domains.  To the extent that the City's claim of

validity of the written examinations is based on the linkages or importance ratings of nine

cognitive ability domains to different job tasks as established in the job analysis work reported in

the Morrongiello Report, the available statistical evidence indicates that Written Exams 7029 and

---

[7]  In order to interpret the domain that each factor represents, one commonly assigns items (in a mutually exclusive fashion) as best characterizing a specific factor if (i) the item has a factor loading of at least .30 on that factor and (ii) that loading is at least .10 higher than that item's factor loading on any other factors.  *See* Nunnally, 1978. *Psychometric Theory*, p.423.

[8]  I also forced a nine factor solution by eliminating the minimum Eigen value constraint for defining a factor, to see whether the nine forced factors would correspond to the nine ability domains the test was designed to measure.  They did not.  With the exception of Memorization and, for Written Exam 2043, Spatial Orientation, none of the nine forced factors represented the ability domains the test developers purportedly designed the test to measure.  Moreover, the importance of the nine factors in no way corresponds to the purported intent of the test design.

-10-

2043 do not measure the nine discrete abilities that were rated important for firefighter job performance.

**ISSUE 2(a):   THERE IS NO JUSTIFICATION FOR THE CUTOFF SCORES USED FOR WRITTEN EXAMS 7029 AND 2043.**

17.     The City used a cutoff score of 84.705 for Written Exam 7029 and a cutoff score of 70.00 for Written Exam 2043.  As I demonstrated in my prior report, the pass/fail use of Written Exams 7029 and 2043 with these cutoff scores has resulted in a statistically significant disparate impact upon both African-American and Hispanic candidates.  The City has stated that it choose the cutoff scores for administrative reasons,[9] but it has offered no psychometric justification.  The City does not contend that the cutoff scores used for Written Exams 7029 and 2043 measure the minimum level of the abilities purportedly tested that is necessary for successful performance of the job of entry-level firefighter in the FDNY.[10]

18.     The City's experts, Drs. Philip Bobko and F. Mark Schemmer, appear to claim, based on meta-analysis, that (i) performance on cognitive tests correlates with firefighter job

_____

[9]  For example, the City states that it chose 84.705 as the cutoff score on Written Exam 7029 so that there would be a sufficient number of candidates on the Exam 7029 eligibility list, based on the number of hires the FDNY expected to make over the life of the list, but not so many that a large number of candidates on the list would not be reached for hire before the list expired.  *See* Dep. Test. of Carol Wachter, January 17, 2008, pp. 74-75, 86-88; Dep. Test. of Sherry Kavaler, February 22, 2008, p. 384-85; Rule 30(b)(6) Dep. Test. of the City (T. Patitucci, designee), pp. 90-91, 102-103; *see also* Personnel Rules and Regulations for the City of New York, Rule 4.4.9 (setting the default pass mark on an examination at 70).

[10]  *See* City's Resp. to Interrog. No. 30 in Def.'s Supplemental Resps. and Objections to Pl.'s United States' Interrogs. (Nos. 29-31).  The City also does not contend that there is any score or range of scores on Written Exam 7029 or 2043 that corresponds to the minimum level of cognitive ability necessary to perform the job successfully.  *See* the City's Resps. to Interrogs. Nos. 34 and 35 in Def.'s Resps. and Objections to Pl.'s First Set of Reqs. for Admis. (Nos. 1-23), Second Set of Interrogs. (Nos. 33-35) and Second Set of Reqs. for Prod. of Docs. (Nos. 98-11).

-15-

| Candidate | Eligible to be Hired? | Test Scores | | Transformed Score[18] Exam 7029 |
|---|---|---|---|---|
| | | Written Exam 7029 | Physical Exam 7029 | |
| A | Yes | 84.705 | 75.0 | 70.000 |
| B | No | 70.588[19] | 100.0 | 70.813 |
| C | Yes | 90.353 | 87.5 | 83.024 |
| D | No | 83.529 | 100.0 | 83.652 |

As the chart above shows, the candidate (Candidate D) who is predicted by the examination results to perform best as a firefighter is not eligible to be hired, because he failed Written Exam 7029 at the cutoff score of 84.705 used by the City. Conversely, the candidate (Candidate A) who is predicted by the examination results to perform worst as a firefighter is eligible to be hired. Exclusion of individuals based solely on their written score cannot be justified by the assumption that the written examination is correlated with performance (*i.e.,* "more is better") since (i) there is no evidence that those who scored below 84.705 on the written examination do not have the necessary skills, abilities and other characteristics to do the job and, more significantly, (ii) if those who failed the written examination had been allowed to take the PPT, they may have been predicted to be better performers than those actually hired, when their written and physical skills and abilities were jointly assessed.

**ISSUE 2(b):    THE SCORING METHODOLOGY FOR WRITTEN EXAM 6019 INDICATES THAT THE CUTOFF SCORES ON WRITTEN EXAMS 7029 AND 2043 WERE TOO HIGH.**

---

[18]  The transformed scores were calculated using the methodology set forth in the Firefighter Exam. No. 7029 Explanation of Test Scores, Pl.'s Dep. Ex. 35. *See* Appendix D.

[19]  This is the minimum score on Written Exam 7029 which is at or exceeds 70 percent, the cutoff used on Written Exam 2043.

-16-

25.    As noted above, the City has developed a new written examination, Written Exam 6019, which measures cognitive abilities and other important attributes not measured by Written Exams 7029 and 2043.  Written Exam 6019 consists of three components: (i) timed, (ii) situational judgement, and (iii) cognitive abilities.[20]  None of the components are scored as pass/fail.  A candidate passes or fails Written Exam 6019 on the basis of whether or not the candidate's "final score" is at least 70 percent.[21]  See Firefighter, Exam No. 6019 – Explanation of Test Scores, Pl.'s Dep. Ex. 203, Appendix F; see also Dep. Test. of Catherine Cline, June 19, 2008, pp. 73-74.  Therefore, poor performance on one component can be offset by good performance on the other components.  On Written Exam 6019, the standardized cognitive score receives a weight of 40 out of 90 or 44.4 percent; the standardized timed score receives a weight of 15 out of 90 or 16.7 percent; and the standardized situational judgment score receives a weight of 35 out of 90 or 38.9 percent.[22]  The combined score is converted to a final average, and a final score of at least 70 is needed to pass Written Exam 6019.[23]  See Firefighter, Exam No. 6019 –

---

[20]  The timed component consists of items designed to measure memorization, speed of closure and perceptual speed.  The situational judgment component consists of items designed to measure adaptability, tenacity, work standards, resiliency, coordination, integrity and interpersonal relationships.  The cognitive component consists of items designed to measure deductive reasoning, flexibility of closure, information ordering, inductive reasoning, number facility, problem sensitivity, spatial orientation and visualization.

[21]  This is a transformation of the weighted average of the standardized score of each of the three components.

[22]  A candidate who scores at the mean of each test receives a combined weighted z score of 0, while one who scores one standard deviation above the mean on the cognitive component and at the mean on the other components would score 0.444 ((0*15+0*35+1*40)/90).

[23]  The final average is computed as 9.817 * the combined weighted z score + 86.826.  In order to score at least 70 and pass Written Exam 6019, a candidate's combined weighted z score must be equal to or higher than -1.713.

-17-

Explanation of Test Scores, Pl.'s Dep. Ex. 203, Appendix F; *see also* Firefighter, Exam. No.

6019 Final Answer Keys, Pl.'s Dep. Ex. 202, Appendix G. A candidate who answered all of the

cognitive component questions incorrectly (which would yield a negative cognitive component

final score) could still pass the test if the candidate answered all of the other questions correctly;

in that case, the candidate's final average would be 75.811, a passing score. This would indicate

that the cognitive abilities can be totally offset by other skills and no cutoff would be appropriate

for the cognitive component.

    26.    While there is no cutoff score on the cognitive component of Written Exam

6019, there was a cutoff score for Written Exams 7029 and 2043, which tested only cognitive

abilities. Memorization was considered to be a cognitive ability in the construction of Written

Exams 7029 and 2043, but it is part of the timed component of Written Exam 6019. To study the

effect of this difference, I computed what would happen to the scores on Written Exam 6019 if a

candidate answered all of the cognitive component items as well as all the Memorization items

incorrectly, but answered all the other items on Written Exam 6019 correctly. My computations

revealed that, even in that case, a candidate would still pass Written Exam 6019, with a score of

71.953. Similarly, another difference between Written Exams 7029 and 2043 and Written Exam

6019 is that Written Exams 7029 and 2043 were designed to measure directly the cognitive

ability of Written Comprehension (9 of the 85 questions, or 10.6 percent of the questions on

Written Exams 7029 and 2043 were designed to measure Written Comprehension), while

Written Exam 6019 measured Written Comprehension only indirectly.[24] If we assume that poor

---

    [24] According to Dr. Cline, Written Exam 6019 measures Written Comprehension
indirectly in that one obviously needs some ability to comprehend written materials to understand
the written questions asked in any written examination. *See* Dep. Test. of Catherine Cline,

-18-

Written Comprehension would reduce the number of non-cognitive questions that one would answer correctly by roughly 10 percent (actually 10.6 percent), then if one answers roughly 90 percent (actually 89.4 percent) of the non-cognitive questions correctly, one would only need to answer 31 percent of the cognitive questions correctly in order to pass. Thus, the scoring methodology for Written Exam 6019 indicates that if a cutoff score is appropriate on Written Exams 7029 and 2043, the cutoff scores on Written Exams 7029 and 2043 should have been well below 70 percent, and perhaps as low as 30 percent.

**ISSUE 3:    MOREOVER, THERE IS AFFIRMATIVE STATISTICAL EVIDENCE THAT THE CUTOFF SCORES THE CITY USED FOR WRITTEN EXAMS 7029 AND 2043 ARE NOT JUSTIFIED.**

27.    As discussed above, there is no valid statistical evidence that the cutoff scores the City used on Written Exams 7029 and 2043 are justified. However, I also was asked to determine whether there is any affirmative statistical evidence that the cutoff scores are not justified. That is, I was asked to determine to what extent there is evidence in the data provided by the City that those who failed either Written Exam 7029 or 2043 could nevertheless do the job of firefighter. Given the City's selection practices, it is reasonable to assume that passing either of the written examinations is an indicator that a candidate had the minimum cognitive ability necessary to perform the job of firefighter.[25] Since numerous candidates took both Written

_____

February 21, 2008, p.170.

[25] Clearly, the City believed that everyone who passed Written Exam 7029 had the ability necessary to perform the job because the City exhausted the Exam 7029 eligibility list. While the City did not exhaust the Exam 2043 eligibility list, it treated anyone who passed both Written Exam 2043 and the PPT as eligible for hire (unless disqualified by some other step in the process, such as the background investigation). *See* Rule 30(b)(6) Dep. Test. of the City (T. Patitucci, designee), p.145; Dep. Test. of Carol Wachter, January 17, 2008, pp.112-13.

-19-

Exams 7029 and 2043, one can address this issue by looking at the degree to which candidates who took both written examinations were consistently deemed either qualified (*i.e.*, passed both written examinations) or unqualified (*i.e.*, failed both) by the written examinations.

28.    A total of 2,667 candidates took both Written Exams 7029 and 2043. Clearly, using a cutoff score of 84.705 for Written Exam 7029 and then using a cutoff score of 70 for Written Exam 2043 (which is purportedly the same test)[26] suggests that the 84.705 cutoff score is not meant to represent the minimum level of cognitive performance necessary to do the job of firefighter.[27] Among those who took both written examinations, 54.8 percent (17 out of 31) of those who failed Written Exam 2043 scored 70 or above on Written Exam 7029. Of those who scored below 70 on Written Exam 7029, 75.9 percent (44 out of 58) passed Written Exam 2043. Thus, of those failing either examination at a 70 percent cutoff score, 81.3 percent (61 out of 75) failed one written examination but passed the other. Since these figures reflect a single candidate taking different administrations of what is purportedly the same test, the high degree of inconsistency affirmatively highlights the fact that the cut-off scores on the written examinations do not reliably predict the presence or absence of the minimum cognitive skills and abilities to do the job.

29.    As stated previously, the City has developed a new written examination, Written Exam 6019. One-hundred and fifty-six candidates, who scored below 70 on either Written Exam

---

[26]    See Letter from G. Pestana to E. Yorke, dated January 9, 2004, stating that the two written examinations are "substantively identical."

[27]    Of course, the City does not make such a claim. The data shows that 92.9 percent of those who scored below 84.705 on Written Exam 7029 and then took Written Exam 2043 passed Written Exam 2043, as would be expected since most of those who failed Written Exam 7029 scored above 70 on the examination.

-20-

7029 or Written Exam 2043 took Written Exam 6019. Of those 156 candidates, approximately

85 percent (actually, 84.6 percent) of those who previously scored below 70 on Written Exam

7029 or Written Exam 2043 passed Written Exam 6019 and are now considered by the City to be

qualified[28] to be a firefighter for the FDNY.

**ISSUE 4(a): THE PHYSICAL AND WRITTEN EXAMS WERE NOT GIVEN EQUAL WEIGHTS IN THE RANKING PROCESS, AND WERE NOT EVEN GIVEN THE SAME WEIGHTS FOR EXAMS 7029 AND 2043.**

30.    In creating the combined written examination and PPT score for the purpose of

ranking candidates on the Exam 7029 and 2043 eligibility lists, the City did not assign equal

weights to the PPT and the written examinations, as it intended. In fact, the PPT was given about

twice the weight of Written Exam 7029. Conversely, Written Exam 2043 was given about 10

percent more weight than the PPT.[29]

31.    In combining the written examination and PPT score, the City standardized the

scores and then averaged the standardized scores. *See* Appendices D and E for the City's

explanation of this process for Exams 7029 and 2043, respectively. Correct standardization

would have resulted in the written examination and the PPT being weighted equally. However,

the City incorrectly used the written scores of all candidates who took the written examination

and the PPT scores of all candidates who took the PPT to standardize the scores. *See* Appendices

---

[28] Of course, candidates must pass the other steps in the process, such as the background investigation, in order to be hired.

[29] Neither the weight actually given the written exam and PPT for Exam 7029 nor those actually given the written exam and PPT for Exam 2043 reflect the relative importance of cognitive and physical abilities to the firefighter job as determined by the 2005 DCAS survey referred to previously. *See* Firefighter Survey Requirements of Physical vs. Cognitive Abilities, Pl.'s Dep. Ex. 243.

-21-

C and D; *see also* Rule 30(b)(6) Dep. Test. of the City (T. Patitucci, designee), pp. 155-56. The problem is one of "mixing apples and oranges."[30] A candidate who failed the written examination could not take the PPT, and a candidate who failed the PPT was not on the eligibility list to be ranked. To properly weight each test for ranking purposes, the standardization should have been based on the common set of written examination and PPT passers who were on the eligibility list to be ranked. Because of this methodological error, the PPT and written examinations were not given equal weight. The actual weight given to each component for each of the examinations is delineated below.[31] The lower weight for Written Exam 7029 is due to the higher cutoff score (84.705) used for Written Exam 7029.[32]

---

[30] Using all the PPT scores is also a problem because the scores of those who failed were all truncated to 62.5, so a true score distribution did not exist. Dr. Cline also noted this difficulty in her deposition testimony. *See* Dep. Test. of Catherine Cline, February 21, 2008, pp. 67-69.

[31] The effective weight of each component is the squared correlation (referred to as the coefficient of determination) of each component with the final weighted composite score (*i.e.*, the combination of the written and physical scores) scaled to sum to one.

[32] If the standard deviation used is larger than the correct standard deviation, the effective weight of the test will be less than its planned weight (assuming the correct standard deviation is used to weight the other test(s)). Conversely, if the standard deviation used is smaller than the correct standard deviation, the effective weight of the test will be greater than its planned weight. The largest difference between the standard deviation used and the correct standard deviation occurred for Written Exam 7029. Because the City used such a high cutoff score on Written Exam 7029, the standard deviation used (the standard deviation of all written exam takers) was substantially larger than the correct standard deviation (the standard deviation of the group restricted to those on the eligibility list), and the effective weight of Written Exam 7029 was substantially less than the planned 50% weight.

-22-

| Examination | Actual Weight in Creating Combined Scores for Ranking on Eligibility List | |
| | Written Exam | PPT Exam |
| --- | --- | --- |
| 7029 | 38% | 62% |
| 2043 | 55% | 45% |

32.    Moreover, the majority of the candidates on the eligibility lists for both Exams 7029 and 2043 scored 100 on the PPT. For Exam 7029, 69.5 percent of the candidates on the eligibility list scored 100 on the PPT. On the Exam 2043 eligibility list, 75.3 percent of the candidates scored 100 on the PPT. Thus, setting aside bonus points, for the group of approximately 70 percent of the candidates on each eligibility list who scored the highest on the PPT, ranking was based solely on the candidates' scores on the written examination.[33]

**ISSUE 4(b):    INCORRECTLY ANSWERING A SINGLE QUESTION ON WRITTEN EXAM 7029 OR 2043 OR FAILING A SINGLE PPT EVENT BY ONE SECOND HAD AN UNJUSTIFIABLY LARGE IMPACT UPON A CANDIDATE'S RANKING.**

33.    Table 5 displays a rank-order list for Exam 7029 based on the City's weighting of the written examination and the PPT, excluding all bonus points. Table 6 contains a similar list for Exam 2043. As Table 5 shows, 439 persons scored 100 on Written Exam 7029 and 100 on the PPT. If a candidate who scored 100 on Written Exam 7029 had failed one component of the PPT, their PPT score would have fallen to 87.5 and their maximum rank would have fallen from 1 to 3,603 on the list. Failing a second PPT component would have dropped them to 5,471 on the list. In this regard, it should be noted that performing one PPT event one second more slowly

---

[33]    Thus, as the City apparently was aware, to a great extent the PPT was serving as a pass/fail test with a 100 being the passing score. *See* Meeting Notes on PPT, dated March 1, 2002, Pl.'s Dep. Ex. 537, p. 2.

-23-

could be the difference between a candidate passing all eight PPT events (and receiving a PPT score of 100), and failing one event (and receiving a PPT score of 87.5).

34.    Similarly, a candidate who scored 100 on the PPT but got one question wrong on Written Exam 7029 would have fallen from a maximum rank of 1 to a maximum rank of 440.  A second wrong answer on Written Exam 7029 (*i.e.*, a score of 98.82) would have dropped the candidate's rank to a maximum of 1,146; four wrong answers to Written Exam 7029 (*i.e.*, a score of 95.294) would have dropped the candidate's maximum rank to 2,454 on the list.  Given the standard error of measurement of Written Exam 7029 (*i.e.*, 2.64),[34] a wrong answer to four questions on Written Exam 7029 is within the range of normal variation in scores due to chance (and may not represent any true difference between individuals).

35.    The standard error of measurement of Written Exam 2043 is 2.63, which is almost identical to that of Written Exam 7029.  As Table 6 shows, the scores for Written Exam 2043 were similarly clustered at the top, so four incorrect answers rather than a perfect score (which would constitute a drop from a score of 100 to a score of 95.294 on Written Exam 2043) with a 100 on the PPT, would have dropped a candidates' rank from a maximum rank of 1 to a maximum rank of 1,713.  Similarly, a failure on a single component of the PPT rather than a perfect score on both the PPT and Written Exam 2043 would have dropped a candidate from a maximum rank of 1 to a maximum rank of 3,439; failure on a second component of the PPT would have dropped the candidate to a maximum rank of 5,776.  Clearly, the ranking process resulted in large differences in rank due to small changes in performance on the written

---

[34] The standard error of measurement stated above was computed from candidates' answers to each test item based on the Kuder Richardson 20 formula.

-24-

examinations or the PPT.

