**EXHIBIT GG**

-511-

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

THE UNITED STATES OF AMERICA,

                    Plaintiff,

       and

VULCAN SOCIETY, INC., for itself and on
behalf of its members, CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,

             Plaintiff-Intervenors,

         -a-

CITY OF NEW YORK, FIRE DEPARTMENT OF
THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER
NICHOLAS SCOPETTA, in their Individual
and Official capacities,

             Defendants.

- - - - - - - - - - - - - - - - -x

          271 Cadman Plaza
          Brooklyn, New York

          March 11, 2008
          9:49 a.m.

       DEPOSITION OF

1

2      Q.    How is problem sensitivity

3   important to the firefighter job?

4      A.    I don't know.

5      Q.    Do you think it's important

6   to the firefighter job?

7      A.    I don't understand the

8   meaning of problem sensitivity.  I

9   don't understand that description, the

10  definition.

11     Q.    Okay.  We'll move on to the

12  next one then.  The ninth entry right

13  under problem sensitivity says

14  deductive reasoning; is that correct?

15     A.    Yes.

16     Q.    And it says, "Deductive

17  reasoning the ability to apply general

18  rules to specific problems to come up

19  with logical answers.  It involves

20  deciding if an answer makes sense."  Is

21  that correct?

22     A.    Yes.

23     Q.    Do you think deductive

24  reasoning is important to the

25  firefighter job?

1

2      A.    Again, I don't understand the

3   definition.  I'm sorry.

4      Q.    Just moving on down to the

5   next one, the tenth entry on

6   Plaintiff's Exhibit 92.  It says

7   inductive reasoning; is that correct?

8      A.    Yes.

9      Q.    And it says, "Inductive

10  reasoning is the ability to combine

11  separate pieces of information, or

12  specific answers to problems, to form

13  general rules or conclusions.  It

14  involves the ability to think of

15  possible reasons for why things go

16  together."  Is that right?

17     A.    Yes.

18     Q.    Do you think inductive

19  reasoning is important to the

20  firefighter job?

21     A.    I don't know.

22     Q.    Do you understand this

23  definition?

24     A.    No.

25     Q.    Moving on down to the

-514-

Page 61

1

2    burning building.

3        Q.    Can you think of any other

4    tasks where spatial orientation is

5    important that the firefighter

6    performs?

7        A.    No, not right now.

8        Q.    I'm just going to turn the

9    page to NYC11031.  I'm going to look at

10   number 15.  At the top of the page it

11   says that "Visualization is the ability

12   to imagine how something would look

13   when it is moved around or when its

14   parts are moved or rearranged.  It

15   requires the forming of mental images

16   of how patterns or objects would look

17   after certain changes, such as

18   unfolding or rotation.  One has to

19   predict how an object, set of objects,

20   or pattern will appear after the

21   changes have been carried out."  Is

22   that what it says?

23       A.    Yes.

24       Q.    Do you think visualization is

25   an important skill for a firefighter to

-515-

Page 62

1
2   have?
3       A.    I don't know.
4       Q.    Why don't you know?
5       A.    I can't understand the
6   definition.
7       Q.    Just go to the last one on
8   the page which is time sharing.  And it
9   says, "Time sharing is the ability to
10  shift back and forth between two or
11  more sources of information," correct?
12      A.    Yes.
13      Q.    Do you think time sharing is
14  important to the firefighter job?
15      A.    I don't understand the
16  definition.
17      Q.    So you don't know whether
18  time sharing is important to the
19  firefighter job because you don't
20  understand the definition as stated on
21  Exhibit 92; is that correct?
22      A.    Yes.
23      Q.    I'm just going to ask you to
24  keep out Exhibit 92 as well as Exhibit
25  134 and Exhibit 77.  I know you've

Page 69

1
2      Q.    Do you agree with the rater's
3  rating of three, that written
4  comprehension is critical to the
5  performance of the task in task cluster
6  G?
7      A.    Yeah, you know, for written
8  comprehension I would give it a zero.
9      Q.    Why would you give it a zero?
10     A.    Because, again, it has
11  nothing to do with the written word to
12  perform these tasks.
13     Q.    Going over to the next page,
14  task cluster H.  If you look at written
15  comprehension under the rating, she
16  also -- the rater for here gave it a
17  three or critical for written
18  comprehension for task cluster H; is
19  that correct?
20     A.    Yes.
21     Q.    And just looking, flipping to
22  the page, again, on Exhibit 134, to
23  NYC11002.  Are you on that page?
24  "Supplies water for hose operation.
25  These tasks involve connecting or

**EXHIBIT HH**

-517-

1

2    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
3    Civil Action No. 07-CV-2067

4    -----------------------------------------------X
     THE UNITED STATES OF AMERICA,
5
                            Plaintiff,
6    and
     VULCAN SOCIETY, INC., for itself and on
7    behalf of its members, CANDIDO NUNEZ,
     MARCUS HAYWOOD and on behalf of a Class
8    of All Others Similarly Situation,
                            Plaintiff-Intervenors
9
                    - against -
10
     CITY OF NEW YORK, FIRE DEPARTMENT OF THE
11   CITY OF NEW YORK, NEW YORK CITY
     DEPARTMENT OF CITYWIDE ADMINISTRATIVE
12   SERVICES, MAYOR MICHAEL BLOOMBERG and
     NEW YORK CITY FIRE COMMISSIONER NICHOLAS
13   SCOPETTA, in their Individual and
     Official capacities,
14
                    Defendants.
15   -----------------------------------------------X

16                  271 Cadman Plaza East
                    Brooklyn, New York
17
                    February 27, 2008
18                  9:47 a.m.

19

20          DEPOSITION of

21   pursuant to Notice, held at the above

22   place, date and time, before Alice

23   Schulman, a Notary Public of the State of

24   New York.

25

67

1

2      reasoning when you take the examination.

3      For all I know, I probably didn't know

4      what it meant so I gave it a two since I

5      didn't know what it was quite frankly.

6      Inductive, where's the --

7          Q.    That's Exhibit No. 92.

8          A.    I got it, inductive, okay

9      basically it combines separate pieces of

10     information.  Okay, we discussed that I

11     gave you the scenario of getting back to

12     that building, there's a heavy fire load,

13     there's an I-beam and it's expanding.

14     That would be a situation where inductive

15     reasoning would come into critical play.

16         Q.    How does it come into play?

17         A.    Seeing what we have in front of

18     us and seeing what might possibly happen

19     in case of this heavy fire load in this

20     building.

21         Q.    So just turning back to when you

22     were filling these out.

23         A.    Yes.

24         Q.    Do you recall whether you had

25     the final Ability List to match up the

72

 1

 2          Q.    And how is deductive reasoning

 3     somewhat important to the performance of

 4     these tasks?

 5          A.    Very important.

 6          Q.    You ranked it somewhat

 7     important.  Do you disagree with your

 8     answer?

 9          A.    I disagree, I don't believe I

10     really knew what deductive reasoning was

11     at the time of the examination.

12          Q.    Why do you say it's important

13     now?

14          A.    Because you need to know.  I'll

15     give you an example.  If there was a fire

16     in the house and it was the middle of the

17     night, more than likely the people would

18     be upstairs in the bedroom.  That would be

19     deductive reasoning.  You need to go to

20     the second floor where most of the

21     bedrooms are.

22          Q.    And turning back to your ratings

23     on Exhibit 79.  We are going to go to page

24     USA 004408, and we are looking at this for

25     Task Cluster G, one of the entries in the

91

1

2    you assigned a rating of two to written

3    expression; is that correct?

4         A.    Yes.

5         Q.    And that means you rated written

6    expression as important to the performance

7    of Task Cluster P; is that correct?

8         A.    Yes.

9         Q.    How is written expression

10   important to the performance of Task

11   Cluster P?

12        A.    It's the ability to understand

13   written paragraphs, reading instructions,

14   I'm assuming would be a sentence or

15   paragraph.  I gave you an example of the

16   neck brace.

17        Q.    But we are looking at written

18   expression versus written comprehension.

19        A.    Got you.  So written expression

20   I guess would be, there's no written

21   expression.  I guess it would be

22   irrelevant to the situation of medical.

23        Q.    So you gave it a two.  Would you

24   change that answer if you were filling

25   this out today?

92

1

2          A.     Now it says written, got you.  I

3     was looking at the wrong one.  Yes, I

4     would change the answer to zero.

5          Q.     And turning back to your ratings

6     on Exhibit No. 79, page USA004418, that's

7     Task Cluster Q, and looking at the entry

8     at the top, written comprehension, it says

9     you assigned a rating of two to written

10    comprehension with respect to Task Cluster

11    Q; is that correct?

12         A.     Yes.

13         Q.     That means you rated written

14    comprehension as important to the

15    performance of Task Cluster Q?

16         A.     Yes.

17         Q.     And looking back at Exhibit 134,

18    Elevator Related Tasks, these tasks,

19    sorry, I'm looking at NYC11004, is these

20    tasks involve controlling elevators and

21    rescuing persons from stalled elevator

22    cars.

23              Uses elevator which has been put

24    into fire service to ascend to appropriate

25    floor; is that correct?

93

1

2      A.    Yes.

3      Q.    And how is written comprehension

4  important to the performance of the task

5  in Task Cluster Q?

6      A.    It's not that important.  I'm

7  sorry, written comprehension is very

8  important. Obviously we have procedures as

9  far as making rescues in elevators and the

10  various things we have to do as far as

11  shutting down electricity and putting

12  halligan in the wheel and tools we use to

13  open up the elevator, so it would be very

14  important.

15      Q.    When do you do the reading?

16      A.    Prior to the incident.

17      Q.    Do you do any reading while

18  you're using elevators to ascend to the

19  appropriate floor?

20      A.    No.

21      Q.    Turning to back to Exhibit 79,

22  Task Cluster R, that's page USA004419.

23  Looking at the entry in the list near the

24  middle, deductive reasoning, it says you

25  assigned a rating of one with respect to

94

1

2    Task Cluster R; is that correct?

3          A.    Yes.

4          Q.    And turning to Exhibit 134; page

5    NYC11005.   Task Cluster R is training.

6    These tasks involve participating in

7    drills which simulate important fire or

8    rescue activities, and attending lectures

9    or formal training.

10               Reviews/critiques activities

11   performed at fire scene upon return to

12   station or on next tour.

13               Participates in drills to

14   practice basic company skills.

15               Participates in drills in which

16   working fire activities are practiced.

17               Participates in drills in which

18   a response to an emergency is simulated,

19   and participates in inter-agency drills;

20   is that correct?

21         A.    Yes.

22         Q.    How is deductive reasoning

23   somewhat important to the performance of

24   these tasks?

25         A.    It's very important. I mean you

95

1

2    have to, bear with me.  It's identifying

3    the task that's needed, and as a result of

4    that you have to come up with different

5    procedures in order to address the issue,

6    I guess.

7              For instance, you know, you have

8    simulated drills, participating in drills,

9    participate in basic company skills,

10   raising ladders and stretching hose line

11   in a situation like that, raising a

12   35-foot ladder, it demands two people, and

13   you have to know if you have enough room

14   to bring the ladder out so someone can

15   actually climb the ladder.

16        Q.    You answered it was very

17   important, but you indicated on your

18   ratings it was somewhat important.

19        A.    I believe, before deductive

20   reasoning I didn't have, I didn't have an

21   explanation of what deductive reasoning

22   was, so to answer it I was just guessing.

23        Q.    And turning back to Exhibit No.

24   79 for Task Cluster S, Watch Duties, page

25   USA 004420.

**EXHIBIT II**

-525-

1

2       UNITED STATES DISTRICT COURT

3       EASTERN DISTRICT OF NEW YORK

4       Civil Action No. 07-CV-2067

5       ------------------------------------------------X
        THE UNITED STATES OF AMERICA,
6
                              Plaintiff,
7       and
        VULCAN SOCIETY, INC., for itself and on
8       behalf of its members, CANDIDO NUNEZ,
        MARCUS HAYWOOD and on behalf of a Class
9       of All Others Similarly Situated,
                              Plaintiff-Intervenors
10
                        - against -
11
        CITY OF NEW YORK, FIRE DEPARTMENT OF THE
12      CITY OF NEW YORK, NEW YORK CITY
        DEPARTMENT OF CITYWIDE ADMINISTRATIVE
13      SERVICES, MAYOR MICHAEL BLOOMBERG and
        NEW YORK CITY FIRE COMMISSIONER NICHOLAS
14      SCOPETTA, in their Individual and
        Official capacities,
15
                              Defendants.
16      ------------------------------------------------X

17                        271 Cadman Plaza East
                          Brooklyn, New York
18
                          June 17, 2008
19                        9:35 a.m.

20

21                   DEPOSITION of

22      pursuant to Notice, held at the above

23      place, date and time, before Alice

24      Schulman, a Notary Public of the State of

25      New York.

-526-

54

1

2        A.    Correct.

3        Q.    How important is spatial

4   orientation to the successful performance

5   of the firefighter job?

6        A.    Important.

7        Q.    Can you please give me specific

8   tasks where spatial orientation is

9   especially important?

10       A.    In a fire, also because you

11  can't see anything, the ladder guys get

12  mixed up about how far they are into a

13  building.  So you really have to pay

14  attention because you do lose contact of

15  where you're at.  So I think it's

16  important, yes.

17       Q.    If you could please turn the

18  page and look at the 15th ability,

19  visualization.  Visualization is the

20  ability to imagine how something would

21  look when it is moved around or when its

22  parts are moved or rearranged.  It

23  requires the forming of mental images of

24  how patterns or objects would look after

25  certain changes, such as unfolding or

55

1

2      rotation.  One has to predict how an

3      object, set of objects, or pattern will

4      appear after the changes have been carried

5      out, correct?

6          A.    Correct.

7          Q.    How important is visualization

8      to the successful performance of the

9      firefighter job?

10         A.    I'm not sure exactly about that.

11         Q.    You're not sure what is meant

12     here?

13         A.    Of the meaning of it.

14         Q.    I'm sorry, just so I'm clear,

15     you're not sure of the --

16         A.    The clarification of the

17     visualization.

18         Q.    I just want to make sure I'm

19     clear.  Are you saying you're not sure

20     what the definition of the word

21     visualization here means?

22         A.    Yes.

23         Q.    So would it be difficult for you

24     to talk about how important it is to the

25     performance of the firefighter job?

-528-

68

1

2       it.  Then we would do it hands on.

3           Q.      You would actually practice

4       doing it?

5           A.      Yes.

6           Q.      With respect to the part of

7       understanding what the person was writing

8       on the board during the drill, would you

9       say that's written expression or written

10      comprehension?

11          A.      I'm not sure.

12          Q.      If you could please turn to Task

13      Cluster L and, actually, I'm sorry, I want

14      to go back to Task Cluster H for a

15      second.

16              Is it fair to say that while

17      you're actually supplying water for hose

18      operation that you're not writing anything

19      down?

