UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

                    Plaintiff,

      -and-

THE VULCAN SOCIETY, INC., MARCUS
HAYWOOD, CANDIDO NUÑEZ,
ROGER GREGG,

                 Plaintiff-Intervenors,

      -against-

THE CITY OF NEW YORK, FIRE
DEPARTMENT OF THE CITY OF NEW
YORK, NEW YORK CITY DEPARTMENT
OF CITYWIDE ADMINISTRATIVE
SERVICES, and MAYOR MICHAEL
BLOOMBERG and NEW YORK CITY FIRE
COMMISSIONER NICHOLAS SCOPPETTA,
in their individual and official capacities,

                 Defendants.
-----------------------------------------------------------------X

**MEMORANDUM & ORDER
07-CV-2067 (NGG)(RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

      For over 200 years, the New York City Fire Department has served the people of New

York with uncommon bravery, skill, and determination.  New York's status as one of the world's

great cities is owed in no small part to the commitment and unflagging effort of its firefighters,

who provide the city with a degree of security that is rarely acknowledged only because it is so

rarely called into question.  On September 11, 2001, the world witnessed the magnitude of that

commitment, and nobody who was in the city on that day or in the years after will forget the

heroism that was displayed by firefighters as the tragedy unfolded, or the role that the Fire

Department played in rallying and sustaining the city during the aftermath.

Nonetheless, there has been one persistent stain on the Fire Department's record. For decades, black and other minority firefighters have been severely underrepresented in the Department's ranks. According to the most recent census data, black residents make up 25.6% of New York City's population; when this case was filed in 2007, black firefighters accounted for only 3.4% of the Department's force. In other words, in a city of over eight million people, and out of a force with 8,998 firefighters, there were only 303 black firefighters. This pattern of underrepresentation has remained essentially unchanged since at least the 1960s. While the city's other uniformed services have made rapid progress integrating black members into their ranks, the Fire Department has stagnated and at times retrogressed. When it comes to being a New York firefighter, blacks and other minorities face entry barriers that other applicants do not.

In July 2009, this court found that the written examinations that the Fire Department used to screen and rank applicants between 1999 and 2007 had discriminatory effects on certain minority applicants, including black applicants, and failed to test for relevant job skills. These examinations unfairly excluded hundreds of qualified black applicants from the opportunity to serve as New York City firefighters. Today, the court holds that New York City's use of these examinations constitutes a pattern and practice of intentional discrimination against blacks, in violation of the Fourteenth Amendment to the United States Constitution, Title VII of the Civil Rights Act of 1964, and State and City Human Rights Laws.

## I.      BACKGROUND

The factual and procedural background of this case is substantially detailed in United States v. City of New York, 637 F. Supp. 2d 77 (E.D.N.Y. 2009) ("D.I. Op." or "Disparate Impact Opinion") (granting Federal Government's and Intervenors' motions for summary

judgment on their Title VII disparate-impact claims).  Only a general summary and the facts relevant to the instant motions are recited below.

In May 2007, Plaintiff United States of America (the "Federal Government") brought suit against the City of New York (the "City") under Sections 706 and 707 of Title VII, 42 U.S.C. §§ 2000e-5 & 2000e-6, alleging that the City's procedures for screening and selecting applicants for entry-level firefighter positions discriminated against black and Hispanic applicants.  (See Compl. (Docket Entry # 1) ¶¶ 1, 29-31, 34-37.)  The Federal Government challenged two separate employment practices, each involving the City's use of two written examinations to appoint applicants to the rank of entry-level firefighter in the Fire Department of the City of New York ("FDNY" or the "Department").  The first challenged practice was the City's use of the two examinations – Written Examination 7029, first administered in February 1999, and Written Examination 2043, first administered in December 2002 – as "pass/fail screening devices" to eliminate applicants who failed the examination from the pool of potential appointees.  The second challenged practice was the "rank-order processing" of applicants, whereby applicants who passed the written examination and a physical performance test ("PPT") were placed on a hierarchical hiring list in descending rank order of their combined written-examination and PPT scores, plus applicable "bonus points."  See generally D.I. Op., 637 F. Supp. 2d at 84-86.  The Federal Government alleged that these practices had a disparate impact upon black and Hispanic applicants and were not job-related for the position in question or consistent with business necessity, in violation of Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).  These claims were resolved by the Disparate Impact Opinion.  See generally D.I. Op., 637 F. Supp. 2d 77.

In September 2007, the court permitted the Vulcan Society, Inc., Marcus Haywood, Candido Nuñez, and Roger Gregg (the "Intervenors") to intervene in this action.[1]  (See Docket Entry # 47.)  The Intervenors challenge the same practices challenged by the Federal Government, but the scope of their claims is substantially different.  The Intervenors' Complaint alleges discrimination only against black, rather than black and Hispanic, applicants. (Intervenors' Compl. (Docket Entry # 48) ¶¶ 2, 3.)  The Complaint adds four defendants to the action: the FDNY, the New York City Department of Citywide Administrative Services ("DCAS"), Mayor Michael Bloomberg, and former New York City Fire Commissioner Nicholas Scoppetta[2] (collectively, with the City, "Defendants").  Most importantly, in addition to reiterating the "disparate impact" claims from the Federal Government's Complaint, the Intervenors allege that Defendants' use of the pass/fail and rank-ordering procedures constituted intentional discrimination against black applicants.  (Id. ¶¶ 3, 51, 56.)  This allegation serves as the basis for five additional claims not found in the Federal Government's Complaint: that Defendants' acts violated (1) the "disparate treatment" provisions of Title VII, 42 U.S.C. §§ 2000e-2(a) & 2000e-2(m); (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981; (3) the Equal Protection Clause of the Fourteenth Amendment under 42 U.S.C. § 1983; (4) the New York State

---

[1] The Vulcan Society is "an organization of black firefighters first constituted in the 1940s in response to what was then quite blatant and open discrimination against firefighters of color." (Intervenors' Compl. (Docket Entry # 48) ¶ 18.)  The individual plaintiffs are black applicants for the position of entry-level firefighter who passed the written examination and were ranked low on the hiring list.  (Id. ¶¶ 21-23.)

[2] Nicholas Scoppetta resigned his position as Fire Commissioner at the end of 2009.  See Al Baker, Fire Commissioner to Step Down at Year-End, N.Y. Times, Oct. 8, 2009, available at http://www.nytimes.com/2009/10/09/nyregion/09scoppetta.html (last visited Jan. 11, 2010).

Human Rights Law, New York Executive Law §§ 290 and 296; and (5) New York City Local

Law 59 of 1986, as amended by Local Rule 39 of 1991, §§ 8-101, et seq.  (Id. ¶¶ 57-61.)[3]

This court has issued several decisions in this case that affect the posture and

determination of the instant motions.  First, this case has been bifurcated into separate liability

and relief phases.  (Docket Entry # 47.)  Therefore, the questions currently before the court on

the parties' various dismissal and summary judgment motions concern only the Defendants'

liability for the charged acts, and not their obligations, if any, to remedy their behavior.  Second,

upon the Intervenors' motion, this court certified a class consisting of:

> All black firefighters or firefighter applicants who sat for either Written Exam
> 7029 or Written Exam 2043 and were harmed by one or more of the following
> employment practices:
>
> > (1) Defendants' use of Written Exam 7029 as a pass/fail screening device with
> > a cutoff score of 84.75;
> >
> > (2) Defendants' rank-order processing of applicants who passed Written Exam
> > 7029;
> >
> > (3) Defendants' use of Written Exam 2043 as a pass/fail screening device with
> > a cutoff score of 70.00; and
> >
> > (4) Defendants' rank-order processing of applicants who passed Written Exam
> > 2043.

United States v. City of New York, 258 F.R.D. 47, 67 (E.D.N.Y. 2009).[4]  Thus, the Intervenors

are proceeding as a class rather than as individuals, a fact which, as will be developed below in

---

[3] In support of their motion, the Intervenors have submitted a Rule 56.1 Statement of Undisputed Facts (Docket
Entry # 344) ("Int. 56.1"), a Declaration of Richard A. Levy (Docket Entry # 345) ("Levy Decl."), a Memorandum
in Support of Intervenors' Motion for Summary Judgment and in Opposition to the Individual Defendants' Motion
for Qualified Immunity (Docket Entry # 343) ("Int. SJ Mem."), a Memorandum in Further Support of Intervenors'
Motion for Summary Judgment (Docket Entry # 376) ("Int. Reply Mem."), and an Affidavit of Paul Washington
(Docket Entry # 125) ("Washington Aff.").  In opposition, the Defendants have filed a Rule 56.1 Statement of
Undisputed Facts (Docket Entry # 365) ("Def. 56.1"), a Response to Intervenors' Statement of Undisputed Facts
(Docket Entry # 364), a Declaration of William Fraenkel in Support of Defendants' Motion to Dismiss (Docket
Entry ## 320-21) ("Fraenkel MTD Decl."), a Declaration of William Fraenkel in Opposition to Intervenors' Motion
for Summary Judgment (Docket Entry # 360) ("Fraenkel SJ Decl."), a Declaration of Martha Pierre (Docket Entry #
361) ("Pierre Decl."), a Declaratio of Matthew Morrongiello (Docket Entry # 362) ("Morrongiello Decl."), a
Declaration of Alberto Johnston (Docket Entry # 363) ("Johnston Decl."), a Memorandum of Law in Support of
Defendants' Motion to Dismiss (Docket Entry # 323) ("Def. MTD Mem."), a Reply Memorandum of Law in
Support of Defendants' Motion to Dismiss (Docket Entry # 357) ("Def. MTD Reply Mem.") and a Memorandum of
Law in Opposition to Intervenors' Motion for Summary Judgment (Docket Entry # 359) ("Def. SJ Mem.").

Section IV.A.2, has important implications for the analysis of their discrimination claims. <u>See</u>

<u>generally</u> 1 Lex K. Larson, Employment Discrimination § 9.03[1] (2d ed. 2008).

### A.        Disparate Impact Ruling

In July 2009, this court issued a decision granting the Federal Government's and

Intervenors' joint motions for summary judgment on their prima facie case of disparate impact

and on the City's business necessity defense. <u>D.I. Op.</u>, 637 F. Supp. 2d at 82-83.  This ruling

established that the City was liable for disparate-impact discrimination under Title VII. <u>Id.</u> at

132.  The ruling itself was based on two basic conclusions:

> First, Plaintiffs have shown that there is no triable issue of fact as to whether the
> City's use of Written Exams 7029 and 2043 has resulted in a statistically and
> practically significant adverse impact on black and Hispanic firefighter applicants.
> Black and Hispanic applicants disproportionately failed the written examinations,
> and those who passed were placed disproportionately lower down than white
> candidates on the hierarchical hiring lists resulting from their scores. Second,
> although the City has had the opportunity to justify this adverse impact by
> showing that it used the written examinations to test for the relevant skills and
> abilities of entry-level firefighters, the City has failed to raise a triable issue on
> this defense. Under Second Circuit precedent, the evidence presented by the City
> is insufficient as a matter of law to justify its reliance on the challenged
> examinations.

<u>Id.</u> at 83.

### 1.        <u>The Plaintiffs' Prima Facie Case</u>

To establish a prima facie case of disparate-impact discrimination, the Federal

Government and Intervenors (collectively, "Plaintiffs") presented extensive statistical evidence.

For each challenged employment practice, Plaintiffs' experts conducted analyses that

demonstrated the existence of statistically significant disparities between groups of candidates.

> For each of the pass/fail uses of the examinations, these analyses demonstrate that
> the disparities between the pass rates of whites and minority candidates were

---

[4]This class was certified only for the liability phase of Intervenors' disparate-treatment and disparate-impact claims,
and is subject to revision at the remedial stage.  <u>United States v. City of New York</u>, 258 F.R.D. 47, 68 (E.D.N.Y.
2009).

between 10.5 and 33.9 units of standard deviation.  For each of the rank-ordering uses of the examinations, the analyses demonstrate that the disparities between the rankings of whites and minority candidates were between 4.6 and 9.7 units of standard deviation. These statistical disparities show that black and Hispanic candidates disproportionately failed Written Exams 7029 and 2043, and were placed disproportionately lower on the eligibility lists created from those examinations.

Id. at 93.[5]  Under clearly established Second Circuit precedent, this showing was more than adequate to make out a prima facie case against the City.  See id. at 94.

Plaintiffs' evidence also demonstrated that the statistical disparities were significant as a practical matter.  According to the expert analyses,

[A]pproximately one thousand additional black and Hispanic candidates would have been considered for appointment as FDNY firefighters had it not been for the disparities resulting from the examinations. Further, absent these disparities, approximately 293 additional black and Hispanic candidates would have been appointed from the eligibility lists used from 2001 through 2008, and approximately 249 black and Hispanic applicants who were actually appointed would have been appointed sooner. Given that, in 2007, the FDNY had 8,998 firefighters, including only 303 black firefighters and 605 Hispanic firefighters, it is clear that these disparities have a substantial practical significance. In fact, the disparities are overwhelming.

Id.

The City did not dispute either the accuracy or practical significance of Plaintiffs' statistical analyses.  Id.  Instead, the City attacked Plaintiffs' reliance on statistical-significance testing as a general matter.  The City's principal contention was that the large sample sizes at issue in this case rendered statistical-significance testing unreliable because, as the City stated in its opposition papers, "the larger the group we are examining, the more candidates who sit for the exam, the greater our likelihood that some of them will not do as well as others." (City's

---

[5] A full description of the use and probative value of statistical-significance and standard-deviation analysis in employment discrimination cases can be found in the Disparate Impact Opinion.  See D.I. Op., 637 F. Supp. 2d at 87, 94.  As a general matter, standard-deviation analysis is used to determine the likelihood that the difference between observed and expected values could occur randomly.  The larger the standard deviation, the less likely it is that a result is the product of chance.

Memorandum of Law in Opposition to Pls.' Motion for Summary Judgment on Prima Facie Case of Disparate Treatment (Docket Entry # 256) at 5.)  As noted in the opinion, this argument flew in the face of common sense, Second Circuit precedent, the testimony of one of the City's statistical experts, and the City's own admissions.  See D.I. Op., 637 F. Supp. 2d at 94-96. "Rather than undermining confidence in statistical significance testing, large sample sizes make such testing more reliable.  Larger sample sizes create a greater likelihood that random differences between individuals will even out among all groups, and a lower likelihood that significant differences between the performance of racial or ethnic groups will have resulted from chance." Id. at 95.

The City also argued that Plaintiffs' statistical analyses "inappropriately compare[d] the racial disparity in test results to a hypothetical world in which racial and ethnic groups perform equally well," id. at 96, and that the disparities between white, black, and Hispanic candidates could be explained by native differences in those groups' "capability and preparedness," id. at 97.  This argument misconstrued both the purpose of statistical-significance analysis and the nature of the prima facie disparate-impact case.  Because the goal of statistical-significance testing is to determine whether an observed disparity is the product of chance rather than some other factor, statistical testing properly assumes equal aptitude across groups.  Id.  This determination is crucial at the prima facie stage, because the elimination of random chance as an explanation for the observed disparity permits the plaintiff to carry its burden of demonstrating that the disparity is attributable to the challenged employment practice.  The City's identification of a possible explanation (however dubious) for the disparity, which would only be germane to a second-stage "business necessity" defense, was irrelevant to the question of whether Plaintiffs had demonstrated the existence of a practice that adversely affected minority applicants.  Id.

