UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                    Plaintiff,

      -and-

THE VULCAN SOCIETY, INC., for itself and
on behalf of its members; MARCUS
HAYWOOD, CANDIDO NUÑEZ,
ROGER GREGG, individually and on
behalf of a class of all others similarly situated,

                   Plaintiffs-Intervenors,

      -against-

THE CITY OF NEW YORK,

                   Defendant.
------------------------------------------------------------X

**MEMORANDUM & ORDER
07-cv-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

        Plaintiff United States of America (the "Federal Government"), as well as the Vulcan

Society, Inc. (the "Vulcans" or the "Vulcan Society"), Marcus Haywood, Candido Nuñez, and

Roger Gregg (the "Individual Intervenors") (together with the Vulcans, the "Intervenors"),

brought suit to challenge the use by Defendant City of New York (the "City") of two written

examinations in the screening and selection of applicants for entry-level firefighter positions in

the Fire Department of New York ("FDNY").  Based upon extensive briefing and voluminous

factual submissions from the parties, the court found the City liable for disparate-impact

discrimination on July 22, 2009 (see Docket Entry # 294) and intentional discrimination on

January 13, 2010 (see Docket Entry # 385).

Following its two liability rulings, the court now proceeds to the remedial phase.  The parties have briefed remedial proposals in light of the court's first liability ruling – the disparate impact decision.[1]   The parties have also briefed the Intervenors' motion to continue class certification for the purposes of the remedial phase.  (See Docket Entries ## 328-35, 352, 354, 366.)  In this Memorandum & Order, the court does not order any particular form of relief.  Instead, the court outlines the broad contours of relief and resolves several basic disputes regarding the implementation of a remedy.  The court reserves ruling on many of the subsidiary details that require further information from the parties, and raises numerous issues regarding those details.[2]  These issues are listed in the Conclusion Section, infra, and the parties should be prepared to address them at a conference to be scheduled for the second week in February (the "February Conference").

In essence, the court concludes that two broad forms of relief are needed to remedy the City's discrimination:  (1) compensation for the identified victims of the City's discriminatory testing practices, and  (2) compliance measures to ensure that the City implements and administers a fair and job-related test for entry-level firefighters.  These forms of relief are simple in concept, but will be complex in execution.  Achieving these basic aims will require ongoing oversight, attention to myriad details, and resolution of disputes among the parties.

As set forth in more detail below, the court will order the following measures designed to compensate identified victims of discrimination:  (1) there will be a notice-and-claims procedure

---

[1] The Federal Government submitted a Proposed Relief Order ("PRO") on September 10, 2009.  (See Docket Entries ## 315-16.)  The court subsequently received responses from the Intervenors, as well as the City, and reply briefing from the Federal Government.  (See Docket Entries ## 328, 347-49, 353, 358.)  The court also accepted comments on the remedy from the Uniformed Firefighters Association (the "UFA") as amicus curiae.  (See Docket Entry # 346.)

[2] The parties should also be prepared to schedule further briefing on the ramifications of the latest liability ruling for the scope of relief.

by which the approximately 7,400 minority applicants who sat for Written Examinations 7029 and 2043 will have the opportunity to claim entitlement to relief; (2) the City will have the opportunity, and the burden, to show that any of these individual candidates were not victims of discrimination because they were not hired for legitimate reasons; (3) the remaining, identified victims of discrimination will be eligible for monetary relief, apportioned on a pro rata basis among them; (4) 293 victims of discrimination – the shortfall of minority hires resulting from the City's use of Written Examinations 7029 and 2043 – will be eligible for priority hiring relief, provided that they meet the current requirements for appointment as an entry-level firefighter; and (5) retroactive seniority will be available to priority hires, as well as to those whose hiring was delayed by the City's discrimination.  The court provides further detail on these areas below, and raises several issues for the parties to address at the February Conference.

The court will also order the following compliance relief:  (1) the City, in conjunction with the other parties, will develop a new testing procedure for the position of entry-level firefighter; (2) the court will conduct a hearing to consider the validity of the City's current examination, Written Examination 6019, and to decide whether and how the City may use that examination on an interim basis; (3) following the development of a new test, the court will consider whether that new test serves the City's legitimate needs as well as, or better than, Exam 6019, and has less discriminatory impact on minority candidates, and is thus a preferable nondiscriminatory alternative to Exam 6019; and (4) if the new examination is a better alternative to Exam 6019, the court will order steps to implement that examination and consider measures to ensure ongoing compliance with Title VII.  In reaching these conclusions, the court declines at this time to impose interim hiring quotas on the City as part of its remedy.  The court

provides further detail on these areas below, and raises several questions for the parties to address at the February Conference.

In what follows, the court begins by setting out the basic legal framework for the types of relief ordinarily available in Title VII cases.  The court then provides a summary of the preliminary relief order proposed by the Federal Government (the "PRO").  Next, the court addresses the scope of individual and compliance relief.  The court goes on to address some of the proposals made by the Uniformed Firefighter Association ("UFA") and the Intervenors. Finally, the court addresses the issue of remedial-phase class certification.  In the Conclusion Section, the court summarizes its principal conclusions and lists the issues that the parties should be prepared to address at the February Conference.

## I.      BASIC FORMS OF AVAILABLE RELIEF

"The primary purposes of Title VII are to prevent discrimination and achieve equal employment opportunity in the future, and to make whole the victims of past discrimination." Assoc. Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 278 (2d Cir. 1981) (internal citations omitted) ("AADE").  In order to achieve these purposes, a "district court has broad, although not unlimited, power to fashion the relief it believes appropriate." Berkman v. City of New York, 705 F.2d 584, 594 (2d Cir. 1983).   Courts have generally recognized three categories of relief in Title VII cases:  compliance relief, compensatory relief, and affirmative relief.  See id. at 595.

Compliance relief is "designed to erase the discriminatory effect of the challenged practice and to assure compliance with Title VII in the future."  Id.  Among other measures, compliance relief involves "restricting the use of an invalid exam, specifying procedures and

standards for a new valid selection procedure, and authorizing interim hiring that does not have a disparate racial impact." Guardians Assoc. of New York City Police Dept., Inc. v. Civil Service Comm'n,  630 F.2d 79, 108 (2d Cir. 1980) ("Guardians").   It may also involve "restricting appointments from an eligibility list compiled by reference to the results of an invalid test. . . ." Berkman, 705 F.2d at 595.  Compliance relief is "appropriate whenever a Title VII violation has been found, irrespective of any history of prior discriminatory practices or the intent of the defendant."  Id. (citing AADE, 647 F.2d at 278 and Guardians, 630 F.2d at 108 & n.25).

Compensatory relief is "designed to 'make whole' the victims of the defendant's discrimination."  Id.  "The object in making a plaintiff whole is simply to place the injured party, as near as may be, in the situation he would have occupied if the wrong had not been committed."  Sands v. Runyon, 28 F.3d 1323, 1329 (2d Cir. 1994) (internal quotation marks, alteration and emphasis omitted).  Such make-whole relief typically includes "backpay, payment of the value of past fringe benefits, and retroactive seniority."  Berkman, 705 F.2d at 595. "These forms of relief are generally appropriate under the same circumstances as compliance relief."  Id. (citing AADE, 647 F.2d at 278-80).  "To the extent that an order requires the hiring of a . . . victim of the discrimination . . .[,] it constitutes both compliance relief and compensatory relief."  Id. at 595-96.

Finally, affirmative relief is "designed principally to remedy the effects of discrimination that may not be cured by the granting of compliance or compensatory relief."  Id. at 596.  This type of relief may involve "setting of long-term hiring targets or the imposition of a requirement that the defendant actively recruit or train members of the Title VII-protected group," as well as "interim hiring relief that is extended to persons other than members of the plaintiff class and in

proportions exceeding the ratio of plaintiff class members to the total applicant pool." Id. Such relief is only appropriate when a "defendant's discrimination has been intentional, or there has been a long-continued pattern of egregious discrimination." Id.

## II.    THE PROPOSED RELIEF ORDER

The PRO submitted by the Federal Government is the starting point in fashioning the appropriate remedy. It is laid out in eight sections, each addressing a different aspect of the proposed remedial plan.[3] **Section I** provides definitions of terms that are used later in the PRO. (See PRO ¶¶ 1-10.) **Section II**, entitled "General Injunctive Relief," prohibits the City from (1) relying on Written Examinations 7029 or 2043 as part of a firefighter selection process, (2) retaliating against any person who has complained about discrimination, participated in the investigation or litigation of discrimination, or sought or obtained relief in this litigation (3) using any written examination as part of a firefighter selection process in a manner that results in a disparate impact upon black or Hispanic applicants and is not job-related, or in a manner that is otherwise inconsistent with the requirements of Title VII, or (4) using any written examination for the job of entry-level firefighter without prior approval of the court. (See id. ¶¶ 11-13.)

**Section III**, entitled "Interim Hiring Procedure," addresses the City's hiring needs in the period during which a final remedy is imposed. This Section permits the City to continue using its current open-competitive eligible list from its current written examination, Written Examination 6019. Under the PRO, the City may continue using Exam 6019 until the earlier of

---

[3] There are numerous aspects of the proposal that none of the parties address in their briefing. The court does not review every aspect of proposed relief in this Memorandum & Order. This overview is intended to summarize the PRO, not to revise its detailed provisions. To the extent that the PRO is inconsistent with the rulings of the court – set out in a later section of this Memorandum & Order – the court's rulings control. As indicated below, the Federal Government will eventually need to submit a revised PRO to reflect the court's rulings.

January 1, 2011 or the date on which a new eligibility list is created based upon newly established selection procedures (the development of which is provided for later in the PRO). (See id. ¶ 14.)  The City would subsequently have to hire from among the black and Hispanic applicants on the Exam 6019 eligibility list who had not yet been reached for selection until any "shortfall" of such applicants resulting from any disparate impact form the interim use of Examination 6019 had been remedied.  (See id. ¶ 15.)

**Section IV**, entitled "Individual Relief," sets out procedures to determine which individuals have been affected by the City's discrimination and to establish the amount and kind of relief they are entitled to.  This Section requires the City to deposit into an interest-bearing account the total amount of money that will eventually be paid in monetary awards to identified black and Hispanic victims of discrimination.[4]  (See id. ¶¶ 16-17.)  It establishes a notice-and-claims process for black and Hispanic applicants who sat for Written Exams 7029 and 2043, which would notify victims of the availability of relief, and require each to submit a claim form to the Federal Government.  (See id. ¶¶ 18-20.)   Claimants would be required to indicate the form of relief sought.  (See id. ¶ 21.)   Section IV then requires the Federal Government to summarize the claims information and to make an initial relief eligibility and apportionment determination with respect to each claimant.  (See id. ¶¶ 21-24.)  It also provides a process by which the parties would seek to resolve, outside of court, any disagreements with respect to these initial relief determinations.  (See id. ¶¶ 25-27.)

---

[4] The total amount of relief would be determined on a class-wide, pro rata basis, based upon the shortfall of black and Hispanic candidates who were not hired from Written Exams 7029 and 2043, as well as the amount of time that applicants who were hired from Written Exams 7029 and 2043 were delayed based upon the use of those examinations.  (See PRO at 2.)  The total amount of relief would include "lost wages, including overtime pay, plus the value of benefits, less mitigation, plus prejudgment interest."  (See id.)

Following these initial determinations, Section IV requires the Federal Government to submit to the court a "Relief Awards List" containing information about each individual who submitted a claim form, including the type of relief sought and the Federal Government's assessment of eligibility and amount of appropriate relief.  (See id. ¶ 28.)  Section IV provides for a "Fairness Hearing" following the submission of this Relief Awards List, which would allow affected parties to object to these initial remedial determinations.  (See id. ¶ 29.)  The court would resolve any objections and a final remedial list would then be approved.  (See id. ¶¶ 30-33.)

