UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

         **MEMORANDUM & ORDER**
         **APPOINTING SPECIAL**
         **MASTER**

      Plaintiff,      **07-cv-2067 (NGG) (RLM)**

 -and-

THE VULCAN SOCIETY, INC., for itself and
on behalf of its members; MARCUS
HAYWOOD, CANDIDO NUÑEZ,
ROGER GREGG, individually and on
behalf of a class of all others similarly situated,

    Plaintiffs-Intervenors,

 -against-

THE CITY OF NEW YORK,

    Defendant.
------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

## I. BACKGROUND

### A. Litigation History

In decisions issued on July 22, 2009 and January 13, 2010, this court held that the City of New York's procedures for screening and selecting applicants for entry-level firefighter positions discriminated against black and Hispanic applicants, in violation of Title VII, 42 U.S.C. § 2000e et seq., the Equal Protection Clause of the Fourteenth Amendment, the Civil Rights Act of 1866, 42 U.S.C. § 1981, the New York State Human Rights Law, New York Executive Law §§ 290 and 296, and New York City Local Law 59. (Docket Entry ## 294, 385.) On the basis of these conclusions and the undisputed facts supporting them, this court entered an order on January 21, 2010 outlining the initial steps that the parties will take during the remedial phase of

1

this litigation to compensate the victims of the City's discrimination and bring the City into compliance with the law. (Docket Entry # 390 ("Initial Remedial Order").) Among other things, the court ordered the following compliance relief: (1) the City, in conjunction with the other parties, will develop a new, non-discriminatory procedure for selecting entry-level firefighters; (2) the court will conduct a hearing to consider the validity of the City's current examination, Written Examination 6019, and to decide whether and how the City may use the results of that examination on an interim basis; (3) following the development of a new selection procedure, the court will consider whether that procedure serves the City's legitimate needs as well as or better than Exam 6019, has less discriminatory impact on minority candidates, and is thus a preferable nondiscriminatory alternative to Exam 6019; and (4) if the new procedure is a better alternative to Exam 6019, the court will order steps to implement that procedure and consider measures to ensure future compliance with federal and state anti-discrimination laws. (Id. at 3.)

At this juncture, two obstacles are preventing swift and rigorous implementation of the necessary compliance relief. The first is the City's chronic – now bordering on recalcitrant – failure to fulfill its court-ordered obligations in a timely manner. The second is the complexity and opacity of the exam-construction process. These obstacles are impeding the development of a new selection procedure and preventing the court from rendering a timely decision on interim firefighter hiring. The court touches briefly on each of these problems.

  **B.**  **Development of a New Selection Procedure**

Beginning with the Initial Remedial Order, the court has repeatedly emphasized that the top priority in the remedial phase is to develop a new, non-discriminatory selection procedure. (Id. at 31, 44; Feb. 24, 2010 Hearing Tr. 20, 53-55; Feb. 24, 2010 Minute Entry.) This court is obligated to assure the City's future compliance with the law, and has no intention of letting the

City backslide into its previous unlawful practices as it did after Judge Weinfeld's nearly identical liability ruling in the 1970s.  See United States v. City of New York, 07-cv-2067 (NGG), 2010 U.S. Dist. LEXIS 2506, at *22-34 (E.D.N.Y. Jan. 13, 2010).  The test-development process will be lengthy and complicated, and will likely require a comprehensive rethinking of the City's prior practices.  See, e.g., Guardians, 630 F.2d at 100-06; United States v. City of New York, 637 F. Supp. 2d 77, 108-131 (E.D.N.Y. 2009).

The court recently learned, however, that the City has not yet taken the preliminary step of retaining a test-development expert, and does not anticipate being able to do so until October 2010 at the earliest.  (See May 13, 2010 Letter from Def., Ex. A (Docket Entry # 434).)  Without an expert, the City cannot begin working with the Plaintiffs to develop a new selection procedure.  The City claims that municipal procurement rules dictate this protracted schedule, and that any contract proposal must pass through a Byzantine hierarchy of bureaucratic review before it can be approved.  (Id.)  Yet according to the United States, in 2006 the City obtained "emergency" approval of an expert in a mere eight days, based on nothing more urgent than anticipation of this litigation.  (See May 17, 2010 Letter from the United States (Docket Entry # 435).)  The City insists that the current situation is somehow less pressing.  (May 18, 2010 Letter from Def. (Docket Entry # 436).)

This court is thoroughly unconvinced by the City's justifications for the delay.[1] More importantly, however, it does not have the time or inclination to launch an investigation into the arcana of the City's procurement policy, or any other policy. Going forward, the City will have to mobilize multiple agencies to design a new testing procedure. This court cannot pore over the city charter, untangle the city's administrative hierarchy, and hold hearing after hearing each time the City invokes some wrinkle of local governance to postpone the imposition of a remedy. This court is prepared to issue whatever orders are necessary to cut through any red tape, but it cannot do so without an understanding of what is actually feasible, given the City's rules and needs.

