UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
                                                                               :

UNITED STATES OF AMERICA,

                                                                                :

                    Plaintiff,

                                                                                 :      **SPECIAL MASTER'S**

      -and-                                                                             **REPORT ON POTENTIAL**

                                                                                 :      **INTERIM HIRING**

THE VULCAN SOCIETY, INC., for itself and on behalf of      **PROCEDURES**
its members, and MARCUS HAYWOOD, CANDIDO      :
NUÑEZ and ROGER GREGG, individually and on behalf
of a class of all others similarly situated,                **07-cv-2067 (NGG)(RLM)**

                                                 :

                    Plaintiffs-Intervenors,       :

          -against-                                   :

THE CITY OF NEW YORK,                               :

                    Defendant.                      :

-------------------------------------------------------------------------x

MARY JO WHITE, Special Master.

        On August 4, 2010, the Court found that Written Exam 6019 ("Exam 6019") used

by Defendant The City of New York (the "City") to hire new firefighters, does not

comply with Title VII of the United States Code.  At the Court's request, the Special

Master began discussions with the parties on August 17th, which continued on August

24th, 30th, 31st, September 1st, and September 3rd, to explore whether the parties could

agree on an interim method (subject to Court approval) by which the City lawfully could

hire new budgeted classes of firefighters before a new permanent selection procedure is

implemented.[1]  The purpose of this report is to apprise the Court of the results of those

discussions and the range of potential interim hiring procedures considered by the parties.

As discussed below, there is no agreement among the parties as to what interim

procedure should be followed pending development of a new selection procedure.  The

parties do agree, however, on several points that are relevant to the Court's consideration

of an appropriate interim hiring procedure.

A.     Background

In 2007, the City administered Exam 6019 to approximately 22,000 candidates for

the position of entry-level firefighter.  (Dkt. No. 505 at 4.)  All but approximately 750

test-takers "passed" the exam by achieving a final written exam score of at least 70.  (Id.)

The City awarded bonus points to passing candidates based on, among other things,

residency and military service.  The bonus points, if any, were added to each final written

exam score to yield an adjusted final score.  The City then ranked each of the passing

candidates by their adjusted score to create an eligibility list.  The City then began

processing candidates for potential hiring according to their rank on the Exam 6019

eligibility list.  Prior to the Court's decision on August 4, 2010, the City had processed or

begun processing approximately 2,000 candidates.  Approximately 312 of the processed

candidates were deemed qualified and appointed to the firefighter academy in July 2008.

(Id.)  Since the appointment of that class, the City continued processing candidates and

---

[1]     In discussions with the Special Master, the City has stated its desire to hire two
        classes of approximately 312 firefighters each, one now and one in January 2011.

currently has processed approximately 316 candidates whom it has internally determined are qualified for appointment, provided that they pass a final physical endurance test (hereinafter, the "Processed Candidates").  The Special Master is informed by counsel for the City that no written notice has yet been sent to the Processed Candidates of their current status and none has yet been called in to take the required physical endurance test.

As noted above, on August 4, 2010, the Court held that the City's use of Exam 6019 is not in compliance with Title VII and temporarily enjoined the City from hiring firefighters until the Court had an opportunity to hold a hearing on an appropriate interim hiring method.  (*See* Dkt. No. 505.)  On August 11, 2010, the Court held a scheduling conference and discussed briefly with the parties the need to hire firefighters while the parties are engaged in the process of developing a new selection procedure that will comport with Title VII.  At the conclusion of the scheduling conference, the Court set August 19, 2010 as the date for a hearing to address a number of issues related to the City's hiring of new firefighters in light of the invalidity of Exam 6019, including the status and timing of the City's current processing of candidates and whether the City has a current compelling need to hire new firefighters.  The Court also requested that the Special Master meet with the parties in an effort to facilitate an agreement by the parties on a mutually acceptable interim hiring method.

The Special Master held discussions with the parties beginning on August 17th. The parties were unable to agree on any interim hiring solution and the remedial hearing proceeded as scheduled.  Since that hearing, the Special Master has continued to discuss with the parties the possibility of reaching a mutually agreed upon solution, but no

agreement on an optimal interim procedure has been achieved and all parties maintain

their original positions previously expressed to the Court with respect to which methods

of interim selection would be lawful and optimal.

**B.     Points of Agreement**

In their discussions with the Special Master, the parties agreed on several points:

- *First*, all parties agreed that randomly selecting candidates for processing from the entire applicant pool for Exam 6019 would be race-neutral and, therefore, a lawful hiring procedure under Title VII.

