

THE CITY OF NEW YORK

**MICHAEL A. CARDOZO**
*Corporation Counsel*

# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

**JAMES M. LEMONEDES**
*Assistant Corporation Counsel*
Phone: (212) 788-0881
Fax: (212) 788-0877
JLemoned@law.nyc.gov
E-Mail and Fax No. Not For Service of Papers

September 9, 2010

VIA ECF FILING
Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

By ECF filing

Re:  USA v. City   Civil Action No.: 07 CV 2067 (NGG)(RLM)
Law Dept. No.: 2007-017441

Dear Judge Garaufis:

I write in response to the Court's September 7, 2010 order (Docket Entry # 523), directing that the parties address any concerns regarding the Special Master's Report on Potential Interim Hiring and Supplemental Report (Docket Entries ## 521 & 522; hereinafter jointly referred to as "the Hiring Report") by today.  Defendant appreciates the substantial efforts of the Special Master in assisting the parties' attempt to reach agreement on an interim hiring procedure given the Court's finding regarding the validity of Exam 6019 (Docket Entry # 505).   The Special Master took considerable time reviewing the various proposals to address a fair, equitable and legally permissible means of structuring such interim hiring.

In light of the Plaintiff's-Intervenors' recent request to address a hiring proposal that was identified in the Hiring Report (*see* Docket Entry # 520), as well as the Court's recent order, Defendant respectfully submits this brief letter-response to address the two illustrations of the interim hiring proposal advocated by Plaintiff and Plaintiffs-Intervenors, specifically "applicant flow" proposal.  The two illustrations of this proposal were submitted by the Plaintiff at the last minute and, thus, did not receive the same level of discussion afforded the other proposals.  *See*  Hiring Report § D, pp. 9-11, footnotes 3 & 4 (Docket Entry # 521).  Defendant contests this proposal as a quota system and disputes the legality of the system proposed.  Indeed, the Plaintiff's and Plaintiffs-Intervenors' "applicant flow" procedures specifically require that fully qualified candidates be rejected for employment simply because they are white.  These fully qualified white candidates, who scored highly on the exam *and* took their own time, money and effort to become fully processed so they would be ready for appointment as soon as the

Lemonedes to Hon. Nicholas Garaufis
Aug. 9, 2010; p. 2

FDNY could hire, are exactly the innocent non-victims which the Supreme Court has instructed must be considered in granting any interim relief. *See, e.g.*, *International Brotherhood of Teamsters v US*, 431 U.S. 324, 371-72 (1977)("after the victims have been identified and their rightful place determined, the District Court will again be faced with the delicate task of adjusting the remedial interests of discriminatees and the legitimate expectations of other employees innocent of any wrong doing"); *see also Franks v. Boman Transport Co.*, 424 U.S. 747, 773 (1976). Moreover, although the applicant flow procedure purports to require the FDNY to offer employment to the various ethnic groupings in the same proportions that these ethnic groupings sat for the exam, due to the higher drop out rate of blacks and Hispanics,[1] it is clear that FDNY will be required to afford the opportunity to serve as NYC firefighters to blacks and Hispanics candidates at a higher rate than these ethnic groupings sat for the exam.[2]

The Hiring Report details the two illustrations Plaintiff provided at the last minute.[3]  *See* Hiring Report § D, pp. 9-10, footnote 3.  Under the first illustration the next

---

[1]      In examining the different drop-out rates for the ethnicities, the data regarding processing for the 6019 eligible list shows that there is a significant difference in the drop-out rates between the different ethnicities.  In order to ensure that this drop-out rate is completely independent of any action by the FDNY, and thus cannot be a basis for any claim of discrimination, drop out rates for only the following reasons were considered: failure to report to intake/investigation, failure to report to medical exam, failing the medical exam, and failing the physical exam (the CPAT).  Using these categories, the data establishes: 56% of white candidates drop out of processing; 70% of blacks drop out of processing; and 59% of Hispanics drop out of processing.  Thus, in order to fill certain positions with only minority candidates (as the applicant flow proposal requires), the FDNY will be required to process additional minority candidates than would be required if the hiring was on a race-neutral basis.  For example, to fill 10 positions with *only* black candidates, FDNY would be required to process 33 black candidates – yet filling these same 10 positions on a race-neutral basis will necessarily require processing a smaller number of candidates.

