IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>PLAINTIFF,<br><br>THE VULCAN SOCIETY INC., ET AL.,<br><br>PLAINTIFFS-INTERVENORS<br>V.<br><br>CITY OF NEW YORK, ET AL.,<br><br>DEFENDANTS. | CIV. ACTION NO. 07-CV-2067 (NGG)(RLM) |

**PLAINTIFF UNITED STATES' RESPONSE SUPPLEMENTING THE
SPECIAL MASTER'S REPORT ON POTENTIAL INTERIM HIRING PROCEDURES**

Pursuant to the Court's orders of June 1, 2010 (Dkt. No. 448) and September 7, 2010 (Dkt. No. 523), the United States respectfully submits this Response Supplementing the Special Master's Report on Potential Interim Hiring Procedures ("Report"), Dkt. No. 521, so that the record before the Court will include additional facts relating to two of the interim hiring procedures described in the Report: (1) the proposal for random selection after re-scoring, described in Section C.1.(c) of the Report (the "re-scoring proposal"), *see id.* at 7-8, and (2) the United States' and Plaintiffs-Intervenors' proposal for hiring proportional to applicant flow, *see id.* at 9-10. Although the Special Master's description of these proposals is accurate, the Report does not include a detailed description of the re-scoring procedure or the re-scored examination. Nor does it provide a detailed comparison of the results of the re-scoring proposal to those of the applicant flow proposal. The United States respectfully submits that the record should include these additional facts in order to permit a thorough consideration of these proposals and of the

equities relating to these and other proposed interim hiring procedures.

## I. BACKGROUND

At a status conference on August 11, 2010, the Court inquired whether the parties agreed that it would be productive to have discussions with the Special Master regarding proposals for an interim hiring process for entry-level firefighters pending development of a new, lawful selection procedure. *See* Attachment A, Aug. 11, 2010 Tr. at 25-27. The Court suggested that if such discussions resulted in an agreement among the parties regarding an interim hiring procedure, it would not be necessary for the Court to hold a hearing, scheduled to take place on August 19, 2010, to consider whether the City has a need to hire firefighters in advance of the development of the new selection procedure. *Id.* at 25-26, 27. At the status conference, counsel for the City and the Plaintiffs-Intervenors agreed that it would be productive to participate in discussions with the Special Master. *Id.* at 27-28. By letter dated August 13, 2010, the United States advised the Court that it did not object to participating in discussions regarding potential interim hiring proposals. *See* Dkt. No. 509.

The Court then issued an order outlining the Special Master's role with respect to the discussions of interim hiring proposals and permitting the Special Master to have *ex parte* communications with the parties to facilitate the discussions. *See* Dkt. No. 511. The parties thereafter engaged in discussions with the Special Master, as outlined in the Report. Although no agreement was reached prior to August 19, and the hearing went forward as scheduled, at the Court's direction, discussions with the Special Master continued until issuance of the Report.

In the Report, the Special Master outlined several of the proposals that were discussed by the parties and the Special Master. A number of the proposals involve random selection of

candidates for processing from various suggested pools or subgroups of candidates who took Written Exam 6019. *See* Report, Dkt. No. 521, at 5-9. As the Report notes, although the parties did not agree regarding the best, most equitable interim hiring method, they did agree that random selection of candidates for processing from a "proportional" or "representative" pool or subgroup[1] of candidates would be lawful. *Id.* at 4.[2] One of these proposals, referred to in the Report as "random selection after re-scoring the exam" (and herein as the "re-scoring proposal"), involves re-scoring Written Exam 6019, re-ranking candidates based on the re-scored examination plus bonus points, and then creating a pool of the 2,500 highest-ranked candidates from which random selections would be made. The parties agreed that the resulting pool of the highest-ranked 2,500 candidates would be a proportional pool.

## II. DISCUSSION

Because the Court has indicated that any order it issues regarding an interim hiring procedure will consider not only the lawfulness of the method, but also the relevant equities, *see* Attachment A, Aug. 11, 2010 Tr. at 7-8, it is important that the Court be provided with all information necessary to evaluate those equities. While the method of identifying the pool of candidates from which random selections would be made is relatively straightforward for the other random selection proposals described in the Report, the re-scoring proposal is more

---

[1] For purposes of this Response, "proportional pool" has the same meaning as "representative pool," as defined in the Special Master's Report – *i.e.*, a pool of candidates in which the representation of blacks and Hispanics is proportional to their representation among all applicants who took Written Exam 6019. *See* Report, Dkt. No. 521, at 4.

