UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                        Plaintiff,

      -and-

THE VULCAN SOCIETY, INC., MARCUS
HAYWOOD, CANDIDO NUÑEZ, and
ROGER GREGG,

                     Plaintiff-Intervenors,

      -against-

THE CITY OF NEW YORK,

                    Defendant.
------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

**07-cv-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

On August 4, 2010, this court found that New York City's use of its current written

examination, Exam 6019, has discriminatory effects on minority applicants for the position of

entry-level firefighter and fails to test for relevant job skills, in violation of Title VII of the Civil

Rights Act of 1964.  As a result, the court temporarily enjoined the City from using Exam 6019

to appoint entry-level firefighters and directed the parties to begin devising an appropriate, non-

discriminatory interim hiring procedure.

Under the supervision of Special Master Mary Jo White, the parties held multiple

meetings to discuss possible hiring measures.  Special Master White has submitted a detailed

report outlining seven hiring procedures that the parties have proposed.  Based on its review of

these proposals, the court finds that four of these procedures, as well as one that the court has

crafted itself, are lawful, equitable compliance measures that adequately balance the court's

1

duty to eradicate illegal discrimination with the need to safeguard New York's citizens and firefighters.  Three of these proposals would require the City to process additional candidates before appointing its next class.  (See Proposals 2, 4, and 5 below.)  Two would permit the City to appoint a class immediately (Proposals 6 and 7), and one those two proposals would permit the City to immediately appoint all of the candidates that it has processed and found qualified, provided it offsets the disparate impact in a subsequent class (Proposal 7).  Because each of these five proposals is a lawful remedy, and because the City is in the best position to weigh its financial and operational interests, as well as the interests of the applicants who took Exam 6019, the court will allow the City to choose which of the five hiring procedures the court will order.

I.      **BACKGROUND**

A.      **Factual and Procedural History**

The court assumes familiarity with the factual and procedural background of this case, as set forth in its August 4, 2010 Memorandum and Order (Docket Entry # 505 ("6019 Validity Order").)  The court offers only a brief summary below.

Between 1999 and 2008, the City used two competitive examination processes, Exam 7029 and Exam 2043, to screen and select applicants for entry-level firefighter positions.  In July 2009, this court held that the City's use of Exams 7029 and 2043 as pass/fail and rank-ordering devices constituted disparate-impact discrimination in violation of Title VII of the Civil Rights Act of 1964.  See United States v. City of New York, 637 F. Supp. 2d 77 (E.D.N.Y. 2009).  In January 2010, this court held that the City's actions constituted intentional discrimination in violation of Title VII and the Fourteenth Amendment.  United States v. City of New York, 683 F. Supp. 2d 225 (E.D.N.Y. 2010).

The disparate-impact and intentional discrimination decisions obligated this court to consider, as an exercise of its remedial jurisdiction, whether the City could continue to use its current entry-level firefighter examination, Exam 6019.  See United States v. City of New York, 681 F. Supp. 2d 274, 295 (E.D.N.Y. 2010) ("Initial Remedial Order"); see generally Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975); Guardians Assoc. of New York City Police Dept., Inc. v. Civil Service Comm'n, 630 F.2d 79, 108, 109 (2d Cir. 1980)  ("Guardians").  On June 29, 2010, the City informed the court that it intended to use the Exam 6019 eligibility list to hire a new class of approximately 300 firefighters in late August or early September 2010. (Docket Entry # 456.)   Accordingly, on July 20 and 21, 2010, the court held a hearing (the "Validity Hearing") at which it took evidence and heard testimony regarding the validity of Exam 6019.  On August 4, 2010, the court found that the City's use of Exam 6019 as a rank-order and pass/fail device with a cutoff score of 70 was inconsistent with Title VII because it had a disparate impact on black and Latino applicants and was not job-related.  (See 6019 Validity Order.)  Based on this finding, the court temporarily enjoined the City from taking any further steps to initiate or finalize a fire academy class using the Exam 6019 eligibility list until October 1, 2010.  (Id. 37.)

To assist the court in reaching a permanent equitable solution to the question of interim hiring, the court held a hearing on August 19, 2010 (the "Hiring Hearing"), at which it received testimony and evidence regarding the City's need for a new firefighter class and the means by which a new class could be hired.  The court heard testimony from Stephen Rush, the FDNY's Assistant Commissioner for Finance and Budget; Donay Queenan, the FDNY's Assistant Commissioner for Human Resources; and Chief Robert Sweeney, the FDNY's Chief of Operations.

Additionally, at a status conference on August 11, 2010, the court suggested, and the parties agreed, that it would be beneficial for the parties to meet with Special Master Mary Jo White to discuss whether (or to what extent) they could agree on an interim hiring proposal. Accordingly, the Special Master held intensive discussions with the parties over the course of six days to explore lawful hiring options.[1]  (See Special Master's Report on Potential Interim Hiring Procedures (Docket Entry # 521) ("Hiring Report") 1-2.)  On September 4, 2010, the Special Master filed a Hiring Report describing seven proposals that the parties had discussed, as well as the parties' positions regarding the legality and desirability of each proposal.[2]  (Id.) The parties each filed a response to the Hiring Report on September 9, 2010.  (See Docket Entry ## 524-26.)

**B.      Exam 6019 and the City's Current Hiring Procedure**

Approximately 21,983 candidates took Exam 6019, and 21,235 candidates passed by scoring at least 70.  (6019 Validity Order 4.)  Candidates who failed the exam were excluded from further consideration for the job.  The City calculated each passing candidate's "Adjusted Final Average" by adding any applicable residency, veteran, and legacy bonus points to the candidate's exam score.[3]  (Pl. Proposed Findings of Fact (Docket Entry # 483) ("Pl. PFF") ¶ 15.)  The City then assigned each candidate a list number (or rank) based on the candidate's Adjusted Final Average, with the lowest list numbers (i.e., the highest ranks) assigned to the

---

[1] The court thanks the Special Master for her tireless efforts in this regard.

