IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

      PLAINTIFF,

THE VULCAN SOCIETY INC., ET AL.,

      PLAINTIFFS-INTERVENORS

V.

CITY OF NEW YORK, ET AL.,

      DEFENDANTS.

CIV. ACTION NO. 07-CV-2067 (NGG)(RLM)

SERVED JUNE 16, 2010

**PLAINTIFF UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT WITH RESPECT TO THE
AMOUNT OF BACKPAY AND BENEFITS LOST BY AFRICAN-AMERICAN
AND HISPANIC VICTIMS OF THE CITY'S DISCRIMINATION**

# TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.  APPLICABLE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Law Pertaining to Title VII Monetary Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.  DR. SISKIN'S MONETARY LOSS ESTIMATE IS CONSERVATIVE
    AND CONSISTENT WITH THE COURT'S LIABILITY FINDINGS . . . . . . . . . . . . . . 4

    A.  Dr. Siskin's Calculation of the Economic Loss to Non-Hires . . . . . . . . . . . . . . . 5

        1.  Dr. Siskin's Allocation of the Shortfall Across Academy Classes . . . . . . 6

        2.  Dr. Siskin's Mitigation of Lost Earnings . . . . . . . . . . . . . . . . . . . . . . . . . 6

        3.  Dr. Siskin's Calculation of the Mitigated Value of Benefits Lost . . . . . . . 8

    B.  Dr. Siskin's Calculation of the Economic Loss Due to Delayed Hiring . . . . . . . 8

V.  DR. ERATH'S CRITICISMS AND ANALYSES ARE CONTRARY TO
    THE COURT'S LIABILITY FINDINGS AND ARE BASED ON
    UNSUPPORTED ASSUMPTIONS AND A MISUNDERSTANDING
    OF DR. SISKIN'S ANALYSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    A.  Dr. Erath's Analysis of the Economic Loss to Non-Hires . . . . . . . . . . . . . . . . . . 9

        1.  Dr. Erath's Recalculation of the Shortfall Is Contrary to the Court's
           Liability Phase Findings and Is Based on an Erroneous Understanding
           of the Practices the Court Found Unlawful . . . . . . . . . . . . . . . . . . . . . . . 9

        2.  Dr. Erath's Re-Allocation of the Shortfall Across Academy Classes
           Also Is Based on an Erroneous Understanding of the Practices That
           the Court Found Unlawful and on Unsupported Assumptions . . . . . . . . 12

3.    Dr. Erath's Criticisms of Dr. Siskin's Mitigation Ratios Are Based on an Erroneous Understanding of How the Mitigation Ratios Were Calculated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

4.    Dr. Erath's Proposed Mitigation Ratios Are Based on Unsupported Assumptions and on "Data" That Dr. Erath Himself Admits Is Unreliable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

5.    Dr. Erath's Analysis of the Value of Lost Benefits Is Based on His Misunderstanding of the Nature of the Relief Sought by the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

6.    Dr. Erath's Analysis Concluding That There Was No Delayed Hiring Is Both Incorrect and Foreclosed by the Court's Liability Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## I.   FEDERAL CASES

*Association Against Discrimination in Employment, Inc. v. City of Bridgeport*,
479 F. Supp. 101 (D.Conn. 1979), *aff'd in part*, 647 F.2d 256, *cert. denied*,
455 U.S. 988 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Disability Advocates, Inc. v. Paterson*, 2009 WL 1312112 (E.D.N.Y. 2009) . . . . . . . . . . . . . . 10

*International B'hd of Teamsters v. United States*, 431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . 4

*Kulak v. City of New York*, 88 F.3d 63 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) . . . . . . . . . 19

*Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134 (2d Cir. 1993),
*cert. denied*, 510 U.S. 1164 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wrenn v. Dep't of Veterans Affairs*, 918 F.2d 1073 (2d Cir. 1990),
*cert. denied*, 499 U.S. 977 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## II.   FEDERAL RULES

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# I.    INTRODUCTION

Using the class-wide approach approved by the Court, the United States' expert with regard to monetary relief, Bernard R. Siskin, Ph.D., calculated that the total amount of the economic losses suffered by African-American and Hispanic applicants due to the City's discriminatory practices is approximately $63.5 million. The City's expert presents three alternative estimates, ranging from $0 to over $29.5 million. Those estimates, as well as the City's criticisms of Dr. Siskin's, are based on unsupported assumptions and erroneous understandings of Dr. Siskin's analyses and of the Court's liability phase findings. Indeed, many of the conclusions of the City's expert contradict the Court's findings. For example, Dr. Siskin calculated the amount of two primary categories of loss: the loss suffered by applicants who were not hired and that suffered by applicants whose hiring was delayed. With respect to delayed hires, the City's expert concludes, contrary to the Court's liability findings, that there was *no* delay in the hiring of African-American and Hispanic applicants. With respect to non-hires, the City's expert recalculates and substantially reduces the hiring shortfall of 293 found by the Court in the liability phase. The Court should reject the estimates of the City's expert and award an amount of monetary relief equal to Dr. Siskin's $63.5 million estimate of the class-wide loss.

# II.   BACKGROUND

As one element of relief in this case, the United States seeks an award of monetary relief in the form of backpay, including the value of benefits, less mitigation, plus interest. Dkt. No. 315-2, pp. 2, 5. In its Initial Remedial Order (Dkt. No. 390), the Court held that such relief will be awarded on a class-wide basis, in an amount to be determined by the Court. Discovery regarding the amount of monetary relief to be awarded closed on May 17, 2010.

Pursuant to the schedule set by the Court, the United States' expert with respect to

monetary relief, Dr. Siskin, submitted his relief phase report on December 18, 2009. Pl. Facts, ¶ 1.[1] In his report, Dr. Siskin explained how he calculated, on a class-wide basis, the amounts of wages and benefits lost by African-American and Hispanic applicants for the position of firefighter as a result of the City's discriminatory practices. According to Dr. Siskin, a conservative estimate of the amount of class-wide economic loss is $63,524,294. Pl. Facts, ¶ 6.[2]

On January 22, 2010, Plaintiffs-Intervenors' expert with respect to monetary relief, Louis R. Lanier, Ph.D., submitted his report. Pl. Facts, ¶ 88. In his report, Dr. Lanier, agreed that Dr. Siskin's calculations are conservative in several respects. Pl. Facts, ¶ 89. Indeed, Dr. Lanier stated that, in his opinion, Dr. Siskin's calculations are *too* conservative. Thus, according to Dr. Lanier, the class-wide economic losses of African-American victims of the City's discriminatory practices are $7,670,541 higher than Dr. Siskin estimated. Pl. Facts, ¶ 90. Adding this amount to Dr. Siskin's estimate would result in a total economic loss of $71,194,835.

