UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

UNITED STATES OF AMERICA,

                      Plaintiff,

        -and-

VULCAN SOCIETY INC., for itself and on behalf of its
members; MARCUS HAYWOOD, CANDIDO NUÑEZ,
and ROGER GREGG, individually and on behalf of a class
of all others similarly situated,

                   Plaintiffs-Intervenors,

        -against-

THE CITY OF NEW YORK, THE FIRE DEPARTMENT
OF THE CITY OF NEW YORK, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE
SERVICES, MAYOR MICHAEL BLOOMBERG and
NEW YORK CITY FIRE COMMISSIONER NICHOLAS
SCOPPETTA, in their individual and official capacities,

               Defendants.

------------------------------------------------------------------------ x

**CIVIL ACTION NUMBER:
07-CV-2067 (NGG)(RLM)**

Served August 13, 2010

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF UNITED STATES' AND PLAINTIFFS-INTERVENORS' MOTIONS FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS-WIDE BACK-PAY AND ECONOMIC DAMAGES AND PLAINTIFFS-INTERVENORS' <u>MOTION TO EXCLUDE DR. ERATH'S TESTIMONY</u>

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF UNITED STATES' AND PLAINTIFFS-INTEVENORS'
MOTION FOR SUMMARY JUDGMENT AND IN FURTHER OPPOSITION TO
PLAINTIFFS-INTEVENORS' MOTION TO EXCLUDE DR. ERATH'S TESTIMONY**

## I.     Introduction – opposition regarding economic damages

Defendants respectfully submit this memorandum of law in opposition to Plaintiff United States' motion for summary judgment with respect to class-wide back-pay and economic damages. The primary disputes between the parties concern factual issues[1] rather than legal disputes[2]; specifically: 1) the appropriate calculation of both the short-fall[3] as well as the timing of the hire of the shortfalls[4], which constitutes the multiplier that is used to determine class-wide economic damages; 2) the proper calculation of lost heath benefits based upon the cost to the employer rather than any actual loss to the class members; and 3) the proper calculation of mitigation based upon disputed premises rather than the most reliable data to most accurately calculate class-wide damages. Although Plaintiff is fond of asserting Defendants somehow "misunderstand" either Dr. Siskin's analyses and/or the Court's liability phase findings, the truth is: Defendants fully understand both Dr. Siskin's analyses and the Court's liability rulings, but simply disagree with the bold and often-times false representations made by Plaintiff.

---

[1]     Because the primary disputes between the parties concern factual issues, there is little dispute concerning legal issues, except, however, the dispute concerning the appropriate measure of health benefits in determining economic damages. This issue is more fully addressed in Point II, below.

[2]     Defendants, however, preserve their right to appeal all issues relating to damages, and further maintain that a more individualized assessment is required for non-economic relief, such as competitive seniority.

[3]     In this context, Defendants dispute both the calculation of a short-fall as concerns individuals who were not hired (subsequently identified as the "non-hired shortfall"), as well as individuals who were delayed in being hired (subsequently identified as the "delayed hired shortfall").

[4]     Plaintiff calculates damages in part by asserting that some of the minorities hired were hired at a later time than would be expected but for the improper written exams. Accordingly, this is a separate, but related, element of damages. Defendants contest that any delay in hiring was the result of the contested exams, and that the delay in hiring occurred for reasons which had nothing to do with the contested exams. This issue is addressed in more detail in Point I (B), below.

The clearest example of both Dr. Siskin's improper analyses and Plaintiff's false representation of the Court's liability finding is the simple assertion that there were actually 293 blacks and Hispanics who were not hired from Exams 7029 and 2043 who would have been hired had there been no disparate impact based on the written Exams themselves (hereinafter the "non-hired shortfall"). *See, e.g.*, Plaintiff's Memorandum of Law in Support Of Summary Judgment with Respect to Economic Damages, at pp. 6, & 9-10 (hereinafter "Plt's SJ brief"). As is more fully established below, the calculation of a shortfall of 293 individuals is based upon Dr. Siskin's reliance on incomplete data and improper assumptions, which did not accurately reflect the actual hiring that occurred. All parties agree that, when the actual hires from Exam 2043 are calculated the so-called shortfall is less than 293 individuals[5]; thus Dr. Siskin's initial shortfall calculations (which were reported by the Court in the liability decision) were inaccurate and improperly inflated. Indeed, Dr. Siskin recognized this error and made revisions in his rebuttal report in order to account for the completed hiring that occurred after his report was submitted.[6] Nevertheless, Plaintiff continues to press for the continued use of the inaccurate and improperly inflated shortfall - 293. *See* Plt's SJ Brief, pp. 6, 9. Thus, Plaintiff insists upon ignoring reality

---

[5]       There is a further dispute as to exactly what the actual shortfall is – how much lower than the initial projection of 293 is warranted under the undisputed facts. The disputes concerning the appropriate calculation of this shortfall are addressed below. Regardless of those differences as to how much below 293 the appropriate shortfall is, it is undisputed that the actual shortfall is lower that Dr. Siskin's initial projections. Plaintiff acknowledges this fact, but insists that Defendant is to blame for Dr. Siskin's errors in calculating the shortfall. *See*, Lemonedes' Declaration at ¶ 5 and transcript to the June 15, 2010, Court Conference at 16:2-5. *See also*, Plt's SJ brief at p. 10.

