UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                  Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., MARCUS
HAYWOOD, CANDIDO NUÑEZ, and
ROGER GREGG,

                                                  Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

                                                  Defendant.
-----------------------------------------------------------------X

                              **DECISION
                            AND INJUNCTION**

                         **07-cv-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

       On June 29, 2010, the City – asserting that it had an "immediate" need for additional firefighters – notified the court of its intent to initiate a new firefighter class by the first week of September. (Docket Entry # 456.) On July 16, 2010, the City claimed that if hiring were delayed by "three to six months," it "would impair public safety in the City of New York." (Docket Entry # 491 at 15-16.) At that time, the parties were preparing for a hearing on the validity of Exam 6019, the City's current written examination for entry-level firefighters.

       The court asked the parties to suggest hiring methods that the City could use if the court were to find that some aspect of Exam 6019 was inconsistent with Title VII of the Civil Rights Act of 1964. The City proposed random selection from a pool of the highest scorers on Exam 6019, selected "in proportion to the rates at which those ethnicities took the examination." (Docket Entry # 491 at 17.) This approach would have ensured that the City did not use Exam

1

6019 in a way that disparately impacted black and Hispanic firefighters. The City touted two additional benefits of its proposal: (1) "it would ensure that only top candidates are selected" and (2) it did not involve a "quota." (Id.)

The City has since repudiated each of these positions. It first represented that its need for firefighters was based on safety, and later that it was based on financial considerations. Now, the City asserts that even the financial benefits of hiring are minor – and it appears to be contemplating eliminating existing firefighter jobs to save money. The City has also rejected interim hiring procedures that would have allowed it to hire many of the firefighter applicants it has already processed. Some of those applicants have been patiently waiting to join the Fire Department since well before July 2008, the last time that the City hired new firefighters.

Moreover, when presented with an interim hiring option that was nearly identical to the City's own proposal, the City called it a "quota," "bad policy," and – without any support – "illegal." The City has not come forward with any other method of hiring that is both acceptable to it and compatible with the law. Now, in the City's own Orwellian phrasing, delaying hiring until a new exam is created "is not an unacceptable alternative." (Docket Entry # 561 at 5.)

The City's shifting and contradictory positions have needlessly diverted the parties from the critical work of developing a new examination. The City has imposed unnecessary burdens on the other parties, a Special Master who has generously donated her time, and this court.[1] The City gave hope to candidates who took Exam 6019, only to capriciously dash that hope based on contrived and fundamentally irreconcilable positions. With its hyperbolic – and ultimately baseless – claims regarding public safety, the City has needlessly jeopardized its own

---

[1] Plaintiffs-Intervenors have effectively documented the considerable effort that the parties and the court have invested to accommodate the City's asserted hiring needs. (See Docket Entry # 567.)

credibility in the areas where it matters most. While the court is dismayed by the City's apparent duplicity and lack of good faith, it is not entirely surprised. This is simply the latest episode in the City's long campaign to avoid responsibility for discrimination in its Fire Department, whatever the cost. Should this conduct continue, the court will be forced to consider whether litigation sanctions are appropriate.[2]

In this order, the court permanently enjoins the City from hiring firefighters based on the results of Exam 6019, except under one of the interim approaches already endorsed by the court (the "Hiring Options.") (See Docket Entry # 527.) Plaintiff and Plaintiffs-Intervenors (collectively, "Plaintiffs") initially sought such relief (Docket Entry # 558), but now indicate that, because the City "has chosen to defer hiring," it is no longer necessary (Docket Entry # 566 at 1). The court disagrees with Plaintiffs' characterization of the City's position and the need for further injunctive relief.[3] The City itself does not raise any objection to injunctive relief, except insofar as it disagrees with its predicate, the court's conclusions regarding the validity of Exam 6019.

## I. BACKGROUND

### A. Litigation Generally

The court's previous orders have chronicled the factual and procedural background of this case. (See, e.g., Docket Entry # 505 ("6019 Validity Order"); Docket Entry # 385 ("Disparate Treatment Opinion"); Docket Entry # 294 ("Disparate Impact Opinion").)[4] Accordingly, the court provides only some general context below.

