UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,

     -and-

THE VULCAN SOCIETY, INC., for itself and on
behalf of its members, MARCUS
HAYWOOD, CANDIDO NUÑEZ, and
ROGER GREGG, individually and on behalf of a
class of all others similarly situated,

                Plaintiff-Intervenors,

     -against-

THE CITY OF NEW YORK,

                Defendant.

---------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

In this Opinion the court decides Plaintiff-Intervenors' motion for remedial-phase class certification. The court also discusses several other issues affecting the individual claims process that flow from these decisions and from the court's analysis of certain provisions of the United States' Revised Proposed Relief Order. In light of the court's rulings in this Opinion, the court outlines its plan for the remedial phase of the litigation.

## I. BACKGROUND

On May 21, 2007, the United States of America sued the City of New York alleging that the City's use of four employment practices—the pass/fail and rank-ordering uses of two written examinations—to screen and select entry-level firefighters had an unlawful disparate impact on black and Hispanic applicants for that position, and constituted race discrimination in violation

1

of the disparate impact provisions of Title VII of the Civil Rights Act of 1964 ("Title VII").[1]

(USA Compl. (Docket Entry # 1).)  The United States sought equitable compliance and make-whole relief, including backpay and hiring preferences for victims of the four discriminatory employment practices.  (Id. at 11-12.)

The Vulcan Society, Inc. (the "Vulcan Society"), Marcus Haywood ("Haywood"), Candido Nuñez ("Nuñez"), and Roger Gregg ("Gregg") (collectively, "Plaintiff-Intervenors"), moved to intervene as individual plaintiffs as of right under 42 U.S.C. § 2000e-5(f)(1), on September 25, 2007.  (Int. Compl. (Docket Entry # 48.) ¶ 8.)  In addition to the disparate impact allegation in the United States' Complaint, Plaintiff-Intervenors' Complaint alleged that the City's actions demonstrated a pattern or practice of intentional discrimination on the basis of race in violation of the disparate treatment provisions of Title VII, the Fourteenth Amendment to the United States Constitution, and New York State law.  (Id. ¶ 3.)  Plaintiff-Intervenors sought compensatory damages for noneconomic losses caused by the City's pattern or practice of intentional discrimination, and sought additional forms of compliance and affirmative relief.  (Id. ¶¶ 1, 4.)  Plaintiff-Intervenors filed the action seeking to represent the interests of a class of black persons harmed by the City's discrimination.  (Id. ¶¶ 9-10.)

Because the United States Department of Justice has independent statutory authority under 42 U.S.C. § 2000e-5(f)(1) to bring an employment discrimination action against the City and to seek relief for the victims of such discrimination, the United States is not required to move for class certification in order to seek relief for the black and Hispanic applicants harmed by the City's four challenged employment practices.  See General Telephone Co. of the Northwest, Inc., v. EEOC, 446 U.S. 318, 323-326 (1980) ("General Telephone").  Plaintiff-Intervenors, however,

---

[1]     The court assumes the parties' familiarity with the factual and procedural background of this litigation and sets forth only the background facts relevant to this opinion.

are required to satisfy the requirements of Federal Rule of Civil Procedure 23 in order to represent the interests of black firefighter applicants harmed by the City's challenged employment practices and the City's pattern or practice of intentional discrimination. On May 11, 2009, pursuant to the Second Circuit's guidance in Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147 (2d Cir. 2001), the court bifurcated the case into liability and remedial phases; certified, for the liability phase only, a Rule 23(b)(2) mandatory class of black firefighter applicants who sat for the two written examinations and were harmed by the City's challenged employment practices; and indicated that it would revisit the propriety of class certification if the United States and Plaintiff-Intervenors prevailed on the question of the City's liability. (Liability Cert. Order (Docket Entry # 281) at 33-34.)

The court subsequently found the City liable for disparate impact discrimination on July 22, 2009 (Disparate Impact Op. (Docket Entry # 294) ("DI Op.")), and for engaging in a pattern or practice of intentional discrimination against black firefighter applicants on January 13, 2010 (Disparate Treatment Op. (Docket Entry # 385) ("DT Op.")). As a result of these findings, the parties entered the remedial phase of the litigation and, on September 10, 2009, the United States filed its Proposed Relief Order ("PRO") (Docket Entry # 315-1), in which it set out its plan for remedial-phase proceedings. Plaintiff-Intervenors filed their motion for continued class certification on October 7, 2009 (Int. Mot. for Cont'd Class Cert. (Docket Entry # 329)), and the United States responded on November 10, 2009 (USA Response to Continued Class Cert. (Docket Entry # 354)).

On January 21, 2010, the court issued its Initial Remedial Order, in which it addressed some of the remedial phase issues raised in the PRO, continued the certification of the class with the Vulcan Society serving as class representative, and ordered conditional certification of the

individual Plaintiff-Intervenors for the purposes of individual relief. (Initial Remedial Order (Docket Entry # 390) ("IRO") at 52.) The court expressed concerns, however, about potential antagonisms that might emerge during the remedial phase between black applicants who were not hired (the "non-hire victims") and those whose hiring was delayed (the "delayed-hire victims") because of the City's discriminatory employment practices. (Id. at 53.) The court observed that an incumbent black firefighter whose hiring was delayed "may prefer that non-hire victims not be awarded priority hiring or retroactive seniority." (Id. at 52.) Consequently, the court directed Plaintiff-Intervenors to renew their motion for continued class certification on issues of individual relief before the court entered a preliminary relief order so that the court could consider whether it would be necessary to certify subclasses corresponding to the particular remedial-phase interests of the putative class members. (Id. at 53.)

Subsequent to the IRO, the parties stated their views as to the propriety of continued class certification and the necessity of certifying subclasses for particular issues. (See Joint Stmt. on PRO Issues (Docket Entry # 400-1) at 64-72; Int. Mem. on Class-wide Compensatory Damages for Noneconomic Losses (Docket Entry # 401) at 12-13 n.5.) On September 17, 2010, the United States and Plaintiff-Intervenors filed their motions for summary judgment as to the calculation of the aggregate amount of backpay and benefits lost by the black and Hispanic applicants who were victims of the City's four discriminatory employment practices. (See Docket Entry ## 536, 540.) On November 23, 2010, Plaintiff-Intervenors filed their motion for summary judgment as to the calculation of the aggregate amount of damages required to compensate the black victims of the City's pattern or practice of intentional discrimination for their noneconomic losses. (Int. Noneconomic Loss Mem. (Docket Entry # 577).) On December 9, 2010, Plaintiff-Intervenors moved for prospective injunctive relief and for service awards for

the class representatives. (Int. Inj. Relief Mem. (Docket Entry # 596).) At a status conference on

February 8, 2011, the court directed Plaintiff-Intervenors to submit a class-definition statement

conforming to the requirements of Federal Rule of Civil Procedure 23(c)(1)(B). (See Supp. Br.

Order (Docket Entry # 613).) Plaintiff-Intervenors filed a class-definition statement on February

18, 2011. (Int. Class Def. Stmt. (Docket Entry # 615).)

## II.    CLASS CERTIFICATION

### A.    Legal Standard

#### 1.    Rule 23(a)

"In determining whether class certification is appropriate, a district court must first

ascertain whether the claims meet the preconditions of Rule 23(a)[2] of numerosity, commonality,

typicality, and adequacy." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,

546 F.3d 196, 201-02 (2d Cir. 2008) ("Bombardier"). "The numerosity requirement provides

that the class must be 'so numerous that joinder of all members is impracticable.'" Brown v.

Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)). "The commonality

requirement is met if there is a common question of law or fact shared by the class." Id.

"Typicality requires that the claims or defenses of the class representatives be typical of the

claims or defenses of the class members. This requirement 'is satisfied when each class

member's claim arises from the same course of events, and each class member makes similar

legal arguments to prove the defendant's liability.'" Id. (quoting Marisol A. v. Giuliani, 126

---

[2]    Federal Rule of Civil Procedure 23(a) provides that:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

F.3d 372, 376 (2d Cir. 1997)).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 625-26 (1997) (quotations, citations, and alterations omitted).  The Supreme Court has observed that "[t]he adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  <u>Amchem Products</u>, 521 U.S. at 626 n.20 (quoting <u>General Telephone Co. of the Southwest v. Falcon</u>, 457 U.S. 147, 157 n.13 (1982) ("<u>Falcon</u>")).  The four explicit requirements of Rule 23(a) imply a fifth: that the identities of the class members are reasonably ascertainable by reference to objective criteria.  <u>See</u> <u>In re Initial Public Offerings Secs. Litig.</u>, 471 F.3d 24, 44-45 (2d Cir. 2006) ("<u>In re IPO</u>") (quoting <u>In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.</u>, 209 F.R.D. 323, 337 (S.D.N.Y. 2002) ("<u>In re MTBE</u>")).

> 2.    <u>Rule 23(b)</u>

"If those criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)."  <u>McLaughlin v. Am. Tobacco Co.</u>, 522 F.3d 215, 222 (2d Cir. 2008), partially abrogated on other grounds by <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008).  The Second Circuit summarized the requirements for certification under Rule 23(b)(2) and (b)(3), the only provisions of Rule 23(b) applicable here, in <u>Brown v. Kelly</u>:

> Under Rule 23(b)(2), class certification is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to

> the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).
>
> Under Rule 23(b)(3), class certification is appropriate if "the questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class litigation is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." In re Nassau County Strip Search Cases, 461 F.3d 219, 225 (2d Cir. 2006) (internal quotation marks omitted).

Brown, 609 F.3d at 476. The Second Circuit has explained that a class can be certified under Rule 23(c)(4) as to particular issues in order "to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)['s predominance requirement]." In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006) ("In re Strip Search Cases").

