UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                          Plaintiff,

                  -and-

THE VULCAN SOCIETY, ET AL.,

                                          Plaintiffs-Intervenors,

                  -against-

CITY OF NEW YORK,

                                          Defendant.

Case No. CV 07 2067
(NGG) (RLM)

## PUTATIVE SUBCLASS REPRESENTATIVES' RESPONSE TO DEFENDANT'S SUBMISSION THAT THE LIABILITY CLASS SHOULD BE DECERTIFIED

Levy Ratner, P.C.
80 Eighth Avenue, Floor 8
New York, NY 10011-5126
(212) 627-8100
(212) 627-8182 (fax)

Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012-2399
(212) 614-6438
(212) 614-6499 (fax)

On the Brief:    Robert H. Stroup

56-001-00001: 10045422

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-and-

THE VULCAN SOCIETY, ET AL.,

Plaintiffs-Intervenors,

-against-

CITY OF NEW YORK,

Defendant.

Case No. CV 07 2067
(NGG) (RLM)

## PUTATIVE SUBCLASS REPRESENTATIVES' RESPONSE TO DEFENDANT'S SUBMISSION THAT THE LIABILITY CLASS SHOULD BE DECERTIFIED

### Introduction

Pursuant to this Court's Order of June 22, 2011 (Dkt. # 646), the putative subclass representatives submit this memorandum of law in response to the Defendant's submission that the liability class should be decertified.

### Argument

### POINT I.
### THE CITY HAS FAILED TO SHOW HOW DECERTIFICATION OF THE CLASS IS APPROPRIATE

The City now argues both that the Court's "23(b)(2) certification of the Liability Phase must be vacated in light of *Wal-Mart*" and that "continued certification of this case under 23(b)(2) is "therefore, inappropriate and the class must be decertified." (Letter of Michael A. Cardozo to the Court dated June 24, 2011 (Dkt. # 652) ("6/24/11 Letter"), at 1-2.) The City's argument goes too far. The City itself does not dispute that certification pursuant to Rule 23(b)(2) of the injunctive and declaratory relief issues remain appropriate going forward.

(Defendants' Memorandum of Law Addressing the Impact of the Supreme Court's Decision in *Wal-Mart Stores, Inc. v. Dukes* on Plaintiffs-Intervenors' Motion to Define Subclasses ("6/21/11 Memo,") at 2, n.2).   That alone suggests that decertification of the entire class is inappropriate. Nor is decertification necessary with respect to the damages issues as the Plaintiffs-Intervenors sought and fully briefed the propriety of certification of the liability (and damages) phase under Rule 23(b)(3).   Because the Court could have certified the injunctive and declaratory relief issues pursuant to Rule 23(b)(2) and the monetary relief issues pursuant to Rule 23(b)(3) at the outset, decertification of the liability phase certification is not appropriate.

Plaintiffs-Intervenors briefed the propriety of class certification under Rule 23(b)(3) in 2008, and the City's made no arguments at the time that certification under Rule 23(b)(3) was improper. In their Memorandum of Law in Support of Motion for the Certification of a Class (Dkt. # 121) (also attached hereto as Exhibit A), at 27-30, Plaintiffs-Intervenors cited applicable law and facts in support of Rule 23(b)(3) certification.   Plaintiffs-Intervenors argued that certification was proper because both the predominance and superiority tests were met, noting *inter alia*, that "Rule 23(b)(3) encompasses cases, such as the instant one, in which a class action would achieve economies of time, effort and expense, and would promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about an undesirable result. (citing) Adv. Comm. Notes, Rule 23, 39 F.R.D. 69, 102-03 (1966)." Ex. A, at 28.   Plaintiffs-Intervenors also argued that the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat certification, given the predominance of common questions as to liability generally (citing Newberg) and further noting the Second Circuit's decision in *In Re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) that

56-001-00001: 10045422

Rule 23(b)(3) required only the "predominance, not the exclusivity, of common questions." Ex. A, at 29.

Plaintiffs-Intervenors showed common questions that demonstrated Rule 23(a) commonality. Those questions included, inter alia, "(1) whether Written Exam 7029 had an adverse impact on the class, whether it was job related and whether there existed reasonable selection alternatives that would have reduced or eliminated adverse impact; (2) whether Written Exam 2043 had an adverse impact on the class, whether it was job related and whether there existed reasonable selection alternatives that would have reduced or eliminated adverse impact; and . . . (11) whether defendants' conduct represents a deprivation of the rights guaranteed to the class members by the Constitutions of the United States and the State of New York, as well as federal, state and local laws." (Ex. A, at 19-20.)

All of these questions, plus the common questions regarding the subclasses' non-economic losses, meet the Supreme Court's standard for common questions under Rule 23(a) – they "generate common answers [that are] apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, 564 U.S. ___ (June 20, 2011), Slip Op. at 9-10. Moreover, the Supreme Court's contrasting of the facts in that case with the facts in a case involving "biased testing procedures" (*Wal-Mart*, Slip Op. at 12-13), is further grounds to conclude that Plaintiffs-Intervenors have made a particularly strong showing of common questions in this case. Those common Rule 23(a) questions support certification of both the liability and damages phases under Rule 23(b)(3).  As this Court correctly noted in its Order of June 6, 2011 (Dkt. # 640) ("6/6/11 Order"), at 31, issues common to the class that are resolved earlier in the litigation remain "common" in later phases. *In re Strip Search Cases*, 461 F.3d 219, 227-29 (2d Cir. 2006).

56-001-00001: 10045422

At the time of the initial class certification briefing, the City did not address Plaintiffs-Intervenors arguments that they had shown the applicable Rule 23(b)(3) requisites. The City's Memorandum of Law in Opposition to Plaintiffs-Intervenors' Motion for Class Certification (Dkt. #170) makes no mention of Rule 23(b)(3). The City did not address the Rule 23(b)(3) requirements – that common questions of law or fact predominate over any individual questions and that a class action is superior to other available methods of resolving the controversy.

The common questions – among them those noted above – do predominate over the individual questions, and a class action is superior to any other available methods of resolving the controversy. Failing to certify the subclasses for non-economic damages would require the class members to bring their own lawsuits for non-economic damages, an alternative unlikely to be pursued given the costs involved in bringing such an individual claim, the need to find counsel, and uncertainties as to the size of the potential individual recovery. As noted in 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 4.27 (4th ed. 2010):

> It must be remembered that Rule 23(b)(3)'s superiority requirement expressly compares class actions "to other available methods for the fair and efficient adjudication of the controversy." . . . When the claims of class members are small, denial of a class action would effectively exclude them from judicial redress.

2 *Newberg* § 4.27, at 4–247 to 4–251. *See also, In Re Prudential Ins. Co. of American Sales Practices Litigation*, 962 F.Supp. 450, 523 (D. N.J. 1997) (noting that death benefits involved in litigation amounted to only $35,000, thereby indicating that individual class members were unlikely to file their own lawsuits). Nor would the filing of hundreds or thousands of individual lawsuits for compensatory damages – even if subclass members were to do so – be a more efficient way of resolving the controversy than doing so by way of class certification.

The City's post-*Wal-Mart* briefings do not undermine Plaintiffs-Intervenors showing that the common questions associated with a biased testing procedure predominate over individual

questions, and that class treatment is superior to other available methods for resolution of the controversy given overall efficiencies and fairness achieved through class certification.

Instead, the City erroneously exaggerates the extent of the individual questions without considering the common questions shown as to both liability and damages. The City blatantly exaggerates the "individualized discovery needs and hearings" associated with certification of the non-economic damages subclasses – arguing that there will be "up to 7,100 claimants."[1] Yet the combined Non-Hire and Delayed Victim Subclasses are less than half that number. The City inflates this number by including Hispanic victims in this total, even though Hispanic victims have never been included within any of the class or subclass definitions in this case. Even the City's argument based upon the estimated numbers of subclass members who would likely file claims – 2200 – is similarly inflated, as that number too includes potential Hispanic claimants not included within the subclasses at issue here. Moreover, there is no reason to believe that the claims process to be adopted in this case will result in challenges by and court hearings for 100% of the claimants.

Nor is the City's argument regarding the lack of superiority of class treatment persuasive. The City argues that the Court's consideration of the appointment of a special master to make thousands of individualized determinations is "strong evidence that the individualized determinations are so unmanageable that class action treatment is not superior to other available methods of fairly and efficiently adjudicating the claims." (6/24/11 Letter, at 3.) Yet the City fails to identify what other available methods for fairly and efficiently adjudicating the claims exist other than class treatment, let alone how those other available methods are superior to class

---

[1] The Court, as recently as its Order of June 6, 2011, noted that the Delayed Hire Victim Subclass could not exceed the 203 black test-takers actually hired by the City, and that the Non-Hire Victim Subclass was, at maximum, 2,939 black applicants. (6/6/11 Order, at 25-26). These numbers are less than 50% of the numbers cited by the City.

treatment.  The only apparent alternative is for class members to file their own lawsuits to obtain non-economic damages – an outcome with no obvious efficiencies.  In fact, such lawsuits would appear to risk the potential inefficiencies about which the City complains without the advantages of class treatment.

Finally, the City concludes its argument regarding class decertification with an assertion about special masters and jury trials.  The City argues that "each claimant will be entitled to demand [a jury trial] and class counsel's waiver in all likelihood will be unenforceable as to individual claimants."  (6/24/11 Letter, at 3.)  The City cites no authority for this assertion, and counsel for the putative subclasses have been unable, based upon their legal research conducted subsequent to the filing of the City's 6/24/11 Letter, to find any authority supporting the City's assertion.

