UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                          Plaintiff,                              **MEMORANDUM & ORDER**

          -and-                                                   **07-CV-2067 (NGG) (RLM)**

THE VULCAN SOCIETY, INC., for itself and on
behalf of its members, MARCUS
HAYWOOD, CANDIDO NUÑEZ, and
ROGER GREGG, individually and on behalf of a
class of all others similarly situated,

                          Plaintiff-Intervenors,

          -against-

THE CITY OF NEW YORK,

                          Defendant.

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

         In this Order the court addresses the effect of the Supreme Court's recent decision in

Wal-Mart Stores, Inc. v. Dukes, No. 10-277, 2011 WL 2437013, at *1 (U.S. June 20, 2011).

Applying Wal-Mart, the court denies the City's motion to decertify the liability-phase class;

denies Plaintiff-Intervenors' motion for summary judgment as to compensatory damages for

noneconomic losses; and under Federal Rule of Civil Procedure 23(b)(3), certifies the non-hire

and delayed-hire victim subclasses as to common remedial-phase issues.

## I.       BACKGROUND

         In the court's June 6, 2011 First Remedial Phase Class Certification Order (First

Remedial Cert. Order (Docket Entry # 640) at 48), the court granted in part and denied in part

Plaintiff-Intervenors' motion for continued remedial-phase certification of the class of black

1

victims of the City's discrimination that the court had conditionally certified at the beginning of the remedial phase of the litigation.[1]  In that Order, the court certified noneconomic loss and injunctive relief subclasses, each comprised of black non-hire and delayed-hire victims of the City's discrimination.  (Id. at 25.)  The court appointed the Individual Intervenors—Marcus Haywood ("Haywood"), Roger Gregg ("Gregg"), and Candido Nuñez ("Nuñez")—as representatives of the noneconomic loss subclass, and the Vulcan Society as representative of the injunctive relief subclass.  (Id. at 28-29.)

With respect to issues of make-whole relief, including backpay and benefits, priority hiring, and retroactive seniority, the court denied Plaintiff-Intervenors' motion for certification of a single class represented by the Vulcan Society, but permitted Plaintiff-Intervenors to move for certification of non-hire victim and delayed-hire victim subclasses as to issues of make-whole relief as long as they were represented by individual subclass members.  (Id. at 12-18, 18 n.7.)  Subsequent to the court's Order, Plaintiff-Intervenors sought permission to move for certification of non-hire victim and delayed-hire victim subclasses that included those groups' claims for compensatory damages for noneconomic losses.  (Int. Mot. for Clarification (Docket Entry # 641) at 1.)  The court granted this request on June 10, 2011, and Plaintiff-Intervenors moved for certification of the non-hire and delayed-hire victim subclasses on June 13, 2011.  (Int. Mot. for Subclass Cert. (Docket Entry # 643).)

Individual Intervenors Gregg and Haywood, and non-party Kevin Walker ("Walker") (collectively, the "Non-Hire Representatives"), seek to represent the non-hire victim subclass as to issues of backpay and benefits, retroactive seniority, priority hiring, and compensatory damages for noneconomic losses.  (Int. Subclass Cert. Mem. (Docket Entry # 643-1) at 3-4.)

---

[1]      The court assumes familiarity with the factual background of this litigation.  Additional procedural background relevant to this Order is contained in the court's First Remedial Phase Class Certification Order.  (See First Remedial Cert. Order (Docket Entry # 640) at 1-5.)

Specifically, Gregg, Haywood, and Walker seek class treatment of the determination of aggregate classwide backpay and benefits (exclusive of individual issues relating to mitigation), the amount and applicability of retroactive seniority, the number of priority hiring slots, and the issues identified by the court in the First Remedial Phase Class Certification Order that are common to all black victims' claims to compensatory damages for noneconomic losses.  (Id. at 2; see First Remedial Cert. Order at 33 (certifying noneconomic loss subclass as to two common issues).)  The Non-Hire Representatives propose that the non-hire victim subclass be defined to "include all black firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were not hired as firefighters from the eligibility lists created from the administration of either of those exams."  (Int. Subclass Cert. Mem. at 2.)   They further propose that Levy Ratner, P.C. ("Levy Ratner") be appointed as counsel to the non-hire victim subclass.  (Id. at 4.)

Individual Intervenor Nuñez, and non-party Kevin Simpkins ("Simpkins") (collectively, the "Delayed-Hire Representatives"),[2] seek to represent the delayed-hire victim subclass with respect to the same issues described above. Unlike the Non-Hire Representatives, the Delayed-Hire Representatives do not seek to represent the members of their subclass with respect to issues relating to priority hiring relief.  (Id. at 2-4.)  Nuñez and Simpkins propose that the delayed-hire victim subclass be defined to "include all black firefighters who were hired from the eligibility lists created through the use of either Written Exam 7029 or Written Exam 2043, except those who were hired in the first Academy classes hired from those eligibility lists."  (Id. at 2.)  They further propose that the Center for Constitutional Rights ("CCR") be appointed as counsel to the delayed-hire victim subclass.  (Id. at 4.)

---

[2]     For ease of reference, the court will refer to the non-hire victim and delayed-hire victim subclasses together as "Plaintiff-Intervenors."

Before Wal-Mart, Plaintiff-Intervenors contended that the two subclasses should be certified as mandatory subclasses under Rule 23(b)(2).  (Id. at 6-7.)  In the alternative, they argued that they also qualified for certification under Rule 23(b)(3).  (Id. at 7-9.)  After Plaintiff-Intervenors filed their motion for certification of the two subclasses the Supreme Court decided Wal-Mart, on June 20, 2011.  The court ordered the parties to submit additional briefing addressing Wal-Mart's effect on the pending motions for certification of the two subclasses.  (Supp. Br. Order of June 20, 2011.)  The parties filed letters stating their views on Wal-Mart's effect on June 21, 2011.  At the June 21, 2011 litigation management conference, the City and Plaintiff-Intervenors requested permission to submit additional briefing on Wal-Mart, and the court subsequently set a briefing schedule.  (Scheduling Order (Docket Entry # 648).)

In their briefs Plaintiff-Intervenors concede that Wal-Mart precludes certification of the subclass plaintiffs' claims under Rule 23(b)(2), but argue that the subclasses satisfy the requirements of Rule 23(b)(3).  (Int. Wal-Mart Mem. (Docket Entry # 647) at 2.)  For its part, the City contends that Wal-Mart requires the court to decertify the liability-phase class originally certified under Rule 23(b)(2) in the court's May 11, 2009 Liability Phase Class Certification Order (see Liability Cert. Order (Docket Entry # 281)), and further argues that the subclasses fail Rule 23(b)(3)'s predominance and superiority requirements.  (NYC Cert. Opp. (Docket Entry # 652) at 1.)  The City also argues that under Wal-Mart, the aggregate amount of noneconomic losses suffered by members of the subclasses is not susceptible to classwide proof.  (NYC Noneconomic Loss Cert. Opp. (Docket Entry # 645) at 3-4.)

II.     **CLASS CERTIFICATION**

      A.     **Legal Standard for Class Certification under Rule 23**

            1.     Rule 23(a) Prerequisites

"In determining whether class certification is appropriate, a district court must first ascertain whether the claims meet the preconditions of Rule 23(a) of numerosity, commonality, typicality, and adequacy." Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 201-02 (2d Cir. 2008) ("Bombardier"). "The numerosity requirement provides that the class must be 'so numerous that joinder of all members is impracticable.'" Brown v. Kelly, 609 F.3d 467, 475 (2d Cir. 2010) (quoting Fed. R. Civ. P. 23(a)(1)).

"The commonality requirement is met if there is a common question of law or fact shared by the class." Id. Questions are common to the class if the class members' claims

> depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

Wal-Mart, 2011 WL 2437013, at *7. Thus, the commonality analysis requires the court to determine (1) whether the class members' claims "will in fact depend on the answers to common questions," id. at *9, and (2) whether classwide proceedings have the capacity to "'generate common answers apt to drive the resolution of the litigation,'" id. at *7 (quoting Richard Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)); see also In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006) ("Strip Search Cases") ("[A]n issue is common to the class when it is susceptible to generalized, class-wide proof."). "[F]or purposes of Rule 23(a)(2) even a single common question will do." Id. at *11 (quotation marks and alterations omitted).

"Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members.  This requirement 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  Brown, 609 F.3d at 475 (quoting Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997)).  "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent.  A class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625-26 (1997) (quotations, citations, and alterations omitted).  "The adequacy-of-representation requirement 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a), which 'serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  Amchem, 521 U.S. at 626 n.20 (quoting General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982) ("Falcon")).

The four explicit requirements of Rule 23(a) imply a fifth: that the identities of the class members are reasonably ascertainable by reference to objective criteria.  See In re Initial Public Offerings Secs. Litig., 471 F.3d 24, 44-45 (2d Cir. 2006) ("In re IPO") (quoting In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 209 F.R.D. 323, 337 (S.D.N.Y. 2002)).

2.       Standards for Certification under Rule 23(b)

 "If [the Rule 23(a)] criteria are met, the district court must next determine whether the class can be maintained under any one of the three subdivisions of Rule 23(b)."  McLaughlin v. Am. Tobacco Co., 522 F.3d 215, 222 (2d Cir. 2008), partially abrogated on other grounds by

Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008).  The Second Circuit summarized

the requirements for certification under Rule 23(b)(2) and (b)(3), the only provisions of Rule

23(b) applicable here, in Brown v. Kelly:

>        Under Rule 23(b)(2), class certification is appropriate if "the party
> opposing the class has acted or refused to act on grounds that apply generally to
> the class, so that final injunctive relief or corresponding declaratory relief is
> appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

>        Under Rule 23(b)(3), class certification is appropriate if "the questions of
> law or fact common to class members predominate over any questions affecting
> only individual members, and . . . a class litigation is superior to other available
> methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.
> 23(b)(3).

Brown, 609 F.3d at 476.

       In Wal-Mart, the Supreme Court compared Rule 23(b)(2) to (b)(3), concluding that "the

combination of individualized and classwide relief in a (b)(2) class is [] inconsistent with the

structure of Rule 23(b)."  Wal-Mart, 2011 WL 2437013, at *12.  The Wal-Mart Court reasoned

that a class certified under (b)(2) has "the most traditional justification[] for class treatment . . .

that the relief sought must perforce affect the entire class at once."  Id.  A class certified under

(b)(3), by contrast, "allows class certification in a much wider set of circumstances but with

greater procedural protections."  Id.; see also Amchem, 521 U.S. at 615 ("Framed for situations

in which 'class-action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2)

situations, Rule 23(b)(3) permits certification where class suit 'may nevertheless be convenient

and desirable.'" (quoting Fed. R. Civ. P. 23 adv. comm. n. to 1966 amend.)).  Thus, Wal-Mart

held "that individualized monetary claims belong in Rule 23(b)(3)."  2011 WL 2437013, at *13.

       "To qualify for certification under Rule 23(b)(3), a class must meet two requirements

beyond the Rule 23(a) prerequisites: Common questions must 'predominate over any questions

affecting only individual members'; and class resolution must be 'superior to other available

methods for the fair and efficient adjudication of the controversy.'"  <u>Amchem</u>, 521 U.S. at 615

(quoting Rule 23(b)(3)).  "Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a

court's close look at the predominance and superiority criteria."  <u>Id.</u> at 615-16 (quotation marks

omitted).  Those factors are:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed. R. Civ. P. 23(b)(3).

"As a general matter, the 'Rule 23(b)(3) predominance inquiry tests whether proposed

classes are sufficiently cohesive to warrant adjudication by representation.'"  <u>Strip Search Cases</u>,

461 F.3d at 225 (quoting <u>In re Visa Check/MasterMoney Antitrust Litig.</u>, 280 F.3d 124, 136 (2d

Cir. 2001) ("<u>In re Visa Check</u>")).

> "[E]conomies of time, effort, and expense" in fully resolving each plaintiff's claim will only be served, and the predominance requirement satisfied, if the plaintiffs can show that "some" of the [common] questions can be answered with respect to the members of the class as a whole "through generalized proof" and that those common issues are "more substantial" than individual ones.

<u>Myers v. Hertz Corp.</u>, 624 F.3d 537, 549 (2d Cir. 2010) (internal citations omitted, quoting

<u>Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.</u>, 502 F.3d 91, 104 (2d Cir. 2007)

and <u>Moore v. PaineWebber, Inc.</u>, 306 F.3d 1247, 1252 (2d Cir. 2002)).

