UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                       Plaintiff,

        -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, *and* RUSEBELL WILSON, *individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and* KEVIN WALKER, *individually and on behalf of a subclass of all other non-hire victims similarly situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated*,

                  Plaintiff-Intervenors,

        -against-

THE CITY OF NEW YORK,

                 Defendant.

--------------------------------------------------------------------X

**MEMORANDUM**

**FINDINGS OF FACT**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

      On August 1, 2011, the court began a bench trial with the purpose of supplementing the

factual record in this case with additional evidence relevant to the need for and scope of

permanent injunctive relief.  The bench trial having concluded, this Memorandum constitutes the

court's findings of fact, pursuant to Federal Rule of Civil Procedure 52(a), with respect to the need for and scope of permanent injunctive relief.[1]

## I.    THE CITY'S FIREFIGHTER HIRING PROCESS

### A.    Overview of the City's Multi-Stage Firefighter Hiring Process

Until now, the litigation in this case has focused on the design and administration of the civil service examination the City of New York ("City") uses to screen and select candidates for the position of entry-level firefighter in the Fire Department of the City of New York ("FDNY"). But taking and performing well on the civil service examination is only the first step on the long road to becoming a New York City firefighter.  Firefighter candidates who pass the written examination are placed in rank order on a civil service hiring list certified by the New York City Department of Citywide Administrative Services ("DCAS").  (Disparate Impact Op. (Docket Entry # 294) at 10-12.)  Candidate rankings are based on the scores candidates received on the examination adjusted to include any bonus points awarded to candidates entitled to special credits (e.g., the New York City residency credit).  (Id.)

When the FDNY decides to appoint a class of probationary firefighters to attend the Fire Academy, the FDNY's Candidate Investigation Division ("CID") contacts firefighter candidates in the order of their rank on the certified list, beginning with those firefighter candidates ranked highest on the list.  (Id.; Injunctive Relief Bench Trial Transcript ("Tr.") at 20:1-15.)  In the post-

---

[1]       In this Memorandum the court cites specific portions of the bench trial record to direct the reader to trial testimony or exhibits that are relevant to particular facts found by the court.  The court's findings of fact are not based solely on these specific citations, however, but reflect the court's assessment of the trial record as a whole, including all testimony and exhibits admitted into evidence.  Moreover, the court's assessment of the evidence presented at trial is influenced by the factual record established in earlier stages of the litigation, including the court's determination that the City's pass/fail and rank-order uses of Exams 7029 and 2043 had an unjustified disparate impact on black and Hispanic firefighter candidates (Disparate Impact Op. (Docket Entry # 294)), the court's conclusion that the City's repeated and knowing use of discriminatory testing procedures established the City's liability for a pattern and practice of intentional discrimination against black firefighter candidates (Disparate Treatment Op. (Docket Entry # 385)), and the court's conclusion that Exam 6019 was invalid because it was not job-related for the position of entry-level firefighter and had a disparate impact on black and Hispanic firefighter candidates (Exam 6019 Validity Op. (Docket Entry # 505)).  (See Tr. at 963:24-964:25.)

examination screening phase CID is responsible for verifying that each firefighter candidate satisfies the minimum requirements specified on the Notice of Examination issued by DCAS and the criteria for any special credits they claim, and investigates each candidate's character and fitness to be a firefighter.[2]  (Tr. at 17:8-19:23.)  Among the requirements specified on the Notice of Examination is the age requirement.  To be eligible to apply to take the firefighter examination, firefighter candidates must be at least 17-and-a-half years old by the end of the exam application period, and must not have reached their 29th birthday by the beginning of the application period.[3]

CID summons a firefighter candidate for processing by mailing the candidate several forms with questions seeking details of his or her personal history and background.  (Tr. at 21:10-22:19.)  The CID mailing instructs the candidate to bring the completed forms and certain listed documents to an intake interview with CID investigators.  (Id.)  CID sends the intake forms to the mailing address provided by the candidate to DCAS when the candidate applied to take the examination.  (Id.)  In some cases, three to five years may elapse between the date that a candidate gives DCAS his or her address and the date CID mails him or her an intake packet for further processing.  (Tr. at 26:3-8.)  When candidates apply to take the written examination, they are asked to update their mailing addresses with the City; but if a candidate's mailing address changes and the candidate does not affirmatively contact the FDNY to update his or her address, CID does not attempt to contact the candidate or otherwise track down the candidate's new mailing address.  (Tr. at 24:7-27:3, 82:5-83:9.)  As a result, some candidates who

---

[2]   CID's role in the post-examination screening phase is discussed more extensively in Section III.

[3]   See New York City Dep't of Citywide Administrative Services, Second Amended Notice of Examination: Firefighter Exam No. 2000, 1 (July 15, 2011), available at
http://www.nyc.gov/html/dcas/downloads/pdf/noes/201202000000.pdf.

are sent intake forms never receive them and do not know that they have been called to advance to the next step in the firefighter hiring process.  (Tr. at 24:7-27:3.)

If a firefighter candidate fails to report for the intake interview the candidate is not hired and his or her application for employment is denied with a "failed to report" designation.[4]  (Tr. at 22:14-19.)  A firefighter candidate who appears for the intake interview but fails to provide necessary information or documentation is advised to supply the information or documentation within two weeks.  (Tr. at 28:3-29; 686:1-687:23.)  If the candidate fails to comply he or she is denied employment and given a "failed to cooperate" designation.  (Id.)  Firefighter candidates are also required to appear to take a physical abilities test[5] (Tr. at 33:18-34:4), to appear for a medical examination, and to appear for a psychological assessment (Tr. at 33:4-34:24, 614:13-18).  If a candidate fails to complete any of those steps, he or she is denied employment and given a "failed to cooperate" designation.  All together, the post-examination processing phase of the hiring process takes at least six months from the day the candidate is directed to report to CID until the day the candidate is appointed to the fire training academy.  (Tr. at 685:18-25.)

**B.      Attrition During the Post-Examination Screening Phase of the Hiring Process**

Years elapse between the day that a firefighter candidate takes the civil service examination and the day the candidate is appointed a probationary firefighter.  This has been true for decades.  Testimony offered by current and former firefighters and fire officers at trial shows that firefighters routinely wait for years and pursue other careers while waiting to hear from the

---

[4]      There was some confusion in the testimony as to the exact designations given to candidates who failed to complete various phases of the post-examination processing phase.  (See Tr. at 687:1-8.)

[5]      For Exam 7029 and Exam 2043 a "physical performance test" or "PPT" was administered as part of the exam before the civil service lists from those exams were certified.  For Exam 6019, a Candidate Physical Ability Test ("CPAT") was administered separately after the results of the written examination were used to create the civil service hiring list and as part of the post-examination screening phase.  (Disparate Impact Op. at 10-11; Exam 6019 Validity Order at 6; Tr. at 33:18-34:4.)

FDNY.  Chief of Department Edward Kilduff took the firefighter exam in 1971 and was not appointed to the fire training academy until 1977.  (Tr. at 1239:4-21.)  Fire Lieutenant Michael Marshall and retired Fire Lieutenant Sheldon Wright both took the test to become a firefighter offered in 1977, and both were appointed firefighters in 1982.  (Tr. at 430:25-431:5, 433:3-5, 965:24-966:2, 966:18-24.)  Lieutenant Marshall worked as a member of the Carpenters Union while waiting five years to be appointed (Tr. at 966:25-967:4), and Wright was still in college when the FDNY called him for processing (Tr. at 433:19-435:22).  Fire Captain Paul Washington took the test offered in 1982, but was not appointed a firefighter until 1988.  (Tr. at 1011:19-1012:20.)  While he waited six years to become a firefighter, Captain Washington worked as an air traffic controller for the Federal Aviation Administration in Anchorage, Alaska, and as a field geologist in Los Angeles, California.  (Tr. at 1013:6-17.)  Firefighter John Coombs took the written examination in 1992 but was not appointed until 1999.  (Tr. at 166:11-14, 170:6-9.)  Firefighter Rusebell Wilson took Exam 7029 (administered in 1999) and was appointed in 2003.  (Tr. at 1084:14-19.)  Wilson worked as a track worker for the New York City Transit Agency and an aircraft mechanic while waiting four years to be appointed.  (Tr. at 1086:7-1087:11.)

These examples are consistent with the results of research performed by Columbia University graduate students who assessed the FDNY's hiring and recruitment practices.  In 2003 and 2004 Master of Public Administration ("MPA") students in workshops at Columbia University's School for International and Public Affairs ("SIPA") collaborated with the FDNY to research and critique the FDNY's firefighter recruitment and hiring practices, resulting in a total

of four reports that were provided to the FDNY in 2003 and 2004.[6]  One Columbia MPA

workshop report compared the FDNY's hiring process to those used by other fire departments

nationally and  noted the incredible length of the FDNY's hiring process relative to other major

metropolitan fire departments in the United States.

> Several FDNY chiefs voiced concern that the length of the candidacy process was
> a particular impediment for individuals who do not have a family tradition of
> firefighting.  New York City offers written and physical exams to become a
> firefighter every four years, the least frequently of any of the departments we
> examined.  After the candidates take the exams, the waiting time between the
> exams and appointment to Academy is nearly two years longer in New York than
> in any other city that was studied.  Boston, Los Angeles, Miami, and San
> Francisco offer the written exam every two to three years, while Phoenix and San
> Antonio administer their written exams annually.. . .
>
> FDNY offers the written exam the least often and has the longest interim period
> between test-taking and appointment to the academy.

(Columbia MPA Workshop Report, Def. Ex. 22 at 14-15.)  Former Fire Lieutenant Sheldon

Wright made similar observations based on his experience as an FDNY recruiter from the mid-

1990's through May 2002:

> The problem that we had in recruitment ~~speaking~~ from my experience as a person
> running the recruitment effort ~~was~~ that the time between a person signing up for

---

[6]      The City originally provided all four Columbia MPA workshop reports to the court as Defendant's Exhibits
21, 22, 23, and 24.  (See NYC Witness and Exhibit List (Docket Entry # 686) at 5.)  Initially Plaintiff-Intervenors
sought to admit only one report, the first 2004 report (Defendant's Exhibit 23), as Plaintiff-Intervenors' Exhibit A.
During subsequent questioning the court separately admitted Defendant's Exhibit 21.  (Tr. at 283:12-285:18.)  At the
end of trial the court admitted all four Columbia MPA Workshop reports and directed the City to include them all in
the final exhibit binder.  (Order on Motions in Limine (Docket Entry # 722) at 3.)  The City did not do so, reasoning
that it had tried to introduce the testimony of William Eimicke, Ph.D., in order to lay foundation for the reports but
because the court had excluded him it has not had the chance to introduce them into evidence.  (NYC Letter re
Columbia Reports (Docket Entry # 727).)  The problem with this argument is that the court, in ruling on the City's
last-minute request to introduce Dr. Eimicke's testimony (see Tr. at 1331:10-1336:21), had already explicitly
rejected it:

> The only reasons cited by the City for Dr. Eimicke's testimony are to admit into evidence the
> Columbia study reports and to respond to Captain Washington's testimony regarding the efficacy
> of radio advertisements, presumably based on the findings of the Columbia study.  Plaintiff-
> Intervenors have stated that they will consent to the admission of all the Columbia study reports,
> consequently, Dr. Eimicke's testimony is unnecessary and will be excluded.  *All* of the Columbia
> study reports are received into evidence.

(Order on Motions in Limine at 3.)  Plaintiff-Intervenors are correct: by "[*a*]*ll* of the Columbia study reports" the
court indeed meant *all*.  (See Docket Entry # 728.)

that examination and showing up for their physical and showing up for their investigation and following through on all of these milestones that they have to get through, you lose people along the length of that process, you have an attrition process, and [you need to] do things to intervene, you know, to keep them in the process.

(Tr. at 446:24-447:15, 456:16-458:18.)

It is unsurprising that over the course of FDNY's long hiring process large numbers of firefighter candidates fall through the cracks between its numerous steps.  A CID analysis of the disposition records for candidates who took Exam 7029 and Exam 2043 showed that "voluntary attrition" for candidates "failure to report" and "failure to cooperate" is responsible for eliminating approximately 30% of firefighter candidates called for post-examination processing from further consideration.  CID called 6,467 firefighter candidates who took Exam 7029 for post-examination processing.  (Tow Decl. (Docket Entry # 349) ¶ 3.)  Of those called, 564 candidates failed to report.  (Id. ¶ 4.)  An additional 1,157 candidates reported to CID but subsequently failed to cooperate with CID's investigation and further processing.  (Id. ¶ 5.)  An additional 133 candidates voluntarily discontinued their candidacy.  (Id. ¶ 6.)  All told, 1,854 candidates, representing 28.67% of those called for further processing, did not advance in the hiring process for voluntary reasons.  (Id. ¶¶ 7-8.)  An additional 1,382 candidates were involuntarily disqualified from hiring based on the subsequent screening process.  (Id. ¶ 9.)  The total attrition rate for candidates called for further processing by CID was 50.03%.  (Id.)

Following Exam 2043, CID called 7,495 firefighter candidates for post-examination processing.  (Id. ¶ 10.)  Of those called, 1,848 candidates failed to report.  (Id. ¶ 11.)  An additional 340 candidates reported to CID but subsequently failed to cooperate with CID's investigation and further processing.  (Id. ¶ 12.)  An additional 166 candidates voluntarily discontinued their candidacy.  (Id. ¶ 13.)  All told, 2,354 candidates voluntarily did not advance in the hiring process, representing 31.41% of those called for further processing.  (Id. ¶¶ 14-15.)

An additional 2,348 candidates were involuntarily disqualified from hiring.  (Id. ¶ 16.)  The total

attrition rate for candidates called for further processing by CID was 62.74%.  (Id. ¶ 16.)

The Director of CID, Dean Tow, testified that, in his experience, given the high rate of

attrition among candidates who are called to report to CID, "[f]or every three candidates you look

at one will make it through the process." (Tr. at 20:16-21:9.)  Thus, CID expects to call

approximately 900-1,000 candidates for interviews when processing candidates for a 300

firefighter academy class, and expects to conduct around 500 or more interviews, depending on

the response rate.  (Tr. at 85:25-86:17.)

### C.    Risk of Adverse Impact of Attrition

The City had never assessed the effect of attrition in the post-examination hiring process

for potential adverse impact on black or Hispanic firefighter candidates until this litigation

began.  (Tr. at 685:4-688:22.)  In connection with litigation over the validity of Exam 6019 a

statistician retained by the City, Christopher Erath, Ph.D., created a chart summarizing the racial

distribution of those firefighter candidates who took Exam 6019 and who were not hired[7] by the

City because they failed to report to their initial candidate screening interview.[8]  The Exam 6019

post-examination processing data showed that, of the firefighter candidates who were denied

employment for failing to report for their intake interview, approximately 36% were black and

26% were white.  (See Pl.-Int. Ex. T.)  Thus, black firefighter candidates were approximately

40% more likely to be denied employment for failing to report than white firefighter candidates.

---

[7]     Exam 6019 was administered in January 2007.  One academy class of firefighters had already been
processed and appointed off the eligible list in 2008 and another was being processed when the parties began
litigating the validity of Exam 6019 in the spring of 2010.  (See Exam 6019 Validity Order at 6.)

[8]     At the bench trial the City conceded that Dr. Erath created the graph and consented to its admission into
evidence.  (Tr. at 22:20-24:6, 57:25-58:6, 227:10-228:4.)  Indeed, the record reflects that the City attempted to
introduce the same graph as a summary exhibit in connection with the Exam 6019 Validity Hearing.  (See NYC
Witness and Exhibit List for Exam 6019 Validity Hearing (Docket Entry # 473) at 5 (seeking to admit Exhibit F-1,
titled "Summary by ethnicity regarding candidates who were disqualified for failing to appear").)

One of the Columbia MPA workshop reports also noted data tending[9] to show that a similar disparity had occurred in the Exam 7029 hiring process.

> There is a higher candidate attrition rate during the application process among non-White applicants; 30% of applicants at the beginning of the February 1999 exam (Exam 7029) were minorities yet they represent only 13% of those entering the Academy as of September 2003.

(Columbia MPA Workshop Report, Def. Ex. 21 at 8.)

These attrition data are consistent with survey data obtained by the Columbia MPA students who researched the FDNY's recruitment and hiring practices. As part of the research for the two reports issued in 2003, the Columbia MPA students enlisted the FDNY's Office of Recruitment and Diversity ("ORD") to survey approximately 2,200 firefighter candidates who had passed Exam 2043 and were preparing for the physical fitness examination. (See Columbia MPA Workshop Report, Def. Ex. 22 at 6.) The MPA students then analyzed a random sample of those surveys. (Id.) Based on survey responses obtained from candidates who passed Exam 2043, the Columbia MPA students found that

> [t]he presence of relatives in the Department was a significant factor in an individual's decision to pursue a career in firefighting. The role of familial connections and the relationship to race was significant in the candidacy process as well: white candidates were more likely to report that a parent or friend played a role in their commitment to becoming a firefighter.
>
> . . .
>
> In addition, candidates with relatives in FDNY were more likely than other candidates to have an accurate perception of how long it might take to be appointed to the Academy. The same is true for white candidates compared to African American and Hispanic candidates. Misperceptions among minority candidates about the length of time it will take to be appointed to the Academy may make them less likely to successfully complete the candidacy process.

---

[9]    The report apparently does not distinguish between voluntary attrition (e.g., failure to report), and involuntary attrition (e.g., being found medically unqualified). But while these numbers for Exam 7029 likely do not specifically describe the racial breakdown of voluntary attrition, the large disparity between gross applications and gross fire training academy appointments tends to support the conclusion that a component of that gross disparity is a disparity in rates of voluntary attrition.

> Therefore, candidates without relatives in the Department, which by definition are also disproportionately minority candidates, seem to be at a disadvantage in the candidacy process.  While we cannot conclude that misperceptions about the length of the candidacy process negatively affect retention, it is an area that warrants further study.

(Columbia MPA Workshop Report, Def. Ex. 22 at 15-16.)

The survey data reported in the Columbia MPA workshop report are consistent with the experiences of FDNY officials involved in the post-examination screening phase of the hiring process.  CID Investigator Iris Ramos made similar observations in a November 2004 memorandum she sent to the Deputy Commissioner for Administration Douglas White:

> Many candidates will take and pass the firefighter written and physical exams only to drop out of the investigation.  Our "minority" candidates are not familiar with the investigation process and are easily intimidated.  Other candidates receive guidance from family members or friends that work for the Department while the "minority" candidates very often do not know anyone that could provide guidance in this regard.  "Minority" candidates have a greater likelihood of getting caught up in hurdles and giving up on the process.  I would suggest that the FDNY Recruitment Unit work in conjunction with the CID Unit to fill this void for "Minority" candidates.  This can be easily achieved by inviting a representative of the Candidate Investigation Division (CID) to orientation sessions to discuss the investigation process and provide answers to frequently asked questions.

