UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

UNITED STATES OF AMERICA,

                               Plaintiff,

              -and-

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated*,

                        Plaintiff-Intervenors,

           -against-

THE CITY OF NEW YORK,

                        Defendant.

-----------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

      This Memorandum and Order explains the court's intention to impose the Draft Remedial

Order, Permanent Injunction and Order Appointing Court Monitor attached as an Exhibit ("Draft

Remedial Order"), notifies the parties of the provisions of the Draft Remedial Order relating to

the appointment of a Court Monitor and offers them the opportunity to comment pursuant to

Federal Rule of Civil Procedure 53(b)(1), and directs the parties to appear for a conference to

1

schedule a Fairness Hearing at which the court will consider the objections to the Draft Remedial Order presented by interested non-parties pursuant to 42 U.S.C. § 2000e-2(n)(1).

## I.     BACKGROUND

The United States Department of Justice began this litigation on May 21, 2007, when it filed a complaint alleging that the City of New York's pass/fail and rank-order uses of written examinations 7029 and 2043 to hire entry-level firefighters had an unlawful disparate impact on black and Hispanic applicants. (USA Compl. (Docket Entry # 1).) But this lawsuit is only the most recent effort in what amounts to a nearly forty-year struggle to integrate the Fire Department of the City of New York ("FDNY"). While the City's other uniformed services and fire departments across the country have changed to reflect the communities they serve,[1] employment as a New York City firefighter—arguably "the best job in the world"[2]—has remained a stubborn bastion of white male privilege.

The evidence in this case has established that the FDNY has not remained segregated-in-fact for over forty years by accident. In its opinions and findings of fact in this case, the court has extensively detailed how policies, procedures, and practices adopted by the City of New York are responsible for systematically excluding black and Hispanic firefighter candidates from the ranks of the FDNY. The result of these actions—deliberately undertaken by the City of New York despite its officials' knowledge of their discriminatory effects—has been exactly the kind of systematic employment discrimination Congress intended to eradicate and prevent when it passed Title VII of the Civil Rights Act of 1964. That this discrimination has been allowed to persist in New York City for so long is a shameful blight on the records of the six mayors of this

---

[1]     See Disparate Impact Op. (Docket Entry # 294) at 2 n.5.
[2]     See FDNY, Current Opportunities,
http://www.nyc.gov/html/fdny/html/community/employment_index.shtml (last visited Sept. 28, 2011).

2

City who failed to take responsibility for doing what was necessary to end it. (See Disparate Treatment Op. (Docket Entry # 385) at 51.)

In the court's Disparate Impact Opinion, the court found that the City of New York's pass/fail and rank-order uses of Exam 7029 and Exam 2043 to hire entry-level firefighters had a disparate impact on black and Hispanic firefighter candidates. (Disparate Impact Op. (Docket Entry # 294) at 16-23, 91-92.) Describing the process the City used to create the tests, the court found that the City was unable to establish that the gross disparities created by the City's uses of these two examinations were justified by business necessity. (Id. at 35-37, 92.)

In the court's subsequent Disparate Treatment Opinion the court found that Plaintiff-Intervenors had established that the City of New York's repeated and knowing use of discriminatory testing procedures constituted a pattern and practice of intentional discrimination against black firefighter candidates. (Disparate Treatment Op. at 28-33.) In that Opinion the court noted the undisputed statistical evidence of adverse impact on black firefighter candidates who took Exams 7029 and 2043, and recounted the numerous times the City has been sued for the same basic failure to design and administer civil service examinations that are job-related and do not have a disparate impact upon minority groups.

In its Disparate Treatment Opinion, the court concluded that the City's pattern and practice of discrimination against black firefighter applicants caused the disproportionate underrepresentation of blacks in the FDNY, and that the underrepresentation of blacks in the FDNY is a vestige of that discrimination:

> Together, [Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, 360 F. Supp. 1265 (S.D.N.Y. 1973) aff'd in relevant part by 490 F.2d 387 (2d Cir. 1973)], [Guardians Ass'n of the New York City Police Dep't, Inc. v. Civil Serv. Comm'n, 630 F.2d 79 (2d Cir. 1980)], and this court's Disparate Impact Opinion demonstrate that the City's use of discriminatory testing procedures to select uniformed service-members is a decades-old problem. The

3

historical data amassed by the Intervenors shows that blacks have been consistently and drastically underrepresented in the FDNY relative to their representation in the City population; that blacks have been underrepresented in the FDNY relative to their representation in the fire departments of other large cities; and that blacks have been underrepresented in the FDNY relative to their representation in New York's other uniformed-services agencies."

(Id. at 31.) The court further explained:

The disparate impact of the City's hiring policies is reflected in the FDNY's racial composition. When this litigation commenced in 2007, blacks constituted 3.4% of the firefighter force. During the period 2006-2008, blacks constituted 25.1% of the City population. As stated above, this disparity is highly probative of discrimination because, "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition of the population in the community from which employees are hired." Teamsters [v. United States], 431 U.S. [324,] 340 n.20 [(1977)].

(Id. at 49.)

Following the court's Disparate Impact and Disparate Treatment Opinions, the court held a hearing to inquire into the validity of the City's most recent examination for entry-level firefighters, Exam 6019, which had been administered in January 2007, not long before this litigation began. In the court's Exam 6019 Validity Opinion, the court concluded that Exam 6019 suffered from the same flaws that crippled Exams 7029 and 2043, even though Exam 6019 had been developed *after* the U.S. EEOC found reasonable cause to believe that the City's uses of Exams 7029 and 2043 violated Title VII. (Exam 6019 Validity Op. (Docket Entry # 505) at 1-5, 37.) In the court's Exam 6019 Validity Opinion the court found, as it had in its Disparate Impact Opinion, and as Judge Weinfeld found before that in his 1973 opinion in Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n of the City of New York, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973), that the City's uses of a civil service test to hire entry-level firefighters had a disparate impact on black and Hispanic test takers, and that the City's uses of the test were not justified by business necessity.

