

**MICHAEL A. CARDOZO**
*Corporation Counsel*

T**HE** C**ITY OF** N**EW** Y**ORK**
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, N.Y. 10007-2601

(212) 788-0800
FAX (212) 227-5641
mcardozo@law.nyc.gov

October 17, 2011

VIA ECF FILING

Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  USA v. City, Civil Action No.: 07 CV 2067 (NGG)(RLM)
           Law Dept. No.: 2007-017441

Dear Judge Garaufis:

      Defendants respectfully write in response to the Court's Memorandum & Order dated October 5, 2011 (Dkt. # 743)("Memo & Order"), which directed the parties to submit comments on the scope and terms of the Court's intended appointment of a Court Monitor.[1] For the convenience of the Court, the defendants' comments are numbered in accordance with the paragraph numbers of the Draft Remedial Order, Permanent Injunction and Order Appointing Court Monitor ("Draft Order")(Dkt. # 743-1).

      In addition to generally objecting to the appointment of a monitor on the grounds that the facts in this case do not justify such an appointment, the City objects to the Court's appointment of a Monitor on the terms proposed because the proposed order effectively places the Monitor in control of FDNY's Office of Recruitment and Diversity, Equal Employment Opportunity Office, Candidate Investigation Division, and Personal Review Board. As a general matter, the City

---

[1] Pursuant to the Court's direction, the City has limited its comments to the terms of appointment of the Court Monitor. This submission should not be construed as a consent to the Draft Order or any of its terms.

objects to the scope of the Monitor's duties to the extent that they encompass steps in the hiring process other than the oversight of future written exams as the liability phase of this proceeding was limited to the City's written FDNY entry-level exams. The City's specific objections to the terms of the Monitor's appointment, include the following.

**Draft Order Creates Ambiguity as to Who Will Authorize Use of Exam 2000: the Court or the Court Monitor (¶ 15)**

By Order dated January 21, 2010 (Dkt. # 390) at p. 3 & 54, the Court ruled that any new selection device had to be approved by the Court before it can be utilized by the City. The Draft Order, however, indicates that the Court Monitor must approve all steps in the process for selecting entry-level firefighters. Draft Order ¶ 15. It is unclear whether paragraph 15 of the Draft Order supersedes the January 21, 2010 Order or applies to selection devices proposed to be used after Exam 2000.

**Draft Order Confuses Roles of Special Master and Court Monitor (¶¶ 15, 21, 22, 31-33)**

The City objects to those terms of appointment for the Court Monitor which confuse the roles of the Special Master for test development and the Court Monitor.

By order dated June 1, 2010 (Dkt. # 448), the Court appointed Mary Jo White as the Special Master responsible for among other things:

> Monitoring and reporting on the parties' compliance with the Initial Remedial Order and subsequent orders of the court regarding the development of a new procedure for screening and selecting applicants for the position of entry-level firefighter, and ordering such plans, processes, or other measures that the Special Master believes will facilitate the timely development of the new selection procedure;

June 1, 2010 Order, ¶ 2.b. Under the supervision of the Special Master and over the past 17 months, the parties and their experts have developed and are implementing a multi-step project plan for the development of Exam 2000 that includes both pre-test administration and post-test administration phases. In its recent Memo & Order at p. 23-24, the Court acknowledged that this process has worked well and lauded the Special Master's efforts.

Halting the Exam 2000 test development process or subjecting it to review by a Court Monitor at this late stage undoubtedly would impact the test development and administration process as the Court Monitor would have to become familiar with the process to date. Yet, certain proposed terms of the Court Monitor's appointment seem to envision such a role. For example:

> paragraph 15 provides that "The City of New York shall not take any step in any process for the selection of entry-level firefighters, or use any examination as part of such process, without first obtaining the approval of the Court Monitor . . . ."

paragraph 21 provides that "the Court Monitor shall adopt a schedule which requires the City of New York to notify the Monitor and the Parties before commencing any step in a process for the selection of entry-level firefighters."

paragraph 22 provides that "the Court Monitor may require the City to establish that it has satisfied conditions specified by the Monitor, or to obtain the Monitor's explicit approval before commencing any step in the process for the selection of entry-level firefighters."

Therefore, the City strenuously objects to the proposed terms to the extent the Court intends to shift any responsibility for the development and administration of Exam 2000 from Special Master White to the Monitor.

It is also unclear whether the requirement of a top to bottom assessment of the FDNY's entry-level firefighter selection process is applicable to Exam 2000, which is still under development. To the extent it is directed at Exam 2000, it would require the City to duplicate the extensive and ongoing efforts undertaken by the Parties and the Special Master for the past seventeen months.

