# Exhibit

# B

**COHEN & GRESSER** LLP

800 Third Avenue
New York, New York 10022
212 957 7600 phone
212 957 4514 fax
www.cohengresser.com

Mark S. Cohen
212 957 7601
mcohen@cohengresser.com

November 23, 2011

BY EMAIL

Georgia Pestana, Esq.
The City of New York Law
Department 100 Church Street
New York, NY 10007

Re: *United States v. City of New York, No. 07-CV-2067 (NGG) (RLM)*

Dear Georgia:

Thank you for forwarding the decisions on attorneys' fees in the Eastern District. We view this as another constructive step in the discussions regarding the appropriate hourly rate to be paid to the Court Monitor (the "Monitor") in this matter.

We nevertheless believe the decisions you brought to our attention are inapplicable, and that even if they did apply, they would support rather than undermine an order granting hourly rates in the range we proposed. Briefly stated:

- Our requested rates are in line with rates paid to monitors appointed in a variety of matters and settings. As such, they are reasonable under the legal standards applied by the courts and, we believe, would be approved by the Court. As set out below, however, we are proposing a discount of 15 percent off the hourly rates that we initially proposed.

- Virtually all of the decisions you brought to our attention relate to awards of prevailing party attorneys' fees under 42 U.S.C. § 1988. As such, they have no bearing on the appropriate hourly rate to be paid to the Monitor. Among other things, the difficult and time-sensitive tasks we have been directed to perform are entirely distinct in type and duration than those performed by counsel entitled to prevailing party fees under § 1988. Even if they were

**COHEN & GRESSER** LLP

Georgia Pestana, Esq.
November 23, 2011
Page 2

>   relevant, moreover, the decisions you have cited would weigh in favor of our proposed hourly rate.

- You also cited two decisions involving fees for Special Masters under Fed. R. Civ. P. 53(g). Neither is applicable to court monitors, and neither supports your position. The legal standards governing compensation for Special Masters are consistent with compensation at the rates we have put forward.

- To place arbitrary caps on the size of our team would be counterproductive. Further, the staff numbers we discussed are reasonable as a practical and legal matter.

**I.      Our Proposal**

Although are confident that the rate schedule we originally submitted to you is reasonable and would be approved by the Court, we offer the following proposal in a spirit of compromise and in light of the strong public interest served by a collaborative and expeditious remediation process.

*Hourly Rates*: The rates below represent a discount of approximately 15 percent from the rates we originally proposed.

|            | Initial Proposal (hourly) | New Proposed (hourly) |
|------------|---------------------------|-----------------------|
| Partners   | $650 to $750              | $525 to $650          |
| Counsel    | $550 to $650              | $450 to $550          |
| Associates | $300 to $595              | $250 to $525          |
| Paralegals | $100 to $225              | (unchanged)           |

*Staffing*: We currently anticipate using a team of six attorneys, including an appropriate blend of partners, counsel, and associates, as well as two paralegals. This does not include outside experts and consultants. As discussed more fully below, however, we believe it would be counterproductive at this preliminary stage to cap the size of our staff at any specific level. We have no interest in deploying too large a team and every intention to conduct the monitorship as efficiently and cost-effectively as possible. But we also require the flexibility to adjust our team in response to changing circumstances, particularly at the outset of the monitorship.

Given the magnitude of the tasks assigned to the Monitor under the Draft Remedial Order, we have little doubt that a staff of six attorneys – to be adjusted if and when circumstances require – would be deemed reasonable under any standard.

COHEN & GRESSER LLP

Georgia Pestana, Esq.
November 23, 2011
Page 3

## II.     The Proposed Rates Fall Well Within Standard Compensation for Monitors

The Monitor's proposed rates can only be evaluated with reference to the compensation awarded to other monitors, not to attorneys' fees under § 1988 or special masters' fees under Fed. R. Civ. Pr. 53(g). By this measure, our proposed rates are well within acceptable norms, if not conservative.[1]

Monitors appointed by the Department of Justice as part of deferred prosecution and non-prosecution agreements earn anywhere from $290 to $895 per hour. *See* Eileen R. Larence, Testimony Before the Subcommittee on Commercial and Administrative Law, Committee on the Judiciary, House of Representatives, Nov. 19, 2009. Other sources place the high end of the spectrum at $800 to $1000 per hour. See Sue Reisinger, "Someone to Watch Over You," Law.com (Oct. 1, 2007).[2] In either case, our proposed rates fall near the median and squarely within a reasonable range.

