# Exhibit

# C



THE CITY OF NEW YORK
## LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007

MICHAEL A. CARDOZO
*Corporation Counsel*

GEORGIA PESTANA
*Chief, Labor and Employment Law*
*(212) 788-0862*

November 28, 2011

Mark S. Cohen
Cohen & Gresser, LLP
800 Third Avenue
New York, NY 10022

> Re: <u>USA v. City</u>, Civil Action No.: 07 CV 2067 (NGG)(RLM)
> Law Dept. No.: 2007-017441

Dear Mark:

     Thank you for your letter setting forth the reasoning to support your requested hourly rates. I appreciate your willingness to reduce your firm's customary rates by approximately 15%, but hope that you can reduce your rates further. I write to alert you to an apparent misunderstanding regarding your appointment and scope of duties, as well as to refer you to an interesting law journal article which may provide a methodology we can use.

     Your November 23, 2011 letter asserts, among other things, that Rule 53(g) and cases concerning fees awarded to Special Masters are inapplicable because you have been appointed as a "Court Monitor". Although the Court's October 5, 2011 Memorandum and Order and Proposed Remedial Order refer to a "Court Monitor," the appointment is made pursuant to the Court's equitable power and Rule 53 which governs the appointment of "Special Masters." See Dk. # 743, p. 1 and 29; Dkt #743-1, ¶¶ 55. Further, the Proposed Remedial Order references Rule 53 in discussing the duties of the Monitor, objections to orders of the Monitor, and other procedural matters. See Dkt # 743-1 ¶¶ 56(e), 59, 60 and 72. Consequently, cases and other analysis discussing fees to be paid to Special Masters appointed under Rule 53 are relevant.

     Unfortunately, as we have both discovered, there is not a wealth of guidance about the rates to be paid to Special Masters or Court Monitors. However, rates paid to monitors appointed by the Department of Justice as part of deferred prosecution and non-prosecution agreements and rates paid to monitors supervising complex discovery in securities cases are inapt because the roles of those monitors appear to be quite different from that of a Special

Master or Court Monitor who is delegated authority normally exercised by the Court to ensure a governmental entity's compliance with a court order. Unlike cases in which the monitor is chosen because of expertise in an area the court lacks, the monitor in this case has been delegated by the Court because it does not have the time to perform the work itself. The Court Monitor should not be earning four or five times the district judge's salary to perform this work. *See e.g. Newton v. Consolidated Gas Co.*, 259 U.S. 101 (1922).

The duties of the Court Monitor in this case, as set forth in the Proposed Remedial Order, are monitoring the City's compliance with steps the Court will order the City to take and approving the City's selection of certain consultants the Court intends to order the City to hire.[1] Although knowledge of and experience in employment discrimination law will be valuable, the Court Monitor's role is largely to ensure that the City is responsibly undertaking the operational reviews the Court intends to order and to review reports and make recommendations to the Court with respect to the City's proposed response to the results of those reviews. These duties are significantly different from that of monitors in securities fraud cases or in deferred or non-prosecution agreements. I do not know enough about the role of the monitor in *Shackman v. Democratic Organization of Cook County* to assess why the monitor in that case was to be compensated at his customary hourly rate.

The City maintains that it is appropriate to look to the rates set for attorneys' fee awards under 42 U.S.C. §1988 for guidance because §1988 requires that fee awards be "reasonable" – a standard which should result in a rate that meets the standard articulated by the Supreme Court in *Newton* -- "liberal, but not exorbitant." As you recognized, under *Arbor Hill Concerned Citizens Neighborhood Assn v. County of Albany*, 522 F.3d 182, 191 (2d Cir. 2008), the reasonable rate is arrived at by reviewing the rates in the district where the case was brought. The fact that the FDNY obviously has a presence in all five boroughs is irrelevant. Management decisions of the kind at issue in this case are made at FDNY headquarters in Brooklyn. Moreover, the fact that the Court considered Manhattan firms and ultimately selected one, does not require that Manhattan law firm rates be applied. Many attorneys and firms who regularly litigate in the Eastern District of New York are based in Manhattan. Nevertheless, Eastern Courts repeatedly recognize that the Second Circuit requires that attorneys' hourly rates in fee applications should be determined by the rate in the district where the case was litigated. *See e.g. Whitney v. JetBlue Airways Corp.*, 07 CV 1397 (CBA) (CLP), 2009 U.S. Dist. LEXIS 118323, at *15-20; *Gutman v. Klein*, No. 03-CV-1570 (BMC), 2009 U.S. Dist. LEXIS 123057 (E.D.N.Y. Oct. 13, 2009).

