**COHEN & GRESSER** LLP

800 Third Avenue
New York, New York 10022
212 957 7600 phone
212 957 4514 fax
www.cohengresser.com

Mark S. Cohen
212 957 7601
mcohen@cohengresser.com

February 17, 2012

<u>VIA ECF</u>

Hon. Nicholas G. Garaufis
United States District Judge
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:   *United States v. City of New York, No. 07-CV-2067(NGG)(RLM)*

Dear Judge Garaufis:

We write in response to the letter of February 15, 2012 from Defendant City of New York (the "City") objecting to the Court's approval of the Initial Work Plan and Budget (the "Work Plan") for the Court Monitor's expert, Manitou, Inc. ("Manitou").  The role of Manitou as set forth in the Work Plan is entirely consistent with the Court's Remedial Order, and there is no need for the Court to reconsider or vacate its approval of that plan.

I.      The City's Letter Rests on a Mistaken Belief Regarding Manitou's Role

The City's letter asks the Court to vacate its approval of portions of the Work Plan that the City believes are duplicative of tasks to be performed by the City and its experts.  The City's concern is misplaced.

A.   The Work Plan, Including Tasks 3-5,  is Entirely Consistent with and Necessary to the Monitor's Role as Defined in the Remedial Order

The City objects to Manitou performing a baseline evaluation of the FDNY Recruitment and Hiring Process, reviewing the NYPD's practices with regard to diversity, and researching best practices at large metropolitan public safety agencies.  (Tasks 3-5 of the Work Plan).  However, under the Remedial Order, the Monitor has a number of duties that require the Monitor to have a thorough understanding of these issues, and Manitou's assistance will be invaluable in

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
February 17, 2012
Page 2

developing this understanding.  To discharge the Monitor's responsibilities under the Remedial Order, the Monitor must (among other things):

- work cooperatively with the City's consultants to develop plans for the consultants' research, and approve any final research plan (Remedial Order and Partial Judgment, Permanent Injunction, and Order Appointing Court Monitor dated December 8, 2011 (Docket # 765) ¶¶ 27, 48);

- evaluate the final reports of the City's recruitment and EEO consultants and the City's response to those reports, and recommend any additional remedial steps the Monitor deems necessary (*id.* ¶¶ 29-30, 32, 50-51);

- review and approve the City's "comprehensive, top-to-bottom assessment" of its firefighter selection process and alternative processes recommended by the City, and certify that the assessment was conducted in good faith and with reasonable diligence (*id.* ¶¶ 33-34); and

- "[p]roactively investigat[e] any matters related to the Court Monitor's duties." *Id.* ¶ 58(d).

The Monitor is specifically authorized in the Remedial Order to retain expert consultants to help carry out these tasks. (*Id.* ¶ 71).  The Remedial Order explicitly requires the Monitor to make affirmative recommendations regarding alternate choices that the City might not have considered, or with which the City may even disagree, and expressly contemplates that the Monitor may need to seek guidance from its own consultants to make such suggestions. *E.g.,* ¶ 32 ("[T]he Court Monitor (in consultation with consultants as needed) may also propose alternative selection processes for consideration."); ¶ 36 (permitting the Monitor to file a separate response to the City's report).

Each of the tasks set forth above – developing and approving research plans, evaluating final reports, reviewing City proposals, and recommending alternatives – requires full understanding of the issues involved.  To provide input to a research plan and approve the final plan, the Monitor needs guidance from its own experts, and the Monitor's experts need an understanding of the relevant context and the range of available alternatives.  Likewise, to evaluate reports by the City's consultants, the Monitor needs the benefit of its own expert's perspective, and the Monitor's expert needs to be able to critically assess the reports based on an independent analysis, not merely sign off.  By way of example, once the City has completed its top to bottom assessment of firefighter selection processes, one natural source for any "alternative selection processes" the Monitor is authorized to propose under the Remedial Order

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
February 17, 2012
Page 3

would be the result of the Monitor's own assessment of best practices in other jurisdictions.  The City and the Monitor will not necessarily draw the same conclusions from the same evidence, assign equal weight to various pros and cons of an approach, or even structure their inquiry along the same lines.

B.  The City Stands to Benefit from Coordination of Experts

Rather than duplicating tasks assigned to the City's experts, the Work Plan may well streamline the collective efforts of the parties' consultants.  It is the Monitor's intention that (as has been the case for the parties' experts with respect to matters under the supervision of the Special Master), consultants retained by the Monitor will work cooperatively with the independent consultants appointed by the City to develop and carry out a coordinated plan where possible and appropriate.

The Monitor anticipates that Manitou's perspective will be especially helpful in this regard because Manitou's staff is familiar with the key issues that underlie the Monitor's work as laid out in the Remedial Order, including the cultural and logistical factors that must be addressed in any effective remediation.  Importantly, both of Manitou's principals are experienced firefighters (one a sitting Chief).  As such, they have a compelling foundational understanding from which to approach an analysis of fire department and New York Police Department practices.  Likewise, they possess an existing network of contacts and industry knowledge to bring to bear on the project of reaching out to other Fire Departments.  Indeed, they are co-editors of a treatise titled Managing Fire and Emergency Services, have consulted to or worked for fire departments including Alexandria, Boston, Phoenix, White Plains, and others, and serve on task forces with sitting fire safety personnel from other jurisdictions.

The Monitor's goal, as always, is to carry out the Court's Remedial Order as thoroughly and cost effectively as possible.  The Work Plan will advance that goal, but only if the City and its expert consultants take full advantage of the opportunities for shared work and other efficiencies.

II.     The City's Additional Concerns Regarding Tasks 9 and 10 Are Unwarranted

A.  Task 9

Task 9 of the Initial Work Plan contemplates review and input by Manitou on "recruitment campaigns and other FDNY messaging around diversity and inclusion."  The City asserts that this work is premature because the recruitment campaign for Exam 2000 is over and no additional recruitment campaigns will begin in the near future.

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
February 17, 2012
Page 4

The City's argument misses the mark for several reasons. First, recruitment is an ongoing process. Informal friends and family networks do not stop and start abruptly in anticipation of specific examination cycles, and neither should formal efforts intended to extend the benefits of similar encouragement more fairly across a broader range of populations. The City itself recognizes the importance of systematically enticing and attracting talent, *e.g.*, at the Fire Department High School. Cultivating deep commitment to a firefighting career, and the patience to wait to get the job, is unlikely to be achieved by lengthy lulls interrupted by spurts of recruitment activity in the twelve months leading up to an exam.

Second, "other FDNY messaging around diversity and inclusion" is presumably ongoing, particularly with respect to attrition mitigation. Manitou is qualified to provide valuable insight on any FDNY messaging related to diversity and inclusion, and the Work Plan allows the Monitor to draw on that expertise as needed.

Third, the Monitor, assisted by Manitou, also has a role to perform in between exams, in terms of assessing the effectiveness of prior recruitment campaigns after the fact, based on their actual results.

B.  Task 10

Task 10 contemplates that Manitou's staff may provide assistance with PRB meetings. Manitou's assistance in this regard is appropriate under paragraphs 6, 43, and 71 of the Remedial Order, though as the City notes no budget has yet been submitted for that task.

Conclusion

For the foregoing reasons, the Monitor respectfully recommends that this Court deny the City's request to vacate and clarify portions of its Order dated February 15, 2012 approving the Initial Work Plan and Budget of Manitou, Inc.

Respectfully submitted,

/s/

Mark S. Cohen

cc:  All Counsel