UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

UNITED STATES AMERICA,                                       :

                                                             :

              Plaintiff,                                     :

                                                             :

     -and-                                                  :

                                                             :

THE VULCAN SOCIETY, INC., *for itself and on*                :

*behalf of its members*, JAMEL NICHOLSON, and                :

RUSEBELL WILSON, *individually and on behalf of a*:

*subclass of all other victims similarly situated seeking* :

*classwide injunctive relief,*                               :      **07-cv-2067 (NGG) (RLM)**

                                                             :

ROGER GREGG, MARCUS HAYWOOD, and                             :

KEVIN WALKER, *individually and on behalf of a*              :

*subclass of all other non-hire victims similarly*           :

*situated;* and                                              :

                                                             :

CANDIDO NUÑEZ and KEVIN SIMPKINS,                            :

*individually and on behalf of a subclass of all other*      :

*delayed-hire victims similarly situated,*                   :

                                                             :

             Plaintiff-Intervenors,                         :

                                                             :

     -against-                                              :

                                                             :

THE CITY OF NEW YORK,                                        :

                                                             :

                      Defendant.           :

----------------------------------------------------------------x

## <u>MONITOR'S REPORT TO THE COURT</u>

Pursuant to paragraph 59 of this Court's Remedial Order and Partial Judgment, Permanent Injunction, and Order Appointing Court Monitor dated December 8, 2011 (the "Remedial Order") (Docket # 765), Mark S. Cohen, in his capacity as Court Monitor (the "Monitor") in the above-captioned matter, respectfully submits the Monitor's first 90-day report concerning the status of the parties' compliance with the Remedial Order.

## I.   <u>Overview</u>

Paragraph 59 of the Remedial Order requires the Monitor to "provide periodic reports to the court and to the Parties concerning the status of the Parties' compliance with this Order and other orders of the court or the Court Monitor, including their progress, any barriers to compliance, and potential areas of noncompliance." Remedial Order ¶ 59. The Remedial Order further provides that "[t]he Court Monitor shall file a report with the court under this provision at least once every 90 days." *Id.* Accordingly, this Report sets forth an update regarding the parties' compliance with the terms of the Remedial Order, and provides the Monitor's observations thus far on the progress of the parties in fulfilling the goals of the Remedial Order.

The Monitor has been holding conference calls with the parties on a weekly basis, during which the Monitor has reviewed upcoming deadlines with the parties, discussed ongoing tasks required to be performed by the City pursuant to the Remedial Order, and addressed procedural and substantive issues that are raised by the parties. The Monitor has found these weekly calls to be productive in ensuring compliance with specific tasks and deadlines set forth in the Remedial Order.

The Monitor has also met separately with both FDNY and Vulcan Society officials to gain a better understanding of the positions of the respective parties and their thoughts on addressing the objectives of the Remedial Order.

The sections below summarize the steps taken by the parties and the Monitor since the date of the Remedial Order, including the retention of consultants for the Monitor and City, Firefighter Test Development, Firefighter Applicant Recruitment, the City's Attrition Mitigation Plan, EEO tasks, and the document retention plan for the City.  This report also notes certain issues that have emerged as needing further analysis.

## II.    **Monitor's Retention of Consultants**

Paragraph 71 of the Remedial Order authorizes the Monitor to "hire staff or expert consultants to assist the Monitor in performing his or her duties."  Remedial Order ¶ 71.  On January 10, 2012, the Monitor submitted the Monitor's Notice of Proposed Consultant Engagement (Docket # 791) notifying the Court and the parties of his engagement of Manitou, Inc. ("Manitou") to assist the Monitor with his responsibilities under the Remedial Order, including the duties set forth in paragraphs 16, 25-27, 30-33, 36, 41-44, 46-48, and 51 thereof, and certain other tasks that the Monitor has been required to perform in the course of his engagement.

