UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                          Plaintiff,

                -and-

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated*,

                  Plaintiff-Intervenors,

        -against-

THE CITY OF NEW YORK,

                  Defendant,

        -and-

THE UNIFORMED FIREFIGHTERS ASSOCIATION
OF GREATER NEW YORK,

                  A Non-Aligned Party.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

      In this Opinion, the court considers Plaintiffs' Motions for Summary Judgment for

backpay damages and several other issues relating to the individual claims process.  Upon due

consideration, the court denies Plaintiffs' Motions but does find there is no genuine issue as to

1

the amount of aggregate pre-mitigation wage backpay owed through 2010.  The court grants the City leave to amend its Answer to raise the defense of failure to mitigate.  The court grants the parties' joint request for a definition of Non-Hire Claimant and Delayed-Hire Claimant, and the use of six additional criteria agreed upon by the parties.  The court denies the City's request for the use of criteria beyond those agreed to by all parties.  The court selects four special masters and directs them to file affidavits pursuant to Federal Rule of Civil Procedure 53(3)(A-B).  The court denies the City's motion to delay the individual determinations of monetary relief during the pendency of the City's appeal of the court's Remedial Order.  Finally, the court orders the parties to appear for a litigation management conference on March 22, 2012, at 1:00 p.m.

## I.   PROCEDURAL HISTORY

The factual and procedural background of this case is complex, and will not be recounted here in full.  Only the events that are relevant to the issues before the court today will be summarized.[1]

In 2007, the United States brought suit against the City of New York (the "City"), alleging that certain aspects of the City's policies for selecting entry-level firefighters for the New York City Fire Department ("FDNY") violated Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq. ("Title VII").  (July 22, 2009 Mem. & Order (Docket Entry # 294) (the "D.I. Op.") at 2.)  The United States alleged that the City's use of two exams— Written Exams 7029 and 2043— as pass-fail screening and rank-ordering devices had a disparate impact on black and Hispanic candidates for entry-level firefighter.  (Id. at 3.)  The Vulcan Society and several individuals intervened in the lawsuit as plaintiffs, alleging similar claims of disparate impact and also alleging disparate treatment (raising both theories of liability under

---

[1]     A more extensive history can be found in the court's previous rulings, most recently in the Memorandum & Order issued after the court's August 2011 bench trial on the need for and scope of affirmative injunctive relief. (Oct. 5, 2011 Mem. & Order (Docket Entry # 743) at 2-5.)

federal, state, and local law) on behalf of a class of black entry-level firefighter candidates.  (See Sept. 5, 2007 Mem. & Order (Docket Entry # 47) at 20 (granting motion to intervene); May 11, 2009 Mem. & Order (Docket Entry # 281) at 33-34 (certifying a class for the liability stage of the case).)

In July 2009, the court considered the United States' and Plaintiff-Intervenors' Motions for Summary Judgment on disparate impact liability.  (D.I. Op. at 93.)  In its opinion, the court recounted the City's basic process for selecting entry-level firefighters.  Applicants applied to sit for a written, multiple choice exam; the City administered Exam 7029 from 1999 until 2002 and Exam 2043 from 2002 until 2007.  (Id. at 10.)  Each exam had a pass-fail cutoff; applicants who scored at or above that cutoff were allowed to take a physical performance test (the "PPT"), while those who failed were not allowed to take the PPT or progress any further in the hiring process.  (Id.)  Candidates who also passed the PPT were placed on a rank-order hiring eligibility list.  (Id. at 11.)  Applicants' list rank was determined by a final score that was produced through a process of combining applicants' written exam and PPT scores (along with additional points for New York City Residents, legacy candidates, and veterans).  (Id.)  When the FDNY intended to hire entry-level firefighters for a new class, the City would certify a portion of the eligibility list (by rank order) for further processing such as background checks and medical and psychological examinations; a person who passed through all of the further processing was appointed.  (Id. at 11-12.)  The City used the eligibility list from Exam 7029 to hire firefighter classes from 2001 through 2004, and the list from Exam 2043 from 2004 through 2008.  (Id. at 12.)

After recounting the basic FDNY firefighter hiring process, the court considered the evidence of a prima facie case of disparate impact.  Plaintiffs challenged two practices for each

of the two exams: the pass-fail cutoff score and the rank-ordering of candidates based on their

scores.  (Id. at 24.)  The statistical evidence Plaintiffs offered (largely though not exclusively

through the work of the United States' expert, Bernard R. Siskin, Ph.D.) was telling.

As to the pass-fail usage of the exams, blacks passed Exam 7029 at 67% of the pass rate

of whites; the disparity was equivalent to 33.9 units of standard deviation, meaning the

likelihood of the disparity occurring by chance was "infinitesimally small."[2]  (Siskin Liability

Report (Docket Entry # 254 Ex. A) at 3, 21, & Table 1.)  Hispanics passed Exam 7029 at 85.3%

of the pass rate of whites; the disparity was equivalent to 17.4 units of standard deviation,

meaning the likelihood of the disparity occurring by chance was infinitesimally small.  (Id. at 3,

23, & Table 2.)  Blacks passed Exam 2043 at 87.7% of the pass rate of whites; the disparity was

equivalent to 21.8 units of standard deviation, meaning the likelihood of the disparity occurring

by chance was infinitesimally small.  (Id. at 5, 26, & Table 5.)  Hispanics passed Exam 2043 at

95.5% of the pass rate of whites; the disparity was equivalent to 10.5 units of standard deviation,

meaning the likelihood of the disparity occurring by chance was infinitesimally small.  (Id. at 5-

6, 27-28, & Table 6.)

As to the use of the exams as rank-ordering devices, blacks were disproportionately

ranked disadvantageously on the Exam 7029 list; for example, while 33% of white candidates

had eligibility list numbers at or above 2000, only 21% of black candidates did, and while 20%

of white candidates had list numbers at or below 5001, 30% of black candidates did.  (United

States Rule Disparate Impact Motion 56.1 Statement (Docket Entry # 252) ¶¶ 118-19.)  The

disparity in ranking is equivalent to 6.48 units of standard deviation, meaning the likelihood of

the disparity occurring by chance was less than 1 in 11 billion.  (Siskin Liability Report at 4 &

---

[2]        Dr. Siskin used the phrase "infinitesimally small" to mean a less than 1 in 4.5 million-billion chance of a
random occurrence of the discrepancy.  (See Siskin Liability Report, passim.)

24.)  Similarly, the eligibility list created from the Exam 7029 results disproportionately ranked Hispanic candidates disadvantageously.  While 33% of white candidates had eligibility list numbers at or above 2000, only 28% of Hispanic candidates did, and while 20% of white candidates had list numbers at or below 5001, 29% of Hispanic candidates did.  (United States Rule 56.1 Statement ¶¶ 128-29.)  The disparity in ranking was equivalent to 4.57 units of standard deviation, meaning the likelihood of the disparity occurring by chance was less than 1 in 204,000.  (Siskin Liability Report at 4 & 25.)  Blacks were disproportionately ranked disadvantageously on the Exam 2043 eligibility list.  While 28% of white candidates had eligibility list numbers at or above 2000, only 18% of black candidates did, and while 30% of white candidates had list numbers at or below 5001, 50% of black candidates did.  (Id. ¶¶ 137-39.)  The disparity in ranking was equivalent to 9.5 units of standard deviation, meaning the likelihood of the disparity occurring by chance was calculated to be less than 1 in 4.5 million-billion.  (Siskin Liability Report at 7 & 32.)  Hispanics were disproportionately ranked disadvantageously on the Exam 2043 eligibility list.  While 28% of white candidates had eligibility list numbers at or above 2000, only 25% of Hispanic candidates did, and while 30% of white candidates had list numbers at or below 5001, 39% of Hispanic candidates did. (United States Rule 56.1 Statement ¶¶ 150-51.)  The disparity in ranking was equivalent to 4.6 units of standard deviation, meaning the likelihood of the disparity occurring by chance was less than 1 in 186,225.  (Siskin Liability Report at 8 & 34.)

Plaintiffs put forward evidence about the practical significance of the statistical disparities documented above.  As to the pass-fail use of the exams, the disparity in the rate at which black candidates passed Exam 7029 accounted for 74.7% of failing black candidates—eliminating 519 candidates from contention (these candidates are called "shortfall candidates").

From those 519, approximately 114 additional black entry-level firefighters would have been selected ("shortfall hires").  (<u>Id.</u> at 3, 22, & Table 1.)  Dr. Siskin calculated the approximate number of shortfall hires by assuming that the shortfall candidates would have passed the PPT and completed the other hiring requirements at the same rate as passing candidates did.  (<u>Id.</u> at 16-17.)  The disparity in the rate at which Hispanic candidates passed Exam 7029 accounted for 56.9% of failing Hispanic candidates—eliminating 282 candidates from consideration.  From those 282, 62 additional Hispanic entry-level firefighters would have been appointed.  (<u>Id.</u> at 3, 23-24, & Table 2.)  As for Exam 2043, the disparity in the rate at which black candidates failed the Exam accounted for 81.3% of the black candidates who failed—eliminating 165 black candidates from consideration.  From those 165 candidates, 30 additional black firefighters would have been hired.  (<u>Id.</u> at 5-6, 27, & Table 5.)  The disparity in the rate at which Hispanic candidates failed Exam 2043 accounted for 61.8% of the Hispanic candidates who failed—eliminating 94 Hispanic candidates from consideration.  From those 94 candidates, an estimated 17 would have been hired.  (<u>Id.</u> at 6, 28, & Table 6.)

Plaintiffs put forward evidence of the practical significance of the rank-order usage of the Exams as well.  For example, Plaintiffs offered statistical evidence that the disproportionately low ranking of black candidates on the 7029 list meant that out of 104 black candidates who were appointed to be entry-level firefighters, 68 were appointed disproportionately late, creating an aggregate total of 20 years of lost wages and seniority.  (<u>Id.</u> at 4, 25, & Table 3 Part B.)  Similarly, the disproportionately low average location of Hispanic candidates on the 7029 list meant that out of 274 Hispanic candidates who were hired, 86 were delayed in their appointments, creating an aggregate total of approximately 23 years of lost wages and seniority.  (<u>Id.</u> at 4-5, 26, & Table 4 Part B.)

Plaintiffs offered evidence of the practical significance of the rank-order usage of Exam 2043 as well.  For example, the disproportionately low rank of the 80 black candidates on the 2043 list who were hired meant that 44 were delayed in their appointments, for an aggregate estimated total of 14 years of delayed wages and seniority.  (Id. at 9, 33-34, & Table 12 Part B.) Similarly, the disproportionately low rank of the Hispanic candidates on the 2043 list meant that 51 out of the 187 Hispanic hires off the list were delayed in appointment, resulting in an aggregate total of 12 years worth of delayed wages and seniority.  (Id. at 9, 35, & Table 14 Part B.)

However, the eligibility list produced from Exam 2043 differed from that produced from Exam 7029 in at least one important way: the 2043 list was not exhausted, i.e., the City did not certify every candidate who had passed Exam 2043 and the PPT; the 7029 list, on the other hand, was exhausted eventually.  (See id. at 18 n.9.)  Consequently, the practical significance of the rank-order usage of Exam 2043 took an additional form.  As described by Dr. Siskin, candidates who ranked too poorly on the list (i.e., had combined scores that were relatively low) had "failed" the "rankings test" of the Exam.  (Id. at 32-35.)  Dr. Siskin generated a statistical analysis of the disparity between the number of white candidates who had passed the rankings test by achieving a rank high enough to be considered for hiring and the black and Hispanic candidates who had been similarly ranked.  Black candidates were disproportionately likely to have been ranked too poorly to have been considered for hiring.  This disparity produced a shortfall of 95 candidates, and out of those 95 candidates, 42 would have been hired as entry-level firefighters.  (Id. at 19, 32-33, & Table 11.)  Similarly, Hispanic candidates were disproportionately likely to have been ranked too poorly to have ever been considered for hiring.

7

This disparity produced a shortfall of 63 candidates, and out of those 63 candidates, an estimated 28 additional Hispanic firefighters would have been hired.  (Id. at 19, 34-35, & Table 13.)

The court concluded that the undisputed statistical evidence Plaintiffs put forward showed that black and Hispanic candidates disproportionately failed Written Exams 7029 and 2043, were ranked disproportionately lower on the eligibility lists the exams created, and that the standard deviation analysis offered showed a very small likelihood that any of the disparities occurred by chance.  (D.I. Op. at 26.)  The standard deviations calculated "strongly support[ed] a conclusion of a causal relationship between the observed disparities and the employment practices at issue."  (Id.)  The court concluded that the significance of the statistical evidence of disparity was bolstered by the evidence of practical significance.  The court was persuaded by the United States' expert's analysis of the practical significance of each of the disparities:

> [A]pproximately one thousand additional black and Hispanic candidates would have been considered for appointment as FDNY firefighters had it not been for the disparities resulting from the examinations.  Further, absent these disparities, approximately 293 additional black and Hispanic candidates would have been appointed from the eligibility lists used from 2001 through 2008, and approximately 249 black and Hispanic applicants who were actually appointed would have been appointed sooner. . . . [I]t is clear that these disparities have had a practical significance.

(Id. at 27.)  The court concluded that the evidence for a prima facie case of disparate impact was "overwhelming."  (Id.)

