IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

       PLAINTIFF,

THE VULCAN SOCIETY INC., for itself and
on behalf of its members, JAMEL
NICHOLSON, and RUSEBELL WILSON,
individually and on behalf of a subclass of
all other victims similarly situated seeking
classwide injunctive relief;

ROGER GREGG, MARCUS HAYWOOD, and
KEVIN WALKER, individually and on behalf
of a subclass of all other non-hire victims
similarly situated; and

CANDIDO NUÑEZ and KEVIN SIMPKINS,
individually and on behalf of a subclass of
all other delayed-hire victims similarly
situated,

       PLAINTIFFS-INTERVENORS

V.

CITY OF NEW YORK, ET AL.,

       DEFENDANTS.

CIV. ACTION NO. 07-CV-2067 (NGG)(RLM)

---

**PLAINTIFF UNITED STATES' MEMORANDUM IN RESPONSE TO THE CITY'S
AND PLAINTIFFS-INTERVENORS' BRIEFS REGARDING
THE CLAIMS PROCESS FOR INDIVIDUAL RELIEF**

# TABLE OF CONTENTS

I.   The City' back pay and pre-judgment interest calculations ...................................................... 1

   A.  Non-hire Claimants ....................................................................................................... 1

      1.  The City's proposal violates the Court's Back Pay Order because it drastically
          reduces the City's aggregate, pre-mitigation back pay liability .................................. 2

         a.   The City's use of the median hire date to cap back pay liability will result in
              an improper $8 million reduction of its aggregate back pay liability ..................... 2

         b.   The City's proposed back pay reduction ratio is simply a "numbers game" that
              vastly devalues the City's aggregate back pay liability ordered by the Court ........ 5

      2.  The City's proposal contradicts precedent because it fails to evaluate interim
          earnings on an annual basis ........................................................................................ 11

   B.  Delay Claimants ........................................................................................................... 12

      1.  The City improperly sets the cap on what a Delay Claimant may be awarded .......... 13

      2.  The City's proposal fails to account for the amount of delay, measured against
          the first academy class, that a claimant experienced .................................................. 14

II.  The Court should require all priority hire claimants to take Exam 2000 ............................... 18

III. Priority hires should receive their retroactive salary and benefits immediately after they
     complete the 12-month probationary period ........................................................................... 20

IV.  The Court should provide individuals with thirty (30) days to submit their objections
     to the relief order in connection with Fairness Hearing I ....................................................... 23

V.   The Court should not adopt any of the Special Masters' recommendations for, or any
     of the parties' new proposals about, the claims process at this time ..................................... 25

VI.  Conclusion ............................................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport*,
    647 F.2d 256 (2d Cir. 1981)................................................................................... 19, 22

*EEOC v. Chicago Miniature Lamp Works*, 668 F. Supp. 1150 (N.D. Ill. 1987),
    *rev'd on other grounds,* 947 F.2d 292 (7th Cir. 1991)............................................... 6

*EEOC v. Chicago Miniature Lamp Works*, 640 F. Supp. 1291 (N.D. Ill. 1986),
    *rev'd on other grounds,* 947 F.2d 292 (7th Cir. 1991)........................................... 6, 7

*EEOC v. Joint Apprenticeship Comm. Of the Joint Indus. Bd. Of the Elec. Indus.,*
    186 F.3d 110 (2d Cir. 1998).................................................................................... 22

*EEOC v. O&G Spring and Wire Forms Specialty Co.*, 790 F. Supp. 776 (N.D. Ill. 1992)............ 6

*Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976)................................................................ 22

*Hameed v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers,*
    *Local Union No. 396*, 637 F.2d 506 (8th Cir. 1980).................................................. 6

*Leftwich v. Harris-Stowe State College*, 702 F.2d 68 (8th Cir. 1983)........................................ 12

*Lewis v. City of Chicago*, No. 98 C 5596, Dkt. 480 (N.D. Ill. Aug. 17, 2011)............................ 19

*Luciano v. Olsten Corp.,* 912 F. Supp. 663 (E.D.N.Y. 1996)........................................................ 2

*Mister v. Illinois Cent. Gulf R.R. Co.*, 790 F. Supp. 1411 (S.D. Ill. 1992) ................................... 6

*Sands v. Runyon*, 28 F.3d 1323 (2d Cir. 1994) ........................................................................... 2

*Sims v. Mme. Paulette Dry Cleaners*, 638 F. Supp. 224 (S.D.N.Y. 1986) .................................. 12

*Taddeo v. Ruggiero Farenga, Inc.*, 102 F. Supp. 2d 197 (S.D.N.Y. 2000) ................................. 12

*United States, et al. v. City of New York, et al.*, 07-CV-2083 (S.D.N.Y. Oct. 7, 2010) .............. 25

I.      **The City' back pay and pre-judgment interest calculations**[1]

   A.      **Non-hire Claimants**

The City's back pay proposal has one overriding effect:  it siphons enormous sums of the back pay fund away from victims of the City's discrimination and thus deprives these victims of adequate – much less make whole – relief.  Although the United States generally agrees that a claimant's back pay award should be reduced by a proportion of his or her interim employment and the remainder should revert to the City, the City's back pay calculation attempts to recoup far more of the back pay fund than simply the interim earnings of claimants.  The City does so by setting arbitrary, unjustifiable caps on the amount of back pay damages for which the City may be liable.  These caps contradict the Court's March 8, 2012 Memorandum and Order ("Back Pay Order"), which held that the City owed $125,553,442 in "gross, aggregate" back pay (*i.e.,* pre-mitigation) to eligible Non-hire Claimants through December 31, 2010.  Dkt. 825 at 46.[2]

For two primary reasons, described more fully below, the City's proposed method for calculating back pay makes it *impossible* for the City to be even potentially liable for an aggregate back pay amount that equals the $125 million figure for Non-hire Claimants set by the Court.  Unless the method for calculating back pay owed to Non-hire Claimants produces an aggregate, pre-mitigation amount of $125,553,442, it is inconsistent with the determinations

---

[1]  The United States' proposed method to calculate back pay awards, as well as its response to the City's back pay proposal, was prepared in consultation with the United States' expert, Dr. Bernard Siskin.  Dr. Siskin agrees with the United States' back pay proposal, as well as the United States' position regarding the flaws in the City's proposal.

[2]  The Plaintiffs-Intervenors agree with the United States' proposed method of calculating back pay for Non-hire and Delay Claimants, as well as the United States' responses to the City's back pay proposal.

already made in the Court's Back Pay Order.  Because the City's proposed back pay calculation

fails this test, the Court should reject the City's proposal.

     1.   *The City's proposal violates the Court's Back Pay Order because it drastically*
         *reduces the City's aggregate, pre-mitigation back pay liability*

       a.   <u>The City's use of the median hire date to cap back pay liability will result in an</u>
           <u>improper $8 million reduction of its aggregate back pay liability</u>

     The City's proposed back pay calculation[3] is plagued with flaws and should be rejected.

