IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

          PLAINTIFF,

THE VULCAN SOCIETY INC., for itself and
on behalf of its members, JAMEL
NICHOLSON, and RUSEBELL WILSON,
individually and on behalf of a subclass of
all other victims similarly situated seeking
classwide injunctive relief;

ROGER GREGG, MARCUS HAYWOOD, and
KEVIN WALKER, individually and on behalf
of a subclass of all other non-hire victims
similarly situated; and

CANDIDO NUÑEZ and KEVIN SIMPKINS,
individually and on behalf of a subclass of
all other delayed-hire victims similarly
situated,

          PLAINTIFFS-INTERVENORS

v.

CITY OF NEW YORK, ET AL.,

          DEFENDANTS.

CIV. ACTION NO. 07-CV-2067 (NGG)(RLM)

**PLAINTIFF UNITED STATES' MEMORANDUM OF LAW
REGARDING THE PROPER SCOPE OF DISCOVERY
IN THE CLAIMS PROCESS FOR INDIVIDUAL RELIEF**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Background ................................................................................................ 2

III.    Because the City cannot prove that jobs substantially equivalent to the FDNY
        firefighter position exist in New York City, the only relevant question regarding
        their job search efforts is whether a claimant worked or made some effort to find
        work during periods of unemployment ...................................................... 4

        A.      Applicable legal standards ................................................................ 5

        B.      No job in New York City was substantially equivalent to the FDNY
                firefighter position during the back pay period....................................... 7

        C.      Since the City cannot prove substantially equivalent jobs existed, its failure-
                to-mitigate defense must fail if a claimant worked or attempted to find a job
                during periods of unemployment ...................................................... 8

IV.     Income from collateral sources should not be used to reduce claimants' back pay
        awards ................................................................................................ 11

V.      Claimants' back pay periods cannot be cut off based on speculation that claimants
        would have left the firefighter position due to their educational,
        medical/psychological, and criminal/character backgrounds ........................... 12

        A.      Because no objective standards exist for determining whether an individual
                claimant would have left the firefighter job based on the background
                information sought, the City cannot use this information to cut short
                claimants' back pay periods ........................................................ 13

        B.      The Court has already accounted for the likelihood of claimant attrition by
                discounting the City's aggregate back pay liability, and the City should not
                be permitted to discount its back pay liability a second time for attrition........... 14

VI.     If the City believes it needs additional evidence of claimants' interim earnings,
        it should propose a method for collecting this additional evidence................ 16

VII.    Conclusion ................................................................................................ 20

# TABLE OF AUTHORITES

**Cases**

*Broadnax v. City of New Haven*, 415 F.3d 265 (2d Cir. 2005)............................................. 6, 9, 10

*Dailey v. Societe Generale*, 108 F.3d 451 (2d Cir. 1997)............................................................. 10

*Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73 (3d Cir. 2009)............................................ 6

*EEOC v. Yellow Freight System, Inc.*, 98-CV-2270, 2001 WL 1568322
    (S.D.N.Y. Dec. 6, 2001)............................................................................................................. 11

*Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469 (S.D.N.Y. 2001)................................. 6, 9

*Gerardi v. Hofstra Univ.*, 897 F. Supp. 50 (E.D.N.Y. 1995)....................................................... 6, 7

*Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998) ..................................................... 9

*Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344 (D. Me. 2007) ................................................... 10

*Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir. 1998)............................................... 5

*Orr v. Mukasey*, 631 F. Supp. 2d 138 (D.P.R. 2009)................................................................... 10

*Parrish v. Immanuel Med.l Ctr.*, 92 F.3d 727 (8th Cir. 1996)....................................................... 7

*Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1 (1st Cir. 1999) ....................................................... 6, 9

*Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614 (6th Cir. 1983) ..................................... 6

*Robinson v. Metro-North Commuter R.R. Co*, 267 F.3d 147 (2d Cir. 2001)............................... 14

*Roniger v. McCall*, No. 97-cv-8009, 2000 WL 1191078 (S.D.N.Y. Aug. 22, 2000).................... 6

*Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225 (S.D.N.Y. 2001) ......................... 6, 11

*Siracuse v. Program for the Dev. of Human Potential*, 07-CV-2205, 2012 WL 1624291
    (E.D.N.Y. Apr. 30, 2012)......................................................................................................... 11

*Wills-Hingos v. Raymond Corp.*, 104 Fed. Appx. 773 (2d Cir. 2004)........................................... 5

I.      **Introduction**

In accordance with Title VII precedent and this Court's prior orders, the United States and Plaintiffs-Intervenors, who join this memorandum, request that the Court resolve three disputes related to the City's failure-to-mitigate defense that directly impact the scope and volume of discovery that claimants will be subjected to during the claims process. By way of context, the Court's most recent order regarding the City's failure-to-mitigate defense contemplated that the defense could affect claimants' back pay awards in two ways: (1) the back pay award of claimants who were employed during the relevant back pay period could be reduced by amounts earned (*i.e.,* interim earnings),[1] and (2) claimants who did not use reasonable diligence to find other suitable employment may forfeit their right to back pay. *See* Dkt. 825 at 48.

