UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                    Plaintiff,                              **MEMORANDUM & ORDER**

          -and-                                            **07-CV-2067 (NGG) (RLM)**

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated*,

                    Plaintiff-Intervenors,

          -against-

THE CITY OF NEW YORK,

                    Defendant,

          -and-

THE UNIFORMED FIREFIGHTERS ASSOCIATION
OF GREATER NEW YORK,

                    A Non-Aligned Party.
--------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

In this Memorandum and Order, the court resolves several issues relating to the compensatory relief phase of the case.[1] After considering the positions of the parties, the court: approves the United States' proposed method of awarding backpay damages to individual Non-Hire and Delayed-Hire Claimants; grants the United States' and the City's request that putative priority hires take and pass Exam 2000 if that exam is held valid; grants the United States' and the Plaintiff-Intervenors' request that priority hires be paid according to their retroactive seniority as of the date they join the fire academy; grants the parties' joint request that notice of the anticipated fairness hearing be given to the individuals who took Exam 2000; grants the United States' and Plaintiff-Intervenors' request that those individuals receive a thirty-day objection period; grants the parties' joint request that the court stay consideration of the Special Masters' recommendations; grants the United States' request that the City reimburse it for the cost of obtaining records from the Social Security Administration; and determines the conditions under which Levy Ratner, P.C., and the Center for Constitutional Rights may represent claimants in the individual claims process.

## I.    DISCUSSION

### A.    Method for Calculating Backpay Awards

The court first considers the parties' dueling proposals for a method of distributing the aggregate, pre-mitigation backpay award to individual claimants and reducing that award by claimants' interim earnings. The court considers the proposals for Non-Hire Claimants first, and the proposals for Delayed-Hire Claimants second.

#### 1.    The Method for Non-Hire Claimants

---

[1]    The court assumes the reader's familiarity with the extensive history of this case, and particularly its recent ruling concluding there is no genuine issue of fact as to the amount of gross, aggregate wage backpay due to eligible claimants through 2010. (See Mar. 8, 2012 Mem. & Order (Docket Entry # 825) (the "Backpay Op.") at 46.) Thorough discussions of the case's history can be found in several of the court's rulings. (See id. at 2-12; Oct. 5, 2011 Mem. & Order (Docket Entry # 743) at 2-5.)

The three primary disagreements between Plaintiffs and the City in the context of Non-Hire Claimants are the use of a median hire date to estimate the wages a claimant would have earned as an entry-level firefighter, whether to use the number of potential claimants or the number of claimants who have submitted claim forms and actually found to be eligible to determine the probability that a claimant would have been hired by the FDNY, and the use of an annualized or aggregate method for comparing a claimant's gross award to his or her interim earnings. The court rules on these three issues first and then details the appropriate method in light of those rulings.

The City urges the court to apply a median hire date to determine the earnings a Non-Hire Claimant might have received as a firefighter. (May 3, 2012 City Mem. (Docket Entry # 868) at 4.) The Plaintiffs oppose this position. The United States notes that the court had already accepted the recommendations of its statistical expert, Dr, Siskin, and distributed the estimated "hiring shortfall candidates across academy classes and calculated the average amount of salary earned by applicants hired into those classes." (May 17, 2012 United States Reply Mem. (Docket Entry # 880) at 3.) The United States estimates that the City's proposal has the effect of reducing its previously determined amount of aggregate, pre-mitigation back pay by $ 8 million. (Id. at 4.) The City, on the other hand, defends its proposal on the basis that Dr. Siskin allocated shortfall hires across the academy classes for each exam and, to be consistent with that method, the court must either use a weighted average method of determining a claimant's potential earnings or, as a simpler alternative, its proposal of using a median hire date to estimate a claimant's potential lost earnings. (See May 17, 2012 City Reply Mem. (Docket Entry # 881) at 6-7.)

The City's argument misconstrues the methodology that the court relied upon in its ruling on backpay liability. The aggregate, pre-mitigation losses for each category of Non-Hire victim that the court found in that ruling—$62,202,409 for black candidates from Exam 7029, $33,754,299 for Hispanic candidates from Exam 7029, $18,193,080 for black candidates from Exam 2043, and $11,403,654 for Hispanic candidates from Exam 2043(see Backpay Op. at 35)—were weighted estimates of loss. These amounts were the United States' expert's estimates of aggregate, pre-mitigation loss, generated through a process that included, inter alia, multiplying the number of shortfall hires that had been allocated to each academy class by the average earnings of a firefighter of that class. (Id. at 31-35.) The United States' proposal for allocating amounts to individual claimants divides those weighted amounts by the number of Shortfall Hires, producing weighted averages: "Determine the aggregate back pay of one shortfall hire from each specific back pay category. This amount is determined by dividing the amount of money in a specific back pay category by the number of shortfall hires in that category." (May 3, 2012 United States Mem. at 3.) Thus, the weighted method that the City suggests would be acceptable, but simultaneously argues would be more complicated than using a median hire date, is essentially the method that Plaintiffs propose.[2] The court therefore denies the City's request for the use of a median hire date as the starting point for estimating potential earnings, and adheres to the weighted losses that it previously found in its backpay opinion.

