Civil Action No. 07 CV 2067 (NGG) (RLM)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

Plaintiff,

-and-

THE VULCAN SOCIETY, INC. *for itself and on behalf of its members,* JAMEL NICHOLSON, *and* RUSEBELL WILSON, *individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief;* ROGER GREGG, MARCUS HAYWOOD, *and* KEVIN WALKER, *individually and on behalf of a subclass of all other non-hire victims similarly situated;* and CANDIDO NUNEZ *and* KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

Plaintiffs-Intervenors,

-against-

CITY OF NEW YORK, THE FIRE DEPARTMENT OF THE CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES, MAYOR MICHAEL BLOOMBERG and NEW YORK CITY FIRE COMMISSIONER NICHOLAS SCOPPETTA, in their individual and official capacities,

Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFF UNITED STATES' MEMORANDUM OF LAW REGARDING THE PROPER SCOPE OF DISCOVERY IN THE CLAIMS PROCESS FOR INDIVIDUAL RELIEF

### *MICHAEL A. CARDOZO*

*Corporation Counsel of the City of New York*

*Attorney for Defendants*
*100 Church Street*
*New York, N.Y. 10007*

*Law Dept. No.: 2007-017441-LE*

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................ i

PRELIMINARY STATEMENT ......................................................................... 1

POINT I

      DISCOVERY AS TO CLAIMANTS' EFFORTS
      TO FIND COMPARBLE EMPLOYMENT IS
      BOTH NECESSARY AND APPROPRIATE ........................................... 3

      A.  Legal Standard ...................................................................... 3

      B.  Suitable Employment ............................................................ 4

      C.  The *Greenway* Exception .................................................... 12

      D.  Withdrawal from the Job Market ........................................ 13

POINT II

      INCOME FROM UNEMPLOYMENT AND
      WORKERS' COMPENSATION SHOULD
      OFFSET BACK PAY AWARDS. ............................................................ 14

POINT III

      THE INDIVIDUAL RECORD OF EACH
      DELAYED-HIRE CLAIMANT MUST BE
      EXAMINED TO DETERMINE WHETHER THE
      CLAIMANT IS RESPONSIBLE IN WHOLE OR
      IN PART FOR THE DELAY IN HIRING ............................................... 17

POINT IV

      THE NEED FOR ADDITIONAL DISCOVERY
      OF CLAIMANTS' INTERIM EARNINGS
      SHOULD BE ASSESSED ON AN
      INDIVIDUALIZED BASIS. .................................................................... 22

CONCLUSION .................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**                                                                    **Pages**

*Broadnax v. City of New Haven,*
  415 F.3d 265 (2d Cir. 2005) ...................................................................4

*City and NYPD v. SBA,*
  2 OCB 2d 41 (BCB 2009) ......................................................................13

*Civil Serv. Emples. Ass'n, Local 1000 ex. rel. Minton v. State,*
  223 A.D.2d 890 (N.Y. App. Div. 3d Dep't 1996) ......................................16

*Clarke v. Frank,*
  960 F.2d 1146 (2d Cir. 1992) ...................................................................4

*Dailey v. Societe Generale,*
  108 F.3d 451 (2d Cir. 1997) ....................................................................14

*EEOC v. Enterprise Ass'n Steamfitters Local,*
  No. 638, 542 F.2d 579 (2d Cir. 1976) ......................................................14

*EEOC v. Yellow Freight System, Inc., 98-CV-2270,*
  2001 U.S. Dist. LEXIS 20240 (S.D.N.Y. Dec. 6, 2001) ..........................16

*Epstein v. Kalvin-Miller Int'l, Inc.,*
  139 F. Supp. 2d 469 (S.D.N.Y. 2001) .....................................................12

*Ford Motor Co. v. E.E.O.C.,*
  458 U.S. 219 (1982).............................................................................3, 4

*Greenway v. Buffalo Hilton Hotel,*
  143 F.3d 47 (2d Cir. 1998) .........................................................3, 4, 5, 13

*Hawkins v. 1115 Legal Service Care,*
  163 F.3d 684, 695 (2d Cir. 1998) .............................................................4

*Harding v. Cianbro Corp.,*
  498 F. Supp. 2d 344 (D. Me. 2007) ....................................................12, 14

*N.L.R.B. v. Thalbo Corp.,*
  171 F.3d 102 (2d Cir. 1999) ....................................................................4

*Orr v. Mukasey,*
  631 F. Supp. 2d 138 (D. P. R. 2009) .......................................................13

*Quint v. A.E. Staley Mfg. Co.,*
  172 F.3d 1 (1st Cir. 1999)...............................................................12, 14, 15

| **Cases** | **Pages** |
|---|---|

*Reilly v. Cisneros,*
    835 F. Supp. 96 (W.D.N.Y. 1993),
    *aff'd*, 44 F.3d 140 (2d Cir. 1995)................................................................................10, 11, 12

*SBA, LBA, DEA v. City, OCB,*
    No. I-41-69, Impasse Panel, Decision of Hearing Officer Theodore W. Kheel at 4
    (Nov. 24, 1969)........................................................................................................13

*Shannon v. Fireman's Fund Ins. Co.,*
    136 F. Supp. 2d 225 (S.D.N.Y. 2001) .................................................................10, 11, 16

*Siracuse v. Program for the Dev. of Human Potential,*
    07-cv-2205, 2012 WL 1624291 (E.D.N.Y. Apr. 30, 2012)....................................................16

*Stratton and Williams v. Sec'y of the Navy,*
    853 F. Supp. 66 (E.D.N.Y. 1994) ............................................................................17

*Stratton v. the Dep't for the Aging for the City of New York,*
    922 F. Supp. 857 (S.D.N.Y. 1996) ..........................................................................15

**Statutes**

26 U.S.C. §3121(b)(7) ..............................................................................................22

N.Y. Labor Law §597 [3]............................................................................................16

N.Y. Labor Law §§565.4 and 565.5 ..............................................................................15

N.Y. Military Law § 243 .............................................................................................10

N.Y. City Admin. Code § 14-109....................................................................................10

