IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        PLAINTIFF,

THE VULCAN SOCIETY INC., for itself and
on behalf of its members, JAMEL
NICHOLSON, and RUSEBELL WILSON,
individually and on behalf of a subclass of
all other victims similarly situated seeking
classwide injunctive relief;

ROGER GREGG, MARCUS HAYWOOD, and
KEVIN WALKER, individually and on behalf
of a subclass of all other non-hire victims
similarly situated; and

CANDIDO NUÑEZ and KEVIN SIMPKINS,
individually and on behalf of a subclass of
all other delayed-hire victims similarly
situated,

        PLAINTIFFS-INTERVENORS
v.

CITY OF NEW YORK, ET AL.,

        DEFENDANTS.

CIV. ACTION NO. 07-CV-2067 (NGG)(RLM)

**PLAINTIFF UNITED STATES' REPLY IN SUPPORT
OF ITS MEMORANDUM REGARDING THE
PROPER SCOPE OF DISCOVERY IN THE CLAIMS PROCESS**

# TABLE OF CONTENTS

I.  No jobs substantially equivalent to the FDNY firefighter position existed in New York City, and claimants were not required to apply to the NYPD or reapply to the FDNY in order to mitigate their damages. ................................................................................ 2

    A.  The NYPD police officer position is not substantially equivalent to the FDNY firefighter position. ................................................................................ 2

    B.  Claimants had no obligation to undergo the FDNY's discriminatory hiring process again after it failed to hire them. ................................................................ 3

II.  The City has failed to prove that substantially equivalent jobs existed in the outlying counties surrounding New York City. ................................................................ 5

III.  For claimants who lived in New York City, discovery regarding job search efforts should be limited to determining whether they looked for work.  For claimants who lived elsewhere, the City should be required to prove the existence of substantially equivalent employment before it is permitted to seek additional discovery. ..................... 8

IV.  The parties appear to agree that unemployment compensation and workers compensation paid by the City to its own employees will be deducted from back pay awards. ................................................................................................ 9

V.  The City did not dispute that it should be prohibited from taking discovery on claimants' educational, medical/psychological, and criminal/character backgrounds. .... 10

VI.  The Court should limit the City's ability to take additional discovery of individual claimants' interim earnings information. ................................................ 10

VII.  The Court should not allow the City to avoid liability to Delay Claimants by arguing that these claimants were responsible for the delay in their hiring. ................. 12

    A.  At this late date, the Court should not change the eligibility criteria that it has set for Delay Claimants. ................................................................ 12

    B.  There is no accurate basis to determine the validity of the City's allegations of self-induced delay. ................................................................ 13

    C.  Allowing the City to inquire into whether Delay Claimants self-induced delay would require unduly burdensome and time-consuming discovery to recreate the circumstances of these claimants' processing by the City. ............................. 16

VIII.  Conclusion ................................................................................ 17

i

# TABLE OF AUTHORITIES

**Cases**

*Ass'n Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981) ................................................................................................................ 16

*Caufield v. Center Area Sch. Dist.,* 133 Fed. App'x 4 (3d Cir. 2005) ........................... 6

*Eassa v. Hartford Fire Ins. Co.*, No. 90-cv-321, 1991 WL 255111 (N.D.N.Y. Nov. 29, 1991) .... 7

*EEOC v. Pennsylvania*, 772 F. Supp. 217 (M.D. Pa. 1991) ........................................... 7

*Gerardi v. Hofstra University*, 897 F. Supp. 50 (E.D.N.Y. 1995) ......................... 2, 3, 6

*Hemphill v. City of Wilmington*, 813 F. Supp. 2d 592 (D. Del. 2011) ........................... 6

*Moore v. Univ. of Notre Dame*, 22 F. Supp. 2d 896 (N.D. Ind. 1998) ........................... 7

*Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727 (8th Cir. 1996) ..................................... 2, 3

*Reilly v. Cisneros*, 835 F. Supp. 96 (W.D.N.Y. 1993) ................................................... 3

*Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225 (S.D.N.Y. 2001) ................ 6

*Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114 (4th Cir. 1983) ...................................... 7

*Taylor v. Polygram Records*, No. 94-CV-7689, 1999 WL 124456 (S.D.N.Y. Mar. 8, 1999) ........ 4

The United States does not seek a finding that the City cannot, under any circumstances, demonstrate a need for individual discovery regarding a particular claimant's mitigation efforts. Rather, the United States seeks a determination that the City must demonstrate that substantially equivalent employment existed before it may engage in full-scale discovery of the efforts of hundreds or thousands of eligible claimants to find work over the span of a decade.  If the City cannot establish that substantially equivalent employment existed, it can only satisfy its failure-to-mitigate defense if a claimant made no attempt to look for work.  In which case, extensive exploration of their job search efforts over the back pay period would be a burdensome, time-consuming, and irrelevant exercise.   Further, the information relied upon by the City in its June 13 brief does not establish that substantially equivalent employment existed in or surrounding New York City.

