UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

UNITED STATES OF AMERICA,

                                          Plaintiff,

And

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members,* JAMEL NICHOLSON, *and* RUSEBELL WILSON, *individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief;*

CANDIDO NUNEZ *and* KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

                                  Plaintiff-Intervenors,

                            -against-

THE CITY OF NEW YORK,

                                          Defendant.

-------------------------------------------------------------------- x

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

07 CV 2067 (NGG)(RLM)

        Defendant, City of New York, by its attorney, Michael A. Cardozo, Corporation Counsel of the City of New York, as and for its Proposed Findings of Fact and Conclusions of Law on the issue of compensatory damages respectfully submits the following:

**PROPOSED FINDINGS OF FACT ON THE CHARACTERISTICS OF THE JOB OF FDNY FIREFIGHTER**

**Firefighter Schedule**

        1.     Firefighters are scheduled to work two consecutive day tours from 9:00 a.m. until 6:00 p.m., followed by two consecutive 24-hour days off, followed by two consecutive

night tours from 6:00 p.m. until 9:00 a.m., followed by three consecutive 24-hour days off, followed by a return to the beginning of the cycle, that is, two consecutive day tours. Testimony of John Coombs, ("Coombs") Transcript[1] ("Tr.") 201:13-202:7; Testimony of Michael Marshall ("Marshall"), Tr. 969:20-25, Testimony of Rusebell Wilson, ("Wilson"), Tr. 1088:15-19.

2. Firefighters are permitted to adjust their schedules by arranging "mutuals" or "24s" whereby they exchange tours with other firefighters in order to work 24 consecutive hours. That is, a firefighter who is scheduled to work two consecutive night tours, may exchange one of his or her night tours with someone scheduled to work the day tour. Each of the two firefighters would work a day tour followed by a night tour and then have the next 24 hours off, in addition to their regular days off. Coombs, Tr. 202:18-25; Marshall, Tr. 970:5-12.

3. Firefighters who arrange mutuals work 24 consecutive hours followed by three days off with the result that they work twice a week or approximately eight 24-hour days a month. Coombs, Tr. 204:2-8; Marshall, Tr. 969:25-970:1; Testimony of Paul Washington ("Washington") Tr. 1027:17-21; 1028:8-14; 1033:16-1034:3; Testimony of Candido Nunez ("Nunez"), Tr. 1118:23.

4. Firefighters are also permitted four "self-mutuals" a year. A "self-mutual" occurs when a firefighter is not able to find someone to exchange a tour with him or her and needs a day off. The firefighter takes the tour off and owes the Fire Department a tour. Marshall, Tr. 976:18-25; Nunez, Tr. 1121:2-4.

5. The firefighters' schedule, including the ability to arrange mutual, allows firefighters to spend time with their families, work second jobs, or study. Coombs, Tr. 205:24-

---

[1] References to transcripts and exhibits are to the specified portions of the record of the hearing held in this matter on August 1, 2, 3, 8, 9, 15, 16, 23 and 25, 2011.

-3-

206:1; Marshall, Tr. 971:16-24; 972:3-8; Washington, Tr. 1028:2-7; 1029:4-25; 1031:5-1032:2; Nunez, Tr. 1119:23-1120:3.

6. Firefighters are permitted to and do hold second jobs, as long as they do not work in the nine hours before they are scheduled to report for duty with the FDNY. Coombs, Tr. 206:11-13.

7. Not all firefighters arrange mutuals. Some usually work the regular schedule. Wilson, Tr. 1087:17-21; Nunez, Tr. 1122:24-1123:3.

8. The firefighters' schedule is not completely flexible. Firefighter Nunez's testimony was postponed twice because his schedule did not permit him to testify on the dates that he was expected. Nunez, Tr. 1131:1-11.

**Work Performed by Firefighters**

9. While there is some time for leisure activities during the longer night tours, firefighters have a number of tasks and work to complete, as well as training to undergo when they are not responding to calls. During a typical day or night tour, the officer in charge assigns each firefighter a position at the beginning of the tour. Firefighters maintain the firehouse, inspect the fire trucks and engines ("apparatus") and prepare their personal equipment, as well as the equipment related to their assigned positions to ensure that it is in order. Firefighters familiarize themselves with anything that happened the tour before. In addition, during each tour, firefighters shop for groceries and return to the firehouse to prepare the meal. Coombs, Tr. 207:3-13; Wilson, Tr. 1091:22-1092:2; Testimony of Edward S. Kilduff ("Kilduff"), Tr. 1209: 9-19.

