UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    PLAINTIFF,

  -AND-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members,* JAMEL NICHOLSON *and* RUSEBELL WILSON, *individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief;*

ROGER GREGG, MARCUS HAYWOOD, *and* KEVIN WALKER, *individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

    PLAINTIFFS-INTERVENORS,

    V.

CITY OF NEW YORK, ET AL.,

    DEFENDANTS.

CIV. ACTION NO. 07-CV-2067
(NGG)(RLM)

**PLAINTIFFS-INTERVENORS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW REGARDING
THE NONECONOMIC BENEFITS OF THE FIREFIGHTER JOB**

## PROPOSED FINDINGS OF FACT

Based on testimonial and documentary evidence adduced during a bench trial held in August 2011,[1] Plaintiffs-Intervenors propose the following findings of fact related to the noneconomic benefits of the job of New York City firefighter.

1.      Class members who experienced a delay in being hired or were not hired at all as New York City firefighters have been denied the benefits of what the City itself, in the words of FDNY Assistant Commissioner Michele Maglione, describes as "the best job in the world [with] the best benefits in the world." 8/2/2011 Remedial Hearing Transcript (hereinafter "Tr.") 292:12-18; Plaintiffs-Intervenors' Trial Exhibit (hereinafter "PI Ex.") III. The benefits range from a high quality of life due to flexible scheduling, economic security, and an extremely collegial working environment, to gratification in helping others and being held in uniquely high community esteem.

### Flexibility and Control Over Schedule

2.      Foremost among the benefits of the job is the extraordinary flexibility and control over scheduling that allows firefighters significant time for other pursuits. As firefighter John Coombs, Lieutenant Michael Marshall, and Captain Paul Washington testified, it is a widely accepted practice for firefighters to switch shifts, or work a "mutual" with a coworker so that they work one twenty-four hour tour every four days, or eight tours per month, which gives them 22-23 days free per month. 8/1/2011 Tr. 202:9-205:20 (J. Coombs); 8/15/2011 Tr. 969:25-

---

[1] Exhibits referred to herein as Plaintiffs-Intervenors' Trial Exhibits were submitted to the Court at the Remedial Hearing in August 2011.  As the Court stated in discussing permanent injunctive relief, evidence submitted for the Remedial Hearing was intended to "supplement the factual record in this case with additional facts. . . . The parties should not limit their argument to evidence adduced during this trial, but should rely on the entire record of the case in making their arguments." 8/15/2011 Tr. 964:16-24. Documents not in the Remedial Hearing record but already placed before the Court in other proceedings have been annexed hereto for the Court's convenience.

970:3, 970:22-917:8 (M. Marshall); 8/15/2011 Tr. 1032:5-19 (P. Washington).  This practice happens informally, sometimes even at the spur of the moment, and does not require a supervisor's approval. 8/1/2011 Tr. 205:5-17 (J. Coombs).

3.      If no colleague is available to work the shift requested, a firefighter may take a "self-mutual" — up to four per year — and rely on the Fire Department to fill his or her shift. 8/15/2011 Tr. 976:18-977:3 (M. Marshall). In testimony before this Court, firefighters asserted that they had never been unable to take time off when they so desired. 8/15/2011 Tr. 975:4-17 (M. Marshall); 8/16/2011 Tr. 1121:16-18 (C. Nuñez); 8/1/2011 Tr. 204:10-12 (J. Coombs).

4.      Within broad limits, firefighters can essentially set their own schedule of days and shifts they will work, as long as they fulfill their total shift requirement for the year.

5.      This flexibility allows many firefighters to enjoy significant time with their families.  As Captain Washington recounted,

> I walk [my children]...to school in the morning...We have a lot of fun with that. It's just a small thing, but it's probably the type of thing that they'll remember, you know, and it will hopefully have a good impact on them…We have races on the way to school and so on. And coming home from school, we'll stop and get something to eat, things like that. So I'm available to do that.

8/15/2011 Tr. at 1031:10-1032:2.

6.      Lieutenant Marshall's schedule as a firefighter allowed him to raise his children:

> [W]hen my kids were adolescents I spent all of my time off with my kids. I would drop them off, pick them up from school, I was with them constantly. Whatever I had to do, I did between 8:30 in the morning and 2:30 in the afternoon, and wherever I was at 2:30, I was on my way to school. And I was always with my kids.

8/15/2011 Tr. at 972:16-21.

7.      Vulcan Society President  John Coombs offered similar testimony:

> [W]hen I joined the Fire Department, I had smaller children.  So

2

> [the] majority of my time was spent raising children.   My wife
> returned for a second masters.  She is a principal now.  So I spend a
> lot of time with my family and it has been a great opportunity for
> me.

