**COHEN & GRESSER** LLP

800 Third Avenue
New York, New York 10022
212 957 7600 phone
212 957 4514 fax
www.cohengresser.com

Mark S. Cohen
212 957 7601
mcohen@cohengresser.com

September 14, 2012

<u>VIA ECF</u>

Hon. Nicholas G. Garaufis
United States District Judge
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:  <u>United States v. City of New York, No. 07-CV-2067(NGG) (RLM)</u>

Dear Judge Garaufis:

As the Court is aware, certain issues have arisen among the parties concerning communications distributed within New York City firehouses via FDNY fax machines, the FDNY's response to those communications, and the FDNY's investigation of alleged violations of existing FDNY policies.  In particular, the parties have raised issues regarding the use of FDNY fax machines and bulletin boards.  The parties have exchanged correspondence on these issues and have discussed them on joint telephone conference calls, as well as in person during a meeting on April 20, 2012.[1]  Both City employees and members of Plaintiff-Intervenors Vulcan Society, Inc. (the "Vulcan Society") also discussed the issue in separate meetings with the Monitor.[2]

On June 18, 2012, this Court ruled that the Monitor has jurisdiction over this issue and ordered the Monitor to attempt to "facilitate a consensual resolution of this issue."  June 18, 2012 Order (Dkt. # 902) at 2.  The parties have conferred with each other as directed by the Court, as

---

[1] The parties' submissions and other correspondence, with enclosures including the relevant faxes, are being filed in conjunction herewith as a single Appendix.  The page citations provided herein are to pages of the Appendix.

[2] The City has asked for confirmation that the Monitor's recommendation is not based on communications that were held *ex parte* with other parties, to which the City would not have had a chance to respond.  The Monitor confirms that the basis of the instant recommendation is the parties' submissions made to the Monitor as well as statements made by counsel for the parties during regularly scheduled calls with the Monitor, on which all parties were present.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 2

well as with the Monitor, and have exchanged additional correspondence, but have been unable to resolve their issues. Accordingly, the Monitor submits the following recommendation.[3]

At the outset, the Monitor notes that the recommendations set forth herein pertain solely to written materials conveyed on FDNY fax machines and/or postings on FDNY bulletin boards. The Monitor's recommendation, and indeed the parties' dispute, does not encompass speech outside the firehouse, including speech criticizing this litigation, the Court or the Monitor. As the Vulcan Society noted: "[t]he issue here is not the overarching right of individuals to free speech; it is the use of City property to disseminate controversial materials to a wide audience of City employees on work time." April 25, 2012 Vulcan Society Letter (App. A at 67).

In making the recommendation below, the Monitor is mindful of the Court's desire to "strike a balance between the need for close supervision of the City's compliance with applicable equal employment opportunity laws and the court's orders, and the court's preference for leaving the City in charge of the day-to-day minutiae of administering the FDNY's firefighter hiring process and EEO compliance activities." *United States v. City of N.Y.*, 07-CV-2067 NGG RLM, 2011 WL 4639832 at *12 (E.D.N.Y. Oct. 5, 2011). The Monitor notes, however, that administration of the City's Limited Use Policy and other City policies necessarily must be guided by the principles set forth in the Remedial Order, as well as governing law.

I.   Background of the Dispute

    A.   The City's Limited Use Policy and Authority to Adopt Reasonable Restrictions

The parties agree that the City is permitted to adopt reasonable restrictions on the time, place and manner of the use of City resources. The City has adopted such restrictions, as embodied in its Limited Use Policy for FDNY equipment and electronics, set forth, *inter alia,* in Section 3.2 of the FDNY's Limited Use Policy, and a recent Departmental Order. (App. A at 46 and 43, respectively). The City has represented during the course of the parties' discussions with the Monitor that the Limited Use Policy "is nearly identical to the Limited Use Policy in effect at almost every other Mayoral agency in New York City." March 12, 2012 Responses by City to Questions Posed by Court Monitor (App. A at 61).

---

[3] On August 21, 2012, the Monitor circulated a draft of the Monitor's recommendation set forth below to the parties for comment. Certain of the parties' comments are discussed below and/or incorporated in this Recommendation. The Monitor respectfully requests that the Court provide the parties with a window of time in which to file any responses to the Recommendation.

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 3

The most relevant portions of the Limited Use Policy to this dispute are set out below.

*Section 3.1.1* – The FDNY states that personal use of FDNY office equipment may not "interfere with or otherwise impede . . . employee productivity." (App. A at 45).

*Section 3.2.2* – The FDNY states that use of its resources "is a privilege, and as such it can be revoked at any time." (App. A at 46).

*Section 3.2.3* – The FDNY states that the use of its resources is "subject to monitoring and other restrictions that may be indicated by the FDNY." (App. A at 46).

*Section 3.2.4* –The FDNY limits personal use, and provides examples of permitted uses. "Limited Personal Use includes such things as occasionally making a photocopy, sending a one or two page fax, using a printer to print out a few pages of material, making a brief personal telephone calls, sending a short personal e-mail message, or making limited use of the Internet for personal reasons." The FDNY prohibits use of its resources for chain letters (including both transmission and "re-transmission" of such letters) or "other unauthorized mass mailings or mass e-mails regardless of subject matter." (App. A at 46).

*Section 3.3.4* – The FDNY prohibits use of resources that are prohibited by applicable laws, rules, regulations or agency policy. (App. A at 47). As well, the Monitor notes that any use that is inconsistent with the Remedial Order would be prohibited.

*Section 3.3.5* – The FDNY prohibits posting on bulletin boards, or creating, copying or transmitting via facsimile or email, any materials that are "obscene, sexually explicit or sexually oriented, hate speech, threatening, defamatory, known to be fraudulent or ridicule others on the basis of race, creed, religion, color, gender disability, national origin, or sexual orientation."[4] (App. A at 47).

*Section 3.3.14* – The FDNY prohibits sending messages that "contain personal opinions expressed in such a way that it may be interpreted as FDNY or City policy. It is general practice in such cases to include a disclaimer such as: 'The opinions expressed here are

---

[4] Other types of speech that the City has prohibited from being conveyed using FDNY technology are fund raising, lobbying, and product or service endorsement. *Id.* at 3.3.7. (App. A at 47).

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 4

my own and do not necessarily reflect the policy of the Fire Department of the City of New York.'" (App. A at 48).

