UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

UNITED STATES OF AMERICA,

               Plaintiff,

       -and-

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief;*

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated;* and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated,*

               Plaintiff-Intervenors,

      -against-

THE CITY OF NEW YORK,

               Defendant.

-----------------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ SEP 1 8 2012 ★

BROOKLYN OFFICE

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

    Today the court discusses how compensatory damages for noneconomic harm are to be awarded to black victims of the City of New York's discriminatory entry-level firefighter exams. Although the court held a bench trial in August 2011 to determine the noneconomic benefits of the job of New York City firefighter, it now concludes that those benefits are not relevant to the compensatory damages owed to claimants, and thus declines to make findings of fact based on the bench trial. Instead, a claimant may be granted compensatory damages only if he or she

1

makes an entirely individualized showing of one or more of certain limited categories of damages that have been recognized and defined in the common law of tort, which the court describes below. The court also denies the City's request that it revisit its certification of the non-hire victim and delayed-hire victim subclasses.

## I.    BACKGROUND

The court assumes the reader's familiarity with the background of this case, and will review only certain portions of the procedural history here.

On January 13, 2010, this court held the City liable for engaging in a pattern or practice of intentional discrimination against black applicants for the job of firefighter, in violation of Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"); 42 U.S.C. § 1981; the Equal Protection Clause of the Fourteenth Amendment; New York Executive Law § 296(1)(1) ("NYSHRL"); and New York City Administrative Code § 8-107(1)(a) ("NYCHRL"). (Disparate Treatment Liability Op. (Docket Entry # 385).) The parties then entered into the remedial phase of this litigation.

The court had previously certified, for the liability phase only, a mandatory class of black firefighter applicants who had allegedly been harmed by the City's hiring practices. (Docket Entry # 281.) After the court held the City liable, Plaintiff-Intervenors sought certification of a class of black victims for the purposes of awarding them compensatory damages for noneconomic harm. (Docket Entry # 401.) They also filed a motion for summary judgment as to the aggregate amount of those damages. (Docket Entry # 577.)

On June 6, 2011, the court certified a single subclass of black victims (the "noneconomic loss subclass"), pursuant to Federal Rule of Civil Procedure 23(b)(3), with respect to two issues common to their claims for compensatory damages for noneconomic harm. (See First Remedial

Cert. Order (Docket Entry # 640) at 33.) The court noted that it would address in a separate opinion Plaintiff-Intervenors' motion for summary judgment, and that, to the extent that there were any disputed genuine issues of material fact regarding compensatory damages, the court would hold a bench trial on those issues in August 2011. (Id. at 31 n.16, 48.)

Soon after that decision, the Supreme Court decided Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). On July 8, 2011, the court issued an opinion addressing the effect of Wal-Mart on its class certification decision. (Second Remedial Cert. Order (Docket Entry # 665).) Although the court denied the City's motion to decertify the liability-phase class, it granted the City's motion to decertify the noneconomic loss subclass in light of Wal-Mart. (Id. at 19, 21, 58.) The court found that "the fact and extent of claimants' noneconomic losses," unlike the calculation of backpay, were "not susceptible to classwide proof" (id. at 34); rather, these issues required individualized assessments of "how significant the intangible benefits of the job [of firefighter] were to [a] particular claimant," and "whether the claimant obtained other intangible benefits from interim employment that tend[ed] to diminish the magnitude of the intangible benefits lost because of discrimination" (id. at 26, 28). As a consequence of this finding, the court denied Plaintiff-Intervenors' motion for summary judgment as to the aggregate amount of classwide compensatory damages. (Id. at 35.) However, the court certified two subclasses of non-hire victims and delayed-hire victims as to certain common remedial phase issues under Rule 23(b)(3). (Id. at 58.) It found that a number of remedial issues could be resolved on a classwide basis, including aggregate backpay, retroactive seniority, priority hiring relief, and, with respect to compensatory damages for noneconomic losses, the characteristics of a New York City firefighter's job that may have resulted in intangible benefits to particular claimants. (Id. at 43-44.) The court concluded that these common questions predominated over

3

individualized questions, and that a class action was superior to other methods for fairly and efficiently adjudicating Plaintiff-Intervenors' claims. (Id. at 42-51.) The court further noted that, "[a]fter class proceedings resolve[d] common questions of fact relating to the characteristics of a firefighter's job, the individual claims process would be concerned primarily with establishing those facts unique to each individual claimant's claims for loss of enjoyment of life." (Id. at 46.)

In August 2011, the court held a bench trial to determine the noneconomic benefits of the job of New York City firefighter. On June 29, 2012, the parties submitted Proposed Findings of Fact and Conclusions of Law ("FOF") based on the bench trial regarding the compensatory damages owed to claimants for their noneconomic harm. (City FOF (Docket Entry # 910); Int. FOF (Docket Entry # 911).) Plaintiff-Intervenors asserted that the noneconomic benefits of the job of firefighter include: (1) flexibility and control over work schedules, which permit firefighters significant time for other activities like spending time with their families, holding second jobs, and pursuing further education (Int. FOF ¶¶ 2-12); (2) economic security (id. ¶¶ 13-22); (3) respect from the community and a sense of pride (id. ¶¶ 23-27); (4) pleasure in the job itself and a sense of fulfillment in overcoming challenges to help others (id. ¶¶ 28-31); (5) valued camaraderie in the firehouse community (id. ¶¶ 32-34); and (6) overall job satisfaction (id. ¶¶ 46-48). Plaintiff-Intervenors requested that the court direct the Special Masters assigned to hold hearings for individual claimants to compare the particular attributes of the firefighter job with the positive and negative aspects of the positions held by particular claimants to determine the value of the qualitative differences (if any) between the actual life experiences of victims and the benefits they would have obtained from the firefighter position. (Id. at 17.) The City's FOF discussed, among other things, the risks, unpredictability, and emotional toll inherent in the

firefighter job (City FOF ¶¶ 15-79), and argued that claimants are not entitled to compensatory damages unless they can "establish that one or more of their senses were impaired or that they c[ould] no longer engage in particular activities as a result of" the City's discrimination (id. ¶ 85), or "that the lost opportunity to become a NYC firefighter caused emotional distress for [them] personally" (id. ¶ 86).

On July 25, 2012, the court issued an Order stating that the parties' FOF "d[id] not sufficiently address whether the court has the authority under federal and New York law to award the forms of compensatory damages discussed by Plaintiff-Intervenors," and directed the parties to submit supplemental briefing on these issues. (Supp. Briefing Order (Docket Entry # 932) at 1-2.) Plaintiff-Intervenors submitted their supplemental brief on August 8, 2012, arguing that claimants are entitled to "plenary" compensatory damages "for any and all proven adverse consequence of racial discrimination." (Int. Supp. Mem. (Docket Entry # 938) at 2-3.) The City filed a response on August 22, 2012, arguing that Plaintiff-Intervenors should be entitled to seek only damages for loss of enjoyment life and for pain and suffering, and that these categories of damages are strictly circumscribed. (See City Supp. Mem. (Docket Entry # 954) at 1, 13.) The City further argued that the court should revisit its Rule 23(b)(3) certification of the non-hire and delayed-hire subclasses "in light of Plaintiff-Intervenors' current effort to recover plenary compensatory damages." (Id. at 12.)