36.    To further examine the effect of small changes in examination scores on ranks, I studied the 2,667 test takers who took both Written Exam 7029 and 2043. The mean score of those who took both tests was 91.52 on Written Exam 7029, with a standard deviation of 7.52. While their average score on Written Exam 7029 was almost identical to the average of all test takers (*i.e.*, 91.18), their standard deviation was statistically significantly smaller (7.52 versus 9.46).[35]

37.    Even though the two tests purportedly measure the same cognitive abilities and are constructed in the same way,[36] the rankings of the candidates based on one exam are very different from the rankings of the same candidates based on the other exam. In the extreme, when comparing a candidate's rank on Written Exam 7029 to his rank on Written Exam 2043, we find that 12 candidates dropped more than 2,000 places in rank (out of 2,667 total places) and nine candidates rose more than 2,000 places in rank. Although not as extreme, the typical (*i.e.*, median) change in ranking is still large. Comparing the rankings of all of the 2,667 candidates who took both examinations, we find the typical change in an individual's rank between Written

---

[35] This makes sense. Candidates who scored very high on Written Exam 7029 were more likely to be hired and, therefore, not to take Written Exam 2043. Candidates who scored very low on Written Exam 7029 may have been discouraged from taking Written Exam 2043.

[36] The correlation between the two test scores is an indicator of the reliability of the written examinations' design and construction, since the two examinations were supposed to measure the same cognitive abilities. It should be noted, however, that the correlation is not a perfect indicator of reliability, since there was such a long time lapse between the administrations of the two exams. Since the standard deviation of the multiple test takers was restricted, I corrected the correlation for restriction in range in computing the correlation between the Written Exams 7029 and 2043 scores. The corrected correlation between the two written examination scores for the 2,667 individuals who took both written examinations was 0.646.

-25-

Exam 7029 and Written Exam 2043 was 458 positions (a change of about 20 percent up or down) on the list.  Apparently, large changes in rank occurred primarily due to chance.[37]

---

[37] Some of this change could be due to the time lapse between the administrations of the two examinations and the possibility that, as a result, the candidates' skills and knowledge might have actually changed between the administrations of the examinations.

TABLE 1

ITEM INTERCORRELATIONS WITHIN AND BETWEEN COGNITIVE ABILITY DOMAINS

EXAM 7029

| | DEDUCTIVE REASONING | INDUCTIVE REASONING | INFORMATION ORDERING | MEMORIZATION | PROBLEM SENSITIVITY | SPATIAL ORIENTATION | VISUALIZATION | WRITTEN COMPREHENSION | WRITTEN EXPRESSION |
|---|---|---|---|---|---|---|---|---|---|
| DEDUCTIVE REASONING | 0.139 | | | | | | | | |
| INDUCTIVE REASONING | 0.136 | 0.156 | | | | | | | |
| INFORMATION ORDERING | 0.135 | 0.133 | 0.119 | | | | | | |
| MEMORIZATION | 0.078 | 0.072 | 0.071 | 0.082 | | | | | |
| PROBLEM SENSITIVITY | 0.125 | 0.124 | 0.114 | 0.073 | 0.109 | | | | |
| SPATIAL ORIENTATION | 0.147 | 0.145 | 0.138 | 0.076 | 0.128 | 0.163 | | | |
| VISUALIZATION | 0.129 | 0.132 | 0.125 | 0.071 | 0.114 | 0.139 | 0.120 | | |
| WRITTEN COMPREHENSION | 0.148 | 0.141 | 0.137 | 0.078 | 0.127 | 0.153 | 0.136 | 0.144 | |
| WRITTEN EXPRESSION | 0.153 | 0.157 | 0.145 | 0.088 | 0.136 | 0.157 | 0.146 | 0.155 | 0.163 |

**TABLE 2**

ITEM INTERCORRELATIONS WITHIN AND BETWEEN COGNITIVE ABILITY DOMAINS

**EXAM 2043**

| | DEDUCTIVE REASONING | INDUCTIVE REASONING | INFORMATION ORDERING | MEMORIZATION | PROBLEM SENSITIVITY | SPATIAL ORIENTATION | VISUALIZATION | WRITTEN COMPREHENSION | WRITTEN EXPRESSION |
|---|---|---|---|---|---|---|---|---|---|
| DEDUCTIVE REASONING | 0.158 | | | | | | | | |
| INDUCTIVE REASONING | 0.150 | 0.222 | | | | | | | |
| INFORMATION ORDERING | 0.169 | 0.215 | 0.259 | | | | | | |
| MEMORIZATION | 0.075 | 0.060 | 0.073 | 0.087 | | | | | |
| PROBLEM SENSITIVITY | 0.137 | 0.189 | 0.192 | 0.061 | 0.184 | | | | |
| SPATIAL ORIENTATION | 0.128 | 0.108 | 0.126 | 0.078 | 0.102 | 0.172 | | | |
| VISUALIZATION | 0.128 | 0.116 | 0.134 | 0.080 | 0.117 | 0.124 | 0.219 | | |
| WRITTEN COMPREHENSION | 0.142 | 0.143 | 0.154 | 0.089 | 0.128 | 0.114 | 0.116 | 0.140 | |
| WRITTEN EXPRESSION | 0.124 | 0.116 | 0.133 | 0.067 | 0.106 | 0.121 | 0.102 | 0.113 | 0.117 |

**EXHIBIT W**

1

1

2    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF NEW YORK
3         Civil Action No. 07-CV-2067
     - - - - - - - - - - - - - - - - - - -x
4    UNITED STATES OF AMERICA,

5              PLAINTIFF,

6    AND

7    VULCAN SOCIETY, INC., FOR ITSELF AND ON
     BEHALF OF ITS MEMBERS, CANDIDO NUNEZ,
8    MARCUS HAYWOOD AND ON BEHALF OF A CLASS
     OF ALL OTHERS SIMILARLY SITUATED,
9
               PLAINTIFF-INTERVENORS,
10
     V.
11
     CITY OF NEW YORK, FIRE DEPARTMENT OF THE
12   CITY OF NEW YORK, NEW YORK CITY
     DEPARTMENT OF CITYWIDE ADMINISTRATIVE
13   SERVICES, MAYOR MICHAEL BLOOMBERG AND NEW
     YORK CITY FIRE COMMISSIONER NICHOLAS
14   SCOPPETTA, IN THEIR INDIVIDUAL AND
     OFFICIAL CAPACITIES,
15
               DEFENDANTS.
16   - - - - - - - - - - - - - - - - - - -x
                  January 17, 2008
17                  9:47 a.m.

18

19      DEPOSITION of CAROL WACHTER, taken by
     Plaintiff, pursuant to Rule 30(b)(6)
20   Notice, held at the United States
     Attorney for the Eastern District of New
21   York, 271 Cadman Plaza East, Brooklyn,
     New York, before Jamie Ann Stanton, a
22   Shorthand Reporter and Notary Public of
     the State of New York
23         *    *    *

24

25

74

1          C. Wachter

2     Q     (Handing.)

3     A     (Reviewing exhibit.)

4     Q     Have you seen this document

5   before?

6     A     Well, my signature is on it, so

7   I assume I did.

8     Q     What is it?

9     A     "Summary of Written Test Scores

10   for Exam 7029 Firefighter."

11     Q     I would like to call your

12   attention to the top of the exhibit.  It

13   states that the pass mark for the written

14   part of Exam 7029 is 84.705; is that

15   correct?

16     A     I guess it is.

17     Q     What was your involvement, if

18   any, in the decision to set the pass mark

19   for Written Exam 7029 at 84.705?

20     A     Okay.  From my recollection, I

21   believe we had discussions with the Fire

22   Department as to how to set this pass

23   mark.  The Fire Department gave us their

24   estimate of how many hires they expected

25   to make over the course of a four-year

75

1         C. Wachter

2    list.  Using past experience, we worked

3    backwards from that number to determine

4    how many people we would need to pass the

5    multiple choice test in order to come up

6    with a list of that number.  Taking into

7    consideration the percentage of people who

8    would likely show up for the physical, the

9    percentage that would pass the physical,

10   the percentage of those people who would

11   meet the requirements, actually show up

12   for their interviews, pass investigation

13   and the medical and therefore be ready to

14   be eligible to be appointed.

15   Q    It sounds to me like there were

16   some sort of calculations involved in

17   order to determine --

18   A    Right.

19   Q    -- make this determination?

20   A    Right.

21   Q    Were those calculations

22   committed to paper?

23   A    I couldn't -- I really don't

24   remember at this point.

25   Q    Now, you mentioned we had

85

1        C. Wachter

2    regarding whether it was appropriate to

3    limit the number of candidates based on

4    the written test score alone?

5        A    I don't remember.

6        Q    Did you ever express an opinion

7    about whether it was appropriate to limit

8    the number of candidates based on the

9    written test score alone?

10        A    Did I ever express an opinion?

11        Q    Yes, ma'am.

12        A    I don't -- I really don't

13    remember.

14        Q    Were any validity studies

15    conducted with respect to the pass mark

16    for Written Exam 7029?

17        A    No.

18        Q    Was any job analysis done in

19    connection with the setting of the pass

20    mark for Written Exam 7029?

21        A    Not that I'm aware of.

22        Q    Setting the pass mark of 84.705,

23    did DCAS consider whether that cutoff

24    corresponded to the minimum level of

25    skills measured by the written exam that

86

1          C. Wachter

2   are necessary to perform the job of

3   entry-level firefighter successfully?

4      A   I don't know that we did that

5   specifically.  You know, our ordinary pass

6   marks would have been 70.  So if one would

7   assume that 70 was the minimal competency

8   level, then certainly 84 would have not

9   been less than the competency level.

10     Q   Is it fair to say that 84.705

11  was in excess of the minimum competency

12  level?

13     A   I think you could say that.

14     Q   Did anyone at the Fire

15  Department or within DCAS express concerns

16  that the setting of the pass mark at

17  84.705 might increase the likelihood of

18  litigation regarding Exam 7029?

19     A   I don't remember that being an

20  issue.

21     Q   Now, why did you want to limit

22  the number of candidates for the physical

23  exam to 15,000?

24     A   There were probably a couple of

25  issues involved that I can think of

179

1          C. Wachter

2    to that particular time.

3        Q    Let me ask it this way:  In this

4    instance, with respect to Written Exam

5    7029, do you think it would have been

6    responsible to go with a lower pass mark

7    for the written examination --

8        A    I think we could have --

9        Q    I'm sorry.

10       A    I thought you were finished.

11       Q    Would it have been possible to

12   go with the lower pass mark for the

13   written examination, and with this lower

14   pass mark, still select only candidates

15   who are qualified for the position at

16   least on the basis of the written exam?

17       A    Yes.

18       Q    So to be more clear:  You

19   believe that by setting the pass mark at

20   84.705, qualified candidates were excluded

21   from consideration for processing?

22       A    Well, they probably would not

23   have been reached for appointment any way,

24   so it's kind of moot.

25       Q    Was the eligibility list for

180

1          C. Wachter

2   Exam 7029 exhausted?

3      A   I believe it was, but I'm not a

4   hundred percent sure.  After 9/11 the Fire

5   Department had a need for more hiring than

6   they had anticipated, so I would think

7   that it was exhausted.

8      Q   So given that the eligibility

9   list for Exam 7029 was exhausted, would it

10   be fair to conclude that setting the pass

11   mark at 84.705 eliminated qualified

12   candidates for the position who might

13   otherwise have been appointed but for

14   setting the pass mark at 84.705?

15      A   Isn't hindsight wonderful?

16      Q   Yes, ma'am.  Is that an unfair

17   conclusion?

18      A   No.

19         MR. REESE:  I don't have any

20     further questions.

21   EXAMINATION BY

22   MR. EDWARD:

23      Q   If I can direct your attention,

24   Ms. Wachter, to Plaintiff's Exhibit 25.

25         Do you see there, at the top, it

181

1          C. Wachter

2    says "Summary of Written Test Scores"?

3      A    Yes.

4      Q    It says "84.705"?

5      A    Correct.

6      Q    I want to know the reason why it

7    was set at 84.705. I think we covered

8    this. I want to read for you the bottom

9    paragraph down there.

10          It says: "Reasons for

11   recommendation. The Fire Department has

12   requested that a total of 15,000

13   candidates from both test and the

14   promotion test to be called to the

15   physical. At this pass mark, the Fire

16   Department's request is met."

17          Is that the reason why the pass

18   mark was set at 84.705?

19

20          [Continued on the next page to

21   allow for signature line and jurat.]

22

23

24

25

182

1

2

3    A    Yes.

4         MR. EDWARD:  No further

5    questions.

6

7         [TIME NOTED:  2:28 p.m.]

8

9    _____

10   CAROL WACHTER

11

12

13        _____
          Subscribed and sworn to
          before me this _____
14        day of _____,
          2008.

15        _____

16        Notary Public

17

18

19

20

21

22

23

24

25

**EXHIBIT X**

1

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF NEW YORK
3          Civil Action No. 07-CV-2067
       - - - - - - - - - - - - - - - - - - -x
4      UNITED STATES OF AMERICA,

5              PLAINTIFF,

6      AND

7      VULCAN SOCIETY, INC., FOR ITSELF AND ON
       BEHALF OF ITS MEMBERS, CANDIDO NUNEZ,
8      MARCUS HAYWOOD AND ON BEHALF OF A CLASS
       OF ALL OTHERS SIMILARLY SITUATED,

9
               PLAINTIFF-INTERVENORS,
10
       V.
11
       CITY OF NEW YORK, FIRE DEPARTMENT OF THE
12     CITY OF NEW YORK, NEW YORK CITY
       DEPARTMENT OF CITYWIDE ADMINISTRATIVE
13     SERVICES, MAYOR MICHAEL BLOOMBERG AND NEW
       YORK CITY FIRE COMMISSIONER NICHOLAS
14     SCOPPETTA, IN THEIR INDIVIDUAL AND
       OFFICIAL CAPACITIES,
15
               DEFENDANTS.
16     - - - - - - - - - - - - - - - - - - -x
                    January 14, 2008
17                   9:00 a.m.

18

19        DEPOSITION of MATTHEW MORRONGIELLO,
       taken by Plaintiff, pursuant to Rule
20     30(b)(6) Notice, held at the United
       States Attorney for the Eastern District
21     of New York, 271 Cadman Plaza East,
       Brooklyn, New York, before Jamie Ann
22     Stanton, a Shorthand Reporter and Notary
       Public of the State of New York
23
            *    *    *
24

25

74

1         M. Morrongiello

2    Supervisor, Sanitation.  Those are the

3    ones that come to mind.

4      Q    So it sounds like you had

5    developed a written exam for entry-level

6    sanitation worker; is that correct?

7      A    Correct.

8      Q    Is that the only entry-level

9    exam you had developed before 7029?

10     A    That's all I can recall right

11   now.

12     Q    And before when you said you had

13   done maybe four or five job analyses

14   already at the time you were working on

15   7029, were those for entry-level positions

16   or promotional positions?

17     A    That would be a combination.

18     Q    How many for entry-level?

19     A    Right now, sanitation worker

20   comes to mind.  That's all I can recall.

21     Q    Do you know what a

22   criterion-related validity study is?

23     A    Yes.

24     Q    Have you ever conducted a

25   criterion-related validity study?

75

1          M. Morrongiello

2     A    Not that I'm aware of.

3     Q    Do you know what a construct

4    validity study is?

5     A    Yes.

6     Q    Have you ever conducted a

7    construct validity study?

8     A    Not that I'm aware of.

9     Q    Have you ever conducted a

10    content validity study?

11     A    Not that I'm aware of.

12     Q    I want to talk a little bit

13    about your training for various things

14    like job analysis and test development.

15    What I mean by "training," as opposed to

16    formal education, is something that's not

17    a course at a college or university.  It

18    could be on-the-job training or any other

19    training outside of a university or

20    college.

21          My first question is:  What

22    training have you had in conducting job

23    analyses?

24     A    Well, we really consider it

25    on-the-job training.  The training I had

94

1          M. Morrongiello

2     A    No.

3     Q    Now, maybe this is obvious, but

4  I just want to make sure we are clear.  On

5  the document, on Exhibit 54, it says "Test

6  Development Report."  I just want to make

7  sure that we characterize the report in

8  the proper way.

9          I take it you consider this a

10  test development report, correct?

11    A    Correct.

12    Q    Was it intended to be anything

13  other than a factual narrative,

14  essentially, of what you did in order to

15  develop or prepare the written exam used

16  for Exam 7029?

17    A    Intended to be anything -- no.

18    Q    Was it intended in any way to be

19  a validity report?

20    A    No.

21    Q    To your knowledge, is Exhibit 54

22  the only written report ever prepared

23  regarding Exam 7029?

24    A    To the best of my knowledge, it

25  is.

96

1       M. Morrongiello

2    expensive to do.

3       My current question is whether

4    you have ever heard that discussed by

5    anyone?

6    A    I don't recall hearing that

7    discussed.

8    Q    Have you ever done any analysis

9    of whether a score of 84.705 on Written

10   Exam 7029 corresponded to the minimum

11   level of the tested abilities necessary to

12   perform the FDNY firefighter job

13   successfully?

14   A    Repeat that once more.

15   Q    Sure.  Have you ever done any

16   analysis of whether the cutoff score of

17   84.705 used on Written Exam 7029

18   corresponds to the level of the tested

19   abilities necessary to perform the

20   firefighter job successfully?

21   A    No.

22   Q    Have you ever done any analysis

23   of whether a score of 70 on written Exam

24   2043 corresponds to the minimum level of

25   the tested abilities necessary to perform

97

1          M. Morrongiello

2     the firefighter job successfully?

3     A    No.

4     Q    Do you know whether anyone has

5     ever attempted a criterion-related

6     validity study with respect to Exam 7029?

7     A    I don't know.

8     Q    Do you know whether anyone who

9     has ever attempted a criterion-related

10    validity study regarding Exam 2043?

11    A    I don't know.

12    Q    Do you know whether anyone has

13    ever attempted a construct validity study

14    regarding either Exam 7029 or Exam 2043?

15    A    I don't know.

16    Q    We've been told that for

17    purposes of ranking on the Exam 7029

18    eligibility list, the written exam and the

19    physical exam, the PPT, were given equal

20    weight; is that correct?

21    A    Correct.

22    Q    Why were they given equal

23    weight?

24    A    Well, my understanding is

25    that -- just give me one second.  My

118

1          M. Morrongiello

2      that we were going to use that physical

3      for 7029.

4          Q    Did someone tell you that, or is

5      that some conclusion that you came to,

6      that the physical was still appropriate?

7          A    No, I was told that.

8          Q    Who told you that?

9          A    I don't remember who said that

10     specifically.

11         Q    After that note, there is

12     something that is kind of off to the right

13     and circled.  It appears to say:  "First

14     day scale" -- can you read to me what is

15     in that circled portion?

16         A    You mean starting at the left?

17         Q    Yes.

18         A    "First day scale for tasks.  And

19     then there is an arrow.  Then reading to

20     the right, it says:  "Just performance."

21     There is a "2" circled above it.  And

22     "frequency," there is a "3" circled above

23     it.  And then the word "importance."

24         Q    In your job analysis

25     Questionnaire, you did not include a first

129

1          M. Morrongiello

2    analysis Questionnaire.

3          And the question?

4      Q    When you referred to "all the

5    Fleishman's," you are only referring to

6    those twenty-one and not to the physical

7    abilities and the psychomotor abilities

8    that are also included in Dr. Fleishman's

9    taxonomy; is that correct?

10     A    Correct.

11     Q    Did you consider including any

12   noncognitive abilities or characteristics

13   in your list?

14     A    I believe it was decided to go

15   with our -- what I'll call the standard

16   Fleishman ability list that we used for

17   the Open Competitive.

18     Q    My question was:  Did you

19   consider using anything else, though?

20     A    I'm not sure.

21     Q    Have you ever discussed with

22   anyone from the FDNY, the Fire Department,

23   the relative importance to the firefighter

24   job of noncognitive or personality

25   characteristics as compared to cognitive

130

1           M. Morrongiello

2    abilities?

3        A    As part of the job analysis?  Is

4    that what you mean?

5        Q    No.  Ever.  Have you ever

6    discussed it with anyone from the FDNY?

7        A    Just repeat that once more.

8        Q    Sure.  Did you ever discuss,

9    ever --

10       A    Ever.

11       Q    -- discuss with anyone from the

12    FDNY the relative importance of

13    noncognitive or personality

14    characteristics as compared to cognitive

15    abilities for the firefighter job?

16       A    I don't recall having those

17    discussions.

18       Q    Have you ever discussed that

19    with anyone else?