20          A.      Correct.

21          Q.      If you could please now --

22          A.      Actually, I'm wrong on that one

23      as the chauffeur will be writing something

24      down.

25          Q.      What are the chauffeurs writing

**EXHIBIT JJ**

1

1

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - -x
     THE UNITED STATES OF AMERICA,
5
                          Plaintiff,
6
                 and
7
     VULCAN SOCIETY, INC., for itself and on
8    behalf of its members, CANDIDO NUNEZ,
     MARCUS HAYWOOD and on behalf of a Class
9    of All Others Similarly Situated,

10                   Plaintiff-Intervenors,

11                   -a-

12   CITY OF NEW YORK, FIRE DEPARTMENT OF
     THE CITY OF NEW YORK, NEW YORK CITY
13   DEPARTMENT OF CITYWIDE ADMINISTRATIVE
     SERVICES, MAYOR MICHAEL BLOOMBERG and
14   NEW YORK CITY FIRE COMMISSIONER
     NICHOLAS SCOPETTA, in their Individual
15   and Official capacities,

16
                          Defendants.
17   - - - - - - - - - - - - - - - - - - -x

18                        271 Cadman Plaza
                          Brooklyn, New York
19
                          March 21, 2008
20                        9:41 a.m.

21

22

23              DEPOSITION OF

24

25

-530-

46

1

2      reasoning important to the firefighter

3      job, if you can think of anything?

4          A.      I guess I can relate this to

5      the Fire Department by saying deductive

6      reasoning is the ability to apply

7      general rules.  Those general rules

8      could mean, for example, our standard

9      operating procedures.  But if we -- an

10     example would be if we have a standard

11     operating procedure for fighting fire

12     in a two story private dwelling, not

13     every private dwelling is the same.

14     But we have general standard

15     operating -- general rules to fight a

16     fire in a private dwelling.  But since

17     not every private dwelling is the same,

18     deductive reasoning would probably be

19     important to come up with a logical

20     answer for, say, building construction

21     differences or, you know, layout of the

22     property or something like that.  You

23     know, just come up with an answer to a

24     problem.

25         Q.      The 10th entry on the final

47

1

2      ability list says, "Inductive reasoning

3      is the ability to combine separate

4      pieces of information, or specific

5      answers to problems, to form general

6      rules or conclusions.  It involves the

7      ability to think of possible reasons

8      for why things go together."  Correct?

9          A.     That's what it says.  I'm

10     going to read it again.

11         Q.     Sure.

12         A.     All right.

13         Q.     How would inductive reasoning

14     be important to the firefighter job?

15         A.     I'm not sure.  It's almost

16     the opposite of deductive, right?  Can

17     somebody explain that to me, inductive,

18     deductive?  The way I see it it's a

19     little bit of the opposite.  In other

20     words, deductive you have the rules and

21     you come up with a problem -- you come

22     up with an answer to the problem.

23              Inductive is -- I'm not sure

24     what they're trying to say.  You

25     already have the answer to the problem

48

```
 1
 2    and you come up with a rule.  Because
 3    you come up with an answer, now you can
 4    come up with a rule.  Is that what it's
 5    basically saying?
 6         Q.    I'm sorry.  We can't answer
 7    that.
 8         A.    I'm not sure.
 9         Q.    That's fine.
10         A.    I'm not sure how that
11    relates.  From the way I see it, if you
12    have an answer to a problem, and you're
13    the guy that's coming up with the rule
14    for that problem, it probably means
15    you're a little bit of a senior guy and
16    a chief officer or something.  You know
17    what I'm saying?  Like, that's the way
18    I'm reading it, in relating it to the
19    Fire Department.  I could be reading it
20    wrong, though.
21         Q.    Based on your understanding,
22    can you indicate how inductive
23    reasoning would be important to the
24    firefighter job?  And if you can't,
25    that's okay.
```

49

```
 1
 2             MR. SAMPLE:  Objection.
 3        Repetitive.  You can answer the
 4        question if you can.
 5        A.    I guess it just comes down to
 6   experience, you know.  When you've seen
 7   answers to problems, it just means you
 8   have experience, and that's helpful.
 9        Q.    How often does the
10   firefighter put on personal protective
11   gear such as turn out coat, helmet,
12   boots, breathing apparatus?
13        A.    All day long.
14        Q.    And how necessary is
15   inductive reasoning to putting on
16   protective -- personal protective gear,
17   if it is necessary to that?
18        A.    I'm not really sure what
19   you're asking.
20        Q.    Would you say that --
21        A.    I really wasn't sure what
22   they're trying to say by inductive
23   reasoning to begin with.  So I'm going
24   to have problems with your questions on
25   inductive reasoning.
```

51

1

2      tasks where you think information

3      ordering would be especially important?

4          A.    Charging a hose line could

5      be, you know, there's steps and order

6      to do it so it's done correctly.

7          Q.    Number 14 of the final

8      ability list spatial orientation.   It

9      says, "Spatial orientation is the

10     ability to tell where you are in

11     relation to the location of some object

12     or to tell where the object is in

13     relation to you."   Correct?

14         A.    Correct.

15         Q.    How would spatial orientation

16     be important to the firefighter job?

17         A.    This sounds like a -- it's

18     more of a physical thing, like I mean,

19     is it saying that is it important that

20     firefighters wear their glasses?   Is

21     that what it's saying?

22         Q.    I'm sorry.  I can't answer

23     the question.

24         A.    You know what I'm saying.  I

25     don't know how I went through this in

52

 1

 2      1998.  Looking at this closely, to tell

 3      you where you are in relation to some

 4      object.  Where the object is in

 5      relation to you.  I mean, first thing I

 6      think of is the little thing in the

 7      rearview mirror.  Objects may be closer

 8      than they are.  I guess it could be

 9      important at night on the roof of a

10      smoky building, I guess it could be

11      important.  Yes.  You don't want to

12      walk up a building.  Yes, it could

13      happen.

14          Q.      Turning to the second page of

15      Exhibit 92, the final ability list,

16      number 15.  "Visualization is the

17      ability to imagine how something would

18      look when it is moved around or when

19      its parts are moved or rearranged.  It

20      requires the forming of mental images

21      of how patterns or objects would look

22      after certain changes, such as

23      unfolding or rotation.  One has to

24      predict how an object, set of objects,

25      or pattern will appear after the

**EXHIBIT KK**

1

1

2      IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF NEW YORK
3          Civil Action No. 07-CV-2067
       - - - - - - - - - - - - - - - - - -x
4    UNITED STATES OF AMERICA,

5           PLAINTIFF,

6    AND

7    VULCAN SOCIETY, INC., FOR ITSELF AND ON
     BEHALF OF ITS MEMBERS, CANDIDO NUNEZ,
8    MARCUS HAYWOOD AND ON BEHALF OF A CLASS
     OF ALL OTHERS SIMILARLY SITUATED,
9
           PLAINTIFF-INTERVENORS,
10
     V.
11
     CITY OF NEW YORK, FIRE DEPARTMENT OF THE
12   CITY OF NEW YORK, NEW YORK CITY
     DEPARTMENT OF CITYWIDE ADMINISTRATIVE
13   SERVICES, MAYOR MICHAEL BLOOMBERG AND NEW
     YORK CITY FIRE COMMISSIONER NICHOLAS
14   SCOPPETTA, IN THEIR INDIVIDUAL AND
     OFFICIAL CAPACITIES,
15
           DEFENDANTS.
16   - - - - - - - - - - - - - - - - - -x
                 January 15, 2008
17                  9:18 a.m.

18

19      DEPOSITION of ALBERTO JOHNSTON, taken
     by Plaintiff, pursuant to Rule 30(b)(6)
20   Notice, held at the United States
     Attorney for the Eastern District of New
21   York, 271 Cadman Plaza East, Brooklyn,
     New York, before Jamie Ann Stanton, a
22   Shorthand Reporter and Notary Public of
     the State of New York
23        *   *   *

24

25

19

1          A. Johnston

2     A    I want to go back a little.

3   Developing.  What do you mean by

4   "development"?  You mean take the exam

5   from beginning?  I did not -- for 2043,

6   for the record, I did not develop 2043.

7   What happened was I was told that we

8   probably can use the old job analysis from

9   I think it was 7029, so in that sense, I

10  took over using a prior job analysis.

11  Basically, I just verified that, in fact,

12  we can still use that prior job analysis.

13    Q    So we will walk through all of

14  these steps.

15          Let me actually ask you this

16  first:  What is meant by "develop an exam"

17  in your department?  So when I say to you,

18  did you develop an exam, what would it

19  mean within USEG to develop an exam?

20    A    If I am assigned an exam -- you

21  used the word develop.  Basically, I am

22  the examiner who is assigned an exam, I

23  would be the examiner who would go out

24  and, from beginning to end, start a job

25  analysis.

1        A. Johnston

2      Q    So you went from ensuring the

3    test plan was appropriate to writing

4    items?  Was that the next step?

5      A    Okay.  Well, when you say --

6    okay.  I am a little confused, because

7    your questions are so broad, I mean, to

8    me.  Could you be a little bit more

9    specific in the sense that you say,

10    okay -- specifically what do you do?

11      Q    All my questions right now only

12    involve what your role was on Exam 2043.

13      A    Okay.

14      Q    Not what you generally do for an

15    exam.

16      A    Okay.

17      Q    And right now I am just looking

18    for, you know, very general terms of what

19    you did.  It sounds like we talked about

20    making sure the test plan was appropriate.

21    Again, this is just for 2043.  Then there

22    is a process to write items; is that

23    correct?

24      A    Yes.  Let me go back a little.

25    So basically what I would do is get some

24

1        A. Johnston

2    subject matter experts to come in to look

3    at the task list that was used for the

4    previous job analysis, because I am using

5    that and the belief is that it's still

6    current to be used for 2043.

7        Q    Did you say "task list"?

8        A    Yes, task list, yes.

9        Q    So the task list from the

10   previous exam, from 7029, right?

11       A    Right.  And we would have the

12   expert look it over, and basically what

13   they say, if they say, hey, there are

14   changes or what have you, we would

15   evaluate that.  I think in this case there

16   were no changes.  The best of my

17   knowledge, there was no changes as far as

18   the experts.  They thought it was very

19   current.

20       Q    You gave them a task list.  Did

21   you give them an abilities list as well?

22       A    Yes.  They probably saw the test

23   plan.

24       Q    When you say "test plan," what

25   do you mean?

25

1        A. Johnston

2        A    Usually, in this case, 2043,

3    being it's an ability-based test, it will

4    list the abilities and particular tasks.

5    So the category that makes up that

6    particular -- in this case, 2043 --

7    examination.  That's where the questions

8    would really come from, eventually, that

9    was going to be written.

10      Q    So after the subject matter

11   experts, what's the next?

12      A    Well, once we ascertain that, in

13   fact, everything seems current, we can use

14   that previous job analysis, then it's my

15   task to train the experts on how to write

16   questions for 2043.

17      Q    So after the item writing,

18   what's next?

19      A    Once the questions are written,

20   they are edited.  They are reviewed by

21   myself and maybe some other examiners,

22   they would give me their input, and it's

23   my judgment to decide I use what they

24   recommend or just stay with what I

25   believe.

26

1        A. Johnston

2    Q    So there is a review panel?

3    A    Yes.

4    Q    What is after the review panel?

5    A    Okay.  Go back.  Review panel --

6  it's two different things.  Before the

7  review panel, once the questions are

8  written by the experts that they have, I

9  edit it and I also have other examiners

10  like myself, me as one of the examiners,

11  look at it and get the feedback.

12    Q    Okay.

13    A    The review panel is a separate

14  panel.  It would not be the same item

15  writers that would be called because we

16  don't want the same people -- if you are

17  going to critique, a review panel to look

18  at something to say that they, in fact,

19  offer critic, you wouldn't want the same

20  people who wrote the exam to be a critic.

21  It would be hard to critique yourself.  So

22  review panel is a separate panel, separate

23  members that would be called.  And they

24  would go through all the items of the

25  written and they would give their feedback

1      A. Johnston

2    and we would hopefully make the

3    appropriate changes.

4      Q    And so there is a review panel.

5    What is after the review panel?

6      A    Then after the review panel,

7    there is some internal checks where we

8    have like a read-through of the exam, like

9    we read to someone and we pick up

10    something and we say, gee, this doesn't

11    make sense, oh, my goodness, okay, check

12    that.  So we do a total read-through and

13    then we go through where I might have my

14    superior just look at certain things, read

15    it over and see that, in fact, the

16    details, like little minor things, but

17    it's very important, like if you have a

18    question 1, that there are four choices:

19    A, B, C, D.  Little things that you might

20    think is not important, but yet it's

21    very -- we've got to be very meticulous.

22       So there tend to be more reviews

23    and more editing-type stuff to see that,

24    in fact, some change was, in fact, made or

25    didn't get changed afterwards.  But they

1        A. Johnston

2    are very important.  You never can look

3    too long and review things.  I mean, it's

4    really unbelievable.

5      Q    So the process, then, is

6    basically to get booklets formatted; is

7    that right?

8      A    Before it becomes a booklet.

9    Because once it goes to print, then that's

10   it.  Unless they catch something, then

11   there will be an errata sheet sent in.

12     Q    Now, after the final booklets

13   are printed -- and I know that there are

14   multiple versions of these booklets -- do

15   you have any other role in the exam?

16     A    Yes.

17     Q    What other roles do you have?

18     A    Anything to do with 2043.  You

19   are speaking of 2043, right?

20     Q    Correct.

21     A    I would be the person that tends

22   to initiate it.  And by that, I mean, for

23   example, before the exam is given, you

24   have to let Test Administration know, hey,

25   we are giving this examination, we are

Page 331

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Civil Action No. 07-CV-2067
---------------------------------------x
THE UNITED STATES OF AMERICA,
          Plaintiff,
and
VULCAN SOCIETY, INC., for itself and on
behalf of its members, CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,
          Plaintiff-Intervenors

          -against-

CITY OF NEW YORK, FIRE DEPARTMENT OF THE
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPETTA, in their Individual and
Official capacities,
          Defendants.
---------------------------------------x
                    February 4, 2008
                    10:26 a.m.


          Continued Deposition of ALBERTO

     JOHNSTON, taken by the Plaintiff, pursuant to

     Notice, at the offices of the United States

     Attorney for the Eastern District of New York,

     271 Cadman Plaza East, New York, New York,

     before David Levy, CSR, a Notary Public of the

     State of New York.

e08c178f-7848-4a99-8be2-89b57197c25a

Page 488

Johnston

2  created by your panels and you in 2002 for use in

3  test 2043, right?

4      A.  Yes.

5      Q.  So I'm asking you, to your knowledge,

6  did your set of questions for 2043 conform to any

7  particular reading level and if so, what was the

8  level?

9      A.  Well, I don't remember.  I don't

10  recall.  But I'm sure it's -- the level would

11  have matched the level that was used in 729.