8

Finally, the City urged the court to rely on the so-called "80% Rule," rather than statistical significance testing, to assess Plaintiffs' statistical evidence. The 80% Rule derives from a Department of Labor regulation stating that a selection rate for a racial group that is less than four-fifths the selection rate for the group with the highest rate (in this case, white applicants) "will generally be regarded by Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D). This court denied the City's request, observing that the 80% Rule is merely a "rule of thumb" that is not binding on courts and may be ignored when other statistical evidence demonstrates disparate impact. D.I. Op., 637 F. Supp. 2d at 98. Given the large sample size and overwhelming standard-deviation evidence, the court refused to exclude statistical-significance testing in favor of the 80% Rule. Id.

Accordingly, based on the strength of Plaintiffs' statistical evidence and the City's inability to demonstrate any material dispute regarding that evidence, this court granted summary judgment to Plaintiffs on their prima facie case of disparate-impact discrimination. Id. at 98-99.

2.     The City's Business-Necessity Defense

The court next turned to the merits of the City's business-necessity defense, which shields employers from Title VII liability if they can demonstrate that a challenged practice is justified by legitimate business and job-related considerations. D.I. Op., 637 F. Supp. 2d at 99. To be considered job-related, an employment examination must be properly "validated," Gulino v. N.Y. State Educ. Dep't, 460 F.3d 361, 383 (2d Cir. 2006), meaning that it must be "shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job or jobs for which candidates are being evaluated." Albemarle Paper Co. v. Moody, 422 U.S. 405, 431 (1975). The validity of

an employment examination is assessed using the five-part test set forth in <u>Guardians</u>

<u>Association of the New York City Police Department, Inc. v. Civil Service Commission</u>:

> (1) the test-makers must have conducted a suitable job analysis;
> (2) they must have used reasonable competence in constructing the test itself;
> (3) the content of the test must be related to the content of the job;
> (4) the content of the test must be representative of the content of the job; and
> (5) there must be a scoring system that usefully selects from among the applicants those who can better perform the job.

630 F.2d 79, 95 (2d Cir. 1980).

This court held that the City had failed to meet its burden to show that the challenged examinations were job-related under the <u>Guardians</u> standard.  The undisputed facts established, <u>inter alia</u>, that (1) the City could not demonstrate a correspondence between the tasks or work behaviors required of entry-level firefighters and the abilities that the examinations were meant to measure, <u>D.I. Op.</u>, 637 F. Supp. 2d at 110-115; (2) the City failed to consult outside experts to construct appropriate test questions, and did not conduct sample testing on the questions it adopted, <u>id.</u> at 115-16; (3) the examinations did not actually test for the job-related abilities they were intended to test for, <u>id.</u> at 116-18; (4) the examinations failed to test for cognitive and non-cognitive abilities that are important to the job, the cognitive abilities that were tested for were not the most important cognitive abilities for the job, and as a general matter, non-cognitive abilities were more important to the job than cognitive abilities, <u>id.</u> at 118-22; (5) the examinations were written at an unnecessarily high reading level, <u>id.</u> at 122-23; and (6) the chosen cutoff scores for the examinations did not bear any relationship to the necessary job qualifications, <u>id.</u> at 123-28.  The undisputed facts also demonstrated that the rank-ordering procedure failed to distinguish between qualified and unqualified candidates because it relied on the faulty written examinations and produced significant differences in ranking based on statistically insignificant differences in test performance.  <u>Id.</u> at 128-31.  Moreover, the City

could not show that an applicant's ranking corresponded to future job performance.  Id. at 130-31.

Because Plaintiffs had demonstrated the absence of any genuine issue of material fact with respect to their prima facie case of discrimination and the City's business-necessity defense, and because the undisputed evidence was insufficient to demonstrate that the City's pass/fail and rank-ordering practices were job-related, this court found that the City was liable as a matter of law for disparate-impact discrimination against black and Hispanic firefighter applicants in violation of Title VII.  Id. at 132.

### B.      Prior Litigation

####     1.      The *Vulcan Society* Litigation

As this court noted in its previous opinion, "[t]his is not the first time the City has been brought to federal court to defend its entry-level firefighter examinations against charges of discrimination."  D.I. Op., 637 F. Supp. 2d at 81.  In 1973, Judge Edward Weinfeld in the Southern District of New York held that the City's written and physical examinations for entry-level firefighters violated the Equal Protection Clause because of their discriminatory impact on black and Hispanic applicants.  See Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973) (hereafter, "Vulcan Society"), affirmed in relevant part by 490 F.2d 387 (2d Cir. 1973).  The Vulcan Society opinion is instructive not only for its breadth and acuity, but because it furnishes proof of an old adage: the more things change, the more they remain the same.

In Vulcan Society, the Vulcan and Hispanic Societies brought suit against the New York City Civil Service Commission, among others, alleging that the FDNY's hiring procedures

discriminated against blacks and Hispanics in violation of the Equal Protection Clause.[6]  Vulcan Society, 360 F. Supp. at 1266.  The gravamen of plaintiffs' claim was that the FDNY's use of a pass/fail written examination and a rank-ordering protocol based on applicants' performance on the written examination resulted in the disproportionate exclusion of minority applicants.[7]  Plaintiffs further alleged that the examination did not test the skills and qualifications needed to become a firefighter.  Id. at 1266, 1288.

The testing procedure at issue in Vulcan Society was strikingly similar to the testing procedures in this case.  Applicants were required to take a written examination, which was administered approximately every four years; those who scored below 70% were disqualified, while those who passed were placed on an "eligible list" in order of their scores.  Id. at 1267.  As openings occurred in the FDNY, they were filled by candidates in order of their ranking on the eligible list, provided the candidates passed a second-stage process consisting of a physical fitness test, medical examination, and character evaluation.  Id.

Judge Weinfeld held a bench trial, at which plaintiffs used statistical evidence to make out a prima facie case of discrimination.  These statistics demonstrated that, while 11.5% of the applicants who took the written examination were black or Hispanic, only 5.6% of the applicants who passed the written examination and were called to take the second-stage physical and medical examinations were black or Hispanic.  Id. at 1268.  Plaintiffs' statistical expert

---

[6] Although the plaintiffs also alleged that the FDNY's promotion procedures discriminated against minorities, Judge Weinfeld's opinion only dealt with the FDNY's entrance procedures.  Vulcan Society, 360 F. Supp. at 1266.

[7] The Vulcan Society plaintiffs brought their claim under the Equal Protection Clause, which at the time was held to prohibit actions that had an unjustified discriminatory impact on racial minorities, in addition to intentionally discriminatory actions.  Chance v. Board of Examiners, 458 F.2d 1167, 1176 (2d Cir. 1972); cf. Washington v. Davis, 426 U.S. 229 (1976) (equal protection claim requires proof of intentional discrimination).  The order and form of proof for such claims was identical to the burden-shifting structure currently used for Title VII disparate-impact claims: plaintiffs were required to make out a prima facie case of discrimination (which could be accomplished by use of statistics demonstrating adverse impact), at which point the burden shifted to the defendant to demonstrate that the challenged action was "job-related."  Chance, 458 F.2d at 1176.

established that, among those applicants who passed the written and second-stage examinations, the ratio of whites to minorities was 2.3 to 1.  Id. at 1269.  Among those applicants who ranked in the top half of the eligible list and passed both sets of examinations, the ratio of whites to minorities was 2.8 to 1.  Id.  Plaintiffs' expert testified that this latter disparity was "statistically significant to a very high degree," in that the odds of such a result obtaining by chance were less than 1 in 10,000.  Id.  The expert concluded, in sum, that "the entire examination process had a substantial discriminatory impact on the minority groups."  Id.  Judge Weinfeld also noted the "overwhelming disparity between minority representation in the Department (5%) and in the general population of New York City within the age group eligible for appointment (32%)," an "extreme incongruity" that was "confirmatory of plaintiffs' statistical showing."  Id.

Defendants did not contest the accuracy of the plaintiffs' statistical analyses.  Id.  Instead, they enfiladed the accuracy of the raw data relied on by plaintiffs, the sufficiency and scope of the data sample, and the precision of the expert's findings.  Id. at 1270-72.  Judge Weinfeld rejected each of defendants' arguments, three of which bear mentioning here.  First, in contradistinction to the City's current defense strategy, the Vulcan Society defendants argued that the sample size at issue was too small to yield meaningful analysis.  Judge Weinfeld declared this attack to be "without substance," as the 14,168 candidates who sat for the written examination and the 7,987 candidates on the eligible list constituted a data sample that was "certainly sufficient . . . to yield meaningful information."  Id. at 1271.  Second, defendants argued, as the City did in the present case, that "the adverse impact of the examination on minorities [was] explicable in terms of the educational and cultural deprivations of minority groups."  Id. at 1272.  Judge Weinfeld rejected that contention in language that the City would have done well to heed here:

> It is no defense . . . that the discriminatory impact of the examination procedure may be due to socio-economic disadvantages suffered by minority groups.  The very essence of the concept of de facto discrimination . . . is that when state action which is neutral on its face unintentionally disadvantages racial minorities in areas such as public employment, the state has the burden of demonstrating that the action in question has at least a substantial relation to a legitimate state interest such as hiring qualified employees.  Inquiries into ultimate causes are irrelevant. The law views de facto racial classifications, whatever their ultimate sociological explanation, as sufficiently suspect to place upon the state a heavy burden of justification.

Id.  Finally, defendants objected that plaintiffs' evidence did not prove that the adverse impact was the result of the written examination, rather than the second-stage examination procedures. Id. at 1271.  Judge Weinfeld found, to the contrary, that the evidence established the "overwhelming likelihood" that the written portion standing alone had a substantial discriminatory impact.  Id. at 1272.  Moreover, any apportionment of fault among the constituent parts of the testing procedure could not obscure the ultimate conclusion that the overall procedure had a "significant and substantial discriminatory impact upon minorities."  Id. at 1272. Plaintiffs' statistics therefore made out a prima facie case of discrimination.  Id.

Judge Weinfeld further held that defendants had failed to carry their burden of demonstrating that the examination was job-related.  Some of the reasons for this holding have the quality of déjà vu.  For example, Judge Weinfeld found that (1) the FDNY failed to validate the written examination, inasmuch as the Department failed to identify the job-related abilities that the examination was meant to test, id. at 1274-75; (2) many of the questions on the examination had "little apparent relationship to the job of fireman" and therefore did not test for job-related abilities, id. at 1276; (3) miniscule differences in test performance produced significant differences in applicants' rankings, id.; and (4) defendants failed to demonstrate that an applicant's performance on the written examination corresponded to future job performance, id. at 1273.

Accordingly, Judge Weinfeld held that plaintiffs had proved that the FDNY's written examination violated the Equal Protection Clause because of its discriminatory impact on black and Hispanic applicants.  Id. at 1277.

2.      History of the FDNY Post-*Vulcan Society*

As part of the remedy in Vulcan Society, Judge Weinfeld ordered the defendants to hire one minority applicant for every three non-minority candidates hired.  Vulcan Soc. of New York City Fire Dep't. Inc. v. Civil Serv. Comm'n, 490 F.2d 387, 391 (2d Cir. 1973).  This order and the underlying liability finding were upheld by the Second Circuit.  Id. at 398-99.  Judge Weinfeld also ordered the defendants to create a new examination that did not discriminate against blacks and Hispanics, as described in Berkman v. New York, 536 F. Supp. 177, 183 (E.D.N.Y. 1982).[8]  In 1973, the City, using money obtained from a Congressional grant, contracted with a private consulting firm to construct validated written and physical tests; three years later, however, the City cancelled these contracts, ostensibly due to a fiscal crisis.[9]  Id. at 184.  The Vulcan Society injunction lapsed in 1977.  (Int. 56.1 ¶ 9.)  That year, the City abandoned the 3:1 hiring ratio and instituted a hiring procedure that required applicants to take a cognitive examination and demonstrate minimum appointment requirements such as college credits, a driver's license, and certified first responder with defibrillation training.  (Affidavit of Paul Washington (Docket Entry # 125) ("Wash. Aff.") ¶ 5.)

---

[8] In Berkman, female candidates for the job of entry-level firefighter challenged the physical examination component of a prior FDNY test.  See Berkman, 536 F. Supp. at 205-16.

[9] It is not clear why the City's fiscal problems should have required cancelling the consulting contract, since the contract was funded with federal money.  As District Court Judge Charles P. Sifton noted in Berkman,

> What the fiscal crisis prevented was the hiring of the firemen . . . who were to be the subjects of the validation study.  Since . . . the [consultants'] study contemplated a criterion-based validation study to find out whether the test scores accurately predicted actual job performance, the failure by the City to do any hiring is said to have made such a criterion study impossible. The fiscal crisis does not, however, entirely explain why a concurrent validation study not involving new hiring . . . could not have been performed with [federal] money.

Berkman, 536 F. Supp. at 184 fn.1.

The subsequent history of the FDNY demonstrates that whatever practical effect Judge Weinfeld's injunction may have had on minority hiring dissipated shortly after the injunction expired.  Indeed, the history suggests that any such effect constituted little more than a brief departure from an otherwise relentless pattern.  In 1963, ten years before the Vulcan Society litigation, 4.15% of all FDNY employees (including non-uniformed employees) were black.  (Id. ¶ 1.)  In 1971, that number was essentially unchanged.  (Id.)  At the time of the Vulcan Society litigation, blacks and Hispanics constituted 32% of the City's population, but only 5% of the Department.  Vulcan Society, 360 F. Supp. at 1269.  In 1990, almost two decades later, blacks made up 29% of the City's population, but only 4% of firefighters.  (Int. 56.1 ¶ 11.)  In 2002, 25% of the City's residents were black, compared to only 2.6% of its firefighters.  D.I. Op., 637 F. Supp. 2d at 80.  Between 1991 and 2007, black firefighters never constituted more than 3.9% of the force, and by the time this case was filed in 2007, the percentage of black firefighters in the FDNY had dropped to 3.4%.  (Int. 56.1 ¶¶ 14-15.)

This pattern of underrepresentation becomes starker when juxtaposed against the hiring patterns of other large municipal fire departments.  The following table, based on a report by the City's Equal Employment Practices Commission ("EEPC") and data from the most recent census, compares the racial composition of the fire departments and local populations in eight of America's nine largest cities[10]:

---

[10] See U.S. Census Bureau, State & County QuickFacts, available at http://quickfacts.census.gov/qfd/index.html (last visited on December 24, 2009); U.S. Census Bureau, Incorporated Places of 100,000 or More, Ranked by Population, available at http://www.census.gov/population/www/cen2000/briefs/phc-t5/tables/tab02.pdf (last visited December 28, 2009); Declaration of Richard A. Levy dated February 2, 2009 (Docket Entry # 264) ("Feb. 2 Levy Decl.") Ex. D (showing percentages of minority firefighter representation in American cities in 1999).  The Feb. 2 Levy Declaration does not include information about the Phoenix fire department.