Section IV also sets out the forms of relief that would be distributed.  First, it provides for "monetary relief awards" to be provided to eligible applicants, and sets out a procedure for payment.  (See id. ¶¶ 34-40.)  Second, it provides for "priority hiring" relief, which would permit up to 293 black and Hispanic candidates who failed Written Examination 7029 or 2043 to be hired on a priority basis by the City.[5]  (See id. at ¶¶ 41-53.)  Specifically, following the entry of a final relief order, the City would have to appoint two black priority hires and one Hispanic priority hire out of every five appointments for entry-level firefighter until 293 qualifying minority applicants had been offered a position (or the list of such applicants had been exhausted).  In doing so, the City would not be required to offer a position to any claimant

---

[5] This calculation is based on the assumption that the black and Hispanic candidates who would have passed Written Examinations 7029 and 2043, absent the examinations' discriminatory impact, would have been selected at roughly the same rate as white candidates.  (See Siskin Declaration (Docket Entry # 254), Ex. A ("Siskin Report"), at 14-17.) The calculation assumes that minority test takers would have met the non-written test qualifications at the same rate as white test takers.  (See id.)  Accordingly, of the approximately 519 black and 282 Hispanic applicants who failed on account of Written Examination 7029's discriminatory impact, only 114 black and 62 Hispanic candidates would have been hired.  (See United States v. City of New York, 637 F. Supp. 2d 77, 88-89 (E.D.N.Y. 2009) ("D.I. Op.").) Of the approximately 165 black and 94 Hispanic applicants who failed on account of Written Examination 2043's discriminatory impact, only 30 black and 17 Hispanic candidates would have been hired.  (Id. at 89-90.)  In addition, of the 95 black and 63 Hispanic candidates who passed Exam 2043 – but were never reached on its resulting eligibility list – 42 black and 28 Hispanic candidates would have been hired.  (Id. at 91-92.)  These calculations account for the fact that many individuals who passed the discriminatory examinations never became firefighters.

determined to be currently unqualified based upon the City's objective, nondiscriminatory criteria.  (See id. ¶¶ 49-53.)  A candidate's current qualifications for appointment would not consider whether he or she had met an age requirement.  (See id. ¶ 53.)

Finally, Section IV provides for the awarding of "retroactive seniority" relief to some of the victims of discrimination, including seniority for the purposes of pay, pension and benefits, as well as "competitive" seniority used when incumbent firefighters compete for promotions, transfers or other benefits.  (See id. ¶¶ 54-56, 10.)  Such seniority would be available to those who were hired under the "priority hiring" relief mentioned above, as well as to those victims who were already hired by the City, but whose hiring was delayed because of the discriminatory impact of Written Examinations 7029 and 2043.  (See id.)  The calculation of seniority would extend back until the victim's "presumptive hire date" – i.e.,  a victim would be entitled to seniority as of the median hiring date for the eligibility list created from either Exam 7029 or 2043 (depending upon which the applicant sat for).  (See id. ¶¶ 54-55, 9.)  A victim would be awarded seniority as if they had been hired on February 2, 2003 (the median hire date of the Exam 7029 eligibility list) or June 11, 2006 (the median hire date for the Exam 2043 eligibility list).  (See id. ¶ 9.)

**Section V**, entitled "Development of a New Selection Procedure," requires the City, in consultation with the Federal Government and the Vulcan Society, to "design, develop and validate" a new selection procedure for the job of entry-level firefighter.  (See id. ¶ 57.) Following the development and validation of a new selection procedure, the City would report its results to the Federal Government and the Vulcans, who could either (1) agree to jointly submit the new test for the court's approval, and seek implementation of an eligibility list based upon

the new procedure within six months, or (2) file objections to the new procedure with the court, and seek a hearing to determine the validity of the new test and the availability of alternative procedures for prompt implementation.[6]  (See id. ¶¶ 58-61.)

Section VI, entitled "Compliance Monitoring," requires the City to maintain various records and documents relating to its hiring of entry-level firefighters and its compliance with the court's remedial order.  (See id. ¶¶ 63-67.)  The Section requires the City to make these records available to the Federal Government and to the Vulcans upon request.  (See id. ¶ 64.)  It also requires the City to make available for interview or deposition any individuals with knowledge or information necessary to verify the City's compliance.  (See id. ¶ 65.)  As part of its compliance obligations, the City would also have to provide reports to the Federal Government and to the Vulcans about various aspects of its entry-level firefighter selection process.  (See id. ¶¶ 66-67.)

Section VII of the PRO, entitled "Retention of Jurisdiction," provides for the retention of the court's jurisdiction over the case until certain benchmarks have been reached.  (See id. ¶ 68.) Section VIII, entitled "Costs and Fees," requires the City to pay for certain costs and fees incurred in the course of the litigation.  (See id. ¶¶ 69-71.)

## III.   INDIVIDUAL RELIEF

Following its liability rulings, the court must fashion relief that "makes whole" the victims of the City's discriminatory testing practices.  The PRO sets out a basic framework for awarding that type of relief, and the court will adopt the broad contours of the Federal Government's proposal, including:  a notice-and-claims process designed to identify – and seek

---

[6] The City would bear the costs of developing the new selection procedure, except for the United States' attorneys' and expert fees.  The PRO also provides for the payment of the Vulcans' reasonable attorneys' and expert fees.

information from – black and Hispanic applicants who sat for Written Examinations 7029 and 2043; a process by which the City may attempt to show a nondiscriminatory reason for not hiring those applicants; a pro rata distribution of monetary benefits to the identified victims of discrimination; and a determination of which 293 victims, if any, are currently interested and qualified to be awarded priority hiring as entry-level firefighters with retroactive seniority.

The City objects to several aspects of this relief, and the court has identified several areas in which further information is required.  In this Section, the court addresses:  (A) the burdens of proof applicable to individual relief determinations; (B) the process for making individual relief determinations; (C) the distinction between those victims eligible for monetary relief only and those also eligible for priority hiring; and (D) the availability of retroactive competitive seniority.

As set forth below, the court concludes that (A) the basic, burden-shifting framework set out by the Supreme Court in Franks v. Bowman Transportation Company, 424 U.S. 747 (1976), is applicable to the remedial determinations in this case; (B) further information or clarification from the parties is needed on the process for making individual relief determinations; (C) only applicants who are currently qualified to be firefighters are eligible for priority hiring, but further information or clarification is needed on the nature of those qualifications; and (D) the retroactive seniority set out in the PRO is properly available to priority hires, but further information or clarification is needed concerning retroactive seniority for victims delayed by the City's  discriminatory practices.

The court addresses each of these four areas in turn.  In doing so, the court overrules the City's objections to the basic burden-shifting framework at the relief phase, and to the award of retroactive competitive seniority as an available form of relief.

## A.      Burden to Prove Individual Eligibility

The City argues that the PRO improperly lightens Plaintiffs'[7] burden to show that particular individuals were actual victims of the City's discriminatory hiring practices. According to the City, following the court's liability ruling, Plaintiffs still carry a burden:

> They must prove which of the class members would have actually gone forward with the [hiring] process.  Thereafter, the defendants have the burden of showing which of those, in this reduced pool, would not have been able to enter the academy.  Then, a further examination and determination is still required for the Court to determine which class members were actually victims, i.e., which would have actually advanced beyond simply being on a list and gone to the Fire Academy.

(See Defendants' Opposition (Docket Entry # 347) ("Def. Mem.") 23-24.)  For support, the City relies principally on the Supreme Court's decisions in International Brotherhood of Teamsters v. United States,  431 U.S. 324 (1977) and Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561 (1984).  The City points to language, for example, that a plaintiff "must carry [the] burden of proof, with respect to each specific individual, at the remedial hearing to be conducted by the District Court . . . ."  (Def. Mem. 20 (quoting Teamsters, 431 U.S. at 371); see also id. at 20-21 (quoting Stotts).)  What the City ignores, however, is that the quoted language applies to a type of claim that is not present in this case:  a claim by an individual who did not actually apply for a job, but who claimed to have been deterred by a selection practice.  For the type of claim at issue here, however, the applicable burden-shifting framework was set forth by the Supreme Court in Franks v. Bowman Transportation Company, 424 U.S. 747 (1976).

In Franks, the Supreme Court held that "proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief" for the victims of discrimination.

---

[7] In this Memorandum & Order, the court uses the term "Plaintiff" to refer to Plaintiff and Plaintiffs-Intervenors who are seeking relief for the victims of discrimination.

Teamsters, 431 U.S. at 359 n.45 (describing Franks). Plaintiffs "need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination." See id. at 362. Following this showing, "the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." Id. (citing Franks, 424 U.S. at 773 n.32); see also 42 U.S.C. § 2000e-5(g)(2)(A). By its terms, this burden-shifting framework applies to cases in which actual applicants for employment have been refused a job on account of a discriminatory selection practice.

In Teamsters, the Supreme Court expressly affirmed – and extensively relied upon – its decision in Franks. A new issue presented in Teamsters, however, was how a court should assess the claims of individuals who did not actually apply for the job in question, but who nonetheless claimed to have been deterred by a discriminatory hiring practice. See Teamsters, 31 U.S. at 364-71. The Supreme Court held that seniority relief would be available to such individuals only if they could demonstrate that they were "potential victim[s] of unlawful discrimination." Id. at 367. The Supreme Court held that a nonapplicant claiming to be deterred by an employer's discriminatory practices bears "the not always easy burden of proving that he would have applied for the job had it not been for those practices." Id. at 367-68. "When this burden is met, the nonapplicant is in a position analogous to that of an applicant and is entitled to the presumption" applicable to actual applicants. Id. at 368. In other words, Teamsters held that nonapplicants bear the burden of demonstrating that they would have applied for a job, but it did not disturb the presumption of relief afforded to actual applicants.

Nor did the Supreme Court's holding in Stotts alter this distinction in the burdens of proof between applicants and nonapplicants.  In the Stotts language quoted by the City, the Supreme Court noted that individuals who prove that they were victims of discrimination may be awarded competitive seniority, but those who were nothing more than members of the same minority group as those victims could not necessarily be awarded such relief.  Stotts, 467 U.S. at 578-79.  This language – relying on Franks and Teamsters – does not address the manner by which applicants and nonapplicants may satisfy their burden.  As set forth in Teamsters, actual applicants meet their initial remedial burden by showing that they have unsuccessfully applied for a position, while nonapplicants satisfy their burden only by affirmatively demonstrating that they would have applied.  431 U.S. at 357-71.

Consistent with Teamsters and Stotts, individual relief in this case is available to actual test takers – i.e., those who sat for Written Examinations 2043 and 7029 – unless the City is able to show that those individuals would not have been hired for nondiscriminatory reasons.  As set forth in the PRO, actual test takers would receive notice of the availability of relief, and would be given the opportunity to submit a claim form indicating that they sat for Written Examination 7029 or 2043, and were discriminated against based upon the City's use of one of those examinations.  (See PRO ¶¶ 18-20.)  Once a claimant comes forward with evidence that, for example, he or she failed Written Examination 7029 or 2043, that individual would be entitled to a presumption that he or she was the subject of discrimination and is entitled to compensatory, make-whole relief.[8]  See Teamsters, 431 U.S. at 362; see also Cohen v. West Haven Bd. of Police Com'rs, 638 F.2d 496, 502 (2d Cir. 1980) ("Where there has been an unlawful refusal to

---

[8] The PRO is currently silent on the specifics of these notification and claims procedures, but it is clear that the remedial process will apply solely to actual applicants.  (See PRO ¶¶ 18, 3, 5, 8.)

hire, individual class members establish their prima facie entitlement to backpay simply by showing that they applied for the job and were not hired."); Acha v. Beame, 531 F.2d 648, 656 (2d Cir. 1976) (noting that plaintiff could "satisfy her burden by demonstrating that she actually filed an application for employment").

Following this simple showing, the burden would rest on the City "to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." Teamsters, 431 U.S. at 362 (citing Franks, 424 U.S. at 773 n.32); see also Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 159-60 (2d Cir. 2001). The City could attempt to show that, based upon nondiscriminatory hiring criteria in place at the time, the City would not have hired the individual, or the individual would have voluntarily withdrawn from the process. Doubts as to the existence of such nondiscriminatory reasons would be resolved against the City, which is responsible for the uncertainty. See Cohen, 638 F.2d at 502; AADE, 647 F.2d at 289. Should the City succeed in showing a nondiscriminatory reason, no relief would be awarded. If the City should fail to show a nondiscriminatory reason, the claimant would be entitled to make-whole relief.