---

[1] The City claims that an "emergency" existed in April 2006 because the existing list of eligible firefighter applicants was set to expire in May 2008, and DCAS's Commissioner "was concerned that proceeding through the ordinary procurement process to retain an expert to work on the development of the next test could result in the existing civil service eligible list expiring without a new list available to take its place." (May 18, 2010 Letter from Def. at 2.) The same letter goes on to argue that, by contrast, today – that is, in May 2010 – no analogous emergency exists because "the current eligible list for firefighter, Exam 6019, terminates on June 11, 2012," giving the City ample time to proceed through the ordinary procurement process and develop a new exam before the 6019 list expires. (Id.) Seldom does an argument refute itself so neatly. The time periods at issue are identical: two years and one month in each case. The City does not explain why a scenario that previously required "emergency" action is now an occasion for repose.
    The City also argues that the "emergency" procurement procedure would preclude a thorough vetting of candidates and impoverish the exam-development process. (Id. at 3.) If accurate, this assertion casts doubt on the validity of Exam 6019, and the court will reconsider the City's statement when the issue of that exam's validity arises. More importantly, this argument reveals a basic misunderstanding of the City's role in the remedial phase. The court is not required to postpone a remedy until the losing party can muster the personnel that would best represent its interests. The court is not even required to let the losing party have any say in the crafting of a remedy for its own malfeasance. Presumably, the United States and the Intervenors will each provide a competent test-development expert, and a court-appointed master could add a third. If the goal of the development process is to create a selection procedure that complies with the law, then it may be that the marginal value of a fourth expert will be minimal. The court is permitting and indeed soliciting the City's input because it wants the ultimate result to be sensitive to the particular circumstances in New York City, not because the City has some inalienable right to craft a remedy on its own terms.
    Finally, the City states that although it initially used the emergency procurement process to obtain a test-development expert, it ultimately chose an internal DCAS consultant, Dr. Catherine Cline, to develop Exam 6019. According to the City, because Dr. Cline was "pre-cleared to work on projects on an as needed basis . . . . DCAS was not required to engage in the procurement process to retain [her] to develop Exam 6019." (Id. at 2 & n.1.) The court thanks the City for bringing this option to its attention, and will consider it as a possible solution to the supposedly insuperable problem of formal procurement.

The problem of timely exam construction is compounded by the complexity of the design process. Title VII and Guardians require the designers of employment tests to follow complicated procedural and substantive guidelines. As described in the court's disparate-impact opinion, the development process is highly involved and technical. See United States v. City of New York, 637 F. Supp. 2d at 108-131. The task of overseeing and developing a valid selection procedure will require more than just analytic problem-solving skills; it will require management and mediation skills, as well as the time and resources to become educated in the minutiae of municipal firefighting.

This court does not want the selection procedure to be dictated by experts and presented to it for rubber-stamping. Rather, development of the new selection procedure must be overseen by someone who can develop an understanding of the intricacies of the design process and use that understanding to resolve disputes intelligently and move the parties toward the outcomes that Title VII and Guardians require. Such oversight would improve this court's confidence in the validity of the resulting selection procedure and help it make informed decisions about future remedial actions.

### C. Exam 6019 Discovery

The remedial phase of this litigation presents the court with conflicting imperatives: the court cannot permit additional firefighter appointments from the Exam 6019 eligible list unless it is satisfied that the exam complies with Title VII, but it just as clearly cannot endanger the welfare of the City's citizens by preventing necessary firefighter hiring. The court's solution, as announced in the Initial Remedial Order, was to direct the parties to prepare for a hearing on the validity of Exam 6019 prior to any further firefighter hiring. (Initial Remedial Order 41-44.) Based on the City's representation that it might begin hiring firefighters as early as July 2010,

the court and Magistrate Judge Mann set an expedited discovery schedule that was intended to prepare the parties for a June 21, 2010 hearing. (Docket Entry # 409.) The City has been a vocal proponent of this plan, and has urged the court to address the validity of Exam 6019 and to expedite related discovery to avoid possible hiring delays. (See Joint Letter (Docket Entry # 400-1) 54-56.)