- *Second*, all parties agreed that random selection for processing from a representative subgroup of the applicant pool also would be a lawful procedure under Title VII, provided that the subgroup's racial demographics reflected the racial demographics of the entire applicant pool (hereinafter, a "Representative Pool").

- *Third*, Plaintiff and Plaintiffs-Intervenors agree that the City may make use of the results of Exam 6019 for interim hiring so long as the resulting pool from which a random selection would be made is a Representative Pool.

**C.     Interim Hiring Procedures Discussed**

The Special Master and the parties discussed a number of alternative interim

hiring processes. Some of the procedures discussed would permit the City to make use of

the results of Exam 6019, provided that no disparate impact results. The City has argued

that it may make some use of the results of Exam 6019 for interim hiring even in light of

the Court's August 4th ruling, with which the City disagrees. Aug. 11, 2010 Scheduling

Conference Tr. at 14 (Mr. Lemonedes: "My client is still of the opinion, with all due

respect, that there is some inherent validity to the exam and there is some way of looking

at people with a higher grade as being more qualified for the position of firefighter than

those with a lower grade.").  Both Plaintiff and Plaintiffs-Intervenors have acknowledged that it would be lawful for the City to use the exam results in a non-discriminatory manner.  *See* Ltr. from Sharon Seeley to the Special Master 1 (Aug. 16, 2010) ( "[T]he City may hire in a manner (including a manner that uses Written Exam 6019 scores) that does not result in a disparate impact upon African-American and Hispanic Candidates.");  Aug. 11, 2010 Scheduling Conference Tr. at 18-19 (Mr. Levy:  "It could be random, it could be an invalid test.  It wouldn't be an issue unless there was discrimination as a result of its use.  So I don't think we have a vested interest in whether or not they use results from that test.  I think we have a vested interest in seeing that no one is discriminated against by use of that test.").

The potential hiring procedures discussed fell into three categories:  (*i*) random selection procedures; (*ii*) applicant flow; and (*iii*) a hybrid procedure incorporating elements of both.[2]

### 1.      Random selection procedures

As noted, the parties have all agreed that random selection from either the entire applicant pool for Exam 6019 or a Representative Pool would be a lawful means of conducting interim hiring.  The parties thus all agreed that random selection could be

---

[2]     Whatever interim selection process is used for potential entry-level firefighters who took Exam 6019, the City has indicated that it also intends to offer positions in the next academy class to the 13 emergency medical technicians ("EMTs") who have passed the required promotional exam and have been fully processed and determined to be qualified for hiring.  Plaintiff and Plaintiffs-Intervenors have expressed no objection to this plan.

conducted from a Representative Pool by assigning a unique random number to each member of the pool and processing candidates according to the number assigned. The Special Master and the parties discussed several different possible candidate pools, some of which proved to be representative (and, therefore, legally viable in the view of all parties) and others that did not. In addition to discussing the legal viability of the potential pools, the Special Master and the parties also discussed their respective views of the relative pros and cons of various methods of selection. Each of the potential methods of interim hiring discussed with the parties are described below.

### (a)      Random selection from the entire applicant pool

Under this procedure, the City would randomly select candidates for processing from the entire Exam 6019 applicant pool. The parties have agreed that this approach would be a lawful interim hiring procedure. Nonetheless, the parties have raised certain concerns about this potential selection method. Plaintiffs believe that this method is suboptimal because it does not assure proportional hiring based on race, only that the pool from which selections are made for processing will be proportional. The City expressed concern that candidates who received extremely low scores on the exam, all of whom would be included in this pool, may not be fit for the position of firefighter. All agree that one drawback to this procedure is that it carries a non-negligible risk that few, if any, of the Processed Candidates would be selected for appointment, thus necessitating a possible delay in identifying and training new firefighters.

### (b)    Random selection from the highest-ranked 2,500 after adjustment of rankings

The City estimates that in order to select a class of approximately 312 new firefighters, at least 1,000 candidates must be processed.  Since it will take some time to develop a new hiring procedure, the City has urged that any eligible interim pool should consist of 2,500 candidates so that, if necessary, two new classes could be selected in the interim period.  Under one such procedure that was discussed, the rankings of candidates on the current eligibility list would be adjusted so that the top 2,500 candidates would constitute a Representative Pool.  The adjustment would be accomplished by replacing the lowest-ranked white candidates with the highest-ranked minority candidates listed below 2,500 on the current eligibility list.  Because this method would create a Representative Pool, the parties agree that randomly selecting from this pool would be a lawful method of interim selection.  Using this smaller pool as opposed to the entire applicant pool would increase the probability that Processed Candidates would be selected for appointment – the City believes that it is indeed likely that all or substantially all of the Processed Candidates would be in this pool.  Use of this smaller pool also would address the concern expressed by the City that candidates who received extremely low scores on the exam would be appointed since they would not be among the candidates chosen for this pool.