[2]      Plaintiff and Plaintiffs-Intervenors assert that because 60.7 percent of the 6019 test-takers were white, 17.4 percent of the test-takers were black, 18.5 percent of the test-takers were Hispanic, 2.1 percent of the test-takers were Asian (*see* Hiring Report § D, p. 9, footnote 3), the applicant flow procedures requires that a similar percentage of each ethnic group must be hired as NYC entry-level firefighters. *See* Hiring Report § D, p. 9. Yet, in order to fill the quotas required by applicant flow procedures, FDNY will need to process black and Hispanic candidates at rates much higher than their proportional representation among test-takers.  For example, to fill an Academy class of 100 with 61 white candidates, 18 black candidates, 19 Hispanic candidates and 2 Asian candidates, the FDNY would be required to process: 139 whites, 60 blacks, 46 Hispanics, and 4 Asians.  Accordingly, FDNY would need to process a total of 249 candidates: only 56% of which are white, while over 24% are black.  Thus, "applicant flow" proposal actually requires that blacks be given a greater opportunity to serve as a NYC entry-level firefighter.

[3]      Defendant notes that the numbers provided by Plaintiff in the noted illustrations are not consistent with the data concerning processing.  In the first illustration Plaintiff suggests that there were "approximately 231 white processed candidates." *See* Hiring Report § D, pp. 9-10, footnote 3.  However, there were 236 white processed candidates as reflected on the latest available FDNY spreadsheet labeled as: "FDNY processing 6019 list - DOJ Request 8.2.10.xls - (# Legal 2723306).XLS" (this spreadsheet identified 224 white candidates as "Qualified," and 12 white candidates as "Qualified Restored").  Thus, Plaintiff *understates* the number of qualified white candidates to be rejected under the applicant flow

Continued…

2

Lemonedes to Hon. Nicholas Garaufis
Aug. 9, 2010; p. 3

Academy class would consist of 279 candidates from 6019 eligible list, including: 169 white candidates, 49 black candidates, 42 Hispanic candidates, and 6 Asian candidates. In order to satisfy these hiring quotas, the FDNY will be required to **reject** 62 fully qualified white candidates and then FDNY will need to replace them by hiring all the minority candidates that had been processed and found qualified (which Plaintiff asserts are: 22 black candidates, 33 Hispanic candidates and 5 Asian candidates), *and* by processing additional black and Hispanic candidates to fill the remaining positions (27 black positions, 19 Hispanic positions and 1 Asian position). In order to do this, FDNY will need process a greater number of minority candidates than would be required if the processing was race-neutral, and would require moving black and Hispanic candidates into the hiring pool above higher or even equally scoring white candidates.

The second illustration posits that the next Academy class would consist of 200 candidates from the 6019 eligible list, including: 122 white candidates, 35 black candidates, 37 Hispanic candidates, and 6 Asian candidates. Again the FDNY would need to reject a sizable number of qualified white candidates (114) based solely on their race and to continue to process, that is, offer the opportunity to become NYC firefighters, to additional minority candidates in numbers proportionally greater than their representation among test-takers to achieve these quotas.

Remarkably, the Plaintiff and Plaintiffs-Intervenors continue to insist that their "applicant flow" proposal does not involve quotas. *See* Hiring Report § D, p. 10. However, because this procedure sets specific limits on the number of qualified white candidates that can be hired while further requiring that FDNY hire a specific proportion of minority candidates, the "applicant flow" proposal is undoubtedly a quota system. Moreover, because this proposal requires that FDNY offer the opportunity to serve as NYC firefighters to black and Hispanic candidates in numbers greater than their proportional representation among candidates who took the exam to assure that pre-determined numbers of black and Hispanic candidates are hired, this quota is unfair and unlawful.