[2] The Special Master filed a supplement to the Report on September 4, 2010, indicating that the City does not agree that one of the proposals for random selection from a proportional pool (random selection from the highest-ranked 2,500 candidates after adjustment of the rankings to create a proportional pool or class) is lawful. *See* Dkt. No. 522.

complex. In describing the way in which Written Exam 6019 was re-scored for purposes of the re-scoring proposal, the Special Master's Report states only that the re-scoring involves "re-scoring the exam after eliminating primarily those questions as to which the average score of white candidates was more than 0.05 higher than that of black candidates." Report, Dkt. No. 521, at 7-8. Moreover, while the Report states that the parties agreed that the re-scoring proposal would result in a proportional pool of candidates from which random selection would be made, the Report does not provide detail regarding the composition of the pool. The United States therefore submits this Response to supplement the record before the Court.

### A. The Re-Scoring Proposal Re-Ranks Candidates Based on Scores on a New Examination Composed Primarily of Situational Judgment Exercise Items.

The re-scoring proposal involves the complete elimination from the written examination of 46 of the Written Exam 6019 items (*i.e.*, questions), and a re-scoring of the remaining items. In order to determine which items would be eliminated for purposes of the re-scoring, the City calculated the average score of white, African-American, and Hispanic candidates for each item on Written Exam 6019.[3] As set forth in the Report, items for which the average score of white candidates was more than 0.05 higher than the average score of black candidates were eliminated. *See* Report, Dkt. No. 521, at 8. This resulted in the elimination of 35 items. Eleven additional items were also eliminated, including 10 questions for which the answer key reflected

---

[3] In order to calculate these average scores, a numerical value was assigned to each item. The numerical value of the item was given to each candidate who answered the item correctly, and a value of zero was given to each candidate who did not answer the item correctly. For each item, the average for whites (and separately for blacks and for Hispanics) was calculated by totaling the values for all white (or black or Hispanic) candidates and dividing by the number of white (or black or Hispanic) candidates.

4

more than two correct answers. Items that were not eliminated were weighted and used to calculate a new final score for each candidate. Candidates were re-ranked based on their new final scores plus bonus points. In effect, the re-scoring proposal involves the creation of a new examination, composed of a subset of Written Exam 6019 items, that has not been subject to evaluation by the parties' testing experts or to review by the Court.

The City did not provide, and the Special Master therefore did not report, information regarding which of the 18 constructs originally targeted for measurement by Written Exam 6019 each of the items remaining in this new, re-scored examination was intended to measure. However, the United States' analysis of the re-scoring proposal indicates that, after the City eliminated 46 items, as described above, the remaining items included 95 items from the situational judgment exercise ("SJE") component of Written Exam 6019, 42 items from the "timed" component and only 12 items from the cognitive component. The United States' analysis of the re-scoring proposal indicated that approximately 61 percent of the candidates' new final score, prior to the addition of bonus points, is derived from items from the SJE portion of Written Exam 6019; approximately 23 percent from the cognitive portion; and approximately 15 percent from the "timed" portion. *See* Attachment B, Decl. of David P. Jones, Ph.D., ¶ 6.

**B.      The Re-scored Examination Results in a Disparate Impact and Is Not Valid.**

      1.      <u>The Re-Scoring Proposal Results in a Disparate Impact.</u>

As set forth in the Report, the parties agreed that the re-scoring and re-ranking of candidates that would be performed under the re-scoring proposal would result in a pool of candidates that is proportional to the representation of whites, blacks and Hispanics among all applicants who took Written Exam 6019. However, in considering the various interim hiring

procedures discussed, it should be noted that the new examination resulting from the elimination of 46 items from Written Exam 6019 and re-scoring of the remaining items, as described above, still has a disparate impact. As shown below, the proportionality of the pool results from the addition of bonus points to arrive at a final adjusted score used to rank the candidates.