[2] In authorizing the Special Master to facilitate discussion among the parties, the court specified that the Special Master would not have the authority to bind the parties to a particular hiring proposal or to decide any disputed questions of law or fact relating to interim hiring, and that any agreement reached among the parties would ultimately have to be ratified by the court.  (See Docket Entry # 511.)  The court did not authorize the Special Master to recommend or approve any particular proposal or course of remedial action.  Accordingly, the Hiring Report is restricted to describing and explaining the parties' proposals and positions.

[3] In contrast to the scoring process for Exams 7029 and 2043, the City did not consider any measure of candidates' physical abilities when calculating the Adjusted Final Average on Exam 6019.  (Pl. PFF ¶ 18.)

4

candidates with the highest Adjusted Final Averages.  Candidates with the same Adjusted Final

Average were ranked based upon their Social Security numbers.  (Id. ¶ 17.)

Candidates' exam scores and resulting list ranking determine the order in which they are

processed for hiring.  Candidates are invited to take the Candidate Physical Ability Test

("CPAT") based on their rank on the Exam 6019 eligibility list.  (Id. ¶ 21.)  To be appointed,

candidates passing the CPAT also have to appear on a certification list, meet all requirements

for appointment set forth in the Exam 6019 notice of examination, and pass a medical and

psychological examination.  (Id.)  Because the City hires firefighters in classes – typically

between 150 and 300 hires at a time – it processes candidates off of the eligibility list in large

groups, as many as 1,000 at a time.  (6019 Validity Hearing Tr. ("VH Tr.") 227-30.)  Because

candidates can be eliminated for many reasons, the City typically needs to process between four

and five times as many candidates as it plans to appoint.  (Id. 228; Hiring Report 7.)  The

candidates who are found to be qualified are hired in rank-order off of the eligibility list,

meaning that a candidate who has completed all steps in the selection process may still not be

hired if the City fills its academy class before the candidate's list number is reached.  (Pl. PFF ¶

26.)

After establishing the Exam 6019 eligibility list in June 2008, the City hired one

academy class from it in July 2008.  According to the Special Master's Hiring Report, the City

now wishes to hire two classes of approximately 312 candidates each, one as soon as possible

and one in January 2011.  (Hiring Report 2 n.1.)  As of August 4, 2010, the City had processed

approximately 2,000 candidates from the 6019 eligibility list, including the candidates that it

processed to select the July 2008 class.  (Id. 2.)  The City has identified approximately 316

candidates who are currently qualified for immediate appointment to the next academy class,

provided they pass the CPAT (hereinafter, the "Qualified Candidates").  The Qualified

Candidates have not received notice of their current status and have not yet been called in to

take the CPAT.  (Id. 3.)

## II.    THE COURT'S EQUITABLE POWERS

As described in more detail below, the City has not agreed to depart from its plan to hire

a new class of firefighters in the ordinary manner.  Therefore, any remedial hiring procedure

that the court orders – including giving the City a choice of options – will take the form of an

injunction, and must meet the appropriate standard for equitable Title VII remedies.

As a matter of general equity law, the court may only grant permanent injunctive relief if

four factors are present.  The court must find: "(1) that [the plaintiff] has suffered an irreparable

injury; (2) that remedies available at law, such as monetary damages, are inadequate to

compensate for that injury; (3) that, considering the balance of hardships between the plaintiff

and defendant, a remedy in equity is warranted; and (4) that the public interest would not be

disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391

(2006).  As the eBay Court implicitly recognized, however, Congress may abrogate or reduce

these requirements when authorizing equitable remedies for statutory violations.  See id.

Congress enacted Title VII "to assure equality of employment opportunities and to

eliminate those discriminatory practices and devices which have fostered racially stratified job

environments to the disadvantage of minority citizens."  McDonnell Douglas Corp. v. Green,

411 U.S. 792, 800 (1973).  In order to meet this sweeping mandate, "Congress deliberately gave

the district courts broad authority under Title VII to fashion the most complete relief possible."

Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 465 (1986).  Title VII

directly authorizes district courts to choose from a wide spectrum of remedies for illegal

discrimination, ranging from compensatory relief such as back pay to "affirmative relief" such as the imposition of hiring quotas.  See 42 U.S.C. § 2000e-5(g); Local 28 of Sheet Metal Workers' Int'l Ass'n, 478 U.S. at 464-65; Berkman v. City of New York, 705 F.2d 584, 595-96 (2d Cir. 1983).  In particular, once liability for racial discrimination has been established, the district court "has not merely the power but the duty" to "bar like discrimination in the future." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975) (quoting Louisiana v. United States, 380 U.S. 145, 154 (1965)).  This so-called "compliance relief" is designed to assure future compliance with Title VII.  Berkman, 705 F.2d at 595.  In the context of discriminatory testing regimes, such relief involves "restricting the use of an invalid exam, specifying procedures and standards for a new valid selection procedure, and authorizing interim hiring that does not have a disparate racial impact."  Guardians, 630 F.2d at 108.

As the above Supreme Court and Second Circuit decisions make clear, the equitable powers that courts use to remedy Title VII violations flow from Congress's grant of authority in § 2000e-5(g) rather than from the general equitable authority that all district courts possess.  See Albemarle Paper Co., 422 U.S. at 418.  Consistent with the statutory language and congressional intent, those powers are activated as soon as a Title VII violation is established, rather than upon a further showing of injury or a weighing of hardships and the public interest. See, e.g., id. at 422 (finding of unlawful discrimination triggers backpay award); Rios v. Enterprise Assoc. Steamfitters Local 638, 501 F.2d 622, 629 (2d Cir. 1974) ("Once a violation of Title VII is established, the district court possesses broad power as a court of equity to remedy the vestiges of past discriminatory practices."); Guardians, 630 F.2d at 109 ("Once an exam has been adjudicated to be in violation of Title VII, it is a reasonable remedy to require that any subsequent exam or other selection device receive court approval prior to use.");

Berkman, 705 F.2d at 595 (compliance relief, including interim hiring orders, are "appropriate whenever a Title VII violation has been found"); EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1578 (7th Cir. 1997) ("Once employment discrimination has been shown . . . district judges have broad discretion to issue injunctions addressed to the proven conduct.").  Therefore, this court has the authority to order compliance relief based solely on its prior determination that the City's use of Exams 7029 and 2043 violated Title VII, without reference to the traditional injunction standard recited in eBay.