On March 12, 2010, the City's expert, Christopher Erath, Ph.D., submitted his report. Pl. Facts, ¶ 91. Based on his recalculation of the hiring shortfalls and delays found by the Court during the liability phase, a "perfect parity" argument rejected by the Court in the liability phase,

---

[1] Citations to "Pl. Facts" refer to the Rule 56.1 Statement of Undisputed Facts Regarding the Amount of Backpay and Benefits Lost by African-American and Hispanic Victims of the City's Discrimination Practices, filed concurrently with this memorandum.

[2] The amount stated above assumes that losses will continue to accrue until the end of 2010 – *i.e.*, that priority hires will not be made before 2011. Pl. Facts, ¶ 6. It should be noted that the total loss originally stated in Dr. Siskin's December 2009 report was $55,890,348. Pl. Facts, ¶ 6 n.1. However, Dr. Siskin later corrected two programming errors. The effect of the first programming error, corrected on January 19, 2010, was minimal. *See* Pl. Facts, ¶ 6 n.1. The effect of the second error, which was pointed out by the City's expert, resulted in a substantial increase in the total amount of the losses. Pl. Facts, ¶ 6 n.1. The corrected figures are used in this memorandum.

an incorrect understanding of the practices found by the Court to be unlawful, an incorrect understanding of Dr. Siskin's analyses, and a series of unsupported assumptions, Dr. Erath estimated the economic losses due to the City's discriminatory practices under three scenarios. His three estimates range from a low of $0 to a high of $29,502,179. Pl. Facts, ¶ 92.

Given the Court's determination that monetary relief will be awarded on a class-wide basis, there are no genuine issues of material fact with respect to the amount of monetary relief. To the extent that Dr. Erath's estimates are based on an attempt to re-litigate issues already decided and arguments already rejected by the Court, or on his erroneous understanding of the practices the Court has found unlawful, the Court must reject those estimates as a matter of law. To the extent that they are based on unsupported conjecture and speculation, the Court must reject them as insufficient to defeat a motion for summary judgment.

## III.   APPLICABLE LAW

### A.   Summary Judgment Standard

The summary judgment standard applied by the Court in the liability phase applies here. *See* Dkt. No. 294, p. 9 (and cases cited therein).  Summary judgment is appropriate when the pleadings and admissible evidence show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are material only if they might affect the outcome under the governing law, and a dispute is genuine only if a reasonable finder of fact could return a verdict for the nonmovant based on the evidence. Dkt. No. 294, p. 9. Once the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must do more than raise "some metaphysical doubt as to the material facts." *Id.* "[C]onclusory statements, conjecture, or speculation" cannot defeat

3

summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

  B.  Law Pertaining to Title VII Monetary Relief

  One of the essential purposes of Title VII is to "make persons whole" for the injuries they

suffer as a result of discrimination. *International B'hd of Teamsters v. United States*, 431 U.S.

324, 364 (1977). In a hiring discrimination case, backpay is a basic component of "make whole"

relief. *Wrenn v. Dep't of Veterans Affairs*, 918 F.2d 1073, 1076 (2d Cir. 1990), *cert. denied*, 499

U.S. 977 (1991). "The purpose of backpay is to completely redress the economic injury the

plaintiff has suffered." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993)

(internal quotations and citations omitted), *cert. denied*, 510 U.S. 1164 (1994). Thus, the

backpay awarded to victims of discrimination should include "the sum of the value of all regular

and overtime wages, fringe benefits, pension benefits, and all other benefits to which firefighters

are or were entitled . . . , including all increments, together with interest." *Association Against

Discrimination in Employment, Inc. v. City of Bridgeport*, 479 F. Supp. 101, 118-19 (D.Conn.

1979), *aff'd in part*, 647 F.2d 256, *cert. denied*, 455 U.S. 988 (1982); *see also Saulpaugh*, 4 F.3d

at 145 (backpay should include "anticipated raises, and fringe benefits;" and it is "ordinarily an

abuse of discretion" not to award pre-judgment interest).

**IV. DR. SISKIN'S MONETARY LOSS ESTIMATE IS CONSERVATIVE AND
   CONSISTENT WITH THE COURT'S LIABILITY FINDINGS**

  As Dr. Siskin explains in his December 2009 report, given the Court's liability findings,

there are two major categories of economic loss: (1) the loss to applicants who were not hired

because of the City's discriminatory practices ("non-hires"); and (2) the loss to applicants who

were hired but whose hiring was delayed ("delayed hires"). Pl. Facts, ¶ 7. Dr. Siskin separately

calculated each of these losses for African-American applicants and Hispanic applicants, and for Exams 7029 and 2043. Pl. Facts, ¶ 8. His results are shown in the table below:

**ESTIMATE OF CLASS-WIDE ECONOMIC LOSS**
(to December 31, 2010)

|  | EXAM 7029 | | EXAM 2043 | | TOTAL | |
|---|---|---|---|---|---|---|
|  | African Americans | Hispanics | African Americans | Hispanics | African Americans | Hispanics |
| Non-Hires | $31,705,079 | $15,673,859 | $ 9,178,697 | $5,158,444 | $40,883,776 | $20,832,303 |
| Delayed Hires | $   591,982 | $   672,779 | $  267,789 | $ 275,665 | $   859,771 | $  948,444 |
| **TOTAL** |  |  |  |  | $41,743,547 | $21,780,747 |

Pl. Facts, ¶ 9. Dr. Siskin's methodology is explained in detail in his December 2009 report and his April 2010 rebuttal report. *See* Exhs. A and E.[3] It is summarized briefly below.

    A.    <u>Dr. Siskin's Calculation of the Economic Loss to Non-Hires</u>

    As Dr. Siskin explained in his December 2009 report, calculation of the economic loss to non-hires requires six steps: (1) determination of the hiring shortfall[4] and the academy class into which each "shortfall hire" would have been hired absent discrimination; (2) estimation of the average amount the shortfall hires would have earned; (3) adjustment of the earnings for "attrition" (*i.e.*, the likelihood that a shortfall hire would have left the FDNY); (4) mitigation of the expected earnings by the amount the shortfall hires reasonably could have been expected to earn from other employment; (5) addition of an amount representing the (mitigated) value of

---

    [3] Citations to Exhibits ("Exh.") in this memorandum refer to the exhibits attached to the Declaration of Sharon A. Seeley filed concurrently with this memorandum.

    [4] The hiring shortfall is the additional number of African-American or Hispanic applicants who would have been hired absent the disparate impact of the discriminatory practices. Pl. Facts, ¶ 12.

benefits the shortfall hires would have received; and (6) addition of interest. Pl. Facts, ¶ 11. In his report, the City's expert did not disagree with Dr. Siskin's estimation of the earnings a shortfall hire would have made (step 2), his adjustment for attrition (step 3), or his calculation of interest (step 6). Pl. Facts, ¶¶ 124-125, 182-183. Thus, only Dr. Siskin's first, fourth and fifth steps are explained below.