[6]       It is significant to note, however, that while Dr. Siskin's rebuttal report adjusted the shortfall to reflect the additional hiring that occurred after his initial report was submitted, it continued the improper assumptions which were contradicted by the evidence. This issue is addressed in more detail below.

and actually blames Defendants for Dr. Siskin's errors.[7]  *See*, Plt's SJ brief at p. 10.  Certainly, there is no mistake or misunderstanding on any of those points.

Defendants simply disagree that merely because Dr. Siskin's inaccurate and improperly inflated calculations are mentioned in the Court's liability decision, that somehow the Court and the parties are required to accept such false calculations in order to calculate damages. Indeed, the fact that Dr. Siskin actually – but belatedly – recalculated the shortfall to be less than 293, demonstrates that even Plaintiff acknowledges (or at least should acknowledge) that the shortfall reported by the Court in the liability decision (293), should **not** be applied.  If the shortfall reported in the Court's liability decision should not be applied because it is inaccurate – then all the more reason to consider all the calculations and the underlying premises relied on by Dr. Siskin to establish the shortfall.

Defendants respectfully assert that class-wide damages must be calculated based on the actual data **and** that the calculations cannot be based on assumptions, which are specifically contradicted by the actual data.  Only in this way can the damage be calculated to make victims whole, rather than grant a windfall to every black and Hispanic who took Exam

---

[7]       Indeed, during the pre-motion court conference for this very summary judgment motion, Plaintiff's counsel, Ms. Seeley, acknowledged that in light of the actual hires made, the shortfall reported by Dr. Siskin was inaccurate and the actual shortfall was less than he projected.  *See* Lemonedes Declaration ¶ 5 and transcript to the June 15, 2010, Court Conference at 16:2-5.  Plaintiff complains that Dr. Siskin's inflated estimates are appropriate because of the Defendants' "failure to produce all of the Exam 2043 hiring data during the liability phase,…"  *See*, Id. *and see* Plt's SJ brief, p.10.  Plaintiff's complaint is as baseless as its excuse for continuing to insist that economic damages be based on improperly inflated estimates of the shortfall, which are known to be false.  Plaintiff's complaint is improper for two reasons.  First, it fails to account for the simple timing of both the expert reports and the actual completion of hiring for Exam 2043:  Dr. Siskin's expert report was due on November 23, 2007, while the hiring for Exam 2043 was not completed until January 20, 2008.  Thus, it was impossible for Defendants to provide Dr. Siskin with the data for the actual hiring **before** that hiring occurred.  The second reason that Plaintiff's complaint is improper is that Plaintiff confuses facts required for a finding of liability with the facts required for a finding of damages.  All the Court needed to know regarding the issue of liability was whether there would have been a shortfall in hiring – not what that actual shortfall would have been.  When the Court turns its attention to damages is when the issue of exactly what that shortfall was becomes important.

2043.  Indeed, Defendants respectfully assert that any calculation of class-wide damages based upon an improperly inflated shortfall constitutes punitive damages, which are not permitted against a municipality.

Similar to the dispute concerning the calculation of the appropriate short-fall and length of delayed hires, defendants dispute the premises relied upon by Dr. Siskin in determining the health benefits and the proper mitigation.  Defendants assert that the calculation of damages for lost Medical benefits must be based upon the loss suffered by the victims rather than the cost of insurance incurred by the employer/defendant.  In essence, it is Defendants' position that the calculation of damages should be based upon the most accurate information possible to properly calculate the actual damages to the class of plaintiffs, rather than the overly broad assumptions used by Dr. Siskin.

## II.    Introduction – opposition regarding application to strike testimony

Plaintiffs-Intervenors seek to exclude Dr. Erath's testimony merely because he uses a list actually provided by Plaintiff as supporting corroboration for his analysis in order to determine a proper mitigation for a group of candidates who sought public service job, it would be most appropriate to focus on other public service jobs that such candidates were capable of performing.   Indeed, Dr. Erath's analysis stands without the additional corroboration of the list created by Plaintiff – thus there is no sufficient basis asserted by Plaintiffs-Intervenors to attack Dr. Erath's analysis.

2731690_1.DOC

**Point I**

**BECAUSE PLAINTIFF'S CALCULATION OF THE
SHORT-FALL IS INACCURATE AND IMPROPERLY
INFLATED, PLAINTIFF'S CALCULATIONS OF DAMAGES
IS IMPROPER AND SHOULD BE DISREGARDED**

**A.**      **Dr. Siskin's Calculation of Shortfall in hiring
is inaccurate and improperly inflates damages**

It simply cannot be disputed that Dr. Siskin's initial calculation of the non-hired shortfall was based upon his projections of what he expected the final hiring from Exam 2043 would be, and it is further undisputed that those estimates were **not** supported by the final results of all candidates **actually** hired from Exam 2043.  In reality, when looking at the **actual** hires from Exam 2043, even in accepting all the premises Dr. Siskin makes (many of which are simply unsupported by the undisputed facts)  there is a smaller number of non-hired individuals than Dr. Siskin "projected."  Thus, Dr. Siskin's initial analyses were inaccurate and improperly inflated the shortfall.  Defendants are not mistaken about this simple fact.  Indeed, Dr. Siskin admitted this error and revised his calculated shortfall in his rebuttal report.  This fact in and of itself demonstrates that Dr. Siskin's calculations are not sacrosanct.  Defendants simply assert that Dr. Siskin's errors in calculation are not solely caused by his failure to utilize the full information concerning the hiring, which were not known at the time he made the initial calculations.  In fact, Dr. Siskin's calculations suffer a deeper infirmity, in that they chose to ignore the undisputed facts that specifically contradict the premises he relies on to calculate the shortfall.