---

[2] The court could impose such sanctions either pursuant to Federal Rule of Civil Procedure 11 or the court's inherent power. See Chambers v. NASCO, Inc., 501 U.S. 32, 43-46, 50 (1991).

[3] The City did oppose Plaintiffs' request for certain "ancillary" reporting and recordkeeping requirements. (See Docket Entry # 561 at 6.) The court addresses this request below. See infra Part III.

[4] These opinions are reported at 681 F. Supp. 2d 274 (E.D.N.Y. 2010); 683 F. Supp. 2d 225 (E.D.N.Y. 2010); 637 F. Supp 2d 77 (E.D.N.Y. 2009). The court refers to the pagination in the original orders issued by the court.

1. <u>The Composition of the Fire Department</u>

The Fire Department's use of discriminatory testing procedures is a decades-old problem. Indeed, this litigation is not even the first time that the City has been brought to federal court to defend its entry-level firefighter examination against charges of racial discrimination. In 1973, Judge Edward Weinfeld in the Southern District of New York held that the City's written and physical examinations for entry-level firefighters violated the Equal Protection Clause because of their discriminatory impact on black and Hispanic applicants. <u>See</u> <u>Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n</u>, 360 F. Supp. 1265, 1269, <u>affirmed in relevant part by</u> 490 F.2d 387 (2d Cir. 1973). Judge Weinfeld imposed hiring quotas and ordered the creation of a new test. Unfortunately, the gains of that litigation were limited, in both their magnitude and duration.

According to the most recent census data, black residents make up 25.6% of New York City's population and Hispanic residents make up 27% of New York City's population.[5] When the United States filed this case in 2007, black and Hispanic firefighters comprised just 3.4% and 6.7%, respectively, of all firefighters in New York City.[6] More concretely, in a city of over eight million people, and out of a force of 8,998 firefighters, there were only 303 black firefighters and 605 Hispanic firefighters. These numbers stand in stark contrast to other large cities in this country, where minority firefighters are represented in significantly higher percentages.[7] The Fire Department is also significantly less diverse than the City's other

---

[5] <u>See</u> U.S. Census Bureau, State & County QuickFacts ("Census Data"), <u>available at</u> http://quickfacts.census.gov/qfd/index.html

[6] <u>See</u> Declaration of Sharon Seeley dated January 21, 2009 (Docket Entry # 253) app. C.

[7] <u>See</u> Declaration of Richard A. Levy dated February 2, 2009 (Docket Entry # 264) Ex. D; Census Data; Disparate Impact Opinion at 16-17.

4

uniformed services. For example in 2001, the proportional representation of blacks was over four times greater in the Police Department, over six times greater in the Sanitation Department, and over sixteen times greater in the Department of Correctional Services. (See Disparate Treatment Opinion at 18.)

        2.       The Court's Findings

Plaintiffs seek to enforce the right of black and Hispanic candidates to be treated fairly in Fire Department hiring. They challenged the City's use of two written examinations, Exam 7029 and Exam 2043, which the City used between 1999 and 2008 to screen and select applicants for entry-level firefighter positions.

In July 2009, this court held that the City's use of Exams 7029 and 2043 constituted disparate-impact discrimination in violation of Title VII of the Civil Rights Act of 1964. The court found that the City had improperly constructed its entry-level exams and that the exams did not screen for either the abilities that they purported to test, or for abilities that were important to the job of firefighter. (Disparate Impact Opinion at 35-89.) Moreover, the City failed to show that an applicant's success on the exams corresponded to future job performance. (Id. at 89-91.)