 "[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met" and "only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." In re IPO, 471 F.3d at 41. The court must make these findings by a preponderance of the evidence. Bombardier, 546 F.3d at 202. Where factual questions underlying a Rule 23 requirement overlap with merits questions, the court is obligated to decide them, but "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." In re IPO, 471 F.3d at 41.

### B. Plaintiff-Intervenors' Proposed Class Definition

In their class-definition statement Plaintiff-Intervenors ask the court to certify a class of "all black firefighters or firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were harmed by the City's pass/fail or rank-ordered use of one or more of those examinations for the selection of entry-level firefighters." (Int. Class Def. Stmt. at 1-2.)

Plaintiff-Intervenors request that the class be certified with respect to three issues. First, they seek class certification with respect to "the scope of class-wide relief, including aggregate back pay and benefits for the class, the number of priority hires and the amount and applicability of retroactivity seniority." (Id. at 2.) They state that class treatment is not requested with respect to the determination of any individual class member's eligibility to receive a share of the damages, priority hiring, or retroactive seniority, nor is class treatment sought with respect to "issues relating to the creation of a process for identifying individual claimants eligible to receive" such as make-whole relief. (Id.) Plaintiff-Intervenors nevertheless anticipate that they will "continue to have the opportunity to provide input regarding those processes in their capacities as parties to the litigation." (Id.) With respect to this issue, the Vulcan Society asks to be appointed as class representative. (Id.)

Second, Plaintiff-Intervenors ask the court to certify the class with respect to the issue of class-wide prospective compliance, monitoring, and related injunctive relief, with the Vulcan Society serving as class representative for this issue.[3] (Id. at 3.) Third, they ask the court to certify the class with respect to "the calculation of the overall amount of [] class-wide compensatory damages, issues relating to the creation of a process for identifying claimants eligible to receive compensatory damages, and the determination that a particular class member is or is not eligible," with individual intervenors Haywood, Nuñez, and Gregg serving as class representatives for this issue. (Id. at 3-4.) Plaintiff-Intervenors argue that the class should be certified under Rule 23(b)(2), but argue in the alternative that the class would also satisfy Rule 23(b)(3). ((Docket Entry # 329) at 2-3; (Docket Entry # 401) at 7-11.)

---

[3]     Plaintiff-Intervenors' class-definition statement divides the second issue into two distinct issues, injunctive and monitoring relief; however the issues are sufficiently similar that the court will treat them as one issue.

In response, the United States cryptically states that it relies on "the previously submitted agreed understanding between the United States and the Plaintiffs-Intervenors regarding the scope and contours of the Plaintiffs-Intervenors' proposed relief-phase class certification request," and "takes no position" on Plaintiff-Intervenors' class-definition statement. (USA Response to Class Def. Stmt. (Docket Entry # 618) at 1.) The United States' response references its October 29, 2010 response to Plaintiff-Intervenors' motion for summary judgment as to class-wide compensatory damages for noneconomic losses. (See USA Stmt. on Remedial Phase Class Cert. (Docket Entry # 582).) In that memorandum, the United States stated its agreement with Plaintiff-Intervenors that no class would be certified as to issues of individual eligibility to receive compensatory damages, priority-hiring relief, or retroactive seniority. (Id. at 6-7.)

The City agrees with Plaintiff-Intervenors' request to certify the class with respect to the issue of injunctive relief, and to appoint the Vulcan Society as class representative with respect to that issue. (NYC Response to Class Def. Stmt. (Docket Entry # 617) at 1.) The City argues, however, that subclasses are necessary for any class certified with respect to the issue of compensatory damages for noneconomic losses, because of conflicts that may emerge between applicants who were not hired, and those whose hiring was delayed as a result of the City's pattern or practice of intentional discrimination. (Id. at 2.)

C.      **Application of Rule 23 to the Proposed Class**

For the reasons set forth below, the class-definition statement submitted by Plaintiff-Intervenors suffers from certain defects and cannot be approved in its current form. The court concludes, however, that certification of a class broken into more narrowly defined subclasses is appropriate. Accordingly, the court first discusses the problems in Plaintiff-Intervenors'

proposed class-definition statement on an issue-by-issue basis, and then proceeds to certify those subclasses that comply with the requirements of Rule 23.

### 1. Plaintiff-Intervenors' De Facto Subclass Structure

Plaintiff-Intervenors' class-definition statement indicates that they seek certification of a single class, but ask for class treatment of four issues, with class representatives appointed to correspond to particular issues and not others. (<u>See</u> Int. Class Def. Stmt.) Plaintiff-Intervenors do not seek to have each of the four issue areas certified as subclasses—indeed, they argue subclasses are unnecessary. (<u>Id.</u> at 2 n.2.) Structuring the class in the manner Plaintiff-Intervenors propose, however, would effectively require the court to treat each issue as a separate class without explicitly certifying each issue as a separate subclass under Rule 23(c)(5). It is unclear from Plaintiff-Intervenors' proposal what responsibility, if any, class representatives appointed for a particular issue would owe to the class as a whole with respect to any other issues. Plaintiff-Intervenors do not explain how this procedure would affect the commonality, typicality, and adequacy inquiries required by Rule 23(a), and cite no authority for their proposal.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Accordingly, class representatives assume fiduciary duties to absent class members, <u>Martens v. Thomann</u>, 273 F.3d 159, 173 n.10 (2d Cir. 2001), and are obligated to remain "alert for, and [] report to the court, any conflict of interest on the part of class counsel," <u>Maywalt v. Parker & Parsley Petroleum Co.</u>, 67 F.3d 1072, 1078 (2d Cir. 1995). But in order to appreciate whose interests they are bound to protect, class representatives must be able to identify the class for which they serve as representative parties. The de facto subclass structure proposed by Plaintiff-Intervenors is inappropriate because it creates uncertainty as to whether the

class representatives are obligated to protect the interests of all black firefighter applicants harmed by the City's discriminatory uses of the two examinations, or only those black applicants affected by the particular issues for which the class representatives are appointed to serve as representative parties. Moreover, where a particular class member is an unsuitable class representative as to a particular issue, appointing that class member a representative party with respect to other issues raises the possibility that the class member may exert influence over class counsel with respect to the litigation of issues for which he or she would be an atypical or inadequate representative.

Together, issue certification under Rule 23(c)(4) and subclass certification under Rule 23(c)(5) are among the tools available to district courts to carry out their "ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel." Maywalt, 67 F.3d at 1078 (collecting cases); see, e.g., In re Flag Telecom Holdings, Ltd. Secs. Litig., 574 F.3d 29, 37 (2d Cir. 2009) (expressing confidence in district courts' "wisdom and ability to utilize the available case management tools to see that all members of the class are protected" including Rule 23(c)(5)); In re Strip Search Cases, 461 F.3d 219, 227 (holding "that courts may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)").

The de facto subclass structure proposed by Plaintiff-Intervenors circumvents the formalities of subclass certification under Rule 23(c)(5) and impermissibly deprives absent class members of the procedural protections those formalities provide. See Marisol A., 126 F.3d 372, 378-79 (criticizing district court for certifying one class "implicitly consist[ing] of two large subclasses," and ordering the district court to "engage in a rigorous analysis of the plaintiffs' legal claims and factual circumstances in order to ensure that appropriate subclasses are

identified, that each subclass is tied to one or more suitable representatives, and that each subclass satisfies Rule 23(b)(2).").  For these reasons the court will approve the class structure requested by Plaintiff-Intervenors only if each issue is certified as a separate subclass. Accordingly, the court considers below whether each of the issue subclasses meets the requirements of Rule 23.

2.    <u>Backpay and Benefits, Retroactive Seniority, and Priority Hiring Subclass</u>

Plaintiff-Intervenors' proposed subclass as to issues of make-whole relief, including backpay and benefits, retroactive seniority, and priority hiring, suffers from three defects: (1) the court cannot certify a single subclass comprised of both delayed-hire and non-hire victims; (2) the Vulcan Society cannot serve as a representative of either the delayed-hire victim subclass or the non-hire victim subclass; and (3) fact questions relating to each individual claimant's efforts to mitigate his or her losses are not susceptible of class-wide proof, and the court cannot certify any subclass with respect to mitigation.

a.    *Separate Subclasses for Non-hire and Delayed-hire Victims*

Plaintiff-Intervenors' claims to retroactive seniority and priority-hiring relief implicate a conflict of interest between putative class members.  Specifically, these claims implicate a conflict between the interests of the delayed-hire victims and the non-hire victims.  If non-hire victims are awarded priority-hiring relief and retroactive seniority, that seniority will dilute the value of the seniority accumulated by delayed-hire victims and place the two groups in direct competition for the various employment benefits that greater seniority makes more accessible. Under the Revised Proposed Relief Order ("RPRO"), all non-hire victims who receive priority-hiring relief will be given retroactive seniority from their presumptive hire date.  (<u>See</u> RPRO

(Docket Entry # 619-4) ¶ 78.) Therefore, the greater the aggregate number of non-hire victims who obtain priority-hiring relief, the greater the dilutive effect on delayed-hire victims' seniority.

In <u>General Telephone</u>, 446 U.S. 318, 331, the Supreme Court addressed this precise situation in dicta:

> [T]he adequate-representation requirement is typically construed to foreclose the class action where there is a conflict of interest between the named plaintiff and the members of the putative class. In employment discrimination litigation, conflicts might arise, for example, between employees and applicants who were denied employment and who will, if granted relief, compete with employees for fringe benefits or seniority. Under Rule 23, the same plaintiff could not represent these classes.

Rule 23(a)(4) precludes the court from certifying a class as to issues of retroactive seniority and priority hiring—even if only as to the aggregate amount of such relief—if it includes the claims of both non-hire victims and delayed-hire victims. A delayed-hire victim cannot adequately protect the interests of non-hire victims, nor can a non-hire victim protect the interests of delayed-hire victims.