To the contrary, counsel has found a number of cases where class counsel waived jury trials in the damages phase. These include *In Re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litigation*, 2003 WL 23669376, *3 (D. Or. 2003) (certifying employment pay action pursuant to Rule 23(b)(3) while noting that "the parties have waived their right to a trial for purposes of liability and damages . . .."); *LaMarca v. Turner*, 662 F.Supp. 647, 652-53 (S.D. Fla. 1987) (concluding, over defendants' objections, that jury trial had been waived in certified class action seeking damages in prison gang rape and assault case); *In Re Nassau County Strip Search Cases*, 742 F.Supp.2d 304, 307 (E.D.N.Y. 2010) (noting, in damages phase of Rule 23(b)(3) class action, that counsel waived the right to a jury trial on class-wide general damages); *Cf. Wilcher v. City of Wilmington*, 139 F.3d 366, 379 (3rd Cir. 1998) (in class action brought on behalf of all city firefighters for injunctive relief and damages stemming from city's drug testing practices, class counsel waived right to jury trial on certain liability issues by failing to preserve

those rights during course of trial on liability and damages.[2]

The City's patently incorrect assertions about 7,100 claimants and 27 years to process claims, and the City's utterly unsupported assertion about waiver of jury trials, are not sufficient grounds to deny certification of the Non-Hire and Delayed Hire Victim Subclasses pursuant to Rule 23(b)(3), including the class non-economic damages.

## Conclusion

This Court correctly concluded in its 6/6/11 Order that the non-economic damages issue was properly certifiable under Rule 23(b)(3), after taking into account the appropriate Rule 23(b)(3) standards. (6/6/11 Order, at 30-33.) Neither *Wal-Mart*, nor any arguments advanced by the City subsequent to the *Wal-Mart* decision, alters the correctness of that conclusion. As to the City's suggestion that the class should be decertified with regard to the liability finding, there is no basis to do so. The City has acknowledged that continued treatment pursuant to Rule 23(b)(2) remains appropriate with respect to the injunctive and declaratory judgment issues. (6/21/11 Memo, at 2, n.2.) And, because separate grounds existed for certification of the liability phase under Rule 23(b)(3), there is no basis to decertify the class concerning any other portion of the liability phase.

Dated: June 27, 2011
       New York, New York

---

[2] In fact, if class representatives and their counsel could not waive jury trials in a Rule 23(b)(3) case, no settlements of Rule 23(b)(3) class actions involving common law damages would be possible.

56-001-00001: 10045422

LEVY RATNER, P.C.

By:    Richard A. Levy
       Robert H. Stroup
       Dana E. Lossia
       80 Eighth Avenue
       New York, NY 10011
       (212) 627-8100
       (212) 627-8182 (fax)

CENTER FOR CONSTITUTIONAL RIGHTS
Darius Charney
Anjana Samant
666 Broadway, 7th Floor
New York, NY 10012-2399
(212) 614-6438
(212) 614-6499 (fax)

*Attorneys for Plaintiffs-Intervenors*

56-001-00001:  10045422

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                              Plaintiff,

            -and-

THE VULCAN SOCIETY, INC., ET AL,                    Civil Action No. 07-CV-2067
                                                              (NGG)(RLM)
                              Plaintiffs-Intervenors,

                                                            ECF Case
            -against-

THE CITY OF NEW YORK, ET AL,

                                              Defendants.
-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS INTERVENORS' MOTION FOR THE CERTIFICATION OF A CLASS


LEVY RATNER, P.C.                          CENTER FOR
80 Eighth Avenue, 8th Floor                CONSTITUTIONAL RIGHTS
New York, NY 10011                         666 Broadway, 7th Floor
(212) 627-8100                             New York, NY 10012-2399
(212) 627-8182 (fax)                       (212) 614-6438
                                           (212) 614-6499 (fax)

SCOTT + SCOTT, LLP
29 West 57th Street                        *Attorneys for Plaintiffs-Intervenors*
New York, New York  10019
(212) 223-6444
(212) 223-6334 (fax)


On the brief:
Richard A. Levy
Dana Lossia
Judy Scolnick
Walter Noss

{Worldox Files\NU537\001\04\08004424.DOC}

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 3

I.     THE PARTIES........................................................................................................ 3

    A.   Plaintiffs-Intervenors The Vulcan Society, Inc. ........................................... 3

    B.   Individual Plaintiffs-Intervenors................................................................. 4

    C.   Defendant FDNY ........................................................................................ 5

    D.   Defendant Department of Citywide Administrative Services ("DCAS")........... 7

    E.   Defendant Mayor Michael Bloomberg ...................................................... 8

    F.   Defendant Fire Commissioner Nicholas Scoppetta .................................. 9

II.    THE SELECTION DEVICES AT ISSUE............................................................. 10

    A.   Exam 7029 ................................................................................................ 12

    B.   Exam 2043 ................................................................................................ 14

    C.   Exam 6019 ................................................................................................ 15

ARGUMENT ................................................................................................................... 16
    THIS IS A PROPER CASE FOR CLASS CERTIFICATION AND
    PLAINTIFFS ARE APPROPRIATE REPRESENTATIVES ...................................... 16

    A.   Legal Standards for Class Certification ................................................... 16

    B.   The Class Meets The Requirements of Rule 23(a). .................................. 17
       1.   Numerosity.................................................................................... 17
       2.   Commonality. ............................................................................... 19
       3.   Typicality. .................................................................................... 21
       4.   Adequacy. ..................................................................................... 23

    C.   The Class Meets The Requirements of Rule 23(b)(2). .............................. 25

    D.   The Class Meets The Requirements of Rule 23(b)(3). .............................. 27

CONCLUSION ................................................................................................................. 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*In re Agent Orange Product Liability Litigation,*
   506 F. Supp. 762 (E.D.N.Y. 1980), *modified on other grounds*, 100 F.R.D. 718
   (E.D.NY. 1983) ............................................................................................... 19, 27-28

*In re Agent Orange Product Liability Litigation,*
   818 F.2d 145 (2d Cir. 1987) ....................................................................................19

*Alliance to End Repression v. Rochford,*
   565 F.2d 975 (7th Cir. 1977) ..................................................................................21

*Allman v. Coughlin,*
   577 F. Supp. 1440 (S.D.N.Y. 1984).........................................................................20

*Amchem Products, Inc. v. Windsor,*
   521 U.S. 591 (1997)..................................................................................................28

*Anderson v. Gamer,*
   22 F. Supp. 2d 1379 (N.D. Ga. 1997) .....................................................................26

*Arnold v. Ballard,*
   390 F. Supp. 723 (N.D. Ohio 1975).........................................................................17

*Ashe v. Board of Elections in City of New York,*
   124 F.R.D. 45 (E.D.N.Y. 1989) ..............................................................................23

*Association Against Discrimination in Employment v. City of Bridgeport,*
   594 F.2d 306 (2d Cir. 1979).....................................................................................17

*In re Auction Houses Antitrust Litigation,*
   193 F.R.D. 162 (S.D.N.Y. 2000) .............................................................................17

*Avagliano v. Sumitomo Shoji America, Inc.,*
   103 F.R.D. 562 (S.D.N.Y. 1984) .............................................................................23

*Baby Neal for & by Kanter v. Casey,*
   43 F.3d 48 (3d Cir. 1994) ........................................................................................19

*Barone v. Safway Steel Products, Inc.,*
   2005 U.S. Dist. LEXIS 17645 (E.D.N.Y., August 23, 2005) ...........................................23

*Berkman v. City of New York,*
   705 F.2d 584 (2d Cir. 1983)...................................................................................17

*Bowen v. General Motors Corp., AC Spark Plug Division,*
 542 F. Supp. 94 (D.C. Ohio 1981) ........................................................................23

*Bradley v. City of Lynn,*
 443 F. Supp. 2d 145 (D. Mass. 2006) ...................................................................17

*Brunet v. City of Columbus,*
 1 F.3d 390 (6th Cir. 1993) ....................................................................................17

*Castaneda v. Partida,*
 430 U.S. 482 (1977) ..............................................................................................14

*Canadian St. Regis Band of Mohawk Indians v. New York,*
 97 F.R.D. 453 (N.D.N.Y. 1983) ...........................................................................19

*Corner v. Cisneros,*
 37 F.3d 775 (2d Cir. 1994) ...................................................................................26

*Davis v. Northside Realty Associates, Inc.,*
 95 F.R.D. 39 (D.C. Ga. 1982) ..............................................................................22

*In re Diamond Shamrock Chemical Co.,*
 725 F.2d 858 (2d Cir. 1984), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1417 (1984)...........19

*Dogier v. Chupka,*
 295 F. Supp. 836 (S.D. Ohio 1975) ......................................................................17

*Doglow v. Anderson,*
 43 F.R.D. 472 (E.D.N.Y. 1968), *rev'd on other rounds,* 438 F.2d 825 (2d Cir.
 1970) ......................................................................................................................29

*In re Drexel Burnham Lambert Group, Inc.,*
 960 F.2d 285 (2d Cir. 1992) ..................................................................................23

*Dura-Bilt Corp. v. Chase Manhattan Corp.,*
 89 F.R.D. 87 (S.D.N.Y. 1981) .........................................................................22, 23

*Eisen v. Carlisle & Jacquelin,*
 391 F.2d 555 (2d Cir. 1968), *rev'd on other grounds,* 479 F.2d 1005, 1022 (2d
 Cir. 1973), *vacated by,* 417 U.S. 156 (U.S. 1974) ...............................................23