In determining whether common issues will predominate overall, district courts are

required to consider *all* factual or legal issues, including those conceded by the party opposing

class certification or resolved earlier in the litigation.  <u>See</u> <u>Myers</u>, 624 F.3d at 550 ("[T]he reason

for this is that the predominance requirement requires a district court to consider *all* factual or

legal issues, to determine whether the issues subject to generalized proof are more substantial

than those subject to individual inquiry." (quotation marks and citation omitted)); <u>Strip Search Cases</u>, 461 F.3d at 227-29 (holding that district court abused its discretion in finding predominance requirement unsatisfied where defendants conceded "all the major liability issues" and asserted an affirmative defense requiring only de minimis individualized inquiry). Moreover, the Second Circuit has held that a class can be certified as to particular common issues under Rule 23(c)(4) in order "to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3)['s predominance requirement]." <u>Strip Search Cases</u>, 461 F.3d at 227.

3.   <u>Burden of Proof</u>

"[A] district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met" and "only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established." <u>In re IPO</u>, 471 F.3d at 41.  The court must make these findings by a preponderance of the evidence.  <u>Bombardier</u>, 546 F.3d at 202.  Where factual questions underlying a Rule 23 requirement overlap with merits questions, the court is obligated to decide them, but "a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement." <u>In re IPO</u>, 471 F.3d at 41; <u>see also</u> <u>Wal-Mart</u>, 2011 WL 2437013, at *7 ("[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'  Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." (quoting <u>Falcon</u>, 457 U.S. at 160-61) (internal citations omitted)).

9

**B.     Motion to Decertify the Liability-Phase Class Certified under Rule 23(b)(2)**

Before Wal-Mart, the Second Circuit's opinion in Robinson v. Metro-North Commuter Railroad Co., 267 F.3d 147 (2d Cir. 2001), governed the application of Rule 23(b)(2) to employment discrimination class actions in this Circuit.  While all parties now agree that Wal-Mart precludes remedial-phase certification of the two subclasses as to the victims' claims for backpay and compensatory damages under (b)(2), the City goes further, arguing that Wal-Mart requires the court to decertify the class certified under (b)(2) in the liability phase.  (See NYC Cert. Opp. at 1-2.)  The City argues that the court's May 11, 2009 Liability Phase Class Certification Order was inconsistent with Rule 23(b) because it improperly certified a plaintiff class seeking non-incidental monetary relief under (b)(2).  (Id.)

On reconsideration after Wal-Mart, the court concludes that its decision to certify the question of the City's liability for disparate impact and pattern-or-practice disparate treatment violations under Rule 23(b)(2) was consistent with Wal-Mart and controlling Second Circuit precedent, and denies the City's motion to decertify the liability-phase class.

1.     The Court's Liability Phase Class Certification Order

In the court's September 5, 2007 Bifurcation Order, the court followed the Second Circuit's guidance in Robinson, 267 F.3d at 168, and bifurcated the litigation into liability and, if necessary, remedial phases pursuant to Federal Rule of Civil Procedure 42(b).  (Bifurcation Order (Docket Entry # 47) at 3-4.)  In the court's May 11, 2009 Liability Phase Class Certification Order, the court certified a class of

> [a]ll black firefighters or firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were harmed by one or more of the following employment practices:  (1) Defendants' use of Written Exam 7029 as a pass/fail screening device with a cutoff score of 84.705; (2) Defendants' rank-order processing of applicants who passed Written Exam 7029; (3) Defendants' use of Written Exam 2043 as a pass/fail screening device with a cutoff score of 70.00;

10

and (4) Defendants' rank-order processing of applicants who passed Written Exam 2043.

(Liability Cert. Order at 33-34.)  The class was certified to litigate only "the liability phase of the disparate treatment and disparate impact claims asserted by the Intervenors."  (Id. at 34.)

As the court noted in its analysis of Rule 23(a)(2)'s commonality requirement, the liability phase presented four common questions that were relevant to the class's disparate impact and pattern-or-practice disparate treatment claims:

> whether Defendants' uses of Written Examination 7029 and Written Examination 2043 had a disparate impact upon black applicants for the position of entry-level firefighter; whether Defendants' uses of those examinations were job related to the position in question and consistent with business necessity; whether alternative practices that satisfy the asserted business necessity without disparate effect are available; and whether Defendants engaged in a pattern or practice amounting to intentional discrimination.

(Id. at 28-29.)  The court stated that Plaintiff-Intervenors' request for non-incidental monetary relief could potentially raise individual questions and due process concerns, but noted that those concerns would not arise, if at all, until the remedial phase of the litigation.  (Id. at 32-33.)  The court quoted Robinson's observation that "'for those stages of this case where the interests of the class members are essentially identical (i.e., the liability phase of the pattern-or-practice suit and the class-wide phases of the disparate impact claim), the due process rights of absent class members are ensured by adequate class representation alone.'"  (Id. at 33 (quoting Robinson, 267 F.3d at 167 n.10).)  Consequently, the court certified the liability-phase class under Rule 23(b)(2), and stated its intent to reconsider class certification if the litigation proceeded beyond the liability phase.  (Id. at 33-34.)

2.      The Second Circuit's Decision in <em>Robinson</em>

Understanding how Wal-Mart has changed the law of this Circuit—and how it has not—requires a brief comparison of Robinson's and Wal-Mart's holdings.  In Robinson the Second

11

Circuit decided an appeal from the district court's denial of a motion to certify, under Rule 23(b)(2), a class of African-American Metro-North employees who claimed that they were the victims of employment discrimination on the basis of their race in violation of Title VII of the Civil Rights Act of 1964.  267 F.3d at 155.  The class challenged "Metro North's company-wide policy of delegating to department supervisors discretionary authority to make employment decisions related to discipline and promotion," and asserted both disparate impact and pattern-or-practice disparate treatment claims.  Id.  The class plaintiffs moved "for (b)(2) class certifications of both the pattern-or-practice disparate treatment claim and the disparate impact claim."  Id. at 156.  The district court denied certification of both the disparate impact and disparate treatment claims.  Id. at 156-57.

With respect to the disparate impact claim the Second Circuit relied on well-established precedent permitting employment discrimination plaintiffs to recover backpay in (b)(2) class actions, stating "we think it plain that (b)(2) certification of disparate impact claims seeking both injunctive and equitable monetary relief remains appropriate."  Id. at 169-70.[3]  The Second Circuit, therefore, instructed the district court to certify the class's disparate impact claims under Rule 23(b)(2).  Id. at 172.

With respect to the class plaintiffs' pattern-or-practice disparate treatment claims, including the class plaintiffs' request for compensatory damages, Robinson elaborated a new ad hoc balancing approach for district courts to use in determining whether damages or injunctive relief were the predominant form of relief sought by the plaintiff class.  Id. at 155, 164.  Robinson held that a district court could certify a claim seeking both injunctive and monetary

---

[3]      The court reached this conclusion after observing that the Civil Rights Act of 1991, codified at 42 U.S.C. § 1981a, which authorized compensatory and punitive damages in disparate treatment cases, did not alter the remedial structure of disparate impact claims.  Id. at 157-58.  The court noted that "prior to the enactment of the Civil Rights Act of 1991, Title VII discrimination claims seeking both injunctive and equitable monetary relief, like the disparate impact claim here, were routinely certified as (b)(2) classes."  Id. at 169 (collecting cases).

relief under Rule 23(b)(2) if it found that the requested monetary relief did not predominate over the requested injunctive relief.  Id.  If, after using the ad hoc balancing approach, the district court determined that the pattern-or-practice disparate treatment claim could not be certified under Rule 23(b)(2) as a whole, Robinson held that the district court should still certify the liability phase of the pattern-or-practice claim for class treatment under Rule 23(b)(2) by using its authority to certify particular issues for class treatment under Rule 23(c)(4).  Id. at 167-68. Robinson reasoned that the interests of the class members were "essentially identical" in the liability phase of a pattern-or-practice disparate treatment action, and in the classwide phase of a disparate impact action.  Id. at 166-67 n.10.  But the Second Circuit recognized that certifying a mandatory (b)(2) as to claims for non-incidental monetary relief posed a due-process risk.  Id. Therefore, Robinson held that "any due process risk posed by (b)(2) class certification of a claim for nonincidental damages can be eliminated by the district court simply affording notice and opt out rights to absent class members for those portions of the proceedings where the presumption of class cohesion falters—i.e., the damages phase of the proceedings."  Id. at 166.

To summarize, Robinson held in relevant part: (1) that a class seeking both classwide injunctive and individual backpay relief on a disparate impact claim should be certified for class treatment under (b)(2); (2) that a pattern-or-practice disparate treatment claim seeking compensatory damages in addition to equitable relief may be certified for class treatment under (b)(2) if the monetary relief sought does not predominate over the injunctive relief sought; (3) that even if the entire pattern-or-practice disparate treatment claim cannot be certified under (b)(2), a district court should still certify the liability phase of the claim for class treatment under (b)(2), and reconsider the propriety of continued (b)(2) certification if the case proceeds to the remedial phase; and (4) that a district court may mitigate due process concerns implicated by using

(b)(2) to decide questions of individual monetary relief in the remedial phase by affording notice

to absent class members and giving them the right to opt-out of the (b)(2) class under Rule

23(c)(2).

> 3.    The Supreme Court's Decision in *Wal-Mart*

In Wal-Mart the Supreme Court held that claims for monetary relief may not be certified

under Rule 23(b)(2), "at least where (as here) the monetary relief is not incidental to the

injunctive or declaratory relief. . . . [A]t a minimum, claims for *individualized* relief (like the

backpay at issue here) do not satisfy the Rule."[4]  2011 WL 2437013, at *12.  In so holding, a

unanimous Supreme Court reduced to rubble more than forty years of precedent in the Courts of

Appeals, which had long held that backpay is recoverable in employment discrimination class

actions certified under Rule 23(b)(2).  See Robinson, 267 F.3d at 169 (collecting cases); see also

Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998).

The Supreme Court's opinion in Wal-Mart abrogated three of the Second Circuit's

holdings in Robinson.  After Wal-Mart, it is clear that claims for neither backpay nor

compensatory damages may be certified for class treatment under Rule 23(b)(2), at least where

those claims are more than wholly incidental to the injunctive relief sought by the class.  2011

WL 2437013, at *12.  Furthermore, Wal-Mart held that claims for individual monetary relief

may only be certified for class treatment under Rule 23(b)(3) after the district court has made the

---

[4]     Although Wal-Mart's holding in relation to the appropriate scope of Rule 23(b)(2) certification was apparently limited to individualized *monetary* relief, the Court's reasoning was not so limited.

> In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  *It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.*  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.

Wal-Mart, 2011 WL 2437013, at *12 (emphasis added).  Because the court certifies the two subclasses under Rule 23(b)(3) for the reasons explained below, the court need not decide whether Wal-Mart precludes (b)(2) certification of claims for individualized injunctive relief, such as priority hiring or retroactive seniority.

requisite findings of predominance and superiority, and if the court provides absent class members with notice and opt-out rights.  Id. at *13-15.  Finally, Wal-Mart clarified that the structure of Rule 23(b) requires that claims for non-incidental monetary relief be certified for class treatment only if all of the (b)(3) requirements are satisfied—notice-and-opt-out rights alone are insufficient.  Id. at *13.

      4.      Issue Certification under Rule 23(b)(2) and (c)(4) after *Wal-Mart*

Robinson's holding requiring Rule 23(b)(2) certification of the liability phase of pattern-or-practice disparate treatment cases is, however, technically undisturbed by Wal-Mart, and remains the law in this Circuit.  Wal-Mart interpreted only Rule 23(a)(2) and (b).  The Supreme Court did not have occasion to decide whether a district court may order (b)(2) certification, under Rule 23(c)(4), of particular issues raised by disparate impact or pattern-or-practice disparate treatment claims that satisfy (b)(2)'s requirements.  In Wal-Mart, the Court's conclusion that the class failed Rule 23(a)(2)'s commonality requirement foreclosed the certification of *any* class.  See 2011 WL 2437013, at *11.