(Tr. at 94:1-96:4; Pl.-Int. Ex. S at 2.)[10]

Several FDNY officials testified that firefighters and fire officers remain actively involved in monitoring the progress of firefighter candidates who are their friends or family members—even going so far as to attempt to intervene in the firefighter hiring process on their behalf.  Dean Tow testified that fire officers and FDNY officials occasionally call or visit him to ask about particular firefighter candidates who are under investigation by CID and have potentially derogatory information in their investigation files.  (Tr. at 96:8-22.)  It is unclear how frequently this occurs because Tow does not record in a memorandum or in any other record

---

[10]   When asked about the memorandum, Tow said that he remembered having read it, but no actions were taken to address Ramos's concerns. (Tr. at 94:1-96:4.)  Deputy Commissioner White testified that he could not recall reading the memorandum or discussing it with anyone.  (Tr. at 549:20-553:6.)

whether he is contacted in this manner about CID's investigation of a particular candidate.  (Tr. at 96:23-97:1.)

Friends and family members of firefighter candidates in the FDNY also involve themselves in discussions in the FDNY's Personnel Review Board ("PRB") of a candidate's character and fitness to be a firefighter.[11]  Assistant Commissioner for Human Resources and PRB member Donay Queenan testified that when members of the PRB know a firefighter candidate or know of a firefighter candidate under review they are allowed to say what they know about the candidate, participate in the PRB's discussion of the candidate, and vote on the candidate.  (Tr. at 674:1-676:16.)  The deposition testimony of Queenan's predecessor, Sherry Kavaler, is illustrative of the influence a candidate's friends-and-family connection might have over the PRB's consideration of firefighter candidates.

> LEVY:  Was there any inquiry made whether anyone on the PRB panel knew the candidate?
>
> KAVALER:  If they knew the candidate, that would be a positive thing because they would bring insight into what was just on paper.
>
> LEVY:  So it did happen that people knew the candidate?
>
> KAVALER:  Yes.
>
> LEVY:  How frequently did that happen?
>
> KAVALER:  I'm sure probably at every one or every other meeting there is some candidate that is known.
>
> LEVY:  And did it ever happen that someone was a relative of someone on the PRB?
>
> KAVALER:  Not so much the relative of the PRB but maybe a relative of someone within the Fire Department that the PRB people knew.
>
> LEVY:  Were those people given that consideration?

---

[11]    The PRB's role in the post-examination screening phase of the hiring process is discussed in more detail in Section III.

KAVALER:    Yes.

LEVY:    And were they more likely to be passed?

KAVALER:    Yes.

. . .

LEVY:    What would be the nature of the conversations?

KAVALER:    Somehow or other, although I am very upset with my staff, it appears people knew who was going to PRB.  It got leaked out of my CID area.  No one would ever tell me who did or why.  People knew what was going on and who was going to the PRB.  You would have lieutenants and captains, whatever, posting chief of department: This is the son of so and so, this is the son of so and so.  I lived next door to him for years. He's a good guy.  He just had a fight in a disco.  He got drunk.  Someone made a pass at his girlfriend.  He socked him.  He did community service.  Something like that.  Whatever it was.  He beat his wife but his wife took him back so he shouldn't be considered a wife beater.  He still could be a good firefighter.  These types of things, that would be brought to the table and people would say I know this guy.  He's a good guy.  His son has got to come on the job.  I will vouch for him. I will bring him into my office tomorrow.  I'll read him the riot act, say he's getting the chance of a lifetime and he better own up to it and make us proud and we would hire him.

. . .

LEVY:    Were there certain topics that would come up routinely?  Was there a sort of checklist at the PRB, what to look for?

KAVALER:    No, it wasn't a checklist or anything like that.   You're dealing with a lot of Irishmen who are drunks and they get into bar fights and they get arrested and they get arrested again.  They fight, they sock their girlfriends, this is the things that cause their records to pop up to us because they get arrested, because they fought with the police when they got arrested.  This is boys being boys, that type of thing.

(Tr. at 97:22-104:6; Pl.-Int. Ex. II at 366:18-367:16, 368:23-370:18.)[12]

---

[12]  At trial the City objected to portions of Assistant Commissioner Kavaler's deposition testimony on hearsay grounds.  The court includes Kavaler's deposition testimony solely for the non-hearsay purpose of showing that members of the PRB made references to candidates' relationships to members of the FDNY in PRB discussions.  Whether or not the out-of-court statements by members of the PRB as to a candidate's relationship to a member of the FDNY are true, it is relevant to the court's conclusions that members of the PRB thought that merely making statements to that effect would be relevant to the PRB's decision-making process.  The court does not consider these out-of-court statements for the truth of the matter asserted.

### D.  Need for Attrition-Mitigation Plan

The evidence shows—and the court finds—that the FDNY's hiring practices and procedures have the effect of promoting significant rates of voluntary candidate attrition during the firefighter hiring process.[13]  The FDNY's use of a multi-stage firefighter hiring process longer than any other in the SIPA reports significantly increases the proportion of firefighter candidates who will fail to proceed to the next step of the hiring process when called to do so.  (Columbia MPA Workshop Report, Def. Ex. 22 at 14-15.)  Indeed, retired Fire Lieutenant Sheldon Wright makes a good point in calling the FDNY's hiring process an "attrition process."  The proportion of firefighter candidates who are not hired because they failed to report to CID or to cooperate with post-examination processing is so large—approximately 30%—that voluntary candidate attrition is, in effect, one of the most pervasive screening and selection devices relied upon by the FDNY in hiring entry-level firefighters.

The City's use of voluntary candidate attrition to select firefighters is entirely inconsistent with the City's position that firefighters should be selected on the basis of merit.  City officials have routinely maintained that the purpose of the firefighter hiring process is to select the best possible candidates to become firefighters; or in the words of Mayor Bloomberg: "I want to make sure that if my kids are in that building, I want the best-trained, smartest firefighter that we can possibly have coming through that door."  (USA Request for Exam 6019 Injunction (Docket Entry # 558) at 6, Ex. B (attaching NY1.com article reporting on a statement made by Mayor Bloomberg in his weekly radio show).)

---

[13]     The court uses the term "voluntary attrition" to describe applicants the City disqualified from further consideration and "involuntary attrition" to refer to applicants that the City fully processed and affirmatively disqualified.  The court's use of "voluntary" should not be misunderstood as a finding that the City's policies and practices are not responsible for causing candidates to drop out of the post-examination screening phase.  To the contrary, the court explicitly finds that the City's hiring policies and practices are directly responsible for causing candidates to drop out in significant numbers.

But the City's use of voluntary candidate attrition does not select firefighters on the basis of merit.  Not every candidate who passes an examination to become a New York City firefighter is called for post-examination processing.  The numbers of people who take the City's firefighter examinations are extremely large,[14] and the City's firefighter hiring needs rarely cause it to exhaust the entire firefighter list during the four year life of the certified list.[15]  Because CID calls candidates for processing in the order they are ranked on the list, the candidates who are called for processing and disqualified for failing to report are among the most highly ranked candidates on the civil service list.  (Tr. at 25:1-9.)  Assuming for the sake of argument that candidates who score higher on the City's written examination will be better firefighters,[16] the City's reliance on hiring policies and practices that promote voluntary candidate attrition actually causes the City to hire candidates who are less qualified than the candidates they would hire if they had not dropped out of the hiring process.  It is entirely unclear why the FDNY uses such a long process to hire firefighters when it is well aware that the process causes large numbers of potentially qualified candidates to drop out before they can be screened.

The FDNY's use of voluntary candidate attrition to screen and select entry-level firefighters is relevant to this litigation because the evidence shows that the FDNY's use of attrition to select firefighter candidates will more likely than not have a disparate impact upon black firefighter candidates.  The evidence shows that white firefighter candidates are significantly more likely to have friends or family members in the FDNY maintaining contact

---

[14]     See infra Table 1 at Section II.B.1.

[15]     The one notable exception to this is Exam 7029.  The firefighter candidates placed on the civil service list created from the results of Exam 7029, administered in 1999, were all called for processing as the FDNY struggled to rebuild after suffering the devastating loss of 343 of its members in the terrorist attacks of September 11, 2001.  (See Tr. at 25:14-25, 1148:1-14.)

[16]     As the court has discussed extensively in its opinions in this litigation, the City has yet to establish that any of its recent written firefighter examinations actually identify the candidates who are most qualified to become firefighters.

with them and encouraging them to persevere through the FDNY's inordinately long hiring

process.[17]  Black firefighter candidates are significantly less likely to have similar informal

support mechanisms available to them because of the City's history of using discriminatory

testing procedures that systematically excluded black firefighter candidates from becoming

firefighters.  The result, according to the FDNY's data, is that black candidates who took Exam

6019 and were called for processing were approximately 40% more likely than white candidates

to be disqualified for failing to report to CID.  It is clear that, the FDNY's use of voluntary

candidate attrition, unless sufficiently mitigated by policies and practices designed to encourage

firefighter candidates to participate and persevere through the hiring process, will serve to

perpetuate the underrepresentation of blacks in the ranks of the FDNY.

        While the court has doubts about the continuing viability of a "merit-based" hiring process

that operates on the assumption that 30% of candidates will voluntarily drop out, the more

immediate concern for the court is the short-term efforts the City will make to ensure the lowest

attrition rate possible during the processing of candidates who will take Exam 2000.

Commendably, Assistant Commissioner Maglione has already taken some action to mitigate the

voluntary candidate attrition rate.  Maglione testified that when she was hired in 2006 one of the

first things she did was to assess the places in the hiring process where firefighter candidate

attrition occurs.  (Tr. at 285:11-287:13.)  As a result of that analysis Maglione determined that a

large number of applicants who paid a fee to take the exam did not actually end up taking it.

(Id.)  Maglione decreased attrition on the Exam 6019 test day by making robo-calls to applicants

using pre-recorded messages from then-Fire Commissioner Nicholas Scoppetta.  (Id.)  She also

used the recruitment phone bank to make reminder calls to applicants up until test day.  (Id.)

---

[17]        These factual conclusions are reinforced and supported by similar conclusions explained in the section of
these Findings of Fact detailing the effect of friends-and-family connections on firefighter candidate recruitment.
See infra Section II.B.1.

Assistant Commissioner Maglione stated that while she was successful in shrinking the attrition rate, she was not as successful as she would have liked.  (Id.)  Maglione testified that she plans to use these tactics and others to get as many applicants as possible to actually take Exam 2000.  (Tr. at 392:1-395:11.)

In 2008, following the certification of the list of candidates who took Exam 6019, CID for the first time adopted a practice of sending the list of candidates who failed to report to their intake interviews to the FDNY's Office of Recruitment and Diversity for follow-up.  (Tr. at 22:4-19, 90:3-15, 394:11-395:11.)  CID did so at the request of Assistant Commissioner Maglione.  (Id.)  Maglione testified that she personally calls each firefighter candidate who fails to report to his or her intake interview and has a personal conversation with each of them about the job.  (Id.)  Before Maglione instituted this new process, CID made no effort to follow up if a candidate failed to report because DCAS provided only the candidate's mailing address to CID.  (Tr. at 24:7-27:3.)  Maglione also testified that she among other efforts used the phone bank operation to encourage candidates who took Exam 6019 and were called for processing to attend a 12-step training program for the CPAT at the fire training academy on Randall's Island.  (Tr. at 285:11-287:13.)

Assistant Commissioner Maglione's efforts to decrease the voluntary candidate attrition rate show promise.  Although Maglione did not say what her goals with respect to attrition were, she did state that she had not been as successful as she hoped with Exam 6019, implying that she has a goal in mind for mitigating voluntary candidate attrition.  If the FDNY provides its Office of Recruitment and Diversity ('ORD') with sufficient resources to carry out Maglione's plans to mitigate voluntary candidate attrition, the City may succeed in significantly limiting or

eliminating the adverse impact upon black firefighter candidates caused by City policies and

practices that promote voluntary candidate attrition.

## II.     FIREFIGHTER RECRUITMENT

Primary responsibility for firefighter candidate recruitment lies with the ORD, headed by

Assistant Commissioner Michele Maglione.  Maglione has led the FDNY's recruitment efforts

since joining the FDNY in January 2006, and supervised the recruitment campaigns for Exams

6019 and 2000.  (Tr. at 231:20-232:12, 235:18-236:14.)  In addition to recruiting firefighter

candidates, ORD is responsible for recruiting for the titles of EMT, paramedic, and fire

protection inspector, and runs several programs, including the FDNY's diversity training

program, a leadership training program for teenagers called the Fire and EMS Explorers

program, and the FDNY's affiliation with the FDNY High School.  (Tr. at 232:13-25.)

### A.     A Recent History of FDNY's Recruitment Campaigns

The FDNY's recent recruitment campaigns show that, slowly but surely, the FDNY has

made significant improvement in its efforts to recruit firefighter candidates over the last 10 years.

#### 1.     Recruitment Campaign for Exam 2043

Firefighter John Coombs, the current president of the Vulcan Society, was involved in the

FDNY's recruiting efforts for the two most recent examinations prior to Exam 2000: Exam 2043,

administered in December 2002, and Exam 6019, administered in 2007.  (Tr. at 170:8-17.)  He

became involved in recruitment after he was injured in a car accident and placed on light duty,

not long before the City administered Exam 2043.  (Tr. at 170:18- 171:7.)  Coombs's light-duty

assignment was to work as a recruiter.  (Id.)  During the FDNY's recruitment campaign for Exam

2043, approximately 20 firefighters were assigned to work as essentially part-time recruiters.

(Tr. at 177:3-13.)  None of the firefighters were given any training before being assigned to

recruit applicants for the exam.  (Tr. at 174:25-176:15.)  As a result, firefighters did not

necessarily know the answers to potential applicants' questions about the firefighter selection

process and recruiters sometimes gave them incorrect information.  (Id.)  With the exception of a

battalion chief who led the recruitment effort and one firefighter permanently assigned to the

unit, all of the firefighters the FDNY used to recruit applicants for Exam 2043 had been injured

and, like Coombs, had been given recruitment as a light-duty assignment.  (Tr. at 172:11-

174:24.)  The injured light-duty firefighters were frequently excused from their recruitment

duties to receive physical therapy.  (Id.)

    The FDNY's recruitment campaign for Exam 2043 was hampered by poor preparation

and a lack of resources.  The recruitment unit was assigned two vans, one of which was used

exclusively by the Battalion Chief in charge of the unit.  (Tr. at 176:16-177:2.)  Firefighters sent

to recruit at different events and venues spread around the City had to share a single van to get

there.  (Tr. at 171:16-172:10.)  But the van was not used exclusively for recruitment activities;

one firefighter used the van to chauffeur other firefighters to their physical therapy appointments.

(Tr. at 176:16-177:2)  When the recruiters finally arrived at their assigned events they had flyers

and job applications to pass out, but no tables to put them on, no chairs to sit in, and no pens that

applicants could use to fill out the applications.  (Tr. at 171:16-172:10.)  NYPD recruiters

attending the same events had tents, tables, chairs, and pens.  (Id.)  Despite the well-known and

long-standing rivalry between the two uniformed services, the NYPD recruiters at one event

allowed the FDNY recruiters to sit with them.  (Id.)

    During the recruitment campaign for Exam 2043, the FDNY recruiters focused on

recruitment events and venues in predominantly minority communities and worked with a few

different community organizations to find recruitment opportunities.  (Tr. at 178:2-179:4.)

According to Assistant Commissioner Maglione, ORD records show that the recruiters worked 278 events in the community during the recruitment campaign for Exam 2043.  (Tr. at 319:17-320:10.)  At these events FDNY recruiters collected expressions of interest from approximately 23,000 people.  (Id.)   The recruiters also put up recruitment posters around the City, and the Arnell Group, an advertising agency, donated time to create a television advertisement for the campaign that ran a few times.  (Tr. at 179:5-15.)

Separate from the FDNY's recruitment effort, the Vulcan Society pursued its own campaign to recruit applicants to take Exam 2043.  The Vulcan Society raised money to run radio ads and sent as many as 40 of its members to recruit at community events on the weekends. (Tr. at 179:16-180:14.)  The Vulcan Society used some of the FDNY's recruitment literature but mostly funded their effort themselves.  (Id.)

2.    Recruitment Campaign for Exam 6019

In 2006 the FDNY asked Coombs to work on an overtime basis as a recruiter for the Exam 6019 recruitment campaign because he had experience from the Exam 2043 campaign. (Tr. at 182:6-19.)  The FDNY's effort for Exam 6019 was, in Coombs's opinion, "a leap forward from what had been done in the past." (Tr. at 182:20-183:17.)  Under the leadership of Michele Maglione, then the Director of Recruiting (Tr. at 231:20-232:12), the FDNY invested in print advertising, assigned additional vehicles and firefighters to the recruitment unit, increased the number of events and venues at which they recruited, and paid overtime to firefighters to work recruiting events so they had an incentive to be there.  (Tr. at 182:20-183:17.)  The FDNY also engaged in a running dialogue with the Vulcan Society and implemented some of its suggestions for recruiting black applicants.  (Id.)  During the recruitment campaign for Exam 6019, ORD

19

recruiters worked approximately 2,600 recruitment events and collected expressions of interest from 51,000 people.  (Tr. at 319:17-320:10.)

The Vulcan Society again ran its own recruitment campaign in addition to the FDNY's. The Vulcan Society's efforts included raising money to run ads on radio stations they believed had large audiences among young black and Hispanic listeners and sending their members to recruit in minority communities throughout the City.  (Tr. at 183:18-184:23.)

### 3.   Recruitment Campaign for Exam 2000

At the time of her testimony, Assistant Commissioner Maglione supervised a staff of 64 people, including 29 temporary workers who staff a recruitment phone bank, 4 firefighters on light duty, and 10 firefighters detailed to ORD for 2 months[18] to assist in the campaign to recruit firefighter candidates to take Exam 2000.  (Tr. at 233:4-25.)  The 14 firefighters on light duty or detailed to ORD all worked as recruiters.  (Tr. at 234:1-23.)  They were supplemented by a 'recruitment cadre' of approximately 800 firefighters and fire officers trained as recruiters and who are paid overtime to staff recruitment events year-round.  (Tr. at 385:25-386:23.)  Over 180 members of the recruitment cadre self-identify as black, and 55 members identify as members of the Vulcan Society.  (Tr. at 343:10-344:4.)  ORD does not employ any full-time permanent recruiters outside of the examination application period, and relies on the recruitment cadre to work overtime at recruitment events.  (Tr. at 235:8-17.)  Maglione believes that part-time recruiters benefit the recruitment effort by bringing in 'fresh energy' to what can be a grueling full-time job.  (Tr. at 242:23-243:21.)