4

The court's Disparate Impact Opinion and Exam 6019 Validity Opinion established that the City's last three firefighter examinations had an un-justifiable disparate impact on black and Hispanic firefighter candidates. The court's Disparate Treatment Opinion established that the underrepresentation of blacks in the ranks of New York City firefighters is a vestige of the City's discrimination against black firefighter candidates. But the scope and nature of the court's prospective remedy for these violations remained in dispute. In August 2011 the court conducted a remedial-phase bench trial seeking answers to two basic questions regarding prospective injunctive relief:

(1) What relief is necessary to ensure that the City will not—yet again—violate the requirements of Title VII of the Civil Rights Act of 1964 and other applicable equal employment opportunity laws?

(2) What relief is necessary to eliminate the primary vestige of the City's intentional discrimination against black firefighter candidates—the underrepresentation of blacks in the ranks of the City's firefighters?

Drawing on the factual record created through four years of litigation, and supplemented by the court's Findings of Fact from the August 2011 bench trial (Findings of Fact as to Injunctive Relief (Docket Entry # 741) ("Findings of Fact")), this Memorandum and Order explains the scope and nature of the prospective relief the court currently intends to impose on the City of New York through the Draft Remedial Order attached as Exhibit A. Furthermore, the court offers the parties the opportunity to be heard regarding the court's intent to appoint a Court Monitor to oversee the City's compliance with its orders, and orders the parties to attend a status conference to plan a Fairness Hearing to allow non-parties to the litigation to object to the Draft Remedial Order.

## II.    LEGAL STANDARD

Congress enacted Title VII of the Civil Rights Act of 1964 "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which

5

have fostered racially stratified job environments to the disadvantage of minority citizens."
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973). In order to meet this sweeping
mandate, "Congress deliberately gave the district courts broad authority under Title VII to
fashion the most complete relief possible." Local 28 of Sheet Metal Workers' Int'l Ass'n v.
EEOC, 478 U.S. 421, 465 (1986); see also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402
U.S. 1, 15 (1971) (Once a district court has found a violation of federal law, the scope of its
"equitable power to remedy past wrongs is broad").

Once liability for racial discrimination has been established, a district court "has not
merely the power but the duty" to "bar like discrimination in the future." Albemarle Paper Co. v.
Moody, 422 U.S. 405, 418 (1975) (quoting Louisiana v. United States, 380 U.S. 145, 154
(1965)). "Compliance relief is designed to erase the discriminatory effect of the challenged
practice and to assure compliance with Title VII in the future." Berkman v. City of New York,
705 F.2d 584, 595-96 (2d Cir. 1983). In the context of discriminatory testing regimes, such
relief involves "restricting the use of an invalid exam, specifying procedures and standards for a
new valid selection procedure, and authorizing interim hiring that does not have a disparate
racial impact." Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Service Comm'n,
630 F.2d 79, 108 (2d Cir. 1980). According to the Second Circuit, where a court determines that
the use of a written examination violates Title VII, it is "obviously appropriate to bar its
continued use, except on an interim basis with adjustments that eliminate its disparate racial
impact and thereby avoid its unlawful effect." Id. at 91.

But the court's remedial powers are not limited to simply enjoining an employer from
using discriminatory tests in making hiring decisions. "In some instances [], it may be necessary
to require the employer or union to take affirmative steps to end discrimination effectively to

enforce Title VII. Where an employer or union has engaged in particularly longstanding or egregious discrimination, an injunction simply reiterating Title VII's prohibition against discrimination will often prove useless and will only result in endless enforcement litigation." Local 28 of Sheet Metal Workers Int'l Ass'n, 478 U.S. 421, 448 (1986). "Further, even where the employer or union formally ceases to engage in discrimination, informal mechanisms may obstruct equal employment opportunities." Id. at 449. "Affirmative relief is that designed principally to remedy the effects of discrimination that may not be cured by the granting of compliance or compensatory relief. . . . Such relief may be required where, for example, the defendant has intentionally or egregiously engaged in a practice of discrimination that is likely to have discouraged members of the protected group from becoming members of the applicant pool at any stage." Berkman, 705 F.2d at 596. "Affirmative relief is normally justified only if the defendant's discrimination has been intentional, or there has been a long-continued pattern of egregious discrimination." Id. (internal citation omitted).

At the same time, principles of federalism compel a "proper respect for the integrity and function of local government institutions" in imposing a remedy—"local authorities have the 'primary responsibility for elucidating, assessing and solving' the problems of desegregation." Missouri v. Jenkins, 495 U.S. 33, 51 (1990) (quoting Brown v. Bd. of Educ., 349 U.S. 294, 299 (1955)). Such respect does not, however, "require a court to adopt wholesale the local government's choice of remedies." United States v. Yonkers Bd. of Educ., 29 F.3d 40, 43 (1994) ("Yonkers"). "A district court that finds that a local government entity that has committed a violation of the Constitution must provide the local government a reasonable opportunity to remedy a constitutional deficiency, imposing upon it a court-devised solution only if the state plan proves to be unfeasible or inadequate for the purpose." Schwartz v. Dolan, 86

7

F.3d 315, 319 (2d Cir. 1996) (quotation omitted). "The district court has not only the power but the duty to ensure that the defendant's proposal represents the most effective means of achieving desegregation." Yonkers, 29 F.3d at 43.

## III.    DISCUSSION

### A.    The Probability of the City's Prospective Compliance

The court does not approach its task of fashioning a remedy in this case blind to the fact that it is not the first court to attempt to integrate the FDNY by judicial decree. In the Disparate Treatment Opinion, the court noted Judge Weinfeld's 1973 ruling provided the context for this case:

> The history of the City's efforts to remedy its discriminatory firefighter hiring policies can be summarized as follows: 34 years of intransigence and deliberate indifference, bookended by identical judicial declarations that the City's hiring policies are illegal. . . . In the interim, the City cycled through six mayoral administrations and ten fire commissioners. The percentage of black firefighters in the FDNY, meanwhile, held steady at around 3%. In 2001, the FDNY had almost half as many black firefighters as it did in 1965, one year after the passage of Title VII.

(Disparate Treatment Op. at 51.)