**Draft Order Imposes Numerous Obligations Unrelated to the Liability Findings in this Case (¶¶ 25-29. 30, 38-39, 40-41, 45)**

The City objects to the imposition of a Monitor relating to issues that were not the subject of the complaints filed in this action or the Court's liability findings in its Disparate Impact or Disparate Treatment opinions. Those include:

paragraphs 25 – 29: the retention of a recruitment consultant and the Monitor's oversight of the consultant's research;

paragraphs 30: the development of an attrition mitigation plan and the Monitor's oversight of that work;

paragraph 38: the requirement that the Monitor approve all written policies and procedures adopted for CID's operations;

paragraph 39: the requirement that the Monitor approve all written policies and procedures adopted for PRB's operations;

paragraph 40: the requirements that the Monitor approve the selection of a third-party EEO trainer for CID and PRB members, approve the curriculum for the CID and PRB training and participate in each of the training sessions;

paragraph 41: the requirement that the Monitor attend all PRB meetings and the prohibition on any communications between PRB members about Exam 2000 candidates outside the presence of the Monitor; and

paragraph 45: the requirement that the Monitor approve the selection of an independent EEO consultant, work on the development of a research plan for that consultant and then approve the plan.

**Provisions of the Draft Order which are Unclear and/or Burdensome (¶¶ 10, 20, 22-23, 33-34, 35-37)**

Paragraph 10 defines the phrase "process for the selection of entry-level firefighters" to include a series of steps in the process. In some instances in that paragraph, the Court uses the term "firefighter" rather than "entry-level fighter". The distinction is important as paragraph 8 explicitly excludes the promotional exam from the definition of "entry-level firefighter." The Draft Order should consistently use the term "entry-level firefighter" throughout its provisions to avoid any suggestion that the Monitor has any duties pertaining to the firefighter promotional exam.

Paragraph 20 requires that all submissions to the Court must be signed by the Mayor rather than an attorney who has appeared in this action. The City objects to this provision as unnecessary, unwarranted and extraordinarily burdensome.

Paragraph 22 should make clear that it does not require the disclosure of any privileged communications.

Paragraph 23 requires the City to state in writing the race and national origin of applicants. However, pursuant to the Court's July 13, 2011 Order (Dkt. # 673), the application form for Exam 2000 was modified to require that applicants choose one of the following "Race/Ethnicity" options: "White, Black, Hispanic, American Indian/Alaskan Native, or Asian/Pacific Islander." Therefore, that is the only demographic information that the City will be able to provide to the Monitor and the language of paragraph 23 should be clarified accordingly.

Paragraphs 33-34 are internally inconsistent. Paragraph 33 requires that the City file its final report after the Monitor has certified that the City has carried out its assessment of its then current entry-level selection process and researched and evaluated alternative selection processes in good faith and with reasonable diligence. Paragraph 34, on the other hand, appears to suggest that the final report is being submitted by the Monitor as it says that the "Monitor or any Party may file a reply to the Mayor's response explain[ing] whether the Monitor or Party believes the Mayor's response to the final report is sufficient . . . " Furthermore, if the Monitor has certified that the City conducted its assessment in good faith and with reasonable diligence, how can he then take the position that the City's final report/response is "insufficient"?

Paragraphs 35-37 are overbroad and ambiguous. What does "involved" and "informally" mean in this context. Does this mean that the CID staff must memorialize every oral

conversation they have during the background investigation process? Do these provisions require that Vulcan Society members record every oral conversation they have with applicants advising them on how to navigate the CID process?

**Ex Parte Communications (¶¶ 66-67)**

Paragraphs 66-67. The City objects to the provisions allowing the Monitor to communicate with a Party or Party's counsel on an ex parte basis. The Court could not do so if it were supervising post-trial matters and, therefore, the Monitor as an agent of the court should likewise be constrained from having such ex parte communications. The Advisory Committee notes for the 2003 Amendments to Rule 53 state that "Ordinarily the order should prohibit such communications, assuring that the parties know where authority is lodged at each step of the proceedings."

The City also objects to the provisions allowing the Monitor to communicate with the Court on any matters other than scheduling and logistics. The term "non-substantive matter" is not very precise and the Court should list with specificity the categories of non-administrative matters with the Monitor that could be the subject of ex parte communications with the Court. To the extent that ex parte communications with the Court are permitted, the Monitor should document them and submit periodic reports to the parties advising them of the date and subject of the communication.

Thank you for your consideration of this request.

Respectfully submitted,

Michael A. Cardozo

Cc: All counsel