Further, it is commonplace for court-appointed monitors to be compensated at their usual hourly rates. *See, e.g.*, Reisinger, *supra* (citing monitor in Eastern District securities fraud case, a name partner in a major Manhattan firm, as stating that his hourly rates as a monitor are the same as those he charges "any client at his firm"); *U.S. Commodity Futures Trading Com'n v. BP Products North America Inc.*, No. 06-C-350, 2007 WL 3407430, at * 19 (N.D. Ill. Oct. 25, 2007) (appointing monitor and directing that "The Monitor, and any persons hired by the Monitor" be compensated "in accordance with their respective typical hourly rates."); *Shakman v. Democratic Organization of Cook County*, No. 69-cv-02145, Order Appointing Court Monitor and Counsel (Aug. 5, 2007) (appointing monitor to oversee enforcement of consent judgment regarding city hiring practices, and directing that the monitor and monitor's counsel be compensated "at their customary hourly rate"); *SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937, Final Judgment as to Defendant Bear Stearns, Addendum A at 16 (S.D.N.Y. Oct. 31, 2003) (requiring firms subject to Global Research Analyst Settlement to compensate monitor "and persons engaged to assist" the monitor "at their reasonable and customary rates").

The staffing we envision is also in line with market norms, particularly in light of the scope and difficulty of the monitor's role as set forth in the Draft Remedial Order. For instance, in a monitorship of the police department of the city of Cincinnati – a much smaller metropolitan area than that covered by Judge Garaufis's order – a staff of ten was

---

[1] Although the discussion below is based on the rates and staffing levels proposed in this letter, we are confident that the rates we originally proposed would withstand judicial scrutiny.

[2] Available at http://www.law.com/law/LawArticleFriendly.jsp?id=900005491069.

COHEN & GRESSER LLP

Georgia Pestana, Esq.
November 23, 2011
Page 4

needed to complete the work mandated by the federal district judge. *See* Saul Green, City of Cincinnati Independent Monitor's First Quarterly Report (April 1, 2003).[3]

The rates and staffing levels we propose are thus well within the average range for monitors in comparable circumstances, and far below the top-end rates.

**III.     Decisions under § 1988 Do Not Apply, and In Any Event Fully Support the Proposed Rates.**

As noted, virtually all of the decisions you brought to our attention concern awards of attorneys' fees to prevailing parties under 42 U.S.C. § 1988(b). That statute allows awards of "reasonable attorneys' fees" to prevailing parties in civil rights cases. It does not govern compensation of court monitors, and we have found no authority to the contrary.

Prompted by your email, we have nevertheless reviewed the prevailing law in the Eastern District and Second Circuit regarding the appropriate rate to be charged under § 1988. Even if that case law were applicable, which it is not, our proposed rates would be justified.

A.    *"Reasonable" Rates Are Those Paid in the Relevant Market for Similar Services*

A court's determination of attorneys' fees to be awarded under § 1988 begins with setting a reasonable hourly rate. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989), *citing Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984) (additional citations omitted). That rate is "calculated on the basis of rates and practices prevailing in the relevant market, *i.e.*, 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* (citation omitted); *see also Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 184 n.2 (2d Cir. 2008) (rates must comport with those prevailing in the community "for *similar services*") (emphasis in *Arbor Hill*; internal quotation marks and citation omitted).

In unusual cases – a description that surely applies here, particularly in comparison to the § 1988 cases that set the norm for this standard – a court may adjust this baseline hourly rate by looking to various case-specific factors. *See Perdue v. Kenny A. ex rel. Winn*, __ U.S. __, 130 S. Ct. 1662, 1673 (2010). These factors may include "the nature of representation and type of work involved." Arbor Hill, 522 F.3d at 184 n.2.