---

[1] We are both slightly disadvantaged by not knowing exactly what the Monitor's duties will be because the Court has not yet entered the Remedial Order. Although your letter notes that the Monitor will be responsible for overseeing the design and administration of a survey relating to firefighter recruitment, the parties requested that the Court leave responsibility for supervising the development of the survey to be taken by applicants for the next civil service exam for Firefighter (Exam 2000) to be administered beginning in late February or March, 2012, as well as other aspects of the Proposed Remedial Order relating to Exam 2000 with Special Master Mary Jo White.

Although it is not recent, I found a law journal article, *Calculating Fees of Special Masters*, 37 Hastings L.J. 141 (1985) which provides a useful brief history of the compensation of Special Masters and discusses three approaches to the setting of Special Master fees that emerge from a study of the available cases.[2] Ultimately, the author recommends a modified lodestar approach. Although the term "lodestar" has been disapproved in the Second Circuit since *Arbor Hill*, the methodology for determining a reasonable fee continues to require consideration of the number of hours spent by counsel and other personnel that are deemed reasonably necessary and the setting of reasonable hourly rates for such counsel and personnel. I ask you to consider the approach recommended at the conclusion of the Hastings Law Journal article.

The first approach discussed in the article is grounded on *Newton v. Consolidated Gas Co.*, 259 U.S. 101 (1922). While recognizing that equity courts had broad discretion, the Supreme Court ruled that such discretion "did not 'extend to arbitrary and unreasonable action" and that the compensation of Special Masters should be "liberal, but not exorbitant." *Id* at 104. While this standard has sometimes resulted in compensation close to what masters receive in their private practice, courts have generally looked to the rates charged by firms in the area. 37 Hastings L.J. 161-163. The author of the law journal article ultimately concludes that *Newton's* admonition to provide for compensation that is "liberal, but not exorbitant" is too vague to be used as a standard and its reference to the salaries of judicial and elected officials unworkable. *Id* at 180-181.

The second approach is based on Judge Weinstein's decision in *Hart v. Community School Board*, 383 F.Supp. 699, 768 (E.D.N.Y. 1974) *aff'd*, 512 F.2d 37 (2d Cir. 1975) which I noted in my email to you and on a series of Sixth Circuit decisions in *Reed v. Rhodes*. In *Reed*, the Sixth Circuit reversed a district court's award of fees to a Special Master that was based on the top rates charged by firms in the area. The Sixth Circuit reviewed the work performed by the Special Master and concluded that gathering information, meeting and reviewing plans submitted by the defendants did not warrant such high rates and that the more complex work was performed by a public accounting firm and two experts the Special Master had retained. The Sixth Circuit was particularly mindful that the Special Master's fees in this desegregation case would be paid out with public funds. Ultimately, the Sixth Circuit cited approvingly to *Hart* and reduced the Special Master's rate to half the highest rate in the area. *Reed v. Rhodes*, 607 F. 2d 737, 746-748 (6th Cir. 1979). In a subsequent fee decision covering a later period of work, the district court in *Reed* applied the lodestar approach used in attorneys' fee awards. *Reed v. Rhodes*, 516 F.Supp. 561 (N.D. Ohio 1981). The Sixth Circuit again reversed finding the approach inappropriate because attorneys in civil rights actions receive higher fees in recognition of the contingent nature of their engagement. While attorneys bringing civil rights cases will only be paid if they prevail in the action, Special Masters do not face a similar risk. *Reed v. Rhodes*, 691 F.2d 266 (6th Cir. 1982). As it had in its earlier

---

[2] A fourth manner of setting Special Master fees, "unbounded discretion," is discussed briefly and discarded as inappropriate, particularly in institutional reform litigation. 37 Hastings L.J. at 179.

decision, the Sixth Circuit cited approvingly to the *Hart* decision. *Id.* at 267. However, the article rejects the "half the commercial rate" approach to setting rates for law firms on the ground that the Special Master in *Hart* was a law professor who was supported by a university and did not have the overhead expenses of a law firm. 37 Hastings L.J. at 183-184.