### A.    Manitou

As described in the notice of engagement, Manitou is led by Dr. Charles Jennings and Chief Adam Thiel, both of whom have significant experience in fire department management and personal experience serving as firefighters.  Dr. Jennings was formerly First Deputy Commissioner, Department of Fire Safety and Acting Fire Chief for the City of White Plains. He is also an Associate Professor of public administration and fire science at John Jay College of Criminal Justice, where his course load has included graduate and undergraduate classes covering all aspects of fire department management.  Chief Thiel is currently Fire Chief for the City of Alexandria, Virginia, and helped to establish a diversity policy for all of Virginia's fire

departments.

B.     Coordination with Consultants Retained by the City

To date, Manitou has assisted the Monitor with his review of the City's Attrition Mitigation Plan (as further discussed in Section V of this Report), evaluating the City's selection of its own consultants, developing a research plan for examining the diversity efforts of the FDNY to date, studying diversity efforts of fire departments in other jurisdictions, and investigating additional matters that have arisen concerning the FDNY.  The Monitor expects that Manitou's efforts during the next twelve months will be focused largely on these research efforts, including coordinating its research efforts with the City's consultants as part of the top-to-bottom assessment to be performed by the City and its consultants pursuant to paragraph 32 of the Remedial Order.

## III.    Firefighter Test Development and Administration

The Monitor understands that the City and the parties have been working with Special Master Mary Jo White in the development of Exam 2000, and that exam administration will begin on March 15, 2012, and continue through late April 2012.   As much of the test development and administration that has occurred thus far remains within the purview of the Special Master (Remedial Order ¶ 7), the Monitor has had limited involvement in the development and administration of the upcoming entry-level firefighter examination.   The Monitor has remained generally informed about the Special Master's work through party updates and communications with the Special Master.  As set forth in Section IV(C) *infra,* the Monitor has had substantial involvement in the parties' applicant outreach efforts with regard to registering for and planning to take the examination.   Going forward, the Monitor expects to receive, pursuant to paragraph 15 of the Remedial Order, advance notice and information from

the City regarding any step in any process for the selection of entry level firefighters, except with regard to the steps specifically enumerated in paragraph 7 of the Remedial Order, over which the Special Master continues to have oversight.

**IV.**    **Firefighter Applicant Recruitment**

    A.    Optional Survey

Paragraph 25 of the Remedial Order provides that "[t]he City of New York, specifically ORD and DCAS, shall, in consultation with the Court Monitor, the United States, and the Injunctive Relief Subclass, design an optional survey which the City of New York shall administer to all individuals who take Exam 2000 at the time they take Exam 2000." Remedial Order ¶ 25. On December 12, 2011, the City circulated a draft of its optional survey to the parties and the Monitor. During the parties' weekly conference call with the Monitor on December 13, 2011, the United States and the Vulcan Society agreed to provide the City with comments and proposed revisions to the draft optional survey. At the Monitor's recommendation, the parties held a conference call on December 22, 2011 with the Monitor to discuss the parties' comments and proposed revisions to the optional survey. The parties reached agreements on the revisions to the optional survey, and the City's test consultant, PSI, has incorporated the finalized optional survey into the end of the computer-based test that the City has been developing under the supervision of the Special Master.

    B.    Retention of Independent Recruitment Consultant

The Remedial Order provides that "[t]he City of New York shall, no later than January 15, 2012, retain an independent recruitment consultant, whose selection shall be subject to the approval of the Court Monitor." Remedial Order ¶ 26. At the City's request, the parties and the Monitor agreed to extend the City's deadline for the retention of an independent recruitment

consultant to February 15, 2012.  The extension of this deadline was approved by the Court on December 16, 2011 (Docket # 781).  On February 9, 2012, the City advised the Monitor that its proposed independent recruitment consultant was Verna Myers, the principal of Verna Myers Consulting Group, LLC.  The Monitor interviewed Ms. Myers on February 13, 2012, and requested references from Ms. Myers, as well as samples of her qualitative and quantitative analyses (which were reviewed by the Monitor's consultant, Manitou).  After reviewing Ms. Myers' references and samples of her work, the Monitor confirmed his approval of the City's selection of Verna Myers as the independent recruitment consultant on February 21, 2012.  In confirming his approval for Ms. Myers, the Monitor noted that Ms. Myers indicated that she does not have quantitative expertise in-house and may need to outsource some quantitative aspects of the engagement to resources that she had used for such services in the past.  The Monitor agrees that Ms. Myers' use of outsourced quantitative resources would be appropriate on an as needed basis.