The court then considered the City's arguments in opposition to Plaintiffs' prima facie case of disparate impact.  The City had put forward three arguments: that the "80% rule" should be used instead of statistical significance analysis (id. at 33-34); that the size of the populations tested in the case was too large to produce statistical significance tests (id. at 28-31); and that Dr. Siskin's "shortfall" analysis improperly assumed that all races and ethnic groups could perform equally well on the exams and other components of the hiring process (id. at 32-33).  The court

8

rejected each these arguments as nothing more than metaphysical doubts about the nature of statistical evidence that were unsupported in law.  (<u>Id.</u> at 35.)  The court granted summary judgment to Plaintiffs on the prima facie case of disparate impact: "[t]here is no dispute that Plaintiffs have satisfied a statistical standard for a prima facie case of disparate impact . . . , nor is there any dispute that they have shown that the disparity has had a substantial, practical significance for the composition of the eligibility lists and hiring of entry-level firefighters." (<u>Id.</u>)  The court then considered the City's business necessity defense, and after an exhaustive review of whether the process that the City had used to create the challenged exams was sufficient to satisfy Second Circuit precedent on the issue of the business necessity of employment examinations, concluded that the City had offered no genuine issue of fact as to the business necessity defense.  (<u>Id.</u> at 50-91.)

The court later considered Plaintiff-Intervenors' Motion for Summary Judgment on Disparate Treatment Liability.  As relevant to the issues before the court in the instant opinion, the court cited much of the statistical evidence discussed above as part of the prima facie case of disparate treatment discrimination by the City against black firefighters.  (<u>See</u> Jan. 13, 2010 Mem. & Order (Docket Entry # 385) ("D.T. Op.") at 29-31.)  The court granted summary judgment to Plaintiff-Intervenors as to the City's liability on Plaintiff-Intervenors' claims of disparate treatment, violation of the Equal Protection clause, and state and local law disparate impact and disparate treatment claims.  (<u>See</u> <u>id.</u> at 70.)

After the court issued both of its liability opinions, it proceeded to the remedial phase of the case.  The court issued an Initial Remedial Order which provided a preliminary outline for the remedial phase.  As is relevant for the purposes of today's opinion, the court made clear that it would order compensatory, "make whole" relief for the individual victims of the disparate

impact of the entry-level firefighter hiring process.  (Jan. 21, 2010 Mem. & Order (Docket Entry # 390) (the "I.R. Order") at 10.)  Following the Supreme Court's seminal opinion in Franks v. Bowman Transportation, 424 U.S. 747 (1976), the court ruled that compensatory relief would be available to actual test-takers—any black or Hispanic person who sat for Exams 7029 or 2043—unless the City could prove that particular individual applicants would not have been hired for non-discriminatory, lawful reasons.  (I.R. Order at 13-15.)  A claimant's initial burden would be to show that he or she took an exam and was not hired.  (Id.) The court noted that the initial remedial plan the United States had proposed gave the United States the initial authority to determine a claimant's eligibility.  The court noted that a special master might do the same job. (Id. at 16-17 & n.11.)  The court encouraged the parties to develop an agreed-upon list of criteria that would disqualify claimants.  (Id. at 17-18.)  The court next reviewed the types of relief potentially available for claimants—monetary and hiring—and the primary difference in eligibility for the two types: a claimant would be eligible for monetary relief if he or she was eligible to be hired at the time the exams were administered, but only eligible for hiring relief if currently eligible to be hired according to the City's non-discriminatory hiring criteria.  (Id. at 19-20.)  The court left open what exact criteria a claimant might have to demonstrate to be eligible for priority hiring relief, and how the parties would resolve who would receive hiring relief if more than 293 individuals were eligible and interested.  (Id. at 20-22 n.18.)  The court's Initial Remedial Order operated on the underlying principle that the City should hire 293 candidates from the victims as part of the make-whole relief required by the City's prior conduct.  (Id.)  The court further considered the parties' suggestions on whether to award retroactive seniority to the 293 priority hires; the City objected to awarding retroactive seniority, but was silent on the number of priority hires.  (Id. at 23-24.)  The court overruled the City's

objection and reiterated that priority hiring would be limited to 293 positions because that was the shortfall number determined in the disparate impact liability opinion.  (Id. at 25-27.)  The court noted that monetary relief would be based on the same shortfall number but distributed pro rata to the larger pool of eligible claimants.  (Id. 25 n.22.)  The court then expressed intent to order retroactive seniority for claimants who were hired by the FDNY but whose hiring was delayed.  The court relied on the statistical analysis that it had approved in the Disparate Impact Liability Opinion for the number of delayed hires for each ethnic group and each exam, and for the number of years of wages and seniority lost due to the delays.  (Id. at 29.)  The court ordered the parties to consider various issues related to creating a notice-and-claims process for compensatory relief.  (Id. at 56.)

Most recently, the court considered Plaintiff-Intervenors' motion for class certification in the remedial phase.  (June 6, 2011 Mem. & Order (Docket Entry # 640) at 9-18.)  While the court conditionally certified subclasses (the Delayed-Hire Victim Subclass and the Non-Hire Victim Subclass) to allow for class-wide resolution of several issues of make-whole relief (backpay, benefits, and retroactive seniority and priority hiring (see id. at 14)), the court refused to certify any subclass with regard to the issue of mitigation of damages (id. at 24-25.)  The court reasoned that resolution of mitigation of damages will turn on individual issues—the earnings and actions of each class member—and therefore is not an issue common to the class.  (Id. at 21-22.)  The court further observed that class-wide resolution of mitigation is unnecessary because the parties had already planned for a notice-and-claims process for individual claimants.  The court proposed modifying that process to include a process for considering the extent to which each claimant mitigated his or her damages.  (Id. at 24.)  The court observed that this same logic,

which compelled the court to deny class certification as to mitigation, would also compel it to deny summary judgment as to a class-wide mitigation calculation.  (Id. at 25 n.12.)

The court also concluded that exceptional conditions justified the appointment of a special master to conduct an individual claims process under Federal Rule of Civil Procedure 53(a)(1)(B).  (Id. at 40.)  The court proposed that special masters would be used to make findings of fact and conclusions of law as to individual claimants on certain issues:

> (1) each claimant's eligibility to receive individual relief; (2) the share of the aggregate amount of backpay to which each eligible claimant is entitled; (3) the extent of a claimant's mitigation and, if the City meets its burden of production on this question, the reasonableness of a claimant's mitigation efforts and the availability of substitute employment; (4) for black claimants, the amount of the claimant's compensatory damages for noneconomic losses; and (5) the claimant's eligibility for priority-hiring relief and/or the amount of retroactive seniority, if applicable.

(Id.)  The court also projected a need for the special masters to oversee settlement negotiations and a discovery process to collect information from individual claimants.  (Id.)  The court suggested that the role of special master might be filled by a United States Magistrate Judge appointed pursuant to Rule 53(h).  (Id. at 41.)  However, the court did not make a final determination on that point, nor did it appoint a special master.

## II.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT FOR BACKPAY

### A.   Legal Standards

#### 1.   Summary Judgment Standard

A motion for summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, "the court must draw all reasonable inferences in favor of the nonmoving party."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000).  Further, the burden of showing the

absence of any genuine dispute as to a material fact rests on the movant.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  A fact is material if its existence or non-existence "might affect the outcome of the suit under the governing law," and an issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.  A grant of summary judgment is proper "[w]hen no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight." Gallo v. Prudential Res. Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994).

The party opposing summary judgment is not entitled to rely on unsworn allegations in the pleadings, but must instead "show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion." Fitzgerald v. Henderson, 251 F.3d 345, 360-61 (2d Cir. 2001).  A "genuine issue [is not] created merely by the presentation of assertions that are conclusory." Patterson v. County of Onieda, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).  Likewise "conjecture[] or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

    2.    Title VII Backpay Standards

The legal principles relevant to Plaintiffs' Summary Judgment Motion are for the most part pellucid.  Municipal employers are subject to Title VII's prohibition on employment

discrimination.  See Annis v. County of Westchester, 36 F.3d 251, 254 (2d Cir. 1994).  Disparate

impact has been a recognized theory of liability under Title VII since Griggs v. Duke Power Co.,

401 U.S. 424, 431 (1971).  Where a court has found a violation of Title VII, it may consider a

number of equitable remedies: "the court may . . . order such [relief] as may be appropriate,

which may include, but is not limited to, reinstatement or hiring of employees, with or without

back pay, . . . or any other equitable relief as the court deems appropriate."  42 U.S.C. § 2000e-

5(g)(1).  The purpose of providing the court with equitable authority in Title VII cases is to

"allow the most complete achievement of the objectives of Title VII that is attainable under the

facts and circumstances of the case."  Franks v. Bowman Transportation Co., 424 U.S. 747, 770-

71 (1976).  One objective of Title VII is to "make persons whole" if they have suffered

employment discrimination.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 364 (1977).

       The Supreme Court has made clear that the use of the words "equitable" and "may" in 42

U.S.C. § 2000e-5(g)(1) do not imply that district courts have unfettered discretion when

considering whether to grant an award of backpay.  See Albemarle Paper Co. v. Moody, 422

U.S. 405 (1975).  Considering the purposes Congress contemplated when it drafted Title VII, the

Court held that "given a finding of unlawful discrimination, backpay should be denied only for

reasons which, if applied generally, would not frustrate the central statutory purpose of

eradicating discrimination throughout the economy and making persons whole for injuries

suffered through past discrimination."  Id. at 421.  Backpay is one of the basic components of

"make whole" relief.  Wrenn v. Dep't of Veterans Affairs, 918 F.2d 1073, 1076 (2d Cir. 1990).

Backpay consists of "lost salary, . . . anticipated raises, and fringe benefits."  Saulpaugh v.

Monroe Community Hosp., 4 F.3d 134, 145 (2d Cir. 1993).  In addition to those principal

components of backpay, "it is ordinarily an abuse of discretion *not* to include pre-judgment

interest in a back-pay award." Id. (quoting Clarke v. Frank, 960 F.2d 1146, 1153-54 (2d Cir.

1992)) (emphasis in original).  In fashioning a backpay award, the court "must, as nearly as

possible, recreate the conditions and relationships that would have been had there been no

unlawful discrimination." Ingram v. Madison Square Garden, Inc., 709 F.2d 807, 811 (1983)

(internal quotation marks removed).  Backpay can be awarded in class actions; however, where

the facts are not so clear as to allow a determination as to which class members should be

awarded backpay, a court may equitably "compute a gross award for all the injured class

members and divide it among them on a pro rata basis." Id. at 812.  For example, "where the

number of qualified class members exceeds the number of openings lost to the class through

discrimination and identification of individuals entitled to relief would drag the court into a

quagmire of hypothetical judgments and result in mere guesswork," Catlett v. Mo. Highway &

Transp. Comm'n, 828 F.2d 1260, 1267 (8th Cir. 1987), a case "may require class-wide, rather

than individualized, assessments of monetary relief," Robinson v. Metro-North Commuter R.R.,

267 F.3d 147, 161 n.6 (2d Cir. 2001), overruled in part, Wal-Mart v. Dukes, No. 10-277, 2011

WL 2437013, at *12-15 (U.S. June 20, 2011).

 Employers' liability for backpay extends to two years before the filing of the relevant

EEOC charge.  42 U.S.C. § 2000e-5(g)(1).  However, in a class action, unnamed class members

do not have to file a charge with the EEOC to be eligible for backpay.  Albemarle Paper Co., 422

U.S. at 414 n.8.

 While it is clear that backpay includes the value of fringe benefits, see Saulpaugh, 4 F.3d

at 145, the law is less clear with regard to how to value some of those benefits, such as

employer-provided health insurance.  Some courts have held that an employer is liable for the

amount it would have paid in premiums for an employee's health insurance.  See, e.g., EEOC v.

Dial Corp., 469 F.3d 735, 744 (8th Cir. 2006); Mister v. Illinois Cent. Gulf R.R., 790 F. Supp.

1411, 1418-19 (S.D. Ill. 1992) (applying this method of calculating value in a class action

context).  However, the weight of authority appears to be in favor of a contrary rule—that an

employer is liable for an employee's out-of-pocket expenses that would have been covered under

the employer's health plan.  See, e.g., Galindo v. Stoody Co., 793 F.2d 1502, 1517 (9th Cir.

1986) (interpreting backpay provisions of the National Labor Relations Act and holding that

"plaintiff should be compensated for the loss of [health] benefits if the plaintiff has purchased

substitute insurance coverage or has incurred, uninsured, out-of-pocket medical expenses for

which he or she would have been reimbursed"); Mugavero v. Arms Acres, Inc., 689 F. Supp. 2d

544, 582-83 (S.D.N.Y. 2010) (in Title VII case, requiring proof of what benefits plaintiff

received at previous employer and thus would be entitled to reimbursement for out-of-pocket

expenses that would have been covered); Evans v. State of Conn., 967 F. Supp. 673, 683 (D.

Conn. 1997) (in Title VII case, "plaintiff can only be compensated for his actual out of pocket

cost of medical insurance").  As the court discusses in greater detail below, the court concludes

that the latter approach is the appropriate one.