In Step 1 of its proposal, the City effectively sets a cap for what a claimant could be awarded in

back pay damages.  Dkt. 868 at 4.  The City defines this cap as the aggregate amount of money

one shortfall hire could have earned during the back pay period, which the City calculates based

on one shortfall hire's earnings since the median hire date of the relevant exam.[4]  As described

below, setting the cap in this manner results in an automatic, unwarranted $8 million reduction in

the aggregate back pay amount established in the Court's Back Pay Order.

---

[3]  The City's proposal for calculating back pay awards to Non-hire Claimants is:
    (1) Credit each claimant with the earnings that an entry-level firefighter, who was hired on
        the median hire date of the relevant exam, would have earned;
    (2) Deduct each claimant's actual interim earnings, or, if a claimant failed to properly
        mitigate back pay damages, an estimate of what the claimant could have earned;
    (3) Multiply the difference between Steps 1 and 2 by the "probability of hire" ratio to
        determine the claimant's net back pay award.  The "probability of hire" ratio is the
        number of shortfall hires in a particular back pay category divided by the number of
        "potential claimants," *i.e.* the total number of test takers who meet the definition of
        "Non-hire Claimant."
    (4) Add prejudgment interest to the net back pay award.

[4]  The City's proposal to use the median hire date as the starting point for the back pay period
also conflicts with case law, which holds that the back pay period should commence on the date
on which the discriminatory action occurred (*e.g.,* the failure to hire).  *See Luciano v. Olsten
Corp.,* 912 F. Supp. 663, 676 (E.D.N.Y. 1996) (citing *Sands v. Runyon,* 28 F.3d 1323 (2d Cir.
1994)).  Here, the City's failure to hire claimants first occurred on the date of the first academy
class for the relevant exam.  Moreover, starting the back pay period on the date of the first
academy class is consistent with the back pay period that the Court set for Delay Claimants.  *See*
Dkt. 825 at 53 and Dkt. 861 at 6.

The United States' method is the proper way to determine one shortfall hire's earnings because it ensures that the amount credited as the aggregate earnings of each shortfall hire in a particular back pay category is no more – or less – than the total amount of damages set by the Court for that particular back pay category. The United States' proposal determines the aggregate back pay of one shortfall hire (*i.e.,* the cap on individual damages) by simply dividing the amount of money in a specific back pay category by the number of shortfall hires in that category (*e.g.,* for the Exam 7029 black Non-hire category, $62,202,409/114 shortfall hires, which equals $545,635.16 per shortfall hire).

On the other hand, the City's proposal to set the cap on a claimant's back pay award based on the median hire date will, as set forth in Table 1 below, effectively reduce the City's potential back pay liability for Non-hire Claimants from $125 million to $117 million even before the claims process begins and before any reduction is made for claimants' interim earnings. This is true because the Court, in determining the amount of money available for distribution in each Non-hire Claimant back pay category, did not assume that every shortfall hire would have been hired on the median hire date. Rather, the Court, accepting Dr. Siskin's calculations (Dkt. 537-1 at 7-8), distributed the hiring shortfall across academy classes and calculated the average amount of salary earned by applicants hired into those classes. Dkt. 825 at 17-19, 29.

**Table 1:  The effect of the City's use of the median hire date to determine the aggregate earnings of a shortfall hire**

| Back pay category | Total money in back pay category[5] | Total money in back pay category under City's proposal (median hire date earnings[6] x shortfall hires) | Reduced amount of aggregate back pay liability |
|---|---|---|---|
| Exam 7029 black Non-Hire (median hire date 2/2/2003) | $62,202,409 | $60,741,138 ($532,817 x 114) | $1,461,271 |
| Exam 7029 Hispanic Non-Hire (median hire date 2/2/2003) | $33,754,299 | $33,034,654 ($532,817 x 62) | $719,645 |
| Exam 2043 black Non-Hire (median hire date 6/11/2006) | $18,193,080 | $14,526,360 ($201,755 x 72) | $3,666,720 |
| Exam 2043 Hispanic Non-Hire (median hire date 6/11/2006) | $11,403,654 | $9,078,975 ($201,755 x 45) | $2,324,679 |
| **TOTAL** | **$125,553,442** | **$117,381,127** | **$8,172,315** |

Thus, the City's proposed cap on a claimant's back pay award would violate the Court's Back Pay Order because this cap results in a more than $8 million reduction of the Court-ordered $125,553,442 in aggregate back pay liability.  As such, the Court should reject the City's proposal that all eligible Non-hire Claimants' back pay awards should be capped based on what an applicant hired on the median hire date for each exam would have earned.

---

[5]  The figures in this column are from the Back Pay Order.  *See* Dkt. 825 at 46.

[6]  The median hire date earnings in this column are from the Back Pay Order, using the 2001-2010 average earnings adjusted for attrition for the February 2, 2003 academy class (median hire date for Exam 7029) and for the June 11, 2006 academy class (median hire date for Exam 2043.  *See* Dkt. 825 at 32-35.

b.  The City's proposed back pay reduction ratio is simply a "numbers game" that vastly devalues the City's aggregate back pay liability ordered by the Court

Step 3 of the City's back pay calculation contains the most serious – and ultimately fatal – flaws in the City's proposal.  Dkt. 868 at 4.  The City asserts that a claimant's net back pay award must be reduced by a back pay ratio that the City (improperly) deems the "probability of hire" ratio.  This back pay reduction ratio is not based on the number of actual, eligible claimants compared to the number of shortfall hires (as precedent dictates); instead, the City's ratio is based on the number of potential claimants compared to the number of shortfall hires.  In other words, the City asserts that the probability that absent claimants and ineligible claimants would have been hired must be considered in determining the amount of eligible claimants' back pay awards.  Thus, the key issue here is the proper denominator to which the number of shortfall hires must be compared in order to determine the back pay reduction ratio:  actual, eligible claimants (the United States' proposal) versus potential claimants (the City's proposal).  As explained below, the City's proposal would severely shortchange the victims of the City's discrimination and result in an enormous windfall to the City.[7]

Title VII precedent establishes that, where, as here, a class-wide back pay amount must be divided among a group of individuals that exceeds the number of shortfall hires on which the class-wide back pay amount was based, any *pro rata* reduction of an individual's share of the

---

[7]  As an initial matter, the City advocates that the back pay reduction ratio should be determined using "the total number of test takers who meet the Court approved definition of Non-Hire Claimant, that is . . . the total number of potentially wronged test takers."  Dkt. 868 at 6.  The City incorrectly asserts that even test takers who do not return a claim form should be included in the reduction ratio because they were "potentially wronged."  *Id.* at 7.  However, it is not possible to determine whether a test taker was "potentially wronged" unless he or she actually submits a claim form because, without a claim form, it is impossible to determine whether the test taker met the City's "other lawful qualifications" (*i.e.*, minimum hiring qualifications).  *See* Dkt. 825 at 53-54.  If a test taker did not meet these "other lawful qualifications" then s/he would not have been hired by the City and is not a "potentially wronged" test taker.