The first dispute that must be resolved is whether the City can establish its threshold burden to prove that other suitable employment (*i.e.,* "substantially equivalent employment") existed. The second dispute relates to the City's intent to argue that worker's compensation, Social Security Disability benefits, and unemployment earnings should be deducted from claimants' back pay awards as interim earnings.[2] Finally, the third dispute centers on the City's

---

[1]   The United States reiterates that evidence of each eligible claimant's actual interim earnings will be obtained during the claims process, which will establish the years in which a claimant worked and the amounts earned for such work. These interim earnings will then be used to proportionally reduce, to the extent required by Title VII, an eligible claimant's *pro rata* back pay award. Interim earnings information will be obtained from the Social Security Administration ("SSA") through a process the Court has previously approved. *See* Dkt. 861 at 7.

[2] The City also contends that it needs information regarding claimants' interim earnings beyond what will be obtained from SSA. For the reasons stated in Section VI, the City should propose how it intends to obtain such information so that the parties may attempt to reach agreement on this issue.

1

argument that a claimant's back pay period should be cut off if he or she would have left the firefighter job during the back pay period.

The resolution of these three disputes is intertwined with the amount and type of discovery that claimants will be subjected to during the claims process, which has significant implications for both the length and complexity of the claims process and the claimant participation rate. Therefore, the United States respectfully requests that the Court resolve these issues before the parties undertake the next steps in the claims process, including the City's proposal to seek discovery from claimants through a mitigation questionnaire.

## II.    Background

Under Title VII, victims of discrimination have a duty to try to minimize their economic damages:  "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e-5(g). The Court's June 6, 2011 Order held that, although the aggregate amount of back pay due to claimants could be determined on a class-wide basis, the Court would determine mitigation amounts on an individual, rather than class-wide, basis. *See* Dkt. 640 at 18-25. As a result, the Court directed that the individual claims process "be modified to enable fact finding on questions of mitigation," suggesting that each claimant's actual interim earnings should first be ascertained and that amount should then be used "to proportionally reduce each claimant's share of the aggregate backpay award." *Id.* at 24. Next, the Court stated that the City would "have the opportunity, under Second Circuit case law, to prove that suitable work existed, and that the claimant did not make reasonable efforts to obtain it."[3] *Id.* In the City's July 8, 2011 brief on the organization and management of the claims process, the City proposed mailing

---

[3] In deciding the United States' motion for summary judgment regarding the amount of the City's aggregate back pay liability, the Court reaffirmed this holding. *See* Dkt. 825 at 48.

a questionnaire to all eligible claimants in order to "expedite the collection of mitigation

evidence."  Dkt. 667 at 4.  According to the City, this mitigation questionnaire would require all

eligible claimants to:

> (a) provide a list of all schools and colleges attended, period of attendance and
> highest class completed;
>
> (b) provide a list of all occupations and employers since leaving school and the
> reason for separation from each employer, as well as a listing of any periods of
> unemployment and how s/he supported him/herself during such period;
>
> (c) mark "Yes" or "No" on a list of illnesses or injuries to indicate whether they now
> have or have had such illness or injury and provide an onset date and requesting a
> brief explanation for any illness or injury marked "Yes"; [and]
>
> (d) provide a list of convictions, including felonies, misdemeanors or violations
> (excluding juvenile delinquency and youthful offender convictions) and provide
> docket, date, and court.

*Id.*  The City's brief also suggested that "in appropriate cases," the City would seek the following

additional information from eligible claimants:

> (e) a release to obtain any filings for Social Security Disability benefits and/or
> workers compensation benefits; [and]
>
> (f) information with respect to job hunting efforts and job offers received and
> unemployment filings.

*Id.* at 5.

The City has never specifically explained how it intends to use the information collected

in the mitigation questionnaire.  However, based on representations made during meet-and-

confer discussions with the parties, the United States understands the City's mitigation

questionnaire to seek evidence from eligible claimants in order to dispute:  (1) the reasonableness

of claimants' job search efforts, based on their educational backgrounds and employment

histories; (2) the amount of claimants' interim earnings, including information about periods of

unemployment, as well as filings for disability and/or workers compensation benefits; and (3)

whether claimants could have continued to work as an FDNY firefighter during the relevant back pay period, based on their medical/psychological and character backgrounds, as well as their educational history.

The United States addresses each of these three areas of dispute.  First, because no job in New York City was substantially equivalent to the FDNY firefighter position, the only issue to be resolved is whether a claimant attempted to look for work during periods of unemployment. As a result, the City should not be permitted to argue that, although a claimant made job search efforts, such efforts were insufficient.  Second, the City should be prohibited from using income from collateral sources to reduce claimants' back pay awards because such income does not constitute interim earnings.  Finally, the Court should bar the City from asserting that a claimant's back pay period should be cut short because he or she may have left the FDNY during the relevant back pay period.  A claimant's back pay period should not be truncated because (a) no objective standards exist to determine whether a claimant would have remained employed as an FDNY firefighter and (b) the City's back pay liability has already been reduced by the likelihood that claimants would have left the firefighter job (*i.e.,* attrition).