The next issue on which the parties disagree is which figure constitutes the correct denominator to be used to determine an eligible claimant's probability of being hired. The City

---

[2] The City describes the process of creating a weighted average as thus: "To illustrate the weighted average approach, consider a simple example where the hiring shortfall is 10 and there are only two hiring classes, with a shortfall of three in the first class and seven in the second class. If firefighters hired in the first class earned $100,000 to date and those hired in the second class earned $60,000 to date, the weighted lost earnings figure applicable to any claimant would be: 3/10 x $100,000 + 7/10 x $60,000 = $72,000. This figure, which takes into account that a claimant had a 30 percent chance of hire into the first class and a 70 percent chance of hire into the second class, would be used for all claimants." (May 17, 2012 City Reply Mem. at 7.)

argues that the shortfall hires the court has previously found (see Backpay Op. at 18-19) should be divided by the number of potential claimants (each black or Hispanic test-taker who was not hired in the relevant exam period but would have been eligible to have been hired) (May 3, 2012 City Mem. at 4). The Plaintiffs propose that the number of shortfall hires be divided by the number of claimants who have submitted claim forms and been found eligible. (May 3, 2012 United States Mem. at 4.) The City defends its proposal by arguing that using the total number of eligible potential claimants is more accurate and more equitable, in that it would come closer to compensating claimants to only the extent of the probability that the claimant would have been hired, and would prevent any claimant from receiving a "windfall" award. (May 17, 2012 City Reply Mem. at 3-6.) The United States defends its proposal by noting that courts have consistently used the number of actual eligible claimants to determine the pro rata distribution of backpay awards under Title VII and by demonstrating that the City's proposal would likely lead to a substantial reduction in the City's liability even before interim earnings are taken into account, contrary to the court's backpay summary judgment opinion. (May 17, 2012 United States Reply Mem. at 5-11.)

In effect, the City's proposal would divide the aggregate, pre-mitigation backpay into shares for estimated potential claimants, but then actually award shares of backpay to only the individuals who have actually made claims and been found eligible; this would leave some number of shares unclaimed and, presumably, revert-able to the City. The court declines to adopt this proposal. First, the City's proposal is contrary to the logic and weight of precedent. Since the court has already determined that the City has inflicted an injury in the form of a shortfall hire in the amount of 293 entry-level firefighters (114 hires from among the black candidates of Exam 7029, 62 hires from among the Hispanic candidates of Exam 7029, 72 hires

from among the black candidates of Exam 2043, and 45 hires from among the Hispanic candidates of Exam 2043), the court must follow the dictates of the Supreme Court and "make persons whole for injuries suffered" because of the City's violations of Title VII, Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975); the measure of the compensation that injured persons should receive should "be equal to the injury" that the City's actions inflicted, id. at 419, and the injured persons are those minority candidates who were otherwise eligible to be hired for the position of entry-level firefighter. In Ingram v. Madison Square Garden Center, 709 F.2d 807, 812-13 (2d. Cir. 1983), the Second Circuit held that individual relief in a Title VII case should be limited "to those class members who would have filled vacancies had there been no discrimination." The Second Circuit has also approved of pro rata distribution of monetary relief "where the number of qualified class members exceeds the number of openings lost to the class through discrimination." Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 161 n.6 (2d Cir. 2000) (emphasis supplied, quotation marks and citations omitted), overruled in part by Wal-Mart, Inc. v. Dukes, 131 S. Ct. 2541 (2011). The quoted language from the two cases emphasizes the importance of designing a process that gives relief to those class members who were qualified to be hired as entry-level firefighters; it would be incoherent with that concept to consider the entire number of potential claimants, whose eligibility for hire has not been determined, rather than the number of actually eligible claimants, in dividing the backpay amounts (and thus, rendering the compensation paid unequal to the injury inflicted).

Second, the City's proposal defeats a substantial reason to have a claims process, which was designed so that the court and the parties could determine which minority candidates who were not hired would have been eligible to be hired. Neither the parties nor the court has a reliable method of estimating what percentage of the candidates not hired would not have been

eligible for hire other than the process designed to determine which candidates were eligible for hire. While the City speculates that some candidates who would have been eligible for hire would decline to submit claims forms because they have been hired into well-paying jobs and therefore lack a financial incentive to participate in the claims process, and thus the number of actual claimants might understate the number of minority candidates who were eligible to be hired (May 17, 2012 City Reply Mem. at 4), the court considers it equally likely that many of the individuals who choose not to submit claim forms would do so because they determine that they would not be eligible for relief, and thus the number of actual claimants may accurately reflect the number of minority candidates who were eligible for hire.[3] In any case, the claims process is the process the court and the parties have to evaluate which of the minority candidates who took the two exams were actually eligible for hire. It was incumbent on the City to come forward with a proposed process that more accurately determines what percentage of the individuals not hired were eligible to be hired. It has not proposed any process that would avoid self-selection bias.[4]

Finally, the court notes that the City's concerns about inequity are misplaced. So long as the City is found liable for no more than the amount of the injury it inflicted—i.e., the aggregate, pre-mitigation amount of backpay lost due to the hiring shortfalls—the City has received the equity it is due. Any windfall that an eligible claimant may receive under the Plaintiffs' proposal comes not from the City but from other potentially eligible claimants who have chosen not to file

---

[3]     The eligibility criteria for monetary relief have been determined by an earlier Opinion and consequently are public knowledge. (Backpay Op. at 51-52.)