## PRELIMINARY STATEMENT

The restrictions plaintiffs seek to impose on discovery during the individual relief

phase of this case, if adopted, will deprive the City of its ability to challenge individual

claimant's mitigation efforts and effectively eliminate the City's right to reduce its financial

liability, a right this Court most recently acknowledged in its March 8, 2012 decision which

addressed mitigation among other issues. Dkt. # 825 at 48. In short, plaintiffs argue that the

Court should conclude as a legal matter that none of the claimants had to make a reasonable

effort to mitigate damages by looking for comparable employment because an entry-level New

York City ("FDNY") firefighter job is unique. Plaintiff United States' Memorandum of Law

Regarding the Proper Scope of Discovery in the Claims Process for Individual Relief at 4-5

("United States' Memo")("[T]he City should not be permitted to argue that claimants failed to

satisfy their duty to mitigate based on the reasonableness of their job search efforts.").[1] That

contention is incorrect for many reasons, not the least of which is that the position of a New

York City police officer, while different in certain respects, is comparable to that of a New York

City firefighter in material respects, except for work schedules. Plaintiffs also contend that to the

extent that claimants are required to prove that they used diligent efforts to obtain suitable

employment, the relevant geographic area for their job search efforts should be limited to the five

boroughs of New York City. That contention ignores the fact that historically many New York

City firefighters have commuted to work from surrounding communities[2] and many class

members were not New York City residents at the time they applied to take either Exam 7029 or

---

[1] Plaintiffs-Intervenors joined the United States' Memo. United States' Memo at 1. In addition, they filed a separate letter brief dated May 23, 2012 that addresses two issues, the collateral source rule and the use of earnings information from the Social Security Administration ("Plaintiffs-Intervenors' Letter Brief").

[2] As noted in the Notice of Exam for 7029 and 2043, attached as Ex. A, New York City firefighters are permitted to live in the New York State counties of Nassau, Orange, Putnam, Rockland and Westchester.

2043.  Finally, plaintiffs argue that the City's inquiry into a claimant's job search efforts during periods of unemployment should be limited to two questions: 1) Were you unemployed? and if so, 2) Did you look for work? According to the plaintiffs, if the claimant responds affirmatively to the second question, that ends the inquiry.  That truncated approach clearly would deprive the City of the ability to develop a factual basis for attempting to contradict the claimant's self-serving testimony.

Contrary to the plaintiffs' contention, the City, a self insurer, should be permitted to offset the back pay awards of any claimant who worked for the City and received unemployment benefits or workers compensation as a result of that work.  The City's records should contain all of the information that is required to establish this offset.  The City is not seeking to offset back pay awards as a result of unemployment benefits and workers' compensation received in connection with non-City employment.

The back pay awards of claimants whose delay in hiring was self-induced should be reduced by the amount of any back pay attributable to a period of self-induced delay.  The individualized fact-finding process should address the issue of self-delay.  Identifying those who may have contributed to the delay in being hired should be a relatively easy task to accomplish based on the data made available to the parties' experts during the liability phase of the case.  Moreover, on or about July 18, 2012, the parties should know the identity of all delayed hire class members who have submitted claims. *Proposed Remedial Phase Timeline*, Dkt. # 844-2 at 2.  The candidate investigation files of those candidates then can be produced and reviewed by all of the parties and a determination can be made as to whether the claimant's delayed hiring resulted from his own actions or inactions.

As the City has consistently maintained and the plaintiffs now apparently concede, Social Security Administration wage statements exclude various types of income not subject to the Social Security tax.  As these amounts could be quite substantial, the City should

2

be permitted to conduct discovery to obtain information about any such exclusions, as explained more fully below, targeted at actual claimants determined to be initially eligible for a back pay award by the United States.

## POINT I

### DISCOVERY AS TO CLAIMANTS' EFFORTS TO FIND COMPARABLE EMPLOYMENT IS BOTH NECESSARY AND APPROPRIATE.

The City does not dispute that it has the burden of proof on the following two issues which are critical to the individual damage phase of this case: 1) whether an individual claimant failed to use reasonable diligence to find suitable employment (subject to the exception set forth in *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47 (2d Cir. 1998) which is discussed below); and 2) how much should be deducted as interim earnings from an individual claimant's gross back pay award. However, as explained below, the City can not meet its burden on these issues without the benefit of discovery. Recognizing that the Court previously held that the claims process had to "be modified to enable fact finding on questions of mitigation," Dkt. # 825 at 48, plaintiffs now seek to short circuit that fact finding process by seeking what amounts to a class-wide determination that the City can not meet its burden on the threshold question of whether jobs substantially equivalent to the FDNY entry-level firefighter position were available to individual claimants at any point during the decade long damage period. They do so even though the parties have yet to ascertain the identity of all the actual claimants and do not know where these individuals actually lived throughout the damage period.

### A.      Legal Standard

"Victims of employment discrimination are required to mitigate their damages." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d at 53. Discharged employees have a duty to "use reasonable diligence in finding other suitable employment," *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982). The ultimate question "is whether the plaintiff acted reasonably in

attempting to gain other employment or in rejecting proffered employment." *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684, 695 (2d Cir. 1998) (internal quotations and citations omitted). Suitable employment means a job that is "substantially equivalent" to plaintiff's former job. *Ford Motor Co.*, 458 U.S. at 232.  While a plaintiff must demonstrate reasonable diligence in seeking suitable employment, "the employer has the ultimate burden of proving that the discriminatee failed to mitigate damages." *N.L.R.B. v. Thalbo Corp.*, 171 F.3d 102, 112 (2d Cir. 1999). *See also Clarke v. Frank*, 960 F.2d 1146, 1152 (2d Cir. 1992) ("The employer bears the burden of proving that suitable work existed, and that the employee did not make reasonable efforts to obtain it.").

The employer generally carries its burden by demonstrating "(1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005). (citation omitted).  *Greenway* established an exception to these two requirements, holding that "[a]n employer . . . is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment." 143 F.3d at 53.  The rationale for the exception "is that an employer should not be saddled by a requirement that it show other suitable employment in fact existed -- the threat being that if it does not, the employee will be found to have mitigated his damages -- when the employee, who is capable of finding replacement work, failed to pursue employment at all." *Broadnax*, 415 F.3d at 268 (citation omitted).  An employer bears the burden of showing that the *Greenway* exception applies. *Id.* at 270.