The City's assertion that this approach will "deprive the City of its ability to challenge individual claimant's mitigation efforts and effectively eliminate the City's right to reduce its financial liability . . ." (Dkt. 900 at 5) is without merit.  Regardless of whether it proves that substantially equivalent employment exists, the City will receive the following information about each eligible claimant during the claims process:  (1) interim employment earnings for each year of the back pay period; (2) any periods of unemployment; (3) whether the claimant sought work during any periods of unemployment; and (4) where the claimant resided during the back pay period.[1]  Thus, the City's claim that it will be deprived of evidence to establish a claimant's interim earnings, and thereby reduce its financial liability, is unfounded.  The Plaintiffs-Intervenors agree with, and join, the United States' brief.

---

[1]  Moreover, for claimants who the City employed during the back pay period, the City will have access to additional information.

I.    **No jobs substantially equivalent to the FDNY firefighter position existed in New York City, and claimants were not required to apply to the NYPD or reapply to the FDNY in order to mitigate their damages.**

For the reasons stated below, and contrary to the City's arguments, claimants were not required to apply for a New York City Police Department ("NYPD") police officer position or reapply for an FDNY firefighter position in order to mitigate their back pay damages.

A.    **The NYPD police officer position is not substantially equivalent to the FDNY firefighter position.**

Important differences between the positions of NYPD police officer and FDNY firefighter, including a material difference that the City concedes, preclude a finding that the two positions are substantially equivalent. As the United States' May 23 brief explained, courts have held that in order for two jobs to be substantially equivalent they must be "virtually identical." Dkt. 884 at 6. As an illustration, the United States cited *Gerardi v. Hofstra University*, 897 F. Supp. 50 (E.D.N.Y. 1995), which the City failed to rebut in its brief. As *Gerardi* demonstrates, differences between the work schedules of two jobs preclude a finding that they are substantially equivalent. *Id.* at 54-55. The City maintains that the job of a NYPD police officer "is comparable to that of a New York City firefighter in material respects, *except for work schedules*." Dkt. 900 at 1 (emphasis added). This key difference, which the City concedes, is fatal to the City's argument of substantial equivalence.

Furthermore, the City's arguments regarding the NYPD job focus heavily on the benefits of the job (salary, vacation, pension) and the characteristics of the agencies (emergency services units, marine fleets), while almost entirely ignoring the substantial differences between the actual job duties of an FDNY firefighter and an NYPD police officer. Dkt. 900 at 8-10. Courts have held that jobs are not substantially equivalent if their duties differ, even if that difference is slight. *See Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 735-36 (8th Cir. 1996) (holding that two

hospital registrar jobs were not substantially equivalent because they involved admitting
different types of patients); *see also Gerardi*, 897 F.Supp. at 55 (holding that two school
counselor jobs were not substantially equivalent, in part because the jobs involved counseling
different types of students).  The differences between the positions of FDNY firefighter and
NYPD police officer are far greater than those considered material in *Gerardi* and *Parrish*.  For
example, unlike NYPD police officers, FDNY firefighters do not investigate crimes, apprehend
crime suspects, or carry firearms.  Moreover, firefighting is not part of an NYPD police officer's
standard job responsibilities.[2]  Therefore, in addition to the differences in schedules, which the
City concedes, the position of NYPD police officer is not substantially equivalent to FDNY
firefighter because of the different job duties.[3]

> **B.**     **Claimants had no obligation to undergo the FDNY's discriminatory hiring
> process again after it failed to hire them.**

Contrary to the City's brief, claimants did not have an obligation to reapply for FDNY
firefighter positions in order to mitigate their damages.  Dkt. 900 at 5-6.  First, it would be
inequitable to insist that claimants reapply for a firefighter position with the FDNY, and subject
themselves again to the FDNY's discriminatory hiring processes, in order to mitigate their
damages.  This is particularly true because the Court found that the FDNY subjected all black
and Hispanic applicants who took Written Exams 7029, 2043, and 6019 to an unlawful and

---

[2]   A summary of a NYPD police officer's job duties can be found at
http://www.nypdrecruit.com/faq (last visited Jun. 14, 2012), which is attached as Exhibit 1.