10. There is mandated training during each tour. Firefighters are required to engage in a drill to practice operational procedures and emergency responses or watch a safety video. Coombs, Tr. 207:14-17; Nunez, Tr. 1123:9-10; 1124,2-6; Kilduff, Tr. 1144:14-1145:3.

11. Day tours are busier than night tours because "committee work," which consists of mopping, cleaning, making beds and general maintenance, is performed. Marshall, Tr. 977:15-19.

12. Three days a week fire companies conduct building inspections for three hours during the day tour. Marshall, Tr. 977:20-23; Tr. 981:5-12; Nunez, Tr. 1123:9-10; Kilduff, Tr. 1209:19-22.

13. During night tours, firefighters take turns being on housewatch for three hours at a time. While on housewatch, firefighters take calls and record information about runs. Kilduff, Tr. 1210:21-25.

14. During night tours, if there are no calls requiring the fire company to respond (also known as runs), after the drill is completed and the meal is over, firefighters can engage in leisure activities or studying. Coombs, Tr. 207:18-22; 210: 23-25; Marshall, Tr. 981:18-982:2; Wilson, Tr. 1092:9-14; Kilduff, Tr. 1211:2-7.

**Firefighters' Work is Unpredictable**

15. Firefighting is challenging because it is unpredictable. Marshall, Tr. 987:7-9.

16. The number of calls each firehouse must respond to each tour or each day is unpredictable and can vary widely. Coombs, Tr. 207:23-208:5. Marshall, Tr. 978:24-979:9.

17. The amount of time each call takes to resolve varies depending on the nature of the call. Coombs, Tr. 209:7-9; Kilduff, Tr. 1225:21-1226:9.

18. Firefighters cannot predict what their day will be like when they report to work. Other than inspecting the apparatus and preparing food, nothing else about the tour is predictable. Coombs, Tr. 210:3-8; Marshall, Tr. 979:6-9.

19. Firefighters must adapt to incidents. For example, an initial call may describe an incident, but the situation might be different by the time the firefighters arrive. Kilduff, Tr. 1161:23-1162:7.

**Dangers and Risks of Firefighting**

20. Firefighters are confronted with dangerous situations and are sometimes injured. Coombs, Tr. 213:11-20; Marshall, Tr. 998:17-19.

21. Firefighters face dangers day in and day out as they respond to incidents around the City. Unlike the work of transit workers, carpenters, and sanitation workers, the nature of the work of firefighters is to put themselves in harm's way. The risks to firefighters are in addition to and greater than the risks of occupational accidents that exist in other jobs. Kilduff, Tr. 1141:23-1142:6.

22. A collapse is probably the most serious danger to firefighters because the nature of construction in New York City and the synthetic nature of the contents of apartments and commercial space burn quicker, hotter and faster and tend to reignite. Kilduff, Tr. 1152:3-23; 1231:21-1232:7.

23. The danger of a backdraft is unpredictable. A backdraft occurs when there is a low-burning or smoldering fire in a confined space like a room or hallway. When oxygen is introduced, the smoldering fire erupts and engulfs the room. Kilduff, Tr. 1160:11-23.

24. Fires in commercial buildings which range from mom and pop shops to factories and warehouses are particularly difficult and dangerous because of uncertainty over the contents and construction. Kilduff, Tr. 1161:1-13.

25. Flashovers occur when the contents burning in a room are below the point of ignition but as the heat increases in the room, the ignition point is reached and the entire room explodes into flames. Kilduff, Tr. 1168:15-19.

26. Wind conditions impact how to approach a fire, particularly in high-rise buildings, because wind blowing through a window can create blow-torch like conditions. Kilduff, Tr. 1164:13-20.

27. The concentration of buildings in residential areas also poses a threat to firefighters because fire can spread beyond the initial area to adjoining buildings and the firefighters have to expand their area of operation. Kilduff, Tr. 1166:18-1167:5.