8/1/2011 Tr. 205:21-206:4.

8.       Firefighter Candido Nuñez also had the opportunity to play a significant role in

caring for his children: "I take care of my kids, take them to school, pick them up, take them to

doctor appointments." 8/15/2011 Tr. 1119:25-1120:3 (C. Nuñez).

9.       Many firefighters use the available time for a second job. A United States Bureau

of Labor Statistics study showed that 28.1 percent of firefighters nationally hold second jobs. In

fact, firefighters were found to moonlight more than any other occupation. *See* December 2009

Relief Phase Report of Bernard R. Siskin, Ph.D. at 14, n.18 (Dkt. 538-1), citing Amirault,

Thomas, "Characteristics of Multiple Jobholders, 1995," Monthly Labor Review, 1997

(attached hereto as Exhibit A).

10.      The range of second jobs held by firefighters, according to testimony at trial,

include carpenter, high-school basketball coach, nurse, volunteer Vulcan Society officer,

limousine driver, truck driver, plumber, bartender, construction worker, brick-layer, and

electrician. 8/15/2011 Tr. 972: 3-9 (M. Marshall); 8/15/2011 Tr. 1029:3-1030:24 (P.

Washington). Others own their own businesses, such as a construction company, a bar, and a

bagel shop.  8/15/2011 Tr. 1029:9-17 (P. Washington).

11.      Some firefighters use the time off and the significant downtime on the job itself to

pursue further education to become nurses and lawyers. 8/15/2011 Tr. 981:18-24 (M. Marshall);

8/15/2011 Tr. 1029:23-1030:6 (P. Washington).

12.      Flexibility in scheduling extends to time spent on the job as well. Lieutenant

Marshall's busy firehouse averages thirteen runs per day, yet he was nonetheless able to do

most of his studying for the lieutenant test on the job. 8/15/2011 Tr. 967:10-16; 993:12-23; 981:20-982:2 (M. Marshall). Firefighter Coombs, describing an average evening at his company, testified that "[t]he majority of the evening is spent on the drill, preparing dinner, and then after that, if you don't receive any emergencies, it's conceivable that you can watch a movie, you can read a book and it's a lot of – it can be a lot of down time at times." 8/1/2011 Tr. 207:18-22.   Other firefighters spend their time at work reading, working out, watching television, playing cards or basketball, or listening to music.   8/1/2011 Tr. 210:10-211:1 (J. Coombs); 8/15/2011 Tr. 1092:8-14 (R. Wilson). Firefighter Rusebell Wilson said of the time on the job at the firehouse, "It's like being at home." 8/15/2011 Tr. 1092:9-14 (R. Wilson).

### Virtually Unparalleled Economic Security

13.     Firefighters enjoy a rarely paralleled level of economic security based on the competitive salaries they earn, extraordinary benefits coverage, including retirement benefits (PI Ex. JJJ: 1-4), and the opportunity to work an additional second job. This security and economic well-being brings emotional benefits.   Retired FDNY firefighter Sheldon Wright stated, "The job…gave me the dignity to be able to support my kids." 8/3/2011 Tr. 451:10-13 (S. Wright).

14.     The salary of an FDNY firefighter provides a comfortably middle-class standard of living. The undisputed calculations of Dr. Siskin, the industrial/organizational psychologist retained by the United States Department of Justice, showed that candidates hired into the first three Academy classes for Exam 2043 (May through December 2004) had first-year earnings (in 2005) ranging, on average by Academy class, from $54,454 to $60,592.  By 2009 persons hired in those 2004 classes were earning, on average, between $72,404 and $82,772. *See* PI Ex. AAA, Siskin Report, Tables A-7.12 - A-7.14.  After 23 years of service, Captain Washington earned approximately $142,000 annually. 8/15/2011 Tr. 1026:23-24 (P. Washington). He

4

earned this salary despite working "very little overtime" in order to pursue outside volunteer work with the Vulcan Society and spend time with his family. 8/15/2011 Tr. 1027:1-10.

15. Beyond their regular hours and pay, firefighters are guaranteed overtime, and firefighters employed in Special Operations—which include squad companies, rescue companies, and hazardous material or "hazmat" mitigation companies—earn an additional 12% in hourly wages. 8/15/2011 Tr. 1025:7-1026:3 (P. Washington); PI Ex. BBBB at 10.