*Section 8.2* – The FDNY states that Supervisors shall monitor use of the FDNY's resources to assure that misuse does not occur.

*Section 9* – The FDNY provides for sanctions for unauthorized personal use.

FDNY regulations governing use of FDNY resources state that "Chief and company officers will be held strictly responsible for ensuring full compliance with this section." FDNY Reg. 19.2.2. (App. A at 36). *See also Policy on Limited Use of Office and Technology Resources* at 3.3. (App. A at 46).

On January 25, 2012, the City issued a new Department Order ("D.O. 6") which limits posting on bulletin boards to items relating to "official Department business or important information relating to approved Departmental organizations." (App. A at 43).

Another FDNY Regulation, the General Conduct and Behavior Regulation, 25.1, further provides:

25.1.8  Members shall not engage in any activity that may be instrumental in arousing religious, racial or any other hatred, whether by actions, speech, writings or dissemination of materials. (App. A at 25).

In addition to the specific provisions listed above, it is well settled that, as a public employer, the City is constitutionally permitted to impose reasonable time, place and manner restrictions on speech within the workplace. *See, e.g., Greer v. Spock,* 424 U.S. 828, 836-37 (1976) ("The guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please."). Additionally, government employers may restrict speech that is reasonably predicted to disrupt workplace operations and working relationships. *See United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 492 (1995) ("[W]e consistently have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved was on a matter of public concern"); *Rankin v. McPherson,* 483 U.S. 378, 388 (1987) ("We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."); *Locurto v. Giuliani,* 447 F.3d 159, 182 (2d Cir. 2006) (quoting *Connick v. Myers,*

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 5

461 U.S. 138, 151-52 (1983) ("[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate")).

Public safety agencies such as police and fire departments, in particular, have settled interests in promoting workplace harmony, maintaining the ability to recruit from all segments of the community, and safeguarding the public trust. *See, e.g., Locurto*, 447 F.3d at 182 (police officers' racial derision warranted termination where "the motive for the defendants' actions was a concern for the potential disruption the plaintiffs' activities would cause to the NYPD and FDNY"); *Pappas v. Giuliani*, 290 F.3d 143, 147-48 (2d Cir. 2002) (proper for police department to take disciplinary action for anti-Semitic correspondence by police officer, in part because if anyone outside department were to become aware of such speech, it would harm department's ability to "recruit and train" from diverse communities); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir. 1979) ("When lives may be at stake in a fire, an Esprit de corps is essential to the success of the joint endeavor. Carping criticism and abrasive conduct have no place in a small organization that depends upon common loyalty and 'harmony among coworkers'"). A public employer's ability to place reasonable restrictions on speech to avoid workplace disruption extends to topics covered by Title VII. *See Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise").

 B. The Faxes

On January 25, 2012, counsel for the Vulcan Society sent the Monitor a letter enclosing three faxes, dated August 16, 2011, December 6, 2011, and January 10, 2012, which the Vulcan Society represented had been transmitted on FDNY fax equipment. (App. A at 1-13). These faxes (as well as others provided subsequently, which appear in the Appendix and are discussed further below), cover a variety of subtopics, but share a general theme of criticism of the Court's orders, the Court and its agents, the Vulcan Society (including members identified by name), the current litigation, and beneficiaries of the litigation. The faxes state that they are authored by FDNY Deputy Chief Paul Mannix, who maintains a website dedicated to these topics on behalf of an organization titled "Merit Matters."[5]

In April 2012, the Vulcan Society informed the Monitor and parties that a member of the Vulcan Society had filed a formal EEO complaint with the FDNY concerning fax transmissions on FDNY equipment. April 25, 2012 Vulcan Society Letter (App. A at 66-67).

---

[5] Merit Matters is not an approved Departmental Organization.

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 6

In total, the Vulcan Society has presented the Monitor and parties with eleven faxes, which counsel for the Vulcan Society represents were transmitted on City fax equipment, likely multiple times. According to the Vulcan Society, the specific instances reported by the Vulcan Society are representative of a broader pattern of conduct.

The Vulcan Society asserts that, in addition to the specific examples that were brought to the Monitor's attention and appear in the Appendix, other posts from the Merit Matters website have also been transmitted to firehouses and/or during City fax equipment. The Vulcan Society further alleges that certain of the faxes have been posted on FDNY bulletin boards. In June 2012, the City's counsel informed the Monitor and parties during a telephone call that the City had confirmed an instance of such posting reported by the Vulcan Society, and had located a fax dated as of February 2012 posted under glass in a firehouse.

The Vulcan Society submits that, on each occasion when a Vulcan Society member happened to be on duty and report a transmission, the fax most likely was circulated more broadly, to other firehouses and/or during other shifts. As reported to the Monitor, on August 28, 2012, a member of the Vulcan Society attempted to test this theory upon receiving a fax, by contacting five other firehouses to inquire whether they too had received the fax during the same shift. According to counsel for the Vulcan Society, each of those firehouses had received the same fax, in the same two-hour period, and none of the firehouses contacted had not received it.[6] (App. A at 144).

With regard to their content, among other things, the faxes:

- Assert that the plaintiffs in this litigation should be placed under investigation. August 16, 2011 fax. (App. A at 4-5).

- Assert that the plaintiffs support racial discrimination. January 10, 2012 fax. (App. A at 11-13).

- State that the plaintiffs have "defied Departmental orders and should be disciplined." Id. (App. A at 12).

- State that the "Vulcan leadership supports quotas (which discriminate on the basis of race), apparently has little if any respect for the dangers of firefighting, apparently is free to show disrespect to superiors and defy orders without

---

[6] After being advised of the August 28, 2012 fax, counsel for the City asked counsel for the Vulcan Society for certain additional factual information. (App. A at 144). The Vulcan Society has supplied the City with names of firefighters who have indicated they are willing to speak to the City to provide additional detail.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 7

consequence, can align themselves with someone who makes blatantly racist remarks, and even accuses FDNY members of killing someone . . . ." *Id.* (App. A at 12).

- Purport to draw a distinction between firefighters who "earned" their jobs and future minority hires, who are characterized as "incapable of earning the position through the testing process and [who] will not be able to perform the requirements of the job – mental or physical." June 11, 2012 fax. (App. A at 106-07).