## II.    COMPENSATORY DAMAGES FOR NONECONOMIC HARM

Plaintiff-Intervenors argue that they are entitled to the full range of compensatory damages they seek under three provisions federal law—Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983—and two provisions of state law—the NYSHRL and the NYCHRL. (Int. Supp. Mem. at 1.) The court does not agree with Plaintiff-Intervenors that these provisions authorize

damages for any conceivable noneconomic harm that might be considered appropriate to make the victims of the City's discrimination whole. Instead, for the reasons that follow, federal and New York law permit the court to award damages only in specific categories that have been recognized and defined in the common law of tort, such as emotional distress, loss of enjoyment of life, inconvenience, and lost future earning capacity; the noneconomic benefits of the job of firefighter are not relevant to those categories.[1]

The court will begin by discussing generally the kinds of damages authorized by the federal (Part II.A) and state (Part II.B) statutes at issue. The court will then discuss more specifically how claimants may attempt to establish the forms of damages authorized by the federal and state statutes (Part II.C).

### A. Federal Law

#### 1. Title VII

Before 1991, "a plaintiff seeking a monetary award for disparate treatment . . . under Title VII could recover only back pay and front pay," not compensatory damages. Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 157 (2d Cir. 2001), overruled in part on other grounds by Wal-Mart v. Dukes, 131 S. Ct. 2541 (2011). The Civil Rights Act of 1991 (the "1991 Act") amended Title VII to authorize "compensatory and punitive damages in disparate treatment disputes." Id. at 158; see also Williams v. Pharmacia Opthalmics, Inc., 926 F. Supp. 791, 794 (N.D. Ind. 1996) ("Williams I") ("The availability of compensatory damages apart from

---

[1]    Plaintiff-Intervenors argue that, "[b]ecause claimants have not yet had the opportunity to proffer evidence of the variety of noneconomic harms they may have suffered, it is premature to place any limitations on the types of harms they may assert." (Int. Supp. Mem. at 18-19.) The court disagrees. Although "the variety of noneconomic harms [claimants] may have suffered" is an evidentiary question, whether those harms are properly *compensable* is a question of law. The court may not be able to anticipate every single kind of harm that victims will claim to have suffered, but it sees no problem with setting the legal contours of the kinds of harms that are compensable. To the contrary, it would be inefficient and unnecessarily costly to the City to permit claimants to proffer evidence of noneconomic harms that are not legally compensable.

back and front pay demonstrates Congressional recognition that discriminatory employment practices inflict injuries beyond mere loss of a paycheck or reduction in wages and benefits, and Congressional intent that victims of employment discrimination should be compensated for those non-pecuniary injuries.").

Specifically, the 1991 Act provides that Title VII plaintiffs who have been subjected to "unlawful intentional discrimination . . . may recover compensatory and punitive damages as allowed in subsection (b) of this section," so long as they "cannot recover under section 1981." 42 U.S.C. § 1981a(a)(1). Subsection (b) then provides that "[t]he sum of the amount of compensatory damages awarded under this section for future pecuniary losses, *emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses*, and the amount of punitive damages awarded under this section, shall not exceed for each complaining party" certain specified amounts that depend on the size of the employer. 42 U.S.C. § 1981a(b)(3) (emphasis added).

As the court has repeatedly emphasized in this litigation, "the purpose of Title VII is to make persons whole for injuries suffered on account of unlawful employment discrimination," and to place such persons, "as near as may be, in the situation [they] would have occupied if the wrong had not been committed." Albermarle Paper Co. v. Moody, 422 U.S. 405, 417-19 (1975). But where (as here) Congress sees fit to enumerate a specific list of terms in a statute, a court must attempt to give meaningful effect to those terms. See Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 633 (1973) ("[A]ll parts of a statute, if at all possible, are to be given effect."). It is therefore unsurprising that the Second Circuit has held that Title VII plaintiffs "who seek compensatory damages in addition to individualized equitable relief *must* [ ] prove that the discrimination caused them 'emotional pain, suffering, inconvenience, mental

anguish, loss of enjoyment of life, [or] other nonpecuniary losses." Robinson, 267 F.3d at 160 (emphasis added) (quoting 42 U.S.C. § 1981a(b)(3)). In other words, a grant of compensatory damages under § 1981a *must* be tailored to the terms listed in the statute.

The specific terms listed in § 1981a related to nonpecuniary losses—emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life—are each associated with categories of damages that have been recognized and defined in the common law of tort. See, e.g., Miller v. Love's Travel Stops & Country Stores, Inc., No. 06-CV-1008 (D), 2008 WL 2025065, at *1 (W.D. Okla. May 6, 2008) ("Oklahoma law permits the recovery in tort of damages for mental anguish and emotional distress . . . ."); Hare v. H & R Indus., Inc., No. 00-CV-4533, 2002 WL 777956, at *1 (E.D. Pa. Apr. 29, 2002) (both tort law and Title VII entitle plaintiff to "compensatory damages for pain and suffering"); Mayer v. Belton Corp., No. 86-CV-5871, 1989 WL 98003, at *3 (E.D. Pa. Aug. 17, 1989) ("Under Section 929 of the Restatement of Torts (Second), plaintiffs are entitled to recover damages for the inconvenience and discomfort caused by their inability to live in their home for approximately four and one-half months."); McDougald v. Garber, 73 N.Y.2d 246, 254 (1989) (damages for loss of enjoyment of life recoverable in personal injury action).

These specific terms should be interpreted in accordance with their common law definitions for several reasons. First, it is a "settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definitions of statutory terms." Whitfield v. United States, 543 U.S. 209, 213 (2005); see also In re Halpin, 566 F.3d 286, 292 (2d Cir. 2009) ("[A]s a general rule, undefined statutory terms should be construed in accordance with their common-law meaning."). Moreover, Title VII's legislative history suggests that the statute was intended to provide "tort-like damages." 137 Cong. Rec. S15,348,

8

S15,383 (Oct. 29, 1991) (statement of Sen. Jeffords); see also 137 Cong. Rec. H1666 (Mar. 12, 1991) (statement of Rep. Michel) (characterizing the new provision for compensatory damages as a "tort-style approach" to employment law). Courts have also noted that "compensatory damages [under § 1981a] are limited by 'tort-like principles.'" Pappas v. Watson Wyatt & Co., No. 04-CV-304 (EBB), 2007 WL 4178507, at *4 (D. Conn. Nov. 20, 2007) (collecting cases); cf. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1191 (2011) ("[W]hen Congress creates a federal tort it adopts the background of general tort law.").