20       A    Well, in this case, we did talk

21    about the possibility of doing -- that we

22    want to do a job analysis for the

23    physical.  That's one example.  That's all

24    that come to mind.

25       Q    So you don't recall ever talking

226

1       M. Morrongiello

2    Q   Now, the firefighters who were

3   given the job analysis Questionnaire were

4   asked to rate the importance of the

5   abilities -- I think the term I would use

6   is globally, importance to the entire job

7   rather than to any particular task or task

8   category, correct?

9    A   The scale is asking them to

10   compare it to the other abilities, so can

11   you repeat what you just said?

12   Q    Right. My question was that

13   they were asked to rate the importance, to

14   use this scale, to rate the importance of

15   the abilities to the performance of their

16   whole job, not to the performance of any

17   particular task or task category; is that

18   correct?

19   A    That's correct.

20   Q    Were the firefighters given any

21   guidance on how to judge the importance of

22   each ability to the job as a whole?

23   A    I don't recall saying anything

24   specific about the importance scale.

25   Q    So is it true, then, that they

227

1        M. Morrongiello

2    weren't given a deposition of what

3    somewhat important meant in the rating

4    scale?

5        A    That's true.  I'm not aware of a

6    definition that we would have given.

7        Q    Or they weren't given an

8    explanation of the difference between a

9    rating of important to the performance of

10    the job versus critical to the performance

11    of the job; is that right?

12        A    I'm not aware of any instruction

13    that we would have given for that.

14        Q    Were the firefighters who filled

15    out the job analysis Questionnaire given

16    any examples of what those ratings would

17    mean?

18        A    For this administration, I don't

19    recall being that specific, talking about

20    the questionnaire.

21        Q    Essentially the same question

22    for the importance scale for tasks, which

23    was on the previous page, Scale B.

24        Were they given any definitions

25    or explanations or examples of what the

228

1        M. Morrongiello

2    various points on the importance scale for

3    tasks meant?

4        A    I don't recall giving any

5    instruction for that.

6        Q    Now, if we go back into the body

7    of your report on page 10.

8        A    (Complying.)

9        Q    It looks like the scales that we

10    saw in the actual job analysis

11    Questionnaire, the A, B, C, D scales were

12    converted to numeric scales of 1 through

13    4.

14        Is that what you did?

15        A    I just want to make sure.  Yes,

16    they were, right, converted to numeric.

17        Q    Why did you convert the

18    alphabetic scales to numeric?

19        A    Well, that allows us to get a

20    number reading on the scales -- on the

21    responses.

22        Q    So that you can do things like

23    averaging them; is that correct?

24        A    Correct.  Correct.

25        Q    So who chose which numeric value

251

1       M. Morrongiello

2           My question is:  Was the Linking

3   Panel given any definition or explanation

4   of what "somewhat important," "important"

5   and "critical" mean?

6     A    Not that I am aware of.

7     Q    Were they given any examples of

8   what those mean?

9     A    I'm not aware of any.

10      Q    So other than giving the

11  definitions that we see here on the page

12  for the ratings scale, was anything done

13  to ensure that the members of the Linking

14  Panel understood how to rate "somewhat

15  important" versus "important" versus

16  "critical"?

17    A    Can you repeat that?

18    Q    Yes.  I think it got garbled in

19  the middle somewhere, but the question

20  essentially was:  Other than just what is

21  here in writing as the definitions of 0

22  through 3 on the ratings scale, was the

23  Linking Panel given any explanation of how

24  to distinguish between "critical,"

25  "important" and "somewhat important" to

252

1

2    rate the abilities?

3        A    I don't remember giving any.

4        Q    Now, if we can go to the page

5    Bates numbered C-002546, which is where

6    the ability list begins --

7            MS. SCOLNICK:  Sharon, would

8        this be a good place to take a break?

9            MS. SEELEY:  Yes.  I guess we

10       will stop there and continue some

11       other day.

12           [TIME NOTED:  4:10 p.m.]

13

14    _____

15    MATTHEW MORRONGIELLO

16

17

18       Subscribed and sworn to
         before me this _____
19       day of _____,
         2008.
20    _____

21       Notary Public

22

23

24

25

Page 258

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Civil Action No. 07-CV-2067
---------------------------------------x
THE UNITED STATES OF AMERICA,
            Plaintiff,
and
VULCAN SOCIETY, INC., for itself and on
behalf of its members; CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,
            Plaintiff-Intervenors

            -against-

CITY OF NEW YORK, FIRE DEPARTMENT OF THE
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPETTA, in their Individual and
Official capacities,
            Defendants.
---------------------------------------x
                January 29, 2008
                10:42 a.m.


        Continued Deposition of MATTHEW

    MORRONGIELLO, taken by the Plaintiff, pursuant

    to Rule 30(b)(6) Notice, at the offices of the

    United States Attorney for the Eastern

    District of New York, 271 Cadman Plaza East,

    New York, New York, before David Levy, CSR, a

    Notary Public of the State of New York.

Page 299

1                              Morrongiello

2          A.   Yes.

3          Q.   Do you recall that Linking panel?

4          A.   That used the same list?

5          Q.   Yes.

6          A.   I can give you the names of open

7     competitive exams where in all likelihood, we

8     used the same list.  One that comes to mind is

9     the police officer exam.  Right now, that's all I

10    can think of.

11         Q.   And do you recall that particular

12    Linking panel session?

13         A.   No.

14         Q.   After the Linking panel session for

15    exam 7029 was over, did you conduct any

16    statistical analyses of the reliability or

17    interrater agreement among the ratings of the

18    twelve Linking panel members?

19         A.   No.

20         Q.   Did you look at all at the extent to

21    which the ratings of the Linking panel members

22    agreed or did not agree with each other?

23         A.   Um -- I don't recall doing that.

24         Q.   Okay.  I'm going to ask you some

25    questions now about the exhibits that we've

Page 315

1              Morrongiello

2    offer is that perhaps in either, in the training

3    that firefighters receive, there could be some

4    written material that states how to trim broken

5    glass, the procedures to use, which tools to use.

6    That's an explanation that I can offer.

7          Q.  So let me ask this, then:

8                Are you saying that a Linking panel

9    member might have rated written comprehension as

10   important to some degree to any given task if

11   they read some written material about that task

12   in training?

13         A.  Possibly.  You'd have to ask the

14   people who filled it out.  But --

15         Q.  Is that what they were supposed to

16   do?

17         A.  Well, based on the explanation or the

18   definition of the -- of the ability, if that

19   involved any material that they would need to

20   read, then they most likely would apply that.

21         Q.  So the task, then, doesn't just

22   involve performing the task itself.  It also

23   involves training for that task, is that correct?

24         A.  I'm just offering an explanation how

25   a, someone doing the job could rate something

                    Morrongiello

1

2    like written comprehension critical for a task

3    that doesn't just come out and state --

4         Q.   And what I'm trying to get at, is, is

5    that what you intended?  Would that be an

6    appropriate rating?  Was a task supposed to refer

7    only to performance of the task rather than

8    training for the task or writing about the task

9    later?

10        A.   Many times when we give directions,

11   we ask people to think about the job they are

12   currently doing.  I guess the best explanation I

13   could give you and my best response would be, if

14   they feel that, in their job they are currently

15   doing, if this ability is important for that

16   particular task, then they would rate it

17   appropriately.

18        Q.   But what I intended my question to

19   be, at least, maybe I didn't ask it clearly, was

20   whether that is what they are supposed to be

21   doing, what you want them to be doing; consider

22   only the task in the performance of the task, or

23   also consider things that are like training for

24   the task or writing later about the task, but not

25   the actual performance of the task.

1                          Morrongiello

2          A.   We generally would like them to just

3    focus in on performing that particular task.

4    That's what we ask them to respond to.  So that's

5    really where we're going.  We generally say,

6    "Right now on your job, to perform this task,

7    would you would you rate these abilities?"

8          Q.   I think I understand.  But you don't

9    know what was actually going on in the mind of

10   any one of these individuals when they did the

11   ratings, correct?

12         A.   That's correct.  That's correct.

13   Could I just add something to that?  Generally,

14   that's why we try to have groups involved.  When

15   we do surveys, sometimes having a number of

16   people, you may get different responses.

17         Q.   Okay.  Let me ask you, still looking

18   at Exhibit 85, when you got the ratings from

19   Rater 9, did you notice that this rater gave a

20   pretty much large majority of the ratings as

21   rating 3, "Critical"?

22         A.   Probably not.

23         Q.   Did you actually review the ratings

24   given by the Linking panel members to see if they

25   made sense?

Page 318

Morrongiello

A. I generally will look through the packets. Generally, though, not to see if they make sense.

Q. For what purpose would you look through them?

A. There could have been some blanks left. That's the sort of thing we would add, return it to the -- to the panel member and point it out and --

Q. So you would actually review it when they turned it in to you at the session.

A. Generally. Generally we try to, and for the reason I just stated. If they leave us and there are some blanks, we, you know, it could be hard to get them back or --

Q. Is there anything else that you review the packets for?

A. I just recall, like I said, looking over to make sure that things are complete.

Q. Just to make sure I'm clear on this, did you talk to any of the Linking panel members about any of their ratings?

A. I don't recall.

Q. Is that something you would normally

Page 456

Morrongiello

Q.  Well, the item writers are not specialists in knowing what reading levels are.

A.  No, that's true.  Like, for example, we're not asking them to keep the test items appropriate to what someone might need on the job.  Maybe that's a better way to describe it.  So we don't ask them to say, "Could a tenth grader read this."  It's more towards what would people need to know for the job.

Q.  And how about the examiners, what would the examiners do to make sure it's at the right level?

A.  It's probably similar.  I mean, I think we do have, you know, examiners, I think the safe to say, have at least an idea of something that might be high school level or something that maybe someone with a Bachelor's degree might, if you need a Bachelor's degree to read something.

So there's nothing formal about it. That's why we have a number of people review our items to give their best judgement.

Q.  How do they get that idea?

A.  I'm sorry?

Page 457

1                         Morrongiello

2          Q.  The examiners, how do they get that

3    idea of what would be an appropriate level?

4          A.  I guess it's based on experience.

5          Q.  So it's sort of -- it's informal,

6    eyeballing-it level?

7          A.  Yes.  Except for, as I said, there

8    have been cases, I don't know if -- I talked

9    about that readability index.  Could have done

10   that for other exams.  I'm just not aware right

11   now if we did that for other exams, that more

12   formal readability index that we're talking

13   about.

14         Q.  And as far as the 7029, I'm sorry,

15   tell me whether you did it in the 7029.

16         A.  I may have.  I'd have to look back at

17   the records.

18         Q.  If you did, would you have expected

19   something like that to be included in your test

20   in Exhibit 54, test development report?

21         A.  Unlikely, but it would be, if it was

22   done, it would be in the records.  Or it should

23   be in the files.

24         Q.  In preparing for 7029, did you review

25   0084?

Page 458

1                    Morrongiello

2         A.   What part of 0084?

3         Q.   Any part of 0084.

4         A.   The test, the --

5         Q.   The test.

6         A.   The test.  I can't recall

7    specifically reviewing it.  I -- I'm looking

8    back, I -- I probably did, if not all the test,

9    then some portions of it.  But I just can't

10   recall if I read through every page and every

11   item.

12        Q.   Was there an item analysis prepared

13   for 0084 similar to Exhibit 47 for 7029?

14             MR. SAMPLE:  Objection, speculation.

15        A.   Most likely.

16        Q.   Most likely yes?

17        A.   Most likely yes.  There would be an

18   item analysis.  That's standard for really all

19   our tests, is to produce item analyses in most

20   cases.

21        Q.   Going back, how long did you have

22   item analyses?

23             MR. SAMPLE:  Objection, ambiguous.

24        A.   I can't recall.  Since I've worked

25   there, I seem to recall item analysis always

**EXHIBIT Y**

FIREFIGHTER
EXAM. NO. 7029
EXPLANATION OF TEST SCORES

Congratulations, you passed the examination for Firefighter, Exam. No. 7029. You had to achieve a written test score of 84.705 or greater in order to be eligible to take the physical test part of this examination. In order to pass the physical test, you had to pass 6 out of the 8 physical test events (75%). You had to pass both the written and physical tests in order to pass the overall examination. The enclosed Notice of Result card includes the following test information:

Final Average (Part H)
Written Test Score (Part E)
Physical Test Score (Part U)
Residency Credit, if applicable (Part R)
Legacy Credit, if applicable (Part Y)
Veterans Preference, if applicable
Adjusted Final Average
List Number



PLAINTIFF'S EXHIBIT
35
10/9/07    AJ

I.    COMPUTING YOUR FINAL AVERAGE (Part H)

A.    Computing your Standardized Written Test Score

Your standardized written test score was computed by subtracting the average of all candidates' written test scores (91.230) from your written test score (Part E), and dividing the result by the standard deviation of the written test (9.308). Round the product to 5 decimal places. Note that your standardized written test score may be either a positive or a negative number.

B.    Computing your Standardized Physical Test Score

Your standardized physical test score was computed by subtracting the average of all candidates' physical test scores (87.262) from your physical test score (Part U), and dividing the result by the standard deviation of the physical test (15.582). Round to 5 decimal places. Note that your standardized physical test score may be either a positive or a negative number.

C.    Computing your Combined Weighted Standard Score

1.    Your Standardized Written Test Score was multiplied by the weight of the written test (.50) to produce your Weighted Standardized Written Test Score. Round to 5 decimal places.

2.    Your Standardized Physical Test Score was multiplied by the weight of the physical test (.50) to produce your Weighted Standardized Physical Test Score. Round to 5 decimal places.

3.    Your Weighted Standardized Written Test Score and your Weighted Standardized Physical Test Score were then added together to produce your Combined Weighted Standard Score. Round to 3 decimal places.

D.    Computing your Transformed Score

Your Transformed Score was computed by multiplying your Combined Weighted Standard Score by 18.47290640394088 6699 and rounding the product to 3 decimal places. The product was then added to 83.74384236453 and rounded to 3 decimal places to produce your Transformed Score.

E.    Computing your Final Average (Part H)

Your Final Average (Part H) was computed by adding your Residency Credit, if applicable (5 points) and Legacy Credit, if applicable (5 points) to your Transformed Score.

II.    COMPUTING YOUR ADJUSTED FINAL AVERAGE

Your Adjusted Final Average was computed by adding your Veterans Preference, if applicable (5 points for Veterans; 10 points for Disabled Veterans) to your Final Average.

B-000007

USA004935

EXAMPLE OF HOW TO COMPUTE YOUR ADJUSTED FINAL AVERAGE

| Written Test Score (Part E) (50%) 96.750 | Physical Test Score (Part U) (50%) 100.000 | Residency Credit (Part R) 5.000 | Legacy Credit (Part Y) 5.000 | Veterans Preference V |
|---|---|---|---|---|

I.    COMPUTING YOUR FINAL AVERAGE (Part H)

    A.    Computing your Standardized Written Test Score

Standardized Written Test Score = $\dfrac{\text{Written Test Score (Part E)} - 91.230}{9.308}$

Standardized Written Test Score = $\dfrac{96.750 - 91.230}{9.308}$ = 0.59304 (Round to 5 decimal places)

    B.    Computing your Standardized Physical Test Score

Standardized Physical Test Score = $\dfrac{\text{Physical Test Score (Part U)} - 87.262}{15.582}$

Standardized Physical Test Score = $\dfrac{100.000 - 87.262}{15.582}$ = 0.81748 (Round to 5 decimal places)

    C.    Computing your Combined Weighted Standard Score

      1.    Weighted Standardized Written Test Score = Standardized Written Test Score x .50

         Weighted Standardized Written Test Score = 0.59304 x .50 = 0.29652 (Round to 5 decimal places)

      2.    Weighted Standardized Physical Test Score = Standardized Physical Test Score x .50

         Weighted Standardized Physical Test Score = 0.81748 x .50 = 0.40874 (Round to 5 decimal places)

      3.    Combined Weighted Standard Score = Weighted Standardized Written Test Score + Weighted Standardized Physical Test Score

         Combined Weighted Standard Score = 0.29652 + 0.40874 = 0.705 (Round to 3 decimal places)

    D.    Computing your Transformed Score

Transformed Score = (Combined Weighted Standard Score x 18.472906403940886699) (Round to 3 decimal places) + 83.74384236453

Transformed Score = (0.705 x 18.472906403940886699) (Round to 3 decimal places) + 83.74384236453 = 96.767 (Round to 3 decimal places)

    D.    Computing your Final Average (Part H)

Final Average = Transformed Score + Residency Credit, if applicable + Legacy Credit, if applicable

Final Average = 96.767 + 5.000 + 5.000 = 106.767

II.    COMPUTING YOUR ADJUSTED FINAL AVERAGE

Adjusted Final Average = Final Average + Veterans Preference points, if applicable

Adjusted Final Average = 106.767 + 5 = 111.767

B-000008

USA004936

**EXHIBIT Z**

to increasing validity and to lowering adverse impact against black test takers. Some of these characteristics or abilities are: teamwork, responsibility, desire to learn, courage, resistence to stress, getting along with others, honesty, and medical interest. Dr. Schemmer also testified that "certainly tests of those constructs or categories were available during that time frame [for Exam 7029]."[67]

### Part V: The DCAS Job Analysis Does Not Support Validity

DCAS conducted only one job analysis for both Exams 7029 and 2043, and that one job analysis was seriously flawed in design, construction, and administration, to the point that the data summaries cannot be trusted and are not suitable to be used to support the content validity of the WT.

1.  **The Job Analysis Omitted Important Testable Abilities and Characteristics**
    The abilities rated by the Firefighters in the job analysis (and tested on the WTs) were chosen without any consultation with Firefighters and were limited to cognitive abilities (and specifically to the Fleishman cognitive abilities),[68] omitting such non-cognitive characteristics as dependability, integrity, or the ability to get along with others. Numerous studies done in other jurisdictions nationwide point to abilities DCAS did not even consider for inclusion on the WT. The 7029 job analysis process did not allow Firefighters to add to the abilities to be rated, and only rated abilities were included in the Test Plan (the outline of the number of questions testing for each ability).[69] There is no indication of the reason for the omission of non-cognitive abilities in the Test Development Report for Written Test 7029.[70] Omitting non-cognitive abilities from the 7029 job analysis precluded their being included in DCAS exams 7029 and 2043,[71] and assured that the DCAS Written Tests would not measure non-cognitive abilities, and so reduced validity and maximized the level of adverse impact (against blacks) of the Written Tests. This is a major shortcoming because tests of non-cognitive abilities show less adverse impact than tests of cognitive abilities, while contributing to the validity of the selection process (as testified to by Defendant's experts, as I say above). In sum, important abilities, both non-cognitive and cognitive, were omitted from both the DCAS job analysis and the WTs.

---

[67]Schemmer 290 line 4 - page 291 line 16, page 301 line 17 - page 302 line 5

[68]Test Development Report for Exam 7029, page USA004814.

[69]Test Development Report for Exam 7029, page USA004918.

[70]The full report is numbered USA004811-USA004918.

[71]Bilingual abilities are also not to be found in the DCAS JAQ.

Page 31

The importance of certain personal characteristics for successful performance as a Firefighter was made clear in a nationwide study conducted by the US Civil Service Commission (US CSC) in 1976 and published by the US CSC in 1977[72] and then reported again in a 1988 in a textbook on job analysis. (In the 1970's the US CSC, now US OPM, was providing professional support to state and local merit systems in the area of personnel assessment and personnel selection, in support of merit system principles.) Based on a review of the literature and a job analysis study of over 100 fire departments nationwide, the US CSC report provided a test weighting plan for 20 abilities and characteristics. (The US CSC report also provided a list of existing tests that measure each of these 20 abilities/characteristics.) This report shows that the 5 highest-weighted (highest importance) abilities/characteristics are non-cognitive, personal or interpersonal in nature (i.e., responsibility, desire to learn, teamwork, activity (energy), getting along with people, see Table 2). None of these most highly important non-cognitive abilities are included in the Exams 7029 or 2043. Of the 20 abilities or characteristics that the US CSC included in its recommended test weighting plan, only 4 are cognitive: problem-solving ability, mechanical ability, verbal skills (both written and verbal), and math skills. Of these, DCAS measured only 1½ (problem solving and written communication). Thus Exams 7029 and 2043 covered only 7.5% of the abilities and characteristics that the US CSC report recommended for an entry-level Firefighter written test.