12      Q.  And how was that tested for?

13      A.  Excuse me?

14      Q.  How was that tested for?  How did you

15  determine that the questions on 2043 were at the

16  reading level that you were looking for?

17      A.  Well --

18      Q.  Did you test for it?

19      A.  Specifically, no.

20      Q.  Okay.  Have you ever heard of a

21  Flesch-Kincaid test?  Have you ever heard of

22  that?

23      A.  I don't think so.

24      Q.  Have you ever heard of any test that

25  you can think of that was used to indicate or

Page 489

1                          Johnston

2      analyze the reading level of particular questions

3      or particular exam content?

4          A.  Yes.  I think there is a, for

5      example, in my -- in my -- there are certain

6      principles --

7          Q.  Please listen to my question.  Do you

8      know of a test, any test, that specifically

9      examines the question of reading level on an

10     entrance exam?

11         A.  I can't recall at this time.

12         Q.  Okay.  In preparing 2043, did you

13     employ any test, whether or not you can remember

14     the name of it, did you employ any specific test

15     to determine the reading level of the questions

16     after they were created?

17         A.  No.

18         Q.  Now, was the ranking system that was

19     used on test 2043, was that a ranking system that

20     was developed by DCAS?

21         A.  When you say "ranking system," what

22     do you mean?

23         Q.  Well, we know that applicants were

24     ranked according to their final composite test

25     score, the written and the physical and any bonus

**EXHIBIT LL**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
Civil Action No. 07-CV-2067
-------------------------------------x
THE UNITED STATES OF AMERICA,
            Plaintiff,
and
VULCAN SOCIETY, INC., for itself and on
behalf of its members, CANDIDO NUNEZ,
MARCUS HAYWOOD and on behalf of a Class
of All Others Similarly Situated,
            Plaintiff-Intervenors

            -against-

CITY OF NEW YORK, FIRE DEPARTMENT OF THE
CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPETTA, in their Individual and
Official capacities,
            Defendants.
-------------------------------------x
                    January 30, 2008
                    9:47 a.m.


        Deposition of DANIEL A. NIGRO, taken by

    the Plaintiff, pursuant to Notice, at the

    offices of the United States Attorney for the

    Eastern District of New York, 271 Cadman Plaza

    East, New York, New York, before David Levy,

    CSR, a Notary Public of the State of New York.

Page 78

1                          Nigro

2       in job-related activities.  For example, enter an

3       apartment and respect the belongings of others."

4           Correct?

5           A.  Yes.

6           Q.  How important is integrity in the

7       successful performance of the firefighter job?

8           A.  I would think it's very important.

9       It's important in -- I can't think of too many

10      jobs it would not be important in, but it's

11      certainly very important for firefighters.

12          Q.  On the same page, looking at the

13      entry titled "Work Standards," it says, "Work

14      standards is the ability to set high goals or

15      standards of performance for self, subordinates,

16      others, and organization.  Dissatisfied with

17      average performance."

18              Correct?

19          A.  Yes.

20          Q.  How important are work standards in

21      the successful performance of the firefighter

22      job?

23          A.  Oh, I -- I don't think people that --

24      if you don't set high goals for yourself in that

25      particular job, you won't get the job done.  I

1                           Nigro

2      think the people in the City will suffer.  So I

3      think it's very important.

4           Q.  Looking at the entry on the same

5      page, Bates numbered DCAS 00108683, titled,

6      "Resilience," it says, "Resilience involves the

7      degree to which one can handle disappointment

8      and/or rejection while maintaining

9      effectiveness."

10          Correct?

11          A.  Yes.

12          Q.  How important is resilience in the

13     successful performance of the firefighter job?

14          A.  I think it's another quality that you

15     should have.  The job will be very difficult if

16     you don't have it.  If you can't accept criticism

17     or failure, you're certainly not going to save

18     everyone in this world and...

19          Q.  On the same page, referring to the

20     entry titled, "Coordination," it says,

21     "Coordination is the ability to adjust actions in

22     relation to others' actions."

23          Is that correct?

24          A.  Yes, it is.

25          Q.  Again, how important is coordination

1                          Nigro
2    in the successful performance of the firefighter
3    job?
4            A.   Extremely.
5            Q.   On the same page, Bates numbered
6    DCAS 0008683, looking at the entry titled,
7    "Establishing and Maintaining Interpersonal
8    Relationships," it says, "Establishing and
9    maintaining interpersonal relationships involves
10   the degree to which one can develop constructive
11   and cooperative working relationships with others
12   and maintaining them over time."
13           Correct?
14           A.   Yes.
15           Q.   Again, how important is establishing
16   and maintaining interpersonal relationships in
17   the successful performance of the firefighter
18   job?
19           A.   Well, I think it's -- it's somewhat
20   important.
21           Q.   But not very important?
22           A.   Well, I wouldn't put it in the
23   category of coordination or work standards, no.
24   I think it's important to the individual.  I
25   think you have a lot better career if you work

Page 81

                           Nigro

1
2    well with others.  But...
3         Q.   Now referring just a few pages
4    earlier to the page Bates numbered DCAS 0008679,
5    I see an entry entitled, "Oral Comprehension."
6              And it says that, "Oral comprehension
7    is the ability to understand spoken English words
8    and sentences."
9              Is that correct?
10        A.   Yes.
11        Q.   How important is oral comprehension
12   in the successful performance of the firefighter
13   job?
14        A.   Very.
15        Q.   And then finally, referring to the
16   entry titled, "Oral Expression," it says that,
17   "Oral expression is the ability to use English
18   words or sentences in speaking so that others
19   will understand"; correct?
20        A.   Correct.
21        Q.   Chief, how important is oral
22   expression in the successful performance of the
23   firefighter job?
24        A.   Very.
25        Q.   Chief, did you participate in any way

**EXHIBIT MM**


PLAINTIFF'S
EXHIBIT
163
2/21/08    9L

## TEST SPECIFICATIONS

There are a variety of ways of deriving test specifications from job analysis results. One of them involves looking at the abilities that linked to first-day task clusters and brainstorming ways in which each of the abilities could be measured in a job-related fashion. At times, sample items are generated for the abilities to aid discussion in terms of the feasibility and measurability of the ability.

The types of testing instruments under discussion for Examination 6019 included written multiple-choice questions, structured oral interview questions, written situational judgment type questions using a Likert type response, work sample exercises and physical examination exercises. Other types of testing instruments, such as essay, fill-in-the-blank, etc. were considered, but discarded because written expression had been eliminated from consideration for the examination because of its low overall linking mean.

### Test Method

To assist in our thinking, an "Ability by Measurement Modality" chart was constructed of the possible ways in which the abilities could be feasibly measured. This chart is given on the next page. An "X" indicates that it was thought that an ability could be measured in a particular format. In some cases, where there are multiple "X"s, we believe abilities might be measured in multiple formats.

Under "Written," there are three possibilities. "MC" stands for multiple-choice and implies an A,B,C,D response format. MC items usually have only one correct answer. "SJE" stands for Situational Judgment Exercise which frequently employs a Likert 1 to 5, Strongly Agree to Strongly Disagree response format. SJE items sometimes have multiple answers keyed as correct, for example, Strongly Agree and Agree might both be keyed as correct in a particular situational problem. "Picture" implies that some of the information in the item would be presented in a picture format, and the responses would be multiple-choice. For some picture items, such as the picture stimulus testing Memory, the picture would be presented for a certain period of time and then taken away. For other picture items, such as those measuring Speed of Closure, the picture stimulus would not be taken away from the candidate.

For an oral method, we considered using a structured interview, where candidates would be asked to give examples from their own experience or asked to answer hypothetical questions based on the ability to be measured. The use of a structured oral interview seemed particularly appropriate for some of the abilities such as Oral Expression. It was decided that conducting structured oral interviews was not feasible for several reasons. First, security of oral examination questions could not be guaranteed while thousands of candidates were interviewed over a period of weeks or months. Second, the number of trained interviewers who would be needed to carry out this task would be difficult to

NYC104704

obtain and train to an appropriate level of standardization. Finally, the cost and time needed to carry out this project in a valid and reliable fashion would be very high.

| ABILITY X MEASUREMENT MODALITY CHART | WRITTEN | | | ORAL | PHYSICAL |
|---|---|---|---|---|---|
| | MC | SJE | Picture | | |
| ORAL COMPREHENSION | X | X | X | X | X |
| WRITTEN COMPREHENSION | X | X | | | |
| ORAL EXPRESSION | | | | X | |
| FLUENCY OF IDEAS | | | | X | |
| MEMORIZATION | X | X | X | X | |
| PROBLEM SENSITIVITY | X | X | X | X | |
| NUMBER FACILITY | X | | | X | |
| DEDUCTIVE REASONING | X | X | X | X | |
| INDUCTIVE REASONING | X | X | X | X | |
| INFORMATION ORDERING | X | X | X | X | |
| SPEED OF CLOSURE | | | X | | |
| FLEXIBILITY OF CLOSURE | | | X | | |
| SPATIAL ORIENTATION | | | X | | |
| VISUALIZATION | | | X | | |
| PERCEPTUAL SPEED | X | | X | | |
| TOLERANCE FOR STRESS | Not Measured | | | | |
| TIME SHARING | X | X | X | X | X |
| ADAPTABILITY | | X | | X | |
| TENACITY | X | X | | X | |
| INTEGRITY | X | X | | X | |
| WORK STANDARDS | X | X | X | X | |
| RESILIENCE | X | X | | X | |
| COORDINATION | X | X | | X | |
| ESTABLISHING AND MAINTAINING INTERPERSONAL RELATIONSHIPS | | X | | X | |
| STATIC STRENGTH | | | | | X |
| EXPLOSIVE STRENGTH | | | | | X |
| DYNAMIC STRENGTH | | | | | X |
| STAMINA | | | | | X |
| EXTENT FLEXIBILITY | | | | | X |
| DYNAMIC FLEXIBILITY | | | | | X |
| GROSS BODY EQUILIBRIUM | | | | | X |
| SPEED OF LIMB MOVEMENT | | | | | X |
| GROSS BODY COORDINATION | | | | | X |
| FINGER DEXTERITY | Not Measured | | | | |
| MANUAL DEXTERITY | | | | | X |
| ARM-HAND STEADINESS | | | | | X |
| RATE CONTROL | Not Measured | | | | |

NYC104705

Finally, there were some abilities that we believed could not be measured reliably with any of the measures under consideration, or for which there is no recognized way of measuring the ability. These abilities are identified as "Not Measured" in the chart.

After discussion, it was decided that a written test, incorporating as great a variety of item types as possible would be administered along with a physical test. The written examination added many abilities not previously measured on the written test given for firefighter, and the aim was to assess as many of the personal abilities as possible through the use of SJEs.

## Written Test

The written test was designed to measure almost all of the abilities that could be measured in a MC, SJE or Picture format. Abilities that could be measured only in an oral or physical format were not included in the Written Test. The abilities that were targeted by the written test were: Memorization, Problem Sensitivity, Number Facility, Deductive Reasoning, Inductive Reasoning, Information Ordering, Speed of Closure, Flexibility of Closure, Spatial Orientation, Visualization, Perceptual Speed, Adaptability, Tenacity, Integrity, Work Standards, Resilience, Coordination and Establishing and Maintaining Interpersonal Relationships. Written Comprehension and Time Sharing were also intended to be measured indirectly throughout the written test.

Within the written test, it was decided to consider weighting all of the targeted abilities equally. That is, all targeted abilities would be measured using the same number of items, except when the test formal made this inadvisable (i.e., Perceptual Speed and abilities measured with the SJE format.) Weights within a test (and numbers of items) are sometimes decided based on the JAQ Mean, the Overall Linking Mean, or a combination of the two numbers. However, in this case there was not a large range in either set of means since decision rules had been previously applied. (Means are presented in Table 7 of the Job Analysis Report for this examination.) Since number of items based on the job analysis data would probably range from 4 to 6 items for each of the 18 abilities if the means were multiplied together to give a weight based on 100 items, and number of items based on an additive approach would result in 5-6 items being the appropriate weight for each ability based on a total of 100 items, it seemed to make greater sense to have all important entry-level abilities weighted equally. (See Wainer, 1976 for a discussion of the comparability/superiority of unit weighting as opposed to regression weighting in test validity.)

Accordingly, it was decided that each of the 18 abilities should be weighted 5 points, and thus add to a total of 90 points. However, because SJE items, in the experience of Dr. Cline, typically have less variance than MC items, it was thought that at least three SJE items should be written for each MC item. This would also allow broader content sampling in terms of the scenarios used in the SJE items, and add to content validity.

This means that the final number of items for each ability measured on the written test would be 5 items if the ability were measured in a MC or Picture format (except in the

case of Perceptual Speed), but 15 items if it were measured in an SJE format. However, the SJE scores would be divided by 3 to bring the weights back in line with the other abilities. The number of items used to measure Perceptual Speed would be determined through pilot testing, and the actual score for this ability would be divided by some constant so that the number of points allocated to this ability would range from zero to five points.

### Physical Test

For the physical we considered, and ultimately decided upon, the use of the Candidate Physical Ability Test (CPAT), a physical examination which has been validated for firefighter selection and which simulates important physical tasks performed by a firefighter. In our informed analysis, the CPAT measures most of the physical abilities identified as important, first-day abilities in the job analysis report for this examination. Since it was constructed to simulate many of the physical tasks performed by firefighters, it can also be considered a work sample test.

The eight events included in the CPAT are: the stair climb, the hose drag, the equipment carry, the ladder raise and extension, the forcible entry, the search, the rescue and the ceiling breach and pull. These events assess "both aerobic and anaerobic capacities in almost equal measure." (IAFF, p. 7-9) The CPAT has been validated to show that:

- Test events require a level of physical exertion that is similar to the physical exertion required by essential job duties of an FDNY firefighter. (IAFF, p. 6-41).
- Test events require a range of activities that is similar in nature to the activities required by actual job tasks of an FDNY firefighter. (IAFF, p. 6-42).
- Test events can be performed by individuals with little or no prior orientation or training. (IAFF, p. 6-42.)

The eight events of the CPAT are a good match with important tasks and task clusters identified earlier in the job analysis survey conducted for the New York City Firefighter position. To demonstrate this, the events and the matching tasks and task clusters are given in the chart below. Given that the FDNY was a participant in the consortium that developed the CPAT, CPAT events were linked to critical and physically demanding tasks in NYC, as well as in other jurisdictions. (IAFF, 1999)

Physical abilities linked highly to the task cluster are also given in the table below. (Eleven out of 13 surviving physical abilities were highly linked to at least one of the task clusters.) No physical abilities were highly linked to the Task Cluster in which the Equipment Carry is found, but it is likely that this event measures Static Strength, Explosive Strength, and possibly Stamina.[1]

---

[1] These abilities link at the .3 level or higher to the Size Up and Initial Actions Task Cluster in which the Equipment Carry task is found.