**Table 1.**

| City | Black Population (% of total population) | Black Firefighters (% of force) | Ratio of Black Representation in Municipal Fire Department to Black Representation in Municipal Population |
|------|------------------------------------------|---------------------------------|----------------------------------------------------------------------------------------------------------|
| Los Angeles | 11.2 | 14.0 | 1.25 |
| San Antonio | 6.8 | 7.0 | 1.01 |
| San Diego | 7.9 | 7.7 | 0.97 |
| Dallas | 25.9 | 18.1 | 0.70 |
| Houston | 25.3 | 17.1 | 0.68 |
| Philadelphia | 43.2 | 26.3 | 0.61 |
| Chicago | 36.8 | 20.4 | 0.55 |
| New York | 26.6 | 2.9 | 0.11 |

The ratios in the right-hand column of Table 1 measure the degree to which the actual percentage of blacks in each municipal fire department departed from the percentage that would obtain if blacks were represented in the fire department in proportion to their representation in the local population.[11] What this table demonstrates is that, of the fire departments in the nine largest American cities, two had roughly the expected number of black firefighters, and in a third, the Los Angeles Fire Department, black firefighters were actually overrepresented. Four of these fire departments had between one-half and seven-tenths the expected number of blacks. The FDNY, however, had approximately <u>one-tenth</u> the expected number of blacks. The proportional representation of blacks in the FDNY was five times lower than the municipal fire department with the next-lowest ratio, and over 11 times lower than the department with the highest such ratio.

---

[11] It is appropriate to base expected hiring outcomes on local racial demographics because, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 340 n.20 (1977).

17

This pattern of underrepresentation has been repeated at the local level as well.  In May 2001, the New York City Public Advocate sent a letter to the Fire Commissioner and Deputy Mayor that included the following table illustrating that "the firefighter force is the least diverse ethnically [and] racially . . . of all the uniformed services in the City"[12]:

**Table 2.**

| Department | Blacks (%) | Latinos (%) |
|---|---|---|
| Fire Department | 3.8 | 3.2 |
| Police Department | 16.6 | 18.0 |
| Sanitation Department | 24.3 | 14.6 |
| Correction Department | 61.4 | 18.0 |

As Table 2 demonstrates, the proportional representation of blacks was over four times greater in the New York City Police Department ("NYPD"), over six times greater in the Sanitation Department, and over 16 times greater in the Correction Department.  This disparity has only become more pronounced: as of June 2009, the percentage of black rank-and-file officers in the NYPD had increased to 18%, while the percentage of black firefighters had actually decreased to 3.4%.[13]

## II.   DEFENDANTS' MOTIONS TO DISMISS

Motions from both parties are currently before the court.  The Intervenors have moved for summary judgment against all Defendants on all claims that were not resolved by the Disparate Impact Opinion.  (Docket Entry # 343.)  The Intervenors' remaining claims allege four types of illegality: (1) disparate treatment, in violation of Title VII; (2) intentional discrimination, in violation of the Equal Protection Clause and 42 U.S.C. § 1981; (3) intentional

---

[12] See Int. 56.1 ¶¶ 20-21.

[13] See Al Baker, "Police Commissioner Plans to Put More Minority Officers in Top Posts," N.Y. Times A20 (June 26, 2009), available at http://www.nytimes.com/2009/06/26/nyregion/26nypd.html (last visited on July 21, 2009); D.I. Op., 637 F. Supp. 2d at 80.

discrimination, in violation of State and City human rights laws; and (4) disparate impact, in violation of State and City human rights laws.

Defendants have filed a motion seeking: (1) dismissal of all claims against the FDNY and DCAS; (2) dismissal of the Title VII claims against Mayor Bloomberg and Commissioner Scoppetta; (3) dismissal of the intentional discrimination claims against the City, Mayor Bloomberg, and Commissioner Scoppetta; and (4) in the alternative, summary judgment with respect to the intentional-discrimination claims against Mayor Bloomberg and Commissioner Scoppetta, on the basis of qualified immunity. (See Docket Entry # 319.)

Because Defendants' three dismissal motions seek to pare down the number of claims and defendants, the court discusses them here first in order to clarify the issues for summary judgment. Mayor Bloomberg's and Commissioner Scoppetta's entitlement to qualified immunity, however, turns on questions of constitutional law that are necessarily raised by the Intervenors' motion for summary judgment, and the court will return to the Defendants' qualified immunity motion in Section VII, following its discussion of the Intervenors' intentional discrimination claims.

### A.       Dismissal of All Claims Against the FDNY and DCAS

Defendants assert, and Intervenors do not dispute, that the FDNY and DCAS are not suable entities. Under Rule 17(b)(3) of the Federal Rules of Civil Procedure, a party's amenability to suit in federal court is determined by the law of the state in which the district court is located. The State of New York has neither stated nor implied that the FDNY or DCAS can be sued individually. To the contrary, under the New York City Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided

19

by law." N.Y. City Charter Ch. 17, § 396. It follows that the FDNY and DCAS are not suable entities, and that all claims against them must be dismissed. See Warheit v. City of New York, 2006 U.S. Dist. LEXIS 58167, at *40 (S.D.N.Y. Aug. 15, 2006) (FDNY not suable); Damino v. City of New York, 2004 U.S. Dist. LEXIS 18243, at *11 (E.D.N.Y. Sept. 13, 2004) (DCAS not suable).

**B.    Dismissal of Title VII Claims Against Mayor Bloomberg and Commissioner Scoppetta**

It is firmly established that individuals are not subject to liability under Title VII. Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004); Wrighten v. Glowski, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam). Accordingly, the Title VII claims against Mayor Bloomberg and Commissioner Scoppetta are dismissed in their entirety.

**C.    Dismissal of Intentional Discrimination Claims Against the City, Mayor Bloomberg, and Commissioner Scoppetta**

Defendants move to dismiss the Intervenors' Complaint on the ground and to the extent that it fails to state a claim for intentional discrimination against the City, Mayor Bloomberg, and Commissioner Scoppetta. The timing of this motion is curious, to say the least. The Intervenors filed their complaint in September 2007, and Defendants filed the instant motion in September 2009. (See Docket Entries ## 48, 319.) In the two-year interim, there were 270 entries in the case docket. The parties have engaged in extensive motion practice, and this court has issued rulings denying the Intervenors' motion to amend their complaint (Docket Entry # 182), denying Defendants' motion to dismiss the Intervenors' Complaint on timeliness grounds (Docket Entry # 231), partially granting the Intervenors' motion for class certification (Docket Entry # 281), and granting the Intervenors' request to compel the deposition of Mayor Bloomberg (Docket Entry # 301). The parties have also engaged in extensive discovery, the fruits of which are

20

currently before the court in the form of five separate declarations submitted in connection with the parties' various motions.  Interrogatories and document requests have been exchanged, litigated, and answered; the named defendants have been deposed; experts on both sides have exchanged reports and been deposed; and both sides have moved for summary judgment.  In short, this case has moved well beyond the pleadings.

Nonetheless, Defendants now assert for the first time that the Intervenors' Complaint is deficient on its face.  Although Defendants decline to cite any particular Federal Rule of Civil Procedure in support of their motion (see Def. MTD Mem. at 1-7), it is clear from the substance of the motion that Defendants seek relief under Rule 12(c).  Specifically, Defendants assert that the allegations against the City and individual defendants fail to meet the pleading standard announced in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009).

In addition to their motion papers, both parties have submitted declarations and exhibits in support of or in opposition to Defendants' motion to dismiss.  (See, e.g., Levy Decl.; Wahsington Aff.; Fraenkel MTD Decl.; Fraenkel SJ Decl.; Pierre Decl.; Morrongiello Decl.; Johnston Decl.)   Both parties' submissions are voluminous, and draw heavily from the discovery materials produced in this litigation. The exhibits to these declarations include, inter alia, expert testimony, deposition transcripts, city administrative reports, scores of letters and emails, reports and communications from the EEPC and Equal Employment Opportunity Commission, and the deposition testimony of numerous individuals.

When matters outside the pleadings are presented in connection with a motion to dismiss for failure to state a claim, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material."  Friedl v.

City of New York, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotation marks omitted).  This rule

applies where, as here, a motion to dismiss for failure to state a claim upon which relief can be

granted is brought under Rule 12(c) rather than Rule 12(b)(6).  Sellers v. M.C. Floor Crafters,

Inc., 842 F.2d 639, 642 (2d Cir. 1988).  In either case, the District Court has broad discretion to

determine whether to convert a motion to dismiss into one for summary judgment.  Carione v.

United States, 368 F. Supp. 2d 186, 191 (E.D.N.Y. 2005).

Because a summary judgment motion can result in a binding determination on the merits,

the non-movant must be given notice and an opportunity to respond before the court converts a

motion to dismiss.  Groden v. Random House, 61 F.3d 1045, 1052 (2d Cir. 1995).  However,

formal notice is unnecessary when "the parties were . . . apprised of the likelihood of conversion

by less formal or direct means and, in fact, had a sufficient opportunity to present the materials

relevant to a summary judgment motion."  5C Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1366 (3d ed. 2004).  "The essential inquiry is whether the [non-

movant] should reasonably have recognized the possibility that the motion might be converted

into one for summary judgment or was taken by surprise and deprived of a reasonable

opportunity to meet facts outside the pleadings."  In re G. & A. Books, Inc., 770 F.2d 288, 295

(2d Cir. 1985).  Significantly, "[a] party cannot complain of lack of a reasonable opportunity to

present all material relevant to a motion for summary judgment when both parties have filed

exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a

motion to dismiss."  Id.

The court finds that conversion is appropriate in this case.  Both parties have presented

substantial factual materials in connection with the dismissal motion.  Moreover, both parties

have submitted materials and briefing in connection with the Intervenors' motion for summary

judgment.  That is, the parties have not only had a "reasonable opportunity to meet facts outside the pleadings" – they have in fact engaged in full motion practice over facts outside the pleadings.  Given the highly developed record before the court, neither party should be surprised by the court's decision to convert Defendants' motion to dismiss to a motion for summary judgment, and neither party should be surprised by the court's reluctance, at this late date, to ignore years' worth of discovery materials and confine its inquiry to the facial sufficiency of the Intervenors' Complaint.

Accordingly, the court converts Defendants' motion to dismiss the intentional discrimination claims against the City, Mayor Bloomberg, and Commissioner Scoppetta into a motion for summary judgment.  Because the Intervenors have moved for summary judgment on the same claims, and because the disposition of both motions will turn on common questions of law and fact, the court addresses the motions jointly in Sections V and VII below.

### D.      The Intervenors' Remaining Claims

Based on the disposition of Defendants' dismissal motions, the Intervenors' motion for summary judgment is reduced to the following claims: (1) disparate treatment under Title VII against the City only; (2) intentional discrimination under § 1981 and the Equal Protection Clause; against the City only; (3) intentional discrimination under the State and City Human Rights laws against the City; (4) intentional discrimination under federal and state law against Mayor Bloomberg and Commissioner Scoppetta, subject to a finding of qualified immunity; and (5) disparate impact under state and local law, against the City only.  The court considers each of these claims in turn.

### III.   SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the pleadings and admissible evidence proffered to the district court show that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .'" Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  Conclusory allegations or denials are insufficient to create a genuine issue of material fact.  Fed. R. Civ. P. 56(e)(2); Anderson, 277 U.S. at 256.  Factual disputes that are irrelevant or immaterial to the disposition of a case cannot preclude a grant of summary judgment.  See Loria v. Gorman, 306 F.3d 1271, 1282-83 (2d Cir. 2002).

In considering a motion for summary judgment, the court construes the facts "in the light most favorable to the nonmoving party," and draws "all reasonable inferences in its favor."  SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009).  "[T]he moving party bears the burden of demonstrating the absence of a genuine issue of material fact."  Baisch v. Gallina, 346 F.3d 366, 371-72 (2d Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). In response, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . .'"  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

## IV.   INTERVENORS' TITLE VII PATTERN-OR-PRACTICE DISPARATE TREATMENT CLAIM

### A.   Proving Pattern-or-Practice Disparate Treatment Claims

#### 1.   Standard of Proof

The Intervenors assert that the City's use of the written examinations and rank-ordering procedure to screen entry-level firefighters constitutes a pattern or practice of intentional discrimination against black applicants.  This "disparate treatment" claim differs significantly from the "disparate impact" claim previously litigated in this case.  Whereas disparate impact liability can be established by proof that an employer's policy had unjustified adverse effects on a protected group, a disparate treatment claim requires additional proof that the challenged policy was adopted with the intent to discriminate against the protected group.  Ricci v. DeStefano, 129 S. Ct. 2658, 2672-73 (2009).  In pattern-or-practice disparate treatment cases, plaintiffs must establish by a preponderance of the evidence that the defendant took the challenged action "because of" its adverse effects on the protected class, Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-986 (1988), and that such intentional discrimination was the defendant's "standard operating procedure."  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977).

#### 2.   Mode and Order of Proof

Courts recognize that "direct evidence of intentional discrimination is hard to come by," Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J. concurring), and that plaintiffs will rarely be able to produce "'eyewitness' testimony as to the employer's mental processes."  USPS Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983).  Accordingly, the Supreme Court has devised a system of shifting evidentiary burdens for Title VII disparate-treatment claims that is "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination."  Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248,

25

255 n.8 (1981); see also Watson, 487 U.S. at 986.  The plaintiff bears "the initial burden of

offering evidence adequate to create an inference that an employment decision was based on a

discriminatory criterion . . . ."  Teamsters, 431 U.S. at 358; see also McDonnell Douglas Corp. v.

Green, 411 U.S. 792, 802 (1977).  The burden then shifts to the defendant to "provide a

nondiscriminatory explanation for the apparently discriminatory result."  Teamsters, 431 U.S. at

360 n.46; see also McDonnell Douglas, 411 U.S. at 802.  This general back-and-forth framework

applies to both individual and pattern-or-practice suits.[14]  Teamsters, 431 U.S. at 358, 360.

    A class-action pattern-or-practice suit is typically divided into "liability" and "remedial"

phases, as has been done in this case.[15]  See id. at 360-62; United States v. City of New York,

2007 U.S. Dist. LEXIS 65668 (E.D.N.Y. Sept. 5, 2007).  At the liability stage, the plaintiffs must

first make out a prima facie case of a policy, pattern, or practice of intentional discrimination

against the protected group.[16]  Teamsters, 431 U.S. at 360; Cooper v. Federal Reserve Bank, 467

U.S. 867, 876 n.9 (1984).  At this stage, the plaintiffs are "not required to offer evidence that

each person [who] will ultimately seek relief was a victim of the employer's discriminatory

policy.  [Plaintiffs'] burden is to establish a prima facie case that such a policy existed."

Teamsters, 431 U.S. at 360.

    In order to meet this burden, plaintiffs typically depend on two types of circumstantial

evidence: "(1) statistical evidence aimed at establishing the defendant's past treatment of the

---

[14] The plaintiff in an individual disparate-treatment suit bears the additional burden, if the plaintiff wishes to undertake it, of proving that the nondiscriminatory explanation offered by the defendant is in fact a pretext for discriminatory motive.  See McDonnell Douglas, 411 U.S. at 804.  This showing is not required in class-action pattern-or-practice suits.  Teamsters, 431 U.S. at 360; Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 158-59 (2d Cir. 2001).

[15] As the Second Circuit has noted, "[r]eferring to the first phase of a pattern-or-practice disparate treatment suit as the 'liability phase' is something of a misnomer because . . . the remedial phase also implicates questions of liability, albeit liability to each individual class member rather than to the class as a whole."  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 158 n.4 (2d Cir. 2001).