To the extent that the City objects to this burden-shifting framework, the City's objection is OVERRULED.

**B.      Process for Determining Individual Eligibility**

In order to provide individual relief to the victims of the City's discrimination, the court must implement a workable process by which the thousands of potential victims can be identified and compensated. The PRO establishes the starting point. It sets out a claims process coupled with pro rata relief that will allow the court to approach the task of remedying widespread

15

discrimination without resorting to thousands of individualized hearings. It also sets out a process in which the Federal Government would make the initial eligibility determination, the City and the Vulcans would object, and the parties would attempt to resolve their differences outside of court. (See PRO ¶¶ 25-27.) Following this process, the Federal Government would provide the court with its initial eligibility determinations, to which any party (including the City, the Vulcans, individual claimants, and others) would have the chance to object at a court-ordered "Fairness Hearing." (See id. ¶¶ 28-30.)[9] This would limit the number of disputes that the court would be required to resolve.

Nonetheless, the court requires further information to determine whether all the particulars of the process set out in the PRO should be ordered as currently drafted. The court identifies three issues with respect to the eligibility determinations. First, the PRO does not explicitly state that its initial, out-of-court eligibility determinations will be made in accordance with the Franks burden-shifting framework. In other words, the PRO does not state that a claimant would have the initial burden of demonstrating that he or she was an actual test taker, followed by an opportunity for the City to satisfy its burden to show a nondiscriminatory reason for its hiring decision.[10] (See PRO ¶ 22.) Instead, it appears that the Federal Government would make an initial, out-of-court eligibility determination, and that each of its determinations would

---

[9] The provisions relating to the Fairness Hearing are not entirely clear to the court. The language of the PRO suggests that the Fairness Hearing would be designed to notify and hear objections from the claimants themselves. (See PRO ¶¶ 29-30.) The provision cited by the Federal Government relating to the Fairness Hearing, however, is designed to provide an opportunity to affected third parties – rather than claimants – to make their views known. See 42 U.S.C. § 2000e-2(n); see also § 2000e-2(n)(2)(C). Presumably, all of these groups of individuals could present their objections at the Fairness Hearing (although multiple hearings might be appropriate). In addition, the PRO indicates that a separate Fairness Hearing would be held prior to the determination of the total amount of money to be distributed. (See PRO ¶¶ 16-18.) **At the February Conference, the parties should be prepared to address the nature and scope of the Fairness Hearing or Hearings proposed by the PRO.**

[10] It appears that the Federal Government would utilize the Franks framework in making its initial determination (see United States' Memorandum (Docket Entry # 316) ("USA Mem.") 18-20)), but such a conclusion does not seem to be compelled by the PRO.

have the presumption of correctness.  Any objecting party – whether it be a claimant, a third party, or the City – would have the burden of overcoming that presumption.  (See PRO ¶¶ 31, 33 (requiring any objector to show that United States' determination was not "reasonable, equitable and consistent with the provisions of this Order"); see also PRO ¶ 32 (requiring any objector to priority hiring determination to show that claimant "would not have been hired from the relevant eligible list, absent the City's use of the practices the Court has found resulted in an unlawful disparate impact in violation of Title VII").)  Providing a presumption in favor of the Federal Government's determinations would help to streamline a process which will involve assessing thousands of potential award recipients.[11]   But, the precise process for making such a determination is not clear to the court from the face of the PRO.  The parties should be prepared to address the details of the eligibility determination process at the February Conference.[12]

Second, the initial eligibility determination should involve a simple determination of whether an individual sat for one of the two discriminatory examinations, followed by a determination of whether the City has shown a nondiscriminatory reason that an individual would not have been hired.  The reasons the City will rely upon will likely fit into a discrete universe of nondiscriminatory qualifications for the job of entry-level firefighter at the time of Written Examination 7029 and 2043.  The City might argue, for example, that a particular claimant was not medically, psychologically or physically fit, or that he or she had a criminal record.  (See Declaration of Richard A. Levy (Docket Entry # 264), Ex. L (Notices of

---

[11] Reliance on an objective court-appointed monitor or special master might achieve the same result. The parties have not addressed the possibility of a court-appointed master or monitor to oversee aspects the implementation of relief. **At the February Conference, the parties should be prepared to address the possibility of designating such an individual.**

[12] **At the February Conference, the parties should be prepared to discuss the eligibility determination process for determining entitlement to individual relief.**

Examinations 7029 and 2043).)  It might, therefore, be efficient for the City to develop early on a list of the nondiscriminatory criteria it will rely upon to challenge individual claimants' eligibility.  The court could then settle any disagreement about these criteria and provide the parties with a framework for the City's objections going forward.  Establishing such criteria would increase efficiency by allowing eligibility determinations to be made with the aid of identified standards, and allowing the court to resolve any disputes about those standards.[13]

Third, although the City bears the burden of proving nondiscriminatory reasons for individual hiring decisions, it might be inefficient for the City to gather all the information relevant to its objections.  For example, information about some of the individual qualifications, such as a criminal record or a high school diploma, could be more easily obtained from the individual claimants themselves.  To increase efficiency, therefore, the individual claim forms might require information about some of the straightforward qualifications, to be supplied under oath, from claimants themselves.  Requiring the claimants to provide this information would likely have little effect on the burden of proof for making the ultimate qualifications determination.  Cf. AADE, 647 F.2d at 289 ("With respect to most of the City's prerequisites . . . we would expect the allocation of the burden of proof to have little impact.").[14]

In sum, the court substantially agrees with the PRO's eligibility framework, but requires the parties' views on several issues relating to the implementation of that process.  At the February Conference, the parties should be prepared to address these issues.

---

[13] **At the February Conference, the parties should be prepared to discuss the possibility of establishing a list of qualifications that the City would rely upon in proving a nondiscriminatory reason for its hiring decisions. The City should be prepared to address the issue of what qualifications it intends to rely upon.**

[14] **At the February Conference, the parties should be prepared to discuss the efficacy of requiring claimants to provide certain information under oath pertinent to their relief eligibility.**

18

C.      **Types of Individual Relief: Monetary or Hiring**

For victims who failed the written examinations, two basic categories of make-whole relief are available:  monetary relief and hiring relief.  Yet, not all victims will necessarily be entitled to both forms of relief.  (See PRO ¶ 23.)  This is sensible because, as set forth below, entitlement to priority hiring requires a victim to be currently qualified to be an entry-level firefighter, but entitlement to monetary relief does not.

Eligibility for compensatory relief, as a general matter, turns on a candidates' qualifications at the time of Written Examination 7029 and 2043.  See, e.g., AADE, 647 F.2d at 289.  The hiring of a victim as a remedial measure, however, depends on the victim being currently in compliance with the City's nondiscriminatory qualifications for entry-level firefighter.  See Franks, 424 U.S. at 772-73 n.31 (noting that applicants must be "presently qualified" to be eligible for priority hiring).  Such qualifications appear to include physical, medical, and psychological fitness tests, as well as background checks and basic language proficiency.[15]  (See Declaration of Sharon Seeley (Docket Entry # 316) ("Seeley Decl."), Ex. E (setting forth qualifications from Notice of Examination 6019); see also PRO ¶¶ 45-53 (setting forth procedures for determining current qualifications for priority hiring).)  Moreover, to ultimately work as a firefighter, a victim would have to successfully complete training at the Fire Academy.[16]  Should a claimant be unable to meet these qualifications, he or she would be limited to monetary relief.

---

[15] The court does not pass on the nondiscriminatory requirements at this time, but only notes the existence of requirements that, it appears, the City will rely on.  The City will be given the opportunity to present a list of nondiscriminatory criteria to the court.

[16] Retroactive seniority would be awarded following completion of a probationary period.  (See PRO ¶ 55.)

The distinction between eligibility for monetary relief and hiring relief balances the need to make whole the victims of past discrimination with the concern for public safety that is inherent in any decision to hire a firefighter.[17]   The need to ensure that firefighters possess relevant qualifications can outweigh the preference for hiring as an available form of make-whole relief.  See AADE, 647 F.2d at 281-82 n.24 (rejecting argument that relief order would "require the City to hire persons who are not qualified to be firefighters," because, in part, "[a]ll will be required to pass physical fitness tests, and meet the City's other requirements, other than the written test").   In order to balance these considerations, the City must be given the opportunity to challenge a victim's current qualifications for the job of entry-level firefighter.

The PRO sets out a procedure that allows the City to do so.  (See PRO ¶¶ 45-53.)  Among those eligible for priority hiring, the City would have to make an "offer of priority hire" to up to 293 victims.[18]  (See PRO ¶¶ 41-46.)  The City would have no obligation to hire any individual who, for example, refused hiring, failed a post-offer medical or psychological evaluation, or failed to appear without good cause on his or her first day at the Fire Academy.   (See id. ¶ 47.)  The PRO also permits the City to contend that a claimant is "not currently qualified for the entry-level firefighter position using the lawful, objective hiring criteria in use by the City at that time . . . ."   (See id. ¶ 49.)   The parties would attempt to resolve any dispute over current

---

[17] In practice, this distinction may mean, for example, that a minority test taker would be entitled to monetary relief because the City has been unable to show a nondiscriminatory reason for not hiring the individual at the time of the City's discrimination, but the victim would be ineligible for hiring relief because he or she has become currently unqualified for the position based upon nondiscriminatory criteria.

[18] The PRO does not appear to address a situation in which more than 293 victims who failed or effectively failed Examination 7029 or 2043 are found to be currently qualified and interested in being firefighters.  Because the PRO would offer no more than 293 positions, the actual hiring of such candidates could probably be performed on a random basis from the overall list of those qualified.  **At the February Conference, the parties should be prepared to address the possibility that more than 293 individuals will be found to be interested in and currently qualified to be entry-level firefighters.**

qualifications outside of court, and the court would resolve any disputes the parties could not. (See id. ¶¶ 51-52.)   The court agrees that this basic framework is a sensible approach to determining which individuals are currently qualified.

Nevertheless, the PRO does not make precisely clear what sorts of qualifications will be considered at this stage.[19]   For example, the PRO suggests that an individual victim would have to sit for Written Examination 6019, and score at least a 60 to be considered currently qualified. (See PRO ¶ 48 (in section relating to current qualifications, requiring City to notify Plaintiffs if claimant failed to sit for Written Examination 6019 or failed to score a 60); ¶ 47 (noting that a claimant could not be considered currently unqualified if he or she scored at least a 60 on Written Examination 6019).)   But it is not clear why eligibility for priority hiring for victims of discrimination should depend on a grade of 60 on Exam 6019.[20]   In any event, at the February

---

[19] There is one "qualification" that plainly may not be considered:  a victim's failure to score a passing grade of 84.705 on Written Examination 7029 or a passing grade of 70 on Written Examination 2043 does not necessarily mean that he or she is currently unqualified for hiring relief.  The court has already ruled that those examinations – and the pass/fail cut-off scores they utilized – are not related to the job of entry-level firefighter.  Failing those examinations, therefore, does not mean that a candidate must be unqualified to be a firefighter.  As the Second Circuit stated, in a similar context:

> We find no merit in defendants' contention that the order will require the City to hire persons who are not qualified to be firefighters.  All will be required to pass physical fitness tests, and meet the City's other requirements, other than the written test.  As to the written test, its omission cannot be detrimental to the City.  The district court found and defendants do not here dispute that these exams were not job related.  Indeed, the Bridgeport Fire Chief testified that the 1975 exam might well rank lowest those candidates who would be the best firefighters.  On the record in this case, therefore, it cannot be said that the minority applicants who failed the firefighters exams are any less qualified than the nonminority individuals who passed.

AADE, 647 F.2d at 282 n.24.  Likewise here, an applicant's having failed Written Examination 7029 or 2043 does not necessarily mean he or she is less qualified than passing candidates, especially because such a candidate will be required to meet the job's current nondiscriminatory qualifications.  Of course, the City might still present evidence that a particular individual's score was so severely low on one of the discriminatory written examinations that he or she would be ineligible.  The City would carry the burden of making such a showing.