According to the United States, on April 26, 2010 – four days before the United States' expert report on the validity of Exam 6019 was due – the City produced "several thousand documents, two compact disks and one floppy disk containing information, data and other materials related to the development of Written Exam 6019." (Letter from United States dated April 28, 2010 (Docket Entry # 425) 1.) Notwithstanding the City's misinformed protestations, these documents should have been produced over two years ago, pursuant to Judge Mann's March 7, 2008 discovery order. (See id. at 2; United States' March 4, 2008 Motion to Compel Discovery (Docket Entry # 77) 1-2; March 7, 2008 Order Compelling Discovery (Docket Entry # 82).) According to the City, these responsive documents were discovered in the offices of a former Department of Citywide Administrative Services ("DCAS") attorney.[2] Their belated "discovery" in April 2010 is troubling, given that the City was aware of their existence and location as early as June 2008. (See May 5, 2010 Letter from Intervenors at 5-6 (Docket Entry # 429) (quoting DCAS Examiner's June 2008 testimony that responsive 6019 documents were in DCAS counsel's possession).) And it is even more troubling in light of the City's repeated assurances to this court over the course of several years that all documents relating to the Exam 6019 have been produced. (Id. at 1-4.) As noted in this court's recent order to show cause, it appears that "for the last two years the City has been violating a judicial order, perverting the

---

[2] DCAS was the City agency primarily responsible for developing the entry-level firefighter examinations. See United States v. City of New York, 637 F. Supp. 2d at 101.

6

efficient administration of justice, and ultimately imperiling its ability to hire new firefighters in a timely manner." (Order to Show Cause (Docket Entry # 426) 3.)

This discovery dispute may not be a particularly weighty matter in itself, but it is symptomatic of a larger problem in this litigation. For whatever reason – inertia, resource-allocation, or calculated strategy – the City has been dragging its feet throughout the remedial phase. The City is approaching the remedial phase in the posture of a pre-trial defendant who will not move expeditiously on any issue until forced to do so. The City does not appear to understand that it already <u>lost</u> this case, and that its obligation now is not to fight tooth and nail against the possibility of change, but to move with alacrity to cure its illegal practices. Put bluntly, the constitutional rights of thousands of its citizens are at stake. This court will not permit the City to filibuster the remedial process while it tries to get out from under this court's liability rulings. Regular, vigilant, and comprehensive oversight will be necessary to police the parties throughout the remedial phase.

**D.     Conclusion**

In light of this court's workload and the pressing need for relief in this case, the court will be unable to expeditiously resolve the complex issues relating to test-development and remedial-phase discovery. <u>See</u> Fed. R. Civ. P. 53(a)(1)(C). In such circumstances, appointment of a Special Master is appropriate under Fed. R. Civ. P. 53 and the court's inherent equitable powers. <u>See</u> 3 Wright & Miller, Federal Practice and Procedure § 2602.1 (2008) (reliance on a master appropriate "when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed."); <u>id.</u> at § 2605 (appointment appropriate to implement complex judgments); <u>see also</u> <u>Ensley Branch, NAACP v.</u>

7

Seibels, 31 F.3d 1548, 1574 (11th Cir. 1994) (district court may appoint special master to design and evaluate non-discriminatory job selection procedures); In re AOL Time Warner, Inc. Sec. Litig., 2006 U.S. Dist. LEXIS 49162 (S.D.N.Y. July 13, 2006) (special master used to handle discovery disputes). This court finds it necessary to appoint a Special Master to address post-trial matters in this litigation.

## II. TERMS OF APPOINTMENT

In accordance with Fed. R. Civ. P. 53(b)(1), the court previously notified the parties of its intention to appoint a master and gave them an opportunity to suggest candidates and comment on proposed terms of appointment. (Docket Entry ## 428, 430, 438.) A number of the parties' suggestions have been incorporated into the Appointment Order. The court interviewed four candidates, including two of the candidates that the parties proposed. Based on these interviews, and in light of the foregoing considerations, the court has selected The Honorable Robert M. Morgenthau to serve as Special Master. Accordingly,

IT IS HEREBY ORDERED:

1. Pursuant to Fed. R. Civ. P. 53(a)(1)(C) and the court's inherent equitable powers, The Honorable Robert M. Morgenthau is appointed to serve as Special Master in this litigation;

    a. Prior to being appointed, the Special Master must file an affidavit "disclosing whether there is any ground for disqualification under 28 U.S.C. § 455." Fed. R. Civ. P. 53(b)(3); see also Rule 53(a)(2) (discussing grounds for disqualification). Attached to this Order is the affidavit submitted to the court by the Special Master, dated May 25, 2010.