### (c)    Random selection after re-scoring the exam

Another procedure considered would create a Representative Pool by re-scoring the exam after eliminating primarily those questions as to which the average score of

7

white candidates was more than 0.05 higher than that of black candidates.  Following

discussions with the Special Master, the City had its expert determine and eliminate such

questions, then re-scored the exams and produced the results to the other parties.  The

parties have agreed that if the questions identified by the City's expert were eliminated

and the exam re-scored and bonus points awarded, the top 2,500 candidates would

constitute a Representative Pool – thus, yielding a method all parties agree would be

lawful.  The parties have also confirmed that the pool would remain a Representative

Pool if those candidates already hired from the current eligibility list and those already

determined through post-exam processing to be permanently disqualified were excluded

from consideration.  The advantages of this proposal are similar to those of adjusting

rankings to create a Representative Pool as described above in paragraph (b).  The City

reports that a significant portion of the Processed Candidates, 239 of the 316, would be

included in the pool.

**(d)**      **Random selection from a proportional pool after exclusion of the lowest scoring test takers**

A number of other alternatives were explored to address the concern that random

selection from the entire applicant pool could potentially result in the hiring of very low-

scoring candidates.  The testing of these alternatives, conducted by the City, involved

analyzing the exam data to determine whether there was any Exam 6019 cut-off score, at

some point above the lowest scores, that would yield a Representative Pool among all

higher scoring candidates.  None of these various cut-off-score alternatives yielded a

Representative Pool, so this method proved not to be a means of conducting interim

hiring that all of the parties would agree comports with Title VII.

**D.      Applicant Flow**

Under an applicant flow procedure, suggested by Plaintiff and Plaintiffs-

Intervenors, the City would hire (using any criteria desired by the City) a class with racial

demographics that reflect those of the applicant pool.  Accordingly, the City would be

required to hire in proportion to the racial and ethnic representation of the applicant pool

for Exam 6019.[3]  The City opposes the use of any applicant flow procedure.  It

---

[3]    After the Special Master had informed the parties of her intention to file a report with
the Court on the parties' discussions about interim hiring procedures and read a draft
of the report to the parties, the plaintiffs, on September 3rd, sent to the Special
Master and the City two illustrations as to how the City might hire its next academy
class using the applicant flow methodology.  The Special Master finds these
illustrations useful to include in this report for the Court's consideration.

Under the first illustration, the City would hire an academy class of 300,
comprising 279 candidates from the 6019 eligibility list and 21 candidates who took
the EMT promotional exam or who are on a special military eligibility list.  In this
scenario, the 279 candidates from the 6019 eligibility list would be 60.5% white,
17.6% black, 18.6% Hispanic, 2.2% Asian, and 1% unknown.  (The entire 6019
applicant pool was 60.7% white, 17.4% black, 18.4% Hispanic, 2.1% Asian, 0.2%
Native American, and 1.2% unknown.)  These 279 candidates would include 169 of
approximately 231 white Processed Candidates and all of approximately 60 non-
white Processed Candidates (22 black, 33 Hispanic and 5 Asian).  The remaining 50
spots in the class of 300 would be filled by 50 additional non-white candidates (27
black, 19 Hispanic, 1 Asian, and 3 other).  Plaintiffs estimate (based on assumed
drop-out rates) that in order to identify these additional candidates, the City would
need to: (*i*) complete processing for 37 black candidates, 46 Hispanic candidates, and
3 Asian candidates whom the City has already begun to process, and (*ii*) process as
many as 42 additional black candidates and 10 additional candidates in the "other"
category.

Under the second scenario, the City would hire an academy class of 221
firefighters, comprising 200 candidates from the 6019 eligibility list and 21

characterized the procedure as a quota system and questioned its legality.  The City also

questioned whether the procedure would actually permit the City to hire more

expeditiously than one of the random selection procedures because it was unclear how

long it would take to process a sufficient number of additional minority candidates to

enable the hiring of a proportional academy class.  Plaintiff and Plaintiffs-Intervenors do

not view this proposal as a quota system, and emphasize that, in addition to being lawful,

it is the fairest and least disruptive path for interim hiring.  They describe the following

advantages: (*i*) it eliminates adverse impact; (*ii*) it satisfies the City's desire to hire from

among the top scorers on Exam 6019; and (*iii*) it would permit the City to hire the

majority of those candidates it has already processed, thus allowing the City to more

quickly staff its fire department, and minimize the disappointment of those candidates

who have already been processed.[4]

---

candidates who took the EMT promotional exam or who are on a special military eligibility list.  In this scenario, the 200 candidates from the 6019 eligibility list would be 61% white, 17.5% black, 18.5% Hispanic, 2% Asian, and 1% unknown. These 200 candidates would include 122 white Processed Candidates and 59 non-white Processed Candidates (22 black, 33 Hispanic and 4 Asian).  In addition, the City would need to continue processing black and Hispanic candidates for whom processing is pending until it identifies an additional 13 black candidates and 4 Hispanic candidates for hiring.  Finally, the City would have to process an additional 6 candidates whose race/ethnicity is "other" to identify 2 such candidates for appointment.

[4]   Plaintiff has also proposed an alternate version of applicant flow under which the City would select for processing (as opposed to select for hiring) a Representative Pool of the smallest size necessary likely to yield a sufficient number of qualified candidates for appointment.  For example, assuming the City intended to hire 100 firefighters and assuming that the processing drop-out rate was 33.33%, the City would identify a Representative Pool of 300 candidates.  All of the candidates would be processed.  If exactly 100 of the processed candidates were qualified, they would

**E.     Hybrid Approach**

The Special Master and the parties also discussed a hybrid approach under which

the City would hire immediately a small class of firefighters that is a representative

subgroup of the applicant pool from among the Processed Candidates.  Approximately

117 such candidates could thus likely be immediately hired while maintaining the same

racial proportionality as the entire pool taking the exam.  The City would then select

remaining candidates for processing at random from either the entire applicant pool or a

Representative Pool.  The hybrid approach would permit the City to hire a smaller, but

substantial class of firefighters immediately and assure that a large percentage of

Processed Candidates are appointed.  This approach would not require the City to hire

into the first, smaller class any candidates it was not planning to hire in the absence of the

Court's recent rulings.  Further, the City could supplement this class with the 13

emergency medical technicians who have passed the required promotional exam and

have been fully processed and determined to be qualified for hiring.  These candidates are

on a separate eligibility list.

---

be appointed to the academy.  If more than 100 qualified candidates were identified, then the City would randomly select 100 of the qualified candidates for appointment. If fewer than 100 candidates were qualified, then the City would start the process over to make-up the shortfall.  For example, if the original representative pool yielded only 80 qualified candidates, the City would select a new Representative Pool of 60 candidates for processing (20/.333 = 60.06).  After all 60 candidates are processed, one of the following would occur:  (*i*) if exactly 20 qualified candidates are identified from the new representative pool, then all 20 would be appointed; (*ii*) if more than 20 are identified, then 20 randomly selected qualified candidates would be appointed; and (*iii*) if fewer than 20, all qualified candidates would be appointed and the process repeated until the class is full.

Plaintiff and Plaintiffs-Intervenors have stated that they believe this method, like other applicant flow and random selection methods, would be lawful under applicable law.  Plaintiffs-Intervenors urged a modification to this approach, *i.e.*, that the size of the first class hired include all Processed Candidates plus as many additional minority candidates as necessary to make the class representative of the applicant pool.  Plaintiffs-Intervenors estimated that such a class would comprise about 400 firefighters.

The City opposes that aspect of the hybrid approach that uses applicant flow for the same reasons it opposes the other applicant flow procedures.  In addition, the City stated that it would not be logistically feasible to implement the version advocated by Plaintiffs-Intervenors because a class of 400 is too large for the academy facilities to accommodate.

## F.    Candidate Processing

Plaintiff and Plaintiffs-Intervenors expressed concerns that the manner in which the City processes candidates may disadvantage African-American and Hispanic candidates relative to white candidates.  In particular, they are concerned that: (*i*) African-American and Hispanic candidates whose cases are referred to the Personnel Review Board ("PRB"), which reviews certain potentially disqualifying issues discovered during a candidate's background examination, may be disqualified more frequently than white candidates with the same or similar issues; (*ii*) they may not be able to remedy disqualifying medical or psychological exams as easily as white candidates can; and (*iii*) they may change residences more frequently than white candidates, resulting in these

candidates being disqualified for failure to respond when notified of their selection for

processing more frequently than white candidates.  Although the Court did not

specifically refer processing issues to the Special Master or make any findings on this

issue, the Special Master discussed these process concerns with the parties.

During the course of these discussions, the plaintiffs made several proposals that

they believed addressed their concerns.  The Special Master asked the City to consider all

of the proposals to determine which ones, if any, it would agree to implement.  The City

has informed the Special Master and the parties that it will agree to the following process

proposals.

### 1.      Reporting for Investigation

The City will provide counsel for Plaintiff and Plaintiffs-Intervenors ("Plaintiffs'

Counsel") with: (*i*) a list, before or at the same time that a candidate receives notice, of all

candidates who are invited to attend a scheduled intake which will include their names,

identifying information, contact information on file, and their scheduled intake dates; and

(*ii*) monthly reports regarding the status of processing for these candidates, including

disposition codes (for instance, "fail[ed] to report [to] Investigator").  The City proposes

that Plaintiffs' Counsel would then follow-up as appropriate with candidates and provide

the Fire Department of New York ("FDNY") with any updated contact or other relevant

information no later than two weeks after receiving this information.  In the event that a

candidate fails to report for intake, the City would agree to reschedule the intake of any

candidate who contacts the FDNY directly within the two-week period following the date

13

of its last monthly report; however, candidates who do not appear at a rescheduled appointment and fail to contact the City within two weeks from the date on which the monthly status report is provided to Plaintiffs' Counsel will not be considered for the upcoming academy class.

### 2.      Character and Background Evaluation

The City has agreed that after a group of candidates has been considered by the PRB, the City will: (*i*) provide Plaintiffs' Counsel with a list of the candidates that includes the PRB's recommendation, for attorney's eyes only; (*ii*) provide the candidates with notice that they were considered but not selected for employment, have the right to seek an Article 78 review, and that they may contact Plaintiffs' Counsel for assistance in connection with the review; and (*iii*) if a candidate elects to provide the FDNY with a written waiver, produce to Plaintiffs' Counsel a copy of the "PRB package," *i.e.*, the material provided to the members of the PRB in reviewing the candidate.

### 3.      Medical Exam and Psychological Exam

The City will modify the notice it currently provides to candidates that have been disqualified from appointment due to medical and/or psychological reasons, to advise these candidates that they may seek assistance from Plaintiffs' Counsel in connection with an appeal to the New York City Civil Service Commission.  The revised notice will also include Plaintiffs' Counsel's contact information.

### 4.    Physical Exam

Finally, the City has agreed to provide Plaintiffs' Counsel with: (*i*) notice, in the form of a monthly statement from the New York City Department of Citywide Administrative Services ("DCAS"), of candidates (including identifying information), who are scheduled to take the Candidate Physical Ability Test ("CPAT"), and (*ii*) notice as part of the monthly report described under the heading "Reporting for Investigation" above, of  a candidate's failure to appear and/or failure to pass the CPAT.

Plaintiff and Plaintiffs-Intervenors sought additional processing changes, to which the City has not agreed.  For instance, they requested that the various notices and information about individual candidates be provided to the Vulcan Society, not just its counsel, and that the City provide African-American and Hispanic candidates with a written decision stating the basis of the PRB's decision.  Further, Plaintiff and Plaintiffs-Intervenors object to the two-week timeframe proposed by the City as the maximum period it will allow for a candidate to contact the City in order to be rescheduled for an intake for the upcoming class.  They point out that applicants are not currently subject to any deadlines other than that imposed by virtue of the City's appointment of a full class.

The Special Master is not inclined to pursue these process issues further for purposes of reporting to the Court on interim selection procedures.  As noted, the process issues, unlike the issue of the validity of the City's written exams, have not been the subject of a hearing or any judicial findings.  In the absence of agreement by the parties, it would not be appropriate for the Special Master to opine on disputed post-selection process issues.  The Special Master is of the view, however, that the process

enhancements agreed to by the City should be followed in any interim selection procedure.

* * * *

The Special Master wants to thank the parties and their counsel for their cooperation in this matter, which is of great importance to the public as well as to the parties.

*/s/  Mary Jo White*____

Mary Jo White

Dated:  September 3, 2010