In considering the applicant flow procedures proposed by the Plaintiff and Plaintiffs-Intervenors it is important to consider two determinations established by the District Court in this litigation. First, the Court's initial decision concerning the impact case found that the initial exams being challenged (exams 7029 and 2043), had "unfairly excluded hundreds of qualified people of color from the **opportunity to serve** as New York City firefighters." *U.S. v City of New York,* 637 F. Supp. 2d 77, 79 (E.D.N.Y. 2009)(emphasis supplied). Yet, the applicant flow proposal would provide the minority candidates with far more than a *fair opportunity to serve* as a firefighter. In fact, the quota system provides minority candidates with

_____

illustration. Accordingly, FDNY will need to reject 67 fully qualified candidates because they are white (not 62 as Plaintiff projected). Similarly, Plaintiff *overstates* the number of qualified black candidates who had been fully processed. The latest spreadsheet shows that there are 21 black candidates fully processed as qualified (20 black candidates identified as "Qualified," and 1 identified as "Qualified Restored"). Thus, FDNY will need to process additional candidates to meet the quota established under Plaintiff's and Plaintiffs-Intervenors' applicant flow procedures.

3

Lemonedes to Hon. Nicholas Garaufis
Aug. 9, 2010; p. 4

an **unfair advantage** to serve as NYC firefighters at the expense of other qualified white candidates. Moreover, and more importantly, in advocating the applicant flow procedures, the Plaintiff and Plaintiffs-Intervenors specifically *ignore* this **Court's strong instruction that it will not be imposing quotas.**[4] *See* Transcript of July 21, 2010 hearing, p. 428, line 1 to p. 429, line 12. Despite this *clear*, unequivocal instruction from the Court, Plaintiff and Plaintiffs-Intervenors continue to insist on seeking quotas. Here again, they seek quotas and simply cloak them in different verbiage as "applicant flow."

In considering the purported "equitable advantages" presented by the applicant flow proposal advocated by the Plaintiff and Plaintiffs-Intervenors, *see* Plaintiffs-Intervenors September 3, 2010 letter to the Court (Docket Entry # 520), it is important to remember the following flaws:  1) these quotas require the exclusion of scores of fully qualified white

---

[4]     During the July 21, 2010 hearing concerning the validity of Exam 6019, the Court specifically instructed the parties as follows:

> The plaintiff has made a suggestion about using the 6019 in a certain way with percentages of different groups. Let me just make it very clear.
>
> The Court is -- has no intention of establishing a system of -- or one -- one example of or one situation of quotas of minorities and ethnics and whites. The Court is not going to do that unless -- I can't imagine -- I can't imagine a circumstance where I would do that.
>
> I think that what they need to do is -- is develop a test that can be validated, given, and then utilized to hire firefighters. That is the objective here. I said that over and over again. And quotas are not -- are not in my -- they are the furthest thought from my thinking and judging process. And **I just want you to understand my view on quotas**. It has been my view on quotas throughout this litigation and hasn't change my mind.
>
> And I understand the desire of the United States to find some way of dealing with the City's needs without utilizing the test in a -- 6019 in a rank order manner, but I just -- I will not -- **I will not impose quotas**. So I want you to tell your client that. You tell your client that. You tell your client that here. **We are not going to have quotas in this litigation**, but **we are going to, should we need it, have some other solution as an interim solution**. I am not sure we are going to need it, but I just wanted you to understand my position.
>
> Is that clear?
>
> MR. LEMONEDES:  Yes.
>
> THE COURT:  Is that clear?
>
> MR. LEVY:  Yes, Your Honor. I am not happy, but I am --
>
> The COURT:  Please, is it clear?
>
> MR. LEVY:  It's clear.
>
> ...
>
> MS. SEELEY:  It is clear, Your Honor.

*See* Transcript of July 21, 2010 hearing, p. 428, line 1 to p. 429, line 12 (emphasis supplied)(hereinafter "7/21/10 hearing Tr. __").

**Lemonedes to Hon. Nicholas Garaufis**
**Aug. 9, 2010; p. 5**

candidates based solely on their race;  2) these quotas require that minority candidates be given unfair preference in being offered an opportunity to serve as NYC firefighters in order to ensure that minority candidates with higher drop out rates be hired to satisfy the quotas; 3) the Court has specifically instructed that: "[w]e are not going to have quotas in this litigation, [and] …, should we need it, [we will] have some other solution as an interim solution." 7/21/10 hearing Tr. 429. Accordingly, Defendant objects to the applicant flow procedures and asserts that they simply do not provide the equitable advantages asserted, nor are they consistent with the clear instructions of this Court or with the law.

            Thank you for your attention to this matter.

                              Respectfully submitted,


                              James M. Lemonedes
                              Assistant Corporation Counsel


JML/tim
cc:      All counsel via ECF