The United States analyzed the pool of the highest-ranking 2,500 candidates that would be created if ranking were based only on the re-scored examination, without bonus points. The results are shown below:

|  | Number (% of Pool of 2,500) in Re-Scored Pool Without Bonus Points | Number (% of Pool of 2,500) in Re-Scored Pool With Bonus Points | Number (% of Total Applicants) in Exam 6019 Applicant Pool |
|---|---|---|---|
| Black | 271 (10.8%) | 411 (16.4%) | 3,858 (17.4%) |
| Hispanic | 315 (12.5%) | 464 (18.6%) | 4,084 (18.4%) |
| White | 1,849 (73.4%) | 1,533 (61.3%) | 13,439 (60.7%) |

Attachment B, Decl. of David P. Jones, Ph.D., ¶ 8. Based on the above, using the re-scored examination without bonus points, black candidates would place among the top 2,500 candidates at only 52% of the rate at which white candidates would place among the top 2,500 candidates. *Id.*, ¶ 9. Similarly, but for the addition of bonus points, Hispanic candidates would place among the top 2,500 at only 56% of the rate of white candidates. *Id.* In other words, the adverse impact ("80% Rule") ratio resulting from the re-scoring, prior to the addition of bonus points, is .52 for black candidates and .56 for Hispanic candidates. The differences between the rates at which black candidates and Hispanic candidates, as compared to white candidates, would place among

6

the top 2,500 without the addition of bonus points are highly statistically significant, equivalent to 11.2 and 10.3 units of standard deviation, respectively. *Id.*, ¶ 11. Thus, in considering the equities of the re-scoring proposal, the Court should be aware that the re-scored examination that the City would use has a severe disparate impact upon black and Hispanic candidates.

2. <u>The Re-Scored Written Examination Is Not Valid.</u>

The Court also should be aware that none of the parties claims that there is any psychometric justification for the selection of items to be included in (or excluded from) the re-scored examination or for determining that only the highest-scoring 2,500 test-takers should be included in the pool from which random selections would be made. At the August 11 status conference, the City suggested that – despite this Court's ruling to the contrary – it believes that Written Exam 6019 has some level of validity based on its measurement of general cognitive ability. *See* Attachment A, Aug. 11, 2010 Tr. at 21-22. However, as set forth above, the relative weight that would be given to items from the cognitive portion of Written Exam 6019 in calculating candidates' final scores under the re-scoring proposal is only approximately 23 percent. In contrast, the SJE items included in the re-scored examination account for approximately 61 percent of candidates' final scores. Thus, it is clear that the decision regarding which items to eliminate was not based on any notion that the cognitive potion of Written Exam 6019 has some minimal level of validity. Indeed, given the Court's discussion of the problems with the SJE items, *see* Aug. 4, 2010 Mem. and Or., Dkt. No. 505, at 18-19, 23-24, 27, as well as its finding regarding the lack of validity of Written Exam 6019 as a whole, there is reason to believe that a re-scoring of the examination that relies heavily on the SJE items is not valid. Thus, in considering the equities of the re-scoring proposal, the Court should be aware that the

selection of items to be eliminated was based entirely on the racial composition of the pool of candidates that would result, and cannot be defended as job-related.

### C. Interim Hiring Based on Applicant Flow Will Allow the Hiring of All Candidates Who Are Currently Qualified Into One of the Next Two Fire Academy Classes With Minimal Processing Delays.[4]

The Special Master's Report indicates that one advantage of the re-scoring proposal is that, as compared to random selection from the entire applicant pool, the use of the re-scoring proposal would increase the likelihood that candidates who already have been processed will be selected for appointment. *See* Report, Dkt. No. 521, at 6-7, 8. However, the Report provides little detail and no direct comparison with the likelihood that such already-processed candidates would be selected if the Court adopts the United States' and Plaintiffs-Intervenors' proposal for an interim hiring procedure based on applicant flow – *i.e.,* an interim hiring process that requires the City to hire black, Hispanic, and white candidates from the Written Exam 6019 eligibility list in proportion to their representation in the overall applicant pool but otherwise allows rank-order use of the current list.[5] *See id.* at 9-10.

If the United States' proposal were adopted and the City were to hire an academy class of 300 fire recruits, the City could hire into that class 224 of the 286 (78.3%) black, Hispanic and

---

[4] For the Court's convenience, attached to this Response are the two illustrations referenced in footnote 3 of the Report. *See* Attachment C (illustration of academy class of 300); Attachment D (illustration of academy class of 221 based on completing the processing of black and Hispanic candidates whose processing status is currently listed as "pending"). The additional information discussed in this Section is set forth in these attachments.

[5] If the Court were to simply order the City to hire in proportion to applicant flow, it would be unnecessary for the Court to specify the manner in which the City does so, and the City would have the freedom to use candidates' scores on the re-scored Written Exam 6019 – or anything else it chooses – to select a proportional class from among candidates.

white candidates who already have been processed and deemed qualified for appointment by the City. In order to be proportional, the class would have to include an additional 27 black and 19 Hispanic candidates not yet found qualified. Based on the overall rates at which the City asserts that black and Hispanic candidates "drop out" during processing, due either to failure to report or disqualification,[6] it is estimated that the City would be required to process (or complete the processing of) approximately 61 black and 32 Hispanic candidates in order to hire these additional 27 black and 19 Hispanic candidates. In this regard, it should be noted that there are 37 black and 56 Hispanic candidates whose processing status was, as of the August 4, 2010 processing information provided by the City, listed as "pending."[7] It also should be noted that, because these "pending" candidates already have appeared for investigation and begun processing (and, according to the City, many of the candidates who drop out do so by failing to appear for investigation), the expected "drop out" rate from among these candidates would likely be substantially lower than that of a group of candidates who have not yet begun processing. Thus, it is likely that the City could hire a proportional class of 300 by processing 24 (or fewer) black candidates and no Hispanic candidates that the City has not yet begun to process. Additionally, although using the method of selecting a class of 300 described above would result in 62 (21.7%) of the already qualified white candidates not being hired into the first class of 300, it is highly likely that all of these candidates would be hired into the second class contemplated

---

[6] The City has asserted that the "drop out" rate from among candidates processed from the Exam 6019 eligibility list to date is 66% for black candidates and 59.1% for Hispanic candidates.

[7] The City has not provided detail regarding what processing remains for each of the candidates listed as pending.

by the City (*see* Report, Dkt. No. 521, at 2 n.1), because another proportional class of 300 would include 224 white candidates. In other words, using this method, it can be expected that 100% of the candidates currently qualified and awaiting hire likely would be hired into the two classes the City contemplates.

Thus, in evaluating the equities of the proposals set forth in the Report, it is important to note that the applicant flow proposal permits hiring that compares favorably to the hiring that would occur under the re-scoring proposal both in terms of the likelihood that candidates who have already been processed and deemed qualified for appointment will be hired, as well as the amount of additional processing that would be necessary to fill a prospective class. As stated in the Special Master's Report, the re-scoring proposal's pool of 2,500 (from which the City contemplates hiring two classes of approximately 300 each) includes only 239 candidates already processed and found qualified. Report, Dkt. No. 521, at 8. Thus, up to – but no more than – 239 (83.6%) of the 286 such candidates could possibly be hired if the re-scoring proposal were adopted. However, the 239 already-qualified candidates comprise only 9.6% of the pool of 2,500 from which random selections would be made. While some of these 2,500 candidates already have been disqualified and therefore would not be hired from the pool, it is clear that random selection from the pool is likely to result in the appointment of substantially fewer of the candidates – black, Hispanic and white candidates – who already have been qualified and are expecting to be hired than would be the case if hiring proportional to applicant flow is done as described above. For similar reason, the re-scoring proposal (and any other proposal involving random selection) would likely require the processing of many more candidates that the City has not even begun processing, resulting in additional delay in the next academy class.

## III. CONCLUSION

For the reasons stated above, the United States respectfully submits this Response to supplement the Special Master's Report with the additional facts stated herein so that the Court can consider these additional facts in determining how the City will be allowed to appoint firefighters during the interim period while a new, lawful selection procedure is being developed.

Dated: September 9, 2010

Respectfully submitted,
THOMAS E. PEREZ
Assistant Attorney General

LORETTA KING
Acting Chief

/s/SHARON A. SEELEY
Acting Deputy Chief
Telephone: (202) 514-4761
Facsimile: (202) 514-1005

MEREDITH L. BURRELL
Senior Trial Attorney

JENNIFER M. SWEDISH
Trial Attorney

United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Patrick Henry Building, Room 4500
Washington, D.C. 20530

LORETTA E. LYNCH
United States Attorney

/s/ELLIOT M. SCHACHNER
DAVID ESKEW
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201-1820
Telephone: (718) 254-6053
Facsimile: (718) 254-6479