Nonetheless, this court believes it is prudent and appropriate to consider traditional equitable principles when selecting an interim hiring remedy.  In particular, the court is sensitive to the potential public safety issues implicated in any firefighter personnel-hiring decision.  The court will also consider any genuine budgetary problems that might be occasioned by a lengthy hiring delay.  By accounting for these consequences, the court can address the public-interest and hardship-balancing prongs of the eBay standard and, it is hoped, arrive at a genuinely equitable solution.

## III.   EVALUATING THE PARTIES' PROPOSALS

The Hiring Report sets forth seven proposals for how the City could conduct interim firefighter hiring in a manner consistent with Title VII.  The parties disagree strongly about the feasibility and desirability of these proposals, and the City has not agreed to voluntarily undertake any of the proposals.  Nonetheless, the parties agree on several points:

1. All parties agree that randomly selecting candidates for processing from the entire applicant pool for Exam 6019 would be race-neutral and, therefore, a lawful hiring procedure under Title VII.

2. All parties agree that random selection for processing from a representative subgroup of the applicant pool also would be a lawful procedure under Title VII,

provided that the subgroup's racial demographics reflect the racial demographics of the entire applicant pool (hereinafter, a "Representative Pool").[4]

3. The United States and the Intervenors agree that the City may make use of the results of Exam 6019 for interim hiring so long as the resulting pool from which a random selection would be made is a Representative Pool.

(Hiring Report 4.)

The hiring proposals fall into two general categories: random selection procedures and "applicant flow" procedures. The acceptable proposals are necessarily imperfect, since each relies in some way on the results of an invalid examination. The court's duty, however, is to balance the competing principles and interests at stake in order to arrive at a practical, equitable remedy. At this point, the court is more interested in achieving a swift and fair resolution to this matter than engaging in an academic exercise. Accordingly, the court will evaluate each proposal in turn.

A.      **Random Selection Procedures**

1.          **Proposal # 1: Random Selection From the Entire Applicant Pool**

Under this procedure, "the City would randomly select candidates for processing from the entire Exam 6019 applicant pool." (Hiring Order 6.) This procedure has the benefit of being formally consistent with the court's finding that Exam 6019 is invalid. Because the City failed to demonstrate that the Exam 6019 results convey any meaningful information about candidates' fitness for the job of entry-level firefighter, it necessarily failed to demonstrate that any use of the exam results to distinguish among candidates would be reasonable. And because random selection would necessarily be race-neutral, the court agrees with the parties that this method would be lawful under Title VII.

---

[4] As described below, the parties disagree over whether particular methods of creating or selecting a Representative Pool are lawful.

Nonetheless, a completely random selection procedure has at least one fatal drawback: it would permit candidates who received extremely low scores to potentially be selected for an academy class.  (See Docket Entry # 299 (Exam 6019 testing data) (sealed).)  Exam 6019 may be invalid, but that does not mean that every candidate score is equal.  There is no functional difference between a candidate who scored 95 and a candidate who scored 98, but a candidate who scored in the 20s, for example, probably abandoned the exam midway or is functionally illiterate, and either way is not fit to be a firefighter.  Because of the fire department's role in maintaining public safety, formal equal treatment must be tempered by practical considerations. Accordingly, random selection from the entire applicant pool is not a viable interim hiring measure.

One obvious solution to the problem of unfit candidates would be to cut out the very lowest-scoring applicants and select randomly from the remaining pool.  The Special Master reports, however, that the parties were unable to identify a cutoff score above the lowest scores that would yield a Representative Pool of higher-scoring candidates – that is, the parties could not identify a cutoff score that did not have a racially disparate impact.  (Hiring Order 8-9.) Therefore, random hiring from an unadjusted subset of the rank-ordered Exam 6019 eligibility list is also not a viable option.  See Guardians, 630 F.2d at 109 (court's duty when ordering interim hiring relief is "to avoid a disparate racial impact").

### 2.      Proposal # 2: Random Selection From a Rank-Adjusted Pool

As previously noted, the City wants to hire two classes of approximately 312 firefighters each, one now and one in January 2011.  Given the estimated rate of dropouts and disqualifications while candidates are being processed, the City recommends that any

Representative Pool should contain at least 2,500 members in order to produce two classes of 312 qualified candidates.  (Hiring Order 7.)

The Special Master reports that the parties discussed a procedure whereby "the rankings of candidates on the current eligibility list would be adjusted so that the top 2,500 candidates would constitute a Representative Pool.  The adjustment would be accomplished by replacing the lowest-ranked white candidates with the highest-ranked minority candidates listed below 2,500 on the current eligibility list."  (Id.)  The City would then randomly select applicants from this pool for processing or, if the randomly selected applicant was one of the 316 Qualified Candidates who have already been found immediately qualified, immediate appointment to the next academy class.[5]  The court clarifies that the Representative Pool of the top 2,500 candidates would not include candidates who have already been hired or candidates who have already been processed and permanently disqualified because, for example, they were found to have committed a felony or are too old.[6]  The court also clarifies that "minority candidates" would only include black and Hispanic candidates.

---

[5] The court and the parties would need to discuss how to mechanically implement this procedure.  For example, the candidates in the Representative Pool could be randomly assigned a ranking from 1 to 2,500, and the rankings then rescaled to a 100-point scale to approximate an exam "score."  The City could then add bonus points to each "score," re-rank the candidates according to their adjusted score, and process them in the ordinary fashion.  (See, e.g., 6019 Validity Order 5-6.)  It is possible, however, that the parties have discussed or agreed upon a separate "scoring" and ranking procedure, and the court will consider such a procedure if it is brought to the court's attention.  It is also possible that the City's usual appointment method will need to be adjusted to ensure, for example, that the Qualified Candidates don't simply move straight into the first academy class because they have already been processed and the other candidates in the Representative Pool have not.  (See Hiring Hearing Tr. 123-24.)

The court also observes that the rank-adjustment procedure is not perfectly addressed to the City's discriminatory practices, since the procedure uses the existing Exam 6019 eligibility list (which incorporates bonus points), rather than candidates' raw exam scores, to create a Representative Pool.  But the City has repeatedly represented that the use of bonus points actually helps minority candidates' rankings relative to white candidates.  Therefore, the rank-adjustment procedure should not result in minorities being less well represented than they would be under a completely neutral random-selection procedure.  The court also finds that the added value of a procedure that permits the City to hire the pre-processed Qualified Candidates offsets any concerns about using the eligibility list rather than raw exam scores.

[6] If the City were to choose the rank-adjustment procedure, the court would take submissions from the parties before deciding which qualifications could result in "permanent disqualification" for purposes of this order.

11

This rank-adjustment proposal has numerous benefits.  First, as the Special Master notes, using this smaller pool as opposed to the entire applicant pool would increase the probability that the Qualified Candidates would be selected for appointment.  According to the Special Master, "the City believes that it is indeed likely that all or substantially all of the [Qualified Candidates] would be in this pool."  (Hiring Report 7.)  Because the Qualified Candidates have already been processed, the City would not need to process as many candidates as it ordinarily would in order to appoint its first class.  Therefore, the City would be able to convene a class quickly, and would incur lower processing costs than it would by randomly selecting from a larger applicant pool.  Second, because the rank-adjustment proposal ensures that a high percentage of the Qualified Candidates will be appointed to one of the next two firefighter classes, it is less likely to upset the expectations of the Qualified Candidates, white and minority alike.  Third, the use of a small pool of high-scoring candidates would eliminate the possibility that candidates with extremely low scores would be appointed as firefighters.  In fact, the proposal permits the City to restrict appointments to only the highest-scoring candidates, as it has desired to do all along.  Finally, by creating a truly Representative Pool, the rank-adjustment proposal comes as close as is practically feasible to eliminating the disparate impact of the City's discriminatory scoring practices.[7]

---

[7] The Plaintiffs make several arguments against other random-selection procedures that apply with equal force to the rank-adjustment procedure.  With respect to random selection from the entire pool, Plaintiffs argue that such a procedure is "suboptimal" because "it does not assure proportional hiring based on race, only that the pool from which selections are made for processing will be proportional."  (Hiring Report 6.)  In a similar vein, the Intervenors argue that the rescoring procedure described below in Section III.A.3, which is also intended to create a Representative Pool, is undesirable because "[t]here is a chance that from the proportional pool . . ., a disproportionately larger number of whites, blacks or Hispanics will be randomly selected for hire or will succeed in the candidate processing steps."  (Int. Ltr. Response (Docket Entry # 524) 2.)  These arguments, which apply equally to the rank-adjustment procedure under discussion here, misconceive the court's role and the scope of the City's misconduct.  If the City's use of Exam 6019 did not violate Title VII – that is, if the City's pass/fail and rank-order policies did not have a disparate impact – the racial composition of the Exam 6019 eligibility list would reflect the racial composition of the entire pool of test-takers, with whites and minorities distributed evenly across the rankings.  In order to become firefighters, those candidates would still have to be processed, take the CPAT, and complete the many intermediate steps that all candidates must complete to be appointed to an academy class.

There is no question that the rank-adjustment proposal is a race-conscious compliance measure.  The court is satisfied, however, that this proposal is lawful.[8]  An unbroken string of Supreme Court and Second Circuit case law confirms that race-conscious remedial compliance measures are permissible under Title VII.  See, e.g., Local 28 of Sheet Metal Workers' Int'l Ass'n, 478 U.S. at 450-51, 464 (holding that Title VII permits courts to award "affirmative race-conscious relief" and stating that "a district court may find it necessary to order interim hiring or promotional goals pending the development of nondiscriminatory hiring or promotion procedures.  In these cases, the use of numerical goals provides a compromise between two unacceptable alternatives: an outright ban on hiring or promotions, or continued use of a discriminatory selection procedure."); United States v. Paradise, 480 U.S. 149, 166 (1987) ("It is now well established that government bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination."); Guardians, 630 F.2d at 109 ("[O]ne appropriate way to assure Title VII compliance on an interim basis is to avoid a disparate racial impact.  This means selecting from among adequately qualified applicants either on a random basis, or according to some appropriately noncompensatory ratio, normally reflecting the minority ratio of the applicant pool or the relevant work force.") (internal citations omitted).  Most recently, in Ricci, the

---

Over the course of that process, it is entirely possible that a disproportionately larger number of white, black, or Hispanic candidates would be disqualified, and that the racial composition of the resulting academy class would no longer match the racial composition of the entire applicant pool.  But that consequence would not alter the fact that the City's pass/fail and rank-order uses of Exam 6019 complied with Title VII.  In other words, eliminating the City's discriminatory test-scoring practices would only guarantee that the pool of candidates that enter the subsequent qualification process would be representatively apportioned and ranked; it would not guarantee that the City's eventual firefighter class would also be representative of original applicant pool.  It may be, as the Intervenors allege, that aspects of the City's candidate processing practices are unfair or work to the detriment of black and Hispanic candidates, and the court will consider such matters at an appropriate juncture as an exercise of its remedial authority.  But such concerns are not an adequate ground for arguing that a particular proposal for correcting the City's discriminatory use of Exam 6019 is inappropriate.

[8] The City believes that the rank-adjustment procedure is unlawful.  (See Supplement to Special Master's Report (Docket Entry # 522).)

Supreme Court held that an <u>employer</u> may engage in race-conscious action for the asserted purpose of avoiding or remedying an unintentional disparate impact if the employer has a strong basis in evidence to believe that a disparate-impact violation would otherwise result.  129 S. Ct. at 2677.  Here, the relevant actor is not an employer attempting to avoid a prospective, unintentional disparate impact, but a federal court attempting to remedy identified intentional discrimination.  The detailed findings in the 6019 Validity Order provide much more than a "strong basis in evidence" to believe that the City's use of Exam 6019 violates Title VII.  The court therefore has little trouble concluding that the rank-adjustment proposal is acceptable as a matter of Title VII law.

Because the rank-adjustment procedure would require the City to begin processing candidates from a new pool of candidates, the procedure would entail at least a several-month delay before a new class could be appointed.  At the 6019 Validity Hearing and the 6019 Hiring Hearing, the court heard testimony and took evidence about the cause, length, and consequences of that delay.  Based on that testimony and evidence, the court believes that the imposition of a non-discriminatory interim hiring procedure that requires the City to temporarily delay the appointment of the next firefighter class will not be unduly burdensome to the City or contrary to the public interest.

The court's primary concern with respect to delaying firefighter hiring is the safety of the city's citizens and of its firefighters.  There is little question that an indefinite hiring freeze would have deleterious effects on the city and on the FDNY.  Chief Robert Sweeney, the FDNY's Chief of Operations, testified that understaffing requires firefighters to work more overtime, and that as firefighters are lost through attrition, the additional overtime necessary to fill tours can "stress the system."  (6019 Hiring Hearing Tr. ("HH Tr.") 152.)  But Chief

14

Sweeney also testified that "[o]n a short-term basis I think we can adequately staff, I think we can minimize the risk . . . ."  (Id.)  According to Chief Sweeney, the "tipping point" at which a hiring freeze would impact safety would occur "months and maybe years" into the future.  (Id.) Specifically, Chief Sweeney testified that a six-month hiring delay "would not create an initial safety impact" in the absence of a terrorist attack and if medical leave remained at its current low levels.  (Id. 159.)  Assistant Commissioner for Finance and Budget Stephen Rush also testified that the number of structural fires in the city has been falling over the past several years, and that firefighter response times have been improving, despite decreasing manpower. (Id. 62.)

The City presented evidence that the FDNY's head count is currently 261 below the budgeted maximum.  (Id. 26.)  Commissioner Rush's testimony makes clear, however, that decisions regarding head counts and firefighter hiring are driven primarily by cost-management concerns.  The City's Office of Management and Budget ("OMB") establishes the yearly maximum head count for the FDNY and decides whether or not the FDNY is permitted to hire a new class.  (Id. 28.)  Whether the FDNY is at "full manpower" or below is defined by the budgeted head count, not by the city's actual need for more or fewer people to fight fires.  (See id. 30.)  Earlier this year, the Mayor proposed closing 20 fire houses to save money, and is currently proposing to reduce staffing on 60 engine companies.  (Id. 20, 22.)  According to Commissioner Rush, because rookie firefighters make $35 per hour less than senior firefighters, the OMB in previous years has authorized the FDNY to hire above the authorized head count – in other words, to flood the department with rookie firefighters – in order to avoid paying overtime to senior firefighters, even though the senior firefighters are presumably more adept

and practiced at actually fighting fires.  (Id. 14, 17.)  The prevailing sentiment was accurately

captured in the following exchange regarding the City's hiring needs for fiscal year 2010:

> COMMISSIONER RUSH: [W]e laid out our hiring plans which were modest for
> fiscal year '10 and we laid out a need for 200 to 250 firefighters over two
> classes.
>
> MR. LEMONEDES: Okay. Ultimately that proposal -- is that called a personnel
> action request?
>
> COMMISSIONER RUSH:  Yeah, it's called a PAR, we call it a PAR. The PAR
> has to go over to OMB requesting approval to hire and we then give them the
> background analysis. We work closely with OMB so we both try to understand.
>
> MR. LEMONEDES: Okay. Now, let me take you to –
>
> THE COURT: Can I just ask a question about that.  In terms of what you provide
> to OMB, does that include a discussion of why you have the need beyond the
> numbers; in other words, are there other considerations such as the potential for
> creating a more dangerous working condition or putting the public at risk in not
> hiring or is this strictly, pardon the expression, a numbers crunching exercise?
>
> COMMISSIONER RUSH:  It is a numbers crunch exercise.

(HH Tr. 30-31.)  The court therefore is not swayed by the bare fact that the FDNY is currently

261 firefighters below the budgeted headcount. What truly matters is the safety of the city and

its firefighters, and there is no evidence that delaying the next two classes by a number of

months each would pose a grave and immediate danger to either.

　　　The court is also persuaded that the City could expedite candidate processing in order to

mitigate safety and budgetary concerns.  Assistant Commissioner Donay Queenan testified at

both hearings that it would take approximately six months to process enough candidates to

create a class of 312 qualified academy appointees.  (VH Tr. 253; HH Tr. 113.)  The court has

no reason to doubt that it would ordinarily take six months to process a class, but it is clear from

the City's representations and Commissioner Queenan's testimony that the processing period

could be shortened.  First, the City currently has one class of 316 candidates qualified for

16

immediate appointment to the next academy class.[9]  The City has not processed any more candidates since the court temporarily enjoined the City from taking any further steps to initiate or finalize a fire academy class on August 4, 2010.  During the discussions with the Special Master in late August 2010, the City represented that it intended to hire another academy class in January 2011.  (Hiring Report 2 n.1.)  What this means is that the City believes it can process and appoint an entire class of candidates in approximately four months – fewer, if the City's calculations accounted for any delays occasioned by this lawsuit.  Second, it is clear that the City could take a number of steps to expedite candidate processing.  Commissioner Queenan's testimony established that the City generally solicits, rather than pursues, the background information that it needs to process candidates.  This approach makes perfect financial sense under ordinary circumstances.  But the court is confident that, should the need arise, the City could locate the resources and personnel to permit the FDNY's Bureau of Personnel Services to actively investigate candidates' backgrounds.  For example, Commissioner Queenan testified that the most time-consuming aspect of processing is the employment and educational background check, because the City sends out letters to the employers and institutions and then must wait for letter responses.  (VH Tr. 239.)  As Commissioner Queenan admitted, however, the City could expedite this process simply by picking up the phone and making immediate, direct inquiries to the employers and schools, rather than passively waiting for letters.[10]  (See HH Tr. 139-41.)  Similarly, instead of waiting for the candidate to retrieve criminal background information, the City could require candidates to sign releases, and then pursue information

---

[9] At the time of the 6019 Validity Hearing on July 20, 2010, the City had only identified approximately 260 qualified candidates.  (VH Tr. 251.)

[10] With respect to candidates' education, Commissioner Queenan testified that information concerning the basic requirements – a high school diploma and 15 college credits – could be readily ascertained by looking at transcripts and a diploma, without complex background checks.  (VH Tr. 144-45.)

from the relevant law enforcement agency itself.  (Id. 142-43.)  Currently, the City also permits candidates to take 12 weeks to get in shape before taking the CPAT, a period that Commissioner Queenan admitted could be shortened.  (Id. 143.)

The City also presented evidence that delaying the next firefighter class by several months could eventually cost the City millions or even tens of millions of dollars in overtime pay.  (Def. HH Exs. B-5, B-6.)  These calculations exaggerate the overall impact of a delay; for example, they do not account for the possibility that the City could offset overtime costs by hiring larger classes, see HH Tr. 55-56, and it is unclear whether they account for the fact that the City is contractually obligated to pay firefighters 100 hours of overtime per year, see id. 13.  Nonetheless, the court accepts the City's basic contention that hiring delays will impose serious financial costs on the City.  This problem, however, is largely of the City's own making.  After hiring the first class off the Exam 6019 eligibility list in July 2008, the City could have hired another class in December 2008 and another in April 2009, before this court's July 2009 disparate-impact ruling.[11]  (See HH Tr. 59-60.)  Had the City done so, it would not now be facing a hiring shortfall and increased overtime outlays – indeed, it would not need to hire at all.  (Id. 60, 162.)  The City did not hire new classes in 2008 and 2009 or petition this court to hire a new class earlier in 2010 because it wanted to save money over the short term.  (See id. 60-61, 162.)  The ineluctable consequence of that decision was that the FDNY would lose firefighters through attrition and overtime costs would increase.  Until August 4, 2010, there was no external force stopping the City from hiring firefighters, and yet the FDNY was 261 members below its budgeted head count.  This court is not responsible for ameliorating the negative effects of budgetary decisions that the City made years ago with full knowledge of their

---

[11] Because academy training takes 18 weeks, and because the academy only has room for one class at a time, the City can only appoint one class every 18 weeks.

consequences, and it certainly will not compromise its responsibility to eradicate the City's

racial discrimination in order to relieve those consequences.  If the City is worried about the

cost of a delay, it should expedite candidate processing to reduce that delay.

More importantly, the court notes that racial discrimination is not costless for the

victims, who stand to lose valuable job opportunities, and remedying racial discrimination is

never costless for the discriminatory employer.  According to the City's FY 2011 budget, the

City of New York plans to spend over $6.3 billion this year, or 63,000 million dollars.[12]  A

non-discriminatory hiring measure that runs into the tens of millions of dollars over the course

of the next three years will not undermine the City's operating budget.  Moreover, the

alternative to an immediate interim solution in this litigation is almost surely another Title VII

lawsuit based on Exam 6019, followed by another costly compensatory remedy.  From the

perspective of the City and its taxpayers, the long-term benefit of an injunctive remedy that

eradicates Exam 6019's discriminatory effects outweighs the short-terms cost of delayed hiring.

In this case, to paraphrase Chief Justice Roberts, the best way to stop paying for discrimination

on the basis of race is to stop discriminating on the basis of race.  Cf. Parents Involved in Cmty.

Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 748 (2007).

Because the rank-adjustment procedure will move some white candidates further down

the eligibility list, the court must balance "the remedial interests of discriminatees" against "the

legitimate expectations of other employees innocent of any wrong doing."  Int'l Bhd. of

Teamsters v. United States, 431 U.S. 324, 372 (1977).  The court is satisfied that the rank-

adjustment method does not unduly infringe the interests of white candidates.  As a general

matter, any hiring procedure that does not follow the City's current, invalid procedure will upset

---

[12] See New York City Office of Management and Budget, July 2010 New York City Five-Year Financial Plan
Revenues and Expenditures (July 13, 2010), available at
http://www.nyc.gov/html/omb/downloads/pdf/fp07_10.pdf (last visited Sept. 12, 2010).

the settled expectations of the candidates on the 6019 eligibility list.  For example, randomly

selecting from the entire applicant pool, or even a subset of the applicant pool, would deprive

the top scorers – the majority of whom are white – of the benefit of their high scores.  Yet the

City agreed that such a procedure would be lawful under Title VII.  It is true that by shifting the

lowest-scoring white candidates out of the Representative Pool, the court would be

extinguishing, rather than merely diminishing, those candidates' chances of being hired in the

next two classes.  But the City does not have a fixed hiring schedule that would create a genuine

expectation that a candidate ranked at or near 3,000 on the eligibility list would be reached for

appointment during the four-year life span of the list.[13]  Prior to the City's announcement in

June 2010 that it intended to hire a new class, the City had hired just one class of 312 candidates

in two years.  Moreover, assuming that the City's estimates of dropout and disqualification rates

are accurate, the lower-ranking white candidates who would be shifted out of the hiring pool

would be at or near the top of the eligibility list should the City decide to hire an additional

class.  These mitigating circumstances support the court's judgment that the legitimate interests

of the white candidates who would be affected by the rank-adjustment procedure do not

outweigh the need to ensure that the City's interim selection procedure does not have a racially

disparate impact.

Accordingly, the court finds that the rank-adjustment procedure, as described in the

Hiring Report and with the clarifications announced herein, is an equitable interim hiring

measure that complies with Title VII.

---

[13] The court conservatively estimates that the lowest-ranked candidates in a pool of 2,500 would be ranked at or near 3,000 on the eligibility list, given that the City has already hired 312 candidates and permanently disqualified several hundred others.  (See Def. Hiring Hearing Ex. A-3, A-4.)

### 3.    Proposal # 3: Random Selection After Re-Scoring the Exam

The Special Master reports that another procedure that the parties considered "would

create a Representative Pool by re-scoring the exam after eliminating primarily those questions

as to which the average score of white candidates was more than 0.05 higher than that of black

candidates."  (Hiring Report 7-8.)  According to the Special Master,

> [T]he City had its expert determine and eliminate such questions, then re-scored
> the exams and produced the results to the other parties.  The parties have agreed
> that if the questions identified by the City's expert were eliminated and the exam
> re-scored and bonus points awarded, the top 2,500 candidates would constitute a
> Representative Pool – thus, yielding a method all parties agree would be lawful.
> The parties have also confirmed that the pool would remain a Representative
> Pool if those candidates already hired from the current eligibility list and those
> already determined through post-exam processing to be permanently disqualified
> were excluded from consideration. The advantages of this proposal are similar to
> those of adjusting rankings to create a Representative Pool as described above . .
> . .  The City reports that a significant portion of the [Qualified] Candidates, 239
> of the 316, would be included in the pool.

(Id. 8 (emphasis added).)

As the United States points out, this selection method does not comply with Title VII,

because it does not eliminate the discriminatory effects of the City's test-scoring practices.  (See

USA Response (Docket Entry # 526) 5-8.)   As described fully in footnote 7 above, the court's

remedial duty is to ensure that the manner in which the City uses candidates' Exam 6019 test

scores does not disparately impact candidates on the basis of race.  The racial composition of

the pool of candidates that emerges after the application of any remedial "scoring" system that

the City uses – whether that system involves random selection or rescoring a subset of the exam

questions – must reflect the racial composition of the entire applicant pool, prior to the

application of bonus points.  The United States' submissions demonstrate, however, that

rescoring the exam in the manner that the parties discussed will have a statistically significant

disparate impact on black and Hispanic candidates.  (See id. 5-8 & Att. B.)   The rescoring

procedure relies on the addition of bonus points to candidates' scores to create a Representative

Pool, and therefore does not eliminate the disparate impact of the exam itself.  Therefore, the

rescoring procedure is not an adequate interim hiring measure.

### B.     "Applicant Flow" Procedures

The Special Master reports that, "[u]nder an applicant flow procedure, suggested by

Plaintiff and Plaintiffs-Intervenors, the City would hire (using any criteria desired by the City) a

class with racial demographics that reflect those of the applicant pool.  Accordingly, the City

would be required to hire in proportion to the racial and ethnic representation of the applicant

pool for Exam 6019."  (Hiring Report 9.)  The plaintiffs offered several illustrations of how

such a procedure might work.

### 1.     Proposal # 4: Class of 300 Candidates

With respect to the first applicant flow proposal, the Special Master reports as follows:

> Under the first illustration, the City would hire an academy class of 300,
> comprising 279 candidates from the 6019 eligibility list and 21 candidates who
> took the EMT promotional exam or who are on a special military eligibility list.
> In this scenario, the 279 candidates from the 6019 eligibility list would be 60.5%
> white, 17.6% black, 18.6% Hispanic, 2.2% Asian, and 1% unknown. (The entire
> 6019 applicant pool was 60.7% white, 17.4% black, 18.4% Hispanic, 2.1%
> Asian, 0.2% Native American, and 1.2% unknown.) These 279 candidates would
> include 169 of approximately 231 white [Qualified] Candidates and all of
> approximately 60 nonwhite [Qualified] Candidates (22 black, 33 Hispanic and 5
> Asian). The remaining 50 spots in the class of 300 would be filled by 50
> additional non-white candidates (27 black, 19 Hispanic, 1 Asian, and 3 other).
> Plaintiffs estimate (based on assumed drop-out rates) that in order to identify
> these additional candidates, the City would need to: (*i*) complete processing for
> 37 black candidates, 46 Hispanic candidates, and 3 Asian candidates whom the
> City has already begun to process, and (*ii*) process as many as 42 additional
> black candidates and 10 additional candidates in the "other" category.

(Id. 9 n.3.)  The court modifies this proposal as follows: the City would be under no obligation

to ensure that Asian, Native American, or "other" candidates are represented in any particular

proportion in the academy class.[14]  The City's only obligation would be to ensure that black and Hispanic candidates are represented in proportion to the racial composition of the entire applicant pool.  The court also clarifies that, for the proposed second (January 2011) class, the City could either appoint candidates in proportion to the racial composition of the applicant pool or use the rank-adjustment procedure described in Section III.A.2 to create, and randomly select from, a Representative Pool of the top 1,250 remaining candidates.

### 2.       Proposal # 5: Class of 221 Candidates

With respect to the second applicant flow proposal, the Special Master reports as follows:

> Under the second scenario, the City would hire an academy class of 221 firefighters, comprising 200 candidates from the 6019 eligibility list and 21 candidates who took the EMT promotional exam or who are on a special military eligibility list. In this scenario, the 200 candidates from the 6019 eligibility list would be 61% white, 17.5% black, 18.5% Hispanic, 2% Asian, and 1% unknown. These 200 candidates would include 122 white [Qualified] Candidates and 59 nonwhite [Qualified] Candidates (22 black, 33 Hispanic and 4 Asian). In addition, the City would need to continue processing black and Hispanic candidates for whom processing is pending until it identifies an additional 13 black candidates and 4 Hispanic candidates for hiring. Finally, the City would have to process an additional 6 candidates whose race/ethnicity is "other" to identify 2 such candidates for appointment.

(Id.)  The court modifies this proposal as follows: the City would be under no obligation to ensure that Asian, Native American, or "other" candidates are represented in any particular proportion in the academy class.  The City's only obligation would be to ensure that black and Hispanic candidates are represented in proportion to the racial composition of the entire applicant pool.  The court also clarifies that, for the proposed second (January 2011) class, the

---

[14] This court's decisions regarding Exam 7029 and 2043 during the liability phase, and its findings with respect to Exam 6019 during the remedial phase, have been limited to the effects of the City's policies on black and Hispanic candidates only.  The court has not considered or ruled on any evidence regarding other minority candidates. Because compliance relief should be tailored to the City's identified misconduct, the court declines to enforce any particular hiring measures with regard to Asian, Native American, or "other" minority candidates.

City could either appoint candidates in proportion to the racial composition of the applicant pool or use the rank-adjustment procedure described in Section III.A.2 to create, and randomly select from, a Representative Pool of the top 1,250 remaining candidates.

### 3.       Proposal # 6: Proportional Hiring Across the Next Two Classes

Another applicant-flow procedure, which the parties did not discuss but the court now posits as an option, would require the City to ensure that the entire pool of candidates hired over the course of the next two classes is racially representative.  Under this procedure, the City could immediately appoint the 316 Qualified Candidates to the next academy class.  The City would then be required to process and appoint black and Hispanic candidates to the subsequent class in a manner that guarantees that the racial composition of the two classes combined reflects the racial composition of the entire applicant pool.  Under this proposal, the City would be obligated to hire a second class of at least 300 candidates from the Exam 6019 eligibility list within one week after the completion of the next academy class, unless otherwise directed by the court.

### 4.       Proposal # 7: "Hybrid" Applicant-Flow Hiring

Under this proposal, "the City would hire immediately a small class of firefighters that is a representative subgroup of the applicant pool from among the [Qualified] Candidates.  Approximately 117 such candidates could thus likely be immediately hired while maintaining the same racial proportionality as the entire pool taking the exam.  The City would then select remaining candidates for processing at random from either the entire applicant pool or a Representative Pool."  (Hiring Report 11.)  Additionally, "[t]he City could supplement this class with the 13 emergency medical technicians who have passed the required promotional exam and have been fully processed and determined to be qualified for hiring."  (Id.)

The court clarifies that the City would be under no obligation to ensure that Asian, Native American, or "other" candidates are represented in any particular proportion in the academy class.  The City's only obligation would be to ensure that black and Hispanic candidates are represented in proportion to the racial composition of the entire applicant pool. Moreover, for the reasons stated in Section III.A.1, above, the court does not believe that random selection from the entire applicant pool is an appropriate selection method.  The court therefore clarifies that, with respect to any subsequent hiring, the City could either appoint candidates in proportion to the racial composition of the applicant pool or use the rank-adjustment procedure described in Section III.A.2 to create, and randomly select from, a Representative Pool of the top remaining candidates.

The applicant-flow proposals have a number of drawbacks.  First and foremost, these proposals strongly resemble racial hiring quotas.  As explained above in Section III.A.2, the court has the legal authority to implement race-conscious interim hiring requirements as an exercise of its remedial authority.  See Local 28 of Sheet Metal Workers' Int'l Ass'n, 478 U.S. at 450-51, 464; Paradise, 480 U.S. at 166; Guardians, 630 F.2d at 109.  That does not mean that the court believes that such measures are optimal or generally appropriate.  This court has repeatedly stated that it will not impose hiring quotas on the City in the absence of an overwhelming need or justification.  Racial quotas are a blunt tool for accomplishing a delicate task, and the court would prefer to use them only as a last resort.  Second, as a means of interim compliance, the applicant-flow proposals go beyond the court's goal of correcting the effects of the City's pass/fail and rank-order uses of Exam 6019.  Eliminating the discriminatory effects of Exam 6019 would guarantee that minority candidates enter the subsequent qualification procedures on an equal footing with white candidates, but it would not guarantee that they

would be <u>hired</u> in proportion.  (<u>See</u> n. 7, above.)  Yet the applicant-flow procedures would require the City to hire in proportion to the racial composition of the applicant pool.

Nonetheless, this court cannot ignore the genuine needs of the City, the FDNY, and the citizens of New York.  Based on the testimony and evidence presented, the court is satisfied that a temporary hiring delay will not imperil the safety of the city's residents or its firefighters.  (<u>See</u> Section III.A.2, above.)  But the City may have access to different or more complete information that was not presented to the court.  The City's current fiscal condition may also be such that it cannot reasonably bear the costs of further firefighter hiring delays.

One undeniable benefit of the applicant-flow procedures is that they would permit the City to appoint its next firefighter class either immediately or in the very near future.  Under the two-class procedure suggested above, for example, the City could immediately appoint all 316 of the Qualified Candidates to an academy class.  The City could satisfy its desire to hire from among the top scorers on Exam 6019, could hire all of the candidates it has already processed, and would not disappoint any of the candidates who have already been processed.  The City could appoint this class in a matter of weeks, thereby avoiding the eight-figure cost overruns projected by Commissioner Rush.  Most importantly, the City of New York would have 300 more firefighters on the streets by late winter of 2011, and another 300 by the summer.  If the City truly believes that public safety and the municipal fisc require the immediate appointment of a firefighter class, then the court will set aside its reservations and order applicant-flow hiring.

Accordingly, the court will permit the City to choose one of the applicant-flow procedures as an interim hiring measure.

**IV.      CONCLUSION**

Having reviewed the interim hiring proposals in the Special Master's Hiring Report, the court concludes that Proposals (2), (4), (5), (6), and (7), as described in Sections III.A.2 and III.B of this Memorandum and Order, are lawful and equitable remedial compliance measures. Because the City is in the best position to assess its own needs and requirements, the court will permit the City to choose which proposal it would prefer the court to implement.   Accordingly, based on the findings in the 6019 Validity Order and in Section III.A.2, above, the court hereby continues the temporary injunction announced in the 6019 Validity Order and directs the City to inform this court of its choice not later than 12:00 noon on Friday, September 17, 2010.  The court will then so-order the chosen injunctive remedy with appropriate instructions.

SO ORDERED.

         _/s/ Nicholas G. Garaufis____
Dated: Brooklyn, New York           NICHOLAS G. GARAUFIS
       September 13, 2010           United States District Judge