          1.     Dr. Siskin's Allocation of the Shortfall Across Academy Classes

To calculate the class-wide monetary loss for non-hires, Dr. Siskin estimated the average loss for each shortfall hire, then summed the amounts over all shortfall hires. Pl. Facts, ¶ 10. For these calculations, Dr. Siskin used the total hiring shortfall of 293 determined by the Court in the liability phase. Pl. Facts, ¶¶ 13-15. To determine the date on which backpay for a shortfall hire would begin to accrue, however, Dr. Siskin had to allocate each of the 293 shortfall hires to one of the academy classes hired from Exams 7029 and 2043. Pl. Facts, ¶ 16. Dr. Siskin did so based on the percentage of all actual hires from the relevant eligibility list that the class represented. Pl. Facts, ¶ 17. For example, if 10% of all hires from the Exam 2043 eligibility list were hired into the class beginning on December 5, 2004, Dr. Siskin would have allocated 10% of the Exam 2043 shortfall to that class.

          2.     Dr. Siskin's Mitigation of Lost Earnings

Dr. Siskin next calculated a number of possible "mitigation ratios" using census earnings data for a group comparable to the victims in this case. Pl. Facts, ¶ 24. A mitigation ratio is the percentage of lost earnings that a shortfall hire could reasonably have been expected to earn from other employment. Pl. Facts, ¶ 25. Thus, for example, a mitigation ratio of .60 means that a shortfall hire could have been expected to earn 60% of what he would have earned as a

firefighter. In calculating the mitigation ratios, Dr. Siskin used census earnings data for African-American (and, separately, Hispanic) male United States citizens between the ages of 21 and 30 who reside in the New York City Metropolitan Statistical Area.[5] Pl. Facts, ¶¶ 30-31. The various mitigation ratios Dr. Siskin calculated differ depending upon the education and earnings criteria he used to further restrict the census data to a group comparable to the victims of the City's discriminatory practices. Pl. Facts, ¶ 33. For example, in calculating one of the possible mitigation ratios, Dr. Siskin restricted the census sample to male African-American citizens between the ages of 21 and 30 with at least one year of college, but less than a Bachelors degree, who worked full-time, full-year in 1999 and earned less than $100,000.[6] *See*. Exh. A, p. 13, Table 3. Dr. Siskin explains that, in his opinion, the most appropriate mitigation ratio for the African-American shortfall hires is .531, and the most appropriate mitigation ratio for the Hispanic shortfall hires is .578. Pl. Facts, ¶¶ 50, 52.[7]

---

[5] As Dr. Siskin explains in his December 2009 report, he restricted the sample to males because a very small percentage of the Exam 7029 and 2043 applicants were women. Pl. Facts, ¶ 31. This restriction increased the mitigation ratio – *i.e.*, reduced the total amount of monetary loss he calculated. Pl. Facts, ¶ 32. The City's expert does not argue in his report that Dr. Siskin's definition of the relevant population group by age, race, gender or area of residence is incorrect. Pl. Facts, ¶ 126. Dr. Siskin calculated the mitigation ratios by determining the average earnings reported in the census data for the relevant group and dividing that figure by the average full-year earnings of beginning firefighters in the FDNY. Pl. Facts, ¶ 37. To calculate some of the possible mitigation ratios, Dr. Siskin adjusted the average census earnings to take into account the fact that some of the shortfall hires may have been unemployed for some period. Pl. Facts, ¶¶ 39, 42.

[6] For purposes of Dr. Siskin's mitigation analysis, "full-time" means at least 35 hours per week, and "full-year" means at least 48 weeks in the year. Pl. Facts, ¶ 35.

[7] These are the mitigation ratios for African-American and Hispanic male citizens age 21 to 30, with at least one year of college but not a Bachelors degree, who worked full-time, full-year and earned at least minimum wage but less than 10% more than the average entry-level firefighter, adjusted for unemployment. Pl. Facts, ¶¶ 49, 51. As Dr. Siskin explained in his

3.   Dr. Siskin's Calculation of the Mitigated Value of Benefits Lost

Finally, with respect to benefits, Dr. Siskin included in his calculation amounts

representing lost health benefits.[8] Pl. Facts, ¶ 58. Dr. Siskin conservatively assumed that the

shortfall hires who were employed would have fully mitigated these benefits. Pl. Facts, ¶ 59. In

other words, he assumed that the health benefits the shortfall hires would have received from

other employment would be as good as the health benefits they would have received as FDNY

firefighters. Pl. Facts, ¶ 59. Thus, Dr. Siskin included in his calculations an amount representing

the value of lost health benefits only for the percentage of shortfall hires he estimated would have

been unemployed. Pl. Facts, ¶ 61. For that percentage of the shortfall hires, he included the full

cost to the City of the benefits that the shortfall hires would have received. Pl. Facts, ¶ 62.

B.   Dr. Siskin's Calculation of the Economic Loss Due to Delayed Hiring

The economic losses of delayed hires are, in essence, the same as the losses of shortfall

hires, "but for a shorter period of time (i.e., the period of the delay)." Pl. Facts, ¶ 73. To

───────────────

rebuttal report, restricting the data to those who do not earn more than 10% above the average
firefighter earnings makes sense because individuals for whom the firefighter job would
represent a substantial pay cut are less likely to apply for the job. Pl. Facts, ¶¶ 53-54.

[8] Dr. Siskin did not include any amount for lost pension benefits because, under the
United States' Proposed Relief Order, the 293 applicants hired as priority hires would receive full
retroactive pension benefits. Pl. Facts, ¶ 63. FDNY Firefighters also receive an annuity
distributed by the Uniformed Firefighters Association ("UFA"). Pl. Facts, ¶ 64. The City pays
an amount to the UFA to fund this benefit. Pl. Facts, ¶ 65. Dr. Siskin therefore included in his
calculation of lost benefits an amount representing annuity benefits. Pl. Facts, ¶¶ 66-67. The
City's expert, Dr. Erath did not disagree with the amount calculated by Dr. Siskin. Pl. Facts,
¶ 173. Instead, Dr. Erath stated only that he was told by counsel for the City that retroactive
annuity benefits would be awarded to priority hires. Pl. Facts, ¶ 174. In his rebuttal report, Dr.
Siskin agreed – as does the United States – that, if the Court awards to priority hires full
retroactive annuity benefits, then no amount representing the lost annuity should be included in
the total economic losses. Pl. Facts, ¶ 69.

determine the appropriate period of time, Dr. Siskin used the average periods of delay he had

calculated in the liability phase. Pl. Facts, ¶ 74.[9] Using these periods of delay, Dr. Siskin

calculated the total loss due to delayed hiring to be $859,771 for African-Americans (of which

$591,982 is attributable to Exam 7029, and $267,789 is attributable to Exam 2043) and $948,444

for Hispanics (of which $672,779 is for delayed hires from Exam 7029, and $275,665 is for

delayed hires from Exam 2043). Pl. Facts, ¶¶ 9, 82-87.

## V.   DR. ERATH'S CRITICISMS AND ANALYSES ARE CONTRARY TO THE COURT'S LIABILITY FINDINGS AND ARE BASED ON UNSUPPORTED ASSUMPTIONS AND A MISUNDERSTANDING OF DR. SISKIN'S ANALYSES

### A.   Dr. Erath's Analysis of the Economic Loss to Non-Hires

1.   Dr. Erath's Recalculation of the Shortfall Is Contrary to the Court's Liability Phase Findings and Is Based on an Erroneous Understanding of the Practices the Court Found Unlawful.

In the liability phase of this case, the Court found that the discriminatory practices used

by the City resulted in a total shortfall of 293 African-American and Hispanic hires. Pl. Facts,

¶ 13. The total of 293 included a shortfall of 72 African-American hires and 45 Hispanic hires

attributable to Exam 2043. Pl. Facts, ¶ 15. Dr. Siskin used those shortfalls in calculating the

class-wide amount of the monetary losses for Exam 2043. Pl. Facts, ¶¶ 13, 15. Despite the

Court's findings, in his calculations Dr. Erath reduced the Exam 2043 shortfall by approximately

---

[9] In the liability phase, Dr. Siskin estimated that a total of 249 African-American and Hispanic firefighters had their hiring delayed due to the City's discriminatory practices, for a total of approximately 69 years of delay. Pl. Facts, ¶ 75. Based on these figures, Dr. Siskin then calculated that the average delay for African-American firefighters hired from Exam 7029 was 3.48 months, and the average delay for Hispanics hired from Exam 7029 was 3.24 months. Pl. Facts, ¶¶ 78-79. Similarly, Dr. Siskin calculated that the average period of delay for African-American and Hispanic firefighters hired from Exam 2043 was 3.84 and 2.88 months, respectively. Pl. Facts, ¶¶ 80-81.

43%, to 44 African-American hires and 23 Hispanic hires. Pl. Facts, ¶ 93. His excuse for recalculating the Exam 2043 hiring shortfalls is that, due to the City's failure to produce all of the Exam 2043 hiring data during the liability phase, the Court relied on incomplete hiring data in its liability findings and Initial Remedial Order.[10] Pl. Facts, ¶¶ 94-95. However, Dr. Erath does not merely recalculate the Exam 2043 shortfalls to take into account additional hires that the City did not timely disclose.[11] Instead, he goes yet further afield from the Court's liability findings by using a completely different method of calculating the shortfalls than that used by Dr. Siskin and relied upon by Court. Pl. Facts, ¶ 100. The Court's findings in the liability phase are law of the case. *Disability Advocates, Inc. v. Paterson*, 2009 WL 1312112 at *1-2 (E.D.N.Y. 2009). Having failed to timely produce all hiring data during the liability phase – despite its obligation under the Federal Rules of Civil Procedure and despite the United States' requests for supplementation, Pl. Facts, ¶ 94, – the City cannot now seek to relitigate the shortfalls.

---

[10] According to Dr. Erath, 318 hires from the Exam 2043 eligibility list were not disclosed to the United States (or the Court) during the liability phase. Pl. Facts, ¶ 95. Dr. Erath also claims that, in calculating the shortfall of African-American and Hispanic hires from Exam 2043 during the liability phase, Dr. Siskin assumed that an additional 1,000 hires would be made from the list before it expired. Pl. Facts, ¶¶ 96-97. Dr. Erath is wrong. Dr. Siskin did estimate what the hiring shortfall would be if the City reached 1,000 candidates further down the Exam 2043 eligibility list than it reported it had, but those hypothetical figures were not relied on by the Court. Pl. Facts, ¶¶ 98-99. The figures relied on by the Court were based on the hiring data timely provided by the City. Pl. Facts, ¶¶ 94-95.

[11] Dr. Erath's March 12, 2010 report is misleading in this regard, stating only that he arrived at the shortfalls he uses for Exam 2043 by "[u]sing the actual data for exam 2043." Exh. I, p. 5. In his deposition, Dr. Erath at first maintained that the only difference between his shortfall calculations and Dr. Siskin's was the inclusion of the 318 additional hires. Exh. M, 38:11-39:25. However, he subsequently admitted that he had in fact used a different methodology. Pl. Facts, ¶ 100. Re-calculating the shortfall solely to account for the 318 additional hires would have had a minimal effect on the shortfall, reducing it by one for African Americans and by four for Hispanics. Pl. Facts, ¶¶ 101-102.

Moreover, Dr. Erath's new method of calculating the shortfalls is based on an argument rejected by the Court in its July 22, 2009 liability order. According to Dr. Erath, Dr. Siskin should not have calculated the shortfalls by comparing the results of the challenged practice to what would have happened had there been *no disparity* between the ranks of African-American or Hispanic applicants and the ranks of white applicants. Pl. Facts, ¶ 104. Instead, the City's expert argues, the shortfalls should be calculated by comparing the results of the challenged practice to the results of some other practice that the City could have used. Specifically, according to Dr. Erath, the shortfalls should be calculated by comparison to what would have happened if the City had selected in rank order based on scores on the physical performance test ("PPT") the City used for Exams 7029 and 2043. Pl. Facts, ¶¶ 103, 105.[12] This is a re-tread of the City's familiar "perfect parity" argument. *See* Dkt. No. 294, pp. 31-33. In the liability phase, the City argued that shortfalls should not be determined by comparing the results of the challenged practice to "perfect parity" – *i.e.*, to what would have happened had there been no disparity in the pass rates (or the ranks) of whites and those of African Americans or Hispanics. *See id.* In its liability order, the Court correctly rejected the City's argument. *See id.*

In addition, Dr. Erath's new method of calculating the shortfall is based on a fundamental misunderstanding of the rank-order selection practice found unlawful by the Court. In his

---

[12] Dr. Erath's assumption that, had the City not unlawfully ranked applicants based on a combination of their written examination and PPT scores, it would (and lawfully could) have ranked them based on their PPT scores alone is completely unsupported. There is no evidence that the City ever has or ever would have ranked applicants based on PPT scores alone. To the contrary, for its current examination, Exam 6019, the City uses a pass/fail physical test that has no affect whatsoever on applicants' ranks on the eligibility list. Pl. Facts, ¶¶ 106-107. In fact, as the United States' experts with respect to job-relatedness explained in their liability phase reports, ranking based – in whole or in part – on the PPT used for Exams 7029 and 2043, as scored by the City, is not job related. Pl. Facts, ¶¶ 108-109.

11

deposition, Dr. Erath testified that he believed that the City's use of the written examination

scores was the ranking practice found unlawful. Pl. Facts, ¶ 110. In fact, however, the practice

found unlawful was the City's rank-order selection of applicants from the eligibility list based on

a *combination* of their written examination *and PPT* scores. *See* Dkt. No. 294, p. 15. Thus, it

makes as little sense for Dr. Erath to calculate shortfalls using a method that assumes that it

would be appropriate for the City to rank applicants based on their PPT scores as it would for

him to calculate shortfalls using a method that assumes that it would be appropriate for the City

to rank applicants based on their scores on Written Exam 2043. In fact, as Dr. Siskin explains in

his rebuttal report, Dr. Erath's new method of calculating the hiring shortfalls does incorporate

the effects of rank-order use of Written Exam 2043. Pl. Facts, ¶¶ 111-112.[13] Accordingly, even

if the Court's prior findings were not law of the case, the Court should reject Dr. Erath's reduced

shortfalls because they were calculated using a method that is inconsistent with the Court's

holding that the City's rank-order selection based on a combination of Written Exam 2043 and

PPT scores is discriminatory.

> 2. Dr. Erath's Re-Allocation of the Shortfall Across Academy Classes Also Is Based on an Erroneous Understanding of the Practices That the Court Found Unlawful and on Unsupported Assumptions.

With respect to the allocation of the shortfall hires into the various academy classes, Dr.

Erath presents two alternatives. Pl. Facts, ¶ 113. First, he argues that all shortfall hires for each

of the examinations would have been hired into the last possible class(es). Pl. Facts, ¶ 114. The

---

[13] Dr. Erath's method incorporates the effect of the written examination on the hiring of
African-American and Hispanic applicants because it is based on the actual hire rates of
applicants with the same PPT scores (and bonus points). Pl. Facts, ¶ 112. Actual hire rates, of
course, were affected by the written examination scores.

last possible class(es) would be either the last class hired from the relevant (*i.e.*, Exam 7029 or 2043) eligibility list or, if the last class was not large enough to accommodate the entire shortfall, into the last two classes. Pl. Facts, ¶ 114. Alternatively, Dr. Erath posits that all shortfall hires would have been hired on or after the median hire date for the relevant eligibility list. Pl. Facts, ¶ 116. In other words, Dr. Erath argues that the entire hiring shortfall would have been hired, at the earliest, only after half of all hires from the relevant eligibility list already had been made.

Dr. Erath's first argument in support of these alternative allocations across academy classes is based on his misapprehension of the rank-order selection practice found unlawful by the Court. According to Dr. Erath, because applicants' PPT scores were correlated with their written examination scores, African-American and Hispanic applicants who received low scores on the written examinations would have ranked relatively low on the eligibility lists even if the City had ranked applicants based only on their PPT scores. Pl. Facts, ¶ 118. As explained above, the Court should reject this argument because it assumes that it would be appropriate for the City to select applicants in rank order based on their PPT scores. *See* Section V.A.1., *supra*.

Second, Dr. Erath argues that African-American and Hispanic applicants would have ranked low on the eligibility lists even if the City had not used applicants' scores on Written Exams 7029 and 2043 for ranking because scores on those examinations are correlated with scores on Written Exam 6019. Pl. Facts, ¶ 119. Thus, according to Dr. Erath, "if exam 6019 is assumed to be a fair test" then the African-American and Hispanic applicants who scored low on Written Exam 7029 and 2043 would also have scored low "on a fair exam" and, therefore, would

13

have been hired relatively late.[14]  Pl. Facts, ¶ 119.  Dr. Erath's argument is, again, based on an argument already rejected by the Court in the liability phase of this case.  Specifically, it is yet another iteration of the City's "perfect parity" argument.  *See* Dkt. 294, pp. 31-33.  The City is once again asking the Court to accept the premise that the baseline against which the unlawful practice should be measured is not what would have happened if there were *no disparity* between African-Americans, Hispanics and whites.  According to the City, the baseline should be what would have happened had the City used a different selection practice – here, selection based on Written Exam 6019.

Third, Dr. Erath posits that, if Written Exam 7029 and 2043 "contained any valid questions," then African-American and Hispanic applicants who scored relatively low on Written Exam 7029 and 2043 would score relatively low on "a hypothetical fair test."  Pl. Facts, ¶121.  Dr. Erath argues that, on a hypothetical test that contained "any valid questions," if test-taker A scored 88 and test-taker B scored 48, then "applicant A's score on a hypothetical fair test might be expected to be greater than applicant B's."  Pl. Facts, ¶ 122.  As Dr. Siskin explains in his rebuttal report, "Dr. Erath is simply wrong."  Exh. E, p. 12.  Dr. Erath's error is clearly illustrated by applying his own hypothetical to a 100-item examination that contains 30 "valid questions."  Pl. Facts, ¶¶ 122-123.  As Dr. Siskin explains, it is not possible to conclude that test-taker A would be expected to score better than test-taker B on the "hypothetical fair test" without knowing how the applicants scored on the 30 valid questions:

Suppose, as Dr. Erath proposes, that Written Exam 2043 contains 30 "valid questions"

------

[14]  Dr. Erath admits he cannot offer an opinion as to whether rank-order use of Written Exam 6019 is "fair."  Pl. Facts, ¶ 120.

and 70 "invalid questions." White Test Taker A correctly answers 18 valid questions and 70 invalid questions (achieving a score of 88 as Dr. Erath notes). African-American Test Taker B correctly answers 30 valid questions and 18 invalid questions (achieving a score of 48, as Dr. Erath notes).

Pl. Facts, ¶ 123. As Dr. Siskin explains, in that case, one clearly should not assume that white Test Taker A will perform better on a "hypothetical fair test" than African-American Test Taker B, because "Test Taker B answered more valid questions correctly than did Test Taker A." Pl. Facts, ¶ 123. Thus, Dr. Erath's third argument is incorrect.

In short, Dr. Erath's method of allocating shortfall hires across the academy classes is based on a misunderstanding of the rank-order selection practice that the Court found unlawful, and relies on the "perfect parity" argument rejected by the Court in the liability phase, as well as a hypothetical that cannot withstand scrutiny. Thus, Dr. Erath's allocation of the shortfall hires is both inconsistent with the Court's liability ruling and incorrect.

> 3.   Dr. Erath's Criticisms of Dr. Siskin's Mitigation Ratios Are Based on an Erroneous Understanding of How the Mitigation Ratios Were Calculated.

In his report, Dr. Erath criticizes Dr. Siskin for: (1) excluding anyone earning more than 10% above beginning firefighter earnings from the census earnings data he relied on, and (2) incorrectly estimating (according to Dr. Erath) unemployment rates when calculating his mitigation ratios. *See* Exh. 1, pp. 8-10. As Dr. Siskin explains in his rebuttal report, both of these criticisms are based on a misunderstanding of Dr. Siskin's analysis. Exh. E, pp. 15-18.

First, Dr. Erath criticizes Dr. Siskin for using a ceiling on the census earnings data he used to calculate the mitigation ratios – specifically, excluding workers who, in 1999, were earning at least 10% more than entry-level firefighter earnings. Exh. I, pp. 8-9. According to Dr.

15

Erath, the exclusion of these workers is erroneous because "[t]he question of interest is not what a potential applicant might be earning before applying to the FDNY, but rather what an applicant would be expected to earn after being turned down by the FDNY." Exh. I, p. 9. In addition, according to Dr. Erath, the exclusion of individuals who earn substantially more than beginning firefighters is incorrect because some of them might be interested in the firefighter position. Exh. I, p. 9. Apparently, Dr. Erath does not understand what Dr. Siskin actually did.

As explained in Section IV.A.2., *supra*, Dr. Siskin's first step was to define a group within the census data that is comparable to the African-American and Hispanic victims of the City's discriminatory practices. Pl. Facts, ¶¶ 29-30. In addition to the other criteria he used to define that group, Dr. Siskin conservatively included only individuals who were employed full-time, full-year in 1999. Pl. Facts, ¶ 34. He then further restricted the sample to those earning less than 10% above the mean entry-level firefighter earnings. Pl. Facts, ¶ 34. In doing so, Dr. Siskin did not assume that *no* individual earning more would apply for the firefighter job. He did make the reasonable assumption that only a *small percentage* of such individuals could or would take such a substantial pay cut. Pl. Facts, ¶¶ 54-55. Therefore, because including all persons earning 10% or more above the beginning firefighter earnings would bias the results, Dr. Siskin excluded such high earners. Pl. Facts, ¶ 55.

Once Dr. Siskin had defined the group that he found most comparable to the victims, he then considered what Dr. Erath calls "the question of interest" – *i.e.*, what this group could be expected to earn in the future. Dr. Siskin assumed that, on average, the growth rate of firefighter earnings would be the same as that of earnings in other positions, so that the mitigation ratio would stay the same over time. Pl. Facts, ¶ 56. This assumption was conservative (*i.e.*, resulted

in a low estimate of monetary losses). Pl. Facts, ¶ 56. According to Dr. Erath, one reason some individuals earning 10% or more above first year firefighter earnings might apply for the position is that firefighter earnings grow more rapidly than those of other workers. Exh. I, p. 9. If that is the case, then the mitigation ratio should decrease over time as firefighter earnings increase more than earnings from other jobs. Pl. Facts, ¶ 57. Thus, in considering what applicants could reasonably be expected to have earned after they were "turned down by the FDNY," Dr. Siskin took a more conservative approach than Dr. Erath's analysis would warrant.

Dr. Erath's criticism of the unemployment rates Dr. Siskin used in calculating mitigation ratios is similarly mistaken. In support of this criticism, Dr. Erath argues that Dr. Siskin's unemployment rates include the "voluntarily unemployed." Exh. I, pp. 9-10. As Dr. Siskin explains, however, Dr. Erath is incorrect because an unemployed person is, by definition, someone who is seeking work but unable to obtain it. Pl. Facts, ¶ 40. Persons who are not employed and not seeking work (*i.e.*, are "voluntarily unemployed") are not counted in the census data as unemployed. Pl. Facts, ¶ 41.

Dr. Erath also argues that the unemployment rates Dr. Siskin used are based on a sample with "some earnings." *See* Exh. I, pp. 9-10. This argument is based on a misunderstanding of what Dr. Siskin did to determine the unemployment rates he used. Specifically, Dr. Siskin considered only persons who reported working in 1999 and earning at least $11,400 (full-time earnings from minimum wage at that time). Pl. Facts, ¶¶ 42-43. For his unemployment rates, Dr. Siskin then used the March 2000 unemployment rate of this group – a group that had been fully employed the previous year. Pl. Facts, ¶ 44. As Dr. Siskin explains, the result was that he likely *under*stated the unemployment rate (*i.e.*, overstated the mitigation ratios). Pl. Facts, ¶ 45. For

17

example, as a result of restricting his sample to individuals who earned at least $11,400 in 1999,

Dr. Siskin used a 5% unemployment rate for African Americans with an Associates degree, even

though the unemployment rate among all African Americans with an Associates degree was over

15%. Pl. Facts, ¶¶ 46-47.

4. Dr. Erath's Proposed Mitigation Ratios Are Based on Unsupported
Assumptions and on "Data" That Dr. Erath Himself Admits Is Unreliable.

Dr. Erath presents three alternative mitigation scenarios. Pl. Facts, ¶ 127. Each of these

scenarios is based on assumptions that are unsupported and unreasonable. First, all three of Dr.

Erath's mitigation scenarios are fundamentally flawed because they are based on a list of 145

white, African-American and Hispanic applicants produced by the United States during the

liability phase of this case. Pl. Facts, ¶ 128. Dr. Erath relies on this list to conclude that *only*

public sector jobs should be considered when calculating mitigation ratios in this case because,

according to Dr. Erath, the list demonstrates that victims of the City's discriminatory practices

have a "predilection" for public sector employment. Pl. Facts, ¶¶ 130-132.[15] However, Dr. Erath

himself admits that he can draw "no formal conclusion" from this list. Pl. Facts, ¶ 137. Indeed,

Dr. Erath admits that he does not know how this "sample" was selected or how the "data" was

gathered. Pl. Facts, ¶¶ 133-135. He also admits that he does not know the current job or pay

rate – or anything else about the employment history – of any of the individuals listed. Pl. Facts,

¶ 136. Indeed, in his deposition, Dr. Erath admitted that when he said in his report that "this

group of applicants was far more likely to secure public sector employment than is typical for the

---

[15] As Dr. Siskin points out in his rebuttal report, the census earnings data he used to
calculate his mitigation ratios includes, but is not limited to, earnings data for individuals
employed in the public sector. Pl. Facts, ¶ 28.

workforce in general," he was not referring to all victims of the City's discriminatory practices or even to all 145 applicants on the list. Pl. Facts, ¶ 138.   Instead, "this group" refers only to the 102 individuals for whom an employer is identified on the list. Pl. Facts, ¶ 138.   Nonetheless, based at least in part on this "sample of unknown composition," Dr. Erath's mitigation scenarios all rely on information (and assumptions) about jobs in the public sector.[16] Pl. Facts, ¶¶ 130, 133. Dr. Erath's unsupported speculation must be rejected by the Court.   Fed. R. Evid. 702 (expert knowledge must be more than "unsupported speculation"); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (expert opinions based on speculation and conjecture are inappropriate for consideration on summary judgment).

Even if the Court were to consider Dr. Erath's public-sector-only scenarios, none of them would provide a reliable basis for an estimate of the amount that victims of the City's discrimination reasonably could have earned in mitigation. *See* Exh. E, pp. 19-23.   In his first scenario, Dr. Erath assumes that all of the victims could have obtained positions as police officers in the New York Police Department ("NYPD").   Pl. Facts, ¶ 139.   According to Dr. Erath, the "the FDNY and NYPD have similar pay scales, and consequently applicants who joined the NYPD would have *no losses* save possibly for a delay in beginning employment while

_____

[16] In some instances, Dr. Erath explicitly attempts to justify his mitigation scenarios by reference to the list of 145 applicants.  For example, in discussing the scenario under which he assumes that victims could have become police officers, Dr. Erath states, "The data produced by the federal government also show more than 10 percent of those" 102 applicants on the list "who listed an employer listed the NYPD, further evidencing the possibility of seeking and securing NYPD employment for failed FDNY applicants."  Pl. Facts, ¶ 147.  Similarly, in discussing the scenario under which he assumes that all unsuccessful firefighter applicants could have become sanitation workers, Dr. Erath notes "that the sample of rejected applicants produced by the federal government shows three people currently working for Sanitation."  Pl. Facts, ¶ 132.

the applicant [obtained] 60 college credits, more than the 30 credits required to apply for a firefighter position." Pl. Facts, ¶ 140. (emphasis added).

Dr. Erath does not present any estimate of the losses accrued while an applicant attempted to obtain the additional college credits required to become a police officer. Pl. Facts, ¶ 141. Nor does he present any evidence that the actual earnings of police officers are the same as those of firefighters, given that firefighters earn substantially more than their base salary in the overtime earnings and shift differentials that result from their unique schedules. Pl. Facts, ¶¶ 142-146. Moreover, aside from his reliance on the fact that ten of the 145 applicants on the list "of unknown composition" worked at some point for the NYPD,[17] Dr. Erath presents no basis for assuming that all unsuccessful applicants for the firefighter position were qualified for and interested in a police officer position or that all would have been hired as police officers before suffering any monetary losses.[18] Pl. Facts, ¶¶ 148, 150, 152-153. Nor does he present any basis for asserting that, even making those unsupported assumptions, the victims of the City's discrimination did not reasonably mitigate their losses by staying in the positions they held when they applied for the firefighter position, rather than leaving them to become police officers. *See, e.g., Ingram v. Madison Square Garden Center, Inc.*, 535 F. Supp. 1082, 1092 (S.D.N.Y. 1982) ("persons holding full time jobs [are] not required to do anything more to mitigate"). In short, Dr. Erath's first scenario provides no basis for the conclusion that the victims of the City's

---

[17] There is no evidence that all ten of these individuals worked as police officers for the NYPD. Pl. Facts, ¶ 149.

[18] In his deposition, Dr. Erath admitted that he did not look into the selection procedures and criteria for the positions with the City that he assumes unsuccessful firefighter applicants could have obtained. Pl. Facts, ¶ 151.

discrimination suffered no economic loss.

Dr. Erath's second scenario is equally unavailing.  Here, Dr. Erath assumes that all of the victims of the City's discriminatory practices could have obtained employment with the City as sanitation workers before suffering any economic losses because the sanitation worker position requires only a high school diploma.  Pl. Facts, ¶ 154.  Based on that assumption, Dr. Erath concludes that a 90% (.90) mitigation ratio would be appropriate.  Pl. Facts, ¶ 161.  Both Dr. Erath's assumption that all unsuccessful firefighter applicants could have become sanitation workers and his conclusion that a 90% mitigation ratio is appropriate are incorrect.

First, Dr. Erath's assumption that all unsuccessful firefighter applicants would have been hired as sanitation workers suffers from the same flaws as his assumption that they would have been hired as police officers.  Thus, he provides no basis for assuming that all unsuccessful firefighter applicants were qualified for and interested in the sanitation worker job and that all would have been hired as sanitation workers.  Pl. Facts, ¶¶ 155-158.  Indeed, as Dr. Siskin noted, publicly available information indicates that there were many more applicants for the sanitation worker job than there were positions to fill.  Pl. Facts, ¶ 159.  Based on the job announcement relied on by Dr. Erath, sanitation workers were selected from an eligibility list rank ordered on the basis of a written examination that appears to measure some of the same cognitive abilities that Written Exams 7029 and 2043 purported to measure.  Pl. Facts, ¶ 160.  Thus, there is no reason to believe that all unsuccessful firefighter applicants could have obtained sanitation worker positions.

In addition, even if one were to accept Dr. Erath's unsupported assumption that they could have, it does not follow that the mitigation ratio of 90% proposed by Dr. Erath would be

21

appropriate. Dr. Erath based the 90% mitigation ratio on the fact that the base pay of sanitation workers was approximately 90% of the base pay of firefighters. Pl. Facts, ¶ 161. Base pay is an unreliable basis for a comparison of firefighter earnings to those of other occupations because, as stated previously, firefighters earn substantially more than their base pay due to overtime and shift differentials.[19] Pl. Facts, ¶¶ 143-146. Yet Dr. Erath did not compare total sanitation worker earnings to total firefighter earnings. Pl. Facts, ¶ 162.

Dr. Erath's third and last scenario assumes that all of the unsuccessful applicants for the firefighter position could have obtained employment in a job paying at least $20,000 per year. Pl. Facts, ¶ 163. Dr. Erath bases this assumption on the fact that, according to a document prepared by counsel for the City, there were positions available with the City during the relevant time period (2001 to 2010) that had no education or experience requirements. Pl. Facts, ¶ 165. According to Dr. Erath, he calculated that the average pay rate (reduced to 1999 dollars) for all such positions was approximately $20,000 per year. Pl. Facts, ¶ 165. Under this scenario, Dr. Erath therefore recalculated Dr. Siskin's census-based mitigation ratios by applying a lower bound of $20,000 to the census data used. Pl. Facts, ¶ 164. The total amount of the monetary losses calculated by Dr. Erath under this scenario is nearly $30 million. Exh I., p. 19.

However, Dr. Erath provides no reliable basis for his use of a $20,000 floor on earnings. Pl. Facts, ¶¶ 166-168. He presents no evidence that all unsuccessful firefighter applicants could have obtained City jobs paying at least $20,000 per year (in 1999 dollars).[20] Pl. Facts, ¶ 167. He

---

[19] In addition, as Dr. Siskin points out, the unusual work schedule of firefighters allows them to earn additional amounts from "moonlighting." Pl. Facts, ¶¶ 144-145.

[20] Indeed, if that were the case, then it is hard to believe that any male citizen with at least one year of college (but no Bachelors degree) employed full-time in New York would work in a

did not inquire into the selection processes for such jobs. Pl. Facts, ¶ 169. In fact, the

announcement for Motor Vehicle Operator, one of the jobs Dr. Erath relied on, states that

applicants had to pass a multiple-choice test that "may require the use of" Written

Comprehension, Memorization, Problem Sensitivity, Information Ordering, Deductive

Reasoning, Spatial Orientation, Inductive Reasoning and Visualization – cognitive abilities

purportedly measured by Written Exams 7029 and 2043. Pl. Facts, ¶¶ 170-172.

> 5.    Dr. Erath's Analysis of the Value of Lost Benefits Is Based on His
>        Misunderstanding of the Nature of the Relief Sought by the United States[21]

According to Dr. Erath, no amount of monetary relief should be awarded to represent the

value of the health benefits that would have been earned by the 293 shortfall hires absent the

City's discriminatory practices. Pl. Facts, ¶ 175. Some of Dr. Erath's criticisms of Dr. Siskin's

analysis of the health benefits can be quickly dismissed because they are based on the same errors

and unsupported assumptions discussed previously. Thus, Dr. Erath argues that Dr. Siskin's

analysis uses unemployment rates that include the "voluntarily unemployed." Exh. I, p. 12. Dr.

Erath also argues that all victims of the City's discriminatory practices could have gotten other

---

job paying less than $20,000 per year. But apparently they did, or there would be no reason for
Dr. Erath to think about applying a floor of $20,000.

   [21] As stated previously, Dr. Siskin did not include in his calculations any amount for the
value of lost pension benefits because, under the United States' Proposed Relief Order, the 293
individuals hired as priority hires will receive full retroactive pension benefits upon completion
of their probationary period. Pl. Facts, ¶ 63. In addition, the parties' experts are in agreement
that, if the Court awards retroactive annuity benefits to the 293 individuals hired as priority hires,
then no amount representing the value of the UFA annuity benefit should be included in the
monetary relief awarded. Pl. Facts, ¶¶ 69, 174. If the Court does not award retroactive annuity
benefits to the priority hires, then the amount that Dr. Siskin calculated to represent the value of
the UFA annuity benefits lost should be included in the monetary relief awarded. *See* Pl. Facts,
¶¶ 66-67. Accordingly, only health benefits are addressed above.

jobs with the City and received the same health benefits as firefighters.  Exh. I, p. 13.  The fallacy

of these arguments is explained above in the context of mitigation.[22]  *See supra*, pp. 17, 19-22.

Dr. Erath also asserts two new arguments specific to health benefits.  First, Dr. Erath

argues that there is no evidence of a relationship between the *cost to the City* of providing health

insurance and *the value of the benefit to a victim* in his twenties.  Pl. Facts, ¶ 176.  Second,

because Dr. Siskin includes in his calculations an amount representing the value of health

benefits only for those he assumes would be unemployed, Dr. Erath argues that a victim who was

unemployed could defer medical care until he became employed.  Pl. Facts, ¶ 177.  Both of these

arguments are based on a fundamental misconception about the nature of the relief sought.  Dr.

Erath analyzes the value of health benefits as if the United States were seeking that value as an

element of compensatory damages.  Thus, according to Dr. Erath, if a victim did not make any

out-of-pocket payments for health care, then the victim is entitled to no compensation.  Pl. Facts,

¶ 178.  Here, however, the value of lost benefits will be awarded as an element of equitable

backpay relief.  *See, e.g.*, *Saulpaugh*, 4 F.3d at 145 (backpay includes benefits).  Therefore, it is

irrelevant whether a victim was lucky enough not to have required medical care while not

employed.  Regardless of what medical expenses the victims incurred, had the City hired the

additional 293 African-American and Hispanic applicants it would have hired absent

discrimination, part of their compensation would have been the health benefits that the City

provides.  It is the amount of those health benefit "earnings" that Dr. Siskin includes in

---

[22]  Dr. Erath also argues that Dr. Siskin relies on samples that are too small and on one
"fabricated number" for his unemployment rates.  Exh. I., p. 12.  However, as Dr. Siskin explains
in his rebuttal report, the small sample and "fabricated number" were the result of one of the
programming errors that Dr. Siskin corrected in his rebuttal report.  Pl. Facts, ¶ 48.

calculating the class-wide monetary value of the wages and benefits lost. Pl. Facts, ¶ 62.

> 6.   Dr. Erath's Analysis Concluding That There Was No Delayed Hiring
> Is Both Incorrect and Foreclosed by the Court's Liability Findings.

Finally, Dr. Erath asserts that there is no amount of loss due to delayed hires, because there was no delay in the hiring of African-American and Hispanic firefighters as a result of the City's discriminatory practices. Pl. Facts, ¶ 179.[23]   In its July 22, 2009 liability order, the Court held that hundreds of African-American and Hispanic applicants who were hired from the Exam 7029 and 2043 eligibility lists had their hiring delayed due to those practices. Pl. Facts, ¶ 75. Thus, the City once again – this time without even the excuse of adjusting for hiring data that was not timely produced – attempts to reargue an issue already decided by the Court. The City has made absolutely clear that it disagrees with the Court's liability findings. Nonetheless, the Court has made certain findings, and those findings govern the relief phase of this case.

## VI.   CONCLUSION

For the foregoing reasons, the Court should award a class-wide amount of monetary relief equal to Dr. Siskin's estimate of the total value of wages and benefits lost by the victims of the City's discriminatory practices, less mitigation, plus interest – $63,524,294.[24]

_____

[23]   Dr. Erath's conclusion clearly is incorrect. African Americans and Hispanics ranked significantly lower on the Exam 7029 and 2043 eligibility lists than did whites. As a result, they disproportionately were not reached for hire, and those who were reached were reached later. Dr. Erath's erroneous conclusion to the contrary is based on his review of applicants who *were not hired* from the Exam 7029 and 2043 eligibility lists. Pl. Facts, ¶ 180. Given that only those applicants who *were hired* could be delayed hires, Dr. Siskin appropriately focused only on those who were hired. Pl. Facts, ¶ 181. In his rebuttal report, Dr. Siskin provides an example that further illustrates the fallacy of Dr. Erath's analysis. Exh. E, pp. 24-26.

[24]   As stated previously, if the Court awards the full value of the UFA annuity to the 293 victims hired as priority hires, the Court should deduct from the total award the amount representing the mitigated value of the annuity benefit.

Dated: June __, 2010

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General

JOHN M. GADZICHOWSKI
Chief

_____

/s/SHARON A. SEELEY
Acting Deputy Chief
Telephone:  (202) 514-4761
Facsimile:   (202) 514-1005

MEREDITH BURRELL
VARDA HUSSAIN
Senior Trial Attorneys
United States Department of Justice
Civil Rights Division
950 Pennsylvania Avenue, N.W.
Patrick Henry Building, Room 4500
Washington, D.C.  20530

LORETTA E. LYNCH
United States Attorney

_____

/s/ELLIOT M. SCHACHNER
DAVID ESKEW
Assistant United States Attorneys
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York  11201-1820
Telephone: (718) 254-6053
Facsimile: (718) 254-6479