Plaintiff's objection to Dr. Erath's re-calculation of the shortfall fails to recognize the fundamental distinction between findings required to determine liability and findings required to determine damages.[8]  Now that the Court is considering the amount of damages to be

---

[8]      *See* footnote 7, and accompanying text, above.

awarded on a class-wide basis, the Court must necessarily address the issue of the **actual** shortfall of individuals not hired as a result of the written exams, which were the subject of the Court's liability finding.  In considering the shortfall, the Court needs to keep in mind that the shortfall number is basically a multiplier applied to the base salary and benefits that a firefighter would have received if he/she had been hired during the various academy classes hired from the eligible lists for Exams 7029 and 2043.  Thus, if the shortfall is inappropriately high, the amount of damages to be awarded to the class is beyond the actual damages incurred by the potential victims of discrimination (those who would have passed and been hired absent the discriminatory written exam).  Accordingly, any award of damages based on a falsely inflated shortfall constitutes a windfall to the plaintiffs rather than a legitimate attempt to make the actual victims of discrimination whole.  Defendants further contend that an award of damages based upon a falsely inflated shortfall would constitute punitive damages, which are not permissible against a municipality.  *See, Kolstad v. ADA*, 527 U.S. 526,534 (1999); *see also City of Newport v Fact Concerts*, 453 US 247, 260-70 (1981).

Beyond making calculations based upon incomplete data, Dr. Siskin made other substantial errors in calculation of the shortfall by making assumptions that are contrary to the record evidence in this case.[9]  These errors are more fully addressed in the expert report of Dr. Christopher Erath, but the three most significant errors are highlighted here: 1)  Dr. Siskin manipulates the data by altering the denominator to improperly inflate the shortfall (the denominator-deception); 2) Dr. Siskin manipulates the PPT score to improperly inflate the shortfall (the PPT-ploy); and 3) Dr. Siskin ignores the different attrition rates for the different

---

[9]      Because the Plaintiffs-Intevenors' expert, Dr. Lanier, adopts Dr. Siskin's analyses concerning the calculation of the shortfall, these flaws in analyses are applicable to the damage calculations for both Dr. Siskin and Plaintiffs-Intevenors' expert, Dr. Lanier.

2731690_1.DOC

- 7 -

ethnicities during the processing of candidates who passed the exam and are being processed for entry-level firefighters in order to further improperly inflate the shortfall (the attrition-disappearance).

**1)      The denominator-deception:**

Dr. Siskin manipulates the denominator between calculating test passers and establishing the appointment rate. Dr. Siskin first calculates a "shortfall" based on all test-takers and passers but makes an assumption as to how many of the presumed additional passers would have been appointed as firefighters. He does this by calculating an appointment rate based on "effective passers" – this distinction is significant and leads to an inflated shortfall. For example, as Dr. Erath explains in his declaration (*see* Erath Decl at ¶ 13), if the Court assumes that there were 1,000 test-passers, of whom 100 were ultimately hired, the Court should expect an appropriate appointment rate to be 10% (as 10% of the test-passers were actually hired).[10] However, Dr. Siskin refuses to use such a clear and reasonable guideline. Instead, Dr. Siskin decided to create an artificial construct of "effective passers" – claimed to be those who achieved at least the score of the lowest-scoring person actually appointed. Then Dr. Siskin tallies the "effective passers," and if, say, 500 test-takers had received a score of 94 or better then Dr. Siskin replaces the denominator; so that rather than calculating the appointment rate as 100/1000 (hirees divided by test-passers), Dr. Siskin calculates the appointment rate as 100/500 (hirees divided by "effective passers"). This mechanism improperly inflates the shortfall. In our example, using Dr. Siskin's model the appointment rate for blacks and Hispanics would be 20%

---

[10]      Curiously, Plaintiff asserts that Dr. Erath's methodology is inappropriate as it rejects the "perfect parity" position asserted by the Plaintiff. *See* Plt's SJ Brief p. 11. Clearly, Plaintiff has a fundamental misunderstanding of Dr. Erath's position. Indeed, under Dr. Erath's analysis the proper hiring percentage would be 10% to be applied to each of the three ethnic groups – 10% of the test takers for each group: perfect parity. Instead it is Dr. Siskin that rejects this perfect parity argument in asserting that the minorities should be given a hiring percentage of 20%. This issue is addressed in more detail below. *See* footnote 10 and accompanying text.

not 10%. There is, however, absolutely no basis for Dr. Siskin's inflation. Indeed, he falsely assumes that *everyone* who should have passed the written test would have been an "effective passer," which is contradicted by logic and the evidence, and Dr. Siskin's own methodology for determining the shortfall in test passers. This false assumption requires the conclusion that no one would have achieved a score between 70 (the passing score) and 94 (the lowest score obtained by anyone who was appointed).

The flaw in Dr. Siskin's analysis is highlighted by the following hypothetical: assume that 100 whites and 100 blacks took the exam and 25 % of the whites and 50% of the blacks failed the exam. Dr. Siskin finds discrimination and asserts 25 more blacks should have passed the exam. Further assume that of the 75 white and 50 blacks who passed the exam (a total of 125) the scoring breakdown was as follows: 50 candidates (30 whites and 20 blacks) scored between 90 and 100; 50 candidates (30 whites and 20 blacks) scored between 80 and 90; and 25 candidates (15 whites and 10 blacks) scored between 70 and 80. Then assume the City only needed 100 firefighters and consequently hired all those who scored between 80 and 100. To be consistent with the calculation of the shortfall of 25 test passers, the appointment rate should be determined by dividing the hirees by the test-passers (100/125), so the appointment rate should be 80% - thus 80% of the additional 25 blacks who should have passed would have been hired. Dr. Siskin, however, suggests that we look only at test passers who scored 80 or better (the effective passers) and thus asserts that hiring rate should be determined by dividing the hirees by the scores who had an 80 or better (100/100), so the hiring rate would be 100% - thus 100% of the 25 blacks who should have passes also should have been hired. Accordingly, Under Dr. Siskin's analysis there would have been 60 whites hired and 65 blacks hired – so that the blacks actually receive a windfall. Application of the actual appointment rate would yield:

60 whites were hired, 60% of the total; and 60 blacks should have been hired, again 60% of the total.   Under Dr. Siskin's approach, however, there would be 60 blacks hired (the 40 who actually were hired, plus the full additional 25 who should have passed).   Accordingly, in this example Dr. Siskin's approach inflates the hiring rate for blacks beyond the hiring rate for whites.[11]

2)      **The PPT-ploy**:

Dr. Siskin further manipulates the data to improperly inflate the shortfall by choosing to ignore the actual scores received on the Physical Performance Test ("PPT") for candidates who passed Exam 2043.   Thus, in determining whether someone was an "effective passer," Dr. Siskin further employs the false presumption that **everyone** got 100 on the PPT no matter what their actual score or whether they even showed up to take the PPT and does not explain this alteration to the actual data.   The data establishes that blacks and Hispanics candidates achieved lower scores on the PPT, and all other things equal, those scoring lower on the PPT would be hired later.[12]   The data further demonstrates that there is a correlation between the scores on the written exam and scores on the PPT, with lower written scores associated with lower PPT scores, again indicating that non-hired shortfall applicants would be expected to be late hires.   Defendants are not mistaken about what the data shows; indeed, Plaintiff has not disputed these facts.   Nor are Defendants mistaken that Dr. Siskin ignores this data.   There is no misunderstanding here – simply a disagreement regarding the applicability of such clear data in calculating the timing for the non-hired shortfall.   By ignoring this data, Dr. Siskin artificially

---

[11]      This problem arises because Dr. Siskin calculates a shortfall based upon all passers and then asserts a hiring rate based upon "effective passers."

[12]      Indeed, the data establishes that blacks were less likely than whites to even show up to take the PPT.   *See* Erath Decl ¶ 15.

and impermissibly inflates the non-hired shortfall – thereby again inflating the multiplier to calculate class-wide economic damages.[13]

3)      **The attrition-disappearance**:

Dr. Siskin next seeks to improperly inflate the shortfall by refusing to account for the disparity in attrition rate between ethnicities during the processing of candidates who are offered the opportunity to become firefighters. As Defendants attempted to demonstrate during the hearing on the validity of Exam 6019, but the Court refused to accept evidence on, there is a greater attrition rate among black and Hispanic candidates, as compared to white candidates, who are actually offered an opportunity to become a firefighter, in that they are offered the opportunity to be processed: complete the necessary paperwork concerning educational and employment history, appear for the intake, appear and pass the PPT, appear and pass the medical and psychological tests, provide the required documentation to support their request for certain credits, etc. Indeed, the data shows that a greater number of black and Hispanic candidates will simply not appear for processing. Significantly, it must be remembered that this litigation has concerned only the claims that the written exams 7029 and 2043 violated Title VII, there has been no showing – or any specific claim presented – that there is discrimination in the processing of candidates from the eligible list. Indeed, Dr. Siskin seeks to hide this disparity by choosing to apply an attrition rate based upon all ethnicities. This procedure causes a further inflation of the shortfall calculation.[14]

As noted during the summations to the hearing on the validity of Exam 6019, any attempt to impose a hiring quota which fails to account for the greater attrition rate of black and

---

[13]     Plaintiff's attempts to suggest that by ignoring this data they are seeking perfect parity is purely disingenuous. This data has noting to do with the use of written Exams 7029 and 2043.

[14]     This issue is addressed in footnote 2 to Dr. Erath's report.

Hispanic candidates during the processing of all candidates in essence requires the employer to offer employment (in this case meaning: an opportunity to complete processing and thus be hired) to a higher percentage of blacks and Hispanics than the percentage offered to white candidates - thereby violating the Title VII rights of the white test takers. *See* Transcript of July 21, 2010, hearing at p. 423.   The same analysis applies to calculating the shortfall for Exams 7029 and 2043.   Indeed, as this Court pointed out in its liability ruling, the discrimination occurred when black and Hispanic candidates were improperly denied the **opportunity** to become firefighters.   When, as here, those black and Hispanic candidates are afforded the opportunity to become firefighters, but choose not to proceed with that process, then their absence from the Academy class is the result of their choice not discrimination. Accordingly, when the calculation of the shortfall ignores the greater attrition rate of blacks and Hispanics, than of white candidates, the defendant is being required to pay for more damages than could reasonably be expected if there had been no discrimination in the written exam.

### 4) Dr. Siskin's improper assumption on the timing of hires further inflates damages

Dr. Siskin's assumptions concerning the timing of hires, like his analyses concerning the size of the non-hired shortfall, ignores available data which indicates that blacks and Hispanics would be expected to be hired later than whites.   There are three relevant undisputed facts in the record: first, as noted above, the data demonstrates that black and Hispanic candidates were more likely to be delayed in hiring than white candidates, because the black and Hispanic candidates were more likely to delay in producing the documentation, such as a High School diploma, which was required in order to be processed.   Indeed, available data demonstrates that blacks and Hispanics were more likely to be delayed in processing for reasons that had nothing to do with the written tests.   Second, again as noted above, the data

demonstrates that black and Hispanic candidates achieved lower scores on the PPT. And third, again as noted above, there is a correlation between the scores on the written exam and scores on the PPT, with lower scores written scores associated with lower PPT scores.

**5)   Plaintiff's fundamental misunderstanding:**

Plaintiff attempts to deflect Dr. Erath's criticism of Dr. Siskin's analysis by returning to a favorite ploy and asserting that Dr. Erath's criticism relies upon a rejected "perfect parity" argument[15] which was rejected by the Court and is "based upon a fundamental misunderstanding of the rank-order selection practice found unlawful by the Court." *See* Plt's SJ Brief pp. 11-12. In fact, Plaintiff is wrong on both counts. As demonstrated above, any consistent application of the passing and appointment rates leads to **perfect parity** – because 60% of the white candidates that passed the test were appointed, and 60% of the black candidates who passed (and should have passed) should be appointed. It is Dr. Siskin that tips the scales away from "perfect parity" to improperly inflate the appointment rate (and thus improperly inflate the shortfall) as Dr. Siskin's analysis, as demonstrated by the above example, would provide that even though 60% of the white candidates who passed the test were appointed, 65% of the black candidates who passed (and should have passed) should be appointed – clearly Dr. Siskin presents an **IMperfect parity**.

Plaintiff is also mistaken in asserting that Dr. Erath's criticism of Dr, Siskin's approach is based upon a fundamental misunderstanding of the Court's rulings. Indeed, the primary criticism of Dr. Siskin's approach is completely independent of the Court's liability

---

[15]     Plaintiff complains that Dr. Erath's analysis somehow mirrors the City's arguments concerning the use of the 4/5ths Rule rather than the "perfect parity" in an ideal world. *See* Plt's SJ Brief p. 11. Remarkably, Plaintiff asserts that if there had been no discrimination, then there should be "perfect parity" in the pass rates of white candidates and black candidates. Sadly, however, Dr. Siskin's analysis does **not** provide such perfect parity – but improperly calculates the rates to obtain an inflated appointment rate for black and Hispanic candidates presumed to have passed the test.

rulings. The criticism is that Dr. Siskin's analysis is that he manipulates the passing and "effective passing" rates to improperly exaggerate the hiring shortfall.[16]  In essence Dr. Siskin engages in a statical three card Monty: using one ratio to determine "passers" then to improperly assume that all "passers" should have been "effective passers" in order to inflate the hiring shortfall.   This sleight of statistics has nothing to do with the Court's rulings concerning the PPT.[17]

**B.**          **Dr. Siskin's calculation of delayed hiring is inaccurate and improperly inflates damages**

Dr. Siskin presents a separate damage amount which he styles as damages from delayed hires.   As above, he disregards attrition causing him to overstate damages.  Perhaps the clearest example of how attrition rates impact Dr. Siskin's calculation of the delayed hires is that Dr. Siskin asserts that one black candidate should have been in the May 25, 2004 hiring class from Exam 2043.  Dr. Siskin, however, ignores the fact that three black candidates were given the opportunity to become a firefighter and be hired in that class.  Yet each of these candidates simply did not complete the application process in a timely manner by failing to provide the required documentation.  Thus, the data establishes that three black candidates were actually

---

[16]     As noted above, Dr. Siskin also alters the data in determining "effective passers" by assuming everyone received a 100 on the PPT whether they received this score or even took the test.

[17]     The Court's ruling regarding the combination of the written score and the PPT score had absolutely nothing to do with the validity of the PPT. Indeed, as the Plaintiff argued, the problem was that a candidate was not permitted to take the PPT unless the candidate had achieved a particular grade on the written exam, and the fact that the PPT was a scored exam. Plaintiff argued that if a candidate barely missed passing the written exam, but had the opportunity to take the scored PPT, it would be possible for that candidate to achieve a higher combined score than the candidate immediately above him/her but he/she would never have a chance at appointment.  For example, if candidate A received the lowest passing written score, but only received a 75 on the PPT; and candidate B, who just missed the cut-off score was denied the opportunity to take the PPT.  If candidate B had the chance to take the PPT, and would have scored 100 on the PPT, then candidate B would have achieving a higher combined score than candidate A. This analysis, however has absolutely nothing to do with Dr. Erath's criticism of Dr. Siskin. Indeed, it is Plaintiff who has a fundamental misunderstanding of what Dr. Etath's criticism – which has absolutely nothing to do with the Court's ruling regarding the use the PPT as part of the combined score.

given the opportunity to be in the first Academy class from Exam 2043, but chose not to accept that opportunity. *See* Erath Report pp. 14-15.  While Dr. Siskin posits that this class should have had at least one black candidate, the facts establish that three black candidates were given the opportunity to be in that class.   Under these circumstances the conclusion that one black candidate would have been hired in that class if not for the asserted discrimination is inappropriate – the City offered the opportunity to become a firefighter in this class to *three* black candidates, and each elected not to peruse this opportunity.

Dr. Erath considers these factors and concludes that there was no delayed hiring caused by written exams 7029 and 2043, and instead, such delays in hiring were the result of the choices made by the minority candidates offered the opportunity to join early firefighter academy classes but who chose not to complete the application process or did not complete it in a timely manner.  Dr. Erath concludes that there could be no damages for delayed hires because both black and Hispanic candidates were successful in sufficient numbers during the testing process and were offered the opportunity to become firefighters (by going through the processing process) to satisfy all the calculated membership in each Academy class posited by Dr. Siskin – in essence there were sufficient numbers of black and Hispanic candidates that could have completed the processing to wipe out the delayed hiring shortfalls posited by Dr. Siskin.  Indeed, the only reason there were not the numbers of black and Hispanic candidates posited by Dr. Siskin in each class was a result of the candidates who were given the opportunity to become firefighters electing not to accept that opportunity – either by not appearing at intake, not providing documentation etc. – none of which has anything to do with the conduct of the defendant.

Dr. Siskin's refusal to consider these basic factual issues in calculating the shortfall and delayed hires are sufficient reason for the Court to reject Dr. Siskin's calculations. Indeed, in considering the statistical analysis the Court must examine both the methodology used as well as the data relied upon to reach the conclusions asserted by an expert. When the expert simply chooses to ignore relevant data that undermines his or her conclusion or uses inappropriate populations in conducting a statistical analysis, then the Court should reject the expert's conclusions. *See, e.g.*, *Smith v Xerox Corp.*, 196 F.3d 358, 370 (2d Cir. 1999)(Circuit affirmed the District Court's rejection of an expert's analysis because the expert relied upon the wrong populations in calculating the alleged disparate impact).

**Point II**

**BECAUSE PLAINTIFF'S CALCULATION OF THE
MEDICAL BENEFITS ARE BASED UPON DEFENDANTS' COST
RATHER THAN THE VICTIM'S LOSSES, PLAINTIFF'S
CALCULATIONS OF MEDICAL BENEFITS
<u>ARE IMPROPER AND SHOULD BE DISREGARDED</u>**

While Defendants do not generally dispute the legal issues concerning the appropriateness of providing class-wide economic damages, defendants dispute Plaintiff's method of calculating Medical benefits both from a factual and legal basis. Defendants agree that the appropriate calculation of economic damages involves a calculation for "benefits" – such as vacation days, pension benefits, etc. Defendants, however, dispute that a calculation of Medical benefits can be made on the basis of the employer's cost rather than the actual loss incurred by the class of victims. Indeed, the case-law establishes that damages for Medical benefits must be applied for the loss suffered by the victim and not based upon the expense incurred by the employer. *See*, *Taylor v. Central Pa. Drug & Alcohol Servs. Corp.*, 890 F. Supp. 360 (M.D. Pa. 1995); *see also*, *Miner v. Glens Falls*, 1992 U.S. Dist. LEXIS 17370, *36 (N.D.N.Y. Nov. 12, 1992) aff'd, 999 F.2d 655, 1993 U.S. App. LEXIS 19416 (2d Cir. 1993).

In *Miner*, the District Court rejected an award of Medical benefits for an employee who was wrongfully discharged because the claimed Medical benefits were based upon the employer's cost rather than any loss incurred by the victim of discrimination. The Court explained: "It is within the court's discretion to award lost medical benefits. However, where there is no evidence in the record that plaintiff purchased replacement medical insurance, no evidence that he expended money on health care as an uninsured which would have been covered under the Blue Cross-Blue Shield plan, and no evidence even to indicate that he may

have held back on seeking health care because he was uninsured, there is no basis for the court to exercise its discretion." *Miner*, *supra*, 1992 U.S. Dist. LEXIS 17370, at *36.

The Court in *Taylor* specifically considered the issue of back-pay in the context of a Title VII case and explained the appropriate analysis:

> Back pay may include other benefits, if paid to other employees. Had they remained in the employ of CPDASC, plaintiffs would have been eligible to receive the annual Christmas bonuses. They are, therefore, entitled to have the bonuses which they would have received included in their award of back pay.
>
> Their asserted right to recover insurance premiums payable by CPDASC during their term of employment is another matter. Title VII plaintiffs have no right to recover such premiums for the period subsequent to their leaving the defendant's employ, unless they can establish: 1) that they incurred an expense for the purchase of equivalent substitute medical insurance; 2) that they incurred medical expenses which would otherwise have been paid by their employer-provided coverage.
>
> Here, neither element was established by either plaintiff. Each was apparently without medical coverage for the period she was unemployed. However, neither plaintiff introduced evidence of expenses incurred during that period for substitute coverage or for medical care. Plaintiffs are not, therefore, entitled to any recovery associated with the cessation of insurance coverage subsequent to their departure from CPDASC's employ.

*Taylor v. Central Pa. Drug & Alcohol Servs. Corp.*, *supra*, 890 F. Supp. at 372 (citations omitted). In this case, there has been no showing that any potential victim of discrimination incurred any expense for the purchase of substitute medical insurance or that any potential victim incurred medical expenses which would otherwise have been paid by the FDNY provided insurance coverage. If the value of Medical benefits are to be awarded at all, they must be can only be awarded on a class-wide basis if there is some appropriate evidence of instances of actual damages incurred by the class of potential victims. Such evidence can be provided by means of a questionnaire sent to the class, and based upon an appropriate response (an appropriate percentage of the claimants actually providing information concerning either their purchase of

equivalent substitute medical insurance or actually incurred medical expenses that would otherwise have been paid by the FDNY-provided insurance coverage). With such information a projection can be made of the award of Medical benefits based upon evidence of damages actually incurred by the class as a whole.

The imposition of damages for Medical benefits based upon the employers cost rather than any showing of actual damage incurred by the potential victims is simply an imposition of punitive damages. *See, e.g.*, *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.*, 604 F. Supp. 962, 965 (E.D. Pa. 1985) aff'd 789 F.2d 253 (3d Cir. 1986)("However, plaintiff also seeks to recover the average amount Kaiser spent per employee in providing dental, vision and life insurance coverage even though plaintiff neither obtained such insurance, nor died, nor incurred any out-of-pocket expenses which would have been compensable under Kaiser's dental or vision plan. Requiring Kaiser to reimburse plaintiff for the amounts it would have incurred in providing insurance coverage when no loss has been suffered by the plaintiff is not consistent with the "make whole" policy of the ADEA. Such an award of damages would be punitive rather than remedial. Awarding plaintiff amounts not expended for dental repairs or eye glasses would not place him in the economic position he would have been in but for his illegal discharge. Neither would it take from Kaiser the amount it saved by terminating plaintiff since no amount would have been expended even if he were not discharged. The court finds that plaintiff is entitled only to out-of-pocket expenses incurred for other insurance and/or actual medical expenses.")

**Point III**

**BECAUSE PLAINTIFF'S AND PLAINTIFFS-INTERVENORS'
CALCULATION OF MITIGATION IS BASED UPON TRUNCATED
CENSUS FIGURES AND INAPPROPRIATE ASSUMPTIONS,
RATHER THAN A MORE APPROPRIATE MEASURE OF THE
VICTIM'S ACTUAL MITIGATION, SUCH CALCULATIONS
OF MITIGATION SHOULD BE DISREGARDED**

The primary dispute between Dr. Erath and both Dr. Siskin and Dr. Lanier concerns what is the best means of estimating the mitigation of damages fairly attributed to the class. Just as Dr. Siskin sought to inflate the shortfall by ignoring evidence in the record and making assumptions which are wholly unjustified in order to increase damages, so too do Dr. Siskin and Dr. Lanier make inappropriate assumptions to unfairly limit the amount of mitigation calculated in order to further inflate the damages.

Dr. Siskin inappropriately seeks to minimize mitigation by improperly truncating census data to include only those earning less than ten percent more than entry-level firefighters, as he improperly presumes that someone making over ten percent above an entry-level firefighter would not be inclined to seek a position as a firefighter. There is simply no basis for this assumption to limit mitigation. Indeed, the report of Dr. Lanier establishes the fallacy of Dr. Siskin's assumption. Dr. Lanier asserts that damages should be higher because a firefighter's salary increases at a higher rate than the general contrasting jobs reflected in the census data. Accordingly, based upon Dr. Lanier's analysis, a potential firefighter would very likely **be inclined** to seek an entry-level firefighter position even though it would initially be paying less than ten percent of whatever other employment that candidate currently had because the candidate could reasonably expect to receive the quicker salary increase and additional benefits achieved by firefighters. Thus, Dr. Siskin's presumption in limiting the census data to calculate mitigation is rebutted by Dr. Lanier's conclusions to further enhance damages. Dr. Siskin's

Case 1:07-cv-02067-NGG-RLM   Document 543   Filed 09/17/10   Page 21 of 25 PageID #: 15794

premise is further flawed as his analysis is backwards, like looking through the wrong end of the telescope in order to minimize mitigation (mitigation in the mirror is larger than appears from Siskin's analysis.  Dr. Siskin excludes census data because of his premise that someone *who already had a higher paying job* wouldn't apply for an entry-level firefighter position, but the appropriate question is whether a person who had lost the opportunity to become an entry-level firefighter *would have applied for a higher paying job*.  Obviously, there can be no basis to assume that someone who was qualified for a higher paying job would not have applied for it after having lost the opportunity to become an entry-level firefighter – and that is the appropriate time to be viewing mitigation.   Thus, Dr. Siskin's limitation is inappropriate.

Dr. Siskin's and Dr. Lanier's analysis is further flawed as they fail to provide for people who are voluntarily unemployed (for example, if they chose to return to school in order to obtain a better paying job), and they fail to account for those who work sporadically (such as in construction industry).  In either case such individuals shouldn't be listed in the unemployment rate utilized by Drs. Siskin and Lanier.  Moreover, the census data relied upon by Drs. Siskin and Lanier include people who work in private sector and non-profit industries rather than focus on data concerning public service position.  It is undisputed that non-profit positions are generally lower paying than

In contrast to Drs. Siskin and Lanier, Dr Erath proposes that the appropriate focus should be on public sector jobs.  Dr. Erath presents compelling reason to support his analysis in focusing on public sector job in seeking to calculate an appropriate mitigation for the class.  Initially, it must be observed (although completely ignored by both Drs Siskin and Lanier) that **each** of the members of the class have one significant factor in common – they **all demonstrated a preference for a public service job**.  Indeed, they would not have members of this class had

2731690_1.DOC

- 21 -

they not applied for the public service position of an entry-level firefighter. Moreover, neither Dr. Siskin nor Dr. Lanier dispute that there were public service positions available for the class members to seek. Moreover, the list which the Plaintiff undoubtedly expended time and resources to compile demonstrates that a high percentage of those 146 class members located by the Plaintiff had actually secured another public service position. This issue is more fully address in point IV below. In light of these undisputed factors, it would be irresponsible to ignore the possibility of public service employment for members of the class.

      The one thing that can be agreed upon by the experts is that the best way to measure the actual mitigation for the class is to use a survey to see what employment positrons class members actually obtained over the years since they actually took the exams in question. With a proper survey, the experts could make reasoned calculations based upon actual data collected from the class members, rather than making assumptions which are open to question and debate. Indeed, the Court is contemplating using a survey to assist the parties in determining which class members would be appropriate for priority hires. Under these circumstances, this survey should also be used as a means of collecting valuable data concerning the employment that the class members had obtained over the last several years. Then, the experts could analyze that data to make far more reliable and well reasoned calculations about the actual mitigation realized by the class members. Indeed, given the Court's equity powers it would be most appropriate to seek such reliable information before speculating about whether it would be better to use truncated census data or other available public service employment data to estimate mitigation.

**Point IV**

**BECAUSE DR. ERATH'S CONCLUSIONS ARE PRESENTED
INDEPENDENTLY FROM THE LIST OF CLASS MEMBERS
THAT WAS CREATED BY PLAINTIFF, THERE IS NO BASIS
TO STRIKE DR. ERATH'S TESTIMONY AND PLAINTIFFS-
INTERVENORS' MOTION TO EXCLUDE SHOULD BE DENIED**

As noted above, one of Dr. Erath's approaches to the mitigation issue is to consider what jobs were available to unsuccessful firefighter candidates. One line of inquiry is to ask if the employer had other jobs for which the unsuccessful applicant was qualified. Here that employer was the City of New York. As such, Dr. Erath investigated for what other City jobs were the unsuccessful firefighter candidates qualified. Certainly, there were also private sector jobs around, but by turning to the City positions Dr. Erath is able to give the Court real, not hypothetical, examples of job for which the candidates could have applied and would have enjoyed a probability of obtaining. Moreover, all unsuccessful candidates demonstrated an interest in City employment by seeking to become firefighters. To corroborate this interest, Dr. Erath turned to a list generated by plaintiff showing that indeed some unsuccessful firefighter candidates sought and obtained City employment.

Plaintiffs-Intervenors try to assert that Dr. Erath's approach to mitigation was unreliable. They claim he used unreliable data, the list plaintiff produced, as the foundation of his mitigation theory. However, as explained above Dr. Erath used plaintiff's list merely as corroborating evidence. The list also gives an indication that the applicants for the firefighter position have a disposition favoring public sector employment which was already demonstrated by the candidates' expression of interest in the difficult job of urban firefighting. But, the list did not serve as the sole foundation of the mitigation theory. Indeed, at page 7 of his report Dr. Erath states how he is using the list: Dr. Erath writes that "[w]hile no formal conclusion can be

drawn from this sample of unknown composition, it shows that this group of applicants was far more likely to secure public sector employment than is typical for the workforce in general." See Exhibit 1 to the Erath Declaration at 7. Dr. Erath's own words demonstrate that he did **not** use the list in the manner Plaintiffs-Intervenors claim.

Although Plaintiffs-Intervenors accuse defendants of basing their analysis on unreliable data, it is actually the reverse. Dr. Lanier, in his rebuttal report and in a complete change of methodology from his original report, adopts the position that all candidates who should have been hired would have earned identical amounts in each year. That is, whether a firefighter would have been hired in 2003 or 2007, Dr. Lanier's assumption is that their 2008 earnings would be the same. Such an assumption flies in the face of seniority and is flatly contradicted by the data in Dr. Lanier's possession. Moreover, Dr. Lanier has now abandoned his initial premise that mitigation earnings would grow by only two percent per year after Dr. Erath pointed out the well-known result in economics that earnings grow more rapidly early in the career. However, he lowers Dr. Erath's Census-derived growth rate by changing the ages of the comparison group to 21-34 (instead of 21-29), claiming that he is trying to match the age at appointment for firefighters. But the age at appointment is not of interest here, as candidates who failed the firefighter exams would not have waited years to begin alternate work simply because they would have been appointed years later had they become a firefighter. Only through application of this unsupported and absurd assumption – that unsuccessful candidates would not have sought work for the number of years until they would have become a firefighter – can Dr. Lanier generate additional losses.

## CONCLUSION

For the reasons stated above, both Plaintiff's and Plaintiffs-Intervenors' motions for summary judgment with respect to class-wide back-pay and economic damages, as well as Plaintiffs-Intervenors' motion to exclude Dr. Erath's testimony, should be denied. Accordingly, Defendants respectfully request that each of these motions be denied and for such other and further relief as this Court deems proper.

Dated:          New York, New York
                August 13, 2010

                                    Respectfully Submitted,

                                    **MICHAEL A. CARDOZO**
                                    Corporation Counsel of the City of New York
                                    Attorney for Defendants
                                    100 Church Street, Room 2-175
                                    New York, New York 10007
                                    (212) 788-0881
                                    jlemoned@law.nyc.gov

                        By: _____
                                    James M. Lemonedes
                                    Assistant Corporation Counsel

William S.J. Fraenkel,
Of Counsel.