In January 2010, this court held that the City's hiring practices constituted intentional discrimination in violation of Title VII and the Fourteenth Amendment. At the time, the court noted the compelling evidence that intentional discrimination was the City's "standard operating procedure." (Disparate Treatment Opinion at 25 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 366 (1977)).) The court also noted that, although Judge Weinfeld's 1973 ruling "informed the City that what it was doing with respect to firefighter hiring was not merely bad policy or a disfavored business practice," but "illegal conduct," (id. at

5

52-53) the City's top officials "exhibited an attitude of deliberate indifference to the discriminatory effects of the hiring policies that they were charged with overseeing" (id. at 57).

On January 21, 2010, the court issued a preliminary relief order that directed the parties to take certain actions to begin remedying the City's violations. The court established a framework to provide compensation to identified, past victims of discrimination, and to ensure compliance with Title VII going forward. It also ordered the parties to develop a new test and notified the parties that it would, as soon as possible, hold a hearing to consider the validity of Exam 6019, and to "decide whether and how the City may use that examination on an interim basis." (Initial Remedial Order at 3.) The court noted that there was evidence that Exam 6019 might be just as flawed as its predecessors (id. at 33-35) and warned the parties that, if this turned out to be the case, the court would need to devise interim hiring procedures that did not rely on the results of Exam 6019 (id. at 43.).

3. Exam 6019

Under the able supervision of Magistrate Judge Roanne Mann and Special Master Mary Jo White, the parties engaged in discovery in preparation for the Exam 6019 validity hearing. Although the court will not address that process in detail, it notes that certain events called the City's diligence and good faith into question. For example, on April 26, 2010, a mere four days before the United States' expert report on Exam 6019 was due, the City produced several thousand documents related to the creation of Exam 6019, including documents created by the City's relief-phase expert, Dr. Catherine Cline. (See Docket Entry ## 425, 426.)

Those documents would likely have been useful to Plaintiffs in deposing Dr. Cline. Moreover, the City's failure to produce them was contrary both to a March 2008 discovery order (Docket Entry # 82) and to the City's unequivocal representations to Judge Mann on

6

March 20 that it had produced all such documents. (Docket Entry # 96 at 2.) According to the City, the documents had been sitting in boxes in the office of a former Department of Citywide Administrative Services lawyer for over a year and a half. (Transcript of Sanctions Hearing at 23.) Moreover, on May 3, 2010, at a hearing regarding those documents, the City alerted the court that it had additional documents related to the creation of Exam 6019 that it had failed to disclose. (Id.)

Shortly thereafter, on June 29, 2010, the City informed the court that it intended to initiate a class of 300 firefighters in either the last week of August 2010 or the first week of September 2010. (Docket Entry # 456.) The City promised the court that, the following day, it would "address the City's immediate hiring needs and how to best and most expeditiously present this matter to the court for further proceedings." (Id. (emphasis added).) Based on the City's asserted need to hire new firefighters, the court accelerated the schedule for addressing the validity of Exam 6019.

On June 30, 2010, Special Master Mary Jo White instructed the parties to file pre-hearing briefs that set forth, inter alia, "the remedy or remedies sought in the event [Exam 6019] is found to be invalid" for further hiring purposes. (Docket Entry # 457.) The City filed its brief on July 16, 2010. (Docket Entry # 491.) It claimed that its "need to immediately hire approximately 300 new firefighters constitutes [a] compelling necessity." (Id. at 16.) The City stated that 225 firefighter candidates had been fully processed, and that another 92 candidates were in the "latter stages of processing." (Id. at 15) The City asserted that any court order compelling it to hire applicants who had not yet entered processing would delay the initiation of the class by three to six months (id.) and "would impair public safety in the City of New York" (id. at 16).

The City suggested two possible interim hiring approaches that could be used if the court found Exam 6019 to be invalid. (Id. at 17-18.) The first option – which the City characterized as an "applicant flow" procedure – involved the creation of a pool of top-ranking candidates "in proportion to the rates at which those ethnicities took the examination." (Id. at 17.) The City proposed that random selections be made from this pool. (Id.) According to the City, this proposal had two main advantages: (1) "it would ensure that only the top candidates are selected for Firefighter" and (2) "it would also <u>ensure that the selection of minorities would be based on the rate at which the minority group took the exam and not on any set quota</u>." (Id. (emphasis added).)

Plaintiffs presciently cautioned the court not to "uncritically accept the City's assertion that any delay, however brief, in hiring the class the City proposes to begin on August 30 would result in a risk to public safety." (Docket Entry # 499 at 1.) They pointed out that delaying hiring could simply mean that the City's approximately 9,000 existing firefighters would need to perform an extra hour or two of overtime a week. (Id.)

On July 20 and 21, 2010, the court held a hearing regarding the validity of Exam 6019. On August 4, 2010, the court found that the City's use of Exam 6019 disparately impacted black and Hispanic applicants for the position of entry-level firefighter and failed to test for relevant job skills, in violation of Title VII. As the court explained, "[i]n the words of the Second Circuit Court of Appeals, the examination 'satisfies a felt need for objectivity, but it does not necessarily select better job performers.'" (6019 Validity Order at 2 (quoting <u>Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Service Comm'n</u>, 630 F.2d 79, 100 (2d Cir. 1980).) Indeed, the City "ignored comments from firefighters and fire lieutenants who reviewed the examination before it was administered and overwhelmingly agreed that large

portions of the exam should not be used." (Id.) The court enjoined the City from taking any steps to initiate an academy class using the Exam 6019 eligibility list until October 1, 2010. (Id. at 37.)

At a status conference on August 11, 2010, the court suggested, and the parties agreed, that it would be worthwhile for the parties to meet with Special Master Mary Jo White to discuss whether they could agree on a lawful interim hiring proposal. The court also explained that "[u]nless the City is willing to pursue an interim hiring solution that does not rely on the 6019 eligibility list, it must demonstrate that the City's need for a new firefighter class is so compelling that this Court should overlook a Title VII violation in order to meet that need." (Transcript of August 11, 2010 Conference at 6-7.) The Special Master held intensive discussions with the parties over the course of six days to explore interim hiring options.[8] (See Docket Entry # 521 at 1-2.)

Additionally, in order to ensure that this litigation did not interfere with any genuinely urgent hiring needs, the court held a hearing on August 19, 2010. The court heard testimony from Stephen Rush, the FDNY's Assistant Commissioner for Finance and Budget; Donay Queenan, the FDNY's Assistant Commissioner for Human Resources; and Chief Robert Sweeney, the FDNY's Chief of Operations. The hearing testimony demonstrated that the City's reasons for seeking to hire a class were largely financial. (See 6019 Validity Order at 14-16.) Despite the City's previous representations, there was no evidence that a delay in hiring of several months would have any impact on public safety.[9] (Id. at 16.)

---

[8] The court again thanks the Special Master for her tireless efforts in this regard.

[9] Indeed, the City now asserts that "[t]he evidence presented at that hearing to assess the hiring needs of the City confirmed that the hiring needs are primarily financial." (Docket Entry # 561 at 5.)

9

On September 4, 2010, the Special Master filed a report detailing seven proposals that the parties had discussed, as well as the parties' positions regarding the legality and desirability of each proposal. (Docket Entry ## 521, 522.) On September 13, 2010, this court issued an order addressing those proposals. The court rejected certain of the proposals discussed by the parties. For example, the court found that selection from the entire Exam 6019 applicant pool was inappropriate because the lowest scorers likely either "abandoned the exam midway or [were] functionally illiterate, and either way [were] not fit to be a firefighter." (Id. at 10.) The court also rejected a procedure that would "re-score" Exam 6019 by eliminating certain questions based only on the relative performance of racial groups. (Id. at 21.)

Ultimately, the court offered the City five Hiring Options that balanced "the court's duty to eradicate illegal discrimination with the need to safeguard New York's citizens and firefighters." (Id. at 1-2.) The court first noted that all of "[t]he acceptable proposals are necessarily imperfect, since each relies in some way on the results of an invalid examination." (Id. at 9.) The court nonetheless discussed, at length, the advantages of "Proposal # 2" – which was essentially the same hiring procedure that the City proposed in July. (See id at 10-20.) The court also explained the basis for its conclusion that "race-conscious" interim hiring measures were lawful in this case. (Id. at 13-14.) It noted that certain of the other Hiring Options "strongly resemble racial hiring quotas" – which it characterized as a "blunt tool for accomplishing a delicate task" (id. at 25) – but opted to give the City flexibility to choose the Hiring Option that best fit its financial and operational interests. The court asked the City to inform the court of its chosen course of action by September 17, 2010.

4. The City's Decision

On September 17, 2010 – after more than ten weeks of asserting that it urgently needed additional firefighters – the City notified the court that it "decline[d]" to select any of the five Hiring Options. (Docket Entry # 532 at 1.) It asserted that each option involved "some form of race-based quota" and that each was contrary to the public policy interests of the City and to the law.[10] (Id.) The City's letter was signed by Michael A. Cardozo, the City's Corporation Counsel. So far as the court is aware, this is the only submission that Mr. Cardozo has personally signed.

By order dated September 21, 2010, the court explained that, "[b]ecause the City is unwilling to adopt any of the proposals identified by the court and has not come forward with any other lawful and equitable way to hire using Exam 6019, the court must now consider whether it is appropriate to permanently enjoin the City from using Exam 6019 to select entry-level firefighters." (Docket Entry # 554 at 3.) The court noted that the City's position was difficult to reconcile with its previous claims about the urgency of its hiring needs. (Id. at 2-3.) The court extended the temporary injunction imposed in the 6019 Validity Order to October 31, 2010 to permit the parties to submit briefing regarding the need for permanent injunctive relief. (Id. at 3.)

The basis for, and scope of, appropriate injunctive relief is discussed in Part II below. Here, the court addresses several claims that the City made in an October 8, 2010 letter. (Docket Entry # 561.) Although that letter is styled as a "response" to Plaintiffs' application for permanent injunctive relief, it fails to address the merits of that application, except insofar as it opposes Plaintiffs' request that ancillary reporting and recordkeeping requirements accompany

---

[10] Mr. Cardozo did not cite any authority in support of the City's surprising claims regarding the illegality of the proposed hiring methods.

11

future hiring. The City's letter nonetheless exposes several of the contradictory and unsupported claims that the City has made in recent weeks.

First, the City's letter correctly highlights the court's reluctance to impose quotas in this litigation.[11] (Id. at 1-2.) It then asserts that all of the Hiring Options "involve quotas" and therefore represent "bad public policy." (Id. at 3.) Perhaps in response to the court's admonition that assertions about the law be accompanied by citation to legal authority, the City provides a laundry-list of cases involving quotas and other "race conscious" remedies. (Id. at 4.) But not one of these cases offers any support for the City's assertion that the Hiring Options are "illegal." Even the City no longer appears to press that claim, asserting instead that the cases it cites establish that quotas are "disfavored and can only be used when no other method is available." (Id.) Indeed – in words capturing the very premise of the court's efforts to offer it interim hiring options – the City states: "The use of quotas pending the development of a new, nondiscriminatory hiring procedure can be justified when it is 'a compromise between two unacceptable alternatives: an outright ban on hiring or promotions or continued use of a discriminatory hiring procedure.'" (Id. at 5 (quoting Local 28 of Sheet Metal Workers Int'l Ass'n v. EEOC, 478 U.S. 421, 450-51 (1986).) In sum, the City has again changed its position and now implicitly accepts that the court has the authority to order quotas in appropriate circumstances.

Moreover, as the court has already pointed out, one of the Hiring Options – "Proposal 2" – is essentially identical to the City's own July 16, 2010 proposal. And the City previously stated that proposal was not a quota. Finally, the City – despite ample opportunity to do so – has not subsequently suggested any other interim hiring method that it believes would comply

---

[11] The court expressed its misgivings about quotas in its September 13, 2010 order, but also stated "[i]f the City truly believes that public safety and the municipal fisc require the immediate appointment of a firefighter class, then the court will set aside its reservations." (Docket Entry # 526 at 26.)

12

with Title VII. Instead of proposing actual solutions, the City apparently prefers to forego hiring from Exam 6019 altogether.

Tellingly, for the first time, the City now concedes that its hiring needs "are financially driven as opposed to a safety issue." (Id. at 5.) It further asserts that pursuing any of the Hiring Options "at this point" – i.e., late in the fiscal year – would "fail to make much, if any, impact on the City's financial situation." (Id.) This claim is peculiar because the City has always represented that hiring new firefighters resulted in short-term costs and long-term savings. (See Docket Entry # 527 at 18.) It is unclear why those long-term savings have dissipated in a matter of weeks. In any event, to the extent that the City's claim is accurate, it is a situation entirely of the City's making. In a desire to preserve short-term savings, the City has not hired firefighters since July 2008. It has also been on notice of possible problems with Exam 6019 since – at the very latest – January 2010 and has in no way adjusted its processing of applicants.

## II. LEGAL BASIS FOR INJUNCTIVE RELIEF

At the moment, the City is temporarily enjoined from using Exam 6019 to initiate a fire academy class. As set forth below, the court now concludes that it is appropriate to permanently enjoin the City from using Exam 6019 to hire firefighters until such time as the City selects one of the Hiring Options approved by the court. Plaintiffs initially sought such an injunction, as well as ancillary reporting and recordkeeping requirements. (Docket Entry # 558.)

Then, after receiving the City's response, Plaintiffs asserted that the court should "defer" consideration of an injunction because the City had decided not to hire. (Docket Entry # 566 at 1.) The court does not agree with Plaintiffs' interpretation of the City's position. The City has been clear that it disagrees with the court's conclusions regarding Exam 6019. The City's

recent decision to forego hiring is best understood in the context of its objections – however meritless – to the Hiring Options, and the City's newfound inability to support any solution that is consistent with the court's conclusions regarding Exam 6019. Without any injunction in place, there would be nothing to prevent the City from hiring in any manner it saw fit, even if it was fundamentally inconsistent with the court's conclusions regarding Exam 6019's invalidity.[12] There is no reason to believe that the City would not pursue such a course.

Nonetheless, in the current posture of the case, the City's latest position – i.e., that it does not wish to hire in a manner that is consistent with the court's conclusions regarding Exam 6019 – is quite helpful. It is compelling evidence that enjoining the City from hiring off that test, except according to one of the Hiring Options, would not unduly burden the City and – in the City's own characterization – is a "fair, sensible, prudent interim resolution" at this juncture. (Docket Entry # 561 at 5.)

### A. Title VII

Congress enacted Title VII of the Civil Rights Act of 1964 "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). In order to meet this sweeping mandate, "Congress deliberately gave the district courts broad authority under Title VII to fashion the most complete relief possible." Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC, 478 U.S. 421, 465 (1986). Consequently, Title VII directly authorizes district courts to

---

[12] Moreover, Plaintiffs' request that the Court "direct the City to inform [it], no later than ninety (90) days prior to the planned beginning date of a firefighter academy class, if the City decides that it wishes to hire firefighters" (Docket Entry # 566 at 1) is, in substance, equivalent to a request for injunctive relief. The practical effect of such an order would be continued control by the court over the City's hiring, with "serious consequences" for the City. See Commodity Futures Trading Comm'n v. Walsh, Nos. 09-3742-cv, 09-3787-cv, 2010 WL 3191456, at *4 (2d Cir. Aug. 13, 2010).

14

choose from a wide spectrum of remedies for illegal discrimination, ranging from compensatory relief such as back pay to "affirmative relief" such as the imposition of hiring quotas. See 42 U.S.C. § 2000e-5(g); Local 28 of Sheet Metal Workers' Int'l Ass'n, 478 U.S. at 464-65; Berkman v. City of New York, 705 F.2d 584, 595-96 (2d Cir. 1983).

Once liability for racial discrimination has been established, a district court "has not merely the power but the duty" to "bar like discrimination in the future." Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975) (quoting Louisiana v. United States, 380 U.S. 145, 154 (1965)). This so-called "compliance relief" is designed to assure future compliance with Title VII. Berkman, 705 F.2d at 595. In the context of discriminatory testing regimes, such relief involves "restricting the use of an invalid exam, specifying procedures and standards for a new valid selection procedure, and authorizing interim hiring that does not have a disparate racial impact." Guardians, 630 F.2d at 108. According to the Second Circuit, where a court determines that the use of a written examination violates Title VII, it is "obviously appropriate to bar its continued use, except on an interim basis with adjustments that eliminate its disparate racial impact and thereby avoid its unlawful effect." Id. at 91.

This court has already concluded that the City engaged in a pattern or practice of discrimination with respect to Exam 7029 and Exam 2043. It has also found that the City's prior use of Exam 6019 is inconsistent with Title VII. Accordingly, injunctive relief preventing the City from continuing to use Exam 6019 in a discriminatory way is justified under Title VII. The City has not cited any case law to the contrary.

### B. General Equitable Principles

The equitable powers that courts use to remedy Title VII violations flow from Congress's grant of authority in § 2000e-5(g), rather than from the general equitable authority

that all district courts possess. See Albemarle Paper Co., 422 U.S. at 418. See, e.g., id. at 422 (finding of unlawful discrimination triggers backpay award); Rios v. Enterprise Assoc. Steamfitters Local 638, 501 F.2d 622, 629 (2d Cir. 1974) ("Once a violation of Title VII is established, the district court possesses broad power as a court of equity to remedy the vestiges of past discriminatory practices."); Guardians, 630 F.2d at 109 ("Once an exam has been adjudicated to be in violation of Title VII, it is a reasonable remedy to require that any subsequent exam or other selection device receive court approval prior to use."); Berkman, 705 F.2d at 595 (compliance relief, including interim hiring orders, are "appropriate whenever a Title VII violation has been found"); EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1578 (7th Cir. 1997) ("Once employment discrimination has been shown . . . district judges have broad discretion to issue injunctions addressed to the proven conduct."). Nonetheless, as it has previously indicated (see Docket Entry # 527 at 8), the court believes it is also prudent and appropriate to consider traditional equitable principles in fashioning permanent injunctive relief.

As a matter of general equity law, a court may only grant permanent injunctive relief if four factors are satisfied. The court must find: "(1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).[13] Here, these factors strongly support permanent injunctive relief preventing the City from using Exam 6019 in a way that disparately impacts black and Hispanic firefighters.

---

[13] As the eBay Court implicitly recognized, however, Congress may abrogate or reduce these requirements when authorizing equitable remedies for statutory violations.

First, with respect to "irreparable injury," courts have repeatedly held that Title VII serves the twin purposes of "making whole" victims of discrimination and ensuring that unlawful employment practices do not occur in the future. See Teamsters, 431 U.S. at 364; Franks, 424 US. at 764; Albemarle Paper Co., 422 US. at 417-18. When the United States brings suit under Title VII, it acts not only to obtain relief for individual victims, but also to vindicate the public interest in preventing employment discrimination. See, e.g., EEOC v. Waffle House, Inc., 534 U.S. 279, 296 (2002). That public interest is particularly strong here, given the prominence of the Fire Department and the esteem in which it is rightfully held. This court has already identified the "uniquely disabling" effects of the City's past discriminatory conduct. Allowing further discrimination would irreparably compound those injuries.

Second, the threatened injuries cannot be adequately remedied by an award of monetary damages. Monetary damages would benefit individual victims – blacks and Hispanics who would have been hired as firefighters but for the discriminatory impact of Exam 6019 – but would not vindicate the public interest in ensuring that those who wish to serve in the Fire Department have an equal opportunity to do so regardless of race. Nor would damages eradicate the harm to the public that would be caused by further aggravating the underrepresentation of black and Hispanic firefighters.

Third, the balance of hardships between Plaintiffs and the City favors injunctive relief. The court, Plaintiffs, and the Special Master have all endeavored to minimize the hardship that any injunction would impose on the City. Although the City is clearly unhappy with the Hiring Options, it has not come forward with any other hiring method that is consistent with Title VII. The City has also had ample opportunity to demonstrate that an injunction would cause it to suffer financial hardship or would place public safety at risk. It has not done so. Indeed, earlier

this year, the Mayor proposed closing 20 firehouses and reducing staffing on 60 engine companies to save money. (See Docket Entry # 517 at 15.) As recently as October 14, 2010, a newspaper article reported that the Fire Department "is on the verge of permanently slashing manpower at dozens of the city's busiest fire companies."[14] The City itself no longer argues that hiring would produce any significant safety or financial gains.

Moreover, if the City continued to hire from Exam 6019 in the same manner as it has in the past, there would almost certainly be another Title VII lawsuit based on Exam 6019, followed by another costly compensatory remedy. From the perspective of the City and its taxpayers, the long-term benefit of an injunctive remedy that eradicates Exam 6019's discriminatory effects outweighs the costs. The Hiring Options approved by the court would also permit hiring in the near future, should the City's needs change. Finally, to the extent that the City continues to believe that Exam 6019 tests relevant attributes for the position of firefighter, the Hiring Options would also allow the City to select from among top-ranked candidates on that exam.[15]

Fourth, and finally, because both the United States and the City are governmental entities, the analysis of the balance of hardships greatly overlaps with the question of whether an injunction would serve the public interest. The Hiring Options approved by the court minimize hardship to the City as much as is possible without authorizing a wholesale violation of Title VII.

---

[14] See Jonathan Lemire, "Firefighters see red on schedule, staffing changes," New York Daily News, Oct. 14, 2010, at 20.

[15] It is worth noting, however, that performance on the written examination was never the primary basis for determining who the City ultimately hired. "Bonus points" based on residency, legacy, and veteran's status often bump candidates well ahead of others with significantly higher test scores. See Docket Entry # 567 at 2.

**III.     ANCILLARY RELIEF**

Plaintiffs also ask the court to impose reporting and recordkeeping requirements to ensure that black and Hispanic candidates are not subject to "harsher treatment in the implementation of one of the permitted hiring methods." (Docket Entry # 558 at 6.) Plaintiffs-Intervenors seek the imposition of additional procedural protections. (See Docket Entry # 559.)

The City has made it clear that it does not currently intend to hire firefighters under any of the Hiring Options. In this order, the court permanently enjoins the City from hiring from Exam 6019 in any other manner. Accordingly, there is no need to address Plaintiffs' requests for ancillary relief at this time. If, and when, the City notifies the court that it intends to initiate a fire academy class – whether under one of Hiring Options or with a new test – the court will evaluate the need for such measures.

**IV.     CONCLUSION**

For the reasons set forth above, as well as the findings of fact and conclusions of law in its previous opinions, the court finds that it is appropriate to permanently enjoin the City from hiring using the Exam 6019 applicant list, except in accordance with the Hiring Options identified in the court's September 13, 2010 order. Should the City decide that it wishes to hire under one of those options, it should notify the court sufficiently far in advance of the time it intends to commence processing applicants, but no less than 90 days beforehand, so that the court can consider whether additional reporting or recordkeeping requirements are appropriate.

Additionally, the court is compelled to take action to promote coherence in the City's future positions. To that end, Michael A. Cardozo, the City's Corporation Counsel, shall personally sign all further submissions by the City in this matter. Any submissions that do not comply with this requirement will be struck. Moreover, the City is advised that while it should

not strive for consistency at the expense of reality, it must acknowledge when it changes position and endeavor to explain why it has done so.

SO ORDERED.

Dated: Brooklyn, New York
   October 19, 2010

                  _/s/ Nicholas G. Garaufis__
                  NICHOLAS G. GARAUFIS
                  United States District Judge