Nonetheless, Plaintiff-Intervenors argue that the conflict is moot because the court has already decided to award priority-hiring relief and retroactive seniority, and because non-parties will have the opportunity to object under the RPRO. (Int. Class Def. Stmt. at 2 n.2) This characterization of the court's prior ruling is inaccurate; the court has not entered an order awarding priority-hiring relief or retroactive seniority to any claimant. Although the court anticipates that it will likely do so at the appropriate time, this expectation is largely based on the arguments presented by counsel for the single conditionally certified subclass and the United States. The purpose of certifying separate subclasses is to enable the representatives and counsel for the non-hire victim and delayed-hire victim subclasses to present their arguments to the court in a context in which there are no structural conflicts preventing them from fully and fairly

representing the interests of their subclasses.  But the court has not yet heard from these subclasses with respect to their views on priority hiring and retroactive seniority.  Finally, a claimant's ability to object following a fairness hearing is no substitute for Rule 23's requirement that the class representatives be able to fairly and adequately protect the interests of all class members.

Consequently the court will certify two subclasses as to issues of make-whole relief—a subclass seeking backpay, benefits, retroactive seniority, and priority-hiring relief for non-hire victims, and a subclass seeking backpay, benefits, and retroactive seniority for delayed-hire victims.[4]

> b.    *Vulcan Society as Representative of Make-Whole Relief Subclasses*

Plaintiff-Intervenors have asked the court to appoint the Vulcan Society to act as class representative with respect to issues of make-whole relief, including "aggregate back pay and benefits for the class, the number of priority hires and the amount and applicability of retroactivity seniority."[5]  (Int. Class Def. Stmt. at 2.)  The court concludes that the Vulcan Society cannot represent the interests of either the non-hire victim or delayed-hire victim subclasses and, therefore, will not appoint the Vulcan Society as class representative with respect to issues of make-whole relief.

The Vulcan Society lacks standing to represent the members of the non-hire victim subclass because the Vulcan Society's members are not members of this subclass, and because the Vulcan Society's members who are delayed-hire victims cannot adequately represent the

---

[4]    The court refers to these two subclasses as the delayed-hire victim and non-hire victim subclasses.

[5]    This represents a change in the position adopted by Plaintiff-Intervenors in their original motion for continued class certification.  In that motion, filed nearly two years ago, Plaintiff-Intervenors argued that, in the event the court determined that subclasses were necessary, the court should appoint Nuñez as representative of the delayed-hire victim subclass, and Haywood and Gregg as representatives of the non-hire victim subclass.  (Int. Cont'd Class Cert. Mem. (Docket Entry # 329) at 9-10.)  Plaintiff-Intervenors also offered Kevin Simpkins and Kevin Walker as potential class representatives.  (Id. at 10-12.)

non-hire victims.  Associations have standing to assert the claims of their members if they meet

the three-prong test of Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333,

343 (1977).  "Under this test, the association has standing if '(a) its members would otherwise

have standing to sue in their own right; (b) the interests it seeks to protect are germane to the

organization's purpose; and (c) neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit.'"  Bano v. Union Carbide Corp., 361 F.3d

696, 713 (2d Cir. 2004) (quoting Hunt, 432 U.S. at 343).

The Vulcan Society's membership includes only incumbent firefighters (see Washington

Aff. (Docket Entry # 125) ¶ 3), and there is no indication that the relationship between the non-

hire victims and the Vulcan Society "possess[es] [any] of the indicia of membership in an

organization."  Hunt, 432 U.S. at 344-45 (listing indicia of membership).  Under the first prong

of the Hunt test, the Vulcan Society lacks associational standing to represent the interests of non-

hire victims because none of its members, all of whom are current firefighters, would have

standing to assert the claims of the non-hire victims in their own right.  See Hunt, 432 U.S.

at 343.

The Vulcan Society cannot represent the delayed-hire subclass because it fails Rule

23(a)(4)'s adequacy-of-representation requirement.[6]  "Adequacy is twofold: the proposed class

representative must have an interest in vigorously pursuing the claims of the class, and must have

no interests antagonistic to the interests of other class members."  Denney v. Deutsche Bank AG,

443 F.3d 253, 268 (2d Cir. 2006).  "A conflict or potential conflict alone will not, however,

---

[6]      Citing Bano and Robinson, the court indicated in the Liability Phase Class Certification Order that if the
litigation reached the remedial phase, "the court [would] need to identify individual members of the class to which
non-injunctive and nondeclaratory benefits would be owed."  (Liability Cert. Order at 21.)  Because the court
concludes that the Vulcan Society is an inadequate class representative with respect to the claims of the delayed-hire
victim subclass, the court does not decide whether the Vulcan Society would have associational standing to
represent delayed-hire victims with respect to their claims for backpay and retroactive seniority.

necessarily defeat class certification—the conflict must be 'fundamental.'" Id.; see also Falcon, 457 U.S. 147, 156 ("We have repeatedly held that a class representative must be part of the class *and possess the same interest* and suffer the same injury as the class members." (emphasis added, internal quotation omitted)).

Although the Vulcan Society's membership is comprised only of incumbent firefighters (Int. Class Cert. Reply (Docket Entry # 174) at 22; Washington Aff. ¶ 3), it considers it integral to its purpose to aid "incumbent firefighters and entry-level firefighter applicants who have claims of discrimination at work or in the hiring process" (Int. Class Cert. Mem. (Docket Entry # 121) at 3), and has expended "significant resources in terms of time and money to assist and support black applicants or would-be applicants for firefighter positions," (Int. Class Cert. Reply at 22 (citing Washington Aff.)). The Vulcan Society has indicated in its filings with the court that its organizational mission is strongly focused on the goal of expanding the ranks of black firefighters in the FDNY. (See id. ("These incumbent firefighters, Vulcans members, seek an increase in the numbers of blacks at all ranks within the department and in all the firehouses across the City to further their own security, comfort and sense of fairness in their place of employment.").) As an organization, the Vulcan Society has repeatedly demonstrated its commitment to this goal by zealously litigating the present case over the last four years, and by filing one of the EEOC charges that resulted in the United States' decision to file suit against the City.

This goal, however, is in conflict with the self-interest of delayed-hire victims insofar as the Vulcan Society's pursuit of the goal would cause it to support priority-hiring relief and retroactive seniority for non-hire victims. Current black firefighters of the FDNY who are delayed-hire victims may well support the Vulcan Society's goals with respect to priority-hiring

relief and retroactive seniority for non-hire victims, but their choice to do so would be at the expense of their own interests in minimizing competition for the various employment benefits that seniority would help them to obtain. This conflict, which affects all current black firefighters, is especially acute for the delayed-hire victims, because non-hire claimants awarded priority-hiring relief would likely receive an amount of retroactive seniority equivalent to the seniority of some delayed-hire victims—placing the non-hire claimants and delayed-hire victims in direct competition. Thus, the court finds that the Vulcan Society's organizational purpose presents a fundamental conflict with the interests of the delayed-hire victims, and prevents the Vulcan Society from adequately and fairly protecting the interests of the delayed-hire victim subclass.

In the liability phase of this litigation the court found that the Vulcan Society had associational standing to represent the interests of both the delayed-hire victims who are its members, as well as the non-hire victims who were similarly situated. In Bano, 361 F.3d at 715, the Second Circuit implied that an association may maintain a suit as a class action and serve as class representative under Rule 23 if the association satisfies the three-prong test for associational standing set forth in Hunt. The delayed-hire victims who are members of the Vulcan Society suffered the same basic injury as those victims who were not hired—both groups were harmed by the City's discriminatory uses of two written examinations to hire entry-level firefighters.

But in the remedial phase of this litigation, the interests of the delayed-hire and non-hire victims have diverged on issues of priority hiring and retroactive seniority, and delayed-hire claimants can no longer adequately protect the interests of non-hire victims as to those issues. Because the purpose of Hunt's test is to guarantee that in maintaining an action the association

represents the interests of its members, the court concludes that an association may be appointed to represent a class including one of its members only if the three-prong <u>Hunt</u> test is satisfied, and one of the association's members would qualify to serve as a representative of the class under Rule 23(a). None of the Vulcan Society's delayed-hire-victim members can adequately represent the interests of the non-hire victims, therefore the Vulcan Society cannot adequately represent the interests of the non-hire victims.

Pursuant to Rule 23(d)(1)(C), the court will not certify the non-hire victim and delayed-hire victim subclasses until it is presented with individuals who satisfy the requirements of Rule 23(a) to serve as class representatives.[7] The conflict between non-hire and delayed-hire victims also prevents the two make-whole relief subclasses from being represented by the same counsel. The court directs current counsel for the class conditionally certified for the remedial phase to indicate to the court whether they will seek appointment to represent one of the two make-whole relief subclasses under Rule 23(g).

### c. *Class Treatment of Mitigation*

While the class-wide calculation and pro rata distribution of backpay and lost benefits is supported by Title VII case law, the parties' proposed method for calculating and distributing the aggregate backpay award inappropriately determines mitigation on a class-wide basis. Because

---

[7]     Although the court concludes that the Vulcan Society is not an adequate representative of either subclass, the court is reluctant to reach back two years and accept Plaintiff-Intervenors' alternative arguments that the court should appoint Nuñez, Haywood, Gregg, Simpkins, and Walker as class representatives without assurances that they remain qualified to represent the subclasses and are willing to do so. (Int. Cont'd Class Cert. Mem. at 9-12.) Moreover, in light of the conflicts identified in this opinion, the court requires assurances from individuals seeking to serve as class members that they understand their responsibilities to protect their respective subclass's unique interests, and that those interests may diverge from the interests of other parties to the litigation.

Should these individuals continue to be willing to serve as representatives of these subclasses, the court requires affidavits from them that indicate their qualifications under Rule 23(a), and that make the requested assurances. It may be desirable to have more than one or two representatives appointed for each subclass because of the possibility that a class representative may be determined to be ineligible for individual relief in the individual claims process, potentially requiring a replacement to be appointed.

the court concludes that questions of mitigation are not susceptible to class-wide proof, the court denies certification of any subclass appointed with respect to determining mitigation.

The United States, Plaintiff-Intervenors, and the City all agree that the aggregate amount of backpay and benefits lost by those harmed by the City's four challenged employment practices should be calculated on a class-wide basis. (See NYC Opp. to SJ on Backpay (Docket Entry # 543) at 2.) The parties also agree on the broad contours of the formula to be used in making this determination, disagreeing only on a relatively discrete set of issues affecting the variables in that formula. (Id.) Generally speaking, the parties agree that the court must: first, determine how many black and Hispanic firefighters would have been hired but for the City's challenged employment practices; second, calculate the aggregate value of the pay and benefits those firefighters would have received had they been hired at the same rate as white firefighters; and finally, discount the aggregate value of backpay and lost benefits by a mitigation ratio reflecting the value of the pay and benefits a typical black or Hispanic applicant would have been expected to earn if he had obtained interim employment. After the court determines the aggregate value of backpay and lost benefits, the parties anticipate that they will identify those applicants who could have been hired but for the City's discriminatory employment practices, and distribute to them a pro rata share of the aggregate value of the backpay and lost benefits.

Ordinarily, "[r]emedial relief should be granted only to those class members who would have filled vacancies had there been no discrimination." Ingram v. Madison Square Garden Center, Inc., 709 F.2d 807, 812-13 (2d Cir. 1983) (citing Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 284-87 (2d Cir. 1981) ("AADE")). The Second Circuit and several other circuit courts agree, however, that class-wide calculation and pro rata distribution of backpay is appropriate in cases, such as this one, "where 'the number of

qualified class members exceeds the number of openings lost to the class through discrimination.'" Robinson, 267 F.3d 147, 161 n.6 (quoting Catlett v. Mo. Highway & Transp. Comm'n, 828 F.2d 1260, 1267 (8th Cir. 1987)); see also Ingram, 709 F.2d at 812-13; United States v. City of Miami, 195 F.3d 1292, 1299-1301 (11th Cir. 1999); Segar v. Smith, 738 F.2d 1249, 1289-91 (D.C. Cir. 1984). In cases such as this one, the court is unable to reliably determine which of the eligible job applicants would have been hired in the absence of discrimination. Robinson, 267 F.3d at 161 n.6 (quoting Catlett, 828 F.2d 1260, 1267). Instead of attempting to make such determinations on an individualized basis, "[t]he fairer procedure [is] to compute a gross award for all the injured class members and divide it among them on a pro rata basis." Ingram, 709 F.2d at 812-13.

In these circumstances, calculating the amount of backpay lost by members of the class because of the employer's discriminatory employment practices does not require individualized proof because the aggregate amount of backpay does not depend on the individual circumstances of any class member. The only individual questions relate to whether a particular individual is a victim of the employment practices causing the discrimination and is, therefore, a member of the class. As the Second Circuit stated in Robinson, if "[e]ach class member [] show[s] that he or she was among those adversely affected by the challenged policy or practice . . . the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action." Robinson, 267 F.3d at 161-62.

An individual class member's efforts to mitigate his damages is not, however, an issue that is common to the class, and the court concludes that class treatment is inappropriate as to questions of mitigation. "[A] prevailing plaintiff in a Title VII case must attempt to mitigate her

damages by using 'reasonable diligence in finding other suitable employment.'" Dailey v. Societe Generale, 108 F.3d 451, 455 (2d Cir. 1997) (quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982)). Title VII provides that "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g)(1). Under this provision, a prevailing claimant's backpay award is reduced by the actual amount of his or her earnings from interim employment[8] unless the defendant establishes that the claimant failed to satisfy his duty mitigate his damages. Dailey, 108 F.3d at 456. The claimant's duty to mitigate "is not onerous," id., and "the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position," if "substantially equivalent" employment is unavailable, Ford Motor Co., 458 U.S. at 231. "The ultimate question 'is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment.'" Wills-Hingos v. Raymond Corp., 104 F. App'x 773, 775 (2d Cir. 2004) (quoting Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 695 (2d Cir. 1998)).

A defendant may establish that a claimant failed to mitigate his damages by introducing evidence sufficient to persuade the trier of fact "(1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." Dailey, 108 F.3d at 456; see also NLRB v. Thalbo Corp., 171 F.3d 102, 112 (2d Cir. 1999) ("The employer has the ultimate burden of proving that the discriminatee failed to mitigate damages."). Nonetheless, "an employer 'is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment.'" Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005) (quoting Greenway v. Buffalo Hilton Hotel, 143 F. 3d

---

[8] The court uses the terms "interim employment" and "alternative employment" to refer to employment obtained by victims of discrimination in lieu of employment as New York City firefighters after the City chose not to hire them.

47, 54 (2d Cir. 1998)). But even if a claimant "offer[s] absolutely no evidence of any effort on her part to seek alternative employment," the claimant will still be entitled to a backpay award unless the *defendant* proves that the claimant made no reasonable efforts to seek alternative employment. Id. "[O]nce the employer meets its burden of showing failure to seek alternative employment, the burden shifts to the plaintiff to show that compensation for such employment is not comparable and thus the plaintiff is entitled to limited damages." Id.

Therefore, while the aggregate amount of backpay and lost benefits is a question that is common to the class, a particular class member's efforts to mitigate those losses is not. In calculating a class-wide mitigation ratio applicable to all black and Hispanic firefighter applicants, the parties make numerous assumptions, based on a variety of data points, about what a typical unsuccessful black or Hispanic applicant might have done after being denied employment as firefighter.[9] Assuming the City produced evidence of a particular claimant's efforts to obtain alternate employment, the appropriate question would not be what the typical, hypothetical black or Hispanic victim of discrimination would have done; the pertinent question would be whether a particular claimant's actions were actually reasonable in light of all the circumstances relevant to that claimant. As the Second Circuit has stated, "an assessment of the reasonableness of a plaintiff's effort to mitigate . . . entails a consideration of such factors as the individual characteristics of the claimant and the job market, as well as the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work." Dailey, 108 F.3d

---

[9]     The City's expert's amusing but flawed assumption that all unsuccessful black or Hispanic applicants should reasonably be expected to have obtained employment as municipal employees in other departments is particularly illustrative of the problems inherent in making such assumptions. (NYC Opp. to Backpay at 21.) But while the City's assumption is obviously absurd, the United States' and Plaintiff-Intervenors' assumptions are no more reliable. For example, the United States' expert emphasizes that his varied assumptions are "conservative" without explaining why their conservatism means they are more likely to approximate the actual extent to which the victims of discrimination mitigated their damages, and why those mitigation efforts were reasonable in light of a particular claimant's unique circumstances. (See, e.g., USA Backpay Mem. (Docket Entry # 536) at 16.)

at 456 (internal quotation omitted, collecting cases). This inquiry requires a highly individualized, retrospective examination of the actions actually taken by a claimant in light of the particular circumstances faced by that claimant.

In assessing the reasonable efforts of hypothetical claimants to mitigate their losses, the parties shortchange some claimants and give a windfall to others. The parties' proposal prejudices claimants who might have been unable to obtain substantially equivalent employment, despite their reasonable efforts, and who actually earned substantially less from their interim employment (or unemployment) than what the parties estimate they reasonably should have earned. This method also produces a windfall for claimants in the opposite position—those who were able to obtain employment that paid them more than what the parties estimate they should have received.

The problems inherent in the parties' attempt to calculate class-wide mitigation are among the reasons the Second Circuit has cautioned that class-wide monetary relief "is the exception, not the rule: Where possible, 'there should be . . . a determination on an individual basis as to which class members are entitled to [recovery] and the amount of such recovery.'" Robinson, 267 F.3d 147, 161 n.6 (quoting Shipes v. Trinity Industries, 987 F.2d 311, 318 (5th Cir. 1993)). The purpose of determining backpay on a class-wide basis is to avoid "the quagmire of hypothetical judgments" and "mere guesswork" that would inevitably occur if the court were forced to determine whether a particular claimant would have been hired but for the employer's discrimination. Robinson, 267 F.3d at 161 n.6 (quoting Catlett, 828 F.2d 1260, 1267). The parties' proposal for calculating class-wide aggregate backpay simply adds a new layer of guesswork by including a class-wide calculation of mitigation that is based not on the claimants' actual mitigation efforts, but on "hypothetical judgments" about what the parties assume typical

23

victims of discrimination would, or reasonably should, have done. An analysis of economic data to estimate what a hypothetical claimant could reasonably be expected to have done under the circumstances simply cannot substitute for the individualized factual inquiry required by Title VII.

Unlike the class-wide calculation of backpay, class-wide calculation of mitigation is simply unnecessary in this case. The parties have already planned for an individual claims process to determine which of the applicants who sat for one of the two examinations would have been eligible to be hired in the absence of discrimination. This process can be modified to enable fact finding on questions of mitigation. The first step would be to ascertain what each claimant's actual interim earnings were, and to use that amount to proportionally[10] reduce each claimant's share of the aggregate backpay award. The City would then have the opportunity, under Second Circuit case law, to prove that a particular claimant made no efforts to obtain suitable employment, or to prove that suitable work existed, and that the claimant did not make reasonable efforts to obtain it.[11] The court is not required to guess what might have been had the City not discriminated against the claimants in order to determine whether and to what extent an individual claimant has mitigated his damages. Because the same circumstances warranting the class-wide calculation of aggregate backpay do not obtain with respect to mitigation, the court

---

[10]    Each claimant's pro rata share of the backpay award can be expressed as a percentage of the pay that one successful applicant would have received had he or she been hired. A claimant's award would not be discounted by the full amount of his interim earnings but rather, by this same percentage of his interim earnings.

[11]    Because this process will have to occur with each of potentially thousands of claimants, and as further explained below, the court concludes that a special master is required to perform this task.

will not permit class treatment as to questions of mitigation and will resolve each claimant's mitigation on an individual basis.[12]

**D.      Certified Classes**

While the non-hire victim and delayed-hire victim subclasses cannot currently be certified, the court concludes that there are two subclasses that can be certified under Rule 23: (1) a noneconomic loss subclass; and (2) an injunctive relief subclass.

1.      Rule 23(a) Requirements

*a.      Numerosity*

These two subclasses satisfy Rule 23(a)(1)'s numerosity requirement.  Expert testimony accepted by the court during the liability phase showed that, but for the City's discriminatory employment practices, there were 186 black test takers who were not hired but would have been hired by the City (see DI Op. at 17, 19, 23), and 112 black test takers who were hired but would have been hired sooner but for the City's challenged employment practices (see id. at 20). Because the City's discriminatory employment practices prevented many black applicants from proceeding further in the application process, it is impossible to determine precisely which of the black test takers would ultimately have been hired, or which black test takers would have been hired sooner but for those unlawful employment practices.  It is clear, however, that the number of black test takers who can show that they were harmed by the City's discriminatory employment practices is larger than the 186 black applicants who would have been hired and the 112 black applicants who would have been hired sooner.  The group of delayed-hire victims could include, at most, the 104 black applicants who took Exam 7029 (id. at 20), and the 80

---

[12]      Although the issue of class-wide calculation of mitigation arises on Plaintiff-Intervenors' motion for class certification, the court's conclusion is equally applicable to the United States' motion for summary judgment as to class-wide backpay.  Although the court will separately rule on the United States' and the Plaintiff-Intervenors' motions for summary judgment on class-wide backpay, the same reasoning requires the court to deny summary judgment as to any class-wide calculation of mitigation.

black applicants who took Exam 2043 (id. at 22) and were actually appointed by the City. Subsequent to the court's Disparate Impact Opinion, 19 additional class members were hired by the City. (Int. Cont'd Class Cert. Mem. at 10 n.2.) At its greatest extent, the group of non-hire victims could include the 1,749 black applicants who took Exam 7029 (DI Op. at 16), and the 1,393 black applicants who took Exam 2043 (id. at 18). After excluding the 203 black test takers who were actually hired by the City, the non-hire victim group may be comprised of as many as 2,939 non-hire victims. (Int. Cont'd Class Cert. Mem. at 10 n.2)

In the Second Circuit, Rule 23(a)(1)'s numerosity requirement is presumed satisfied if there are at least forty putative class members. See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). Although the precise number of delayed-hire and non-hire victims is presently unknown, Plaintiff-Intervenors have established that the putative members of each of these two subclasses are sufficiently numerous that joinder of all putative class members would be virtually impossible. The noneconomic loss and injunctive relief subclasses are each comprised of both the delayed-hire and non-hire victim groups and likewise satisfy the numerosity requirement.

### b. Commonality

The court has narrowly defined the issue subclasses to include only those issues of law and fact that are common to the claims of the members of each of the subclasses. Thus, there are common questions of fact and law common to the claims of the members of each of the subclasses. The members of the noneconomic loss subclass share common questions of fact and law relating to the monetary value of the intangible risks and benefits of employment as a firefighter, and whether the monetary value of the intangible benefits of their interim employment should offset the value of the benefits of employment as a firefighter. Issues of fact

and law relating to the City's prospective efforts to comply with Title VII and to remedy the effects of its four discriminatory employment practices, as well as its pattern or practice of intentional discrimination, are questions common to the injunctive relief subclass.

<em>c.    Typicality and Adequacy</em>

i.    <u>Injunctive Relief Subclass</u>

Plaintiff-Intervenors ask the court to appoint the Vulcan Society to act as class representative with respect to injunctive relief, including monitoring the City's development and implementation of a new entry-level firefighter selection procedure. (Int. Class Def. Stmt. at 3.) No party objects to the Vulcan Society serving as class representative as to issues of injunctive relief.

In <u>Warth v. Seldin</u>, 422 U.S. 490, 515 (1975), the Supreme Court observed that an association generally has standing to represent the interests of its members in cases where "the association seeks a declaration, injunction, or some other form of prospective relief." <u>Id.</u> at 515. In those cases, the Court reasoned, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." <u>Id.</u>; <u>see also</u> <u>Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock</u>, 477 U.S. 274, 287-88 (1986) ("<u>Brock</u>") (finding associational standing where "[n]either the[] claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member" and "[t]he suit raise[d] a pure question of law").

In the Liability Phase Class Certification Order, the court ruled that the Vulcan Society was able to adequately represent the interests of the class during the liability phase because "individualized issues [were] not presented, and the Vulcan Society [was] advocating simply for a legal ruling." (Liability Cert. Order at 21.) The court held that "to the extent that the Vulcan

27

Society seeks injunctive and declaratory relief on behalf of black firefighters, such relief can reasonably be supposed to inure to the benefit of those firefighters," and found that the Vulcan Society had associational standing to represent the black victims of the City's discrimination in connection with their claims for injunctive relief. (Id. at 20-24, 30-33.) In the IRO, the court found that it was appropriate to continue the certification of a class as to issues of class-wide injunctive relief and that the Vulcan Society remained an appropriate representative of a class certified as to those issues. (IRO at 52.) Nothing has changed that would affect these determinations. For the reasons stated in the court's Liability Phase Class Certification Order, the Vulcan Society remains an adequate representative of a subclass certified as to issues of injunctive relief.

### ii. Noneconomic Loss Subclass

Plaintiff-Intervenors ask that the court appoint the Individual Intervenors, Haywood, Nuñez, and Gregg, as representatives of the noneconomic loss subclass. (Int. Class Def. Stmt. at 3-4.) In the Liability Phase Class Certification Order the court found that, Haywood and Gregg had claims typical of the class, and were sufficiently familiar with the litigation to protect the interests of absent class members. (Liability Cert. Order at 24-25.) Nuñez did not file an affidavit with the court and he was not appointed to represent the class during the liability phase, though he remained a party plaintiff in the action. (Id. at 25 n.11.) In the IRO the court conditionally certified the Individual Intervenors as representatives of the class for purposes of individual relief based on affidavits they submitted in October 2009. (IRO at 52; Haywood Cont'd Cert. Aff. (Docket Entry # 330); Nuñez Cont'd Cert. Aff. (Docket Entry # 333); Gregg Cont'd Cert. Aff. (Docket Entry # 334).) All three Individual Intervenors have now submitted affidavits in support of Plaintiff-Intervenors' motion for summary judgment based on a class-

wide valuation of the noneconomic loss subclass's claims for compensatory damages resulting from the City's pattern or practice of discrimination. (<u>See</u> Nuñez Noneconomic Loss Affs. (Docket Entry # 515-1) Exs. E and M; Haywood Noneconomic Loss Affs. (Docket Entry # 515-1) Exs. F and G; Gregg Noneconomic Loss Aff. (Docket Entry # 515-1) Ex. K.)

Based on these affidavits, the court finds that the Individual Intervenors remain qualified to represent the interests of the noneconomic loss subclass. The Individual Intervenors share a common interest in establishing the greatest possible monetary valuation for the intangible benefits of employment as a New York City firefighter because each of them stands to obtain a greater damages award as a result. Furthermore, there is no evidence that the Individual Intervenors have any claims or are subject to any defenses unique to them, or that there is any reason why, despite their common interests, they would be unable to fairly and adequately protect the interests of absent class members. The court is satisfied, based on their knowledge of and participation in the action as disclosed in their affidavits, that they are sufficiently familiar with the litigation to continue acting as representative parties.

        2.     <u>Rule 23(b) Certification</u>

        *a.*     *Injunctive Relief Subclass*

The injunctive relief subclass qualifies for mandatory class certification under Rule 23(b)(2) because it focuses exclusively on declaratory and injunctive relief necessary to remedy the group-wide injury suffered by the black victims of the City's discrimination. <u>See</u> <u>Robinson</u>, 267 F.3d 147, 162 ("The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."). Moreover, the parties agree that any prospective relief flowing from the court's liability rulings—including

monitoring, compliance, and affirmative relief to prevent future discrimination—should be resolved on a class-wide basis.

### b. *Noneconomic Loss Subclass*

Plaintiff-Intervenors are entitled to certification under Rule 23(b)(3)[13] if they can "demonstrate that common 'questions of law or fact' predominate over 'any questions affecting only individual members'; and [] establish that the class action mechanism is 'superior to other available methods for the fair and efficient adjudication of the controversy.'" In re Strip Search Cases, 461 F.3d 219, 225 (quoting Fed. R. Civ. P. 23(b)(3)). "As a general matter, the Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Id. (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 136 (2d Cir. 2001)). "The Rule 'encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" Id. (quoting Fed. R. Civ. P. 23(b)(3) adv. comm. n. to 1966 amend.)

Plaintiff-Intervenors have moved for summary judgment as to the total amount of the noneconomic losses[14] suffered by black victims of the City's pattern or practice of discrimination. Plaintiff-Intervenors propose that the court calculate, on a class-wide basis, the aggregate amount of noneconomic losses suffered by black firefighter applicants who were

---

[13]    Plaintiff-Intervenors are not entitled to mandatory class certification under Rule 23(b)(2) because the noneconomic loss subclass seeks an award of money damages. "For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class." AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1751 (2011) (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-812 (1985)).

[14]    The noneconomic losses suffered by the black victims of the City's discrimination are the lost intangible benefits of being a firefighter which, according to Plaintiff-Intervenors, include: prestige, job satisfaction, camaraderie, unique excitement, enjoyment of flexible scheduling, unusual employment stability, feelings of security derived from retiring with a full pension and lifetime medical benefits, and the potential for career advancement. (Int. Noneconomic Loss Mem. at 4-5.)

victims of the City's pattern or practice of intentional discrimination. Plaintiff-Intervenors propose that the court compute class damages for noneconomic losses in substantially the same manner in which the parties agree that the court should calculate aggregate class-wide backpay. Specifically, Plaintiff-Intervenors propose that the court calculate class-wide compensatory damages for non-economic losses by "1) determining the number of victims;[15] 2) estimating the length of time that they suffered losses; and 3) establishing a monetary valuation of their injury." (Int. Noneconomic Loss Mem. at 13.) After determining the aggregate class damages for non-economic losses Plaintiff-Intervenors propose to distribute it among eligible black claimants. (Id. at 17-20.)[16]

Issues common to the claims of the members of the noneconomic loss subclass predominate over individual issues. Underlying the compensatory damages claims of each of the black test takers who sat for Exams 7029 and 2043 are the common legal and factual questions resolved in the liability phase, as well as several separate questions of law and fact which await resolution in the remedial phase and are common to the members of each of the subclasses. For purposes of Rule 23(b)(3)'s predominance analysis, issues common to the class that are resolved earlier in the litigation remain "common" in later phases. In re Strip Search Cases, 461 F.3d 219, 227-29 (holding that the district court erred in failing to consider common questions that had been resolved by the defendants' concession of liability in deciding that questions common to the class did not predominate over questions affecting only individual members under Rule 23(b)(3)). Common to each putative class member's claim for damages for noneconomic losses

---

[15]     In using the term "victims" Plaintiff-Intervenors refer to the number of black applicants who would have been hired, and the number of applicants who would have been hired sooner in the absence of discrimination. (Int. Noneconomic Loss Mem. at 14.)

[16]     At this time the court does not rule on the viability of Plaintiff-Intervenors' proposed method of calculating class-wide damages for noneconomic losses. The court will rule on Plaintiff-Intervenors' motion for summary judgment as to class-wide damages for noneconomic losses in a separate opinion.

is the fact question of the monetary value of the intangible benefits of being a New York City firefighter. The City also correctly observes, however, that there are common questions of fact relating to the unique dangers firefighters face as part of their employment, and the degree to which those dangers should offset any monetary valuation of the intangible benefits of employment as a firefighter. (NYC Opp. to Noneconomic Loss (Docket Entry # 580) at 18.) Indeed, the unique danger New York City firefighters face is the principal reason they are held in such high esteem by the people of this City.

There are, however, individual questions which affect the Rule 23 analysis. Plaintiff-Intervenors' motion for summary judgment indicates that they seek compensation for the intangible benefits of employment, not all of which are unique to service as a firefighter. It is conceivable that some individual claimants will have obtained interim employment that, because of the job's unique risk/reward profile, has more valuable intangible benefits than those that come with being a New York City firefighter. It would be difficult to argue that a class member has actually suffered a noneconomic loss where he has greater overall job satisfaction in his interim employment than he would have had if he been hired as a firefighter. Whether the intangible benefits of interim employment ought to offset the intangible benefits of employment as a firefighter is, however, a legal question that is also common to each putative subclass member's claim for compensatory damages.

Depending on the resolution of that legal question, individual fact issues may arise as to the value of the intangible benefits a particular subclass member obtained from their interim employment. Those individual questions can be dealt with, however, during the individual claims process. By allowing the parties to avoid relitigating these issues each time the court must place a value on a particular claimant's noneconomic losses, the resolution of these

common fact questions on a class-wide basis will substantially improve the efficiency of deciding each subclass member's claims. Furthermore, the Individual Intervenors have already conducted extensive litigation on behalf of the noneconomic loss subclass in the liability phase of this case, and it would be a more efficient use of scarce judicial resources to continue litigating questions relating to black victims' compensatory damages claims in a single forum. Therefore, class treatment of common issues is superior to other available methods for fairly and efficiently adjudicating the controversy.

The court certifies, under Rule 23(b)(3), a subclass of all black non-hire and delayed-hire victims of the City's pattern or practice of intentional discrimination with respect to two issues common to their claims for compensatory damages for noneconomic losses: (1) the monetary value of the intangible benefit of service as a New York City firefighter after taking into account the offsetting intangible cost of the risks to which New York City firefighters are exposed; and (2) the legal question regarding whether the monetary value of intangible benefits subclass members obtain from interim employment should offset the lost value of the intangible benefits of employment as a New York City firefighter.

## III.    INDIVIDUAL CLAIMS PROCESS

The court has reviewed the United States' plan for the individual claims process and for awarding individual relief to victims of the City's discrimination. In light of the court's decisions in this Opinion, the court has determined that the plan for the individual claims process contained in the RPRO must be substantially modified. In general, the court concludes that relying on the United States alone to make eligibility determinations and recommend awards of individual relief is insufficient to protect the interests of individual claimants. In part because of decisions made in this Opinion relating to mitigation, allocating individual relief will require the

court to make a significant number of findings of fact, and to conduct a far less standardized computation of damages than that envisioned by the parties. The most appropriate mechanism for the speedy resolution of these individual questions is the appointment of a special master for individual relief.

Below, the court discusses its concerns with the RPRO's procedure for making individual eligibility determinations, and sketches out the role the court anticipates the special master would play in the individual claims process.

### A. Determination of Eligibility for Individual Relief

Under the burden-shifting framework set out by the Supreme Court in <u>Franks v. Bowman Transportation Co.</u>, 424 U.S. 747 (1976), and explained in <u>International Brotherhood of Teamsters v. United States</u>, 431 U.S. 324 (1977),

> "proof of a discriminatory pattern and practice creates a rebuttable presumption in favor of individual relief" for the victims of discrimination. <u>Teamsters</u>, 431 U.S. at 359 n.45 (describing <u>Franks</u>). Plaintiffs "need only show that an alleged individual discriminatee unsuccessfully applied for a job and therefore was a potential victim of the proved discrimination." <u>See id.</u> at 362. Following this showing, "the burden then rests on the employer to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." <u>Id.</u> (citing <u>Franks</u>, 424 U.S. at 773 n.32).

(IRO at 12-13.) In the IRO the court observed that under Second Circuit case law, claimants would benefit from a presumption that they are entitled to obtain individual relief simply by making out a prima facie case that they were harmed by the City's discriminatory employment practices.[17] (<u>Id.</u> at 14-15.) <u>See</u> <u>Robinson</u>, 267 F.3d 147, 161-62 ("Each class member must show that he or she was among those adversely affected by the challenged policy or practice. If this

---

[17] Making out a prima facie case that they were harmed by the City's discriminatory employment practices would require an individual claimant to come forward with evidence that he or she was a member of the class of individuals discriminated against (i.e., that he or she is black or Hispanic), that he or she actually took one of the challenged examinations, and that he or she was not hired (for non-hire victims), or was not among the first academy class of firefighters hired from the cohort of applicants who sat for the same exam (for delayed-hire victims). (IRO at 14-15.)

showing is made, the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action."); AADE, 647 F.2d 256, 289 (remanding for modification of remedial order in disparate impact case where district court improperly "place[d] on these discriminatees the burden of proving that they met the City's requirements other than passage of the written exam").  The court was concerned, however, that the PRO did not adequately explain how the Franks burden-shifting framework would apply to individual claimants.  (IRO at 15-18.)

     In response to these concerns, the United States and Plaintiff-Intervenors explained that, under the PRO, the United States would determine whether each claimant was actually harmed by the City's discriminatory employment practices and was prima facie eligible for individual relief based on the City's applicant data.  (Joint Stmt. on PRO Issues at 3-5.)  They stated that after Fairness Hearing II, the City, and any other objector, would bear the burden of proving by a preponderance of the evidence that there were nondiscriminatory reasons that a particular claimant would not have been hired absent discrimination.  (Id. at 4-5.)  The United States and Plaintiff-Intervenors observed, however, that "none of the parties has an interest in obtaining remedial relief for individuals who would not have been hired absent the discriminatory practices," and indicated their intent to use the City's applicant data, and information submitted by claimants, to identify those claimants who would not have been hired in the absence of discrimination.  (Id. at 5-6.)  Under the PRO, those claimants that the United States determines would not have been hired absent discrimination would have the opportunity to object at Fairness Hearing II, and would have the burden of establishing their eligibility by a preponderance of the evidence.  (Id. at 6-7.)

The RPRO largely retains this plan for making individual eligibility determinations. (USA RPRO Mem. (Docket Entry # 619-1) at 8-10.) The RPRO, however, anticipates that the United States will conduct a multistage-eligibility-determination process to provide a claimant with the opportunity to contest the evidence relied upon by the United States in making its determinations. (Id. at 9 n.16.) The United States anticipates that these objections would be raised at the two fairness hearings provided for in the RPRO. (Id. at 10.)

The RPRO's convoluted and ultimately unsuccessful attempt to apply the Franks/Teamsters burden-shifting framework to the circumstances of this case reveals the framework's shortcomings in the exceptional circumstance where monetary relief is calculated on a class-wide basis and distributed pro rata to eligible claimants. See Robinson, 267 F.3d at 161 n.6 ("[T]his is the exception, not the rule: Where possible, 'there should be . . . a determination on an individual basis as to which class members are entitled to [recovery] and the amount of such recovery.'" (quoting Shipes, 987 F.2d at 318)). In proposing that the United States take on the City's burden of identifying which claimants would not have been hired absent the City's discrimination, the PRO misapplies Franks/Teamsters but recognizes that a strict application would unfairly prejudice truly deserving claimants.

In the ordinary pattern-or-practice case the defendant's backpay liability would be measured largely by the number of victims harmed. The more victims of discrimination, the greater the defendant's total backpay liability. Thus, in placing the burden on the employer to show that there were lawful reasons for the adverse employment decision, the Franks court placed the burden of proof on the party with the greatest incentive to establish that a particular unsuccessful applicant was not a victim of discrimination. Furthermore, as the Teamsters court observed, the holding in Franks, reflected the fact that "the employer was in the best position to

show why any individual employee was denied an employment opportunity." <u>Teamsters</u>, 431 U.S. at 359 n.45.

In this case, however, the City would obtain little benefit from establishing that there were nondiscriminatory reasons why a particular applicant was not hired.  Because the court will distribute the aggregate backpay award pro rata to eligible claimants, the City's total backpay liability will be the same irrespective of whether it carries its burden of rebutting the inference that a particular claimant was a victim of discrimination.  The only effect of establishing that a claimant was not an actual victim of discrimination would be to increase the pro rata share of those claimants who actually were victims of the discrimination—the City would obtain no benefit while paying a high price to litigate each claimant's eligibility.  Thus, if the court were to strictly apply the <u>Franks</u>/<u>Teamsters</u> burden-shifting framework in this case, the burden of establishing that a particular claimant was not an actual victim of discrimination would lie on the party with the least incentive to carry it.  If the City chose not to carry that burden, only the actual victims of the City's discrimination would suffer by being forced to share the backpay award with claimants who never would have been hired absent the City's discrimination.

"[O]ne of the central purposes of Title VII is 'to make persons whole for injuries suffered on account of unlawful employment discrimination.'" <u>Franks</u>, 424 U.S. at 763 (quoting <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 418 (1975)).  In this case, placing the burden on the City to rebut the presumption that any unsuccessful black or Hispanic applicant was a victim of discrimination would not serve the policies Title VII was intended to advance.  Not only would relying on the City to identify the test takers who were non-victims make it less likely that a particular deserving claimant would receive a full recovery, it would also increase the probability that an undeserving claimant would receive a windfall award.  Cf. <u>Firefighters Local</u>

Union No. 1784 v. Stotts, 467 U.S. 561, 579-80 (1984) (only actual victims of illegal discrimination may be beneficiaries of make-whole relief); see also 42 U.S.C. § 2000e-5(g)(2)(A) (prohibiting backpay awards to non-victims).

The court concludes that Franks and Teamsters do not require it to impose their burden-shifting framework in determining which claimants were actual victims of the City's discrimination. In Teamsters the Court explained that Franks was an application of the general principle—drawn from McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973)—"that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." Teamsters, 431 U.S. at 358-59. Applying Franks, the Teamsters Court noted that "not all class actions will necessarily follow the Franks model." Id. at 360. Indeed, Franks recognized that the provisions of Title VII are "intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible." Franks, 424 U.S. at 764 (quoting legislative history). "[F]ederal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution." Id.

Fairness to black and Hispanic claimants who were actual victims of the City's discrimination requires that the court distinguish between class members who would not have been hired absent discrimination, and those who could have been hired. As anticipated in the RPRO, the party in the best position to obtain evidence on these questions and make an initial determination of eligibility is the United States. As the Supreme Court noted in General Telephone,

> unlike the Rule 23 class representative, the EEOC is authorized to proceed in a unified action and to obtain the most satisfactory overall relief even though competing interests are involved and particular groups may appear to be disadvantaged. The individual victim is given his right to intervene for this very

> reason.  The EEOC exists to advance the public interest in preventing and remedying employment discrimination, and it does so in part by making the hard choices where conflicts of interest exist.

446 U.S. at 331.  The same reasoning applies to actions brought on behalf of the United States by the Department of Justice.

But while the United States' purpose in bringing this action is the pursuit of the public interest in ending employment discrimination, allowing it to make the initial eligibility decisions on its own—largely free of direct court supervision—is troubling.  It is the court's view that the appointment of a special master to render impartial determinations on each claimant's eligibility is necessary to enable claimants to seek meaningful review of the United States' initial determinations.  Waiting until the Fairness Hearings to challenge the United States' eligibility determinations simply does not permit claimants the opportunity to meaningfully challenge the evidence raised against them and provide evidence of their own.  Moreover, a special master would help to protect the interests of absent claimants, who cannot be expected to participate in every other claimant's eligibility hearings, but have a clear interest in insuring that only actual victims of discrimination receive individual relief.

The court's view of the United States' role in making these determinations deviates somewhat from the RPRO in that the court would require the United States to solicit relevant evidence from claimants through declarations made under penalty of perjury if more reliable sources of information were unavailable.  To the extent the City possessed the relevant proof, the court would require it to cooperate with the United States.  After the United States obtained evidence sufficient to make an initial determination, the court would require the United States to submit its recommendation to the special master for approval.  The special master would be charged with examining the evidence and independently determining the claimant's eligibility

for individual relief.  The claimant would have the opportunity to present argument and evidence to the special master, and would be able to seek review of her decision by the court.

**B.    Appointment of Special Master for Individual Relief**

It is apparent that numerous fact questions will need to be decided in the individual-claims process, all of which implicate questions of equity, basic fairness, and the due process rights of individual claimants.  The court does not, however, have the ability to make these determinations with respect to all of potentially thousands of individual claimants.  It is apparent that exceptional conditions exist that require the appointment of a special master to conduct the individual claims process under Rule 53(a)(1)(B).  <u>See also</u> 3 Herbert B. Newberg & Alba Conte, <u>Newberg on Class Actions</u> § 9.70 (4th ed. 2011).

The court anticipates that the special master for individual relief would take evidence, make findings of fact, and determine issues of law unique to individual claimants, with respect to the following issues: (1) each claimant's eligibility to receive individual relief; (2) the share of the aggregate amount of backpay to which each eligible claimant is entitled; (3) the extent of a claimant's mitigation and, if the City meets its burden of production on this question, the reasonableness of a claimant's mitigation efforts and the availability of substitute employment; (4) for black claimants, the amount of the claimant's compensatory damages for noneconomic losses; and (5) the claimant's eligibility for priority-hiring relief and/or the amount of retroactive seniority, if applicable.  The court anticipates that the special master would also have responsibility for overseeing the process of obtaining discovery from individual claimants, and for overseeing settlement negotiations between the City and individual claimants.

The inclusion of a special master in the individual claims process would not remove the United States from the administration of the claims process.  As the United States has previously

stated, it has "experience processing claims for relief and making preliminary determinations in cases such as this, including cases involving thousands of claimants. The United States can handle this process efficiently, while minimizing the costs of the claims process." (Joint Stmt. on PRO Issues at 31-32.) The court anticipates that the special master's role would be largely adjudicatory and might best be filled by one or more United States Magistrate Judges appointed to serve as special masters under Rule 53(h).

The United States' expertise in administering the claims process would help it to run smoothly and efficiently. The United States could receive the claim forms, act as the claimants' point of contact for information about deadlines, hearing dates, and questions relating to the organization of the claims process, and coordinate the discovery to be obtained from the claimants. The United States would marshal the available evidence for each claimant and make recommendations to the special master as to the determination of fact questions relating to claimant eligibility, backpay, priority hiring, and retroactive seniority. At this point the City or the claimant would have the ability to object to the recommendations in writing, or request a hearing before the special master. The special master would hold hearings if claimants or the City objected to the United States' determinations, and would have independent authority to order a hearing if she disagreed with the United States' recommendation or determined that it was necessary to receive additional evidence. The special master would hold hearings to determine the amount of each eligible black claimant's compensatory damages for noneconomic losses. For each claimant the special master would file a statement of her findings and recommend such individual relief as she found to be appropriate. The parties to the case and the individual claimants would be obligated to object to the special master's findings and seek review by the court within the time periods specified by Rule 53(f)(2). If the parties agreed, and

if the claimant consented, the factual findings of the special master could be final, or could be subject to review for clear error under Rule 53(f)(3).

After all claims were adjudicated and individual relief determinations made, the special master would submit a final award list to the court for approval. The court would hold a fairness hearing with notice to public, including claimants determined to be ineligible for individual relief, disclosing the proposed awards. After ruling on timely objections from the public, the court would enter judgment.

The United States and the City previously indicated that they objected to the appointment of any special master because they believed the services of a special master were unnecessary in light of the United States' offer to volunteer its services as claims administrator. (Joint Stmt. on PRO Issues at 31-33.) They reaffirm this position in the RPRO. (USA RPRO Mem. at 12-13.) This position, however, was adopted before the court determined that equitable and due process concerns require a neutral decision-maker to adjudicate claimants' eligibility to obtain individual relief, the extent of their mitigation efforts, and the monetary valuation of each of the black victims' noneconomic losses. In light of these decisions the United States and City should reconsider whether they wish to object to the appointment of a special master. Likewise the parties should consider whether they are willing to consent to a more liberal standard of review for factual findings made by the special master in the interest of efficiency under Rule 53(f)(3).

## IV.   LITIGATION PLAN

The court's rulings compel a number of changes to the litigation plan contained in the United States' RPRO. Below, the court sets forth the next steps in the litigation, directs the

parties to brief specific issues and questions,[18] and orders the parties to prepare for trial. This schedule is aggressive, but the court intends to adhere to it as closely as possible and the parties are warned that extensions of time—even those on consent—are unlikely to be granted. The parties are advised that the court may schedule oral argument and rule on issues as they arise with relatively little notice.

### A. Pre-Notice Period

Litigation Management Conference: The court will hold a litigation management conference to discuss the issues addressed in this Opinion on June 21, 2011, at 3:00 p.m. All parties shall attend and prepare accordingly.

Motion for Certification of Non-hire Victim and Delayed-hire Victim Subclasses: On or before June 13, 2011, pursuant to this Opinion, Plaintiff-Intervenors shall file a motion for the certification of the non-hire victim and delayed-hire victim subclasses, which addresses the deficiencies identified by the court: (1) the need to appoint separate individual class representatives; and (2) the need to appoint separate counsel. The motion must be accompanied by declarations made by the putative subclass representatives demonstrating that they meet the requirements of Rule 23(a) and that they understand their responsibilities to protect their subclass's unique interests. Putative class counsel shall likewise submit declarations indicating

---

[18]    In several recent submissions the parties have referenced arguments they have previously advanced in memoranda, letters, and other documents filed with the court over the course of this litigation. Over the past four years the court has received voluminous briefing on myriad legal questions. Directing the court to arguments raised in past briefing needlessly burdens the court with additional work and circumvents the page limits the court imposes on the parties' submissions. In the future, if the parties believe an argument is worth making they shall make it in the brief to which it pertains instead of directing the court to a separate document. Arguments "incorporated by reference" will be deemed waived.

    Furthermore, when the parties electronically file their briefs, they are directed to use language in the docket text describing the subject the document addresses instead of generic descriptions of the document such as "Letter to Hon. Nicholas G. Garaufis." Such generic descriptions in the docket text hinder the court in locating relevant briefing on the electronic case filing system. This will become especially important as the parties file the extensive briefing the court requests in this section.

they qualify to represent the subclass under Rule 23(g), and that they understand their responsibility to protect their subclass's unique interests.

Proposed Notice to Claimants and Claims Form: The United States and Plaintiff-Intervenors disagree as to when notice should be given to absent class members and potential claimants. Plaintiff-Intervenors seek to give notice to absent class members as soon as possible, while the United States prefers that the court wait to order notice until the preliminary relief order is issued and the three pending motions are resolved. (USA RPRO Mem. at 4-8.) In light of the rulings in this Opinion, however, the court concludes that potential claimants should receive notice of the claims process and should be provided copies of the claim form so that the process can begin as soon as possible. For black claimants, this notice should also be designed to satisfy the notice-and-opt-out requirement imposed by Rule 23.[19] To the extent that additional public notice is required to give absent persons a reasonable opportunity to object to a proposed final judgment or relief order, the court will order such additional notice at the appropriate time.

The parties shall immediately meet and confer regarding the form of notice to be sent to absent class members/individual claimants, including the information to be obtained from them through claim forms. By June 17, 2011, the United States, on behalf of the parties, shall file a proposed form of notice, a plan for the distribution of the form of notice, a proposed claim form, and one document setting forth each party's objections to the contents of the notice, the plan of notice, and the claim form. The court anticipates ruling on all objections by June 22, 2011, and the notice shall issue pursuant to the plan of notice soon thereafter.

---

[19] Although the court has not yet ruled whether the non-hire victim and delayed-hire victim subclasses will be certified under Rule 23(b)(2) or (b)(3), the parties should prepare the form of notice under the assumption that the court will order notice and opt-out for both of the make-whole relief subclasses.

### B. Pre-Claims Period

Briefing on Claimant Eligibility Determinations: The parties have previously stated that they have disagreements as to which nondiscriminatory hiring-eligibility criteria may be used in determining which claimants will be considered to have been eligible for hiring as entry-level firefighters at the time they took one of the two tests.  In a recent submission to the court, however, the United States appears to indicate that no such disagreements remain.  (See USA RPRO Mem. at 11.)  The United States shall submit on behalf of the parties a joint memorandum indicating which criteria the parties agree can be used to determine whether a particular claimant would have been eligible to be hired as of the date they took one of the examinations.  The letter should also indicate how the parties anticipate that the criteria will be applied to particular claimants, and what evidence the parties anticipate they will rely on to establish these criteria.  Any party with different views should file a separate memorandum setting forth their reasons and explaining how their proposed eligibility criteria would be used.  The joint letter and other initial memoranda shall be filed by June 24, 2011.  Responses, if any, shall be filed by July 1, 2011.

Briefing on Organization and Management of the Claims Process: While the parties discuss the proposed form of notice, they shall submit briefing regarding the organization of the claims process.  The parties shall state their views on the following issues: (1) the selection of a special master for the claims process, including whether one or more United States Magistrate Judges should be appointed as special masters; (2) the management and scope of discovery as to each claimant; (3) the duties of a special master in determining claims, including the specific factual and legal findings the special master will be required to make as to each applicant; (4) the United States' role in making initial eligibility and other determinations; (5) a timetable of deadlines and proceedings for the administration of the claims process; and (6) any other issues

relevant to the management of the claims process. Initial briefs shall be filed by July 1, 2011. Responses shall be filed by July 15, 2011.

        <u>Bench Trial on Questions Relating to Injunctive Relief</u>: The Vulcan Society has filed a motion requesting a broad range of injunctive relief stemming from the court's disparate treatment decision, and has submitted evidence in support of those requests. (<u>See</u> Int. Inj. Relief Proposed Order (Docket Entry # 594).) The court prefers, however, to hold a bench trial and take testimony to establish the factual basis supporting the relief requested by the Vulcan Society. Therefore, the motion is DENIED with leave to renew following the bench trial.

        By July 1, 2011, the Vulcan Society, as class representative for the injunctive relief subclass, shall file a pretrial brief regarding their requests for injunctive relief.[20] The Vulcan Society's pretrial brief shall include a memorandum of law describing, with the greatest specificity possible, the forms of additional injunctive relief it requests, the legal basis for the requested relief (including, where available, reference to cases in which such relief has been ordered or approved by federal courts), and the evidence that the Vulcan Society anticipates introducing during the bench trial that will establish a factual basis for the requested relief. The Vulcan Society shall also submit a witness list which indicates, in very brief and general terms, the anticipated subject matter of each witness's testimony, including whether the witness will testify as an expert. The Vulcan Society shall also make the disclosures required by Federal Rule of Civil Procedure 26(a)(2) and (3) simultaneous with filing their pretrial briefs.

        By July 22, 2011, the City shall file a pretrial brief which includes a memorandum of law citing legal authority in opposition to the Vulcan Society's requests, and which references evidence the City anticipates introducing in opposition to the Vulcan Society's requests. The

---

[20]      The court refers to Plaintiff-Intervenors' requested injunctive relief as disclosed in their Proposed Order for Injunctive Relief. (Docket Entry # 594.)

City shall submit a witness list and make the disclosures required by Rule 26(a)(2) and (3) under the same conditions applicable to the Vulcan Society's submissions.

Trial will begin August 1, 2011, and will end no later than August 5, 2011. While the trial relates primarily to relief requested by the Vulcan Society, the United States has indicated that some of the requested relief may implicate the interests of Hispanic victims of the City's discrimination. Therefore, an attorney for the United States shall attend the trial and be prepared to address the United States' concerns with respect to the positions of the City or the Vulcan Society. The United States may also submit a letter responding to each of the pretrial briefs submitted by the Vulcan Society and the City. Any objections not raised by the United States during or before trial shall be deemed waived.

Intervention by Interested Non-Parties: To the extent that other interested non-parties, including amicus curiae the Uniformed Firefighters Association ("UFA") and the Uniformed Fire Officers Association Local 854 ("UFOA") (collectively, "the Unions"), have views on the injunctive relief requested by the Vulcan Society, they should consider whether to move to intervene in the action. (See UFA Intervention Op. (Docket Entry # 47) at 9-10, 11-13 (denying UFA's motion for intervention for purposes of the liability phase but granting UFA leave to renew its motion during the remedial phase, and indicating that UFA should be allowed to participate in such portions of the remedial phase implicating firefighter safety concerns).) Should the court grant the Unions leave to intervene as to some or all of the issues implicated by the Vulcan Society's motion, the Unions would be expected to participate in the bench trial on injunctive relief to at least the same extent as the United States. Accordingly, if the Unions wish to intervene in the action, they should file their motions to intervene by July 1, 2011. The parties

to the action shall file responses indicating whether they oppose or consent to the Unions' intervention by July 11, 2011.

Bench Trial on Disputed Issues Relating to Backpay: The court will decide the United States' and Plaintiff-Intervenors' motions for summary judgment as to the calculation of class-wide backpay in a separate opinion. To the extent that opinion identifies genuine issues of material fact that are in dispute, the parties are advised that the court will hold a bench trial of those issues beginning August 8, 2011 and ending no later than August 12, 2011. The court will indicate what pretrial briefing, if any, is required in its opinion on the summary judgment motions.

Bench Trial on Disputed Issues Relating to Noneconomic Losses: The court will decide the United States' and Plaintiff-Intervenors' motions for summary judgment as to the calculation of class-wide noneconomic losses in a separate opinion. To the extent that opinion identifies genuine issues of material fact that are in dispute, the parties are advised that the court will hold a bench trial of those issues beginning August 15, 2011 and ending no later than August 19, 2011. The court will indicate what pretrial briefing, if any, is required in its opinion deciding the summary judgment motion.

## V.    CONCLUSION

Plaintiff-Intervenors' motion for continued class certification is GRANTED IN PART and DENIED IN PART with leave to file a motion to certify the non-hire victim and delayed-hire victim subclasses subject to the conditions imposed in this Opinion. Plaintiff-Intervenors' motion for additional injunctive relief is DENIED with leave to renew following trial.

SO ORDERED.

                                                     /s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                   NICHOLAS G. GARAUFIS
       June 6, 2011                         United States District Judge