*Gomez v. Illinois State Board of Education,*
 117 F.R.D. 394 (ND. Ill.), *aff'd in part, rev'd in part on other grounds,* 811 F.2d
 1030 (7th Cir. 1987) ..............................................................................................18

*Great-West Life & Annuity Insurance Co. v. Knudson,*
    534 U.S. 204 (2002)......................................................................................27

*Guilino v. Board of Ed. of the City School District of the City of New York,*
    201 F.R.D. 326 (S.D.N.Y. 2001) .............................................18, 21, 22, 25, 27

*Hazelwood School District v. United States,*
    433 U.S. 299 (1977).....................................................................................14

*Hnot v. Willis Group Holdings, Ltd.,*
    241 F.R.D. 204 (S.D.N.Y. 2007) ...................................................................19

*Hood v. New Jersey Department of Civil Service,*
    680 F.2d 955 (3rd Cir. 1982) ........................................................................17

*Jenkins v. Raymark Industrial,*
    782 F.2d 468 (5th Cir. 1986) ........................................................................19

*King v. Carey,*
    405 F. Supp. 41 (W.D.N.Y. 1975) .................................................................17

*Latino Officers Association of N.Y., et al. v. City of New York, et al.,*
    No. 99-9568 (S.D.N.Y. 2004)........................................................................25

*Latino Officers Association of N.Y., et al. v. City of New York, et al.,*
    209 F.R.D. 79 (S.D.N.Y. 2002) ...............................................................17, 21

*Ledford v. City of Highland Park,*
    2000 U.S. Dist. LEXIS 11101 (N.D. Ill. July 31, 2000)....................................26

*Lewis v. City of Chicago,*
    2005 WL 693618 (N.D. Ill. March 22, 2005) .................................................17

*Los Angeles v. Davis,*
    440 U.S. 625 (1979).....................................................................................17

*Lundquist v. Security Pacific Automotive Finance Services Corp.,*
    993 F.2d 11 (2d Cir. 1993)............................................................................16

*Mack v. Suffolk County,*
    191 F.R.D. 16 (D. Mass 2000).......................................................................19

*Marisol A .v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997)..............................................................16, 19, 22, 27

*Mersay v. First Republic Corp. of America,*
    43 F.R.D. 465 (S.D.N.Y. 1968) ................................................................24

*Miles v. Merrill Lynch & Co. (In re Initial Public Offering Sec. Litigation),*
    471 F.3d 24 (2d Cir. 2006)......................................................................16

*In re Oil Spill by the Amoco Cadiz off the Coast of France on Maritime 16, 1978,*
    954 F.2d 1279 (7th Cir. 1992) .................................................................28

*Ottaviani v. State University of New York at New Paltz,*
    875 F.2d 365 (2d Cir. 1989).....................................................................14

*In re Philip Morris, Inc. v. National Asbestos Workers Medical Fund,*
    214 F.3d 132 (2d Cir. 2000).....................................................................28

*Phillips v. Joint Legislative Committee,*
    637 F.2d 1014 (5th Cir. 1981) .................................................................18

*Port Authority Police Benevolent Association v. Port Authority of New York and New Jersey,*
    698 F.2d 150 (2d Cir. 1983)......................................................................21

*Pruitt v. Allied Chemical Corp.,*
    85 F.R.D. 100 (E.D. Va. 1980) ................................................................28

*Robertson v. National Basketball Association,*
    389 F. Supp. 867 (S.D.N.Y. 1975)...........................................................22

*Robidoux v. Celani,*
    987 F.2d 931 (2d Cir. 1993).....................................................................16

*Robinson v. Metropolitan-North Commuter Rail Road,*
    267 F.3d 147 (2d Cir. 2001)......................................................................27

*Rossini v. Ogilvy & Mather, Inc.,*
    798 F.2d 590 (2d Cir. 1986)......................................................................20

*Schneider v. Whaley,*
    417 F. Supp. 750 (S.D.N.Y. 1976), *modified on other grounds,* 541 F.2d 916 (2d Cir. 1976) ...................................................................26

*Sharif ex rel. Salahuddin v. New York State Education Department,*
    127 F.R.D. 84 (S.D.N.Y. 1989) ...............................................................16

*Tenants Associated for a Better Spaulding v. United Stats Department of Housing &*
    *Urban Development,*
    97 F.R.D. 726 (D.C. III. 1983)........................................................................................18

*United Food & Commercial Workers Union Local 751 v. Brown Group,*
    517 U.S. 544, 116 S. Ct. 1529 (1996)............................................................................28

*United States ex rel. Walker v. Mancusi,*
    338 F. Supp. 311 (W.D.NY. 1971), *aff'd*, 467 F.2d 51 (2d Cir. 1972) ............................17

*Vulcan Social of New York City Fire Department, Inc. v. Civil Service Com.,*
    490 F.2d 387 (2d Cir. 1973)...........................................................................................3,

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust*
    *Litigation),*
    280 F.3d 124 (2d Cir. 2001)...........................................................................................29

*Wright v. Stern,*
    2003 WL 21543539 (S.D.N.Y. July 9, 2003) ........................................................21, 26, 27


## FEDERAL STATUTES

42 U.S.C. §§ 2000e, *et seq.*..........................................................................1, 17, 21, 25, 27

42 U.S.C. § 1981...................................................................................................................1

42 U.S.C. § 1983...................................................................................................................1


## FEDERAL RULES

Federal Rule of Civil Procedure 23 ....................................................................... *passim*


## STATE STATUTE

New York Executive Law §§ 290 and 296 ...........................................................................1


## LOCAL STATUTES AND RULES

New York City Administrative Code §§ 8-101, *et seq*..........................................................1

Personnel Rules and Regulations of the City of New York........................................13

## TREATISES AND OTHER AUTHORITIES

Advisory Committee Note to 1966 Amendment, Fed. R. Civ. P. 23......................................25, 26

Advisory Committee Notes, Rule 23, 39 F.R.D. 69 (1966)...........................................................28

1 Newberg on Class Actions (3d ed. 1992) ....................................................................22, 25-26

6 Newberg on Class Actions (4th ed. 2002) ................................................................................29

7AA Federal Practice & Procedure (3d ed. 2008) ................................................................26, 29

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                  Plaintiff,

          -and-

THE VULCAN SOCIETY, INC., ET AL,                       Civil Action No. 07-CV-2067
                                        (NGG)(RLM)
                       Plaintiffs-Intervenors,

                                        ECF Case

         -against-

THE CITY OF NEW YORK, ET AL,

                              Defendants.
------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS INTERVENORS' MOTION FOR THE CERTIFICATION OF A CLASS

### INTRODUCTION

      Plaintiffs-intervenors assert in their Complaint that defendants have used screening and selection criteria and devices in appointing entry-level firefighters to the Fire Department of the City of New York ("FDNY") which have a disparate impact upon black applicants and cannot be shown to be valid under criteria enumerated by Congress, the federal courts, and the Equal Employment Opportunity Commission ("EEOC"). As a result, defendants have unfairly denied black applicants employment as firefighters with FDNY on the basis of their race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1983, the New York State Human Rights Law, New York Executive Law §§ 290 and 296, and New York City Administrative Code §§ 8-101, et seq. Plaintiffs-intervenors seek, for themselves and for the proposed class, declaratory and injunctive

relief, back and future pay, and compensatory and punitive damages, to secure future protection and to redress the past deprivation of rights under these local, state, and federal laws.

Pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, plaintiffs-intervenors now move for the certification of a class consisting of all black firefighters or firefighter applicants who have been or continue to be subject to race discrimination in the unlawful screening and selection criteria and devices used by defendants in connection with open competitive firefighter examinations 7029, 2043 and 6019, as well as future black applicants for entry-level firefighter positions who will be discriminated against by similar selection processes absent an Order of this Court modifying the discriminatory selection devices and procedures challenged here.

The claims presented here are paradigmatic class action claims and are well-suited for class-wide resolution. Each claim arises out of actions by the defendants that discriminate against black applicants for firefighter positions, and all members of the proposed class have claims arising out of these same actions by the defendants. The class easily meets the numerosity requirement as it consists of thousands of individuals who have been similarly affected, as well as thousands of others who will be affected by the challenged selection devices and procedures if they are not altered. The commonality and typicality requirements are also easily satisfied, as the same set of selection devices and procedures form the basis for each of the claims here, including the claims of the class representatives. Finally, more than adequate representation is available to the class in the form of the named representatives, the Vulcan Society, and plaintiffs-intervenors' counsel. The case law has confirmed that civil rights actions such as this one are precisely the types of matters that are consistently treated as class actions.

## FACTS

### I.    THE PARTIES

#### A.    Plaintiffs-Intervenors The Vulcan Society, Inc.

The Vulcan Society, Inc. (the "Vulcan Society" or "Vulcans") is a nationwide organization of black firefighters who have been the primary voice within the FDNY challenging race discrimination in hiring and at the workplace. The Vulcan Society has fulfilled this role for more than fifty years. The Vulcan Society assists both incumbent firefighters and entry-level firefighter applicants who have claims of discrimination at work or in the hiring process. The Vulcans filed the underlying EEOC charges in this case alleging discrimination in hiring with respect to the 1999 and 2002 entry-level firefighter examinations, which led to the EEOC's findings of probable cause, the United States Department of Justice's investigation, and ultimately the commencement of this action.

The Vulcan Society brought a similar race discrimination action against the City in the early 1970s concerning the discriminatory impact of the entry-level firefighter examinations in use at that time. The Second Circuit upheld District Judge Weinfeld's findings of fact that those written firefighter examinations had a racially discriminatory impact and were insufficiently job related to withstand constitutional attack (essentially the same allegations brought by the United States and plaintiffs-intervenors in this case). See Vulcan Soc. of New York City Fire Dept., Inc. v. Civil Service Com., 490 F.2d 387 (2d Cir. 1973). Under a consent decree entered into in conjunction with that case, the City was required to hire firefighters at a ratio of three (3) majority candidates to one (1) minority candidate from 1973-1977. The City abandoned the 3:1 hiring ratio in 1977 and returned to a cognitive test and minimum appointment requirements that weeded out black applicants. Over the ensuing years, the City continued to add additional non-validated requirements such as college credits, a driver's license, and certified first responder

with defibrillation ("CFR-D") training at the applicant's expense, which have created new barriers to minority applicants and have resulted in a steady decline in the number of black firefighters employed by the City.

**B.   Individual Plaintiffs-Intervenors**

The individually named plaintiffs-intervenors are all black applicants or black firefighters who seek to be, or have been, employed by the FDNY and have been adversely affected by defendants' discriminatory selection and appointment practices.   The individually-named plaintiffs-intervenors are:

Roger Gregg

Mr. Gregg is a 33 year old black man, a United States citizen by birth, and a resident of the Bronx. See Affidavit of Roger Gregg, dated March 18, 2008 at ¶2.  Mr. Gregg works at a credit union. Id. at ¶ 4.  He registered and sat for the December 2002 open competitive written examination, receiving a passing score of 78.823. Id. at ¶ 9.  He scored a perfect 100 on the physical agility test. Id. at ¶ 10.  His combined written and physical test scores, with an added 5-point bonus for New York City residency, gave him an adjusted overall score of 91.107. Id.  Mr. Gregg is currently number 6017 on the ranked list of eligibles. Id.  Given that the City has stated its intention not to hire additional firefighters from the eligibility list from Exam 2043 after May 2008, there is virtually no possibility that Mr. Gregg will be appointed to a probationary firefighter position.   Mr. Gregg is now past the age limit to sit for a future firefighter examination.

Marcus Haywood

Mr. Haywood is a 26 year old black man.  Born and raised in Brooklyn, he currently works as a barber. See Plaintiffs-intervenors' Complaint, Dkt No. 48, hereinafter "Compl.," at ¶ 23.  Mr. Haywood sat for the December 2002 open competitive examination.  He earned a

passing score of 85.713 on the written test and a perfect 100 on the physical test. Id. With the 5-point New York City residency bonus, his final score placed him at number 6990 on the ranked eligible list. Id. Like Mr. Gregg, Mr. Haywood has virtually no possibility of being appointed off of the Exam 2043 eligibility list and will likely be too old to take the examination the next time it is administered.

Candido Nuñez

Mr. Nuñez is a 31 year old black and Latino man. Born in Honduras, Mr. Nuñez emigrated to the United States in 1998 and has lived in New York City since that time. On April 25, 2004, he was naturalized as a United States citizen. Mr. Nuñez registered and sat for the December 2002 open competitive written examination, receiving a passing score of 83.529 and a perfect 100 on the physical agility test. (Compl., ¶21). His combined written and physical test scores, with an additional 5-point bonus for New York City residency, gave him an adjusted overall score of 94.199. Id. Mr. Nuñez was placed at number 5003 on the ranked list of eligibles. Id. At the time of the filing of the Complaint Mr. Nuñez was employed full-time in a civil service job with the City, but earlier this year he was appointed as a probationary firefighter, more than five (5) years after he applied for the position.

**C.     Defendant FDNY**

The FDNY is the largest fire department in the United States, currently employing in excess of 11,000 uniformed firefighters in all ranks. Although 28% of New York City residents are black, according to the most recent U.S. Census data, only 2.9% of FDNY firefighters are black. (Compl., ¶30). The FDNY has a long history of unlawfully discriminating against blacks in appointment, and despite the Vulcan Society's successful litigation against the FDNY in 1973, the Department has maintained its disproportionately low number or black firefighters in comparison to the demographics of the City as a whole. At the time of the Vulcans' prior

litigation, only five percent (5%) of firefighters were minorities. Now, in 2008, the number of black firefighters has fallen to 2.9%.

For more than a decade, the City's own Equal Employment Practices Commission ("EEPC"), which monitors discrimination in the City, has conducted audits finding that the FDNY's recruitment and hiring practices were deficient, leading to a disproportionately low number of black firefighters. (See Ex. 8 to the Affidavit of Paul Washington, dated April 20, 2008, hereinafter "Washington Aff."). The FDNY has consistently refused to comply with many of the EEPC's recommendations, particularly with regard to its hiring criteria. (Washington Aff. Ex. 9, 10).

Despite the numerous EEPC recommendations, a report of the New York City Public Advocate (Washington Aff Ex. 15), and a report of the New York City Council (Washington Aff Ex. 16), all urging the Department and the City to take action to end the disparate impact of its selection processes on black applicants, and the EEOC's probable cause findings on plaintiffs-intervenors' complaints (Washington Aff. Ex. 2, 4, 5, 6), the City and the FDNY have repeatedly refused to remedy this obviously discriminatory situation. Defendants have thus intentionally – or with reckless disregard – perpetuated a racially discriminatory hiring system. (Compl., ¶33).

The low levels of appointment of black candidates is not a result of the outcome of the written and physical examinations alone. The FDNY plays an active role in making dozens of discretionary and subjective appointment decisions for each new class of incoming firefighters. The FDNY conducts background investigations of all firefighter candidates whose names appear on an eligible list resulting from an open competitive examination, and any firefighter whose background information, as stated in his or her applicant papers, conflicts with the information the FDNY receives from past employers, educational facilities or law enforcement agencies has

his or her file "flagged" for review by the FDNY's Personnel Review Board ("PRB"). The FDNY's former Deputy Commissioner for Human Resources, Sherry Ann Kavaler, described this mechanism. <u>See</u> Ex. B to the Affidavit of Joel P. Wiesen, Ph.D., dated April 9, 2008. Members of the PRB would vote on whether to appoint a candidate, often relying upon their personal acquaintance with either the candidate or one of the candidate's relatives or friends already employed by the FDNY. <u>Id</u>. at 362, 366-367. Ms. Kavaler has admitted that those "flagged" candidates with relatives or friends in the FDNY are given more consideration and are more likely to be appointed than those without such personal connections. <u>Id</u>.

In addition to the discriminatory conduct described above, plaintiffs-intervenors challenge the following practices as both causes of disparate impact and as evidence of disparate treatment against black applicants:

1.  Defendants' minimum educational requirement;

2.  Defendants' driver's license requirement;

3.  Defendants' lax enforcement of the residency requirements (purportedly designed to improve minority representation) for obtaining the 5-point residency credit;

4.  Defendants' discontinuance of the Fire Cadet Program; and

5.  Defendants' insistence that applicants and not the FDNY incur the cost of certified first responder with defibrillation ("CFR-D") training (between $350 - $700).

**D.**    <u>**Defendant Department of Citywide Administrative Services ("DCAS")**</u>

DCAS is the agency responsible for developing and administering entry-level firefighter examinations, as well as setting the minimum qualifications required for appointment to a firefighter position. Current or former employees of DCAS have conceded various flaws in the development and utilization of Exams 7029 and 2043. For example, Matthew Morrongiello, the

DCAS examiner who developed Exam 7029, has testified that to his knowledge DCAS did no analysis of the extent to which the passing scores used for Exam 7029 (84.705%) or 2043 (70%) corresponded to the abilities the exams purported to measure. See Washington Aff. Ex. 23 at 96-97. DCAS's former Assistant Commissioner for Examinations, Carol Wachter, later conceded that the pass mark set for Exam 7029, at least, eliminated qualified candidates who would otherwise have been appointed. See Washington Aff. Ex. 11 at 179-180.

Even where DCAS had good reason to believe that adverse impact would result from a particular selection procedure, such impact was not avoided. Ms. Wachter testified that she believed adverse impact could increase as a result of the imposition of a 30 college credit requirement. See Washington Aff. Ex. 11 at 148-152. Despite communicating this to the FDNY, the college credit requirement was instituted, without any study of its validity as a selection criterion. Id.

### E.    Defendant Mayor Michael Bloomberg

As Mayor of the City of New York, Michael Bloomberg has the ultimate power and responsibility to oversee the conduct of City agencies. Mayor Bloomberg has consistently been educated about the problem of black under-representation in the fire department and has willfully ignored it. The Mayor has known about the Vulcan Society's complaints since at least the Spring or Summer of 2002, when he met with the Vulcans to discuss both recruitment and testing. See Washington Aff. at ¶19. No progress came out of that meeting.

The Vulcan Society was not the only voice raising these concerns. By letter dated April 8, 2003, the EEPC submitted its FDNY audit report to Mayor Bloomberg and specifically requested that the Mayor "direct Fire Commissioner Nicholas Scoppetta to implement the following corrective actions:

- Conduct an adverse impact study on the (then) 60 college credit requirement for firefighter applicants, and
- Conduct an adverse impact study on the written examination."

See Washington Aff. Ex. 12.

Mayor Bloomberg's one-page response on October 23, 2003 states that he is "satisfied that the Fire Department has adequately addressed the points raised in the EEPC's report." See Washington Aff. Ex. 14. While the Mayor claims that the FDNY "has undertaken a wide-ranging recruitment campaign," his letter does nothing to address the FDNY's continued failure to study the potential adverse impact of the college credit requirement or the written examination itself. Increased recruitment, by itself, cannot overcome adverse impact owing to these unlawful screening devices, but the Mayor has evidenced no intention to remedy the unlawful discrimination that has been ongoing at the FDNY.

**F.    Defendant Fire Commissioner Nicholas Scoppetta**

Fire Commissioner Nicholas Scoppetta has also been well-aware of the very low appointment rates of black firefighters. But he has actively defended the FDNY's faulty testing and selection devices and procedures, at times obstructing the work of other City agencies in order to maintain the status quo. In response to the EEPC's April 8, 2003 letter to the Mayor, Commissioner Scoppetta sent the Mayor a letter on May 7, 2003. See Washington Aff. Ex. 13. The letter concedes that the FDNY did not comply with the EEPC's recommendations to conduct adverse impact studies, but defends the FDNY's conduct by saying: "first we believe that the college credits are relevant and second, we believe that there is no adverse impact on Department hiring attributable to the written exam." (emphasis added). Commissioner Scoppetta claimed to base these beliefs on information from DCAS, stating that DCAS

> has informed me that the Department's written test was validated in 1998 and that two tests have been given since then without

> challenge...DCAS has informed me that its statistical analysis
> indicates there is no adverse impact on the December 14, 2002,
> firefighter exam [2043].

In fact, however, the City has now conceded that it did not conduct a criterion-related validity study on either written examination, as required by the EEOC's *Uniform Guidelines on Selection Procedures*, and that adverse impact against blacks existed with respect to both written exams 7029 and 2043. See the Declaration of Richard A. Levy, dated April 10, 2008, hereinafter "Levy Dec.," at Exhibit 1, Admission No. 1, 3, 5, 6, 20, 23.

With respect to the college credit requirement, Commissioner Scoppetta clarified to the Mayor that the current FDNY requirement is 30 college credits and states that

> the police department requires 60 college credits and that
> requirement has not adversely affected their minority recruitment.
> Additionally, the Fire Department believes that the college credits
> are relevant and job related.

The basis for these assertions is unclear. Commissioner Scoppetta cited no adverse impact study of the police department requirement, nor did he clarify why a lack of adverse impact on one civil service title would necessarily translate into a lack of adverse impact in another title. Finally, he offers no basis for the assertion that the college credit requirement – which may be fulfilled by taking courses in any subject matter, including for example fine arts or European history – is relevant or related to the job of firefighter.

By refusing to even study potential adverse impact, Commissioner Scoppetta either recklessly or intentionally perpetuated a selection process that has had statistically significant adverse impact on black candidates for firefighter.

## II.   THE SELECTION DEVICES AT ISSUE

Defendants are responsible for establishing the screening and selection procedures and devices that are used to test and appoint entry-level firefighters. (Compl., ¶34). The defendants

used the same basic selection and appointment process for the firefighter examinations administered in 1999 and 2002, designated as "Exam 7029" and "Exam 2043," respectively.[1] Each exam included a timed written test consisting of multiple choice questions and a timed physical performance test ("PPT") consisting of several "events". (Compl., ¶36). Candidates' scores on each segment of the test were totaled, with the written and physical portions equally weighted. Bonus credits were then added for New York City residency, veteran status and other factors. The written exams were used as "pass/fail" screening devices in that only those applicants who passed the written exam were eligible to take the PPT. (Compl., ¶39). Defendants also "rank ordered" applicants, so that those who passed both the written examination and the PPT were placed on an eligibility list in descending rank order of their combined written examination and PPT scores, plus bonus points.

Prior to hiring a candidate off of an eligibility list, defendants verify that the applicant meets all other qualifications for employment. (Compl., ¶40). These qualifications include age, medical and psychological fitness, the requisite college credits, military or work experience, possession of a valid driver's license, and completion of certified first responder with defibrillation ("CFR-D") training. As the FDNY has needed to appoint entry-level firefighters, defendants have processed applicants from the eligibility list in this descending rank order. These eligibility lists, once established, have a "life" of four years before they expire. Thus, lower-scoring applicants may wait three or four years from the date they are ranked (which may be a year or more after the test was taken) for an appointment, or they may not be reached for hiring at all.

---

[1] Indeed, Exams 7029 and 2043 were modeled after Exam 0084, which was administered in 1992.

The report of plaintiffs-intervenors' expert, Dr. Joel P. Wiesen, concludes that both Exam 7029 and Exam 2043 had practically and highly statistically significant adverse impact against black applicants in, among other areas, (1) passing the written exams, (2) rank on the resulting eligibility lists, which impacts time of appointment, and (3) ultimate appointment to firefighter positions. See "Expert Report Concerning a Study of Possible Adverse Impact of the 1999 and 2002 Examinations for Firefighter, NYC Fire Department" prepared by Joel P. Wiesen, Ph.D., as corrected January 4, 2008, hereinafter "Report," attached as Ex. A to the accompanying Affidavit of Joel P. Wiesen, Ph.D., dated April 9, 2008, hereinafter "Wiesen Aff." Comparable conclusions with respect to adverse impact were reached by the expert for the United States. See "Report in the matter of United States of America v. City of New York" by Bernard R. Siskin, Ph.D., attached as Exhibit 2 to the Levy Dec.

A.    **Exam 7029**

Exam 7029 was administered beginning in February 1999, and the eligibility list generated from that exam was used to hire firefighters from February 2001 until December 2004. Defendants offered positions to proximately 3,101 entry-level firefighters from the Exam 7029 eligibility list, of whom only 115 (6.7%) were black. Wiesen Aff. at ¶7, Report at 14. Dr. Wiesen found that the highly statistically significant adverse impact against blacks on the written portion of Exam 7029 resulted in a shortfall of 457 black test passers. Wiesen Aff. at ¶8; Report at 18-19. There was also adverse impact against blacks in rank order placement on the eligibility list resulting from Exam 7029, and blacks were appointed from the list at a rate of only 28% of the rate at which whites were appointed. Wiesen Aff. at ¶9-10; Report at 13-16, 27-28. This large adverse impact meant a shortfall of 254 black firefighter appointments. Wiesen Aff. at ¶10; Report at 16. Dr. Siskin reported similar findings. See Levy Dec. Ex. 2 at 21-22, 24-25.

The passing score for Exam 7029 was set at 84.705, well above the standard 70% pass mark that is favored by the Rule 4.4.9(a) of the Personnel Rules and Regulations of the City of New York.  This pass mark eliminated qualified candidates who would otherwise have been appointed.  See Washington Aff. Ex. 11 at 179-180.  Indeed, former DCAS Assistant Commissioner Carol Wachter admitted that the passing score was based on an administrative estimate of the FDNY's hiring needs – not upon the level of skill or ability necessary to perform as a firefighter.  Id. at 180-182.  Dr. Wiesen's report shows that the City was well aware of the adverse impact upon blacks that would result in the setting of such a high pass mark.  Wiesen Aff. at ¶13; Report at 36-37.

Dr. Wiesen also found that, in hiring off of the eligibility list for Exam 7029, a disproportionate number of black applicants were reviewed by the FDNY's Personnel Review Board ("PRB") – which makes discretionary hiring decisions in cases where an applicant's file reveals a potential background or character concern – and not hired as a result.  Wiesen Aff at ¶11; Report at 35-36.  A partial explanation for this was offered by Sherry Ann Kavaler, the former Deputy Commissioner for Human Resources at the FDNY, who was a member of the PRB.  Ms. Kavaler testified at her deposition that at approximately every other PRB meeting an applicant before the PRB was known to a voting member of the PRB.  See Wiesen Aff. Ex. B at 367.  She testified that if a candidate being reviewed by the PRB was related to someone within the Fire Department that a PRB member knew, that candidate would be more likely to be passed through the PRB.  Id.  Given that only around 3% of firefighters are black, there were likely very few black candidates on review at the PRB who were related to someone within the FDNY.  Wiesen Aff. at ¶12.  Rather, the benefit of such relations clearly flowed to white candidates.  Id.

At this stage in the litigation, expert discovery has only been completed with respect to adverse impact, but in the face of clear evidence of adverse impact against blacks the City has already made several important admissions.   The City has admitted that in comparing the proportion of white candidates who passed Written Exam 7029 with the proportion of black candidates who passed Written Exam 7029, "there was a difference greater than three units of standard error."  See Levy Dec. Ex. 1 at Admission No. 1.  The City has also admitted "that a statistically significant difference exists between the ranked positions of Black candidates, as a group, and the ranked positions of White candidates, as a group, on the eligibility list relation to Exam 7029" and that these differences are "equivalent to more than three (3) units of standard error."  Id. at Admission No. 5, 6.

Courts in this Circuit have generally found that differences corresponding to 2-3 units of standard deviation (or standard error) are statistically significant and reliable differences that were not the result of chance.  See Ottaviani v. State Univ. of New York at New Paltz, 875 F.2d 365, 371-72 (2d Cir. 1989) (a disparity of 2 standard deviation units establishes threshold level of statistical significance); see also Hazelwood School Dist. v. United States, 433 U.S. 299, 309, n. 14 (1977), citing Castaneda v. Partida, 430 U.S. 482, 496-497, n. 17 (1977).  Thus, there should be no dispute that adverse impact has occurred as a result of Exam 7029.

**B.**   **Exam 2043**

Defendants administered Exam 2043 beginning in December 2002 and have used the resulting eligibility list to hire firefighters since May 2004.  (They will retire the list in May 2008).   As of the date of the City's last production, defendants had offered positions to approximately 2,355 entry-level firefighters from the eligibility list that resulted from Exam 2043, of whom only 101 (or 7.3%) were black.  Wiesen Aff. at ¶14; Report at 39.  Dr. Wiesen

found statistically significant adverse impact against blacks in passing written Exam 2043, which corresponded to a shortfall of 150 black test passers. Wiesen Aff. at ¶15; Report at 42-43. There was also statistically significant adverse impact against blacks in their rank order placement on the Exam 2043 eligibility list and in their rates of appointment. Wiesen Aff. at ¶16, 18; Report at 39-41, 51-53. Indeed, black applicants had less than ½ the chance of being appointed as white applicants, corresponding to a shortfall of 96 appointments of black firefighters. Wiesen Aff. at ¶18, Report at 40. Dr. Siskin again made similar findings. See Levy Dec. Ex. 2 at 26-34.

As with Exam 7029, the City has made several important admissions regarding adverse impact. The City admits that in comparing the proportion of white candidates who passed Written Exam 2043 with the proportion of black candidates who passed Written Exam 2043, "there was a difference greater than three units of standard error." See Levy Dec. Ex. 1 at Admission No. 3. The City also admits that "the proportion of Black candidates on [the Exam 2043] eligibility list who" ranked at or above the rank of the last person appointed from the list "is less than 80% of the proportion of White candidates on that eligibility list" who were ranked at or above the rank of the last person appointed from the list. Id. at Admission No. 16. Thus, again, there is little doubt that adverse impact against blacks resulted from Exam 2043.

**C.    Exam 6019**

In January 2007, defendants administered Exam 6019, which for the first time tests for personal attributes, rather than solely cognitive abilities. Also for the first time, actual scores on the physical test are not combined with written scores. Rather, the physical is simply pass/fail, and levels of performance beyond passing do not impact an applicant's final score. The City intends to use the eligibility list from Exam 6019 to hire firefighters from May 2008 until in or about May 2012. Despite some improvements over Exams 7029 and 2043, Exam 6019

continues to have adverse impact on black test takers in their pass rates on the exam, as well as adverse impact against black test passers with respect to their rank ordering on the Exam 6019 eligibility list.  Wiesen Aff. at ¶19.

    With these facts, we turn to the suitability of class certification.  Some facts specifically related to plaintiffs-intervenors' motion for class certification are incorporated below and not repeated separately above.

**ARGUMENT**

**THIS IS A PROPER CASE FOR CLASS CERTIFICATION AND<br>PLAINTIFFS ARE APPROPRIATE REPRESENTATIVES**

**A.**    **Legal Standards for Class Certification**

    The Second Circuit has emphasized that, in deciding class certification motions, the district courts must construe the applicable criteria liberally, in line with Rule 23's "inherent flexibility."  See Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997), citing Sharif ex rel. Salahuddin v. New York State Educ. Dep't., 127 F.R.D. 84, 87 (S.D.N.Y. 1989).  The Second Circuit has also stressed that courts of appeal are "noticeably less deferential...when [the district] has denied class status than when it has certified a class...." Lundquist v. Security Pacific Automotive Fin. Serv. Corp., 993 F.2d 11, 14 (2d Cir. 1993), citing Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993).  In deciding whether to certify a class, the Court must make factual determinations as relevant to each Rule 23 requirement, but "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.), 471 F.3d 24, 41 (2d Cir. 2006).

    The class that plaintiffs-intervenors seek to represent is proper and appropriate, and it satisfies all of the requirements of Rules 23(a), 23(b)(2), and 23(b)(3).  Indeed, federal courts in many other districts have certified precisely this type of class in virtually identical litigation

across the country. See, e.g., Bradley v. City of Lynn, 443 F. Supp.2d 145, 149 (D. Mass. 2006) (granting judgment on liability for plaintiff class, including Vulcan Society, Inc., and finding examinations used to qualify and rank black and Hispanic applicants for entry-level firefighter positions had a disparate and impact in violation of Title VII); Lewis v. City of Chicago, 2005 WL 693618, at *15 (N.D. Ill. March 22, 2005) (granting judgment on the issue of liability to class challenging racial discrimination in the hiring by the Chicago Fire Department).[2]  For these reasons and those set forth below, the Court should grant the instant motion.

**B.      The Class Meets The Requirements of Rule 23(a).**

**1.      Numerosity.**

Rule 23(a)(l) requires the plaintiffs-intervenors to show that the proposed class is so numerous that joinder of its members would be impracticable. See Latino Officers Ass'n of the City of New York v. City of New York, 209 F.R.D. 79, 88 (S.D.N.Y. 2002).  There is no set number of class members required to sustain a class action, but numbers less than fifty (50) have often sufficed. See In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 164 & n. 2 (S.D.N.Y. 2000) (citing examples); see also King v. Carey, 405 F Supp. 41, 44 (W.D.N.Y. 1975) (class composed of 38 members was "so numerous as to make joinder impractical"); United States ex rel. Walker v. Mancusi, 338 F. Supp. 311, 315-16 (W.D.NY. 1971) (38 members was sufficiently numerous to warrant certification of class action), aff'd, 467 F.2d 51 (2d Cir. 1972).

Based on the data provided by defendants, 3,142 black applicants sat for Exam 7029 and 2043, administered in 1999 and 2002 respectively, and only 216 blacks were offered positions,

---

[2] See also Los Angeles v. Davis, 440 U.S. 625 (1979); Berkman v. City of New York, 705 F.2d 584 (2d Cir. 1983); Ass'n Against Discrimination in Employment v. City of Bridgeport, 594 F.2d 306 (2d Cir. 1979); Hood v. N.J. Dep't of Civil Serv., 680 F.2d 955 (3rd Cir. 1982); Brunet v. City of Columbus, 1 F.3d 390 (6th Cir. 1993); Arnold v. Ballard, 390 F. Supp. 723 (N.D. Ohio 1975); Dogier v. Chupka, 295 F. Supp. 836 (S.D. Ohio 1975).

most of them after a substantial delay due to their rankings on the eligibility list. See Wiesen Report at 5, 14, 39. Accordingly, plaintiffs-intervenors have satisfied the Rule 23(a)(1)'s numerosity requirement. See Guilino v. Bd. of Ed. of the City School Dist. of the City of N.Y., 201 F.R.D. 326, 331 (S.D.N.Y. 2001) (numerosity satisfied where defendants' data revealed that proposed class consisted of at least 2,083 persons affected by testing requirements to receive or retain teaching license).

In addition to the bare number of probable class members, factors to be considered in evaluating numerosity include judicial economy, the ability of class members to institute individual lawsuits, and "the practicality of forcing relitigation of a common core of issues." Gomez v. Illinois State Bd. of Educ., 117 F.R.D. 394, 399 (ND. Ill.), aff'd in part, rev'd in part on other grounds, 811 F.2d 1030 (7th Cir. 1987); Tenants Associated for a Better Spaulding (TABS) v. U.S. Dept. of Housing & Urban Dev. (HUD), 97 F.R.D. 726 (D.C. Ill. 1983). Here, the class plaintiffs-intervenors seek to certify would include present and future members, and potential members, of the Vulcan Society, e.g., blacks who just took Exam 6019 and failed or have not been selected, and others who will take future examinations that are biased against them. Courts have stressed that the numerosity requirement "is met where, as here, the class includes individuals who will become members in the future. As members in the future, they are necessarily unidentifiable, and therefore joinder is clearly impracticable." Gomez, 117 F.R.D. at 399; Phillips v. Joint Legislative Comm., 637 F.2d 1014, 1022 (5th Cir. 1981).

Thus, the proposed class is sufficiently large, and joinder is sufficiently impracticable, to satisfy the numerosity requirement of Rule 23(a)(1).

### 2. Commonality.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Total commonality is not required. As long as the claim arises out of the same legal or remedial theory, the presence of certain individual variations is not sufficient to preclude class treatment. See Marisol A., 126 F.3d at 376 (commonality is satisfied "if plaintiffs' grievances share a common question of law or fact."); see also Hnot v. Willis Group Holdings, Ltd., 241 F.R.D. 204, 210 (S.D.N.Y. 2007); Canadian St. Regis Band of Mohawk Indians v. New York, 97 F.R.D. 453, 457 (N.D.N.Y. 1983). Moreover, the threshold of commonality is not high, see Jenkins v. Raymark Indus., 782 F.2d 468, 471-72 (5th Cir. 1986), and it is aimed at "determining whether there is a need for combined treatment and a benefit to be derived therefrom." In re Agent Orange Prod. Liab. Litig., 506 F. Supp. 762, 787 (E.D.N.Y. 1980), modified on other grounds, 100 F.R.D. 718 (E.D.NY. 1983); see also In re Diamond Shamrock Chem. Co., 725 F.2d 858 (2d Cir. 1984), cert. denied, 465 U.S. 1067, 104 S.Ct. 1417 (1984).

"The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994), citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir. 1987). "Because the [commonality] requirement may be satisfied by a single common issue, it is easily met." Id.; see also Mack v. Suffolk County, 191 F.R.D. 16, 22 (D. Mass 2000) ("[a] single common or legal issue can suffice.").

In this case, there are a multitude of factual and legal issues that are common to all class members, and thus warrant class treatment. These issues include, inter alia, (1) whether Written Exam 7029 had an adverse impact on the class, whether it was job related and whether there existed reasonable selection alternatives that would have reduced or eliminated adverse impact;

(2) whether Written Exam 2043 had an adverse impact on the class, whether it was job related and whether there existed reasonable selection alternatives that would have reduced or eliminated adverse impact; (3) whether earlier Exams 0084 and 7022 (administered in 1992 and 1988, respectively) had an adverse impact that was known to defendants and whether they took any measures to alleviate the disparities, (4) whether and why the FDNY, DCAS and the other defendants ignored or defied the recommendations of New York City's own Equal Employment Practices Commission regarding the firefighter selection process, (5) whether the college credit requirement had an adverse impact on the class and was job related, (6) whether the defendants' discontinuance of the Fire Cadet Program was motivated by discrimination, (7) whether the defendants' lax enforcement of the residency bonus credit was discriminatory, (8) whether the expense of the driver's license requirement and the CFR-D requirement deterred potential black applicants, (9) whether the blatant favoritism displayed toward friends and family members of incumbent firefighters at the PRB in a workforce that is 97% white was motivated by discrimination, including nepotism and favoritism toward white applicants, (10) whether defendants have deprived members of the class of their right to be free of discrimination in employment and hiring on the basis of race; and (11) whether defendants' conduct represents a deprivation of the rights guaranteed to the class members by the Constitutions of the United States and of the State of New York, as well as federal, state, and local laws.

These issues constitute the very sort of "common" questions that courts have routinely found sufficient to meet the commonality requirement. See Rossini v. Ogilvy & Mather, Inc., 798 F.2d 590, 599 (2d Cir. 1986) (finding that commonality was established where plaintiffs alleged existence of a "discriminatory system" at workplace); Allman v. Coughlin, 577 F. Supp 1440, 1444 (S.D.N.Y. 1984). Indeed, it is well settled that an allegation that defendants engaged

in a systematic pattern of misconduct against class members is sufficient to establish commonality. Port Auth. Police Benev. Ass'n v. Port Auth. of New York and New Jersey, 698 F.2d 150, 154 (2d Cir. 1983); Alliance to End Repression v. Rochford, 565 F2d 975, 979 (7th Cir. 1977).

Particularly relevant here is Gulino v. Bd. of Ed. of the City School Dist. of the City of New York, 201 F.R.D. 326 (S.D.N.Y 2001). In Gulino, the Court found the commonality requirement satisfied where the question at the heart of the lawsuit was "whether defendants' use of [certain tests] to demote and penalize public school teachers has a disparate impact on African-Americans and Latino teachers and is not justified by any legitimate business interests, and whether defendants' use of these tests violates Title VII of the Civil Rights Act of 1964" Id. at 331. The Court noted: "Class members need not allege the same injury to show commonality . . . [a]s long as there are legal issues common to class members' claims – such as defendants' misuse of tests creating a disparate impact on teachers of color – certification is appropriate." Id; see also Wright v. Stern, 2003 WL 21543539, at *4 (S.D.N.Y. July 9, 2003).

Here, plaintiffs-intervenors allege that defendants' use of Exams 7029 and 2043 – as well as earlier and later exams and other selection devices – have had, are having and will have an adverse impact on themselves and the class, and they have satisfied Rule 23(a)(2)'s commonality requirement per Gulino, 201 F.R.D. at 331-32, and Wright, 2003 WL 21543539, at *5-6.

### 3.     Typicality.

Rule 23(a)(3) requires that the claims of the class representatives be typical of the claims of the class. Latino Officers Ass'n, 209 F.R.D. at 89. Typicality refers to the nature of the class representatives' claims "and not to the specific facts from which the claim arose or relief is

sought." Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 99 (S.D.N.Y. 1981).  Thus

the proper inquiry is:

> [W]hether other members of the class have the same or similar
> injury, whether the action is based on conduct not special or unique
> to the named plaintiffs, and whether other class members have
> been injured by the same course of conduct.

Id.

Typicality is satisfied when "each class member's claim arises from the same course of

events, and each class member makes similar legal arguments to prove the defendant's liability."

Marisol A., 126 F.3d at 376; accord H. Newberg & A. Conte, 1 NEWBERG ON CLASS ACTIONS §

3.15, at 3-78 (3d ed. 1992).  Courts have stressed that typicality may properly be found

regardless of whether the amount of damages that would be awarded to each member of the class

might be different.  See Robertson v. Nat'l Basketball Ass'n, 389 F. Supp. 867, 898 n.57

(S.D.N.Y. 1975); see also Davis v. Northside Realty Assocs., Inc., 95 F.R.D. 39, 43 (D.C. Ga.

1982).

In this case, each of the named class representatives asserts the same legal theories of

recovery that the class members generally will assert, arising from defendants' conduct in

utilizing discriminatory selection devices for entry-level firefighter positions.   Plaintiffs-

intervenors also reasonably anticipate that defendants will raise the same legal defenses to the

claims of the named representatives claims as they would for all class members.  Accordingly,

plaintiffs-intervenors satisfy Rule 23(a)(3)'s typicality requirement.  See Gulino, 201 F.R.D. at

332 (finding typicality satisfied where class representatives – African-American and Latino

teachers – were subject to disparate passing rates on the certification tests and suffered adverse

impact therefrom).

In addition, the Vulcan Society itself represents black firefighters who are its members and have suffered the same discriminatory hiring hurdles as the named plaintiffs-intervenors. The Vulcans have also represented hundreds of black applicants whom they recruited, trained and counseled on issues relating to the exams.

4.    **Adequacy.**

The adequacy requirement of Rule 23(a)(4) looks both to the qualifications of the class representatives and to those of their counsel.  See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 291 (2d Cir. 1992).  Adequacy of the named representative is sufficient, regardless of whether the named representative is the best of all possible plaintiffs.  See Ashe v. Board of Elections in City of New York, 124 F.R.D. 45, 50 (E.D.N.Y. 1989); see also Bowen v. General Motors Corp., AC Spark Plug Div., 542 F. Supp. 94 (D.C. Ohio 1981).   The principal requirement is that the representative be someone who "will pursue a resolution of the controversy in the interests of the class." Avagliano v. Sumitomo Shoji Am., Inc., 103 F.R.D. 562, 583 (S.D.N.Y. 1984); see also Dura-Bilt Corp., 89 F.R.D. at 101 (citing cases).  It is irrelevant to the adequacy determination whether any proportion of the class subjectively considers the representation to be adequate.  Thus, the courts have stressed that, in certifying a class action, there is no requirement that class members have expressly authorized the representation.  See Barone v. Safway Steel Prods., Inc., 2005 U.S. Dist. LEXIS 17645, *13 (E.D.N.Y., August 23, 2005), citing Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968), rev'd on other grounds, 479 F.2d 1005, 1022 (2d Cir. 1973), vacated by, 417 U.S. 156 (U.S. 1974).

There are no known or anticipated conflicts or antagonistic interests among the members of the putative class.  The interest of each class member is to gain the opportunity to compete for

appointment on the basis of an exam that measures actual aptitudes required for the position in a way that does not discriminate on the basis of race.  Moreover, there is no conflict between those class members who failed the examinations and those who passed but were ranked low on the eligibility lists because their legal claims are the same, even though the amount of relief they are entitled to in the damages phase of the litigation may differ.  As discussed below, differences in entitlement to relief does not defeat class certification.

The principle factors Courts examine in assessing the adequacy of named class representatives include their conscientiousness and willingness to pursue the action.  The main consideration is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class, so as to ensure them due process.  See Mersay v. First Republic Corp. of Am., 43 F.R.D. 465, 470 (S.D.N.Y. 1968).  With regard to these factors, the class representatives clearly fulfill the adequacy requirement.  Mssrs. Nuñez, Gregg and Haywood actively pursued charges of discrimination with the EEOC for more than three years leading up to the EEOC's findings of probable cause, and they worked with representatives of the Vulcan Society, Levy Ratner, P.C., Scott + Scott, LLP and the Center for Constitutional Rights to initiate this litigation.  They have demonstrated their tenacity in pursuing this matter.

The Vulcan Society is also well-qualified as a representative of the black applicants for firefighter positions.  The Vulcans have performed this role for decades, including acting as lead plaintiff in the case that led to a finding of discrimination by Judge Weinfeld, and affirmed by the Second Circuit Court of Appeals in 1974.  The Vulcans brought the instant charges to the EEOC, the Department of Judge and this Court in order to press these claims forward, and they are prepared to actively prosecute this case.

Sufficient financial resources and competent legal representation are available to the named Plaintiffs to fully pursue the class claims to resolution.   The law firm of Levy Ratner, P.C. has successfully pursued similar Title VII race discrimination litigation in federal court. Mr. Levy has been litigating discrimination cases since the early 1970s.  In 2004, he settled the matter of <u>Latino Officers Association of N.Y., et al. v. City of New York, et al.</u>, No. 99-9568 (S.D.N.Y. 2004), which resulted in awards of damages to more than 500 New York City police officers, amounting to $17 million and other important affirmative relief.  The law firm of Scott + Scott brings a wealth of relevant experience with federal class action litigation, including both employment matters and complex securities litigation.  The Center for Constitutional rights has been litigating civil rights actions in the federal courts for more than forty years and has spent the last seven years advocating for the increased representation of African Americans in the FDNY. Annexed hereto are the firm resumes of Levy Ratner, P.C., Scott + Scott, LLP and the Center for Constitutional Rights, all of which have agreed to pursue this case without payment at this time and shall seek payment only through the recovery of attorneys fees in the course of this litigation.  <u>See</u> Firm Resumes, Levy Dec. Ex. 2.

Accordingly, plaintiffs-intervenors satisfy the Rule 23(a)(4) adequacy requirement.

**C.      The Class Meets The Requirements of Rule 23(b)(2).**

This class easily satisfies the requirements of Rule 23(b)(2).  Rule 23(b)(2) is satisfied if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).  Moreover, "[c]ases which seek to enjoin discriminatory practices employed by a governmental defendant are presumptively appropriate for Rule 23(b)(2) certification." <u>Gulino</u>, 201 F.R.D. at 333.  As Newberg emphasizes, Rule 23(b)(2) is "designed

specifically for civil rights cases" seeking broad declaratory or injunctive relief. 1 NEWBERG ON CLASS ACTIONS § 4.11, at 4-39. As the Second Circuit explained in <u>Corner v. Cisneros</u>, 37 F.3d 775 (2d Cir. 1994), "pattern of racial discrimination cases for injunctions against state or local officials are the 'paradigm' of Fed. R. Civ. P. 23(b)(2) class action cases." <u>Id</u> at 796; <u>see</u> <u>Ledford v. City of Highland Park</u>, 2000 U.S. Dist. LEXIS 11101, at 1-5 (N.D. Ill. July 31, 2000) (holding that Rule 23(b)(2) certification was appropriate where defendants' police department engaged in a "regular practice" of racially discriminatory misconduct). In fact, the Advisory Committee's Notes to Rule 23(b)(2) emphasize that this provision is intended, first and foremost, to function as an effective vehicle for bringing suits alleging racial discrimination. Adv. Comm. Note to 1966 Amendment, Fed. R. Civ. P. 23.

Because defendants' testing policies and procedures disparately impact the class as a whole, the remedies plaintiffs-intervenors seek will pertain to the class as a whole. As in <u>Wright</u>, of course, for a class action to be appropriate under Rule 23(b)(2)'s "generally applicable" provision, it is not required that the party opposing the class have acted directly against each member of the class. <u>See</u> Adv. Comm. Notes to 1966 Amendment, Fed. R. Civ. P. 23. The liberal standard is whether defendants' actions have generally impacted all persons similarly situated (as are black applicants for firefighter positions) in a way that pertains to the class as a whole. <u>See</u> Charles Wright & Arthur Miller, 7AA FEDERAL PRACTICE & PROCEDURE § 1775 (3d ed. 2008); <u>Schneider v. Whaley</u>, 417 F. Supp. 750, 753 (S.D.N.Y. 1976), <u>modified on other grounds</u>, 541 F.2d 9l6 (2d Cir. 1976); <u>Anderson v. Gamer</u>, 22 F. Supp.2d 1379, 1386 (N.D. Ga. 1997). Here, the injury has been caused by conduct of the defendants that is based on policies and practices that apply to the proposed class generally, satisfying the Rule 23(b)(2) standard.

See Marisol A., 126 F.3d at 378, Gulino, 201 F.R.D. at 333-34; Wright, 2003 WL 21543539, at *7-8.

Plaintiffs-intervenors' request for monetary relief does not make certification inappropriate under Rule 23(b)(2). "Where plaintiffs seek monetary damages along with injunctive or declaratory relief, certification is appropriate when the equitable relief sought predominates over the claims for monetary relief." Wright, 2003 WL 21543539, at *7-8. Here, the back pay being sought is properly considered to be equitable relief, rather than a monetary award. See e.g., Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, fn. 4 (2002), Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 157 (2d Cir. 2001) ("back pay and front pay have historically been recognized as equitable relief under Title VII"). Moreover, in this case, "(1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." Robinson, 267 F.3d at 164. Regardless of monetary relief, plaintiffs-intervenors would still seek injunctive relief "to ensure that the alleged race[-based]...discrimination ceases...." Wright, 2003 WL 21543539, at *8. And injunctive relief – the end of defendants' discriminatory practices – is reasonably necessary and appropriate should plaintiffs-intervenors prevail. Id. Accordingly, this class should be certified pursuant to Rule 23(b)(2).

### D.      The Class Meets The Requirements of Rule 23(b)(3).

Finally, certification is also proper in this case under Rule 23(b)(3) because (1) common questions of law or fact predominate over any individual questions, and (2) a class action is superior to other available methods of resolving the controversy. See In re Agent Orange Prod.

Liab. Litig., 100 F.R.D. 718, 721 (E.D.N.Y. 1983); Pruitt v. Allied Chemical Corp., 85 F.R.D. 100 (E.D. Va. 1980).

Rule 23(b)(3) is the vehicle by which class members may obtain compensatory damages. Indeed, "Rule 23(b)(3) added to the complex-litigation arsenal class actions for damages designed to secure judgments binding all class members save those who affirmatively elected to be excluded." Amchem Prods., Inc. v. Windsor, 521 US. 591, 614-15 (1997). As a general matter, the Supreme Court has explained, "'[r]epresentative damages litigation is common – from class actions under Fed. R. Civ. P. 23(b)(3) to suits by trustees representing hundreds of creditors in bankruptcy to parens patriae actions by state governments to litigation by and against executors of decedents' estates.'" United Food & Commercial Workers Union Local 751 v. Brown Group, 517 U.S. 544, 557, 116 S.Ct. 1529, 1536 (1996) (quoting In re Oil Spill by the Amoco Cadiz off the Coast of France on Mar. 16, 1978, 954 F.2d 1279, 1319 (7th Cir. 1992) (per curiam)); see generally In re Philip Morris, Inc. v. Nat'l Asbestos Workers Medical Fund, 214 F.3d 132 (2d Cir. 2000). Rule 23(b)(3) encompasses cases, such as the instant one, in which a class action would achieve economies of time, effort and expense, and would promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about any other undesirable result. See Adv. Comm. Notes, Rule 23, 39 F.R.D. 69, 102-03 (1966).

With regard to the elements of subdivision 23(b)(3), there can be no doubt that a case involving systematic discrimination and civil rights violations by government entities and officials against a broad class generally fulfills both the predominance and superiority requirements. The issues common to all class members in each subclass, and the issues that predominate in the case, arise from defendants' use of facially biased and discriminatory

selection procedures and devices and their intentional and/or reckless disregard for the adverse impact of its selection procedures and devices on black applicants. This conduct caused similar economic and emotional harm to all class members. A single pervasive and ongoing pattern of operative facts establishes defendants' liability, there is a single general causal nexus linking defendants' misconduct to each potential class member's harm, and there is likely to be general uniformity in terms of each defendant's possible defenses as to all class members' claims. See WRIGHT & MILLER, *supra*, at § 1778.

The fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification, given the predominance of common questions as to liability generally. See A. Conte & H. Newberg, 6 NEWBERG ON CLASS ACTIONS § 18:27 (4th ed. 2002) ("A particularly significant aspect of the Rule 23(b)(3) approach is the recognition that individual damages questions do not preclude a Rule 23(b)(3) class action when the issue of liability is common to the class."). Rule 23(b)(3) requires only that the common issues predominate, not that they be unanimous. See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc. (In re Visa Check/MasterMoney Antitrust Litig.), 280 F.3d 124, 140 (2d Cir. 2001) ("The predominance requirement calls only for predominance, not exclusivity, of common questions") (internal quotation marks and citation omitted); Doglow v. Anderson, 43 F.R.D. 472, 490 (E.D.N.Y. 1968) ("The fact that questions peculiar to each individual member of the class may remain after the common questions have been resolved does not dictate the conclusion that a class action is not permissible"), rev'd on other rounds, 438 F.2d 825 (2d Cir. 1970). It is also significant that, quantitatively, the vast majority of litigation time will be spent dealing with the common liability questions.

A class action is far superior to other available methods for fairly and efficiently resolving this controversy. Indeed no other judicial procedure, short of settlement, is superior or equal to class action treatment of plaintiffs-intervenors' claims. The four factors enumerated in Rule 23(b)(3) pertinent to a determination of superiority all weigh in favor of certification. The sort of harm sustained in this case, to livelihood and earnings, to emotional well-being and reputation, coupled with the existence of liability issues common to all class members, establishes that a collective prosecution is proper, subject to the notice provision of Rule 23(c)(2).

## CONCLUSION

For all the reasons stated above, plaintiffs-intervenors respectfully request that their motion for certification of a class action pursuant to Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure be granted in all respects.


Dated: New York, New York
     April 25, 2008

               Respectfully submitted,

               LEVY RATNER, P.C.


By:       /s/
               Richard A. Levy
               Dana Lossia
               80 Eighth Avenue, 8th Floor
               New York, NY 10011
               (212) 627-8100
               (212) 627-8182 (fax)
               rlevy@lrbpc.com
               dlossia@lrbpc.com

SCOTT + SCOTT, LLP
Judy S. Scolnick
Beth A. Kaswan
Walter Noss
Amanda Lawrence
29 West 57th Street
New York, New York  10019
(212) 223-6444
(212) 223-6334 (fax)
jscolnick@scott-scott.com
bkaswan@scott-scott.com
wnoss@scott-scott.com
alawrence@scott-scott.com

CENTER FOR CONSTITUTIONAL RIGHTS
Darius Charney
666 Broadway, 7th Floor
New York, NY 10012-2399
(212) 614-6438
(212) 614-6499 (fax)
dcharney@ccrjustice.org

*Attorneys for Plaintiffs-Intervenors*