The Second Circuit has consistently endorsed a broad reading of Rule 23(c)(4).  In Robinson, the Court of Appeals stated that "[d]istrict courts should take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies."  Robinson, 267 F.3d at 167 (quotation marks and alterations omitted).  Robinson, held that (c)(4) may be used to certify those portions of a claim that satisfy (b)(2) even if the claim as a whole does not.  267 F.3d at 167-68.  And, in Strip Search Cases, the Second Circuit held that (c)(4) may be used "to certify a class as to a specific issue where the entire claim does not satisfy Rule 23(b)(3)'s predominance requirement."  461 F.3d at 226.  Strip Search Cases quoted the Advisory Committee Notes, observing that "the notes

illustrate that a court may properly employ this technique to separate the issue of liability from damages." Id. (quoting Fed. R. Civ. P. 23(c)(4) adv. comm. n. to 1966 amend. ("For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.")).

The Second Circuit's interpretation of Rule 23(c)(4) is consistent with Wal-Mart's interpretation of Rule 23(b). Wal-Mart's interpretation of Rule 23(b) turned on the Court's analysis of the structural differences between (b)(2) and (b)(3) classes. The Court noted that "[t]he key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" Wal-Mart, 2011 WL 2437013, at *12 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 98, 132 (2009)). The Court reasoned that (b)(2) does not provide the same procedural protections for absent class members that (b)(3) does because the members of a (b)(2) class share a unity of interest in the remedy that they would not if they sought monetary relief requiring individualized determinations of fact and law.

> When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so—which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class.

Id. at *13. In light of the structure of Rule 23(b), the Wal-Mart Court concluded that it was "clear that individualized monetary claims belong in Rule 23(b)(3)." Id.

Issue certification of bifurcated liability-phase questions is fully consistent with Wal-Mart's careful attention to the distinct procedural protections attending (b)(2) and (b)(3) classes.

16

Robinson observed that a plaintiff class seeking to establish a defendant's liability for discrimination under either a pattern-or-practice disparate treatment theory or a disparate impact theory must introduce evidence of discrimination against the protected group as a whole.  For pattern-or-practice disparate treatment claims, International Brotherhood of Teamsters v. United States ("Teamsters") requires district courts to conduct an initial liability phase to determine whether the plaintiffs have "establish[ed] a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group." Robinson, 267 F.3d at 158 (citing Teamsters, 431 U.S. 324, 360 (1977)). Robinson noted that if a plaintiff successfully carried its burden of persuading the trier of fact that the defendant engaged in a pattern or practice of intentional discrimination, the court could "proceed to fashion class-wide injunctive relief." Id. at 159 (citing Teamsters, 431 U.S. at 361).

The initial classwide phases of a disparate impact claim similarly focus on the defendant's employment actions vis-à-vis the protected group as a whole.  Disparate impact plaintiffs must "establish by a preponderance of the evidence that the employer 'uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" Id. at 160 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).  "As with the liability phase of a pattern-or-practice disparate treatment claim, statistical proof almost always occupies center stage in a prima facie showing of a disparate impact claim." Id.  The employer's defenses focus on the sufficiency of the plaintiffs' statistics and whether the challenged employment practices are job-related and consistent with business necessity. Id.  "Should the plaintiffs succeed in establishing a Title VII disparate impact violation, the court may order prospective class-wide injunctive relief." Robinson, 267 F.3d at 161.

Individual issues arise in disparate impact and pattern-or-practice disparate treatment cases only if the class establishes the employer's liability and the litigation proceeds to the remedial phase.  In pattern-or-practice disparate treatment cases, <u>Robinson</u> observed that the court considers questions of individual relief such as backpay, frontpay, and compensatory damages in a "remedial phase," <u>id.</u> at 159 (citing <u>Teamsters</u>, 431 U.S. at 362), only after the trier of fact finds that intentional discrimination against the protected group was the defendant's "standard operating procedure," <u>id.</u> at 158 (quoting <u>Teamsters</u>, 431 U.S. at 336).  <u>Robinson</u> explained that "the remedial phase also implicates questions of liability, albeit liability to each individual class member rather than to the class as a whole."  <u>Id.</u> at 158 n.4.  "[A] class member at the remedial stage of a pattern-or-practice claim need only show that he or she suffered an adverse employment decision 'and therefore was a potential victim of the proved [class-wide] discrimination.'"  <u>Id.</u> at 159 (quoting <u>Teamsters</u>, 431 U.S. at 362).  "The burden of persuasion then shifts to 'the employer to demonstrate that the individual [was subjected to the adverse employment decision] for lawful reasons.'"  <u>Id.</u> at 159-60 (quoting <u>Teamsters</u>, 431 U.S. at 362).  Disparate impact claims follow the same pattern:

> In order for an employee to obtain individual relief (e.g., back or front pay), an inquiry similar to the remedial stage of a pattern-or-practice disparate treatment claim is generally required.  Each class member must show that he or she was among those adversely affected by the challenged policy or practice.  If this showing is made, the class member is entitled to individual relief unless the employer in turn can establish by a preponderance of the evidence that a legitimate non-discriminatory reason existed for the particular adverse action.

<u>Id.</u> at 161-62.

Disparate impact and pattern-or-practice disparate treatment claims raise individual questions of law or fact only after the plaintiff class proves that the defendant "acted or refused to act on grounds that apply generally to the class."  <u>See</u> Fed. R. Civ. P. 23(b)(2).  In the liability phase, the class seeks an indivisible declaration that the employer has discriminated against a

protected group of which the class plaintiffs are members.  See Wal-Mart, 2011 WL 2437013,
at *13 ("When a class seeks an indivisible injunction benefitting all its members at once, there is
no reason to undertake a case-specific inquiry into whether class issues predominate or whether
class action is a superior method of adjudicating the dispute.  Predominance and superiority are
self-evident.").  Regardless of which forms of relief individual class members are most interested
in obtaining, all class members' claims to relief depend on establishing the employer's liability.
Thus, Robinson observed that in "the liability phase of the pattern-or-practice suit and the class-
wide phases of the disparate impact claim," "the interests of the class members are essentially
identical."  Robinson, 267 F.3d at 166-67 n.10.

      Consequently, even where class plaintiffs file a complaint seeking non-incidental
individual monetary relief, the classwide liability questions raised by their disparate impact and
pattern-or-practice disparate treatment claims are properly certified under Rule 23(b)(2) and
(c)(4).  The court's Liability Phase Class Certification Order was not erroneous and the City's
motion to decertify the liability-phase class is denied.

### C.     Common Questions as to Compensatory Damages for Noneconomic Losses

      The City argues that the court should reconsider its determination that Plaintiff-
Intervenors' claims for compensatory damages for noneconomic losses raise common questions
of fact and law.  (NYC Cert. Opp. at 2-3.)  Specifically, the City argues that it is impossible to
determine the aggregate amount of compensatory damages required to compensate the members
of the non-hire victim and delayed-hire victim subclasses for their noneconomic losses on a
classwide basis because "claimants may have pursued very different avenues in their lives and
the value of the 'intangibles' would vary as individual's [sic] satisfaction with their work and
lives will vary."  (Id. at 2.)  The court agrees and finds that the non-hire victim and delayed-hire

victim subclasses do not share common questions of fact and law as to the determination that the putative subclass members have suffered noneconomic injuries, the extent of those losses, or the amount of damages required to compensate them for those losses.  As a further consequence of this finding, the court denies Plaintiff-Intervenors' motion for summary judgment on classwide compensatory damages.  (Int. Noneconomic Loss Mot. (Docket Entry # 575).)

1.    The First Remedial Phase Class Certification Order

In the court's First Remedial Phase Class Certification Order, the court found that there were common questions of fact and law shared by the members of the noneconomic loss subclass, that those common questions predominated over individual questions, and that a class action was a superior means of resolving them.  (First Remedial Cert. Order at 30-33.) Advocating for certification of the plaintiff class as to questions relating to their claims for compensatory damages for noneconomic losses, Plaintiff-Intervenors contended that

> because of the unique nature of the firefighter job, each Class Member shares the same common harms – such as the loss of prestige, enjoyment of life, flexible scheduling and job security – that are inherent to having lost the opportunity to become a New York City firefighter.  These common losses exist for all members of the Class, regardless of the specific circumstances of any particular Class member.

(Int. Noneconomic Loss Mem. (Docket Entry # 577) at 2.)  Consequently, Plaintiff-Intervenors proposed a classwide method of proving the existence and extent of the subclasses' noneconomic losses, and calculating the damages necessary to compensate them for those losses.  The court described this method in its First Remedial Phase Class Certification Order:

> Plaintiff-Intervenors propose that the court compute class damages for noneconomic losses in substantially the same manner in which the parties agree that the court should calculate aggregate class-wide backpay.  Specifically, Plaintiff-Intervenors propose that the court calculate class-wide compensatory damages for non-economic losses by "1) determining the number of victims;[1] 2) estimating the length of time that they suffered losses; and 3) establishing a monetary valuation of their injury."  (Int. Noneconomic Loss Mem. at 13.)  After

20

determining the aggregate class damages for non-economic losses Plaintiff-Intervenors propose to distribute it among eligible black claimants.  (Id. at 17-20.)

(First Remedial Cert. Order at 31.)

The court did not, however, endorse Plaintiff-Intervenors' approach to calculating compensatory damages on a classwide basis.  The court stated: "At this time the court does not rule on the viability of Plaintiff-Intervenors' proposed method of calculating classwide damages for noneconomic losses.  The court will rule on Plaintiff-Intervenors' motion for summary judgment as to classwide damages for noneconomic losses in a separate opinion."  (Id. at 31 n.16.)  Nevertheless, the court found that each subclass member's claims to noneconomic losses raised common questions of fact and law, including:

> (1) the monetary value of the intangible benefit of service as a New York City firefighter after taking into account the offsetting intangible cost of the risks to which New York City firefighters are exposed; and (2) the legal question regarding whether the monetary value of intangible benefits subclass members obtain from interim employment should offset the lost value of the intangible benefits of employment as a New York City firefighter.

(Id. at 33.)

### 2.    Legal Standard for Commonality

On reconsideration after Wal-Mart, the court concludes that it erred when it certified the noneconomic loss subclass in its First Remedial Phase Class Certification Order without deciding whether the fact and extent of Plaintiff-Intervenors' noneconomic losses and the aggregate damages required to compensate them for those losses were questions susceptible of classwide proof.  See Strip Search Cases, 461 F.3d at 227 ("[A]n issue is common to the class when it is susceptible to generalized, class-wide proof.").  Before finding that there were common questions of fact or law shared by the members of the noneconomic subclass, the court should have determined whether the putative subclass members' proposed method of proving

classwide compensatory damages was permissible under the law authorizing victims of discrimination to recover compensatory damages for their noneconomic losses.

Wal-Mart put a fine point on this principle when it disapproved of the Ninth Circuit's statement that it was possible to replace the individualized remedial-phase proceedings required by Teamsters, 431 U.S. at 361-62, with a statistical sampling method the Supreme Court dubbed "Trial by Formula." Wal-Mart, 2011 WL 2437013, at *15. The Supreme Court explained that "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,'" Rule 23 cannot authorize a method of proof that would effectively deprive a litigant of a right guaranteed by the underlying substantive law to be litigated in class proceedings. Id. (quoting 28 U.S.C. § 2072(b)). Wal-Mart's rejection of "Trial by Formula" means that the underlying substantive law determines whether individual proceedings are required; a litigant may not convert an individual question into a common question by concocting a method of classwide proof that subverts rights created by the underlying substantive law. When determining whether a question is common to the class, the court must look to the underlying substantive law to determine whether the proposed method of classwide proof prevents the party opposing class certification from asserting its substantive rights.

3.      Legal Standard for Recovery of Compensatory Damages

Victims of intentional discrimination in violation of Title VII are entitled, under 42 U.S.C. § 1981a, to compensatory damages for losses that are not otherwise compensable under

the enforcement provisions of 42 U.S.C. § 2000e-5(g).[5]  The compensatory damages authorized

by § 1981a are, in contrast to the backpay ordinarily available § 2000e-5(g), a tort-like remedy.

See United States v. Burke, 504 U.S. 229, 240-42 (1992) (contrasting Title VII's focus on

redressing "legal injuries of an economic character" with 42 U.S.C. § 1981, which permits

victims of some forms of employment discrimination to obtain tort-like damages); Druse v. IBM

Corp., 252 F.3d 151, 160-61 (2d Cir. 2001) (discussing Burke).  "[D]amages in tort cases are

designed to provide *compensation* for the injury caused to plaintiff by defendant's breach of

duty."  Memphis Community Schools District v. Stachura, 477 U.S. 299, 306 (1986) (quotation

marks omitted).  Thus, a plaintiff who seeks compensatory damages must prove that the

defendant's breach of duty caused him actual injury.  Id. at 308 (holding that "principles of tort

damages on which . . . [42 U.S.C.] § 1983 is grounded" require plaintiff to prove actual injury).

Consistent with these principles, the Second Circuit has held that victims of intentional

employment discrimination may recover compensatory damages under § 1981a(a)(1) if they

"prove that the discrimination caused them 'emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, [or] other nonpecuniary losses.'"  Robinson, 267 F.3d at 160

(quoting 42 U.S.C. § 1981a(b)(3)).  This requires proceedings capable of determining "whether

and to what extent" the discrimination caused the injuries complained of by the plaintiff.  See

Cowan v. Prudential Ins. Co. of Am., 852 F.2d 688, 690-91 (2d Cir. 1988) (affirming award of

compensatory damages under § 1981 and Title VII where, after bench trial, district court

---

[5]      In the court's Disparate Treatment Opinion, the court granted summary judgment in favor of the plaintiff
class on the question of the City's liability for engaging in a pattern-or-practice of intentional discrimination against
black firefighter applicants in violation of Title VII, 42 U.S.C. §§ 1981, 1983, the Equal Protection Clause of the
Fourteenth Amendment, N.Y. Exec. Law § 296(1)(a) ("NYSHRL"), and NYC Administrative Code § 8-107(1)(a)
("NYCHRL").  See United States v. City of New York, 683 F. Supp. 2d 225, 273 (E.D.N.Y. 2010).  In their briefs,
Plaintiff-Intervenors apparently focus on the damages available under § 1981a, and do not draw distinctions between
the damages available under these various provisions, except to note the NYSHRL and NYCHRL make
compensatory damages available even for disparate impact violations.  (See Int. Mem. on Classwide Compensatory
Damages for Noneconomic Losses (Docket Entry # 401) at 6; Int. Noneconomic Loss Mem. at 13.)  Although, these
provisions provide distinct remedies, they all rely on the common law tort principles the court applies here.

considered that the plaintiff "himself was the cause of some of the humiliation he suffered and some of the difficulties he had with co-workers").  Other circuit courts have held that individualized assessments of intangible injury are required:

> Damages can be awarded only after proof of discrimination and injury specific to the individual plaintiff, so deciding the damages claims depends on an individualized analysis of each class member's circumstances and requires additional hearings to resolve the disparate merits of each individual's case. . . . [E]ach individual plaintiff pursuing damages claims [] would need to establish that [the employer's] discrimination caused her personal injury and would need to show the magnitude of injury to determine compensatory damages.

Lemon v. Int'l Union of Operating Engineers Local No. 139, 216 F.3d 577, 581 (7th Cir. 2000); see also Allison, 151 F.3d at 416-17 ("[C]ompensatory damages for emotional distress and other forms of intangible injury will not be presumed from mere violation of constitutional or statutory rights.  Specific individualized proof is necessary, and testimony from the plaintiff alone is not ordinarily sufficient.") (citations omitted).

### 4.   Plaintiff-Intervenors' Proposed Method of Classwide Proof

Plaintiff-Intervenors argue that the unique characteristics of a firefighter's job allow firefighters to enjoy their lives more than employees in other jobs, and they seek to recover for the lost intangible enjoyment of life "directly resulting from the denial of the unique characteristics of the firefighter job."  (Int. Noneconomic Cert. Mem. (Docket Entry #650) at 5.) Under Plaintiff-Intervenors' proposal, proving that the subclass members suffered noneconomic losses would be a relatively simple affair:

> the Court would hear testimony from firefighters and/or class members who are able to provide the Court with evidence so that the Court could evaluate the opportunities for the enjoyment of life as a firefighter versus that of other jobs that lack those unique characteristics.  On that basis, the Court could evaluate the intangible loss associated with the denial of the firefighter job. . . . [T]he individual state of mind of the class members need not be considered.

(Int. Noneconomic Cert. Mem. at 4-5.)  According to Plaintiff-Intervenors, the intangible benefits of being a firefighter include: prestige, job satisfaction, camaraderie, unique excitement, enjoyment of flexible scheduling, unusual employment stability, feelings of security derived from retiring with a full pension and lifetime medical benefits, and the potential for career advancement.  (Int. Noneconomic Loss Mem. at 4-5.)  Plaintiff-Intervenors submit affidavits from several current firefighters, some of whom are delayed-hire victims, to establish the existence of these characteristics of the firefighter's job, as well as several other affidavits from non-hire victims to establish that their interim employment[6] has not provided them the same intangible benefits.  (See id. at 6-12 (summarizing affidavits).)

Plaintiff-Intervenors contend that based on the anticipated testimony and the affidavits "[t]he Court should find that the annual emotional loss to each of the class members denied hire (i.e., the 186-person shortfall) is $10,000."  (Id. at 15.)  They state that the court should use this number because it is supported by the affidavits filed in support of the motion, and it is "well within the range of awards affirmed by New York courts for 'garden variety' emotional harm damages in employment discrimination cases."  (Id. at 16.)  Under Plaintiff-Intervenors' method, the court would multiply the annual amount of loss by the number of years the shortfall hires would have been employed if they had been hired, and by the number of years the delayed-hire victims were delayed in hiring because of the City's discrimination.  (Id. at 13.)  The court would

---

[6]       The court uses the term "interim employment" to refer to employment obtained by victims of discrimination in lieu of employment as New York City firefighters after the City chose not to hire them.

then distribute the aggregate damages to each eligible claimant pro rata, without conducting any individualized determination of the loss suffered by particular claimants. (Id. at 17-18.)[7]

### 5. Assessment of Monetary Relief for Subjective Loss

Plaintiff-Intervenors' proposal presents numerous problems that prevent the court from approving it. The first is that it assumes that there is a freestanding, objective valuation of the intangible benefits of being a firefighter that is shared by all applicants for the job. This is simply not the case. Different people will inevitably be attracted in differing degrees to different intangible benefits offered by a particular job. In assessing the magnitude of the actual injury sustained by a claimant denied the intangible benefits of employment, the trier of fact must determine how significant the intangible benefits of the job were to the particular claimant. This determination is necessarily a subjective one that requires an individualized assessment. The Restatement (Second) of Torts reaches essentially the same conclusion in a comment discussing the appropriate measure of recovery for compensatory damages for nonpecuniary harm:

> [A]ll relevant circumstances are considered, including sex, age, condition in life and any other fact indicating the susceptibility of the injured person to this type of harm. . . . there is no rule of certainty with reference to the amount of recovery permitted for any particular type of emotional distress; the only limit is such an amount as a reasonable person could possibly estimate as fair compensation. . . . The extent and duration of emotional distress produced by the tortious conduct depend upon the sensitiveness of the injured person.

Restatement (Second) of Torts § 905 cmt. i.

---

[7]      This method resembles the method the Supreme Court termed "Trial by Formula." Wal-Mart includes a brief description of that method:

> A sample set of the class members would be selected, as to whom liability for sex discrimination and the backpay owing as a result would be determined in depositions supervised by a master. The percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings

Wal-Mart, 2011 WL 2437013, at *15. See Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571, 625-628 (9th Cir. 2010) (quoting Hilao v. Estate of Marcos, 103 F.3d 767, 782-87 (9th Cir. 1996)), rev'd Wal-Mart, 2011 WL 2437013.

In certain situations it is appropriate to calculate individual relief on a classwide basis and distribute it to claimants eligible to receive relief on a pro rata basis. Ordinarily, "[r]emedial relief should be granted only to those class members who would have filled vacancies had there been no discrimination." Ingram v. Madison Square Garden Center, Inc., 709 F.2d 807, 812-13 (2d Cir. 1983) (citing Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 284-87 (2d Cir. 1981) ("AADE")). The Second Circuit and several other circuit courts have agreed, however, that classwide calculation and pro rata distribution of *backpay* is appropriate in cases, such as this one, "where 'the number of qualified class members exceeds the number of openings lost to the class through discrimination.'" See Robinson, 267 F.3d 147, 161 n.6 (quoting Catlett v. Mo. Highway & Transp. Comm'n, 828 F.2d 1260, 1267 (8th Cir. 1987)); see also Ingram, 709 F.2d at 812-13; United States v. City of Miami, 195 F.3d 1292, 1299-1301 (11th Cir. 1999); Segar v. Smith, 738 F.2d 1249, 1289-91 (D.C. Cir. 1984). In cases such as this one, the court is unable to reliably determine which of the eligible job applicants would have been hired in the absence of discrimination. Robinson, 267 F.3d at 161 n.6 (quoting Catlett, 828 F.2d 1260, 1267). Instead of attempting to make such determinations on an individualized basis, "[t]he fairer procedure [is] to compute a gross award for all the injured class members and divide it among them on a pro rata basis." Ingram, 709 F.2d at 812-13.

But a classwide method for assessing individual relief only makes sense when the trier of fact is capable of making a classwide determination without the involvement of individual claimants. As the court explained in the First Remedial Phase Class Certification Order:

> In these circumstances, calculating the amount of backpay lost by members of the class because of the employer's discriminatory employment practices does not require individualized proof because the aggregate amount of backpay does not depend on the individual circumstances of any class member. The only individual questions relate to whether a particular individual is a victim of the employment practices causing the discrimination and is, therefore, a member of the class.

27

(First Remedial Cert. Order at 20.)  In that Order the court rejected class treatment of questions of mitigation because the determination of mitigation "requires a highly individualized, retrospective examination of the actions actually taken by a claimant in light of the particular circumstances faced by that claimant."  (Id. at 23.)  The court held that where the logic justifying the classwide approach authorized in Ingram and Robinson does not apply, relief should be decided on an individual basis.  (Id. at 24-25.)  As the Second Circuit stated in Robinson, classwide monetary relief "is the exception, not the rule: Where possible, 'there should be . . . a determination on an individual basis as to which class members are entitled to [recovery] and the amount of such recovery.'"  Robinson, 267 F.3d at 161 n.6 (quoting Shipes v. Trinity Industries, 987 F.2d 311, 318 (5th Cir. 1993)).

The same subjective considerations that prevented the court from determining mitigation on a classwide basis prevents the court from determining the aggregate value of damages required to compensate all victims of the City's discrimination for the intangible losses they have suffered in one classwide proceeding.  Unlike the determination of the pay that a claimant would have received if he or she had become a firefighter, determinations of the fact and extent of a claimant's noneconomic losses require an individualized assessment.

      6.      Proof Required to Establish the Fact and Extent of Noneconomic Losses

The second problem with this proposal is that is presumes that claimants have suffered actual losses.  Even if the trier of fact determined the value of the intangible benefit denied to the claimant, the fact finder must still determine whether the claimant obtained other intangible benefits from interim employment that tend to diminish the magnitude of the intangible benefits lost because of discrimination.  The court raised this concern in the First Remedial Phase Class Certification Order: "[i]t would be difficult to argue that a class member has actually suffered a

noneconomic loss where he has greater overall job satisfaction in his interim employment than he would have had if he been hired as a firefighter."  (First Remedial Cert. Order at 32.)

Nevertheless, Plaintiff-Intervenors argue that the court can infer the existence of the non-hire victims' and delayed-hire victims' losses "from the circumstances of the defendant's violation of the law."  (Int. Noneconomic Loss Cert. Mem. at 4.)  Plaintiff-Intervenors explain that their "claims for non-economic damage focus upon the common loss of the intangible benefits of the job that arise from the unique characteristics of the job, it is not necessary to assess each individual claimant's state of mind and job status during the damage period."  (Id.) Plaintiff-Intervenors' method of classwide proof rests on a misconception of what it is they must prove in order to establish their entitlement to compensatory damages for lost enjoyment life. This misconception is illustrated by comparing Plaintiff-Intervenors' theory of recovery and method of proof to two of the cases cited in their briefs.

Plaintiff-Intervenors cite Patrolmen's Benevolent Association of the City of New York v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002) ("PBA"), for the proposition that the Court of Appeals "rel[ied] upon 'the objective circumstances of the violation itself' as substantiation for an award of compensatory damages of $50,000 to each of the named plaintiffs affected by the same unlawful job transfer."  (Int. Noneconomic Loss Mem. at 12 (quoting PBA, 310 F.3d at 55).)  The damages affirmed by the Second Circuit in PBA were awarded by a jury after a 22 day trial at which "[m]ore than 40 witnesses testified . . . , *including all of the plaintiffs*, other NYPD officers and officials, [the New York City Police Commissioner], two expert witnesses, and [a City Councilwoman]."  PBA, 310 F.3d at 48 (emphasis added).  Those plaintiffs offered the jury personal accounts of the emotional distress they suffered as a result of the NYPD's decision to transfer them to a different police precinct because of their race.  Id. at 48-49.

They cite <u>Berger v. Iron Workers Reinforced Rodmen, Local 201</u>, 170 F.3d 1111, 1138 (D.C. Cir. 1999), for the proposition that the court upheld "an award of compensatory damages to a class of plaintiffs, not on the basis of individual testimony regarding their losses, but rather on the basis that damages 'may be inferred from the circumstances of the violation.'" (Int. Noneconomic Loss Mem. at 12.) <u>Berger</u> affirmed an award of compensatory damages by a special master to experienced African-American construction workers who were required to take entry-level training courses before being permitted to sit for a union entrance exam. <u>Berger</u>, 170 F.3d at 1138. The court explained "[t]here can be little doubt that claimants, who were experienced rodmen, suffered emotional distress by having to subject themselves to an unnecessary training program for up to two years before being permitted to take the union entrance exam." <u>Id.</u> The special master's determination of the damages required to compensate the claimants for their emotional distress was based on a liability-phase finding that the training requirement was discriminatory, and was reached after he held individual trials for 64 claimants and made "case-by-case" determinations of each claimant's level of experience during the remedial phase. <u>Id.</u> at 1116-18. Indeed, the special master's report evidences detailed individualized assessments of each claimant's experience and the extent of the emotional distress they suffered. <u>See</u> <u>Berger v. Iron Workers</u>, No. 75-CV-1743, 1994 WL 151292, at *1 (D.D.C. Apr. 14, 1994) (report of the special master).

Determining what a plaintiff has lost because of discrimination requires the trier of fact to compare the world as it is with the world as it should have been in the absence of discrimination. Where a claimant seeks emotional distress damages, the actual loss is the emotional distress actually caused by the discrimination because the plaintiff would not have suffered that emotional distress in the absence of discrimination. In <u>PBA</u>, the jury awarded the plaintiffs

30

compensatory damages only after finding that the City transferred them explicitly because of their race, and only after the plaintiffs individually testified about the emotional distress they suffered. 310 F.3d at 48. In <u>Berger</u>, the special master's award of compensatory damages was based on an individualized assessment of each claimant's level of experience, and, in many cases, an inference that an experienced rodman would have been humiliated by being forced to take discriminatory entry-level training courses. <u>See, e.g.</u>, <u>Berger</u>, 1994 WL 151292, at *44-46 (finding "no doubt" that claimant who had 9,300 hours of experience as an ironworker suffered because of the racial discrimination against him, and stating that "[w]hen such an injury is likely to have occurred but difficult to establish, some form of award for presumed damage is appropriate").

For Plaintiff-Intervenors to prove that they have lost the enjoyment of life, however, they must prove that they have actually enjoyed life *less* than they would have if they had been hired by the City. Under the theory of recovery that Plaintiff-Intervenors advance, the fact finder must compare the enjoyment of life claimants actually obtained as a result of their interim employment with the enjoyment they would have obtained from being firefighters in the absence of discrimination—the difference is the extent of their loss. Plaintiff-Intervenors can prove neither that they suffered a loss nor the extent of the loss without proving what intangible advantages and disadvantages they obtained from their interim employment after they were subjected to discrimination.

Plaintiff-Intervenors apparently appreciate, to a certain extent, the significance of evidence of the characteristics of Plaintiff-Intervenors' interim employment. The affidavits submitted by potential non-hire claimants discuss in great detail the disadvantages of their current jobs. One affiant who works for the Metropolitan Transportation Agency states that his

31

"job as a train conductor is probably the opposite of the firefighter job," and describes being spit on and cursed at by angry passengers.  (Nicholson Noneconomic Loss Aff. (Docket Entry # 575-1) Ex. H ¶¶ 14-15.)  A driver for United Parcel Service laments that his work schedule is such that he has had to live on four hours of sleep a day in order to spend time with his children.  (Haywood Noneconomic Loss Aff. (Docket Entry # 575-1) Ex. F ¶¶ 4-5.) [8]  If the positive intangible value of being a firefighter—and not the value of a job as a firefighter relative to other employment—were all that mattered in determining the fact and extent of claimants' losses, this information about claimants' current employment would be entirely irrelevant.

The mix of intangible advantages and disadvantages characteristic of employment as a firefighter may be unique, but specific intangibles (e.g., prestige, camaraderie, scheduling flexibility) are also available in other occupations, though perhaps to different degrees.  Illustrating this point, Haywood and Nicholson compare the pride and respect they feel in their current employment (low) with the pride and respect they believe they would have felt if they had been hired as firefighters (high).  (See Haywood Noneconomic Loss Aff. ¶¶ 9-10; Nicholson Noneconomic Loss Aff. ¶¶ 14-15.)  But not all interim employment will necessarily compare to a firefighter's job in the same way for each characteristic.  For example, the City may be able to adduce evidence, perhaps through examining the claimant himself, that a claimant currently employed as a United States Marine experiences high degrees of satisfaction from his job because of the deep sense of pride he feels serving his country as member of one of our nation's most elite fighting forces, the camaraderie he shares living and serving with his fellow marines, and the respect he is given by citizens grateful for his service.  On the other hand, the claimant could introduce evidence showing that he has been ordered to leave his family for months at a

---

[8]     With one exception, (see Nicholson Noneconomic Loss Aff. ¶ 13), the affidavits neglect to discuss the intangible disadvantages (e.g., danger, stress, etc.) that are part and parcel of a firefighter's job.

time, has repeatedly exposed himself to great personal danger, has little control over his schedule

even when he is not deployed abroad, and is often required to perform mundane, repetitive tasks.

All of this information would be relevant to determining the fact and extent of the loss suffered

by a particular claimant, but the affidavits submitted by Plaintiff-Intervenors do not disclose the

characteristics of all potential claimants' current employment—just a select few.

        In PBA, the Second Circuit stated that "the mere fact that a constitutional deprivation has

occurred does not justify the award of such damages; the plaintiff must establish that she

suffered an actual injury caused by the deprivation.  The damage award 'must be supported by

competent evidence concerning the injury.'"  310 F.3d at 55 (internal citation omitted, quoting

Carey v. Piphus, 435 U.S. 247, 264 n.20 (1978)).  PBA further explained that "[a] plaintiff's

subjective testimony, standing alone, is generally insufficient to sustain an award of emotional

distress damages.  Rather, the plaintiff's testimony of emotional injury must be substantiated by

other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's

distress, or the objective circumstances of the violation itself."  Id. (internal citations omitted).

Similarly, Berger noted that in Memphis the Supreme Court "distinguished the impermissible

award of compensatory damages—where they are presumed merely from the violation of a

right—from the 'form of presumed damages [that] may possibly be appropriate . . . [to] roughly

approximate the harm that the plaintiffs suffered.'"  Berger, 170 F.3d at 1138 (quoting Memphis,

477 U.S. at 311).  "The critical distinction made by [] Memphis . . . is that courts may properly

infer emotional distress from factual circumstances—and award damages to compensate for that

distress—but may not presume damages from a bare violation of a statutory or constitutional

right."  Id. (quoting Memphis, 477 U.S. at 311).

The method of classwide proof proposed by Plaintiff-Intervenors, removes the individual claimants' burden to prove that they suffered actual injury and the magnitude of that injury, and replaces it with a measure of damages presumed merely from the City's violation of the law, unmoored from any measure of actual loss suffered by a particular claimant.  This method would prevent the City from insisting that each claimant carry his burden of proof, and from advocating for a diminished measure of damages for any particular claimant on grounds unique to that claimant.  That any measure of the recovery required to compensate a particular claimant for their noneconomic losses will be rough, inexact, and imprecise, cannot justify denying the City the opportunity to make its case to the trier of fact.

Under the facts of this case, presumed or general damages are inappropriate and are not authorized under §§ 1981, 1981a, or 1983.  Any measure of compensation for the members of the subclasses must be made in individualized proceedings during the individual claims process. Though the hearings that will be required to resolve these claims may be large in number,[9] the court will not shrink from the task of making the victims of the City's discrimination whole.  The court is prepared to do what is necessary to give all parties the opportunity to fully litigate their claims and defenses.

Plaintiff-Intervenors' motion to certify the non-hire victim and delayed-hire victim subclasses as to the classwide calculation of aggregate damages required to compensate the members of the subclasses for their noneconomic losses is denied because the fact and extent of claimants' noneconomic losses are not susceptible to classwide proof.  For the same reasons, the

---

[9]     The parties estimate that there are 7,100 black and Hispanic firefighter applicants who sat for one or more of Exams 7029 and 2043, and estimate that approximately 2,200 of those applicants may be eligible for individual relief.  (USA Proposed Notice Mem. (Docket Entry # 644) at 3.)  The Hispanic victims of the City's discrimination will not be eligible to recover compensatory damages because the United States has not alleged or proven that the City engaged in a pattern or practice of intentional discrimination against them.

court denies Plaintiff-Intervenors' motion for summary judgment as to the aggregate amount of classwide compensatory damages.

**D.     Certification of the Non-Hire Victim and Delayed-Hire Victim Subclasses**

      1.    <u>Rule 23(a) Prerequisites</u>

      *a.     Numerosity*

In the First Remedial Phase Class Certification Order, the court found that Plaintiff-Intervenors had established that there were approximately 203 black delayed-hire victims and as many as 2,939 black non-hire victims of the City's discrimination.  (First Remedial Cert. Order at 25-26.)  The court noted that "the precise number of delayed-hire and non-hire victims is presently unknown," but held that the evidence was sufficient to conclude that the noneconomic loss and injunctive relief subclasses were "sufficiently numerous that joinder of all putative class members would be virtually impossible."  (<u>Id.</u> at 26.)

Here, the precise number of black non-hire and delayed-hire victims remains unknown, but Plaintiff-Intervenors have established by a preponderance of the evidence that the members of each of the two groups of victims are sufficiently large that joinder of all the members of either group would be impracticable.  <u>See</u> <u>Consol. Rail Corp. v. Town of Hyde Park</u>, 47 F.3d 473, 483 (2d Cir. 1995) (numerosity presumed satisfied where putative class members number forty or more).  Both the non-hire victim and delayed-hire victim subclasses satisfy the numerosity requirement of Rule 23(a)(1).

      *b.     Commonality*

      i.    <u>Common Liability Questions</u>

During the liability phase of the litigation, each class member's disparate impact and pattern-or-practice disparate treatment claims raised the same common questions:

whether Defendants' uses of Written Examination 7029 and Written Examination 2043 had a disparate impact upon black applicants for the position of entry-level firefighter; whether Defendants' uses of those examinations were job related to the position in question and consistent with business necessity; whether alternative practices that satisfy the asserted business necessity without disparate effect are available; and whether Defendants engaged in a pattern or practice amounting to intentional discrimination.

(Liability Cert. Order at 28-29.)  An employer's use of a biased testing procedure to evaluate applicants for employment is sufficient to demonstrate the existence of questions of fact and law common to the claims of the members of the class alleging they were harmed by the discrimination.  See Wal-Mart, 2011 WL 2437013, at *8 (quoting Falcon, 457 U.S. at 159 n.15).

## ii.   Common Individual Relief Questions

While it is unclear whether these common liability-phase questions—since resolved—are implicated in the remedial-phase commonality analysis,[10] there are other common questions raised by the black non-hire and delayed-hire victims' claims for individual relief.  Under Title VII's two-stage process for adjudicating pattern-or-practice disparate treatment and disparate impact claims, potential victims seeking individual relief during the remedial phase must show that they were among those harmed by the City's discrimination, and the City must be given an opportunity to establish that there was a nondiscriminatory reason for the adverse employment action.  See Robinson , 267 F.3d at 161-62 (observing that if class members seek individual relief for a disparate impact violation or a pattern or practice of intentional discrimination the court must conduct a remedial phase).  Because it is impossible to determine exactly which non-hire victims would have received job offers and which delayed-hire victims would have been hired sooner in the absence of discrimination, the court must first determine the aggregate

---

[10]   See Strip Search Cases, 461 F.3d at 227-29 (holding that Rule 23(b)(3) predominance inquiry requires court to consider even those common issues that have been conceded).

36

amount of individual relief to which the subclasses are entitled and then distribute that relief pro

rata to eligible claimants.[11]  (See First Remedial Cert. Order at 18-20.)

Consequently, during the remedial phase, the members of the non-hire victim and

delayed-hire victim subclasses share numerous common questions of fact and law, including:

how to organize the process for determining which claimants have been victims of

discrimination, and thus eligible for individual relief; what other hiring criteria qualify as

nondiscriminatory reasons for the City's adverse employment action;[12] what is the aggregate

value of backpay and benefits lost by the members of the two subclasses; with respect to the

delayed-hire victims, what is the aggregate amount of retroactive seniority lost by the members

of the subclass; on what terms will retroactive seniority be made available to members of the two

subclasses; to what employment benefits will retroactive seniority apply; and, with respect to the

non-hire victims, how many priority hiring slots will be available, and under what conditions will

priority hiring relief be made available to non-hire victims.

---

[11]     Under Title VII, a classwide assessment of monetary relief is appropriate in those cases "where 'the number of qualified class members exceeds the number of openings lost to the class through discrimination and identification of the individuals entitled to relief would 'drag the court into a quagmire of hypothetical judgments' and result in 'mere guesswork.'"  See Robinson, 267 F.3d at 161 n.6 (quoting Catlett, 828 F.2d at 1267); see also Ingram, 709 F.2d 812-13.  The classwide assessment of monetary relief is a consequence of substantive Title VII law, and not a creative method of proof intended to accommodate the logistical demands of class proceedings.  See, e.g., Dougherty v. Berry, 869 F.2d 605, 614-15 (D.C. Cir. 1989) (R.B. Ginsburg, J.) (in a consolidated non-class action, directing classwide assessment and pro rata distribution of monetary relief among eight eligible firefighters who were denied two promotions on the basis of race).  For this reason, the classwide assessment of relief does not implicate Wal-Mart's warning that courts not use class proceedings under Rule 23 as an excuse to create new methods of proof that have the effect of modifying the parties' substantive rights.  See Wal-Mart, 2011 WL 2437013, at *15 (disapproving of "Trial by Formula").

[12]     The criteria used in determining which job applicants might have been hired in the absence of discrimination is a question that is common to the class because, as the court explained in the First Remedial Phase Class Certification Order, each subclass member has an interest in ensuring that they share the aggregate award with only those applicants who actually could have been hired in the absence of discrimination.  The determination that any particular claimant could have been hired in the absence of discrimination, and thus is eligible for individual relief, will reduce every other claimant's share of the aggregate individual relief award.  (First Remedial Cert. Order at 36-40.)  Thus, every claimant has a common interest in ensuring that only the appropriate criteria are used to determine which claimants are eligible to receive relief.

Although the court has found that the subclasses do not share common questions of fact or law with respect to the fact or extent of individual claimants' noneconomic losses, or the damages award necessary to compensate those losses, there are common questions of fact relating to the characteristics of a New York City firefighter's job.  While every job applicant will value different aspects of the job differently, each applicant will be required to prove by a preponderance of evidence the characteristics of the job from which he claims he would have derived intangible benefits.  Similarly, to the extent the City intends to argue that other characteristics of the job (e.g., danger and stress), offset the value of these benefits, the City would need to establish by a preponderance of the evidence that those characteristics exist.  Determining which characteristics have been proven or not proven in class proceedings would decide a contention common to each subclass member's claims for compensatory damages for noneconomic losses.

> c.    *Typicality and Adequacy*

In the First Remedial Phase Class Certification Order the court determined that the Individual Intervenors—Gregg, Haywood, and Nuñez—held claims for compensatory damages for noneconomic losses that were typical of those of the members of the noneconomic loss subclass, and that they could fairly and adequately protect the interests of the members of the subclass.  (Remedial Cert. Order at 28-29.)  The court indicated, however, that if Gregg, Haywood, Nuñez, Simpkins, and Walker sought to represent the interests of the non-hire victim and delayed-hire victim subclasses, the court would require them to submit new affidavits indicating their qualifications to serve as representative parties.  (Id. at 18 n.7, 43-44.)

In support of their motion for certification of the non-hire and delayed-hire victim subclasses, Plaintiff-Intervenors have submitted affidavits executed by Gregg (Gregg Aff.

38

(Docket Entry # 643-4)), Haywood (Haywood Aff. (Docket Entry # 643-5)), Walker (Walker

Aff. (Docket Entry # 643-6)), Nuñez (Nuñez Aff. (Docket Entry # 643-7)), and Simpkins

(Simpkins Aff. (Docket Entry # 643-8)).  Based on these affidavits, the court finds that Gregg,

Haywood, and Walker satisfy the requirements of Rule 23(a)(3) and (a)(4) with respect to their

representation of the non-hire victim subclass, and Nuñez and Simpkins satisfy the requirements

of Rule 23(a)(3) and (a)(4) with respect to their representation of the delayed-hire victim

subclass.

Gregg, Haywood, and Walker are black[13] men who each sat for either Exam 7029 or

Exam 2043 and were not hired for the position of entry-level firefighter by the City.  (Gregg Aff.

¶ 1; Haywood Aff. ¶ 1; Walker Aff. ¶ 1.)  Gregg and Haywood filed charges of discrimination

with the EEOC in 2005, and intervened as plaintiffs in this litigation in 2007.  (Gregg Aff. ¶ 2;

Haywood Aff. ¶ 2.)  Since that time, Gregg and Haywood have submitted numerous affidavits in

support of motions filed by counsel for Plaintiff-Intervenors.  Walker read about this case in the

New York Times in 2009 and contacted Levy Ratner about participating in the litigation.

(Walker Aff. ¶ 2.)  Although he has not yet been added to the litigation as a plaintiff, Walker has

---

[13]   The aggregate amount of individual relief available for distribution among the victims of the City's discrimination in the individual claims process will vary between black and Hispanic non-hire victims and black and Hispanic delayed-hire victims, reflecting the different degrees to which each protected group was harmed by the City's discrimination.  (See Disparate Impact Op. (Docket Entry # 294) ("DI Op.") at 16-23.)  Furthermore, only the black victims have established that the City engaged in a pattern or practice of intentional discrimination against them, and only the black victims are seeking compensatory damages.  (See Disparate Treatment Op. (Docket Entry # 385) ("DT Op.").)  Therefore, although someone may consider themselves to be both black *and* Hispanic, for the purposes of this litigation each claimant will need to establish that they are either a black or Hispanic victim of the City's discrimination.  During the claims process it may be sufficient to rely on a claimant's indication of their ethnicity as stated on their application to take the examination to be a firefighter.

Each of the black non-hire victim and delayed-hire victim affiants who seek appointment as representatives of their respective putative subclasses identifies himself as "African-American," except for Nuñez who identifies himself as "African-American and Latino."  (Nuñez  Aff. ¶ 1.)  The court interprets the putative subclass representatives' submission of affidavits in support of the motion for certification of  two subclasses of black victims of the City's discrimination as their election that they consider themselves to be black victims of the City's discrimination, and that each seeks relief on the same terms as the other black victims of the City's discrimination.  This election precludes the affiants from later claiming in the individual claims process that they are Hispanic victims of the City's discrimination.

assisted Plaintiff-Intervenors' efforts to litigate this case since 2009 by submitting affidavits in support of their motions.  Each of Gregg's, Haywood's, and Walker's affidavits indicate that they have discussed the litigation with putative non-hire victim subclass counsel Levy Ratner and understand the posture of the case, including the unique interests of the non-hire victim subclass vis-à-vis the delayed-hire victim subclass, and the common issues for which they will represent the members of the subclass.  (Gregg Aff. ¶¶ 4, 6-7, 12; Haywood Aff. ¶¶ 4, 6-7, 12; Walker Aff. ¶¶ 3, 5, 8.)  The affidavits further indicate Gregg's, Haywood's, and Walker's commitment to securing the greatest measure of relief possible for the non-hire victims of the City's discrimination.  (Gregg Aff. ¶¶ 5, 8-13; Haywood Aff. ¶¶ 5, 8-13; Walker Aff. ¶¶ 4, 6, 10.)

Nuñez and Simpkins are black men who sat for Exam 2043 and Exam 7029, respectively, and were eventually hired as entry-level firefighters by the City.  (Nuñez Aff. ¶ 1; Simpkins Aff. ¶ 1.)  Neither man was hired into the FDNY as part of the first academy class of firefighters hired off of the eligibility lists created from the results of their respective tests.  (Id.)  Nuñez filed a charge of discrimination with the EEOC in 2005, and intervened as a plaintiff in this litigation in 2007.  (Nuñez Aff. ¶ 2.)  Since that time, Nuñez has submitted numerous affidavits in support of motions filed by counsel for Plaintiff-Intervenors.  Simpkins has actively followed the progress of the litigation for several years, and in 2009 he submitted an affidavit in support of Plaintiff-Intervenors' motion for remedial phase class certification.  (Simpkins Aff. ¶ 2.)  Each of Nuñez's and Simpkins's affidavits indicate that they have discussed the litigation with putative delayed-hire victim subclass counsel CCR and understand the posture of the case, including the unique interests of the delayed-hire victim subclass, as opposed to the non-hire victim subclass, and the common issues for which they will represent the members of their subclass.  (Nuñez Aff. ¶¶ 4, 7,

40

11; Simpkins Aff. ¶¶ 3-4, 6, 9.)  The affidavits further indicate Nuñez's and Simpkins's

commitment to securing the greatest measure of relief possible for the delayed-hire victims of the

City's discrimination.  (Nuñez Aff. ¶¶ 5-13; Simpkins Aff. ¶¶ 4-11.)

  The affidavits submitted by the putative Non-Hire Representatives and the putative

Delayed-Hire Representatives establish that after years of litigation they remain engaged in the

details of the case and committed to securing relief for similarly situated victims of the City's

discrimination.  Their affidavits indicate that each putative representative will be able to establish

a prima facie case of employment discrimination, and that, barring new disqualifying evidence

submitted during the individual claims process, they are each currently eligible to receive

individual relief.[14]  Furthermore, the speed with which the putative subclass representatives

executed and filed these affidavits—just days after the court ordered counsel to submit new

affidavits—demonstrates that the putative subclass representatives remain engaged, alert, and

available to protect the members of their respective subclasses from potential conflicts of

interest, and to assert the interests of their subclass in this litigation when need be.

  Each of the putative subclass representatives shares the interests of the subclass he seeks

to represent with respect to the issues that the court has determined are common to the members

of each subclass.  Moreover, there is no evidence that any of the putative subclass representatives

has any claims or is subject to any defenses unique to him, or that there is any reason why,

despite his common interests, he would be unable to fairly and adequately protect the interests of

---

[14] To be clear, the court is not finally determining whether the putative subclass representatives are eligible to receive individual relief.  The court is merely determining that, on the basis of the evidence supplied to the court in support of the motion for class certification, that the putative subclass representatives currently hold claims that are typical of the members of the subclass they seek to represent, and that there is no evidence establishing that they are themselves ineligible to receive the relief they seek on behalf of the subclass.  Each subclass representative will have to separately seek individual relief through the individual claims process, and the court's findings here have no impact on the determinations that a Special Master for Individual Relief would be required to make during that process if one were appointed.

absent subclass members.  Based on their knowledge of and participation in the litigation, the

court finds that the Non-Hire Representatives and Delayed-Hire Representative are sufficiently

familiar with and engaged in the litigation to fairly and adequately represent the interests of their

respective subclasses.

> 2.    Rule 23(b)(3) Requirements

The City argues that (b)(3) certification is inappropriate because resolution of questions

of mitigation and compensatory damages will require potentially thousands of individual

proceedings that will overwhelm the litigation of issues common to the subclasses.  (NYC Cert.

Opp. at 2-3.)  Accordingly, the City argues that the subclasses fail both the predominance and

superiority requirements of Rule 23(b)(3).  (Id.)  Although the non-hire victims' and delayed-hire

victims' claims to individualized make-whole relief cannot be certified under Rule 23(b)(2), the

court finds that the predominance and superiority inquiries are satisfied and therefore certifies

the subclasses under Rule 23(b)(3).

> a.    Predominance

"[T]he predominance requirement requires a district court to consider *all* factual or legal

issues, to determine whether the issues subject to generalized proof are more substantial than

those subject to individual inquiry."  Myers, 624 F.3d at 550; see also Strip Search Cases, 461

F.3d at 227-29.  Each putative subclass member's claims to individual relief depend on the

court's findings of disparate impact and pattern-or-practice disparate treatment liability in the

liability phase of this litigation.  Specifically, the court found that the City's pass/fail and rank-

ordered uses of Written Exam 7029 and Written Exam 2043 to select entry-level firefighters had

an unlawful disparate impact on black applicants for the position of entry-level firefighter that

was not justified by business necessity.  (Disparate Impact Op. (Docket Entry # 294) ("DI Op.")

42

at 91-93). Furthermore, the court found that the City's uses of these written examinations constituted a pattern or practice of intentional discrimination in violation of numerous provisions of federal and state law. (See Disparate Treatment Op. (Docket Entry # 385) ("DT Op.") at 28-33.) The major liability questions in this litigation are common to each of the subclasses, see Strip Search Cases, 461 F.3d at 227, and each of the subclass members' claims to individual relief "arise from the same core allegation": that the City repeatedly, knowingly, and without justification, used discriminatory testing procedures to select entry-level firefighters. See Brown, 609 F.3d at 484 ("[W]here plaintiffs were 'allegedly aggrieved by a single policy of the defendants,' and there is 'strong commonality of the violation and the harm,' this 'is precisely the type of situation for which the class action device is suited.'" (quoting In re Visa Check, 280 F.3d at 146)).

In the remedial phase of the litigation, individual claimants will bear the burden of proving that they are victims of the classwide discrimination established in the liability phase. Whether any particular claimant was a victim of the discrimination is obviously an individual question, as is the determination of what particular forms of relief an individual claimant will to receive. Nonetheless the court has determined that it will assess the aggregate backpay, retroactive seniority, and priority hiring relief available to the members of the non-hire victim and delayed-hire victim subclasses on a classwide basis because it is impossible to reliably determine exactly which subclass members would have received job offers in the absence of discrimination. (See First Remedial Cert. Order at 18-20.) Individual relief will then be distributed pro rata among eligible claimants. (Id.)

In these circumstances, and as more fully explained in the court's analysis of the commonality requirement, see supra Section II.D.1.b.ii, each subclass member's claims to relief

43

will depend on the determination of the aggregate amount of relief available to each subclass—the greater the relief awarded to the subclass as a whole, the greater the amount of relief awarded to individual members of the subclasses;  the larger the number of other eligible claimants the smaller the award each individual claimant will receive.  Thus, the members of both subclasses also have common interests in organizing the process by which the court determines which claimants are eligible for individual relief, the criteria used to make those determinations, and the determination of who will be eligible to receive retroactive seniority and priority hiring relief.  With respect to the subclass members' claims for compensatory damages for noneconomic losses, each claimant's claim for loss of enjoyment of life will depend on proving the characteristics of a New York City firefighter's job that would have provided the claimant the intangible advantages he claims.  Findings of fact relating to the characteristics of a firefighter's employment will be essential to the determination of each of the putative subclass members' claims to compensatory damages.

Individual proceedings will be necessary to determine a particular claimant's eligibility to receive individual relief and what relief is available, questions relating to a claimant's mitigation efforts, and to determine whether and to what extent the City's discrimination has caused a claimant noneconomic losses compensable under federal and state law.  But the resolution of these individual questions is of relatively minimal significance to the litigation as a whole.  The resolution of the common questions will determine the greatest extent of the City's backpay, priority hiring, and retroactive seniority liability to the members of the two subclasses, thereby "promot[ing] uniformity of decision," see Fed R. Civ. P. 23(b)(3) adv. comm. n. to 1966 amend., as to questions that in fairness should be resolved on a classwide basis, see Ingram, 709 F.2d at 812-13 ("The fairer procedure [is] to compute a gross award for all the injured class members

44

and divide it among them on a pro rata basis.").  Moreover, resolving these common questions in class proceedings will ensure that the individual proceedings will be focused almost exclusively on individual claimants' unique circumstances, and not on those actions of the City pertinent to all claimants' claims for individual relief.

The City argues, however, that the discovery and individual proceedings required to adjudicate the claimant eligibility, mitigation, and compensatory damages questions are simply too numerous and too burdensome for the parties, writing that "[t]he prospect of individualized discovery needs and hearings for up to 7,100 claimants is daunting to all concerned."  (NYC Cert. Opp at 3.)  The City further contends that Plaintiff-Intervenors' liability-phase waiver of a jury trial will not bind the members of the non-hire victim and delayed-hire victim subclasses as to questions decided in the remedial phase, and that the court may need to hold potentially thousands of jury trials to decide the subclass members' claims to individual relief.  (Id.)

The City misunderstands the nature of the predominance inquiry under Rule 23(b)(3). The question is not one of scale; instead it is whether certification "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  Myers, 624 F.3d at 547 (quotation marks omitted).  The mere fact that there are a great many people with plausible claims that the City has discriminated against them is hardly a reason to conclude that the individual issues that will arise in their claims will diminish the economies achieved by resolving those issues common to the claims of all the City's victims in a single class proceeding.  The number of potential claimants says nothing about the relationship between common and individual issues.

Indeed, the larger the number of victims of the City's discrimination, the greater the economies of scale achieved by adjudicating common claims in a class proceeding.  If the City is daunted by the prospect of obtaining discovery from thousands of claimants relating to issues of mitigation and noneconomic losses, it should be absolutely terrified by the prospect of relitigating the aggregate amount of backpay and the characteristics of a firefighter's employment thousands of times over.  In deciding whether class certification will achieve substantial efficiencies, the proper comparison is not between class litigation and no litigation at all, but between class litigation and actions conducted separately by individual class members.

The City's arguments also ignore a crucial point that distinguishes this litigation from most other class actions.  The United States is the original Plaintiff in this case and is seeking backpay, retroactive seniority, and priority hiring relief for the black and Hispanic victims of the City's discrimination.  Even if the court were to decide against certifying the two subclasses under Rule 23(b)(3), the City will *still* have to litigate individual issues—such as mitigation—on an individual basis against the same thousands of claimants during the individual claims process. (See First Remedial Cert. Order at 24-25.)  The only individual issue the City would avoid litigating during the individual claims process is Plaintiff-Intervenors' claim to compensatory damages for noneconomic losses.  The marginal burden of litigating individual compensatory damages questions in the individual claims process is slight, and the inclusion of individual compensatory damages questions in the litigation actually achieves additional efficiencies.  After class proceedings resolve common questions of fact relating to the characteristics of a firefighter's job, the individual claims process would be concerned primarily with establishing those facts unique to each individual claimant's claims for loss of enjoyment of life.  Because the trier of fact will need to consider the unique characteristics of the claimant's interim employment

46

to determine whether and to what extent he suffered a noneconomic loss when he was denied a

job as a firefighter, the claimant-specific fact-finding will relate primarily to the claimant's

interim employment.  Thus, the City's litigation of the compensatory damages claims will

benefit from the same kinds of discovery the City will need to perform in order to litigate

questions of a particular claimant's mitigation efforts.  Consequently, the resolution of individual

claimants' compensatory damages claims in the individual claims process[15] achieves additional

economies of time, expense, and effort, beyond those realized by resolving the classwide

questions.

The court concludes that the questions common to the non-hire victim and delayed-hire

victim subclasses are far more significant than individual questions, and that the predominance

inquiry is satisfied.  Moreover, even if the individual questions were significant enough to defeat

certification under Rule 23(b)(3), the court will isolate those common questions appropriate for

class treatment by narrowly certifying the non-hire victim and delayed-hire victim subclasses as

to the issues susceptible to classwide proof.  See Strip Search Cases, 461 F.3d at 227 ("[C]ourts

may use subsection (c)(4) to single out issues for class treatment when the action as a whole does

not satisfy Rule 23(b)(3).")

### b.    Superiority

Class proceedings have already achieved significant economies of time, effort, and

expense in the litigation conducted during the liability phase.  See Fed. R. Civ. P. 23(b)(3)(B).

The liability-phase class marshaled significant statistical and testimonial evidence—likely

beyond the capability of any individual plaintiff to procure—that established the City's liability

---

[15]     These efficiencies illustrate why the organization and administration of the individual claims process itself
is a question common to the subclasses' claims for relief.  Properly organized, the claims process will allow
individual claimants and the City the opportunity to fully litigate their claims to individual relief far more quickly
than they would be litigated in separate actions.

for disparate impact and pattern-or-practice disparate treatment violations.  By proving that the City engaged in classwide discrimination against a protected group, the liability-phase class significantly reduced the burden of time and expense on any individual victim of discrimination to obtain relief.  Through their considerable efforts litigating this case over the last four years, the putative subclass representatives and their counsel have amassed considerable case-specific knowledge, experience, and expertise that will enable them to efficiently and intelligently litigate questions common to the non-hire victim and delayed-hire victim subclasses during the remedial phase of the case.  Moreover, the determination of the aggregate amount of backpay, retroactive seniority, and priority hiring relief depends on largely the same classwide statistical proof relied on by Plaintiff-Intervenors and the United States to establish the City's liability for disparate impact violations.

The City argues, however, that "[t]he fact that the Court is considering appointment of a Special Master to make thousands of individualized determinations is strong evidence that the individualized determinations are so unmanageable that class action treatment is not superior to other available methods of fairly and efficiently adjudicating the claims."  (NYC Opp. Cert. at 3.)  The City has it backwards—a special master is one of the tools available to the court to make class actions more manageable.  In Strip Search Cases, the Second Circuit ordered the district court to consider certifying a damages-phase class under Rule 23(b)(3), and admonished the district court to "bear in mind that there are a number of management tools available to a district court to address any individualized damages issues, such as bifurcation, *the use of a magistrate or special master*, alteration of the class definition, the creation of subclasses, or even decertification after a finding of liability."  Strip Search Cases, 461 F.3d at 231 (emphasis added, quotation marks and alteration omitted); see also In re Visa Check, 280 F.3d at 140-41

48

("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." (quotation marks omitted)).  The court is amply equipped to respond to any manageability concerns as they arise, and finds that certifying the non-hire victim and delayed hire victim subclasses will not present significant difficulty.  <u>See</u> Fed. R. Civ. P. 23(b)(3)(D).

Finally, the City argues that "[w]hile counsel for the class may have waived the class' right to a jury, each claimant will be entitled to demand one and class counsel's waiver in all likelihood will be unenforceable as to individual claimants.  At this juncture, there is no way to even estimate how many claimants will exercise that right."  (NYC Opp. Cert. at 3.)  The City is correct that the Rule 23(b)(2) liability-phase class's waiver of its jury trial right as to questions of liability will not apply to its members' right to a jury trial as to remedial-phase questions.  This does not, however, present as significant an obstacle to the manageability of the action as the City imagines.  The non-hire victim and delayed-hire victim subclasses can choose to waive a jury trial on behalf of their members as to all remedial-phase questions as long as the subclasses provide notice of this waiver to absent subclass members and give them the opportunity to opt out of the subclasses.  As the court explained in the commonality analysis, the process by which individual claims are adjudicated is a question that is common to each of the subclasses because each subclass member will have to go through the process to obtain individual relief.  The subclasses could reasonably conclude that it is advisable to waive the jury trial right in favor of a more efficient individual claims process before a special master, magistrate judge, or the court. If a subclass member desires a jury trial, the subclass member can opt out of the subclass and pursues his rights on his own in a separate action.

The court believes that an individual claims process along the lines of the remedial-phase litigation plan outlined in the court's First Remedial Phase Class Certification Order (see First Remedial Cert. Order at 33-42) strikes the appropriate balance between "the class members' interests in individually controlling the prosecution or defense of separate actions," see Fed. R. Civ. P. 23(b)(3)(A), and the efficiencies that will be obtained from resolving common questions in class proceedings and "concentrating the litigation of the claims" in a streamlined claims process, see Fed. R. Civ. P. 23(b)(3)(C).  As an initial matter, it is unlikely that many subclass members would come forward to separately litigate their claims for individual relief if the court denied certification of the subclasses.  Although this litigation has received some attention in the media, "without class notification, most putative class members will not even know that they suffered a violation of their constitutional [and statutory] rights."  Strip Search Cases, 461 F.3d at 230.  Moreover, the difficulty and expense of litigating separate actions would likely deter individual claimants from asserting their claims to individual relief if the court were to deny certification of the two subclasses.  The subclass members' interests in individually controlling the litigation of their claims are greatest with respect to those aspects of their claims and the City's defenses that turn on their unique factual circumstances.  The individual claims process will focus on the factual and legal questions unique to each individual claimant's claims to relief and permit the claimant to control the litigation of these issues.  Consequently, the individual claims process will achieve efficiencies by coordinating and streamlining the litigation of individual questions while affording individual claimants control over the litigation of those issues of greatest importance to them.

The court finds that class litigation through the non-hire victim and delayed-hire victim subclasses "is superior to other available methods for fairly and efficiently adjudicating the

controversy."[16]  Fed. R. Civ. P. 23(b)(3).  Therefore, the court certifies the non-hire victim and delayed-hire victim subclasses under Rule 23(b)(3) as to those questions common to the subclasses' claims for individual relief.  Because the non-hire victim and delayed-hire victim subclasses are being certified with respect to those issues common to their members' claims to compensatory damages for noneconomic losses, the noneconomic loss subclass, which combines the compensatory damages claims of both non-hire victims and delayed-hire victims, is no longer necessary and is decertified.

### E.      Rule 23(g) Appointment of Subclass Counsel

Plaintiff-Intervenors propose that the court appoint Levy Ratner to serve as counsel for the non-hire victims and CCR to serve as counsel for the delayed-hire victims.  (Int. Subclass Cert. Mem. at 9-11.)  Richard A. Levy, Esq. and Darius Charney, Esq. have filed declarations in support of these motions swearing that they satisfy the requirements of Rule 23(g).  (Levy Decl. (Docket Entry # 643-2); Charney Decl. (Docket Entry # 643-3).)

---

[16]     Although the City did not raise this objection in response to Plaintiff-Intervenors' motion for remedial-phase subclass certification, the court notes that the fact that the United States is litigating substantially similar questions as part of its claims against the City does not mean that the United States' suit is an "other available method[] for fairly and efficiently adjudicating the controversy."  (See Liability Cert. Order at 16-19.)  As the court explained in its Liability Phase Class Certification Order:

> The Intervenors are private plaintiffs with their own interest in this litigation, and, as such, the Federal Government's case is "both logically and legally distinct from the private suit."  Jefferson v. Ingersoll Int'l Inc., 195 F.3d 894, 899 (7th Cir. 1999) (recognizing this distinction in case with EEOC intervention).  The Federal Government "could dismiss its action or settle . . . on terms that leave the private plaintiffs dissatisfied," id., and the private litigants retain an independent stake in pursuing the claims that they assert.  It is therefore appropriate to consider the Intervenors' claims and requested relief separately from the case brought by the Federal Government.

(Id. at 17.)

> Rule 23(g)(1)(A) requires the court to consider
>
> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).  Each of these considerations weighs in favor of appointing Levy Ratner and CCR to represent the non-hire victims and delayed-hire victims, respectively.  Levy Ratner and CCR have been involved in this litigation from the beginning and have extensive knowledge of the case and the legal and factual questions raised by their respective subclasses' claims.  Their efforts thus far demonstrate that they can, and will, bring significant resources to bear in representing the subclasses.  Moreover, they have extensive experience litigating the types of claims raised in this case and in litigating other similarly complex cases.  (Levy Decl. ¶¶ 3-5; Charney Decl. ¶¶ 3-4.)

Rule 23(g)(4) requires the court to determine whether class counsel can "fairly and adequately represent the interests of the class."  In the court's First Remedial Phase Class Certification Order, the court held that a conflict of interest between non-hire and delayed-hire victims prevented them from being members of the same class, and ordered Plaintiff-Intervenors to move for the certification of separate subclasses as to questions of make-whole relief.  (First Remedial Cert. Order at 12-18.)  The court perceives no conflict of interest that would prevent either Levy Ratner or CCR from adequately representing the members of the subclasses.  Neither the firms' prior representation of the liability-phase class nor their concurrent representation of the injunctive relief subclass presents a conflict in the remedial phase.  Their representation of the injunctive relief subclass is limited to questions of classwide prospective injunctive relief and does not overlap with the relief they will seek on behalf of the non-hire or delayed-hire victim

subclasses.  Furthermore, both firms indicate that they appreciate "their responsibility to protect their subclass's unique interests."  (Levy Decl. ¶ 6; Charney Decl. ¶¶ 5-6.)

The court appoints Levy Ratner as counsel to the non-hire victim subclass, and CCR as counsel to the delayed-hire victim subclass.

## III.    INJUNCTIVE RELIEF SUBCLASS REPRESENTATION

In the First Remedial Phase Class Certification Order, the court certified, under Rule 23(b)(2), a subclass as to questions of classwide injunctive relief, and appointed the Vulcan Society, Inc. ("Vulcan Society") as subclass representative.  (See First Remedial Cert. Order at 25-30.)  Subsequent to that Order, the court determined that it would be advisable to augment the representation of the injunctive relief subclass, and, under Rule 23(d), directed the Injunctive Relief Subclass to submit individual non-hire and delayed-hire victims of the City's discrimination for approval as additional subclass representatives.  (Scheduling Order (Docket Entry # 648) at 2.)  The Injunctive Relief Subclass has now submitted non-hire victim Jamel Nicholson ("Nicholson") and delayed-hire victim Rusebell Wilson ("Wilson") for approval as additional representatives of the injunctive relief subclass.  (Inj. Relief Representation Mem. (Docket Entry # 655-1).)

Nicholson's and Wilson's affidavits demonstrate that they hold claims to relief that are typical of the non-hire victims and delayed-hire victims of the City's discrimination.  Nicholson is a black man who passed Written Examination 2043 and the subsequent physical assessment, but was not hired by the City because his eligibility list number was never reached for appointment.  (Nicholson Inj. Relief Aff. (Docket Entry # 655-3) ¶ 2.)  Wilson is a black man who passed Written Examination 7029 and the subsequent physical assessment, and was hired as a New York City firefighter on May 4, 2003, as part of the ninth academy class hired from the

eligibility list derived from the results of Exam 7029.  (Wilson Inj. Relief Aff. (Docket Entry # 655-2) ¶¶ 2-3.)

The affidavits show that the forms of prospective classwide injunctive relief sought by both men raise questions of fact and law that are common to the classwide injunctive relief sought by the members of the Injunctive Relief Subclass.  (Nicholson Inj. Relief Aff. ¶ 7; Wilson Inj. Relief Aff. ¶ 7.)  Moreover, they share with the non-hire victim and delayed-hire victim members of the subclass a common interest in seeking relief that ends the City's pattern and practice of discrimination against black applicants.  (Nicholson Inj. Relief Aff. ¶ 8; Wilson Inj. Relief Aff. ¶ 8.)  Both men state that they are committed to obtaining classwide injunctive relief that will end the City's employment discrimination against black firefighters and firefighter applicants, and seek injunctive relief that will help to reverse its effects.  (Nicholson Inj. Relief Aff. ¶ 8; Wilson Inj. Relief Aff. ¶ 8.)

Based on their affidavits, the court finds that Nicholson and Wilson satisfy Rule 23(a)'s commonality, typicality, and adequacy requirements.  Therefore the court modifies its order certifying the Injunctive Relief Subclass to name Nicholson and Wilson representatives of the subclass.

## IV.   SUBCLASS-DEFINITION STATEMENTS

In this Order, and in the court's First Remedial Phase Class Certification Order, the court has certified three subclasses.  Pursuant to Rule 23(c)(1)(B), the court defines these subclasses below.

**A.     Injunctive Relief Subclass**

      1.     <u>Subclass Definition</u>

The Injunctive Relief Subclass is comprised of all black firefighters and firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were harmed by the City's pass/fail or rank-ordered use of one or more of those examinations for the selection of entry-level firefighters.

      2.     <u>Subclass Issues</u>

The Injunctive Relief Subclass is certified under Rule 23(b)(2) and (c)(4) to litigate the subclass members' claims for prospective classwide compliance and affirmative injunctive relief necessary to eliminate the vestiges of the City's discrimination against black firefighter applicants.

      3.     <u>Subclass Representatives</u>

The representatives of the Injunctive Relief Subclass are the Vulcan Society, Inc., Jamel Nicholson, and Rusebell Wilson.

      4.     <u>Subclass Counsel</u>

Levy Ratner, P.C., Scott + Scott LLP, and the Center for Constitutional Rights are appointed as counsel to represent the Injunctive Relief Subclass.

**B.     Non-Hire Victim Subclass**

      1.     <u>Subclass Definition</u>

The Non-Hire Victim Subclass is comprised of all black firefighter applicants who sat for either Written Exam 7029 or Written Exam 2043 and were not hired as firefighters from the eligibility lists created from the administration of either of those examinations because of the

City's pass/fail or rank-ordered use of one or more of those examinations for the selection of entry-level firefighters.

>    2.    Subclass Issues

The Non-Hire Victim Subclass is certified under Rule 23(b)(3) and (c)(4) to litigate the following questions common to each of its members' claims for individual make-whole relief: the organization of the individual claims process; the criteria used to determine which claimants are eligible for individual relief; the aggregate amount of backpay to which the subclass is entitled; the terms under which priority hiring and retroactive seniority relief will be made available to the subclass; the aggregate number of priority hiring slots to which the subclass is entitled; the amount and applicability of retroactive seniority relief; and the determination of the characteristics of a New York City firefighter's job.

>    3.    Subclass Representatives

The representatives of the Non-Hire Victim Subclass are Roger Gregg, Marcus Haywood, and Kevin Walker.

>    4.    Subclass Counsel

Levy Ratner, P.C. is appointed as counsel to represent the Non-Hire Victim Subclass.

> **C.    Delayed-Hire Victim Subclass**

>    1.    Subclass Definition

The Delayed-Hire Victim Subclass is comprised of all black firefighters who sat for either Written Exam 7029 or Written Exam 2043 and were hired to be firefighters from the eligibility lists created through the use of either of those examinations, except those firefighters who were hired in the first academy classes hired from those eligibility lists.

56

### 2.      Subclass Issues

The Delayed-Hire Victim Subclass is certified under Rule 23(b)(3) and (c)(4) to litigate the following questions common to each of its members' claims for individual make-whole relief: the organization of the individual claims process; the criteria used to determine which claimants are eligible for individual relief; the aggregate amount of backpay to which the subclass is entitled; the terms under which retroactive seniority relief will be made available to the subclass; the amount and applicability of retroactive seniority relief; and the determination of the characteristics of a New York City firefighter's job.

### 3.      Subclass Representatives

The representatives of the Delayed-Hire Victim Subclass are Candido Nuñez and Kevin Simpkins.

### 4.      Subclass Counsel

The Center for Constitutional Rights is appointed as counsel to represent the Delayed-Hire Victim Subclass.

## V.    NONECONOMIC LOSS BENCH TRIAL

The non-hire and delayed-hire victims' claims to compensatory damages for noneconomic losses raise common questions of fact relating to the characteristics of a firefighter's employment that require the court to hold a trial as to those issues. Subclass counsel shall confer with the representatives of their respective subclasses and determine whether to waive their subclass members' rights to a jury trial as to remedial-phase claims to individual relief and shall file a letter with the court indicating their intent to proceed with or waive a jury trial by July 15, 2011. Assuming that the subclasses will choose to waive their jury trial rights,

subclass counsel and the City shall meet and confer to set a pretrial schedule[17] for a bench trial to be held in August.  To the extent that evidence relevant to the firefighter job characteristics bench trial will overlap with evidence introduced in the injunctive relief bench trial (e.g., common witnesses and other evidence), the parties should, to the extent possible, take steps to needlessly avoid duplication of effort.

## VI.    CONCLUSION

Plaintiff-Intervenors' motion to certify the Non-Hire Victim and Delayed-Hire Victim Subclasses under Rule 23(b)(2) are DENIED.  Plaintiff-Intervenors' motion to certify the Non-Hire Victim and Delayed-Hire Victim Subclasses under Rule 23(b)(3) is GRANTED IN PART and DENIED IN PART as set forth above.  The Noneconomic Loss Subclass is DECERTIFIED, and the Injunctive Relief Subclass is MODIFIED to add additional subclass representatives. Plaintiff-Intervenors' motion for summary judgment as to classwide compensatory damages for noneconomic losses is DENIED.  The Clerk of Court is further directed to amend the caption to add the following parties as Plaintiff-Intervenors: Kevin Walker, represented by Levy Ratner, P.C.; Kevin Simpkins, represented by the Center for Constitutional Rights; and Jamel Nicholson and Rusebell Wilson represented by Levy Ratner, P.C., Scott + Scott LLP, and the Center for Constitutional Rights.

SO ORDERED.

  /s/ Nicholas G. Garaufis  

Dated: Brooklyn, New York                                   NICHOLAS G. GARAUFIS
      July 8, 2011                                                     United States District Judge

---

[17]          This schedule should follow the general format—if not the deadlines—of the pretrial briefing schedule set by the court for the injunctive relief bench trial.  (See First Remedial Cert. Order at 46-47.)