ORD's vehicle fleet currently features several late model cars including a Volkswagen Routan and Nissan Quest donated to the FDNY by Howard Koeppel, who is a member of the

---

[18]     Although the examination application period opened on July 15, 2011, the 10 firefighters were not detailed to the recruitment effort until July 25, 2011, 10 days into the application period.  (Tr. at 235:19-25.)

board of directors of the non-profit FDNY Foundation.  (Tr. at 265:8-269:23, Pl.-Int. Ex. J.)  The
vehicles were made available to ORD not long after Assistant Commissioner Maglione wrote an
email and memorandum to Deputy Commissioner White and Commissioner Scoppetta's
Executive Officer in January 2008 deploring the perilous condition of the vehicles used by ORD
staff to perform recruiting work.  (Id.)  Assistant Commissioner Maglione testified that since she
wrote that email those vehicles have been replaced.  (Id.)

In contrast with previous years, ORD now recruits year-round, regardless of the timing of
the next entry-level firefighter examination.  (Tr. at 921:4-22.)  As part of this effort, between
January 2010 and August 2011, ORD used its recruitment cadre to staff approximately 6,196
events to increase the visibility and public awareness of the FDNY as an employer in advance of
Exam 2000.  (Tr. at 235:8-17, 242:5-18.)  This represents a sizeable increase from the 2,600
recruitment events ORD staffed leading up to Exam 6019.  (Tr. at 244:14-245:1, 319:17-320:10.)
During the recruitment events preceding the open application period for Exam 2000, ORD
recruiters obtained expression-of-interest forms from approximately 130,000 potential applicants
in which each potential applicant indicated how likely they were to apply for the next firefighter
examination and provided their contact information.  (Tr. at 249:24-251:2, 259:15-260:4,
319:17-321:24.)  Those 130,000 expressions of interest are more than double the 51,000
expressions of interest the FDNY obtained in advance of the application period for Exam 6019.
(Tr. at 319:17-321:24.)  When DCAS opened the application period, ORD sent an email 'blast' to
all those who expressed interest in taking the next firefighter examination to notify them of their
opportunity to do so.  (Tr. at 345:3-350:4, Def. Exs. 8, 11.)  Throughout the application period
ORD's phone bank operators used the contact information obtained from the expression-of-
interest forms to call people who stated they were likely to apply in order to persuade them to do

so. (Id.) ORD's phone bank now uses a more efficient computer-based system, which makes it much easier for operators to record in a computerized database whether particular individuals who have expressed interest need to be contacted again in order to persuade them to file applications. (Tr. at 345:9-348:6, Def. Ex. 11.)

After the application period for Exam 2000 opened, ORD sent recruiters into the field with Wi-Fi equipped laptops to help potential applicants enroll on the spot using DCAS's online application system. (Tr. at 249:24-251:2, 292:23-294:2, 382:4-386:23, Def. Ex. 10.) These mobile filing sites were located throughout the City but were focused in areas with concentrations of black and Hispanic residents. (See Def. Ex. 10.) Because DCAS's online application system required applicants to pay the application filing fee using a debit or credit card, ORD's recruiters at these filing sites carried prepaid VISA gift cards that they sold to potential applicants, thus allowing applicants who did not have credit or debit cards to use DCAS's online exam application system. (Tr. at 382:4-386:23, Def. Ex. 10.)

The Exam 2000 advertising campaign focused on the salary and benefits firefighters receive, and prominently featured black, Hispanic, and female firefighters to encourage individuals from those underrepresented groups to apply for Exam 2000. (Tr. at 365:21-368:2, 370:4-373:24, 387:5-388:17, Def. Exs. 7, 28.) ORD placed nearly $900,000-worth of insertion orders for print and online advertisements in approximately 70 publications and several websites, and purchased $498,000 in radio advertising on radio stations popular with young black and Hispanic people. (Tr. at 354:13-360:3, 365:21-368:2, Def. Ex. 9.) ORD concentrated its print, radio, and web advertising campaign around the open application period for Exam 2000 in order to make the most effective use of its approximately $1.3 million advertising budget. (Tr. at 260:5-14.) For Exam 2000 the Arnell Group once again donated its services designing the

recruitment campaign's branding and advertising strategy.  (Tr. at 360:4-361:14, 365:21-368:2, 373:4-24.)  The Arnell Group indicated to the FDNY that it provided approximately $56,000, in pro bono services during 2011.  (Tr. at 368:3-369:11.)

In addition to the advertising campaign and field work performed by ORD's recruitment cadre, Fire Commissioner Salvatore J. Cassano ("Cassano") himself became personally involved in the Exam 2000 recruitment campaign.  (Tr. at 857:18-858:9.)  Commissioner Cassano helped launch the recruitment campaign with an appearance at The Reverend Floyd Flake's church, the Greater Allen A.M.E. Cathedral of New York in Jamaica, Queens.  (Tr. at 375:5-378:21, Def. Ex. 13.)  He has also visited several other black churches and military recruiting events in an effort to improve the recruitment of black and Hispanic firefighter candidates to take Exam 2000. (Tr. at 857:18-858:9.)

The City significantly increased its financial investment in the Exam 2000 recruitment campaign over the resources it allotted for the Exam 6019 recruitment campaign.  Assistant Commissioner Maglione testified that she had originally been allotted $717,000 for overtime expenses, but the City was allowing her to spend a great deal more in overtime to recruit for Exam 2000.  (Tr. at 380:13-381:4.)  As of the date of Maglione's testimony, ORD had already spent $2.5 million on overtime expenses with 7 weeks left in the application period for Exam 2000.  (Tr. at 380:13-381:4, 243:22-246:15.)  This represented an increase over the $1.7 million ORD spent on overtime for Exam 6019 in all of 2006.  (Tr. at 243:22-246:15.)  For Exam 2000, Commissioner Cassano made an exception to FDNY policy and allowed ORD to continue using members of the recruitment cadre who had already hit the FDNY's per-person overtime cap.  (Tr. at 264:20-265:7.)  For Exam 2000 ORD spent $1.3 million on advertising up from the $1.0 million ORD spent on advertising for Exam 6019.  (Tr. at 243:22-246:15.)  These financial

resources are in addition to ORD's baseline $1.4 million annual budget for ORD's ordinary staff expenses.  (Tr. at 243:22-246:15.)

In a refreshing departure from the testimony and declarations the court has received from other City officials in this case, Assistant Commissioner Maglione acknowledged at trial that the FDNY's recruitment efforts could be better.  (Tr. at 406:23-407:14.)  Maglione explained that in an effort to improve on the ORD's recruitment efforts, she sends supervisors into the field to evaluate her recruiters, has sought advice from NYPD recruiters, and compares the FDNY's achievements to the NYPD's.  (Id.)  The ORD holds a yearly recruitment retreat where FDNY recruitment staff talk about the work they did, identify what worked well and what did not, discuss ways they can improve, and set goals for the future.  (Tr. at 391:15-25, 400:17-401:16.)  Maglione explained that "[t]his is a work in progress for us where we are always going to measure against our own success to improve upon." (Tr. at 406:23-407:14; see also Tr. at 262:19-263:6.)  Since Assistant Commissioner Maglione joined the FDNY, however, ORD has not researched the recruitment tactics and strategies used by other fire departments to increase the number of black and Hispanic firefighter applicants, nor has it consulted a publicly available survey of best practices created by a consulting firm and the International Association of Firefighters, or employed an expert to advise it on the best methods for recruiting potential black and Hispanic firefighter applicants.  (Tr. at 260:22-262:4.)

> **B.    Areas of Concern and Room for Improvement**

Despite the FDNY's recent improvements in recruiting black and Hispanic firefighter candidates, there remain areas of concern and room for improvement.

1.      Importance of Sustained Remedial Recruitment

The City's recent investments in firefighter recruiting have produced significant increases in the number of black and Hispanic applicants for the entry-level firefighter examination as compared to previous recruitment campaigns.  Table 1 compares the unprecedented number of applicants who signed up to take Exam 2000 to the size of the applicant pools for previous firefighter examinations administered by the City.  Table 2 shows the racial composition of each applicant pool in terms of the percentage of each racial group's representation in the applicant pool as a whole.

Table 1.  Size of applicant pools for each firefighter examination by applicant race.

| Race | Applicants for Exam 2000 (2012) | Applicants for Exam 6019 (2007) | Applicants for Exam 2043 (2002) | Applicants for Exam 7029 (1999) | Applicants for Exam 0084 (1992) | Test Takers[19] for Exam 7022 (1987) |
|---|---|---|---|---|---|---|
| WHITE | 31,014 | 17,379 | 17,732 | 15,819 | 29,370 | 24,028 |
| BLACK | 14,122 | 5,759 | 2,971 | 3,067 | 3,388 | 3,629 |
| HISPANIC | 14,110 | 5,810 | 2,165 | 2,595 | 3,734 | 3,387 |
| ASIAN/PACIFIC ISLANDERS | 1,900 | 659 | 396 | 263 | 223 | 159 |
| AMER. INDIAN/ALASKAN | 293 | 91 | 19 | 54 | 200 | N/A |
| OTHER/NOT IDENTIFIED | 0 | 265 | 584 | 1,023 | 2,953 | 2,248 |
| TOTAL | 61,439 | 29,963 | 23,867 | 22,821 | 39,868 | 33,451 |

Source: Exam 2000 & Exam 6019 Applicant Data (Docket Entry # 732) Exs. 2-a, 2-b; Pl.-Int. Ex. E[20]; Def. Ex. 21 at 19.

---

[19]     Prior to 1991, the City of New York did not collect demographic information from exam applicants; demographic data for Exam 7022 are available only for those applicants who actually took the exam.  (See Pl.-Int. Ex. E at EEPC 0462.)

[20]     Plaintiff-Intervenors' Exhibit E was admitted into evidence by the court subject to a relevance objection from the City.  That objection is denied.  (See Tr. at 931:21-935:9, 1450:15-1451:12, Pl.-Int. Ex. E.)

Table 2.  Racial composition of applicant pools for each firefighter examination.

| Race | Applicants for Exam 2000 (2012) | Applicants for Exam 6019 (2007) | Applicants for Exam 2043 (2002) | Applicants for Exam 7029 (1999) | Applicants for Exam 0084 (1992) | Test Takers[21] for Exam 7022 (1987) |
|------|------|------|------|------|------|------|
| WHITE | 50.48% | 58.00% | 74.30% | 69.32% | 73.67% | 71.83% |
| BLACK | 22.99% | 19.22% | 12.45% | 13.44% | 8.50% | 10.85% |
| HISPANIC | 22.97% | 19.39% | 9.07% | 11.37% | 9.37% | 10.13% |
| ASIAN/PACIFIC ISLANDERS | 3.09% | 2.20% | 1.66% | 1.15% | 0.56% | 0.48% |
| AMER. INDIAN/ALASKAN | 0.48% | 0.30% | 0.08% | 0.24% | 0.50% | N/A |
| OTHER/NOT IDENTIFIED | 0.00% | 0.88% | 2.45% | 4.48% | 7.41% | 6.72% |
| TOTAL | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

Source: Exam 2000 & Exam 6019 Applicant Data (Docket Entry # 732) Exs. 2-a, 2-b; Pl.-Int. Ex. E; Def. Ex. 21 at 19.

The 61,439 applicants who have applied to take Exam 2000 easily dwarf the number of applicants for the second most popular firefighter examination that the City has offered in the last 25 years—Exam 0084, administered in 1992.  Notably, however, the number of white applicants for Exam 2000, 31,014, is similar to the number of white applicants for Exam 0084, 29,370.  The major difference between the applicant pools for Exams 2000 and 0084 is the number of black and Hispanic applicants.  There were approximately 21,000 more black and Hispanic applicants for Exam 2000 than for Exam 0084—a 400% increase over the approximately 7,000 black and Hispanic applicants for Exam 0084.

During the bench trial the City provided the court with periodic updates of the number of applicants enrolled to take Exam 2000 compared to the number of applicants enrolled to take Exam 6019 at the same point during the open application period.  (See Def. Exs. 25, 26, 31, 32, 38, 39, 43A, 43B, 58A, 58B, 58C.)  Following trial and the conclusion of the Exam 2000 application period, the court asked the City to provide comprehensive applicant data for each day during the application periods for both Exam 6019 and Exam 2000.  The data provided by the City break down the total numbers of applicants for the two examinations by race and gender for

---

[21]    See supra note 19.

each day of the application periods.  (See Exam 2000 and Exam 6019 Applicant Data Exs. 1-a, 1-b, 2-a, 2-b.)  Specifically, the data show the racial and gender breakdown of the applicants who applied each day during the application period (id. Exs. 1-a, 1-b), and the cumulative breakdown of the total applicant pool day-by-day during the application period (id. Exs. 2-a, 2-b).

Table 3 summarizes and compares certain relevant features of these data.

Table 3.  Changes in the racial composition of daily and cumulative applicant pools for Exam 6019 and Exam 2000 during the course of each exam application period by 7-day increments.

| Days in Exam Application Period[22] | Race | % of Exam 6019 Applications Filed During 7-Day Range | % of Cumulative Exam 6019 Applications as of Last Day in 7-Day Range | % of Exam 2000 Applications Filed During 7-Day Range | % of Cumulative Exam 2000 Applications as of Last Day in 7-Day Range |
|---|---|---|---|---|---|
| Days 1-7 | WHITE | 72.16% | 72.16% | 67.07% | 67.07% |
| | BLACK | 8.14% | 8.14% | 9.40% | 9.40% |
| | HISPANIC | 15.63% | 15.63% | 20.12% | 20.12% |
| Days 8-14 | WHITE | 73.90% | 72.88% | 59.62% | 64.45% |
| | BLACK | 8.67% | 8.36% | 15.20% | 11.44% |
| | HISPANIC | 15.28% | 15.49% | 21.50% | 20.61% |
| Days 15-21 | WHITE | 72.40% | 72.75% | 52.03% | 61.33% |
| | BLACK | 8.02% | 8.27% | 21.40% | 13.94% |
| | HISPANIC | 16.35% | 15.72% | 22.74% | 21.14% |
| Days 22-28 | WHITE | 72.73% | 72.75% | 48.18% | 58.65% |
| | BLACK | 9.40% | 8.51% | 23.84% | 15.96% |
| | HISPANIC | 14.50% | 15.46% | 24.04% | 21.73% |
| Days 28-35 | WHITE | 70.04% | 72.24% | 44.27% | 56.08% |
| | BLACK | 9.63% | 8.72% | 25.91% | 17.74% |
| | HISPANIC | 17.44% | 15.83% | 25.72% | 22.44% |
| Days 36-42 | WHITE | 69.01% | 71.63% | 42.11% | 53.95% |
| | BLACK | 10.79% | 9.11% | 28.52% | 19.38% |
| | HISPANIC | 17.04% | 16.06% | 25.73% | 22.95% |
| Days 43-49 | WHITE | 60.81% | 69.30% | 42.95% | 52.69% |
| | BLACK | 16.76% | 10.76% | 27.90% | 20.36% |
| | HISPANIC | 19.25% | 16.74% | 25.65% | 23.25% |
| Days 50-56 | WHITE | 60.47% | 66.98% | 48.70% | 52.03% |
| | BLACK | 16.25% | 12.21% | 25.33% | 21.19% |
| | HISPANIC | 20.24% | 17.66% | 22.26% | 23.09% |
| Days 57-64 | WHITE | 62.66% | 65.86% | 50.71% | 51.59% |
| | BLACK | 16.99% | 13.44% | 23.57% | 21.97% |
| | HISPANIC | 16.92% | 17.47% | 22.35% | 22.85% |
| Days 65-67 | WHITE | 60.33% | 63.83% | 37.68% | 50.48% |
| | BLACK | 18.66% | 15.20% | 34.87% | 22.99% |
| | HISPANIC | 18.11% | 17.77% | 24.09% | 22.97% |

Source: Exam 2000 & Exam 6019 Applicant Data (Docket Entry # 732) Exs. 1-a, 1-b, 2-a, 2-b.

---

[22]     The open application period for Exam 2000 was just over two months long, from July 15, 2011 through September 19, 2011.  The open application period for Exam 6019 was three-and-a-half months long, running from August 7, 2006 through November 3, 2006.  (See Exam 2000 and Exam 6019 Applicant Data Exs. 1-a, 1-b.)  The City voluntarily extended the application period for Exam 6019 when it became clear that the City was not achieving the response from black and Hispanic applicants that the FDNY desired.  (Tr. at 912:16-913:7.)  This Table shows only 67 days of the application period for Exam 6019 in order to compare it to the application period for Exam 2000, which was 67 days long.  The application period for Exam 6019 was 89 days long.  (See Exam 2000 and Exam 6019 Applicant Data Exs. 1-a, 1-b.)

The data show that for both Exam 6019 and Exam 2000 there was an initial surge in applications filed by white applicants shortly after the application periods opened.  During the first three days of the application periods, 74.45% of Exam 6019 applicants were white, while 76.19% of Exam 2000 applicants were white.  (<u>See</u> Exam 2000 and Exam 6019 Applicant Data Exs. 2-a, 2-b.)  Blacks accounted for just 7.30% of Exam 6019 applicants and 5.07% of Exam 2000 applicants during the same three-day period.  (<u>Id.</u>)  The data show that the percentage of daily applications filed by blacks increased significantly as the application periods for Exams 6019 and 2000 progressed, but it increased much more quickly during the application period for Exam 2000 than for Exam 6019.  (<u>Id.</u> Exs. 1-a, 1-b.)

The applicant data strongly support evidence presented at trial that, in the absence of a formal FDNY recruitment campaign, white firefighter candidates are significantly more likely to be recruited to apply for the firefighter exam through an informal friends-and-family recruitment network.  The applicant data also strongly support evidence that these same informal friends-and-family recruitment mechanisms are significantly less likely to result in the recruitment of black firefighter candidates because blacks are significantly less likely to have friends or family in the FDNY.   This, in turn, is a direct result of the City's longstanding use of discriminatory testing procedures that systematically excluded blacks from the FDNY.

> THE COURT:        And, and are there any other ways that people become interested in the job as far as you know beside, you know, seeing the Fire Department do its job in the neighborhood?
>
> CASSANO:          Well, I mean, naturally, the old family members, friends.
>
> THE COURT:        That's a sort of would you say that's a significant source of candidates to the Fire Department?
>
> CASSANO:          Sure.  Well, it's a significant source of knowledge about the Department, for sure, but I think that we've realized that and that's why we have reached out in our last exam and then this one, for sure.  I am certainly going to be

> out there in the next six weeks as much as I can to get the word out how good this
> job is.

(Tr. at 922:18-923:6.)  Historically, the FDNY did not devote significant resources to actively

recruit firefighters.[23]  It didn't need to.  For generations New York City firefighters have been

recruited at the dinner table—literally.  (See Tr. at 1013:18-25.)  As Commissioner Cassano put it,

"the benefits of the job are . . . told and handed down and . . . they see the value of becoming a

firefighter because, you know, their father was a firefighter, their uncle was a firefighter." (See

Tr. at 926:4-14.)

These accounts of the FDNY's informal friends-and-family recruitment network are borne

out in survey data collected by the FDNY in collaboration with Columbia MPA students.  Data

obtained from a survey administered to firefighter candidates who had taken and passed Exam

2043 showed that 40% of male respondents and 33% of female respondents had a relative in the

FDNY.  (Columbia MPA Workshop Report, Def. Ex. 22 at 6-7.)  The 2003 MPA workshop

report titled "Project Diversity: Creating a Fire Department that Better Reflects New York City—

Interim Report" assessed survey data showing that white candidates are significantly more likely

to have a family member in the FDNY than black candidates:

> Based on FDNY's racial composition, we expected that white male candidates
> who passed the written test and responded to the pre-physical exam survey would
> be more likely to report having friends and/or relatives in the Department.  Our
> analysis of these survey respondents supported this assumption, with white
> candidates significantly more likely than minority candidates to have a relative
> within the Department—among males, 50% of white candidates had a relative in the
> Department compared to 28% of Hispanic, 17% of African-American, and 6% of
> Asian candidates.
>
> . . .
>
> This familial connection to the Department is significant because firefighter
> candidates often become interested in a career in the fire service due to their
> personal relationships with firefighters.  Our analysis of survey data indicates that

---

[23]   See supra Table 1, Table 2, and Section II.A.

> for all racial groups, friends and family members are the largest sources of
> recruitment messages.   However, disparities do exist between racial groups.
> White candidates are significantly more likely to be recruited by friends and
> family than are minority groups.   However, these recruitment percentages are
> relatively high for all of the groups: among male respondents, [66%] of white
> candidates report being recruited by friends and family, as do 50% of Hispanics,
> 40% of African Americans and 37% of Asians.

(Columbia MPA Workshop Report, Def. Ex. 22 at 11; see also Def. Ex. 21 at 21; Tr. at 877:20-

879:7, 880:6-881:7.)  When asked about the hypothesis that the lack of a friends-and-family

connection may make members of minority groups less likely to apply, Commissioner Cassano

conceded that it was possible, and explained

> that's one of the reasons why I have been out, heavily involved in this recruitment
> process, to let people in minority neighborhoods know the values of this job; and I
> have personally taken on the opportunity to get as many people familiar with the
> benefits of the job.  We did that in 2006 and we are continuing to do that.

(Tr. at 880:6-881:7.)

The informal friends-and-family recruitment network offers a compelling explanation of

the applicant data for Exams 6019 and 2000.  For both Exam 6019 and Exam 2000, the initial

surge in applications filed by white firefighter candidates in the early days of the exam

application period was followed by a steady increase in the percentage of daily applications filed

by black firefighter candidates as the application period—and the FDNY's recruitment campaign—

progressed.  Moreover, the data show that the increase in the percentage of daily applications

filed by black firefighter candidates was much quicker and much greater during the FDNY's more

robust recruitment campaign for Exam 2000 than during its relatively weak recruitment

campaign for Exam 6019.

The informal friends-and-family recruitment network is race-neutral on its face; the

evidence shows that black firefighter candidates are also recruited by friends and family in the

FDNY.  Captain Paul Washington, who is black, exemplifies this tradition.  Captain

31

Washington's father, his older brother, two older cousins, and an uncle were all firefighters when he applied to take the examination.  (Tr. at 1013:18-25.)  But reliance on informal friends-and-family recruitment operates to disproportionately exclude blacks and to perpetuate the underrepresentation of blacks in the FDNY.  This is so because the City's longstanding use of discriminatory tests to hire firefighters has systematically and disproportionately excluded black firefighter candidates from the FDNY.  Thus, potential black firefighter candidates are significantly less likely to have a friend or family member in the FDNY who will recruit them informally to take the examination.

Fortunately, the applicant data prove that a formal remedial recruitment campaign can succeed in recruiting blacks to apply to take the firefighter examination in significant numbers. The data show that as the FDNY's recruitment campaigns for Exams 6019 and 2000 progressed, and as the FDNY communicated its recruitment message to black and Hispanic communities, black and Hispanic applicants comprised an ever greater share of the daily applicant pool for those exams.  Moreover, the applicant data show that when the FDNY makes a significant investment of recruitment resources—as it did during its campaign for Exam 2000—black representation in the daily applicant pool increases much more quickly than for those campaigns in which it makes a small investment in recruitment—as it did in Exam 6019.

The court finds by a preponderance of the evidence that the underrepresentation of black firefighters in the FDNY—a direct result and vestige of the City's pattern and practice of discrimination against black firefighter candidates—is responsible for making blacks significantly less likely to apply to become New York City firefighters in the absence of a formal recruitment program.  Because friends and family in the FDNY are traditionally involved in recruiting potential firefighter candidates to take the City's firefighter examination, whites are significantly

32

more likely to know about the examination and the benefits of the job than blacks.[24]  In the

absence of a robust and highly-organized remedial recruitment campaign, these facts guarantee,

and the evidence in fact shows, that whites will ~~and do~~ apply to become firefighters in numbers far

greater than their representation in New York City, and that blacks will ~~and do~~ apply to become

firefighters in numbers far lower than their representation in New York City.  Consequently, any

policy or practice of the City of New York that fails to adequately recruit black persons to

become firefighter candidates serves to maintain and perpetuate the effects of the City's

discrimination against black firefighter candidates.

        2.    <u>Risk that Financial Support Will Falter</u>

When asked about the sufficiency of the resources the City has committed to firefighter

recruiting, Maglione stated that

> We've pretty much always gotten what we have asked for through the city and
> certainly the current ~~and~~ the past administration of the Fire Department that I have
> worked with since 2006 has been unbelievably supportive and given us
> everything we have asked for and said that we needed.

(Tr. at 275:6-276:5.)  Maglione explained that the ORD has "been given a lot of resources in–we

have spent an awful lot of money in overtime. We ~~I~~ would say we are resource heavy." (Tr.

at 242:5-18.)

Although Maglione believes the resources she has been given are sufficient, there is no

indication that the resources she has been allocated to recruit firefighters for Exam 2000 are tied

---

[24]      To be clear, the friends-and-family advantage also works to make black people with family members in the
FDNY more likely to apply to join the FDNY than black people without a friend or family member in the FDNY.
The Exam 2043 survey data presented in the Columbia MPA workshop reports—and Captain Washington's
example—show that family members are also a significant source of recruitment messages for black firefighter
candidates.  But on the whole, black people are significantly less likely to have friends or family in the FDNY
because the FDNY's discriminatory hiring policies and practices have operated to systematically exclude blacks
from the FDNY.

to any objective assessment of ORD's needs in the context of its goals.  Indeed, there are indications that the City was <u>unusually</u> generous in budgeting for recruitment for Exam 2000.

   For example, Assistant Commissioner Maglione emphasized at trial the importance of face-to-face interaction between firefighter-recruiters and potential applicants to the success of ORD's recruitment efforts.  (Tr. at 239:22-240:2.)  Maglione explained that the most important support ORD receives from the FDNY is a large overtime budget (Tr. at 245:2-10), and she credited the FDNY's commitment of "extensive resources" in the form of overtime for ORD's improvement in its efforts to recruit for Exam 2000 (Tr. at 242:5-18).  During the recruitment campaign for Exam 2000 ORD's overtime budget for its recruitment cadre was effectively unlimited, but it seems clear that the FDNY cannot sustainably commit to provide ORD an unlimited overtime budget over the long-term.  (Tr. at 264:20-265:7.)  Ultimately, Assistant Commissioner Maglione is not the person who decides how much money to allocate to recruitment.  (Tr. at 271:4-272:14.)

   In another example, ORD's advertising budget was augmented at the last minute and in the midst of trial by an additional $300,000 approved by an unnamed official in City Hall, to partially fund a $498,000 radio advertising buy for which the Vulcan Society had been lobbying for months.  (Tr. at 245:16-247:11, 257:24-259:14, 264:7-12, 271:15-273:24.)  No City official who testified could explain what motivated this infusion of cash, a 30% increase in ORD's advertising budget, or why the City waited to provide these resources until weeks after the two-month application period opened.  (Tr. at 271:15-273:24.)  Some of ORD's other resources are handouts from well-meaning private citizens and corporations.  For example, ORD's new vehicles were donated to the FDNY by a private city resident (Tr. at 265:8-269:23, Pl.-Int. Ex. J),

and the Arnell Group donated $56,000 in time and effort to help the FDNY design its recruitment campaign for Exam 2000 (Tr. at 368:3-369:11).

Assistant Commissioner Maglione has demonstrated that she will fully employ all of the resources made available to her to recruit black and Hispanic applicants to become firefighters. Yet Maglione is only one relatively junior bureaucrat in the City's leadership. What is of more concern to the court than what Assistant Commissioner Maglione will do with the resources she is given is the strength of the City's commitment to continue providing those resources to her and her successors. As the court detailed extensively in its Disparate Treatment Opinion, the City as an institution, and especially this Mayoral Administration, have a well-established track record of ignoring warnings from their own officials and from others concerned that the City's firefighter hiring practices violate federal, state, and City equal employment opportunity laws. (See Disparate Treatment Op. at 31-33, 51-61.) In the harsh glare of federal litigation spotlighting its near-total disregard for the requirements of the equal employment laws, the City has recently, and haltingly, enhanced its firefighter recruitment efforts. But firefighter recruitment costs money, and the City has been guilty of using fiscal austerity as an excuse to retreat from its responsibilities under the equal employment laws before.[25]

While the resources the City has provided to ORD to recruit firefighters for Exam 2000 are certainly a vast improvement over its efforts to recruit firefighters for Exam 6019, the court finds that the City's financial commitment to enhanced firefighter recruitment lacks indications of long-term sustainability. The City's fortuitous allocation of additional advertising resources to

---

[25]    In the court's Disparate Impact Opinion the court noted that after Judge Weinfeld's 1973 ruling, the City's firefighter examination had a disparate impact on black firefighter applicants and that the examination was not job-related for the position of entry-level firefighter: "[T]he City contracted with a private consulting firm to construct valid written and physical examinations; these contracts were cancelled three years later, however, apparently on account of a budget crisis." (Disparate Impact Op. at 4-5 (citing Berkman v. City of New York, 536 F. Supp. 177, 184 (E.D.N.Y. 1982).)

ORD's recruitment efforts in the midst of trial, and after the recruitment period for Exam 2000 had already opened, smacks of litigation gamesmanship not a sustainable commitment to do what is necessary to increase the numbers of blacks and Hispanics who apply to be firefighters. The City's willingness to accept handouts from the public to fund its branding strategy and to provide vehicles to its recruiters does not demonstrate its commitment to recruitment. To the contrary, it demonstrates that the City does not value recruitment highly enough to pay those costs itself. Until the City ties its financial commitment to recruit black and Hispanic firefighter candidates to a realistic assessment of the FDNY's recruiting needs, the court cannot be sure that *this time* the City really means to adopt a permanent effort to recruit black and Hispanic firefighter candidates. The court finds that in the absence of court supervision the City will more likely than not significantly curtail its commitment of financial resources to firefighter recruitment in advance of future firefighter examinations.

### 3.   Refusal to Set Measureable Goals

Part of the reason it is difficult to say what level of funding and resources the ORD requires is that the FDNY refuses to set any measureable goals for its recruitment efforts. Maglione explained that it is her job "to find as many interested young men and women of diverse background to be part of the applicant pool." (Tr. at 239:14-240:17.) To achieve that vague goal Maglione explained that ORD is always trying to improve over its performance in the last examination, saying that "[w]e feel like we're so far ahead of where we were in 2006, which was so far ahead of where the department was in 2002." (Tr. at 262:19-263:6.) Maglione explained that "[t]he way we think about our goals is we want to surpass what we did in 2006. So if our numbers are at the end of this we will know we have succeeded if we have surpassed those, what we did in 2006." (Tr. at 274:4-276:5.) Commissioner Cassano echoed this view:

LEVY:        Do you think it would be worthwhile to set a goal like 25 percent, which would reflect the demographics of the city, or 30 or 35 percent, recruit applicants in those numbers, so that the net result would be to bring up the number of incumbents in the department?

. . .

CASSANO:   No, I don't believe that that would be helpful.  Why would I limit myself to those numbers when my goal is to get as many minority candidates as possible to sit for the exam?

LEVY:        Well, without a goal how do you know if you have done what you are seeking to do?

CASSANO:   My goal is  I think we have established the fact that we have done very well, and we have about six weeks left in the campaign, and I will continue to get the message out about the job and get as many minority candidates to sit for the test.

(Tr. at 891:12-892:2.)

The FDNY's recruitment campaign for Exam 6019 in 2006 was more successful than its

campaign for Exam 2043 in 2002, but blacks were still underrepresented in the applicant pool for

Exam 6019.  While the FDNY is certainly doing "better," better does not say anything about

whether the FDNY is doing "enough."  Commissioner Cassano's failure to provide a responsive

answer to the very basic question "how do you know if you have done what you are seeking to do,"

confirms the obvious shortcomings in failing to set such goals.  Without goals, ORD and the

court lack a yardstick against which the effectiveness of ORD's recruitment efforts can be

measured.  But the City refuses to set a goal, apparently because goal-setting would, to

paraphrase Commissioner Cassano, "limit [the FDNY] to those numbers."  This, of course, is

nonsense.  A goal is an aspiration, not a limit.  A more likely explanation one consistent with the

City's culture of bureaucratic blame-shifting and accountability avoidance is that the City does not

want to be held accountable for the results of its recruitment efforts.  This is unacceptable.

37

The purposes of the FDNY's remedial firefighter recruitment effort must be to (1) change the perception that the job is available only to white male candidates; (2) increase awareness of the benefits of the job across all communities in New York City; and (3) thereby change the applicant pool to more closely reflect the population of New York City. This much, at least, the City implicitly acknowledges in its officials' answers to pointed questions about the sufficiency of its recruitment efforts that trumpet the growing percentage of the applicant pool comprised of black and Hispanic applicants. (See Tr. at 237:7-239:13.) The City's failure to set goals that measure its success in achieving these remedial purposes prevents the court and the City from meaningfully assessing the sufficiency of the City's remedial recruitment efforts.

4.     Failure to Coordinate

ORD's recruitment efforts are hampered by the City's failure to coordinate the actions of its other departments and administrative units with ORD. ORD's targeted recruitment campaign for a particular firefighter examination begins only once the application period for the examination opens, but ORD does not find out when the application period will open until DCAS publicly announces the start of the application period, leaving ORD to scramble to escalate its recruitment activities. (Tr. at 259:9-260:21.) ORD is not consulted about when the application period should begin, or how long it should last to ensure that ORD can recruit an applicant pool representative of the City. (Tr. at 260:15-21.) When asked whether the two-month application period for Exam 2000 was long enough period to effectively recruit for the firefighter examination, Maglione was matter-of-fact: "This is the filing period that we have been given, and recruitment, we are doing everything that we can to make sure the folks that we reached out to file within the timeframe given." (Tr. at 235:18-237:17.)

The downsides of ORD's exclusion from exam administration planning are evident in the short extension of time the court recently granted for the application period for Exam 2000. The original Notice of Examination called for the application period for Exam 2000 to run from July 15, 2011, through September 15, 2011. But what the parties realized only later on was that a major recruitment opportunity—the City's annual African-American Parade in Brooklyn—would take place on Sunday, September 18, 2011. Accordingly, the parties jointly asked for an extension of the application period through Monday, September 19, 2011. (See Docket Entry # 731.) Had FDNY's senior leadership and DCAS consulted ORD when they originally scheduled the application period, ORD could have advised that it would be desirable for the application period to remain open through the weekend to take advantage of the recruitment opportunity offered by the parade. Moreover, ORD could have researched community events scheduled during the period to identify the best recruiting opportunities, and could have planned the resources it would need for an effective campaign in advance of the application period. ORD did not even know when the application period would open and was not able to request additional advertising funds from City Hall, plan its media strategy, or buy advertising until after the application period had begun. (Tr. at 257:24-260:4.)

> 5.   Insufficient Evidence that FDNY's Racial Composition or Reputation Deters Black Applicants

At trial, Plaintiff-Intervenors offered newspaper articles reflecting public reports of serious allegations of racial discrimination in the FDNY. (See Tr. at 937:15-940:22, 1451:13-1452:10, Pl.-Int. Exs. K, L, M, X.) Similarly, several Vulcan Society members testified concerning specific acts of racial discrimination that they witnessed and of which they were victims. While the evidence presented by Plaintiff-Intervenors is troubling, the evidence is too

anecdotal for the court to conclude that there is a broadly negative perception of the FDNY in the black community that would meaningfully deter black applicants from applying to become firefighters. Finding the existence of such a public perception based on this evidence would be highly speculative. Indeed, the strong black representation in the applicant pool for Exam 2000 suggests that a negative perception of that sort does not exist. Consequently, the court is not persuaded that the FDNY's reputation in the black community significantly deters blacks from applying to become firefighters.

III.   **FDNY'S POST-EXAMINATION SCREENING PHASE**

The evidence at trial showed that the FDNY's policies and practices at multiple stages of the post-examination screening phase of the hiring process work in combination to create a significant risk that black firefighter candidates will be disadvantaged by the FDNY's improper use of arrest information in making hiring decisions.

     **A.**     **The Post-Examination Screening Process**

          1.     <u>Candidate Investigations</u>

CID is responsible for performing background checks on firefighter candidates before they are selected to attend the academy and appointed probationary firefighters. (Tr. at 16:1-21.) CID is headed by a director, currently Dean Tow, who oversees all background investigations performed by the FDNY, and reports to the Assistant Commissioner for Human Resources. (Tr. 15:23-16:21.) The Assistant Commissioner for Human Resources is currently Donay Queenan ("Queenan"), and, prior to Queenan's appointment in fall 2004, was Sherry Kavaler ("Kavaler"). (Tr. at 16:5-15.). While Tow is not a firefighter or fire officer, the FDNY has filled the director's position with uniformed personnel in the past. (Tr. at 66:9-12.) CID investigators are non-uniformed personnel who hold a civil service title and are hired for the position off of a civil

40

service list.  (Tr. 30:4-13.)  In the past CID has been split between investigators who were

dedicated to investigating firefighter candidates and investigators dedicated to investigating EMT

and paramedic candidates.  (Tr. at 29:18-30:3.)  This meant that approximately six investigators

were dedicated to investigating firefighter candidates.  (Id.)  Recently, however, CID re-trained

its investigators to be able to investigate candidates for all titles hired by the FDNY.  (Tr.

at 691:25-692:15)

In general, CID investigators are tasked with verifying that each candidate meets the

eligibility criteria stated in the Notice of Examination, but CID also checks to see whether

candidates who have claimed special credits, such as the New York City residency credit,

actually qualify for that credit, and whether there is any indication that a candidate may lack the

character necessary to be a firefighter.  (Tr. at 17:8-18:1.)  There are just two objective facts that,

if discovered during the investigation process, automatically disqualify a candidate from further

consideration: (1) the candidate does not meet the age requirement; or (2) the candidate has a

felony conviction or a dishonorable discharge from the military.  (Tr. at 18:2-9.)  Candidates

with these disqualifying characteristics are not ordinarily reviewed further by CID, and their files

are not sent to the FDNY's Personnel Review Board ("PRB") for further consideration.  (Tr. at

18:10-19:19.)

CID generally plans to investigate approximately three candidates for every slot in a fire

academy class.  (Tr. at 20:16-25.)  Thus, if the FDNY intends to appoint 300 probationary

firefighters to an academy class, CID starts investigating a group of approximately 900-1,000

candidates from the list certified by DCAS.  (Id.)  CID's investigators begin the background

investigation process by sending a packet of intake forms to firefighter candidates who may be

selected for the next academy class.  (Tr. at 21:10-25.)  Included in the intake forms is a date that

41

candidates are instructed to report for intake interviews with CID investigators and to be

fingerprinted.  (Id.)

Candidates who report for an intake interview with CID investigators bring their

completed intake forms and a money order to pay for fingerprinting to the FDNY's auditorium.

(Tr. at 28:3-29.)  Approximately 65 to 100 candidates are summoned for an intake interview at

one time.  (Tr. at 86:5-8.)  At the intake interview CID investigators sit down with each

candidate individually and go through the paperwork with them to identify any missing

documents CID still needs from the candidate.  (Tr. at 28:3-29.)  If CID determines that one of

the candidates is missing any required documents, the candidate is given a list of the missing

documents and a postage-paid envelope and told to send the missing documents to CID as soon

as possible.  (Id.)  The intake interview is the first opportunity that CID has to determine if a

particular candidate falls within the eligible age group.  (Tr. at 28:25-29:3.)  If a candidate is

found to be under-age or over-age based on the investigator's review of their birth certificate, CID

would determine at that time to cease processing that candidate's application.  (Id.)  Candidates

who fall within the eligible age group and provide a $75.00 money order are fingerprinted at the

intake interview.  (Tr. at 29:4-17.)

Among the documents that CID asks candidates to bring to their intake interviews are

documentation from the relevant court of the disposition of the candidate's past arrests and a list

of the candidate's prior employers.  (Tr. at 31:4-16.)  Candidates are asked to provide a written

statement explaining the circumstances of any arrests or convictions.  (Tr. at 32:4-6.)  CID

independently sends a verification and reference letter to each employer using the contact

information provided by the candidate, and uses each candidate's fingerprints to obtain a rap

sheet detailing his or her history of arrests and convictions.  (Tr. at 31:9-32:13)  CID also obtains

records of each candidate's attendance at any high schools and colleges, including their

transcripts and disciplinary history.  (Tr. at 50:16-25.)

### 2.    Consideration Reports

If CID investigators discover derogatory information about a candidate during their

investigation, they prepare a consideration report to the FDNY's Personnel Review Board ("PRB").

(Tr. at 32:14-33:3.)  A consideration report is a memorandum from the Director of CID to the

PRB alerting the FDNY of potential reasons for concern about a particular candidate.  (Tr. at

32:14-23.)  The consideration report is the mechanism by which the PRB reviews a candidate's

character and fitness to be a firefighter.  (Tr. at 32:24-33:3.)  The PRB does not evaluate a

candidate's character and fitness unless the Director of CID sends a consideration report to the

PRB bringing the candidate to the PRB's attention.  (Tr. at 38:20-25.)  A consideration report is

not ordinarily prepared, and the PRB does not ordinarily evaluate a candidate's character and

fitness to be a firefighter, until after a candidate's investigation is completed.  (Tr. at 659:20-

661:8.)  If a consideration report is not sent to the PRB, and CID does not discover any objective

reason why the candidate is not qualified for employment, the candidate proceeds to the next step

of the hiring process, which usually consists of medical and psychological examinations and,

depending on the structure of the written examination, a physical abilities test.  (Tr. at 33:4-

34:4.)

Individual CID investigators exercise limited discretion to refer potentially derogatory

information to the Director of CID for a potential consideration report.  As Director of CID, Tow

instructs his investigators to report any potentially derogatory information to him so that he can

make a decision as to whether to prepare a consideration report.  (Tr. at 36:21-37:19, 49:18-

50:25.)  Tow personally audits every investigation file prepared by CID investigators to ensure

that he has reviewed all potentially derogatory information.  (Tr. at 36:21-37:19.)  Other than

Tow's instruction to his investigators to bring all potentially derogatory information to his

attention, the investigators apparently follow no other guidance in determining what information

should be considered potentially derogatory.  (Id.)

 Not all potentially derogatory information results in a consideration report to the PRB,

however.  While Tow requires his investigators to keep him apprised of potentially derogatory

information and directs further examination of such information, Tow ultimately makes the

decision whether or not to send a consideration report to the PRB.  (Tr. at 37:20-38:4.)  In the

past, Tow would send a consideration report to the PRB based on a candidate's arrest record only

if it was, in his view, "substantial."  (Tr. at 37:24-38:19, 51:18-53:12.)  Recently, however,

Assistant Commissioner Queenan created a policy limiting Tow's discretion.  (Tr. at 35:3-13,

39:5-16, 53:13-22.)  Under the new policy Tow is required to send a consideration report to the

PRB for "virtually any arrest."  (Id.)  Assistant Commissioner Queenan explained that a firefighter

is a peace officer under New York law, and part of the PRB's role is to evaluate whether the

candidate can be trusted with the powers given to peace officers.  (Tr. at 608:17-25, 610:14-

611:2, 644:3-9.)  As a result she believes that the PRB should consider the fitness of any

candidate who has previously been arrested.  (Id.)

 Other than the arrest record policy, however, Tow's discretion is unfettered.  A number of

different facts could cause Tow to send a consideration report to the PRB, including a poor

driving history, poor employer references, or a school disciplinary history.  (Tr. at 32:17-23,

50:19-25.)  As Tow explained, he would send a consideration report to the PRB if there is

"anything that surfaces in the investigation that the investigator and certainly [he] feel[s] the

department should be made aware of."  (Tr. at 32:17-23, 610:3-11.)  There are no official

guidelines informing Tow's decision to send a consideration report to the PRB other than the policy governing consideration of candidates with arrest records.  (Tr. at 41:20-25.)

Occasionally, fire officers or FDNY executives will call or visit Tow and ask him about particular candidates who are under investigation by CID and have potentially derogatory information in their investigation files.  (Tr. at 96:8-22.)  Tow does not record in a memorandum or in any other record whether he is contacted in this manner about CID's investigation of a particular candidate.  (Tr. at 96:23-97:1.)  Tow states that he does not disclose information to the people who contact him and claims that these contacts have no influence on his exercise of discretion, but he knows who they are and is aware of their positions in the FDNY's hierarchy. (Tr. at 96:23-97:9.)  Because Tow does not keep records that would show whether he was contacted about particular candidates, it is impossible to independently determine whether those contacts have in fact affected his use of discretion in sending consideration reports to the PRB, or in deciding to direct additional investigation into certain candidates' histories.

The consideration report is a compilation of information from a candidate's investigation file, including a summary of the candidate's arrest history, the candidate's statements concerning his or her prior arrests, employment history and references, and educational records.  (Tr. at 32:1-23.)  In the past the consideration report included a letter from the Director of CID explaining the concerns that led him to send the PRB the consideration report, and recommending that the FDNY appoint or not appoint the candidate.  (See Tr. at 67:15-68:9; Pl.-Int. Ex. U-5.)  Beginning with the FDNY's processing of some of the candidates who took Exam 2043 and the candidates who took Exam 6019, Assistant Commissioner Queenan changed FDNY policy to require that both she and the FDNY's Chief of Uniformed Personnel also issue recommendations to the PRB.  (Tr. at 39:8-16.)  Because Assistant Commissioner Queenan and

45

the Chief of Uniformed Personnel both sit on the PRB and recommend a course of action with respect to particular candidates under review by the PRB before the PRB meets, their votes are effectively decided before the PRB even discusses a candidate.. (Tr. at 611:21-612:10; 669:23-671:8.)

Assistant Commissioner Queenan also introduced a number of changes to the consideration report itself. Queenan instructed CID to stop including pictures of the candidate in the consideration reports distributed to PRB members, and to redact race and ethnicity information from the consideration report packages. (Tr. at 570:4-21, 616:10-25.) She also decreased the size and complexity of the consideration reports. In her words:"instead of it being a report of several pages and here are convictions, here is the education, here is the driving infractions, I tried to make it a full—Imade it a full assessment on one sheet." (Tr. at 615:11-616:9.) The consideration report package sent to the PRB is not a candidate's full investigation file. The first page of the report is a one-page candidate assessment summary intended to show "the entire picture . . . not just . . . arrests and convictions." (Tr. at 615:23-25.) The report also contains other relevant information obtained by CID that may reflect on the candidate's character and fitness including, for example, employer references. Queenan tried to redact the candidate's name from the consideration report package, but this proved too difficult because a candidate's name appears repeatedly in the documents included in the consideration report package. (Tr. at 680:2-23.)

Under the current process, Tow prepares the consideration reports with his recommendations and sends them to the Chief of Uniformed Personnel who includes his recommendations and forwards the packages to Assistant Commissioner Queenan for her recommendations. (Tr. at 40:13-19, 609:9-610:2.) While the Director of CID has the entire

candidate investigation file available to him when he makes his recommendation, the recommendations made by the Chief of Uniformed Personnel and Assistant Commissioner for Human Resources are based solely on the information contained in the consideration report prepared by CID and the Director of CID's recommendation; the entire investigation file is not provided to either person unless he or she specifically requests it.  (Tr. at 41:15-16.)  After the Assistant Commissioner for Human Resources prepares her recommendation, the consideration report is distributed to the members of the PRB for their review prior to the next meeting of the PRB.  (Tr. at 42:1-22, 43:14-23.)

3.   <u>PRB Organization and Function</u>

The PRB is a particularly enigmatic institution within the FDNY.  It is organized and, in effect, directed by the Assistant Commissioner for Human Resources, Donay Queenan, who began working at the FDNY in her current role in October 2004 when she replaced former Assistant Commissioner Sherry Kavaler.  (Tr. at 601:16-602:2.)  As Assistant Commissioner for Human Resources, Queenan supervises the CID, among other units, and reports to the Deputy Commissioner for Technical and Support Services.  (Tr. at 604:10-17.)  Queenan is responsible for organizing meetings of the PRB and distributing copies of consideration report packages to the members of the PRB in advance of PRB meetings.  (Tr. at 567:5-14.)

The PRB is comprised of eight senior FDNY officials: (1) the Assistant Commissioner for Human Resources (Donay Queenan); (2) the Deputy Commissioner for Administration (Douglas White); (3) the First Deputy Commissioner (Donald Shacknai); (4) the Executive Officer to the Fire Commissioner (Peter Tronolone); (5) the Chief of Department (Edward Kilduff); (6) the Chief of Fire Operations (Robert Sweeney); (7) the Chief of Uniformed Personnel (Michael Gala, Jr.); and (8) the Chief of Training (Thomas Galvin).  (<u>See, e.g.</u>, Tr.

at 605:12-606:17, 669:23-672:4.)  Five of the eight members of the PRB are uniformed members

of the FDNY.  (Tr. at 676:24-677:14.)

     None of the FDNY officials who were asked seemed quite sure why these eight officials

sit on the PRB, and it is unclear whether there is a formal FDNY policy that dictates the

composition or function of the PRB.  (Tr. at 562:16-22, 672:5-11.)  Nonetheless, the FDNY

officials who testified at trial agreed that the PRB's purpose is to exercise hiring discretion on

behalf of the FDNY when presented with a consideration report prepared by the Director of CID.

(Tr. at 564:4-565:14, 618:17-619:1.)  The PRB has the discretion to allow a firefighter candidate

to move forward in the hiring process, reject a candidate, or in unusual cases, to ask the CID to

collect more information about the candidate, send the candidate to an interview with a staff

chief (a high-ranking uniformed officer), or appoint the candidate subject to a stipulation.  (Tr.

at 612:9-614:3.)  When the FDNY appoints a candidate subject to a stipulation, the candidate is

appointed subject to certain conditions, such as random drug testing, that apply during the first

two years of his or her employment.  (Tr. at 613:15-614:3.)  The FDNY officials who testified

also agreed that, if he so chooses, the Fire Commissioner can overrule the decision of the PRB.

(Tr. at 677:17-22.)  In recent years the Fire Commissioner has not exercised this authority,

however, so an adverse determination by the PRB effectively ends a firefighter candidate's

candidacy.  (Tr. at 677:23-678:3.)

    **B.**    **Deficiencies in the FDNY's Post-Examination Firefighter Selection Process**

       1.    <u>Failure to Adopt Guidelines for Consideration Report Recommendations</u>

     There is no written guideline or policy that informs an FDNY official's decision to

recommend that the PRB permit or deny a candidate's appointment as an entry-level firefighter.

(Tr. at 41:17-25.)  The decision to recommend a candidate for appointment is entirely within the

discretion of the official making the recommendation.  (Id.)  The lack of guidance from the

FDNY to its officials in making these recommendations materially increases the risk that any

recommendation will be arbitrary or based on impermissible factors, including race.  For

example, on February 6, 2004, Tow recommended the appointment a white male candidate ("U-1")

who had been arrested on a domestic violence charge but reconciled with the victim (Tr. at

59:16-62:17, Pl.-Int. Ex. U-1), and, on July 14, 2003, recommended *against* the appointment of a

Hispanic male candidate ("U-2") arrested on a domestic violence charge over his wife's objections

(Tr. at 62:18-64:5, Pl.-Int. Ex. U-2.)  The charges against U-1 were arguably more serious than

those against U-2, in that the menacing charges against U-1 involved the use of a weapon.  (Tr.

at 61:15-21.)  Nonetheless, CID never investigated the menacing charges against U-1 to

determine if there was a factual basis for the weapons charge.  (Id.)  With respect to U-2, Tow

stated that he may have drawn an inference against him because U-2 explained that a new law in

Suffolk County required the officers responding to a domestic violence call to arrest a suspect,

and that he was arrested despite his wife's objections.  (Tr. at 70:15-72:8.)  A nearly identical

statement provided by U-1 to CID, however, did not cause Tow similar concern.  (Tr. at 73:21-

74:10.)  When asked, Tow could not explain the differences in his recommendations as to U-1

and U-2.  (Tr. at 63:14-19.)

### 2.   Improper Use of Arrest Information

Even more concerning however, is the cumulative effect of the FDNY's policy of

referring all candidates with prior arrests that do not result in conviction to the PRB, its standard

practice of not investigating the circumstances of those prior arrests, and its failure to provide

guidance or training to PRB members regarding the ways they may appropriately consider such

information.  Together, these policies and practices virtually guarantee that PRB members will

49

improperly interpret the fact of a candidate's prior arrest as prima facie evidence that he or she committed a crime, and will inappropriately penalize the candidate for maintaining his or her innocence.

During her testimony Assistant Commissioner Queenan was presented with guidance issued by the United States Equal Employment Opportunity Commission ("EEOC")[26] advising employers that a prior arrest that did not result in a conviction is not evidence that the applicant committed the underlying crime, and directing employers to independently "determine whether the applicant is likely to have committed the conduct alleged." (Tr. at 650:6-652:25, Pl-Int. Ex. PP.)  When asked about the FDNY's policy governing CID's investigations into a candidate's past arrests, Assistant Commissioner Queenan testified that there is no FDNY policy requiring that CID investigators conduct *any* independent investigation into the factual circumstances underlying a candidate's past arrests.  (Tr. at 653:21-654:10.)

The evidence shows that CID conducts an "investigation" of a candidate's past arrests that is essentially limited to paperclipping records together, and does not independently determine whether the applicant is likely to have committed the underlying conduct.  CID uses each candidate's fingerprints to obtain a rap sheet, which shows only the charge on which the candidate was arrested; it does not show any detail about the circumstances of the arrest itself. (Tr. at 56:1-4.)  CID investigators rarely, if ever, attempt to substantiate the facts underlying a candidate's arrest, instead relying only on information provided by the candidate and the candidate's rap sheet.  (Tr. at 55:23-25, 611:3-18.)  CID investigators "don't go [into] the field—all [CID] investigators work strictly from [the] office." (Tr. at 24:17-18.)

---

[26]     See U.S. EEOC, Policy Guidance on the Consideration of Arrest Records in Employment Decisions under Title VII of the Civil Rights Act of 1964, Notice No. 915.061, 1990 WL 1104708, at *1 (Sept. 7, 1990), available at http://www.eeoc.gov/policy/docs/arrest_records.html.

In rare circumstances, Tow has directed his investigators to contact the arresting law enforcement agency or witnesses to obtain additional information about the circumstances of a candidate's arrest, and in some cases information is brought to the attention of CID by another source,[27] "but for the most part, what [CID] go[es] on is the information provided to [CID] by the candidate and by virtue of the rap sheet." (Tr. at 54:25-55:25.)  CID's actual investigative practices simply do not support Assistant Commissioner Queenan's assertion that CID investigators "frequently" conduct independent investigations into a candidate's past arrests.  (Tr. at 647:7-648:22.)

While Tow is aware of the EEOC guidelines on the use of arrest information in employment decisions (the "EEOC arrest guidelines"), he is "not too familiar with them" and he and his investigators do not use them in deciding whether to refer a candidate's arrest history to the PRB.  (Tr. at 56:20-57:3.)  As a matter of policy, CID does follow New York State law requiring employers to "look at the whole person" in considering a candidate for employment's history of arrests and convictions.  (Tr. at 56:5-19.)  Nevertheless, it is unclear how CID could apply the "whole person" policy in light of CID's adherence to FDNY policy requiring the Director of CID to send a consideration report to the PRB whenever a candidate has an arrest record.  Although the FDNY has not adopted standards for evaluating candidates with arrest histories, Tow has been involved in discussions with Assistant Commissioner Queenan, and the Chief of Uniformed Personnel, about setting such standards.  (Tr. at 80:15-81:6.)

Once the fact of a candidate's prior arrest is submitted to the PRB in the consideration report, no rules govern the PRB's use of that information, and its members are given no guidance or training at all in considering candidates.  (Tr. at 562:23-566:3, 673:3-5.)  Although he

---

[27]     Tow did not specify what other sources provide information to CID about a candidate's past arrests.  Tow did testify, however, that he is occasionally called by firefighters or fire officers asking about candidates under investigation by CID, but Tow claimed that these calls do not affect his decisions.  (Tr. at 96:8-97:9.)

disagreed with the statement that the PRB exercises "unbridled discretion," Commissioner Cassano did not identify any constraints on the PRB's decision-making and characterized the PRB's decision-making process as essentially standardless—"a very open discussion, [] a lot of opinion goes into it."[28]  (Tr. at 860:18-861:1.)  Assistant Commissioner Queenan testified that when members of the PRB are considering candidates with arrest records they "are using the EEOC guidelines."(Tr. at 617:8-17.)  But this was news to the other members of the PRB who testified at trial.  Commissioner Cassano served on the PRB for five years before becoming Fire Commissioner but could not remember if he had ever reviewed the EEOC arrest guidelines.  (Tr. at 904:19-905:9.)  Deputy Commissioner White (an attorney), who has served on the PRB since 2002, did not know of any rules or guidelines applicable to PRB decisions.  (Tr. at 565:15-566:3.)

Queenan testified she does not believe that in her time serving on the PRB the PRB has ever rejected a candidate based solely on an arrest that did not result in a conviction.  (Tr. at 614:10-12.)  She acknowledged, however, that a candidate would be sent to the PRB for review even if the only derogatory information in the candidate's file was a prior arrest that did not result in a conviction.  (Tr. at 643:16-645:2.)  Queenan also agreed that since all candidates with arrest records are sent to the PRB, the PRB could choose to reject a candidate even if the only derogatory information in the candidate's record was an arrest that did not result in a conviction.  (Tr. at 645:3-16.)  It is thus unsurprising that Commissioner Cassano recalled that

---

[28]     As the court explained during trial (see Tr. at 588:23-589:21), the court called Commissioner Cassano to testify so that the court could hear from the City official ultimately responsible for hiring entry-level firefighters before the court decided what remedy to impose in this case.  The City objected on the grounds that "the court as fact finder . . . do[es] not request witnesses to be produced."  (Tr. at 588:19-22; Scheduling Order (Docket Entry # 701).)  Although the court has already overruled the City's objection, the court notes that Federal Rule of Evidence 614 explicitly authorizes the court to independently call and interrogate witnesses.  The court offered the City the opportunity to make more specific objections to its questioning of Commissioner Cassano during the trial, but the City did not avail itself of that opportunity.  (Tr. at 963:24-964:25.)

while he served on the PRB, the PRB had rejected individuals based solely on their arrest

records.  (Tr. at 902:9-903:5.)

In explaining how the PRB evaluates a candidate who had previously been arrested but

not convicted, Commissioner Cassano illustrated how PRB members turn a candidate's prior

arrest without conviction into a presumption of guilt:

> LEVY:        So did you actually determine whether or not the crime which underlay the arrest was committed?

> CASSANO:    Well, if the person there were a couple of processes there.

> In the course of the candidate investigation, when a candidate has an arrest, they actually write a brief description of what it was about, why they were arrested and the circumstances and that was some of the things, that was one of the things that we reviewed so that if there were things within it that didn't sound totally right or didn't sound like they were, in whatever, his description was, maybe it wasn't in line with the arrest or if they blamed the arrest on somebody else and never took responsibility for being arrested, those are the things that we considered, but in my recollection, I can't remember somebody with one arrest that wasn't, that wasn't convicted that wasn't accepted.

(Tr. at 903:19-904:9.)  The same problem likely also affects an FDNY official's decision to

recommend or not recommend a candidate's appointment to the PRB.  In at least one instance

Tow's predecessor, Captain Robert Dayboch, decided that a candidate's explanation of the

circumstances of his prior arrests was not credible without making any effort to verify the

candidate's account, and recommended that the PRB refuse to appoint the candidate based solely

on the fact of his prior arrests and Dayboch's opinion of the credibility of the candidate's

explanation of the circumstances of the arrest.  (Tr. at 67:15-69:9; Pl.-Int. Ex. U-5.)

The policies and practices of the CID and PRB significantly increase the risk that

firefighter candidates who have been arrested but not convicted will be denied employment as

firefighters because they were previously arrested.  The CID does not investigate the

circumstances of a candidate's prior arrests to make an independent determination that the

53

candidate actually committed the crime for which he was arrested.  But even though the FDNY

has no evidence that a candidate with a prior arrest has committed a crime, the FDNY follows a

policy of automatically submitting all candidates who have previously been arrested for review

by the PRB, a body of eight senior officials.  Presented, in some cases, with nothing more than

the fact that a candidate was previously arrested and denies his guilt for committing the

underlying crime, these eight people are given the power to decide, without rules, guidelines, or

training, whether the candidate will be allowed to become a firefighter.  When they reject a

candidate, they tell no one why.  The evidence shows that it is more likely than not that the PRB

will improperly use this arrest information in making hiring decisions, and that this information

will negatively affect a firefighter candidate's chances of obtaining employment as an entry-level

firefighter.

### 3.    Adverse Impact from Improper Use of Arrest Information

While the FDNY's failure to prevent the improper use of arrest information should be a

concern to the FDNY entirely independent of this litigation, the evidence shows that these

serious deficiencies in the FDNY's post-examination selection procedures are relevant to the

remedy the court must impose because Plaintiff-Intervenors have established that black

firefighter candidates are significantly more likely to have been arrested in New York City than

white firefighter candidates.  Thus it is more likely than not that black firefighter candidates will

be disproportionately subjected to and disadvantaged by the FDNY's improper use of arrest

information.  Consequently, the court finds that the FDNY's failure to train the members of the

CID and PRB in the proper use of arrest information and failure to adopt rules and guidelines to

prevent the improper use of arrest information in employment decisions stand as a barrier to the

elimination of the principal vestige of the City's discrimination against black firefighter candidates—the underrepresentation of blacks within the FDNY.

According to arrest data compiled by the NYPD, 48.96% of all arrests made by the NYPD from 2005 through 2009 were arrests of people the NYPD identified as "black."[29]  (Tr. at 156:2-157:3, Pl.-Int. Ex. DD.)  Arrestees identified by the NYPD as either "white-Hispanic" or "black-Hispanic" comprised 34.27% of all arrests made by the NYPD from 2005 through 2009.  (Tr. at 154:7-24, Pl.-Int. Ex. DD.)  Arrestees identified by the NYPD as "white" comprised 11.96% of all the arrests made by the NYPD from 2005 through 2009.  (Tr. at 157:25-158:14, Pl.-Int. Ex. DD.)

Demographic data obtained by the U.S. Census Bureau during the 2010 Census, and made publicly available by the City's Department of Planning, show that approximately 22.77% of the total population of New York City identify as black, 33.31% identify as white, 28.58% identify as Hispanic, and 1.82% identify as members of two or more non-Hispanic racial groups.[30]  Unlike the arrest data, the Census data can be manipulated to create unique age groupings.  The Census data show that, of the roughly 1.5 million residents of New York City

---

[29]     For each arrest made from 2005 through 2009 the NYPD recorded the arrestee's race as either black, black-Hispanic, white, white-Hispanic, American Indian, Asian/Pacific Islander, or unknown.  (Tr. at 154:8-23, 155:18-156:1.)  The 48.96% calculation reflects the number of individuals who were arrested and identified only as black.  (Id.)

[30]     See New York City Dep't of City Planning, Total Population by Single Years of Age and Sex, 2010, Tables SF1 P-6A–H (July 14, 2011), available at http://www.nyc.gov/html/dcp/html/census/demo_tables_2010.shtml.  The Department of City Planning explains that each race and Hispanic group is mutually exclusive, i.e., none of those counted as Hispanic is also counted as black, and those counted as black are not counted as members of any other race or Hispanic group.  The City provided a more limited subset of the SF1 P-6 tables in Defendant's Exhibit 34, as well as a spreadsheet calculating the percentage of those within the age group eligible to become firefighters who are black.

who are within the age group eligible to apply to be a New York City firefighter,[31] 21.88%

identify as black, 31.27% identify as white, 31.22% identify as Hispanic, and 1.93% identify as

members of two or more non-Hispanic racial groups.[32]

There are limitations inherent in using these two datasets to draw conclusions about the

pool of New York City residents otherwise eligible to be firefighters.  The NYPD arrest data and

Census data do not disclose what percentage of arrestees and those surveyed in each racial group

would pass the FDNY's physical fitness test, or would pass its medical and psychological

examinations.  The arrest data do not disclose what percentage of arrestees in each racial group

fall within the age group of those eligible to apply to be firefighters in the FDNY, how many

arrests were of the same person, the number of arrests of New York City residents made by other

law enforcement agencies both inside and outside of New York City, and the data include arrests

of individuals who are not New York City residents.  Thus, it is possible that a comparison of

blacks and whites using the general NYPD arrest and Census data may obscure significant

distinctions between the subsets of white and black arrestees and survey-takers otherwise eligible

to be New York City firefighters.  For example, it is possible that a more specific dataset could

---

[31]     According to the Notice of Examination for Exam 2000, prospective firefighter candidates must be at least 17.5 years old by the end of the application period, and must not have reached their 29th birthday by the beginning of the application periods.  Consequently, the eligible age group used by both the court and the City in manipulating the Census data is 17 to 28 years old.  See New York City Dep't of Citywide Administrative Services, Second Amended Notice of Examination: Firefighter Exam No. 2000, 1 (July 15, 2011), available at http://www.nyc.gov/html/dcas/downloads/pdf/noes/201202000000.pdf; see also Def. Ex. 34.

[32]     Other demographic data available on the Department of City Planning's website indicate that, of those individuals who identified themselves as members of two or more non-Hispanic racial groups, approximately 41.39% stated that one of those groups was "black/African-American," and 49.31% stated that one of those groups was "white."  See New York City Dep't of City Planning, Total Nonhispanic Persons of Two or More Races, 2010, Table PL-P4 (March 2011), available at http://www.nyc.gov/html/dcp/html/census/demo_tables_2010.shtml.  By applying those ratios to the overall populations of New York City residents who identified themselves as members of two or more non-Hispanic race groups the court can estimate how many New York City residents identify as black or white, either alone or in combination with another non-Hispanic race group.  Approximately 23.52% of New York City residents of all ages, and 22.68% of New York City residents within the age group eligible to apply to take the City's firefighter examination identified themselves as black, alone or in combination with another non-Hispanic race group.  Approximately 34.20% of New York City residents of all ages, and 32.22% of New York City residents within the age group eligible to apply to take the City's firefighter examination identified themselves as white, alone or in combination with another non-Hispanic race group.

show that the black people arrested by the NYPD are concentrated in age groups that would make them ineligible to be firefighters, and that black people who are within the age group eligible to become firefighters are arrested by the NYPD in proportion with their representation in the overall population.  It is also possible that the racial distribution of the subset of arrestees who are residents of New York City differs materially from the racial distribution of all arrestees.

But although the City originally collected and compiled the NYPD arrest data,[33] the City has introduced no evidence suggesting that any such material differences are apparent in its data. Even if it is possible that there are material differences in the racial distribution of arrests between the group of all those arrested by the NYPD and the subset of arrestees otherwise eligible to become firefighters or the subset of arrestees who are residents of the City, it is not plausible, and certainly not probable.  The only data provided to the court that are more specific than the general population data are Census data specific to the age group eligible to take Exam 2000.  Far from showing a material difference between the general population and the subset, the Census data show that the racial distribution of New York City residents ages 17 to 28 is substantially similar to the racial distribution of New York City residents of all ages.  (Def. Ex. 34.)  Without evidence to the contrary, it is reasonable to infer that the racial distribution of those arrested by the NYPD who are otherwise eligible to become firefighters is substantially similar to the racial distribution of all those arrested by the NYPD.

The data show that any given person arrested by the NYPD is approximately one-third as likely to be white and two times more likely to be black than those groups' representation in the City's population would otherwise suggest.  Put another way, a black New York City resident is approximately six times more likely to have been arrested than a white New York City resident.

---

[33]      The NYPD arrest data were collected and compiled by the City in connection with <u>Floyd v. City of New York</u>, 08-CV-1034(SAS) (S.D.N.Y.), a case pending before Judge Shira Scheindlin in the United States District Court for the Southern District of New York.

Though the court is mindful of the limitations inherent in drawing conclusions from these two different datasets, the NYPD arrest data and Census data lead the court to conclude, by a preponderance of the evidence, that a black New York City firefighter candidate is significantly more likely to have been arrested in New York City than a white firefighter candidate, and is thus, significantly more likely to be subjected to and disadvantaged by a PRB review.  These data establish, moreover, that the PRB's improper use of arrest information in exercising hiring discretion will more likely than not have an adverse impact on black firefighter candidates.

4.      PRB Policies Prevent Review of PRB Decisions

Once the PRB renders a decision, CID receives a letter announcing the PRB's decision and directing the CID to either move forward with the appointment process, hold the candidate over to a later training academy class, or not appoint the candidate.  (Tr. at 46:23-47:5.)  If a candidate is rejected for appointment by the PRB, the CID sends the candidate a letter informing him or her that he or she will not be appointed a probationary firefighter.  (Tr. at 48:9-49:6, 618:5-16.)  If a candidate is approved by the PRB, the CID is told to continue processing the candidate and, if appropriate to send him or her to the next step in the appointment process.  (Tr. at 617:18-618:4.)

The PRB does not provide the CID, the FDNY's Equal Employment Opportunity Office ("EEO Office"), the candidate, or anyone else with a reason for its decision, and only rarely includes a tally of the votes taken by PRB members in its letters to the CID.  (Tr. at 47:6-12, 47:21-48:8, 678:17-24.)  The Chief of Uniformed Personnel, however, maintains a tally of the votes taken with respect to a particular candidate.  (Tr. at 609:1-8.)

A candidate aggrieved by a PRB decision has no option to appeal the decision of the PRB to the Fire Commissioner or the Civil Service Commission.  (Tr. at 619:16-21.)  A candidate can,

however, file an Article 78 petition in New York State Supreme Court, or file a charge of discrimination with the EEOC, the New York City Human Right Commission, or the New York State Division of Human Rights challenging the PRB's decision.  (Tr. at 619:16-620:16, 862:22-863:5.)  While FDNY officials suggested that a candidate would be able to obtain an explanation of the reason for the PRB's decision through one of those processes, such assertions lack credibility.  (See Tr. at 623:16-625:6, 862:22-863:5.)  In her testimony, Assistant Commissioner Queenan suggested that if an aggrieved candidate wanted an explanation of the PRB's decision, the FDNY would simply refer the aggrieved candidate to his or her own consideration report package because it "is actually a summary of what transpired in that candidate's history" (Tr. at 623:7-15), and the PRB's decision is based on the "whole history of a candidate" (Tr. at 625:7-21).  Pointing an aggrieved candidate to a consideration report, however, is no more an answer to the question "why did you do it" than "because we did."

Current and former PRB members disagree about whether the FDNY should adopt a policy requiring the PRB to provide a reason for its decisions.  Deputy Commissioner White thought it would beneficial for the PRB to give an explanation for its decisions as to particular candidates.  (Tr. at 570:4-21.)  But other FDNY officials, including Commissioner Cassano and Assistant Commissioner Queenan thought that providing a reason for the PRB's decision would prevent "open" and "frank" discussion about candidates.  (Tr. at 623:7-15, 862:12-863:5.)  Moreover, Queenan thought keeping minutes of PRB meetings would be burdensome, and was worried that someone would be able to file a New York State Freedom of Information Law ("FOIL") request to obtain the minutes and learn confidential information about particular candidates.  (Tr. at 621:23-623:1.)

The PRB is comprised of eight individuals.  The FDNY keeps a tally of votes for particular candidates but no record of the reasons why particular members of the PRB voted the way they did.  The PRB itself does not even adopt a consensus rationale to explain why a particular candidate was rejected.  In order to make an after-the-fact determination why the PRB made any particular decision would require a rejected candidate to depose each of the eight members of the PRB to understand why they voted the way they did.  The reality is that the PRB is, in function, a black box that permits arbitrary decision-making unguided by rules or training and without the possibility of meaningful review—and that is the way the FDNY wants it.  In choosing to vest hiring discretion in a body of eight people who never give a reason for their decision, the FDNY has rendered its use of hiring discretion practically unreviewable.  Plaintiff-Intervenors have established that, absent court monitoring of PRB decision-making, the court will be unable to assure that firefighter candidates are treated fairly by the PRB regardless of race.

## IV.    THE FDNY'S EQUAL EMPLOYMENT OPPORTUNITY OFFICE

The evidence at trial showed that the FDNY's EEO Office is the agency primarily responsible for ensuring the FDNY's compliance with applicable equal employment opportunity laws and policies.  The evidence also showed, however, that the FDNY's policies and practices prevent the EEO Office from fulfilling that role.  As a result, Plaintiff-Intervenors have established that the court cannot adequately ensure the City's compliance with applicable equal employment opportunity laws and policies, and with the court's orders in this case in the absence of court supervision.

60

A.      **EEO Office Organization and Responsibilities**

1.      EEO Office Resources

The FDNY's Equal Employment Opportunity Office (the "EEO Office") is overseen by the

Assistant Commissioner for Equal Employment Opportunity, Lyndelle Phillips ("Phillips"), who

has held the position since June 6, 2006.  (Tr. at 753:11-16.)  Although the Assistant

Commissioner for EEO reports directly to the Fire Commissioner, Commissioner Cassano

stopped meeting with Phillips in March 2011, and delegated responsibility for directly

supervising the EEO Office to Deputy Commissioner White.  (Tr. at 909:4-910:13.)  Since that

time, Phillips has not met with Commissioner Cassano.  (Tr. at 823:13-15, 909:4-910:13.)

The EEO Office itself is currently comprised of Phillips, who is an attorney; a deputy

director, who is an attorney; and two full-time staff attorneys.  (Tr. at 754:18-24.)[34]  The EEO

Office also has six temporary staff, one of whom is an attorney.  (Id.)  The staff attorneys are

responsible for conducting investigations of discrimination complaints, including interviewing

witnesses and drafting memoranda summarizing their findings and recommendations;

conducting compliance investigations of FDNY facilities; and providing EEO training to FDNY

civilian employees, Emergency Medical Service ("EMS") staff (emergency medical technicians

("EMTs") and paramedics), and fire suppression staff (firefighters and fire officers).  (Tr.

at 754:25-755:13.)  The temporary staff attorney is responsible for performing intake work for

discrimination complaints, and investigating complaints, including interviewing witnesses, but

not for conducting training.  (Tr. at 755:14-19.)  Two temporary staff members are responsible

for case management, data input, and preparing reports to DCAS; one temporary staff member

performs general office administrative tasks; another works on reasonable accommodation

---

[34]      As with Commissioner Cassano, the court called both Assistant Commissioner Lyndelle Phillips and
Deputy Commissioner Douglas White to testify at the bench trial over the City's objection.  (Tr. at 592:21, 515:20-
21.)  See  Fed. R. Evid. 614(a); see also n.28 supra.

issues, including religious and disability accommodations; and one staff member assists the deputy director in coordinating the investigative process.  (Tr. at 755:20-757:4.)  One uniformed employee detailed to the EEO Office is responsible for coordinating and scheduling EEO training sessions for FDNY employees.  (Tr. at 757:5-10.)

When Phillips became Assistant Commissioner in 2006, she had four full-time staff attorneys and eight full-time non-attorney staff for a total staff, including Phillips, of thirteen. (Tr. at 757:12-20, 763:2-764:5.)  In mid-2008 a staff attorney left, leaving the EEO Office with three.  (Tr. at 758:10-21.)  A second departure in March 2010 left the EEO Office with two staff attorneys, and a third departure in August 2010 left the EEO Office with one permanent staff attorney from August 2010 until March 2011.  (Id.)  After the first departure in 2008, and with each subsequent departure, Assistant Commissioner Phillips sought permission to hire a new attorney to fill the vacant position, but FDNY officials refused because of a hiring freeze.  (Tr. at 758:22-761:23, 770:11-771:13.)  As a result, the EEO Office currently has 4 or 5 vacancies out of 13 total positions.  (Tr. at 831:13-832:9.)

## 2.    EEO Training

The "biggest drain on the [EEO Office's] resources" is providing four hours of EEO training to the FDNY's firefighters and EMS personnel every single workday.  (Tr. at 834:1-836:18.) Every year each of the FDNY's firefighters, fire officers, and EMS employees is given a medical evaluation at the FDNY's headquarters in Brooklyn.  These medical evaluations are carried out every workday throughout the year.  (Tr. at 800:20-801:18.)  As part of these "medical days" one of the EEO Office's two staff attorneys trains EMS personnel every morning from 9:00 a.m. to 11:00 a.m., and firefighters and fire officers every afternoon from 3:00 p.m. to 5:00 p.m.  (Id.)  In addition to these training sessions, the EEO Office also provides managerial EEO training to

newly promoted fire captains, battalion chiefs, deputy chiefs, and senior non-uniformed

employees.  (Id.)  These training sessions focus on the requirements of federal, state, and City

EEO laws and are separate and apart from the diversity training program provided by the

Recruitment and Diversity Division.  (Tr. at 276:6-281:21.) Diane Crothers ("Crothers"), formerly

the City's Chief Diversity and EEO Officer, noted that the FDNY EEO Office's responsibility for

providing four hours of EEO training every day imposed a "very heavy" burden on the EEO

Office's small number of staff attorneys.  (Tr. at 498:2-499:6.)

        3.     EEO Complaint Investigations

One of the FDNY EEO Office's major responsibilities is the investigation and resolution

of EEO complaints.  The EEO complaint resolution process begins when the EEO Office is

notified of a potential EEO concern and a staff member drafts an intake report summarizing the

facts that form the basis of the complaint.  (Tr. at 785:12-787:4.)  Phillips meets with her staff

and, based on the intake report, determines whether the complaint relates to an EEO concern, and

if so, assigns an attorney to investigate the complaint.  (Tr. at 787:18-789:3.)  After the attorney

interviews witnesses and collects information about the complaint, the attorney drafts a

memorandum to Phillips for the Commissioner, summarizing the investigation and

recommending a finding that the complaint be found to be either substantiated or not

substantiated and, if applicable, recommending a course of action.  (Tr. at 789:4-16.)  The

Commissioner may concur in the result, request additional information from the EEO Office, or

ask that the EEO Office reconsider a finding.  (Tr. at 790:2-792:1.)  Ultimately the EEO Office

has the power to require additional training or recommend an advisory or counseling

memorandum be issued, but cannot impose discipline on its own, and must recommend that the

Commissioner refer the matter to the FDNY's Bureau of Investigation and Trials ("BITS") if the EEO Office believes disciplinary action is warranted.  (Tr. at 790:15-24, 792:12-794:17.)

Each mayoral agency's EEO complaint resolution activity, including the FDNY's, is supervised by and subject to regulation by DCAS.  Specifically, DCAS has a policy requiring each EEO office to complete an internal investigation of an EEO complaint and submit it for review by the agency head within 90 days.  (Tr. at 486:20-487:2.)  The DCAS policy makes exceptions to the 90-day policy for special circumstances, including a lack of sufficient staff to perform the investigation.  (Tr. at 487:3-13.)  A backlog of complaints is, without more, not considered a special circumstance warranting an extension of time to complete an investigation. (Tr. at 497:6-8.)  Each agency is also required to report statistics about its EEO complaint caseload to DCAS quarterly and annually.  (Tr. at 477:19-479:2.)  Each agency's complaint reports disclose the number of new complaints filed and the number resolved in a given fiscal year or quarter, but do not disclose the total number of active complaints that remain unresolved. (Tr. at 478:18-484:18, Pl.-Int. Ex. P.)  Mayoral agencies are also required to submit, with their quarterly and annual reports, a document called a discrimination complaint investigation time extension log ("time extension log") when a complaint cannot be resolved within the 90-day window (an "overdue complaint investigation").  (Tr. at 488:1-494:20, Pl.-Int. Ex. JJ.)  The time extension log shows how many active investigations are pending before the reporting agency, reports the date by which the agency anticipates completing each active investigation, and specifies the special circumstance necessitating the extension of time.  (Id.)  DCAS does not hold agencies accountable for either the anticipated investigation completion dates or the sufficiency of the agency's explanations justifying the extensions of time.  (Tr. at 494:5-13.)

4.    Prioritizing the EEO Office's Complaint Investigation Backlog

When Assistant Commissioner Phillips took over the FDNY's EEO Office on June 6,

2006, the Office had a growing backlog of unresolved and overdue EEO complaint

investigations.  (Tr. at 810:3-811:12.)  Although the FDNY EEO Office's and DCAS's record-

keeping and reporting policies make it impossible to know precisely how many active complaint

investigations the FDNY EEO Office had when Phillips took over, the FDNY EEO Office's

annual complaint investigation reports and time extension logs provide some indication.  In fiscal

years 2003 through 2006 (which ended June 30, 2006),[35] the FDNY EEO Office opened a total

of 139 more complaint investigations than it resolved during the same period.  (See Pl.-Int. Exs.

P, FF.)  In Assistant Commissioner Phillips's first year on the job, fiscal year 2007, the FDNY

EEO Office opened 127 more complaint investigations than it resolved.  (Id.)  These statistics do

not indicate how many complaint investigations were already active at the beginning of fiscal

year 2003, however the FDNY EEO Office reported that as of the end of the third quarter of

fiscal year 2005—March 31, 2005, approximately one year before Phillips became Assistant

Commissioner—the Office had 98 overdue complaint investigations.  (Pl.-Int. Ex. P.)  In an August

9, 2005, memorandum to DCAS regarding the backlog, Phillips's predecessor, former Assistant

Commissioner Paulette Lundy ("Lundy"), explained that "[t]he Fire Department's EEO Office has,

for several years, suffered from understaffing," but expressed optimism that four new

investigators and "several other support staff members" would end the backlog during the first

quarter of fiscal year 2006.  (See Pl.-Int. Ex. Q, see also Tr. at 930:12-18.)  Nevertheless, as of

the end of the fourth quarter of fiscal year 2007 on June 30, 2007, two years after Lundy's

memorandum and over a year after Phillips started, the FDNY EEO Office reported 261 overdue

---

[35]    The City's fiscal year ends on June 30.  The first quarter of a fiscal year begins on July 1 of the preceding calendar year.  Thus the first quarter of fiscal year 2009 began on July 1, 2008, and the third quarter of fiscal year 2005 ended on March 31, 2005.  (See Tr. at 496:13-19.)

complaint investigations in its time extension log, 114 of which had been opened before Phillips

took over the FDNY EEO Office on June 6, 2006.  (See Pl.-Int. Ex. LL.)

As a general practice the FDNY EEO Office indicated on its time extension logs that it

anticipated that each active complaint investigation would be completed on a date 90 days (one

fiscal quarter) after the end of the fiscal quarter for which the report was submitted.  (Tr.

at 808:1-810:7, Pl.-Int. Exs. JJ, LL.)  For example, the FDNY's time extension log for the third

quarter of fiscal year 2008 (which ended March 31, 2008, and was submitted on April 30, 2008)

anticipated that all 244 overdue active internal complaints would be resolved by July 1, 2008, the

first day of the first quarter of fiscal year 2009.  (Tr. at 497:9-16, 500:10-501:19, Pl.-Int. Ex. JJ.)

Crothers, as the City's Chief Diversity and EEO officer, was the official in DCAS

responsible for compliance oversight of the EEO activities of the City's 40 mayoral agencies,

including the FDNY, from July 2007 through her retirement in May 2011.  (Tr. at 474:6-475:3,

515:3-7.)  In that capacity, Crothers reviewed the complaint investigation reports created by the

FDNY EEO Office and submitted by Assistant Commissioner Phillips.  Crothers testified that

the FDNY's standard practice of anticipating that all complaint investigations would be

completed in 90 days was a concern for her, and recalled that the FDNY EEO Office "often did

not meet [its] goal[s]," noting that the 328 active complaint investigations listed on the FDNY's

report of investigations active during the third quarter of fiscal year 2008 were "a very large

number of cases compared to the staff they had." (Tr. at 500:10-501:19, Pl.-Int. Ex. JJ.)  One

complaint included in the third quarter 2008 time extension log had been filed on February 12,

2004, yet remained unresolved as of March 31, 2008.  (Tr. at 496:23-497:8, Pl.-Int. Ex. JJ.)  In

time extension logs submitted by the FDNY from 2007 until some point in fiscal year 2010, the

FDNY EEO Office listed "complaint backlog" as the "special circumstance" necessitating an extension of time for *every* overdue complaint investigation. (See Pl.-Int. Exs. JJ, LL.)

On January 1, 2010, the beginning of the third quarter of the 2010 fiscal year, Cassano, formerly the FDNY's Chief of Department, became Commissioner, replacing Commissioner Nicholas Scoppetta. (Tr. at 849:12-850:7.) As Commissioner Cassano explains it, he took office and determined that the EEO Office's complaint investigation backlog was a problem, and ordered Assistant Commissioner Phillips to clear it. (Tr. at 864:21-866:3.) The facts tell a somewhat different story.

Long before Commissioner Cassano took office,[36] and even while the FDNY EEO Office's complement of staff attorneys fell 75% from mid-2008 (approximately the start of the first quarter of the City's 2009 fiscal year) to August 2010 (approximately the start of the first quarter of the City's 2011 fiscal year), the FDNY EEO Office began significantly reducing its backlog of overdue complaint investigations. (Tr. at 765:22-766:4.) Time extension logs show that the FDNY EEO Office ended the fourth quarter of the 2008 fiscal year on June 30, 2008, with 275 overdue complaint investigations, but reduced the backlog to 201 overdue complaint investigations by the end of the fourth quarter of the 2009 fiscal year on June 30, 2009. (See Pl.-Int. Ex. LL.) A year later, the FDNY EEO Office ended the fourth quarter of the 2010 fiscal year with 63 overdue complaint investigations. (Id.) From mid-2008, a year and a half before Commissioner Cassano took office, through June 30, 2010, seven months into Cassano's tenure, Assistant Commissioner Phillips reduced the FDNY EEO Office's overdue complaint

---

[36]     Both Assistant Commissioner Phillips and Commissioner Cassano recalled that around the time Cassano became Commissioner in January 2010 there were roughly 190 to 200 backlogged complaint investigations. (Tr. at 769:10-770:3, 865:17-20.) The parties did not submit the FDNY's time extension logs for the second quarter of fiscal year 2010, which ended on December 31, 2009, so it is not possible for the court to independently verify that number. It is unclear whether this number refers to all open complaint investigations, or just those older than 90 days.

investigation backlog by 77%.  (Id.)  At the time of Cassano's testimony, the FDNY had 25

overdue complaint investigations pending.  (Tr. at 865:21-866:3)

The statistical decline in the complaint investigation backlog is misleading, however.

Although Assistant Commissioner Phillips and her staff did achieve real gains in reducing the

FDNY EEO Office's complaint investigation backlog, the numerical reduction is largely the

result of superficial accounting changes and not indicative of actual improvements in the EEO

Office's capacity to investigate and resolve complaints of discrimination.

Phillips testified that she was able to reduce the FDNY EEO Office's complaint

investigation backlog in a few different ways.  First, Phillips testified that she changed the EEO

Office's method of accounting for certain kinds of complaint investigations.  Assistant

Commissioner Phillips testified, that in the past, investigators who discovered workplace

conditions that violated the EEO laws during compliance inspections would open a separate

complaint investigation against every FDNY employee in the facility where the EEO violation

was found, though each investigation related to the same underlying facts.  (Tr. at 820:1-25.)

Phillips changed policy in 2009 and directed her attorneys to open a complaint investigation

against only the manager in an FDNY facility where an EEO violation is found.  (Id.)  Phillips

also changed the EEO Office's method of accounting for investigations of complaints that are

based on alleged violations of multiple EEO laws.  Previously, if a complainant believed that he

had been discriminated against on the basis of age, race, and gender, for example, the EEO

Office would open a separate complaint investigation for each of the three asserted EEO

violations.  (Tr. at 828:9-829:1.)  Phillips changed policy and directed her attorneys to open only

one complaint investigation where the complainant alleged multiple violations of the EEO laws.

These accounting changes allowed Phillips to close numerous investigations that were duplicative of each other because they were based on the same underlying facts, but the changes did not result in an actual reduction in the EEO Office's complaint resolution workload. Although the decision to collapse several open complaint investigations into one investigation decreased the number of complaints reported by the EEO Office to DCAS, the EEO Office was still required to investigate the same set of underlying facts.  (Tr. at 822:5-823:8.)  Thus, the accounting changes did not affect the amount of work that the EEO Office was required to complete.  (Id.)  Instead, the accounting changes obscure the degree to which the statistical reduction in the FDNY's complaint investigation backlog reflects actual work performed by the EEO Office, and makes it difficult to compare complaint investigation statistics that pre-date the accounting changes to those affected by them.  At trial, Assistant Commissioner Phillips agreed that current complaint investigation backlog statistics are not directly comparable to those pre-dating the accounting changes because they are "apples and oranges."  (Id.)

Second, in November 2009, Assistant Commissioner Phillips implemented a policy of screening new complaints filed with the EEO office during weekly staff meetings to determine whether a new complaint raised EEO concerns.  (Tr. at 785:12-787:4.)  This represented a change from the EEO Office's prior practice of assigning all complaints to attorneys for investigation.  (Id.)  Under the new policy Phillips and her staff make a threshold determination that a complaint relates to an EEO question based on the initial complaint itself, including an intake interview if the complaint is presented orally, and without conducting any further investigation.  (Id.)  If Phillips and her staff determine that the matter does not relate to an EEO concern based on the initial information they obtain during intake, no case file is opened.  (Id.)  This is so even though EEO complaints are not necessarily submitted by individuals who are

targeted by discriminatory conduct, but also by 'mandated reporters'—FDNY managers and supervisors who are required by the FDNY EEO Policy to advise the EEO Office of an EEO issue of which they become aware.  (Tr. at 783:12-785:11, Def. Ex. 20.)  As a result, not all complaints of discrimination against FDNY employees are investigated, and some are rejected before potential targets of allegedly discriminatory conduct are interviewed or the underlying facts reported by mandated reporters are independently determined.  (Tr. at 787:18-789:3.)

It is unlikely, however, that much of the FDNY EEO Office's backlog of overdue complaint investigations was attributable to complaints actually unrelated to legitimate EEO allegations.  Subject-matter screening and weekly staff meetings with investigators were among the changes recommended by Crothers to Assistant Commissioner Phillips as a way to avoid creating an overdue complaint investigation backlog.  (Tr. at 498:2-500:7.)  But Crothers also noted that a DCAS audit of some of the FDNY's EEO complaints filed before July 1, 2007 determined that 'maybe 17 out of 23 or so' complaints stated a claim for discrimination on their face.  (Tr. at 501:23-502:5.)  Of the other complaints audited by DCAS, 'there was insufficient data to know if [they] also stated claims.'  (Id.)  Even before Assistant Commissioner Phillips implemented this new screening policy, Crothers had determined that the FDNY EEO Office's efforts to screen complaints for EEO jurisdiction 'did not seem to be a problem' (id.), and thought that the EEO Office opened investigations for complaints that did not allege an EEO violation 'probably occasionally' (Tr. at 507:18-21).  To the extent the FDNY EEO Office now emphasizes rejecting, before any investigation is performed, those complaints whose relationship to an EEO concern is unclear, that practice creates a substantial risk that the EEO Office will reject meritorious complaints and be seen by employees as hostile to complaints of discrimination.  As

Crothers explained, "somebody might make a complaint that was not in fact in the EEO complaint[, but] [s]ometimes you only find that out during investigation." (Tr. at 498:9-18.)

Finally, and most importantly, Phillips reallocated resources within the EEO Office to focus on complaint investigations and reduce the backlog. As Assistant Commissioner Phillips explained at trial, she and her staff put in "a whole lot of hard work":

> When I say hard work, I mean attorneys—I had a war room and I put people in there and we worked on them and we worked on them and we worked on them and we spent time during the holidays and we worked on them and we worked on them, and we conducted investigations and we interviewed people and we drafted memos and we reviewed, but it really—I looked at reviewing, purging, merging and distinguishing cases and that's how I got it down.

(Tr. at 821:15-23.) Diane Crothers agreed:

> LOSSIA:      Subsequent to your review of the FDNY EEO office, it decreased the backlog, correct?
>
> CROTHERS:  Yes.
>
> LOSSIA:      When did that happen, to the best of your recollection?
>
> CROTHERS:  Quarter by quarter by quarter. They went from about, what was it, 247, something like that, down to the most recent quarter, I think about 31.[37] They worked on it. I couldn't recall exactly which quarters it was. It was generally just quarter by quarter by quarter, a lot of overtime, a lot of focusing.

(Tr. at 502:6-503:17.)

Assistant Commissioner Phillips testified that the EEO Office's workload did not decline while the Office worked to reduce the complaint backlog and the hiring freeze reduced her staff. (Tr. at 765:22-770:3.) One of the responsibilities of staff attorneys in the EEO Office is conducting compliance inspections of FDNY workplaces, including firehouses, EMS stations, and civilian office spaces. (Tr. at 754:25-755:13, 766:5-10.) When the EEO Office was regularly performing compliance inspections it inspected approximately six to eight facilities a

---

[37]      Crothers later clarified that she could not recall whether the 31 cases were the total number of active complaint investigations or just the number of overdue complaint investigations. (Tr. at 506:8-25.)

month.  (Tr. at 832:10-833:4.)  In order to make resources available for complaint investigation

work, Phillips was forced to stop performing compliance inspections of FDNY facilities in 2009.

(Tr. at 765:22-767:22, 798:17-799:5.)  As Phillips explained: "You can't do everything.  So you

have to prioritize." (Tr. at 833:5-23.)  Commissioner Cassano testified that, in order to fill the

enforcement gap created when the EEO Office ceased EEO compliance inspections of FDNY

facilities, he tasked BITS with looking for EEO violations during its periodic surprise inspections

of firehouses for alcohol.  (Tr. at 867:3-13.)  There is no indication, however, that BITS

investigators were given specialized EEO enforcement or investigations training required by the

Citywide EEO Policy (Tr. at 787:5-17; <u>see also</u> Def. Ex. 19), and it is unclear whether the BITS

inspections actually resulted in the EEO Office opening any EEO complaint investigations.

After the EEO Office stopped performing regular compliance inspections, the single vehicle that

had been assigned to the unit to allow its investigators to travel to the FDNY's far-flung

firehouses and EMS stations was re-assigned.  (Tr. at 766:12-767:22.)  The EEO Office must

now put its name on a list to check vehicles out of the FDNY's motor pool in order to conduct

compliance inspections. (Tr. at 918:21-919:20.)

    It is impossible to measure the extent of the EEO Office's "real" reduction in its complaint

investigation backlog because the EEO Office's complaint investigation accounting changes

prevent the court from meaningfully comparing recent complaint investigation statistics to those

pre-dating the accounting changes.  Nonetheless, the evidence shows that the "real" reduction in

the EEO Office's complaint investigation backlog—however large it may be—is attributable to the

EEO Office's single-minded focus on complaint investigation and resolution to the neglect of its

other responsibilities.  At its current staffing level the FDNY EEO Office cannot sustain this

focus on complaint investigation unless it continues to neglect its other enforcement responsibilities.

Commissioner Cassano's response to Assistant Commissioner Phillips's efforts toward reducing the complaint investigation backlog could not have been reassuring to the staff in the EEO Office.  In March 2011, after Assistant Commissioner Phillips had dramatically reduced a backlog of overdue complaint investigations she inherited from her predecessor despite deep cuts in her staff, Commissioner Cassano decided to replace her, and stopped meeting with her altogether.  Cassano explained:

> [A]fter I took over the Commissionership job and we saw, we saw the backlog of cases and I thought maybe it was time to make a change.  I waited a while longer before I really looked to post for the position and there was a, a case to me that was very troubling, the way it was handled, and I decided that I wanted to change the leadership in the EEO office.

(Tr. at 909:4-910:13.)  The court is not in a position to assess Assistant Commissioner Phillips's overall job performance, and lacks information concerning the 'troubling' case Commissioner Cassano cited as one of the reasons he decided to replace her.  But Commissioner Cassano's suggestion that Assistant Commissioner Phillips bears responsibility for the FDNY EEO Office's complaint investigation backlog is extraordinary and misplaced.  Even more extraordinary, however, is Cassano's attempt to claim credit for reducing that backlog.  During testimony Cassano explained:

> Well, the EEO office, the commissioner reports directly to the fire commissioner, and I oversee it.  I'm very actively involved in it, and I'm certainly doing a good job since I became the commissioner.  And when we first ~~when~~ I first came aboard we were made aware that there was a very large backlog of cases. I personally got involved and told the EEO office that one of my goals was to clear up the backlog as quickly as possible while still doing thorough investigations; and we brought that down.

(Tr. at 865:2-11.)

The EEO Office's efforts to reduce the complaint investigation backlog were already well underway by the time Cassano became Commissioner and "personally got involved." The evidence shows that Assistant Commissioner Phillips inherited a large complaint investigation backlog from her predecessor, and achieved real gains in reducing that backlog despite significant reductions in the EEO Office's staffing level only through becoming personally involved in complaint investigations and persuading her staff to work overtime and give up their holidays.  Though Assistant Commissioner Phillips occupies a senior position in the FDNY hierarchy and, theoretically, reports directly to the Fire Commissioner, Phillips and her deputy were forced to take on the responsibilities and work that would have been assigned to the EEO Office's staff attorneys in order to clear the complaint investigation backlog.  (Tr. at 833:5-23.) Commissioner Cassano, however, essentially ignored Assistant Commissioner Phillips's request for more resources to meet the EEO Office's needs.

**B.    Deficiencies in the EEO Office**

The evidence presented at trial shows that the FDNY's EEO Office is hobbled by serious resource deficiencies which prevent it from adequately ensuring that the FDNY complies with federal, state, and City EEO laws and policies, and with the court's orders in this case.

1.    Failure to Assess Firefighter Recruitment and Selection Devices for Adverse Impact

Pursuant to the City Charter and the City EEO Policy issued by Mayor Bloomberg and DCAS in 2005, the mandate of EEO Offices in City agencies, including the FDNY, is broad, and includes complaint investigation, training, and the assessment of employment practices for barriers to EEO, including employee recruitment, hiring, retention, and compensation.  (Tr. at 775:11-18, 775:25-778:7, Def. Ex. 19.)  The City EEO Policy specifically requires each City

agency to prepare an annual EEO plan.  (Tr. at 778:8-780:2, Def. Ex. 19 at 12.)  According to the

Citywide EEO Policy issued by Mayor Bloomberg in 2005,

> [e]ach agency head or, at his or her direction, the agency EEO officer and/or personnel officer, should review agency statistical information (including total employment and new hires and promotions, by race/ethnicity and gender), EEO complaints made during the previous fiscal year and the agency's employment practices, policies and programs.  The agency head should then work with the EEO officer, the General Counsel and the personnel officer to identify: (1) whether there are any barriers to equal opportunity within the agency; (2) the agency's obligations as a result of government grants and/or contracts; and (3) what, if any, corrective actions are required under court decrees and/or governmental audits.

(Def. Ex. 19 at 12-13; <u>see</u> Tr. at 776:14-777:18.)  Each agency's annual EEO plan

> must, at a minimum, include . . .

> A commitment that each agency will assess recruitment efforts to determine whether such efforts adversely impact any particular group. . . .

> A commitment that the agency will assess the manner in which candidates are selected for employment, to determine whether there is any adverse impact upon any particular racial, ethnic, disability, or gender group.  To the extent that adverse impact is discovered, the agency head will determine whether the criteria being utilized are job-related.  If the criteria are not job-related, the agency will discontinue using that method. Methods which diminish adverse impact will be preferred over those with greater impact, provided that the agency's job-related aims are not compromised by using the method with a diminished impact.

(Def. Ex. 19 at 13-14.)

The annual EEO plan is intended to serve as a kind of roadmap for the agency's EEO

goals over the course of the coming year.  (Tr. at 779:21-24.)  Nonetheless, in the last five years

the FDNY EEO Office has created an "annual" EEO plan only two or three times.  (Tr. at 778:12-

779:20.)  Even when the FDNY has created an annual EEO plan, the FDNY EEO Office has

never reviewed its performance to determine whether the FDNY met the goals it set in the annual

EEO plan.  (Tr. at 779:25-780:2.)

The FDNY has consistently failed to comply with those portions of the Citywide EEO Policy requiring the FDNY to commit to assessing its firefighter recruitment and hiring procedures for adverse impact. The FDNY EEO Office rarely has any contact with the FDNY's Recruitment division at all and Assistant Commissioner Phillips has never met with Assistant Commissioner Maglione. (Tr. at 824:25-825:14.) The Assistant Commissioner for EEO does not sit on the PRB, and no one who sits on the PRB is directly responsible for ensuring that the PRB complies with the EEO laws. (Tr. at 673:17-25.) Assistant Commissioner Queenan testified, however, that she considers it her responsibility, as a member of the PRB, to ensure that the PRB's decisions are fair and are not made on the basis of race. (Tr. at 661:15-662:17.) Each of the current or former PRB members who testified said that, in their experience, the PRB never made a decision about a candidate on the basis of race. (Tr. at 103:8-104:6, 560:16-18, 863:15-21, 895:9-13.) But while none of those PRB members perceived the PRB's decisions as discriminatory, it is undisputed that neither the EEO Office nor any other unit within the FDNY analyzes the decisions made by the PRB to determine whether the PRB has been consistent in its decision-making, or whether particular racial or ethnic groups are disproportionately disadvantaged by the PRB's decisions. (Tr. at 678:25-680:1, 684:20-23, 824:3-825:14.) The EEO Office has entirely failed to examine the CID's or PRB's roles in the firefighter hiring process to assess those selection devices for adverse impact. (Tr. at 824:3-825:14.)

Currently, the FDNY EEO Office's operations are limited to investigations of complaints of discrimination by FDNY employees, conducting EEO compliance inspections of FDNY facilities (resources permitting), providing EEO training to FDNY employees, and acting on requests for reasonable accommodation from FDNY employees with disabilities or religious requirements. (Tr. at 754:5-12.)

2.     CID and PRB Record-Keeping Policies Prevent Adverse Impact Analysis

FDNY records reflect that a candidate was not appointed because he or she was rejected by the PRB with a "CNS" designation code, which means "considered, not selected." (Tr. at 49:7-15.)  But the FDNY does not record in an easily accessible format whether a candidate was evaluated by the PRB and allowed to proceed to the next step of the hiring process.  The FDNY does not keep an accessible record of all candidates who are submitted by the Director of CID for review by the PRB, or of the recommendations given by the Director of CID or of the Assistant Commissioner for Human Resources, or the Chief of Uniformed Personnel.  (Tr. at 663:4-665:13.)  The only record of a consideration report sent to the PRB is kept in a candidate's investigation file, and the FDNY would need to individually review every investigation file to identify all candidates evaluated by the PRB, and the recommendations given by particular FDNY officials.  (Id.)  As counsel for the City and Plaintiff-Intervenors demonstrated in examining Plaintiff-Intervenors' expert witness, Joel Wiesen, Ph.D. (see, e.g., Tr. at 133:7-145:14), and the City's expert witness, Christopher Erath, Ph.D. (see, e.g., Tr. at 715:14-718:10, 723:6-724:20, 727:20-742:23, 743:3-25. ), it is extremely difficult to conduct a scientifically rigorous assessment of the impact of a particular post-examination selection device on candidates of different racial and ethnic groups without the ability to compare the treatment of a group of candidates to the entire universe of candidates who are subjected to that selection device.  (See also Tr. at 664:7-17.)

The FDNY's recordkeeping policies are a barrier to assessing the FDNY's post-examination selection devices for adverse impact, including: (1) the Director of CID's selection of individual candidates for consideration reports; (2) the recommendations provided by FDNY employees to the PRB; and (3) the decisions made by the PRB as to particular firefighter

candidates.  Unless the FDNY's record-keeping policies are changed the FDNY will be unable to assure the court of its compliance with federal, state, and City EEO laws and policies.

3.      Chronic Lack of Resources

The evidence shows that the FDNY EEO Office remains chronically under-resourced and over-burdened despite repeated pleas from City officials—both inside and outside of the FDNY—for increased staffing.  The FDNY is a massive employer: 11,000 firefighters, over 3,000 EMS personnel, and roughly 2,000 civilians work for the City of New York under the auspices of the FDNY.  (Tr. at 851:2-6.)  The FDNY's employees are by far its greatest expenditure: 90% of the FDNY's $1.6 billion budget goes to pay for its day-to-day operations, including salaries.  (Tr. at 851:7-13.)

Yet the FDNY unit charged with ensuring equal employment opportunity for the FDNY's 16,000 workers is tiny by comparison.  When Assistant Commissioner Phillips took over the FDNY EEO Office, 13 people—0.08% of the FDNY's total workforce—worked in the FDNY's EEO Office.  (Tr. at 763:2-25.)  During her tenure that number has declined even further, and permanent, career employees have been replaced by temporary workers.  As a hiring freeze caused the EEO Office to lose several attorneys in 2010, Phillips raised concerns about the effect of these reductions with Commissioner Cassano and First Deputy Commissioner Donald Shacknai ("Shacknai").  (Tr. at 764:9-21.)  FDNY officials explained to Assistant Commissioner Phillips that "every unit was taking a hit and every unit was not able to fill vacancies."  (Tr. at 765:7-21.)  Ultimately, Phillips was allowed to hire two temporary attorneys in November 2010.  (Tr. at 771:20-772:7.)

Assistant Commissioner Phillips was not the only City official to complain about the FDNY EEO Office's lack of resources.  During her tenure at DCAS, Diane Crothers determined

that the FDNY EEO Office's low number of staff attorneys and their "very heavy training assignment" were barriers to the FDNY's compliance with DCAS EEO complaint investigation policies.  (Tr. at 498:2-500:7, 504:13-506:2.)  Crothers recommended to First Deputy Commissioner Shacknai and Assistant Commissioner Phillips that the FDNY hire additional staff attorneys for the EEO Office and modify the duties of the current staff attorneys.  (Tr. at 504:13-506:2.)  In response to Assistant Commissioner Phillips's and Crothers's concerns, Commissioner Cassano allowed Assistant Commissioner Phillips to hire just one full-time attorney to fill one of the vacant attorney positions during March 2011.  (Tr. at 504:13-506:2, 764:22-765:6.)  But this was only at the cost of moving one of Phillips's temporary staff attorneys to a non-attorney administrative position.  (Tr. at 830:11-831:2.)  Consequently, the number of staff attorneys in the EEO Office remained the same.

Assistant Commissioner Phillips testified that the loss of staff attorneys had a significant impact on the EEO Office's ability to meet its responsibilities.

> THE COURT:          Okay.  And in terms of processing the EEO complaints that you have that are open, how has this diminution of available personnel affected the processing of those complaints, if at all in terms of time–
>
> PHILLIPS:            Yeah. You can't do everything. So you have to prioritize. So the – I cut down on the compliance inspections.  In fact, they are pretty much nonexistent for over a year, a year and-a-half, and focus on the investigations and the training and the reasonable accommodation.  So assigning the case and having them investigated in a timely manner is impacted by the number of people that we have.  We had a larger case load.  For a while, I was operating from -- from August or September of 2010 until March of this year, I had one attorney having to do all of the investigations.  Of course, we all pitched in and the deputies started investigating and I was helping.  But it takes longer to conduct the investigation, interview the witnesses, prepare the memorandum if you have one or two people versus if you have four or five.  You can allocate the resources.

(Tr. at 833:5-23.)

Commissioner Cassano does not view the staffing level of the FDNY EEO Office as a concern, however.  When asked about the EEO Office's staff reductions, Cassano acknowledged

them, saying that "[t]here has been a reduction in staff of all of my bureaus . . . as one of my

bureaus, we had to cut a couple of lines in the EEO office." (Tr. at 866:5-22.)  But Cassano

opined that those cuts were not "drastic" (id.), and he implied that additional staffing is not

necessary to meet the EEO Office's needs:

> MILLER:     Okay. With respect to the reduction in staff, did the reduction
> happen as the backlog was being addressed?
>
> CASSANO:   Yeah. We  with less employees we cleaned up a lot more cases. So
> the  we made a focus of reducing the cases, and they did.

(Tr. at 866:23-867:2.)

Commissioner Cassano testified at trial that he had "just recently [] asked [his]

commissioner for budget to restore some of those lines to bring the staffing level up." (Tr.

at 866:5-22.)  But the court takes little solace in Commissioner Cassano's very recent decision to

"add[] a couple more lines to bring the level up." (Id.)  Cassano's decision to add two employees to

a unit as under-staffed as the FDNY's EEO Office is little more than a token bid to placate the

court and thereby avoid judicial supervision of the office within the FDNY responsible for

ensuring its compliance with the EEO laws.  There is no indication that the staffing level of the

FDNY's EEO Office has ever been tied to an assessment of the resources the EEO Office needs

to enable it to meet its obligations.  It is doubtful that even the thirteen employees Assistant

Commissioner Phillips inherited from her predecessor (nearly 30% of which she has lost to a

hiring freeze) would be sufficient to allow the EEO Office to meet all, or even most, of the

considerable number of responsibilities the City EEO Policy assigns it.  (Tr. at 763:2-25; see also

Def. Ex. 19.)  Even with thirteen employees the FDNY's EEO Office racked up a considerable

complaint investigation backlog and never assessed the FDNY's firefighter hiring practices,

including post-examination selection devices, for adverse impact.  Assistant Commissioner

Phillips has testified that, at its current staffing level, the EEO Office does not have the resources

to perform compliance inspections of FDNY facilities without the assistance of volunteer summer interns.  (Tr. at 798:17-799:5.)

The FDNY EEO Office lacks the resources to ensure that the FDNY meets its obligations under federal, state, and City EEO laws.  It is isolated within the FDNY hierarchy, and is excluded from involvement in or influence over firefighter recruitment and the hiring process. Were the court to simply enjoin the City of New York from using discriminatory testing procedures to hire entry-level firefighters, the FDNY EEO Office would not have the resources or institutional support to be capable of ensuring the FDNY's compliance with that order.  But perhaps more troubling is the fact that the FDNY EEO Office is so hobbled that it lacks even the resources to timely investigate, and thereby deter, acts of discrimination or retaliation against the black and Hispanic firefighters who will join the ranks of the FDNY in the coming months and years.  The City of New York's commitment to equal employment opportunity in the FDNY—as exemplified by its investment in the FDNY's own EEO Office—is sorely lacking.

V.    CONCLUSION

The court finds that the foregoing facts have been proven.  A memorandum of law will follow.

SO ORDERED.

  /s/ Nicholas G. Garaufis

Dated: Brooklyn, New York                                   NICHOLAS G. GARAUFIS
          September 30, 2011                                  United States District Judge