Though the City's use of discriminatory hiring practices has persisted through numerous changes in City leadership, the evidence adduced in this case gives the court little hope that Mayor Michael R. Bloomberg or any of his senior leadership has any intention of stepping up to the task of ending discrimination at the FDNY. The Disparate Treatment Opinion details how the City's current leaders have consistently failed to take responsibility for ensuring that the City's firefighter hiring practices comply with federal, state, and City equal employment opportunity laws and policies. (Disparate Treatment Op. at 32, 54-61.) Despite the efforts of members of the Vulcan Society, politicians at all levels of government, the U.S. EEOC, and some City officials and agencies to constructively discuss clear evidence that the City's hiring

8

practices were discriminatory with Mayor Bloomberg and the City's last two fire commissioners, the City did nothing. (Id.) Indeed, for only the second time in the City's history, when the City's independent Equal Employment Practices Commission ("EEPC") advised Mayor Bloomberg that the FDNY had failed to comply with its obligation under the Mayor's own Citywide EEO Policy to *study* the FDNY's hiring practices for the possibility of adverse impact, Mayor Bloomberg rejected the EEPC's recommendation, tersely stating that he was satisfied with the FDNY's compliance efforts. (Id. at 56.)

The following summary highlights the repeated attempts of numerous City officials and institutions to persuade Mayor Bloomberg and his Administration to take action on the City's use of discriminatory hiring procedures to hire entry-level firefighters:

- Equal Employment Practices Commission

The Equal Employment Practices Commission ("EEPC") is an independent, non-mayoral entity charged with monitoring the compliance of City agencies with the City's EEO policies. (Pl.-Int. Rule 56.1 Statement (Docket Entry # 344) ¶ 64-65.) Beginning in 1999,[3] the EEPC conducted an audit of Firefighter Exam 7029, the preliminary results of the which "showed that the pass rate of whites was 91.6%, while the pass rate of blacks was only 61%." (Id. ¶ 75.) In May 2000, the EEPC notified the FDNY of this issue (id.), but despite the EEPC's efforts over multiple years, neither the FDNY nor the Mayor took action to so much as *investigate* the potential disparate impact of the exam. As the court discussed in Disparate Treatment Opinion:

> Over the next two years, the EEPC continually asked the FDNY to conduct a study on the adverse impact of the written examination, and reminded the Commissioner that he had a legal duty under the City's Equal Employment Opportunity Policy ("EEO Policy") to examine the FDNY's hiring practices for possible discriminatory impacts. Each time, the

---

[3]     Although the court discusses the City's response to the 1999-2000 audit conducted by the EEPC here, the record in this case contains evidence of additional EEPC efforts to collect information about the FDNY's non-compliance with EEO policy and make recommendations to remedy this failure that date back to at least 1994. (See Pl.-Int. Rule 56.1 Statement ¶¶ 69-96.)

9

FDNY . . . either refused to conduct the study outright or claimed that it was taking the EEPC's suggestion under consideration. In the spring of 2003, the EEPC finally issued a report concerning the FDNY's failures directly to Mayor Bloomberg, a measure it had only had to resort to twice before over the course of approximately 200 agency audits. This report recounted the history of the EEPC's audit, including its statistical findings of disparate pass rates between white and black candidates, and documented the FDNY's failure and refusal to implement various corrective measures aimed at bringing it into compliance with the City's EEO policy. In October 2003, Mayor Bloomberg responded in a two-paragraph letter that he was satisfied with the FDNY's compliance efforts.

(Disparate Treatment Op. at 55-56; see also Bloomberg Letter (Ex. Z to Decl. of Richard Levy (Docket Entry # 345).) Ignoring the FDNY's utter failure to comply with EEO policy and implement necessary changes, Mayor Bloomberg simply stated, "I am satisfied that the Fire Department has adequately addressed the points raised in the EEPC's report." (Bloomberg Letter at 1.)

- Public Advocate

On May 3, 2001, then-New York City Public Advocate Mark Green sent a letter to the Deputy Mayor and the Fire Commissioner, urging them to address the "long and unacceptable history of de facto and formal segregation of one of the City's largest and most vital uniformed services." (Green Letter (Ex. B to Decl. of Richard Levy); see also Pl.-Int. Rule 56.1 Statement ¶ 20.) This letter compared the representation of blacks and Hispanics in the Fire Department to the representation of blacks and Hispanics in the New York City Police Department, the Sanitation Department, and the Correction Department.[4] The Public Advocate noted that "the

---

[4]    The Public Advocate's letter included the following table:

| Department | Blacks (%) | Latinos (%) |
|---|---|---|
| Fire Department | 3.8 | 3.2 |
| Police Department | 16.6 | 18.0 |
| Sanitation Department | 24.3 | 14.6 |
| Correction Department | 61.4 | 18.0 |

(Green Letter at 1; see also Pl.-Int. Rule 56.1 Statement ¶ 20 .) As the court noted in its Disparate Treatment Opinion, this table reveals a stark contrast in the representation of minorities in the Fire Department versus other uniformed services, and that relative to the FDNY "the proportional representation of blacks was over four times greater in the New York City Police Department ("NYPD"), over six times greater in the Sanitation Department, and over 16 times greater in the Correction Department. (Disparate Treatment Op. at 18 n.12.)

firefighter force is the least diverse ethnically [and] racially . . . of all the uniformed services in the City." (Green Letter at 1.) Furthermore, the Public Advocate compared the FDNY to fire departments in other major cities, whose efforts have resulted in significantly more diversity in their ranks, and urged the City to take proactive steps toward reform.[5] (Id. at 1-4 ("New York City must do a better job recruiting and hiring African Americans, Latinos, and women as firefighters.").)

- City Council Members and Other Officials and Concerned Citizens

Additionally, multiple high-ranking government officials have written to Mayor Bloomberg expressing their concerns about the lack of racial minorities in the FDNY and the potentially discriminatory nature of the firefighter testing and hiring procedures. (See Affidavit of Paul Washington ("Washington Aff.") (Docket Entry # 125) Exs. 18, 20, 21, 22; see also Disparate Treatment Op. at 56 n.30.) On February 24, 2005, then-City Council Member Yvette D. Clarke[6] wrote a six-page letter to Mayor Bloomberg in her capacity as the Chair of the Committee on Fire & Criminal Justice Services.[7] (Clarke Letter (Ex. 18 to Washington Aff.).) This letter, written after two years of attempting to "engage the FDNY in a dialogue on

---

[5]     The letter included the following table, comparing the percentage of blacks and Hispanics in the FDNY with the percentages in fire departments in other cities with populations of over one million:

| City | Black Population (% of total population) | Black Firefighters (% of force) | Ratio of Black Representation in Municipal Fire Department to Black Representation in Municipal Population |
|------|------|------|------|
| Los Angeles | 11.2 | 14.0 | 1.25 |
| San Antonio | 6.8 | 7.0 | 1.01 |
| San Diego | 7.9 | 7.7 | 0.97 |
| Dallas | 25.9 | 18.1 | 0.70 |
| Houston | 25.3 | 17.1 | 0.68 |
| Philadelphia | 43.2 | 26.3 | 0.61 |
| Chicago | 36.8 | 20.4 | 0.55 |
| New York | 26.6 | 2.9 | 0.11 |

(Green Letter at 2.)

[6]     Clarke is now a United States Congressional Representative.

[7]     On the same day, then-Council Member Clarke also wrote a letter to then-Fire Commissioner Scoppetta expressing her dissatisfaction with the Fire Department's lack of progress with regard to firefighter diversity. (Ex. 19 to Washington Aff.)

diversity," detailed the Committee's concern with the underrepresentation of minorities and women in the Fire Department's ranks and the "level of effort made" to remedy the situation. (Id. at 1-2 ("After two years of discussing this issue. . . I am frustrated by the lack of sincere, demonstrative and proactive effort by the FDNY.").) The Committee's letter also made recommendations designed to help remedy this problem, including restoring the Fire Cadet Program, properly funding the Department's diversity initiatives, and reforming several aspects of the testing and selection process. (Id. at 2-4.) Nonetheless, in the absence of court supervision, Mayor Bloomberg failed to direct the Fire Department to implement any of these recommendations or take any other responsive action.

Mayor Bloomberg received similar letters from multiple other officials and community leaders, including United States Congressional Representatives Charles B. Rangel (Ex. 22 to Washington Aff.) and Gregory W. Meeks (Exs. 20, 21 to Washington Aff.), as well as City Council Members Charles Barron and Miguel Martinez, the Reverend Al Sharpton, and then-State Senator David Patterson (Ex. 20 to Washington Aff.). Additionally, members of the Vulcan Society met with the Mayor in 2002 and 2006, further alerting him to the discriminatory effects of the Fire Department's hiring policies. (Disparate Treatment Op. at 56 n.30 (citing Washington Aff. ¶¶ 19, 27-28).)

The clear evidence of disparate impact that Mayor Bloomberg and his senior leadership chose to ignore was obvious to anyone else who looked. Instead of facing hard facts and asking hard questions about the City's abysmal track record of hiring black and Hispanic firefighters, the Bloomberg Administration dug in and fought back. The only reason that the court today considers how to end the City's discriminatory hiring practices and eliminate their lasting effects is that a coalition of black New York City firefighters and President George W. Bush's attorney

12

general, Alberto Gonzalez, decided their only recourse was to sue the City of New York to make it stop.

Today—four years of litigation and two adverse liability rulings later—the City still doesn't get it. In testimony and depositions in this case, the City's senior leaders have routinely denied that they are responsible for doing anything to remedy nearly forty years of discrimination. Throughout this litigation City officials have routinely disclaimed accountability for the City's failures, shifting blame to offices, bureaus, divisions, and departments that lie outside the scope of their narrow parochial concerns. Examples of the City's culture of bureaucratic blame-shifting in this case are legion. They include former Fire Commissioner Von Essen's assertion to the City's EEPC in September 2000 that the EEPC's recommendation that the FDNY conduct a disparate impact study of its written examination was "Not Applicable" to the FDNY, because it was the Department of Citywide Administrative Services' ("DCAS") responsibility to perform an exam validation study. (See Fraenkel Decl. (Docket Entry # 321) Ex. 3 ("EEPC Audit Report") at EEPC 0388.) The EEPC's response to Commissioner Von Essen noted that the FDNY's response was contradicted by the City's own EEO Policy. (EEPC Audit Report at EEPC 0393.)

Examples also appear in the City's litigation conduct. In one particularly revealing example, the City's Office of Corporation Counsel responded to Magistrate Judge Mann's order to show cause (see Docket Entry ## 132, 137) why sanctions should not be imposed for what the court would later call the City's "chronic—now bordering on recalcitrant" discovery violations (see First Special Master Appointment Order (Docket Entry # 441) at 2). In its letter explaining the Office of Corporation Counsel's efforts to obtain responsive documents from document

13

custodians in DCAS, Corporation Counsel included the text of two emails sent by DCAS's

Deputy General Counsel to DCAS employees:

> Tom and Matt, you are going to be deposed next week. If, during those
> depositions, DOJ learns that there are more documents which were not supplied,
> the consequences could be serious, such as motions for contempt of court.
>
> I'm not sure of how many other ways to say this: DOJ and Federal Court are not
> the Civil Service Commission, or the City Council, or even State court. They are
> mean SOB's.

(NYC Response to OSC (Docket Entry # 139) at 2-3.) An earlier email conveyed the same

point:

> We are not dealing here with a schlock law firm in State court. This is DOJ and
> Federal Court. There are very, very serious consequences for not turning over
> documents which are responsive and, I believe (but I will check), there are serious
> consequences even if the failure to supply a document was purely unintentional.

(Id. at 3-4.) Putting to one side the implication that DCAS employees are less careful in meeting

their discovery obligations in connection with state court proceedings than those in federal court,

the fact that the City's own in-house counsel cannot secure the City's compliance with its legal

obligations without threats of federal court enforcement speaks volumes about the magnitude of

the task the court faces in securing the City's compliance with the equal employment opportunity

laws and the court's remedial orders. Unfortunately, even threats were not enough. *Two years

later* the City's lawyers were still "discovering" thousands of documents it had been obligated to

produce under the very discovery orders at issue in the City's response to Judge Mann's April

29, 2008 Order to Show Cause. (See April 29, 2010, Order to Show Cause for Discovery

Sanctions (Docket Entry # 426) at 2-3; First Special Master Appointment Order at 5-7.)

The blame-shifting and accountability-avoidance that goes on at the highest levels of the

City's leadership was on full display at the remedial-phase bench trial. Commissioner Cassano

was asked whether he thought that the fact blacks *still* only represent 3% of firefighters was a

14

problem, especially because blacks had comprised just 3% of firefighters for nine years since the EEOC charges of discrimination that culminated in this lawsuit, and nearly forty years since Judge Weinfeld's ruling. (Injunctive Relief Bench Trial Tr. at 873:13- 874:8.) Cassano replied "[w]ell, all we can do as a department is recruit as many minority candidates as we can. . . . That's the Fire Department's involvement in the process." (Id.) Commissioner Cassano's testimony also showed that the City's bureaucratic boundaries, while open for inter-departmental finger-pointing, block positive reforms. When asked whether he was aware of the fact that over 50% of the NYPD's police officers are black or Hispanic, in contrast with the FDNY's firefighters, Cassano replied: "I'm not aware of it, but I don't see what the difference is. I run the Fire Department, not the Police Department." (Injunctive Relief Bench Trial Tr. at 876:9-877:3.)

Even if the court were to take seriously the proposition that the internal division of responsibilities between the City's bureaucratic fiefdoms shields senior City officials from any accountability for the City's duty to comply with the law, a reasonable person might expect to find a high-ranking official atop the City's hierarchy who bears ultimate responsibility for the actions of the subordinates he employs to carry out his orders. Indeed, both the current and most recent City EEO Policies do exactly that. The City EEO Policy issued by Mayor Bloomberg in 2005 provided that: "Each agency head will ensure that his or her agency does not discriminate against employees or applicants for employment as prohibited by federal, state and local laws. Agency heads are accountable to their respective Deputy Mayors[8] for their agencies' EEO practices." (Injunctive Relief Bench Trial Tr. at 776:23-777:18, Def. Ex. 19 ("2005 NYC EEO

---

[8]     According to the New York City Charter, the City's Deputy Mayors serve at the pleasure of the Mayor: "The mayor shall appoint one or more deputy mayors with such duties and responsibilities as the mayor determines." N.Y.C. Charter § 7.

15

Policy") at 17.) The City EEO Policy in effect from 1996 to 2005[9] included similar language, but also explicitly provided that: "The Mayor of the City of New York has ultimate responsibility for ensuring that the EEO laws are being adhered to and that the appropriate EEO policies are developed and enforced." (See Fraenkel Decl. (Docket Entry ## 321, 322), Ex. 5 ("Bloomberg Dep.") at 56:5-24; Levy Decl. (Docket Entry # 345) Ex. F ("1996 NYC EEO Policy") at 17.)

Nonetheless, if this litigation has proven anything, it is that it is folly to expect any official of the City of New York to accept accountability for seeing that the equal employment opportunity laws are followed. In deposition testimony, Mayor Bloomberg denied even knowing what it means to be "responsible":

| | |
|---|---|
| LEVY: | Do you consider yourself responsible for seeing that EEO laws and policies are followed? |
| BLOOMBERG: | You just asked that question. I don't know what the word "responsibility" is and I can't answer your question. |
| LEVY: | Well do you consider yourself responsible in any sense? |
| BLOOMBERG: | I don't know what the word "responsible" is, counsel. |
| LEVY: | Did you ever hear the phrase "The buck stops with me," or "The buck stops with him"? |
| BLOOMBERG: | I have heard that. |
| LEVY: | Does that refer to you? |
| BLOOMBERG: | I have heard that. |

---

[9]     The City EEO Policy issued by Mayor Giuliani in 1996 (see Levy Decl. (Docket Entry # 345) Ex. F ("1996 NYC EEO Policy") at 17), remained in effect until 2005 when Mayor Bloomberg replaced it with a new policy (see 2005 NYC EEO Policy at 1 ("This Policy and the EEO Policy Handbook replace the previous Equal Employment Opportunity Policy of the City of New York (1996).").

(Bloomberg Dep. at 59:2-18.) In his deposition testimony Mayor Bloomberg claimed to be unable to recall the City's EEO Policies—including the one he issued. (Bloomberg Dep. at 50:2-56:4.)

Commissioner Cassano's statement that "all we can do as a department is recruit as many minority candidates as we can" reveals a deeper truth about the City's response to this litigation. Though the evidence in this case has established that the City's discrimination against black firefighter candidates is historic, in both duration and magnitude, the City is determined to change as little as possible. In the face of dramatic disparities in the FDNY, Commissioner Cassano's testimony remained self-congratulatory: He testified that he saw no need for injunctive relief—and even more remarkably no need for any improvements at all—in connection with the Department's recruitment efforts (Injunctive Relief Bench Trial Tr. at 852:6, 857:20 ("I think we are doing a very good job"), 858:13-14); the PRB review process (id. at 860:3-10 ("It's an extremely fair process, non-discriminatory"), 863:20-21); the Deparment's record-keeping and transparency (id. at 862:15-21, 864:3-7); the EEO office (id. at 865:3-11 (stating that he is "actively involved in [the work of the EEO office], and I'm certainly doing a good job")); or the Department's diversity initiatives overall (id. at 876:16-21 (stating that he is "extremely satisfied")).

The one area in which the City has been willing to admit any fault is its failure to adequately recruit black and Hispanic firefighter candidates. With respect to recruiting at least, the City has made significant improvements. But if left to its own devices, the court has no doubt that the City's solution to the underrepresentation of black and Hispanic firefighters caused by the City's use of discriminatory testing procedures would be to recruit as many black and Hispanic firefighter candidates as possible and subject them to a hiring process that has been

17

proven to systematically—and illegally—exclude blacks and Hispanics at rates much higher than whites. Enhanced recruitment will simply not adequately address the deficiencies the court has found in the City's hiring process. See Yonkers, 29 F.3d at 43 ("The district court has not only the power but the duty to ensure that the defendant's proposal represents the most effective means of achieving desegregation.").

This litigation could have turned out much differently. Had the City's leadership shown the least bit of concern for the effect of the court's liability rulings, had the City demonstrated by word and deed an intention to use this litigation as an opportunity to reconsider and reevaluate hiring practices and procedures that have illegally excluded black and Hispanic firefighter candidates for nearly forty years, this would be a much different order. Instead, the court's assessment of the evidence, including the testimony of senior City officials, reveals a pervasive disregard—an absolute rejection—of the court's conclusions. Lacking from the City's response to this litigation is an attitude of voluntary compliance and any indication that its leaders have the will to carry out a program of reform to prevent future violations of the equal employment opportunity laws at the New York City Fire Department.

At trial, the City argued that court intervention is unnecessary because the City has policies, procedures, and institutions erected independent of this litigation to prevent this discrimination from recurring. The City is correct—on paper the City has an exceptional commitment to equal employment opportunity. But as detailed in the court's Findings of Fact, in practice the City's institutions lack the capacity to ensure the City's compliance with applicable equal employment opportunity laws. The court's Disparate Treatment Opinion describes how Mayor Bloomberg and his Fire Commissioners ignored warnings from the City's own institutions like the Office of the Public Advocate and the EEPC, from the Mayor's own officials

18

in DCAS, and ignored the mandates of the City's EEO Policy in refusing to act on clear evidence that the City's written firefighter examinations disproportionately disadvantaged black and Hispanic firefighters. Time after time, City officials denied accountability and blamed someone else. Time after time, institutions created to prevent lawsuits just like this one were ignored and their effectiveness compromised by the City's leaders.

Not even the threat of court action has been enough to cause the City to reevaluate how it fulfills the mandates of the equal employment opportunity laws. In the court's Findings of Fact the court examined the FDNY's EEO Office—the office responsible under the City's own EEO Policy for ensuring the FDNY's compliance with applicable equal employment opportunity laws. The court found that even after the court's finding of disparate impact and disparate treatment discrimination, the City allowed a hiring freeze to hollow out the FDNY's EEO Office, depriving it of the resources to conduct all but the most perfunctory of investigations and limiting its role to little more than customer service for dissatisfied employees. Today the FDNY's EEO Office stands as little more than a bureaucratic Potemkin village, pointed out to casual observers as evidence of the City's commitment to comply with the equal employment opportunity laws. But behind the name and its prominent position on the FDNY's Organizational Chart, it is an office hobbled by a chronic lack of resources and policies and practices that prevent it from effectively carrying out its assigned role.

The record developed in this case, viewed against the backdrop of a nearly identical liability ruling almost forty years ago and the failed remedial order that followed it, makes abundantly clear that the City will not comply with its obligations under the applicable equal employment opportunity laws and this court's orders without close and continuing court supervision. The court notes that this conclusion is as applicable to the remedy for the City's

19

violation of the disparate impact provisions of Title VII as it is to the remedy for the City's intentional discrimination against black firefighter candidates. Regrettably, Counsel for the United States declined to actively participate in the remedial-phase bench trial because the United States did not believe the evidence presented in that proceeding to be relevant to the injunctive relief the court would impose for the City's violations of Title VII's disparate impact provisions. On the contrary, much of the evidence presented in that proceeding demonstrated that the City is incapable of assuring the court that it will henceforth comply with applicable equal employment opportunity law, much less the court's orders. The court's findings as to the need for injunctive and monitoring relief to prevent the City from committing further violations of the equal employment opportunity laws are as applicable to the City's violations of the disparate impact provisions of Title VII as they are to the need to prevent further acts of intentional discrimination by the City.

**B.     The Relief Required**

1.     General Purpose of the Draft Remedial Order

The court's Draft Remedial Order does not impose hiring quotas in any shape or form on the City of New York. Despite the City's misleading and inflammatory statements to the contrary,[10] this court has never endorsed hiring quotas in this litigation, and has repeatedly stated that it does not believe quotas would be an effective to remedy the City's discrimination. (See, e.g., Order on Interim Hiring (Docket Entry # 527) at 25.) Indeed, Judge Weinfeld imposed hiring quotas on the City to remedy the same discrimination in 1973, yet here we are again, nearly forty years later. (See Disparate Treatment Op. at 15 (citing Vulcan Soc'y of New York

---

[10]     See Exam 6019 Injunction Op. (Docket Entry # 569) at 8, 12 (observing that the City cited absolutely no legal authority or reasoning for its claim that the approved Exam 6019 Hiring Options were "hiring quotas," and pointing out that one of the hiring options the City called a quota was actually suggested to the court by the City itself).

City Fire Dep't. Inc. v. Civil Serv. Comm'n, 490 F.2d 387, 391, 398-99 (2d Cir. 1973) (affirming Judge Weinfeld's order that the City hire one minority applicant for every three non-minority applicants hired).)

Instead, the court's Draft Remedial Order would compel the City to undertake a program of court-guided institutional reform to make its equal employment opportunity compliance activities effective, to eliminate the barriers its hiring policies and practices have erected or maintained that serve to perpetuate the underrepresentation of blacks and Hispanics as firefighters in the FDNY. The Draft Remedial Order attempts to strike a balance between the need for close supervision of the City's compliance with applicable equal employment opportunity laws and the court's orders, and the court's preference for leaving the City in charge of the day-to-day minutiae of administering the FDNY's firefighter hiring process and EEO compliance activities.

Plaintiff-Intervenors have asked the court to order the City to take highly-specific steps to remedy the City's discrimination and eliminate the vestiges of its discrimination against black firefighter candidates. For example, Plaintiff-Intervenors have requested that the court require the FDNY to advertise on specific radio stations during its recruitment campaigns, and to reinstate a program called the Fire Cadet Program that successfully mentored and encouraged black and Hispanic youth to join the FDNY. (See Pl.-Int. Pretrial Br. (Docket Entry # 658) at 37-39.) Without doubt, many of Plaintiff-Intervenors' specific suggestions, including the Fire Cadet Program, show promise in increasing the representation of blacks and Hispanics in the FDNY.

But the specific relief requested by Plaintiff-Intervenors is simply a means to an end—the end of the City's discrimination and the end to the City's policies and practices that perpetuate

21

the effects of the City's discrimination against black firefighter candidates. The evidence at trial did not establish that Plaintiff-Intervenors' proposed specific remedial measures were the only ones capable of ending the City's discrimination or even that they are, all things considered, preferable to other means of doing so. Accordingly, with a few minor exceptions[11] the court's Draft Remedial Order does not require the City to adopt specific policy changes or specific hiring or recruitment policies or practices. It is the court's view that nearly forty years of discrimination will not be cured by a few simple tweaks to the City's policies and practices. What is needed is for the City to comprehensively re-assess its policies and practices, to analyze the evidence showing the effect of those policies and practices, and to rationally consider how they can be changed to achieve a firefighter hiring process that is—in actual practice and effect—fair and open to all. Thus, the Draft Remedial Order simply compels the City to take a hard look at its policies and practices, consider the evidence, and decide what actions should be taken. The court believes that the process set out in the Draft Remedial Order preserves the City's "primary responsibility" for desegregating the FDNY. See Missouri v. Jenkins, 495 U.S. at 51.

To be sure, the court will not brook any defiance from the City in undertaking necessary remedial action. Where the evidence shows that the City's policies and practices perpetuate the effects of the City's discrimination against black and Hispanic firefighter candidates—like those addressed in the court's Findings of Fact—the City must take remedial action. But where the evidence shows that there is more than one acceptable reform available to give effect to the remedial purposes of the Draft Remedial Order, it is the court's view that the City should be the

---

[11]     In the Draft Remedial Order the court requires the City to adopt a few specific remedial policies and practices that are intended to protect black and Hispanic firefighter candidates who will be processed for hiring off of the civil service hiring list created using the results of Exam 2000, to be administered in January 2012. Because the court does not anticipate that the process of studying and reforming the City's policies and practices will have been completed by the time the City begins to process firefighter candidates who will take Exam 2000, these remedial measures are necessary to ensure minimum protections for these firefighter candidates in the interim.

22

party to choose among them. See Schwartz v. Dolan, 86 F.3d 315, 319 (2d Cir. 1996) (holding that where "there were different possible ways to remedy the violation" local government entity should have been allowed to choose among them). In the end, the court will hold the City accountable for its results, not its means.

Below the court briefly summarizes the aims of the Draft Remedial Order.

### 2. General Terms of the Permanent Injunction

The Draft Remedial Order enjoins the City from continuing to use the hiring practices found unlawful by the court in its Disparate Impact Opinion, Disparate Treatment Opinion, and Exam 6019 Validity Opinion. Furthermore, the Draft Remedial Order directs the City to take steps to end those hiring policies and practices that operate to perpetuate the effects of the City's pattern and practice of discrimination against black firefighter candidates.

### 3. Firefighter Test Development and Administration

The Draft Remedial Order continues the court's supervision over the City's development and administration of the examinations used by the City to screen and select entry-level firefighters. The Parties and court-appointed Special Master Mary Jo White have worked together for over a year to develop a firefighter examination that—unlike its recent firefighter examinations—actually identifies the candidates most qualified to be hired for the position of entry-level firefighter. While the process of developing that new test, Exam 2000, is not yet complete, the Parties and the Special Master have worked well together. The court credits the Parties, including the City of New York, and non-parties, including the Uniformed Firefighters Association and the Uniformed Fire Officers Association, for cooperating to develop a test that selects the best candidates to be appointed entry-level firefighters and does so in a manner that treats all candidates fairly. The court is especially grateful for the assistance of Special Master

23

White and the attorneys at her law firm, Debevoise & Plimpton LLP. The working relationship that Special Master White has fostered among the Parties in this contentious litigation has been instrumental in moving this difficult process forward.

The Draft Remedial Order does not necessarily require the Court Monitor and the Parties to engage in the same level of consultation and supervision that has marked the Special Master's management of the test development process for Exam 2000. The court is hopeful that the City will be able to use its experience in designing Exam 2000 to design the next firefighter examination in a more self-directed manner. Thus, the Draft Remedial Order leaves the management and supervision of the process for the development of the next firefighter examination to the discretion of the Court Monitor.

### 4. Firefighter Candidate Recruitment

As the court detailed in its Findings of Fact, the City's firefighter candidate recruitment efforts for Exam 2000 were a improvement over its past efforts. The court credits the City for making the significant financial investments that made that effort a success and Assistant Commissioner for Recruitment and Diversity Michele Maglione for using those resources to great effect. Nevertheless, in its Findings of Fact the court found that a formal remedial recruitment program is absolutely essential to ending the underrepresentation of blacks and Hispanics in the ranks of the City's firefighters, and found several facts that suggest the City may retreat from its commitment to invest significant resources in a formal recruitment program for Exam 2000 may not be sustainable going forward.

The Draft Remedial Order seeks to build on the City's success recruiting for Exam 2000 by creating a process that will result in an independent review of the City's firefighter recruitment efforts and will require the City to set measureable goals against which its

24

recruitment efforts can be judged. The independent review will result in a determination of the level of resources that are required to effectively implement an effective firefighter candidate recruitment program, will offer an evidence-based critique of the City's recruitment efforts and recommend useful changes in strategy and tactics based on empirical evidence.

### 5. Post-Examination Firefighter Candidate Screening

As detailed in its Findings of Fact, the court has found significant deficiencies in the City's post-examination firefighter candidate screening process. In the Findings of Fact, the court found that friends and family members of firefighter candidates seek to insert themselves in the firefighter candidate screening process in ways that may disproportionately favor white candidates over black firefighter candidates. Thus, the Draft Remedial Order imposes a duty on all those involved in firefighter candidate screening to create records of communications relating to specific firefighter candidates in order to document this practice and prevent its potentially harmful effects. Furthermore, the Draft Remedial Order requires the FDNY's Personnel Review Board ("PRB") to adopt policies and procedures regarding the participation of PRB members who have a potential conflict of interest with respect to any candidate under review by the PRB, or have information about a candidate obtained outside the Candidate Investigation Division ("CID")'s formal investigative process.

The court's Findings of Fact noted that CID and PRB operate without written policies and guidelines for the investigation, referral, and consideration of a firefighter candidate's character and fitness to be a firefighter. More specifically, the court found that the City's policies and practices significantly increased the probability that the City would misuse arrest information in making decisions regarding a candidate's character and fitness to be a firefighter, and that the misuse of arrest information would disproportionately disadvantage black firefighter

25

candidates. Consequently, the Draft Remedial Order requires CID and PRB to adopt policies and procedures for the investigation, referral, and consideration of a firefighter candidate's character and fitness to be a firefighter and specifically the investigation and use of arrest information in making those decisions. The Draft Remedial Order also requires members of CID and PRB to be trained to follow and apply the EEO laws and policies in the performance of their respective responsibilities. Finally, the Draft Remedial Order requires the Court Monitor to observe all PRB meetings held in connection with PRB's consideration of any candidate who took Exam 2000 and to issue a report recommending changes in PRB's policies and practices based on these observations.

### 6. EEO Compliance Reform

In its Findings of Fact the court found that the FDNY's EEO Office is woefully under-funded and fails to effectively carry out its responsibilities to ensure the FDNY's compliance with the EEO laws. The Draft Remedial Order requires an independent top-to-bottom reassessment of the City's EEO compliance policies and practices with respect to the FDNY as the first step to reforming the City's EEO compliance program in the FDNY. A further purpose of the Draft Remedial Order is to require the City to develop and implement a plan to prevent and deter acts of retaliation and discrimination against current, former, and future City employees who participated in this litigation in any way.

### 7. Attrition Mitigation Plan and Reassessment of Entry-Level Firefighter Selection

The court has found that the City's hiring policies and practices promote high rates of voluntary candidate attrition during the post-examination firefighter candidate screening process. The court concluded that the number of candidates disqualified for dropping out of the post-

examination firefighter candidate screening process makes voluntary candidate attrition one of the City's most pervasive firefighter candidate selection devices. Moreover, the court found that black firefighter candidates are significantly more likely than white firefighter candidates to be disqualified for dropping out of the post-examination screening process.

In its Findings of Fact the court noted some of the efforts being made by Assistant Commissioner Maglione to decrease the high rate of voluntary candidate attrition between the firefighter hiring process's numerous steps. Building on those efforts, the Draft Remedial Order requires the City to draft and implement a written plan to mitigate and diminish high rates of voluntary candidate attrition over the short-term, and to consult with the Parties and the Court Monitor in doing so. The Draft Remedial Order also requires the City to perform a long-term top-to-bottom reassessment of the firefighter hiring process, and to develop a range of alternative firefighter hiring processes in consultation with the Parties and the Court Monitor. The purpose of the long-term reassessment is to determine whether other firefighter hiring policies and practices are available that would fairly select qualified firefighter candidates while preventing the harms caused by the defects in the City's current firefighter hiring process.

### 8.    Retention of Jurisdiction

The Draft Remedial Order contemplates that the court will retain jurisdiction over the remedial phase of this litigation for at least ten years after the court issues its Final Remedial Order or through the City's implementation of the next two entry-level firefighter hiring processes. The court must retain jurisdiction for a period of time long enough to ensure that the City takes lasting steps to guarantee its compliance with the mandates of applicable equal employment opportunity laws and policies. The Draft Remedial Order contemplates that upon the occurrence of the later of ten years after the issuance of the Final Remedial Order or after the

27

City has completed two full processes for the selection of entry-level firefighters the court will hold a bench trial to re-evaluate the City's compliance with applicable equal employment opportunity laws. If after the bench trial the court concludes that the City has shown that, among other things, it has ended its discriminatory hiring practices and taken sufficient affirmative measures to end the policies and practices that have perpetuated the harmful effects of those discriminatory hiring practices and procedures, the court will relinquish jurisdiction. On the other hand, if the City fails to demonstrate that it has effectively remedied its non-compliance with the mandates of applicable equal employment opportunity laws, the court will order such other further relief as it finds is warranted under the circumstances.

### C.  Need for a Court Monitor

The Draft Remedial Order contemplates that a court-appointed monitor will play an important role in ensuring the City's compliance with the requirements of the Draft Remedial Order. The Draft Remedial Order contemplates that the Court Monitor will take primary responsibility for leading the parties through the specific remedial steps the court requires the parties to complete. Moreover, the Court Monitor will have the duty and the authority to proactively audit and investigate the City's compliance with the terms of the Draft Remedial Order. For example, the Court Monitor will have the authority to perform independent investigations of the FDNY's EEO compliance program and the post-examination screening phase of the City's process for selecting entry-level firefighters.

A court monitor is necessary because the court lacks the time and resources to perform the supervisory tasks necessary to ensure that the City carries out its obligations under the Draft Remedial Order in good faith and with reasonable diligence. District courts have frequently made use of court-appointed monitors and other masters in similarly large and complex civil

28

rights litigations where ensuring a large organization's or municipality's compliance with the court's orders would be too time-consuming or difficult for the court to undertake without assistance.

Under Federal Rule of Civil Procedure 53(b)(1) the court directs the parties to submit any comments on the terms of the court's intended appointment of a court monitor. The court also directs the parties to submit names, biographies, and resumes of individuals the parties believe would suitably carry out the responsibilities of the Court Monitor as specified in the Draft Remedial Order. The parties should endeavor to present a joint list of candidates, but in the event that the parties cannot agree to one list, the parties may submit separate lists.

### D.  Fairness Hearing

Pursuant to 42 U.S.C. § 2000e-2(n)(1) the court will hold a Fairness Hearing to permit non-parties to this litigation to voice objections to the court's Draft Remedial Order before the court issues a Final Remedial Order. Prior to scheduling that Fairness Hearing the court requires briefing from the parties on the scheduling and administration of the Fairness Hearing, including the form and medium of the notice the court should provide to non-parties and the length of time non-parties should be given to object to the court's Draft Remedial Order. The court encourages the parties to attempt to resolve as many of these questions as possible prior to submitting briefing to the court.

## IV.  CONCLUSION

Pursuant to Federal Rule of Civil Procedure 53(b)(1), the parties shall submit briefing on the scope and terms of the court's intended appointment of a Court Monitor, and on the logistics of a Fairness Hearing by Monday, October 17, 2011. By Wednesday, October 19, 2011, the parties shall jointly or separately suggest three or more names of individuals who they believe

29

would suitable in carrying out the role of Court Monitor, and submit those individuals' resumes and short biographies to the court. The parties shall appear for a status conference to discuss these matters on Thursday, October 20, 2011 at 2:30 p.m. in Courtroom 4D South.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
     October 5, 2011

NICHOLAS G. GARAUFIS
United States District Judge