---

[3] Available at http://www.elearinghouse.net/ehDocs/publie/PN-OH-0005-0015.pdf

COHEN & GRESSER LLP

Georgia Pestana, Esq.
November 23, 2011
Page 5

     B. *The Proposed Rates Are Reasonable in the "Relevant Market"*

     The reasonableness of an hourly rate under § 1988 is judged by rates "prevailing in the relevant market." *Jenkins*, 491 U.S. at 275. Although the "relevant market" is typically defined as the district in which the action is litigated, out-of-district rates may be awarded if "retention of an out-of-district attorney was reasonable under the circumstances." *Arbor Hill*, 522 F.3d at 191. To overcome the presumption against out-of-district rates, "a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009).

     The "relevant market" in this case cannot be limited to the Eastern District. The relief to be overseen by the monitor, and the work to be performed, will be uniquely citywide in scope and importance. The Fire Department of New York obviously spans all boroughs, as do the recruiting, testing, and hiring activities to be monitored under the Remedial Order. The Monitor's mandate and labors will thus not be confined to the Eastern District. Under these unique circumstances, a "reasonable, paying client" would be fully justified in looking outside the Eastern District for the appropriate counsel to act as Monitor. *Id.*

     Judge Garaufis conducted a search for attorneys best suited to the demands of the monitorship, drawing from a pool of able and willing candidates. The Court presumably concluded that broadening the roster of potential candidates to include attorneys and firms based in Manhattan was necessary given the breadth and difficulty of the assignment.

     Against this backdrop, the rates we propose are entirely reasonable. Courts in New York frequently approve fee applications from Manhattan-based attorneys — including attorneys at large commercial firms — charging their normal hourly rates. *See, e.g., Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 58 (S.D.N.Y. 2000) (finding counsel's customary hourly rates of $520.69 for partners and $278.50 for associates in an intellectual property action in 2000 to be "commensurate with the rates prevailing in the community" for that type of case) (citation and internal quotation marks omitted); *Lowrance v. Coughlin*, 88 Civ. 3343 (LBS), 1995 WL 103277, at *1 (S.D.N.Y. Mar. 8, 1995) (holding that standard rates charged by Paul Weiss partners and associates were "in keeping with the prevailing market rates and billing practices for New York City firms of comparable size and expertise"); *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 421-22 (S.D.N.Y. 1999) (approving "Chadbourne & Parke-level rates," and collecting cases awarding hourly rates at customary levels by Paul Weiss and Cravath);

COHEN & GRESSER LLP

Georgia Pestana, Esq.
November 23, 2011
Page 6

*New York State Natl. Org. for Women v. Terry*, 737 F. Supp. 1350, 1361 (S.D.N.Y. 1990), *rev 'd on other grounds*, 41 F.3d 794 (1994) (holding that the relevant "community for similar services" in S.D.N.Y. is "major New York City law firms with litigation practices"); *see also T.S. Haulers, Inc. v. Cardinale*, No. 09 CV 0451 (SJF) (ARL), 2011 WL 344759, at *3 (E.D.N.Y. Jan. 31, 2011) (stating that "[a]n attorney's customary rate is a reasonable starting point in determining an hourly rate") (internal citations omitted).

These decisions all reflect rates charged in 2000 or earlier. Under § 1988, however, courts apply "current rather than historic hourly rates." *Reiter v. MTA New York City Transit Authority*, 457 F.3d 224, 232 (2d Cir. 2006) (internal citations omitted). Reasonable rates in today's market would clearly be materially higher than those cited in *Yurman* and other decisions.

The "relevant market" here can be identified with much greater precision than in cases in which the market consists of commercial practitioners or experienced civil rights litigators. We presume that the pool of candidates from which the Court selected the Monitor included attorneys from firms based in Manhattan, and that many or most of these firms are larger than Cohen & Gresser. The hourly rates charged by attorneys at those firms typically exceed our standard rates by 25 percent or more. That spread, combined with the discount we have offered, underscores the reasonableness of our proposed rates.

In short, the "relevant market" here cannot be defined by the borders of the judicial district where the case was litigated. The issue here is not party representation in civil litigation (although expertise in Title VII issues is necessary and present on our team) but detailed post-judgment oversight of a complex and far reaching remedial scheme — a scheme that, again, will have an impact on FDNY activities throughout the City. Prospective court monitors' hourly rates therefore should not be established by the same standards as litigation counsel.

C. *The Proposed Rates Are in Line with Fees for "Similar Services"*

In determining the proper baseline for attorneys' rates under § 1988, courts look not only to the "relevant market" but also to rates earned for "similar services." *Jenkins*, 491 U.S. at 285.

The services to be performed by the Monitor are not "similar" to those performed by the litigation counsel whose fees are determined under § 1988. Indeed, the Monitor, who is charged with ensuring enforcement of the Court's remedial scheme, will perform

**COHEN & GRESSER LLP**

Georgia Pestana, Esq.
November 23, 2011
Page 7

tasks that by definition are not necessarily performed by the attorneys for parties in civil rights litigation. Among other things, the monitor will:

- Oversee the design and administration of a survey relating to firefighter candidate recruitment;

- Oversee the appointment of an independent recruitment consultant and development of a corresponding research plan, and review and approval of the consultant's final report;

- Oversee the creation and administration of an Attrition Mitigation Plan and reassessment of entry-level firefighter recruitment policies and procedures;

- Monitor the City's "Top-to-Bottom Assessment";

- Participate in post-examination candidate screening and the design of programs for such screening; and

- Approve an EEO consultant and review and approve the consultant's final report.

These tasks, and the skills and commitment of resources required to accomplish them, are different in kind from those required in the litigation context. It is therefore not appropriate to determine the base hourly rate for this work by looking to compensation earned by counsel in commercial practice or civil rights litigation. The only proper basis for comparison is to rates earned by monitors in matters of similar complexity and scope. *Cf. Trout v. Ball*, 705 F. Supp. 705, 709 (D.D.C. 1989) (holding that Special Master's compensation should not be based on "fees paid to attorneys in private litigation, but upon the fees paid to special masters for this kind of work").

Rates earned by monitors must be determined on a completely different scale than those of most civil rights attorneys in the Eastern District. The appropriate comparators are other monitors, who, as discussed above, are frequently partners in substantial New York City law firms and who generally receive their customary rates when acting as monitors. The rates we have proposed fall in the mid-range of those received by such monitors. *See supra* page 2.

When we spoke, you expressed concern that endorsing the hourly rates we proposed would set a precedent for fees in § 1988 cases. We respectfully suggest that such a concern is unfounded. For the reasons just discussed, a court monitor is unlike an attorney seeking fees under § 1988. The Monitor in this case in particular has been

COHEN & GRESSER LLP

Georgia Pestana, Esq.
November 23, 2011
Page 8

assigned far-reaching and long-lasting duties unique to that position. No plausible argument can be made that our hourly rates should form the basis of an award of attorneys' fees award under § 1988.

## IV. Decisions Setting Fees for Special Masters Do Not Apply, and In Any Event Fully Support the Proposed Rates

Your email included citations to two decisions regarding fees for special masters. Neither is applicable here. The Monitor is not a special master, and its compensation cannot be governed by the principles that apply to special masters' fees. *See generally Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003) (noting distinction between special master and monitors), *overruled on other grounds, Coiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009). In any event, even if decisions from the special master context were relevant, which they are not, they are consistent with the hourly rates we have proposed.

To begin with, neither of the decisions you brought to our attention bear on the appropriate rate for the Monitor in this case. In *Hart v. Community School Bd. of Brooklyn, NY*, 383 F. Supp. 699, 767 (E.D.N.Y. 1974), Judge Weinstein appointed a law professor as special master in connection with remedial desegregation efforts. The court suggested, based on "[p]reliminary discussions with counsel," that "a reasonable fee would be based upon about half that obtainable by private attorneys in commercial matters." The "preliminary views" of counsel regarding the appropriate fee for an academic have no bearing on the hourly rates to be paid a court-appointed monitor more than 35 years later. In any event, we have found no decisions within the Second Circuit that strictly apply this formulation.

You also cited *Jackson v. Nassau County Bd. of Sup 'rs*, 157 F.R.D. 612 (S.D.N.Y. 1994), in which the court applied the "lodestar" method in assessing reasonable fees for special master. The "lodestar" method is the same one courts apply in setting attorneys' fees under § 1988, and it begins with the assessment of "rates prevailing in the community for similar services." *Id.* at 618 (quoting Jenkins, 491 U.S.,/ at 286). As such, it is both inapplicable to compensation for court monitors and fully supportive of our proposed rates, for the reasons discussed above.

Even if cases relating to compensation of special masters were applied here, they do not support the reductions in our rate schedule you have proposed. Compensation of a special master falls within the discretion of the district court. *Newton v. Consolidated Gas Co. of New York*, 259 U.S. 101, 105 (1922); *see also Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993) ("The legal standards governing special master compensation leave much to the district court's discretion").

**COHEN & GRESSER LLP**

Georgia Pestana, Esq.
November 23, 2011
Page 9

Courts routinely award compensation to special masters at their customary rates, typically at levels that, if adjusted for generally higher rates in the Southern and Eastern Districts, would compete with if not exceed our proposed rates. *See, e.g., PIC Group, Inc. v. LandCoast Insulation, Inc.*, No. 1:09-cv-662-KS-MTP, 2011 WL 1342951, at *2 (S.D. Miss. Mar. 4, 2011) (appointing special master for electronic discovery issues and setting fees at "customary rate" of $500/hour); *Thabault v. Chait*, No. 85-2441 (HAA), 2009 WL 69332, at *15 (D.N.J. Jan. 7, 2009) (granting special master compensation at his normal hourly rate); *In re World Trade Center Disaster Site*, No. 21 MC 100, 2006 WL 3627760, at *2 (S.D.N.Y. Dec. 12, 2006) (appointing academics to assist with adjudication of 9/11 victims' claims and setting compensation at $500/hour); *Calloway v. Marvel Entertainment Group*, 111 F.R.D. 637, 651-52 (S.D.N.Y. 1986) (compensating special master "on an hourly basis at his customary rates"), *aff'd in part and vacated in part on other grounds*, 854 F.2d 1452 (2d Cir. 1988).

Far from justifying the excessive discount on our hourly rates you have proposed, decisions from the special master context (even assuming, *arguendo,* that they are applicable) support our proposal instead.

## V.     The Proposed Staffing Is Appropriate

As discussed, our current team includes several partners and associates. Going forward, we anticipate using a staff of six attorneys and two paralegals in the early stages of the monitorship. Those figures may change over time – either upward or downward – as the intensity and scope of the work varies. In light of the extensive duties the intends to assign to the monitor, we believe a staff of the size we anticipate is essential. Just as important is that we have the flexibility to adjust staffing as circumstances require.

We understand and share the City's desire to have us avoid wasteful expenditures of time and money. But *ex ante* limits on the number of lawyers and other staff to be deployed by the Monitor would be unwise. The appropriate size for the Monitor's staff cannot be judged in the abstract. We may or may not require a team of any given size, and it is premature to debate the proper number at this stage.

Further, limiting the number of attorneys and others who may assist the Monitor runs the serious risk of hampering our ability to perform our responsibilities effectively and efficiently. deploy resources as necessary. We have been directed to perform a very substantial amount and variety of work, much of it on fixed deadlines. Complex tasks often take longer if they are understaffed and thus less efficient. In fact, all parties share an interest in ensuring the Monitor works as efficiently as possible. That goal is better achieved with an appropriately-sized team than with an artificially small one.

**COHEN & GRESSER LLP**

Georgia Pestana, Esq.
November 23, 2011
Page 10

<u>Conclusion</u>

We submit that the proposal above is fair and reasonable. Critically, our proposed fees and staffing are entirely consistent with the prevailing standards for monitors in similar matters. The decisions you have brought to our attention deal primarily with awards of attorneys' fees under § 1988 and as such are inapplicable. Even if those cases were applicable, moreover, our rates would be reasonable in light of the rates prevailing in the relevant market for similar services.

We are available at your convenience to discuss this matter.

Sincerely,

Mark S. Cohen