Although the Sixth Circuit rejected the lodestar approach in *Reed*, the article concludes that, with some modification, using the methodology applicable to attorneys' fee awards is most appropriate. For Special Masters who perform a wide variety of tasks, the article advocates dividing tasks into different categories of services and setting a rate for each category based on the reasonable rate in the area for legal work requiring similar skill, knowledge and experience. *Id.* at 184. The article suggests that a special master's award may be adjusted upward if the master demonstrates a loss of business due to conflicts of interest presented by his appointment as a master or he has to close his practice due to the obligations of his work as a special master. These factors should not apply to your appointment as your firm's practice appears to be almost entirely in areas in which the City is not typically involved and the Court Monitor's role is largely one of supervision of the City's compliance with the Court's orders and should rarely, if ever, require a full-time commitment by the Monitor. Upward adjustments are also warranted if there are frequent tight deadlines or inconvenient hours, such as weekends or evenings, are required. While there might be time pressures when the Special Master is required to approve a step in the hiring process, as a general matter, the Proposed Remedial Order allows the Special Master 30 days to respond to reports and other submissions by the City and 90 days to file regular reports with the court. Consequently, frequent tight deadlines are unlikely. Weekend and evening hours are also unlikely to be required because the management of the FDNY occurs during regular business hours.

Another modification to a special master's fee may be warranted by promptness or delay in payment. 37 Hastings L.J. at 190-191. The Court's Proposed Remedial Order directed the Court Monitor to submit bills every 60 days and the City to make payment to the Court Monitor within 20 days of his approval of any amount. In light of the required swift payment, your regular rates should be adjusted downward.

The article also cites the prestige or undesirability of the position as a possible reason to increase or decrease a special master's payment. There was no shortage of attorneys interested in serving as the Court Monitor in this case. As you noted in your letter, Judge Garaufis considered a pool of able and willing candidates for the appointment. The desirability and prestige of the appointment, which the Court intends to continue for at least 10 years, warrants a reduction in fees. *Id.* at 191-192.

Finally, the article contends that private attorneys have a professional obligation to perform work pro bono or at reduced rates "to assist the court in the administration of justice." *Id.* at 192. The fact that the Court Monitor will be paid with public funds also militates towards a reduction in the Court Monitor's rate.

I am interested in discussing whether dividing the work of the Court Monitor into different categories and applying different rates to the different categories is an option you are willing to explore. As part of that discussion, I would also like to explore staffing. When I suggested that the team be comprised of two partners and two associates instead of four partners

4

and two associates, I was not intending to set an arbitrary limit on the size of the team but was, as you recognize, concerned about wasteful expenditures of time and money.  Having recently worked with a large firm on a case, I was struck by the number of partners and associates who seemed to periodically rotate onto the case to perform a particular task or research and disappear for several months before reappearing to perform another task.  Constantly having to bring attorneys up to speed was not only inefficient and needlessly expensive, it also may have weakened our defense in that no one had a complete and deep knowledge of the litigation strategy, history and discovery to date.  Monthly bills reflecting countless hours of team meetings, consultations among attorneys, and multiple levels of review for every document were exasperating.  Further, having a large team can also make it difficult to know who to contact about any given issue.  I am not familiar with your firm's usual staffing and am interested in how the Monitor's work would be divided among four partners and two associates so as to avoid inefficiency and ensure continuity, as well as provide clear points of contact for the parties.

I hope we are able to reach agreement and look forward to discussing the rates and staffing with you later today.

Very truly yours,

Georgia Pestana