     C.    <u>Applicant Outreach</u>

As the Court stated in its Findings of Fact dated September 30, 2011 (Docket # 741), "[t]he purposes of the FDNY's remedial firefighter recruitment effort must be to (1) change the perception that the job is available only to white male candidates; (2) increase awareness of the benefits of the job across all communities in New York City; and (3) thereby change the applicant pool to more closely reflect the population of New York City."  Memorandum Findings of Fact at 38.  The parties have engaged in several applicant outreach programs over the past several months, each of which is described in detail below.

1.      Phone Bank Outreach

After the application period for Exam 2000 closed, the FDNY's Office of Recruitment and Diversity ("ORD") established a phone bank that made follow-up calls to all pending applicants whose applications remained incomplete or otherwise required follow-up (*e.g.*, for failure to submit either the required fee or documentation to support a fee waiver request).  The phone bank was staffed with firefighters, including members of the Vulcan Society, the FDNY Hispanic Society, and the United Women Firefighters, as well as 11 additional temporary employees hired by ORD to work as agents on the phones.  An effort was made to have members of the different affinity groups reach out to applicants who had identified themselves as being in that group to personally encourage them to complete their applications and pay the fee or submit documentation supporting entitlement to a fee waiver.

For pending applicants who failed to submit documents and/or information to support their application for fee waivers, the FDNY worked with the City's Human Resources Administration to determine whether any of the pending applicants were entitled to fee waivers based on their participation in public assistance programs.  Based on the Human Resources Administration's records, the City determined that 1,121 pending applicants were eligible for fee waivers.  The City sent e-mails to all of these pending applicants, seeking to confirm their continued interest in taking Exam 2000 and directing them to send a reply e-mail to the Department of Citywide Administrative Services to obtain an Admission Notice for the exam. 191 pending applicants responded that they were still interested, and these applicants have been assigned seats to take Exam 2000.

Additionally, the City searched its database of participants in Workforce 1 programs to determine whether any of the remaining pending applicants were eligible for fee waivers based

upon their participation in that program.  The City was able to determine that 282 pending applicants qualified for a fee waiver based on their participation in a Workforce 1 program. These pending applicants were sent e-mails on February 17, 2012 asking that they confirm their continued interest in taking Exam 2000 and directing them to send a reply e-mail to the Department of Citywide Administrative Services to obtain an Admission Notice.  To date, 35 applicants have replied that they remain interested in taking Exam 2000 and have been sent Admission Notices.  The City has also noted that it will send Admission Notices to any pending applicant who replies to one of the aforementioned e-mails before the first day of test administration, March 15, 2012.

2.      Home Visit Pilot Program

In addition to the phone bank operated by the City, the Vulcan Society requested that the City provide a list of black applicants whose application materials remained incomplete or otherwise required follow-up so that Vulcan Society members could visit the applicants at home on weekends and encourage them to complete the application process.  The parties met and conferred with the Monitor regarding the Vulcan Society's proposal via telephone on December 13 and 15, 2011, and in person on December 16, 2011.

On December 20, 2011, the Monitor issued his recommendation to the Court regarding the Vulcan Society's proposed home visit program.  The Monitor's recommendation (Docket # 782), which was subsequently approved by the Court on December 21, 2011 (Docket # 783), permitted the Vulcan Society to undertake a pilot program of home visits for a period of three weeks (*i.e.,* the weekends of January 7-8, 14-16, and 21-22, 2012).  The Monitor recommended that the Vulcan Society complete reports on each home visit and submit such reports on a weekly basis to the FDNY.  For each home visit, the Vulcan Society designees were to record specific

data from each applicant, including the applicant's name, the name of the visiting Vulcan Society participants, the date and time of the visit, and questions from the City's phone bank script. The Monitor also recommended the Vulcan Society participants note the number of attempts, whether the applicant was home, and whether the applicant was willing to speak to the Vulcan Society designees.

Over the course of three weekends, 25 members of the Vulcan Society, all of whom are active or retired firefighters, participated in the home visit program, knocking on more than 315 doors and reaching 93 applicants. The Vulcan Society reported to the Monitor that its members were pleased to have reached out to the many potential applicants and the community, and that the Vulcan Society participants received a positive response from the homes that they were able to visit.

### 3.    E-mail and Text Messaging Outreach

The FDNY's ORD has developed and is continuing to produce and issue its "Profiles in Bravery," a series of video messages from current firefighters that are designed to inspire and help applicants who will be taking the entry-level firefighter examination. Links to the videos have been included in e-mail blasts sent to the applicant database on a regular basis leading up to the administration of the exam, and the "Profiles in Bravery" are also available on the JoinFDNY Facebook page established by the FDNY.

Additionally, on January 27, 2012, the Vulcan Society requested contact information for all black applicants who have completed their application forms for Exams 2000 and 2500 in order to invite them to tutorial sessions organized by the Vulcan Society. As in past years, members of the Vulcan Society sought to privately fund the costs of a testing expert to develop a tutorial, as a means of aiding black firefighter applicants and an opportunity to begin lasting

mentoring relationships with applicants.  The parties met and conferred with the Monitor on the issue on January 26 and February 2, 2012.  On February 8, 2012, the Monitor recommended (Docket # 806 and # 807) that the City be directed to provide applicant e-mail address information to the Vulcan Society (and to other fraternal organizations that may request such data) solely for the purpose of contacting applicants to introduce the Vulcan Society, inviting applicants to Vulcan Society tutorials, and inviting applicants to supply the Vulcan Society with any other information or data if the applicants wish to do so.  The Monitor recommended that the information provided to the Vulcan Society be limited to e-mail address information, and that the Vulcan Society provide the parties with the text of any proposed e-mail communication with an applicant until such time as the applicant has specifically agreed to follow-up contact.  The Monitor further recommended that the Vulcan Society maintain lists of tutorial attendees and supply such information to the City.  On February 14, 2012, the Court approved the Monitor's recommendation, requiring the City to provide the Vulcan Society with e-mail contact information that it requested, and maintaining the limitations noted in the Monitor's recommendation.  (Docket # 808).  Thereafter, the parties and the Monitor agreed to the Vulcan Society's proposal to send text messages to black applicants as well.

The Vulcan Society has represented that its outreach thus far has consisted of sending four (4) e-mails and two (2) text messages from February 17 through March 6, 2012 to all black applicants who have provided the City with an e-mail address or telephone number.  The e-mails provided information about the Vulcan Society and its tutoring, and the text messages told applicants that they should check their e-mail account for information regarding the Vulcan Society's tutorial programs and encouraged them to attend the City's tutorial as well.  The text of each e-mail and text message was approved by all parties prior to being sent.  The Vulcan

Society has advised the Monitor that of the recipients of the e-mail, 2,431 responded to a survey accompanying the e-mail which asked if the recipient planned to attend a Vulcan Society tutorial session, and 2,403 noted that they did plan to attend. The Vulcan Society has maintained sign-in sheets for each of its tutorial classes, and the Vulcan Society reports that turnout has been higher than expected, necessitating some location changes in order to accommodate a greater number of applicants. At the conclusion of the tutorial classes, the Vulcan Society has agreed to compile the data regarding attendance and share it with the parties and the Monitor.

4.     Tutorial Programs

The FDNY's Office of Recruitment and Diversity ("ORD") has made preparations to administer tutorial sessions to all applicants. Over a seven-week period, the FDNY has advised the Monitor that it will be able to accommodate 9,000 applicants per week, allowing ORD and incumbent firefighters to interact personally with all applicants who elect to participate. The FDNY has undertaken several logistical steps necessary to carrying out the tutorial sessions. First, ORD developed the content of the tutorial program. Four lieutenants and three members of ORD's office staff developed a three-hour program that will include a PowerPoint presentation and 50-page Firefighter Information and Tutorial ("FIT") Session Booklet, along with a pre-recorded motivational message from Fire Commissioner Salvatore Cassano. Second, four ORD event coordinators, assisted by firefighters, surveyed all schools in the New York City area for availability and appropriateness. Coordinators and firefighters visited 104 schools in order to find 21 acceptable locations throughout the five City boroughs (seven schools in Brooklyn, four schools in the Bronx, three schools in Manhattan, four schools in Queens, and three schools in Staten Island). ORD has secured assembly permits from the Department of Education for each of the planned tutorial programs. Additionally, ORD has identified a pool of interested instructors

11

within the FDNY by soliciting members and screening.   The FDNY Audio/Visual Unit is assembling projectors, microphones, and speakers for presentations to applicants in attendance. The FDNY Bureau of Technology Development and Systems is also providing laptops for the tutorial programs.   ORD is operating a phone bank which is contacting applicants to invite and schedule them to attend one of the tutorial sessions.   Applicants are being called according to when they are scheduled to take the firefighter exam.   That is, applicants with earlier test dates are being called and invited to earlier tutorial sessions.   In addition, ORD has made its tutorial program available online at http://www.nyc.gov/html/fdny/html/community/2012_ff_tutorials.shtml.

### V.   Attrition Mitigation Plan and Reassessment of Entry-Level Firefighter Selection

Paragraph 31 of the Remedial Order directs that "[t]he City, in consultation with the Court Monitor and the Parties, shall draft and implement a written plan to mitigate and diminish rates of voluntary candidate attrition between different steps of the City's process for the selection of entry-level firefighters."   Remedial Order ¶ 31.   In accordance with this provision, the City submitted its Draft Attrition Mitigation Plan to the parties on December 1, 2011.   The parties and the Monitor then reviewed the Draft Attrition Mitigation Plan and provided comments to the City.   The City has stated that it intends to revise the plan in light of the comments from the Monitor and the parties, and to have further discussion with the Monitor, the parties, and the consultants after such revision.   The City has stated that it expects the City's mitigation plan to continue to evolve over the length of the Monitorship based on the success of different approaches and input from the Monitor and the parties.

In the course of gathering background information regarding the City's current attrition mitigation efforts and resources, the Monitor and his consultant met with Assistant Commissioner Michele Maglione, who manages the FDNY's Office of Recruiting and Diversity

("ORD"), on January 31, 2012.   Consistent with paragraph 71 of the Remedial Order, the Monitor directed Manitou (the Monitor's consultant) to provide comments on the Draft Attrition Mitigation Plan.  Manitou provided general comments on the plan to the parties at a meeting held on January 17, 2012.  Manitou also attended the meeting between the Monitor and Assistant Commissioner Maglione.

### A.     Draft Attrition Mitigation Plan

In its Draft Attrition Mitigation Plan, the City states that "[t]he Department's goal is to ensure that the applicants sit for the exam, remain interested throughout the lengthy hiring process, and are ready to accept the position when it is offered to them."  To this end, the City outlines a four-phase approach to reducing applicant attrition during the entry-level firefighter selection process.  The four phases of the City's plan are demarcated based on milestones in the administration and scoring of Firefighter Exam 2000 and Promotional Exam 2500, as follows:

Phase 1: Before the Exam

Phase 2: During Exam Administration

Phase 3: After the Exam, Before the List is Established

Phase 4: After the List is Established

Phase 1 of the City's plan entailed outreach by telephone to pending applicants whose applications were still incomplete to encourage these applicants to have their applications completed by the application submission deadline.  The phone outreach conducted by the City was supplemented by members of fraternal organizations, including the Vulcan Society, United Women Firefighters and the Hispanic Society, with each group using the City's automated dialer system and following a script prepared by the City.

Phase 1 of the City's plan also entailed outreach to the entire applicant pool, consisting of

13

(i) email blasts with links to promotional videos, online test tutorials and biographical profiles of minority and female firefighters; (ii) a monthly "e-newsletter" with information on preparing for the written and physical examinations, including information regarding tutorial sessions for the written exams; (iii) firefighter information tutorial sessions; and (iv) a final round of phone calls to provide encouragement to applicants in advance of the written exams.

Phase 2 of the City's plan consists of phone calls to applicants who did not take the exam, for the purpose of collecting data on why the applicants failed to take the exam.

Phase 3 of the City's plan commences with collection of email and phone contact information from firefighter applicants at the end of the exam. The end-of-exam survey would also request contact information for a relative or friend who would be able contact them if the City was unable to. Phase 3 also includes a continuation of the monthly e-newsletter.

Phase 4 continues the monthly e-newsletter, and also includes on-site events, preparation for the physical exam, and a candidate mentorship program leading up to the administration of the physical examination. The City would attempt to contact any candidate who fails to appear for Candidate Intake Investigation Day or the Physical Exam, and the City would then attempt to contact the candidate to ascertain the reason for their failure to appear, with follow-up contacts to be made by the ORD with information provided by CID to collect data and additional efforts to keep candidates in the selection process.

B.     Monitor's Comments on the Draft Attrition Mitigation Plan

The Monitor provided his comments to the City on February 27, 2012. The Monitor noted that the City's plan contained a number of useful approaches to attrition mitigation. The Monitor further identified a number of threshold issues with the firefighter selection process that should be evaluated in connection with the City's attrition mitigation efforts. These issues

include (i) the length of time between the administration of the firefighter examinations and the actual hiring of firefighter candidates, a process that could take as long as five years; (ii) the resources allocated to the attrition mitigation effort, including the ORD's operating budget; (iii) the feasibility of improving the targeting of outreach messaging to distinct groups of applicants and testing messages by means of focus groups, interviews, and survey research; (iv) the identification and targeting of diverse applicants who may be especially well-qualified and highly-motivated to successfully complete the entry-level firefighter selection process; (v) the feasibility of developing measurable success goals for recruitment of diverse applicants; and (vi) the importance of having the highest-ranking officials in the FDNY express the FDNY's commitment to diversity (*see* Section VIII.A. of this Report).

The Monitor also had a number of specific comments to the City's plan, including suggesting a multilingual approach to reach the families of diverse applicants, streamlined communications and use of social media, and deeper engagement of FDNY personnel in its diversity recruitment efforts.  The parties also provided comments to the City's plan, including suggestions regarding establishing measurable goals, targeted messaging, and expanded engagement through social media.

**VI.    EEO Compliance Reform**

A.    Retention of Independent EEO Consultant

Paragraph 47 of the Remedial Order provides that "[t]he City of New York shall retain, by no later than January 15, 2012, an independent EEO consultant, whose selection shall be subject to the approval of the Court Monitor."  Remedial Order ¶ 47.  On January 10, 2012, the City advised the Monitor that its proposed independent recruitment consultant was Merrick T. Rossein, a CUNY law professor and EEO consultant.  The Monitor interviewed Professor

Rossein on January 13, 2012.   After reviewing Professor Rossein's references, the Monitor approved the City's selection of Professor Rossein as the independent recruitment consultant on January 20, 2012.

       B.     <u>EEO Compliance Issues</u>

       Paragraph 47 of the Remedial Order provides that the independent EEO consultant submit a report concerning the City's EEO compliance activities with respect to the FDNY that, among other issues, "evaluates the effectiveness of equal employment opportunity law compliance activities," "identifies best practices used by other offices responsible for ensuring comparable municipal department's compliance with applicable equal employment opportunity laws and policies, and particularly, best practices used by EEO offices in other fire departments nationally," and "recommends a detailed compliance program to be carried out by the EEO Office including specific compliance activities, and which references specific metrics and goals to be used to evaluate the EEO Office's performance in carrying out each activity."   The EEO consultant's report is to be based upon a research plan to be developed by the consultant in cooperation with the City and the Monitor, "subject to the approval of the Court Monitor." Remedial Order ¶ 48.   The Monitor met with Professor Rossein on February 15, 2012, for an initial discussion regarding the development of the research plan.

       In addition to submitting the report, the Remedial Order also tasks the independent EEO consultant with consulting with the City, the City's recruitment consultant, the Parties and the Monitor to "conduct a comprehensive top-to-bottom assessment of all steps in its process for the selection of entry-level firefighters that evaluates the strengths and weaknesses of the City's current selection process as a whole and of individual steps in that process."   Remedial Order ¶ 32.   Toward this end, the Monitor has directed Manitou to commence discussions with the City's

independent consultants regarding this top-to-bottom assessment.  Finally, the Remedial Order requires that "each investigator and manager in CID, and each member of the PRB shall receive interactive training tailored to educate the recipients how to practically apply applicable equal employment opportunity laws and policies in the performance of their responsibilities in CID or on the PRB, respectively."  Remedial Order ¶ 42.  Professor Rossein noted in his meeting with the Monitor on February 15, 2012 that he had opportunity to observe an EEO training session held at FDNY headquarters as part of the firefighters' annual medical evaluations, and that he expected to make recommendations to the City regarding areas for improvement in its EEO training process.

The Monitor has also scheduled a meeting with Margo Ferrandino, the FDNY's Assistant Commissioner of Equal Employment Opportunity, currently scheduled to take place on March 12, 2012, in order to discuss the FDNY's current EEO compliance activities.

## VII.   Document Retention and Preservation

### A.   Document Retention and Preservation Order.

The Remedial Order provides that "[t]he Court Monitor, in consultation with the Parties, shall prepare and file a Document Retention and Preservation Order, for approval by the court, directing the City of New York to retain, preserve, and maintain specified broad categories of documents that are relevant to evaluating the City's compliance with the Order, including documents currently in existence and any document which will be created in the future."  Remedial Order ¶ 52.  The Remedial Order further provides that the Monitor "may amend or supplement the Document Retention and Preservation Order at any time."  *Id.*

The Monitor circulated a draft Document Retention and Preservation Order to the City on January 16, 2012, and to all of the parties on January 18, 2012.  At the request of the parties, the

Monitor re-circulated a reformatted version of the Document Retention and Preservation Order to the parties on January 30, 2012.  During the January 26, 2012 conference call with the parties, the Monitor requested comments on the draft order by February 1, 2012.  The City, the Vulcan Society, and the United States each timely submitted their respective comments to the draft order on February 1, 2012.  On February 15, 2012, the Monitor held a conference call with the City to discuss their comments to the draft Document Retention and Preservation Order and to gain a better understanding of the City's logistical infrastructure for documents.  Following the conference call with the City, the Monitor revised the Document Retention and Preservation Order and will be submitting the revised draft of the order to the parties.

The Monitor received confirmation from the City during the Monitor's first conference call with the parties on December 13, 2011, that the litigation hold from the underlying litigation in this matter is still in place.  Accordingly, the Monitor believes that the City has acted appropriately in the retention and preservation of documents relevant to compliance with the Remedial Order.  The Monitor also notes that the parties have cooperated and worked expeditiously throughout the process of revising the Document Retention and Preservation Order, and the Monitor expects the Document Retention and Preservation Order to be finalized and submitted to the Court in the near future.

B.      Access to Information

The Remedial Order grants the Monitor with "access, on short notice, to individuals, information, documents, materials, programs, services, facilities and premises under the control of the City of New York that the Monitor requires to perform his or her duties under this Order." Remedial Order ¶ 66.  The Monitor notes that all of the parties, including the City, have been forthcoming and cooperated in providing the Monitor with access to information.  Accordingly,

the City has fully complied with paragraph 66 of the Remedial Order to date.

Pursuant to paragraph 67 of the Remedial Order, the City was also required to "designate persons responsible for handling inquiries by the Court Monitor, including without limitation persons responsible for the areas of document retention, CID, ORD, and PRB, which persons' duties shall include taking calls from the Court Monitor and promptly responding to the Court Monitor's communications." Remedial Order ¶ 67. After the issuance of the Remedial Order, the City designated FDNY First Deputy Commissioner Daniel Shacknai as the person responsible for handling inquiries from the Monitor. The Monitor met with First Deputy Commissioner Shacknai on January 17, 2012, and has communicated with him on several occasions since then regarding inquiries to the FDNY.

The City has informed the Monitor that it is in the process of hiring a new associate commissioner who will function as the FDNY's compliance officer, and that, once hired, this individual will serve as the contact person for the Monitor pursuant to paragraph 67 of the Remedial Order.

## VIII.   Emerging Themes and Next Steps

Over the course of the Monitor's first 90 days, certain issues have emerged as potentially significant in connection with the Remedial Order. The Monitor will be discussing these issues further with the parties.

### A.   Senior Leadership Communication with the Outside Community

One issue that the Monitor is studying is the potential need for an increase in positive communication by senior leadership of the FDNY about efforts to increase diversity in the FDNY. As noted in the Remedial Order, the City and its residents benefit from a broader range of talent seeking to qualify for a firefighting career. *See* Findings of Fact at 24-32.

Communication by the FDNY and City, particularly at the senior level, can play an important role in accomplishing this goal.

      B.      <u>Communication within the FDNY</u>

The Monitor is also reviewing whether and how improving communication within the FDNY on diversity-related issues can help achieve the goals of the Remedial Order.  In the next phases of the Monitorship the Monitor intends, in consultation with the City and its consultants, to explore ways that the City can involve firefighters in diversity efforts and improve the FDNY's policies and procedures to ensure that all firefighters understand the FDNY's commitment to diversity and are able to work in a fair and inclusive workplace.

      C.      <u>Need for Empirical Data in Connection with Outreach</u>

The Monitor has emphasized the need for empirical data in approaching the programs and objectives of the Remedial Order.  Collecting data at every step in the remedial process is critical to efforts by the FDNY and the parties to determine what outreach efforts have been successful and to enabling the parties to tailor their efforts and allocation of resources accordingly.  Ultimately, the Monitor believes that this empirical data will help the City and the Court to assess the efficacy of remedial measures over the life of the Remedial Order.

      D.      <u>Resources</u>

As required under the Remedial Order, the Monitor will also review the adequacy of resources that have been made available for use in connection with the recruiting and retention of entry-level firefighter applicants and candidates, including whether such resources are being deployed in the most effective available means.

E.     <u>Near Term Schedule</u>

As previously discussed, the tutorial sessions offered by the FDNY are scheduled to begin on March 2, 2012 and continue through April 2, 2012.  The Vulcan Society's tutorial program that began on February 27, 2012 will continue through March 10, 2012. The administration of Exam 2000 will begin on March 15, 2012, and continue through late April 2012.

The Monitor intends to work closely with its own consultants, in consultation with the parties and the City's consultants, in assessing the City's recruiting and hiring of entry level firefighters as set forth in the Remedial Order, reviewing the experience of the New York Police Department for a local example of hiring practices that have achieved success in the area of diversity, and researching best practices from other jurisdictions.  It is expected that these tasks will take longer than the next 90 days but that significant early-stage work can be accomplished with regard to these projects. The Monitor also expects to work with the parties and the City's consultants regarding EEO and recruiting functions and creation of policies and practices as required under the Remedial Order.

Dated: March 7, 2012
         New York, New York

_____/s/_____
         Mark S. Cohen