### B.    Application

The United States bases its Motion for Summary Judgment largely on the statistical

analyses of Dr. Siskin.  Dr. Siskin's work involved six steps: first, estimating the hiring shortfall

and the academy class into which each shortfall candidate should have been placed; second,

estimating the wages that the shortfall hires would have earned had they been hired between their

date of hire and the point at which losses stop accruing; third, determining the likely rate of

attrition for each shortfall hire; next, estimating the earnings that the shortfall hires would have

been reasonably likely to have made in a job other than that of firefighter, and reducing the total

estimate of backpay accordingly; fifth, accounting for the value of fringe benefits shortfall hires

would have earned as firefighters; and last, applying a rate of interest to the estimates.  (Siskin

Relief Phase Report (Docket Entry # 538-2) at 4.)  The City objects to the methodology and

results for some of the steps.  (City Mem. in Opp. to Backpay Mot. Summ. J. (Docket Entry #

543) at 2.)  The court will review each of Dr. Siskin's steps along with the City's objections, if

any, sequentially.  The court first discusses the methodology and process for determining the loss

of non-hire victims and then the same inquiry for the loss of delayed-hire victims.

    1.    <u>Non-Hire Victims</u>

    *a.*    *Step One*

Dr. Siskin's first step was determining the hiring shortfall and assigning shortfall hires to

academy classes.  (Siskin Relief Phase Report at 4.)  Dr. Siskin's process for determining the

shortfall hiring number was simple: he used the shortfall numbers that the court used in its

Disparate Impact Liability Opinion, which in turn the court had drawn from Siskin's previous

report.  (<u>Id.</u> at 4-5.)  The hiring shortfalls that the court cited in that opinion were: a shortfall of

114 black firefighters from Exam 7029; a shortfall of 62 Hispanic firefighters from Exam 7029;

a shortfall of 72 black firefighters from Exam 2043 (30 due to the pass-fail use of the Exam and

42 due to the rank-order use of the Exam); and a shortfall 45 Hispanic firefighters from Exam

2043 (17 from the pass-fail use of the Exam and 28 due to the rank-order use of the Exam).  <u>See</u>

Section I, <u>supra</u>.

Dr. Siskin next estimated how the shortfall hires would have been distributed to different

academy classes in the absence of discrimination.  (Siskin Relief Phase Report at 5.)  Dr. Siskin

allocated the shortfall hires to academy classes based on the percentage of the total list that was

inducted into each class; e.g., if the first academy class hired off of the 7029 list took 1% of the

total hires from that list, then Dr. Siskin allocated 1% of the black and Hispanic shortfall

candidates from the 7029 Exam list to that class.  (Id.)  Dr. Siskin's data for the total number and

distribution across academy classes of actual hires came from information produced by the City

in discovery.  (Id.)

A tabular representation of Dr. Siskin's distribution of the shortfall from the 7029 Exam

follows:

7029 List Academy Classes and Shortfall Hires

| Academy Class Start Date | Actual Number of Firefighters Hired | Actual Hire Percentage | Black shortfall hires assigned | Hispanic shortfall hires assigned |
|---|---|---|---|---|
| 2.4.2001 | 117 | 3.7% | 4 | 2 |
| 5.6.2001 | 78 | 2.4% | 3 | 2 |
| 7.15.2001 | 124 | 3.9% | 4 | 2 |
| 10.28.2001 | 278 | 8.7% | 10 | 5 |
| 1.27.2002 | 266 | 8.3% | 10 | 5 |
| 5.5.2002 | 284 | 8.9% | 10 | 6 |
| 7.28.2002 | 271 | 8.5% | 10 | 5 |
| 2.2.2003 | 262 | 8.2% | 9 | 5 |
| 5.4.2003 | 341 | 10.6% | 12 | 7 |
| 9.14.2003 | 298 | 9.3% | 11 | 6 |
| 12.10.2003 | 294 | 9.2% | 11 | 6 |
| 3.7.2004 | 237 | 7.4% | 8 | 5 |
| 5.25.2004 | 178 | 5.6% | 6 | 3 |
| 9.12.2004 | 174 | 5.4% | 6 | 3 |
| Total | 3,202 | 100.0% | 114 | 62 |

(See Siskin Relief Phase Report Table A-1.)

A tabular representation of Dr. Siskin's distribution of the shortfall from the 2043 Exam

follows:

2043 List Academy Classes and Shortfall Hires

| Academy Class Start Date | Actual Number of Firefighters Hired | Actual Hire Percentage | Black shortfall hires assigned | Hispanic shortfall hires assigned |
|---|---|---|---|---|
| 12.5.2004 | 145 | 6.8% | 5 | 3 |
| 3.8.2005 | 241 | 11.2% | 8 | 5 |
| 5.31.2005 | 246 | 11.5% | 8 | 5 |
| 9.25.2005 | 223 | 10.4% | 7 | 5 |
| 1.15.2006 | 139 | 6.5% | 5 | 3 |
| 4.11.2006 | 194 | 9.0% | 7 | 4 |
| 6.11.2006 | 188 | 8.8% | 6 | 4 |
| 11.19.2006 | 201 | 9.4% | 7 | 4 |
| 3.25.2007 | 282 | 13.1% | 9 | 6 |
| 8.5.2007 | 289 | 13.5% | 10 | 6 |
| Total | 2148 | 100.0% | 72 | 45 |

(See id.)

The City objects to Dr. Siskin's estimates on several grounds.  The City's relief phase

expert, Dr. Christopher Erath, echoes some of these objections.  The first objection is that Dr.

Siskin's shortfall calculation was based on incomplete data.  Because Dr. Siskin filed his

Liability Phase Report in November 2007, he did not (and could not) take into account the last

class that the City hired from the 2043 list in late January 2008.  (See City Mem. in Opp. to

Backpay Mot. for Summ. J. at 3.)  The City argues that Dr. Siskin's shortfall calculation for the

2043 list was therefore inaccurate and should be ignored.[3]  (Id. at 6-7.)  The City further argues

that a mere reference to Dr. Siskin's shortfall calculation in the Disparate Impact Liability

Opinion does not mean that the court should use that calculation; the City claims that the

shortfall number was not consequential to the finding of disparate impact liability and therefore

does not carry over to the monetary relief phase of the case.  (Id. at 4, 6-7, & n.7.)

The City next claims that Dr. Siskin's methodology is faulty in three ways: the so-called

"denominator deception," "PPT-ploy," and "attrition disappearance."  (Id. at 8-12.)  The City's

first critique is its claim of "denominator deception": According to the City, "Dr. Siskin creates

an artificial construct of 'effective passers'—claimed to be those who achieved at least the score

of the lowest-scoring person actually appointed."  (Id. at 8.)  According to Dr. Erath, this

construct distorted Dr. Siskin's results in a manner overly favorable to minority applicants.

(Erath Decl. & Report at ¶¶13-15.)  The second problematic step in Dr. Siskin's methodology,

according to the City, is the "PPT-ploy": "Dr. Siskin further employs the false presumption that

everyone got 100 on the PPT . . . ."  (City Mem. in Opp. to Backpay Mot. for Summ. J. at 10.)

Finally, the City argues that Dr. Siskin engages in "attrition-disappearance": "there is a greater

attrition rate among black and Hispanic candidates, as compared to white candidates . . . .  Dr.

Siskin seeks to hide this disparity by choosing to apply an attrition rate based upon all

ethnicities."  (Id. at 11.)  As evidence for a greater attrition rate among minority candidates, the

City cites Dr. Erath's observation that "the fraction who self-selected out of the process or were

judged ineligible for reasons unrelated to the claims in this case was larger for those with higher

---

[3]        The City is unclear as to how much it believes the incomplete data affected Dr. Siskin's calculations.  Dr.
Erath claims in his expert report that incorporating the missing data, but otherwise using Dr. Siskin's methodology,
reduces the shortfall from Exam 2043 to 44 black firefighters and 23 Hispanic firefighters.  (See Erath Decl. &
Report (Docket Entry # 545) at 17.)  However, Dr. Erath did change the methodology with regard to the candidates
who passed Exam 2043 and were not appointed.  (See id. 17 n.6.)  Dr. Siskin's estimate in how the additional data
would alter his shortfall calculation is discussed below.

(i.e., less advantageous) list numbers . . . ."  (Erath Decl. & Report at n.2.)  Each of these steps, according to the City, inflated Dr. Siskin's estimate of the number of shortfall hires.[4]

The City also objects to Dr. Siskin's method of distributing shortfall candidates to academy classes.  The City argues that shortfall candidates should not be distributed in the same proportion as all the hires because: first, minority candidates were more likely to be delayed in processing than white candidates (as mentioned in the discussion of the "attrition-disappearance" problem the City perceives in Dr. Siskin's methodology); second, minority candidates, on average, scored lower than white candidates on the PPT, which would factor into their ranking; and, third, performance on the PPT was correlated to performance on the written exams.  (City Mem. in Opp. to Backpay Mot. for Summ. J. at 12-13.)  Dr. Erath's Report proposed distributing the shortfall candidates to either the last classes hired from the relevant list or distributing them to the classes hired after the median hire date.  (Erath Decl. & Report at 18-19.)[5]

The court will first address the City's objections to Dr. Siskin's shortfall hire methodology; then, the court will address the issue of the January 2008 fire academy class second; the court will discuss the City's objection to Dr. Siskin's method of distributing shortfall hires to fire academy classes last.  The City's objections to Dr. Siskin's methodology must be rejected for several reasons.  The first is that the number of shortfall hires has been previously

---

[4]     Dr. Erath suggests that Dr. Siskin's methodology for calculating the shortfall candidates was problematic in other ways, even with regard to determining the shortfall from those who failed the Written Exams (as opposed to the shortfall from the candidates who received poor ranks on the 2043 List).  (See Erath Decl. & Report at 16 n.7.) However, the City does not reference Dr. Erath's additional critiques in its Memorandum; moreover, neither the City nor Dr. Erath proposes a methodology that they believe better determines the true hiring shortfall from the candidates who failed the Written Exams.

[5]     Dr. Erath also suggested other reasons to distribute minority shortfall hires to the later classes for each list. For example, Dr. Erath compared how candidates performed on Exams 7029 and 2043 and how they performed on Exam 6019, on the assumption that Exam 6019 was a "fair test."  (Erath Dec. & Report at 18.)  Such an assumption, of course, is unfounded given the court's determination that Exam 6019 is not job-related.  (Aug. 4, 2010 Mem. & Order (Docket Entry # 505) at 1-2.)  Additionally, Dr. Erath proposes that one should assume that the invalid exams had at least some valid questions, and assume that if someone scored poorly on the total exam, he or she also scored poorly on the valid questions.  (Erath Dec. & Report at 18.)

determined in the court's Disparate Impact Liability Opinion, and is thus law of the case.  The law of the case doctrine "commands that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise."  Johnson v. Holder, 564 F.3d 95, 99 (2d Cir. 2009) (citations and quotation marks omitted).  The City suggests that the Disparate Impact Liability Opinion had not resolved this issue.  (City Mem. in Opp. to Backpay Mot. for Summ. J. at 4 n.7.)  A careful reading of the court's Disparate Impact Liability Opinion, however, shows otherwise.  The decision quoted Dr. Siskin's shortfall estimates extensively, as evidence of the practical importance of the statistical disparities in 7029 and 2043 passage rates.  The court concluded that "absent these disparities [in pass rates and rank-ordered results on Exams 7029 and 2043] approximately 293 additional black and Hispanic candidates would have been appointed from the eligibility lists used from 2001 through 2008 . . . [I]t is clear that these disparities have a substantial practical significance."  (D.I. Op. at 27 (emphasis added).)  The court also noted that that "the City has essentially admitted the calculations performed by Plaintiffs' experts showing the disparities' practical significance."  (Id. at 28.)  The court's liability ruling "decided the issue" of the methodology of calculating and the resulting number of shortfall hires that the underlying disparities in pass rates produced.  Moreover, to the extent that was unclear to any party, the court then relied extensively on that same number of shortfall candidates in its Initial Remedial Order.  (See I. R. Order at 20-30.)  The court and the parties have used these calculations, and relied on the methodology that underlies them, for years.

        The City offers no cogent reason for reversing this determination.  The City did not oppose this methodology in calculating a shortfall either in its Opposition for Motion for Summary Judgment or in its briefing filed in anticipation of the Initial Remedial Order.  The

prejudice that such a reversal would create to the United States, the Plaintiff-Intervenors (whose expert relies on Dr. Siskin's work), and the potential claimants waiting for some form of relief for injuries that reach back to 2001 would be substantial.  The court will not reverse itself after the City has failed to utilize so many opportunities to object to the methodology of the United States' principal statistical expert and at a point where the prejudice that would result would be substantial.

Even if the court were inclined to reconsider the issue of the number of shortfall candidates, it would not reach a conclusion contrary to its original number.  The City's arguments against Dr. Siskin's the methodology are the so-called "denominator deception," "PPT-ploy," and "attrition disappearance" discussed above.  (City Mem. in Opp. to Backpay Mot. Summ. J. at 8-12.)  The City's brief is parsimonious in its citations, declining to cite to Dr. Siskin's report, and so it is not entirely clear where the City believes Dr. Siskin commits these errors; however, it appears that the City's first two arguments relate only to Dr. Siskin's method of calculating the number of shortfall candidates who were not hired because the 2043 list was not exhausted.  Here, the City evidently is confused by Dr. Siskin's report.  Dr. Siskin's report included two different analyses—the "effective failure rate" and the "rankings test"—which were two different approaches for the same task: determining the shortfall created through an unexhausted 2043 list.  (Compare Siskin Liability Report at 28-31 & Tables 7 & 9 with Siskin Liability Report at 32-35 & Tables 11 & 13.)  The City's objections appear to be targeted toward Dr. Siskin's first mechanism, which Dr. Siskin described as "effective failure."  Dr. Siskin's effective failure analysis attempted to determine what score a candidate would have needed to earn to have a chance at being hired if that candidate scored a 100 on the PPT; it produced a shortfall of about 70 black firefighters.  (See Siskin Liability Report at 29-30 & Table 7.)  Dr.

Siskin's other form of analysis—the rankings test—used data about candidates who actually had been ranked on the 2043 list—i.e., it incorporated candidates' actual Written Exam 2043 and PPT scores, and, when combined with the shortfall of the candidates who truly failed the Exam, produced a shortfall of 72 black firefighters.  (See Siskin Liability Report at 32-33 & Tables 5 & 11 (combined shortfall from nominal failure rate and "rankings test" pass rate is 72 black firefighters).)  As the United States correctly notes, the court used the latter number—72—in its liability opinion findings on the shortfall in black firefighters from Exam 2043.   (United States Reply Mem. in Support of Backpay Mot. for Summ. J. (Docket Entry #547) at 4.)  Thus, the City's objections to the "effective failure" portion of Dr. Siskin's report are simply irrelevant: The court adopted the rankings test, and Dr. Siskin and the United States accordingly based their estimates of damages on the numbers generated by that test.  (Siskin Relief Phase Report at 2.)

The City's third argument—the attrition disappearance claim—is presumably applicable to all of Dr. Siskin's non-hire shortfall calculations (i.e., his calculations for those who failed 7029, those who failed 2043, and those who passed 2043 and were never hired because of their disadvantageous ranking).  The only basis that the City offers for its contention that black and Hispanic candidates suffered from a higher rate of attrition is Dr. Erath's statement that individuals with less advantageous rankings were less likely to report for processing and submit required documents.  (See Erath Decl. & Report at 15 n.2.)  However, as has already been discussed in some detail above, minority candidates were more likely to be ranked less advantageously than white candidates.  See discussion of D. I. Op. in Part I supra.  The City's evidence does not establish an attrition rate independent of ranking, i.e., independent of the Exams.  Dr. Siskin's assumption—a uniform attrition rate across ethnic groups (see Siskin

Liability Report at 16-17)—is the only mechanism apparent for avoiding the discriminatory effect of the invalid exams.

The court next considers whether to modify the number of shortfall hires to take into account the results of the January 2008 academy class. The court will not do so. The City's actions in this regard were governed by the discovery provisions of the Federal Rules of Civil Procedure. The City is certainly correct that if the last group of firefighters from the 2043 list were hired in January 2008, then it could not have informed the parties about that group of hires until after Dr. Siskin produced his November 2007 liability report. However, the City offers no reason why it did not fulfill its discovery obligations to Plaintiffs by informing them of additional hires once the hiring process was complete. See Fed. R. Civ. P. 26(e)(1)(A) ("a party who has made a disclosure . . . or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . .") Had the City done so, Dr. Siskin could have updated his report before it was filed as part of the United States' motion papers. Instead, the City waited for a year and a half to disclose the last set of data relating to hiring off the 2043 list. (United States Reply Mem. in Support of Backpay Mot. for Summ. J. at 2.) The City's failure to follow the Rules of Civil Procedure created the incomplete nature of Dr. Siskin's data, and the City has not explained why this information should not be excluded as the Rules of Civil Procedure suggest: "if a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Ignoring for a moment the rules of discovery, the City's argument is still unavailing because, as discussed above, the shortfall hire number is the law of the case; the City has had many opportunities to urge the court to change its position and has not done so until now.  One "cogent and compelling reason," Johnson v. Holder, 564 F.3d at 99, for a court to revisit its prior determination is the "availability of new evidence," United States. v. Quintieri, 306 F.3d 1217, 1230 (2d Cir. 2002).  However, the January 2008 fire academy class was not "new" when the court was considering Plaintiffs' Motion for Summary Judgment, filed in March of 2009.  This information was available to the City well before it served its opposition papers, and well before the court issued its Disparate Impact Liability Opinion.  Thus, the City can not avail itself of this reason to depart from the court's previous rulings.  Nor could the City move for reconsideration on this issue, as such a motion would be both untimely, Fed. Rule Civ. P. 59(e) (motions to amend a judgment should be brought within 28 days of that judgment), and not permitted for the purpose of introducing "new" evidence that was available to the movant before the court issued its opinion.  Brown v. J.F.H. Mak Trucking, No. 95-cv-2118 (JS) (JO), 1999 WL 1057274, at *1 (E.D.N.Y. No. 8, 1999).

Finally, the court notes that incorporating the additional hires that the City belatedly disclosed but otherwise using Dr. Siskin's methodology would reduce the number of shortfall candidates by only five.  (Siskin Relief Phase Rebuttal Report (Docket Entry # 538-5) at 9-11.)  Thus, the City will suffer relatively little prejudice.  Moreover, adhering to the court's previous finding on the number of shortfall candidates will not impact the rights of any individual claimant vis-à-vis another, nor will it impact the rights of any third parties.[6]  In sum, the court

---

[6]    The court is referring here to the monetary relief aspect of the case.  If the parties believe that adhering to the court's previous rulings will impact the rights of third parties (who were not present in the case) in the context of priority hiring, then the parties should raise the issue with the court at that time.

sees no reason to revisit what it has already decided to consider information that the City could have presented to the parties and the court and did not.

The City's objections to Dr. Siskin's method of allocating shortfall candidates to different academy classes—i.e., Dr. Siskin's assumption that the 293 shortfall hires would have been hired to each class in the same proportion as the rest of the candidates—are predicated on two arguments. The first is that black and Hispanic candidates "failed" the hiring process due to attrition at a higher rate than did white candidates and the second is that black and Hispanic candidates scored lower on the PPT on average than did white candidates. (City Mem. in Opp. to Backpay Mot. for Summ. J. at 12-13.) The first argument has already been addressed in the context of discussing the City's "attrition disappearance" claim, and the court rejects it for the reason discussed.

The second assumes that the PPT would be a valid rank-order device if used alone, and so its results should be incorporated into the court's estimate of the gross loss of backpay. The City is certainly correct that the court has never ruled that the PPT was not job-related. (City Mem. in Opp. to Backpay Mot. for Summ. J. at 14.) However, the City misunderstands the requirements of Title VII. Once a prima facie disparate impact case has been made out, the employer has the chance to prove that an employment exam is job-related. See Gulino v. New York State Educ. Dep't, 460 F.3d 361, 385 (2d Cir. 2006). The City does not claim to have submitted any evidence from which the court could deduce that rank-order usage of the PPT, by itself, is job-related. Plaintiffs, however, have offered evidence that use of the PPT as a rank-order device is not job-related. (Jones & Hough Expert Report (Docket Entry # 264-4) at 58-60.) Therefore, the City's concession that the PPT produces an adverse impact does not help its position—because the City has not even attempted to offer evidence that using the PPT as a

27

ranking mechanism would be justified by business necessity.  Hence, the court will not assume

that a disparity in PPT passage rates among different ethnic groups is legally justifiable.  Nor

will the court reject Dr. Siskin's report because of his use of a uniform PPT passage rate for all

ethnic groups.

Finally, the court notes that the parties accuse each other in their briefs of not assuming

parity among ethnic groups.  (Compare United States Mem. in Support of Mot. for Backpay

Summ. J. (Docket Entry # 536) at 15 with City Mem. in Opp. to Backpay Mot. for Summ. J. at

13 and United States United States Reply Mem. in Support of Backpay Mot. for Summ. J. at 6.)

Most importantly, the City alleges that if the United States' candidate shortfall number and

distribution of those candidates to fire academy classes were adopted, the City would have been

required to treat black and Hispanic candidates better than white candidates and so engage in

disparate treatment of white firefighter candidates.  (City Mem. in Opp. of Mot. for Summ. J. at

12.)  Firstly, the City's contention is a non sequitur—the United States is not asking for a

remedial order that requires the City to follow Dr. Siskin's estimates and calculations as hiring

policy; it is asking for a remedial order that provides monetary relief for victims of the invalid

Written Exams and accepts certain estimates in doing so, because the City's discriminatory

practices have placed the parties in the position of evaluating the likelihood of counterfactual

events.  Secondly, the City's contention is simply incorrect.  As the United States notes, even

once the shortfall hires of 72 black firefighters and 45 Hispanic firefighters are added to the

minority firefighters hired from the 2043 list, there is still a disparate success rate among ethnic

groups: black candidates would have a 11.84% success rate, Hispanics a 10.83% success rate,

and white candidates a 15.20% success rate.  (United States Reply Mem. in Support of Backpay

Mot. for Summ. J. at 6.)

b.      *Step Two*

Dr. Siskin's next step in his analysis was to estimate the income each shortfall hire would

have made.  Using data that the City provided in discovery disclosing how much each firefighter

from each academy class earned per year, Dr. Siskin was able to compute the average earnings of

a firefighter from a particular academy class per year (assuming a firefighter stayed on the job

for a full year each year).  (Siskin Relief Phase Report at 6.)  The City does not object to this step

in Dr. Siskin's methodology, and Dr. Erath did not disagree with it in his expert report.  (City

Mem. in Opp. of Mot. for Summ. J. at 2; United States Backpay Motion Rule 56.1 Statement

(Docket Entry # 544) ¶ 124.)

c.      *Step Three*

Dr. Siskin's third step was to discount the average earnings of a firefighter by the

likelihood that a shortfall hire would have left the FDNY's employment or taken unpaid leave.

(Siskin Relief Phase Report at 6-7.)  Dr. Siskin did this by using data the City provided that

showed the number of firefighters who had taken leave without pay or left the FDNY between

2001 and 2009.  (Id. at 7 n.6.)  Dr. Siskin created an average probability that a firefighter hired

from a particular academy year would have left or been on leave in a given subsequent year; then

he discounted the earnings an average firefighter made per year based on that probability.  (Id. at

7.)  Neither the City nor Dr. Erath disagreed with Dr. Siskin's methodology or calculations at

this step.  (City Mem. in Opp. of Mot. for Summ. J. at 2; United States Backpay Motion Rule

56.1 Statement ¶ 125.)

Tabular presentations of the data regarding the average earnings of firefighters hired from

the 7029 & 2043 lists from 2001 through 2010 (for firefighters from the 7029 list) and from 2004

through 2010 (for firefighters from the 2043 list), and the discounted average earnings to adjust

for attrition, follow:

### 7029 List Firefighter Earnings, 2001-2010

| Academy Class Start Date | Average earnings for full-year employees | Average earnings adjusted for attrition |
|---|---|---|
| 2.4.2001 | $755,876 | $658,004 |
| 5.6.2001 | $744,818 | $649,644 |
| 7.15.2001 | $726,691 | $684,930 |
| 10.28.2001 | $699,075 | $672,208 |
| 1.27.2002 | $678,088 | $618,571 |
| 5.5.2002 | $652,529 | $595,314 |
| 7.28.2002 | $627,366 | $586,076 |
| 2.2.2003 | $587,640 | $532,817 |
| 5.4.2003 | $560,841 | $528,952 |
| 9.14.2003 | $528,896 | $495,398 |
| 12.10.2003 | $508,378 | $471,544 |
| 3.7.2004 | $481,216 | $454,127 |
| 5.25.2004 | $460,887 | $421,257 |
| 9.12.2004 | $416,263 | $370,059 |

(See Siskin Relief Phase Report Table A-8 Part 1; for calculation of average per-year earnings

per academy class, see id. Tables A-7-A.7.13; note potential discrepancy between Table A-8

Part 1 entries for average earnings adjusted for attrition for 5.5.2002 and 3.7.2004 fire academy

classes and data listed for same fire academy classes on Table A-7.5 & A-7.11.)

2043 List Firefighter Earnings, 2004-2010

| Academy Class Start Date | Average earnings for full-year employees | Average earnings adjusted for attrition |
|---|---|---|
| 12.5.2004 | $397,338 | $378,132 |
| 3.8.2005 | $374,721 | $349,221 |
| 5.31.2005 | $356,032 | $340,655 |
| 9.25.2005 | $336,934 | $312,768 |
| 1.15.2006 | $317,357 | $307,246 |
| 4.11.2006 | $240,655 | $222,681 |
| 6.11.2006 | $227,221 | $201,755 |
| 11.19.2006 | $203,249 | $186,483 |
| 3.25.2007 | $182,507 | $167,912 |
| 8.5.2007 | $155,757 | $147,192 |

(See id. Table A-10 Part 1; for calculation of average per-year earnings per academy class, see id. Tables A-7.14-A-7.23.)

The average earnings of a firefighter from each class, adjusted for attrition, can be combined with the shortfall hire number and distribution (as determined in step one) to estimate the total gross amount of lost wages for the non-hired minority candidates.  Tabular presentations of the arithmetic follow for each of four categories: black candidates who took Exam 7029; Hispanic candidates who took Exam 7029; black candidates who took Exam 2043; and Hispanic candidates who took Exam 2043:

Gross Wage Losses of Black Candidates from Exam 7029

| Academy Class Start Date | 2001-2010 Average Earnings Adjusted for Attrition | Shortfall Hires Allocated to Class | Lost Wages per Academy Class |
|---|---|---|---|
| 2.4.2001 | $658,004 | 4 | $2,632,016 |
| 5.6.2001 | $649,644 | 3 | $1,948,932 |
| 7.15.2001 | $684,930 | 4 | $2,739,720 |
| 10.28.2001 | $672,208 | 10 | $6,722,080 |
| 1.27.2002 | $618,571 | 10 | $6,185,710 |
| 5.5.2002 | $595,314 | 10 | $5,953,140 |
| 7.28.2002 | $586,076 | 10 | $5,860,760 |
| 2.2.2003 | $532,817 | 9 | $4,795,353 |
| 5.4.2003 | $528,952 | 12 | $6,347,424 |
| 9.14.2003 | $495,398 | 11 | $5,449,378 |
| 12.10.2003 | $471,544 | 11 | $5,186,984 |
| 3.7.2004 | $454,127 | 8 | $3,633,016 |
| 5.25.2004 | $421,257 | 6 | $2,527,542 |
| 9.12.2004 | $370,059 | 6 | $2,220,354 |
| Total | $7,815,417 | 114 | $62,202,409 |

(See id. Table A-9 Part 1 & Table A-8 Part 1.)

Gross Wage Losses of Hispanic Candidates from Exam 7029

| Academy Class Start Date | 2001-2010 Average Earnings Adjusted for Attrition | Shortfall Hires Allocated to Class | Lost Wages per Academy Class |
|---|---|---|---|
| 2.4.2001 | $658,004 | 2 | $1,316,008 |
| 5.6.2001 | $649,644 | 2 | $1,299,288 |
| 7.15.2001 | $684,930 | 2 | $1,369,860 |
| 10.28.2001 | $672,208 | 5 | $3,361,040 |
| 1.27.2002 | $618,571 | 5 | $3,092,855 |
| 5.5.2002 | $595,314 | 6 | $3,571,884 |
| 7.28.2002 | $586,076 | 5 | $2,930,380 |
| 2.2.2003 | $532,817 | 5 | $2,664,085 |
| 5.4.2003 | $528,952 | 7 | $3,702,664 |
| 9.14.2003 | $495,398 | 6 | $2,972,388 |
| 12.10.2003 | $471,544 | 6 | $2,829,264 |
| 3.7.2004 | $454,127 | 5 | $2,270,635 |
| 5.25.2004 | $421,257 | 3 | $1,263,771 |
| 9.12.2004 | $370,059 | 3 | $1,110,177 |
| Total | $7,738,901 | 62 | $33,754,299 |

(See id. Table A-9 Part 3 & A-8 Part 1.)

33

Gross Wage Losses of Black Candidates from Exam 2043

| Academy Class Start Date | 2004-2010 Average Earnings Adjusted for Attrition | Shortfall Hires Allocated to Class | Lost Wages per Academy Class |
|---|---|---|---|
| 12.5.2004 | $378,132 | 5 | $1,890,660 |
| 3.8.2005 | $349,221 | 8 | $2,793,768 |
| 5.31.2005 | $340,655 | 8 | $2,725,240 |
| 9.25.2005 | $312,768 | 7 | $2,189,376 |
| 1.15.2006 | $307,246 | 5 | $1,536,230 |
| 4.11.2006 | $222,681 | 7 | $1,558,767 |
| 6.11.2006 | $201,755 | 6 | $1,210,530 |
| 11.19.2006 | $186,483 | 7 | $1,305,381 |
| 3.25.2007 | $167,912 | 9 | $1,511,208 |
| 8.5.2007 | $147,192 | 10 | $1,471,920 |
| Total | $2,614,045 | 72 | $18,193,080 |

(See id. Table A-11 Part 1 & Table A-10 Part 1.)

Gross Wage Losses of Hispanic Candidates from Exam 2043

| Academy Class Start Date | 2004-2010 Average Earnings Adjusted for Attrition | Shortfall Hires Allocated to Class | Lost Wages per Academy Class |
|---|---|---|---|
| 12.5.2004 | $378,132 | 3 | $1,134,396 |
| 3.8.2005 | $349,221 | 5 | $1,746,105 |
| 5.31.2005 | $340,655 | 5 | $1,703,275 |
| 9.25.2005 | $312,768 | 5 | $1,563,840 |
| 1.15.2006 | $307,246 | 3 | $921,738 |
| 4.11.2006 | $222,681 | 4 | $890,724 |
| 6.11.2006 | $201,755 | 4 | $807,020 |
| 11.19.2006 | $186,483 | 4 | $745,932 |
| 3.25.2007 | $167,912 | 6 | $1,007,472 |
| 8.5.2007 | $147,192 | 6 | $883,152 |
| Total | $2,614,045 | 45 | $11,403,654 |

(See id. Table A-11 Part 3 & Table A-10 Part 1.)

As the tables presented above show, the gross loss in wages, from the commencement of the first class chosen from the relevant list to the end of 2010, is $62,202,409 for black Non-Hire candidates from Exam 7029; $33,754,299 for Hispanic Non-Hire candidates from Exam 7029; $18,193,080 for black Non-Hire candidates from Exam 2043; and $11,403,654 for Hispanic Non-Hire candidates from Exam 2043.[7]  The aggregate gross loss on wages for all failure to hire victims is $125,553,442.

---

[7]    These loss calculations do not take into account the value of money over time.  See the discussion of step six, infra.

        *d.*     *Step Four*

The next step in Dr. Siskin's process was creating a class-wide "mitigation ratio," i.e., a "percentage of lost earnings that a shortfall hire could reasonably have been expected to earn from other employment."[8]  (United States Mem. in Supp. of Mot. for Summ. J. at 6.)  Dr. Siskin proposed mitigation ratios calculated from Census data on the earnings of male black and Hispanic United States citizens living in the New York City area between the ages of 21 and 30 and with educations between one year of college and a bachelor's degree.  (Siskin Relief Phase Report at 8-12.)  On the issue of creating a mitigation ratio, Plaintiff-Intervenors departed from the United States' expert; their expert, Dr. Lanier, proposed a refinement of Dr. Siskin's method that compared the growth rate of the salary of a New York City firefighter and the growth rate of the average wages of the comparison group (the group that Dr. Siskin had looked to for his mitigation ratio estimate) over the previous decade; this created a dynamic mitigation ratio reflecting the changes in wages over time rather than the constant ratio the United States proposed.  (Lanier Report (Docket Entry # 537-7) at 4-6; see also Pl.-Intervenors' Mem. in Supp. of Mot. for Summ. J. (Docket Entry # 540) at 17-19.)

The City opposes Plaintiffs' expert calculations of a mitigation ratio based on its own expert report, which adopted a more generous estimate of the average interim earnings of the victims.  (City Mem. in Opp. to Mot. for Summ. J. at 20-22.)  Dr. Erath proposed that mitigation ratios should be based on wages that a claimant could earn if he were employed as a municipal employee in other departments of the City, because, according to Dr. Erath and the City, the disappointed applicants have shown a "predilection" for government work.  (Erath Report at 19-22.)  This method of calculating a mitigation ratio was the basis of Plaintiff-Intervenors' motion

---

[8]     The legal rationale for taking into account these "interim earnings" of unsuccessful candidates is discussed in Section III, infra.

to strike the City's expert report for lack of foundation under the Federal Rules of Evidence. (Pl.-Intervenors' Mem. in Supp. of Mot. for Summ. J. at 6-15.)

The court does not need to resolve the dispute between these dueling expert reports; as discussed above, in the court's June Memorandum and Order the court ruled mitigation is an issue that is not susceptible to class-wide determination because, among other reasons, the question of whether a particular claimant had breached the duty to mitigate his damages is an inherently individual one. (June 6, 2011 Mem. & Order at 18-25.) Therefore, the dispute among the experts is moot, and the court does not accept any class-wide mitigation ratio.[9]

> e.    *Step Five*

Step five of Dr. Siskin's process was to create an estimate of the (mitigated) value of the fringe benefits of the job of firefighter. (Siskin Relief Phase Report 16-17.) The fringe benefits for which Dr. Siskin was attempting to account included health insurance and two benefits paid for by the City but administered through the Uniformed Firefighters Association (the "UFA"): "insurance, health and welfare benefits" and an annuity benefit. (Id.)

The appropriate method of determining a mitigated value of these benefits is the second point of disagreement between Dr. Siskin and Dr. Lanier's reports. Dr. Siskin "conservatively" assumed that the non-hired candidates who were able to obtain interim employment would have received health insurance and health and welfare benefits from their interim employers equivalent that received by FDNY firefighters. (Id. at 16.) "Thus, the mitigated value of these firefighter health benefits equals: the unemployment rate x the value of the benefit." (Id. at 17.) Dr. Siskin labeled this assumption "conservative" because statistics demonstrate that "public sector employees receive more per dollar of wages in health insurance benefits than do

---

[9]    Because the experts' discussion of the best way to estimate mitigation is moot, the court does not rule on whether Dr. Erath's testimony lacked the foundation that Rule 702 requires.

employees in the private sector" and because the health insurance plan the City provided to firefighters is non-contributory—i.e., the City paid the full cost of the premiums for firefighters and their families—which is not necessarily the case for other employers.  (Id. at 17 n.24.)  Dr. Lanier agreed that assumption was conservative, and attempted to create a mitigation ratio that more accurately estimated on a class-wide basis to what extent the class of injured people would be able to mitigate their loss of fringe benefits; he drew on the percentage of employers in the civilian labor force with access to health benefits and the average percentage of health premiums contributed by employers that do so.  (Lanier Report at 6.)

Dr. Erath's report argued that Dr. Siskin should not include the amount the City would have paid out for health insurance premiums.  (Erath Dec. & Report at 24-25.)  Dr. Erath argued that Dr. Siskin did not explain "why there should be any relationship between the cost to the City and the value of this benefit to a person."  (Id.)  Dr. Erath also argued that an unemployed person would suffer an economic loss from not having health insurance only if he or she incurred medical expenses during his or her period of unemployment.  (Id. at 25.)  Dr. Erath concluded by noting that "it is possible that certain rejected applicants may have sustained medical costs which would have been covered had they become firefighters, [but] there is no such evidence available."  (Id.)

The parties disagree on whether an employer's liability for the loss of fringe benefits is valued by the cost the employer would have paid in insurance premiums or the expenses that the victims of discrimination actually incurred.  (See City Mem. in Opp. to Mot. for Summ. J. at 17; United States Reply Mem. in Support of Backpay Mot. for Summ. J. at 9; Plaintiff-Intervenors Reply Mem. in Support of Backpay Mot. for Summ. J. (Docket Entry # 550) at 14.)  As the court noted above, there is disagreement among courts on this exact issue.  Compare Galindo v.

Stoody Co., 793 F.2d 1502, 1517 (9th Cir. 1986), with EEOC v. Dial Corp., 469 F.3d 735, 744

(8th Cir. 2006).  Most district courts in the Second Circuit have applied the latter rule and

required victims to prove that they suffered an out-of-pocket expense due to the denial of access

to the defendant's health insurance.  See Mugavero v. Arms acres, Inc., 689 F. Supp. 2d 544,

582-83 (S.D.N.Y. 2010); Evans v. State of Conn., 967 F. Supp. 673, 683 (D. Conn. 1997).[10]

The court sides with the weight of authority and holds that the City's liability for the loss

of fringe benefits should be valued by expenses that the claimants actually incurred.  The court's

conclusion is driven by first principles: the purpose of the Title VII backpay remedy is to make

victims whole, not more or less than whole.  Int'l Bhd. of Teamsters v. United States, 431 U.S.

324, 364 (1977).  Victims of discrimination who did not purchase substitute health insurance,

contribute to their interim employer's health insurance costs, or pay for medical care directly, did

not suffer an economic loss, and should not receive damages in the amount that the liable

employer would have paid out in insurance premiums.  Conversely, victims who were required

to do any of those things may have suffered a larger loss than would be compensated by a

judgment limited to the amount the liable employer would have paid in health insurance

premiums.  Moreover, while insurance premiums are priced in an attempt to predict the

collective cost of medical care of the insured group ex ante, the court is now determining an

award of damages ex post and therefore has no reason to close its eyes to the expenses

individuals actually incurred.  Cf. Pattee v. Georgia Ports Authority, 512 F. Supp. 2d 1372, 1381

---

[10]     Mody v. Gen. Elec., 2006 WL 3050834, * 5 (D. Conn. 2006), and Shkolnik v. Combustion Engineering,
Inc., 856 F. Supp. 82, 88 (D. Conn. 1994), are not to the contrary.  Shkolnik held that an appropriate measure of the
value of the loss of employer-provided insurance is "the amount the employee paid to obtain comparable insurance."
Id. at 88.  The amount an employee pays to obtain comparable health insurance is a form of out-of-pocket expense.
Moreover, both cases dealt with the loss of life insurance, not health insurance.  There is at least one relevant
difference between the two: The loss caused by a lack of health insurance is felt by the victim, who must pay
medical expenses directly or buy replacement insurance, while the loss caused by the lack of life insurance is felt by
the victim's beneficiary.  A premium or replacement premium measure of value lost may thus be more logical in the
life insurance context than in the health insurance context.

(S.D. Ga. 2007) ("The 'value' of health insurance is only equivalent to the insurance premium being paid if that value is assessed on the day of the tort (past-assessed value), as opposed to assessed today (present value). . . .[L]iability is based on the actual loss to the plaintiff, not on a projection of what the loss might be . . . .").  In other words, it makes little sense for the court to determine the City's insurance based on an ex ante predictive model now that the court has the benefit of real-world information about the costs incurred by the victims.

The main argument for an insurance premium rule that Plaintiffs put forward is the greater convenience of administering such a rule in a class context.  (See United States Reply Mem. in Support of Backpay Mot. for Summ. J. at 10-11.)  The court acknowledges that estimating an aggregate loss based on the City's insurance costs, and then ordering a pro rata distribution of that loss, would be administratively the simplest method of proceeding.  However, that simple method would create non-trivial opportunities for over- or- under -compensation, both between the City and the claimants and among the claimants themselves.  Therefore, the court concludes that this issue is one that cannot be resolved on a class-wide basis and must be addressed in the individual claims processes.[11]

### f.    Step Six

Dr. Siskin's final step was to account for the value of money over time by applying an interest rate to his mitigated wage and fringe benefits determinations.  (Siskin Relief Phase Report at 18.)  In light of the court's determination that neither mitigation nor the valuation of fringe benefits should be conducted on a class-wide basis, the court does not adopt Dr. Siskin's

---

[11]     The parties do not explain in detail what was covered by the insurance, health and welfare benefit that the UFA administered on the City's behalf.  Unless the parties wish to move the court for a contrary determination, the court will also direct claimants to make individual claims for the loss of the value of those fringe benefits by showing out-of-pocket expenses or replacement costs incurred as a result of being denied employment.  The court will direct that the value of the UFA annuity benefit be paid to the 293 putative priority hires unless Plaintiffs wish to move for a pro rata distribution.

determinations on interest.  The court directs the parties to propose a method of calculating

interest for individual non-hire claimants' monetary awards at the conclusion of the individual

claims process.

        2.     <u>Delayed-Hire Victims</u>

The court now reviews the process by which Dr. Siskin calculated an economic loss for

the minority applicants whose hiring was delayed rather than prevented entirely.  Dr. Siskin's

methodology in calculating this loss was similar conceptually to the process that he used for

determining the extent of loss of the victims not hired.  (Siskin Relief Phase Report at 23.)

        *a.*     *Step One*

Dr. Siskin accomplished the first steps in his methodology in his November 2007 liability

report.  Dr. Siskin worked with the number of actual minority hires from each list and estimated

how many would have been hired to each class had there been were no racially-based delay.  Dr.

Siskin then compared that construct to the actual number of minorities hired into each class, and

determined the number of candidates whose hiring was delayed.  Dr. Siskin also calculated the

average delay for each minority candidate who was delayed.  The results of his calculations,

which the court accepted as evidence of the practical significance of the statistical disparate

impact of the rank-order use of Exams 7029 and 2043, were: 68 black firefighters from list 7029

were delayed in their start dates, leading to a total loss of 20.03 years and an average loss of 3.48

months of wages; 86 Hispanic firefighters from list 7029 were delayed in their start dates,

leading to a total loss of 23.11 years and an average loss of 3.24 months of wages; 44 black

firefighters from list 2043 were delayed in their start dates, leading to a total loss of 14.08 years

and an average loss of 3.84 months in wages; and 51 Hispanic firefighters from list 2043 were

delayed in their start dates, for a total loss of 12.36 years and an average loss of 2.88 months in wages.  (See Siskin Relief Phase Report at 4-5, 9, & Tables 3, 4, 12, & 14.)

The City objects to awarding damages to delayed-hire victims because, it argues, Dr. Erath has proven that for most or all of the fire academy classes that Dr. Siskin determined had fewer minority candidates than a proportional distribution would have suggested, the City certified minority candidates who did not complete post-certification processing requirements. (City Mem. in Opp. to Mot. for Summ. J. at 14 (citing Erath Dec. & Report at 14-15).)  The City argues that these individuals who chose to not complete the hiring process account for Dr. Siskin's calculated shortfall.  (Id.)

The City's objection fails for largely the same reasons as its objections to his calculation of the number of non-hire victims.  First, Dr. Siskin's methodology and his resulting calculation of the number of delayed-hire victims were before the court at the liability stage; the City could have attempted to rebut Dr. Siskin's work, but did not.  Consequently, the court relied upon Dr. Siskin's conclusions in its Disparate Impact Liability Opinion.  (D. I. Op. at 27.)  The court also relied on these conclusions in its Initial Remedial Order, and the City did not dispute them at that time.  (I. R. Order at 29.)  These conclusions are part of the law of the case now, and the court sees no cogent reason to revisit them.

Second, even if the court were to revisit its conclusion, it would still accept Dr. Siskin's estimates as to the injury delayed-hire minority firefighters suffered.  The City's argument misunderstands who the Delayed-Hire Claimants are: the firefighters who were hired after being ranked disproportionately unfavorably, not candidates who were not hired as a result of a failure to complete post-certification processing requirements.  That some candidates were given the chance to complete the process and did not does not mitigate the loss suffered by those

42

candidates who were given that chance disproportionately late.  The City's argument is better directed toward the discussion of eligibility criteria for individual relief—i.e., that someone whose delay in hiring was self-induced should not benefit from a damages award intended to make victims whole.

          *b.*      *Step Two*

Dr. Siskin's next step in his calculation of losses for delayed hires was to calculate the wage losses that the average delay in hiring produced.  Dr. Siskin used the earnings of the firefighters hired on the median hire dates for the two lists as a representative amount of the first-year earnings for delayed-hire victims.  (Siskin Relief Phase Report at 22.)  The median hire dates were February 2, 2003, for 7029 list hires and June 11, 2006 for 2043 list hires; Siskin's use of the earnings of candidates from the median hire date is a conservative estimate (i.e., an estimate that reduces potential monetary liability) because on average hires from other classes earned more in their first year.  (Id. at n.27.)  Dr. Siskin then pro-rated those calendar year earnings to create an estimate of the wages a firefighter would have earned for the first 365 days on the job.  (Id. at 22.)  Finally, Dr. Siskin multiplied that estimate of a full year's wages by the average delay (to produce an estimate of the wages lost for a delay of that many months) and by the total number of delayed firefighters for each group of victims.  (Id.)

          *c.*      *Step Three*

Dr. Siskin's third step accounted for attrition—i.e., the likelihood that a firefighter would leave the City's employment—by determining what percentage of minority firefighters left the FDNY within four months of being hired; however, as he notes, the probability of attrition in the first few months of a firefighter's career was relatively low, so the discount is equally small.  (Id.

at 22-23.)  A tabular presentation of Dr. Siskin's second and third steps follows for each of the affected groups.

Losses for Delayed-Hire Victims from List 7029

|  | First Calendar-Year earnings of 2.2.2003 Class | Pro-rated First-Year Earnings (rounded to nearest dollar) | Average Delay in Years | # of Delayed Hires | Total Class Earnings Lost (rounded to nearest dollar) | Loss Adjusted for Attrition |
|---|---|---|---|---|---|---|
| Black Delayed-Hires | $48,865 | $53,561 | .29 | 68 | $1,056,218 | $1,015,579 |
| Hispanic Delayed-Hires | $48,865 | $53,561 | .28 | 86 | $1,289,743 | $1,228,608 |

(Id. at Table A-12 Parts 1 & 2; see accompanying note for first calendar-year earnings and formula for pro-rated first full-year earnings.)

44

Losses for Delayed-Hire Victims from List 2043

| | First Calendar-Year earnings of 6.11.2006 Class | Pro-rated First-Year Earnings (rounded to nearest dollar) | Average Delay in Years | # of Delayed Hires | Total Class Earnings Lost (rounded to nearest dollar) | Loss Adjusted for Attrition |
|---|---|---|---|---|---|---|
| Black Delayed-Hires | $19,616 | $35,097 | .32 | 44 | $494,169 | $487,987 |
| Hispanic Delayed-Hires | $19,616 | $35,097 | .24 | 51 | $429,590 | $411,187 |

(Id.)

  As the tables above show, the gross losses in wages for is $1,015,579 for black Delayed-Hire firefighters from list 7029; $1,228,608 for Hispanic Delayed-Hire firefighters from list 7029; $487,987 for black Delayed-Hire firefighters from list 2043; and $411,187 for Hispanic Delayed-Hire firefighters from list 2043.  The aggregate gross loss on wages for all Delayed-Hire firefighters is $3,143,361.

<em>d. Steps Four-Six</em>

  Dr. Siskin followed steps four through six in a methodology identical to that which he used for the non-hire victims.  For the same reasons that the court rejected class-wide resolution of mitigation and fringe benefits for non-hire victims, the court rejects class-wide resolution of those issues for delayed-hire victims.  The court directs the parties to propose a method of calculating interest for delayed-hire claimants' monetary awards at the conclusion of the individual determination process.

3.    Conclusion as to Backpay

Because both mitigation and fringe benefits must be determined for each claimant through individual proceedings, and because pre-judgment interest must be applied once those proceedings are complete, the court cannot grant summary judgment to the United States and Plaintiff-Intervenors on the issue of backpay.  The court denies those motions.  However, after considering the evidence and argument of all of the parties and their experts, the court concludes that there is no genuine issue as to the amount of gross, aggregate wage backpay due to eligible claimants through 2010.[12]  Pursuant to Federal Rule of Civil Procedure 56(g), the court concludes the following amounts are established for the purposes of this case:

|  | Exam 7029 | Exam 2043 | Both Exams |
|---|---|---|---|
| Black Non-Hire Claimants | $62,202,409 | $18,193,080 | $80,395,489 |
| Hispanic Non-Hire Claimants | $33,754,299 | $11,403,654 | $45,157,953 |
| Black Delayed-Hire Claimants | $1,015,579 | $487,987 | $1,503,566 |
| Hispanic Delayed-Hire Claimants | $1,228,608 | $411,187 | $1,639,795 |
| Total | $98,200,895 | $30,495,908 | $128,696,803 |

---

[12]      Plaintiff-Intervenors asked the court to issue summary judgment as to backpay for the subclasses of black Non-Hire Victims through 2011.  The court believes that the better method of proceeding is to address the backpay losses of all claimants through the end of 2010 now; once the priority hires contemplated in the Initial Remedial Order have joined the FDNY, the parties may move for a finding as to the additional aggregate wage loss suffered from the end of 2010 to the date the priority hires joined the FDNY (the date that the loss will no longer accrue).

The total aggregate amount of gross wage losses is $128,696,803.  The court emphasizes that the amount listed is a gross, i.e., pre-mitigation, amount.  The City will have the opportunity to reduce this amount significantly by proving the interim earnings of claimants in individual proceedings.  It is precisely to allow this opportunity that the court concluded that there should be an individual claimant procedure supervised by special masters.  Consequently, the amount of damages that the City is ultimately liable for may be reduced substantially from the total amount listed through the course of the individual proceedings.  The exact extent of the City's liability for monetary damages will be known when these proceedings are complete.

The court also notes that the City has had many opportunities to avoid financial liability of this magnitude.  The City has been aware of the disparate impact of its entry-level firefighter exams since at least 1973, when Judge Weinfeld held that the City's then-existing written and physical examinations violated the Equal Protection Clause of the United States Constitution. See Vulcan Soc'y of New York City Fire Dep't, Inc. v. Civil Serv. Comm'n, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973).   The City could have resolved the issues surrounding the disparate impact of Exam 7029 almost a decade ago.  In 2000, an audit by the City's Equal Employment Practices Commission (the "EEPC") revealed a stark differential in the passing rate of white and black candidates; despite numerous entreaties by the EEPC to the FDNY and, eventually, to Mayor Michael Bloomberg, the City did not act on this knowledge.  (See Plaintiff-Intervenors' Disparate Treatment Liability 56.1 Statement (Docket Entry # 344) ¶¶ 75-100.)  It has been in the City's power to prevent or remedy the need for damages proceedings for a decade, and it has not done so.  The partial summary judgment on the aggregate amount of gross backpay, and the need for individual proceedings to evaluate mitigation, are consequences of the City's decision to ignore clear violations of federal law.

### III.    MITIGATION

The court will now discuss how the City might reduce the aggregate amount of backpay discussed above.  Title VII imposes on victims of discrimination a duty to minimize their economics damages: "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable."  42 U.S.C. § 2000e-5(g).  Courts have long held that this provision can affect a successful plaintiff in two ways: the backpay award of a plaintiff who has been employed during the pendency of his claims is reduced by the amount he earned, Ford Motor Co. v. EEOC, 458 U.S. 219, 231 (1982); and a plaintiff who did not attempt to mitigate his damages by "us[ing] reasonable diligence in finding other suitable employment. . . [f]orfeits his right to backpay," id. at 231-32.  The defendant bears the "burden of proving amounts which must be deducted from [a plaintiff's] gross backpay."  Sims v. Mme. Paulette Dry Cleaners, 638 F. Supp. 224, 231 (S.D.N.Y. 1986).  A defendant also bears the burden of proving "that a plaintiff has failed to satisfy the duty to mitigate."  Broadnax v. City of New Haven, 415 F.3d 265, 268 (2d Cir. 2005).

After the court ruled mitigation a question that must be addressed individually, as discussed above, the United States raised the argument that the City had failed to plead breach of the duty to mitigate in its Answer and so had waived the opportunity to raise that issue as to individual claimants.  (United States Br. on the Organization and Management of the Claims Process (Docket Entry # 678) at 4-6.)  As the United States correctly argues, a plaintiff's breach of his duty to mitigate damages is an affirmative defense that is generally waived if not raised in the defendant's answer.  See, e.g., Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994) (discussing waiver of the defense of duty to mitigate in a breach of

contract case); Morgenstern v. Cnty. of Nassau, 04-cv-58 (ARL), 2009 WL 5103158, at *1
(E.D.N.Y. Dec. 15, 2009).

It is undisputed that the City's Answer did not raise the defense of breach of the duty to
mitigate.  (Answer (Docket Entry # 8) at 5.)  However, the City argues that it did not waive its
defense of failure to mitigate because, in this litigation, all parties understood that any backpay
award would be decided on a class-wide, mitigated basis.  (City Mem. in Resp. to Brs. on Claims
Process (Docket Entry # 688) at 13-16.)  For example, it points to the United States' initial Rule
26 disclosures, wherein the United States stated that it was seeking "damages, less mitigation,"
as evidence that all the parties contemplated a uniform determination as to mitigation.  (See
United States' Initial Disclosures Pursuant to Rule 26(a)(1) (Docket Entry # 688 Ex. B) at 7.)

The City's argument is simply non-responsive to the point that failure of the duty to
mitigate is an affirmative defense that must be pled in an answer or waived, regardless of
whether that affirmative defense will be litigated on a class-wide or individual basis.  Even if all
parties contemplated resolving mitigation on an aggregated basis, the court was not obligated to
rubber-stamp that method of proceeding—especially where the rights of third parties are at stake.
As the Second Circuit has warned district courts, class-wide monetary relief "is the exception,
not the rule: Where possible, there should be . . . a determination on an individual basis as to
which class members are entitled to [recovery] and the amount of such recovery."  Robinson v.
Metro-North Commuted R.R., 267 F.3d 147, 161 n.6 9(2d Cir. 2001) (internal quotation marks
and citations omitted), overruled in part, Wal-Mart v. Dukes, No. 10-277, 2011 WL 2437013, at
*12-15 (U.S. June 20, 2011).  If the City wanted to preserve the chance to prove that individual
claimants had not mitigated their damages, it could have raised that defense at the outset.  The
court holds that, like the defense of mitigation of damages in other causes of action, mitigation of

damages in an employment discrimination case is an affirmative defense that is waived if not pled in a defendant's answer.

Because the City has not pled failure to mitigate as an affirmative defense in its answer, it will be precluded from arguing that individual claimants have failed to mitigate unless the court gives it leave to amend its answer. Federal Rule of Civil Procedure 15 governs amendment of pleadings. Rule 15 gives the court discretion to allow amendments before, during, and after trial. Leave should be "freely given." See Fed. R. Civ. P. 15. The Second Circuit has cautioned district courts against permitting amendment to add an affirmative defense if doing so would cause "undue prejudice to the plaintiff [or is caused by] bad faith or dilatory motive on the part of the defendant, . . . or [would cause] undue delay of the proceedings." Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir. 2003).

Because none of the parties contemplated litigating whether individual claimants failed to mitigate their damages until years after the case was filed, the court does not accept the United States' contention that the City's failure to plead the defense is due to a dilatory motive. (United States Br. on the Organization and Management of the Claims Process at 6-8.) The court takes more seriously the United States' claim of prejudice: as the United States notes, it did not take discovery on certain issues related to proving failure to mitigate on an individual basis and has not told putative claimants to retain information regarding their attempts to obtain employment since taking Exam 7029 or 2043. (Id.) The court agrees that these are potential concerns, but believes that they can be resolved through careful management of the individual claims process. If the City is able to amend its Answer, the parties may alter the proposed notice and claims forms that they propose sending to putative claimants so that those claimants are on notice of the additional issue and may prepare for discovery on it (as they must prepare for discovery on the

50

issues relating to eligibility, discussed below).  If the United States and Plaintiff-Intervenors believe that discovery against the City on the issue will be useful on a aggregate basis, they may include a proposal for such discovery in a revised proposed remedial plan.  Finally, the court reminds the parties that the burden to prove failure to mitigate will rest with the City.  Broadnax, 415 F.3d at 268.  The court believes that the foregoing are sufficient to counter the potential prejudice of which the United States complains.  Furthermore, the fact that Defendant is a municipality that pays for judgments against it with public funds weighs in favor of allowing it to attempt to reduce the scope of its financial liability.

Given all these considerations, the court will permit the City to amend its Answer to raise the defense of failure of the duty to mitigate if it so wishes.  The City shall file an Amended Answer for the limited purpose of adding this affirmative defense only no later than ten days after the date of this Order.  Assuming the City does so, it shall then be free to attempt to prove that individual claimants did not mitigate their damages.

## IV.    ELIGIBILITY CRITERIA FOR DAMAGES

Having determined both the aggregate amount of backpay available, and the methods by which the City might reduce that backpay, the court now addresses the criteria that will determine whether individuals are eligible or ineligible for individual monetary relief.  At the outset of this discussion, the court emphasizes that it is ruling only on criteria for monetary relief.  Eligibility for priority hiring and retroactive seniority will be resolved at a later date.

In a letter submitted by the United States, the parties laid out the following definition of a Non-Hire Claimant to which they have agreed:

[A]ny black or Hispanic person who:

(a)    failed Written Exam 7029 with a score of 25 or higher and who was not later appointed as an entry-level firefighter;

51

(b)    failed Written Exam 2043 with a score of 25 or higher and who was not later appointed as an entry level firefighter;

(c)    passed Written Exam 2043, had a list number higher than 5646 on the Exam 2043 eligible list, was not appointed as an entry-level firefighter, and was not given by the City's Department of Citywide Administration Services ("DCAS") (as indicated in the data produced by the City to the other parties in November 2007 on a disk labeled "2043 corrected" if the applicant was last certified prior to November 1, 2007) a disposition code of CNS (considered not selected), DEA (declined), DCE (deceased), FRA (failed to report after accepting appointment), FRI (failed to report for interview), NOA (not qualified for appointment), UNA (underage at time of appointment), or UNF (underage at time of filing) the last time the person was certified from the Exam 2043 eligible list.

(United States June 24, 2011 Letter (Docket Entry # 651) at 2-3.)  The court accepts this definition of Non-Hire Claimant.  The parties have adequately justified the use of a score of 25 on Written Exams 7029 and 2043 as a lower bound for individual relief.[13]  The third prong of the definition properly excludes individuals who took Exam 2043, passed it, and were then not hired for a reason unrelated to their rank on the 2043 eligible list.  The implication of the definition is that, for example, an applicant who passed Exam 2043 but then did not report to take the physical exam, or who took the physical exam and failed, is not an eligible claimant.  (See id. at 8.)  The court finds that these definitions appropriately exclude individuals who are demonstrably not victims of the discrimination in the hiring process that gave rise to the City's liability and, therefore, are not eligible for monetary compensation.

In the same submission, the parties jointly propose a definition of a Delayed-Hire Claimant to which they have agreed:

---

[13]    At the court's order, the parties filed a joint letter addressing this part of the definition.  (See Joint Letter (Docket Entry # 814).)  The United States and Plaintiff-Intervenors accept 25 on either exam as a minimum score for individual relief because they do not believe using this score as a minimum would produce a statistically significant disparate impact on black and Hispanic candidates.  (Id. at 2.)  The City argues that the score is a valid minimum because that is the score a test-taker would earn if he answered every question with a random guess and therefore essentially did not complete the exam.  (Id. at 3.)  The court finds that these two justifications are sufficient to support using a score of 25 as a prerequisite for relief.

[A]ny black or Hispanic person who:

(a)     passed Written Exam 7029, was given a list number on the Exam 7029 eligible list and was appointed as an entry-level firefighter after February 4, 2001 (date for first exam 7029 academy class), and was not given by DCAS (as indicated in the data produced by the City to the other parties in November 2007 on a disk labeled "Exam 7029 Corrected Applicant Data") a disposition code of CNS (considered not selected), DEA (declined), DCE (deceased), FRA (failed to report after accepting appointment), FRI (failed to report for interview), NQA (not qualified for appointment), OVA (overage), UNA (underage at time of appointment), or UNF (underage at time of filing) the last time the person was certified from the Exam 7029 eligible list;

(b)     passed Written Exam 2043, was given a list number on the Exam 2043 eligible list and was appointed as an entry-level firefighter after May 25, 2004 (date of first Exam 2043 academy class), and was not given by DCAS (as indicated in the data produced by the City to the other parties in November 2007 on a disk labeled "2043 corrected" if the applicant was last certified prior to November 1, 2007) a disposition code of CNS (considered not selected), DEA (declined), DCE (deceased), FRA (failed to report after accepting appointment), FRI (failed to report for interview), NQA (not qualified for appointment), OVA (overage), UNA (underage at time of appointment), or UNF (underage at time of filing) the last time the person was certified from the Exam 2043 eligible list;

(c)     failed Written Exam 7029 and was appointed as an entry-level firefighter after February 4, 2001 from an eligible list other than the Exam 7029 eligible list; or

(d)     failed Written Exam 2043 and was appointed as an entry-level firefighter after May 25, 2004 from an eligible list other than the Exam 2043 eligible list.

(Id. at 4-5.)  The court accepts this definition of eligible Delayed-Hire Claimant.

The parties also agree that claimants must additionally satisfy "other lawful qualifications" that would have been mandatory minimum qualifications if the claimants had been considered for a position of entry-level firefighter.  The parties agree on the following "other lawful qualifications":

[An applicant must meet] the following minimum qualifications required at the time the [applicant] applied to be an entry-level firefighter as stated in the relevant Notices of Examination:

(a)   Was not younger than 17 ½ years of age by the end of the application period for the relevant examination, which was October 16, 1998 for Exam 7209 and October 31, 2002 for Exam 2043;

(b)   Was not older than 29 by the beginning of the application period for the relevant examination, which was September 2, 1998 for Exam 7029 and June 28, 2002 for Exam 2043 (after a deduction of time, not to exceed six years, spent in military duty as defined Section 243 of the New York State Military Law);

(c)   Can presently understand and be understood in English;

(d)   Had obtained citizenship by four years after the date of the establishment of the relevant eligible list: the relevant eligible list for Exam 7029 was established on November 15, 2000; and the relevant eligible list for Exam 2043 was established on May 5, 2004;

(e)   Had not been convicted of a felony as of four years after the date of the establishment of the relevant eligible list: the relevant eligible list for Exam 7029 was established on November 15, 2000; and the relevant eligible list for Exam 2043 was established on May 5, 2004; and

(f)   Had not received a dishonorable discharge from the Armed Forces as of four years after the date of the establishment of the relevant eligible list: the relevant eligible list for Exam 7029 was established November 15, 2000; and the relevant eligible list for Exam 2043 was established on May 5, 2004.

(Id.)  The court accepts the use of the above-listed lawful qualifications to determine eligibility for individual relief.  The court does note, however, that qualification (c), the requirement that an applicant be able to understand and be understood in English, may be a qualification requiring a subjective evaluation.  The parties are encouraged to propose an objective measure of English fluency; this measure can be either one currently used by the Fire Department in its hiring process or another objective metric to which the parties agree.

The parties did not agree on an additional set of potential lawful qualifications.  The City suggests that a claimant should be disqualified if the fact-finder in the individual claims process determines that the claimant would have been rejected for the position of entry-level firefighter on the basis of medical, psychological, or character issues.  (City June 24, 2011 Letter (Docket

Entry # 649) at 2-3.)  The City's suggestion is that, essentially, the claimants should provide medical, psychological, and background information (covering the claimant's life from the date of the creation of the relevant list to its expiration after four years) that the fact-finder would then examine, attempting to place itself in the position of City hiring officials at the time the City was considering applicants for employment.  (Id.)

The United States and Plaintiff-Intervenors oppose this suggestion, arguing that the City is not able to put forward a concrete list of medical or psychological conditions, or specific examples of background information, that should concern the fact-finder; nor has it proposed a process or guidance for how a fact-finder should evaluate any condition or background information that does concern it.  (United States July 1, 2011 Letter (Docket Entry # 657) at 2-5.)

The court agrees with Plaintiffs' arguments.  The City's proposed criteria are doubly unclear; both with regard to what condition or event in a person's background should raise concern, and how a fact-finder should decide whether someone is eligible or not if it does decide that something in a claimant's background raises a concern.  Without standards or rules, any decision a fact-finder reaches on either issue would be difficult to justify on a reasoned basis; this would pose a problem both for a fact-finder attempting to discharge her duties in good faith and for this court, which would eventually review the fact-finder's findings.  Indeed, the court has heard testimony and issued Findings of Fact that are critical of the FDNY's Personnel Review Board, the entity that is tasked with judging the character of firefighter candidates with potentially troubling personal histories, because the Personnel Review Board operates without standards or consistency.  (Sept. 30, 2011 Findings of Fact (Docket Entry # 741) at 47-60.)  The court will not direct the fact-finder in this portion of the case to attempt to replicate a process that the court has determined to be inadequate in another part of the same case.  While the court is

55

aware that "[r]emedial relief should be granted only to those class members who would have filled vacancies had there been no discrimination," Ingram v. Madison Square Garden Center, Inc., 709 F.2d 807, 812-13 (2d Cir. 1983), the court may not immerse this case in "the quagmire of hypothetical judgments" and "mere guesswork" that would both be time-consuming and produce indefensible judgments at the conclusion, Robinson, 267 F.3d at 161 n.6.  The City's additional criteria would do just that.

The City also suggests that any claimant who had not earned a high school diploma or GED at the time the relevant list was established should be denied relief; the City argues that such a claimant would have been unlikely to complete the remaining educational requirements (30 hours of college credit or two years of military service) during the life of the list and so would not have been hired even if the claimant had passed a valid exam.  (City June 24, 2011 Letter at 2.)  The United States and Plaintiff-Intervenors oppose this argument because the City does not provide any evidence that someone who did not yet have a high school diploma would be unable to earn that diploma and 30 hours of college credit (or serve for two years in the military) over the four-year period that a list is active.  (United States July 1, 2011 Letter at 5.)  Plaintiffs also argue that claimants who either failed an exam or passed and were given a low rank on the resulting eligible list may have made an economic calculation to work in another field rather than earn a diploma; that calculation may have had a different answer if those claimants had received a higher score on an exam and thus had a greater chance of being considered for an entry-level firefighter position.  (Id. at 5-6.)

The court agrees with Plaintiffs' position.  While the presence or absence of a diploma or GED is objectively ascertainable, and so a more plausible criterion than the medical and character criteria discussed above, the City's suggestion still requires consideration of

hypothetical scenarios and guesswork.  A claimant who received a failing score on one of the

entry-level exams may have decided to forego additional education; there is simply no

identifiable method of determining whether that claimant would have acted differently had he or

she received a higher score and thus had a greater chance of being considered for an entry-level

firefighter position.  The uncertainty about what would have happened, like the uncertainty about

what action a City hiring official might have taken in response to a claimant's medical condition,

is "uncertainty [that] should be resolved against the defendant, the party responsible for the lack

of certainty."  Ass'n Against Discrimination in Emp't v. City of Bridgeport, 647 F.2d 256, 289

(2d Cir. 1981) (internal quotation marks omitted).

      For the reasons discussed above, the court accepts the definition of Non-Hire claimant

and Delayed-Hire Claimant, and the six lawful qualifications to which all parties agree, for

determining which claimants are eligible for individual monetary relief.  The court rejects the

City's suggestion that additional criteria be added.

## V.  SPECIAL MASTERS

      The court has, in a previous opinion, concluded that the individual relief phase of this

case presents exceptional conditions justifying the appointment of special masters pursuant to

Federal Rule of Civil Procedure 53(a)(1)(B)(i).  (See June 6, 2011 Mem. & Order at 40-42.)

Particularly in light of the court's decision today to allow the City to amend its Answer to add

the affirmative defense of failure of the duty to mitigate and to require individual determinations

on losses relating to fringe benefits, the court adheres to that conclusion.[14]

      The court next considers who those special masters should be.  The United States and the

City have expressed a preference for United States Magistrate Judges.  (United States Br. on the

---

[14]      Because the court concluded there are exceptional conditions, the court does not require the consent of the
parties to appoint a special master.  Cf. Fed. R. Civ. P. 53(a)(1)(A).

Organization and Management of the Claims Process (Docket Entry # 678) at 27-28; City Mem. in Resp. to Brs. on Claims Process (Docket Entry # 688) at 2-4.). The Plaintiff-Intervenors have urged the court to appoint a special master from the private bar instead. (Pl.-Intervenors Mem. of Law Regarding Claims Process (Docket Entry # 676) at 3-6.)

The court does have the power to appoint sitting Magistrate Judges to serve as special masters. See Fed. R. Civ. P. 53(h). However, the exceptional conditions of this case weigh against selecting sitting magistrate judges for the position of special master. The United States alleges that 7,100 minority applicants sat for Written Exams 7029 and 2043; of those, the United States estimates that 2,200 will be eligible for monetary relief under the eligibility criteria the court has adopted. (United States June 24, 2011 Letter at 8.) While resolving the objections of 4,900 disappointed applicants may be a straightforward task, given the objective criteria for relief that the court adopts in this opinion, holding approximately 2,200 individual proceedings that require the calculation of interim earnings, evaluation of the reasonableness of a claimants efforts to mitigate, the loss incurred through deprivation of medical insurance, and noneconomic damages (for eligible subclass members) will not be. This is a monumental task to give to Magistrate Judges who, in the Eastern District of New York, already carry broad responsibility. For most types of civil proceedings, Magistrate Judges are automatically referred non-dispositive pretrial matters. See Local Rule 72.2; Fed. R. Civ. P. 72(a). Magistrate Judges in this district have an average caseload of approximately 400 cases for which they receive such referrals. If the necessary proceedings for each eligible claimant produce a workload equivalent to the amount of a referred case, the effect of appointing a Magistrate Judge to be a special master would be equivalent to quintupling her docket. Magistrate Judges in this District are also empowered to try civil cases and enter judgment where parties consent to their jurisdiction. See

Local Rule 72.1; 28 U.S.C. § 636(c).  .  The court is loathe to burden one or more Magistrate

Judges with such a dramatic increase in workload.  Therefore, the court will appoint special

masters from among the private bar.

Although the court will issue a formal order appointing special masters when it issues an

opinion structuring the individual relief claims process, the court today identifies four attorneys

who it has selected to be special masters[15]:

The court has selected Steven M. Cohen to serve as a special master.  Mr. Cohen is a

partner at Zuckerman Spaeder LLP.  Prior to joining that firm, Mr. Cohen was Secretary to New

York Governor Andrew Cuomo; before his service in the Governor's office, Mr. Cohen was

Counselor and Chief of Staff to then-Attorney General Cuomo.  Before joining state government,

Mr. Cohen practiced law at a private firm and also served as an Assistant United States Attorney

and Chief of the Violent Gangs Unit in the U.S. Attorney's Office for the Southern District of

New York.  Mr. Cohen is a graduate of the University of Pennsylvania Law School and New

York University.

The court has selected Hector Gonzalez as a special master.  Mr. Gonzalez is a partner at

Dechert LLP.  Mr. Gonzalez's prior experience includes serving as an Assistant United States

Attorney and Chief of the Narcotics Unit in the U.S. Attorney's Office for the Southern District

of New York and serving as an Assistant District Attorney in the Manhattan District Attorney's

Office.  Mr. Gonzalez is a graduate of the University of Pennsylvania Law School, Manhattan

College, and the John Jay College of Criminal Justice.

The court has selected Mitra Hormozi to serve as a special master.  Ms. Hormozi is a

partner at Kirkland & Ellis LLP.  Prior to her affiliation with that firm, Ms. Hormozi was the

---

[15]     The parties were given the opportunity to nominate candidates for the position, pursuant to Rule 53(b)(1).
(Feb. 2, 2012 Order (Docket Entry # 815) at 2.)

Special Deputy Chief of Staff to then-New York Attorney General Andrew Cuomo.  Before her service in the Attorney General's Office, Ms. Hormozi was an Assistant United States Attorney and Chief of the Organized Crime and Racketeering Section in the U.S. Attorney's Office for the Eastern District of New York.  Ms. Hormozi is also a Commissioner on the New York Joint Commission on Public Ethics.  Ms. Hormozi is a graduate of New York University School of Law and the University of Michigan.

The court has selected Breon S. Peace as a special master.  Mr. Peace is a partner at Cleary Gottlieb Steen & Hamilton LLP.  Mr. Peace's prior experience includes serving as an Assistant United States Attorney in the U.S. Attorney's Office for the Eastern District of New York.  Mr. Peace is a graduate of New York University Law School and the University of California at Berkeley.

The court directs the attention of the selected special masters to 28 U.S.C. § 455 and directs them to each file an affidavit as required by Rule 53(3)(A-B).  The court also directs the special masters to the memoranda the parties have provided that lay out their views on structuring the individual relief claims process.  The special masters shall submit to the court no later than April 12, 2012 their comments and recommendations on claims process structuring.

The court now addresses the issue of cost of the service of special masters.  Although the formal order appointing special masters will fix the terms of compensation, the court expects to approve an hourly rate schedule identical to what the court has previously approved for the Court Monitor in this case.  (See Dec. 9, 2011 Order (Docket Entry # 768) at 3-4.)  Rule 53(g)(3) directs the court to allocate payment among the parties based on: "the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master."  Of these factors, the most persuasive one to the court is the

factor of relative responsibility.  Unlike a referral for pretrial issues, this is a referral where the City's liability has been established, and the only issue left is resolving exactly how many victims the City has, and exactly how much the City must compensate those victims.  The City is wholly responsible for the situation that necessitates the referral to special masters.  Moreover, the court's referral of the handling of individual claims proceedings to the special masters is, in effect, a net benefit to the City; it is at these proceedings that the City may attempt to prove interim earnings or failure to mitigate—each of which may reduce the City's total liability for economic damages considerably.  The cost of holding individual proceedings is, in effect, an investment that may benefit the City in the form of reduced damages.  Considering these factors, the court allocates payment for the services of the special masters entirely to the City.  Cf. Jackson v. Nassau Cnty. Bd. of Supervisors, 157 F.R.D. 612, 624 (E.D.N.Y. 1994) (imposing fees for the services of a special master on county previously found to have violated Constitution).

Finally, the court notes that it does not believe that the appointment of multiple special masters will produce a higher total cost to the City than the cost a single special master would produce.  Since the special masters shall charge based on time spent, and the total amount of time needed will be determined by the number of claimants, the total cost would be roughly the same if one special master were billing hourly or if four special masters, dividing the workload by four, were billing hourly.  The only difference between one master and four is that four masters should be able to resolve the total caseload more quickly than one special master.  The ability of four masters to resolve the individual relief proceedings is important both to the individual claimants—some of whom were injured as early February 2001, when the first class

of entry-level firefighters from the 7029 list were hired—and to the City, which continues to be liable until the individual relief process is completed.

## VI.    CITY'S REQUEST TO DELAY INDIVIDUAL DETERMINATIONS

The City has requested that determinations of individual relief be delayed until after resolution of City's appeal of the court's Remedial Order and Partial Judgment, Permanent Injunction, and Order Appointing Court Monitor (Docket Entry # 765) (an order directed toward affirmative relief rather than individual compensatory relief).  (See Feb. 24, 2012 City Letter (Docket Entry # 817) at 1.  The City's argument is that because the appeal challenges, inter alia, the court's liability determination on disparate treatment, and because noneconomic damages are available under federal law only upon a finding of disparate treatment, the court should delay noneconomic damages determinations until after the appeal is resolved.  (Id.)  And because, the City argues, simultaneous consideration of individual claimants' economic and noneconomic damages will be more efficient, the entire individual determination process should be delayed as well.  (Id.)  Plaintiffs oppose this request.  (Feb. 27, 2012 United States Letter (Docket Entry # 818) at 1; Feb. 27, 2012 Plaintiff-Intervenors Letter (Docket Entry # 820) at 1.)

The City's request is denied for several reasons.  Firstly, the City has not moved for a stay of the Remedial Order pending appeal, and neither this court nor the Court of Appeals has made a finding that the City is likely to succeed on the merits of its appeal.  Secondly, as Plaintiff-Intervenors correctly note, noneconomic damages are available upon a finding of disparate impact pursuant to state and local law.  (Feb. 27, 2012 Plaintiff-Intervenors Letter 1-2.) As the City's current appeal is not aimed at reversing the court's disparate impact liability finding, its outcome will not vacate any noneconomic damage determinations.  Finally, the economic damage determinations will involve more claimants and larger sums than the

noneconomic damage determinations; as the City itself has acknowledged, using the existence of the putative noneconomic damage determinations as a justification for shaping the economic damage determinations in a particular way is akin to "the proverbial tail wagging the dog." (City Mem. of Law (Docket Entry 688) at 3.)

The court believes the City's concern may best be addressed by either designing a relief process that proceeds in stages—first determining economic damages for individuals and then noneconomic damages—or by directing the special masters to demarcate clearly what sums are awarded to each claimant for economic and noneconomic damages. The court's future order structuring the claims process and appointing special masters will adopt one of these solutions.

## VII. SCHEDULING ORDER

In this Memorandum & Order, the court has resolved several outstanding issues relating to compensatory relief. There are other issues outstanding, however, and additional steps to take. Therefore, the court orders the parties to appear for a litigation management conference on March 22, 2012, at 1:00 p.m. prepared to discuss several issues.

The first issue on which the court wishes to hear the parties' views is the notice and claim documents to be sent to potential claimants, particularly with regard to: (1) whether the parties believe that their submission of July 15, 2011 (Docket Entry # 677) needs to be updated in light of today's rulings; (2) whether the parties' disagreements expressed in the July submission have been resolved, or whether they require a ruling from the court; and (3) when notice and claim forms can reasonably be expected to be distributed.

The second issue on which the court wishes to hear the parties' views is the claims management process, particularly: (1) whether the disagreements the parties expressed in their July 2011 submissions (Docket Entry ## 667, 676, 678, 683-85, 688) are still extant or have been

63

resolved; (2) whether the parties wish to submit additional materials regarding the individual claims process in light of the court's rulings today; and (3) whether one or two fairness hearings are required for the monetary component of the individual relief process.

The final issue the court wishes to discuss with the parties is next steps on the remedies of priority hiring and retroactive seniority.

## VIII.   CONCLUSION

The court DENIES Plaintiffs' Motions for Summary Judgment for backpay because certain issues must be resolved on an individual basis; the court FINDS that Plaintiffs have established the amount of aggregate gross wage backpay is in the amount of $128,696,803.  The court GRANTS the City leave to amend its Answer as discussed in this Memorandum and Order. The court GRANTS the parties' joint request for a definition of Non-Hire Claimant and Delayed-Hire Claimants, and their joint request for the use of six additional hiring criteria.  The court DENIES the City's request for the use of additional hiring criteria not agreed upon by all the parties.  The court ORDERS Steven M. Cohen, Hector Gonzalez, Mitra Hormozi, and Breon S. Peace to file affidavits as required by Federal Rule of Civil Procedure 53(3)(A-B).  The court DENIES the City's request to delay determinations of individual monetary relief pending resolution of the City's current appeal.  The court ORDERS the parties to appear for a litigation management conference on March 22, 2012, at 1:00 p.m.

SO ORDERED.

                                                              /s/ Nicholas G. Garaufis
Dated: Brooklyn, New York                       NICHOLAS G. GARAUFIS
       March 8, 2012                                  United States District Judge