back pay award should be based on the number of actual claimants (or individuals who will receive a share of the back pay award).  *See EEOC v. Chicago Miniature Lamp Works*, 668 F. Supp. 1150, 1154 (N.D. Ill. 1987) (holding that back pay damages should be calculated by "ratably reducing the total [interim] earnings by each claimant to reflect the ratio of shortfall jobs to the total number of *claimants . . . .*") (alterations and emphasis added), *rev'd on other grounds,* 947 F.2d 292 (7th Cir. 1991); *EEOC v. O&G Spring and Wire Forms Specialty Co.*, 790 F. Supp. 776, 780 (N.D. Ill. 1992) (ordering *pro rata* distribution based on the number of claimants); *Mister v. Illinois Cent. Gulf R.R. Co.*, 790 F. Supp. 1411, 1418 (S.D. Ill. 1992) (adopting the shortfall/pro rata method used in *Chicago Miniature Lamp Works*).  *See also Hameed v. Int'l Ass'n of Bridge, Structural and Ornamental Iron Workers, Local Union No. 396*, 637 F.2d 506, 521 n. 19 (8th Cir. 1980) (class-wide back pay damages for 45 shortfall hires should be distributed *pro rata* and "[i]f there are more than 45 claimants, not all claimants will receive back pay equal to the amount they would receive if they were actual discriminatees.").

The City did not cite to, and counsel for the United States is unaware of, any case in which a court has approved a reduction of an individual's share of a class-wide back pay award based on the number of <u>potential</u> claimants instead of the number of <u>actual</u>, eligible claimants. Indeed, the reduction proposed by the City has been previously considered and rejected.  In *Chicago Miniature Lamp Works*, the defendant sought to set the cap on individual back pay awards by dividing the class-wide back pay fund by the number of potential claimants (*i.e.,* applicants who would have applied for a job but for its discriminatory recruiting), rather than the number of actual claimants.  640 F. Supp. 1291, 1299-1300 (N.D. Ill. 1986), *rev'd on other grounds* 947 F.2d 292 (7th Cir. 1991).  The court characterized the defendant's proposal as a mere "numbers game," because "[s]o long as the number of actual claimants proves less than the

6

number of applicants discriminated against, their claims (as calculated by [defendant]) will not exhaust the back pay fund – even though [defendant] would actually have paid out those funds to blacks in wages, but for its discriminatory hiring." *Id.* at 1300. The City's proposal is likewise a "numbers game" that guarantees the City cannot actually be liable for the back pay amounts ordered by the Court. Instead, an enormous share of the back pay fund intended for discrimination victims will never be paid out even though the City would have paid this amount in wages but for its discriminatory hiring.[8] *Id.*

The following example illustrates the fundamental unfairness of the City's proposal and another reason why it contravenes the Court's Back Pay Order. The hypothetical assumes there are 700 <u>potential</u> claimants in the black Exam 7029 Non-hire Claimant category. It also assumes that only 114 <u>actual</u>, eligible claimants exist (*i.e.,* the number of actual, eligible claimants equals the number of shortfall hires for this back pay category). Finally, this hypothetical assumes that, despite reasonable mitigation efforts, none of these 114 actual, eligible claimants received any interim earnings.[9]

---

[8] Consistent with the above precedent, the Court has previously indicated that a claimant's *pro rata* share of the back pay fund can be expressed as a percentage of the pay that one shortfall hire would have received. Dkt. 640 at 24 n. 10. The Court intimated that a claimant's *pro rata* share of the back pay fund would be based on the "individual claims process," in which it will be determined which applicants "would *have been eligible to be hired* in the absence of discrimination." *Id.* at 24 (emphasis added). That is, applicants who submit claim forms and are deemed eligible for relief during the claims process will determine the number of eligible claimants, which in turn will determine each claimant's *pro rata* share of the total back pay fund.

[9] This assumption regarding interim earnings and mitigation efforts is unlikely to reflect what might occur in the actual claims process, where many claimants will certainly have interim earnings. However, it is provided to illustrate that, in a scenario where a group of claimants is entitled to the maximum amount of back pay a shortfall hire would have earned, the City's proposal would shortchange the claimants by more than $50 million.

**Table 2:  Hypothetical comparison of the City's and the United States' proposals assuming <u>no</u> interim earnings exist**

| Exam 7029 black Non-hire category | City's proposal | United States' proposal |
|---|---|---|
| Total back pay fund | $60,741,138[10] | $62,202,409 |
| # of shortfalls hires | 114 | 114 |
| # of <u>actual</u>, eligible claimants | 114 | 114 |
| # of <u>potential</u> claimants | 700 | 700 |
| Reduction ratio | 16.3% (114/700) | 100% (114/114) |
| Claimant's aggregate back pay award[11] | $532,817  (earnings of one shortfall hire based on median hire date) | $545,635.16 ($62,202,409/114 = $545,635.16) |
| Claimant's interim earnings | $0 | $0 |
| Individual Claimant's net award (aggregate back pay award x reduction ratio) | $86,849.17 ($532,817  x 16.3% = $86,849.17) | $545,635.16 ($545,635.16 x 100% = $545,635.16) |
| Reverts to City per claimant | $445,967.83 | $0 |
| Reverts to City total | $50,840,332.62 ($445,967.83 x 114) | $0 |
| Total back pay amount to all claimants | **$9,900,805.38** | **$62,202,409** |

Under the United States' proposal, and other court-approved proposals, each of the 114 actual claimants would receive the full amount of back pay that one shortfall hire would have earned:  $545,635.16 ($62,202,409/114 = $545,635.16).  Further, no amount of back pay damages would revert to the City because, despite reasonable mitigation efforts, there were no

---

[10]   As described in Table 1, *supra*, the City's proposal improperly reduces the Court-ordered back pay fund for this category by $1,461,271.

[11]   As discussed in Section I.A.1.a, the City's proposal calculates a claimant's aggregate back pay award differently than the United States because it uses the median hire date.

interim earnings.  In contrast, under the City's approach, each of the 114 claimant's back pay share must be radically decreased by the City's proposed back pay reduction ratio.  In this example, each claimant would receive only 16.3% of the pay one shortfall hire would have earned if the City had hired him on the median hire date.  As applied to all 114 claimants, the City would be liable for only **$9,900,805.38** and the remaining **$52,301,603.62** ($62,202,409 - $9,900,805.38) in the back pay fund would revert to the City.

No persuasive or legitimate justification exists in this scenario for any money – much less 84% of the total back pay fund for this category – to revert to the City.  Moreover, this hypothetical demonstrates why, under the City's proposed method for calculating back pay, it would be impossible for the City to be even potentially liable for the pre-mitigation amount of back pay that the Court ordered the City to pay.  Simply put, the City's proposal guarantees that victims of the City's discriminatory conduct cannot be made whole and that the City cannot actually be liable for anywhere near the amount of back pay that the Court has ordered.

Table 3 below illustrates that, in a realistic claims process scenario where eligible claimants have substantial interim earnings, the magnitude of difference between the United States' proposal and the City's proposal remains very significant both as applied to an individual claimant and to the total amount of back pay funds distributed to all eligible claimants.

**Table 3:  Hypothetical comparison of the City's and the United States' proposals assuming interim earnings <u>do</u> exist**

| Exam 7029 black Non-hire category | City's proposal | United States' proposal |
|---|---|---|
| Total back pay fund | $60,741,138 | $62,202,409 |
| Earnings of one shortfall hire | $532,817 (based on earnings from median hire date) | $545,635.16 ($62,202,409/114 shortfalls) |
| # of shortfalls hires | 114 | 114 |
| # of <u>potential</u> claimants | 700 | 700 |
| # of <u>actual</u>, eligible claimants | 400 | 400 |
| Claimant's interim earnings | $250,000 | $250,000 |
| Claimant's <u>aggregate</u> back pay award | $282,817 ($532,817 - $250,000) | $155,506.02 ($62,202,409/400 claimants) |
| Reduction ratio | 16.3%  (114 shortfalls/700 potential claimants) | 28.5%  (114 shortfalls/400 actual, eligible claimants) |
| Reduction ratio applied to interim earnings | Not applicable | $71,250 ($250,000 (interim earnings) x 28.5%) |
| Claimant's <u>net</u> back pay award | **$46,099.17** (16.3% x $282,817) | **$84,256.02**  ($155,506.02 (aggregate award) – $71,250 (reduced interim earnings)) |
| Reverts to City for particular claimant | Unclear under City's proposal[12] | $71,250 ($250,000 (interim earnings) x 28.5% ) |
| Total award (400 actual claimants each w/$250k interim earnings) | **$18,439,668** ($46,099.17 x 400 claimants) | **$33,702,408** ($84,256.02 x 400 claimants) |
| Reverts to City total (400 claimants each w/$250k interim earnings) | **$42,301,470** (assumes difference between total back pay award ($18,439,668) and back pay fund ($60,741,138) | **$28,500,000** ($71,250 x 400 claimants) |

---

[12]   Under the City's proposal, it does not appear that the reversion amount for a particular claimant is calculated by reducing the interim earnings ($250,000) by the reduction ratio (16.3%), which equals $40,750 in the example above.  In the Table 3 example, this reversion amount ($40,750) multiplied by 400 claimants equals $16,300,000.  However, the reversion amount ($16,300,000) added to the total back pay award ($18,439,668), equals only $34,739,668, which is $26,001,470 less than the total back pay fund ($60,741,138).

10

Although the City's back pay proposal fails to specify how it will determine what amount of a claimant's aggregate back pay award must revert to the City, *see* note 12, it is clear that the City will pay barely half the amount of back pay awards to claimants ($18,439,668) under its proposal compared to the United States' proposal ($33,702,408).  Likewise, a far greater amount will revert to the City under its proposal ($42,301,470) than under the United States' proposal ($28,500,000).  These lopsided results are not based on the claimant's interim earnings[13] but, instead, only on the City's flawed and self-serving proposal to (1) base the reduction ratio on the number of potential claimants instead of the number of actual, eligible claimants, and (2) calculate the earnings of each shortfall hire based on the median hire date.  Further, as set forth in the example in Table 3, an individual claimant's net back pay award (after interim earnings and the reduction ratio are applied) would be cut nearly in half under the City's proposal ($46,099.17) as compared to the United States' proposal ($84,256.02).  The inevitable result of the City's proposed method is that victims of the City's discrimination will be significantly shortchanged and, as a result, the City will receive a massive windfall.

2. *The City's proposal contradicts precedent because it fails to evaluate interim earnings on an annual basis*

The City attempts to account for each claimant's interim earnings in the second step of its back pay proposal, but does so on an aggregate, rather than annual, basis.  The weight of legal authority, however, dictates that interim earnings must be evaluated on an annual basis.  This is so because, even if a claimant's aggregate interim earnings exceed his/her aggregate back pay damages, the claimant is still entitled to back pay damages in any year in which interim earnings were less than the back pay damages for that year.  *See, e.g., Taddeo v. Ruggiero Farenga, Inc.,*

---

[13]   As discussed in Section I.A.2, claimants' interim earnings must be evaluated on an annual basis.  However, to illustrate the net effect of the difference between the United States' and the City's proposal, Table 3 evaluates interim earnings on an aggregate basis.

11

102 F. Supp. 2d 197, 198-99 (S.D.N.Y. 2000); *Sims v. Mme. Paulette Dry Cleaners*, 638 F.

Supp. 224 (S.D.N.Y. 1986); *Leftwich v. Harris-Stowe State College*, 702 F.2d 686, 693-94 (8th

Cir. 1983). The City did not cite to, and counsel for the United States is unaware of, any case that

has evaluated interim earnings on an aggregate basis.  For all these reasons, the Court should

reject the City's proposal and adopt the United States' back pay calculation.

### B.  Delay Claimants

The City's proposal regarding the back pay calculation for Delay Claimants, as with Non-

hire Claimants, is riddled with flaws and should be rejected.[14]  Two key flaws exist regarding the

City's proposed back pay calculation for eligible Delay Claimants.  First, the City improperly

calculates the maximum back pay award that could be awarded to a delay shortfall hire in a

particular back pay category (*e.g.,* Exam 7029 black Delay Hire).  Doing so, as explained below,

effectively operates as a cap on the amount of damages an individual Delay Claimant in a

particular back pay category may receive.  Second, the City's proposal fails to account for the

different periods of delay in hiring experienced by claimants in the various academy classes.

---

[14]  The City's proposed methodology for calculating back pay awards to Delay Claimants
consists of the following steps:
  (1) Determine the maximum amount each claimant in a particular back pay category may
      receive by dividing the total amount of back pay for that category by the number of
      delayed hires in that category.  If more eligible claimants than shortfall Delay Hires exist,
      each claimant's maximum back pay award must be reduced by the number of shortfall
      delay hires/number of claimants.
  (2) Determine the average period of delay per delay hire, as well as the mitigation period.
  (3) Calculate the claimant's interim earnings during the mitigation period.  If the number of
      claimants exceeds the number of Delay Hires, interim earnings should be reduced by this
      same proportion (number of shortfall delay hires /number of claimants).
  (4) Determine if any claimant's delay was self-inflected.
  (5) Add prejudgment interest.

1.   *The City improperly sets the cap on what a Delay Claimant may be awarded*

In Steps 1 and 2, the City improperly reduces the amount of back pay that Delay

Claimants may receive.  Dkt. 868 at 5-6.  The City proposes that the first step in determining the

back pay award for a Delay <u>Claimant</u> is to determine the maximum back pay amount that a

Delay <u>Hire</u> could have received if he or she experienced the average amount of delay.  This back

pay amount then operates as a cap on the amount a Delay Claimant may be awarded.  To

illustrate, under the City's proposal, the Court would determine the maximum back pay award of

an Exam 7029 black Delay Claimant's by dividing the aggregate back pay fund ($1,015,579 for

Exam 7029 black Delay Claimants)[15] by the number of black Exam 7029 Delay Hires (68),

which would equal $14,934.98 per claimant.  If more than 68 black Exam 7029 Delay Claimants

exist, then the City indicates that the $14,934.98 cap would be reduced by the following

proportion:  68/(number of claimants).  This cap is inappropriate because it limits Delay

Claimants' recovery to the average amount of delay experienced for the relevant exam, without

regard to when the Delay Claimant was actually hired.

The correct operative unit to determine this cap is not the number of Delay Hires or

Delay Claimants, as the City proposes.  Instead, because of the differing amounts of delay

experienced by Delay Claimants, the operative unit of value should be the length of delay,

measured in months, experienced by Delay Hires, as the United States has proposed.

For Exam 7029 black Delay Hires, Dr. Siskin determined that the amount of delay

equaled an average of 3.48 months per Delay Hire shortfall and that there were 68 Delay Hire

shortfalls.  Dkt. 537-1 at 23-24.  Thus, the total number of months delay experienced by these 68

---

[15]   The City stated that the total amount of back pay due to Exam 7029 black Delay Hires is
$1,056,218.  Dkt. 868 at 5.  However, the Court determined that the City's maximum liability for
this back pay category is actually $1,015,579, Dkt. 825 at 46.

Delay Hire shortfalls is 236.6 (68 shortfalls x 3.48 months).  Once the total number of months

delayed is calculated, the value of one month of delay can be determined by dividing the total

back pay for that category ($1,015,579) by the number of months (236.6), which equals

$4,292.38/month.  Thus, under the United States' proposal, a Delay Hire in this category would

not receive more than $4,292.38 for each month of delay experienced.[16]

> 2. *The City's proposal fails to account for the amount of delay, measured against the first academy class, that a claimant experienced*

The City's proposal to use the same average period of delay per Delay Claimant – about

three months—operates like a class-wide formula and does not permit proper calibration of a

claimant's award based on his/her individual circumstances.  That is, using an average period of

delay fails to account for the relative delay experienced by Delay Claimants in the various

academy classes (*e.g.*, a Delay Claimant hired into the last academy class for Exam 7029

experienced a longer delay in hiring than a Delay Claimant hired into the second academy class).

As set forth in the United States' May 3 brief, in order to account for each claimant's

actual hire date, the aggregate amount of delay experienced by eligible Delay Claimants, as well

as the value of one month of delay, must be calculated.  Dkt. 869 at 11-12.  To do so, all eligible

claimants must first be identified, and then the total number of months delay these claimants

experienced can be determined as follows: (1) calculate the delay in months from the first

academy class to each subsequent academy class; (2) multiply that number of months by the

---

[16]   In the unlikely event that the total number of months delay experienced by all Delay Claimants is less than the number of months delay experienced by Delay Hires (236.6 months in the example above), the difference between the back pay fund and the amount of money distributed to claimants in that category should not revert to the City.  Instead, if this unlikely event should occur, the parties should first attempt to agree upon an appropriate distribution of the remaining back pay fund amount or, if the parties are unable to agree, the Court should decide how such remaining funds should be used.

number of claimants in that particular academy class; (3) add the total number of delay months

together; and then (4) divide that total number of delay months into the total back pay for that

category, which will provide the value of one month of delay for a Delay Claimant based on the

entire pool of actual, eligible claimants.  *See id.*[17]

In Step 3, the City argues that a claimant's interim earnings should be reduced if the

number of actual claimants exceeds the number of Delayed Hires.  Dkt. 868 at 4.  For example, if

100 Exam 7029 black Delay Claimants exist, the City asserts that each claimant's interim

earnings should be reduced by 68% because 68 shortfall hires exist.  This proposal again fails to

account for the differing periods of delay experienced by claimants in different academy classes

and should be rejected.  Instead, to properly account for the value of each month of delay

experienced, a claimant's interim earnings should be reduced by a ratio that is based on the value

of one month of delay for a Delay Hire shortfall ($4,292.38) compared to the value of one month

of delay for a Delay Claimant (*e.g.,* $500), which, in this example, equals 11.6%

($500/$4,292.38).

Tables 4 and 5 below illustrate the difference between the United States' and the City's

proposals as applied to a claimant who was hired into the second and last academy classes.

Note:  the scenarios illustrated in Tables 4 and 5 reflect that there may be more Delay <u>Claimants</u>

than the number of shortfall Delay <u>Hires</u> for that back pay category.  This is true because, for

example, more than 68 black applicants (who may become claimants) were hired based on Exam

7029, even though the number of shortfall Delay Hires for Exam 7029 is set at 68.  In addition,

---

[17]   In addition, the City argues the mitigation period should be (1) approximately three months
immediately prior to a claimant's academy class; or (2) the time period between a claimant's
actual academy class and the preceding academy class.  But to account for the relative
differences in delay experienced by claimants, the back pay (mitigation) period should instead
begin on the date of the first academy class and continue through the date of the claimant's
academy class.

certain rows illustrating the steps in the City's and the United States' back pay proposals do not

correspond exactly because differences exist between the two proposals on such steps.  However,

Tables 4 and 5 are designed to illustrate the net effect between using the City's proposal versus

the United States' proposal.

**Table 4:  Hypothetical comparison of the City's and the United States' proposals applied to a claimant hired into the <u>second</u> academy class for the relevant exam**

| Exam 7029 black Delay Claimant hired in the second academy class | City's proposal | United States' proposal |
|---|---|---|
| Value of a shortfall Delay <u>Hire</u>'s award | $14,934.98 ($1,015,579/68 shortfall delays) | $4,291.66/month (68 shortfall delays x 3.48 mos. = 236.6 mos./$1,015,579 = $4,291.66/month) |
| # of shortfall Delay Hires | 68 | 68 |
| # of actual, eligible claimants | 100 | 100 |
| Determine value of one month of delay for Delay Claimant | Not applicable | $677.05/month (assume that total months of delay experienced by 100 claimants equals 1500 months, $1,015,579/1500 months = $677.05) |
| Back pay reduction ratio | 68% (68 shortfalls/100 claimants) | 15.77% ($677.05 (claimant value of one month) / $4,291.66 (shortfall hire value of one month)) |
| Aggregate value of a Delay <u>Claimant</u>'s delay | $10,155.78 ($14,934.98 x 68/100 (68%)) | $2,031.15  (claimant is in second academy class and experienced 3 months delay: $677.05 x 3 = $2,031.15) |
| Interim earnings | $5,000 (over appx 3 mos) x 68% = $3,400 | $5,000 (over appx 3 mos) x 15.77% = $788.50 |
| Net award to claimant | **$6,755.78** ($10,155.78 - $3,400) | **$1,242.65** ($2,031.15 - $788.50) |

16

**Table 5:  Hypothetical comparison of the City's and the United States' proposals applied to a claimant hired into the <u>last</u> academy class for the relevant exam**

| Exam 7029 black Delay Claimant hired in last academy class | City's proposal | United States' proposal |
|---|---|---|
| Value of a shortfall Delay <u>Hire</u>'s award | $14,934.98 ($1,015,579/68 shortfall delays) | $4,291.66/month (68 shortfall delays x 3.48 mos. = 236.6 mos.; 236.6 months/$1,015,579 = $4,291.66/month) |
| # of shortfall Delay Hires | 68 | 68 |
| # of actual, eligible claimants | 100 | 100 |
| Determine value of one month of delay for Delay Claimant | Not applicable | $677.05/month (assume that total months of delay experienced by 100 claimants equals 1500 months, $1,015,579/1500 months = $677.05) |
| Back pay reduction ratio | 68% (68 shortfalls/100 claimants) | 15.77% ($677.05 (claimant value of one month) / $4,291.66 (shortfall hire value of one month)) |
| Aggregate value of a Delay <u>Claimant's</u> delay | $10,155.78 ($14,934.98 x 68/100 (68%)) | $21,665.60   (claimant is in last academy class and experienced 32 months delay:  $677.05 x 32 = $21,665.60) |
| Interim earnings | $5,000 (over appx 3 mos) x 68% = $3,400 | $80,000 (over appx 32 months) x 15.77% = $12,616 |
| Net award to claimant | **$6,755.78** ($10,155.78 - $3,400) | **$9,049.60** ($21,665.60 - $12,616) |

Unlike the City's proposal, the United States' back pay calculation method distinguishes between Delay Claimants hired into the second class, who likely suffered less damages

17

($1,242.65 award), and Delay Claimants hired into the last academy class, who likely suffered more damages ($9,049.60 award).[18]

For all these reasons, the Court should reject the City's proposal and adopt the United States' back pay and pre-judgment interest[19] calculations. The United States' proposal is consistent with the Court's decision regarding back pay awards and interim earnings (Dkt. 640 at 24 n. 10), as well as other federal court holdings discussed above. It also more precisely and equitably allocates the back pay fund among all eligible claimants, while still allowing the City to recover claimants' interim earnings, in accordance with Title VII. On the other hand, the City's proposal makes it impossible for victims of the City's discrimination to be made whole and unjustly diverts much of the back pay away from victims of the City's discriminatory practices.

## II.   The Court should require all priority hire claimants to take Exam 2000

The parties agree that all claimants who wish to be appointed as priority hires ("priority hire claimants") may not be hired by the City as entry-level firefighters unless they are currently qualified for the position. *See* Dkt. 869 at 11-12. The United States and the City concur that all priority hire claimants should have to take and pass Written Exam 2000, if the Court approves its

---

[18]   Moreover, Step 4 of the City's proposal, determining whether a claimant's delay may have been self-inflicted (in whole or in part), should be rejected because the discovery necessary to resolve this issue is likely to be unduly burdensome on claimants, the Special Masters, and the parties. Further, in all but the most extreme cases, attempting to determine what, if any, portion of a claimant's delay was self-inflicted as opposed to a result of the City's discriminatory post-exam screening processes will result in a quagmire of hypothetical judgments.

[19]   Although the City's proposal regarding pre-judgment interest is unclear as to whether such interest should be compounded annually, the City appears to agree with Dr. Siskin's calculation of pre-judgment interest. *See* Dkt. 868 at 7 and 9. Because Dr. Siskin compounded the interest rate annually*, see, e.g.,* Dkt. 537-1 at 35, it appears that the City agrees that pre-judgment interest should be compounded annually as set forth in the United States' proposal. Dkt. 869 at 14.

use, to demonstrate that they are currently qualified to be hired as entry-level firefighters. *See* Dkt. 869 at 12-14; Dkt. 868 at 1-2. However, the Plaintiffs-Intervenors maintain that priority hire claimants who scored 70 or above on Written Exam 7029 or 2043 should not be required to take and pass Exam 2000, assuming the Court approves its use. The Court should reject this proposal because the score achieved by priority hire claimants on Written Exams 7029 and 2043 (over a decade ago in most cases) does not demonstrate that claimants are currently qualified to become entry-level firefighters.

A claimant's score of 70 or above on Written Exam 7029 or 2043 is simply not an appropriate measure of whether a priority hire claimant in this case is currently qualified. As the Court held, scores on these exams do not "bear any relationship to the necessary qualifications" for an entry-level firefighter nor do they make meaningful distinctions between candidates based on their qualifications for the job. Dkt. 869 at 17 (citing Dkt. 294 at 80; 54). Using a cutoff score of 70 on Exam 7029 or 2043 to make distinctions between the qualifications of priority hire claimants would not only be unfair to priority hire claimants who scored below 70 on Written Exam 7029 or 2043, it would also contravene the Court's prior rulings. Indeed, given the fact that Written Exams 7029 and 2043 were not job-related, no legitimate reason exists for the Court to treat a priority hire claimant who, for instance, scored a 69 on one of these exams differently than a priority hire claimant who scored a 70.[20]

---

[20] The Plaintiffs-Intervenors cite *Lewis v. City of Chicago*, No. 98 C 5596, Dkt. 480 (N.D. Ill. Aug. 17, 2011) and *Ass'n Against Discrimination in Employment, Inc. v. City of Bridgeport*, 647 F.2d 256, 281-82 n.24 (2d Cir. 1981), as support that individuals may receive a priority appointment without taking a new written exam. Dkt. 870 at 2. However, neither of these cases suggests that an individual may receive a priority appointment without demonstrating he or she is currently qualified for the job. As this Court has ruled, "the City must be given the opportunity to challenge a victim's current qualifications for the job of entry-level firefighter" (provided that any required qualifications are non-discriminatory) in order to balance the interest in making whole victims of the City's discrimination with the public safety interest "inherent in any

19

The United States recognizes that requiring priority hire claimants who scored 70 or higher on Written Exam 7029 or 2043 to take and pass Written Exam 2000 may appear to penalize such priority hire claimants.[21]  That is, the predominately white firefighters hired from Exams 7029 and 2043 will not be required to take and pass Written Exam 2000, even though the Court determined that Written Exams 7029 and 2043 failed to adequately measure the necessary qualifications for the entry-level firefighter position.  However, the United States submits that, given the very significant passage of time since priority hire claimants took Written Exam 7029 or 2043, requiring priority hire claimants to be retested – using a valid, job-related test – should not be unduly burdensome and, therefore, is appropriate.   As a result, this Court should order all priority hire claimants to take Written Exam 2000, assuming the Court approves its use.

**III.**     **Priority hires should receive their retroactive salary and benefits immediately after they complete the 12-month probationary period**

The United States and the Plaintiffs-Intervenors agree that priority hires should receive retroactive salary and benefits as soon as they join the FDNY in order to ensure that these individuals receive complete, make-whole relief.  *See* Dkt. 869 at 14-15; Dkt. 870 at 4.  However, the City asserts that priority hires should receive the starting salary of $39,370 currently in place for Exam 2000 hires when they first join the FDNY.  Dkt. 868 at 2.  The City proposes that these individuals should wait to be made whole until after they complete their 12-month probationary period.  That is, once a priority hire completes the probationary period, the

---

decision to hire a firefighter." Dkt. 390 at 20.  Thus, if the Court approves Exam 2000, it is appropriate to require priority hire claimants to demonstrate their current qualifications by taking and passing Exam 2000.

[21]   The passing score for Written Exam 7029 was actually 84.705.  Under the Plaintiffs-Intervenors' proposal, priority hires who scored between 70 and 84 will nonetheless be treated as if they passed Written Exam 7029, and thus eligible for hire, even though Written Exam 7029 candidates who scored in this range could not be hired because they did not pass the exam.

City would increase his or her salary to the level of firefighters hired on their presumptive hire date.[22]  In addition, after the probationary period, the City would provide priority hires with a lump sum payment representing the difference between the Exam 2000 entry-level salary and the retroactive salary (what they would have earned had the City hired them on their presumptive hire date) over the course of the 12-month probationary period.  Dkt. 868 at 2.

The Court should reject the City's proposal for two key reasons.  First, the City's claim that its proposal will "minimize attrition amongst priority hires who join the department and also avoid a windfall to those who drop out," is unsupportable.  Dkt. 868 at 2.  The priority hires that join the FDNY will be highly motivated to complete their probationary period.  They will have completed the City's rigorous selection process, including passing Exam 2000 (if the Court so orders, as argued in Section II), the Candidate Physical Ability Test, and the City's medical, psychological, and character screening.  It is unlikely that a priority hire claimant would persist through all of these steps if he or she was not very committed to becoming a firefighter.  As a result, the false "incentive" of withholding the full retroactive salary and benefits to which these priority hires are entitled is wholly unnecessary to encourage them to complete the probationary period, and, in fact, only serves to prolong the already lengthy period of time that these individuals have been required to bear the effect of the City's discriminatory conduct.[23]

---

[22]  The presumptive hire date for priority hires who took Exam 7029 is February 2, 2003 and the presumptive hire date for priority hires who took Exam 2043 is June 11, 2006.  These are the median hire dates from those exams' eligible lists.  *See* Dkt. 861 at 3.

[23]  The City also claims that it seeks to minimize potential antagonism from new hires in the same academy class as the priority hires who would earn less during the probationary period.   Dkt. 868 at 2-3.  However, under the City's proposal, a salary differential will exist between priority hire claimants and other new hires throughout their employment following the probationary period, and no compelling reason exists to believe that any resulting antagonism would be relieved by denying priority hire claimants their appropriate salary during the first twelve months of employment.  Moreover, such antagonism, if it were to occur, is not an appropriate reason to

Second, the City's proposal would actually discourage individuals from pursuing priority hiring relief and, thus, foster attrition among priority hire claimants, instead of minimizing it.  As the United States has previously explained, failing to pay priority hires their retroactive salary and benefits immediately upon their hire would present a strong disincentive to Non-hire Claimants, many of whom likely have had the opportunity, in the intervening decade or more since they took the City's unlawful exams, to obtain jobs in which their salary now exceeds the current entry-level salary of an FDNY firefighter.  Dkt. 869 at 16.  It is unreasonable to expect that these Non-hire Claimants would be willing or able to shoulder a pay cut for 12 months, particularly when there is no dispute that the City owes priority hires this higher salary.  Thus, the City's purported focus on preventing attrition after the priority hires start their probationary period as firefighters is specious because its approach would likely substantially decrease the number of claimants who seek priority hire relief in the first place.[24]

---

deny or delay this relief.  Appropriate Title VII relief cannot be denied "merely because . . . employees, who have not suffered discrimination, will be unhappy about it," otherwise there would be "little hope of correcting the wrongs to which the [statute] is directed."  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 775 (1976).

[24]  Further, the United States disagrees that the Court should permit the City to defer paying priority hires their retroactive salary and benefits until after they complete their probationary period to avoid giving them a potential "windfall."  As the Plaintiffs-Intervenors have noted, it is impossible for any party to know what would have happened had the City hired the priority hires from the Exam 7029 or 2043 eligible lists.  *See* Dkt. 870 at 5.  Although it is possible that a priority hire might not have completed his or her probationary period if the City had hired him or her from the Exam 7029 or 2043 eligible list, it is equally possible that he or she would have completed his probationary period and continued to work as a firefighter.  The City, not the victim, should have to bear the burden of this uncertainty.  *See EEOC v. Joint Apprenticeship Comm. Of the Joint Indus. Bd. Of the Elec. Indus.,* 186 F.3d 110, 122 (2d Cir. 1998), citing *Bridgeport,* 647 F.2d at 289.

For the reasons stated above and in the United States' and Plaintiffs-Intervenors' May 3 briefs (Dkts. 869 and 870), the Court should require the City to pay priority hires their retroactive salary and benefits as soon as they enter the fire academy.

**IV.** **The Court should provide individuals with thirty (30) days to submit their objections to the relief order in connection with Fairness Hearing I**

The Court should reject the City's position that individuals should have 45 days to file objections to the Court's relief order, instead of 30 days, because the additional time is unnecessary. The Plaintiffs-Intervenors agree with the United States' position on this issue.

As an initial matter, the City previously agreed to the 30-day time period advocated by the United States and the Plaintiffs-Intervenors. Under the remedial phase timeline proposed jointly by all parties (Dkt. 844-2) and subsequently approved by the Court (minute entry dated Apr. 12, 2012), individuals have 30 days from the date that the City mails notice of Fairness Hearing I to mail in their objections to the Court's relief order. *See* Dkt. 844-2 at 3. On May 3, 2012, less than a month after the City agreed to this 30-day deadline for objections, it changed its position and now asserts that the Court should set a 45-day deadline for objections. *See* Dkt. 868 at 3.[25] Apparently, the City now believes that individuals objecting to the Court's relief order should have the same amount of time as claimants returning their claim forms. *See* Dkt. 861 at 7 (setting a 45-day deadline for claim forms).

Contrary to the City's position, however, an important difference exists between the potential claimants and individuals who will receive notice of Fairness Hearing I. All parties agreed that the 45-day time period for claimants to return claim forms was necessary, in part, to

---

[25] The City's perfunctory statement on this issue was, "[t]he Court, therefore, should give a minimum of 60 days notice of Fairness Hearing I to all applicants who took Exam 2000/2500 and 45 days to file objections."  Dkt. 868 at 5.

allow time for the City to re-send notice and claim form mailings when such mail is returned to the City as undeliverable.  *See* Dkt. 850 at 1-2 n. 1.  The parties anticipate that a substantial number of the notice and claim form mailings to potential claimants will be returned to the City as undeliverable because, despite its best efforts, the United States was unable to obtain updated contact information for each of the nearly 7,100 black and Hispanic applicants who took Written Exams 7029 and/or 2043 between 1999 and 2006.  The 45-day time period sought by the parties includes time to research updated mailing addresses and send additional mailings, as necessary. The Court approved the 45-day deadline for claim forms for this reason.  *See* Dkt. 861 at 7.

Unlike the notice and claim form mailing, however, the City should have current addresses for the individuals to whom the parties intend to send notice of Fairness Hearing I. The parties anticipate providing notice to all current uniformed employees of the FDNY, the Uniformed Firefighters Association, the Uniformed Fire Officers Association, the United Women Firefighters, and applicants who took Written Exam 2000 or Written Exam 2500 (who recently provided their addresses to the City on their application).  In addition, the parties will provide notice of Fairness Hearing I to all black and Hispanic applicants who took Written Exams 7029 and/or 2043, for whom the City will have obtained updated mailing addresses through the process of mailing notice and claim form documents.[26]  Accordingly, there should be

---

[26]   The mailing of notice and claim form documents should enable the parties to determine the current addresses for most of the black and Hispanic applicants who took Exams 7029 and 2043. The United States has already collected multiple addresses for most of these individuals.  When notice and claim form documents are returned as undeliverable, the address on that undeliverable envelope will be eliminated from the list of potential addresses for that individual, and then the notice documents can be re-sent to one of the alternate addresses.  Through this process of elimination, the parties should be able to better determine which addresses are current. Additionally, the newspaper and radio advertisements of the claims process are intended to reach these individuals and these advertisements instruct them to contact the United States if they do not receive a claim form.  Indeed, the United States has already received a substantial number of contact information updates as a result.

few, if any, notices of Fairness Hearing I that are returned as undeliverable and, thus, no additional time is necessary to re-send the notices.

As the United States stated in its May 3, 2012 brief, in cases similar to this, other courts have approved a 30-day deadline for submitting objections in connection with fairness hearings. Dkt. 869 at 19.  In addition to the cases the United States cited in its brief, in *United States, et al. v. City of New York, et al.*, 07-CV-2083 (S.D.N.Y. Oct. 7, 2010), a Title VII case involving a pattern-or-practice of sex-based hiring discrimination, the court approved a 30-day deadline for filing objections in connection with a fairness hearing.  *See* Exhibit __ at 4.  Notably, the City agreed to the 30-day deadline for the filing of fairness hearing objections in that case.

Lastly, the cases cited above and in the United States' May 3 brief demonstrate that a 30-day period for objections is reasonable.  Simply because the parties opted to provide claimants a 45-day period in which to return their claim forms, because of the anticipated delays related to outdated contact information (which should not affect potential objectors), does not render the 30-day objection period invalid.  For all the reasons stated above and in the United States' May 3 brief (Dkt. 869), the United States requests that the Court reaffirm its April 12 order and approve a 30-day time period for the filing of objections in connection with Fairness Hearing I.

**V.      The Court should not adopt any of the Special Masters' recommendations for, or any of the parties' new proposals about, the claims process at this time**

All parties agree that the Special Masters and the parties should meet and confer to discuss the recommendations of the Special Masters regarding the individual claims process before the Court adopts any of these recommendations.  *See* Dkt. 868 at 8; Dkt. 869 at 20; Dkt. 870 at 8.  The central reason for this approach is the lack of information available to the parties at this time regarding the rate of claimant participation and the need to resolve several outstanding claims process disputes that the parties will continue to brief this summer.  Although the parties

25

request that the Court refrain from ruling on the Special Masters' recommendations until the parties have had the opportunity to meet and confer, the parties also note in their briefs their respective objections and areas of concern with the Special Masters' recommendations.  In addition, both the City and the Plaintiffs-Intervenors make a number of affirmative proposals for inclusion in the Special Masters' recommendations for the claims process.

Consistent with the parties' agreement, the United States maintains that both the parties' objections and their affirmative proposals[27] should be addressed after the parties and the Special Masters have an opportunity to meet and confer.  Therefore, the United States does not directly address these objections and proposals in this briefing.   However, the United States respectfully reserves the right to respond to the City's and the Plaintiffs-Intervenors' objections and proposals once the parties have met with the Special Masters and attempted to resolve these disputes.  For these reasons, the United States requests that the Court refrain from adopting any of the Special Masters' recommendations and from resolving any objections, including proposed additions to, the Special Masters' recommendations.

## VI.   **Conclusion**

For the reasons stated above, the United States respectfully requests that the Court adopt the United States' proposals set forth herein and in its May 3 brief (Dkt. 869).

---

[27]  Indeed, one important purpose the Special Masters will serve is to consider all parties' positions regarding these types of affirmative proposals and make a recommendation to the Court regarding whether such proposals should be adopted.

Date: May 17, 2012                           Respectfully submitted,

                                             THOMAS E. PEREZ
                                             Assistant Attorney General

                                             DELORA L. KENNEBREW
                                             Chief

                                             MEREDITH L. BURRELL
                                             Deputy Chief


                                             _____
                                             /s/ ERIC K. BACHMAN
                                             Senior Trial Attorney
                                             Telephone:  (202) 305-7883
                                             Facsimile:  (202) 514-1005

                                             JENNIFER M. SWEDISH
                                             ALLAN K. TOWNSEND
                                             BARBARA SCHWABAUER
                                             Trial Attorneys

                                             United States Department of Justice
                                             Civil Rights Division
                                             950 Pennsylvania Avenue, N.W.
                                             Patrick Henry Building, Room 4500
                                             Washington, D.C. 20530

                                             LORETTA E. LYNCH
                                             United States Attorney

                                             _____
                                             /s/ ELLIOT M. SCHACHNER
                                             Assistant United States Attorney
                                             Eastern District of New York
                                             271 Cadman Plaza East
                                             Brooklyn, New York  11201-1820
                                             Telephone:  (718) 254-6053
                                             Facsimile:  (718) 254-6479