**III.  Because the City cannot prove that jobs substantially equivalent to the FDNY firefighter position exist in New York City, the only relevant question regarding their job search efforts is whether a claimant worked or made some effort to find work during periods of unemployment**

As discussed more fully below, except in limited circumstances, a defendant cannot satisfy its failure-to-mitigate defense if it cannot meet its threshold burden to prove that jobs were available to the claimant that were substantially equivalent to the job the claimant sought from the defendant.  Since no jobs in New York City are substantially equivalent to the position of an FDNY firefighter, the City cannot satisfy this element of its defense.  As such, the City should not be permitted to argue that claimants failed to satisfy their duty to mitigate based on

4

the reasonableness of their job search efforts. Instead, the only relevant issue regarding job search efforts is whether a claimant attempted to obtain employment during periods of unemployment.

A very significant difference exists between the amount and type of discovery required to determine the reasonableness of a claimant's job search efforts over the course of an entire decade, versus the discovery necessary to determine whether a claimant attempted to find employment during periods of unemployment. This difference in the volume of discovery will likely directly impact the number of eligible claimants who participate in the claims process and receive back pay awards. Thus, the United States requests that the Court decide this issue before the mitigation questionnaire, which would request information related to job search efforts, is developed and sent to claimants.

### A.    Applicable legal standards

As this Court has recognized, "[a] defendant may establish that a claimant failed to mitigate his damages by introducing evidence sufficient to persuade the trier of fact (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." Dkt. 640 at 21 (citation omitted). "Suitable employment means a job that is 'substantially equivalent'" to the job the plaintiff sought. *Wills-Hingos v. Raymond Corp.*, 104 Fed. Appx. 773, 775 (2d Cir. 2004).[4] Thus, the first prong of the failure-to-mitigate defense requires the City to prove that a job substantially equivalent to the FDNY firefighter job existed. If the City

---

[4]  This defense is sometimes described as requiring the defendant to prove that the plaintiff failed "to use reasonable diligence in finding other suitable employment," which collapses the two prongs into one standard. *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 695 (2d Cir. 1998). For ease of reference, the United States refers to the first prong of the defense as the "substantially equivalent employment" standard and the second prong as the "reasonable diligence" standard.

5

cannot do so, its failure-to-mitigate defense must fail. *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 481-82 (S.D.N.Y. 2001) (defendant failed to meet failure-to-mitigate defense because it offered no evidence that suitable employment existed). However, an exception to this rule exists if the City proves that a claimant, "who is capable of finding replacement work, failed to pursue employment *at all*." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (emphasis added).

Notably, two jobs must be "virtually identical" in order to be substantially equivalent. *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 85 (3d Cir. 2009); *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983); *Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225, 229 (S.D.N.Y. 2001) (holding that defendant could not prove plaintiff failed to mitigate his damages, in part, because defendant failed to prove that the job he declined was "virtually identical" to the job he held with defendant before his termination). To determine whether two jobs are similar enough to be considered substantially equivalent, courts scrutinize the specific compensation, job responsibilities, work schedules, working conditions, promotional opportunities, benefits, and status that the two jobs offer. *Donlin*, 581 F.3d at 85; *Rasimas*, 714 F.2d at 624; *Gerardi v. Hofstra Univ.*, 897 F. Supp. 50, 54-55 (E.D.N.Y. 1995). Additionally, because a job is not substantially equivalent if it would require a significantly greater commute, courts consider whether jobs are in the same "relevant geographic area." *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999); *see also Roniger v. McCall*, No. 97-cv-8009, 2000 WL 1191078, at *4 (S.D.N.Y. Aug. 22, 2000) (faulting expert analysis of available positions because it encompassed the entire country instead of the "relevant geographic region").[5]

---

[5]   The arguments in this brief focuses on the New York City area because it is likely that the vast majority of the potential claimants reside in this area. However, some eligible claimants may reside elsewhere. If the City proves that a substantially equivalent job was available in an area

Even minor differences between two jobs preclude a finding that they are substantially equivalent. *See Gerardi*, 897 F. Supp. at 54-55; *Parrish v. Immanuel Med.l Ctr.*, 92 F.3d 727, 735-36 (8th Cir. 1996) (Trager, J.) (two hospital registrar jobs were not substantially equivalent because one involved admitting patients in an emergency room and the other involved admitting patients who had scheduled medical procedures). In *Gerardi*, the district court held that the proposed equivalent job was not substantially equivalent to the job the plaintiff sought based on relatively minor distinctions in the work schedule and job responsibilities. 897 F. Supp. at 54-55. The job the plaintiff sought would have required her to work evenings only one night per week, and the proposed equivalent job would have required her to work evenings four nights per week. *Id.* at 53. As to the job responsibilities, the job the plaintiff sought involved counseling different types of students while the proposed equivalent job involved counseling only part-time students. *Id.* at 55. Thus, as *Gerardi* illustrates, the City cannot satisfy its burden to prove that substantially equivalent jobs existed by merely identifying available jobs that offered the same pay and benefits as the FDNY firefighter job. Instead, the City must prove that jobs were available, which were virtually identical to the FDNY firefighter position in terms of its job responsibilities, schedule, status, and other characteristics.

### B.      No job in New York City was substantially equivalent to the FDNY firefighter position during the back pay period

The unique job responsibilities, benefits, and status of the FDNY firefighter position, coupled with the fact that no other fire department operates in New York City, demonstrate that no jobs are substantially equivalent to it. First, because the FDNY is the only fire department that exists in New York City, no other employer in New York City offers a job with

_____

outside of New York City during a period of time when an unemployed eligible claimant lived in that area, the City may meet its burden regarding substantially equivalent employment for that claimant.

responsibilities substantially equivalent to those of an FDNY firefighter. Second, the work schedule of an FDNY firefighter is remarkably flexible for a full-time job and offers excellent benefits.[6] For example, FDNY firefighters have the ability to work only eight days per month. Bench Trial Tr. at 204 (Aug. 1, 2011). FDNY firefighters are also permitted to swap shifts with co-workers and reschedule their shifts, which provide even more flexibility. *Id.* at 204-05 (Aug. 1, 2011), 972-77 (Aug. 15, 2011), 1032-35 (Aug. 15, 2011). In their time off, FDNY firefighters are permitted to work a second job, and firefighters routinely do so. *Id.* at 206 (Aug. 1, 2011), 971-72 (Aug. 15, 2011), 1028 (Aug. 15, 2011). They also can take, if necessary, unlimited amounts of paid sick leave. *Id.* at 211 (Aug. 1, 2011). Finally, FDNY firefighters enjoy an unrivaled status in New York City. The public admires firefighters and holds them in high esteem because of their job and the work they do. *Id.* at 212 (Aug. 1, 2011). FDNY firefighters often receive praise from the public and gratitude for their service. *Id.* at 213 (Aug. 1, 2011), 987-89 (Aug. 15, 2011), 1036 (Aug. 15, 2011). Therefore, in light of these unique characteristics of the FDNY firefighter job, no substantially equivalent jobs were available to the claimants in New York City during the back pay period.[7]

    **C.**    **Since the City cannot prove substantially equivalent jobs existed, its failure-to-mitigate defense must fail if a claimant worked or attempted to find a job during periods of unemployment**

As the Court has held, the City can also satisfy its failure-to-mitigate defense if it proves that "the claimant made no reasonable efforts to seek alternative employment." Dkt. 640 at 22.

---

[6] Indeed, the City describes the position as follows: "The best job in the world has the best benefits in the world." New York City Fire Department, Benefits and Salary, http://www.nyc.gov/html/fdny/html/community/ff_salary_benefits_080106.shtml (last visited May 19, 2012).

[7] The Court has indicated it will issue findings of fact on the characteristics of the FDNY firefighter position after the City and the Plaintiffs-Intervenors provide the Court with their proposed findings of fact on June 29, 2012.

The Second Circuit established this exception to the standard requirements of the failure-to-mitigate defense in *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998).  The rationale for the *Greenway* exception is that an employer should not have to show that "other suitable employment in fact existed . . . when the [claimant], who is capable of finding replacement work, failed to pursue employment *at all*."  *Broadnax*, 415 F.3d at 268 (emphasis added).  *See also Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) (adopting the *Greenway* exception and holding "[a]s long as the claimant has made *some effort* to secure other employment, the burden to prove failure to mitigate normally resides with the defendant-employer…which then must show that (i) though substantially equivalent jobs were available in the relevant geographic area, (ii) the claimant failed to use reasonable diligence to secure suitable employment") (emphasis added).

In *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 481-82 (S.D.N.Y. 2001), after being discriminatorily discharged, the plaintiff looked for a comparable job for only a few months before he accepted a lesser paying job and stopped looking for work.  The court in *Epstein* found that the defendant failed to prove that jobs substantially equivalent to the job the plaintiff held with the defendant existed.  As such, the court held that the defendant could not prevail under the *Greenway* exception because the plaintiff had produced evidence that he made some effort to look for work after the defendant terminated him and he had no obligation to continue looking for work after he obtained a job.  *Id.* at 482 and n.4.  Thus, if a claimant made some effort to find work during periods of unemployment, the *Greenway* exception does not apply.

In *Quint*, the First Circuit expressly adopted the *Greenway* exception.  172 F.3d at 16.  As such, courts within the First Circuit have also held that, so long as a claimant makes some

minimal amount of effort to look for work, the defendant has to prove the existence of

substantially equivalent jobs in order to satisfy its failure-to-mitigate defense. *See e.g., Orr v.*

*Mukasey*, 631 F. Supp. 2d 138, 155-56 (D.P.R. 2009) (since plaintiff did not remain "completely

idle" following the defendant's discriminatory decision not to promote him, defendant could not

satisfy its failure-to-mitigate defense because there was no evidence of substantially equivalent

jobs); *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 358-59 (D. Me. 2007) (defendant could

not prevail on failure-to-mitigate defense because plaintiff made "some effort" to look for work).

 As a result, because the City cannot prove that jobs substantially equivalent to an FDNY

firefighter job existed during the back pay period, the City cannot satisfy its failure-to-mitigate

defense as long as claimants made some attempt to find a job during periods of unemployment.

Unless a claimant did not attempt to find a job during periods of unemployment, the Court

should reduce his back pay based only on a proportion of his actual interim earnings to the extent

permitted by Title VII.[8]  As a result, evidence beyond the issue of whether a claimant looked for

a job during periods of unemployment is unnecessary because it cannot be used to reduce a

claimant's back pay award.  Thus, an extensive and burdensome mitigation questionnaire is

unjustified.  On this issue, the mitigation questionnaire should be limited to "yes" or "no"

questions of (1) whether the claimant was unemployed for any periods during the back pay

---

[8]  Even if the City can prove that some claimants failed to look for work, those claimants may
still receive limited damages for the period in which they failed to look for work if they can
prove that no jobs were available to them that paid the same as a FDNY firefighter.  *Broadnax*,
415 F.3d at 270.  Moreover, the decision to stop looking for work may have been reasonable and,
thus, should not reduce a claimant's back pay.  For instance, a claimant may have reasonably
decided to stop looking for work and attend school full-time.  In such a case, his or her back pay
would not be reduced for the period of time in which he or she reasonably stopped looking for
work.  *Dailey v. Societe Generale*, 108 F.3d 451, 458-57 (2d Cir. 1997).

period and, if so, (2) whether the claimant looked for work during these periods of unemployment.

## IV.    Income from collateral sources should not be used to reduce claimants' back pay awards

The City has also indicated that it intends to seek discovery from claimants regarding "unemployment filings," "Social Security Disability benefits," and "workers compensation benefits." Dkt. 667 at 5. It appears the City may be seeking this information to reduce claimants' back pay awards by counting these income sources as interim earnings. However, these income sources are not included in interim earnings because they are collateral sources of income (unless the City paid them directly to the claimants). *Shannon*, 136 F. Supp. 2d at 232 (back pay not reduced by unemployment benefits because defendant only contributed to unemployment trust fund and did not pay benefits to plaintiff); *Siracuse v. Program for the Dev. of Human Potential*, 07-CV-2205, 2012 WL 1624291, at *14 (E.D.N.Y. Apr. 30, 2012) ("When the benefits do not come from the employer, but instead come from a collateral public source, such as unemployment or social security benefits, the Second Circuit has noted that '[a]s between the employer, whose action caused the discharge, and the employee, who may have experienced other noncompensable losses, it is fitting that the burden be placed on the employer.'"); *EEOC v. Yellow Freight System, Inc.*, 98-CV-2270, 2001 WL 1568322, at *1 (S.D.N.Y. Dec. 6, 2001) (permitting offset to back pay for workers compensation benefits because employer paid those benefits directly to claimant). The City should be prohibited from arguing that these benefits constitute interim earnings unless the City paid the benefits directly to claimants. Because the City already has evidence in its possession of any such payments it made directly to a claimant, there is no need for the City to seek discovery from claimants on these

11

types of benefits.  Thus, this information should not be included in the mitigation questionnaire or otherwise collected from claimants during the claims process.

**V.      Claimants' back pay periods cannot be cut off based on speculation that claimants would have left the firefighter position due to their educational, medical/psychological, and criminal/character backgrounds**

The third dispute relates to the City's intent to seek discovery from eligible claimants by including in the mitigation questionnaire questions regarding their educational, medical/ psychological, and criminal/character backgrounds.  *See* Dkt. 667 at 4-5.  The City has yet to explicitly describe how it would use this information to argue for a reduction of individual claimants' back pay awards.  However, in previous discussions with the parties, the City has implied that it would use this information to truncate a claimant's back pay period if the information revealed that the claimant could no longer have held the firefighter job because he or she returned to school on a full-time basis, became physically or mentally incapable of performing the job, or committed a criminal act that would have resulted in their termination by the FDNY.[9]  The City's arguments about claimants' educational, medical/psychological, and criminal/character backgrounds should be rejected for two reasons: (1) the City has not shown that any objective standards exist to evaluate whether a claimant would have continued working as an FDNY firefighter based on this background information; and (2) the City has already received an "attrition credit" in its back pay liability that accounts for the probability that claimants would have left the firefighter job before the end of the relevant back pay period.

---

[9]   The City has also argued that educational background relates to its failure-to-mitigate damages defense because "a claimant's educational attainment is relevant to earning capacity." Dkt. 688 at 8.  However, a claimant's educational background is irrelevant in this case because of the City's inability to prove the existence of substantially equivalent jobs.  *See* Section III.B.

A.    **Because no objective standards exist for determining whether an individual claimant would have left the firefighter job based on the background information sought, the City cannot use this information to cut short claimants' back pay periods**

The information that the City seeks to obtain from eligible claimants for mitigation purposes is essentially the same information it sought for the purpose of determining claimant eligibility for individual relief.[10]   According to the City, the following information regarding individual claimant's educational, medical/psychological, and character/criminal backgrounds is necessary for mitigation purposes:  (1) "a list of all schools and colleges attended, period of attendance and highest class completed"; (2) a checklist "of illnesses or injuries" with "an onset date" and a "brief explanation"; and (3) "a list of convictions, including felonies, misdemeanors or violations (excluding juvenile delinquency and youthful offender convictions)" with "docket, date, and court" information.  Dkt. 649 at 2-3.[11]   The Court has already rejected the City's request to use this information to determine a claimant's eligibility for individual relief, finding that decisions based on this information would amount to nothing more than "mere guesswork" that would lead to "indefensible" individual relief determinations.[12]   Dkt. 825 at 56.

The Court should likewise reject the City's proposal to use these same types of information to argue that a claimant would have left the FDNY prior to the end of the relevant back pay period.  Although the City has generally identified the information it intends to seek

---

[10]   The only distinction pertains to a claimant's educational background.  *Compare* Dkt. 667 at 4-5 (seeking completion of high school and thirty college credits) *with* Dkt. 649 at 2-3 (seeking a list of all colleges/schools attended, period of attendance, and highest level completed).

[11]   If the Court agrees that no jobs are substantially equivalent to the FDNY firefighter position, *see supra* at Section II.B, then these types of information are also well beyond the scope of discovery that is relevant to the issue of whether a claimant attempted to find a job.

[12]   For firefighter applicants, the Court has ruled that the City has no objective standards with respect to disqualifying medical and psychological conditions and non-felony criminal convictions or other character-based information.  *See* Dkt. 649 at 2-3; Dkt. 825 at 54-56.

from claimants, the City has not yet articulated any objective standards by which a fact finder could determine from this information whether a claimant would have left the FDNY during the relevant back pay period. Without objective standards, a fact-finder would become immersed in a "quagmire of hypothetical judgments" when trying to recreate what would have happened to a claimant if the City had not discriminated against him. Dkt. 825 at 56 (quoting *Robinson v. Metro-North Commuter R.R. Co*, 267 F.3d 147, 161 n.6 (2d Cir. 2001)). As a result, "any decision a fact-finder reaches on [this] issue would be difficult to justify on a reasoned basis." *Id.* at 55. Thus, the Court should bar the City from arguing that information from claimants' educational, medical/psychological, and criminal/character backgrounds should cut off their back pay periods.[13]

### B. The Court has already accounted for the likelihood of claimant attrition by discounting the City's aggregate back pay liability, and the City should not be permitted to discount its back pay liability a second time for attrition

In its back pay order, the Court held that attrition would be accounted for on a class-wide basis rather than an individual basis. *See* Dkt. 825 at 29-35. That determination was supported by Dr. Siskin's application of a discount to the City's aggregate back pay liability based on the likelihood that an individual hired as a firefighter would have left employment with the FDNY (the "attrition discount"). Neither the City nor its expert disputed the application of a class-wide attrition discount, and the City did not move for reconsideration of that aspect of the Court's back pay order. Therefore, the City should be precluded from converting this class-wide issue into an individual issue by using a claimant's educational, medical/psychological, or

---

[13] If the City takes discovery regarding whether individual claimants would have left (or been terminated from) the FDNY based on these factors, the United States will seek discovery from the City to determine whether these factors have been applied to firefighters. For example, if the City asserts that a claimant would have left the FDNY because it would have terminated his employment due to a misdemeanor conviction, the United States would seek discovery of how the City treated firefighters convicted of misdemeanors during their employment.

criminal/character background to argue that he or she would have ceased employment with the FDNY.

In its March 8, 2012 Order setting the aggregate amount of back pay owed by the City, the Court adopted the analysis of the United States' expert, Dr. Siskin, with respect to attrition. Dkt. 825 at 29-35, 43-45.  As a result, the City received an attrition discount of approximately $10 million, which was deducted from the City's back pay liability.  *See* Dkt. 538-1 at 83, 85, 89-90, 93-94.  Dr. Siskin's attrition analysis for Non-Hire victims gave the City an "attrition discount" by reducing the City's back pay liability to account for the probability that the 293 shortfall hires, which Dr. Siskin distributed into various academy classes, would have left or taken unpaid leave from the FDNY before December 31, 2010.  Dkt. 538-1 at 9.  For Delay Hire victims, Dr. Siskin gave the City an attrition discount by reducing the City's back pay liability to account for the "percentage of African-American and Hispanic hires [who] were no longer employed as FDNY firefighters within four months of hire," which is the average period of delay experienced due to the City's discrimination  *Id.* at 24-25.  In both instances, Dr. Siskin based his calculation of the attrition discount on actual individuals who were hired into the relevant academy classes and subsequently left the FDNY without receiving pay, regardless of the reason why an individual ceased to be employed by the FDNY.  *See id.* at 8-9, 24.  As a result, each claimant's share of the back pay award has already been reduced to account for the probability that he/she would have left the FDNY – for any reason – prior to the end of the back pay period (*e.g.,* returned to school on a full-time basis, became physically or mentally disabled, or committed a criminal act that would have led to termination by the FDNY).

It is impossible to know whether an eligible claimant would have left the FDNY before the end of the relevant back pay period had the City actually hired him or her.  Further, even

15

assuming the City could prove that the claimant would have left the FDNY before the end of the

back pay period, it is impossible for the City to prove that *this particular claimant* would have

been one of the 293 shortfall hires.  By adopting Dr. Siskin's attrition discount in setting the

City's back pay liability, the Court has acknowledged that Dr. Siskin's attrition analysis is the

best approximation of whether eligible claimants would have left the FDNY before the end of

their back pay periods.[14]  Allowing the City to use such information to curtail a claimant's back

pay period would permit the City to take the attrition discount twice.  Nothing in the Court's

order permitting the City to assert a failure-to-mitigate defense altered its decision that

consideration of attrition would be done on a class-wide basis.  Therefore, in order to prevent the

City from receiving a "double credit" for firefighter attrition in its back pay liability, the City

should not be able to cut off a claimant's back pay period by arguing that claimants would have

ceased employment with the FDNY during the relevant back pay period.  Accordingly, the City

should not be permitted to collect information related to attrition from claimants during the

claims process, particularly since the City's  discovery requests would almost certainly seek

highly personal and confidential information and, coupled with its burdensome nature, would

likely discourage claimant participation in the claims process.

**VI.    If the City believes it needs additional evidence of claimants' interim earnings, it should propose a method for collecting this additional evidence**

As the Court has held, in addition to its burden to prove that a claimant failed to mitigate

her damages, the City must also prove the amount of actual interim earnings that a claimant

earned in order to reduce his or her share of the back pay award.  Dkt. 825 at 47 ("The City will

---

[14] Unlike Dr. Siskin's mitigation ratio analysis, which the Court found inappropriate for class-wide determination because actual interim earnings data for individual claimants exist, there is no "actual" attrition data as to whether an eligible claimant would have left the FDNY prematurely had he or she actually been hired.

have the opportunity to reduce [the aggregate back pay award] significantly by proving the interim earnings of claimants in individual proceedings."). During the summer of 2011, all parties agreed that interim earnings information should be collected from the Social Security Administration ("SSA"). *See* Dkts. 678 at 8; 676 at 2; 688 at 5 n.3. Recently, however, the City expressed concern regarding the completeness of SSA interim earnings information and suggested that the City may need additional information to meet its burden. *See* Dkt. 881 at 20-21. To the extent additional evidence is necessary to prove interim earnings, the City should propose an alternative method to obtain such evidence so that it can be considered in connection with planning the discovery phase of the claims process. Additionally, because the City has asserted that information should be collected from the Internal Revenue Service ("IRS"), the City's proposal should explain why collection of IRS information is necessary, justifiable, and/or will not delay the claims process in light of the information below.

The City's May 17 response brief[15] criticizes the use of SSA interim earnings information, arguing that IRS information would be preferable due to three asserted limitations of SSA information: (1) SSA earnings statements "will not include earnings that exceed the maximum amount of earnings subject to Social Security taxes;" (2) SSA earnings statements "may exclude income that is not subject to Social Security tax due to various employee benefit programs, such as the City's deferred compensation program"; and (3) "state and local governments may not be required to report employee earnings to SSA under certain circumstances." Dkt. 881 at 20-21.

---

[15] The arguments in the City's May 17 brief were made in response to the United States' argument that the City should bear the cost of collecting interim earnings information from the SSA. The scope of discovery regarding interim earnings was not at issue in that briefing.

17

As to the first limitation, assuming interim earnings are evaluated on an annual basis, *see* Dkt. 880 at 14-15, it is immaterial that SSA statements report earnings only up to the maximum taxable income for a given year, because a claimant's maximum possible back pay damages for a given year will always be less than the SSA's maximum taxable income.[16]  For example, the City indicated that an entry-level firefighter hired off the Exam 7029 eligible list earned $30,872 in his or her first year of employment, *see* Dkt. 868 at 4, so a shortfall hire who began employment during the first Exam 7029 academy class would have earned $30,872 in 2001.[17] SSA lists the maximum taxable income for 2001 as $80,400, which is more than two-and-a-half times the back pay of one Exam 7029 shortfall hire for the year 2001.  According to Dr. Siskin's calculations, a shortfall hire who began employment during the first Exam 7029 academy class would have earned $93,222 during 2010.  *See* Dkt. 538 at 33.  This amount is still significantly less than SSA's maximum taxable income for 2010, which is listed as $106,800.  Because SSA's maximum taxable income exceeds a claimant's maximum possible back pay damages for each year of the relevant time period (assuming the Court agrees that interim earnings should be evaluated on an annual basis), the City would not be liable to the claimant for any back pay that year, regardless of the amount by which the claimant's income exceeds the SSA cap.  Therefore, the City's first concern is unfounded.

---

[16]  The SSA website lists the maximum taxable earnings for each year between 1937 and the present.  In terms of the back pay period for Exam 7029 claimants, SSA's maximum taxable income for 2001 was $80,400 and the maximum taxable income for 2011 was $106,800.  *See* Benefits Planner:  Maximum Taxable Earnings (1937 – 2012), Social Security Administration, http://www.socialsecurity.gov/planners/maxtax.htm#maxEarnings (last visited May 21, 2012).

[17] According to Dr. Siskin, an entry-level firefighter hired into the February 2001 academy class earned $43,766 in 2001.  *See* Dkt. 538 at 33.  Even if this is the more appropriate 2001 salary for an Exam 7029 shortfall, SSA's maximum taxable income for the year is still nearly twice this amount.

As to the latter two limitations noted by the City's response brief – that SSA interim earnings statements may exclude income not subject to Social Security tax and income from certain state and local governments – the United States notes that IRS information is similarly limited. In fact, like SSA, the IRS Form W-2 transcript lacks state and local government information. *See* http://www.irs.gov/pub/irs-pdf/f4506t.pdf.

Finally, it should be noted that during the summer of 2011, the United States Department of Justice consulted SSA and IRS to determine how interim earnings information could be collected for eligible claimants. The United States subsequently proposed that SSA interim earnings information should be collected, instead of seeking information from the IRS, based on numerous factors, including the availability of earnings information for the entire back pay period and the cost of obtaining such information.[18] Indeed, IRS would not be able to provide earnings information for the entire back pay period, and the expense of collecting this information cannot be justified when the same information for a longer period of time is available from SSA at a fraction of the cost.[19] The United States explained the disadvantages of IRS information to the City during meet-and-confer sessions. However, the City certainly could have attempted to collect interim earnings evidence from alternative sources, but it did not do so.

---

[18] The IRS enables individual taxpayers to request copies of their tax returns. *See* http://www.irs.gov/efile/article/0,,id=232219,00.html (last visited May 21, 2012). To obtain a copy of a previously filed tax return, a taxpayer must complete a form and pay $57 per tax year requested. *See id.* However, copies are generally available only for returns filed within the preceding seven-year period. *Id.* As a result, copies of IRS tax returns would not be available for the entire back pay period, and the cost of obtaining tax returns for the available time period would be nearly $400 per claimant. IRS also enables an individual taxpayer to request a tax return transcript, which is a document that shows most line items from a tax return. Unlike copies of tax returns, IRS does not charge for a tax return transcript, but the IRS website indicates that such information is only "generally available for the current and past three years." *See* http://www.irs.gov/efile/article/0,,id=232219,00.html (last visited May 21, 2012).

[19] It will cost approximately $68,000 to collect this information from SSA for 2,500 claimants. Dkt. 867-7. At $400 per claimant, the corresponding cost to obtain this information from the IRS would be $1,000,000.

The United States submits that the information available from SSA is, on the whole, more complete and far less expensive to obtain than the information available from the IRS.  Given that the City bears the burden of proving the amounts to be deducted from a claimant's back pay award for interim earnings, the City should make a proposal regarding how it plans to obtain relevant information regarding claimants' interim earnings.  The parties can then evaluate this proposal and work to reach agreement on it.

## VII.    Conclusion

For the reasons stated above, the United States respectfully submits that the City cannot establish that claimants' back pay awards should be reduced because (1) claimants failed to satisfy their duty to mitigate because their job search efforts were unreasonable; (2) claimants received income from collateral sources; and (3) claimants would have left employment as an FDNY firefighter during the relevant back pay period.  It is necessary for the Court to resolve these issues in order to determine the appropriate scope of discovery that may be taken from claimants by the City.

To this end, the United States respectfully proposes that the Court should approve any mitigation questionnaire before the City mails it to claimants.  After the Court rules on the disputes described in this briefing, the City should propose a mitigation questionnaire for the parties' consideration consistent with the Court's ruling.

Date: May 23, 2012                        Respectfully submitted,

                                          THOMAS E. PEREZ
                                          Assistant Attorney General

                                          DELORA L. KENNEBREW
                                          Chief

                                          MEREDITH L. BURRELL
                                          Deputy Chief

                                          _____
                                          /s/ ERIC K. BACHMAN
                                          Senior Trial Attorney
                                          Telephone:  (202) 305-7883
                                          Facsimile:  (202) 514-1005

                                          JENNIFER M. SWEDISH
                                          ALLAN K. TOWNSEND
                                          BARBARA SCHWABAUER
                                          Trial Attorneys

                                          United States Department of Justice
                                          Civil Rights Division
                                          950 Pennsylvania Avenue, N.W.
                                          Patrick Henry Building, Room 4500
                                          Washington, D.C. 20530

                                          LORETTA E. LYNCH
                                          United States Attorney

                                          _____
                                          /s/ ELLIOT M. SCHACHNER
                                          Assistant United States Attorney
                                          Eastern District of New York
                                          271 Cadman Plaza East
                                          Brooklyn, New York  11201-1820
                                          Telephone:  (718) 254-6053
                                          Facsimile:  (718) 254-6479