[4]     The City proposes in its reply memorandum that the court use the number of claimants who submit claim forms and have been found to be eligible to determine what percentage of the total number of minority candidates would be eligible. (May 17, 2012 City Reply Mem. at 5-6.) As the court has already noted, because the eligibility criteria are public knowledge, it is entirely likely that candidates will self-assess whether they are eligible and, if they determine they are not, will not file claim forms. Thus, the City's proposal will most likely result in an overly generous assumption of how many candidates who did not submit forms would have been eligible for hire.

claims (or who did not receive notice of this case despite the parties' efforts). If the court were to adopt the City's proposal, then the court would be obligated to impose a far more rigorous, expensive, and time-consuming process of identifying all eligible individuals and encouraging them to submit claims. For all of the reasons discussed, therefore, the court adopts the United States' proposal and will use the number of claimants found to be eligible in its method of allocating back pay.[5]

The third disagreement between Plaintiffs and the City concerns whether a claimant's gross award should be compared to his or her interim earnings on an annual basis, or an aggregate one. The United States advocates for an annualized basis (see May 3, 2012 United States Mem. at 5; May 17, 2012 United States Reply Mem. at 11-12), while the City advocates for an aggregate basis (see May 17, 2012 Reply Mem. at 8-10). The court notes the division of authority on this issue—Leftwich v. Harris-Stowe State College, 702 F.2d 686, 693-94 (8th Cir. 1983), has held that an annual basis is the appropriate method, while Sinclair v. Insurance Co. of North America, 609 F. Supp. 397, 400-02 (E.D. Pa. 1984), has held that the aggregate basis is superior. Neither holding is binding on this court.[6] The court concludes, however, that the annual basis is the appropriate method because it more closely mirrors the economic reality that the claimants would have experienced over the many years since the exams were administered. Pre-judgment interest will be applied on an annualized basis, see, e.g., Robinson v. Instructional Sys., Inc., 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000); O'Quinn v. N.Y. University Med. Ctr., 933

---

[5] The court notes the City's concern as to what should occur if there are fewer eligible claimants than the number of shortfall hires (May 17, 2012 City Reply Mem. at 3-4 & n.2), and will consider how to respond to such a situation if the initial eligibility determinations of the United States suggest that the situation is likely to come to pass.

[6] The court notes also that Taddeo v. Ruggiero Farenga, Inc., 102 F. Supp. 2d 197, 198-99 (S.D.N.Y. 2000), and Sims. v. Mme. Paulette Dry Cleaners, 638 F. Supp. 224, 229-30 (S.D.N.Y. 1986), the cases from courts within the Second Circuit that the parties have cited, do not appear to address interim earnings but earnings from comparable employment that cut off the period of backpay accrual.

F. Supp. 341, 345-46 (S.D.N.Y. 1996), and interest should be applied to a principal amount that is determined on an annualized basis so that claimants' losses over time are accurately calculated.

Having resolved the three contested issues discussed above, the court concludes that the United States' proposed method for allocating backpay awards to eligible claimants and reducing those awards by claimants' interim earnings is appropriate and adopts it. (See May 3, 2012 United States Mem. at 3-6.) The court summarizes each step below, but notes at the outset that the overarching goal of this process is to divide the aggregate backpay among eligible claimants pro rata (because the number of eligible claimants will most likely exceed the hiring shortfalls that the City's violations of Title VII have produced) and reduce each claimant's gross award by that claimant's interim earnings after reducing those interim earnings by the same fraction of the aggregate award that the claimant's gross award represents.

The first step is to place an eligible Non-Hire Claimant in the appropriate category: black Exam 7029 candidate, Hispanic Exam 7029 candidate, black 2043 Exam candidate, or Hispanic 2043 candidate. The fact-finder must identify the correct category because each category suffered a unique economic loss produced by that category's hiring shortfall.

The second step is to calculate the aggregate backpay of one shortfall hire for the specific backpay category for which the claimant is eligible, by dividing the aggregate backpay losses for that category by the number of shortfall hires in that hire: for black Exam 7029 claimants, $62,202,409/114 shortfall hires; for Hispanic Exam 7029 claimants, $33,754,299/62 shortfall hires; for black Exam 2043 claimants, $18,193,080/72 shortfall hires; and for Hispanic Exam 2043 claimants, $11,403,654/45 shortfall hires.

The third step is to calculate each claimant's pro rata share of the aggregate amount of backpay (or "gross backpay award"). The fact-finder accomplishes this by dividing the aggregate backpay loss for each category of Non-Hire claimant by the number of eligible claimants who have filed claim forms in that category.

The fourth step is to determine the "backpay reduction ratio," equivalent to the "probability of hire," by dividing the amount determined at the third step (the aggregate amount of backpay divided by the number of eligible claimants) by the amount determined at the second step (the aggregate amount of backpay divided by the number of shortfall hires). This step reveals the percentage of the earnings of one shortfall to which each claimant is entitled (pre-mitigation). This is the same percentage as one could find by dividing the number of shortfall hires of a given category by the number of eligible claimants of that category.

The fifth step is to discount the claimant's interim earnings by the ratio determined in step four. The fact-finder will do this by multiplying the claimant's interim earnings for each year of the backpay period (as discussed in previous opinions, the fact-finder must make an individualized finding of each claimant's interim earnings) by the ratio determined in step four. This step is necessary so that when the fact-finder compares the claimant's gross award to his or her interim earnings, the fact-finder is actually comparing like things; if the ratio were not applied to the claimant's interim earnings, the claimant would be prejudiced by the comparison of a fractional award (found in step three) to the entire amount of the claimant's actual earnings. Another way of understanding the need to discount the interim earnings by the ratio is to consider the ratio as an expression of the chance that a claimant would not have earned those interim earnings (because it is the chance the claimant would have been hired as a firefighter and not been employed in the alternative employment which generated the interm earnings.) This

step is also consistent with the court's previous ruling that interim earnings would be reduced by the ratio of one shortfall hire's backpay to which each claimant would be entitled.  (See June 6, 2011 Mem. & Order (Docket Entry # 640) at 24 n.6.)

The sixth step is to determine each claimant's net (i.e., post-mitigation) backpay award for each year of the claimant's backpay period.  Claimants who were Exam 7029 candidates have a backpay period that commenced February 4, 2001, and Claimants who were Exam 2043 candidates have a backpay period that commenced December 5, 2004.  This step has two components: the fact-finder must first divide the claimant's pro rata share of the gross backpay award (determined in step three) by the number of years in that claimant's backpay period.  Next, the fact-finder must subtract the discounted annual interim earnings (from step five) from the annual pro rata share of the gross award.

The seventh step is to apply the rate of interest on the United States one-year maturity Treasury yield, see 28 U.S.C. § 1961(a), to the claimant's net backpay award for each year of his or her backpay period and compound the interest annually.  (The United States describes the application of interest to the claimant's principal amount on page 10 of its memorandum.)

The eighth step is to sum the annual net backpay amounts, and the compounded interest, to determine the total net backpay award for each claimant.

### 2. Method for Delayed-Hire Claimants

The disagreements between the City and the Plaintiffs on the method for determining individual monetary awards for Delayed-Hire Claimants can be summarized as a dispute over whether to give a uniform award, equivalent to a few months' worth of delayed salary, to each claimant in each category of injured Delayed-Hires (which the City proposes) or to vary the award to give greater amounts to claimants hired later and lesser amounts to claimants hired

earlier (the Plaintiffs' proposal). (Compare May 3, 2012 City Mem. at 5-7, with May 3, 2012 United States Mem. at 6-9.) Both proposals would operate within the aggregate backpay amounts for Delayed-Hire Claimants as established by Dr. Siskin and relied upon by the court in its Backpay Opinion—i.e., neither proposal would expose the City to greater liability than the amounts listed in the court's opinion. Moreover, both proposals would allow the City to attempt to prove the interim earnings of the claimants in conformity with Title VII's dictates. Consequently, the court is satisfied that either proposal is legally acceptable, but adopts the Plaintiffs' proposal because it finds that varying relief to account for a firefighter's longer or shorter wait to be hired is more equitable.[7]

The court summarizes the steps for determining the backpay awards for individual Delayed-Hire claimants below. (See May 3, 2012 United States Mem. at 3-6.) The court prefaces this summary with an explanation that the goal of this process is to divide the aggregate backpay amounts for each category of claimant based on the number of months a claimant was hired after the first academy class and reduce each claimant's gross award by interim earnings (as with the Non-Hire Claimant process). This process proves an appropriate way to address the likely situation that more eligible claimants will file claims than actually experienced delay according to statistical analysis, and so divides the aggregate amount lost in an equitable way. The proposal divides the aggregate award pro rata by months of delay, rather than by individuals.

---

[7] The court appreciates the City's eagerness to hue closely to Dr. Siskin's statistical analysis. (See May 17, 2012 City Reply Mem. at 10-11.) However, Dr. Siskin's work, while extremely useful in determining the aggregate number of delayed hires and number of lost years of employment, and thus the aggregate amount of lost wages, cannot determine which of the Delayed-Hire Claimants were actually injured by the City's violations of Title VII, which were unaffected, and which were incidentally helped. Therefore, the court's design of a remedy is not pre-determined by Dr. Siskin's analysis. In any case, the United States' proposal relies on Dr. Siskin's calculations of total loss and average number of months lost, and so is consistent with Dr. Siskin's reports. (See May 3, 2012 United States Mem. at 7.)

The first step is to place an eligible Delayed-Hire Claimant in the appropriate category: black Exam 7029 firefighter, Hispanic Exam 7029 firefighter, black 2043 Exam firefighter, or Hispanic 2043 firefighter. As was true with the Non-Hire Claimants, the fact-finder must identify the correct category because each category suffered a unique economic loss produced by the delay that category experienced.

The second step is to calculate the value of each month of delay for the Delayed-Hires of a particular category. This step requires two components: the first is calculating the aggregate number of months lost by each category of Delayed-Hires by multiplying the number of firefighters who experienced a hiring delay by the average number of months delayed. From List 7029, 68 black firefighters experienced an average delay of 3.48 months and 86 Hispanic firefighters experienced an average delay of 3.24 months. From List 2043, 44 black firefighters experienced an average delay of 3.84 months and 51 Hispanic firefighters experienced an average delay of 2.88 months. Second, once the fact-finder determines the aggregate number of months lost in each category of Delayed-Hire Claimant, the fact-finder must determine the value of each lost month by dividing the aggregate backpay amounts for each category by the aggregate number of months lost. Black Delayed-Hire firefighters from the 7029 list suffered an aggregate loss of $1,015,579; Hispanic Delayed-Hire firefighters from the 7029 list suffered an aggregate loss of $1,228,608; black Delayed-Hire firefighters from the 2043 list suffered an aggregate loss of $494,169; and Hispanic Delayed-Hire firefighters from the 2043 list suffered an aggregate loss of $429,590. This step determines the value of each month lost per category of injured Delayed-Hires.

The third step is to determine the value of each month of delayed hiring for the <u>eligible claimants</u> in each category. The fact-finder must first calculate the aggregate amount of delay

experienced by the eligible claimants of that category by adding together the total number of months each eligible claimant was hired after the first academy class for that category. The fact-finder will next divide the aggregate loss amount for that category by the total number of months of delay experienced by claimants in that category. This will produce the pro rata value of each month of delay for the eligible claimants.

The fourth step is to determine each claimant's gross share of the backpay losses by multiplying the number of months that claimant's hiring was delayed (i.e., how many months after the first academy class he or she started at the fire academy) by the pro rata value of one month as calculated in step three.

The fifth step is to determine a backpay reduction ratio, much like was done with the Non-Hire Claimants. The pro rata value of one month of delay for the eligible claimants of each category (as found in the third step) must be divided by the value of one month of delay for each Delayed-Hire in that category (as found in the second step). This ratio expresses what percentage of one month's worth of delay each claimant of that category would actually receive as a gross award.

The sixth step is for the fact-finder to determine the discounted interim earnings of the claimant. The fact-finder first determines the interim earnings the claimant earned between the first fire academy class hired from his or her list and when he or she joined the fire academy. The fact-finder must then reduce those interim earnings by the ratio determined in the fifth step.

The seventh step is to determine a net backpay award by subtracting the discounted interim earnings (from step six) from the claimant's gross award (as determined in step four).

The eighth step is for the fact-finder should then determine an amount of interest on that net award using the United States one-year constant maturity Treasury yield, referred to in 28 U.S.C. § 1961(a), and compounding the interest annually.

Finally, the court notes the City's argument that it should be able to prove that a claimant who experienced "self-induced" delay should not be able to recover, and the United States' opposition to the City's position. (See May 17, 2012 City Reply Mem. at 12; May 17, 2012 United States Reply Mem. at 18 n.18.) The parties' briefing on this issue is insufficient to allow the court to address it at this time. The City may brief this issue more fully in its June 13, 2012, memorandum and Plaintiffs may respond to it in their June 22, 2012, briefing.

## B.    Priority Hiring

The court considers next two issues relating to the remedy of priority hiring. The first issue the parties have brought to the court's attention is the issue of whether putative priority hires must take and pass Exam 2000 before being considered for hire. The court previously accepted priority hiring as an appropriate remedy in this case (see Jan. 21, 2012 Mem. & Order (Docket Entry # 390) at 19-22) but reserved decision on whether claimants who wish to participate in the priority hiring remedy must take a current, valid, entry-level examination (see Feb. 1, 2012 Mem. & Order (Docket Entry # 802) at 6 n.4).

The United States and the City both argue that putative priority hires should take the Exam. Their arguments can be summarized as follows. First, they argue that Title VII requires a candidate for hiring relief to have fulfilled all non-discriminatory qualifications for employment, see Franks v. Bowman Transp. Co., 424 U.S. 747, 772-73 n.31 (noting that candidates for hiring relief must be "presently qualified" to be eligible for such relief), and passing Exam 2000, if the exam is held to be valid by the court, constitutes one of the non-discriminatory qualifications for

employment as an entry-level firefighter. Second, in response to Plaintiff-Intervenors' argument that the court should allow candidates who scored a 70 or better on either Exam 7029 or 2043 be considered eligible for priority hiring (instead of taking and passing Exam 2000), the United States and the City argue that claimants' scores on Exams 7029 and 2043 would not provide useful information on which to base a claimant's hiring because the use of those exams as pass-fail screening devices was held to be not job-related or consistent with business necessity (see Disparate Impact Liability Op. (Docket Entry # 294) at 80, 85), and because the claimants took those exams between five and thirteen years ago (see id. at 10).

Plaintiff-Intervenors argue that putative priority hires should not be required to take the new exam if they earned a 70 or better on either of the invalid exams. A score of 70 was the official passing score for Exam 2043 and a score considered sufficient to succeed at the Fire Academy for Exam 7029. (See Aug. 12, 2011 City Ltr. (Docket Entry # 706) at 2 n.1.) Plaintiff-Intervenors note that Title VII requires that "persons aggrieved by the consequences and effects of the unlawful employment practice be, so far as possible, restored to a position where they would have been were it not for unlawful discrimination," Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1974), and that the incumbent firefighters are not required to take a new exam merely because the ones that they took to secure admission to the FDNY are invalid. Therefore, the Plaintiff-Intervenors believe that requiring priority hire candidates to take and pass Exam 2000 would be to "require black and Hispanic applicants to overcome an additional hurdle that was not imposed by other Exam 7029 and Exam 2043 applicants." (May 3, 2012 Pl.-Intervenors Mem. (Docket Entry # 870) at 3.)

The court holds that putative hires must take and pass Exam 2000, if the exam is held to be valid and if they did not do so during the general administration of the exam. The court

reaches that conclusion based on the following considerations.  First, as the United States argues, if the exam is held to be valid, then it must be considered one of the current, non-discriminatory qualifications for becoming an FDNY firefighter.  Title VII requires recipients of hiring relief to meet all current, non-discriminatory qualifications.  Franks, 424 U.S. at 772-73 n.31.  As Plaintiff-Intervenors note, the goal of Title VII's remedial regime is to place a claimant where he or she would have been had there been no discrimination.  Albemarle Paper Co. v. Moody, 422 U.S. at 421.  However, contrary to Plaintiff-Intervenors' argument, this principle militates in favor of requiring claimants to take Exam 2000 because, if there had been no discrimination, i.e., if the City had administered an exam that was consistent with Title VII, then applicants would have been expected to take and pass that exam before joining the FDNY.  Indeed, adopting Plaintiff-Intervenors' proposal would result in more people taking advantage of the situation that exists only because of the City's violation of Title VII.

Even without these principles of Title VII, the court would be wary of Plaintiff-Intervenors' proposal.  The court agrees with the United States and the City that claimants' scores on Exams 7029 and 2043 cannot be relied upon to indicate the ability to be a firefighter.  Most applicants who took Exam 7029 did so in 1999, and so that exam's results are stale.  More fundamentally, however, the court has already held that the use of those exams as pass-fail screening devices is not job-related or consistent with business necessity, i.e., they did not have any value in determining whether an applicant was qualified to join the FDNY.  (Disparate Impact Liability Op. at 85; see also id. at 53 ("the undisputed evidence paints an extremely troubling picture of the test construction process and the content that the City sought to test"); id. at 80 ("the City has presented no evidence that its chosen cutoff scores [including the cutoff score of 70 for Exam 2043] bear any relationship to the necessary qualifications for the job of

entry-level firefighter").)  As a consequence of this holding, the court has also permanently

enjoined the City from using either exam in its hiring process.  (See Remedial Order (Docket

Entry 765) ¶ 14.)  Adopting the Plaintiff-Intervenors' suggestion would have the effect of

crediting those exams with some job-related function, which the court cannot do.  Regarding

Plaintiff-Intervenors' concerns that claimants are in effect being held to a higher standard than

incumbent firefighters, who were admitted into the FDNY without passing a valid exam (and are

not being asked to take a new exam), the court cannot overturn decisions the City made to hire

now-incumbent firefighters—who are strangers to this case—before that hiring process was

enjoined.  The court can only make a prospective decision about what should be done now that

those exams have been held to be invalid, and the court does not consider it inequitable to require

claimants do what every applicant should have had to do, i.e., pass a valid exam.

The court notes two conditions to its ruling.  The first, implicit in what it has said above,

is that if Exam 2000 is not valid, then naturally claimants will not be required to take and pass it.

The second is that the court is relying on the parties' previous representations that a special

administration of Exam 2000 can be held for claimants interested in priority hiring.  (See July 29,

2011 United States Ltr. (Docket Entry # 697) at 1-2.)  Of course, claimants who have already

taken and passed Exam 2000 during the general administration of the exam will not need to sit

for a second administration of the exam.

The court next considers the dispute between the parties as to whether priority hire

candidates should receive their retroactively higher salary and benefits during their time in fire

academy, or only upon finishing fire academy (with a lump sum payment upon finishing

academy to make up for the year of a lower salary).  The court agrees with the City that Title VII

requires that claimants be placed in a position equivalent to the one that they would have been in

had they not been discriminated against (see May 17, 2012 City Reply Mem. (Docket Entry # 881) at 14 (citing Albemarle)), but the court believes that either proposal would achieve that goal. The court does not accept the City's argument that a priority hire would receive a "windfall" by joining the fire academy and then dropping out before finishing the academy. (See May 3, 2012 City Mem. (Docket Entry # 868) at 2.) A priority hire who leaves mid-year has received no more of a windfall than any other firefighter of the priority hire's seniority would receive by leaving the FDNY during that year.[8] The court also shares Plaintiff-Intervenors' concern that the lower initial salary that the City wishes to give priority hires might discourage claimants from asking to be considered for the priority hiring remedy. Therefore, the court concludes that priority hires should be paid the salary appropriate for firefighters of their seniority from the date of their admission to the fire academy.

### C. Issues Relating to Notice of Fairness Hearing

Upon prompting from the court (see Mar. 22, 2012 Order), the parties have considered whether candidates who took Exam 2000 should receive notice of the court's intent to hold a fairness hearing on individual compensatory relief issues. The parties agree that it is advisable for the candidates to receive notice. (May 3, 2012 City Mem. at 3; May 3, 2012 Pl.- Intervenors Mem. at 6; May 3, 2012 United States Mem. at 19-20.) The court agrees and orders that notice be sent to all candidates who took Exam 2000.

The parties do not agree how long recipients of notice of the fairness hearing should be given to file objections. The United States and Plaintiff-Intervenors believe that the third parties should be given 30 days (May 17, 2012 Pl.- Intervenors Reply Mem. (Docket Entry # 882) at 6;

---

[8] To the extent the City is suggesting that claimants would be receiving a windfall by being paid more during their time at the academy than other entry-level firefighters, the court notes that the aggregate amount of backpay losses takes into account the low salary of firefighters for their first year, because Dr. Siskin calculated average earnings for a firefighter from each academy class per year, thus accounting for the change in average earnings over time. (See Mar. 8, 2012 Mem. & Order at 29.)

May 3, 2012 United States Mem. at 18-19.), while the City believes 45 days is necessary (May 3, 2012 City Mem. at 3). The City appears to argue for 45 days because that was the period the court gave potential claimants to file claim forms and class opt-outs. (May 17, 2012 City Reply Mem. (Docket Entry # 881) at 17.) However, the court did so because it was concerned that the parties would not have current mailing addresses for many potential claimants (some of whom applied to the FDNY in 1999) and thus the parties would be required to attempt to re-send many notices. (See Apr. 20, 2012 Mem. & Order (Docket Entry # 861) at 7.) Given that the two groups of plausibly interested third parties will consist of incumbent firefighters and the candidates who took Exam 2000, and given that the City will likely have current mailing addresses for both of those groups, the court concludes that 30 days is a sufficient period for objections.

### D. The Recommendations of the Special Masters

The Special Masters for individual compensatory relief have filed recommendations on the structuring of an individual claims process. (See Special Masters Report and Recommendations (Docket Entry #849).) The parties have asked that the court defer adopting these recommendations until after the parties have a meet and confer session with the Special Masters. The court agrees and holds the recommendations in abeyance. The Special Masters and the parties shall meet and confer within 7 business days of the date of this Memorandum and Order. (See Mem. & Order Confirming Appointment of Special Masters (Docket Entry # 883) ¶¶ 2.c., 4.)

### E. The Burden of Paying the Social Security Administration

The United States and the City disagree as to which of them should bear the burden of paying for obtaining earnings information from the Social Security Administration (the "SSA");

the information from the SSA is needed to demonstrate the interim earnings of claimants seeking monetary relief.  (May 3, 2012 United States Mem. (Docket Entry # 867) at 1-2; May 3, 2012 City Mem. at 7-8.).  The United States has interfaced with the SSA on the cost of gaining information and the consent forms claimants will sign to authorize the SSA to give information about their earnings to the United States.  (See May 3, 2012 United States Mem. at 4-5.)  However, the United States seeks reimbursement of the fees it will pay to the SSA; it argues that the costs should be born by the party who has the burden of proving interim earnings—i.e., the City.  (See Backpay Op. at 48 (citing Sims v. Mme. Paulette Dry Cleaners, 638 F. Supp. 224, 231 (S.D.N.Y. 1986).)  The City argues that this information should be considered the equivalent of discovery from an opposing party and thus should be provided to it without cost.  (May 3, 2012 City Mem. at 7-8.)  The United States (which, for the purposes of this litigation, has always referred to the Department of Justice and United States Attorney's Office for the Eastern District of New York) argues that although the SSA and the Department of Justice are both agencies of the United States government, the SSA does not share information freely with other agencies of the government and, as a consequence, SSA records are not in its custody or control, and, thus, are not discoverable materials.  (See May 17, 2012 United States Reply Mem. (Docket Entry # 879) at 3.)

Plaintiff's argument is the better one.  It is the Department of Justice that, for all practical effect, is the Plaintiff in this case, not the United States government in a collective sense.  See 42 U.S.C. 2000e-5(f)(1) ("in the case of a respondent which is a government, governmental agency, or political subdivision . . . the Attorney General [ ] may bring a civil action against such respondent.")  The SSA is not a party to the case.  Moreover, the fact that the SSA requires the Department of Justice to obtain the consent of claimants and pay a fee for the records is

sufficient evidence that the records are not in the custody or control of the Department of Justice and thus do not qualify as information to be provided as party discovery.  <u>See</u> Fed. R. Civ. P. 34(a)(1).  These are third-party materials, and cost of obtaining them should fall on the party that has the burden of proof on interim earnings—i.e., the City.

The City raises the need for other forms of evidence of interim earnings.  (May 17, 2012 City Reply Mem. at 18.)  Whether information from the SSA is sufficient to prove interim earnings is a separate issue from who should pay for that information.  If the City believes that Internal Revenue Service records are required, it should include briefing on that issue in the memorandum it is scheduled to submit to the court on June 13, 2012.

### F.  Representation of Individual Claimants

The parties have also sought the court's resolution of whether counsel for the Subclasses may represent individual claimants in the anticipated claims proceedings.  The United States intends to participate in these proceedings but does not represent any individual claimant.  (Apr. 10, 2012 United States Ltr. (Docket Entry # 850) at 2 n.2.)  The Non-Hire Subclass and Delayed-Hire Subclasses have not been certified as to the issues of individual claimants' eligibility, mitigation, or amount of non-economic damages; therefore, Subclass counsel—Levy Ratner, P.C., counsel to the Non-Hire Subclass, and the Center for Constitutional Rights ("CCR"), counsel to the Delayed-Hire Subclass—do not represent any individual class member regarding those issues in their role as Subclass counsel.  Levy Ratner and CCR desire to represent those class members who request their assistance in their individual proceedings.  (May 11, 2012 Pl.-Intervenors Ltr. (Docket Entry # 872) at 1.)  The United States argues that representing both a Subclass and individual members of that class might pose a conflict of interest.  (Apr. 10, 2012 United States Ltr. at 2-3.)

The court concludes that a conflict of interest would exist only if Levy Ratner or CCR represented individuals whose claims would be barred by positions that those entities have previously advocated in their roles as Subclass Counsel. Specifically, an individual who is ineligible under the minimum criteria for relief that the court adopted—at the urging of all the parties—should not be represented by either Levy Ratner or CCR. (See Backpay Op. at 51-53 (adopting eligibility criteria agreed to by the parties).) Therefore, the court will permit each firm to represent individual Subclass members on the following conditions: if approached by an individual member interested in representation, the firm must provide the class member with the court-approved eligibility criteria and inform the class member that it will not represent any class member seeking to amend or avoid those criteria. If a class member agrees to that limitation on the firm's ability to represent him or her, and if in the course of representing that individual the firm determines that the individual's best argument that he or she is entitled to relief is to challenge the eligibility criteria, the firm must bring that fact to the individual's attention and seek the court's leave to withdraw from representation of that individual. Finally, each firm may only represent individual members of the Subclass of which it already serves as Subclass counsel.

## II. SCHEDULING ORDER

With this Memorandum and Order, the court has ruled on the substantive legal issues that needed to be resolved before a Proposed Remedial Order and fairness hearing notices could be drafted. Accordingly, the court modifies the Remedial Phase Timeline (see Apr. 12, 2012 Scheduling Order approving Joint Remedial Phase Timeline (Docket Entry # 844-2)) in the following ways: the parties shall submit joint proposed Fairness Hearing I notice documents to the court no later than 14 days after the date of this Memorandum and Order. The parties shall

confer with the Special Masters to draft a Proposed Relief Order and the United States shall file the same no later than 30 days after the date of this Memorandum and Order; the Proposed Relief Order shall, inter alia, fully explain the proposed claims process framework and role of the Special Masters. If, after a good-faith collaborative effort, the Special Masters disagree with the Proposed Relief Order's contents, they shall file a report and recommendation outlining their disagreements and proposing alternatives to the Proposed Relief Order's provisions.

## III.    CONCLUSION

As set forth above, the court ADOPTS the United States' method of determining individual backpay awards; GRANTS the United States' and the City's request that all putative priority hires be required to take and pass Exam 2000; GRANTS the parties' joint request that all individuals who took Exam 2000 receive notice of the anticipated fairness hearing; GRANTS the United States' and Plaintiff-Intervenors' request that such individuals receive a thirty-day objection period; GRANTS the parties' joint request to stay consideration of the Special Masters' recommendations; GRANTS the United States' request that the City reimburse it for the cost of obtaining information from the SSA; and GRANTS the request of Levy Ratner, P.C., and the CCR for leave to represent claimants in the individual claims proceedings, subject to the conditions discussed above.

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　 /S/ Nicholas G. Garaufis　
Dated: Brooklyn, New York　　　　　　　　　NICHOLAS G. GARAUFIS
　　　　June 3, 2012　　　　　　　　　　　　United States District Judge