## B.   Suitable Employment

Clearly, another firefighter position within New York City, within the New York metropolitan area or within the community in which an individual claimant worked or lived during the damage period might qualify as a substantially equivalent position for mitigation

purposes.  That factual determination can not be made, however, by either the Court or the parties without examining the factual circumstances of each claimant's unique situation.  At this juncture, very little is known about the potential claimants and discovery about the claimants' residency, employment history, educational background, job search efforts, and earnings during the damage period is essential.  After all claims have been submitted and the United States makes its initial eligibility determinations, the City will be in a much better position to determine whether it needs mitigation discovery from a particular claimant and can tailor its discovery requests to the unique job and residency history of each.

To illustrate the potential mitigation scenarios, the Court should consider the following.  The delayed hires present a classic example of mitigation:  many of the claimants who joined the FDNY after the first Academy classes for Exam 7029 and 2043 properly mitigated their damages.  However, those who contributed to the delay in their admission to FDNY's Academy did not.[3]  Similarly, claimants who took Exam 7029 (the 1999 test) could have mitigated their damages by taking Exam 2043 (the 2002 test) or 6019 the (2007 test) after failing Exam 7029, if they had not turned 29 when registration for the relevant exam opened. Likewise, claimants who took Exam 2043 could have mitigated their damages by taking one of FDNY exams subsequently administered during the damage period.  According to the original contact list prepared by the United States Department of Justice ("DOJ") for the claims process, of the 3,859 black and Hispanic applicants who failed Exam 7029, only 225 took the next entry-level firefighter exam which the City administered three years later.  That means that approximately 3,600 class members did not pursue a job that is identical to the one that is the subject of their claim. That this Court later determined that the subsequent exams were not proven to be job related does not excuse a claimant's failure to at least try to obtain one of the available positions.  If class members who did not take any subsequent firefighter exam despite

being age-eligible submit claims, the City is entitled to explore why they failed to apply to take one of the subsequent exams. For example, if a claimant admits during discovery that he did not take a subsequent exam because either he lost interest in becoming a firefighter or his family had safety concerns about the job, then his failure to apply for the test would be persuasive evidence of a failure to mitigate.

Nor should the Court limit the relevant geographic area to the five boroughs of New York if that is what plaintiffs are asking the Court to do. The plaintiffs' position on this issue is somewhat inconsistent. *Compare* United States' Memo at 4 ("Since no jobs in New York City are substantially equivalent . . . .") *with* United States' Memo at 6-7 n. 5 ("The arguments in this brief focuses [sic] on the New York City area . . . If the City proves that a substantially equivalent job was available in an area outside of New York City during a period of time when an unemployed eligible claimant lived in that area, the City may meet its burden regarding substantially equivalent employment for that claimant.") Plaintiffs' vacillation on this issue underscores the need for discovery as to an individual claimant's residency throughout the damage period and his efforts to find substantially equivalent employment both within and outside of New York City.

Plaintiffs may try to explain this inconsistency by arguing that the Court should find on a class-wide basis that the relevant geographic area for New York City residents is limited to the five boroughs, but assess on an individual basis the relevant geographic areas for non-City residents. However, this approach not only is precluded by this Court's prior decision, Dkt. # 640 at 25, but also flies in the face of the residency requirements for firefighters that were in place in New York City throughout all of the damage period. Firefighters can and do live in Nassau, Westchester, Suffolk, Orange, Rockland and Putnam counties. *See* Ex. A, Notices of Exam for 7029 and 2043. Surely, if firefighters can commute to New York City from these

---

[3] In Point III, the City offers examples of self-induced delays as evidence of failure to mitigate.

counties to perform their jobs, claimants at a minimum should be required to explore firefighter job openings in those New York State counties to discharge their duty to mitigate. The City has obtained notices of exam for 15 entry-level firefighter exams that were given in those communities during the damage period, 1999 through 2010 and 3 for exams given in 2011. *See* Declaration of Kathleen M. Comfrey, dated June 13, 2012, attached as Ex B. Notices for other exams given in the counties surrounding New York City may be available from relevant local jurisdictions as well.

The Court, in fact, should assess the relevant geographic area for each claimant on an individualized basis. According to the original DOJ contact list, approximately 276 class members now reside in New Jersey and discovery may disclose that other class members who submit claims also may have resided in New Jersey at various points during the damage period. The City has identified five entry-level firefighter exams that were administered on a state-wide basis in New Jersey during the damage period. Declaration of Daniel Hill, dated June 13, 2012. Although New Jersey exams are administered on a state-wide basis, local municipalities select off the state-wide list and wages and benefits are set locally. *Id.* at ¶ 3, 6.[4] Discovery as to each claimant's residency and work locations throughout the damage period, therefore, is a necessary prerequisite to assessing the comparability of relevant New Jersey entry-level firefighter positions to that of New York City.

As plaintiffs have conceded, United States' Memo at 6 n. 5, the City may meet its burden for claimants such as New Jersey residents who lived in or near non-New York City communities that were hiring firefighters during the damage period. That rationale also applies

---

[4] According to data published by the U.S. Bureau of Labor Statistics as of May 2011, New Jersey was ranked second as the top paying state for the annual mean wages of firefighters. *See* http://www.bls.gov/oes/current/ocs.332011.htm (copy attached as Ex. D). New York, on the other hand, ranked only fourth. Moreover, the Newark-Union, NJ-PA Metropolitan Division with an annual mean salary of $75,960 was listed ahead of the Nassau-Suffolk, NY Metropolitan

to multiple non-New York City locales which appear to be the current home jurisdictions of a significant number of potential class members.  For example, the original DOJ contact list includes class members with addresses in California (63), Connecticut (46), Florida (212), Texas (50), and Virginia (82) to name but a few non-New York City jurisdictions.

Moreover, in some cases, the relevant geographic area for a claimant will be broader than a single municipality.  The U.S. Bureau of Labor Statistics includes multiple cities in some of the metropolitan areas it defines as amongst the top paying areas in the country for firefighters.  *See*, *e.g.*, San Jose-Sunnyvale-Santa Clara, CA; Oakland-Fremont-Hayward, CA; and Atlantic City-Hammonton, NJ.  Ex. D at 7.

In addition to firefighter positions, the City contends that certain public sector positions are comparable to the position of a New York City firefighter.  Chief among them is the position of a New York City police officer.[5]  Both positions accord the employee peace officer status under New York State law and both have as their principal objective protecting the public.  Recruits for both the FDNY and NYPD say that their desire to help people was one of the primary motivating factors in getting them to apply for the job and that they find their jobs personally rewarding.  NYPD Academy Video @ http://www.nypdrecruit.com/  Both the FDNY and NYPD pride their organizations on being the best and largest public service agencies of their kind in the country and enjoy the public recognition that comes with being associated with such great organizations.  *Compare* Commissioner's Cassano's Message Statement @ http://www.nyc.gov/html/fdny/html/home2.shtml with Commissioner Kelley's Video @ Inside the NYPD video at http://www.nypdrecruit.com/  Moreover, many of the functions of the FDNY

---

Division with an annual mean salary of $69,650 as the top paying metropolitan area in that same report.

[5] Once the identities of the claimants are known, the City must also investigate the law enforcement positions available in the claimants' communities as they may be more plentiful and offer better compensation packages than firefighter positions.

and NYPD overlap or mirror one another.  For example, both have emergency services units. Both have harbor units and maintain a marine fleet that is responsible for protecting the New York City coastline and the boats and ships that use the waterways surrounding New York. http://marine1fdny.com/about_us_new.php; http://www.nyc.gov/html/nypd/html/pr/pr_2008_ph4.shtml

Both NYC firefighters and police officers enjoy exceptional job security and outstanding benefit packages.  Listed below is a chart comparing the FDNY and NYPD current benefit packages (including unlimited sick leave for both) and promotional opportunities.  While the benefit packages are virtually identical, the promotional opportunities in the NYPD are much greater.  Over a third of NYPD's uniformed members hold a rank above that of entry level police officer.  NYPD @ http://www.nypdrecruit.com/benefits-salary/promotional-opportunities

| BENEFITS | NYC FIREFIGHTER | NYC POLICE OFFICER |
|---|---|---|
|  |  |  |
| STARTING SALARY | $39,370 | $41,975 |
| SALARY AFTER 5 YEARS | $76,488 | $76,488 |
| SALARY DIFFERENTIALS | Holiday, Night Shift & Overtime Pay | Holiday, Night Shift and Overtime Pay |
| LONGEVITY PAY | Yes after 5 years | Yes after 5 years |
| UNIFORM ALLOWANCE | Yes | Yes |
| CITY CONTRIBUTION TO WELFARE AND ANNUITY FUNDS | Yes | Yes |
| LIFE LONG CITY PAID HEALTH INSURANCE | Yes | Yes |
| PRESCRIPTION COVERAGE | Yes | Yes |
| DENTAL COVERAGE | Yes | Yes |
| EYEGLASS COVERAGE | Yes | Yes |
| VACATION | 57 hrs (1st & 2nd years) <br> 99 hrs (3rd & 4th years) <br> 162 hrs (5th year) <br> 195 hrs (>= 6 years) | 80 days (1st & 2d years) <br> 104 (3rd, 4th & 5th years) <br> 216 (after 5 years of service) |
| UNLIMITED SICK LEAVE WITH FULL PAY | Yes | Yes |
| MEDICAL BUREAU | Yes | Yes |
| HEART BILL BENEFITS | Yes | Yes |
| LUNG BILL BENEFITS | Yes | Yes |

| HIV BILL BENEFITS | Yes | Yes |
|---|---|---|
| TIER II[6] SERVICE PENSION | Vests after 5 years<br>Opportunity to retire after 20 years | Vests after 5 years<br>Opportunity to retire after 20 years |
| ORDINARY DISABILITY PENSION | Available upon appointment<br>Post employment medical benefits vests upon 10 years of service | Available upon appointment<br>Post employment medical benefits vests upon 10 years of service |
| ACCIDENTAL DISABILITY PENSION | Pension (75% of member's income) and post employment medical benefits available upon appointment | Pension (75% of member's income) and post employment medical benefits available upon appointment |
| ANNUAL VARIABLE SUPPLEMENT PAYMENT UPON RETIREMENT | Yes ($12,000 per year) for ½ service retiree that complete 20 years. | Yes ($12,000 per year) for ½ service retiree that complete 20 years. |
| PROMOTIONAL OPPORTUNITIES | Fire Marshal, Lieutenant, Captain and Battalion Chief | Detective, Sergeant, Lieutenant & Captain |

The number of entry-level positions at the NYPD also is significantly higher than at the FDNY. In the last five years, the NYPD hired 12,318 entry-level police officers. NYPD @ http://www.nypdrecruit.com/academy-prep/hiring-process. Moreover, the upper age limit for a police officer position is much higher. As a general rule, police officer candidates do not age out until they become 35 and members of the military can qualify for appointment to the NYPD until they turn 41. *N.Y. City Admin. Code* § 14-109 and *N.Y. Military Law* § 243 (10-a).

Plaintiffs' contend that two jobs must be "virtually identical" to satisfy the substantially equivalent standard, but fail to cite a Second Circuit decision supporting such a narrow interpretation of the law. United States' Memo at 6. Plaintiffs offer an incomplete quotation from *Shannon v. Fireman's Fund Ins. Co.,* 136 F. Supp. 2d 225, 229 (S.D.N.Y. 2001). The *Shannon* court described the applicable standard as follows: "In order to be substantially similar, 'the new position must afford [the plaintiff] virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the former position.'" *Id.* (citing *Reilly v. Cisneros*, 835 F. Supp. 96, 100 (W.D.N.Y. 1993), *aff'd*, 44 F.3d 140 (2d Cir. 1995). The *Shannon* court concluded that the defendant had failed to meet its burden because

---

[6] Tier II is applicable to employees appointed prior to July 1, 2009.

the position in question was mentioned in a casual conversation, during which no details about the position were offered. *Id.* Furthermore, as plaintiff testified that the company that was the subject of the conversation had previously fired him, the court concluded that he was not required to pursue a job opportunity that he likely would find demeaning given his termination from that same company. *Id.* at 229-30.

In *Reilly*, 835 F. Supp. at 101, which was affirmed by the Second Circuit, the district court ruled that a factual comparison of positions was required noting that, "Where the positions are not exactly the same, however, a court must review the differences and determine whether they are sufficiently comparable as to equate the plaintiff's non-acceptance of such to the forfeiture of his right to further pay." The court concluded that Reilly's rejection of an offer of a Housing Specialist position from his former employer, HUD, was unreasonable because although he viewed the position as a non-lawyer position the court concluded it was comparable to his prior position of Area Counsel, citing, among others, the following factors: it was not a demeaning position; it carried the same compensation and benefits as Reilly's prior position at HUD; it had the same promotional opportunities; the working conditions were the same although the new position had fewer responsibilities which was reflected in the lack of supporting staff members. *Id.* at 101-02. Like the plaintiffs' view of the New York City firefighter job, Reilly viewed his former position as "unique" and "the only one of its kind available in HUD operations in this area." *Id.* at 102. The Court refused to accept such "a narrow definition of substantially similar employment" as it would allow Reilly to reject HUD's offer because in his former position he advised more people and had more staff. *Id.* Finally, the court explicitly found that "*the offered position need not be identical.* It need only be as comparable to the old position as to put the employee who has suffered discrimination in as near to the same position as he would have been absent the discrimination." *Id.* at 103 (emphasis added). The district court concluded that Reilly's rejection of the offer was unreasonable, a finding that was affirmed

11

on appeal by the Second Circuit. *Id*. Thus, contrary to plaintiffs' view "substantially similar" does not mean "identical" and the analysis is fact specific.

**C.      The Greenway Exception**

Absent discovery about job search efforts, the parties can only speculate as to a given claimant's job search efforts. Recognizing this, the plaintiffs argue that the Court should severely restrict the City's mitigation discovery by limiting it to two questions: 1) Were you unemployed? and if so, 2) Did you look for work? The obvious problem with that approach is that it denies the finder of fact any details about the job search effort and relies entirely on the self-serving statement of a claimant, thereby precluding a qualitative assessment of the job search effort or lack thereof.

To justify this truncated discovery, plaintiffs cite a First Circuit decision, *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) and several district court decisions from outside this district which rely on *Quint* for the proposition that the *Greenway* exception does not apply as long as the claimant makes "some effort" to secure alternate employment. However, none of these decisions address the discovery point plaintiffs are advocating and all were either appeals from decisions on post-trial motions or adjudications of post-trial motions.

In *Epstein v. Kalvin-Miller Int'l, Inc.*, 139 F. Supp. 2d 469, 481-82 (S.D.N.Y. 2001), the employer, who had produced no evidence at trial of the availability of suitable employment or of plaintiff's failure to seek employment, argued that the *Greenway* exception should apply because plaintiff "never testified that he sought employment directly with any of his past employers." In its decision, the court analyzed the evidence, or lack thereof, presented at trial and adhered to the burden allocations articulated in *Greenway*. It made no rulings as to the availability of pre-trial discovery on the mitigation issue.

In *Harding v. Cianbro Corp.*, 498 F. Supp. 2d 344, 358-59 (D. Me. 2007), once again the court was assessing the factual record to determine whether there was a factual basis

for a jury's decision.  While the court does not describe the discovery that it permitted prior to trial, it would appear from the trial record that at a minimum the plaintiff had the opportunity to conduct a market survey in support of a vocational expert's opinion.  *Id*. at 359.

In *Orr v. Mukasey*, *631 F. Supp. 2d 138, 1556* (D.P.R. 2009), the plaintiff clearly made more than "some effort" to find comparable employment to the GS-15 promotional opportunity in the U.S. Marshals Service that he had been denied.  He moved from Puerto Rico to Wisconsin to accept a GS-13 position with the U.S. Marshals Service and later sought out and accepted a position with the Air Marshals, an entity which is not part of the U.S. Marshals Service, that paid nearly as much as he made in his former GS-14 position.  Therefore, it is difficult to fathom how this decision could be used to justify the denial of the City's right to discovery especially on an issue for which it may have the burden of proof if the court concludes based on the responses to two "yes" or "no" questions that a claimant has made "some effort" to find suitable employment.

**D.      Withdrawal from the Job Market**

In a footnote, plaintiffs argue that even if the City can prove that a claimant failed to look for work, the claimant still may be entitled to limited wages if he can prove that no jobs were available to him that paid the same as a FDNY firefighter.  United States' Memo at 10 n. 8.  That argument will be impossible to prove as a factual matter.  In New York City, entry-level jobs in the uniformed services (firefighters, police officers, corrections officers and sanitation workers) as a general rule make approximately the same entry-level salary and that parity rule has been in place for over a century.  *See SBA, LBA, DEA v. City*, OCB No. I-41-69, Impasse Panel, Decision of Hearing Officer Theodore W. Kheel at 4 (Nov. 24, 1969)(copy attached as Ex. F; *see also City and NYPD v. SBA*, 2 OCB 2d 41 (BCB 2009) [Dkt. No. BCB-2800-09] (copy attached as Ex. F.

In the same footnote, plaintiffs argue that a claimant's decision to stop work "may have been reasonable" and if it was, then the claimant's back pay award should not be reduced. A claimant should not be permitted to advance this argument unless the City is permitted to conduct discovery on this issue. As the *Quint* decision put it:

> Where an ADA claimant refrains from pursuing alternative employment, we consider it reasonable to presume at the outset that she did so for an articulable reason, perhaps because she possessed information which suggested that a job search would have been futile. *Since it is the claimant who would possess any such information*, however, she is likely to be in the better position to explain her preemptive decision to take no action to obtain employment. We believe it will be the extraordinary case in which an ADA claimant's decision to withdraw from the job market can be found to have been justifiable, given that virtually all reemployment prospects are plainly precluded absent some effort to reenter the job market.

*Quint*, 172 F.3d at 16 (emphasis added). It would be extraordinarily unfair to allow a claimant to contend that his decision to stop work was reasonable without giving the City the opportunity to develop a factual record that contradicts that argument.

## POINT II

### INCOME FROM UNEMPLOYMENT AND WORKERS' COMPENSATION SHOULD OFFSET BACK PAY AWARDS.

The Second Circuit has held that "[t]he decision whether or not to deduct unemployment benefits from a Title VII back pay award rests in the sound discretion of the district court." *Dailey v. Societe Generale*, 108 F.3d 451, 460-61 (2d Cir. 1997). In doing so, the Second Circuit relied on its earlier decision in *EEOC v. Enterprise Ass'n Steamfitters Local No. 638*, 542 F.2d 579 (2d Cir. 1976) that had affirmed a district court's deduction of public assistance from a back pay award stating:

> We are inclined to agree with . . . the rulings in other circuits which have held it not an abuse of discretion to deduct sums received from collateral sources such as unemployment compensation. . . . We see no compelling reason for providing the injured party with double recovery for his lost employment; no

14

compelling reason of deterrence or retribution against the responsible party in this case; and *we are not in the business of redistributing wealth beyond the goal of making the victim of discrimination whole.*

*Id.* at 592 (emphasis added).

Contrary to plaintiffs' contention, the collateral source rule should not be applied in this case to unemployment and workers' compensation benefits paid to claimants who were City employees. Both the United States and Plaintiffs-Intervenors seem to acknowledge that the collateral source rule is not applicable if the employer itself is the source of the benefit. *See* United States' Memo at 11 (emphasis added) ("[T]hese income sources are not included in interim earnings because they are collateral sources of income (*unless the City paid them directly to the claimants*) and Plaintiffs-Intervenors' Letter Brief at 2 (emphasis added) ("[T]he City has absolutely no entitlement to 'recoup' the expenditures of the *outside agencies* that provided such benefits.") As the City self-insures for both unemployment compensation and workers' compensation, the collateral source rule clearly is not applicable. In *Stratton v. the Dep't for the Aging for the City of New York*, 922 F. Supp. 857 (S.D.N.Y. 1996), the district court explained how the City funds unemployment benefits:

> [T]the City of New York elects under New York Labor Law §§ 565.4 and 565.5 to make payments for the unemployment compensation claims paid out to its former employees, rather than making contributions to the state unemployment insurance fund. *See* Affidavit of Beverly Session, Acting Director of the Unemployment Insurance Division of the New York City Department of Personnel, dated March 8, 1996, at 1-2. The City is thus effectively responsible for paying Plaintiff's unemployment benefits.

*Id.* at 866. That same process is applicable today. Declaration of Kevin Williams, Director of the Unemployment Insurance Unit of the Department of Citywide Administrative Services ("DCAS")(formerly known as the New York City Department of Personnel), dated June 8, 2012, attached as Ex. G. The City also self-insures for workers' compensation. Declaration of John

Sweeney, Chief of the Workers' Compensation Division of the Office of Corporation Counsel, dated June 7, 2012, attached as Ex. H.

   Moreover, the case law cited by the United States supports the deduction of both unemployment benefits and workers' compensation paid by the City to offset any back pay award. *See Siracuse v. Program for the Dev. Of Human Potential*, 07-cv-2205, 2012 WL 1624291, at *13-14 (E.D.N.Y. Apr. 30, 2012)(acknowledging that a defendant who self-insures and paid benefit directly to the plaintiff is entitled to offset); *EEOC v. Yellow Freight System, Inc.*, 98-CV-2270, 2001 U.S. Dist. LEXIS 20240 at *5 (S.D.N.Y. Dec. 6, 2001)(finding that evidence that defendant self-insured, if true, would entitle defendant to offset any back pay award by the amount of workers' compensation paid to the plaintiff); *Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d at 232 n. 14 (*distinguishing Stratton* and *Williams v. Sec'y of the Navy*, 853 F. Supp. 66, 72 (E.D.N.Y. 1994), the district court pointed out that unemployment benefits were deducted in those cases because "the defendants [New York City and the Dep't of the Navy], both public agencies, effectively paid the unemployment compensation.") The only decision cited by Plaintiffs-Intervenors, on the other hand, is completely inapposite. Plaintiffs-Intervenors' Letter Brief at 2. The only issue before the court in *Civil Serv. Emples. Ass'n, Local 1000 ex. rel. Hinton v. State*, 223 A.D.2d 890, 892 (N.Y. App. Div. 3d Dep't 1996) was whether an arbitration decision that awarded "full back pay" authorized the deduction of unemployment compensation or was so ambiguous as to be non-final and indefinite. Concluding that the arbitration award was not ambiguous, the Court merely pointed out "the award of 'full back pay' with no setoff for unemployment insurance benefits [would not] necessarily result in a double recovery, for the Commissioner of Labor is authorized to commence an action to recover the benefits when there has been a retroactive payment of remuneration (*see*, Labor Law § 597 [3], [4])." *Id*. The court also noted that the collective bargaining agreement at issue prohibited set offs in disciplinary proceedings. *Id*. Therefore, none of the case law plaintiffs cited warrants

denying an offset for either unemployment or workers' compensation benefits paid to claimants in this case by the City. [7]

The City will not require any discovery as to the amount of unemployment and workers' compensation benefits paid to claimants who were City employees during the damage period as that information should be available from its own records for most of the damage period. The City, of course, will provide the relevant information to plaintiffs during the individual relief phase of this case.

## POINT III

### THE INDIVIDUAL RECORD OF EACH DELAYED-HIRE CLAIMANT MUST BE EXAMINED TO DETERMINE IF THE CLAIMANT IS RESPONSIBLE IN WHOLE OR IN PART FOR THE DELAY IN HIRING.

As this Court recognized in its March 8, 2012 order, Dkt. # 825 at 43, "someone whose delay in hiring was self-induced should not benefit from a damages award intended to make the victim whole." By order dated June 3, 2012, the Court found that the parties' briefing on the issue of self-delay (*See* May 17, 2012 City Reply Mem. at 12; May 17, 2012 United States Reply Mem. at 18 n.18) was insufficient and invited the parties to amplify their positions in the briefs due on June 13 and June 22, 2012 on the scope of discovery.

The City submits that the issue of whether a delayed claimant caused or contributed to the delay in his appointment can be determined for the most part based on an examination of the individual's candidate investigation record and a comparison of his first certification date with his eventual appointment date and that of other candidates in his first certification group. As explained by Donay Queenan, after a civil service list is published, FDNY's Candidate Investigation Division ("CID") begins processing the candidates for

---

[7] The City is not seeking to reduce interim earnings with an offset of Social Security disability benefits.

appointment to the FDNY Academy.   Donay Queenan's Declaration dated June 13, 2012 ("Queenan Decl.")(copy attached as Ex. I at ¶ 2.   The first step in this process is a request from FDNY to DCAS for a certification of a specific number of candidates CID will process for admission into the Academy.   *Id*.   DCAS then prepares a certified list of the top scoring candidates in rank order and forwards it to the FDNY.   *Id.*   The individuals on that list each receive the same certification date.   *Id.*   For example, the first group of candidates called to be processed for Exam 7029 had a certification date of January 19, 2001 and the second group had a certification date of April 23, 2001.   *See* Declaration of Christopher Erath dated June 13, 2012 ("Erath" Decl.")(copy attached as Ex. J), Ex. 1, row 1.

Historically, the CID has asked DCAS to certify approximately 900 to 1,000 candidates for each Academy class which typically is comprised of approximately 300 probationary firefighters.   Queenan at ¶ 3.   Of the candidates contacted for processing for a particular class, a number do not enter that class either because they were not eligible, did not complete the application process prior to the start date for the class or the class was filled before their list number was reached; these candidates were considered for subsequent Academy classes in list order on DCAS's next certification.   *Id*.   This process was repeated for each 7029 and 2043 Academy class and excess candidates were carried forward until a determination was made that they were not qualified or the list expired.   *Id*.

For both Exams 7029 and 2043, the CID process included, among other things, taking the medical and psychological exams and submitting paperwork to substantiate claims for residency, legacy, and veteran bonus points.   *Id*. at ¶ 4.   FDNY must account to DCAS for the processing of each individual on the certification list it furnished to FDNY.   *Id*.   To document a candidate's progress through the screening process and to report to DCAS on FDNY's consideration of each candidacy, CID uses specific codes provided by DCAS to document various actions.   *Id*.   For example, if a candidate failed the medical or psychological screening

18

exam, CID would assign a NQA code to his name, meaning "not qualified for appointment". *Id.*

He then could appeal that determination to the New York City Civil Service Commission and if

his appeal was successful, he was allowed to complete the application process and qualify for

appointment provided he completed all of the other steps in the process. *Id.* During the CID

process for Exam 7029 and 2043, candidates also were required to submit proof of, among other

things, age, citizenship, military service, residency status, veteran's status and for 7029

candidates appointed prior to 9/11 possession of a certificate for First Responders with

defibrillation training ("CFR-D certificate").[8] *Id.* At ¶ 5. If a candidate failed to submit the

proof before the Academy class was filled, FDNY assigned the NAC code to the candidate. *Id.*

Because CID called more candidates than it could place in the Academy class it was trying to

fill, excess candidates who were considered, but not appointed were given one of two codes,

BLN or TIE. *Id.* Those whose list numbers were not reached were given a code designation of

BLN (an acronym for "Balance of List Not Used"). Candidates with completed applications

who had list numbers high enough for appointment but which were identical to another

candidate's score were subject to a tiebreaker and the loser received a TIE code; such candidates

were eligible for the next Academy class

    To determine whether a particular claimant was responsible in whole or in part for

a delay in his appointment, the Court must conduct an individualized examination that considers

the factors contributing to the delay. Those factors could include, for example, being in the

military when first called, failing to become a United States citizen until late in the application

process, and failing to submit proof of residency, veteran status or any of the eligibility

requirements. By examining the data in the database upon which the back pay analysis was built

---

[8] Following 9/11, the CFR-D requirement was changed to allow candidates who did not possess the CFR-D certificate at the time of appointment to obtain one before the end of their probationary periods.

and the individual claimant's CID files, the parties should be able to readily ascertain to what extent an individual claimant contributed to the delay in his appointment.

Dr. Erath has prepared a chart that illustrates how claimants who may be responsible for self-induced delay can be identified. *See* Ex. J, Erath Decl. The first row of his chart pertains to the candidates certified by DCAS to FDNY on January 19, 2001 for processing for the February 4, 2001 Academy class. *Id*. at ¶ 5. Dr. Erath calculated that 8 candidates certified as of January 19, 2001 may have self-delayed. *Id*. The basis for that conclusion is reflected in the first line of his spreadsheet. *Id*. Of the 71 black and Hispanic candidates who were certified as of January 19, 2001, 12 were appointed to the February 4, 2001 Academy class and 44 received the BLN/TIE code with the result that they would receive a second certification date and would be considered for the second Academy class. *Id*. Of the remaining 15 black and Hispanic candidates certified on January 19, 2001, seven never completed the application process and were not hired, making them irrelevant to a delayed hire analysis. The remaining eight are potential self-delays because they did not complete the application process in time to be considered for the first Academy class but were later appointed. Dr. Erath repeated this calculation for each of the certification dates for Exam 7029 with one modification: he subtracted any candidates from certification groups who received CNS designations. *Id*. at ¶ 5.

Three of the black/Hispanic candidates (Applicants # 6, 7 and 8)[9] listed in the first certification group for Exam 7029 and identified as self-delayers achieved perfect scores of 100 on both the written and physical components of the exam. *Id*. at ¶ 6. Therefore, the written exam could not have caused any injury to them. Although Applicant # 6 scored 100 on both the written and the physical exams, he had seven different certifications dates, five caused by a failure to submit paperwork (NAC) and a sixth resulting from a medical disqualification (NQA).

---

[9] For privacy reasons, the City has not identified these applicants by name in the papers being filed with the Court. However, the City has furnished these names to plaintiffs' counsel.

*Id*. at ¶ 6.  Applicant # 7's CID file indicates that he received the NAC code due to failing to satisfy a requirement, but does not identify the specific requirement, *See* Ex.I, Queenan Decl. at ¶ 13; Applicant # 8's CID file indicates that he was appointed on July 15, 2001, approximately two months after obtaining a CFR-D.  *Id*. at ¶ 14.

Donay Queenan's declaration summarizes some of the facts germane to other potential cases of self-induced delay. For example, Applicant # 1's application was delayed by two factors that were not attributable to the exam or the City; military service and his failure to obtain a CFR-D.  *Id*. at ¶ 7.  Applicant # 2's application similarly was delayed by two factors that were not attributable to the exam or the City: lack of citizenship and failure to complete his medical exam.  *Id*. at ¶ 8.    Applicant # 3's hiring was delayed because he failed his initial medical exam and failed to obtain his CFR-D.  *Id*. at ¶ 9.  Applicant # 4's application was delayed by his failure to take his medical exam until sometime in 2004.  *Id*. at ¶ 10.  Applicant # 5 was first processed on May 4, 2004, and passed his medical on August 6, 2004.  The City appointed him to the Academy class that was filled immediately following his medical qualification for the job.  *Id*. at ¶ 11.

Moreover, this individualized analysis should not be either time-consuming or burdensome.  The parties' experts already have the data that Dr. Erath used to prepare a chart illustrating which black and Hispanic applicants should be examined for potential self-induced delay, Erath Decl., Ex. 1, and the candidate's CID files are readily available.  While the number of actual delayed hire claimants is still not known, the parties do know that the maximum number of delayed hire claimants is a relatively small universe of claimants.  Therefore, a review of these CID files would not be burdensome and would enable the parties in short order to resolve for most candidates the issue of whether and to what extent they contributed to the hiring delay.  To summarize, if DCAS certified a candidate to FDNY for processing for a particular Academy class, that candidate should have been hired into that class unless he received a BLN,

21

TIE or CNS code.   Therefore, a comparison of a candidate's first certification date to his appointment date is indicative of self-induced delay.  An examination of the candidate's CID file should reveal the underlying cause of the delay in most cases.

### POINT IV

### THE NEED FOR ADDITIONAL DISCOVERY OF CLAIMANTS' INTERIM EARNINGS SHOULD BE ASSESSED ON AN INDIVIDUALIZED BASIS.

The City does not object to using the Social Security Administration ("SSA") earnings statements as the starting point for an assessment of the claimants' interim earnings. However, as the City has consistently maintained and the plaintiffs now apparently concede, these statements exclude income not subject to Social Security tax and income from certain state and local governments.  United States' Memo at 19; Plaintiffs-Intervenors' Letter Brief at 3.  For example, Social Security wages as reported in Box 3 of an employee's W-2 Wage and Tax Statement are reduced for health insurance premiums, TransitBenefit contributions and some flexible spending program contributions.  Needless to say, these reductions in reportable earnings can be substantial.  For example, an employee's bi-weekly contribution to the City's most expensive health insurance plan for family coverage now stands at $809.58 which amounts to an annual premium totaling approximately $19,430.  Basic Plan and Optional Rider Costs. Ex. J.  In addition, pursuant to 26 U.S.C. § 3121(b)(7), if a state or local government employee contributes 7½%  or more of his wages to a deferred compensation plan, he is not required to pay social security taxes on that amount unless he is a pension member.

Plaintiffs' argument that the City should have attempted to collect interim earnings information for class member before now, but did not do so is absurd and inconsistent with their own conduct.  The United States has been estimating for quite some time that only about 2,200 to 2,500 of the 7,070 class members in all likelihood will submit claims.  Dkt. # 867 at 5, n.3.   It too has waited to start collecting interim earnings data and sensibly will solicit it

only from those class members who it determines, as an initial matter, are eligible claimants. *Proposed Remedial Phase Timeline,* Dkt. # 844-2 at 1. That aspect of the fact gathering process is scheduled to start on July 18, 2012, *Id.* at 1, and is projected to continue until September 17, 2012, *Id.* at 2. In short, collecting earnings data before the eligible claimants are identified would have been an egregious waste of taxpayer dollars.

Plaintiffs' concern about the cost of collecting interim data from sources other than the Social Security Administration strains credulity. The United States has consistently argued that the City should reimburse it for the costs of obtaining the SSA statements and, undoubtedly will take the same position as to any information obtained from the Internal Revenue Service ("IRS"). Any legitimate concern that the United States may have had about the costs associated with this aspect of discovery has been mooted by the Court's June 3, 2012 order, Dkt. # 888, directing the City to reimburse the United States for the SSA costs it incurs. Upon further examination, the City agrees that the IRS information may be subject to some of the same limitations as that of the SSA because the IRS does not receive a copy of the taxpayer's W-2. The most complete source of earnings data for an individual claimant may well be his W-2 Statements and any 1099 Statements issued to him.

The City respectfully suggests that the parties proceed as follows to collect interim earnings data: 1) determine which of the eligible claimants are or were City employees and obtain City's payroll records for them; 2) for non-City employees and those who worked for the City for only a portion of the damage period, obtain copies of their W-2 and 1099 Statements from them or consents to obtain the Statements from their employers; 3) if a claimant did not retain W-2 and 1099 Statements, obtain the claimant's state or local returns, as those returns at least in New York State, if properly completed, should add back pre-tax payments that are excluded from SSA earnings.

## CONCLUSION

For the reasons stated above, the City respectfully submits that the Court should

deny plaintiffs' request to limit discovery.

Dated:     New York, New York
            June 13, 2012

                                   Respectfully Submitted,

                                   **MICHAEL A. CARDOZO**
                                   Corporation Counsel of the City of New York
                                   Attorney for Defendants
                                   100 Church Street
                                   New York, New York 10007
                                   (212) 788-0862

By:                                
                                     Michael A. Cardozo
                                   Corporation Counsel