[3]   In support of its argument that the FDNY firefighter job and NYPD police officer job are
substantially equivalent, the City relies on *Reilly v. Cisneros*, 835 F. Supp. 96 (W.D.N.Y. 1993).
This reliance is misplaced.  Unlike the jobs here, the two jobs in *Reilly* were virtually identical:
they both entailed the provision of legal services on the same subject matter for the same
government agency.  *Id.* at 101-02.  In contrast, FDNY firefighters and NYPD police officers
provide different services and work for different agencies.  In addition, *Reilly* did not address the
issue of positions with different schedules, as is the case with FDNY firefighters and NYPD
police officers.

discriminatory hiring process.  In other words, a fair, nondiscriminatory hiring process for a

FDNY firefighter position simply did not exist.  Under these circumstances, it would be unjust to

require black and Hispanic applicants to repeatedly subject themselves to this discriminatory

hiring process.

Second, if the Court permitted the City to argue that a claimant who did not reapply to the

FDNY should have his back pay reduced due to a failure to mitigate, the Special Masters and the

Court would have to replicate the FDNY's flawed and discriminatory hiring process and engage

in "mere guesswork."   This would be necessary because, when a fact-finder determines that a

plaintiff's back pay award must be reduced because the plaintiff failed to mitigate damages, the

fact-finder must then calculate "the amount that could have been earned during the period in

which the plaintiff failed to mitigate."  *Taylor v. Polygram Records*, No. 94-CV-7689, 1999 WL

124456, at *25 (S.D.N.Y. Mar. 8, 1999).[4]  If a claimant failed to reapply with the FDNY and the

City claimed that he, consequently, failed to mitigate his damages, a Special Master (and

ultimately the Court) would have to (a) determine, if he had reapplied, whether he would have

passed the relevant written exam; and if so, (b) determine how long it would have taken the

FDNY to reach him on the eligible list, if at all, (c) determine whether he would have passed the

physical exam and the background investigation, and, finally, (d) determine which firefighter

academy class he would have entered.  This inquiry necessarily requires layer upon layer of

---

[4]   *See also, e.g.,* Fifth Circuit Labor and Employment Law Pattern Jury Charges § 11.8 at
http://www.lb5.uscourts.gov/JuryInstructions/ (last visited Jun. 22, 2012) ("To prevail on this
[failure to mitigate] defense, Defendant must show, by a preponderance of the evidence, that: (a)
there were "substantially equivalent employment" positions available; (b) plaintiff failed to use
reasonable diligence in seeking those positions; and (c) *the amount by which plaintiff's damages
were increased by [his/her] failure to take such reasonable actions*.") (emphasis added).  This
pattern jury instruction is attached as Exhibit 2.

speculation, and also would require the Special Master to replicate the FDNY's flawed and discriminatory hiring process.

The Court recognized this very problem in its Order of March 8, 2012.  Dkt. 825 at 55. There, the Court held that it and the Special Masters would not consider whether the FDNY would have refused to hire a claimant due to medical, psychological, or character issues when determining eligibility for relief in the claims process.  The Court refused to instruct the Special Masters to "attempt to replicate a [hiring] process that the court has determined to be inadequate in another part of th[is] same case," finding that doing so would render decisions based on "mere guesswork."  *Id.* at 55-56.  This reasoning applies with special force here because the attempted replication involves written exams that the Court has determined are discriminatory.  Thus, the "mere guesswork" would be guesswork aimed at replicating a discriminatory hiring process. Accordingly, claimants' back pay awards should not be reduced because they failed to subject themselves again to the discriminatory FDNY firefighter hiring process.

**II.    The City has failed to prove that substantially equivalent jobs existed in the outlying counties surrounding New York City.**

Contrary to its assertions in its June 13 brief, the City has failed to prove that substantially equivalent jobs existed in the outlying counties surrounding New York City.  Dkt. 900 at 6-7.  Although the City has presented a variety of exam notices for firefighter jobs in these outlying counties, these notices do not prove the existence of a substantially equivalent job to the FDNY firefighter position.  Dkt. 900-1 at 16-157.

First, even if a defendant establishes that jobs similar to the one the plaintiff sought were available, in order to prove that those jobs were substantially equivalent, the defendant must also produce evidence of the job responsibilities, promotional opportunities, working conditions, and other characteristics of the job that courts examine when they assess whether two jobs are

substantially equivalent. *See, e.g., Hemphill v. City of Wilmington*, 813 F. Supp. 2d 592, 599-600 (D. Del. 2011); *cf. Gerardi,* 897 F. Supp. at 55.  Further, two positions are not substantially equivalent simply because they share the same job title. *See Caufield v. Center Area Sch. Dist.,* 133 Fed. App'x 4, 11-12 (3d Cir. 2005) (rejecting defendant's assertion of substantial equivalence because the court could not "merely assume that all elementary teaching positions in the area are, by their nature, substantially equivalent").

Here, the exam notices the City produced do not establish the existence of any jobs substantially equivalent to the FDNY job.  Even the exam notices that provide some of the requisite evidence to determine substantial equivalence still lack critical information.  For example, none of the exam notices provide information about the promotional opportunities and employee benefits that the jobs offer.  Certain exam notices fail to provide any information about the salaries offered, Dkt. 900-1 at 59, 94, 132, and one notice actually indicates a starting salary lower than what the FDNY offered. *Id.* at 16.  In addition, a job is not substantially equivalent if its schedule is less favorable than the FDNY firefighter schedule.  Dkt. 884 at 6-7.  Yet many of the exam notices provide no information about the work schedules that the jobs offer. *Id.* at 28-36, 38-43, 59-63, 65-70, 72-79, 91-92, 94-100, 129-30, and 132-38.  Similarly, the City has failed to produce evidence that these firefighter jobs are substantially equivalent in status to the FDNY firefighter position.  Finally, the City provided no evidence that these employers actually hired any firefighters.  Therefore, the City has not established the existence of jobs in outlying counties around New York City with substantially equivalent salary, benefits, schedule, promotional opportunities, and status. *See Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225, 229 (S.D.N.Y. 2001) ("the new position must afford [the plaintiff] *virtually identical*

promotional opportunities, compensation, job responsibilities, working conditions and status as the former position.") (emphasis added).[5]

Second, the jobs referenced in certain notices are not substantially equivalent because they would have required claimants to relocate. According to these notices, applicants had to live in the town or county where the job was located in order to obtain the job and, in many instances, in order to even apply for the job. Dkt. 900-1 at 16, 20, 29, 39, 45, 73, 91, 95, 129, 133. A job that would require a claimant to leave his home and relocate to a new city is not substantially equivalent. *Spagnuolo v. Whirlpool Corp.*, 717 F.2d 114, 119 (4th Cir. 1983); *Moore v. Univ. of Notre Dame*, 22 F. Supp. 2d 896, 906-07 (N.D. Ind. 1998); *EEOC v. Pennsylvania*, 772 F. Supp. 217, 222 (M.D. Pa. 1991). Thus, for claimants who would have to relocate in order to accept or apply for one of these jobs, the jobs were not substantially equivalent. [6]

For the foregoing reasons, the City has failed to prove that substantially equivalent jobs existed in the outlying counties surrounding New York City.

---

[5] Moreover, certain exam notices that the City produced indicate that the employer would not hire candidates until after the end of 2010. Dkt. 900-1 at 102, 108, 116, 140, 146, 154. However, the back pay period for this claims process concluded at the end of 2010. Dkt. 825 at 46. Thus, such jobs are irrelevant to the assessment of a claimant's mitigation efforts.

[6] Similarly, many of these jobs are also likely not substantially equivalent because they would require a longer and/or more expensive commute than the FDNY firefighter job. It is well-settled that a claimant "need not accept, in mitigation of damages, employment that is located an unreasonable distance from his home.'" *Eassa v. Hartford Fire Ins. Co.*, No. 90-cv-321, 1991 WL 255111, at *10 (N.D.N.Y. Nov. 29, 1991) (quoting *Spagnuolo*, 717 F.2d at 119). If a claimant lived in Brooklyn, for example, the FDNY firefighter job would likely have required a much shorter and less expensive commute than a job in Putnam County. Thus, a job in Putnam County would not have been substantially equivalent to the FDNY firefighter job for the Brooklyn claimant because of the longer commute.

III.    **For claimants who lived in New York City, discovery regarding job search efforts should be limited to determining whether they looked for work.  For claimants who lived elsewhere, the City should be required to prove the existence of substantially equivalent employment before it is permitted to seek additional discovery.**

As the United States proposed in its May 23 brief, because no jobs substantially equivalent to the FDNY firefighter job existed in New York City, discovery from claimants who lived in New York City during the back pay period should be limited to whether the claimant failed to look for work at all during periods when he or she was unemployed.  Dkt. 884 at 10. The United States proposed that this information could be gathered from eligible claimants with a short mitigation questionnaire, which asked "(1) whether the claimant was unemployed for any periods during the back pay period and, if so, (2) whether the claimant looked for work during these periods of unemployment."  *Id.* at 10-11.  In addition to these questions, the United States agrees that information about the other locations where claimants lived during the back pay period should be collected so that (a) it can be determined whether they were New York City residents during periods of unemployment; and (b) the City can attempt to prove that substantially equivalent jobs existed in the areas where claimants lived outside of New York City.  Thus, a third question should be added to the mitigation questionnaire which asks eligible claimants to identify the locations in which they lived during the back pay period.  This questionnaire, in addition to the SSA interim earnings, is the only discovery that should be necessary for eligible claimants who lived in New York City during the back pay period.[7]

For eligible claimants who lived outside of New York City during the back pay period, if substantially equivalent employment existed in their relevant geographic areas, a legitimate need

---

[7]  The City has criticized the United States' proposed mitigation questionnaire because the claimants' responses to the questionnaire would be "self-serving."  Dkt. 900 at 12.  However, claimants can be required to answer these mitigation questions, like the question on the claim form that will determine a claimant's eligibility for relief, under penalty of perjury, which should be sufficient to counter any concerns about self-serving responses.

may exist for the City to collect information from that claimant in addition to the information in the mitigation questionnaire described above, as well as the SSA earnings information. However, to avoid unnecessarily burdening claimants with discovery requests, and unnecessarily prolonging the claims process, the Court should require the City to first prove that substantially equivalent jobs existed in the areas where these claimants lived before it permits the City to seek additional discovery from them regarding their job search efforts.[8]  If the City proves that substantially equivalent jobs existed in an area outside of New York City where claimants resided, the City can seek approval of the Special Masters to conduct discovery on these particular claimants and serve such discovery on that particular group.[9]

**IV.  The parties appear to agree that unemployment compensation and workers compensation paid by the City to its own employees will be deducted from back pay awards.**

In its May 23 brief, the United States stated that "[t]he City should be prohibited from arguing that [unemployment compensation, workers compensation, and Social Security disability] benefits constitute interim earnings unless the City paid the benefits directly to

---

[8]  By way of example, the City has failed to prove that substantially equivalent jobs existed in New Jersey.  Dkt. 900-2 at 2-13.  The declaration and other evidence that the City produced regarding job opportunities in New Jersey does not contain information about which New Jersey cities hired candidates during the back pay period; nor does it contain information about the salaries, benefits, promotional opportunities, work schedules, or status that these jobs offer. Before the City may request discovery in addition to the SSA earnings information and information contained in the mitigation questionnaire from eligible claimants who lived in New Jersey, the City must first prove the existence of jobs substantially equivalent to the FDNY firefighter position in areas of New Jersey where eligible claimants lived.

[9]  In addition, the City will have an opportunity to prove that a claimant failed to look for work at all, in order to reduce the claimant's back pay under the *Greenway* exception.  Dkt. 884 at 9. Claimants who failed to look for work at all during periods of unemployment will have their back pay reduced unless that failure to look for work was reasonable.  The United States agrees that, if an argument is made that a claimant reasonably decided not to look for work at all during a period of unemployment, the City should be permitted to seek approval from the Special Masters to take discovery from that claimant on that issue.  Dkt. 900 at 14.

claimants." Dkt. 884 at 11.  The United States also asserted that "[b]ecause the City already has

evidence in its possession of any such payments it made directly to a claimant, there is no need

for the City to seek discovery from claimants on these types of benefits."  *Id.* at 11-12.  In its

June 13 brief, the City took the same position and, as such, it appears that the parties agree that

they do not require any discovery from claimants regarding their receipt of unemployment

compensation and workers compensation.  Dkt. 900 at 13-17.  The United States agrees with the

City that Social Security disability benefits should not reduce claimants' back pay awards and,

thus, no discovery of these benefits is necessary.  Dkt. 900 at 17 n.7.

**V.     The City did not dispute that it should be prohibited from taking discovery on
         claimants' educational, medical/psychological, and criminal/character backgrounds.**

In their May 23 briefs, the United States and Plaintiffs-Intervenors asked the Court to

preclude the City from seeking discovery from claimants regarding their educational,

medical/psychological, and criminal/character backgrounds.  Dkt. 884 at 12-16; Dkt. 885 at 2.  In

the City's June 13 brief, it did not oppose the United States' and Plaintiffs-Intervenors' request.

As such, for the reasons stated in the United States' and Plaintiffs-Intervenors' May 23 briefs,

the Court should prohibit the City from taking discovery on these issues.

**VI.    The Court should limit the City's ability to take additional discovery of individual
         claimants' interim earnings information.**

The City now apparently concedes that, for purposes of class-wide discovery of interim

earnings, it is appropriate to obtain detailed earnings statements from the Social Security

Administration ("SSA") and not the Internal Revenue Service ("IRS").  Dkt. 900 at 26.

However, the City now contemplates seeking additional discovery of interim earnings

information from individual claimants, presumably based on the information produced by SSA.

The Court should not permit the City to unilaterally conduct additional discovery of individual

claimants' interim earnings without prior approval from the Special Masters. Accordingly, the United States requests that the Court order the following limitations regarding any individual discovery sought by the City of interim earnings information to supplement the information from SSA.

As a threshold matter, the Court should not permit the City to serve any discovery on individual claimants, including discovery of interim earnings information (beyond that provided by SSA), without prior approval by the Special Masters overseeing the claims process. Although the Court will establish the parameters for the City's class-wide discovery related to the claims process, the Special Masters should determine whether and to what extent the City may seek additional discovery from individual claimants. As to interim earnings information, if the City believes, based on SSA earnings statements, that it requires additional information to prove the amount of a claimant's interim earnings, it should make a proposal to the Special Master to which the claimant is assigned. The City's proposal should explain why it believes the information from SSA is insufficient and describe the specific discovery it seeks to request from the individual claimant. The United States and the claimant should then have an opportunity to object to the City's discovery request. The Special Master would then recommend whether the City's proposed discovery should be permitted.

Moreover, the City should be responsible for coordinating any additional discovery it proposes to take from third parties regarding individual claimants' interim earnings. This coordination should include providing copies of such discovery to the parties and the Special Masters. If, for example, the relevant Special Master approves the City's request to seek interim earnings information for an individual claimant from a third party such as government entity, or

11

an employer, the City, not the United States, should take all actions necessary to obtain such information from the third party.

**VII.    The Court should not allow the City to avoid liability to Delay Claimants by arguing that these claimants were responsible for the delay in their hiring.**

The City has asserted that the Court should allow it to inquire into the individual record of Delay Claimants in order to determine whether a Delay Claimant self-induced his or her delay.  Dkt. 900 at 17.  The City has indicated that it intends to use this evidence to argue that a Delay Claimant is ineligible for relief or should receive reduced relief due to alleged self-induced delay.  Dkt. 868 at 6-7 and Dkt. 881 at 12.  The Court should prohibit the City from doing so because (a) whether a claimant or the City actually caused the delay will lead to a "quagmire of hypothetical judgments," and (b) determining whether a claimant caused the delay, even if possible, would require additional time-consuming and burdensome discovery.

**A.    At this late date, the Court should not change the eligibility criteria that it has set for Delay Claimants.**

As a preliminary matter, the United States notes that the Court adopted the parties' agreed-upon eligibility criteria for identifying Delay Claimants in its March 8, 2012 Order.  Dkt. 825 at 52-53.  The definition of Delay Claimant identifies those black and Hispanic applicants whom the City did not hire sooner because of the pass/fail and rank-order uses of Exam 7029 and Exam 2043.  *See* Dkt. 651 at 2.  The City agreed with this definition for Delay Claimants and did not raise any concerns about the possibility of self-induced delay when it provided its objections to the eligibility criteria proposed in the United States' June 24, 2011 letter.  *See* Dkt. 649.  The City knew, or should have known, of its concerns about the possibility of self-induced

delay when it agreed to the definition of Delay Claimant.  *See* Dkt. 543 at 14-15.[10]   Because the

City failed to object to the definition of Delay Claimant prior to the Court's March 8, 2012

Order, the Court should prohibit it from relitigating the eligibility criteria now, particularly since

the United States has begun its initial eligibility determinations of claimants.

> **B.     There is no accurate basis to determine the validity of the City's allegations
> of self-induced delay.**

The City argues that the Court should reduce Delay Claimants' recoveries, in whole or in

part, if the claimant caused his or her delay in hire.  According to the City, the first step for

determining if self-induced delay occurred is to identify Delay Claimants whose actual

appointment dates vary from the typical appointment date of candidates who were certified for

processing by the Department of Citywide Administrative Services ("DCAS") on the same given

date.[11]  Dkt. 900 at 17.  The second step is to review each such Delay Claimant's candidate

investigative file to see if the Delay Claimant received a disposition code indicating that they

were not qualified for appointment ("NQA") or that they failed to submit proof of a requirement

("NAC"), which would have caused the delay.  *Id.* at 17-19; *see also* Dkt. 900-1, Exh. J – Decl.

of Christopher Erath ¶ 6 ("Ex. J").[12]  The City argues that this information will prove whether

the claimant, and not the City, caused the delay in hire.

---

[10]   Moreover, the City has never explained, despite being directed by the Court to do so, why it
did not include these concerns regarding self-delay in the joint proposal regarding eligibility
criteria that was submitted to the Court.  *See* Dkt. 861 at 7 n. 4.

[11] The City does not appear to argue that a Delay Claimant could have self-induced the delay
between the time they took the test and the time at which they were first certified for processing
by DCAS.

[12] According to the City, the deviation from the typical appointment date is not indicative of self-
delay when a candidate investigative file reveals a disposition code of BLN ("balance of list not
used"), TIE (indicating the loss of a tie breaker between two equally-ranked individuals), or CNS
("considered not selected").  Dkt. 900 at 17-18; Ex. J ¶ 4.f.

For the reasons set forth below, the Court should prohibit the City from limiting its liability based on its self-induced delay argument because the City cannot prove that Delay Claimants actually self-induced their delay in whole or in part.  Rather, its proposed method for identifying such delay does not account for the fact that the City, rather than the claimant, may have caused the delay.

The City states that its proposed method will allow it to identify self-delay on behalf of Delay Claimants "for the most part" or in "most cases."  Dkt. 900 at 17, 22.  However, it is doubtful that the City's proposed method will accurately capture alleged self-delay in most cases. First, the City's proposed method and description of candidate processing appear to omit important details about the timing by which Candidate Investigation Division ("CID") processes candidates for appointment, which might lead it to attribute delay to the claimant, which should instead be attributed to outside factors.  The City asserts that CID waited to process candidates until DCAS provided a certified list of 900-1,000 candidates for consideration.  Dkt. 900 at 17-18.  All candidates on this list received the same certification date, *see id.* at 18, and the City provided a list of the fourteen certification dates for Exam 7029, *see* Ex. J at Ex. 1.  Although DCAS may have certified Exam 7029 candidates for processing on one of these dates, the information provided by the City from a sample of CID investigation files suggests that CID's actual processing of these candidates likely does not match the certification date.

For example, the City states that CID first processed Applicant 1 on June 6, 2001, a date that does not match any of the listed certification dates for Exam 7029.  If, as the City states, CID does not process a candidate until after it receives a certified list, than Applicant 1 should have been certified on April 23, 2001 (the closest certification date listed for 7029 before the date on which Applicant 1 was processed).  Thus, Applicant 1 was not even processed by the City until

14

44 days after his April 23, 2001 certification date and 30 days after the May 6, 2001 appointment date for the academy class filled by most individuals who were certified on April 23, 2001. *Compare* Ex. I - Decl. of Donay Queenan ("Ex. I") ¶ 7 *with* Ex. J at Ex. 1. Under the City's proposal, Applicant 1's delay would be considered self-induced because he was not appointed to the May 6, 2001 academy class, even though CID did not begin processing Applicant 1 until 30 days *after* the start of that class. The City's filing shows similar gaps between certification dates and CID processing dates for Applicants 2-5. *Compare* Ex. I ¶¶ 8-11 *with* Ex. J at Ex. 1.[13]

These gaps comport with the Findings of Fact from the August 2011 Injunctive Relief trial, which indicate that CID begins the process by mailing a packet of forms to firefighter candidates, which include specific dates on which each candidate must report for intake. Dkt. 741 at 41-42. CID called candidates in for intake interviews in groups of 65-100. *Id.* at 42. Among other tasks relevant to processing, CID also sends out verification letters to employers and requests high school and college transcripts. *Id.* at 42-43. The Personnel Review Board also subjected some candidates to further review. *Id.* at 43. These additional facets of CID processing, which are outside the candidates' control, also contribute to the timing of Delay Claimants' completion of their application to the FDNY.[14] The City's method for identifying self-delay does not account for the role such actions may play in generating delay.

---

[13] Furthermore, other elements of the City's description of the timing of CID processing suggest that its proposed method for identifying delay is inadequate. It seems highly unlikely that CID could have processed 900-1,000 candidates during the two days between the January 31, 2003 certification date for Exam 7029 and the corresponding academy class on February 2, 2003 or the three days between the May 1, 2003 certification date for Exam 7029 and the corresponding academy class on May 4, 2003. Dkt. 900 at 18; Ex. J at Ex. 1.

[14] Similarly, the NAC code, which is relied on by the City in its proposed method to demonstrate self-induced delay, may also suggest the City's culpability for a candidate's failure to be appointed to the academy class associated with his or her certification date. According to the City, NAC refers to a candidate's failure to submit proof of a requirement for appointment.

Attempting to assign fault to the claimant based upon the City's proposed method for identifying "self-induced delay" can only lead to a "quagmire of hypothetical judgments."[15] *Id.* at 56 (quotation omitted).  Because the City has failed to set forth a reliable method for determining whether a Delay Claimant self-induced her delay, the Court should prohibit the City from making this self-induced delay argument.

   **C.     Allowing the City to inquire into whether Delay Claimants self-induced delay would require unduly burdensome and time-consuming discovery to recreate the circumstances of these claimants' processing by the City.**

   Finally, the Court should also prohibit the City from pursuing its claims of self-induced delay because, contrary to the City's assertion, this inquiry will be time-consuming and require unduly burdensome discovery.  *See* Dkt. 880 at 18 n.8.  The problems with the City's proposed method for identifying self-induced delay, as set forth in Section VII.B, reveal that an inquiry into self-induced delay cannot be limited to the City's applicant data and a review of a candidate's investigative file.[16]  *See* Dkt. 900 at 21-22.  In order to accurately determine whether

---

Ex. I ¶ 3.  However, such failure could be caused, for example, by a mistake in the City's processing of the candidate's documentation or a lack of follow up with a particular candidate to alert them to a perceived deficiency in his or her application.

[15]  Uncertainty as to whether any delay in hiring was caused by a Delay Claimant versus the City "should be resolved against the [City], the party responsible for the lack of certainty."  *Ass'n Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256, 289 (2d Cir. 1981) (quotation omitted).  Because it is impossible to know what would have happened during the processing of these Delay Claimants in the absence of discrimination, the Court should not let the City attempt to limit its liability by arguing that Delay Claimants self-induced their delay in hire.

[16]  Moreover, the United States cannot verify the accuracy of the data relied upon by the City's expert, Dr. Christopher Erath, in his expert declaration (Ex. J) because the United States does not have access to CID investigative files and because the applicant data supplied by the City to the United States does not provide every certification date received by a candidate on the eligibility list (these data provide only the first and last certification date received by a candidate).  It also should be noted that there are discrepancies between Dr. Erath's assertions and the data relied upon by the United States.  For example, while Dr. Erath asserts that Applicant 1 was first processed on June 6, 2001, the data in the United States' possession indicates that Applicant 1

a Delay Claimant self-induced any portion of the delay he or she experienced, the parties would need to request additional information from the claimant regarding the circumstances of any delay in the completion of her application.  The United States would also need to request additional information from the City, such as testimony from City employees who processed applications for Delay Claimants, to determine the extent to which the City caused a claimant's delay in hire.

For the reasons stated above, the Court should prohibit the City from decreasing or avoiding liability based on Delay Claimants' alleged self-induced delay.

## VIII.   Conclusion

For the reasons stated above, the United States respectfully requests that the Court adopt the proposals set forth herein and in its May 23 brief (Dkt. 884).

---

was not even certified until January 14, 2002.  As a result, the United States reserves the right to object to Dr. Erath's findings at a later date, after the City produces the information upon which Dr. Erath relied (if doing so is necessary after the Court rules upon this issue).

Date: June 22, 2012                    Respectfully submitted,

                                       THOMAS E. PEREZ
                                       Assistant Attorney General

                                       DELORA L. KENNEBREW
                                       Chief

                                       MEREDITH L. BURRELL
                                       Deputy Chief


                                       _____
                                       /s/ ERIC K. BACHMAN
                                       Senior Trial Attorney
                                       Telephone:  (202) 305-7883
                                       Facsimile:  (202) 514-1005

                                       JENNIFER M. SWEDISH
                                       ALLAN K. TOWNSEND
                                       BARBARA SCHWABAUER
                                       KATHRYN LADEWSKI
                                       Trial Attorneys

                                       United States Department of Justice
                                       Civil Rights Division
                                       950 Pennsylvania Avenue, N.W.
                                       Patrick Henry Building, Room 4500
                                       Washington, D.C. 20530

                                       LORETTA E. LYNCH
                                       United States Attorney


                                       _____
                                       /s/ ELLIOT M. SCHACHNER
                                       Assistant United States Attorney
                                       Eastern District of New York
                                       271 Cadman Plaza East
                                       Brooklyn, New York  11201-1820
                                       Telephone:  (718) 254-6053
                                       Facsimile:  (718) 254-6479