28. Firefighting is challenging because whether it is a fire or another type of emergency, correct decisions need to be made quickly and under stressful conditions. Washington, Tr. 1041:17-24.

## FDNY Safety Program Attempts to Manage Risk; It Cannot Eliminate Danger

29. The dangers that have always existed to firefighters continue to exist, but the FDNY has focused on training to manage the risk. Kilduff, Tr. 1233:3-12.

30. The FDNY has spent a "tremendous amount of time and effort trying to foster a culture of safety" and now has the most aggressive safety program in the country, probably because it has lost the most firefighters. Kilduff, Tr. 1223:11-1224:19.

31. The FDNY's focus has been to train firefighters to evaluate risk and avoid acting recklessly. Kilduff, Tr. 1190:19-1191:1.

32. As part of its safety program, the Fire Department requires firefighters to engage in daily drills and training to learn and practice responses to different situations in order to reduce the risk and dangers to firefighters. Marshall, Tr. 989:20-24; 990:5-8; Wilson, Tr. 1092:19-1093:5; Kilduff, Tr. 1174:20-1175:15.

33. Every unit attends terrorism training at the training facility several times a year at which they undergo training and practice responses to events such as a bus bomb or an attack on the subway. Kilduff, Tr. 1145:8-20.

34. FDNY has been practicing safety better than ever before, but it takes hard work, diligence, intelligence and training. Kilduff, Tr. 1238:19-24.

35. Every supervisor must ensure that members understand risks and dangers of the job. A supervisor who downplays the dangers of the job is not correctly supervising. Supervisors need everyone to train and be alert when they get on the rig. Kilduff, Tr. 1244:10-25.

36. Firefighters must always be careful and be sure they know what they are doing in order to try to avoid injury. A firefighter who lets his guard down, may get hurt. Marshall, Tr. 990:1-4.

37. Any serious injury or fatality on the job undergoes an extensive investigation by the safety command. Kilduff, Tr. 1139:9-12.

38. The purpose of the investigation is to learn from the fatality to try to prevent another from happening. Kilduff, Tr. 1146:20-1147:3.

39. For example, the FDNY developed a Personal Safety System (PSS) in response to the deaths and injuries on January 25, 2003 when six firefighters jumped out a window to escape flames. Now, every firefighter has a PSS which is a rope system to protect

against a reoccurrence because the PSS is available for firefighters to lower themselves. Kilduff, Tr. 1232: 12-23.

40.   Bunker gear was introduced by the Fire Department to better protect firefighters from certain burns. Marshall, Tr. 990, l. 11-991, l. 8; Testimony of Dr. Kerry Kelly ("Kelly"), Tr. 1402:12-16.

41.   Bunker gear allows firefighters less than 10 seconds to escape from a room engulfed in flames before being severely burned or killed. Kilduff, Tr. 1168:15-24.

42.   While the incidence of burns has remained fairly constant after the introduction of bunker gear, the severity of some of the burns in the area above the knees has improved. Kelly, Tr. 1403:2-8.

43.   Despite the training and introduction of new equipment to try to manage risk, "[a]ny incident can turn on a dime. The members need to be ready and need to understand that there is constant danger when they respond." Kilduff, Tr. 1245:1-5.

44.   While the Fire Department places a lot of emphasis on safety and training to minimize the risk to its firefighters, some injuries to firefighters are unpredictable. Marshall, Tr. 984:7-10.

45.   For example, Firefighter Coombs fell through a floor at a fire in a vacant building and suffered a herniated disc. Coombs, Tr. 213:14-18. As a result of his injuries, he was unable to work for 10 months. Coombs, Tr. 211:12-13.

46.   Firefighter Coombs has also suffered "nicks and burns." Coombs, Tr. 215, l. 19. He also suffered a severe strain of his shoulder after slipping on ice on the sidewalk after a fire was extinguished. Coombs, Tr. 216:1-4.

47. Captain Washington burned his knee at a fire and needed about six weeks to recover. Washington, Tr. 1046:6-8.

48. Firefighter Candido Nunez was injured twice in 2008 at structural fires. The first time, he injured his lower back, shoulder and knee and missed one month of work. The next time he was injured, he missed two weeks of work. Nunez, Tr. 1129:4-21.

49. The more fires a firefighter responds to, the greater the risk. Marshall, Tr. 984:7-10.

50. The risk of injury or fatality is the same for firefighters, fire lieutenants, and fire captains. Marshall, Tr. 1001:10-18.

51. As the captain of an engine company, it is Captain Washington's job to go in to a building to find out exactly where the fire is and come back out and work with the firefighters under his command, as well as direct them. Washington, Tr. 1042:11-18.

52. Battalion chiefs enter into fires to supervise the units operating at the fire. Kilduff, Tr. 1148:18-21 and 1150:2-20.

53. Three hundred forty-one firefighters and fire officers died on September 11, 2001. Kelly, Tr. 1361:4-8. The total included 17 battalion chiefs, the Chief of Department, and a Deputy Chief. Kilduff, 1148:6-14.

54. United States Department of Labor statistics relating to fatalities by occupation (PE VVV) excludes supervisors in the definition of firefighters and, therefore, is not reliable for New York City where the rates of line of duty injury, illness and death of fire officers is similar to such rates for firefighters. Kelly, Tr. 1424:15-19.

55. Firefighting is challenging because there is always smoke and there is always confusion and darkness that must be overcome at a fire in order to put the fire out. Washington, Tr. 1042:18-24.

56. Disorientation due to smoke conditions can cause a firefighter to panic or run out of air or remove his face mask and expose himself to carbon monoxide or fall down an elevator shaft. Kilduff, Tr. 1164:20-1165:19.

57. Two firefighters died and four were in critical condition as a result of one fire on January 23, 2005 when six firefighters jumped out the fourth floor window of a building that was engulfed in flames. Another firefighter died that same day at another fire when he became entangled in the basement and died from burns and carbon monoxide. Washington, Tr. 1070:14-1071:17; Kelly, Tr. 1382:4-8 and Tr. 1383:1-7; Kilduff, Tr. 1153:14-1154:11.

58. Three members of two units in Queens died on Father's Day 2001 at a fire in a hardware store. The combustibles exploded and buried them under a wall. Kilduff, Tr. 1155:16-1156:2.

59. At a four alarm fire in Queens on August 22, 2011, eleven firefighters were initially injured and as of August 23, 2011, 24 firefighters and fire officers were placed on medical leave due to injuries and would not be permitted to return to duty until they were medically cleared. Kelly, Tr.1346:24-1347:22.

60. The challenges for firefighters are present not just at fires, but at other emergencies, too. The challenge of making correct decisions and working as a team at a car accident may make the difference in the survival of accident victims. Washington, Tr. 1043:11-22.

61. Due to the need to respond to emergencies quickly, several hundred traffic accidents happen a year and result in serious injury when fire companies are responding to calls. Kilduff, Tr. 1158:14-1159:1.

62. Firefighter Kevin Washington was on a fire truck responding to an emergency when his truck was hit by another fire truck on its way to a call. He was pinned in the fire truck for a couple of hours and suffered multiple injuries to his knees which caused him to retire. Washington, 1069:23-1070:11; Kilduff, Tr. 1159:15-1160:7.

63. Of the over 50,000 annual visits to the clinic operated by the FDNY's Bureau of Health Services, about two-thirds are by injured fire suppression personnel. Kelly, 1346:6-16.

64. The most common injuries among fire suppression personnel are strains and sprains, but the clinic also sees lacerations, abrasions, fractures, and burns, as well as illnesses. Kelly, Tr. 1346:17-23. Defendants' Exhibit 54-A reflects on the job injuries to fire suppression personnel from 1999 through August 16, 2011. Kelly, Tr. 1391:5-11. The number of cases of injuries ranged from a low of 3808 in 1999 to a high of 8901 in 2006. Defendant's Exhibit 54A.

65. Although firefighters and fire officers can retire with a full pension after 20 years of service, the careers of some firefighters and fire officers are cut short due to illnesses or injuries sustained at work. Kelly, Tr. 1358:22-25.

66. The risks to firefighters are more than being burned in a fire. There are health risks such as contracting cancer due to exposure to smoke and fumes. Kilduff, Tr. 1234:6-14.

67. The hazards unique to the job of firefighter have been recognized by the State legislature in passing bills that create presumptions that certain illnesses result from the nature of firefighters' work. Kelly, Tr. 1356:22-1358:18.

68. The presumptions acknowledge that firefighters and fire officers develop illnesses such as cancer and lung disease as a result of exposure over their careers, despite their masks, to the breakdown of synthetic materials in a fire. The presumptions recognize that the firefighter's illnesses are not related to a single event, but to exposure over multiple events. Kelly, Tr. 1372:15-1373:4.

69. Under General Municipal Law §207-k, there is a presumption that a fatal or disabling heart condition suffered by an FDNY firefighter resulted from his or her employment (the "heart bill"). "[T]he theory behind the bill, as outlined by its proponents, is not only that heart conditions are an occupational hazard for police officers and firemen, but also that this is a unique condition which generally is not the result of any particular incident but involves a gradual and progressive degeneration as a result of the continuous stress and strain of the job." *Uniformed Firefighters Assn. v. Beekman*, 52 N.Y.2d 463, 471 (1981).

70. In 1969, the State passed New York City Administrative Code § B19-7.84.1 (now §13-354) which created a presumption that the total or partial disability or death of a uniformed member of the Fire Department as a result of a lung disease was incurred in the performance of his or her duties. The sponsor's memo explained that firefighters are "repeatedly exposed to products of combustion in super-heated, noxious atmospheres . . . . A firefighter repeatedly exposed to the smoke and gases at fires will inevitably develop disabling lung conditions because of the cumulative effect of the exposure but will not be able to relate the condition to a specific incident." A copy of the sponsor's memo is annexed as Exhibit A.

71. In 1994 the State created a presumption, codified in General Municipal Law § 207-kk, that cancer "affecting the lymphatic, digestive, hematological, urinary, neurological, breast, reproductive or prostate systems" or melanoma resulted from the performance of a firefighter's duties. N.Y. General Municipal Law 207-kk.

72. After the attack on the World Trade Center, N.Y. City Administrative Code § 13-353.1 was added to create a presumption that qualifying "World Trade Center conditions" were job-related if the firefighter participated in rescue, recovery or cleanup operations. Defendant's Exhibit 52 lists all the FDNY uniformed members whose families have applied to have their deaths determined to be in the line of duty as result of the presumption set forth in N.Y. City Admin. Code §13-353.1.

73. While the presumption of the heart bill has always been applicable to both the Police Department and Fire Department, the presumptions regarding cancer and lung diseases were unique to the Fire Department until the World Trade Center bill was passed. Kelly, Tr. 1415:18-1416:2.

74. Defendant's Exhibit 51 lists thirty-five firefighters and fire officers who died in the line of duty since 2000, other than those firefighters and fire officers who died during and as a result of the attack on the World Trade Center. Kelly, Tr. 1376:24-1377:7.

**The Emotional Toll of the Job**

75. In addition to physical injuries, firefighters suffer from emotional trauma. Marshall, Tr. 1002:3-6 and 18-21.

76. The death of firefighters on the job has an emotional impact on surviving firefighters. Marshall, Tr. 1004:7-10.

77. In recognition of the stresses arising from the job, the Fire Department's Bureau of Health Services operates a Counseling Services Unit which provides confidential evaluation and treatment to firefighters with mental health problems. Kelly, Tr. 1379:24-1380:6.

78. In addition to providing services to firefighters and their families for on-the-job and family issues, the Counseling Services Unit responds to the firehouses of members who are seriously injured or killed to ensure the surviving members of the firehouse are emotionally fit and focused to perform the job. Kilduff, Tr. 1156:8-1157:1.

79. Firefighters responding to a bus accident in May 2011 at which 15 people were killed when a sign post split the bus in two were all seen by Counseling Services Unit due to the horrific nature of the injuries to the victims. Kilduff, Tr. 1157:7-1158:4.

**Promotional Opportunities**

80. To be promoted, firefighters must take and pass civil service tests. The promotional steps after firefighter is Lieutenant, followed by Captain, followed by Battalion Chief. Each requires a civil service test and requires that certain educational requirements be met. For example, Lieutenant Michael Marshall did not take the civil service test for captain because he does not have sufficient college credits. Marshall, Tr. 996:5-997:1.

**Security of Retiree Benefits and Pension**

81. The retiree benefits for most uniformed personnel in the City, that is, police, correction, fire, are similar. Marshall, Tr. 995:22- 996:4.

82. With respect to retiree health benefits, § 12-126 of the Administrative Code provides, in part, that "[t]he City will pay the entire cost of health insurance coverage for city employees, city retirees, and their dependents, not to exceed one hundred percent of the full

cost of HIP-HMO on a category basis." Thus, all city retirees are entitled to health insurance coverage for themselves and their dependents. N.Y. City Admin. Code §12-126.

**Fringe Benefits**

83. With respect to the value of fringe benefits, the Court has determined that claimants will have to establish at individualized hearings that "they suffered out-of-pocket expenses due to the denial of access to defendant's health insurance." *United States, et al. v. City*, 2012 U.S. Dist. LEXIS 30989 *60 (E.D.N.Y. March 8, 2012).

84. If Plaintiff-Intervenors move for reconsideration, Defendant will submit opposition.

## PROPOSED CONCLUSIONS OF LAW

85. Plaintiffs-Intervenors have characterized the alleged loss as a "loss of enjoyment of life." As the Second Circuit observed in the context of a Federal Torts Claims Act case, "the concept of loss of enjoyment of life . . . "'provides compensation for the deprivation or impairment of the senses or of one's ability to engage in those activities and perform those functions which were part of the victim's life prior to the injury.'" *Rufino v. United States*, 829 F.2d 354, 359 n. 8 (2d Cir. 1987)(citing Comment, *Loss of Enjoyment of Live as a Separate Element of Damages*, 12 Pac. L.J. 965, 972.) Unless claimants can establish that one or more of their senses were impaired or that they can no longer engage in particular activities as a result of not being hired as a New York City Firefighter or having had his or her hiring delayed, s/he cannot establish a claim for loss of enjoyment of life. Consequently, their claims must be analyzed under the broader category of pain and suffering damages. *See Rounds. v. Rush Trucking Corp.*, 211 F.3d 185, 188-89 (2d. Cir. 2000).

86. The Court cannot award compensatory damages here just because the job at issue may be viewed as desirable. If it did so, it would be setting a per se rule that in every

failure to hire case, the plaintiff would be entitled to compensatory damages because every plaintiff, presumably, desired the job s/he did not obtain. Each claimant must prove that the lost opportunity to become a NYC firefighter caused emotional distress for him or her personally. Compensatory damages under Title VII must be proven and not presumed. *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662, 665 (S.D.N.Y. 1995).

87.     Similarly, a claimant cannot recover compensatory damages under New York Human Rights Law without proving that she suffered mental anguish or humiliation. *Cullen v. Nassau County Civil Service Commission*, 53 N.Y.2d 442, 497-98 (1981) ("Sensitivity or stoicism, as the case may be, is as variable and individualistic in its existence and in its degree as are human beings.")

88.     Although a claimant need not submit corroborating evidence to establish compensable emotional distress damages, she must present evidence of "concrete emotional problems." *EEOC v. Yellow Freight Sys.*, 2002 U.S. Dist. LEXIS 16826, *113-114 (S.D.N.Y. Sept. 4, 2002)(citing *Annis v. Cty. of Westchester*, 136 F.3d 239, 244 (2d Cir. 1998); *Uddin v. New York City*, 2001 U.S. Dist. LEXIS 12207, (S.D.N.Y. Nov. 28, 2001); *Ortiz-Del Valle v. Nat'l Basketball Ass'n*, 42 F. Supp. 2d 334, 341 (S.D.N.Y. 1999) (finding as a matter of law that jury award of compensatory damages was unjustified where plaintiff's only evidence of emotional distress damages was her testimony that she felt ignored and that her dreams and goals were crushed).

89.     In *Hogan v. Bangoor & Aroostook R.R.*, 61 F.3d 1034 (1st Cir. 1995), relied upon by Plaintiff-Intervenors, the Court of Appeals for the First Circuit did not distinguish between damages for emotional distress and damages for loss of enjoyment of life. Rather, the First Circuit found that evidence that plaintiff's income had plummeted from $28,000 to $13,000

with no benefits, that his wife, who had previously cared for their children had to take a job in a shoe factory to obtain medical insurance, and that plaintiff was depressed, withdrawn and gave up his usual activities supported a compensatory damages award. *Id.* At 1037-38.

90. The Court has concluded that up to 293 priority hires and eligible delayed hire claimants will receive retroactive competitive seniority. *United States, et al. v. City*, 2012 U.S. Dist. LEXIS 5612, *5-13 (E.D.N.Y. April 20, 2012); *United States, et al. v. City*, 2012 U.S. Dist. LEXIS 30989 *18-20 (E.D.N.Y. March 8, 2012). The value of a pension must be deducted from any amount of compensatory damages as the city will be paying that amount to the priority hires and delayed hires as part of "make whole" relief.

Dated:   New York, New York
         June 29, 2012

Respectfully Submitted,

**MICHAEL A. CARDOZO**
Corporation Counsel of the City of New York
Attorney for Defendants
100 Church Street
New York, New York 10007
(212) 788-0862

By: _____
    Michael A. Cardozo
    Corporation Counsel

# Exhibit A



**THE SENATE
STATE OF NEW YORK
ALBANY**

JOHN J. MARCHI
23RD DISTRICT
CHAIRMAN
COMMITTEE ON CITY OF NEW YORK

May 20, 1969

Honorable Robert R. Douglass
Executive Chamber
State Capitol
Albany, New York

                Re: Assembly Intro. A4122A
                By: Mr. Chananau

Dear Bob:

The above bill was introduced by me and is before the Governor for consideration.

I am enclosing memorandum in support of this legislation and would recommend favorable action.

                              Sincerely,

                              John J. Marchi

JJM:d

Enc.

62

MEMORANDUM IN SUPPORT

Senate Number   1325     By Mr. Marchi
Assembly Number 4122     By Mr. Amann and Mr. Chananau

## LUNG BILL

This bill will carry into effect an agreed upon collective bargaining agreement between the U.F.O.A. and the City of New York during the 1966-1968 salary negotiations contract.

It states that diseases of the lung shall be presumed deemed to have been incurred in the line of duty. It reflects a changing pattern and understanding of the cumulative effects of the hazardous exposure to smoke, heat, gases, corrosives, dampness and extremes of weather conditions encountered by Fire Officers in years of firefighting. It is in conformity with the modern trend of medical understanding and enlightened labor relations practices as evidenced by similar legislation enacted in nearly one third of the jurisdictions in the nation.

A candidate for the Fire Department is physically tested in a vigorous competitive examination. Prior to his appointment he is subjected to medical examinations by the Department of Personnel and by the Fire Department. Again, at the end of his period of probation, he is examined by the Fire Department Medical Officers. It is, therefore evident that an appointee to the Fire Department is in good medical and physical health when he enters the service.

During his period of service he is repeatedly exposed to the products of combustion in super-heated, noxious atmospheres. Present studies of the air pollution problem throughout the world shows that the effect of exposures to polluted and contaminated air is cumulative and leads to respiratory diseases, often fatal as evidenced in San Francisco and London.

The exposures to polluted air that a firefighter experiences in the normal course of his duties are of a much more severe and concentrated form than the average civilian's exposure to polluted atmosphere. With the acceptance and knowledge of these facts can any logical and reasonable person deny that the duties of a firefighter inevitably contribute to the early death rate of members of the Fire Department?

The pension systems of the Fire Department make provisions for men injured in the line of duty when the medical officers decide that the injury is disabling and of long standing. Lung disorders are considered in that category. The regretable fact is that in order to be determined as a line of duty disability, it must be related to a particular incident. A firefighter repeatedly exposed to the smoke and gases at fires will inevitably develop disabling lung conditions because of the cumulative effect of the exposures but will not be able to relate the condition to a specific incident.

The instant bill will make the existence of a lung disorder a job related disability unless proven otherwise by the city. It will provide to dedicated firefighters the protection which they have earned and deserve.