16. After five years, firefighters receive approximately five weeks, or 210 hours (195 hours plus an adjusted tour), of scheduled paid vacation time per year. 8/15/2011 Tr. 973:23-974:3 (M. Marshall); 8/16/2011 Tr. 1121:19-1122:7 (C. Nuñez); PI Ex. YYY at 16-17; PI Ex. AAAA at 13-14; PI Ex. CCCC at 17 (fire officers receive 20-26 work days). Most firefighters often arrange to work twenty-four hour shifts instead of two-day tours in order to "pick up another day off." 8/15/2011 Tr. 969:25-971:9 (M. Marshall). Vacations may also be extended by arranging "mutuals," which allow firefighters to request others to cover or trade shifts. 8/15/2011 Tr. 1035:22-1036:5 (P. Washington). These mutual work informally:

> [I]f I wanted to go on vacation next week, for instance, it wouldn't be a problem. You know, I would just call up one or two people that work and get off and I could go away. . . . I go on numerous vacations throughout the year. I've been out of the country numerous times in certain years. You know, I go out of the city at least – at least, minimum five to ten times a year I'm on some type of vacation. . . . [I]f you were in my firehouse and I needed to be in court tomorrow when I was scheduled to work, you know, I would say, Dana, could you work for me tomorrow, I have something to do and you would say yes, yes. And if you said yes, you would go in and work for me, and I would owe you a tour. And when you needed something, I would pay you back.

8/15/2011 Tr. at 973:1-19 (M. Marshall).

17. Firefighters enjoy extraordinarily good health insurance with no out-of-pocket costs. 8/1/2011 Tr. 216:10-15 (J. Coombs). They do not pay insurance premiums, co-payments

or deductibles for themselves or their dependents.  PI Ex. YYY at 13; PI Ex. AAAA at 10; PI.

Ex. BBBB at 9; PI Ex. CCCC at 14 (fire officers).  Further, they have an unlimited number of

paid sick days. 8/1/2011 Tr. 216:10-24 (J. Coombs).

18.     Firefighters are eligible to retire after twenty years of employment, but many

choose to remain employed, further accruing salary and pension increases. 8/15/2011 Tr.

992:17-20 (M. Marshall). Those who do choose to retire receive a pension equal to half their

salary at retirement as well as full health insurance coverage for life. PI Ex. BBB at 17-18, 25-

26; PI Ex. CCC at 17, 23.

19.     Firefighters who retire with an accidental disability receive three-quarters of their

last year's salary, including overtime. 8/1/2011 Tr. 216:16-25 (J. Coombs); PI Ex. BBB at 20,

29-30; PI Ex. CCC at 18, 25-26. Accidental disability pension payments are not taxed by the

City or State and only partially taxed, if at all, by the federal government. PI Ex. BBB: 20, 29-

30, 42, CCC: 25-26, 38.

20.     Members also receive survivor benefits and other death benefits, further

increasing a firefighter's sense of security in providing for his or her dependents.  PI Ex. BBB at

23-24, 33-34, 48-49; PI Ex. CCC at 21, 29-30, 44-45.

21.     The job provides unusual employment stability. There have been no layoffs at

least within the last 23 years. 8/15/2011 Tr. 1043:23-1044:9 (P. Washington); 8/1/2011 Tr.

211:2-4 (J. Coombs).

22.     All of these benefits provide a level of economic security and stability that is

highly valuable in the current economic climate. That economic security provides a strong

emotional sense of well-being and satisfaction in life.  As Captain Washington explained,

> To know that you're going to have a steady pay check, not just for
> 20 years but for the rest of your life, I mean that just gives a

> tremendous amount of stability to the things—that lets you know
> that, hey, I can buy this house…I can start this family—I'm going
> to be able to put money aside to send my kids to…college. You
> know, we're going to be able to retire and live a good life once we
> retire. That stability is very important.

8/15/2011 Tr. 1044:16-23 (P. Washington).

### Respect from the Community and Sense of Pride

23.      In addition to tangible health, retirement, and leave benefits and the consequent

sense of security, many firefighter witnesses spoke about the value of the respect and admiration

they receive from the community and the public at large. Lieutenant Marshall described it as

"unmatched as far as I can see in any occupation. . . . Every time I go to my doctor, he thanks me

for doing such a good job.  He's a doctor, I'm looking up to him, and he's thanking me."

8/15/2011 Tr. 987:11-18 (M. Marshall).

24.      Firefighter Coombs agreed, saying that "I think the public really adores us.  They

show me admiration.  They appreciate us . . . It's quite rewarding, warm in that way."  81/2011

Tr. 212:7-11. After a fire is put out, community members "just adore you, appreciate that you did

this brave thing for them. I can't describe it beyond that you're so appreciated for what you do."

8/1/2011 Tr. 212:25-213:7 (J. Coombs).

25.      As Captain Washington stated, "you just get a tremendous amount of respect and

admiration just by being a firefighter." 8/15/2011 Tr. 1036:8-20 (P. Washington). This leads to

an enormous sense of pride and personal satisfaction from helping others:

> At the end of the day you feel good about what you've done.
> You've gone out and you've helped somebody. I mean, it gives
> you just a tremendous feeling of personal satisfaction. And the
> respect that you get…I'm sure in very subtle ways it really
> improves your life. It just gives you a sense that you're doing
> something important with your life.

8/15/2011 Tr. 1037:5-11 (P. Washington).

26. The sense of pride in being a firefighter is heightened among black firefighters. Firefighter Coombs equated being a firefighter to being a preacher in terms of status within the black community. 8/1/2011 Tr. 212:18-21 (J. Coombs).

27. Lieutenant Marshall spoke of the difference in how he is treated by others, saying, "wherever you go as a firefighter it's rewarding, especially to me as a black male in the city of New York, when I tell people that I'm a firefighter, it kind of like changes a lot of people's perception of me because when people know you're a firefighter they assume that you're a good person, a nice person, an honest person." 8/15/2011 Tr. 987:25-988:5 (M. Marshall).

**The Pleasure of the Work Itself**

28. Carrying out the responsibilities of a firefighter provides for a sense of fulfillment in overcoming challenges to help others. Captain Washington described the greatest benefit of the job as the feeling he has when he successfully carries out his duties and helps someone, calling the feeling "almost euphoria." 8/15/2011 Tr. 1036:21-1038:4, 1042:14-1043:14 (P. Washington). After resolving "a challenging call," firefighter Coombs recounted feeling "like I made a difference that day." 8/1/2011 Tr. 213:8-10. For firefighter Wilson, "helping people" is the best part of the job. 8/15/2011 Tr. 1095:12-14.

29. The firefighter job offers challenges in a variety of ways, requiring specialized knowledge, quick decision-making, the ability to act under pressure, and leadership. 8/15/2011 Tr. 1041:17-1042:3 (P. Washington). Explaining why he continues to work after 23 years, when he could have retired after 20 years of service, Captain Washington explained: "I love the job. . . [I]t's rewarding, it's challenging, you know, it's just a great job. And honestly I'm in no rush – I'm in no rush to leave." 8/15/2011 Tr. 1045:22-1046:12.

30.     Among firefighters, the most sought-after firehouses – the so-called "A companies" – are the busiest ones, because they present the most opportunities for meeting the challenges of the work and helping others. 8/1/2011 Tr. 213:24-215:1 (J. Coombs). As firefighter Coombs explained, "It's just part of the culture, really, to be active, to be part of saving lives, extinguishing fires, responding. You want to be part of that. That's why you're there." 8/1/2011 Tr. 214:21-215:1.

31.     Those who demonstrate proficiency and a desire for more responsibility can take civil service examinations to become lieutenants, captains, and chiefs. They can also join specialized units as members of a special operations company. 8/15/2011 Tr. 1024:16-1025:11 (P. Washington).

### Valued Teamwork and Camaraderie in the Firehouse Community

32.     Firefighters find value in the firehouse community that is built through working and living together. On tours, firefighters depend on each other to collectively respond to and manage emergencies. 8/15/2011 Tr. 1038:7-1039:1 (P. Washington).

33.     In the firehouse, firefighters pool together their money for food, and then collectively shop for groceries, cook a meal, and sit down to eat together. 8/15/2011 Tr. 1039:13-1040:13 (P. Washington). Other chores and maintenance of the firehouse such as laundry or minor repairs are similarly shared, with all firefighters on duty dividing up the work. 8/1/2011 Tr. 218:8-16 (J. Coombs).

34.     Firefighters recognize the benefits of camaraderie on the job. As Captain Washington acknowledged, "Everyone likes to belong to something. Everybody likes to be a part of a team. . . . So to be on a team that's doing something as important as fighting fires, savings [*sic*] lives and so on, it makes you feel good." 8/15/2011 Tr. 1041:7-14. When asked what he

9

enjoyed most about his job, firefighter Candido Nuñez responded, "I enjoy what we share together because then it's a brotherhood, it's a family." 8/16/2011 Tr. 1127:20-21. He contrasted the firefighter experience to his previous job at another city agency, the Housing Authority, where the same sense of brotherhood did not exist. 8/16/2011 Tr. 1127:22-25 (C. Nuñez).

**Limited, and Decreasing, Job Risks**

35.     The Bureau of Labor Statistics' examination of national job fatality rates for the year 2007 indicates that, at least with respect to fatalities, firefighting is a job of moderate risk, with a fatality rate of 4.4 in 2009.  PI Ex. VVV.  In comparison, police officers and construction workers had three times the fatality rate in 2009, while some dangerous jobs such as roofer and iron-worker had seven or eight times the death rate of the firefighter job. *Id*. Even sanitation workers were roughly six times more likely to be killed on the job.  *Id*.

36.     While it is true that extraordinary incidents of collapses, backdrafts, and flashovers do occur (8/16/2011 Tr. 1152:3-12, 1160:11-23, 1168:15-19 (E. Kilduff)), these events are very rare.  In the past three or more years, there have been no on-the-job fatalities among firefighters. 8/23/2011 Tr. 1434:16-1435:8 (K. Kelly).

37.     The comparatively moderate risk of the firefighter job is partly due to the small and decreasing number of structural fires (*i.e*., fires inside of buildings), which have decreased to 5.25% of all calls in 2010. PI Ex. QQQ; 8/16/2011 Tr. 1197:8-1198:1 (E. Kilduff); PI Ex. MMM at 5 (reporting a 9% drop in structural fires from 2007 to 2009). This percentage includes fires that are limited in scope and easily extinguished, such as stove or garbage can fires.  8/16/2011 Tr. 1193:5-9 (E. Kilduff).

38.     The decrease in firefighter fatalities is also attributable to advances in training, the development new safety equipment, and computer and other technology. PI Ex. UU:  minutes

5:00-8:00; 13:07-13:23. As a result, "This Department is better and safer than it's ever been before." PI Ex. UU: minutes 5:10-5:28 (FDNY Chief of Safety Stephen Raynis).

39.     Firefighters now wear bunker gear, protective equipment that covers the firefighter from head to toe. The gear includes a helmet, hood, mask, and protective clothing. 8/15/2011 Tr. 990:11-16 (M. Marshall).

40.     City witness Chief of Department Edward Kilduff agreed that the job is safer than ever "because the department is practicing safety better than ever before." 8/16/2011 Tr. 1238:13-24 (E. Kilduff).  As firefighter Wilson explained, "They train you, you know, for different type of situations and, I mean, you don't just [go] running into a burning building just because it's on fire. You always have to think out what you're going to do before you go in there . . . But we're trained, trained for that." 8/15/2011 Tr. 1092:19-1093:5 (R. Wilson).

41.     The injuries that do occur are overwhelmingly minor in nature. Almost 85% are sprains and strains. 8/23/2011 Tr. 1392:24-1393:9; Def. Ex. 54A at 3.

42.     Firefighters observed comparable or worse injuries in other jobs. Transit workers risk getting hit by trains or electrocuted, 8/15/2011 Tr. 1068:18-2 (P. Washington); sanitation workers may be injured by passing cars or sanitation equipment, 8/15/2011 Tr. 1068:14-18 (P. Washington); and airport workers may experience injury from faulty plane equipment. 8/15/2011 Tr. 1093:15-18 (R. Wilson).

43.     While Plaintiffs-Intervenors' placed into evidence publicly-available data on the comparably lower risks inherent in the firefighter job versus other jobs performed by City employees (PI Ex. VVV), the City did not produce data that would clearly be within its possession from the Police Department or the Sanitation Department to refute that evidence.

44.     The fact that firefighter candidates are very likely to be recruited by relatives and friends is a strong indication that the position is not perceived by incumbent firefighters as overly dangerous compared to other highly physical jobs.  Def. Ex. 22 at 11 (66% of whites, 50% of Hispanics and 40% of blacks who took and passed firefighter Exam 2043 were recruited by friends and family); Def. Ex. 21, at 21 (50% of white applicants for Exam 2043 reported having a relative in the FDNY). Firefighters provide such strong encouragement to their relatives and friends to join the Department because they know about the numerous advantages of the position, both economic and noneconomic.

45.     Despite the risks that come with the work, the firefighter position is very highly sought after.  Just this year, there were 61,439 applicants who paid to take for Exam 2000, *see* Findings of Fact, Dkt. 741 at 25, Table 1, attached hereto as Exhibit B, even though the City can only appoint a maximum of 2,400 firefighters (including those who promote from the EMT title) in the four-year lifespan of a civil service eligibility list, due to space constraints that cap attendance in the Fire Academy at 300 recruits every six months.

**Immense Job Satisfaction Overall**

46.     Those most aware of the enormous benefits of the firefighter job – friends and family members of firefighters – are especially likely to pursue the position:

> As a 19, 20-year-old kid, you're in firehouse [sic], you go to see the firehouse and you're sitting in there and, you know, the bells go off and the doors fly up, you know, you see your brother—you see your brother jump on the truck and go out the door, it's very exciting, it has an impact on you. You know, you say wow, this is something that I really would like to do.

8/15/2011 Tr. 1022:18-24 (P. Washington).

47.     A safety video produced in collaboration with the FDNY demonstrates powerfully the emotional satisfactions that come with this career.  Members of the Department made the following remarks:

a. "What's it like working for the FDNY? It's a dream come true."  (Deputy Chief James Daly, Division 1 Commander);

b. "I come to work and I pinch myself that I'm getting to live out my dream." (Deputy Chief Jay Jonas, Division 7);

c. "Being a member of the FDNY is like playing for the New York Yankees in the World Series."  (Captain Michael Dugan, Ladder Company 123).

PI Ex. UU:  minutes 13:23-14:08.

48.     Given the numerous significant benefits of the New York City firefighter job described above, it is more likely than not that due to the City's discriminatory hiring practices, eligible Delayed-Hire and Non-hire class members suffered significant non-economic injuries, in the form of lost opportunities for satisfaction, prestige, emotional well-being, free time and convenience, as a result of denied or delayed appointment as New York City firefighters.  They should be permitted to show the damage caused to them by the loss of the life-changing opportunity to serve as an FDNY firefighter.

## PROPOSED CONCLUSIONS OF LAW

49.     Each of the federal, state, and city law grounds upon which this Court found liability provide for an award of compensatory damages as an element of make-whole relief.

50.     The District Court is empowered to make findings of fact based not only on documentary and testimonial evidence but also on inferences to be drawn from that evidence.

*See, e.g.*, *Ceraso v. Motiva Enters.*, LLC 326 F.3d 303, 316-17 (2d Cir. 2003), citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (in review of findings made after a bench trial, "[t]he decisions as to whose testimony to credit and which of permissible inferences to draw are solely within the province of the trier of fact").

### Federal Claims Provide for Compensatory Damages

51.     Compensatory damages were added to the relief provisions of Title VII in 1991. In passing the 1991 Civil Rights Act, Congress found that "additional remedies under Federal law [were] needed to deter unlawful harassment and intentional discrimination in the workplace." Pub. L. No. 102-166, 1-5 Stat. 445 (1991).  Courts, including the United States Supreme Court, have recognized the need to award compensatory damages in order to provide make-whole relief.  *Landgraf v. U.S. Film Products*, 511 U.S. 244, 282 (1994) ("Section 102 [of the Civil Rights Act of 1991] reflects Congress's desire to afford victims of discrimination more complete redress for violations of rules established . . . in the Civil Rights Act of 1964."); *Williams v. Pharmacia Opthalmics*, Inc., 926 F. Supp. 791, 794 (N.D. Ind. 1996) ("The availability of compensatory damages apart from back and front pay demonstrates Congressional recognition that discriminatory employment practices inflict injuries beyond mere loss of  a paycheck or reduction in wages and benefits, and Congressional intent that victims of employment discrimination should be compensated for those non-pecuniary injuries.").

52.     Under Title VII of the Civil Rights Act of 1964, as amended by the 1991 Civil Rights Act, the elements of compensatory damages that may be recovered include, *inter alia*, "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."  42 U.S.C. § 1981a(b)(3).  Compensatory damages are available on the basis of an intentional discrimination finding.  42 U.S.C. §

14

1981(a)(1) ("In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. §2000e-5, 2000e-16] against a respondent who engaged in unlawful intentional discrimination . . . the complaining party may recover compensatory and punitive damages."). This Court found that the City intentionally discriminated against Plaintiffs-Intervenors in violation of Title VII on January 13, 2010.  Dkt. 385.

53.    Plaintiffs may also recover compensatory damages for violations of 42 U.S.C. §§ 1981 and 1983.  *Johnson v. Railway Express Agency*, 421 U.S. 454, 459-60 (1975); *Carey v. Piphus*, 435 U.S. 247, 255-56 (1978).  This Court also found that the City violated §§ 1981 and 1983.  Dkt. 385.

54.    Plaintiffs claiming discriminatory failure to hire have been awarded compensatory damages for Title VII, and § 1983 violations.  *See, e.g., Jeckell v. Crestwood Area Sch. Dist.*, No. 04cv1135, 2008 U.S. Dist. LEXIS 71380 (M.D. Pa. Sept. 18, 2008) (discussing jury award of compensatory damages in failure to hire claim pursuant to Title VII and §1983).

### State and City Claims Provide a Separate Basis for Compensatory Damages

55.    Even before enactment of the 1991 Civil Rights Act, both the New York City and New York State Human Rights Laws ("HR Laws") provided for the award of compensatory damages.  *See* N.Y.C. Admin. Code § 8-120(8) (providing for compensatory damages in the administrative process); N.Y.C. Admin. Code § 8-2502(a) (authorizing damages in a civil action); Exec Law. § 297 (4) (providing for compensatory damages in the administrative process); Exec. Law §297 (9) (providing for compensatory damages in a judicial proceeding).

56.    New York Courts have recognized the need to award compensatory damages to victims of discrimination since at least 1981. *See Cullen v. Nassau County Civil Serv. Comm'n*, 53 N.Y.2d 492, 495-96, 425 N.E.2d 858, 860; 442 N.Y.S.2d 470, 472-73 (N.Y. 1981) (stating

that the New York legislature specifically authorized the "awarding of compensatory damages to the person aggrieved" by discrimination and noting that compensation "does not depend on a showing that the discrimination which produced it was intentional").[2] New York courts have also recognized, in the tort context, that compensatory damages are necessary to make the victim whole. *See, e.g.*, *McDougald v. Garber*, 73 N.Y.2d 246, 254, 536 N.E.2d 372, 538 N.Y.S.2d 937 (N.Y. 1989) (observing that "the goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred" (internal citation omitted)).

57.     The New York State and City HR Laws provide for compensatory damages not only in intentional discrimination cases but also in disparate impact cases, because, in contrast to Title VII, the HR Laws do not contain statutory language precluding recovery of compensatory damages in disparate impact cases.   It is well established that State and City laws are not bound by federal law limitations on liability or relief.  *See, e.g.*, *Ocher v. Goldwater Memorial Hosp.*, 450 F. Supp. 2d 275, 283 (S.D.N.Y. 2006) (observing that federal law acts as a floor, not a ceiling, on claims under the New York City Human Rights Law).  Thus, the Court's July 22, 2009 disparate impact finding, Dkt. 294, provides a separate basis under the HR Laws for the Court's award of compensatory damages.

58.     Plaintiffs claiming discriminatory failure to hire have been awarded compensatory damages for violations of state anti-discrimination laws.  *See, e.g.*, *Buffalo Athletic Club v. New York State Div. of Human Rights*, 249 A.D. 2d 986, 672 N.Y.S.2d 210 (App. Div. 1998); (upholding but reducing jury award of compensatory damages for discriminatory failure to hire); *Manhattan & Bronx Surface Transit Operating Auth. v. New York State Exec. Dep't,* 220 A.D. 2d 668, 632 N.Y.S.2d 642 (App. Div. 1995) (same).

---

[2] While the plaintiff in *Cullen* sought damages for mental anguish, the statute does not limit compensatory damages to cases of emotional trauma.

59.     The enormous emotional benefits, life satisfaction and sense of pride and stability that flow from the many uniquely positive aspects of the firefighter position were denied to class members who applied and were not hired or whose hiring was delayed because of their race. Individual members of the Non-hire and Delayed-Hire Subclasses should therefore have the opportunity to demonstrate eligibility for recovery of compensatory damages pursuant to Title VII, §§ 1981 and 1983, and the City and State Human Rights Laws.

*        *        *

Based upon the above, Plaintiffs-Intervenors request that the Court direct the Special Masters to compare the particular attributes of the firefighter job with the positive and negative aspects of the positions held by Non-hire and Delayed-Hire victims to determine (a) if there is a qualitative difference in the actual life experiences of the victims as compared to the benefits they would have obtained from the firefighter position, and (b) the value of that difference for each victim, for each year that he or she was not hired.  Plaintiffs-Intervenors request that the parties be given the opportunity to work together to create an appropriate questionnaire to elicit information from eligible Claimants concerning their noneconomic losses.

Dated: New York, New York
           June 29, 2012

Respectfully submitted,

LEVY RATNER, P.C.

/s/
_____

By:    Richard A. Levy
          Robert H. Stroup
          Dana E. Lossia
          80 Eighth Avenue
          New York, NY 10011
          (212) 627-8100
          (212) 627-8182 (fax)

17

*Attorneys for the Non-Hire Subclass*

CENTER FOR CONSTITUTIONAL RIGHTS

/s/ _____

By:   Darius Charney
      Ghita Schwarz
      666 Broadway, 7th Floor
      New York, NY 10012-2399
      (212) 614-6438
      (212) 614-6499 (fax)

*Attorneys for the Delayed-Hire Subclass*


TO:  All Counsel via ECF

Exhibit A

# RELIEF PHASE REPORT

in the matter of

United States of America v. City of New York

by

_(signature)_

Bernard R. Siskin, Ph.D.
Director and Head of Labor Practice Group

LECG
Philadelphia, PA

December 2009

-14-

adjusted for unemployment. This ratio is 60.7 percent for African Americans and 60.9 percent for Hispanics. While I use these mitigation ratios in calculating my estimates of economic loss, I also present in Appendix D the final economic loss estimates due to the hiring shortfall based on the alternative mitigation ratios.[18]

In calculating total economic losses, I assume that the mitigation ratios remain constant over time. In other words, I apply the same mitigation ratio to earnings lost in each year from 2001 to 2010. This may result in a conservative estimate of economic losses for two reasons.

First, the effect of unemployment in the New York area was relatively stable over the period from 1999 through 2008, with the average overall rate being 5.1 percent in 1999, reaching a low of 4.4 percent in 2000 and 2007, and reaching a high of 6.6 percent in 2003. (BLS Survey Output Data, Series LAUMT36356204, LAUMT36356206, LAUMT36356203, LAUMT36356204). Therefore, adjusting the mitigation ratios I use for the effect of unemployment would change the yearly loss figures only slightly until 2009. However, in 2009, unemployment soared, causing overall unemployment rates to jump into the 9 percent range.

---

[18]    It should be noted that the census data used to calculate the mitigation ratios shown in Table 3 include all earnings, including earnings from second jobs ("moonlighting"). According to a study of moonlighting conducted by the Bureau of Labor Statistics ("BLS"), 28.1 percent of firefighters moonlight; in fact, firefighters were found to moonlight more than any other occupation. (Amirault, Thomas, "Characteristics of Multiple Jobholders, 1995," Monthly Labor Review, 1997.) In computing entry-level firefighter earnings, I do not account for any additional earnings a firefighter may obtain from work outside the FDNY. To the extent that firefighter incomes would increase if earnings from moonlighting were included, the mitigation ratios presented in Table 3 should be lower. For example, if a firefighter earned an additional 10 percent of income from a second job, the mitigation ratio for African Americans would fall from 60.7 percent to 55.2 percent and, if the firefighter earned an additional 20 percent of income from a second job, the mitigation ratio would fall to 50.6 percent. Thus, the mitigation ratios I use for my calculations are likely too high, and my results are conservative estimates of economic losses.

Exhibit B

1.      <u>Importance of Sustained Remedial Recruitment</u>

The City's recent investments in firefighter recruiting have produced significant increases in the number of black and Hispanic applicants for the entry-level firefighter examination as compared to previous recruitment campaigns.  Table 1 compares the unprecedented number of applicants who signed up to take Exam 2000 to the size of the applicant pools for previous firefighter examinations administered by the City.  Table 2 shows the racial composition of each applicant pool in terms of the percentage of each racial group's representation in the applicant pool as a whole.

Table 1.  Size of applicant pools for each firefighter examination by applicant race.

| Race | Applicants for Exam 2000 (2012) | Applicants for Exam 6019 (2007) | Applicants for Exam 2043 (2002) | Applicants for Exam 7029 (1999) | Applicants for Exam 0084 (1992) | Test Takers[19] for Exam 7022 (1987) |
|---|---|---|---|---|---|---|
| WHITE | 31,014 | 17,379 | 17,732 | 15,819 | 29,370 | 24,028 |
| BLACK | 14,122 | 5,759 | 2,971 | 3,067 | 3,388 | 3,629 |
| HISPANIC | 14,110 | 5,810 | 2,165 | 2,595 | 3,734 | 3,387 |
| ASIAN/PACIFIC ISLANDERS | 1,900 | 659 | 396 | 263 | 223 | 159 |
| AMER. INDIAN/ALASKAN | 293 | 91 | 19 | 54 | 200 | N/A |
| OTHER/NOT IDENTIFIED | 0 | 265 | 584 | 1,023 | 2,953 | 2,248 |
| TOTAL | 61,439 | 29,963 | 23,867 | 22,821 | 39,868 | 33,451 |

Source: Exam 2000 & Exam 6019 Applicant Data (Docket Entry # 732) Exs. 2-a, 2-b; Pl.-Int. Ex. E[20]; Def. Ex. 21 at 19.

---

[19]      Prior to 1991, the City of New York did not collect demographic information from exam applicants; demographic data for Exam 7022 are available only for those applicants who actually took the exam.  (See Pl.-Int. Ex. E at EEPC 0462.)

[20]      Plaintiff-Intervenors' Exhibit E was admitted into evidence by the court subject to a relevance objection from the City.  That objection is denied.  (See Tr. at 931:21-935:9, 1450:15-1451:12, Pl.-Int. Ex. E.)