- Discourage members of the Delayed Hire Subclass from filing claims for back pay and seniority, or from accepting awards intended to compensate for lost pay due to discrimination. *See, e.g.,* June 11, 2012 fax ("the potential for divisiveness and acrimony…will no doubt be increased if money is claimed and retroactive seniority demanded based on nothing other than the color of someone's skin. Some believe the money not claimed will go to the Vulcan Society . . . We have to remember this money is really taxpayer money . . . please notify us, we would be happy to post your name and offer our congratulations upon confirmation of any gift made, in whole, to a worthy charity."). (App. A at 106-07).

- Assert that an award of retroactive seniority to black and Hispanic victims of discrimination will cause not only "divisiveness and resentment" but may also lead to a "nightmare scenario" that "will no doubt result in unnecessary injuries and deaths;" state that in supposedly comparable circumstances the persons awarded relief were "dangerously incompetent" and were viewed by co-workers with "disgust and resentment;" and conclude that the relief proposed here "will make a dangerous job even more dangerous and place residents of all races in greater danger." *See* August 27, 2012 fax; September 6, 2012 fax. (App. A at 140-43; 147).

C.  The City's Investigation and Steps to Inform Firefighters of City Policy

On January 31, 2012, counsel for the City responded to the Vulcan Society's January 25, 2012 submission described above, stating that an investigation had been commenced but that the City had concluded, based on the fact that the fax numbers at the top of the documents attached to Plaintiff-Intervenors' letter indicate that "the faxes were sent from different machines," that there had been no "mass mailing," as prohibited by the Limited Use Policy. (January 31, 2012 City Letter; June 8, 2012 City Letter (App. A at 32; 87)).  The City's counsel provided an update on the City's investigation in an April 17, 2012 email (App. A at 65); which is summarized below.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 8

As described in the April 17, 2012 email, after the Vulcan Society raised the fax issue, the FDNY's Bureau of Investigations and Trials (BITS) conducted an "investigation into the faxes sent from Battalion 58 on December 6, 2011 and January 10, 2012 and from Battalion 39 on August 16, 2011 to determine whether those faxes were sent to multiple locations." (App. A at 65). BITS "obtained the outgoing fax records" from Battalion 39 for August 16, 2011 and Battalion 58's records for December 6, 2011 and January 10, 2012. *Id.* While these records "do not indicate what information was faxed they do reveal how many faxes were sent and to whom." *Id.* BITS analyzed the total number of faxes sent by Battalion 58 and 39 at the approximate time the faxes identified by the Vulcan Society were faxed, as well as the total numbers faxed from those two Battalions on each of the three relevant dates. BITS determined that:

On August 16, 2011 Batt 39 sent 24 faxes in the entire day, only 3 of which were sent at or about 0704 hours, the time the Merit Matters article dated August 12, 2011, was apparently received.

On December 26, 2011 Batt 58 sent 22 fax transmissions for the entire day, 5 of which were sent within 20 minutes of when the Merit Matters fax was apparently faxed.

Lastly, on January 10, 2012, Batt 58 sent 37 faxes, 6 of which were sent between 0804 hours and 0820 hours; the Merit Matters fax has a timestamp of 0814 hours. Six additional faxes were sent to the same 6 fax numbers between 0823 hours and 0830 hours.

(App. A at 65). According to the City, "[b]ased on these numbers and the fact that the FDNY has 218 firehouses, it is clear that Merit Matters materials were not faxed to all firehouses or widely through the Department." *Id.*

As reported by the City, "BITs also examined where all the faxes were sent by the two battalions on all three dates in question." *Id.*

Batt 39 sent a total of 36 faxes on 8/16/2011, 12/6/2011 and 1/10/2012. 35 of the 36 were sent to companies located in their Battalion and to Headquarters. Battalion 58 sent a total of 96 faxes in those three days. 78 of the 96 faxes were sent to their companies and Headquarters.

Based on the findings above, the City concluded that: "Although we don't know what documents were faxed, the fact that the vast majority of the faxes were sent to companies within the

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 9

battalion and to headquarters provides support for the view that the fax machines are being used primarily for FDNY business." (App. A at 65).

The City's April 17, 2012 email describing the BITS investigation also stated that "DC Mannix is assigned to the 6th Division in the Bronx. Battalions 39 and 58 are in the 15th Division in Brooklyn. Therefore, it is highly unlikely that he sent the faxes." *Id.* In subsequent correspondence, the City stated that: "Deputy Chief Mannix was told in August [2011] not to use the fax machines for mass transmissions and Plaintiff-Intervenors have not presented any evidence that he has." January 31, 2012 City Letter (App. A at 32).[7]

The City also has advised the parties and Monitor that it conducts random EEO compliance inspections in which bulletin boards are inspected. On at least two occasions between January and July 2012, the City advised that it had reminded firefighters and/or officers of the limited use policy and/or bulletin board policy. In the same time frame, firefighters were reminded at least twice of the City's anti-retaliation policy, as discussed further below.

In the case of the fax that was found posted under glass, the City reported that it instructed that the posting be removed and counseled the officer on duty at that firehouse concerning FDNY policy prohibiting posting of such material.

D.    The Plaintiffs' Stated Concerns

The concerns raised by the Department of Justice and the Vulcan Society about the faxes can be generally summarized as follows:

1. Enforcement and Interpretation of Relevant Policies.  The Vulcan Society asserts that the City does not appear to have taken steps to ensure full compliance with the Limited Use Policy, and has taken too narrow a view of what is prohibited by the policy. The Vulcan Society states that the speech at issue is retaliatory, in violation of Title VII and the Remedial Order, and is disruptive to the business of the organization. The Vulcan Society asserts that therefore the City is entitled to, and ought to, take action to prevent further similar uses of its equipment.

2. Posting of Material on Bulletin Boards.  The Vulcan Society objects to the continued posting of these faxes and other unapproved materials on official FDNY bulletin boards. The parties agree that violations of D.O. 6 have occurred since issuance of the January order, but disagree concerning the adequacy of the City's response to such violations.

---

[7] The Vulcan Society notes that the City did not indicate that Deputy Chief Mannix had been asked whether he requested that others send such faxes or whether he has knowledge of others doing so.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 10

3. <u>Adequacy of FDNY Investigation</u>.  The Department of Justice and the Vulcan Society have raised concerns about the nature and scope of the investigation that was conducted by BITS.  The Department of Justice and the Vulcan Society further disagree with the City concerning the extent to which the faxes implicate EEO issues, and believe that the faxes should have been investigated as an EEO dispute with input from the City's EEO consultant.  To the extent the BITS investigation may be indicative of the approach the City does take or would take to EEO complaints, the Vulcan Society and Department of Justice have indicated that the same sufficiency concerns they have raised in connection with the BITS investigation would also apply.

4. <u>Need for FDNY Communications</u>.  The Vulcan Society has requested that corrective communications be made in connection with the use of fax machines.

5. <u>Potential Discipline of Individuals</u>.  The Vulcan Society has requested that appropriate discipline be imposed for individuals in connection with the use of fax machines or violations of Departmental Order 6.

E.      <u>The City's Position.</u>

The City has cooperated with the Monitor, without waiving its position that the Monitor did not have jurisdiction over this dispute.  The City has stated that the choices available to the City to prevent misuse of FDNY fax machines are: (i) to ban personal use of fax machines altogether, or (ii) to permit only limited use.  *See* January 31, 2012 City Letter  (App. A at 32) (stating that the City "can either ban all uses of fax machines that are not related to official department business or have a limited use policy that imposes reasonable restrictions that are not based on viewpoints or opinions.").

The City takes the position, based on its interpretation of the Limited Use Policy and the BITS investigation conducted pursuant to that interpretation, that no violation of the Limited Use Policy occurred and that the Vulcan Society is "seeking to stifle any views that question their actions or do not comport with their views."  *Id.*[8]  As discussed further below, the City also states that the facts here do not fall within the scope of Paragraphs 17 and 19 of the Remedial Order, and that the fax conduct did not implicate EEO concerns.

---

[8] The City has not taken a position in its correspondence on whether the faxes arouse hatred, in violation of City regulation 25.1.8.  The Vulcan Society has asked that the City respond to their allegation that the faxes violate 25.1.8.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 11

II.      Monitor's Recommendation

        The Monitor did not require, and the parties did not submit, sworn statements or live
testimony over the course of the parties' discussions with the Monitor between January and the
present. According to the City, the investigation conducted by BITS addressed solely three faxes
and was limited in scope as described elsewhere in this Recommendation. Accordingly, the
record does not permit the Monitor to reach a firm conclusion regarding the existence, or the
scope, of violations of City policy.

        At a minimum, however, the information presented to the Monitor to date raises a
serious concern that faxes appear to have been sent for least a year in a manner that is not
permitted by the City's Limited Use Policy. Likewise, the parties' submissions have disclosed a
similar concern regarding the possibility of violation of the Remedial Order and Title VII,
including by retaliatory conduct. Each of these concerns was significant enough to warrant
meaningful investigation and fact-finding, as discussed further below.

        The City asserts that the record is inadequate to justify any recommendation by the
Monitor. In the Monitor's view, the materials submitted to the Monitor provide a sufficient basis
to support the recommendation made herein. In any event, the Monitor notes that the City's
position that the record is insufficient to support a recommendation as to whether City policies,
Title VII, or the Remedial Order have been violated, if anything, underscores the need for
effective procedures to develop a record on the basis of which such conclusions can be made,
and for enforcement of such proceedings.

        A.      Plaintiffs Have Raised Valid Concerns Regarding Whether a Violation of the
                Limited Use Policy Occurred.

        *First* the use of the faxes reported by the Vulcan Society as having occurred on repeated
occasions since January appears to violate the ban on mass mailings and chain letters. The
Regulations permit "occasionally making a photocopy, [or] sending a one or two page fax."
(App. A at 46). The FDNY prohibits use of its resources for chain letters or "other unauthorized
mass mailings or mass e-mails regardless of the subject matter." (App. A at 47). Here, the use
appears to have been more than an "occasional photocopy" and inconsistent with the
Regulations. On multiple occasions, in connection with eleven separate faxes, the Vulcan
Society advised the parties and the Monitor that faxes had appeared in firehouses located in
different areas of the City, with the same fax alleged to have been sent to more than one location
on the same day. According to the City's counsel, BITS concluded that Deputy Chief Mannix
was not the sender, indicating that others may be sending the faxes. As noted above, the Vulcan
Society has recently reported that the same fax was sent to at least five locations in a two hour

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 12

period, and that no firehouse contacted in that same period had *not* received the fax, which also suggests a chain or mass mailing.

*Second,* the faxes supplied to the Monitor and attached hereto appear to violate City policy on disclaimers. The author (Deputy Chief Mannix) is a high ranking FDNY officer. Of the eleven faxes that have been presented to the Monitor, at least four – dated August 12, 2011, February 27, 2012, March 22, 2012, and September 6, 2012[9] – contain no disclaimer. This is true even where the author emphasizes his status as a senior officer, thereby increasing the risk that his views might be misinterpreted as FDNY policy – *e.g.,* the August 2011 fax, where the author proposes a "choice: either investigate the Vulcan Society or investigate me. If my concerns are not reasonable based on the evidence presented, *perhaps I should not continue to hold a position of authority in the FDNY."* (emphasis added). (App. A at 5). In no instance did the sender of the faxes appear to have identified him or herself (although the author of the faxed materials, Deputy Chief Mannix, was identified).

*Third,* the City has not indicated that there is supervision of fax usage by FDNY supervisors, as required by Section 8.2, or implementation of any mechanism to make the City aware of violations. The City stated that "Supervisors are not stationed at fax machines or expected to look over employees' shoulders to observe their use of computers or other technology resources. Action is taken when a violation of the policy comes to the attention of a supervisor." (March 12, 2012 City's Responses to Questions Posed by Court Monitor, (App. A at 63)). The City also stated that no special training had been given to supervisors regarding the limited use policy, and that the City had no plans to provide such training. *Id.* The City has opted not to require fax cover sheets or sender identification to date, though the City stated that "in our experience, employees generally use fax cover sheets and/or identify themselves in the transmission." (App. A at 62).

III.     Plaintiffs Have Raised Valid Concerns Regarding the FDNY's Investigation Into the Circumstances of the Fax Conduct at Issue

The Vulcan Society states, and the Department of Justice agrees, that "the results of the City's investigation, which were provided on April 17, do not support a conclusion that the faxing of these materials was limited in scope," because the transmission of the same fax by different Battalions on different dates is "consistent with a faxing tree or chain letter distribution system." (App. A at 70). In particular, according to the Vulcan Society, "Battalion fax machines are programmed so that a sender may transmit a document to each company within the Battalion using a single button," meaning that a single phone record entry might in fact mean that the fax was sent to every company in the Battalion. *Id.* The Vulcan

---

[9] (App. A at 4-7; 76-77; 79-80; 147).

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 13

Society has also advised the Monitor that at least some FDNY fax machines do not have any electronic indication of the number from which they are being sent.

As noted by the Vulcan Society, "the City does not claim to have made any effort to determine the actual scope or frequency of transmissions of Merit Matters communications using Department fax machines," and instead investigated only whether "the faxes sent from Battalion 58 on December 6, 2011 and January 10, 2012 and from Battalion 39 on August 16, 2011 'were sent to multiple locations.'" April 25, 2012 Vulcan Society Letter (App. A at 70) (quoting March 12, 2012 City Letter). The Vulcan Society points out that the City did not look into "whether the same faxes were sent from other Battalions or firehouses, or how broadly they were transmitted." (App. A at 70). Thus, the Vulcan Society and Department of Justice believe that the investigation was too narrow in the scope of its inquiry.

The Department of Justice also raised the following specific concerns, which Plaintiff-Intervenors have stated they share, about the conduct of the investigation (App. A at 81-83):

- The FDNY did not conduct any interviews. For example, the FDNY did not interview the complainants, Deputy Chief Mannix (apart from speaking with him in August 2011), any individual in the fire houses at issue, or any supervisor.

- The FDNY did not seem to be applying any particular standards in its investigation.

- The FDNY did not consult its EEO consultant, Professor Merrick T. Rossein in connection with the investigation.

In the Monitor's view, the approach that appears to have been taken by the City (analyzing two reported faxes and some of the context of their faxing) was a necessary but insufficient step in conducting a full investigation. Additional measures, such as those proposed by the Department of Justice, would appear to be necessary for a full investigation in these circumstances.

On the limited record available, the Monitor makes no recommendation as to whether the City's ultimate conclusion should have been different, or as to the City's decision not to take remedial action. Nor does the Monitor believe that at this stage it would be productive to recommend that the Court direct the City to repeat the investigation described in the City's April 17, 2012 email. Rather, the Monitor believes that the focus should be on what steps will be taken going forward. The Monitor makes certain recommendations in this regard in Sections III and IV below.

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 14

     A.     <u>Plaintiffs Have Raised Valid Concerns Regarding Whether Continued
Dissemination of Faxes and the Investigation Described Above Are Inconsistent
with the Goals and Provisions of the Remedial Order.</u>

     In addition to alleging that the faxes violate the City's Limited Use Policy, Department
Order No. 6, and Regulation 25.1.8, the Department of Justice and the Vulcan Society assert that
the nature of the specific violation presently at issue (in particular the fact that the faxes target
successful plaintiffs and beneficiaries of Title VII litigation, and attempt to dissuade
beneficiaries from claiming monetary relief) merits investigative steps and possibly disciplinary
action to prevent violations of Title VII and the Remedial Order.  Again, the Monitor believes
that these contentions are sufficiently serious to warrant meaningful investigation.

     The Court has identified certain aspects of the FDNY's past practices that "have had an
undeniable adverse impact on black and Hispanic candidates, excluding them from positions as
entry-level firefighters, and closing the doors of opportunity for public service to large segments
of the City's population." *United States v. City of N.Y.,* 637 F. Supp. 2d 77, 132 (E.D.N.Y. July
22, 2009).  The Court noted that these and other factors led in the past to under-representation of
blacks and Hispanics in the FDNY.  Eliminating those factors that historically led to such under-
representation in the past, or that might cause it to continue, is thus a core concern of the
Remedial Order.

     Paragraphs 17 and 19 of the Remedial Order specifically provide, respectively, that:

     17.     The City of New York shall not retaliate against or in any way adversely affect
the terms or conditions of employment of any person because he or she has complained
of discrimination against blacks or Hispanics on the basis of their race or national origin
in the selection and hiring of entry-level firefighters, or has participated in the
investigation or litigation of any claim or allegation of such discrimination, or has sought
or obtained relief from the court in this case.

     19.     The City of New York shall, with reasonable diligence, take all steps necessary to
eliminate the vestiges of its pattern and practice of intentional discrimination against
black firefighter candidates, to remove all barriers to the elimination of these vestiges of
intentional discrimination, and to end all policies and practices that have the effect of
perpetrating the effects of the City's past intentional discrimination, as well as the City's
disparate impact discrimination.

     The Remedial Order notes that Paragraphs 17 and 19 are adopted as minimum
protections pending completion of study of City's policies and practices, but should not be
construed as the exclusive means by which the City is expected to carry out its mandates under

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 15

the Remedial Order. *See United States v. City of N.Y.,* 2011 WL 4639832, at *12-13 n.11 (E.D.N.Y. Oct. 5, 2011).

The Monitor considers the significance of the faxes in light of the above.

     1.     *Paragraph 17 of the Remedial Order.*

Policies such as the City's Limited Use Policy and the City's anti-retaliation policy can play an important role in safeguarding employees from harassment, helping employers to comply with anti-discrimination law, and avoiding distraction from the mission of the employer. Indeed, it seems likely that such concerns, together with a legitimate desire to avoid workplace disruption as permitted by governing law, helped prompt the City to adopt the Limited Use Policy and Regulation 25.1.8 in the first instance.

"Like any compliance program however, [employer anti-harassment and anti-discrimination] policies can only be effective if they are enforced. . . ." *Humphreys v. Cablevision Sys. Corp.,* No. CV-10-4737 (SJF) (GRB) 2012 WL 2317337, at *1 (E.D.N.Y. June 14, 2012). In circumstances where existing official policy covers alleged violations of equal opportunity law, a municipal's employer's failure to take action in response to violations of such policy may itself be a basis of liability. *See Tierney v. City of N.Y.,* No. 02 Civ. 2403 (RWS), 2007 WL 895133, at *18 (S.D.N.Y. Mar. 20, 2007) (noting that "complaints of civil rights violations which are followed by no meaningful attempt on the part of the municipality to take steps to foreclose their recurrence," give rise in turn to an inference that such failure is intentional, on the basis of the "fail[ure] to enforce its stated official policy") (citing, *inter alia, Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 122-23 (2d Cir. 1991). Employers must conduct meaningful investigations into claims of discrimination, or of violation of policies intended to prevent discrimination. *See, e.g., Valenti v. Massapequa Union Free Sch. Dist.,* 09-CV-977(JFB) (MLO), 2010 WL 475203, at *5 (E.D.N.Y. Feb. 5, 2010) (allegations of failure to investigate discrimination claim or take disciplinary action against fellow employee subsequent to plaintiff's instigation of lawsuit sufficed to state claim under Title VII and State Human Rights Law) (citing *Flynn v. N.Y. State Div. of Parole,* 620 F. Supp.2d 463, 498 (S.D.N.Y. 2009) (allegations of failure to investigate discriminatory conduct and failure to enforce policies prohibiting discrimination, as well as tolerance of discriminatory workplace culture, were sufficient to establish issue for trial)).

In addition to a municipality's obligations to investigate potential violations and enforce existing policies, the City must refrain from retaliation. The purpose of the anti-retaliation statutes is broad and is intended to capture a wide variety of conduct. *See Robinson v. Shell Oil Co.,* 519 US 337, 346 (1997) (discussing policy of broad interpretation and noting that a "primary purpose" of anti-retaliation statutes is "maintaining unfettered access to statutory

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 16

remedial mechanisms."); *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.,* 555 U.S. 271, 279 (2009) ("The anti-retaliation provision is meant to prevent harm to employees who report discriminatory employment practices or assist in the investigation of these practices.").

In light of this broad construction, prohibited employer retaliation has been recognized to encompass not only punitive conduct by the employer itself, but also tolerance of harassment by fellow employees, which is known to the employer but not stopped. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 446 (2d Cir. 1999) ("Just as an employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action . . . , so too will an employer be held accountable for allowing retaliatory co-worker harassment to occur if it knows about that harassment but fails to act to stop it") (reversed in other part) (citing *Knox v. Indiana,* 93 F.3d 1327, 1335 (7th Cir. 1996) (finding issue for jury as to whether employer retaliated by "sitting on its hands in the face of the campaign of co-worker harassment")).

In its correspondence with the Monitor and the parties, the City has contested the applicability of Paragraph 17 of the Remedial Order to this issue, for two primary reasons: (i) according to the City, the Vulcan Society "has not pointed to any adverse employment action" that occurred because of the faxes, nor do the faxes create a "severe and pervasive" hostile work environment (one of which the City contends must be established for retaliation to exist); and (ii) the City asserts that the Vulcan Society's history of successful litigation despite past opposition by Merit Matters precludes a finding of retaliation. January 31, 2012 City Letter (App. A at 30-31). These points do not overcome the Monitor's concerns regarding the import of the faxes with respect to Paragraph 17 of the Remedial Order.

With respect to the City's first point, for purposes of the retaliation provisions of Title VII, "materially adverse" employment action is defined as conduct (including conduct by co-workers as discussed above) that is "likely to dissuade 'a reasonable worker from making or supporting a charge of discrimination,'" but does not extend to "petty slights and minor annoyances." *Williams v. City of N.Y.,* 11 CIV. 9679 CM, 2012 WL 3245448, at *10 (S.D.N.Y. Aug. 8, 2012) (quoting *Burlington Northern & Santa Fe Railway v. White,* 548 U.S. 53, 68 (2006)). Concerning hostile work environment, the Supreme Court has also explained in regards to workplace conduct that:

> The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 17

> captured by a simple recitation of the words used or the physical acts performed.
> Common sense, and an appropriate sensitivity to social context, will enable courts
> and juries to distinguish between simple teasing or roughhousing among members
> of the same sex, and conduct which a reasonable person in the plaintiff's position
> would find severely hostile or abusive.

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81-82 (1998) (holding that Title VII covers
same sex harassment).

As summarized above, the faxes disparage the Vulcan Society, particularly with respect
to actions taken by them and others to protest and obtain relief from discrimination. These
communications were transmitted on FDNY equipment, and apparently continue to be posted on
FDNY bulletin boards from time to time in violation of Department policy. The transmissions
apparently continued after the Vulcan Society raised the issue with the City and Monitor, and
after the issuance of Departmental Order 6 in January 2012.

Viewed in the full "constellation of surrounding circumstances," *Oncale* at 82, the use of
the FDNY's fax machines to transmit the faxes appears to rise above the level of non-actionable
petty slight or teasing, and to be conduct that could be construed by a reasonable person as
workplace harm.   For example, in *Bernstein v. Board of Educ.*, No. 98-3910, 1999 WL 594920,
at *4 (7th Cir. Aug. 6, 1999), the Seventh Circuit held that it was not necessary for a plaintiff
whose complaint alleged that her employer failed to investigate the sending of hostile letters by a
co-worker to point to any additional adverse action by the employer, holding it to be "implicit"
that the plaintiff's "employment conditions were adversely affected as she was forced to work in
an environment where an unknown coworker or coworkers so intensely hated her that the
perpetrator(s) prepared a vicious letter, complete with threats and swastikas, and mailed it to her
home." Further, the Monitor notes that the faxes *expressly* seek to dissuade firefighters from
seeking relief in the form of back pay, and so could on their face meet the standard of material
adverse action (if tolerated by the City).

Thus, in the Monitor's view, the conduct complained of by the Plaintiff-Intervenors and
Department of Justice is problematic under Paragraph 17 of the Remedial Order.

2.    *Paragraph 19 of the Remedial Order*

In its Findings of Fact in this case, the Court noted the adverse impact of the post-
examination selection process on black and Hispanic candidates.  The Court cited an internal
FDNY memorandum regarding the investigation phase of the post-examination screening
process, which remarked that "many candidates will take and pass the firefighter written and
physical exams only to drop out of the investigation." Docket #741 at 10. The Court also

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 18

identified instances of different treatment of blacks and Hispanics in the candidate review process.

Continued circulation of the faxes on FDNY equipment appears inconsistent with the goal of eliminating the historic under-representation of black and Hispanic members of the FDNY, and the related goal of preventing black and Hispanic firefighter candidates from dropping out of the candidate process, or being treated unfairly in that process. The faxes at issue appear designed to incite hostility toward firefighter candidates, in that they allege "widespread cheating" to the benefit of minority applicants (August 16, 2011 fax, (App. A at 4-5), express concerns that "entry tests were geared toward 'factors which would enable minority and women applicants to compete for and enhance their changes of being considered for positions as firefighters,'" (February 27, 2012 fax, (App. A at 76-77), and assert that the revised examination process enabled the hiring of candidates "who will not be able to perform the duties required – both physical and mental" (June 11, 2012 fax, (App. A at 106). The making of such negative statements about minority firefighter candidates on FDNY equipment and bulletin boards – particularly if interpreted, incorrectly, as statements of FDNY policy – may pose a barrier to the elimination of the effects of disparate impact. Such messages, when conveyed through channels that are also used to transmit official communications, may impede the employment, promotion and integration prospects of black and Hispanic firefighters by encouraging co-workers to greet the arrival of incoming hires or to treat existing minority firefighters with hostility. Such hostility may, in turn, increase the attrition that is cited in the Court's decision as having contributed to a lack of diversity in the FDNY in the past.

Accordingly, the Monitor concludes that transmission of the faxes on FDNY equipment (and, to the extent such conduct continues, posting on FDNY bulletin boards) is problematic under Paragraph 19 of the Remedial Order.

    B.    <u>Monitor's Recommendation Regarding Limited Use Policy and Reasonable Restrictions</u>

In light of the above, the Monitor believes that the reasonable restrictions contained in the Regulations are not sufficient to comply with the Remedial Order. The Regulations note that personal use is a privilege, not a right. The Regulations further advise that the FDNY can impose restrictions on use of Department resources.

Accordingly, the Monitor recommends that the Court direct the City to adopt further restrictions, on personal use of FDNY equipment, including fax machines, as proposed by the DOJ and the Vulcan Society. These restrictions are as follows:

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 19

- Require, for all faxes, the use of fax cover sheets stating the sender and the recipient of fax transmissions.[10]

- Require that outgoing faxes be logged by sender using a log book or similar device.

- Require, for all faxes, use of fax headers indicating the machine from which a fax was transmitted.

- Specify that the definition of "unauthorized mass mailings" under Section 3.2.4 of the Limited Use Policy includes unauthorized phone tree-type faxes, and make clear that personal use does not include circulation of the same fax to multiple firehouses, either directly or indirectly, by using a phone tree or calling chain.

- Specify that fire officer personnel of all ranks will be held strictly responsible for ensuring full compliance with the Limited Use Policy by those under their supervision.

- Specify that all employees are to report inappropriate use of the fax machines to their supervisors, the FDNY's EEO office and/or Assistant Commissioner Maldonado. Copies of all such reports shall be maintained by the FDNY's EEO office.

As noted, the Monitor defers to the FDNY's day-to-day management of matters. However, the Monitor notes that if the restrictions recommended above are adopted by the Court and prove inadequate to remedy the issues set out herein, then additional measures may be required. Ultimately, if the conduct described above continues, the City may be required to implement a ban on personal use of City fax machines.

Based on recent communications between City counsel and counsel for Plaintiff and Plaintiff-Intervenors, the City is currently investigating a fax reported on August 15, 2012, and the five instances of faxing reported by the Vulcan Society on August 28, 2012.

---

[10] The City objects to this mechanism as "micromanaging" and unworkable, given the number of fax machines and the absence of any personnel stationed to enforce compliance. The City did not propose any alternative mechanism, however, to determine whether the provisions of its Limited Use Policy are being violated as has been alleged, and to what degree. Given the importance of a record, as discussed in other sections of this Recommendation, it appears that some method must be implemented to determine whether violations are occurring.

COHEN & GRESSER LLP

The Monitor recommends that, either as part of the ongoing investigation, or in addition to it (to the extent the City is not already doing so): (i) the FDNY be directed to investigate whether there has been any violation of the City's Limited Use Policy and Departmental Order 6; and (ii) whether, independent of other City policies, there has been a violation of the City's EEO policies (including the anti-retaliation policy).

The Monitor further recommends that as part of these investigations the FDNY be directed to interview (if it has not already done so) the persons whom the Vulcan Society has offered to make available concerning the August 28, 2012 faxes, as well as other past instances of similar conduct of which they may be aware. The Monitor recommends that the City's investigation not be limited to whether any particular individual sent the faxes, or how many faxes were sent from a particular firehouse, but should focus on ascertaining the total pattern of conduct and any impact such conduct may have had on firehouse harmony and the plaintiffs in, or beneficiaries of, this litigation. [11] The City also may wish to interview other firefighters to confirm whether – as the City has postulated – the faxes are isolated occurrences, or, conversely, whether the Vulcan Society is correct in its belief that the faxes occur with some regularity, including at times and places when the Vulcan Society is not present and therefore is unable to call specific instances to the City's attention.

The Monitor further recommends that the City be directed to review its procedures for investigating EEO complaints related to the Limited Use Policy. Among other things, the City may wish to consider whether such investigations should include the additional steps proposed by the Department of Justice and the Vulcan Society. The Monitor further recommends that the City be directed to include its EEO office (again, to the extent it has not done so already) in evaluating the fax issue and the EEO claims made by the Vulcan Society and the Department of Justice (including possible impact under Title VII and the Remedial Order). The Monitor notes that the resources available to assist the City with these investigations  include its independent EEO and recruitment consultants. *See* Remedial Order Paragraphs 47-48 (EEO consultant's final report is to recommend wide variety of improvements, including "specific actions for the EEO Office, and any other relevant agency of the City of New York, to take to deter and prevent acts of retaliation or discrimination against any current and future City of New York employees because of their involvement with this litigation;" and recommend steps to "eliminate barriers to the EEO Office's ability to ensure the FDNY's compliance with applicable laws and regulations").

The Monitor recommends that the FDNY be directed to report back to the Monitor in a reasonable period, but no more than 60 days, regarding its investigation of the August 15 and

---

[11] To the extent the City asserts that additional factual information is required to make a finding regarding the existence of prohibited retaliation, the Monitor recommends that the City be directed to investigate such facts.

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 21

August 28 faxes under the City's Limited Use and EEO policies.  The Monitor does not recommend waiting for a report on these issues until the FDNY's EEO consultant issues his report on March 31, 2013.

There does not appear to be any current dispute that has been brought to the Monitor's attention among the parties regarding the adequacy or scope of the City's Departmental Order 6, adopted January 25, 2012, which restricts the use of firehouse bulletin boards.  It is also undisputed that, notwithstanding the order, at least one of the faxes discussed above was posted in a firehouse subsequent to its adoption.  The Monitor recommends that going forward D.O. 6 be fully enforced and appropriate disciplinary measures be taken in the event of any future violations of D.O.6.

The Monitor believes that the restrictions proposed above are consistent with the current Regulations and do not conflict with any existing Department regulation, and that they are consistent with First Amendment case law.  *See, e.g., Garcetti v. Ceballos,* 547 U.S. 410, 416-17 (2006); *United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 492 (1995) ("[W]e consistently have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved was on a matter of public concern").

IV.     Corrective Communications

A.      The Vulcan Society's Request

The Vulcan Society has requested, as has the Department of Justice, that corrective communications be considered in connection with the use of fax machines.  *E.g.,* February 1, 2012 Vulcan Society Letter (App. A at 59) ("The parties and the Monitor should also consider whether a responsive communication is needed to answer the provocative and defamatory statements made by Merit Matters thus far.").  The Vulcan Society's concern is "the likely perception of many firefighters that Chief Mannix, as an authoritative presence in the FDNY, has the tacit support of the Department," especially where "the Merit Matters documents include a logo that appears to represent an official FDNY organization, and where Merit Matters sends invitations to its meetings via fax blast (March 22, 2012 fax), as only authorized organizations are permitted to do."  April 25, 2012 Vulcan Society Letter (App. A at 71).  For these reasons, the Vulcan Society has requested that the FDNY:

[M]ake clear, through an affirmative communication to employees, that the views of Chief Mannix are not shared by the FDNY.  In particular, it is important for the leadership of the Department to explain that, far from being willing to select candidates who lack merit, the FDNY has worked to develop a firefighter test that will select candidates who possess an even *greater* degree of job-related ability than was

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 22

      measured on prior exams. The FDNY should explain that the goals of diversity and excellence are not at odds but rather go hand in hand, because people with the greatest degree of ability can be found among candidates of all races.

*Id.*

      In his previous reports to the Court, the Monitor noted the importance of "tone at the top." *E.g.,* Monitor's Second Report at 16-17 ("The Monitor continues to study the potential need for an increase in positive communication by senior leadership of the FDNY about efforts to increase diversity in the FDNY. . . . Communication by the FDNY and City, particularly at the senior level, can play an important role in accomplishing this goal . . . .)."

      The Monitor's research on baseline practices at other municipal organizations continues to confirm the critical importance of tone at the top.  The Monitor believes that the significance of potentially divisive issues, such as the use of fax machines, will be greatly diminished in the face of positive tone from the top of the FDNY.

      In this regard, the Monitor believes that recent statements by the FDNY regarding the anti-retaliation provisions and the test are important and positive.  Specifically, during the week of June 11, 2012, the City advised employees that as stated in the City's EEO materials:

      The Department will not tolerate retaliation in any form, including but not limited to verbal or physical threats, reprimands, negative evaluations, harassment, transfers, hazing, tampering with gear, equipment or personal effects, denying reasonable requests to visit the EEO Office, or any other adverse employment action that may have the effect of discouraging individuals from availing themselves of the EEO process.  (App. A at 71).

      On June 28, 2012, the City issued a Departmental Order with a message from FDNY Commissioner Salvatore J. Cassano, explaining that any test that is approved for use by the FDNY will have been found to be job related.  The Departmental Order stated that although the City has appealed the finding of intentional discrimination and the monitorship, "[i]n the meantime, we have done a great deal of work to improve diversity and ensure equal opportunity for all applicants and members,"

      [a]nd while there are many different viewpoints on the litigation and the multiple issues it presents, I want to emphasize that behavior that disrupts or is likely to disrupt FDNY operations will not be tolerated.  Nor will we condone any act of retaliation against anyone who is party to or part of the DOJ/Vulcans case, or who interacts with our EEO office. We recently reinforced the importance of strictly

COHEN & GRESSER LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 23

complying with Department rules and regulations pertaining to wearing only Department-issued clothing in the firehouse, and prohibiting the posting of anything other than Department-issued material on firehouse bulletin boards and walls. We will strictly enforce all of these rules and anyone who violates them will be subject to Departmental discipline. (App. A at 125-26).

The Commissioner reminded firefighters that it is "the responsibility of every member of the Department to observe the highest standards of conduct that will build and maintain our strong team ethic, and not disrupt or compromise the fulfillment of the FDNY's critical public safety mission," and that the FDNY "will become stronger as a result" of working to increase diversity. *Id.*

On July 9, 2012, the City sent an e-mail to test takers from Commissioner Cassano, which stated that it was intended as an update on hiring "as well as the status of the litigation involving the prior firefighter exams."  The email advises of the Commissioner's happiness at the overall number of recent test takers and the diversity of the group, states the FDNY's desire to "make sure that all communities know that being an FDNY firefighter is a great job," emphasizes the priority of diversity in FDNY Strategic Plans since 2004, and affirms the Commissioner's belief that "the planning, development and administration of the recently given firefighter exam was done appropriately" (and with significant input from current firefighters and fire officers), including the view that "I have every reason to believe that this test appropriately assesses candidates for appointment to firefighter."  The Commissioner advised that "I will be sending updates like this regularly in the months to come."  (App. A at 123-24).

These communications were important steps.  The Monitor recommends that the Commissioner keep up the promised regular updates on the status of the test and litigation, and continue to demonstrate to prospective – and current – firefighters the Department's commitment to and belief in the value of a diverse FDNY.

V.      Potential Discipline of Individuals

The Vulcan Society has requested that appropriate discipline be imposed on individuals who violate City regulations.  *See* February 1, 2012 Vulcan Society Letter (App. A at 59) ("If the results of the City's investigation indicate that firefighters have knowingly violated Department regulations, or do so in the future, appropriate discipline should follow.").

**COHEN & GRESSER** LLP

Hon. Nicholas G. Garaufis
September 14, 2012
Page 24

The Monitor notes that if the recommendations set forth herein are adopted by the Court, then any future violations of the revised Limited Use Policy or the City's EEO Policy should be investigated fully, and depending on the circumstances, such investigations may lead to discipline of individual firefighters and/or supervisors.

Respectfully submitted,

_____/s/_____

Mark S. Cohen

cc:   All Counsel