Recognition that § 1981a's specific terms should be given their common law meanings assists the court in interpreting § 1981a's catchall term "other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Under the well-known canon of construction of "*ejusdem generis*," when Congress lists specific terms followed by a general term, a court interprets the general term "to embrace only objects of the same kind or class as the specific ones." United States v. Amato, 540 F.3d 153, 161 (2d Cir. 2008). As Plaintiff-Intervenors point out (see Int. Supp. Mem. at 18), this principle must not be applied "woodenly." Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 227 (2008). For example, it does not apply where there is no ambiguity as to the expansive (or unlimited) nature of the general phrase, such as when the term "any" precedes the general phrase. See, e.g., id. at 218-19 (refusing to apply the rule of *ejusdem generis* to the term "*any* other law enforcement officer" in part because "Congress' use of 'any' to modify 'other law enforcement officer' [wa]s most naturally read to mean law enforcement officers of whatever kind"); Harrison v. PPG Indus., Inc., 446 U.S. 578, 588-89 (1980) (refusing to apply the canon to limit the phrase "*any* other final action" because there was "no uncertainty in the meaning of the phrase"). Nor does the doctrine apply "when the specific terms preceding the general one do not

themselves have a common attribute from which a 'kind or class' may be defined." Amato, 540 F.3d at 160.

Here, however, the *ejusdem generis* canon is fully applicable. The court does not find a total lack of uncertainty in the meaning of "other nonpecuniary losses" because the term contains no particular indicia of expansiveness, such as the addition of the word "any" in the statutes in Ali and Harrison. And the specific terms listed in § 1981a do indeed "have a common attribute from which a 'kind or class' may be defined." Id. As discussed above, these categories are associated with previously recognized common law tort damages. Section 1981a's catchall category should thus be interpreted along those lines as well. See Amato, 540 F.3d at 161.

Certain non-enumerated forms of damages authorized by § 1981a's catchall category have already been identified by federal courts and by the Equal Employment Opportunity Commission ("EEOC"), such as injury to professional standing, injury to character and reputation, lost future earning capacity, and injury to credit standing. See, e.g., Migis v. Pearle Vision, Inc., 135 F.3d 1041, 1053 (citing EEOC, Compensatory and Punitive Damages Available Under Section 102 of the Civil Rights Act of 1991, EEOC Notice No. 915.002 § II(A)(2) (July 14, 1992) ("EEOC Guidance")); Williams v. Pharmacia, Inc., 137 F.3d 944, 952 (7th Cir. 1998) ("Williams II"). These kinds of damages are properly swept within § 1981a's catchall category because, like the enumerated categories, they are associated with recognized forms of common law tort damages. See, e.g., Williams II, 137 F.3d at 952 ("An award of lost future earnings is a common-law tort remedy."); Robinson v. C.I.R., 70 F.3d 34, 36 (5th Cir. 1995) (damages for "injury to credit reputation" were "damages for tort-like personal injuries"); Varela v. Another Way, No. 06-CV-796 (PCT) (SMM), 2006 WL 2091711, at *2 (D. Ariz. July 21, 2006) ("An action for damages to reputation 'lies . . . in the tort of defamation.'" (quoting Fleming v. Dep't

of Pub. Safety, 837 F.2d 401, 409 (9th Cir. 1988))); Wagner v. U.S. Dep't of Housing and Urban Dev., 835 F. Supp. 953, 958 (E.D. Ky. 1993) (noting that "alleged damages for injury to professional reputation . . . sound[ed] in tort"). As will be discussed in Part II.C, however, the same cannot be said of most of the forms of damages that Plaintiff-Intervenors seek in their FOF.[2]

### 2. Sections 1983 and 1981

As discussed above, the court has held the City liable under §§ 1983 and 1981 as well as Title VII.[3] (See Disparate Treatment Liability Op. at 40-61.) Although the texts of these statutes do not address damages specifically, the Supreme Court has held that both permit compensatory damages for noneconomic harm. See Carey v. Piphus, 435 U.S. 247, 255-56 (1978) (§ 1983); Johnson v. Ry. Express Agency, 421 U.S. 454, 459-60 (1975) (§ 1981). Thus, the question is whether those provisions permit the same, broader, or more limited damages than § 1981a. The court concludes that these statutes authorize the same basic forms of damages as § 1981a, namely those that have been previously recognized and awarded in the common law of tort.

---

[2]     Plaintiff-Intervenors quote the EEOC Guidance for the proposition that "'[o]ther nonpecuniary losses could include injury to professional standing, injury to character and reputation, injury to credit standing, loss of health, and *any other* nonpecuniary losses that are incurred as a result of the discriminatory conduct.'" (Int. Supp. Mem. at 17 (emphasis added by Plaintiff-Intervenors) (quoting EEOC Guidance § II(A)(2)).) Plaintiff-Intervenors appear to be suggesting that the EEOC's use of the word "any" implies that it interprets § 1981a to authorize any conceivable compensatory damages that can be determined to result from discriminatory conduct. And indeed, if § 1981a itself had used the word "any," the court might agree. Cf. Ali, 552 U.S. at 218-19; Harrison, 446 U.S. at 588-89. But the Supreme Court has held that the EEOC's interpretive guidelines do not receive deference pursuant to Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 111 n.6 (2002). The EEOC's "interpretations are 'entitled to respect,' . . . but only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris Cty., 529 U.S. 576, 587 (2000) (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). The same is true of the EEOC's adjudicatory positions. See Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 643 n.11 (2007), superseded by statute on other grounds as as recognized in Vuong v. N.Y. Life Ins. Co., No. 03-CV-1075 (TPG), 2009 WL 306391, at *8 (S.D.N.Y. Feb. 6, 2009). To the extent that the EEOC interprets Title VII to authorize compensatory damages for all conceivable noneconomic harm, the court finds this interpretation unpersuasive for the reasons discussed above, particularly because the EEOC provided no analysis in support of any such interpretation.

[3]     Section 1983 permits victims of discrimination to recover for violations of the United States Constitution, and § 1981 permits victims to recover for violations of the right "to make and enforce contracts" equally.

The Supreme Court has "repeatedly noted that 42 U.S.C § 1983 creates a species of tort liability" and has held that, "when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305 (1986). The Court has further noted that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also injuries such as 'impairment of reputation, personal humiliation, and mental anguish and suffering.'" Id. at 307 (alteration omitted) (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974)). These are the same kinds of well-known tort damages that are authorized by § 1981a, as discussed above.[4]

The Supreme Court has similarly suggested that antidiscrimination statutes like § 1981 "sound[] basically in tort." United States v. Burke, 504 U.S. 229, 240 (1992); see also Tillman v. Wheaten-Haven Recreation Ass'n, Inc., 517 F.2d 1141, 1143 (4th Cir. 1975) ("An action brought under [§ 1981] is fundamentally for the redress of a tort."); Pappas, 2007 WL 41785007, at *3 ("The effect of the [1991 Act] was to bring Title VII into line with other 'tort-like' civil rights legislation [including § 1981]."). And consistent with this principle, lower courts in § 1981 cases (including cases cited by Plaintiff-Intervenors (see Int. Supp. Mem. at 4-5)) have awarded damages corresponding to recognized common law categories of the kind enumerated in § 1981a. See, e.g., Cowan v. Prudential Ins. Co. of Am., 852 F.2d 688, 690 (2d Cir. 1988) (awarding damages for "severe emotional distress, humiliation, and loss of self-esteem");

---

[4]    As the Second Circuit has noted, "'the common law is not an infallible guide for the development § 1983.'" Townes v. City of N.Y., 176 F.3d 138, 148 (2d Cir. 1999) (quoting Akickes v. S.H. Kress & Co., 398 U.S. 144, 232 (1970) (Brennan, J., concurring in part and dissenting in part)). "In cases where common law and § 1983 principles conflict, 'the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right." Id. (quoting Carey, 435 U.S. at 258). Here, however, the court finds no conflict between common law and § 1983 principles that would justify a departure from the ordinary rule that § 1983 damages are determined according to tort principles. After all, the § 1981a addition to Title VII—the statute specifically designed to provide relief for victims of employment discrimination—contemplates the same kinds of common law damages held to be compensable in Stachura and its predecessors. (See Part II.A, supra.)

Muldrew v. Anheuser-Busch, Inc., 728 F.2d 989, 992 (8th Cir. 1984) (award for "mental anguish and emotional distress" stemming from loss of a job); Tucker v. Red Apple Supermarkets, Inc., No. 88-CV-5592 (LBS), 1989 WL 34056, at *2 (S.D.N.Y. Mar. 31, 1989) ("Damages [under § 1981] may include recovery for emotional harm, degradation and humiliation." ).

Plaintiff-Intervenors agree that, "[i]n adopting the Civil Rights Act of 1991, . . . one of Congress's purposes was to ensure that the *same* range of compensatory damages available to victims of race discrimination under § 1981 was also available to victims of discrimination under Title VII." (Int. Supp. Mem. at 5.) Of course, Plaintiff-Intervenors believe that *both* Title VII and § 1981 permit them to obtain compensatory damages for all conceivable noneconomic harms. (See id. at 4-6.) They point to no case, however, in which a court awarded Title VII, § 1981, or tort damages for harms other than those falling within the recognized categories discussed above, nor is the court aware of any. Instead, their argument appears to be based entirely on a single word of dicta in a Supreme Court opinion discussing § 1981.

In Patterson v. McLean Credit Union, 491 U.S. 164 (1989), a case that preceded the 1991 Act, the Supreme Court held that a claim for racial harassment—in contrast to racial discrimination in the course of making or enforcing a contract—was not actionable under § 1981. Id. at 189; cf. 42 U.S.C. § 1981(a) ("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ."). The Court reasoned that its holding was necessary to "preserve the integrity of Title VII's procedures without sacrificing any significant coverage of the civil rights laws." Id. at 182. The Court then added in a footnote:

> Unnecessary overlap between Title VII and § 1981 would also serve to upset the delicate balance between employee and employer struck by Title VII in other respects. For example, a plaintiff in a Title VII action is limited to a recovery of backpay, whereas under § 1981 a plaintiff may be entitled to *plenary*

13

*compensatory damages*, as well as punitive damages in an appropriate case. Both the employee and the employer will be unlikely to agree to a conciliatory resolution of the dispute under Title VII if the employer can be found liable for much greater amounts under § 1981.

Id. at 182 n.4 (emphasis added). The Court's decision in Patterson has since been superseded by the 1991 Act, which amended the definition of "make and enforce contracts" in § 1981 to include "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Plaintiff-Intervenors latch onto Patterson to argue that, "[e]ven before the passage of the Civil Rights Act of 1991, . . . it was well established that prevailing parties under 42 U.S.C. § 1981 were entitled to 'plenary compensatory damages.'" (Int. Supp. Mem. at 4 (quoting Patterson, 491 U.S. at 182 n.4).) Then, after arguing that the 1991 Act was intended to ensure that Title VII victims could obtain the same range of compensatory damages as § 1981 victims, Plaintiff-Intervenors conclude that the 1991 Act's compensatory damages provision "should be read as incorporating the full range of 'plenary' compensatory damages available under § 1981," i.e., "damages for the broadest range of harms that an employee or applicant subject to discrimination might experience." (Id. at 5-6.)

Once again, the court agrees with Plaintiff-Intervenors' premise that § 1981 and Title VII plaintiffs may obtain similar forms of compensatory damages, but disagrees with their view of the effect of Patterson. Patterson provided no explanation or even an indication of what it meant by "plenary compensatory damages"—it may have meant simply that a § 1981 plaintiff could recover the full range of *tort-like* damages (in contrast to backpay), or that a plaintiff could recover compensatory damages in an unlimited *amount*. And it is unsurprising that the Court did not explain what it meant by "plenary compensatory damages" because it had no reason to address the kinds of damages authorized by § 1981, let alone by § 1981a (which had not yet been

14

enacted). Even if the Supreme Court meant "plenary" in the way that Plaintiff-Intervenors believe it did (which is far from clear), the court declines to read a single word of dicta, without analysis, in a footnote of an opinion, which is no longer good law, as establishing the principle that both § 1981 and § 1981a now authorize all conceivable forms of compensatory damages, including forms unheard of in the common law upon which the statutes were presumed to be modeled. Cf. Heck v. Humphrey, 512 U.S. 477, 482 (1994) (dicta from previous opinion was "an unreliable, if not unintelligible, guide" because that opinion "had no cause to address, and did not carefully consider, the damages question before [the Supreme Court] today"); Jimenez v. Walker, 458 F.3d 130, 143 (2d Cir. 2006) ("Dicta [is] not and cannot be binding." (internal quotation marks omitted)).

In sum, the court concludes that §§ 1981 and 1983 authorize similar forms of damages to Title VII under § 1981a, namely forms that have been previously recognized and awarded in the common law of tort. These categories are discussed in more detail in Part II.C.

### B. New York State and City Law

Both the NYSHRL and the NYCHRL permit awards of compensatory damages to victims of discrimination. See N.Y. Exec. Law § 297(4)(c) (providing for compensatory damages in the administrative process); id. § 297(9) (providing for damages in a judicial proceeding); N.Y. City Admin. Code § 8-120(8) (providing for compensatory damages in the administrative process); N.Y. City Admin Code § 8-502(a) (authorizing damages in a civil action). The New York Court of Appeals has recognized that such damages are authorized by New York law, and has noted that compensation under New York law, unlike under federal law, does not depend on a showing of intent to discriminate. See Cullen v. Nassau Cty. Civ. Serv. Comm'n, 53 N.Y.2d 492, 495-96 (1981); cf. Ocher v. Goldwater Memorial Hosp., 450 F. Supp.

2d 275, 283 (S.D.N.Y. 2006) (observing that federal discrimination law acts as a floor, not as a ceiling, for New York law).

Although case law on the subject is sparse, the court concludes that the NYSHRL and the NYCHRL authorize forms of well-recognized common law tort damages similar to the federal statutes discussed above, such as humiliation and mental anguish, see, e.g., Consol. Edison Co. v. N.Y. State Div. of Human Rights, 77 N.Y.2d 411, 421 (1991) (collecting cases); Cullen, 53 N.Y.2d at 496, inconvenience, see, e.g., Matter of Mukattash v. Human Rights Comm'n of Westchester, 97 A.D.3d 584, 586 (N.Y. App. Div. 2d Dep't 2012), and loss of enjoyment of life, see, e.g., McDougald, 73 N.Y.2d at 254. The court is aware of no case in which a New York court has awarded NYSHRL, NYCHRL, or tort compensatory damages for noneconomic harms other than those falling within the recognized categories. Indeed, the New York Court of Appeals has noted that "[d]amages for nonpecuniary losses . . . stand[] on less certain ground than does an award for pecuniary damages" because they are based on a "legal fiction" that such losses can be compensated monetarily, McDougald, 73 N.Y.2d at 254, and has accordingly strictly circumscribed its definitions of the forms of compensatory damages available to plaintiffs, as discussed in the next section. The NYSHRL and NYCHRL will thus be interpreted similarly to the federal statutes in terms of the kinds of compensatory damages that are available.

## C. How Claimants May Establish Compensatory Damages

With these concepts in mind, the court now discusses more specifically how victims may attempt to establish the forms of compensatory damages authorized by federal and state law.[5]

---

[5] Plaintiff-Intervenors have proposed that claimants establish damages based on "a survey or questionnaire which seeks information about the characteristics of their interim employment (or unemployment) and the actual noneconomic damages they assert," as opposed to taking the deposition of each eligible claimant. (Int. Supp. Mem. at 4 n.1; see also id. at 16 & n.7.) The City disagrees with this suggestion. (See City Supp. Mem. at 9.) The court will not decide the issue at this time. The Special Masters and the parties shall address this issue—in light of the principles set forth in this Memorandum and Order—as part of the briefing scheduled in December 2012 on "Phase IV" of the claims process. (See Order of Sept. 7, 2012.)

As an important preliminary matter, the court disagrees with Plaintiff-Intervenors (see Int. FOF at 17) that claimants may obtain damages based on a valuation of the differences between the noneconomic benefits of the job of firefighter and the benefits of claimants' actual life experiences. Indeed, the noneconomic benefits of the job of firefighter alleged in Plaintiff-Intervenors' FOF—such as flexibility and control over work schedule, stability, community respect, pride, job pleasure, and camaraderie—are not relevant to the compensatory damages owed to claimants. The court is aware of no case in which a discrimination plaintiff who was denied employment received damages based upon a valuation of the noneconomic benefits of the position that he was denied, despite the fact that if such damages were available, the court would expect such a valuation to occur in *most* failure-to-hire cases. Instead, the damages that have been awarded in federal and state discrimination cases have been based on entirely individualized showings of one or more of the previously recognized common law tort categories, which bear little resemblance to Plaintiff-Intervenors' requested damages. In other words, the court has found no federal or state discrimination case law calling into question the conclusions the court drew in Parts II.A. and II.B: that the federal and state discrimination statutes the City has violated *only* authorize compensatory damages associated with previously recognized common law tort categories.

The court will discuss four main categories of compensatory damages that claimants may attempt to seek: (1) emotional pain, suffering, and mental anguish; (2) loss of enjoyment of life; (3) inconvenience; and (4) lost future earning capacity based on reputational harm. The court does not foreclose the possibility that claimants may be able to establish damages for other forms of noneconomic harm, but these four categories are currently the ones that have been briefed (other than forms of damages that the court has already concluded are not compensable). To the

17

extent that a claimant seeks damages for other forms of noneconomic harm, the Special Master assigned to adjudicate in the first instance the claimant's case must inquire into whether an award of such damages would be consistent with the principles set forth in this opinion, i.e., whether the award would address a category of noneconomic harm that has been recognized as compensable in the common law of tort.

### 1. Emotional Pain, Suffering, and Mental Anguish

Plaintiff-Intervenors argue that they may obtain damages for "emotional pain, suffering and mental anguish as a result of the lost opportunity to obtain the firefighter job." (Int. Supp. Mem. at 12.) These noneconomic harms—which may broadly be termed "emotional distress"— are clearly compensable in a Title VII suit, see 42 U.S.C. § 1981a(b)(3) ("emotional pain, suffering, . . . [and] mental anguish"), a § 1983 suit, see Stachura, 477 U.S. at 307 ("mental anguish and suffering"), a § 1981 suit, see Cowan, 852 F.2d at 690 ("severe emotional distress"), and a suit under New York law, see Cullen, 53 N.Y.2d at 496 ("mental anguish").

It is well-established, however, that a plaintiff attempting to establish emotional distress damages under federal law must prove "*actual injury*," Patrolmen's Benevolent Ass'n of N.Y. v. City of N.Y., 310 F.3d 43, 55 (2d Cir. 2002) (emphasis added), based on "evidence of *concrete emotional problems*," EEOC v. Yellow Freight Sys., Inc., No. 98-CV-2270 (THK), 2002 WL 31011859, at *34 (S.D.N.Y. Sept. 9, 2002) (emphasis added); see also Dejesus v. Village of Pelham Manor, 282 F. Supp. 2d 162, 178 (S.D.N.Y. 2003) (same). The Second Circuit has made clear that federal law does not require a discrimination victim to show either (1) physical manifestations of emotional distress or (2) that he or she sought medical treatment for the emotional injury, see Patrolmen's, 310 F.3d at 55-56, but it has also stated:

> A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages. Rather, the plaintiff's testimony

18

of emotional injury must be substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress, or the objective circumstances of the violation itself.

Id. at 55 (citations omitted); see also Reiter v. Metro. Transp. Auth. of N.Y., No. 01-CV-2762 (JGK), 2003 WL 22271223, at *7 (S.D.N.Y. Sept. 30, 2002) (finding that the discussion in Patrolmen's of the proof required to obtain emotional distress damages applies to both Title VII and § 1983 cases); Dejesus, 282 F. Supp. 2d at 177 ("[E]motional distress damages can not be established by mere subjective statements by the plaintiff, without corroboration, when the plaintiff does not indicate any physical manifestations of her distress.").

As with federal law, New York law requires a plaintiff to prove actual emotional injury caused by the discrimination. See Cullen, 53 N.Y.2d at 497 ("The record must contain proof that the complainant in fact suffered mental anguish or humiliation . . . ."). New York law, unlike federal law, generally permits a plaintiff to establish emotional distress damages based on his or her testimony alone. See id. ("[M]ental anguish or humiliation . . . may be established through the testimony of the complainant alone . . . ."); Iroquois Nursing Home, Inc. v. N.Y. State Div. of Human Rights, 55 A.D.3d 1285, 1286 (N.Y. App. Div. 4th Dep't 2008) (citing Matter of N.Y. City Transit Auth. v. State Div. of Human Rights, 78 N.Y.2d 207, 216 (1991)). But "[c]ompensatory damages for emotional distress may not be presumed simply because a plaintiff suffered discrimination; rather, they must be proved." Yellow Freight, 2002 WL 31011859, at *34 (plaintiff had not demonstrated "mental anguish or humiliation" under New York law because of the "dearth of evidence regarding mental injury"); see also McIntosh v. Irving Trust Co., 887 F. Supp. 662, 665 (S.D.N.Y. 1995) (noting that New York law has rejected a *per se* rule that once a defendant is found liable . . . the plaintiff is entitled to damages for mental anguish"); Ware v. ABB Air Preheater, Inc., No. 91-CV-37 (S), 1995 WL 574464, at *7

19

(W.D.N.Y. Sept. 28, 1995) (upholding jury's denial of emotional distress damages under New York law where "the only evidence that plaintiff suffered compensable mental distress damages was plaintiff's own testimony that he 'felt terrible' and 'lost the will to function in his normal capacity'").

In sum, under both federal and New York law, claimants may not obtain compensatory damages for emotional distress based merely on the fact that they were unable to obtain work in their chosen occupation. Cf. Del Valle v. Nat'l Basketball Ass'n, 42 F. Supp. 2d 334, 341 (S.D.N.Y. 1999) (plaintiff's testimony that "her 'dreams and goals' were crushed" by being fired was insufficient to warrant award of compensatory damages); Cullen, 53 N.Y.2d at 497 (rejecting the argument that plaintiff's "discrimination must have diminished her self-esteem and with it her incentive for self-improvement" without tangible proof of mental anguish and humiliation, and noting that "sensitivity or stoicism, as the case may be, is as variable and individualistic in its existence and in its degree as are human beings"). Under New York law, emotional distress may generally be established based on a claimant's own testimony alone, see Cullen, 53 N.Y.2d at 497, but federal law generally requires corroborating evidence (which does not have to be in the form of physical symptoms or the seeking of medical treatment), see Patrolmen's, 310 F.3d at 55-56. In either case, claimants must show that they have suffered actual emotional injury based on proof of concrete emotional problems. See id. at 55; Yellow Freight, 2002 WL 31011859, at *34; Cullen, 53 N.Y.2d at 497.

### 2. Loss of Enjoyment of Life

Plaintiff-Intervenors argue next that claimants are entitled to recover damages for loss of enjoyment of life. (Int. Supp. Mem. at 7-10.) Such damages are authorized for Title VII

disparate treatment claims, see 42 U.S.C. § 1981a(a)(1), and New York law, see McDougald, 73

N.Y.2d at 254, but only in the limited circumstances discussed below.

The Second Circuit has described damages for loss of enjoyment of life, in a case brought

pursuant to the Federal Tort Claims Act, as follows:

> The concept of loss of enjoyment of life provides compensation for the
> *deprivation or impairment* of the senses or of one's *ability to engage in those
> activities and perform those functions which were part of the victim's life prior to
> the injury*. . . . Proof of loss of the normal pursuits and pleasures of life . . . does
> not depend on evidence of the injury or the accompanying physical sensations and
> emotional response. Rather, a "before and after" method of proof is used which
> requires evidence of (1) the nature and extent of plaintiff's lifestyle *prior* to being
> injured, and (2) the *limited lifestyle* of the plaintiff afterwards.

Rufino v. United States, 829 F.2d 354, 359 n.8 (2d Cir. 1987) (emphases added) (internal

quotation marks omitted). In other words, damages for loss of enjoyment of life may be granted

only if a plaintiff shows impairment of his ability to engage in activities that he *previously*

enjoyed. So far as the court is aware, virtually every case that has discussed the concept of loss

of enjoyment of life has defined it similarly. See, e.g., Allen v. Wal-Mart Stores, Inc., 241 F.3d

1293, 1297-98 (10th Cir. 2001) ("A plaintiff can support her claim for loss of enjoyment of life

damages by presenting evidence that she refrains from participating in activities she previously

enjoyed . . . ."); Furey v. United States, 458 F. Supp. 2d 48, 56 (N.D.N.Y. 2006) ("[L]oss of

enjoyment of life [ ] compensates for the frustration and anguish caused by the inability to

participate in activities that once brought pleasure."); cf. Sedie v. United States, No.

08-CV-04417 (EDL), 2010 WL 1644252, at *24 (N.D. Cal. Apr. 21, 2010) (awarding damages

for loss of enjoyment of life where plaintiff experienced "curtailment of strenuous exercise

which he previously enjoyed"); Schumacher v. Cooper, 850 F. Supp. 438, 453 (D.S.C. 1994)

(awarding damages for loss of enjoyment of life where plaintiff "no longer engage[d] in the

recreational activities he enjoyed so much before, including playing with his two young children"); but see Kurncz v. Honda North Am., Inc., 166 F.R.D. 386, 387 (W.D. Mich. 1996).[6]

The New York Court of Appeals has similarly described loss of enjoyment of life as "the frustration and anguish caused by the *inability* to participate in activities that *once* brought pleasure," and considers loss of enjoyment of life to be a subcategory of traditional pain and suffering damages, which it describes as "the effect of [plaintiff's] injuries on the plaintiff's capacity to lead a normal life." McDougald, 73 N.Y.2d at 257 (emphases added); see also id. at 258-59 (Titone, J., dissenting) (arguing that loss of enjoyment of life should be considered separate from pain and suffering but describing it as loss of "[t]he *capacity* to enjoy life" (emphasis added)). Thus, New York law is perhaps even clearer than federal law in its limitation of damages for loss of enjoyment of life to plaintiffs who have been rendered severely impaired in their ability (or entirely unable) to perform activities that they previously enjoyed.

Plaintiff-Intervenors contest this definition of loss of enjoyment of life in three ways.

First, they argue that cases like Rufino and McDougald are "inapposite" because they were applying the definitions of loss of enjoyment of life in personal injury cases, and "it is inappropriate to import limits upon recovery for loss of enjoyment of life from . . . personal injury law." (Int. Supp. Mem. at 7, 20.) But the court has already concluded that the forms of compensatory damages available to victims of discrimination under federal and state law—including damages for loss of enjoyment of life—should be interpreted in accordance with their

_____

[6]    In Kurncz, the court rejected the defendant's contention that "plaintiffs in Michigan can only recover for the subsequent loss of activities they enjoyed before an injury," and found that the "law provides for the *denial* of *future* enjoyment." 166 F.R.D. at 387 (second emphasis added). To the extent that Kurncz is contrary to the Second Circuit's definition of loss of enjoyment of life, the court must follow the latter. But it may indeed be consistent; the plaintiff in Kurncz sustained head injuries in a car accident that may have resulted in the "deprivation or impairment of the senses," which the Second Circuit in Rufino described as an alternative manner—other than loss of the "ability to engage in those activities and perform those functions which were part of the victim's life prior to the injury"—in which a plaintiff may prove loss of enjoyment of life. 829 F.2d at 359 n.8. And in any event, Kurncz described loss of enjoyment of life as "the denial of life's pleasures," 166 F.R.D. at 388, which strikes the court as very different from simply being denied a job that the person would have found pleasurable.

common law tort definitions. (See Part II.A-B, supra.) Cf. Staub, 131 S. Ct. at 1191 ("[W]hen Congress creates a federal tort it adopts the background of general tort law."). The definitions courts have supplied in personal injury cases are therefore applicable.

Second, Plaintiff-Intervenors argue that "[c]ourts awarding damages in civil rights cases have not imposed the same restrictions that are applied in the state-law personal injury context and have not required physical injury, impairment of senses or loss of the ability to perform functions previously performed, as was required by Rufino." (Int. Supp. Mem. at 7.) But the cases Plaintiff-Intervenors cite for this proposition (see id. at 7-9) are either (1) fully consistent with Rufino's principle, see, e.g., Hogan v. Bangor & Aroostook R.R. Co., 61 F.3d 1034, 1037 (1st Cir. 1995) (affirming award of damages for loss of enjoyment of life where plaintiff "became depressed, withdrawn, and *gave up his usual activities*," and where "[h]is wife, who had *previously* cared for their children, went to work in a shoe factory in order for the family to have medical insurance" (emphases added)); Connolly v. Bidermann Indus., U.S.A., Inc., 56 F. Supp. 2d 360, 362-363 (S.D.N.Y. 1999) (affirming award of damages for loss of enjoyment of life to plaintiff who had lost her hearing); or (2) did not involve loss of enjoyment of life damages at all, see, e.g., Banai v. Sec'y, U.S. Dep't of Housing & Urban Dev. ex rel. Times, 102 F.3d 1203, 1207-08 (11th Cir. 1997) (affirming award of damages for emotional distress in Fair Housing Act ("FHA") case involving plaintiffs whose home had been devastated by a hurricane); Sec'y, U.S. Dep't of Housing & Urban Dev. ex rel. Herron v. Blackwell, 908 F.2d 864, 873 (11th Cir. 1990) (upholding award for damages in FHA case for "embarrassment, humiliation, and emotional distress"); Sec'y, U.S. Dep't of Housing & Urban Dev. ex. rel. Guard v. Ocean Sands, Inc., H.U.D.A.L.J. 04-90-0231-1, 1993 WL 343530, at *20 (Sept. 3, 1993) (awarding

damages for "embarrassment, humiliation, and emotional distress"). These cases are thus of no help to Plaintiff-Intervenors.

Third, Plaintiff-Intervenors argue that "limiting recovery in the context of employment *opportunity* laws to the losses of pleasures *already* enjoyed makes no sense" because "opportunity is a forward, not backward, looking concept." (Int. Supp. Mem. at 20-21.) This point is misguided in several respects. For one thing, the Supreme Court has stated specifically that, "[u]nlike certain other forms of relief, compensatory damages are quintessentially *backward* looking." Landgraf v. USI Film Prods., 511 U.S. 244, 283 (1994) (emphasis added). Moreover, the logic of Plaintiff-Intervenors' argument—that in order to make discrimination victims whole, loss of enjoyment of life should encompass both pleasures that the victims have not yet experienced and those they have previously enjoyed (see Int. Supp. Mem. at 21)—would apply equally to personal injury victims, who could also potentially be deprived of "opportunities" that they have never experienced before; and yet the Second Circuit has made clear in the personal injury context that loss of enjoyment of life involves "a 'before and after' method of proof . . . which requires evidence of [ ] the nature and extent of plaintiff's lifestyle *prior* to being injured." Rufino, 829 F.2d at 359 n.8 (emphasis added). In other words, the court finds no compelling reason to distinguish between the discrimination and personal injury contexts for the purposes of defining loss of enjoyment of life. And even if it could find a good *policy* reason for doing so, the court would reject such a distinction because, as discussed in Part II.A, the federal discrimination statutes should be interpreted according to tort law principles.

The bottom line is that the court is not aware of any federal or state case in which a discrimination victim was awarded damages for loss of enjoyment of life because of his inability to enjoy the benefits of a job that he was denied and never had. Based on the case law and

principles discussed above, the court concludes that such damages are not available. To obtain damages for loss of enjoyment of life, a claimant must establish that the City's discriminatory hiring practices impaired his ability to engage in particular activities that were part of the claimant's life prior to the discrimination.[7] See Rufino, 829 F.2d at 359 n.8; McDougald, 73 N.Y.2d at 257.

### 3. Inconvenience

Next, Plaintiff-Intervenors argue that "[s]ubclass members will likely [ ] assert damages based upon inconvenience." (Int. Supp. Mem. at 10.) Such damages are explicitly authorized by the 1991 Act, see 42 U.S.C. § 1981a(b)(3), and also may be available under New York law, see Mukattash, 97 A.D.3d at 586 (upholding award of compensatory damages where plaintiffs testified that defendant's "refusal to install an adequate ramp" caused them "inconvenience and stress").

However, the court is aware of no authority suggesting that claimants may be able to recover damages based on the positive *conveniences* of the job of firefighter, such as firefighters' ability to take 22-23 free days per month (Int. FOF ¶ 2), to take time off as they desire (id. ¶¶ 3, 16), to care for their children themselves without arranging for others to do so (id. ¶¶ 5-8), and to concomitantly pursue other jobs or further schooling (id. ¶¶ 10-11). (See also Int. Supp. Mem. at 12.) Rather, the dictionary definition of "inconvenience" that Plaintiff-Intervenors themselves provide (see id. at 10-11) defines the term as something that is "unsuited or unadapted to personal needs or comfort" or "something that gives trouble, embarrassment, or uneasiness," and that "disturbs or impedes." Webster's Third New Int'l Dictionary Unabridged (1986). In other

---

[7] For example, a claimant may not obtain damages for loss of enjoyment of life simply because he was "denied the opportunity, available to FDNY firefighters, to spend significant time caring for [his] children or ailing parents" (Int. Supp. Mem. at 7 n.5), but he may recover if his failure to obtain a firefighter position made him incapable of the degree of child-rearing of which he *previously* was capable—if, for example, his failure of the entry-level firefighter exam made him depressed to the point that he could no longer properly care for his children.

25

words, claimants may establish damages only through an individualized showing of negative *in*conveniences that they personally experienced as a result of discrimination—for example, if a claimant was unemployed for some time or worked in a particularly inconvenient occupation as interim employment.

This may seem at first to be a distinction without a difference, but this limited definition is the only one that finds support in case law (as well as the dictionary), and thus the only one that comports with the court's general conclusion that federal and state law authorize forms of compensatory damages that have been previously recognized and awarded at common law. See, e.g., Tullis v. Townley Eng'g & Mfg. Co., 243 F.3d 1058, 1068-69 (7th Cir. 2001) (awarding inconvenience damages where plaintiff "was without work for nine to ten months," which disrupted his family life, forced him to borrow money from his family and friends, and resulted in his lights and phone being shut off, and where his "new job [ ] was as a trucker, which required him to be away from home"); Rubin v. Air China Ltd., No. 10-CV-5510 (LHK), 2011 WL 2463271, at *4 (N.D. Cal. June 21, 2011) (finding that "the inconvenience of being trapped for hours in an unfamiliar airport [wa]s a compensable element of damages for delay in air travel" but noting that the plaintiff could recover damages only "if he c[ould] show that the inconvenience he suffered ha[d] an economic component . . . independent of his other economic damages claims"); Cozzo v. Parish of Tangipahoa, No. 98-CV-2728, 2000 WL 6280, at *8 (E.D. La. Jan. 3, 2000) (inconvenience damages for plaintiff who was evicted from her home).

### 4. Lost Future Earning Capacity Based on Reputational Harm

Finally, Plaintiff-Intervenors seek damages for "lost future earning capacity." (Int. Supp. Mem. at 16-18.) According to Plaintiff-Intervenors, this nonpecuniary injury "is distinct from the loss of income that would been earned from the job itself (which is remedied by an award of

back and front pay)," and "compensates victims for the intangible loss of experiences that would have resulted in enhanced earning capacity, such as additional schooling, experience in a trade or profession, or the building of a business." (Id. at 16.) They argue that because "FDNY firefighters have significant opportunity to pursue education, *e.g.*, studying to become nurses and lawyers, and to work a second job or run a business, many subclass members may assert a claim for lost future earning capacity." (Id. at 16-17 (internal quotation marks and citations omitted) (citing Int. FOF ¶¶ 10-11).) The court agrees that damages for lost future earning capacity may be granted in Title VII cases, but finds this category of damages to be more limited than Plaintiff-Intervenors suggest.

Section 1981a does not explicitly authorize damages for lost future earning capacity, but this form of damages is properly swept within its catchall category of "other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). As the Seventh Circuit has noted, "[a]n award of lost future earnings is a common-law tort remedy" and is therefore an "appropriate" form of damages "under Title VII." Williams II, 137 F.3d at 952. The court has further held that a plaintiff seeking to recover for lost future earning capacity "must produce competent evidence suggesting that his injuries have narrowed the range of economic opportunities available to him," i.e., "that his injury has caused a diminution in his ability to earn a living." Id. (internal quotation marks omitted).

Importantly, however, the case law makes clear that the "injury" resulting in a diminution in the plaintiff's ability to earn a living cannot be simply a denial of employment; a plaintiff must show that the discrimination he suffered caused a *reputational* harm—injury to his professional standing, character, or reputation—which in turn resulted in a narrowing of economic opportunities. See, e.g., id. at 953 ("The lost future earnings award . . . compensates [plaintiff]

for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of [defendant's] discrimination."); Sanders v. Madison Square Garden, L.P., No. 06-CV-589 (GEL), 2007 WL 2254698, at *13 (S.D.N.Y. Aug. 6, 2007) ("[W]here an employee can expect to encounter increased difficulty in finding comparable employment due to injury to her professional standing caused by an employer's unlawful conduct, the employee may recover for the added difficulty in the form of compensatory damages." (internal quotation marks and alteration omitted)); Mahony v. KeySpan Corp., No. 04-CV-554 (SJ), 2007 WL 805813, at *7 (E.D.N.Y. Mar. 12, 2007) ("When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [she] cannot be made whole without compensation for the future earnings she would have received absent the employer's discrimination" (quoting Williams II, 137 F.3d at 953)); Hite v. Vermeer Mfg. Co., 361 F. Supp. 2d 935, 947 (S.D. Iowa 2005) (plaintiff could not obtain damages for lost future earnings because she had "offered nothing to support her assertion that her unlawful discharge taint[ed] her employment record"); Mattenson v. Baxter Healthcare Corp., No. 02-CV-3283, 2004 WL 2967428, at *4 (N.D. Ill. Nov. 30, 2004) ("[L]ost future earnings is a common-law tort remedy available to plaintiffs in a Title VII case . . . [that] compensates a plaintiff for a lifetime of diminished earnings resulting from the reputational harms the plaintiff suffers as a result of the employer's discrimination."); Williams I, 956 F. Supp. at 1466 ("'[L]ost earning capacity' [ ] is closest to the notion of an injury to professional standing, and akin to injuries to reputation or character."). In other words, damages for lost future earning capacity are akin to those available in the common law tort of defamation. Cf. Valera, 2006 WL 2091711, at *2 ("An action for damages to reputation 'lies . . . in the tort of defamation.'" (quoting Fleming, 837 F.2d at 409)).

28

The court is aware of no case awarding damages for lost future earning capacity based on an injury other than reputational harm. Plaintiff-Intervenors have provided no authority for an award of damages based merely on the fact that the position they were denied would have permitted them significant free time to pursue other employment or educational opportunities, and the court concludes that claimants' inability to pursue further work or education would not cause them the kind of "reputational injury" recognized at common law. Plaintiff-Intervenors have also failed to provide support in the common law for their theory that the denial of the reputational *benefits* of a position—such as the "[l]oss of the[] extraordinary prestige of being a firefighter" (Int. Supp. Mem. at 18)—can entitle them to damages for lost future earning capacity. The case law permits damages only if the discrimination *tainted* the *existing* reputation of the victim and if this reputational harm resulted in diminished employment opportunities.

In sum, in order to obtain damages for lost future earnings, claimants must produce "competent evidence" that the City's discriminatory practices caused damage to their professional standing, character, and reputation—beyond simply the denial of the prestige benefits of the firefighter position—and that this injury "caused a diminution in [their] ability to earn a living." Williams II, 137 F.3d at 952.

## III.    THE NON-HIRE VICTIM AND DELAYED-HIRE VICTIM SUBCLASSES

As noted above, the court's July 8, 2011, Memorandum and Order certified subclasses of non-hire victims and delayed-hire victims as to common remedial phase issues under Rule 23(b)(3), concluding that a number of common questions predominated over individualized questions and that a class action was superior to other methods for fairly and efficiently adjudicating Plaintiff-Intervenors' claims. (Second Remedial Cert. Order at 42-51.) The City now asks the court to "revisit the issue of predominance in light of Plaintiff-Intervenors' current

effort to recover plenary compensatory damages." (City Supp. Mem. at 12.) It argues that "the resolution of individual claimants' compensatory damages claims will prove to be time-consuming, burdensome, and costly," and cites as an example Plaintiff-Intervenors' request for emotional distress damages, which "will entail the discovery of medical records and testimony from witnesses that will complicate the discovery process." (Id.)

The court has, however, rejected Plaintiff-Intervenors' argument that they are entitled to plenary compensatory damages. (See Part II, supra.) In any event, even assuming that the court's decision today will introduce more burdens into the compensatory damages inquiry than it eliminates—for example, by necessitating discovery of the claimants' emotional state—this does not significantly change the reasoning of the court's July 8, 2011 Memorandum and Order. It is still true that the members of the non-hire victim and delayed-hire victim subclasses share numerous questions of fact and law, including the major liability questions, the process for determining which claimants have been victims of discrimination, aggregate backpay, retroactive seniority, and priority hiring relief (see Second Remedial Cert. Order at 37, 42-45); that "[e]ven if the court were to decide against certifying the two subclasses under Rule 23(b)(3), the City will *still* have to litigate individual issues—such as mitigation—on an individual basis" (id. at 46); and that "the marginal burden of litigating individual compensatory damages questions in the individual claims process is slight" (id. at 46).

The City's request that the court revisit its certification of the non-hire victim and delayed-hire victim subclasses is therefore denied.

## IV.    CONCLUSION

For the reasons set forth above, it is ORDERED that black victims of the City's discriminatory entry-level firefighter exams will be entitled to compensatory damages for

noneconomic harm only if they can establish on an individualized basis one or more specific forms of compensatory damages that have been previously recognized in the common law of tort. The noneconomic benefits of the job of New York City firefighter—on which the court held a bench trial in August 2011—are not relevant to the compensatory damages owed to claimants, and so the Special Masters shall not award damages based on a valuation of the differences between those benefits and claimants' actual life experiences. Claimants may attempt to obtain damages for emotional distress, loss of enjoyment of life, inconvenience, and lost future earning capacity, in accordance with the definitions and case law discussed in this Memorandum and Order. They may also seek damages for forms of noneconomic harm that the court has not addressed, but may be awarded such damages only if an award would be consistent with the principles discussed above.

The City's request that the court revisit its certification of the non-hire victim and delayed-hire victim subclasses is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      September 19, 2012

NICHOLAS G. GARAUFIS
United States District Judge