When asked in deposition what makes for a good Firefighter, Chief Nigro (the highest ranking uniformed officer in the FDNY) mentioned only non-cognitive abilities and characteristics, saying,

> Page 71
> 6    A.   [Nigro] What makes a good Firefighter?
> 7    That's – that's a good question.  What I think
> 8    you know, I think someone who's reliable, honest,
> 9    physically fit, and someone who has a big heart,
> 8    both in being able to go the extra mile, and also
> 10   someone who has – cares about other people.

---

[72]Personnel Research and Development Center of the US Civil Service Commission, Technical Study 77-B, dated December 3, 1976.

Page 32

| Table 2. US CSC Weighting Plan for Firefighter Exam[73] | |
|---|---|
| **Weight** | **Abilities and Characteristics** |
| 8.0 | Responsibility |
| 7.9 | Desire to Learn |
| 7.9 | Teamwork |
| 7.4 | Activity (energy) |
| 7.1 | Getting Along with People |
| **6.1\*** | **Problem-solving Ability** |
| 6.0 | Honesty |
| 5.4 | Visual Acuity |
| 5.1 | Mechanical Ability |
| 5.0 | Resistance to Stress |
| 4.5 | Quickness (physical) |
| 4.3 | General Body Coordination |
| 4.2 | Cleanliness |
| 4.1 | Dexterity (of limbs and fingers) |
| **4.0\*\*** | **Verbal Skills (written and verbal)** |
| 3.8 | Construction Trade Interest |
| 3.5 | Physical Strength |
| 3.2 | Courage |
| 1.5 | Math Skills |
| 1.1 | Medical interests |
| 100 | Total |

\* DCAS measured this ability in Exams 7029 and 2043 (in bold above)
\*\* DCAS measured the written part of this ability in Exams 7029 and 2043 (half in bold above)

---

[73]Derived from Table 20 (page 94) of Bownas & Heckman (1976) *Job Analysis of the Entry Level Firefighter Position.* Washington, DC: Personnel Research and Development Center of the US Civil Service Commission.

Page 33

The current federal job description system known as the O*Net identifies the following work-style areas[74] as being at the very important level for the job of Firefighter:[75] achievement/effort, adaptability/flexibility, analytical thinking, attention to detail, concern for others, cooperation, dependability, initiative, integrity, persistence, self control, social orientation, and stress tolerance.[76] DCAS did not test for these work-style areas in Exams 7029 and 2043 although DCAS expert, Dr. Schemmer, said it was possible do to do.[77] (See Attachment A for a reproduction of the relevant section of the O*Net web page for Municipal Firefighter.)

Job analysis studies done in various jurisdictions nationwide prior to the time of preparation of Exam 7029 have shown the importance of non-cognitive abilities for successful job performance as a Firefighter. For example, a multi-jurisdictional study done in 1979 revealed the importance of non-cognitive abilities such as: integrity, teamwork, emotional self-control, and dependability.[78] DCAS did not test for these non-cognitive areas in Exams 7029 and 2043.

Criterion-related validation studies done in various jurisdictions nationwide prior to the time of preparation of Exam 7029 have also shown the importance of non-cognitive abilities for successful job performance as a Firefighter. For example, a multi-jurisdictional study done in 1990 showed that "the interpersonal performance dimensions carried twice the weight of the technical dimensions in the raters judgements of overall [job] performance."[79] The simple correlations between test scores and overall job performance scores were .23 for memory and reading and .20 for responsibility and emotional stability.[80] That these numbers are so close means that

---

[74]Personal characteristics that can affect how well a person performs the job of Firefighter.

[75]Detailed summary for Municipal Firefighter downloaded (on 5/29/08) from the O*NET website: http://online.onetcenter.org/link/details/33-2011.01#WorkStyles

[76]Among Firefighters, stress tolerance is related to abuse of alcohol and illegal drugs: Bacharach, Bamberger & Doveh (2008)

[77]Schemmer page 300 lines 4-14.

[78]"The Development and Validation of a Multijurisdictional Fire Service Entrance Examination for the State of Utah" (Table 9, page 12).

[79]Sommerfeld, D. (1990) Firefighter Test Development and Criterion-Related Validation Project. Ann Arbor Michigan: Michigan Municipal League. (Page 6-6)

[80]Sommerfeld, D. (1990) Page 6-18

cognitive and non-cognitive abilities were comparable in validity. DCAS did not test for responsibility and stability in Exams 7029 and 2043.

The importance of non-cognitive abilities for NYC Firefighters is further supported by DCAS Written Test 6019 (first administered in 2007) which measured the following 7 personal characteristics: adaptability, tenacity, integrity, work standards, resilience, coordination (with others), and establishing and maintaining interpersonal relationships.[81] DCAS did not test for these personal characteristics in Exam 7029 and 2043.

Both job analysis and criterion-related validity studies done nationwide prior to the time of preparation of Exam 7029 support the validity of mechanical ability. For example, a multi-jurisdictional study done by the US OPM in 1980[82] found that mechanical ability had the highest correlation with the overall criterion (.20), while reading ability correlated .02 and arithmetic ability correlated .12 with the overall criterion. DCAS did not test for mechanical ability in Exams 7029 and 2043. It is also noteworthy that DCAS did not test mechanical ability, a cognitive ability that could have been tested easily and which has been reported to be a valid cognitive ability for predicting the job performance of Firefighters,[83] and for which tests have been available for many years.[84]

Even after the initial decision to use only Fleishman's cognitive ability areas, DCAS might have noticed some of these omissions if the job analysis were done a little differently. In the DCAS job analysis for Exam 7029, the ability list was not vetted by the Firefighters interviewed using the Field Interview Guide,[85] and there was no place on this form for incumbents to add additional characteristics or abilities that they thought were necessary.[86] Either of these might have revealed to the examiner that

---

[81]Notice of Examination for Firefighter Exam. No. 6019, page 2, paragraph 2.

[82]Bullock, C. (1980) A Study of the Validity of Selected Tests for the Selection of Entry-Level Firefighters in Three Maryland Counties. Page 51.

[83]The New York State Department of Civil Service examination for Firefighter includes mechanical reasoning questions. (Guide to Taking the Written Test for Firefighter Series (2002) New York State Department of Civil Service; Albany, New York, page 5.)

[84]Schemmer page 263 lines 16-22

[85]The Field Interview Guide did not contain any questions about the abilities that would be considered for inclusion in the examination, even though they were known at the time of the field interviews/observations. Pages USA004826 - USA004846.

[86]Test Development Report for Exam 7029, page USA004864.

additional abilities should have been considered.

Related to this restricted range of abilities considered, the Test Development Report for Exam 7029 has two contradictory statements on the page where the preparation for the job analysis is discussed:[87]

Conduct a new, comprehensive job analysis.
Use a Fleishman-based ability test. Among these abilities are Oral Comprehension, Writte [sic] Comprehension, Oral Expression, and Written Expression.

The stated goal, a "comprehensive" job analysis is vitiated by the unsubstantiated decision to limit the test to cognitive Fleishman abilities.

2.    **Fleishman Abilities Not Understood**
The list of Fleishman abilities (e.g., Spatial Orientation and Visualization) used in the job analysis for Exam 7029 are not easily understood by the lay person. The multiple problems this spawned contributed to the collection of job analysis data with unknown meaning.

a.    **Linking Panel Members Now Disagree with Their Own Ability Ratings**
In deposition,               , one of the 12 Linking Panel members who rated the importance of the Fleishman abilities, said that Written Expression was not important to the job of Firefighter.[88] This supports the current evaluation of               another Linking Panel member, that he rated Written Expression too high when he was a member of the Linking Panel.

Mr.        said his rating of importance of Visualization for the salvage task cluster was too high, in retrospect.[89] This Linking Panel member rated Written Expression as "Somewhat important" for Initial Response to Incidents/Driving, but in his deposition he said "a driver is not going to do much driving and writing at the same time",[90] and he would rate Written Expression as zero if he were to do the ratings again.[91] Similarly, now he would rate Written Expression as "Not relevant" for the Ventilation task cluster, but as a Linking Panel member he rated Written Expression as "Somewhat

---

[87]Test Development Report for Exam 7029, page USA004814.

[88]"On a firefighter's job, it's not that important." (        , page 43, lines 9-12).

[89]        page 101, lines 19-25, page 102 lines 2-5.

[90]        page 120, lines 8-10.

[91]        page 120 lines 21-24.

Page 36

| Table 3. Illustration of Multiplying versus Averaging Ratings | | | | |
|---|---|---|---|---|
| Ability | JAQ Average | Linking Panel Average | Multiply | Average |
| Ability X | 3 | 1 | 3 | 2 |
| Ability Y | 4 | 3 | 12 | 3.5 |
| Difference | 1 | 2 | 9 | 1.5 |

7. **JAQ Ability Ratings Received Less Weight than Linking Panel Ability Ratings**
The JAQ average ability importance ratings had little variability, with a range from the lowest to the highest average rating of less than .5 of a scale point for the average ratings of the 9 abilities tested on the 7029/2043 Written Tests. On the other hand, the Linking Panel average ability importance ratings had more variability, with a range of 1.1 scale points for the average ratings of the 9 abilities tested. This means the JAQ ability importance ratings (based on 192 people) had much less weight than the Linking Panel importance ratings (based on 12 people). This inequity in weighting the ratings of the JAQ and the Linking Panel was apparently unintended. It should have been noted and addressed in the Test Development Report, but it was not.[144] This is another example of the job analysis being done in a formulaic, thoughtless fashion rather than as an application of applied research, which requires dealing with the data collected in a thoughtful fashion.

8. **Another Anomaly in the Combination of Ability Importance Ratings**
DCAS made another logical error when it combined the two sets of ability importance ratings, those collected from 192 Firefighters who completed the JAQ and those from the 12 Linking Panel members. Under the DCAS method, the two importance ratings for each ability area were multiplied to get an overall importance rating for each ability.[145] The error arose due to the way DCAS assigned numbers to the 4 possible importance ratings. A four point importance rating scale was used for the JAQ and the Linking Panel, but different numeric values were assigned to the scale points: 1-4 for the JAQ, 0-3 for the Linking Panel (see Table 4).

---

[144]DCAS recognized a very similar problem in combining the scores of the WT and the PPT (and dealt with it by standardizing), but ignored this problem in combining the scores of the JAQ and the Linking Panel.

[145]Within ability this was done for each Task Cluster, and then the products for all the Clusters were averaged. (Test Development Report for Exam 7029, page USA004910).

Page 49

comporting with these widely accepted principles of test writing that the quality of the test questions and the whole test is seriously compromised.

### c. Reading Level of Test Overall Is Too High for the Job

My analyses show that the reading level for Written Tests 7029 and 2043 was too high for the job of Firefighter. I calculated the reading grade level for these tests and for the individual questions.[162] There are several widely used formulas used to calculate reading grade level. The most appropriate formula to calculate the reading grade level for multiple-choice tests is the "SMOG" formula. Unlike other approaches to measuring reading grade level, the SMOG formula was developed to predict 100% comprehension of written passages. (The widely used Flesch approach was designed to predict 75% understanding.[163]) I report reading grade levels based on the SMOG formula, unless otherwise noted. The reading grade level that is most appropriate varies depending on whether the reading material must be understood with or without assistance. For example, in a training environment where discussions with trainers or other trainees are allowed, a higher reading grade level can be tolerated. When a person is reading in an isolated or unassisted fashion, as when taking a civil service test, a lower reading grade level is important so that low reading skill does not obscure the ability being tested.

When written material is used in the training of Firefighters, both in the Fire Academy and in the fire station, the firefighters are allowed and even encouraged to ask questions of supervisors, trainers, or other colleagues.[164] For example, one Linking Panel member testified as follows:

> Page 115
> 23    Q.    If there is anything in the
> 24    written materials that someone in the
> 25    academy didn't understand, is there
> Page 116
> 1              M.J. CARLIN
> 2    always an opportunity to ask questions
> 3    about the materials?

---

[162]Readability formulas use various objective measures to predict the level of reading skill needed to understand the prose material at hand to a specified criterion level of understanding, and most describe that level of skill in terms of the "reading grade level" needed to comprehend the material to that criterion level of understanding. Most such formulas rely on two measures, one for sentence and one for word difficulty.

[163]As described, for example, in DuBay (2007) page 109.

[164]For example, Barretta, page 123 line 21 - page 124 line 21, and page 125 line 8 - page 126 line 6; and Kearns page 124 line 11 - page 125 line 18; Barron page 116 line 4 - line 14.

4    A.    Absolutely.
5    Q.    And you can get an oral
6    explanation of what's in the materials?
7    A.    Yes.
8    Q.    As far as you remember, are
9    there also visual demonstrations of
10    what's taught in the written materials?
11    A.    Yes.

This is a stark contrast to the conditions for taking a written multiple-choice test where talking (and asking questions) is forbidden. Therefore, the reading level requirements of written test questions should be below the reading level of material Firefighters may be given to read at the Fire Academy or in the fire station where assistance is readily available.

My reading grade level analysis shows that the average reading grade level for 7029 and 2043 questions were 12.3 and 12.8.[165] Both the 7029 and 2043 Written Tests contained many questions with high reading grade level, well into college and even graduate school levels. Since the DCAS Minimum Requirements for Firefighter allow people to take the test who have only a High School education, I tallied the number of questions using 12th grade reading level as a cutoff: 50 of the 85 questions on the 7029 Written Test and 56 of the 86 questions on the 2043 Written Test had reading grade levels above the 12th grade. (See Table 7 for a summary of question reading grade levels.)

For the sake of comparison, I provide similar readability information for two other written tests for Firefighter. One Firefighter test used widely is the Merit Employment Assessment Services (MEAS) test authored by Dr. Thomas Tyler. The MEAS readability analysis (see Attachment C) shows that his test has a 7th grade reading grade level (using the Flesch formula), a figure which I adjust up by 3 reading grades to be comparable to the SMOG readability analysis. This yields a SMOG-comparable reading grade level of 10th grade, more than 2 years lower than the comparable reading grade levels for Written Tests 7029 and 2043. Clearly the reading level of WT 7029 and 2043 are higher than needed for a Firefighter exam.

---

[165]That this is not driven by the questions measuring Written Comprehension is indicated by the average reading grade levels of 12.5 and 12.7 for the questions for abilities other than Written Comprehension or Memorization. Parenthetically I note that the DCAS readability analysis for 7029 contains a handwritten annotation that says, "Readability level without paragraphs and headings." (DCAS 004492) Given that the test instructions tell the test taker to answer the questions based on the accompanying paragraphs, omitting the paragraphs from the readability analysis yields an artificially low estimate of the reading level demands of the WTs.

| Table 7.  Summary of Question Reading Grade Levels for Four Tests | | | | | |
|---|---|---|---|---|---|
| | Whole Exam* Reading Grade Level | Lowest Question Reading Grade Level** | Highest Question Reading Grade Level | Mean Question Reading Grade Level | Number of Questions with Reading Grade Level above 12th Grade |
| 7029 Exam | 12.9 | 3.1 | 22.2 | 12.3 | 50 |
| 2043 Exam | 12.7 | 3.1 | 18.9 | 12.8 | 56 |
| Tyler Exam*** | 10.6 | n.a. | n.a. | n.a. | n.a. |

* Reading grade level was computed using the correct answers only.  Incorrect answers were not considered.
** The questions with the lowest reading grade levels all tested Memorization
*** This value is estimated from the Flesch analysis done by Tyler by adding 3 reading grade levels to his reading grade level.[166]

    **d.  Reading Level of Many Individual Questions Too High for the Job**
        Often a readability analysis of test questions is done on the whole test rather than on individual test questions, since individual test questions are usually very short, and short reading passages can yield spuriously high or low reading levels.  However, over half of the questions on both Written Tests 7029 and 2043 contain more than 100 words, so that concern is less relevant for these questions.[167]  A majority of the questions on both the 7029 and 2043 Written Tests were over the 12th grade reading level (see Table 7, Figure 1).

---

    [166]Often the SMOG reading grade level is from 2 to 3 years higher than the Flesch.

    [167]Written Test 7029 contains 11,844 words, and Written Test 2043 contains 11,517 words (omitting headings and tables, but including instructions and wrong answers, with number of spaces taken as a count of the number of words).

---

**Figure 1.  Reading Grade Level for Questions in WT 7029 and 2043**



In summary, the DCAS 7029 and 2043 Written Tests for Firefighter contained a majority of questions written at a reading grade level too high for the job.  Many applicants did not have a fair opportunity to show their abilities, for lack of a reasonable opportunity to understand many of the questions on the 7029 and 2043 Written Tests.

**e.  High Reading Level Violated the APA Standard on Fairness**

The *APA Standards* has a section entitled "Fairness in Testing and Test Use."  One of the "Standards" in that section reads as follows:

> "In testing applications where the level of linguistic or reading ability is not part of the construct of interest, the linguistic or reading demands of the test should be kept to the minimum necessary for the valid assessment of the intended construct.
>     Comment: When the intent is to assess ability in mathematics or mechanical comprehension, for example, the test should not contain unusual words or complicated syntactic conventions unrelated to the mathematical or

Page 61

1. **PPT Weight is Zero for Most Test Passers**

The intended weight for the PPT was 50% for both Exams 7029 and 2043.[225] However, for most of the test takers the PPT had no effect on their ranks at all. Over 70% of the test takers for each exam scored 100% on the PPT (see Table 9). For these test takers the final rankings were determined solely by the Written Test score and special point credits.

| Table 9. PPT Passing Score Distribution for Exams 7029 and 2043 | | |
| --- | --- | --- |
| **Score** | **7029 Number/ Percent** | **2043 Number/ Percent** |
| 75 | 549 9.7% | 535 8.2% |
| 87.5 | 1,139 20.1% | 1,048 16.1% |
| 100 | 3,974 70.2% | 4,943 75.7% |

2. **Equal Weighting of WT and PPT is Unsupported**
The decision to use a WT and PPT, weighted equally, was made prior to collection of any job analysis data.[226] This timing, together with the decision not to consider physical abilities in the job analysis,[227] means that the job analysis could provide no support for the validity of the choice of a WT and a PPT nor their relative weight. Thus there is no validation support for the equal weighting of the WT and PPT.

In addition, Mr. Alexander testified that DCAS has data collected in 1992 and again in 2005 that show that the weight for the PPT and WT should be 55% and 45%, respectively.[228]

3. **PPT z-Score Weighting Disadvantages Blacks**
The DCAS method worked to the disadvantage of blacks for a subtle reason related to

---

[225]As stated on the DCAS Notice for Examination for 7029 and 2043 (pages USA002575 and USA002572).

[226]The Test Development Report for Exam 7029, page USA004814.

[227]The Test Development Report for Exam 7029, page USA004814.

[228]Alexander page 98 line 8 - page 99 line 4.

truncation of scores. The reason for this is difficult to explain concisely, but this problem in scoring impacts every black test passer who did not get a perfect score on the PPT. The problem is that DCAS did not collect scores below 62.5 on the PPT. That throws off the z score weighting, as follows. The z score weighting uses and depends on both the mean and the standard deviation of the PPT raw score. When DCAS calculated the mean PPT using only the scores they recorded (i.e., 62.5, 75, 87.5, and 100) the mean PPT raw score is about 87.5.[229] However, some of the people whose PPT scores were recorded by DCAS as 62.5 were not allowed to complete the PPT test, and some of them would have scored lower than 62.5. If the mean were to be calculated on the full (real) PPT score distribution (including people with scores of 0, 12.5, 25, 27.5, and 50) the mean would be less than 87.5. That would mean that people with a raw PPT score of 87.5 would now be above the (new lower) mean. That would improve their z-score. If the standard deviation were calculated on the full PPT distribution it would be greater, since it would be based on a wider range of possible PPT scores (0 to 100 as compared to 62.5 to 100). The effect of both of these on the z- scores for passers would be to increase the z-scores for those people with a PPT raw score of 87.5 (since 87.5 would be above the mean) and decrease the positive z-scores for those people with a PPT raw score of 100. This would work to the advantage of blacks over whites on Exam 7029 since proportionally more blacks scored 87.5 and proportionally fewer blacks scored 100, as compared with whites. The z-scores for those with a PPT raw score of 75 would be either positive or less negative. This would help blacks since proportionally more blacks than whites achieved a score of 75. In short, the flawed z-score methodology worked to increase adverse impact on blacks on Exam 7029. The same would be seen with Exam 2043 where the mean PPT raw score was calculated by DCAS to be about 89.5.[230] As for Exam 7029, the scores for blacks on Exam 2043 would benefit more, relative to whites, from calculating the z-scores based on the full PPT distribution.

**4.    Passing Points for the Written Tests Were Not Validated**
The merit system in this country was established to combat patronage and assure that people hired are competent to perform the job. Often, public sector employers set the passing score at a point that attempts to assure competence. There is no indication that DCAS did that. The passing points for the WT for Exams 7029 and 2043 are quite different (84.705 and 70.0 respectively), even though the two Exams are roughly comparable in difficulty. The average scores on the two Written Tests differ by about 2 points whereas the passing points for the two tests differ by about 14 points (as shown in Table 10).

---

[229]The DCAS Explanation of Test Scores for Exam 7029 reports the PPT mean as 87.262 (page USA004935).

[230]The DCAS Explanation of Test Scores for Exam 2043 reports the PPT mean as 89.494 (page USA0004931).

takers who left one or more of these 10 questions blank was analyzed for whites and blacks.[202] On the 7029 exam, 0.2% of whites left one or more of these ten questions blank; 1.1% of blacks left one or more of these ten questions blank. On the 2043 exam, 0.4% of whites left one or more of these ten questions blank; 2.7% of blacks left one or more of these questions blank. This difference between whites and blacks for blanks in questions 16-25 was tested for statistical significance. On both exams, blacks had statistically significantly more blanks in questions 16-25 than whites.[203] One plausible explanation of this difference is that it reflects a difference in test taking sophistication, sometimes referred to as less testwise, since it is to the benefit of the test taker to answer all the questions on a test such as WT 7029 or 2043. It may also reflect unnecessarily difficult wording or jargon in the questions.

**d.  Blacks Left More Questions Blank at the End of the Written Tests**

For each exam, the number of test takers who left the last ten questions blank was analyzed for whites and blacks. On both exams, blacks had significantly more blanks in the last 10 questions than whites. On the 7029 exam, less than 1% of whites left one or more of the last ten questions blank while 3% of blacks left one or more of the last ten questions blank. On the 2043 exam, less than 1% of whites left one or more of the last ten questions blank while 3% of blacks left one or more of the last ten questions blank. This difference between whites and blacks for blanks in the last 10 questions was tested for statistical significance. On both exams, blacks had statistically significantly more blanks in the last 10 questions than whites.[204] It may be that the high reading level and similar flaws in test development made it harder for blacks, on average, to finish the test. Since the B-W difference in mean score on the WT is about 8 points for both 7029 and 2043, any aspect of the WT that might have contributed even a one point difference between white and black test takers is of great practical import.

**e.  These Tests Were Speeded But Were Not Intended to Be**

With respect to time limits, multiple-choice employment tests are either power tests, with a generous time limit that allows all test takers to answer all the questions, or speed tests, with a short time limit due to the nature of the test or the testing situation, in which case many or all test takers are expected not to finish. The WT for 7029 and 2043 were intended to be power tests. I say this for several reasons. First, that is the most typical approach to testing the abilities on these tests. Second, the time limit was 3.25 hours, which is a typical time limit for a power test. Third, the DCAS Instructions for Monitors for WT 7029 say that fingerprinting of test takers will take place during

---

[202]Questions 16-25 were chosen because they appear near the start of the test, but after the Memorization questions.

[203]7029: F = 23.1, p < 0.001; 2043: F = 50.2, p < 0.001

[204]7029: F = 84.8, p < 0.001; 2043: F = 65.6, p 0.001

Page 74

**EXHIBIT AA**

1

2   UNITED STATES DISTRICT COURT

    EASTERN DISTRICT OF NEW YORK

3   Civil Action No. 07-CV-2067

    ----------------------------------------------X

4   THE UNITED STATES OF AMERICA,

5                       Plaintiff,

    and

6   VULCAN SOCIETY, INC., for itself and on

    behalf of its members, CANDIDO NUNEZ,

7   MARCUS HAYWOOD and on behalf of a Class

    of All Others Similarly Situated,

8                       Plaintiff-Intervenors,

9        - against -

10  CITY OF NEW YORK, FIRE DEPARTMENT OF THE

    CITY OF NEW YORK, NEW YORK CITY

11  DEPARTMENT OF CITYWIDE ADMINISTRATIVE

    SERVICES, MAYOR MICHAEL BLOOMBERG and

12  NEW YORK CITY FIRE COMMISSIONER NICHOLAS

    SCOPETTA, in their Individual and

13  Official capacities,

14                      Defendants.

    ----------------------------------------------X

15

                    271 Cadman Plaza East

16                  Brooklyn, New York

17                  July 8, 2008

                    9:55 a.m.

18

19

20          CONTINUED DEPOSITION of

21  Non-Party Witness, FREDERIC MARK SCHEMMER,

22  pursuant to Federal Rules of Civil

23  Procedure, held at the above place, date

24  and time, before Alice Schulman, a Notary

25  Public of the State of New York.

M. Schemmer

Q.    Do you agree that even if you have a valid test, the test still may be used in such a way that the validity is weakened or destroyed?

A.    I would phrase that slightly differently.

Q.    How would you phrase it?

A.    I would say that because validity is as much a function of the process and application of the test as is the test itself, that certainly validity can be affected by an improper application or inference as validity doesn't follow the test around.

Q.    Do you agree with this statement, no matter how valid the exam, it is the cutoff score that ultimately determines whether a person passes or fails.  A cutoff score unrelated to job performance may well lead to the rejection of applicants who are fully capable of performing the job.

A.    As stated, I would agree with that.

M. Schemmer

Q.    Let me ask this, you recognize one of the things that you agreed with as coming from the APA standards, correct?

A.    I believe so.

Q.    When the APA standards refer to interpretations of test scores required by proposed uses, what does that mean?

A.    Essentially, I would take that to refer to the particular application of the test scores in whatever personnel selection process in this instance.

Q.    Let me ask this, what interpretation of test scores is required by use of a test as a pass/fail screening device with a cutoff score of 84.705?

A.    I apologize, could you repeat the question?

Q.    Sure.  My question is what interpretation of test scores is required by use of a test as a pass/fail screening device with a cutoff score of 84.705?

A.    The fundamental interpretation would be that individuals scoring higher than that cutoff had a greater likelihood

M. Schemmer

of successfully performing the job or

performing the job at a higher level of

competency than those lower than that test

score.

Q.    Let me ask this, what

interpretation is required by use of a

test for rank order selection?

A.    Essentially the same base

interpretation with the more explicit

expectation of a monotonic relationship

between test scorer or test performance on

the one hand and outcome measure on the

other hand.

Q.    Just because test scores on a

particular test have a correlation with

job performance, that doesn't necessarily

indicate that there's a monotonic

relationship; is that correct?

A.    In general, it would indicate a

monotonic relationship.  Regression or

correlation coefficients most typically

reflect a linear relationship which is

monotonic.

Q.    But not necessarily, correct?

M. Schemmer

1

2    A.    A linear relationship is

3    monotonic.  A monotonic relationship is

4    not necessarily linear.

5    Q.    Okay.  Do you agree with this

6    statement, where composite scores are

7    developed, the basis and rationale for

8    arriving at the composites should be

9    given?

10    A.    I would in principle concur.

11    Q.    Do you agree that in such a

12    situation the rationale and supporting

13    evidence must pertain directly to the

14    specific score or score combination to be

15    interpreted or used?

16    A.    One more time.

17    Q.    Do you agree that where

18    composite scores are used, the rationale

19    and supporting evidence must pertain

20    directly to the specific score or score

21    combination to be used?

22    A.    I would agree with that.

23    Q.    In your report on page 29, in

24    fact, the last sentence on page 29 you say

25    changes to specific content elements

M. Schemmer

1  characteristics, did it?

2  A.    I don't recall that it did.

3  Q.    Then why would you say that you

4  don't agree that the job analysis the City

5  did for exam 7029 overemphasized cognitive

6  skills?

7  A.    Perhaps to make the, parsing to

8  make the statement that it overemphasized

9  cognitive skills, I would want some sort

10  of definitive information suggesting that,

11  I'll say absent component whatever they

12  are of the sort on page 15 of this

13  document or others, that information, had

14  they been included in that job analysis,

15  such other things would have shown a

16  similar level of importance or frequency

17  or depending on whatever sort of ratings

18  were used.

19  Q.    If I told you that the job

20  analysis that was done for exam 6019 found

21  that physical abilities and personal

22  attributes were as important as cognitive

23  skills for the New York firefighter job,

24  and also found that the job had not

257

M. Schemmer

1  changed from the early 90's, would you

2  then agree the job analysis the City

3  conducted for exam 7029 overemphasized

4  cognitive skills?

5       A.    I would certainly come a great

6  deal closer to agreeing with that, yes.

7       Q.    Do you agree that increasing the

8  job analysis domain to capture the full

9  range of KSAs will likely decrease group

10  differences, reduce group differences?

11      A.    At a general level, I do not

12  believe that is necessary, would

13  necessarily be the outcome.

14      Q.    I asked if it was likely.

15      A.    I do not believe it would be

16  likely.

17      Q.    Okay.  If you look at page 20 of

18  Exhibit 663.

19      A.    Page 20?

20      Q.    Page 20.  It has a heading Job

21  Analysis Support for Measuring Multiple

22  Dimensions.  Now, looking at this chart on

23  page 20, in the job analysis that they're

24  reporting here, which category of ability

M. Schemmer

with practical skills.

Q.     You testified earlier about the
Barrett study, do you recall that
testimony?

A.     Yes, sir.

Q.     And you agreed that Barrett had
tested for mechanical, or Barrett's study
referred to the use of mechanical skills
as one of the criteria that was used in
his meta-analysis; is that right?

A.     The Barrett study categorized or
broke the tests into two categories that
they described or labeled as mechanical
and cognitive.

Q.     At the time that 7029 and 2043
were created and administered, the City
could have tested for mechanical skills on
those exams?

A.     Mechanical skills, aptitudes and
the like, certainly tests of those have
been around for quite awhile.

Q.     In your testimony last week, you
mentioned that you had received and looked
over a document that was referred to as a

M. Schemmer

Q.    Cleanliness, important to firefighters?

A.    Yes.

Q.    Medical interest, which I think you used as a criteria, important to firefighters?

A.    Yes.

Q.    According to this document, there were validating tests back in the 70's for all of these KSAs.  Could these all have been tested for in 1999 and 2002 when 7029 and 2043 were administered?

A.    Certainly tests of those constructs or categories were available during that time frame.

Q.    Are you familiar with a company called Previsor?

A.    Generally, yes.

Q.    Is that where Dr. Bobko has a relationship?

A.    I believe he either does or did have an advisory relationship with them. I don't know if that's current.

Q.    I think he testified that he was

292

M. Schemmer

1  on their technical advisory committee,

2  does that sound right to you?

3     A.    Yes.

4        MR. LEVY:  Could we mark this

5     66-A, please.

6        [The document was hereby marked

7     as Plaintiff-Intervenors' Exhibit 66-A

8     for identification, as of this

9     date.].

10    Q.    And I'm handing you a document

11 previously marked 66.  Do you know what,

12 do you know of Previsor and the work they

13 do?

14    A.    At a general level, yes, sir,

15 they are in a remote sense a competitor in

16 the assessment arena to some of

17 ChoicePoint's assessment area.

18    Q.    You wouldn't bad mouth their

19 assessment here?

20    A.    Not at all.

21    Q.    The item that's been marked as

22 Plaintiff's Exhibit 66 says that,

23 advertises that Previsor does personality

24 assessments, evaluating factors such as

293

M. Schemmer

emotional control, stress tolerance, self

confidence, adaptability, independence,

responsibility, initiative

competitiveness, social awareness, empathy

and influence.

1        Are those all items that can be

tested for on a written test?

A.    They are certainly within

assessments or paper and pencil

assessments of those constructs.

Q.    And Dr. Bobko testified that the

company maintains that these are valid

assessment measures.  Do you have any

reason to believe they are not or would

not be?

A.    No, I do not.

Q.    Further down there is a category

called behavioral that involves biodata

instruments used by Previsor.  Have you

used biodata instruments?

A.    Some work that I have done in

the past involve biodata instruments, yes.

Q.    And do you know if they were

valid assessment instruments?

294

M. Schemmer

1      A.      Certainly in at least one study

2    that I can recall the biodata component

3    showed evidence of validity.

4      Q.      The assessments referred to on

5    Plaintiffs' Exhibit 66 are all evaluation

6    measures of the type that could have been

7    utilized in a paper, pencil test in 1999

8    and 2002 when 7029 and 2043 were

9    administered?

10     A.      I would think so.

11     Q.      Let's take a look at the

12   document that's been marked 66-A, also

13   from Previsor.  Did I give you this yet?

14     A.      I think so.

15     Q.      If you look at some of the jobs

16   and the KSAs that were measured, there's

17   not a job I should say for firefighter

18   here.  It's not one of the jobs that they

19   list, but I think some of the jobs that

20   are listed here have some overlap, and I

21   will ask you about those.

22            Do you think on page 3 the job

23   that's called general skilled job that

24   would call material handlers, maintenance

298

M. Schemmer

orientation, dependability and

conscientiousness are items that are

tested for on paper and pencil tests?

    A.    Yes, sir.

    Q.    And could have been tested for

on the 7029 and 2043 exams?

    A.    Yes, sir, exactly the same

answer I gave to the same set of KSAs in

the general skill construction.

    Q.    Would you think that well

developed tests to assess these KSAs that

we've talked about that are referred to on

66-A could add validity to an exam for

firefighter?

    A.    I would say they certainly have

the potential to do so, yes, sir.

    Q.    In your opinion, do you think

that these measures would have a lower

black-white difference in results, a

different d, a lower d than a purely

cognitive test would?

    MR. FRAENKEL:  Objection as to

    form, but you can answer.

    A.    Certainly the literature

M. Schemmer

1    suggests that these sorts of KSAs, I will

2    broadly label them personality

3    characteristics, typically show small

4    letter d's or lesser differences between

5    black and white job applicants or

6    incumbents, yes.

7    Q.    Have you read Dr. Bobko's --

8         MR. LEVY:  Withdrawn.

9    Q.    I'm going to show you a document

10   that's previously been marked

11   Plaintiff-Intervenors' 65.  These are the

12   O&NET KSAs for firefighter.  Have you seen

13   this before?

14   A.    I am familiar with O*NET.  I

15   don't recall this specific page or list

16   offhand.

17   Q.    Well, why don't you take a look

18   at it for a minute.  I'm going to ask you,

19   perhaps without going through all of these

20   individually, whether these are all KSAs

21   that can be tested for on a written paper

22   and pencil test and could have been tested

23   for at the time that 7029 and 2043 were

24   administered.

300

M. Schemmer

1    A.    (Witness complies.)  Is there a

2    question outstanding?

3    Q.    I just wanted you to look at it

4    with some advance advice that there would

5    be a question, and I think I told you what

6    the question is but I'll restate it.

7         It's the same question I was

8    asking you before about the Previsor

9    KSAs.  Are these all KSAs that can be

10   tested for on a paper and pencil test?

11   A.    I would suggest the majority

12   certainly have paper, pencil test

13   implementations.

14   Q.    Are there particular ones that

15   don't, to your knowledge?

16   A.    I'm hard pressed offhand on my

17   part to think of a paper, pencil test of

18   innovation, for example, towards the

19   bottom of the list.

20   Q.    Okay.  Any others?

21   A.    There is certainly some debate

22   as to whether leadership is something that

23   can be systematically assessed with a

24   paper, pencil test.

301

M. Schemmer

1  Q.    All right.  Any others?

2  A.    Self-control is one that, again,

3  depending on the particular

4  implementation, could be difficult in a

5  pre-employment situation since many

6  measures of self-control would potentially

7  step into difficulties with ADA.

8  Q.    But could you test for

9  self-control, for example, in the way that

10  the Stanton test tests for dishonesty

11  which is, I guess, involves self-control?

12  A.    I would buy that some

13  definitions of self-control or some

14  implementations might be testable

15  assessable with a written test.

16  Q.    Would you say with respect to

17  these that you would expect that they

18  could, the use of them in an exam would

19  add to validity?

20  A.    They certainly would have the

21  potential to do so, yes, sir.

22  Q.    Would you also say that they,

23  most of these would be likely to have

24  lower adverse impact than purely cognitive

302

1           M. Schemmer

2    assessments?

3        A.    Broadly or generally speaking, I

4    would anticipate they would have lesser

5    impact than cognitive assessments.

6        Q.    Are these all apart from the

7    ones that you didn't think were testable,

8    KSAs for which there were assessments in

9    1999 and 2002 which could have been used

10   in the 7029 exam or the 2043 exam?

11       A.    I suspect so, yes, sir.

12           MR. LEVY:  It's a quarter to one

13       and I'm perfectly happy to keep going

14       but -- off the record.

15           (Discussion off the record.)

16           (Whereupon at 12:48 p.m. a

17       luncheon recess was taken.)

18           AFTERNOON SESSION.

19           (Time noted: 1:37 p.m.)

20           (Mr. Reese left the hearing room

21       and did not return.)

22   BY MR. LEVY:

23       Q.    We are back on the record.  Dr.

24   Schemmer, I've asked you to look at

25   exhibit, Plaintiffs' Exhibit 149 which is

308

M. Schemmer

1   Q.   Which ones would not?

2   A.   As one example, explosive

3   strength is, the physical abilities in the

4   Fleishman context, an example of one that

5   we very rarely find important to job

6   performance outside of the sports domain.

7   Q.   Do you know why the reference on

8   the right says that Fleishman and

9   Quaintance, well O*NET, important

10  abilities for firefighters, they seem to

11  have rated it important?

12          (Mr. Ling entered the room.)

13  A.   Point of clarification,

14  Fleishman and Quaintance would be the

15  reference source for the source of that

16  ability as opposed to the individuals who

17  wrote the O*NET documents themselves.

18  With many abilities, explosive strength is

19  a very good example of one.  Without

20  careful explanation and delineation

21  between the abilities raters, typically

22  incumbents will often over focus on the

23  label, for example, explosive strength and

24  sort of generalize and not distinguish

309

1                    M. Schemmer

2       between or amongst specific abilities.

3                    That said, by all appearances,

4       whatever raters went into were fed the

5       O*NET documents for firefighters

6       apparently rated that as important.

7           Q.    Doesn't it seem for, logically

8       to be important that a firefighter having

9       to burst into a burning building or grab a

10      child or a person in danger or break down

11      a door after climbing up two flights with

12      80 pounds, or whatever the weight is of

13      equipment, might be very much helped by a

14      good ability to exercise explosive

15      strength?

16          A.    I wouldn't say it's irrelevant

17      by any stretch.  What I'm suggesting from

18      my perspective and experience, and as a

19      particular example with firefighters, it

20      would be substantially less important than

21      static strength or dynamic strength.

22          Q.    What else on this list would you

23      not rate as important?  Referring to the

24      list again, it starts at 215 and goes

25      through 228.

**EXHIBIT BB**

1

1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
3  Civil Action No. 07-CV-2067
   ---------------------------------------x
4  THE UNITED STATES OF AMERICA,
            Plaintiff,
5  and
   VULCAN SOCIETY, INC., for itself and on
6  behalf of its members, CANDIDO NUNEZ,
   MARCUS HAYWOOD and on behalf of a Class
7  of All Others Similarly Situated,
            Plaintiff-Intervenors
8
            -against-
9
   CITY OF NEW YORK, FIRE DEPARTMENT OF THE
10 CITY OF NEW YORK, NEW YORK CITY
   DEPARTMENT OF CITYWIDE ADMINISTRATIVE
11 SERVICES, MAYOR MICHAEL BLOOMBERG and
   NEW YORK CITY FIRE COMMISSIONER NICHOLAS
12 SCOPETTA, in their Individual and
   Official capacities,
13          Defendants.
   ---------------------------------------x
14             February 21, 2008
               10:01 a.m.
15

16         Deposition of CATHERINE S. CLINE, taken

17    by the Plaintiff, pursuant to Notice, at the

18    offices of the United States Attorney for the

19    Eastern District of New York, 271 Cadman Plaza

20    East, New York, New York, before David Levy,

21    CSR, a Notary Public of the State of New York.

22

23

24

25

14

1              Cline

2    looked at?

3         A. In re -- talking with -- in reviewing

4    documents prior to this deposition, I was made

5    aware of some documents by the attorneys that I

6    was not aware of previously.

7         Q. Now, so on your own, to prepare for

8    today's deposition, you looked, just looked back

9    at job analysis 6019, is that correct?

10        A. That's correct.

11        Q. And other than counsel, did you speak

12   with anyone to prepare for the deposition?

13        A. No.

14        Q. Now, you mentioned speaking with

15   counsel and being given documents to review.  How

16   many times did you meet with counsel in

17   preparation for this deposition today?

18        A. Once.

19        Q. And when you're talking about

20   counsel, are you speaking only of Mr. Sample?

21        A. Mr. Sample and Mr. Frankel.

22        Q. Was anyone else present at the

23   meeting?

24        A. No.

25        Q. When did it occur?

15

1              Cline

2    A. Tuesday.

3    Q. Last Tuesday?

4    A. Two days ago.  Today is Thursday,

5  right?

6    Q. Right.

7    A. Tuesday.  The day before yesterday.

8    Q. How long was the meeting?

9    A. Two hours.

10    Q. And you said that you were given

11  documents that you had never seen before?

12    A. I was shown documents that I had

13  never -- never seen before.  I wasn't given them.

14    Q. I see.  Were you shown any documents

15  that you were familiar with?

16    A. One I was shown, which was the job

17  analysis report that was written by Matt

18  Morrongiello for one of the previous exams, I had

19  looked at before.

20    Q. Any other documents that you had seen

21  before?

22    A. No.

23    Q. What documents were you shown that

24  you were not familiar with?

25    A. I had never seen the document that

26

1              Cline

2       Q. Okay.

3       A. Of the test, or the subtest.

4       Q. Anything else?

5       A. I can't think of anything.

6       Q. Okay. So in terms of preparing the

7   test development report, my understanding from

8   your testimony is that you are the only person

9   preparing the report and Dr. Bobko has offered

10   you some comments and edits, is that correct?

11       A. That's correct.

12       Q. Is there anybody else involved?

13       A. No.

14       Q. Now, what is the highest level of

15   education you've attained?

16       A. I have a Ph.D.

17       Q. And from where did you receive this?

18       A. Columbia University.

19       Q. What was your major?

20       A. Psychology, measurement and

21   evaluation.

22       Q. When did you get your Ph.D.?

23       A. 1979.

24       Q. Okay. I assume you also have a

25   Master's degree?

28

```
 1              Cline
 2  through Columbia as part of your larger Ph.D.?
 3      A.  Yes.
 4      Q.  You also have a BA, I see?
 5      A.  Yes.
 6      Q.  And where did you receive your BA
 7  from?
 8      A.  From Barnard College, Columbia
 9  University.
10      Q.  In what field?
11      A.  Psychology.
12      Q.  All right.  And when did you get your
13  BA?
14      A.  1972.
15      Q.  Do you have any other post-secondary
16  degrees?
17      A.  No.
18      Q.  Do you have any professional
19  certifications?
20      A.  I have a license -- I'm licensed as a
21  psychologist in New York State.
22      Q.  Anything else?
23      A.  I've been accepted as an expert
24  witness in the areas of job analysis, test
25  development, adverse impact analysis, by a number
```

29

1                Cline

2  of different courts.

3        Q.  You say job analysis, test

4  development, what was the other?

5        A.  Adverse impact analysis.

6        Q.  Anything else?  Were you accepted as

7  an expert in any other fields?

8        A.  No.

9        Q.  Have you published any books,

10  articles or papers in the area of test

11  development or validation?

12        A.  I did some papers that were on my

13  resume when I was first out of graduate school,

14  but I haven't really published anything since.

15        Q.  How about in the area of job

16  analysis?

17        A.  Not that I can remember.  I don't

18  have anything major published in anything.

19        Q.  Statistics?

20        A.  No.

21        Q.  How many job analyses have you

22  conducted?

23        A.  Maybe a hundred.

24        Q.  Okay.  How many of those job analyses

25  are for public safety positions, would you

41

1          Cline

2          A.  It wasn't a position.  It was a -- it

3     was sort of like a self-informed -- to help

4     people -- more sort of like a personality

5     inventory.  It was to try and help them know more

6     about themselves.

7          Q.  Just part of the course you were

8     teaching?

9          A.  No.  It was just for -- it was just

10    for someone who was a friend-of-a-friend type

11    thing.

12         Q.  Okay.  Now, are you a member of the

13    American Psychological Association?

14         A.  Yes, I am.

15         Q.  How long have you been a member?

16         A.  Probably since 1979 or '80.

17         Q.  Do you hold any positions in the APA,

18    other than member?

19         A.  No.

20         Q.  Have you ever?

21         A.  No.

22         Q.  Are you familiar with a publication

23    called the Standards For Education and

24    Psychological Testing that was published by the

25    APA in 1999?

45

1                    Cline

2        A.  Yes.

3        Q.  And have you read them?

4        A.  Yes.

5        Q.  And how do you use them as a

6   reference in developing or validating a test?

7        A.  Again, pretty much what I said for

8   the standards.  It's not like there's anything in

9   there that I wasn't acquainted with before they

10  wrote them.  It's more to justify why I did

11  something or why something that was done is in

12  conformance with the standards, or is not

13  arbitrary and capricious.

14       Q.  Are you a member of any other

15  professional organizations related to test

16  development or validation?

17       A.  I'm a member of -- well, I'm maybe

18  not a member right now, the Metropolitan

19  Association of Applied Psychology.

20       Q.  How long have you been a member of

21  this organization?

22       A.  Twenty-five years.

23       Q.  Have you held any leadership

24  positions in this organization?

25       A.  I have been president,

64

1          Cline

2   similar to the physical test we had already.

3          Q.  What do you mean by the PPT is or was

4   a competitive test?

5          A.  The physical performance test?

6          Q.  Correct.

7          A.  They rank-ordered people in terms of

8   their performance on it.

9          Q.  Okay.  Can I ask, what was meant by

10  "feasibility" in terms of when it was said in

11  your report that you were trying to explore the

12  feasibility of using the CPAT?

13         A.  I wanted to go talk to the Police

14  Academy and in fact, I did go and talk to the

15  police academy and I talked to the person who was

16  in charge of the police academy and who was in

17  charge of physical training for the recruits.

18  And one of the things I found out was that they

19  were using the CPAT as an exit-level measure of

20  physical fitness in the academy.

21         And I also found out that they were

22  having trouble with the physical fitness of

23  people coming into the academy because in fact,

24  they had taken the physical, the PPT, shall we

25  say, three years earlier, possibly, and in that

65

1            Cline

2    time, they had become not physically fit.

3        Q.  Okay.

4        A.  So it wasn't a current measure of

5    their physical fitness.  And they were having

6    problems with people who entered the academy who

7    were not able to go through basic training, even

8    though they had passed the PPT two or three years

9    ago.

10       Q.  Okay.

11       A.  And they were having a hard time

12   figuring out what to do with it.  So when I

13   talked to them, one of the things they said to me

14   was that they would much rather have the CPAT as

15   an entry-level sort of immediately entry-level

16   screen to the academy than to have the PPT,

17   because then at least they would have a current

18   measure of the candidate's physical fitness.

19           And since we knew that the CPAT had

20   in fact been validated, and in fact that the EEOC

21   had used it and had entered into an agreement, we

22   thought that it made sense and the Fire Academy

23   people thought it made sense to use the CPAT as

24   an immediate measure of a candidate's physical

25   fitness rather than to take one at the time of

1          Cline

2   they had standardized the physical exam scores

3   and the written exam scores, and weighted them

4   fifty-fifty.

5          So I did some -- I looked at some of

6   that data.  And -- and so I knew that, you know,

7   that they had standardized and weighted them

8   fifty-fifty, and I believe it was probably all

9   three of them, 2043, 7029, and probably 0084,

10   though I can't swear to any of that 'cause all I

11   know is I looked at one, of the data from one of

12   those tests.

13          Q.  And in what way do you understand

14   that the written exam and the PPT carried equal

15   weight?

16          A.  I mean that when they were

17   standardized, they were basically, the standard

18   scores were averaged or you could say that each

19   part, each standard score was multiplied by .5.

20          Q.  In your review of the weighting of

21   the written exam and PPT for exam 7029 or 2043,

22   did you note any challenges or difficulties

23   associated with equally weighting the written and

24   PPT exams?

25          A.  Well, one of the things that I noted

1              Cline

2    was that they didn't have scores for people who

3    failed the PPT.  They only gave them, like, I

4    think a score of 60 or something.  So they didn't

5    have complete score data.

6        Q.  Why was that a problem or difficulty?

7        A.  It makes it difficult to calculate a

8    standard score.

9        Q.  Why is that?

10       A.  Because you don't have the entire

11   score distribution, because everyone who was

12   failing was just given a single score.

13       Q.  Okay.  Did you ever perform any

14   analysis regarding the test score distribution

15   for the written exam and PPT underlying exam 7029

16   and 2043?

17       A.  I did.  But I'm not sure exactly what

18   I noted except for the fact that we didn't have a

19   complete score distribution for the physical --

20   well, you know, and the other thing I guess is

21   because you had to take -- pass the written to

22   take the physical.  So that also creates some

23   problems because you're curtailing the score

24   distribution.  You're not giving it to the same

25   population because a larger population takes the

69

1          Cline

2  written than takes the physical.

3          Q.  What did you conclude from that, or

4  what is the difficulty with that?

5          A.  It just makes it difficult to

6  standardize.

7          Q.  Okay.

8          THE WITNESS:  Excuse me, I need to

9  take a break.

10          MS. SEELEY:  Sure.

11          THE WITNESS:  Yes.

12          (Recess taken.)

13  EXAMINATION (Cont'd.)

14  BY MS. GELLER:

15          Q.  Just staying with a discussion of the

16  scoring and equal weighting of 7029 and 2043, did

17  you note that there were only three possible

18  passing scores on the PPT, so distribution is not

19  smooth?

20          A.  I did.

21          Q.  And does that create, does this

22  create any challenges in terms of combining the

23  written and the physical scores, the PPT scores?

24          A.  It might.  You know, I'm just not

25  even sure how those scores were derived.  I just

70

1               Cline

2   don't know.

3       Q.  You just noted it.

4       A.  I just noted that there were only,

5   yes, three, and then everybody who had the

6   failing score was given, I think, a 60.  And I

7   believe there were things where some people

8   weren't even allowed possibly to complete the

9   test because they had failed certain events or

10  were having physical difficulty or -- so there

11  were -- there were things there that would make

12  it difficult to do psychometrically as well.

13      Q.  Now, did you note that the

14  distributions for the PPT, the score

15  distributions for the PPT and the written exam,

16  were bunched together at the high end?

17      A.  I don't remember that.  They may well

18  have been.  I think so.  But I don't remember it

19  myself.

20      Q.  If that were true, that the score

21  distributions for the written exam and the PPT

22  were bunched together at the high end, would this

23  create any challenges for combining the written

24  and the physical scores?

25      A.  Not necessarily.

72

1          Cline

2      Q.  7029.

3      A.  -- right.

4      Q.  So when was the task list updated?

5  Was it updated for the job analysis for exam

6  7029?

7      A.  Am I 7029?  No.  It probably was.  I

8  don't really know what was done on either 2049 or

9  7029.  What I do know was that I updated the task

10  list for --

11      Q.  6019?

12      A.  -- 6019.

13      Q.  So you know that you updated the task

14  list for 6019.  But you do not know whether the

15  task list was updated for 7029 or for 2043?

16      A.  Well, I think if 7029 was Matt's,

17  then he updated it.  I'm pretty sure that he

18  wrote that he did that in the job analysis.

19      Q.  Okay.  Now, do you have any

20  information that the job of entry-level

21  firefighter changed substantially between the

22  time exam 0084, that's the Landy Jacobs that you

23  were involved with, was developed, and exam 7029,

24  that's the Matt Morrongiello exam, was developed?

25      A.  The only thing I can speak to is, it

73

1            Cline

2   didn't seem to me that the job had changed much

3   from when I did observations for the Landy Jacobs

4   job analysis.

5       Q.  Okay.

6       A.  Which was probably somewhere around

7   1990.

8       Q.  Okay.

9       A.  I'm not sure.  And when I talked to

10  people and did observations in 2007, it seemed to

11  me that the job was pretty much the same.  And I

12  also did actually probe them.  When we were doing

13  task reviews for the job analysis for this latest

14  job analysis, I probed them about how the job had

15  changed or whether it might have changed after

16  the World Trade Center, after 9/11, because I had

17  found with, for example, Port Authority Police

18  lieutenant or sergeants, that their jobs had

19  changed considerably as a result of that.

20      So I did probe them some on that as

21  part of the job analysis.

22      Q.  Okay.

23      A.  And they didn't, they really couldn't

24  give me very much in terms of additional things

25  they were doing differently at the firefighter

74

1           Cline

2   level.  I'm sure they do it at the higher levels.

3           Q.  Now, in terms of updating the task

4   list, we talked about updating the task list for

5   6019.  You state in your report on page 3 that

6   the most recent task list was identified to be

7   used as an initial draft for the current effort.

8           A.  Right.

9           Q.  What do you mean by "the most recent

10   task list"?

11           A.  Well, I thought, at the time, I was

12   talking about Mr. Morrongiello's task list.

13           Q.  Okay.

14           A.  I didn't realize that in fact there

15   had been another task list update or something in

16   between Mr. Morrongiello and mine.  I really

17   didn't realize that until I was talking with

18   Mr. Frankel and Mr. Sample in this preparation.

19           Q.  So you were, when you wrote that the

20   most recent task list had to be updated, you were

21   referring to the task, the final task list from

22   exam 7029, correct?

23           A.  I thought I was.  But they gave me

24   the most recent task list, so it might have been

25   Mr. Johnston's.

1                   Cline

2    was determined that it was appropriate to use

3    them as the starting point for a new Job Analysis

4    Questionnaire.  However, it was felt that the

5    abilities list might be updated, explicated and

6    made more comprehensive to target more than

7    physical and cognitive aspects of the job; e.g.,

8    interpersonal abilities."

9         Was the previous job analysis

10   referenced in the statement the one conducted for

11   exam 7029?

12        A.  Yes, in and in fact, I think they had

13   the same, pretty much the same ability list,

14   pretty much throughout, because it's Fleishman's

15   taxonomy.

16        Q.  You mean the 18 Fleischman cognitive

17   abilities included in the 7029 Job Analysis

18   Questionnaire?

19        A.  Yes.

20        Q.  I have to ask it.  Why did you feel

21   that the abilities list used in the previous job

22   analysis might be updated, explicated and made

23   more comprehensive?

24        A.  Well, there's a movement in the field

25   of selection and testing that one way to mitigate

1                    Cline

2    some of the impact that typically occurs in

3    cognitive tests against protected classes is to

4    include more attributes or abilities than

5    cognitive abilities in the predictor instrument;

6    i.e., in the written test or in the testing

7    mechanism, selection mechanism.

8            So this is cognizant with the

9    recognition that, in the last, say, ten or

10   fifteen years, there's been a movement in

11   selection to use more personality instruments as

12   part of the selection mechanism, as a way of

13   possibly reducing impact.

14       Q. Okay.

15       A. So that's been a movement in testing

16   and selection for the last, I'd say, it's coming

17   to the fore in the last ten years. And so both

18   Dr. Bobko and I were aware of this, and so we

19   wanted to expand what we put on the written test

20   in the hope of reducing some of the impact

21   against protected classes.

22       Q. Okay. Now, did the ability list for

23   the 7029 job analysis include physical ability?

24       A. I don't know. It might have.

25       Q. Did it include interpersonal ability?

89

1           Cline

2   many different jobs and the abilities they

3   required.  And that was the predecessor to O*NET.

4   And I had certainly looked at those taxonomies.

5       Q.  When was the predecessor taxonomy of

6   O*NET available?

7       A.  It was certainly available in the

8   '80s and the '90s.  The O*NET, I think

9   probably -- I'm not sure when the transition was

10  made.

11      Q.  Okay.  So the Fleischman and -- I'm

12  not sure how to pronounce --

13      A.  Quaintance.

14      Q.  -- Quaintance's taxonomy was

15  developed in 1984, is that correct?

16      A.  Yes.

17      Q.  And the Thornton and Byham taxonomy

18  was developed in 1982, is that correct?

19      A.  Yes.

20      Q.  And you said you're not sure when the

21  O*NET taxonomy became available, but it's

22  basically a successor to a similar one that was

23  available in the '80s.

24      A.  Right.

25      Q.  And did the predecessor to O*NET also

163

1                    Cline

2    abilities in a written format?

3         A.  When you say "any of the above,"

4    you're talking about specific --

5         Q.  Oral.

6         A.  -- oral?

7         Q.  Comprehension, speed of closure,

8    flexibility of closure, perceptual speed or time

9    sharing.

10        A.  Okay.  Oral comprehension, I

11   definitely worked on tests which presented, you

12   know, a tape recording or a video of speech or

13   actions, but required -- required listening or

14   oral comprehension in order to answer a question,

15   which was then written in a multiple-choice

16   written format.

17            So the stimulus would have been a

18   recording, some sort of recording, and that would

19   be -- so that you would hear speech so that then

20   you could assess it in a written test.

21        Q.  Do you know for what positions you

22   developed exams that tested oral comprehension?

23        A.  Well, the only time I -- certainly, I

24   did it all the time on oral examinations, okay?

25   I'm thinking in terms of written examinations.  I

1                    Cline

2    did some of that in some of the practical

3    examinations that I did in my environmental

4    health studies many years ago.

5         Q.  Do you know when these exams were

6    developed?

7         A.  Oh, these would have been back in the

8    early '80s.

9         Q.  Okay.

10        A.  When I worked at Psychological

11   Corporation which would have been in the early

12   '70s, we did something called the oral directions

13   test.  And I actually did work on that test and a

14   computerized version of that test in which you

15   would give a person instructions orally via

16   recording or via a computer simulation or via --

17   actually, it wasn't a computer, it was a video

18   which was new enough back then, it was a video

19   and the person would tell the person to draw a

20   circle or to put an X in the box or do whatever.

21            And they would have to do whatever,

22   sort of, on the test sheet.  So I've worked,

23   those are two off the top of my head I can

24   remember doing.

25        Q.  How about speed of closure on a

1              Cline

2  written test?

3      A.  Speed of closure, I've never measured

4  before this time.  Speed of closure, as I think I

5  said somewhere else, or maybe not, there aren't

6  that many tests of speed of closure and the ones

7  they have are really abstract.

8      Q.  How did you know speed of closure

9  could be tested on a written test?

10      A.  Because if you research speed of

11  closure, you do find that in fact, it has been

12  measured on written tests in picture formats.

13      Q.  Do you know when you had seen speed

14  of closure tested in written formats?

15      A.  I looked it up when I was considering

16  this.  I think I saw some examples in a basic

17  testing book, Anne Anastasi's Essentials of

18  Psychological Testing, or something like that.

19  And it had some examples of this.

20      Q.  What about flexibility of closure?

21      A.  That was a harder one but I think --

22  I know I found examples when we were looking it

23  up.

24      Q.  Have you ever --

25      A.  No, I've never done it myself.  This

244

1

2  UNITED STATES DISTRICT COURT

3  EASTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - -x
   THE UNITED STATES OF AMERICA,
5
                    Plaintiff,
6
        and
7
   VULCAN SOCIETY, INC., for itself and on
8  behalf of its members, CANDIDO NUNEZ,
   MARCUS HAYWOOD and on behalf of a Class
9  of All Others Similarly Situated,

10          Plaintiff-Intervenors,

11          -a-

12  CITY OF NEW YORK, FIRE DEPARTMENT OF
    THE CITY OF NEW YORK, NEW YORK CITY
13  DEPARTMENT OF CITYWIDE ADMINISTRATIVE
    SERVICES, MAYOR MICHAEL BLOOMBERG and
14  NEW YORK CITY FIRE COMMISSIONER
    NICHOLAS SCOPETTA, in their Individual
15  and Official capacities,

16
            Defendants.
17  - - - - - - - - - - - - - - - - - -x

18          271 Cadman Plaza
            Brooklyn, New York
19
            March 24, 2008
20          9:51 a.m.

21

22

23      DEPOSITION OF CATHERINE CLINE

24

25

1          CATHERINE CLINE

2    sense to combine them.  So I had him

3    correct the correlations for the

4    reliability of each variable that

5    entered into the correlation.

6      Q.   What did you find out?

7      A.   I can't remember.  I mean, I

8    remember that, in fact, the

9    correlations went up pretty high, but

10   they usually do on cognitive tests.

11   You usually have a fairly good -- the

12   test scores do correlate pretty highly.

13   Not totally.  There are still some

14   distinct variances, but they do

15   correlate pretty highly.

16     Q.   Now, if an item is measuring

17   the ability it's intended to measure,

18   that is, items that measure the same

19   ability should be more highly

20   correlated with each other than with

21   items measuring other abilities; is

22   that correct?

23     A.   Yes.

24     Q.   What would it indicate to you

25   if items intended to measure one

1          CATHERINE CLINE

2     A.   No.

3     Q.   Why not?

4     A.   Because my computer wouldn't

5   do it.

6     Q.   Okay.  So if you had

7   performed an analysis of the pattern of

8   correlations between individual test

9   items, wouldn't this have told you

10   whether an item is measuring the

11   ability it's intended to measure, that

12   is, items that measure the same ability

13   should be more highly correlated with

14   each other than with items measuring

15   other abilities?

16     A.   Yes.  I would think so, yes.

17     Q.   And if items measure the

18   abilities or attributes they're

19   supposed to, you would expect to see

20   that pattern correlation; is that

21   right?

22     A.   Yes.

23     Q.   What would it indicate to you

24   if items intended to measure one

25   cognitive ability correlate as or more

1      CATHERINE CLINE

2    A.   I think not.  I think it was

3  just something that Dr. Bobko and I

4  discussed and that was why we wanted to

5  add in more abilities or more personal

6  characteristics or whatever you wanted

7  to call them into the test mix because

8  we knew from the research that some of

9  these types of characteristics, that

10  measures of them had less impact

11  against minority groups than, say,

12  straight cognitive tests did.  So we

13  wanted to add in more of these types of

14  abilities so that we could sort of

15  increase the mix of abilities and

16  possibly come up with a more

17  comprehensive test, but a test which

18  also had less impact on minorities.

19    Q.   And nobody from DCAS spoke to

20  you about that?

21    A.   No.  This is more the way the

22  field is going in terms of -- that's

23  the way the field is going in terms of

24  reducing adverse impact, the inclusion

25  of more different and varied predictor

508

1          CATHERINE CLINE

2    measures in the examination.

3              And so Phil and I knew that,

4    but I don't think DCAS people would

5    have necessarily known that, and maybe

6    not even the lawyers would have known

7    that. But it certainly -- it's

8    certainly -- and certainly the Fire

9    Department wouldn't have known it.

10            But it's certainly something

11   that is of interest in my field. And

12   in the last 10 years there's been a lot

13   of information that's come out that, in

14   fact, yes, situational judgment tests

15   are valid. They do have valid

16   validity. There's been meta analyses

17   conducted that shows that the

18   situational judgment exercises do have

19   validity, that they can be extended to

20   other construct besides judgment.

21   There's been a stream of research that

22   personality measures, when added to

23   cognitive measures, also increase the

24   validity while decreasing impact with

25   minority groups.

1          CATHERINE CLINE

2          So a lot of this research has

3    been in the last 10 years.  So while

4    Dr. Bobko and I were certainly aware of

5    it, it's not necessarily something that

6    people at DCAS would have been aware

7    of.  So we were of the opinion that

8    that would be one way to go to decrease

9    the impact because that was a concern

10   for both of us.

11   Q.   Isn't it a fact that the

12   situational judgment measures and

13   certainly the personality measures go

14   back for 20 years or more?

15   A.   Actually, they haven't been

16   used in an employment setting for that

17   long.  It's been used more for

18   counseling.  It's only been in the last

19   10 or 15 years that people have used

20   the personality measures as ways of

21   predicting job performance, and that

22   there's been data that shows that, in

23   fact, they're valid predictors of job

24   performance in a lot of cases.

25          But there's also been a lot

513

1          CATHERINE CLINE

2     Q.   And New York City is the

3   biggest city in the country?

4     A.   I think so.

5     Q.   And the Fire Department has

6   had roughly three percent

7   African-American incumbents for the

8   last 20 or 30 years?

9     A.   And even fewer females.

10    Q.   And even fewer females?

11    A.   Yes.

12    Q.   And when you worked at DCAS,

13  it was -- the years, was it '84 to '90?

14    A.   Something like that.

15    Q.   And those statistics that I

16  just -- we just talked about, they were

17  standard at that time as well?

18    A.   Yes.

19    Q.   And at that time, people also

20  knew about personality measures?

21    A.   No.  That really -- I'll tell

22  you that really I started becoming more

23  conversant with the use of personality

24  measures a couple of years after I left

25  the City, when I attended a FIAT

514

1          CATHERINE CLINE

2    convention and the huge talk at that

3    FIAT convention was what they call the

4    army project alpha or something.  And

5    this was a large army project which

6    looked at personality tests as

7    independent indicators of job

8    performance in the army.  And so that

9    would have been in 1993 or so.  And

10   that was the first time people started

11   to take personality tests seriously as

12   a predictor of job performance.

13          Because before that people

14   were really -- people can see what

15   they're supposed to be answering, they

16   can see what's socially desirable here

17   to say.  They can take these tests.  So

18   they were really not considered in good

19   repute for a long time.  But with the

20   presentation of the data from the army

21   project, they became much more credible

22   and people started looking at ways to

23   incorporate personality testing into

24   employment testing.

25     Q.   Did the people include the

**EXHIBIT CC**

**OBJECTION AND RESPONSE TO ADMISSION NO. 8:**

      Denied.

**ADMISSION NO. 9:**

      Defendants neither conducted nor arranged for anyone else to conduct an adverse impact study regarding the impact of Written Exam 2043 on black candidates prior to the commencement of litigation in this case.

**OBJECTION AND RESPONSE TO ADMISSION NO. 9:**

      Denied.

**ADMISSION NO. 10:**

      The FDNY was aware at least as of early 2000 that the results of Written Exam 7029 violated the 4/5ths or 80% rule in the EEOC's *Uniform Guidelines on Employee Selection Procedures* with respect to black candidates.  (See Letter dated May 25, 2000 from Frank R. Nicolazzi to Commissioner Von Essen; EEPC 0533.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 10:**

      Denied, but otherwise admit that at least as of early 2000, the FDNY was aware that the EEPC took the position that the results of Written Exam 7029 violated the 4/5ths or 80% rule with respect to black candidates.  (See Letter dated May 25, 2000 from Frank R. Nicolazzi to Commissioner Von Essen; EEPC 0533.).

**ADMISSION NO. 11:**

      DCAS used the same job analysis and test development report for the creation of Written Exam 2043 as had been used for Written Exam 7029.

**OBJECTION AND RESPONSE TO ADMISSION NO. 11:**

      Admit.

**OBJECTION AND RESPONSE TO ADMISSION NO. 19:**

Admit.

**ADMISSION NO. 20:**

As of 1999, defendants were aware that:

a.    the percentage of black firefighters in New York City was approximately 2.90%;

b.    the percentage of black firefighters in Los Angeles, CA was 14.0%;

c.    the percentage of black firefighters in Chicago, IL was 20.4%;

d.    the percentage of black firefighters in Houston, TX was 17.1%;

e.    the percentage of black firefighters in Philadelphia, PA was 26.3%;

f.    the percentage of black firefighters in San Diego, CA was 7.7%;

g.    the percentage of black firefighters in Dallas, TX was 18.1%;

h.    the percentage of black firefighters in San Antonio, TX was 7.0%; and

i.    the percentage of black firefighters in San Jose, CA was 7.1%;

(See Appendix III to Letter from Frank Nicolazzi, Vice Chairman of EEPC, to Commissioner Von Essen dated May 25, 2000; EEPC 0540.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 20:**

Admit as to subpart a. and denied as to subparts b. through i. In addition, as of 1999, defendants were aware that the EEPC took the position that the percentages of black firefighters in the cities represented by subparts b. through i. were as indicated. (See Appendix III to Letter from Frank Nicolazzi, Vice Chairman of EEPC, to Commissioner Von Essen dated May 25, 2000; EEPC 0540.)

**ADMISSION NO. 21:**

As of 2000, defendants were aware that:

    e.    the percentage of black firefighters in Los Angeles, CA was 15.8%, with 2.3% black new hires;

    (See Determination in EEOC Charge# 160 2002-0128, USA 000028 – USA 000033.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 22:**

    Denied.

**ADMISSION NO. 23:**

    Defendants have neither conducted nor arranged for anyone else to conduct an adverse impact study regarding the impact on black candidates of the college credit requirement for appointment to the position of entry-level firefighter.

**OBJECTION AND RESPONSE TO ADMISSION NO. 23:**

    Admit.

**ADMISSION NO. 24:**

    Defendants neither conducted nor arranged for anyone else to conduct an adverse impact study regarding the impact on black candidates of the college credit requirement for appointment to the position of entry-level firefighter prior to the commencement of litigation in this case.

**OBJECTION AND RESPONSE TO ADMISSION NO. 24:**

    Admit.

**ADMISSION NO. 25:**

    Defendants have neither conducted nor arranged for anyone else to conduct an adverse impact study regarding the impact on black candidates of the driver's license requirement for appointment to the position of entry-level firefighter.

## INTERROGATORIES

**INTERROGATORY NO. 33:**

      For each Request for Admission contained in Plaintiffs-Intervenors' First Set of Requests for Admission (Nos. 1-43) which the defendants deny in whole or in part, state all facts and identify all documents on which the defendants' denial is based, and further, identify all persons with knowledge of the facts stated or the location of the documents identified.

**OBJECTION AND RESPONSE TO INTERROGATORY NO. 33:**

      Defendants object to this request as plaintiff-intervenors have exceeded the amount of interrogatories allowed under the Federal Rules of Civil Procedure and the parties' Amended Scheduling Order.  In addition, defendants object to this request to the extent it seeks disclosure of attorney work-product and attorney-client communications.

Dated:     New York, New York
          October 20, 2008

                       MICHAEL A. CARDOZO
                       Corporation Counsel of the City of New York
                       Attorney for Defendant
                       100 Church Street, Room 2-100
                       New York, New York 10007
                       (212) 788-1247
                       gpestana@law.nyc.gov

                     By:                              
                          GEORGIA PESTANA
                          Assistant Corporation Counsel

## OBJECTION AND RESPONSE TO ADMISSION NO. 60

In so far as Exam 2043 was based in part on Dr. Landy's work for Exam 0084, the request is denied, but otherwise admit that no psychometrician was employed or engaged solely to develop Exam 2043.

## ADMISSION NO. 61

DCAS Examiner Matthew Morrongiello did not conduct a content validity study with respect to Exam 7029. (See Morrongiello Deposition January 14, 2008 at Tr. 75:9-11).

## OBJECTION AND RESPONSE TO ADMISSION NO. 61

Admit.

## ADMISSION NO. 62

No one has conducted a construct validity study with respect to Exams 7029 or 2043 that conformed with the requirements of the *Uniform Guidelines*.

## OBJECTION AND RESPONSE TO ADMISSION NO. 62

Defendants object to the request to the extent the request implies that the *Guidelines* require that a construct validity study be performed, but otherwise admit that a construct validity study was not performed with respect to Exams 7029 and 2043.

## ADMISSION NO. 63

All other things being equal, an examination that measures more of the knowledge, skills, abilities or characteristics ("KSACs") that are important for a job is expected to be more valid than an examination that measures fewer of the KSACs that are important for that job.

## OBJECTION AND RESPONSE TO ADMISSION NO. 63

Admit.

## ADMISSION NO. 64

Each of the following KSACs is non-cognitive: (Please admit or deny as to each

KSAC.)

     a.     Resistance to stress;

     b.     Teamwork;

     c.     Responsibility;

     d.     Desire to learn;

     e.     Honesty;

     f.     Cleanliness;

     g.     Medical interest;

     h.     Following instructions;

     i.     Achievement orientation;

     j.     Dependability;

     k.     Conscientiousness; and

     l.     Process monitoring.

## OBJECTION AND RESPONSE TO ADMISSION NO. 64

Denied as to subparts h. and l., but otherwise admit as to subparts a. through g.

and i. through k.

## ADMISSION NO. 65

Each of the KSACs listed in paragraph "64" is important to the job of firefighter.

(See Schemmer deposition July 8, 2008 at Tr. 294). (Please admit or deny as to each KSAC.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 65**

To the extent the request seeks an admission that each of the KSAC's listed in paragraph "64" are, together as a group, important to the job of an entry-level firefighter in the F.D.N.Y. the request is denied, but otherwise admit that disjunctively, each of the KSAC's listed in paragraph "64" have been, on occasion, found to be important to the job of firefighter.

**ADMISSION NO. 66**

Each of the KSACs listed in paragraph "64" could have been tested for using a written exam format at the time that Written Exams 7029 and 7043 were administered. (See Schemmer deposition July 8, 2008 at Tr. 294). (Please admit or deny as to each KSAC.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 66**

Denied.

**ADMISSION NO. 67**

Had the KSACs listed in paragraph "64" been tested for on Written Exams 7029 and 2043, using well developed items, and weighting the items according to the importance of the KSACs, the testing of each would have been expected to add to the validity of Exams 7029 and 2043. (Please admit or deny as to each KSAC.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 67**

Defendants object to the request as vague and ambiguous. Notwithstanding and without waiving the foregoing objection, the request is denied.

**ADMISSION NO. 68**

Had the KSACs listed in paragraph "64" been tested for on Written Exams 7029 and 2043, using well developed items, and weighting the items according to the importance of

- 10 -

the KSACs, Exams 7029 and 2043 would have been expected to have less adverse impact against black test-takers. (Please admit or deny as to each KSAC.)

**OBJECTION AND RESPONSE TO ADMISSION NO. 68**

Defendants object to the request as vague and ambiguous. Notwithstanding and without waiving the foregoing objection, the request is denied.

**ADMISSION NO. 69**

All of the non-cognitive abilities tested for on Exam 6019 are KSACs for which written tests were available prior to 1999.

**OBJECTION AND RESPONSE TO ADMISSION NO. 69**

Denied.

**ADMISSION NO. 70**

Written Exam 6019 was at least as job-related as Written Exam 7029.

**OBJECTION AND RESPONSE TO ADMISSION NO. 70**

Admit.

**ADMISSION NO. 71**

Written Exam 6019 was at least as job-related as Written Exam 2043.

**OBJECTION AND RESPONSE TO ADMISSION NO. 71**

Admit.

**ADMISSION NO. 72**

Written Exam 6019 was at least as consistent with business necessity as Written Exam 7029.

**OBJECTION AND RESPONSE TO ADMISSION NO. 72**

Admit.

**ADMISSION NO. 73**

Written Exam 6019 was at least as consistent with business necessity as Written Exam 2043.

**OBJECTION AND RESPONSE TO ADMISSION NO. 73**

Admit.

**ADMISSION NO. 74**

Written Exam 6019 had less adverse impact against black test takers with respect to their passing rates than Written Exam 7029.

**OBJECTION AND RESPONSE TO ADMISSION NO. 74**

To the extent the request seeks an admission that Written Exam 7029 had an adverse impact against black test takers the request is denied, but otherwise admit that a greater number of black candidates passed Written Exam 6019 than Written Exam 7029.

**ADMISSION NO. 75**

Written Exam 6019 had less adverse impact against black test takers with respect to their passing rates than Written Exam 2043.

**OBJECTION AND RESPONSE TO ADMISSION NO. 75**

To the extent the request seeks an admission that Written Exam 2043 had an adverse impact against black test takers the request is denied, but otherwise admit that a greater number of black candidates passed Written Exam 6019 than Written Exam 2043.

**ADMISSION NO. 76**

Written Exam 6019 had less adverse impact against black test takers with respect to their rank ordering than Written Exam 7029.

**OBJECTION AND RESPONSE TO ADMISSION NO. 76**

To the extent the request seeks an admission that Written Exam 7029 had an adverse impact against black test takers the request is denied, but otherwise admit that a greater number of black candidates achieved a higher ranking on Written Exam 6019 than Written Exam 7029.

## ADMISSION NO. 77

Written Exam 6019 had less adverse impact against black test takers with respect to their rank ordering than Written Exam 2043.

## OBJECTION AND RESPONSE TO ADMISSION NO. 77

To the extent the request seeks an admission that Written Exam 2043 had an adverse impact against black test takers the request is denied, but otherwise admit that a greater number of black candidates achieved a higher ranking on Written Exam 6019 than Written Exam 2043.

## ADMISSION NO. 78

The "situational judgment exercise" items developed for Written Exam 6019 could have been developed and used on Written Exam 7029.

## OBJECTION AND RESPONSE TO ADMISSION NO. 78

Denied.

## ADMISSION NO. 79

The "situational judgment exercise" items developed for Written Exam 6019 could have been developed and used on Written Exam 2043.

## OBJECTION AND RESPONSE TO ADMISSION NO. 79

Denied.

**EXHIBIT DD**

Report in the matter of

United States of America v. City of New York

By


Irwin L. Goldstein, Ph.D.
President, Organizational and Personnel Research, Inc.
Rockville, Maryland


July 31, 2008

An item-writing panel consisting of one Lieutenant and four firefighters wrote the test questions (or "items"). (Id. at pp. 11-12). The test questions were then reviewed by a panel of one FDNY Lieutenant and four firefighters. (Id. at p. 12).

The DCAS Examiner who developed Written Exam 2043, Alberto Johnston, did not conduct a new job analysis. He did not administer a job analysis survey, did not convene a new linking panel and did not develop a new test plan. Instead, he used the test plan developed for Written Exam 7029. Another item-writing panel, consisting of four firefighters and one Lieutenant, wrote new test questions for Written Exam 2043. (Johnston Dep. at pp. 23-28, 249; Pl. Dep. Exh. 104).

## SECTION IV.

## ANALYSES OF PROFESSIONAL STANDARDS AND THE CITY'S USE OF WRITTEN EXAMS 7029 AND 2043

A.   THERE ARE SEVERAL VALIDATION APPROACHES RECOGNIZED BY PROFESSIONAL STANDARDS, INCLUDING CONTENT, CRITERION-RELATED AND CONSTRUCT APPROACHES.

The Uniform Guidelines discuss several approaches to validating a selection procedure, or gathering an appropriate set of evidence establishing that the selection procedure is job related.[6] One approach discussed in the Uniform Guidelines is "content" validity.[7] To establish content validity, it is necessary to show that the test is representative of significant portions of the job. In this case, it is necessary to provide evidence establishing that the test samples (or requires the use of) behaviors that are critical for job performance. Note that, with content validity, no measure of job performance is collected. Rather, it is assumed that, if the critical behaviors being measured on the test overlap the critical behaviors on the job, then it is likely that performance on the test will

---

[6] It should be noted that a selection procedure need not be a written test like those at issue here. Selection procedures also may include such things as minimum qualifications (e.g., a high school diploma requirement), an oral interview or a job simulation exercise. Nevertheless, for simplicity, I will refer to selection procedures as "tests" in this report.

[7] Other approaches discussed in the Uniform Guidelines are known as "criterion-related" (or "predictive" validity) and "construct" validity. Criterion-related validity requires the establishment of a statistical relationship between performance on the test and performance on the job. "Construct" validity involves establishing that a test measures a particular construct or trait (such as leadership ability, spatial ability or deductive reasoning) and then showing that the construct measured by the test is related to job performance. Over the years, most construct validation studies have involved conducting criterion-related analyses or establishing that a test designed to measure a particular construct correlated well with other tests known to measure the same construct, and that criterion-related validity already has been established for the other tests. As stated previously, I understand that other expert reports may address criterion-related and construct validity. This report provides my opinions regarding content validity.

reflect performance on the job. Because actual performance on the job is not being measured when a content validity methodology (as opposed to a criterion-related methodology) is used to validate a test, the use of a robust job analysis which carefully identifies the critical behaviors to be measured is essential. It is only by using data from such a job analysis that a test is likely to be developed which will reflect the behaviors that are important on the job.[8] In addition, as part of establishing content validity, it is critical to use Subject Matter Experts ("SMEs") to independently make judgments of whether the test items developed overlap the important work behaviors, activities and/or worker Knowledge, Skills and Abilities and other characteristics ("KSAOs") identified by the job analysis. Thus, content validity, as compared to criterion-related validity, is especially dependent upon a well-done job analysis, and careful procedures are necessary in order to have confidence in the judgments about the relationship of the test to the job. Of course, it is not the case that job analysis is unimportant when using a criterion-related validity strategy; the job analysis helps establish what type of test should be used and what type of job performance ("criterion") should be used. However, if mistakes are made in the job analysis, the statistical relationship (correlation) between the test and job performance will not be established or will be weak. There is no such statistical relationship for content validity. Thus, for a content validity study, the job analysis and carefully established judgment procedures become especially critical.

As noted in the Principles for the Validation and Use of Personnel Selection Procedures (SIOP (2003), p. 4), the conceptualization of validity over the years has evolved into treating validity as a "unitary" concept, and it is necessary to use the most appropriate strategies to develop evidence of job relatedness. The objective is always to use appropriate methods to establish lines of evidence which support the use of the test at issue.

B.    A CONTENT VALIDITY APPROACH IS NOT APPROPRIATE FOR ESTABLISHING THE VALIDITY OF WRITTEN EXAMS 7029 AND 2043.

There are situations where each of the three validation strategies explained above is not appropriate. For example, there are situations where it is difficult to obtain reliable and appropriate job performance data and, in that situation, it might not be possible to use a criterion-related validity approach. On the other hand, if the test to be validated measures a broad construct, such as leadership ability, spatial ability or deductive reasoning, content validity is not appropriate because it is difficult to establish that the critical behaviors being measured on the test overlap the critical behaviors on the job.

Although the City's experts know of no reason it would not be possible to do so (Bobko Dep., p. 234; Schemmer Dep., p. 57), the City has not conducted a criterion-related

---

[8] In addition, the Uniform Guidelines note that content validity is not an appropriate strategy when a selection procedure involves knowledge, skills and abilities which an employee will be expected to learn on the job (29 C.F.R. 1607(C)(1)). As discussed in the following section of this report, the job analysis approach DCAS used for Exam 7029 did not consider or measure this factor.

Pl. Dep. Exh. 149, p. 12). However, on review of Inductive Reasoning questions originally written for use in Written Exam 6019, Dr. Bobko apparently stated that the questions did not measure "the kind of inductive reasoning [firefighters] talked about at site visits" attended by Dr. Bobko. (DCAS 0013909). In order to establish content validity, it is necessary to show that the test questions actually mirror the content of the job.

No such evidence is presented by the City. The Morrongiello Report ends with the development of the items for Written Exam 7029 and does not report any attempt to link them back to the important aspects of the job. Thus, the DCAS Examiner responsible for the development of Written Exam 7029 was correct when, as noted above, he stated in his deposition that he has never conducted a content validity study and that his test development report is not a validity report. (Morrongiello Dep., p, 75). Similarly, the DCAS Examiner responsible for developing Written Exam 2043 (using the Written Exam 7029 test plan) correctly indicated in his deposition that he also has never conducted a content validity study. (Johnston Dep., p. 76). Without the crucial step of linking the content of the test (the test questions) back to the content of the job, a claim of content validity cannot be justified.

DCAS did not conduct such analyses for either Written Exam 7029 or Written Exam 2043. To the extent that the City might claim that the review of Written Exam 7029 and 2043 items by the Examiners who developed each of the written examinations and by others in DCAS is sufficient to establish the necessary linkage between test content and job content, the City would be incorrect. The procedures followed are not the kind of systematic validity exercise needed. As stated previously, a new written firefighter examination, Written Exam 6019, has been developed by Dr. Cline and administered by the City. Dr. Cline attempted to conduct a content validity analysis, asking five SMEs, who were DCAS Test and Measurement Specialists (*i.e.*, Examiners) and had experience writing cognitive test items, to independently judge whether each test item was a measure of the ability it was originally designed to measure. (6019 Test Development Report, Pl. Dep. Exh. 200, p. 7). Dr. Cline concluded that DCAS Examiners she used to review the Written Exam 6019 items had difficulty differentiating between the various cognitive abilities that the written examinations were supposed to measure. (Cline Dep., pp. 281-90). Specifically, she found that the DCAS Examiners were able to match only "62.5% of the 40 cognitive items on Written Exam 6019 to the intended classifications." (6019 Test Development Report, Pl. Dep. Exh. 200, p. 7). She further found that the DCAS Examiners had a problem distinguishing between items intended to measure Inductive Reasoning and Deductive Reasoning and also between Spatial Orientation and Visualization. (Id.).

As noted in the Principles (SIOP, 2003), "evidence for validity based on content rests on demonstrating that the selection procedure adequately samples and is linked to the important work behaviors, activities, and/or worker KSAOs defined by the analysis of work" (p. 22). No such evidence has been presented for Exam 7029 or Exam 2043. Thus, content validation evidence for Written Exams 7029 and 2043 was not established.

b.    The City Has Not Established That the Important Work Behaviors
and Activities and/or the Important Knowledge, Skills, Abilities and Other
Characteristics That Written Exams 7029 and 2043 Purport to
Measure Are Needed at Entry, as Required to Support a Claim of Content
Validity.

A content valid test should measure work behaviors, activities, and/or worker KSAOs
that are important for performance of the job and are needed at entry, rather than learned
on the job. As discussed in the Uniform Guidelines (1978), content validity is not an
appropriate strategy where the selection procedure involves work behaviors, activities,
and/or worker KSAOs that are to be learned on the job (29 C.F.R. 1607.14(C)(1)). As
stated in the professional literature (Goldstein, Zedeck and Schneider (1993)), to establish
content validity, it is "necessary to determine what is needed at entry and what can be
learned in training or on the job" (p. 16). Thus, if an employer wishes to use a content
validity approach, the job analysis and test development procedures conducted must ask
SMEs to independently judge whether the test components reflect the important KSAOs
that are needed at entry.

This is another respect in which a job analysis conducted to support a claim of content
validity may differ from one used to develop a test that will be validated using a criterion-
related approach. As stated previously, criterion-related validity models attempt to
establish the statistical relationship (correlation) between performance on a test and
performance on a job. Criterion-related validity is concerned with whether test scores
predict job performance. In contrast, content validity models are concerned with
establishing that the content of a test reflects the content of a job – in other words, that
what a candidate must do to perform well on the test corresponds to what a worker must
do to perform well on the job. That critical content validity link is broken if what the
worker must do to perform well on the job is learned after entering the job (and, thus,
after taking the test). Therefore, to establish content validity, it is critical to prove that
the test reflects the KSAOs that are important when entering the job.

There are no analyses presented in the Morrongiello Report establishing that any of the
tasks and/or abilities required by the test items are needed at entry. Indeed, notes made
by the DCAS Examiner responsible for the development of Exam 7029 reflect that he
considered using "Day 1" scales for job tasks and abilities in his job analysis
questionnaire but it was decided in discussions with his DCAS supervisor that he would
not. (Morrongiello Dep., p. 118). When the Examiner was questioned in his deposition
as to why Day 1 scales were not used, he could say only that they had not been used in
the previous job analyses by Landy, Jacobs for Exam 0084. (Id. at p. 119). This does not
excuse the City's failure to use a Day 1 scale in its job analysis for Exam 7029. As stated
previously, the Landy, Jacobs Report indicates that Landy, Jacobs intended to conduct a
criterion-related validity study for Written Exam 0084. The City has presented no
evidence that what is measured by the test items is needed Day 1 on the job and cannot
establish that the Written Exams 7029 and 2043 have content validity.

Again, this lack of proper content validity evidence can be contrasted with the work the City has done in connection with its new examination, Written Exam 6019. Beginning in approximately April 2006, a new job analysis was conducted for Exam 6019. In the job analysis questionnaire administered as part of that job analysis, the SMEs (firefighters) completing the questionnaire were asked to indicate whether a new firefighter would be expected to perform each of the firefighter job tasks on Day 1 and whether various abilities were needed Day 1, as well as to rate the importance of the tasks and abilities. (6019 Job Analysis Report, Pl. Dep. Ex. 149, App. A, pp. 4-5). In order to be considered an important task/ability needed at entry, the task or ability had to be rated a 4 (corresponding to "very important") on a five-point scale. (Id. at p. 9). In addition, 2/3 of the respondents had to rate the ability or task as needed (or expected to be performed if the occasion arose) on Day 1. (Id.). These are the kind of rating data that should be collected in order to determine whether a test is job related using a content validity strategy. Notably, the use of these standards resulted in Dr. Cline dropping from her task list for Exam 6019 43 of the 111 tasks that were used in the final task list for Exam 7029.

Moreover, the emphasis on Day 1 tasks and abilities was carried through to the test development process for Written Exam 6019. During the test development process, Dr. Cline trained the item-writers about the need to use Day 1 tasks linked to the particular ability an item was intended to measure. In yet another step, Dr. Cline had a group of another 12 SMEs (firefighters and lieutenants) rate whether each of the items written for Written Exam 6019 was important for entry-level performance. As a result of that analysis, Dr. Cline reported in her test development report that she dropped a number of test items which did not meet the standard of needed Day 1. (6019 Test Development Report, Pl. Dep. Exh. 200, p. 9). No such procedures were used by DCAS in developing Written Exams 7029 and 2043.

      c.     The Job Analysis Work that Was Conducted by the City Is Flawed and Cannot Support a Claim of Content Validity.

There are a number of other aspects to the job analysis strategy used by the City as part of DCAS's development of Written Exam 7029, as reflected in the Morrongiello Report, that are flawed and make the report and the analyses it reflects an unreliable foundation for a claim of content validity.

      i.     The criteria used to include tasks and abilities were not sufficient to support a claim of content validity.

First, in the Exam 7029 job analysis, DCAS utilized a four-point alphabetical rating scale for establishing which abilities and which tasks were important. DCAS converted the alphabetical rating scale to a numeric scale for purposes of analysis. The numeric scale was: 4 for "critical"; 3 for "important"; 2 for "somewhat important"; and 1 for "not important" or "not relevant." (Morrongiello Report, Pl. Dep. Exh. 54, p. 10). The importance criterion used as the standard for inclusion in the final task list was 2.5 on the four-point rating scale, which is between "somewhat important" and "important." (Id.). In addition, two-thirds of the firefighters who completed the job analysis questionnaire

had to respond that they performed the task. (Id.). According to the DCAS Examiner who developed Written Exam 7029, the criteria for tasks were selected largely based upon whether they resulted in retaining a sufficient number of tasks for use in developing the written examination (and the criteria for abilities were selected in part to be parallel to the criteria for tasks), indicating that the focus was on test development and not on ensuring content validity. (Morrongiello Dep., p. 219). To support a content validity strategy, tasks and abilities must meet more stringent criteria for importance as well as meeting a Day 1 standard.

The analyses conducted by Dr. Cline in connection with Written Exam 6019 used more appropriate criteria and identified a different set of important tasks. First, it should be noted that, as part of the job analysis and test development for Written Exam 6019, Dr. Cline attempted to determine whether the FDNY firefighter job had changed since the early 1990s, when she last studied it, and specifically questioned panels of firefighters about any changes since September 11, 2001. (Cline Dep., p. 73). According to Dr. Cline, she found that the job had not changed appreciably. Yet, using more appropriate criteria to identify important Day 1 tasks, Dr. Cline developed a task list different than that developed by Mr. Morrongiello and used in the development of Written Exam 7029. As noted above, in Dr. Cline's job analysis for Exam 6019, she used a criterion of 4 on a five-point scale, which corresponded to a rating of "very important." Thus, her rating required more than a rating of "somewhat important" to "important." In her deposition, Dr. Cline reported that she would never use "somewhat important" as a scale point because she would want anything she tested for to be important. (Cline Dep., pp. 118-19).

The Bobko/Schemmer Report offers an illustration of the differences that using more appropriate criteria, as Dr. Cline did, can make. The report of Dr. Bobko and Dr. Schemmer states that the tasks in the task category of "Size Up" (such as "Determines appropriate entry into structure for assigned position based on structure type, location of fire, etc."), clearly "invoke cognitive processes." (Bobko/Schemmer Report, p. 28).[9] However, when Dr. Cline completed her content validity analysis, five of the seven tasks listed by Drs. Bobko and Schemmer as being in the "Size Up" category had not met Dr. Cline's criteria that tasks be both important and needed Day 1 on the job. (6019 Job Analysis Report, Pl. Dep. Exh. 149, App. B, Table 4). For example, the "Size Up" task cited in the parenthetical above ("Determines appropriate entry . . .") did not meet the Day 1 criterion. (Id.). As noted above, Dr. Cline's analyses indicated that 43 of the 111 tasks used as a foundation for building test items included in Written Exams 7029 and 2043 did not meet her criteria.

The criteria used by the City in the development of Written Exam 7029 allowed the retention of tasks and abilities that have not been judged to be at least "important" and/or

---

[9] Obviously, this type of statement does not constitute a content validity study, nor is it proof that the written examinations have content validity. It must also be noted that the report of Dr. Bobko and Dr. Schemmer does not state that the City has conducted a content validity study, or that Written Exams 7029 and 2043 have content validity.

are not needed upon entry. This does not provide a strong enough foundation for the inclusion of tasks and abilities in support of a content validity approach.

ii.    The linking panel exercise conducted for Exam 7029 does not provide reliable information that can support a claim of content validity.

As stated previously, in addition to using a job analysis questionnaire to collect data regarding tasks and abilities, in developing Written Exam 7029 DCAS used a "linking panel" composed of 12 firefighters to rate how important each of a set of cognitive abilities was for the performance of various task clusters (categories of related tasks). The linking panel ratings were 3 for "critical"; 2 for "important"; 1 for "somewhat important"; and 0 for "not relevant." (Morrongiello Report, Pl. Dep. Exh. 54, p. 10). In developing Written Exam 2043, the City gathered no new ratings, simply relying on the flawed analyses conducted for Exam 7029.

The City did not check the reliability of the linking panel ratings or do any systematic analysis of whether they were consistent. (Morrongiello Dep., p. 299). If the City had done so, it would have found that there are a number of anomalies in the ratings. For example, in one instance a linking panel member gave a rating of 3 for "critical" to nearly all combinations of task clusters and abilities. (Pl. Dep. Exh. 180, Rater #9). This included indicating that Written Comprehension is critical to the performance of the task "trimming broken glass from window frames." It is difficult to see how Written Comprehension relates to this psychomotor task. When the DCAS Examiner responsible for Exam 7029 was questioned in his deposition as to whether he reviewed the ratings, he indicated that "I generally look through the packets. Generally, though, not to see if they make sense." (Morrongiello Dep., p. 318). Indeed, the DCAS Examiner's only explanation for such ratings was that, although they were not supposed to, the linking panel members may have been thinking about training to perform the job task or writing about performing the job task afterward instead of actually performing the job task itself. (Id. at pp. 315-18). Such ratings indicate that at least some members of the linking panel either did not understand the linking task they were asked to perform or did not perform it conscientiously. Indeed, one of the raters, Rater #1, indicated in her deposition that she did not understand the definitions of Problem Sensitivity, Inductive Reasoning, Visualization and Information Ordering. (Cziko Dep., pp. 57-62). Others, such as Rater #3, indicated that, upon thinking about it, a number of their ratings were incorrect, and/or that they did not know, at the time they completed the linking panel exercise, what concepts like Inductive and Deductive Reasoning were. (Baretta Dep., pp. 49-50, 93-95). Indeed, Rater # 3 stated that he just guessed. (Id. at pp. 65, 72, 93-95). An appropriate job analysis uses methods to ensure that raters like the linking panel members understand the task they are to perform, perform it conscientiously and provide ratings that, at the very least, make sense.

15

D.    FROM A CONTENT VALIDITY PERSPECTIVE, THERE IS NO FOUNDATION FOR THE TEST PLAN THE CITY USED FOR WRITTEN EXAMS 7029 AND 2043 OR THE WAY IN WHICH THE CITY USED THE WRITTEN EXAMINATIONS.

Because of the limited scope of the job analysis conducted for Exam 7029, there is no sound basis for the decisions the City made about which abilities Written Exams 7029 and 2043 would measure or the weights to be given to various abilities in developing and using Written Exams 7029 and 2043. The City also has not justified the pass/fail cutoff scores it used on the written examinations or the weights it gave to the written and physical examinations for purposes of ranking candidates on the eligibility lists.

First, there is the question of whether the components of Written Exams 7029 and 2043 are sufficiently comprehensive. The job analysis questionnaire used an abilities list that included only cognitive abilities taken from a taxonomy that was developed by Fleishman and Quaintance. The taxonomy attempted to specify all the various constructs which make up human performance. The DCAS Examiner responsible for developing Written Exam 7029 indicated that he did not consider including non-cognitive abilities specified in the taxonomy when creating the Exam 7029 job analysis questionnaire. (Morrongiello Dep., pp. 129-130). Also, when the DCAS Examiner responsible for developing Written Exam 2043 was asked in his deposition whether he ever considered non-cognitive abilities, he indicated that he had not. (Johnston Dep., p. 104). There is no good scientific or professional basis given for the decision not to conduct a more comprehensive job analysis and test development process. It is, of course, important to note that tests of cognitive abilities often result in adverse impact against protected classes such as African Americans and Hispanics. The literature also indicates there is considerably less adverse impact in the measurement of non-cognitive personal abilities. Thus, the test development plan is not only incomplete for Exams 7029 and 2043, but it is weighted toward components which tend to produce more adverse impact.

The decision to develop Written Exams 7029 and 2043 as measures of only cognitive abilities can be contrasted with the decisions made more recently in developing Written Exam 6019. In her job analysis for Exam 6019, Dr. Cline established linking data for a wide variety of personal abilities, including Adaptability, Tenacity, Integrity, Work Standards, Resilience, Coordination, and Establishing and Maintaining Interpersonal Relationships. (6019 Job Analysis Report, Pl. Dep. Exh. 149, App. B, Table 5). Indeed, Dr. Cline's analysis of the firefighter job includes physical abilities, cognitive abilities and personal abilities.

In addition, the City has not established that the "weights" assigned to each of the nine cognitive abilities that Written Exams 7029 and 2043 were intended to measure reflect the importance of each ability to the job. As discussed throughout this report, the job analyses procedures used by the City were flawed, and the linking panel ratings are unreliable. Thus, there is no professional or scientific basis for the number of questions assigned each ability in these examinations.

Similar questions arise concerning the pass-fail cutoff scores. For Written Exam 7029, the City has admitted that the cutoff score was not based on data or information gathered from the job analysis. (Patitucci Dep., p. 93). Rather, the City deferred to the Fire Department, which requested that the cutoff score be based on the number of candidates (15,000) they wished to have pass. (Id. at p. 91). Indeed, the City's designee to testify about these matters indicated that he preferred a more "traditional" pass score (the score of 70 specified as a default cutoff score in the City's civil service regulations) because it would be more justifiable and defensible. (Id. at pp. 96-97). In any case, there is no professional or scientific basis for the setting of the cutoff score. For Written Exam 2043, DCAS assumed responsibility for the cutoff score and set it at 70, the civil service regulations' default cutoff score. (Id. at pp. 100-103). Again, there is no reference to professional or scientific standards in setting the cutoff score according to the civil service default score.

## SECTION V.

## CONCLUSION

In summary, it is my opinion that the City has not identified evidence that supports a claim of content validity for the City's use of Written Exams 7029 and 2043 in the selection and appointment of entry-level firefighters.