NYC104707

| CPAT EVENT | NYC Task Cluster | Physical Abilities Highly Linked to NYC Task Cluster (Mean > 4.0) |
|---|---|---|
| Stair Climb | Climbing and Portable Ladder Activities | Static Strength, Explosive Strength, Dynamic Strength, Stamina, Extent Flexibility, Gross Body Equilibrium, Speed of Limb Movement, Gross Body Coordination |
| Hose Drag | Hose Operations During Extinguishment | Static Strength, Stamina |
| Equipment Carry | Size up and Initial Actions | |
| Ladder Raise and Extension | Climbing and Portable Ladder Activities | Static Strength, Explosive Strength, Dynamic Strength, Stamina, Extent Flexibility, Gross Body Equilibrium, Speed of Limb Movement, Gross Body Coordination |
| Forcible Entry | Building Entry | Explosive Strength, Stamina, Dynamic Flexibility, Arm-Hand Steadiness |
| Search | Search | Stamina, Extent Flexibility |
| Rescue | Rescue | Static Strength, Explosive Strength, Dynamic Strength, Stamina, Extent Flexibility, Manual Dexterity |
| Ceiling Breach and Pull | Overhaul | Stamina |

As part of the original development and validation study, study participants were asked if the range of activities contained in the test events were similar to the range of activities performed in the firefighter job. The IAFF report states that more than 90% of the respondents labeled each event as a reasonable and/or accurate simulation of actual job tasks.[2] As reported in p. 6-41 of the CPAT study report "This result also provides strong support for the content validity of the test events." (IAFF, 1999)

The CPAT study report also presents data concerning the pass/fail cut point that is recommended for use with the CPAT. A sample of 33 Training Officers drawn from 10 participating jurisdictions (again, including New York City) individually evaluated tapes of actors performing the events of the CPAT and judged the level of effort and pace that

---

[2] The IAFF report actually reports data (6-37) that the Ladder Raise and Extension was considered reasonable and accurate by only 82% of the sample, but all other events were termed reasonable and accurate by 90 percent or more of the sample.

NYC104708

constituted acceptable or minimally acceptable task performance. Based on the consistency of agreement among the 33 evaluators, a cut-off score of 10 minutes, 20 seconds was chosen as a valid cut-off score. "In effect, the cut-off score was valid because it selected those fire fighter candidates who can better perform the job." (IAFF, 1999, p. 7-14)

## Conclusion

If all abilities targeted by the written test format are measured on the written test, and all physical abilities linked to the task cluster in which the CPAT test event is found are measured on the physical test, then 32 out of 37 possible important, first-day, linked abilities will be measured on Examination 6019. Eighteen of these abilities are tested directly, and Written Comprehension and Time Sharing are measured indirectly, on the written test. Twelve abilities (including 11 physical abilities and Oral Comprehension) would be measured on the physical test. This represents a substantial portion of the ability content domain which has been identified as important to firefighter performance. This systematic job analysis study provides the basis for constructing a valid examination in conformity with the standards for content validity expressed in such sources as the EEOC Guidelines (1970), the APA/AERA/NCME Joint Standards (1999) and the SIOP Principles for Validation and Use of Personnel Selection Procedures (2003).

## References

American Educational Research Association, American Psychological Association, National Council on Measurement in Education. *Standards for educational and psychological testing.* Washington DC: AERA, 1999.

Equal Employment Opportunity Commission. *Guidelines on employee selection procedures.* Federal Register, 35 (149) 12333-12336 (EEOC) (1970).

International Association of Firefighters. *The fire service joint labor management wellness/fitness initiative: Candidate Physical Ability Test.* IAFF, 1999.

Society for Industrial and Organizational Psychology. *Principles for the validation and use of personnel selection procedures* (4th ed.) Bowling Green OH: SIOP, 2003.

Wainer, H. Estimating coefficients in linear models: It don't make no nevermind. *Psychological Bulletin*, 83, 213-217 (1976).

NYC104709

**EXHIBIT NN**

# JOB ANALYSIS REPORT

# FIREFIGHTER, FIRE DEPARTMENT OF NEW YORK CITY

# EXAMINATION NUMBER 6019

**REPORT PREPARED BY:**
**CATHERINE S. CLINE, PH.D.**
**SPECIAL EXAMINER, DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES (DCAS)**

**JUNE 2007**



PLAINTIFF'S
EXHIBIT

149

DCAS-0008649

Table 7.  Comparison of JAQ Means with Llinking Means for the JAQ Abilities

| Ability | JAQ Mean | Overall Linking Mean |
|---|---|---|
| Number Facility | 4.03 | 2.97 |
| Deductive Reasoning | 4.17 | 3.37 |
| Inductive Reasoning | 4.17 | 3.32 |
| Information Ordering | 4.24 | 3.35 |
| Written Comprehension | 4.31 | 2.72 |
| Memorization | 4.07 | 3.42 |
| Speed of Closure | 4.17 | 3.34 |
| Flexibility of Closure | 4.10 | 3.06 |
| Spatial Orientation | 4.41 | 3.30 |
| Visualization | 4.13 | 3.28 |
| Perceptual Speed | 4.09 | 2.88 |
| Oral Expression | 4.43 | 4.04 |
| Written Expression | 4.00 | 2.11 |
| Fluency of Ideas | 4.01 | 3.44 |
| Time Sharing | 4.25 | 3.44 |
| Tolerance for Stress | 4.33 | 3.55 |
| Oral Comprehension | 4.46 | 4.14 |
| Problem Sensitivity | 4.24 | 3.68 |
| Adaptability | 4.02 | 3.17 |
| Tenacity | 4.30 | 3.46 |
| Integrity | 4.22 | 3.07 |
| Work Standards | 4.13 | 3.50 |
| Resilience | 4.00 | 3.22 |
| Coordination | 4.37 | 3.57 |
| Interpersonal Relationships | 4.17 | 3.17 |

DCAS-0008768

**EXHIBIT OO**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,         :
                                  :
          Plaintiff,              :
                                  :
VULCAN SOCIETY, INC. for Itself   :
And on Behalf of Its Members,     :
Candido Nunez, Marcus Haywood     :
And Roger Gregg, Individually     :
And on Behalf of a Class of All   :
Others Similarly Situated,        :
                                  :
          Plaintiff-Interveners,  :
                                  :  CIVIL ACTION NO.:
          v.                      :  07-CV-2067
                                  :
CITY OF NEW YORK, FIRE DEPARTMENT :
Of the City of New York, New York :
City Department of Citywide       :
Administrative Services, Mayor    :
Michael Bloomberg and New York    :
City Fire Commissioner Nicholas   :
Scoppeta, in their Individual and :
Official Capacities,              :
                                  :
          Defendants.             :
                                  :
- - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, June 12, 2008

Deposition of

ROBERT ALEXANDER

DIVERSIFIED REPORTING SERVICES, INC.
(202) 467-9200

1      Q     Okay.  Is that because it's a personality

2  conflict with the person that you would otherwise report to?

3      A     I don't particularly care for the individual who

4  I would have had to report to?

5      Q     And who is that?

6      A     Dennis Davis.

7      Q     Okay.  Now when did you start working at DCAS?

8      A     June 13th, 2005.

9      Q     And what was your position?

10     A     Test and measurement specialist, level one.

11     Q     And did you work anywhere else between DCAS and

12  this new job in applications?

13     A     No.

14     Q     Okay.  Now who was your supervisor when you

15  first started as a test and measurement specialist?

16     A     Matt Morrongiello.

17     Q     Was he your supervisor the entire time?

18     A     Oh, back.  Immediately, it was Barbara Carnival.

19  And then Barbara went over to another division and it became

20  Matt Morrongiello.

21     Q     Okay.  So Barbara Carnival in June 2005?

22     A     Right.

18

1      Q      Well, let me ask it this way:  Were you involved

2   in all stages of developing exam 6019?

3      A      Involved in, yes.

4      Q      Okay.  Were you involved in all the stages

5   involved with validating the exam?

6      A      I did the analysis, yeah, and I did the -- I

7   crunched the numbers SPSS for the job analysis that I

8   analyzed the linking panel with Excel.

9              THE REPORTER:  You analyzed what?

10             THE WITNESS:  What's that?

11             THE REPORTER:  The Lincoln panel?

12             THE WITNESS:  Linking panel.

13             THE REPORTER:  Lincoln?

14             THE WITNESS:  Linking.

15             MR. SIMPLE:  Linking, l-i-n-k-i-n-g.

16             BY MS. GELLER:

17     Q      And how about with scoring of exam 6019; were

18   you involved also in the scoring of it?

19     A      What do you mean by scoring; like choosing the

20   pass mark or actually grading the test?

21     Q      Choosing the pass mark.

22     A      No.

31

1      Q      What about how many written employment

2   examinations had you worked on developing?

3      A      Just firefighter.

4      Q      Okay.  What is the highest education degree

5   you've received?

6      A      I have a BA in psych, and I am two classes and a

7   term paper shy of my master's.

8      Q      Are you attending school currently?

9      A      Not right now.

10     Q      So you have course work towards --

11     A      Uh-huh.

12     Q      -- the master's?  What's the master's in?

13     A      Organizational behavior.

14     Q      Okay.  Where is your BA from?

15     A      Brooklyn College.

16     Q      What about your MA, where was the course --

17     A      Polytechnic University.

18     Q      Is that also in New York?

19     A      Yeah.  Brooklyn.

20     Q      Okay.  When did you get your BA?

21     A      Maybe '03.

22     Q      Okay.  Oh, your BA is from '03?

Page 221

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,      :
                              :
            Plaintiff,         :
                              :
VULCAN SOCIETY, INC. for Itself :
And on Behalf of Its Members,   :
Candido Nunez, Marcus Haywood   :
And Roger Gregg, Individually   :
And on Behalf of a Class of All :
Others Similarly Situated,      :
                              :
       Plaintiff-Interveners,  :
                              :   CIVIL ACTION NO.:
          v.                   :   07-CV-2067
                              :
CITY OF NEW YORK, FIRE DEPARTMENT :
Of the City of New York, New York :
City Department of Citywide     :
Administrative Services, Mayor  :
Michael Bloomberg and New York  :
City Fire Commissioner Nicholas :
Scoppeta, in their Individual and :
Official Capacities,            :
                              :
            Defendants.         :
                              :
- - - - - - - - - - - - - - - x

Washington, D.C.

Friday, June 13, 2008

Continued Deposition of

8511cf93-e8f7-4de8-a5f6-0245fb4f7df5

Page 222

ROBERT ALEXANDER

a witness of lawful age, taken on behalf of the Defendant in

the above-entitled action, before Cindy Lee Fryer, CVR,

Notary Public in and for the District of Columbia, in the

offices of Department Of Justice, 601 D Street, N.W.,

Washington, D.C. 20530, commencing at 10:21 a.m.

APPEARANCES:
        On Behalf of the Plaintiff:
            CLARE GELLER, ESQUIRE
            SHARON SEELEY, ESQUIRE
            DAVID REESE, ESQUIRE
            VARDA HUSSAIN, ESQUIRE
            CAROLYN WEISS, ESQUIRE
            Department of Justice
            601 D Street, N.W.
            Washington, D.C. 20530
            202-307-0143
        On Behalf of Plaintiff-Interveners:
            RICHARD A. LEVY, ESQUIRE
            DANA E. LOSSIA, ESQUIRE
            Levy Ratner, P.C.
            80 Eighth Avenue
            New York, New York 10011-5126
            212-627-8100
        On Behalf of the Defendants:
            EDWARD SAMPLE, ESQUIRE
            Law Department
            100 Church Street
            New York, New York 10007
            212-788-0903


                        *  *  *  *  *



                        //

349

1        A      EBSCOhost.

2        Q      Who is that?

3        A      It's like a research -- a journal, internet

4   journal, depository.

5        Q      And did you read this article at the time?

6        A      I think I used it to write the report.

7        Q      Uh-huh.

8        A      And I probably read most of it or at least the

9   pertinent information.

10       Q      This report -- well, look at the 13593.

11       A      Okay.

12       Q      And would you read that first paragraph at the

13   very top, the summary?

14       A      Sure.  "Cognitive ability tests correlate with

15   measures of job performance across many jobs.  However,

16   cognitive ability tests produce racial differences that are

17   three to five times larger than other predictors, such as

18   biodata, personal inventories, and structured interview that

19   are valid predictors of job performance."

20       Q      I think that's okay for now.

21       A      Okay.

22       Q      But do you agree with that, from your findings?

350

1          A      Based on the research that I read, that's what

2     the research says.

3          Q      Do you know the difference between biodata and

4     personality inventories?

5          A      Personality inventories are more of a

6     questionnaire, and you get your -- like your level of

7     introvertness, extrovertness, are you a leader.  Biodata is

8     just pretty much a summary of your life/experiences.

9          Q      And was either of those used in 6019?

10         A      No.

11         Q      And nor was the structured interview?

12         A      Nor was the structured interview.

13         Q      And do you know why that was?

14         A      One of the reasons for structured interviews

15     that it was going to be a nightmare to administer.

16         Q      Why?

17         A      Manpower, space, timing.  I think that was one

18     of the reasons that was given.

19         Q      If you did a structured interview at the time

20     you did a physical --

21         A      Uh-huh.

22         Q      -- when people have to be spoken to anyway, and

Page 350

1    A    Based on the research that I read, that's what
2  the research says.
3    Q    Do you know the difference between biodata and
4  personality inventories?
5    A    Personality inventories are more of a
6  questionnaire, and you get your -- like your level of
7  introvertness, extrovertness, are you a leader.  Biodata is
8  just pretty much a summary of your life/experiences.
9    Q    And was either of those used in 6019?
10   A    No.
11   Q    And nor was the structured interview?
12   A    Nor was the structured interview.
13   Q    And do you know why that was?
14   A    One of the reasons for structured interviews
15  that it was going to be a nightmare to administer.
16   Q    Why?
17   A    Manpower, space, timing.  I think that was one
18  of the reasons that was given.
19   Q    If you did a structured interview at the time
20  you did a physical --
21   A    Uh-huh.
22   Q    -- when people have to be spoken to anyway, and

Page 351

1  they do things more or less individually, why would it be
2  such a nightmare to do at least a short interview?
3    A    You need trained personnel to administer the
4  interview, you need recording -- like recording pieces to do
5  it.  I would imagine it would be difficult to argue or try a
6  candidate to appeal if the equipment broke.  Or, you know,
7  it's still one person's word against the other.
8    Q    Why would the equipment break?  What kind of
9  concern is that?
10   A    Your tape recorder could snap while you're
11  taping the person.
12   Q    Did anyone -- other than opining in the fashion
13  that you are, did anyone look into the validity of those
14  kinds of concerns?  In other words, did anyone actually check
15  to see what other jurisdictions, if they had had that
16  experience --
17   A    I --
18   Q    broken --
19   A    I'm sorry.
20   Q    -- tapes or inability or excessive cost in
21  training?
22   A    I don't know.

Page 352

1    Q    You didn't?
2    A    I did not.
3    Q    Would you look at the exhibit that's numbered
4  250.  I'm sorry.  You're looking at 250?
5    A    250.
6    Q    Who prepared this?
7    A    I don't know.
8    Q    When did you first see this?
9    A    Yesterday.
10   Q    You had never seen this before?
11   A    No.
12   Q    You were looking into the issue of alternative
13  methods of testing?
14   A    Correct.
15   Q    And this was not shared with you?
16   A    No.
17   Q    Do you have a guess as to who may have prepared
18  this?
19   A    Bill Klimowicz would be my best guess, 'cause he
20  prepared a lot of time lines for the Commissioner.
21   Q    Okay.  Do you have 248 there?
22   A    Yes.

Page 353

1    Q    248 is the -- is a document you prepared?
2    A    Yes.
3    Q    And did that include the discussion that follows
4  the chart that's broken down into sections, cognitive ability
5  tests, validity and utility of selection methods, and so on?
6    A    Please repeat your question.
7    Q    Is this your work?
8    A    Yes.
9    Q    If you look at page 11447 -- 0011447, I'm sorry,
10  on Exhibit 248, you refer to findings concerning the use of
11  biodata instruments, the bottom of the page, and you refer to
12  a review of the literature by Hunter and Hunter in 1984.
13   A    Okay.
14   Q    And then it goes on to discuss biodata studies
15  in 1982 by Riley and Chao, do you see that?
16   A    Yes.
17   Q    And another validity study on biodata in 1972 by
18  Asher?
19   A    Yes.
20   Q    Are these your research findings?
21   A    This is what I got from the journal articles,
22  yes.

Page 354

1    Q    There's another one by Rothstein, Schmidt, Owens
2    & Sparks in 1990, do you see that?
3    A    Yes.
4    Q    So these are articles you found that dealt with
5    these alternative testing methods?
6    A    Yes.
7    Q    So is it fair to say, from your discussion here,
8    that, in 1970 or certainly by 1980, the use of these
9    alternative methods was being well written about and known --
10   A    I --
11   Q    -- and they had been tested for validity, based
12   on your findings?
13   A    I don't know how well researched they were in
14   1972.
15   Q    Uh-huh.
16   A    This article is from 1972. So at least this
17   study was done then.
18   Q    Uh-huh.  But then there are others, in 1982
19   and 1984. I mean would you conclude, based on your research,
20   that this was available information in the -- let's say by
21   the mid '80s?
22   A    Yes.

Page 355

1    Q    And it was being used in various quarters to
2    test for job performance?
3    A    Yes.
4    Q    And, in your reading of these articles, was it
5    your finding that they were being used in part to reduce
6    adverse impact?
7    A    That they were using these things --
8    Q    Yeah.
9    A    -- to reduce adverse impact?
10   Q    Yeah.
11   A    I think so.
12   Q    And was the general consensus of these articles
13   that in fact these were valid, these were valid approaches to
14   job selection, that they had a reasonably high validity
15   correlation to be used for that purpose?
16   A    They are .3 and .35.
17   Q    Right.
18   A    That's -- it's okay.
19   Q    Well, if you look at the second paragraph on
20   page 448 of your analysis, wasn't your finding that combining
21   these alternatives with cognitive testing raised the validity
22   to the point .63, .65 area and actually had a higher validity

Page 356

1    than using general mental abilities alone?
2    A    That is what the article says.
3    Q    Not the article, but isn't that what several
4    articles concluded and that you concluded?
5    A    Oh, I take this stuff straight from the article.
6    Q    Right.
7    A    But I didn't write it though. These are the
8    things I thought were pertinent to what they were writing
9    about. But, yes, if you do it, what is it, the .63 -- .65
10   and .63. If you use a combination of cognitive -- what they
11   call GMA, but it's cognitive abilities, where are we at --
12   what is it? "And the 18 other selection procedures." Yeah.
13   Their combinations seem to be better performing, in terms of
14   validity.
15   Q    I mean this is your summary of your findings
16   from the articles, correct?
17   A    That's correct.
18   Q    And you also found, if I'm reading this
19   correctly, at the bottom of page 448, that if you add biodata
20   measures, you will increase the validity of testing over
21   simply using general mental abilities or GMA; is that right?
22   A    That's what I'm reading. Hold on a second.

Page 357

1    Looking at table one, where it says that --
2    Q    Well, I don't have a table in front of me. I
3    have -- it says "Table One" in the text.
4    A    That only says it -- it barely increases the
5    validity.
6    Q    But it increases it?
7    A    Okay. By .01.
8    Q    Right.
9    A    Okay.
10   Q    So if you add biodata to cognitive, you get a
11   slightly better validity then you would otherwise have; isn't
12   that right?
13   A    By .01. Sure.
14   Q    Yeah. And that's because -- let me withdraw
15   that. The closeness, the little bit of difference, is
16   explained, according to your discussion, by the fact that
17   actually there's a tremendous overlap, that cognitive and
18   biodata tend to correlate very substantially; isn't that
19   right?
20   A    That is what it goes on to say, yes.
21   Q    That does not suggest that you could use
22   biodata at least in part to substitute for cognitive,

Page 198

1  in that filing cabinet.
2      Q    Okay. I'm going to show you Exhibit 261, which
3  is an e-mail from Pamela Lonon to you, Robert Alexander, and
4  the subject line is just "Forward," and then it seems to have
5  a series of item analyses. It's DCAS-E-0021860. Do you
6  recall what those attachments were?
7      A    These are item analyses for the individual
8  sessions and for the portion -- or maybe they're just
9  portions of tests. I will start with -- we'll go in the
10  attachments, 6019 a.m. is the a.m. session of the test.
11     Q    Okay.
12     A    Answer sheet "A." The next one is a.m., answer
13  sheet "B," which was the -- 'cause there was two answers
14  sheets for it. P.m. is the afternoon session. Alternate is
15  the Sunday session. Special SM1 is the 02/09/07 special
16  military exam. And I guess we didn't get the 03/23 special
17  military.
18     Q    So these -- this is an e-mail conveying the item
19  analyses to you?
20     A    Yes.
21     Q    Okay. I'm going to show you -- oh, do you want
22  to finish looking --

Page 199

1      A    No.
2      Q    Okay. I'm showing you what's been previously
3  marked Exhibit 204 and 205. And 204 is the "Preliminary
4  Comparison of Candidate Progress to the Exam Process." It
5  compares exam 2043 and exam 6019. And Exhibit 205 -- I'm
6  sorry. And Exhibit 204 is dated 09/19/07. Exhibit 205 is
7  the "Preliminary Comparison of Candidate Progress to the Exam
8  Process." And it is -- again, it's comparing 2043 and 6019.
9  And it's dated 11/15/07. Do you recognize Exhibits 204 and
10  205?
11     A    I do.
12     Q    Have you seen them before?
13     A    Yes.
14     Q    Did you prepare them?
15     A    Yes. Well, the percentages and the raw data I
16  inputted for 6019. 2043 was already done. And I think they
17  actually reviewed that in one of the earlier pages.
18     Q    Right.
19     A    So that was just brought over into that. But I
20  inputted and calculated the percentages for 6019 on both
21  sheets.
22     Q    Do you know why these documents were prepared?

Page 200

1      A    I don't really know. Just for informational
2  purposes or possibly to show the Commissioner at their weekly
3  meeting with her.
4      Q    Did anyone ever discuss with you these exhibits,
5  the documents that I've put in front of you, the -- actually
6  say the results?
7      A    No. I mean we saw that the pass rate was a
8  little better for minorities on 6019 and 2043. But we didn't
9  have like a long meeting about it.
10     Q    I didn't say on business you had a long meeting.
11  I want to know if anybody ever made any comments to you
12  regarding the results of 6019 versus 2043?
13     A    Yeah. The results of the minority passers were
14  better on 6019 then 2043.
15     Q    Who made that comment to you?
16     A    Probably Bill on one occasion and probably Tom
17  on another occasion.
18     Q    And was anything else said?
19     A    No.
20     Q    Did anyone ever discuss with you whether exam
21  6019 was a success?
22         MR. SAMPLE: Objection. Ambiguous.

Page 201

1         BY MS. GELLER:
2      Q    Do you know what I mean --
3      A    Yeah. I mean I think it was -- it did -- that
4  the minority numbers were better for passers on this than
5  previous exams.
6      Q    Did somebody at DCAS ever discuss with you
7  whether or not exam 6019 was more job related than the
8  previous entry level exam 7029 or 2043?
9      A    I've never had that conversation with anybody.
10     Q    Did anybody talk to you about whether or not
11  6019 was at least as job related as exam 7029 or 2043?
12     A    I have not had that conversation or any job
13  relatedness discussion of 6019 compared to either 2043 or
14  7029.
15     Q    What do you think?
16     A    I think it was a really easy test.
17     Q    No. I asked you whether or not you think it's
18  more job related than --
19     A    I think it has job related -- I think the same
20  processes were used to determine what abilities kept in --
21  you know, what tasks remained in.
22     Q    So it's your testimony that you believe exam

Page 202

1  6019 is at least as job related as exams 7029 and 2043?
2      A    That is my testimony.
3      Q    I mean you never discussed it with anybody?
4      A    No. I mean not real conversations for any
5  policy or anything like that, but I have had conversations.
6  I did the exam. I think the exam was okay.
7      Q    In terms of adverse impact of 6019, it's your
8  understanding that exam 6019 had less disparate impact than
9  exams 2043 and 7029 against minorities; is that correct?
10     A    It is my understanding.
11     Q    Did you have a discussion about the
12 disparate impact of exam 6019 versus 2043 or 7029 with
13 anybody?
14     A    Yes. The fact that is better, but there still
15 is adverse impact.
16     Q    And with whom did you have that discussion?
17     A    Bill Klimowicz.
18     Q    And what did he say?
19     A    That's what he was telling me. You know, I was
20 sitting in the room. I looked at the numbers and they're
21 good, but they're not astronomically better than the previous
22 two exams.

Page 203

1      Q    And that was what he said to you, the numbers
2  are good but they still have impact?
3      A    Yeah. Yes. I would like to add --
4      Q    Sure.
5      A    -- I commented, because based on my schooling, I
6  thought the four-fifths rule would still be the ruling on
7  that. He then told me "No. It's a statistical significance
8  difference between the groups is now what determines adverse
9  impact."
10     Q    So when Bill Klimowicz said "6019 still has
11 adverse impact, he clarified for you --
12     A    Yes.
13     Q    -- not using the four-fifths rule --
14     A    Yes.
15     Q    -- statistical significance?
16     A    Yes.
17     Q    But he also said it was better --
18     A    Yes.
19     Q    -- than 2043 and 7029?
20     A    Correct.
21     Q    And what about Tom Patitucci. Did he ever say
22 anything to you about the job relatedness of exam 6019?

Page 204

1      A    As I said before, I had no conversation
2  regarding the job relatedness of 6019 versus either of the
3  other two exams.
4      Q    How about in general, the job relatedness of
5  6019?
6          MR. SAMPLE: Objection. Repetitive.
7          THE WITNESS: No.
8      BY MS. GELLER:
9      Q    You did not have that discussion with Tom
10 Patitucci?
11         MR. SAMPLE: Objection. Repetitive.
12         THE WITNESS: Not in any format.
13     BY MS. GELLER:
14     Q    And what about any conversation with Tom
15 Patitucci regarding the adverse impact of exam 6019 versus
16 2043 or 7029?
17     A    My conversations were with Bill. I don't know
18 if Bill talked to Tom about it.
19     Q    I'm showing you what has been marked as
20 Plaintiff's Exhibit 206 and 207. Okay. I'm showing you
21 what's been marked previously as Plaintiff's Exhibit 206 and
22 207. Plaintiff's Exhibit 206 is the firefighter exam number

Page 205

1  6019 preliminary eligible list as of 09/19/07, and
2  Plaintiff's 207 is the firefighter exam number 6019
3  preliminary eligible list as of 11/15/07. Do you recognize
4  Exhibits 206 and 207?
5      A    They look familiar, yes.
6      Q    Did you prepare them?
7      A    I don't know if I prepared the entire thing. I
8  may have done some work on it, but I think Bill might have
9  compiled this for the Commissioner.
10     Q    Do you know why this information was wanted?
11     A    I do not.
12     Q    Did anybody ever talk to you about what's
13 contained in these exhibits?
14     A    No. I mean I'm just sort of told what to do,
15 and, you know, I just do it.
16     Q    Do you know why the eligibility list was broken
17 down into sections of a thousand list numbers to look at race
18 and national origin breakdown?
19     A    For ease of -- I'm speculating. For ease of
20 viewing or possibly that's how we're calling our physical
21 test candidates, in groups of thousands.
22     Q    Okay.

da78cd2a-b1ba-464a-94b7-7a703a8b0479

**EXHIBIT PP**



Personnel
Research and
Development
Center

Technical Study 77-8

# Job Analysis of the Entry Level Firefighter Position

United States
Civil Service Commission
Bureau of Policies and Standards

PLAINTIFF'S
EXHIBIT
67
7/2/08 A5

PI·67

VUL 03158

JOB ANALYSIS OF THE ENTRY LEVEL FIREFIGHTER POSITION

David A. Bownas and Robert W. Heckman

U. S. Civil Service Commission

Contract # CS-1642

Dr. Charles H. Anderson, COR

Personnel Decisions, Inc.
821 Marquette Avenue
Foshay Tower
Minneapolis, Minnesota  55402
612 339 0927

3 December 1976

This project was supported under contract number CS-1642 by the U. S. Civil Service Commission.  Points of view or opinions stated in this document are those of the authors, and do not necessarily represent the official positions or policies of the U. S. Civil Service Commission.

I.   EXECUTIVE SUMMARY

Objectives.  This paper reports the procedures and results of a nation-wide job analysis of the entry-level firefighter position.  The research described here is funded by the United States Civil Service Commission (USCSC), and is intended to further the goals of the Equal Employment Opportunity Coordinating Council (EEOCC).  These goals include encouraging the development and validation of usable selection procedures for high-volume public jobs, and the current study is supported by USCSC as a demonstration research project complying with EEOCC's intentions.

Our study was intended to identify the major tasks performed by entry-level firefighters across the United States.  We sought to assess the difficulty of performing each such task, the conditions under which tasks are performed, the relative importance of various job duties, and the knowledges, skills, abilities, and other characteristics (KSA's) required to perform tasks effectively.  Finally, we sought to specify standards for performing firefighter duties at an adequate and at a superior level and to develop an examination plan showing the relative weights to be given to each KSA in predicting job performance.

Procedure.  We included in our sample a total of 109 fire departments, geographically dispersed, of sizes ranging from fewer than 25 to nearly 3,000 uniformed personnel, and representing cities of from no more than 20,000 to more than 2.5 million population.  Comparisons with available data showed that racial minorities were represented in the job analysis phases of our study in approximately the same proportions as those in which they occur in the fire service nationally.

Our study began by identifying, through literature reviews, interviews, and observations, the tasks performed by firefighters in U.S. fire departments.  A task analysis questionnaire was developed from these tasks and distributed to a nationally representative sample of fire departments to estimate the relative importance of each firefighter task.  In the next stage, the tasks identified as most critical were categorized into homogeneous clusters, based on estimates of task performance similarity, and KSA's important for performing each task were suggested.  In a series of workshops, fire service professionals gave us more information about KSA's and the task clusters, described the conditions under which the tasks in each cluster are performed, and wrote examples of inadequate, adequate, and superior performance for each cluster of tasks.  Finally, fire personnel from a national sample of more than 50 departments rated the importance and difficulty of performing various firefighter tasks and clusters, estimated the amount

2.

of each KSA required of firefighter recruits at the time of hire, and rated the importance of each KSA for performing in each task cluster at an adequate and at a superior level.

Results.  At every step in our project, we found excellent agreement among raters, among departments, among regions, and among department sizes for all rating tasks.

Sixteen clusters comprising 109 important firefighter tasks were identified during our job analysis.  These task clusters, or job performance areas, include:

1.  Performing rescue operations
2.  Performing salvage and overhaul
3.  Performing ladder operations
4.  Forcibly entering structures and enclosures
5.  Applying ventilation procedures
6.  Following standard safety procedures
7.  Applying knowledge of fire characteristics
8.  Performing hose evolutions and applying extinguishing agents
9.  Operating apparatus
10.  Administering emergency care
11.  Dealing with the public
12.  Performing preplanning and fire prevention inspections
13.  Participating in training and education
14.  Reconditioning and maintaining equipment
15.  Performing routine station duties
16.  Getting along with peers

We identified 20 knowledges, skills, abilities, and other characteristics reliably rated by fire service experts as contributing to performance in these 16 job areas, recommended instruments for measuring each KSA, and derived the relative weights to be given to each such attribute in estimating future performance as a firefighter.

Finally, we have developed procedures which departments can use to ascertain the similarity of their own firefighter positions to those on which our analysis was conducted.  These procedures can be used to test the appropriateness of the selection procedures described in this report for selecting firefighters in any jurisdiction.

VUL 03161

| US CSC Weighting Plan for Firefighter Exam ||
|---|---|
| Weight | Abilities and Characteristics |
| 8.0 | Responsibility |
| 7.9 | Desire to Learn |
| 7.9 | Teamwork |
| 7.4 | Activity (energy) |
| 7.1 | Getting Along with People |
| 6.1 | Problem-solving Ability |
| 6.0 | Honesty |
| 5.4 | Visual Acuity |
| 5.1 | Mechanical Ability |
| 5.0 | Resistance to Stress |
| 4.5 | Quickness (physical) |
| 4.3 | General Body Coordination |
| 4.2 | Cleanliness |
| 4.1 | Dexterity (of limbs and fingers) |
| 4.0 | Verbal Skills (written and verbal) |
| 3.8 | Construction Trade Interest |
| 3.5 | Physical Strength |
| 3.2 | Courage |
| 1.5 | Math Skills |
| 1.1 | Medical interests |
| 100 | Total |

Derived from Table 20 (page 20) of Bownas & Heckman (1976) *Job Analysis of the Entry Level Firefighter Position*. Washington, DC: Personnel Research and Development Center of the US Civil Service Commission.

VUL 03162

-578-

APPENDIX Q

RECOMMENDED TESTS FOR 20 ATTRIBUTES

References are for studies showing empirical validity for tests
indicated.  Test manuals and publishers are listed at the end of
appendix.



PLAINTIFF'S
EXHIBIT
67A
7/8/08    A·S

1.  Physical strength

    1.  Basic Fitness Tests (BFT).  (Romashko et al. 1974)

        a.  Five-minute free-style stepping
        b.  Hand grip, preferred
        c.  Hand grip, non-preferred
        d.  Free style broad jump
        e.  Softball throw
        f.  Leg lifts

    2.  San Francisco Physical Aptitude Test for Firemen (PATF)
        (Verducci & Meekins, 1973)

        a.  Bent-knee sit-ups
        b.  Hand grip strength
        c.  Pull-ups
        d.  500-yard shuttle run

    3.  Personal History Index (PHI).  Health scale.


2.  General body coordination

    1.  PATF  (Verducci & Meekins, 1973)

        a.  Nozzle threading bimanual coordination test
        b.  Strength and balance test
        c.  Bending and twisting

    2.  BFT (Romashko et al; 1974)

        a.  Balance
        b.  Cable jump
        c.  Twist touch
        d.  Bend, twist, and touch

3.  Quickness

    1.  PATF (Verducci & Meekins, 1973)

        a.  Nozzle threading bimanual coordination test

    2.  Time required to complete all subtests of BFT and PATF

4.  Dexterity

    1.  PATF (Verducci & Meekins, 1973)

        a.  Nozzle threading bimanual coordination test

    2.  Hand Tool Dexterity Test

5.  Visual acuity

    1.  Employee Aptitude Survey (EAS) test #3, Visual Pursuit (Murdy & Norton, 1972)
    2.  Tested visual actuity via Snellen chart

6.  Verbal skills

    1.  EAS test #1, Verbal Comprehension
    2.  Flanagan Industrial Tests, Judgment and Comprehension

7.  Math skills

    1.  EAS Test #2, Numerical Ability
    2.  Fire Aptitude Test, Arithmetic Ability (Rusmore, Note 2)

8.  Problem solving ability

    1.  EAS Test #10, Symbolic Reasoning (Murdy & Norton, 1972)
    2.  California Psychological Inventory (CPI) intellectual efficiency scale (Heckman, 1973b)

9.  Mechanical ability

    1.  Flanagan Industrial Tests, Mechanics
    2.  Flanagan Aptitude Classification Tests (FACT), Assembly
    3.  Fire Aptitude Test, Mechanical and trade information (Rusmore, Note 2)

10.  Courage

    1.  CPI Responsibility (Heckman, 1973b)
    2.  Gough Adjective Checklist (ACL) Self-confidence
    3.  ACL Exhibition (Heckman, 1973b)
    4.  Cattell 16 PF Questionnaire (16 PF) scale O (Self-assured vs. apprehensive) (Murdy & Norton, 1972)
    5.  Jackson Personality Research Form (PRF) Harm avoidance

03.

11.  Resistance to stress

     1.  ACL Lability
     2.  ACL Personal adjustment (Personnel Decisions, Inc., 1971)
     3.  Comrey Personality Scales (CPS) Emotional stability

12.  Teamwork

     1.  ACL Lability (PDI, 1971)
     2.  ACL Autonomy
     3.  CPI Dominance
     4.  CPI Sociability (Heckman, 1973b)
     5.  Biographical items regarding experiences in team sports or other
         activities.

13.  Activity

     1.  Guilford-Zimmerman Temperament Survey (GZTS) General activity
         (Heckman, 1973a)
     2.  CPS Activity
     3.  ACL Endurance

14.  Responsibility

     1.  CPI Responsibility (Heckman, 1973b)
     2.  CPI Communality
     3.  ACL Self-control
     4.  ACL Lability
     5.  Baehr Personal History Index (PHI) Early family responsibility
         (Marks, 1970)
     6.  Gough Personnel Reaction Blank (PRB) Wayward impulse scale
     7.  Biographical history items dealing with previous experience in
         military and previous positions held requiring personal responsi-
         bility for accomplishing objectives

15.  Desire to learn

     1.  ACL Achievement
     2.  ACL Intraception (Heckman, 1973b)
     3.  ACL Abasement (Heckman, 1973b)
     4.  CPI Achievement via conformity
     5.  CPI Intellectual efficiency (Heckman, 1973b)
     6.  CPI Communality (Heckman, 1973b)
     7.  Biographical history items dealing with academic achievement

14.

16. Getting along with others

    1. ACL Succorance (Heckman, 1973a)
    2. ACL Self-confidence (Heckman, 1973b)
    3. ACL Affiliation (Heckman, 1973b)
    4. ACL Self-control (Heckman, 1973b)
    5. ACL Autonomy (Heckman, 1973b)
    6. ACL Deference (Heckman, 1973b)
    7. CPI Self-control (Heckman, 1973b)
    8. GZTS Restraint (Heckman, 1973a)
    9. Biographical history items dealing with sibling friction and other aspects of past interpersonal effectiveness.

17. Honesty

    1. CPI Socialization
    2. Reid Report Attitude toward theft inventory
    3. Reid Report Biographical data blank
    4. Gough PRB Wayward impulse scale

18. Cleanliness

    1. ACL Order (Heckman, 1973a)
    2. GZTS Restraint (Heckman, 1973a)

19. Medical interest

    1. Minnesota Vocational Interest Inventory (MVII) Hospital attendant (Heckman, 1973b)
    2. Strong Campbell Interest Inventory Medical services interest
    3. ACL Nurturance

20. Construction trade interest

    1. MVII Carpentry homogeneous scale (Heckman, 1973a)
    2. MVII Plasterer scale (Heckman, 1973a)
    3. MVII Sheet metal worker scale (Heckman, 1973a)
    4. MVII Mechanical homogeneous scale (Heckman, 1973a)

**EXHIBIT QQ**



Source: O*Net website for Municipal Firefighter
http://online.onetcenter.org/link/details/33-2011.01#WorkStyles

## Work Styles  Save Table (XLS/CSV)

| Importance | Work Style |
|---|---|
| 83 | **Dependability** — Job requires being reliable, responsible, and dependable, and fulfilling obligations. |
| 82 | **Cooperation** — Job requires being pleasant with others on the job and displaying a good-natured, cooperative attitude. |
| 81 | **Attention to Detail** — Job requires being careful about detail and thorough in completing work tasks. |
| 81 | **Self Control** — Job requires maintaining composure, keeping emotions in check, controlling anger, and avoiding aggressive behavior, even in very difficult situations. |
| 79 | **Stress Tolerance** — Job requires accepting criticism and dealing calmly and effectively with high stress situations. |
| 77 | **Initiative** — Job requires a willingness to take on responsibilities and challenges. |
| 76 | **Concern for Others** — Job requires being sensitive to others' needs and feelings and being understanding and helpful on the job. |
| 74 | **Analytical Thinking** — Job requires analyzing information and using logic to address work-related issues and problems. |
| 73 | **Persistence** — Job requires persistence in the face of obstacles. |
| 73 | **Social Orientation** — Job requires preferring to work with others rather than alone, and being personally connected with others on the job. |
| 72 | **Adaptability/Flexibility** — Job requires being open to change (positive or negative) and to considerable variety in the workplace. |
| 70 | **Achievement/Effort** — Job requires establishing and maintaining personally challenging achievement goals and exerting effort toward mastering tasks. |
| 67 | **Integrity** — Job requires being honest and ethical. |
| 62 | **Innovation** — Job requires creativity and alternative thinking to develop new ideas for and answers to work-related problems. |
| 51 | **Leadership** — Job requires a willingness to lead, take charge, and offer opinions and direction. |
| 46 | **Independence** — Job requires developing one's own ways of doing things, guiding oneself with little or no supervision, and depending on oneself to get things done. |

**EXHIBIT RR**



**PReVISOR.**

KNOW IN ADVANCE

1800 367 2509

Change Location

Company    Products & Services    Results    Resources    News & Events    Contact    Log In

Assessments  Interview Tools  Skills Certifications  Consulting Services

## Assessments: Competencies

PreVisor's competency assessments measure multiple attributes such as personality, cognitive ability, past performance, and work-sample behaviors to determine a candidate's suitability for a job role. Using these assessments during selection will help you evaluate a candidate's job fit. This thorough evaluation, particularly when combined with our Knowledge and Skills tests, reveals not only if the candidate can do the job, but also if they will do the job.

**Personality** - Knowing a candidate's personality tendencies helps employers select and place applicants in positions where they are most likely to be motivated and successful. PreVisor's personality testing approach evaluates several factors such as emotional control, stress tolerance, self confidence, adaptability, independence, responsibility, initiative, competitiveness, social awareness, empathy, and influence.

**Abilities** - Cognitive ability is one of the most predictive worker traits, especially in more complex jobs. Along with specific abilities like numerical reasoning, verbal reasoning, and analytical ability, cognitive ability can tell you a lot about a candidate's trainability and problem solving skills. PreVisor's ability tests are frequently combined with other test types to maximize prediction of a variety of performance behaviors, while reducing the potential for adverse impact.

**Behavioral** - PreVisor has industry-leading biodata instruments that reveal a candidate's past behavior and performance to give employers insight into his or her potential for future success on the job. These assessments cover employment and educational background, key developmental experiences, and past achievements. PreVisor's behavioral assessments also include immersive simulations and realistic situational judgment tests that provide additional information predictive of future performance.

For a sample list of our various competencies categorized by job types, please view our test catalog. Or contact us online today.

**Assessments**
- Test Catalog
- Competencies
- Skills
- Simulations
- Pre-Packaged Job Assessments
- Tailored Solutions

**Interview Tools**
**Skills Certifications**
**Consulting Services**
- Job Analysis & Implementation
- Validation & Optimization
- Human Capital Consulting

Home  |  Company  |  Products & Services  |  Results  |  Resources  |  News & Events  |  Contact  |  Log In

Copyright 2008, PreVisor Inc.  Privacy Statement

PLAINTIFF'S EXHIBIT
66
7/2/08    A-S
PENGAD 800-631-6989

PI 66

VUL 03163

Employment Screening, Assessment, Employee Skill Test, Personality Testing

Page 1 of 6





PLAINTIFF'S
EXHIBIT
44A
7/8/08

1800 367 2509

Change Location

Company   Products & Services   Results   Resources   News & Events   Contact   Log In
Assessments   Interview Tools   Skills Certifications   Consulting Services

## Pre-Packaged Job Solutions

Catalog Home | Free Trial

PreVisor offers assessments that combine key knowledge, skill, ability and personality factors all into one easy-to-use assessment tuned to a specific job. Below please find a list of thirty unique job categories covering hundreds of different job titles. These off-the-shelf test batteries are based on decades of research and have been used by many of the largest organizations in the world. For more information on our full line of pre-packaged solutions, please email us or call 1-800-367-2509.

| Administrative | Collections | General Skilled | Phone Banker |
| Administrative with Customer Service | Customer Service | Healthcare Call Center | Professional/Individual Contributor |
| Branch Manager | Customer Service with Sales | Intermediate Sales | Protective Services |
| Call Center | Director/Senior Manager | IT Professional | Sales Manager |
| Call Center with Sales | Executive Officer | Mechanical Operator | Semi-Skilled |
| Clerical | Financial Collection | Nursing Assistant | Senior Sales |
| Clerical with Customer Service | Financial Professional | Personal Banker | Teller |
| | Frontline Manager | Personal Care Aide | |

| SOLUTION | COMMON TITLES | KNOWLEDGE, SKILLS, ABILITIES & COMPETENCIES MEASURED |
|---|---|---|
| Administrative | Clerk<br>Proof Operator<br>Office Assistant<br>Warehouse Clerk | Typing Skills<br>Basic Computer Literacy<br>Achievement Orientation<br>Dependability<br>Conscientiousness |
| Administrative with Customer Service | Front Desk Coordinator<br>Receptionist<br>Administrative Assistant | Typing Skills<br>Basic Computer Literacy<br>Achievement Orientation<br>Dependability<br>Conscientiousness<br>Customer Focus |
| Call Center | Call Center Representative<br>Inbound Call Specialist<br>Customer Service Call Center Representative | Call Center Skills<br>Dependability<br>Customer Focus<br>Achievement Orientation<br>Following Instructions<br>Working with Information<br>Conscientiousness |
| Call Center with Sales | Telemarketer | Call Center Skills |

Employment Screening, Assessment, Employee Skill Test, Personality Testing                    Page 2 of 6

|  |  |  |
|---|---|---|
|  | Telephone Sales Representative<br>Call Center Representative | Following Instructions<br>Persistence and Planfulness<br>Working with Information<br>Customer Focus<br>Sales Focus |
| Clerical | Front Desk Coordinator<br>Receptionist<br>Administrative Assistant | Data Entry Skills<br>Basic Computer Literacy<br>Achievement Orientation<br>Dependability<br>Conscientiousness<br>Customer Focus |
| Clerical with Customer Service | Front Desk Coordinator<br>Receptionist<br>Administrative Assistant | Data Entry Skills<br>Basic Computer Literacy<br>Achievement Orientation<br>Dependability<br>Conscientiousness<br>Customer Focus |
| Collections | Collections Agent<br>Collector<br>Patient Account Representative | Achievement Orientation<br>Persistence and Planfulness<br>Call Center Skills<br>Working with Information<br>Customer Focus<br>Sales Focus |
| Customer Service | Customer Service Representative<br>Retail Associate<br>Cashier | Customer Service Potential<br>Achievement Orientation<br>Dependability<br>Following Instructions<br>Learning Ability<br>Conscientiousness<br>Retention<br>Customer Focus |
| Customer Service with Sales | Representative<br>Retail Sales Associate<br>Sales Clerk | Persistence and Planfulness<br>Customer Service Potential<br>Achievement Orientation<br>Learning Ability<br>Following Instructions<br>Sales Focus<br>Customer Focus |
| Director/Senior Manager | Regional Director<br>Operations Manager<br>Director/Senior Director | Director Potential<br>Director Judgment<br>Business Acumen<br>Drive for Results<br>Building Relationships<br>Self Motivation<br>Problem Solving<br>Verbal Reasoning |
| Executive/Officer |  |  |

| | | |
|---|---|---|
| | Senior Vice President<br>Executive General Manager<br>Chief Executive Officer | Executive Potential<br>Business Acumen<br>Innovativeness/Creativity<br>Vision<br>Thought Focus<br>Work Focus<br>Drive for Results<br>Taking Charge<br>Desire for Achievement<br>Energy Level<br>Self Confidence<br>Building Relationships<br>Influence |
| Frontline Manager | Team Leader<br>First Line Supervisor<br>Manager<br>Branch Manager | Management Potential<br>Management Judgment<br>Business Leadership<br>Leadership Motivation<br>Interpersonal Leadership<br>Self Leadership<br>Problem Solving<br>Verbal Reasoning |
| General Skilled | Material Handler<br>Maintenance Worker<br>Supply Loader<br>Janitor | Following Instructions<br>Achievement Orientation<br>Dependability<br>Conscientiousness |
| Intermediate Sales | Material Handler<br>Maintenance Worker<br>Supply Loader<br>Janitor | Following Instructions<br>Achievement Orientation<br>Dependability<br>Conscientiousness |
| IT Professional | Quality Assurance Specialist<br>Software Engineer<br>Programmer Analyst | Professional Potential<br>Business Acumen<br>Drive for Results<br>Building Relationships<br>Self Motivation<br>Problem Solving<br>Verbal Reasoning |
| Mechanical Operator | Machinist<br>Technician<br>Stationary Engineer | Achievement Orientation<br>Dependability<br>Conscientiousness<br>Process Monitoring |
| Professional/Individual Contributor | Accountant<br>Lawyer<br>Teacher | Professional Potential<br>Business Acumen<br>Drive for Results<br>Building Relationships<br>Self Motivation<br>Problem Solving<br>Verbal Reasoning |
| Protective Services | | |

|  |  |  |
|---|---|---|
|  | Corrections Officers<br>Patrol Officers<br>Security Guards | Measures the applicant's potential for success in protective services jobs based on relevant experiences and aptitude. |
| Sales Manager | Product Area Sales Manager<br>Territory Sales Manager<br>Sales Supervisor | Management Potential<br>Management Judgment<br>Sales Potential<br>Problem Solving<br>Verbal Reasoning<br>Sales Drive<br>Confidence and Independence |
| Semi-Skilled | Mechanic<br>Construction Worker<br>Electrician | Following Instructions<br>Achievement Orientation<br>Dependability<br>Conscientiousness |
| Senior Sales | Sales Executive<br>Senior Sales Director<br>Sales Account Executive | Senior Sales Potential<br>Business Reasoning<br>Drive and Initiative<br>Self Confidence and Autonomy<br>Responsibility and Commitment<br>Focused Innovation<br>Senior Sales Retention |

Back to Top

| JOB TYPE | DESCRIPTION | KNOWLEDGE, SKILLS, ABILITIES & COMPETENCIES MEASURED |
|---|---|---|
| Branch Manager | Directing activities of individuals working in financial institutions, analyzing and classifying risks and investments, approving and rejecting lines of credit, and establishing procedures for custody and control of assets. | Management Potential<br>Management Judgment<br>Leadership Potential<br>Team Management<br>Branch Manager Judgment<br>Branch Manager Problem-solving<br>Business Leadership<br>Leadership Motivation<br>Interpersonal Leadership<br>Self Leadership |
| Finance Collections | Monitoring overdue accounts to update status, calling customers with overdue accounts, and persuading customers to pay their overdue accounts. | Collector Numerical Skills<br>Revenue Recovery<br>Customer Focus<br>Persistence and Planfulness<br>Achievement Orientation<br>Dependability |
| Financial Professional | Recommending investments, acquiring, retaining and | Financial Professional Aptitude<br>Sales Focus |

VUL 03197
7/7/2008

Employment Screening, Assessment, Employee Skill Test, Personality Testing

| | | |
|---|---|---|
| | expanding new and existing customer relationships, proactively contacting & meeting customers, and discovering customer needs. | Self Leadership<br>Interpersonal Leadership<br>Learning Potential<br>Achievement Orientation<br>Conscientiousness<br>Persistence and Planfulness |
| Healthcare Call Center | Taking and receiving information from patients over the phone, working between computer screens, and entering information into a computer. | Achievement Orientation<br>Dependability<br>Healthcare Working with Information<br>Customer Focus<br>Emotional Resilience |
| Nursing Assistant | Turning and re-positioning bedridden patients, feeding patients who cannot feed themselves, and observing patients' conditions, including measuring and recording food intake. | Emotional Resilience<br>Conscientiousness<br>Healthcare Learning Ability<br>Achievement Orientation<br>Dependability<br>Customer Focus |
| Personal Banker | Acquiring, retaining and expanding new and existing customer relationships, discovering customer needs, making the best recommendation, completing sales, proactively contacting & meeting customers, and asking for referrals. | Bank Problem Solving<br>Sales Drive<br>Confidence and Independence<br>Achievement Orientation<br>Learning Potential<br>Persistence and Planfulness<br>Sales Potential<br>Customer Focus<br>Sales Focus |
| Personal Care Aide | Monitoring vital signs and medication intake, administer bedside and personal care such as ambulation and personal hygiene, and preparing and maintaining records of client progress and services performed. | Achievement Orientation<br>Dependability<br>Customer Focus |
| Phone Banker | Explaining products, services and prices to customers, obtaining and entering customer information such as name and address into a computer, and maintaining records of customer accounts. | Working with Information<br>Sales Focus<br>Customer Focus<br>Learning Potential<br>Dependability<br>Persistence and Planfulness |
| Teller | Balancing currency, coin and checks, cashing checks and paying out money, and entering customer transactions into computers. | Learning Potential<br>Customer Focus<br>Dependability<br>Achievement Orientation<br>Teller Numerical Skills<br>Conscientiousness |

Back to Top

Employment Screening, Assessment, Employee Skill Test, Personality Testing          Page 6 of 6

Home | Company | Products & Services | Results | Resources | News & Events | Contact | Log In

Copyright 2008, PreVisor Inc.  Privacy Statement

VUL 03199

**EXHIBIT SS**



JOURNAL OF BUSINESS AND PSYCHOLOGY
Volume 13, No. 4, Summer 1999

# SELECTION TESTS FOR FIREFIGHTERS:
## A COMPREHENSIVE REVIEW
## AND META-ANALYSIS

### Gerald V. Barrett
*University of Akron*

### Michael D. Polomsky
*Barrett & Associates, Inc.*

### Michael A. McDaniel
*University of Akron*

*ABSTRACT:* This study reviewed and summarized the literature on the use of written tests in the selection of firefighters using a sample of 13,418 individuals drawn from 101 samples. For the prediction of job performance, cognitive tests showed substantial validity (.42), although mechanical comprehension tests showed even higher validity (.54). However, the best prediction was obtained by tests which were composites of cognitive and mechanical predictors (.56). Training criteria was best predicted by cognitive measures (.77), although mechanical comprehension predictors also showed substantial prediction value (.62). Tests which were composites of cognitive and mechanical measures showed validities equal to that of cognitive measures (.77).

This study was undertaken to estimate the validity of tests designed to measure cognitive and mechanical ability used in the selection of our nation's firefighters. Quality selection of firefighters is very important because of the critical job duties of firefighters during fire, hazard, and other life-threatening events. Documentation of the validity of common selection procedures for firefighters is also needed given the extensive amount of litigation in the area of fire personnel selection.

Campbell (1982) stated that one of the large voids in the selection literature was validity studies on police officers and firefighters. Hirsh, Northrop and Schmidt (1986) sought to fill part of this void through an

---

Address correspondence to Gerald V. Barrett, Department of Psychology, University of Akron, Akron, OH 44325-4301.

© 1999 Human Sciences Press, Inc.

evaluation of cognitive ability predictors for law enforcement officers. Employing validity generalization methods, the validity of memory, quantitative, reasoning, spatial/mechanical, verbal, and verbal plus reasoning tests for the given criteria of performance in training programs and training on the job was examined. For the training criteria, the hypothesis of situational specificity was rejected for four of the six test types and the 90% credibility value was at least 0.37 for all of the tests. For the job performance criteria, the situational specificity hypothesis was rejected for two of the seven test types. Further, a useful 90% credibility value was obtained for only the spatial/mechanical test type (0.17). The lower validities for job performance were attributed to criterion problems. Given that most police work is conducted in the field, the supervisors have very little opportunity to observe their subordinate's performance and thus have problems providing accurate ratings of performance.

The present study examines the validity of tests for firefighters. Police and firefighters both go through an extensive training period. Similar to the findings of Hirsh et al. (1986) for police officers, we anticipate the selection tests for firefighters to be useful predictors of training performance. Unlike the criterion problems experienced with police occupations, the supervisors of firefighters have substantial opportunity to observe the performance of their subordinates. Thus, in contrast to the findings of Hirsh et al. (1986) for police officers, we anticipate that the selection tests will be useful predictors of the performance of firefighters.

## METHOD

*Meta-analysis as a method of determining validity.* The Schmidt-Hunter meta-analysis method used in this study is based on the hypothesis that much of the variation in results across studies may be due to statistical and methodological artifacts rather than to substantive differences in underlying population relationships. Some of these artifacts also reduce the correlations below their true (e.g., population) values. The method determines the variance attributable to sampling error and to differences between studies in reliability and range restriction, and subtracts that amount from the total amount of variation, yielding estimates of the true variation across studies and of the true average correlation (Hunter & Schmidt, 1990). Artifact distribution meta-analysis, using the interactive method, was employed (Hunter & Schmidt, 1990, Chapter 4). The mean observed correlation ($\bar{r}$) was used in the sampling error variance formula (Hunter & Schmidt, 1990, pp. 208–210; Law, Schmidt, & Hunter 1991; Schmidt, Law, Hunter, Rothstein, Pearlman, & McDaniel, 1993). The computer program utilized is described in McDaniel (1986). Additional detail on the program is presented in Appendix B of McDaniel, Schmidt, and Hunter (1988).

Case 1:07-cv-02067-NGG    Document 264-7    Filed 03/09/09    Page 95 of 103 PageID #:
5674

*Analysis Method*

*Literature search.* The data used in this study was compiled from criterion-related studies of cognitive ability and mechanical/spatial tests conducted over the past two decades. A conscious effort to locate as many validity studies as possible was undertaken in order to enhance the confidence one can place in these results. The analysis undertaken utilized both published selection studies of firefighter examinations as well as unpublished sources. The following references were used to locate firefighter validity studies: *Psychological Abstracts, Psychological Documents, Selected Rand Abstracts, National Technical Information Service, Government Documents, Mental Measurements Yearbook, Tests in Print,* and *Tests*. Information was also requested from test publishers who produced commercially available firefighter tests. Thus, an attempt was aggressively made to locate all published and unpublished firefighter validity studies. The search also utilized automated computer searches.

For job performance criteria, data from 73 independent samples comprising 9,515 individuals were obtained. For training performance, validity data from 28 independent samples comprising 3,903 individuals were located.

*Predictors.* A detailed coding scheme was established to categorize the predictors. To permit an adequate number of coefficients for each predictor category, tests were assigned to one of three categories: cognitive tests, mechanical comprehension tests, and composites of cognitive and mechanical measures. Tests which are mixtures of mechanical and spatial abilities were classified as mechanical.

*Criterion.* The criteria were categorized as training performance or job performance. Firefighters receive substantial training prior to being placed in operational service. Such training is a mixture of classroom learning and hands-on learning. The grades in such training served as training performance criterion. Job performance criterion consisted of supervisory ratings.

*Range restriction and criterion reliability data.* Range restriction, predictor and criterion reliability were obtained from the studies which provided the validity data.[1] The resulting distributions were comparable to those reported by Pearlman (1979) thus adding confidence to the appropriateness of the artifact distributions.

*Decision rules.* Validity coefficients were accepted for the position of entry-level firefighter. This study excluded data on paramedic personnel.

## RESULTS

Table 1 present the results for job performance. Table 2 present the results for training performance. The first column of each table identi-

---

[1]The artifact distributions are available from the senior author.

510                    JOURNAL OF BUSINESS AND PSYCHOLOGY

**Table 1**
**Meta-analysis Results for the Validity of Selection Tests for Firefighters.**
**Criterion Is Job Performance**

| Distribution | Number of $r$ | Total $N$ | Mean Observed $r$ | Observed $\sigma$ | $p$ | $\sigma_p$ | 90% CV |
|---|---|---|---|---|---|---|---|
| Cognitive tests | 24 | 2,791 | .20 | .19 | .42 | .35 | −.03 |
| Mechanical tests | 26 | 3,087 | .26 | .17 | .54 | .29 | .17 |
| Cognitive/mechanical tests | 23 | 3,637 | .28 | .11 | .56 | .12 | .40 |

**Table 2**
**Meta-analysis Results for the Validity of Selection Tests for Firefighters.**
**Criterion Is Training Performance**

| Distribution | Number of $r$ | Total $N$ | Mean Observed $r$ | Observed $\sigma$ | $p$ | $\sigma_p$ | 90% CV |
|---|---|---|---|---|---|---|---|
| Cognitive tests | 14 | 2,007 | .50 | .09 | .77 | .03 | .73 |
| Mechanical tests | 5 | 869 | .37 | .14 | .62 | .17 | .40 |
| Cognitive/mechanical tests | 9 | 1,027 | .50 | .12 | .77 | .12 | .62 |

fies the distribution of validities analyzed. The next four columns present the total sample size, the number of validity coefficients on which each distribution was based, and the uncorrected mean and standard deviation of each distribution. The final three columns present the estimated population mean ($p$), the estimated population standard deviation ($\sigma_p$), and the 90% credibility value for the distribution of true validities. These population distribution estimates are for distributions in which the mean true validities are corrected for unreliability in the criterion and range restriction. Corrections to the mean do not include corrections for predictor unreliability because the tests, as used operationally, have less than perfect reliability. The variances of the true validity distributions are corrected for sampling error and for differences among the studies in predictor and criterion reliability and range restriction.

## DISCUSSION

The results for the prediction of job performance demonstrate the substantial evidence for the validity of commonly used predictors of firefighter job performance. The firefighter position is unusual in that mechanical predictors have a larger mean validity (.54) than do the cognitive predictors

(.42). Typically, cognitive predictors have greater validity than any other predictor. However, the superiority of the mechanical tests is consistent with the substantial mechanical demands inherent in the successful performance of firefighter duties. Although both cognitive and mechanical predictors have substantial levels of prediction, their combination into a cognitive/mechanical composite yields the highest validity (.56).

The validities of the examined tests for the prediction of training performance are also large. Cognitive predictors yield the highest validities (.77). Mechanical predictors also show very large validities (.62). Tests which are composites of cognitive and mechanical predictors yield the same level of validity as the cognitive measures alone. The apparent lack of incremental validity for the mechanical tests over and above the validity of the cognitive tests is suspected to be due to the substantial validity of the cognitive tests. It is very difficult to improve prediction over and above that of the cognitive tests alone at .77.

One can place substantial confidence in the validity evidence for the prediction of job performance criteria. All three distributions shown in Table 1 are based on a relatively large number of coefficients (23 to 26) and the sample sizes within each distribution are also large (2,791 to 3,637). The conclusion drawn from the training criteria are more tentative. The number of coefficients in each distribution are not large (5 to 14) and the total sample sizes are smaller than some might like (869 to 2,007). Still, these results are based on data that is much more impressive than that obtained in any single validity study and represent the best estimates of validity based on data collected to date.

Collectively, the data for the cognitive and mechanical predictors suggest that these tests show substantial validity. Thus, although the continuing litigation concerns in the selection of firefighters may make it wise for organizations to conduct validity studies for each test administered, this study's results provide strong evidence that such validation efforts are largely unneeded on scientific grounds.

## REFERENCES

Campbell, J.C. (1982). Editorial. Some remarks from the outgoing editor. *Journal of Applied Psychology, 67*, 671–700.

Hirsh, H.R., Northrop, L.C., & Schmidt, F.L. (1986). Validity generalization results for law enforcement occupations. *Personnel Psychology, 39*, 399–420.

Hunter, J. E. & Schmidt, F. L. (1990). *Methods of meta-analysis: Correcting error and bias in research findings.* Beverly Hills, California: Sage Publications.

Law, K. S., Schmidt, F. L., & Hunter, J. E. (1991). *Non-linearity of range correlations in meta-analysis: A test of an improved procedure.* Submitted for publication.

McDaniel, M. A. (1986). Computer programs for calculating meta-analysis statistics. *Educational and Psychological Measurement, 46*, 175–177.

McDaniel, M. A., Schmidt, F. L., & Hunter, J. E. (1988). A meta-analysis of methods for rating training and experience in personnel selection. *Personnel Psychology, 41*, 283–314.

Pearlman, K. (1979). *The validity of tests used to select clerical personnel: A comprehensive summary and evaluation (TS-79-1)*. U.S. Office of Personnel Management, Personnel Research and Development Center, (NTIS No. PB 80. 102 650).

Schmidt, F. L., Law, K., Hunter, J. E., Rothstein, J. R., Pearlman, K., & McDaniel, M. A. (1993). Refinements in validity generalization procedures: Implications for the situational specificity hypothesis. *Journal of Applied Psychology, 78,* 3–13.

## APPENDIX A: PUBLISHED FIREFIGHTER STUDIES

Alvares, K.M., and Boston, D.A. (1976). *THe validation of a selection device for metropolitan firefighters: A comparison of measures of aptitude, personality measures, and measures designed to be job-related*. (Technical Report No. TCSC 76-1). Toledo, OH: Toledo Civil Service Commission.

Barrett, G.V., Alexander, R.A., Byers, P., and Klein, I. (1981). *Development of an entrance level selection program for firefighters*. Akron, Ohio.

Bullock, C. (1981). *A firefighter test transportability study: Comparison of Robbins Hose Company (Dover, Delaware) and Maryland counties firefighter jobs*. Philadelphia, PA: U.S. Office of Personnel Management, Mid-Atlantic Region.

Civil Service Board, City of Tampa (1977). *A validation report: Entry-level firefighters*. Tampa, FL: Civil Service Board, City of Tampa.

Ford, S.F., and Sullivan, S.M. (1982). *Firefighter validation study: A concurrent study of the entry-level position*. NJ: New Jersey Department of Civil Service, Division of Examinations.

Henderson, N.D. (1986). *A concurrent validation study of the validity and utility of the 1983 Cleveland firefighter Entry Level examination*. Oberlin, OH, Oberlin College, Department of Psychology.

Kriska, S.D., and Hines, C.V. (1984). *Firefighter selection-test validation study for the City of Columbus*. Columbus, OH: Municipal Civil Service Commission.

Manpower Administration (1958). Technical report on standardization of the General Aptitude Test Battery. Manpower Administration (DOL). Washington, D.C. U.S. Training and Employment Service. June 58.8P.

McCann, F.E., Zupkis, R., Howeth, W.F. and Nichols, G.V. (July, 1975). *The validation of McCann Associates ESV Entrance firefighter written test*. Huntington Valley, PA: McCann Associates.

MacNaughton, J.F., Richardson, P. and Mellon, S.J., Jr. (1978). *Job and worker characteristics of the entry-level firefighter position in the Houston Fire Department*. Houston, TX: City of Houston, Legal Department.

Miller, J.M. (1976). *Validation of a test for selecting firefighters*. Unpublished doctoral dissertation, Marquette University.

Murdy, L.B., and Norton, R.P. (1972). *Fire private test validation study: City of Fort Worth Fire Department* (IBR Technical Report No. 72-2). Forth Worth, TX: Texas Christian University, Institute of Behavioral Research.

Payne, S.S. (1979). *Validity of Test 21 for selection of entry level firefighters in the D.C. Fire Department* (Personnel Research and Development Center).

Psychological Services, Inc. (1983). *A description of the PSI entry-level Firefighter Selection Test*. Washington, D.C.: Psychological Services, Inc.

Rosenfeld, M., and Thornton, R.F. (1976). *The development and validation of a firefighter selection examination for the City of Philadelphia*. Princeton, NJ: Educational Testing Service, Center for Occupational and Professional Assessment.

Ruedebusch, V.M., Vaaler, T.P., Keck, M., Powers, M., Mendenhall, M., Bayreder, C., and Black, P. (1975). *A study of the validity of proposed written examinations for the selection of entry-level firefighters in Des Moines*. St. Louis, MO: U.S. Civil Service Commission, Intergovernmental Personnel Programs, St. Louis Region.

Shores, J.A. (1984). *Validation of a civil service selection procedures for firefighters*. Unpublished master's thesis, California State University, Long Beach, 1984. *Masters Abstracts International, 23 (01), 229.*

G. BARRETT, M. POLOMSKY, AND M. MCDANIEL          513

Skinas, N., and Goldstein, L.S. (1975). *Construction and validation of an entry-level fire-fighter examination.* Trenton, NJ: New Jersey Department of Civil Service, Division of Examinations, Test Validation and Staff Development Unit.

Strand, T. (1975). *A comparative study of two entry level firefighter selection tests.* Unpublished doctoral dissertation, Wayne State University.

Sulzer, J.L. (1977). *Final report. Test development project for entrance exam for firefighter.* New Orleans, LA: City of New Orleans, Department of city civil service.

Tice, T. E. (1970). *Selection systems and performance appraisal in the fire service: A study of criteria development and test validation.* Unpublished master's thesis, Iowa State University of Science and Technology, Ames, Iowa.

Tyler (1980) study (cited in Bullock, 1981).

van Rijn, P., and Payne, S.S. (1980). *Criterion-related validity research base for the D.C. Firefighter Selection Test* (Personnel Research Report 80-28). Washington, D.C.: Office of Personnel Management, Personnel Research and Development Center, Examination Services Branch. (NTIS No. PB-81-122 087).

Waibel, J.J., Billingsley, W., and Thorsen, S. (1974). *The validation of entry-level firefighter examinations in the states of California and Nevada.* Sacramento, CA: Selection Consulting Center. (NTIS No, P-231-997).

Wetrogan, L. I., and Schemmer, F. M. (1986). *Development and validation of the B-3 and B-4 entry-level firefighter examinations.* (Tech. Rep.) Alexandria, Virginia: International Personnel Management Association.

## APPENDIX B
### List of Contributing Studies, the Number of Samples per Study, and Number of r's per Sample

| Author(s) (year) | N of samples | N of rs |
| --- | --- | --- |
| Alvares & Boston (1976) | 1 | 1 |
| Barrett et al. (1981) | 2 | 7 |
| Bullock (1980) | 1 | 5 |
| Civil Service Board, City of Tampa (1977) | 1 | 2 |
| Ford & Sullivan (1982) | 1 | 7 |
| Henderson (1986) | 1 | 3 |
| Kriska & Hines (1984) | 1 | 19 |
| Manpower Administration (1958) | 1 | 7 |
| McCann et al. (1975) | 1 | 1 |
| MacNaughton et al. (1978) | 1 | 3 |
| Miller (1976) | 1 | 4 |
| Murdy & Norton (1972) | 1 | 9 |
| Payne (1979) | 1 | 1 |
| Psychological Services, Inc. (1983) | 1 | 9 |
| Rosenfeld & Thornton (1976) | 1 | 1 |
| Ruedebusch et al. (1975) | 1 | 6 |
| Shores (1984) | 1 | 1 |
| Skinas & Goldstein (1975) | 1 | 3 |
| Sulzer (1977) | 1 | 3 |
| Tice (1970) | 1 | 1 |
| Tyler (1980) | 1 | 4 |
| van Rijn & Payne (1980) | 1 | 3 |
| Waibel et al. (1974) | 1 | 3 |
| Wetrogan (1986) | 1 | 2 |

**EXHIBIT TT**

ORIGINAL                    1

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------------------------------------X
     UNITED STATES OF AMERICA, VULCAN SOCIETY INC., for itself
3    and on behalf of its members; MARCUS HAYWOOD, CANDIDO
     NUNEZ, and ROGER GREGG, individually and on behalf of a
4    class of all others similarly situated,

5                                      PLAINTIFFS,

6                 -against-            Case No:
                                       CV 07 2067
7                                      (NGG) (RLM)

8    THE CITY OF NEW YORK; THE FIRE DEPARTMENT OF THE CITY OF
     NEW YORK; NEW YORK CITY DEPARTMENT OF CITYWIDE
9    ADMINISTRATIVE SERVICES; MAYOR MICHAEL BLOOMBERG and NEW
     YORK CITY FIRE COMMISSIONER NICHOLAS SCOPPETTA, in their
10   individual and official Capacities,

11                                     DEFENDANTS.
     ------------------------------------------------------------X
12

13                     DATE:   October 21, 2008

14                     TIME:   11:40 A.M.

15

16

17                     EXAMINATION BEFORE TRIAL of CANDIDO NUNEZ,

18   a Plaintiff, taken by the Defendants, pursuant to a Notice

19   and to the Federal Rules of Civil Procedure, held at the

20   offices of Michael A. Cardozo, Esq., 100 Church Street, New

21   York, New York 10007, before David Sheldon, a Notary Public

22   of the State of New York.

23

24

25

NUNEZ

1    Q.    They conducted a psychological exam?

2    A.    Yes.

3    Q.    Was there anything about the psychological exam

4    and the way that it was administered that you thought was

5    unfair?

6    A.    I don't know.

7    Q.    Was there anything about the psychological exam

8    in the way that it was administered that you thought that

9    was discriminatory?

10    A.    No.

11    Q.    After you underwent the psychological exam, what

12    happened in the process next in the course of becoming a

13    firefighter?

14    A.    After that, I think I got something in the mail

15    telling me that I was appointed to be a New York City

16    fireman and I had to report to Randalls Island.

17    Q.    When did you receive this correspondence that you

18    were appointed?

19    A.    I got the correspondence in December of '07.

20    Q.    And when were you supposed to report to Randalls

21    Island?

22    A.    January of '08, January 21, '08.

23    Q.    So when you reported to Randalls Island, what

24    happened?

25    A.    Um, that's where the academy is located.

NUNEZ

1    Q.    That was your first day at the academy?

2    A.    Yes.

3    Q.    You have graduated from the academy; is that

4    correct?

5    A.    Yes.

6    Q.    Congratulations.

7    A.    Thanks.

8    Q.    How long is the academy?

9    A.    Twenty-three weeks.

10   Q.    You attended the academy for twenty-three weeks?

11   A.    Yes.

12   Q.    How many people were in your class?

13   A.    We started with 350, and by the day of the

14   graduation, it was 276.

15   Q.    What, if anything, did you do to prepare for the

16   academy before your first day?

17   A.    Um, I trained a lot physically, but also

18   mentally.

19   Q.    And what kind of physical training did you have

20   to undergo?

21   A.    A lot of cardio.

22   Q.    Did anyone assist you in your preparation for the

23   academy?

24   A.    No.

25   Q.    When you say "a lot of cardio," what kind of