[16] The term "pattern or practice" is not a term of art, but is instead intended to denote "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts."  Teamsters, 431 U.S. at 336 & 336 n.16.

protected group, and (2) testimony from protected class members detailing specific instances of

discrimination."  Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 158 (2d Cir. 2001)

(internal quotation marks omitted).  As the Supreme Court has observed, statistical evidence of

workforce disparities is particularly probative of widespread intentional discrimination:

> Statistics showing racial or ethnic imbalance are probative in [disparate-treatment
> cases] because such imbalance is often a telltale sign of purposeful
> discrimination; absent explanation, it is ordinarily to be expected that
> nondiscriminatory hiring practices will in time result in a work force more or less
> representative of the racial and ethnic composition of the population in the
> community from which employees are hired.  Evidence of long-lasting and gross
> disparity between the composition of a work force and that of the general
> population thus may be significant . . . .

Teamsters, 431 U.S. at 340 n.20.  Therefore, although anecdotal evidence may be useful to bring

"the cold numbers convincingly to life," id. at 339, statistical evidence is sufficient on its own to

establish a prima facie case.  Robinson, 267 F.3d at 158-59; Rossini v. Ogilvy & Mather, Inc.,

798 F.2d 590, 604 (2d Cir. 1986).

If the plaintiffs make out a prima facie case, "the burden then shifts to the employer to

defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs']

proof is either inaccurate or insignificant."  Teamsters, 431 U.S. at 360.  The Second Circuit has

clarified the means by which a defendant can meet this burden of production:

> Three basic avenues of attack are open to the defendant challenging the
> plaintiff[s'] statistics, namely assault on the source, accuracy, or probative force.
> The defendant can present its own statistical summary treatment of the protected
> class and try to convince the fact finder that these numbers present a more
> accurate, complete, or relevant picture than the plaintiffs' statistical showing. Or
> the defendant can present anecdotal and other non-statistical evidence tending to
> rebut the inference of discrimination. The prudent defendant will follow all three
> routes if possible, presenting its own version of the numbers game, attempting to
> undermine the plaintiffs' version with specific attacks on [the] validity of the
> plaintiffs' statistics, and garnering non-statistical evidentiary support as well.

Robinson, 276 F.3d at 159 (quoting 1 Arthur Larson et al., Employment Discrimination §
9.03(2), at 9-23 to 9-24 (2d ed. 2001)).  If the defendant either does not respond or fails to
sustain its burden, judgment must be entered for the plaintiffs.  Burdine, 450 U.S. at 254.

     If the defendant meets its burden of production, "the trier of fact then must consider the
evidence introduced by both sides to determine whether the plaintiffs have established by a
preponderance of the evidence that the defendant engaged in a pattern or practice of intentional
discrimination."  Robinson, 276 F.3d at 159.  Upon a finding that such a policy existed, "the
court may proceed to fashion class-wide injunctive relief."  Id.

     If, as in this case, the plaintiffs seek individual relief such as back pay or compensatory
recovery in addition to injunctive relief, the court must conduct an additional "remedial" phase.
The proof at this phase (that is, each individual's entitlement to relief) is also established using a
burden-shifting framework.  By virtue of the adverse finding against the employer at the
"liability" stage, however, class plaintiffs "enter this second phase with a presumption in their
favor 'that any particular employment decision, during the period in which the discriminatory
policy was in force, was made in pursuit of that policy.'"  Id. (quoting Teamsters, 431 U.S. at
362).  Thus, a class plaintiff at the remedial stage "need only show that he or she suffered an
adverse employment decision and therefore was a potential victim of the proved class-wide
discrimination.  The burden of persuasion then shifts to the employer to demonstrate that the
individual was subjected to the adverse employment decision for lawful reasons."  Id. at 159-60
(internal quotation marks omitted).

    **B.**    **The Intervenors' Prima Facie Case**

     As outlined above and detailed in the Disparate Impact Opinion, the Intervenors have
presented sufficient undisputed statistical evidence to support a prima facie case that the City had

a pattern or practice of discriminating against black applicants.  The expert analyses that

Plaintiffs used to make out their disparate impact case establish that, from February 2001

through at least January 2008, the City engaged in four employment practices – the use of Exams

7029 and 2043 on a pass/fail basis, and the rank-order processing of applicants on the basis of

their performance on the two examinations – that had statistically significant adverse effects on

black candidates.  See D.I. Op., 637 F. Supp. at 85-86, 89-92.

     Plaintiffs' analyses demonstrate that while the pass rate of white candidates for Exam

7029 was 89.9%, the pass rate of black candidates was only 60.3%, a disparity equivalent to 33.9

standard deviations.  Id. at 88.  The practical effect of this disparity, according to Plaintiffs'

experts, is that somewhere between 457 and 519 black candidates who would not have failed the

examination but for the disparity were eliminated from consideration.  Id.  According to one

expert's calculations, 114 additional black firefighters would have been appointed to the force

absent the disparity.  Id.  For Exam 2043, the pass rates of white and black candidates were

97.2% and 85.4%, respectively, a disparity equivalent to 21.8 units standard deviations.  Id. at

89.  Plaintiffs' experts estimated that, absent the disparity, between 150 and 165 black candidates

would have passed Exam 2043, and 30 additional black firefighters would have been appointed

to the force.  Id.  The net effect of the City's pass/fail examination policy is that between 607 and

684 black applicants who would not have failed the exams but for the disparity were eliminated,

and 144 black firefighters were denied appointments they would have otherwise received.

     With respect to the rank-ordering use of the examinations, Plaintiffs' experts determined

that, on average, black candidates who passed Exam 7029 were ranked 630 places lower than

white candidates, a disparity equal to 6.5 units standard deviations.  Id. at 90.  As a result, 68 out

of 104 black candidates were appointed to the force a total of approximately 20 years later than

they would have been absent the disparity.  Id.  Within the pool of applicants who passed Exam 2043, black candidates were ranked an average of 974 places lower than white candidates, amounting to a disparity of 9.6 standard deviations.  Id. at 91.  As a practical matter, 44 out of 80 black candidates were appointed a total of approximately 14 years later than they would have been absent the disparity.  Id.  The net effect of the City's rank-ordering policy is that 112 black applicants were denied approximately 34 years' worth of wages and seniority that they would have received absent the policy's disparate effects.

This statistical showing is plainly sufficient to establish a prima facie case of disparate treatment.  The Second Circuit has consistently recognized that statistical disparities exceeding two or three standard deviations can make out a prima facie case that an employer had a pattern or practice of intentional discrimination.  See Waisome v. Port Auth. of N.Y. & N.J., 948 F.2d 1370, 1376 (2d Cir. 1991) ("Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation must be accounted for by some factor other than chance.  A finding of two or three standard deviations (one in 384 chance the result is random) is generally highly probative of discriminatory treatment.") (citation omitted); Ottaviani v. State University of New York, 875 F.2d 365, 372 (2d Cir. 1989) ("It is certainly true that a finding of two to three standard deviations can be highly probative of discriminatory treatment"); see also Hazelwood School Dist. v. United States, 433 U.S. 299, 309 n.14 (1977) ("general rule" in employment discrimination cases with large samples is that "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that [employees] were hired without regard to race would be suspect").  The calculated standard deviations in this case range from 6.5 to 33.9 units, well in excess of both the Second Circuit's

benchmark and the statistical showings that have established a prima facie case of pattern-or-practice disparate treatment in similar cases.  See Wright v. Stern, 450 F. Supp. 2d 335, 347-48 & 364 n.18 (S.D.N.Y. 2006) (disparities in "wage promotions" between minority and white employees ranging from 4.2 to 5.3 standard deviations "demonstrate a pattern or practice of discrimination"); NAACP v. Town of East Haven, 892 F. Supp. 46, 48, 50 (D. Conn. 1995) remanded on other grounds by 70 F.3d 219 (2d Cir. 1995) (statistical disparity of 4 to 6 standard deviations between number of blacks employed in town's private sector and number of blacks employed by city sufficient to establish prima facie case of pattern-or-practice discrimination); Brown v. Nucor Corp., 576 F.3d 149, 154, 156 & n.9 (4th Cir. 2009) (statistical disparity in promotions between white and black employees of 2.54 standard deviations sufficient to establish prima facie case of pattern-or-practice discrimination).

Moreover, as described above in Section I.B and below in Section V.B, the Intervenors have supplemented their statistical showing with extensive historical, anecdotal, and testimonial evidence that intentional discrimination was the City's "standard operating procedure." Teamsters, 431 U.S. at 336.  Together, Vulcan Society, Guardians, and this court's Disparate Impact Opinion demonstrate that the City's use of discriminatory testing procedures to select uniformed service-members is a decades-old problem.  The historical data amassed by the Intervenors shows that blacks have been consistently and drastically underrepresented in the FDNY relative to their representation in the City population; that blacks have been underrepresented in the FDNY relative to their representation in the fire departments of other large cities; and that blacks have been underrepresented in the FDNY relative to their representation in New York's other uniformed-services agencies.  The City does not dispute this evidence.

As developed below in Section V.B, there is also convincing evidence that the City, its agencies, and relevant decisionmakers have been aware that the FDNY's hiring procedures discriminate against black applicants and have nonetheless refused to take steps to remedy this discrimination.[17]   Over several years, the EEPC repeatedly informed Commissioner Scoppetta and his predecessor that the preliminary results of Exam 7029 revealed a wide disparity between the pass rates of white and black test-takers, and that this disparity violated the 80% Rule.  (Int. 56.1 ¶¶ 75-76, 80-93.)  Neither Commissioner took corrective action, despite a municipal law requiring them to assess the discriminatory impact of the FDNY's hiring practices and to explore viable alternatives.  (Id. ¶¶ 47, 52, 81-93.)  When the EEPC sent a report documenting the FDNY's hiring disparities and compliance failures to Mayor Bloomberg, he responded that he was satisfied with the FDNY's efforts. (Id. ¶¶ 95-97, 100; Fraenkel MTD Decl. Ex. 3; Levy Decl. Ex. Z.)

The Department of Citywide Administrative Services ("DCAS"), which is the City agency responsible for designing and administering the Exams, was also aware of the challenged policies' discriminatory impact.  DCAS analyzed test-takers' scores on Exam 7029 and determined that setting the cutoff score at 84.705 would result in an 89.84% pass rate for whites, but only a 61.19% pass rate for blacks.  (Int. 56.1 ¶ 103.)  Although DCAS officials lobbied against the 84.705 cutoff score due to its discriminatory effect, the FDNY required DCAS to use it.  (Fraenkel SJ Decl. Ex. 9 ("Wachter Dep."), at 74-75, 165-66, 177-78, 181-82.)

 The Intervenors' undisputed statistical and anecdotal evidence is powerful evidence that, when it came to the City's firefighter hiring policies, intentional discrimination was the City's "standard operating procedure."  Teamsters, 431 U.S. at 336.  Accordingly, the court finds that,

---

[17] This evidence is analyzed in much greater detail in Section V.B, below, and the court incorporates that analysis by reference here.

as a matter of law, the Intervenors have established a prima facie case that the City had a pattern or practice of disparate treatment.

### C.     The City's Defense

####       1.     Sufficiency of the Intervenors' Proof

Because the Intervenors have satisfied their prima facie requirement, the City bears the burden of "demonstrating that the [Intervenors'] proof is either inaccurate or insignificant" by attacking its "source, accuracy, or probative force."  Robinson, 267 F.3d at 159.  In its opposition papers and submissions, however, the City appears to have abjured this responsibility entirely. The City has not offered a competing "statistical summary treatment of the protected class," has not attempted to undermine the Intervenors' statistics with "specific attacks on [their] validity," and has garnered no "anecdotal [or] other non-statistical evidence tending to rebut the inference of discrimination."  Id.

Instead, the City attempts to circumvent its burden of production entirely by arguing that the Intervenors have not proved that the City harbored a subjective intent to discriminate against black applicants.  In its opposition memorandum, the City states that "the only material issue" with respect to the Intervenors' Title VII pattern-or-practice claim "is whether defendants acted with an intent to discriminate," and that the Intervenors' failure to produce direct evidence of the relevant decisionmakers' culpable mental state is therefore fatal to their claim. (Def. SJ Mem. 1, 5-9.)  Perhaps believing that this argument is a self-proving quietus, the City has chosen to support it with a single peremptory paragraph in its brief and a two-page statement of facts

concerning the Exams' development and the FDNY's recruitment efforts.[18]   (See Def. SJ Mem. 2; Def. 56.1.)

As developed below in Section V, the City's assertion that the Intervenors have failed to adduce sufficient proof of intentional discrimination is incorrect as a factual matter.   It is unnecessary to recite that evidence here, however, because the City's basic argument misapprehends the fundamental nature and structure of the Title VII disparate-impact inquiry, and therefore fails as a matter of law to rebut the Intervenors' prima facie case.

The City is of course correct that, as a general matter, liability in a disparate-treatment case "depends on whether the protected trait . . . actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993); see also Ricci, 129 S. Ct. at 2672-73. Assuming the existence of damages and causation, the dispositive factual question at the end of any Title VII disparate-treatment inquiry is whether or not the employer harbored a discriminatory motive, and plaintiffs who fail to persuade the fact-finder that the employer possessed the requisite mental state will necessarily lose their claim.   It does not follow, however, that the plaintiffs in a Title VII case are obligated to present "smoking-gun" proof of intentional discrimination in order to obtain judgment.   Direct proof of an employer's state of mind is "hard to come by," Hopkins, 490 U.S. at 271, and intentional discrimination may be revealed through circumstantial evidence alone.   See Aiken, 460 U.S. at 714 n.3 & 716.   It is for this reason that the Supreme Court interposed the Title VII burden-shifting structure, which is "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination." Burdine, 450 U.S. at 255 n.8; see also Dister v. Continental Group, Inc., 859

---

[18] Defendants' Opposition Memorandum consists, in its entirety, of one argument reiterated over nine double-spaced pages.  Despite its slightness, this memorandum is riddled with misspellings, elisions, and novel citation formats.  It is disappointing that, in the face of a carefully briefed and voluminously supported omnibus judgment motion that could subject the City – and, ultimately, its taxpayers – to substantial monetary damages, the City has declined to mount a similarly deft or vigorous defense.

F.2d 1108, 1112 (2d Cir. 1988) ("The allocation of burdens and imposition of presumptions in Title VII . . . cases recognizes the reality that direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it.").

In order to effectuate its evidentiary purpose, the Title VII burden-shifting framework prescribes a mandatory mode and order of proof.  Any departure from this framework is fatal to a party's claim or defense, and neither party may proceed to the ultimate factual question of discriminatory intent until it has satisfied its assigned burden.   St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-507, 509-10 & n.3 (1993); Robinson, 267 F.3d at 159.  Thus, for example, the plaintiffs in a pattern-or-practice case may not create a jury issue simply by adducing some shred of undisputed factual evidence suggestive of discrimination; they must introduce sufficient statistical and anecdotal evidence to establish a prima facie case of discrimination, as defined by case law.  Robinson, 267 F.3d at 158.  The establishment of the prima facie case creates a mandatory presumption that the employer unlawfully discriminated against the employees. Hicks, 509 U.S. at 506.  This "presumption" is therefore more than just an inference or a threshold showing; it is a predicate finding that obligates the employer to come forward with an explanation or contrary proof.  Teamsters, 431 U.S. at 361; Hicks, 509 U.S. at 506.  If the employer fails to respond to plaintiffs' prima facie case, or if it fails to carry its burden to dispel the prima facie case, then the court "must find the existence of the presumed fact of unlawful discrimination and must, therefore, render a verdict for the plaintiff."  Hicks, 509 U.S. at 509-10 n.3 (emphasis in original); see also Burdine, 450 U.S. at 254 ("[I]f the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case"); Teamsters, 431 U.S. at 361.

What is important to note is that in either case, although the ultimate question as to the employer's state of mind is technically left unresolved – since the fact-finder has not found by a preponderance of the evidence that the employer acted with discriminatory purpose – the employer's failure to discharge the obligations imposed on it by the burden-shifting framework mandates a finding of unlawful discrimination.  Id. at 506.  It is only by introducing evidence which, taken as true, would permit the conclusion that the plaintiffs' proof "is either inaccurate or insignificant," Teamsters, 431 U.S. at 36, that the defendant may force the fact-finder to proceed to the ultimate question of whether the plaintiffs have established by a preponderance of the evidence that the employer engaged in a pattern or practice of intentional discrimination. Robinson, 267 F.3d at 159.  The reason for this rule is obvious: if defendants were allowed to sustain or circumvent their burden of production by invoking the ultimate issue of intent, the burden-shifting structure would become a nullity.  The operation of the rule is unexceptional: the burden-shifting framework "is a procedural device, designed . . . to establish an order and proof of production," and, like other procedural rules, subjects noncompliant parties to default regardless of the objective merit of their claims or defenses.[19]  Hicks, 509 U.S. at 522 (emphasis in original); see also id. at 510 n.3 ("It is this practical coercion which causes the . . . presumption to function as a means of arranging the presentation of evidence") (internal quotation marks omitted).

The City's appeal to what it believes is an absence of direct evidence of intentional discrimination is therefore unavailing.  Because the Intervenors have established their prima

---

[19] As Justice Scalia noted in a slightly different context in Hicks, "The books are full of procedural rules" that require parties to either respond in a particular manner or lose: "A defendant who fails to answer a complaint will, on motion, suffer a default judgment . . . .  A defendant whose answer fails to contest critical averments in the complaint will, on motion, suffer a judgment on the pleadings . . . .  And a defendant who fails to submit affidavits creating a genuine issue of fact in response to a motion for summary judgment will suffer a dismissal . . . ."  509 U.S. at 522.

facie case, the City's obligation is to come forward with specific evidence attacking the source, accuracy, or probative force of the Intervenors' statistical and anecdotal evidence.  Robinson, 267 F.3d at 159.  At this stage, lack of direct proof regarding the employer's mental state is simply immaterial to the question of whether the City can rebut the presumption of unlawful discrimination created by the Intervenors' prima facie showing.

> 2. The City's Evidence

The City does not attempt to meet or undermine the Intervenors' statistical evidence, and instead offers a brief statement concerning the development of the Exams and the FDNY's efforts to recruit black firefighters.[20]  (Def. 56.1.)  This failure alone is sufficient to mandate entry of judgment for the Intervenors, since the employer's responsibility at this stage is to attack the sufficiency or force of the plaintiffs' proof rather than construct a competing account of its behavior.  See Teamsters, 431 U.S. at 360 (employer's burden is to "defeat the prima facie showing of a pattern or practice by demonstrating that the [plaintiffs'] proof is either inaccurate or insignificant") (emphasis added); Robinson, 267 F.3d at 159.  Nonetheless, this court believes that it would serve the interests of completeness and finality to assess the City's factual submission and its probative value in rebutting the Intervenors' prima facie case.

The City offers three statements derived from the testimony and affidavits of "[t]he individuals who were principally responsible for developing Examinations 7029 and 2043," Matthew Morrongiello and Alberto Johnston.  (Def. 56.1 ¶ 1.)  The City states that Morrongiello and Johnston (1) "attempted to develop the examination in accord with what they believed were appropriate and acceptable test development methods"; (2) "did not, prior to developing the

---

[20] Although this document is captioned "Defendants' Statement of Disputed Material Facts," it is clearly intended to be a statement of additional undisputed facts pursuant to Local Rule 56.1, and the court treats it as such.  (See Docket Entry # 365.)

Examinations consult with counsel or review the <u>Guardians</u> decision"; and (3) "did not intend to discriminate against any protected group."  (<u>Id.</u> ¶¶ 1-3.)  As a means of sustaining the City's burden of production, this testimony is patently inadequate.  The statements concerning the test-makers' state of mind during the development process are precisely the type of conclusory denials of key fact elements that the Supreme Court has considered insufficient to create a genuine issue of material fact, <u>see</u> <u>Anderson</u>, 277 U.S. at 256, and at any rate are inapposite because they go to the ultimate question of discriminatory intent rather than to the City's intermediate obligation to rebut the prima facie case.  Whatever the City hopes to accomplish by revealing that the Exams' designers failed to consult relevant authorities about the legality of their actions, meanwhile, it cannot be to demonstrate that the Intervenors' proof is weak.

More importantly, however, Morrongiello and Johnston's testimony does not bear directly on the Intervenors' claims.  The Intervenors are not challenging the existence or utility of the exams per se; they are challenging the City's policy or practice of using the exams as pass/fail and rank-ordering devices.  For purposes of the Intervenors' claim, then, it does not matter whether the City requires firefighter candidates to take a written exam, complete the Sunday crossword puzzle, or navigate a hedge maze: what matters is (1) whether the City has policies of screening and ranking applicants based on how well they perform the required task, (2) what effect those policies have on black applicants, and (3) why the City decided to adopt those policies.  Thus, the subjective motives of the people who <u>designed</u> the Exams are only circumstantially relevant to the question of whether the City's <u>decision to use</u> the Exams as screening and ranking devices was discriminatory.  On the other hand, a showing that the Exams were <u>constructed properly</u> – that is, that they test for relevant job skills and properly differentiate between better and worse candidates – would be highly relevant to the City's defense because it

would support an inference that the City's actual intent in enforcing the pass/fail and rank-ordering policies was to select the best candidates, and that the Intervenors' prima facie showing of disparate impact is merely the unfortunate by-product of a legitimate, neutral policy.  The City's previous attempt at such a showing was inadequate, however, see D.I. Op., 637 F. Supp. 2d at 100-31, and to the extent that the City could raise a business-necessity defense here, that defense is affirmatively undercut by the designers' admission that they did not consult the very sources that could have shown them how to design a job-related examination.  Cf. Guardians, 630 F.2d at 100-106.

The City also submits evidence demonstrating that "[t]he current administration has devoted increased manpower, funds, spending millions on advertising, and helping to develop the FDNY High School, in an effort to reach out to black communities and increase the number of blacks taking the entry level examination." (Def. 56.1 ¶ 4.)  While laudable, these facts do not raise any doubts about the Intervenors' proof.  The issue in this case is not whether the City recruited enough black applicants, but whether the screening and ranking procedure that the City applied to those applicants was racially discriminatory.  The Intervenors have made out a prima facie case that the City used the exams to discriminate against black applicants – in other words, that the exams illegally harmed black test-takers.  If more blacks were taking the exam as a result of the City's recruitment efforts, then more blacks were being illegally harmed, and the City's evidence is relevant only to the scope of the injury, not its source.  If, on the other hand, the City is only referring to recruitment efforts that were instituted after the challenged policies were discontinued – that is, after the City stopped using Exams 7049 and 2043 as hiring devices – then those efforts bear no relation to the City's motive in enacting and enforcing those policies. Cf. Teamsters, 431 U.S. at 341-342 (an employer's "later changes in its hiring and promotion

policies could be of little comfort to the victims of the earlier . . . discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it.").

The City also asserts that "the defendants have increased the frequency of the examination for promotion to firefighter which draws on larger [sic] minority pool of EMTs and paramedics."   (Def. 56.1 ¶ 5.)  This fact is similarly irrelevant to the City's burden of proof.  The promotion exams for EMTs and paramedics are not at issue in this case, nor have they ever been.  And for the reasons just stated, any invocation of the City's attempts to increase the number of minority test-takers is purely anodyne.

Based on the foregoing, it is clear that there is no genuine issue as to any material fact relating to the Intervenors' disparate-treatment claim.  The Intervenors have established a prima facie case that the City's use of Exams 7029 and 2043 to screen and rank candidates for the position of entry-level firefighter constitutes a pattern or practice of intentional discrimination against black candidates.  The City has failed to present evidence from which a reasonable trier of fact could conclude that the Intervenors' proof is "inaccurate or insignificant," Teamsters, 431 U.S. at 36.  Accordingly, the Intervenors are entitled to judgment as a matter of law, and their motion for summary judgment against the City on their Title VII disparate-treatment claim is GRANTED.

## V.   INTERVENORS' FEDERAL INTENTIONAL-DISCRIMINATION CLAIMS AGAINST THE CITY OF NEW YORK

### A.   Proving Section 1981 and Equal Protection Claims

#### 1.   Standard of Proof

The Intervenors assert that the City's pass/fail and rank-ordering policies discriminate against black applicants in violation of 42 U.S.C. § 1981 and the Equal Protection Clause of the

Fourteenth Amendment.[21]  As with the Intervenors' Title VII disparate-treatment claim, these

claims require the Intervenors to prove by a preponderance of the evidence that the City's

policies adversely affected black applicants, and that the City enforced or reaffirmed these

policies "at least in part" with the intent to discriminate against black applicants.[22]  See Pers.

Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979) (Equal Protection Clause); General Bldg.

Contractors Ass'n v. Pa., 458 U.S. 375, 391 (1982) (§ 1981).

2.     Mode and Order of Proof for § 1981 Claims

The Supreme Court has expressly held that employment-discrimination claims under §

1981 are governed by the same scheme of proof as Title VII disparate-treatment claims.

Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989).  The litigants are subject to the

same system of mandatory presumptions and shifting burdens, and must make the same

evidentiary showings in order to establish or rebut a prima facie case.  Id. at 186-88.  Class-

action employment discrimination claims under § 1981 follow the Teamsters model, with its

bifurcated "liability" and "remedial" phases and corresponding burden structures.  See

Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79, 2009 U.S. Dist. LEXIS 91104, 40-41

---

[21] Section 16 of the Civil Rights Act of 1870, codified at 42 U.S.C. § 1981, provides, inter alia, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ."  42 U.S.C. § 1981(a).  Although the statute "on its face relates primarily to racial discrimination in the making and enforcement of contracts," the Supreme Court has held that "§ 1981  affords a federal remedy against discrimination in private employment on the basis of race."  Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 460 (1975).

[22] The Intervenors' equal protection claim is brought under 42 U.S.C. § 1983.  In order to hold a municipality liable under § 1981 or § 1983, "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."  Patterson v. County of Oneida, 375 F.3d 206, 226 (2d Cir. 2004); see generally Monell v. Dep't of Social Servs., 436 U.S. 658, 690-91 (1978).  The City does not dispute that it had a policy or custom of using the firefighter entrance exams as pass/fail and rank-ordering devices, nor could it.  It is undisputed that the exams were administered on a pass/fail basis, using a fixed passing score, to each of the tens of thousands of applicants who took them.  See D.I. Op., 637 F. Supp. 2d at 84-86.  It is also undisputed that each of the tens of thousands of applicants who passed the exams were ranked according to a uniform formula based in part on their exam score.  Id.  Thus, the only question this court needs to answer in order to determine the City's liability is whether those two policies violated § 1981 and the Equal Protection Clause.

& n.5 (S.D.N.Y. Sept. 29, 2009); Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 759 n.6 (4th Cir. 1998); Payne v. Travenol Laboratories, Inc., 673 F.2d 798, 818 (5th Cir. 1982).

      3.     Mode and Order of Proof for Equal Protection Claims

     The Supreme Court has suggested, without so holding, that it is appropriate to use the Title VII framework to prove the existence of discriminatory purpose under the Equal Protection Clause. Washington v. Davis, the seminal case announcing the "discriminatory purpose" requirement, involved facts similar to those here. 426 U.S. 229 (1976). A class of black plaintiffs brought suit against the District of Columbia, claiming that the Police Department's written examination violated the equal protection component of the Fifth Amendment because the exam was not job-related and excluded a disproportionately high number of black applicants. Id. at 232-35. Although the Court ruled against the plaintiffs because they had failed to establish that the exam was administered with discriminatory intent, id. at 239-48, it indicated that evidence of disproportionate impact could establish a prima facie case of intentional discrimination, and that, "[w]ith a prima facie case made out, the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Id. at 241 (quotations omitted); see also Feeney, 442 U.S. at 284 (Marshall, J. dissenting). Whether holding or dictum, this approach to ascertaining discriminatory purpose was not adopted in subsequent opinions; nor, however, was it considered and rejected. See Arlington Heights, 429 U.S. at 269; Feeney, 442 U.S. at 275-77, 284. In fact, in its most recent pronouncement on the matter, the Supreme Court assumed, in a case construing the McDonnell-Douglas production burdens, that the Title VII framework "is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983." Hicks, 509 U.S. at 506 n.1. To support this assumption, the

Court cited its opinion in Patterson, which held that the Title VII framework applies to claims under § 1981. Id.

What the Supreme Court has suggested by analogy, the Second Circuit has resolved by decree. See Sorlucco v. New York City Police Dep't, 888 F.2d 4, 7 (2d Cir. 1989). The law in this circuit is clear: "[T]he analytical framework of a workplace equal protection claims parallels that of a discrimination claim under Title VII," Cunningham v. N.Y. State DOL, 326 Fed. Appx. 617, 620 (2d Cir. 2009) (unpublished opinion), and where a Title VII claim is paired with an equal protection claim, "the two must stand or fall together." Feingold v. New York, 366 F.3d 138, 159 (2d Cir. 2004) (holding that plaintiff's submission of sufficient evidence to establish elements of a Title VII claim necessarily defeated defendant's motion for summary judgment on plaintiff's equal protection claim); see also Demoret v. Zegarelli, 451 F.3d 140, 149, 151 (2d Cir. 2006), overruled in part on other grounds, Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). Although it does not appear that any of the courts in this Circuit have specifically considered whether the Teamsters framework applies to class-action equal protection claims – as distinguished from the settled question of whether the McDonnell-Douglas framework applies to individual equal protection claims – nothing in the Second Circuit's jurisprudence suggests that the coextension is limited to individual claims. See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."); Jemmott v. Coughlin, 85 F.3d 61, 67 (2d Cir. 1996) (observing that "Title VII law . . . is utilized by courts considering § 1983 Equal Protection claims" and that "several circuits have held that, when § 1983 is used as a parallel remedy with Title VII in a discrimination suit . . . the elements of the substantive cause of action are the same under both statutes."); Patterson v.

County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004) ("Most of the core substantive standards

that apply to claims of discriminatory conduct in violation of Title VII are also applicable to

claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause . . .

."). These cases strongly suggest that the Teamsters scheme of proof applies to class-action

pattern-or-practice employment discrimination claims under the Equal Protection Clause.

      Applying the same analytical framework to both types of claims makes sense as a matter

of logic, jurisprudence, and expedience. Both Title VII and the Equal Protection Clause are

meant to eradicate the same discrete and pernicious harm: intentional discrimination against

individuals on the basis of their membership in a protected class. See Teamsters, 431 U.S. at 335

n.16; Davis, 426 U.S. at 239. The adjudication of a claim under either provision therefore

requires a searching inquiry, by means of the best available proof, into "the elusive factual

question of intentional discrimination." Burdine, 450 U.S. at 255 n.8.

      The Title VII burden-shifting structure was created to serve this very purpose: it is "a

carefully designed framework of proof to determine, in the context of disparate treatment, the

ultimate issue whether the defendant intentionally discriminated against the plaintiff." Patterson,

491 U.S. at 186. It accomplishes this purpose by functioning as a "sensible, orderly way to

evaluate the evidence in light of common experience as it bears on the critical question of

discrimination." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). Thus, under

Teamsters, a prima facie showing of statistically significant hiring disparities creates a

presumption of discrimination "because such imbalance is often a telltale sign of purposeful

discrimination; absent explanation, it is ordinarily to be expected that nondiscriminatory hiring

practices will in time result in a work force more or less representative of the racial and ethnic

composition of the population in the community from which employees are hired." Teamsters,

431 U.S. at 340 n.20.  Courts presume that the acts that cause these disparities, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.  And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons, especially in a business setting."  Furnco, 438 U.S. at 577 (emphasis added).

The employer's responsibility to rebut the prima facie case by offering contrary proof or a legitimate explanation for the disparity is grounded in similar practical considerations.  Given the existence of the prima facie case, the employer's failure to carry its burden is highly probative of intentional discrimination because, "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race."  Id.  Thus, regardless of whether the Title VII burden-shifting structure is appropriate for equal protection claims in other areas, it is uniquely well-suited to adjudicating such claims in the employment-discrimination context.[23] Accordingly, this court believes it is appropriate to apply the Teamsters/Robinson system of mandatory presumptions and shifting burdens of proof to the Intervenors' equal protection claim in order to determine whether the City acted with discriminatory purpose in enforcing or reaffirming the pass/fail and rank-ordering policies.

---

[23] There are, of course, salient differences between the rights of action created by Title VII and § 1983.  To mention a few obvious examples, § 1983 plaintiffs do not need to exhaust administrative remedies prior to bringing suit; individuals are subject to suit under § 1983; and § 1983 does not place a cap on awards for emotional distress damages.  By the same token, Title VII claimants may bring suit against private employers in addition to government employers, and Title VII "offers assistance in investigation, conciliation, counsel, [and] waiver of court costs."  Johnson, 421 U.S. at 460.  These practical differences do not mitigate the value or applicability of the Title VII framework to employment-discrimination claims under § 1983.  Any objection on that ground is at any rate foreclosed by the Supreme Court's decision in Patterson, which applied the Title VII framework to § 1981 claims, despite similar differences in the two statutes' scope and structure.  See 491 U.S. 164; Johnson, 421 U.S. at 460.

Where, as here, the plaintiffs in an equal protection case challenge a facially neutral policy on the grounds that it was adopted or reaffirmed for an invidious purpose, a finding that the defendant acted at least in part out of a discriminatory motive does not end the inquiry. Rather, such proof shifts the burden to the government to prove by a preponderance of the evidence that "the same decision would have resulted even had the impermissible purpose not been considered." Arlington Heights, 429 U.S. at 270-71 & n.21 (citing Mt. Healthy School District v. Doyle, 429 U.S. 274 (1977)). This requirement aligns the structures of proof for the Intervenors' Title VII and equal protection claims by creating analogous "liability" and "remedial" phases. As under Teamsters and Robinson, the Intervenors must use a burden-shifting framework to prove that the City engaged in a policy of intentional discrimination, at which the point the burden will shift to the City to demonstrate that any individual class member was not hired for legitimate reasons.[24]

As noted above, where a single course of action is claimed to violate both Title VII and the Equal Protection Clause, the two claims "must stand or fall together." Feingold, 366 F.3d at 159. This court's entry of judgment on the Intervenors' Title VII pattern-or-practice claim is therefore presumptively dispositive of the Intervenors' equal protection claim. Nonetheless, it

---

[24] The equal protection burden-shifting requirement announced in Arlington Heights is based on a structure laid out in Mt. Healthy. See Arlington Heights, 429 U.S. at 271 n.21. In Mt. Healthy, the Supreme Court held that if a government employee proves that she was fired or demoted based on her constitutionally protected speech, the burden shifts to the government to prove by a preponderance of the evidence that it would have taken the same action even if the speech had never occurred. Mt. Healthy, 429 U.S. at 287. Although the language of Arlington Heights suggests that the specific action that the government must defend is its decision to adopt or reaffirm the challenged policies – here, the pass/fail and rank-ordering policies – that formalist approach makes little sense in the context of a class-action employment-discrimination case where the essence of plaintiffs' claim is that they were harmed by the ineluctable consequences of that policy – in this case, their exclusion from the applicant pool or their placement near the bottom of the hiring list. Mt. Healthy suggests that, at least in the employment-discrimination context, the defendant's burden is to demonstrate that the employee would have suffered the same adverse employment action absent the purposeful discrimination. This approach aligns the equal protection framework with the Title VII framework: under Teamsters and Robinson, once the plaintiffs have shown that the policy is discriminatory at the "liability" stage, the employer's burden at the "remedial" stage is not to demonstrate that it would have adopted the policy anyway, but to demonstrate that each individual plaintiff would have suffered the identical adverse employment action even in the absence of the policy. See Teamsters, 431 U.S. at 362-63; Robinson, 276 F.3d at 159-60.

would be imprudent to pass lightly over a 140-year-old corpus of jurisprudence whose "clear and central purpose" is "to eliminate all official state sources of invidious racial discrimination." Loving v. Virginia, 388 U.S. 1, 10 (1967).  Accordingly, this court proceeds to analyze the merits of the Intervenors' prima facie case and the City's defense in light of the particular requirements of the Equal Protection Clause.  This analysis applies equally to the Intervenors' § 1981 claim.  Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003).

### B.      The Intervenors' Prima Facie Case

In order to establish that an employer acted with discriminatory purpose, the plaintiffs in an equal protection case must rely on "such circumstantial and direct evidence of intent as may be available."  Arlington Heights, 429 U.S. at 266.  "The inquiry is practical.  What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid.  Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'"  Feeney, 442 U.S. at 279 n.24 (citation omitted).

The Supreme Court has identified certain types or sources of evidence as particularly probative of discriminatory intent:

> The impact of the official action – whether it bears more heavily on one race than another – may provide an important starting point.  Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face.  The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes.

Arlington Heights, 429 U.S. at 266-67 (internal quotations and citations omitted).  The court uses this guidance as a rough framework for its analysis of the Intervenors' prima facie case of intentional discrimination under the Equal Protection Clause.

1.      Disparate-Impact Evidence

At the risk of belaboring the evidence, it is clear that the Intervenors have submitted convincing proof that the City's pass/fail and rank-ordering policies had a statistically and practically significant adverse effect on black applicants. The differences in pass rates and average ranking far exceed the threshold of two standard deviations, and the net effect of these policies is that between 607 and 684 black applicants who would not have failed the exams but for the disparity were eliminated; 144 black firefighters were denied appointments they would have otherwise received; and 112 black applicants were denied approximately 34 years' worth of wages and seniority that they would have received absent the policy's disparate effects. D.I. Op. at 85-92. Such evidence is "important evidence of purposeful exclusion," Rogers v. Lodge, 458 U.S. 613, 624 (1982), and, as noted above, is sufficient in its own right to establish a prima facie case of intentional discrimination. Robinson, 267 F.3d at 158-59; Rossini, 798 F.2d at 604.

This statistical showing is more than merely circumstantial evidence of discriminatory purpose: it is direct evidence that the City was selectively indifferent to the interests of black applicants. The statistics make clear that, at least with respect to the pass/fail use of Exam 7029, the City imposed a burden on black applicants that it would not have imposed on white applicants. For Exam 7029, "the cutoff score was based merely on the number of entry-level firefighter job openings expected by the FDNY," meaning that the City chose as many applicants as the FDNY anticipated would be necessary to fill its ranks, and then set the cutoff score so that the remaining applicants failed. D.I. Op, 637 F. Supp. 2d at 124. This cutoff score therefore bore no relation to firefighter ability. Id. at 124-25.

12,915 white applicants took Exam 7029, and 11,613 passed, a pass rate of 89.9%. (Siskin Aff. Table 1.) 1,749 black applicants took the exam, and 1,054 passed, a pass rate of

48

60.26%.[25]  (Id.)  Had white test takers failed the exam at the same rate as black test takers, only 7,783 white applicants would have passed.  The result would have been a deficit of 3,830 firefighters, leaving the FDNY unable to replenish or expand its ranks.  Presumably, in that situation the City would have lowered the cutoff score to increase the number of firefighters; the vital point is that in the instant situation it did not lower the cutoff score to increase the number of blacks.  In other words, the City enforced a consequence against black applicants – the elimination of 39.74% of test-takers – that it would not, and could not, have enforced against whites.  The City's willingness to treat black applicants differently – to tolerate adverse outcomes against one race that it would not tolerate against another – is, if not the textbook definition of discriminatory intent, its nearly indistinguishable synonym.

>        2.        Comparative Evidence

The disparate impact of the City's hiring policies is reflected in the FDNY's racial composition.  When this litigation commenced in 2007, blacks constituted 3.4% of the firefighter force.  (Int. 56.1 ¶ 15.)  During the period 2006-2008, blacks constituted 25.1% of the City population.[26]  As stated above, this disparity is highly probative of discrimination because, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired."  Teamsters, 431 U.S. at 340 n.20.

---

[25] Although DCAS informed the FDNY of this disparity, the FDNY refused to alter the cutoff score.  (Wachter Dep. at 74-75, 165-66, 177-78, 181-82.)

[26] See U.S. Census Bureau, New York City, New York ACS Demographic and Housing Estimates: 2006-2008, available at http://factfinder.census.gov/servlet/ADPTable?_bm=y&-geo_id=16000US3651000&-qr_name=ACS_2008_3YR_G00_DP3YR5&-ds_name=ACS_2008_3YR_G00_&-_lang=en&-_sse=on.

The magnitude of this disparity stands in marked contrast to the situation in the nation's other large cities.  As demonstrated in Table 1, above, the rate at which blacks are represented in the FDNY relative to their proportion in the City population is five times lower than that of any other municipal fire department in the nation's nine largest cities.[27]  The Intervenors' evidence also establishes that the FDNY has a far lower proportion of black firefighters than the City's other uniformed service agencies, and that while the proportion of blacks in the NYPD has increased over the past decade, the proportion of black firefighters has actually decreased.  See Table 2, supra.

These statistics serve two important functions in this case.  The national data refute any assumption, conscious or otherwise, that the dearth of black firefighters in the FDNY is a matter of broad-based cultural preferences or dislikes – that, as a general matter, whites are simply "more interested" in becoming firefighters.  In large cities other than New York, blacks seek and obtain employment as firefighters in rough proportion to their presence in the local population.  Therefore, to the extent that the racial composition of the FDNY reflects a tradition of cultural conformity or social self-selection, that tradition is strictly local, and its conventions are powerful enough to distort the hiring outcomes that would ordinarily be expected in the absence of discrimination.  Cf. Teamsters, 431 U.S. at 340 n.20.  The City-agency data eliminate any possible explanation based on local idiosyncrasy – for example, that blacks in New York have historically avoided the uniformed services, or that some extrinsic condition differentiates the City's black population from that of other large cities.  If the absence of blacks in the FDNY is the product of deep-seated social and historical forces that are beyond the simple powers of a

---

[27] Table 1 does not include information about Phoenix, Arizona.  See supra n.10.

City agency to remedy, then those same forces do not seem to be at work on the NYPD, the Correction Department, the Sanitation Department, or their respective applicant pools.

        3.    <u>Historical Background</u>

The history of the City's efforts to remedy its discriminatory firefighter hiring policies can be summarized as follows: 34 years of intransigence and deliberate indifference, bookended by identical judicial declarations that the City's hiring policies are illegal.

In 1973, Judge Edward Weinfeld held that the City's practice of using non-validated written examinations to screen and rank prospective firefighters was illegal because it had statistically and practically significant adverse effects on black applicants and was not justified by legitimate business necessities.  <u>See</u> <u>Vulcan Society</u>, 360 F. Supp. at 1265.  In 2009, this court held that the City's practice of using non-validated written examinations to screen and rank prospective firefighters was illegal because it had statistically and practically significant adverse effects on black applicants and was not justified by legitimate business necessities.  <u>See</u> <u>D.I. Op.</u>, 637 F. Supp. 2d 77.  In the interim, the City cycled through six mayoral administrations and ten fire commissioners.[28] The percentage of black firefighters in the FDNY, meanwhile, held steady at around 3%.  (Int. 56.1 ¶ 8.)  In 2001, the FDNY had almost half as many black firefighters as it did in 1965, one year after the passage of Title VII.  (<u>Id.</u> ¶ 23.)

The City contends that this stark history is irrelevant to the Intervenors' discrimination claim, and that "the only material issue" is whether the Intervenors can affirmatively demonstrate that all present-day decisionmakers or actors – the City does not state which decisionmakers or actors – were motivated by a specific desire to harm black applicants.  (Def. SJ Mem. 1, 5-9.)

---

[28] <u>See</u> Elected Mayors of New York City, <u>available at</u>
http://www.nyc.gov/html/nyc100/html/classroom/hist_info/mayors.html (last visited Jan. 8, 2010); List of New York City Fire Commissioners, <u>available at</u> http://en.wikipedia.org/wiki/New_York_City_Fire_Commissioner (last visited Jan. 8, 2010).

The court rejects this contention and its underlying rationale as contrary to both law and logic. As explained above, the City's appeal to the ultimate fact question of subjective intent misstates the Intervenors' burden at the prima facie stage and is insufficient to carry the City's burden at the rebuttal stage.  See supra Section IV.C.1.  As a matter of substantive equal protection law, the notion that the history of the City's treatment of black firefighter applicants is irrelevant to an inquiry into present states of mind is simply incorrect.  See Arlington Heights, 429 U.S. at 267.  The sequence of events in this case – a finding of illegal discrimination, followed by an injunction against the discriminatory conduct, followed by a return to the proscribed conduct upon the lapse of the injunction – brings the Intervenors' claim squarely within the Supreme Court's precedents.  "Evidence of historical discrimination is relevant to drawing an inference of purposeful discrimination, particularly in cases . . . where the evidence shows that discriminatory practices were commonly utilized, that they were abandoned when enjoined by courts or made illegal by civil rights legislation, and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo."  Rogers, 458 U.S. at 625.

Any discussion of the historical record in this case must begin with Vulcan Society and Judge Weinfeld's finding, based on clear Second-Circuit precedent, that the use of non-validated written exams to screen and rank firefighter applicants is illegal where such use results in statistically significant racially disparate outcomes.  360 F. Supp. at 1268 (citing Chance v. Board of Examiners, 458 F.2d 1167, 1175-77 (2d Cir. 1972)).  The Vulcan Society opinion is not an inscrutable oracle.  It clearly placed the City on notice that, at any given moment, the legality of its firefighter hiring policies was a matter of statistical record and the City's test-validation efforts.  More importantly, the ruling informed the City that what it was doing with respect to

firefighter hiring was not merely bad policy or a disfavored business practice; it was <u>illegal</u> conduct.

The banality of this observation should not obscure its significance.  What the City has been persisting in for the 33 years since Judge Weinfeld's injunction lapsed is not benign neglect, well-intentioned dithering, or, as the City puts it, "at worst a display of bureaucratic failure and of aspects of the test preparation 'falling through the cracks.'"  (Def. SJ Mem. 5.)  It is unlawful discriminatory conduct, as previously defined by the United States District Court for the Southern District of New York and reaffirmed by the Second Circuit in <u>Guardians</u>.  <u>See</u> <u>D.I. Op.</u>, 637 F. Supp. 2d at 110, 115-16 (observing that "<u>Guardians</u> contains an unusually complete discussion of the details of test validation," but that, in creating the exams, the City "ignored the Second Circuit's guidance" and "appears to be relying on the same practices for which it was criticized by the Second Circuit thirty years ago").  That fact differentiates this case from the typical equal protection case in which plaintiffs face the uphill task of demonstrating that a longstanding and apparently benign policy is nonetheless infected with discriminatory purpose.  <u>See, e.g.</u>, <u>Feeney</u>, 442 U.S. at 278-81; <u>United States v. Moore</u>, 54 F.3d 92, 97-99 (2d Cir. 1995).  Here, the policy at issue was not apparently benign; it was presumptively illegal.

The fact that the City has repeatedly adopted or reaffirmed a presumptively illegal policy prevents it from using the Supreme Court's narrow definition of "intent" to immunize its actions.  It is true, as the City observes, that "'[d]iscriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  <u>Feeney</u>, 442 U.S. at 279.  Thus, the City reasons, the fact that the City was (or should have been) aware of the non-validated exams' effect on black

applicants does not mean that its decision to use them was discriminatory.  The holding in Feeney, however, was conditioned by factual circumstances.  According to the Supreme Court, the foreseeability of the sexually disparate effects of Massachusetts' veterans'-preference law could not "ripen into proof" because "the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate . . . ." Id. at 279 n.25 (emphasis added).  The policy at issue here, by contrast, has not withstood "repeated legal challenges" or "always been deemed legitimate" like the statute in Feeney, see id. at 267, or even gone untested like the police examination in Davis, see 426 U.S. at 232-234.  Rather, it has been proved to be illegitimate by federal district and appellate courts with jurisdiction over the City.  The difference between proceeding with knowledge that an action will produce certain consequences and proceeding with knowledge that an action is illegal is one of kind, not degree.

This court does not need to reach the question of whether persistence in a course of illegal action is direct evidence of a culpable mental state.  Regardless of what constitutes final proof of discriminatory intent, the foreseeability of adverse consequences will support "a strong inference that the adverse effects were desired . . . ." Feeney, 442 U.S. at 279 n.25.  At the prima facie stage, strong inferences are an end, not a means.  The fact that the City was on notice after Vulcan Society and Guardians that exam policies with unjustified adverse effects on black applicants were presumptively illegal, and nonetheless continued to enforce such policies, is, at the very least, powerful evidence supporting an inference of intentional discrimination.

4.      The Sequence of Events Leading Up to the Examinations

"The specific sequence of events leading up to [a] challenged decision . . . may shed some light on the decisionmaker's purposes."  Arlington Heights, 429 U.S. at 267.  As Justice Jackson noted in a different context, "[e]nvironment illuminates the meaning of acts, as context

does that of words.  What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others, the interchange between him and another, the give and take of the situation." Cramer v. United States, 325 U.S. 1, 33 (1945) (cited by Feeney, 442 U.S. at 279 n.24).  In this case, the sequence of events leading up to the decisions to use Exams 7029 and 2043 as pass/fail and rank-ordering devices reveals that the City was deliberately indifferent to those policies' discriminatory effects on black applicants.

The City has been aware for years that blacks have tended to perform worse than whites on the firefighter selection exams, both in terms of pass rates and ranking.  (Levy Dec. Ex. YY (testimony of former Fire Commissioner Thomas Von Essen).)  After Exam 7029 was administered in 1999, DCAS analyzed test-takers' scores and determined that setting the cutoff score at 84.705 would result in an 89.84% pass rate for white applicants, but only a 61.19% pass rates for black applicants.  (Int. 56.1 ¶ 103.)  Despite being aware of this disparity, and despite the fact that DCAS's Assistant Commissioner for Examinations lobbied against using it, the FDNY imposed the 84.705 cutoff score.  (Wachter Dep. at 74-75, 165-66, 177-78, 181-82.)  The City does not suggest that this knowing imposition of a racially disparate impact was tempered by a good-faith belief in the Exam's legality, nor could it, given the candid testimony from the Exams' designers that they "did not, prior to developing the Examinations consult with counsel or review the Guardians decision."  (Def. 56.1 ¶ 2.)

In May 2000, the City's Equal Employment Practices Commission ("EEPC") sent a letter to Fire Commissioner Thomas Von Essen informing him that the preliminary results of its audit of Exam 7029 showed that the pass rate of whites was 91.6%, while the pass rate of blacks was only 61%.  (Int. 56.1 ¶ 75.)  The EEPC's letter stated that this disparity violated the 80% Rule

and therefore "indicate[d] adverse impact."  (Id. ¶ 76.)  Commissioner Von Essen responded that

the impact of the written examination "is a DCAS issue."  (Id. ¶ 80.)  Over the next two years,

the EEPC continually asked the FDNY to conduct a study on the adverse impact of the written

examination, and reminded the Commissioner that he had a legal duty under the City's Equal

Employment Opportunity Policy ("EEO Policy") to examine the FDNY's hiring practices for

possible discriminatory impacts.  (Id. ¶¶ 47, 52, 81-93.)  Each time, the FDNY (now under the

direction of Commissioner Scoppetta) either refused to conduct the study outright or claimed that

it was taking the EEPC's suggestion under consideration.[29]  (Id. ¶¶ 85-93.)  In the spring of 2003,

the EEPC finally issued a report concerning the FDNY's failures directly to Mayor Bloomberg, a

measure it had only had to resort to twice before over the course of approximately 200 agency

audits.  (Id. ¶¶ 95-97, 100.)  This report recounted the history of the EEPC's audit, including its

statistical findings of disparate pass rates between white and black candidates, and documented

the FDNY's failure and refusal to implement various corrective measures aimed at bringing it

into compliance with the City's EEO policy.  (Fraenkel MTD Decl. Ex. 3.)  In October 2003,

Mayor Bloomberg responded in a two-paragraph letter that he was satisfied with the FDNY's

compliance efforts.[30]  (Levy Decl. Ex. Z.)

---

[29] Commissioner Scoppetta also testified that in April 2002 he participated in a meeting with Mayor Bloomberg and
Vulcan Society President Paul Washington regarding the lack of diversity in the FDNY.  (Int. 56.1 ¶ 126.)  In
September 2002, Commissioner Scoppetta was quoted in the New York Daily News as saying, "the Fire Department
is 93% white and male – there's something seriously wrong with that picture."  (Id. ¶ 127.)

[30] The evidence demonstrates that Mayor Bloomberg was placed on notice of the exam policies' discriminatory
effects on multiple occasions.  In 2002, Mayor Bloomberg held a meeting with the Vulcan Society, during which the
Vulcans raised questions about the legality of the examinations and expressed their belief that the exams did not test
for job fitness.  (see Washington Aff. ¶ 19.)  The Mayor met with the Vulcans again in 2006.  At this meeting, the
Vulcans reiterated their position that the exams were discriminatory; Mayor Bloomberg "conceded that there was a
serious problem with the low numbers of blacks in the FDNY and that high scores on the exam did not necessarily
correlate with becoming a good firefighter."  (Id. ¶¶ 27-28.)  Mayor Bloomberg also received letters about the
possibly discriminatory nature of the firefighter testing and hiring procedures from various high-ranking government
officials, including members of the City Council, then-State Senator David Paterson, and members of the U.S.
Congress.  (See id. Exs. 18, 20, 21, 22.)

The City continued using Exam 7029 to select entry-level firefighters through December 2004.  (Int. 56.1 ¶ 116.)  When it came time to create Exam 2043, the City used the same development process it had used for Exam 7029, including the same job analysis and Test Development Report.  D.I. Op., 637 F. Supp. 2d at 100.  Although the City lowered the cutoff score for Exam 2043, they again failed to link this score to any permissible job-related rationale, instead choosing a "default" score set by the City's civil service rules.  D.I. Op., 677 F. Supp. 2d at 124.  In doing so, the City "ignored Guardians' warning against relying solely on a civil service default score."  Id.

The evidence therefore suggests that, while the challenged policies were being implemented, the City was on notice of their discriminatory effects but took no corrective action. The fact that the top officials in the administration were aware of these discriminatory effects is significant, not because their knowledge is necessary to make out a claim (as the City appears to believe), but because it demonstrates that policymakers at the highest levels of the administration were willing to acquiesce in racially exclusionary practices, and that such acquiescence was not confined to a few rogue individuals or sub-agencies.  The fact that the City's top officials exhibited an attitude of deliberate indifference to the discriminatory effects of the hiring policies that they were charged with overseeing raises a strong inference that intentional discrimination was the City's "standard operating procedure."  Teamsters, 431 U.S. at 336.  Accordingly, the court finds that Intervenors have established a prima facie case that the City had a pattern or practice of intentional discrimination.

### C.        The City's Defense

As detailed above in Section IV.C, above, the City has entirely failed to carry its assigned burden under Teamsters and Robinson to demonstrate that the Intervenors' statistical evidence of

significant discriminatory impact "is either inaccurate or insignificant." <u>Teamsters</u>, 431 U.S. at

36; <u>Robinson</u>, 267 F.3d at 159.  Moreover, for the reasons given in that section, the City's

submission of evidence regarding the exams' designers and the FDNY's recruitment efforts is

either incredible or inapposite.

In the Defendants' motion to dismiss the Intervenors' equal protection and § 1981 claims

– now their motion for summary judgment – Mayor Bloomberg and Commissioner Scoppetta

assert that they were either not ultimately responsible for formulating examination policies or not

intimately involved in setting such policies, and that therefore they cannot be shown to have

acted (or failed to act) out of discriminatory motives.  (Def. MTD Mem. 14-15.)  Arguments to

this effect also appear in the City's summary judgment opposition brief.  (Def. SJ Opp. Mem. 4-

5.)  The City offers testimony from Mayor Bloomberg that he did not personally review the

exams, and that he relied on the assurances of FDNY employees to conclude that the exams did

not discriminate on the basis of race.  (Fraenkel MTD Decl. Ex. 5 (Aug. 26, 2009 Deposition of

Michael R. Bloomberg) ("Bloomberg Dep.") 61:24-63:3, 75:23-77:2, 123:25-124:18.)

Commissioner Scoppetta asserts, as his predecessor did, that the responsibility for test formation

and administration lies with DCAS and not the FDNY.  (Fraenkel MTD Decl. Ex. 6 (Aug. 21,

2008 Deposition of Nicholas Scoppetta) ("Scoppetta Dep.") 83:15-85:12.)  To the extent this

evidence is intended to demonstrate that the City, in its role as employer, did not intentionally

discriminate against black firefighter applicants, it is insufficient to rebut the Intervenors' prima

facie case.

It is true that a supervisory official cannot be held liable for unconstitutional acts he did

not directly participate in or know about, and that where an official is charged with violations

arising from his superintendent responsibilities, he must be shown to have acted with the specific

intent to harm the plaintiffs.  Iqbal, 129 S. Ct. at 1949.  By superficial analogy, this principle

could suggest that, if a city's highest policy-making officers are not liable for intentional

discrimination, then the city cannot be either.  But, in the same way that the defendant in a Title

VII pattern-or-practice case is the company and not the CEO, the defendant in a § 1983

municipal-policy case is the City and not the Mayor.  And in the same way that a CEO's

testimony that she heard that the human-resources department was doing a bang-up job is not

particularly probative of whether the company's hiring policies were discriminatory, the Mayor's

testimony that various firefighters told him that the exams were not biased says little about the

subjective motives of those who actually devised and implemented the City's firefighter hiring

policies.

　　　　This is not to say that the Mayor's and Commissioner's knowledge is irrelevant.  As

explained above, the fact that the Mayor and Commissioner were deliberately indifferent to the

exams' impact on blacks is circumstantial evidence that the City engaged in purposeful

discrimination against black applicants.  But the very thing that makes their knowledge of the

adverse impact of the City's policies probative of the existence of a pattern or practice of

discrimination – their remote position at the apex of the governmental structure – also blunts the

force of their testimony that they were not closely involved in the implementation of those

policies.  It is significant that the higher-ups knew about and tolerated the effects of the City's

hiring policies; it is not particularly significant that they were ignorant of the formulation and

operation of those policies.

　　　　These considerations foreground another deficiency in the City's rebuttal.  Whatever the

Mayor's and Commissioner's formal statutory authority over hiring policy may be, the thrust of

the City's arguments and evidence is that they simply were not directing the formulation and

implementation of the policies at issue.  (See Def. MTD Mem.13-16.)  Mayor Bloomberg

suggests that, although his office is ultimately responsible for ensuring that the EEO policy is

followed, he relied on various firefighters' assurances that the exam policies were not

discriminatory.  (Bloomberg Dep. 61:24-63:3, 75:23-77:2, 123:25-124:18.)  Commissioner

Scoppetta claims that DCAS had ultimate responsibility for formulating the exams and,

therefore, the pass/fail and rank-ordering policies. (Scoppetta Dep. 83:15-85:12.)  DCAS's

Assistant Commissioner for Examinations, meanwhile, testified that, at least with respect to

Exam 7049, the FDNY dictated the cutoff score that resulted in the adverse impact.  (Wachter

Dep. at 74-75, 165-66, 177-78, 181-82.)  It is not clear from the record where the buck stops in

the current City administration, only that it is constantly in motion.  As a result, the testimony of

any one officer is not particularly probative of the City's intent in reaffirming and enforcing the

challenged policies.

　　　　Finally, as a matter of substantive equal protection law, the subjective motivations of two

individuals who were not directly involved in setting or enforcing the policies at issue have little

evidentiary value.  The Intervenors' burden is not to prove that the entire City government was

inflamed with discriminatory animus, but to make out a prima facie case that the relevant

decisionmakers who were responsible for the challenged policies acted "at least in part" out of

discriminatory motives.  Feeney, 442 U.S. at 279.  "Rarely can it be said that a legislature or

administrative body operating under a broad mandate made a decision motivated solely by a

single concern. . . .  Thus, the critical constitutional inquiry is not whether an illicit consideration

was the primary or but-for cause of a decision, but rather whether it had an appreciable role in

shaping a given legislative enactment."  Id. at 282-283 (internal quotation marks omitted).

The Intervenors having made out a prima facie case that the City was motivated at least in part by a discriminatory purpose, it follows that the City's burden is to put forward evidence from which a reasonable trier of fact could conclude that that the City was not motivated by discriminatory purpose at all.  In the absence of statistical rebuttal evidence, it is critical that the City present testimonial or anecdotal evidence from the particular individuals in the particular administrative agency that enacted the challenged policies.  By failing to provide evidence about the motivations of the people who actually designed, instituted, reaffirmed, or implemented the pass/fail and rank-ordering policies, the City has necessarily failed to rebut the Intervenors' prima facie case.

Accordingly, the court finds that there is no genuine issue as to any material fact relating to the Intervenors' equal protection and § 1981 claims against the City.  As a matter of law, the Intervenors have established a prima facie case of intentional discrimination, which the City has failed to rebut.  The Intervenors are entitled to judgment as a matter of law, and their motion for summary judgment on their equal protection and § 1981 claims against the City is GRANTED.

## VI. INTERVENORS' DISPARATE-TREATMENT CLAIMS AGAINST THE CITY OF NEW YORK UNDER STATE AND CITY HUMAN RIGHTS LAWS

The Intervenors claim that the City's pass/fail and rank-ordering policies violate the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").[31]  Both statutes make it unlawful for an employer to refuse to hire an individual "because of" his or her race.  N.Y. Exec. Law § 296(1)(a) (McKinney's 2009); NYC Administrative Code § 8-107(1)(a).

---

[31] The Intervenors' claims against Mayor Bloomberg and Commissioner Scoppetta under the NYSHRL and NYCHRL are discussed in Section VII, below.

Both parties agree that employment-discrimination claims under the NYSHRL and NYCHRL use the same liability standard and proof structure as Title VII claims, and are analyzed in the same manner.  (See Int. SJ Mem. 19-20; Def. SJ Mem. 3-4.)  This accord reflects the prevailing law in New York State and the Second Circuit.  See Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 305 & n.3 (2004) (employment discrimination claims under NYSHRL and NYCHRL are analyzed using Title VII standard of proof and burden-shifting framework); Torres v. Pisano, 116 F.3d 625, 629 (2d Cir. 1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII"); Ortega v. New York City Off-Track Betting Corp., 1999 U.S. Dist. LEXIS 7948, at *7 n.2 (S.D.N.Y. May 24, 1999) ("The same analysis is used to determine the sufficiency of Title VII claims as that for employment discrimination claims brought under the state and city [human rights] statutes").  Because of this congruence between Title VII and the NYSHRL, "a finding in favor of the plaintiff on one claim necessitates a finding for the plaintiff on the other claim." Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1048 (2d Cir. 1992).  The defendants have not offered any reason why this rule should not apply to claims under the NYCHRL as well.

As it has elsewhere, the City argues only that the Intervenors must prove that the challenged policies were adopted or enforced for the purpose of discriminating against black applicants, and that the Intervenors' failure to produce direct evidence of a culpable mental state is fatal to their claims under the NYSHRL and NYCHRL.  (See Def. SJ Mem. 3-4.)  For the reasons stated above in Section IV.C and repeated in Section V.A.2, only the first part of this argument is correct; the second is a misstatement of the law and of the City's burden of proof. The Intervenors have established a prima facie case that the City had a pattern or practice of intentional discrimination under Title VII, the NYSHRL, and the NYCHRL.  The City's

obligation under all three statutes is to "defeat the prima facie showing of a pattern or practice by demonstrating that the [Intervenors'] proof is either inaccurate or insignificant." Teamsters, 431 U.S. at 360. Because the City has failed to carry this burden, summary judgment for the Intervenors is required as a matter of law. Id. at 361; Hicks, 509 U.S. at 509-10 n.3. Accordingly, the Intervenors' motion for summary judgment on their disparate-treatment claims under the NYSHRL and NYCHRL is GRANTED.

## VII.   MAYOR BLOOMBERG'S AND COMMISSIONER SCOPPETTA'S IMMUNITY FROM SUIT

The Intervenors allege that Mayor Bloomberg and Commissioner Scoppetta intentionally discriminated against them in violation of § 1981, the Equal Protection Clause, the NYSHRL, and the NYCHRL. The Mayor and Commissioner argue that they are entitled to qualified immunity with respect to the federal-law claims and official immunity with respect to the state-law claims. This court agrees.

### A.       Federal Claims: Qualified Immunity

The federal doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). An official's entitlement to qualified immunity is, at root, an objective question of legal notice: "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001); see also Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . in light of pre-existing law the unlawfulness must be apparent"). To make the

immunity determination, a district court must survey relevant case law to ascertain if the particular right claimed by plaintiff was so clearly established that a reasonable officer would have been aware of it.[32]  See Mitchell v. Forsyth, 472 U.S. 511, 530-536 (1985); Brosseau v. Haugen, 543 U.S. 194, 200-201 (2004).  If the court determines that the right was not clearly established, then the officer is granted immunity and the suit against him is dismissed.

In this case, the particular right asserted by the Intervenors against Mayor Bloomberg and Commissioner Scoppetta is the right to be free from acts of intentional discrimination committed by individuals in their capacities as supervisory officials.  In order to hold a supervisory official liable for violating § 1981 or the Equal Protection Clause, a plaintiff must "prove that the defendant acted with discriminatory purpose," Iqbal, 129 S. Ct. at 1949.  A supervisor's "mere knowledge of his subordinate's discriminatory purpose" is insufficient to establish his individual liability.  Id.

For the reasons set out in Section V.A.2, above, there are strong logical and jurisprudential reasons to apply a Title VII burden-shifting analysis to the Intervenors' employment-discrimination claim.  It stands to reason that this framework should also be used to determine whether the Mayor and Commissioner acted with discriminatory purpose in approving or acquiescing in the challenged hiring policies.  As far as this court is aware, however, neither the Supreme Court nor any court in this circuit has used the McDonnell-Douglas or Teamsters frameworks to determine whether an individual, as opposed to a governmental employer, is

---

[32] Under Saucier, courts were required to determine first whether the facts alleged or shown by plaintiff made out a violation of a constitutional or statutory right; if so, then the court would continue on to determine whether the right at issue was clearly established.  Saucier, 533 U.S. at 201.  In Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), the Supreme Court ruled that the Saucier procedure is no longer mandatory, and that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Here, the court declines to consider whether the Intervenors have made out an equal protection or § 1981 violation against the Mayor or Commissioner, as the individual defendants' entitlement to qualified immunity is wholly dispositive of these claims.

liable for discrimination under either § 1981 or the Equal Protection Clause.  A ruling applying Teamsters to the claims against the Mayor and Fire Commissioner would therefore require an extension, rather than an automatic application, of existing precedents.  In the absence of such precedent, the Mayor and Fire Commissioner could not have reasonably anticipated that their actions would need to conform to the requirements of Title VII.   Accord Patterson v. County of Oneida, 375 F.3d 206, 221 (2d Cir. 2004) (individuals, including supervisors, are not liable under Title VII).

As outlined above, the Intervenors' proof strongly indicates that Mayor Bloomberg and Commissioner Scoppetta were deliberately indifferent to the discriminatory effects of the City's examination policies.  "'Discriminatory purpose,' however, implies more than intent as volition or intent as awareness of consequences.  It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Feeney, 442 U.S. at 279.  The Intervenors have submitted copious evidence from which a reasonable fact-finder could infer that the Mayor and Commissioner harbored an intent to discriminate against black applicants – evidence which, under a Title VII framework, might well establish a prima facie case of intentional discrimination as a matter of law – but no evidence that directly and unmistakably proves that fact.  Even assuming that the Mayor and Commissioner were aware of the policies' effects and nonetheless chose to continue or enforce those policies, it would not have been clear to them from the governing legal precedent that such conduct violated § 1981 or the Equal Protection Clause.  Absent direct evidence that Mayor Bloomberg and Commissioner Scoppetta acted with discriminatory purpose, the court cannot conclude – and no reasonable jury could conclude – that they could not have reasonably believed that their actions were legal.

B.        State-Law Claims: Official Immunity

New York State immunity law "affords public officials considerably greater protection

from individual capacity suits than the federal doctrine of qualified immunity." Hirschfeld v.

Spanakos, 909 F. Supp. 174, 180 (S.D.N.Y. 1995).  The New York Court of Appeals has framed

the official immunity standard as follows:

> Whether an action of a governmental employee or official is cloaked with any
> governmental immunity requires an analysis of the functions and duties of the
> actor's particular position and whether they inherently entail the exercise of some
> discretion and judgment. If these functions are essentially clerical or routine, no
> immunity will attach . . . . If a functional analysis of the actor's position shows
> that it is sufficiently discretionary in nature to warrant immunity, it must then be
> determined whether the conduct giving rise to the claim is related to an exercise
> of that discretion. Obviously, governmental immunity does not attach to every
> action of an official having discretionary duties but only to those involving an
> exercise of that discretion.

Mon v. City of New York, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 532 (1991); see also

Haddock v. City of New York, 75 N.Y.2d 478, 484, 554 N.Y.S.2d 439, 443 (1990) ("when

official action involves the exercise of discretion or expert judgment in policy matters, and is not

exclusively ministerial, a municipal defendant generally is not answerable in damages for the

injurious consequences of that action").

The Intervenors do not attempt to argue that Mayor Bloomberg's and Commissioner

Scoppetta's duties with respect to setting or approving firefighter hiring policies are ministerial,

or that their actions in this case were not exercises of their discretionary functions.  Instead, they

cite language from Haddock to the effect that immunity is only available if the official is in

compliance with the municipal procedures that constrain or direct the exercise of his discretion.

See Haddock, 75 N.Y.2d at 485, 554 N.Y.S.2d at 443.  In Haddock, the plaintiff sought to hold

the City liable for a sexual assault committed by a City employee who was hired despite having

an extensive criminal history.  In rejecting the City's immunity defense, the Court of Appeals

reasoned as follows:

> The difficulty with the City's contention that it is entitled to a cloak of immunity
> for the discretionary decision to retain [the employee] in his status is that there is
> no evidence that, prior to the rape, the City in fact made any such decision or
> exercised any such discretion. This is not a case of a mere error of judgment of
> City officials in choosing to retain [the employee] in his work assignment after
> learning of his criminal record. There is no indication that, before the attack on
> plaintiff, the City made any effort to comply with its own personnel procedures
> for employees with criminal records, and no indication that it made a judgment of
> any sort when it learned that [the employee] both had a criminal record and lied
> egregiously about it.
>       The immunity afforded a municipality presupposes an exercise of
> discretion in compliance with its own procedures. Indeed, the very basis for the
> value judgment supporting immunity and denying individual recovery for injury
> becomes irrelevant where the municipality violates its own internal rules and
> policies and exercises no judgment or discretion.

Id.

The Intervenors argue that, under the reasoning in Haddock, Mayor Bloomberg's and

Commissioner Scoppetta's failure to obey the City's EEO policies precludes them from raising

an official-immunity defense.  The EEO policy at issue required agency heads to assess their

agency's hiring procedures, to ascertain whether those procedures had a racially disparate

impact, and if so, to evaluate the job-relatedness of the procedure and the availability of

alternatives with less impact.  (Levy Decl., Ex. F.)  It is undisputed that neither official fulfilled

this mandate, at least with respect to the FDNY and Exam 7029.  (Int. 56.1 ¶ 94, 146.)

This argument is unavailing for two reasons.  In Haddock, the municipal procedure that

the City flouted was intended to control the decision to hire the employee.  In other words, the

procedural rule directly governed the challenged conduct.  Here, that was not the case.  A rule

requiring an official to conduct a study of agency hiring practices and explore alternative

approaches is not the same thing as a rule requiring the official to alter or abandon those

practices upon a showing of adverse impact.  The EEO policy cited by the Intervenors did not constrain either official's discretion to take the challenged action – that is, to enact or approve the pass/fail and rank-ordering policies.  (See Int. 56.1 ¶ 64, 68 (EEPC is charged with monitoring EEO compliance, but has no independent enforcement authority).)  Thus, the exercise of their discretion was not conditioned on compliance with the municipal procedure that the Intervenors claim they ignored.

Second, the holding in Haddock was premised on the finding that in hiring an employee with an extensive criminal background, the City completely failed to exercise its discretion or "[make] a judgment of any sort."  Haddock, 75 N.Y.2d at 485, 554 N.Y.S.2d at 443.  Because the limited purpose of official immunity is to avoid deterring government officials in the exercise of their discretionary authority, decisions that are made pursuant to automatic or ministerial procedures are not immunized; in Haddock, the Court of Appeals found that, by failing to follow established hiring procedures or conduct even minimal screening, the City was essentially acting in a ministerial capacity when it hired the criminal employee.  Id., 75 N.Y.2d at 484, 554 N.Y.S.2d at 443.  By contrast, it is clear in this case that the Mayor's and Commissioner's actions (or inactions) were the product of conscious choice, inasmuch as they were aware of the hiring procedures' discriminatory effects and nonetheless ratified them or permitted them to continue.  (See Int. 56.1 ¶¶ 47, 52, 81-93, 95-97, 100; Fraenkel MTD Decl. Ex. 3; Levy Decl. Ex. Z.)

Accordingly, the Defendants' motion for qualified and official immunity with respect to the Intervenors' claims against Mayor Bloomberg and Commissioner Scoppetta under § 1981, the Equal Protection Clause, the NYSHRL, and the NYCHRL is GRANTED, and the Intervenors' motion for summary judgment against them is DENIED.

## VIII.   INTERVENORS' DISPARATE-IMPACT CLAIMS AGAINST THE CITY

The Intervenors claim that, based on the determinations and holding in the Disparate Impact Opinion, they are also entitled to summary judgment on their disparate-impact claims against the City under the NYSHRL and NYCHRL.  The City does not respond to these claims or the Intervenors' arguments in its motion papers.

Both the NYSHRL and the NYCHRL forbid employers from maintaining employment practices that have a disparate impact on racial minorities and are not job-related.  See N.Y. Exec. Law § 296; NYC Admin. Code § 8-107(17); see also People v. New York City Transit Auth., 59 N.Y.2d 343, 348-49, 452 N.E.2d 316, 318 (1983).  This court has previously found that the City engaged in precisely this proscribed conduct by using non-validated written examinations to screen and rank black applicants for the job of entry-level firefighter, all in violation of Title VII.  See generally D.I. Op., 637 F. Supp. 2d 77.  As described above in Section VI, employment-discrimination claims under the NYSHRL and NYCHRL are analyzed in the same manner as Title VII claims.  Accordingly, for the same reasons set forth in the Disparate Impact Opinion, the Intervenors' motion for summary judgment with respect to their disparate-impact claims against the City under the NYSHRL and NYCHRL is GRANTED.

## IX.   CONCLUSION

Although the court rules today that the City has violated a wide array of constitutional and statutory prohibitions, the essence of its ruling is simple.  The Intervenors have marshaled extensive statistical, testimonial, and anecdotal evidence to create a prima facie case that the City's examination policies constituted a pattern or practice of intentional discrimination.  The City's burden – its legal obligation – was to respond in kind or to undercut the Intervenors' proof.  Instead of shouldering this burden, the City has tried to cast it off entirely.  Attempts of

this sort are rarely rewarded in the law, and today's ruling is no exception.  The City has failed to raise a triable issue of fact with respect to either the Intervenors' prima facie case or its own evidentiary burden, and as a result the Intervenors are entitled to judgment as a matter of law.

What the Intervenors have demonstrated – and what the City has failed to rebut – is that the City's use of written exams with discriminatory impacts and little relation to the job of firefighter was not a one-time mistake or the product of benign neglect.  It was part of a pattern, practice, and policy of intentional discrimination against black applicants that has deep historical antecedents and uniquely disabling effects.  The consequences that this illegal policy had for blacks who wished to serve their city as firefighters have already been levied; the consequences that this illegal policy will have for the City will be addressed at the remedial stage.

Accordingly, and for the reasons set forth above, the Intervenors' motion for summary judgment with respect to their claims against the City under the Equal Protection Clause, Title VII, 42 U.S.C. § 1981, and the New York State and New York City Human Rights Laws is GRANTED, and Defendants' motion for summary judgment on the Intervenors' equal protection claim against the City is DENIED.  Defendants' motions to dismiss all claims against the FDNY and DCAS and for summary judgment with respect to all claims against Mayor Bloomberg and Commissioner Scoppetta are GRANTED, and the Intervenors' motion for summary judgment on their claims against those entities and individuals is DENIED.

SO ORDERED.

                                                                 __/s/ Nicholas G. Garaufis____

Dated: Brooklyn, New York                        NICHOLAS G. GARAUFIS
       January 13, 2010                        United States District Judge