[20] Because Written Examination 6019 has not been shown to be validated, it is premature to decide whether the court should require a victim of discrimination to pass that examination in order to prove his or her current qualifications to be hired.  Following a hearing on Exam 6019's validity, the court will consider whether and/or how to use Examination 6019 as a measure of a victim's current qualifications.  The validity of Exam 6019 is discussed in further detail below.

Conference, the parties should be prepared to address the issue of the current qualifications of victims.[21]

### D.   Awarding Retroactive Seniority

"A court that finds unlawful discrimination is not required to grant retroactive relief." Ingram v. Madison Square Garden Center, Inc., 709 F.2d 807, 811-12 (2d Cir. 1983). Retroactive seniority is a matter to be determined based upon the circumstances of an individual case and is a matter within the "sound equitable discretion of the district courts." Franks, 424 U.S. at 770.   Nonetheless, "retroactive seniority is ordinarily considered to be a relatively fundamental form of relief where a plaintiff was subject to unlawful discrimination in the hiring process." Sands, 28 F.3d at 1329.  In fashioning an award of retroactive seniority, the Supreme Court has cautioned district courts to consider the degree of impact such an award would have on non-victim employees of a defendant.  In Teamsters, the Supreme Court wrote:

> [A]fter the victims have been identified and their rightful place determined, the District Court will again be faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrongdoing.

431 U.S. at 372.   In deciding whether to award retroactive seniority to identified victims of discrimination, the court must carefully consider the legitimate expectations of "other employees innocent of any wrongdoing." Id.

The PRO provides for retroactive seniority to be awarded to those victims who were never hired by the City, as well as to those victims whose hiring was delayed.  In either case, the awarded seniority would extend back until the victim's "presumptive hire date" – i.e.,  a victim

---

[21] **At the February Conference, the parties should be prepared to address which current qualifications will be required of identified victims of discrimination to show that they are currently eligible for priority hiring relief.**

would be entitled to seniority as of the median hiring date for the eligibility list created from either Exam 7029 or 2043 (depending upon which the applicant sat for).  (See id. ¶¶ 5, 8, 9, 54-55.)  The court addresses each of these categories in turn.

1.    Non-Hire Victims

The PRO allows the court to appropriately balance the considerations set forth by the Supreme Court in Teamsters in awarding seniority relief to victims who were not hired.  Based on the calculations at the liability phase, the PRO begins from the premise that 186 black and 107 Hispanic applicants (293 total victims) would have been hired if not for the City's discriminatory hiring practices.  (See supra, note 5.)  Because it is impossible to determine exactly when these individual black and Hispanic applicants would have been hired, the PRO proposes to assume that each of them would have been appointed as of the median hiring date of each examination.  (See PRO ¶¶ 9, 55.)  Although this assumption will not precisely reflect the circumstances of each individual in the absence of discrimination, relying upon the median of all hiring dates is reasonable under the circumstances.

The City objects to this proposal, arguing that the PRO "improperly seeks to award competitive seniority without making the individualized findings and assessments, which are required for such relief."  (Def. Mem. 8.)  The City contends that monetary awards "can be applied to the entire class on a pro rata basis as any imprecision only has a negative effect on the wrongdoer."  (Id.)  By contrast, the City argues that awards of retroactive seniority require "individualized showings" to determine "the actual victims of discrimination and to cause the least impact on the rights of the innocent non-victim employees."  (Id.)  That is, the City opposes the awarding of retroactive competitive seniority, asserting that the PRO does not identify actual

23

victims of discrimination and does not adequately consider the rights of incumbent firefighters. (Def. Mem. 8-19.)

A fundamental misconception runs through the City's arguments.  The City fails to appreciate that the actual applicants who sat for Written Examinations 7029 and 2043 are presumed to be victims of discrimination based solely upon their having sat for those exams and having failed or effectively failed.  See Teamsters, 431 U.S. at 359 n.45, 362.  Every one of these applicants will be an identified victim of discrimination should the City fail to demonstrate a nondiscriminatory reason that the person was not hired.  The PRO, therefore, does not take a "classwide" approach to identifying the victims of discrimination.  Instead, it requires an individual determination of whether each test taker was discriminated against based upon use of the written examinations or whether he or she was not hired for a legitimate nondiscriminatory reason.

The issue on which the PRO does take a classwide approach is the determination of what form and how much relief will be afforded to these individually identified victims of discrimination.  The PRO bases this calculation for non-hires on a determination of the number of positions and amount of seniority that would have been awarded to black and Hispanic applicants absent the discrimination.  This classwide approach does not fail to identify individual victims – instead, it accounts for the fact that it is impossible to determine which particular identified victims would have been hired for the available positions.  Limiting the number of positions to 293 – and setting the seniority date to the median date of hiring – allows the court to balance the need to compensate victims against the uncertainty created by the City's discriminatory practices.  Rather than being overbroad, the approach is tailored to distribute the

positions and seniority resulting from the minority shortfall to a subset of the victims of discrimination.  This approach is consistent with the case law cited in the parties' briefing.[22] See, e.g., Ingram, 709 F.2d at 812-14; United States v. City of Miami, 195 F.3d 1292, 1300 (11th Cir. 1999); see also Robinson, 267 F.3d at 162 n.6 (noting availability of classwide relief, but indicating preference for individual determinations).

The approach awards seniority in an amount that is coextensive with the shortfall that resulted from the City's discriminatory hiring practices.  Because the court determined that 186 black and 107 Hispanic applicants would have been hired absent the discrimination, the PRO properly fixes the number of available positions at 293.  Assuming that these hires would have been spread out proportionately among all hiring from each respective list, it is reasonable to set the seniority date for each of these hired victims as of the median date.  This approach is designed to re-create the conditions that would have existed absent discrimination, and would do no more than make whole the victims who were, and are, currently qualified to be entry-level firefighters.  Such make-whole relief properly includes competitive seniority.  See Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995) ("Seniority rights – both 'competitive status' seniority and 'benefit' seniority – are important components of 'make whole' relief under Title VII.").

The City contends, however, that the rates of appointment for those who passed Written Examinations 7029 and 2043 demonstrate that many candidates who would have passed one of the written examinations would not have been hired.  (Def. Mem. 22-23.)  As previously noted, however, the shortfall calculation already takes into consideration the hiring rates of candidates

---

[22] Regarding monetary relief, the PRO also takes a pro rata approach.  Because there will likely be many more victims of discrimination than positions that the City would have filled with minority candidates, the PRO provides each victim with a pro rata share of the monetary value of those positions.  By dividing the value of the total number of positions by the total number of eligible victims, the PRO provides each victim the value of the position he or she was denied discounted by the probability that the individual might not have been the one to receive the job.

who passed the written examinations.  (See supra, note 5.)  To the extent that there is uncertainty about whether any particular individual would have carried forward with the process, or would have been disqualified for a nondiscriminatory reason, that uncertainty will be resolved against the wrongdoer.  Moreover, because the PRO would grant seniority to no more than 293 victims, even if the City fails to show a nondiscriminatory basis for its decisions not to hire hundreds of victims, no more than 293 individuals would be granted retroactive seniority.  Therefore, the amount of seniority relief awarded would not exceed the amount of the injury.

Finally, the proposed seniority relief does not unduly burden incumbent firefighters.  First of all, the fact that incumbents are affected is not, on its own, sufficient to defeat an award of retroactive seniority.  As the Supreme Court stated in Franks, more is required:

> [D]enial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central "make whole" objective of Title VII.  These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. . . .  [W]e find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected.  "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed."

424 U.S. at 774-75 (quoting United States v. Bethlehem Steel Corp., 446 F.2d 652, 663 (2d Cir. 1971)).  While the court must carefully consider the interests of incumbent firefighters, the mere fact that these interests will be affected is insufficient to preclude retroactive competitive seniority.

The approach proposed by the PRO properly balances the competing interests.  The PRO proposes that retroactive competitive seniority should be awarded only to identified victims of

discrimination.  This number would be limited to the 293 places that the court determined would have been offered to black or Hispanic candidates absent the discriminatory impact of Written Examinations 7029 and 2043.  Moreover, the effective hiring dates of those candidates – set to the median hiring dates from the respective examinations – does not place the victims in front of every other person hired from those examinations.  Instead, it takes the more modest approach of assuming that minority candidates would have been hired approximately in the middle of each list.  This effectively cuts in half the number of incumbents who would be affected by the grant of seniority.

Accordingly, the negative effects of granting retroactive seniority to 293 individuals will be felt by approximately half of the 5,300 incumbents who were selected based upon the results of Written Examinations 7029 and 2043.  (See D.I. Op., 637 F. Supp. 2d at 80, 85-86, 94.)  The Federal Government points out that 293 is about the size of one academy class so the displacement impact of the seniority awards will amount to, at most, approximately one class year of delayed seniority for those affected.  (USA Reply 18.)  The court also notes that these latter firefighters were themselves the beneficiaries of hiring from the discriminatory examinations.  Although the incumbents bear no responsibility for this discrimination, it is reasonable to require them to carry a small measure of the burden of compensating the examinations' victims.  See Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 281 (1986) ("When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a sharing of the burden by innocent parties is not impermissible.") (internal quotation marks omitted).

27

In reaching this conclusion, the court rejects the City's argument that an award of retroactive competitive seniority would violate the Equal Protection rights of incumbent firefighters.  As set forth in the PRO, these awards would be allotted only to identified victims of discrimination.  Singling out this group for remedial relief is not a classification based upon race or ethnicity, but is instead a classification based upon that individual's status as a victim of prior discrimination.  See Acha, 531 F.2d at 656 ("Award of seniority to those who had actually been discriminated against by these defendants is not a 'preference' because of sex.  It is rather a remedial device well within the broad power conferred on the district court by [42 U.S.C. § 2000e-5(g)].").  And, to the extent that such relief might be unduly burdensome to any particular individual, the PRO provides for a Fairness Hearing to allow individuals to present their circumstances to the court.  See 42 U.S.C. § 2000e-2(n).

For the foregoing reasons, the City's objection with respect to seniority for identified victims of discrimination is OVERRULED.

### 2. Delay Victims

The PRO would also grant retroactive seniority to individuals who were delayed in hiring based on the City's use of Written Examinations 7029 and 2043.  (See PRO ¶¶ 5, 54; see also USA Mem. 20 n.18.)  The Federal Government explains that this provision provides seniority relief to those delayed in hiring "if they were hired after the median hiring date for the relevant eligible list."  (Id.)  In other words, those minority candidates who were hired before the median hiring date on each examination would not be eligible for relief, but those who were hired after the median hiring date would be eligible for retroactive seniority up to that presumptive hiring

date.  Although the parties do not address this aspect of the proposed relief in their briefing, as set forth herein, they should be prepared to do so at the February Conference.[23]

According to the calculations cited in the court's liability ruling, the delay in hiring was computed by comparing the actual distribution of black and Hispanic hires to the distribution of those hires absent discrimination.  (See Siskin Report 19-21.)  The difference between the minority applicants' actual and expected hiring dates was then aggregated to reach the total amount of delayed wages and seniority for those minority appointments.  (See id.)  According to those calculations:  approximately 68 black appointments from Written Examination 7029 were delayed for a total of approximately 20 years of lost seniority; approximately 86 Hispanic appointments from Written Examination 7029 were delayed for a total of approximately 23 years of lost seniority; approximately 44 black appointments from Written Examination 2043 were delayed for a total of approximately 14 years of lost seniority; approximately 51 Hispanic appointments from Written Examination 2043 were delayed for a total of approximately 12 years of lost seniority.  (See D.I. Op., 637 F. Supp. 2d. at 90-92; Siskin Report, tbls. 3b, 4b, 12b, 14b.)

With regard to apportioning the value of this delayed seniority, it is not clear to the court why reliance on the median hiring date would best approximate the amount of seniority each delayed claimant lost on account of the discrimination.  It appears from the expert analysis relating to this delay that the impact of the delay was felt by minority candidates from the very beginning of the City's appointments from Written Examinations 7029 and 2043.  (See Siskin Report, tbls 3a, 4a, 12a, 14a.)  The delay, therefore, affected candidates who were hired before the median cutoff date, yet the PRO does not propose to award them retroactive seniority.

_____

[23] At the February Conference, the parties should be prepared to address the method of calculating seniority awards for victims whose hiring for the job of entry-level firefighter was delayed by the City's use of Written Examinations 7029 and 2043.

29

Unlike for non-hires, the dates on which the delay claimants were hired can be determined, and those candidates who were hired before the median dates would be denied relief if seniority were to be based solely on the median hire date.  Rather than exclude this group of individuals, the court would prefer to devise a method of apportioning relief that could be distributed among all victims.

At the same time, the expert analysis shows that the delay in hiring did not affect every appointment made.  (See D.I. Op., 637 F. Supp. 2d. at 90-92.)   Accordingly, the analysis supposes that some of the hires made both before and after the median hire date were not affected by the discriminatory examinations.  It may therefore be sensible to divide the total amount of delayed seniority pro rata across the total number of hires.  Although not everyone hired was affected, dividing the total amount of seniority would apportion the total value of the loss among the individuals most likely to have been affected, rather than providing a windfall to certain victims at the expense of others.[24]  It would also limit the amount of recovery to the total value of the delayed seniority.[25]

In any event, the parties should be prepared to address methods of apportioning relief among those who were delayed by Written Examinations 7029 and 2043.  Although the current method proposed by the PRO would provide relief to some of those delayed, it does not appear to fully reflect the calculations describing the disparate impact of the ranking.  To the extent a

_____

[24] For example, the court might:  (1) divide the 20 years of lost seniority of black hires from Exam 7029 among all 104 black hires from that examination (amounting to approximately 2.3 months of seniority each); (2) divide the 23 years of lost seniority of Hispanic hires from Exam 7029 among all 274 Hispanic hires from that examination (amounting to approximately 1 month of seniority each); (3) divide the 14 years of lost seniority of black hires from Exam 2043 among all 80 black hires from that examination (amounting to approximately 2.1 months of seniority each); and (4) divide the 12 years of lost seniority of Hispanic hires from Exam 2043 among all 187 Hispanic hires from that examination (amounting to 0.8 months of seniority each).

[25] Alternatively, it may be sensible to rely upon the actual hiring approximations calculated by the Federal Government's expert in ascertaining the amount of delay.  (See Sikin Report, tbls. 3, 4, 12, 14.)

30

closer approximation might be available, it would be preferable to apportion the amount of delay among all victims.

## IV.    COMPLIANCE AND INTERIM RELIEF

In addition to compensating the victims of past discrimination, the court must also impose measures that will ensure the City's future compliance with Title VII.  In light of the history and nature of the discrimination in this case, the court views compliance as a long-term issue.  The development of a new, job-related examination is critical.  Only then can the court be sure that the City's testing practices meet the test-validation requirements of Title VII.  Although the City has developed a new examination that has not been at issue in this litigation – Written Examination 6019 – that examination must be validated before it is utilized, and Plaintiff must have the opportunity to show that a newly developed examination is a better alternative.

As set forth below, the court considers: (A) whether the City should be permitted to use the results of Written Examination 6019 before a new test is created and considered; and (B) what form of interim hiring is appropriate before a new test is developed.  In considering the latter issue, the court first rejects the Intervenors' proposal that the court impose a 60% minority hiring quota as an interim measure.  The court then considers alternative interim measures.  The court concludes that an immediate hearing on the validity of Examination 6019 is appropriate, and directs the parties to address other aspects of interim compliance and interim relief at the February Conference.[26]

---

[26] **At the February Conference, the parties should be prepared to address interim hiring from Written Examination 6019.**

### A.       Authority Over Written Examination 6019

The court must first consider whether its remedial power extends to Examination 6019, which was not at issue in the liability phase.  Several of the City's arguments bring this issue before the court.  First, the City argues that the PRO "improperly presumes that Exam 6019 is invalid, and thus seeks to disregard the results of that exam without permitting the defendant any opportunity to present evidence to establish that the exam is job-related and consistent with business necessity."  (Def. Mem. 2.)   The City also contends that discarding the results of Written Examination 6019 would violate Title VII and the constitutional rights of innocent non-victim candidates, in light of Ricci v. DeStefano, 129 S. Ct. 2658 (2009).  Citing Ricci, the City further contends that the court may not set aside the results of Written Examination 6019 until the City has been given the opportunity to show that the examination is valid, and that its use of the examination is job-related.  (Def. Mem. 6-8.)

Although the validity of the City's use of Exam 6019 was not presented at the liability phase, the liability rulings have brought that examination into play.  At this point in the litigation, the court has an obligation to ensure that the City does not utilize discriminatory testing practices to hire entry-level firefighters.  See Guardians, 630 F.2d at 109 ("Once an exam has been adjudicated to be in violation of Title VII, it is a reasonable remedy to require that any subsequent exam or other selection device receive court approval prior to use."); Teamsters, 431 U.S. at 361 & n.47 (noting broad equitable discretion to issue orders "necessary to ensure the full enjoyment of the rights protected by Title VII") (internal quotation marks omitted).  Although there may have been improvements in its job analysis and test construction, the court still must

be satisfied that Exam 6019 – the City's current testing procedure – is compliant with Title VII's demands.

Several reasons support consideration of Exam 6019 during the remedial phase.  First, the court is extremely reluctant to permit hiring from an examination that has not yet been properly validated.  Although the City highlights the merits of Written Examination 6019, the City's proven history of improper test construction calls its current examination into question.  Second, according to the evidence presented by the Federal Government – which is not disputed by the City[27] – Written Examination 6019 continues the pattern of disparate impact upon black and Hispanic applicants.  (See Declaration of Bernard R. Siskin, PH.D. (Docket Entry # 316) ("Siskin Decl.") ¶ 7-16 (describing statistically significant disparate impact resulting from pass/fail and rank-order use of Exam 6019); see also USA Mem. 8-10 & n.11.)  Third, the current eligibility list does not rank candidates based on any measure of physical abilities, which are skills plainly important to the job of entry-level firefighter.  (See Seeley Decl. Ex. D, at 200.)

Finally, based on the court's initial review of the eligibility list data from Written Examination 6019, the same ranking problems that plagued Examinations 7029 and 2043 are present on the Exam 6019 list.  (See Docket Entry # 299 (Exam 6019 testing data) (sealed).) According to that data, nearly 9,000 test takers scored between 90 and 100 on the examination. (See id., att. 3.)  Over 19,000 test takers scored above an 80 on the examination.  (Id.)  In other words, the vast majority of the 22,000 test takers are bunched within 20 points of one another, raising the issue of whether the examination is able to make fine distinctions between candidates' qualifications.  As the Federal Government's expert puts it:

---

[27] As the Federal Government points out, the City implicitly concedes the disparate impact of Written Examination 6019 on black and Hispanic applicants.  (See USA Reply 2 n.2.)

Six hundred eighty (680) applicants scored above 96 (96.005 to 100), 4,589 applicants scored between 92 and 96 (92 to 95.995), and 6,507 applicants scored between 88 and 91.99 (88.004 to 91.99).  The standard error of measurement of Written Exam 6019 is 2.10.  Therefore a four-point difference in scores on Written Examination 6019, is within the range of normal variation in scores due purely to chance (and thus does not indicate a true difference in scores between individuals).  <u>Given the manner in which Written Exam 6019 was used to rank candidates, non-meaningful differences in score can move an applicant thousands of ranks on the eligible list.</u>

(Siskin Decl. ¶ 16 (emphasis added).)

To make matters worse, it appears that a given candidate's ranking can be significantly influenced by the "bonus" points awarded for "Veteran's," "Legacy," and "Residency" status.[28] Because thousands of applicants scored between 90 and 100, the highest ranked candidates on the eligibility list are those applicants who have been awarded multiple bonus points.  (<u>See</u> Docket Entry # 299, atts. 2, 3.)  For example, the top fifty individuals listed on the eligibility list scored between 105 and 128 points, based on the combination of a testing score between 88 and 100, combined with the addition of between ten and thirty-five bonus points.  (<u>Id.</u>)  Indeed, it appears that, <u>without the addition of bonus points</u>, a candidate would stand virtually <u>no chance</u> of being appointed from the top of the list.  The highest ranked candidate with no bonus points – who scored a 99 on the written examination – has list number 1,838.  (<u>Id.</u>, att. 2, at 34; <u>see also</u> <u>id.</u>, att. 3.)  The second highest candidate with no bonus points – who scored a 98.7 on the written examination – has list number 2,088.  (<u>Id.</u> att. 2, at 39; <u>see also</u> <u>id.</u>, att. 3.)  In a system

---

[28] As set forth in Written Examination 6019's Notice of Examination, "Five Points will be added to the final exam score of those candidates who qualify for the New York City Residency Credit.  To be eligible for the residency credit, a candidate must achieve a passing score on the examination, and must maintain a continuous period of residency in New York City from March 1, 2007 through March 1, 2008."  (Seeley Decl., Ex. E.)  A Veteran's credit can be awarded to a candidate "who is, or by the date of appointment expects to be, an honorably discharged veteran or disabled veteran of the Armed Forces of the United States who has served during a time of war. . . ."  (<u>Id.</u>)  A "Legacy" credit may be awarded to a candidate "whose parent has died while engaged in the discharge of her or her duties as a Police Office or Firefighter, or a candidate who is a sibling of a Police Office or Firefighter who was killed in the service of New York City as a result of the World Trade Center attack on September 11, 2001."  (<u>Id.</u>)

where bonus points are doing so much work, the court questions whether Written Examination 6019 actually ranks candidates according to their proficiencies. To the extent that the use of Exam 6019 in this process has a disparate impact based upon race and ethnicity, but does not really distinguish between candidates' skills and abilities, hiring from the eligibility list is cause for concern.

One aspect of this scoring system anomaly stands out. Out of approximately 22,000 candidates who took Written Examination 6019, nearly 14,000 claimed the five-point Residency Credit. (See id., att. 3 (totaling 13,948 in Column G for "Residency Credit").) In percentage terms, approximately 63% of Exam 6019 applicants claimed residency. This rate is roughly consistent with the 62% of applicants on Written Examinations 7029 and 2043 that claimed residency. (See Declaration of Sharon Seeley (Docket Entry # 381) ("Seeley II Decl."), Ex. B ¶ 6.) A cursory look at the first fifty pages of the eligibility list shows that almost every candidate occupying the top 2,600 places claimed residency. (See Docket Entry # 299, att. 2, at 1-50.) A cursory look at the next fifty pages of the eligibility list shows that, with a few large gaps, nearly all candidates occupying the top 5,100 places claimed residency. (See id. at 51-100.)

The court questions what function this requirement is serving. With two-thirds of test takers receiving the bonus, it appears to be a de facto prerequisite to hiring. And because the brief, one-year residency requirement is easy to satisfy, it is unlikely to distinguish between long-term residents and relative newcomers to the City. In light of the City's sizable minority population, the court is concerned that the current implementation of the residency requirement does not actually provide a preference to those individuals. The parties should be prepared to

address the significance of the residency requirement in the City's scoring systems for the job of entry-level firefighter.[29]

Based on the foregoing, the court concludes that consideration of Written Examination 6019 is required at the remedial phase of the litigation. Therefore, the court proceeds to consider what measures should be taken with respect to the possible interim use of Examination 6019.

### B.       Interim Use of Examination 6019 and Proposal to Impose a Hiring Quota

The court must consider how and whether to make use of Written Examination 6019 while a new testing procedure is developed. The court first considers and rejects the Intervenors' proposal that the court order a 60% minority hiring requirement from the results of that examination. The court then addresses alternative interim measures.

### 1.       Affirmative Relief: 60% Hiring Quota

According to the Intervenors' proposal, the City should be forced to hire from Written Examination 6019 at a rate of three black and three Hispanic applicants out of every ten selections from that examination.[30]  (Intervenors' Reply (Docket Entry # 368) ("Int. Reply") 3.) These hiring percentages "roughly mirror[] the percentage of these minority citizens in the age group in New York City most likely to apply for firefighter jobs.  (Id. at 4; see also Affidavit of Jennifer B. Cahn (Docket Entry # 370) ¶¶ 6-7 (showing population of 18-to-24 year-olds in New York City as 29.28% black and 31.94% Hispanic).)  The Intervenors contend that this approach will "begin to meaningfully remedy the forty or more years of racial exclusion in the FDNY and bring long-overdue racial justice to the citizens of New York."  (Int. Reply 4.)

---

[29] **At the February Conference, the parties should be prepared to address the effect and significance of residency and other bonus points in the ranking of candidates for the job of entry-level firefighter.**

[30] The Intervenors also propose hiring three black candidates and three Hispanic candidates out of every ten hires for the first two administrations of any new selection procedure.  (Int. Reply 3.)

The Federal Government and the City both oppose this form of affirmative, interim relief. (See United States' Response to Plaintiffs-Intervenors' Reply (Docket Entry # 381) ("USA Resp."); Defendant's Response to Plaintiffs-Intervenors' Reply (Docket Entry # 382) ("Def. Resp.").)   The Federal Government argues that the measure is unnecessary to address the findings of discrimination reached by the court.   (USA Resp. 4-7.)   It also argues that the Intervenors have failed to show a compelling justification for race-based affirmative relief, and that the 30%-30% hiring quota is not supported by the evidence.[31]   (USA Resp. 7-16.)   The City argues that Written Examination 6019 has never been the subject of this litigation, that it was based upon entirely different validation procedures, and that the court should not disturb the results of that examination without a strong basis in evidence for doing so.   (See Def. Resp. 1-10.)

Affirmative relief, such as the hiring quotas proposed by the Intervenors, is appropriate only in response to discrimination that is intentional or has been long, continuous and egregious. Berkman, 705 F.2d at 596.   The "form of such affirmative relief, especially the use of quotas, requires a most sensitive approach."   Guardians, 630 F.2d at 108.   In ordering such relief, "a court should consider whether affirmative action is necessary to remedy past discrimination in a particular case before imposing such measures, and . . . the court should also take care to tailor its orders to fit the nature of the violation it seeks to correct."   Local 28 of Sheet Metal Workers' Int'l Assoc. v. E.E.O.C., 478 U.S. 421, 476 (1986) (emphasis added).   The court must weigh the "necessity for the relief and the efficacy of alternative remedies," the "flexibility and duration of the relief," the "relationship of the numerical goals to the relevant labor market," and the "impact

---

[31] These arguments predate the court's liability ruling on the Intervenors' pattern-or-practice claims.   The Intervenors cited evidence from their motion papers on intentional discrimination, however (see, e.g., Docket Entry # 384), and the court has considered the issue of quotas in light of that ruling.

of the relief on the rights of third parties." United States v. Paradise, 480 U.S. 149, 171 (1987); see also United States v. Sec'y of Housing and Urban Develop., 239 F.3d 211, 219 (2d Cir. 2001) ("HUD").  Having weighed these considerations, the court declines to impose the interim affirmative relief proposed by the Intervenors.

        The court recognizes that the City's deliberate and persistent failure to address the historically low numbers of minorities in the FDNY supports broader, rather than narrower, relief.  As the court has found, the City has engaged in a pattern of discrimination in the hiring of entry-level firefighters, bookended by the ruling of Judge Weinfeld in 1973 and this court's ruling in 2009.  (See Docket Entry # 385.)  The need for a remedy is clear, and the court is cognizant of its obligation to redress the City's discriminatory practices in light of Title VII's remedial purposes.  Nevertheless, the violations in this case relate specifically to the City's pass/fail and rank-ordering uses of Written Examinations 7029 and 2043.  The issues and evidence that have been presented relate to the test takers who sat for those examinations, rather than the community of black and Hispanic applicants at large.  In this situation, the court's remedy should be tailored to the testing methods and scoring systems that the City uses to screen firefighter applicants, as well as to the individuals who actually apply to be firefighters.  The court must be careful not to sweep too broadly beyond these parameters in remedying the violation that has been found.

        The proposed hiring quota sweeps too broadly.  First, considering the "necessity for the relief and the efficacy of alternative remedies," as well as the "the flexibility and duration of the relief," Paradise, 480 U.S. at 171, the imposition of quotas is inappropriate.  The City's use of two written examinations has been found to constitute de facto discrimination against black and

38

Hispanic applicants, and intentional discrimination against black applicants.  The PRO proposed by the Federal Government requires the City to take extensive compensatory and compliance measures to address the City's discriminatory testing practices.  The Intervenors' intentional discrimination showing with respect to black applicants will likely require supplemental forms of relief, which they should be prepared to brief to the court.  But the proposed addition of interim quotas would not greatly increase the efficacy of the PRO's relief.

Quotas would provide only a short-term increase in the numbers of black and Hispanic applicants.  Whatever the appeal of such a quick fix, the court views the City's history with testing procedures as evidence of a long-term problem.[32]  The efficacy of a short term quota is extremely limited when considered in the context of the overall problem:  that the City has persisted in the use of testing procedures that have a discriminatory impact upon minorities but no demonstrable relationship to the job of entry-level firefighter.  Following from these liability findings, the central features of relief must be compensating the identified victims of discrimination and ensuring that the City is using fair testing procedures on a long-term basis that properly identify the best firefighters.  See AADE, 647 F.2d at 278. ("The primary purposes of Title VII are to prevent discrimination and achieve equal employment opportunity in the future, and to make whole the victims of past discrimination.") (internal citations omitted). Neither of these goals is served with a short-term quota.

Moreover, in terms of the "relationship of the numerical goals to the relevant labor market," Paradise, 480 U.S. at 171, the proposed quota sweeps too broadly.  Only 20% of the

---

[32] Judge Weinfeld ordered quotas on a short-term basis, see Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, 490 F.2d 387, 398-99 (2d Cir. 1973), but these measures clearly did not solve the problem in the long term.  In this connection, the PRO sets out certain benchmarks for the court's retention of jurisdiction over the remedy, but the court foresees compliance on a broader time horizon than the PRO suggests.  **At the February Conference, the parties should be prepared to address the appropriate length of time during which the court should retain jurisdiction over the implementation of a remedy.**

actual test takers sitting for Written Examinations 7029 and 2043 were black or Hispanic.  (See USA Resp. 13 (citing Seeley II Decl., Ex. A.).)  For Exam 6019, 36% of applicants were black or Hispanic.  (See Seeley II Decl., Ex. B.)  Rather than forcing the City to hire 60% of its workforce from 20%-36% of its applicants, the goal of an interim relief measure should be to increase the minority appointment rate to reflect the percentage of minority test takers, rather than the percentage of minorities in the City's population at large.

Considering the "impact of the relief on the rights of third parties," the proposed quotas are not appropriate.  Imposing a 60% hiring quota for the duration of the use of Written Examination 6019 and the first two future test administrations would place a sizable burden upon the non-minority applicants, who could expect no more than 40% of appointments, apparently irrespective of examination performance.  The court is particularly hesitant to impose this burden upon the takers of a newly-created test that is intended to replace discriminatory examinations that are not job related.  Moreover, unless it becomes absolutely necessary, the court should avoid imposing relief that could result in a stigmatizing effect on minority firefighters.[33]

The court expects that the implementation of a job-related examination for entry-level firefighter – perhaps accompanied by enhanced measures to notify and recruit interested minority candidates, coupled with the other remedial measures discussed above – will properly balance the rights of third parties against the mandate to ensure compliance with Title VII.  For the foregoing reasons, the court concludes that the 30%-30% hiring quota proposed by the

---

[33] If the City should fail to cooperate in good faith with neutral remedial measures, the court would then consider quotas.  See HUD, 239 F.3d at 219-21 (race-based remedy appropriate following persistent failure of race-neutral remedies).

Intervenors is inappropriate under the particular circumstances of this case.  The Intervenors'

quota proposal is DENIED at this time.

2.    <u>Hiring from Written Examination 6019</u>

The Federal Government and the City agree that the City should be given an opportunity

to validate its use of Written Examination 6019 before the court alters or prohibits the use of its

resulting eligibility list.   (<u>See</u> USA Reply 7; Def. Resp. 7.)   According to the Federal

Government:

> [The PRO] does not alter the City's use of the Exam 6019 eligible list until, at the
> earliest, January 2011, so the rights of candidates on the list will not be affected
> before that date.  By January 2011, the parties should have developed a new
> selection procedure, as required by the [PRO].  Once the new selection procedure
> is developed, the Court will hold a hearing on the new selection procedure, at
> which <u>the City will have the opportunity to argue that it should be allowed to
> continue hiring in rank order from the Exam 6019 eligible list</u>.  If the Court
> determines, however, that the new selection procedure meets the City's legitimate
> needs and has less disparate impact than rank-order use of Exam 6019, the parties
> will have identified a less discriminatory alternative employment practice.  In that
> event, under <u>Ricci</u>, discontinuing use of the Exam 6019 eligible list and
> implementing the new procedure will not violate the rights of white candidates on
> that list.  Indeed, it will be required by Title VII.

(USA Reply 7 (internal citations omitted) (emphasis added).)[34]  The City essentially agrees:

> Under <u>Ricci</u> before the results of Examination 6019 can be altered, defendants
> must be afforded an opportunity to establish that Examination 6019 is job related
> for the position in question and consistent with business necessity.  Plaintiff and
> Plaintiffs-Intervenors, of course, will at that time have the opportunity to prove
> the opposite.  If they fail, then Plaintiff and Plaintiffs-Intervenors, if they so
> choose, will have the opportunity to establish the existence of [an] available
> alternative employment practice that has less disparate impact and still serves the
> City's legitimate needs.

(Def. Resp. 7 (internal citation omitted).)[35]

---

[34] The Federal Government appears to propose hiring from Written Examination 6019 based upon a new cutoff
score of 60, rather than 70.  (<u>See, e.g.</u>, PRO ¶ 47.)  It is unclear, however, what basis there is for requiring a cutoff
score of 60 rather than 70 were Examination 6019 to be used on an interim basis.  In any event, the City will have
the opportunity to establish a valid cutoff score following a hearing on Exam 6019.

The focus of the dispute, therefore, is <u>when</u> the City will be given an opportunity to demonstrate that its use of Exam 6019 is job-related.  Because doubts remain about the propriety of continued hiring from Exam 6019, the court intends to hold a hearing on Exam 6019's job-relatedness soon, rather than to wait for a new test, as proposed by the Federal Government. Although waiting for a new test would minimize disruption to the City – by allowing it to continue hiring in the near-term – it has the negative consequence of allowing the City to utilize practices with undisputed disparate impact.[36]  In the court's view, a hearing should be scheduled as soon as possible following the February Conference to allow the City to show that its use of Exam 6019 is job related.[37]   Only then can the proper interim use of that examination be assessed.

Addressing the validity of Examination 6019 early in the remedial process is appropriate in light of the ongoing dispute over the validity of its use.  Early on in this litigation, the court observed that "Examination 6019, unlike Examinations 7029 and 2043, was developed by two outside experts rather than in-house and measures non-cognitive abilities in addition to cognitive abilities."  (<u>See</u> Memorandum & Order dated July 23, 2008 (Docket Entry # 182), at 7.)  For the purposes of Title VII liability, therefore, the court did not permit Exam 6019 to be considered in this case as part of the same continuing hiring practice as Exams 7029 and 2043.  (<u>Id.</u>)  In the time since then, the validity and job-relatedness of Examination 6019 have been repeatedly

---

[35] One error in the City's argument is that, following a prima facie showing of disparate impact, <u>the defendant</u> bears the burden of showing that its use of an examination is job-related.  <u>See</u> <u>D.I. Op.</u>, 637 F. Supp. 2d at 99, 129-30 (rejecting City's arguments that Plaintiffs must demonstrate "invalidity").

[36] In any event, it is not clear to the court what the City's hiring needs are or will be in the short term.  **At the February Conference, the City should be prepared to discuss its expected hiring needs for next two years.**

[37] To the extent that an early hearing would affect the existing remedial discovery schedule, the parties should be prepared to address this issue at the February Conference.

referred to by the parties.  (See, e.g., D.I. Op., 637 F. Supp. 2d. at 105-07, 120-22.)  Plaintiffs

have relied on Examination 6019 to show that equally effective testing alternatives to

Examinations 7029 and 2043 have been available to the City (see, e.g., id. at 120), while the City

has relied on Examination 6019 to argue that the earlier examinations' problems of test

validation have been solved (see Def. Resp. 8-9).  The parties continue to dispute the City's use

of Written Examination 6019.  (See Def. Mem. 2-8; USA Reply 1-7; Def. Resp. 1-10; Letter

dated Jan. 8, 2010 (Docket Entry # 383).)  The court intends conduct a hearing to resolve this

dispute as quickly as is feasible.

One of three outcomes is likely to result from such a hearing.  First, it might result in a

finding that Examination 6019 is not valid for pass/fail or for ranking purposes.  In that case, the

court would devise interim procedures that avoid the use of either scoring device to select

candidates.  Second, Examination 6019 might be found to distinguish between qualified and

unqualified candidates on a pass/fail basis, but not found to distinguish between candidates for

the purpose of ranking.  In that case, the court could devise interim procedures that would rely on

the pool of qualified applicants, without relying on rank-ordering.  The City could then use those

procedures until Plaintiffs were given a chance to show whether the newly developed test was

superior to that use of Examination 6019.  Third, it may be that Examination 6019 properly

distinguishes between candidates for the purposes of pass/fail screening, as well as for rank-

ordering.  In that case, the City would be permitted to use Exam 6019 in the interim and the court

could reserve the question of whether alternative procedures with less discriminatory impact are

available until a new selection procedure is developed.

Whatever the outcome, the point for present purposes is that the nature of interim relief must be guided by the City's showing of the validity of Written Examination 6019. An immediate hearing on Exam 6019 will be important to effectuating that relief. In the meantime, the parties should be prepared to move forward on developing a new selection procedure. This is because, whatever interim measures are taken, the parties will have to work toward an alternative selection procedure for the court's eventual consideration. See Guardians, 630 F.2d at 110 ("[W]hat the decree may require, is that a selection procedure proposed by the City may not be used if the plaintiffs can establish the existence of an alternative procedure with an equivalent degree of job relatedness and a lesser disparate racial impact."); Berkman, 705 F.2d at 595 (compliance relief includes "ordering that new and valid selection procedures be adopted, and authorizing interim hiring that does not have a disparate impact on any group protected by Title VII").

## V.   OTHER REMEDIAL ISSUES

### A.   The UFA's Comments

In its submission to the court as amicus curiae, the UFA raises a concern that is not encompassed by the court's prior discussion.[38] In its letter, the UFA points to Paragraph 10 of the PRO, which states that "retroactive seniority shall not be used for purposes of any applicable probationary period(s) or time-in-grade requirement(s) for eligibility for promotion." (See UFA Letter 2; PRO ¶ 10.) According to the UFA:

> Under current FDNY rules, we believe that a firefighter is not eligible to take the promotional exam for the rank of Lieutenant unless that firefighter has actually

---

[38] Several of the UFA's comments relate to the PRO provisions that appear to approve Examination 6019's cutoff score if it is set as 60 instead of 70. (See Letter dated Nov. 2, 2009 (Docket Entry # 346) ("UFA Letter"), at 1-2.) The court addressed this proposal above, and the parties should be prepared to address interim hiring from Written Examination 6019 in light of the court's decision to hold a hearing on the interim use of that examination..

served three years in the Department. Furthermore, a firefighter cannot actually be promoted to the rank of Lieutenant unless the firefighter has served at least five years in the Department, i.e., reached 1st grade. If a firefighter is going to be promoted to the supervisory rank of Lieutenant, leading other firefighters in dangerous situations, the Order should clearly require that the firefighter should have served a minimal amount of three years before being eligible to take such an examination. Furthermore, that firefighter should have actually worked for at least five years in the Fire Department before being allowed to supervise other firefighters. Retroactive seniority contemplated by the Order is certainly not a substitute for the real life experience required of a fire officer.

(Id. at 2-3.)

In response to these comments, the Federal Government points out that "[n]o modification to the [PRO] is necessary because Paragraph 10 of the [PRO] already makes clear that 'retroactive seniority shall not be used for purposes of any applicable probationary period(s) or time-in-grade requirements for eligibility for promotion.'" (USA Reply 13 n.13 (quoting PRO).) As this response indicates, the parties do not dispute the appropriateness of this exception to the use of retroactive seniority. The parties agree that probationary periods and time-in-grade requirements for promotion to Lieutenant should remain unaffected by any grant of retroactive seniority. The only dispute is whether the PRO currently makes that exception sufficiently clear.

The PRO should explicitly address the concern the UFA raises. The parties agree on the substance, and it is reasonable to allay the UFA's concerns by making that substance more clear. The court strongly agrees that such a provision ensures public safety without compromising the remedial goals of Title VII. Accordingly, the Federal Government and the UFA are directed to confer for the purpose of proposing an additional paragraph for the PRO that would address the UFA's stated concern. If the parties are unable to agree, they should submit their respective proposals to the court.

45

**B.     The Intervenors' Suggestions**

The Intervenors "strongly support the entry of a preliminary relief order," and set out thirteen proposed modifications of the PRO.  (See Letter dated Oct. 7, 2009 (Docket Entry # 328) ("Int. Prop.").)  The Federal Government has replied to each of these proposals.  (See Letter dated Nov. 10, 2009 (Docket Entry # 353) ("USA Int. Resp.").)  The Intervenors' proposals fall roughly into the following categories – proposals on which the parties substantially agree, proposals involving the use of Examination 6019, proposals which relate to class certification, and other proposals on which the parties do not agree.  The court addresses each in turn.

**1.     Areas of Agreement**

The Intervenors and the Federal Government agree or substantially agree on seven of the proposals.  (See Int. Prop. ¶¶ 2, 3, 9, 10, 12, 13 (addressing PRO ¶¶ 7, 13, 57, 59, 60, 67, 69, 71); USA Int. Resp. ¶¶ 2, 3, 9, 10, 12, 13) (same).)  When a preliminary order is finalized, it should incorporate these changes.  To the extent that the parties have disagreements with respect to the precise wording of any these proposals, they should submit to the court their respective proposals, indicating any unresolved issues.

**2.     Examination 6019**

Several of the Intervenors' proposals relate to the interim use of Written Examination 6019.  (See Int. Prop. ¶¶ 4, 7, 8 (addressing PRO ¶¶ 15, 47, 48).)  For example, the Intervenors question the PRO's proposed use of a cutoff score of 60 for the purposes of interim hiring, instead offering a cutoff score of 70.  (See Int. Prop. ¶ 7.)  The City and the UFA have also questioned the use of a cutoff score of 60.  (See UFA Letter; Def. Resp. 9 n.2.)  Moreover, the Intervenors propose language that would allow the City to prove the job-relatedness of Written

46

Examination 6019.  (See Int. Prop. ¶ 4.)  As set forth above, the parties should be prepared to address interim hiring from Written Examination 6019 in light of the court's decision to hold a hearing on the interim use of that examination.

### 3.   Proposals Relating to Class Certification

Two of the Intervenors' proposals raise issues of class certification.  These proposals would require that the Intervenors receive certain information about individual relief directly from the City – for example, that they be notified by the City when award checks have been mailed to individual black claimants (see id. ¶ 5), and that they be permitted to interview or depose City officials in relation to implementation of the remedy (see id. ¶ 11).  The Intervenors also propose that, within thirty days after entry of the PRO, the court should order notification of possible relief to potential claimants.  (See Int. Prop. ¶ 1.)  This notice would, inter alia, "ask that they update address information if it changes, and provide them with contact information for the United States and the Vulcan Society."  (Id.)  In support of this measure, the Intervenors point to difficulties in locating black or Hispanic individuals who took Written Examinations 7029 or 2043.  (Id.)

The Federal Government objects to these proposals on the grounds that the Vulcan Society is not an appropriate class representative for the purposes of individual monetary relief.  Accordingly, the Federal Government argues, the Intervenors should not be permitted to participate in aspects of relief which relate to issues pertinent only to individual claimants.  (See USA Int. Resp. ¶¶ 1, 5, 11.)  Regarding the proposal relating to notice, the Federal Government objects, contending that it would be unnecessary and confusing.  (See USA Int. Resp. ¶ 1.)

It does not appear that the proposals identified in paragraphs five and eleven of the Intervenors' request depend upon the Vulcans' status as a class representative for individual claimants. They appear to be more in the nature of monitoring the City's compliance with court-ordered relief and with Title VII. To that extent, these proposals should be included in a preliminary relief order. The proposal in the first paragraph is entwined with issues of class certification discussed below. In light of the court's certification decision, the parties should be prepared to discuss notice procedures at the February Conference.

4.    Increased Priority Hiring

The Intervenors have proposed that the court increase the number of minority candidates that are hired on a priority basis by the City. (See Int. Prop. ¶ 6.) The PRO would currently require the City to hire two black priority hires and one Hispanic priority hires out of every five candidates that the City hires following a final remedial order. (See PRO ¶¶ 41-48.) The Intervenors propose to increase that hiring ratio from three-out-of-five hires to eight-out-of-ten hires (with five-of-ten new hires being black priority hires and three-of-ten hires being Hispanic priority hires). This would create incoming classes that would be eighty percent black and Hispanic until all priority hires were completed. The Federal Government objects to this proposal. (See USA Int. Resp. ¶ 6.)

In the court's view, the sixty percent rate is reasonable and appropriate. The court agrees with the Federal Government that classes with too high a percentage of priority hires might "be counterproductive" and may "stigmatize victims who receive priority hiring relief to have what is in essence a separate academy class . . . ." (Id.) Moreover, to the extent that the eighty-percent figure helps to provide relief more quickly, the marginal increase over sixty-percent

priority hiring would not significantly change the speed of compensatory hiring relief.  In light of the foregoing, the court denies the Intervenors' request.

## VI.    CLASS CERTIFICATION

For the purposes of the liability phase of proceedings, the court certified the following class:

> All black firefighters or firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were harmed by one or more of the following employment practices:
>
> (1)    Defendants' use of Written Exam 7029 as a pass/fail screening device with a cutoff score of 84.705;
>
> (2)    Defendants' rank-order processing of applicants who passed Written Exam 7029;
>
> (3)    Defendants' use of Written Exam 2043 as a pass/fail screening device with a cutoff score of 70.00; and
>
> (4)    Defendants' rank-order processing of applicants who passed Written Exam 2043.

(See Memorandum & Order dated May 11, 2009 (Docket Entry # 281) ("Certification Order"), at 33-34.)  Relying upon the Second Circuit's guidance in Robinson v. Metro-North Commuter Railroad Company, 267 F.3d 147 (2d Cir. 2001), the court certified this class for the purposes of the liability phase only, and stated its intention, at the remedial phase, to "revisit its class certification decision in order to determine the most expedient method of going forward, including consideration of notice and opt-out procedures, as well as consideration of whether subclass representatives are needed."  (Certification Order 34.)

The Intervenors have moved to continue class certification during the remedial phase. They ask the court to certify the Vulcan Society as class representative for the purposes of "class-wide injunctive relief, including the implementation and monitoring of any remedial

orders entered in this case."  (Memorandum of Law in Support of Continued Class Certification (Docket Entry # 329) ("Int. Class Mem.") 4.)   The Intervenors also propose creating four subclasses – corresponding to the four employment practices challenged in the liability phase – and propose four individuals to represent these subclasses.  (Id. at 9-12; Letter dated Nov. 6, 2009 (Docket Entry # 352) ("Cert. Letter").)[39]  Subject to its objections to certification offered at the liability phase, the City does not object to continuing certification in this manner at the remedial phase.  (See Cert. Letter.)  Accordingly, the Intervenors and the City have submitted a "Proposed Order Continuing Class Certification."  (See id., att.)

The Federal Government does not object to "appointing the Vulcan Society as representative of a class defined in the same manner as the class certified for liability purposes, provided that the Vulcan Society's representation is limited to pursuing classwide injunctive relief . . . ."  (United States' Response to Motion for Class Continued Certification (Docket Entry # 354) ("USA Class Mem.") 6.)  According to the Federal Government, such representation would not include "individual remedial relief such as monetary relief, priority hiring relief and retroactive seniority" (Id. at 8) because the Vulcans cannot adequately represent individuals for the purposes of seeking that relief.[40]

Regarding individual relief, the Federal Government opposes the class proposed by the Intervenors.  It argues that individual representatives for any class at the remedial stage must have interests that conform with the interests of class members at the remedial stage – rather than

---

[39] The Intervenors have offered affidavits from two individuals – in addition to the Individual Intervenors – who they propose as subclass representatives.  (See id.)

[40] The Federal Government asserts that a conflict exists between the interests of individuals seeking relief, and the interests of the Vulcans whose "organizational interest lies primarily in increasing the number of black firefighters in the FDNY [and] does not have the same incentive to pursue vigorously other forms of relief . . . ."  (Id.)

with the interests of class members at the liability phase – and that the Intervenors have not proposed such representation.  (Id. at 10-12.)  The Federal Government contends that, should the court grant certification it should certify subclasses defined according to the type of relief different groups of individuals might seek in order to avoid potential conflicts among groups of class members.  (Id. 13-14.)  Finally, the Federal Government raises the concern that these proposed subclasses cannot be adequately represented by the same counsel that represents the Vulcan Society at the remedial stage.  (Id. at 14-15.)[41]

The issues being litigated during the remedial stage all relate to the nature and scope of remedial measures to be taken in response to the court's liability rulings.  At this stage, therefore, the court agrees with the Federal Government that, for purposes of class certification, individual victims should be grouped not by the particular harm they suffered, but by the particular remedial measures they are seeking.  The broad types of relief that are being sought, as outlined herein, are prospective injunctive relief that would ensure the City's future compliance with Title VII, as well as compensatory relief that would make whole the individual victims of the City's discrimination.  The compensatory relief that will be awarded is subdivided into monetary relief, priority hiring relief, and retroactive seniority.  The central purpose of the remedial phase is to determine which individual victims will receive what types of relief, and in what amounts; any use of the class-action mechanism at this phase should be tailored accordingly.

---

[41] The Federal Government also opposes any form of individual-relief certification on grounds that the PRO's remedial process renders class certification unnecessary.  (Id. at 8-10.)  It argues that, because of the availability of the PRO, the certification of a class is not "superior to other available forms of relief."  (Id. at 10 n.8 (citing Fed. R. Civ. P. 23(b)(3)).)   This contention does not consider supplemental relief for the intentional discrimination case that would remain unaddressed by the PRO.  (See id. at 3 n.4)  Certification for the intentional discrimination case is not rendered unnecessary by the PRO, and, in any event, certification of a class for individual relief would not be mutually exclusive of implementing remedial measures under the PRO.  To the extent that efficiencies can be gained by incorporating  any necessary certification procedures into the procedures proposed in the PRO, such efficiencies would be superior to declining certification, which would leave the victims of intentional discrimination without remedial representation in this litigation.

In light of the issues and interests involved during the remedial phase, the court will order continued certification for the Vulcans, and will order conditional certification of the Individual Intervenors for the purposes of individual relief.  None of the parties object to the Vulcans' continued representation of the previously defined class for the purposes of classwide injunctive relief that is aimed solely at the City's monitoring and compliance with Title VII.  For the reasons set forth in the court's prior ruling (see Certification Order 20-24, 30-33), the court finds the Vulcans to be an appropriate and adequate representative for the purposes of classwide compliance and monitoring relief.  By the same token, the Vulcan's representation may not extend to issues of individual relief.  (See id. (citing Bano v. Union Carbide Corporation, 361 F.3d 696 (2d Cir. 2004)).)

The court will conditionally certify the Individual Intervenors to represent a class of all black firefighters or firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were harmed by the City's pass/fail or rank-ordering use of one or more of those examinations.  The remedial interests of the individual class members are broadly aligned.  With respect to individuals who were not hired, it is largely speculative at this point whether potential conflicts exist among them.  But, the interests of incumbent black firefighters who were delayed in hiring may, in certain respects, be antagonistic to individual black firefighter applicants who are seeking hiring relief.  For example, such individuals may prefer that non-hire victims not be awarded priority hiring or retroactive seniority.[42]  Subclasses broken down according to delay victims and non-hire victims would address this potential antagonism.

---

[42] To this extent, a single representative would be inadequate to represent parties with these conflicting interests.  Cf. General Tel. Co. of the Northwest, Inc. v. EEOC, 446 U.S. 318, 331 (1980) ("In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority.").

The Intervenors have proposed additional representatives for the creation of subclasses (see Int. Class Mem. 10-12; Docket Entries ## 331, 332), but the court does not rule on whether they might serve as subclass representatives.  The Intervenors have not sought certification for subclasses that correspond to the particular remedial interests now at issue in this litigation.  At this point, the court continues class certification with the condition that the Intervenors demonstrate that subclass representatives can be identified and appointed that will adequately represent subclasses in light of remedial-stage interests.  See Fed. R. Civ. P. 23(d)(1)(C); see also Robinson, 267 F.3d at 171 (a court may "condition[] the maintenance of a class action . . . on the strengthening of the representation") (quoting Fed. R. Civ. P 23(d)(3) advisory committee note (1966)).  In order to meet this condition, the Intervenors must renew their motion for continued class certification, identifying representatives for subclasses defined in terms of the form of relief sought.  This motion must be made prior to the court's entry of a preliminary relief order, so that the individual subclass representatives will have the opportunity to weigh in on the proposed relief, as necessary.[43]  The parties should be prepared to address certification for individual relief issues at the February Conference.

Finally, with respect to class certification, the court raises the issue of the notice and opt-out procedures that must be considered at the remedial stage when issues of individual recovery are implicated.  (See Certification Order 34 (citing, inter alia, in Robinson, 267 F.3d at 171).)  To

---

[43] The Federal Government has raised the issue of whether all subclasses could continue to be represented by the same counsel, citing Federal Rule of Civil Procedure 23(g)(1)(B).  Under the Rule, "[i]n appointing class counsel, the court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  As the court noted in its Certification Order, there has been no doubt about the qualifications of the Intervenors' attorneys or about their ability to fairly and adequately represent the interests of the class to this point. (Certification Order 30.)   The court must determine whether existing class counsel can continue to represent individual subclasses at the remedial phase at the same time as it represents the Vulcans for the purposes of pursuing different forms of relief.  **At the February Conference, the parties should be prepared to discuss the adequacy of existing class counsel at the remedial phase, how to assess and ensure that adequacy, and any measures that can be taken to identify and appoint separate counsel for subclasses.**

the extent that issues of individual relief are involved at the remedial stage, the court must give notice to absent class members and allow them an opportunity to consider how they wish to protect their interests.  Robinson, 267 F.3d at 165 ("where non-incidental monetary relief such as compensatory damages are involved, due process may require the enhanced procedural protections of notice and opt out for absent class members"), 166 ("[a]bsent class members may therefore need notice that their claims are being pursued in the class action and the opportunity either to opt out and pursue their claims separately or to intervene, should they conclude such active participation would better protect their individual interests").   Such procedures, if implemented, would have to be integrated into the notice-and-claims process proposed by the PRO.  The parties have not fully addressed this issue.  At the February Conference, the parties should be prepared to address the need for including Rule 23 notice-and-opt-out procedures for class members.[44]

## VII.   SUMMARY AND CONCLUSION

Devising and implementing a remedy in this case involves many complex and fact-intensive judgments.  Each day that a remedy is delayed increases the impact of the City's discrimination on the affected  individuals.  The court intends to move ahead with alacrity to ensure the City's future compliance with Title VII and compensate the victims of the City's past discriminatory practices.  This Memorandum & Order is the court's first step in that process.  To summarize the court's principal conclusions to date:

- **Development of a New Test:**  The City, in conjunction with the other parties, will develop a new testing procedure for the position of entry-level firefighter.  Following the

---

[44] As set forth above, at the February Conference, the parties should be prepared to address the need for including Rule 23 notice-and-opt-out procedures for class members.

development of this test, the court will conduct a hearing to determine whether it should replace the City's existing selection procedure.

- **Exam 6019:**  On a date scheduled after the February Conference, the court will conduct a hearing to consider the validity of the City's current examination, Written Examination 6019, and to decide whether and how the City may use that examination on an interim basis.

- **Monetary Compensation to Victims:**  The court will establish a process to identify and compensate pro rata the victims of the City's discriminatory use of Written Examinations 7029 and 2043, including:

  o   A notice-and-claims procedure by which the approximately 7,400 minority applicants who sat for Written Examinations 7029 and 2043 will have the opportunity to claim entitlement to relief; and

  o   An opportunity for the City to show that any of these individual candidates were not victims of discrimination because they were not hired for legitimate reasons.

- **Priority Hiring of Victims Who Are Currently Qualified and Interested:**  The eligibility process will identify 293 individuals who are currently eligible and currently qualified to be entry-level firefighters.  The 293 figure is based on expert calculations of the shortfall of minority candidate resulting from the discriminatory use of Exams 7029 and 2043.  These individuals will be offered hiring on a priority basis.

  o   Hiring relief for these individuals will include competitive seniority back to the median hiring date from the Exam 7029 or 2043 eligibility list.

  o   The City will offer priority hiring at a rate of two black priority hires and one Hispanic priority hire out of every five hires.

- **Seniority for Delay Victims:**  The victims of discrimination who were delayed in hiring by the City's discriminatory use of Written Exams 7029 and 2043 will be entitled to retroactive seniority.

- **No Quotas:**  The court will not impose quotas at this time.  The court views the problem as requiring a long-term solution, and views quotas as a short-term fix.  If the City fails to cooperate effectively with other remedial measures, quotas may be considered at a later date.

In addition to reaching these conclusions, the court has raised several issues that require clarification from the parties. The next step in the remedial process will be the February Conference at which the parties will have the opportunity to address the following:

(1)  The process for making individual relief determinations, including:

    (a)  The burden of proof to be imposed upon objectors who disagree with the United States' eligibility determination.

    (b)  The possibility of establishing a list of qualifications that the City would rely on to assert nondiscriminatory reasons for its hiring decisions. The City should be prepared to address the issue of what qualifications it intends to rely upon.

    (c)  The possibility of requiring potential victims, in a claim form, to provide information under oath that is relevant to the eligibility determination.

    (d)  The current qualifications that will be required of identified victims of discrimination to show that they are eligible for priority hiring relief.

(2)  The possible use of a court-appointed special master or monitor to help oversee implementation of a remedy.

(3)  The apportionment of priority hiring relief in the event that more than 293 individuals are currently qualified to be entry-level firefighters.

(4)  The method of calculating seniority awards for victims whose hiring for the job of entry-level firefighter was delayed by the City's use of Written Examinations 7029 and 2043.

(5)  The nature and scope of the Fairness Hearing(s) proposed by the PRO.

(6)  Interim hiring and Written Examination 6019, including:

    (a)  The effect and significance of residency and other bonus points in the ranking of candidates for the job of entry-level firefighter.

    (b)  The City's current and expected hiring needs for the next two years.

(7)  Standards or guidelines that will be relied upon in constructing a new test.

(8)  The court's retention of jurisdiction over compliance remedies.

(9)  The need for any supplemental relief occasioned by the court's second liability ruling.

(10)    The issues of continuing class certification raised by the court, including the appointment of subclass representatives and counsel, as well as notice-and-opt-out procedures.

Some of the issues require little more than clarification of existing proposals; the court believes that many of them can be resolved by the parties cooperating in good faith.  With respect to these issues, any joint or separate written submissions that the parties wish to make in advance of the February Conference must be made no later than February 5, 2010.

Following the February Conference, the court will rule on the issues discussed at the Conference and will schedule a hearing to address the validity of Written Examination 6019 (and any other matter requiring a factual hearing).  The court will rule on the issues relating to that hearing, and the Federal Government will then submit a revised PRO reflecting the court's rulings.  The court's issuance of that order will formally implement the remedial process.

In the interim, the parties should take reasonable steps to move forward with any aspects of relief on which the court has reached a decision in principle and should advise the court of any remedial measures on which the parties are able to agree.

SO ORDERED.

                                                    _/s/ Nicholas G. Garaufis____
Dated: Brooklyn, New York                 NICHOLAS G. GARAUFIS
       January 21, 2010                        United States District Judge