Duties

2. The duties of the Special Master shall include the following:

8

a. Monitoring and reporting on the City's compliance with its discovery and disclosure obligations in connection with the review of Exam 6019, making such orders as necessary to ensure the City's compliance with such discovery and disclosure obligations, and making any other orders that the Special Master believes will facilitate the timely assessment of Exam 6019 by the court, in accordance with the Initial Remedial Order (Docket Entry # 390);

b. Monitoring and reporting on the parties' compliance with the Initial Remedial Order and subsequent orders of the court regarding the development of a new procedure for screening and selecting applicants for the position of entry-level firefighter, and ordering such plans, processes, or other measures that the Special Master believes will facilitate the timely development of the new selection procedure;

c. Facilitating the parties' resolution of any disputes concerning compliance with their obligations with respect to the subject matter of the Special Master's duties as set forth in subsections (a) and (b), above, without the court's intervention, and recommending appropriate action by the court in the event an issue cannot be resolved by the parties with the Special Master's assistance.

3. The Special Master's duties shall include investigating any matters related to the duties set forth above and enforcing any orders related to the matters set forth above. The Special Master shall have all authority provided under Fed. R. Civ. P. 53(c).

Reporting and Judicial Review

4. The Special Master shall report to the court and to the parties concerning the status of the parties' compliance with the Initial Remedial Order and other orders of the court or the Special Master, including their progress, any barriers to

compliance, and potential areas of noncompliance. The Special Master shall issue a report under this provision at least once every 30 days until such time as the parties actually begin joint development of a new selection procedure, and at least once every 90 days thereafter.

5. The Special Master may require periodic reports from the parties regarding implementation of the Initial Remedial Order and any other orders of the court or the Special Master, in a format specified by the Special Master, as reasonably required to enable the Special Master to perform his duties.

6. The orders, reports, and recommendations of the Special Master may be introduced as evidence in accordance with the Federal Rules of Evidence.

7. The parties may file objections to – or a motion to adopt or modify – the Special Master's order, report, or recommendations no later than 10 calendar days after a copy is served. The court will review these objections under the standards set forth in Fed. R. Civ. P. 53(f).

8. Before a party seeks relief from the court for alleged noncompliance with any court order that is based upon the Special Master's report or recommendations, the party shall: (i) promptly notify the other parties and the Special Master in writing; (ii) permit the party who is alleged to be in noncompliance five business days to provide the Special Master and the other parties with a written response to the notice, which either shows that the party is in compliance, or proposes a plan to cure the noncompliance; and (iii) provide the Special Master and parties an opportunity to resolve the issue through discussion. The Special Master shall attempt to resolve any such issue of noncompliance as expeditiously as possible.

Record Keeping

9. The Special Master shall file all written orders, reports, and recommendations on the electronic docket, along with any evidence that the Special Master believes

will assist the court in reviewing the order, report, or recommendation. The Special Master shall preserve any documents he receives from the parties.

Access to Information

10. The Special Master shall have the access to individuals, information, documents, materials, programs, services, facilities and premises relevant to the orders of the court that he requires to perform his duties, subject to the terms of this Order Appointing a Special Master.

11. The Special Master may not communicate with a party or a party's counsel or staff on an ex parte basis. The Special Master may communicate with the court on an ex parte basis concerning non-substantive matters such as scheduling or the status of his work.

Engagement of Staff and Consultants

12. The Special Master may, consistent with a budget to be approved by the court, hire staff or expert consultants to assist him in performing his duties. The Special Master will provide the parties advance written notice of his intention to hire a particular consultant, and such notice will include a resume and a description of duties of the consultant.

Budget, Compensation, and Expenses

13. The City will fund the Special Master's work pursuant to a budget proposed by the Special Master and approved by the court. The Special Master and his law firm, Wachtell, Lipton, Rosen & Katz, have agreed that the Special Master's time and that of attorneys and other employees of the firm assisting him will be provided on a pro bono basis, and that they will seek reimbursement only for out-of-pocket expenses and disbursements. The Special Master shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Appointment Order, or such other orders as the court may issue.

14. Every 60 days, the Special Master shall submit to the court an itemized statement of fees and expenses, which the court will inspect for regularity and reasonableness. If the court determines the itemized statement is regular and reasonable, the court will sign it and transmit it to the parties. The City shall then remit to the Special Master any court-approved amount, within 20 calendar days of court approval.

Other Provisions

15. As an agent and officer of the court, the Special Master and those working at his direction shall enjoy the same protections from being compelled to give testimony and from liability for damages as those enjoyed by other federal judicial adjuncts performing similar functions.

16. As required by Rule 53(b)(2) of the Federal Rules of Civil Procedure, the court directs the Special Master to proceed with all reasonable diligence.

17. The Special Master shall be discharged or replaced only upon an order of this court.

18. The parties, their successors in office, agents, and employees will observe faithfully the requirements of this Appointment Order and cooperate fully with the Special Master, and any staff or expert consultant employed by the Special Master, in the performance of their duties.

SO ORDERED.

Dated: Brooklyn, New York
      May 26, 2010

/s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge