UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                    Plaintiff,

          -and-                                                    **MEMORANDUM & ORDER**

THE VULCAN SOCIETY, INC., *for itself and on*                      **07-CV-2067 (NGG) (RLM)**
*behalf of its members*, JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf*
*of a subclass of all other victims similarly situated*
*seeking classwide injunctive relief*;

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a*
*subclass of all other non-hire victims similarly*
*situated*; and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other*
*delayed-hire victims similarly situated*,

                         Plaintiff-Intervenors,

          -against-

THE CITY OF NEW YORK,

                         Defendant.

-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

          This Memorandum and Order addresses the Amended Monetary Relief Consent Decree

("AMRCD" or "Decree") (Dkt. 1468). Plaintiff United States of America (the "United States"),

Plaintiff-Intervenors' Nonhire and Delayed-Hire Victim Subclasses[1] ("Plaintiff-Intervenors"),

---

[1] The Nonhire Victim Subclass is represented by named Plaintiff-Intervenors Roger Gregg, Marcus Haywood, and
Kevin Walker; the Delayed-Hire Victim Subclass is represented by named Plaintiff-Intervenors Candido Nuñez and
Kevin Simpkins. In July 2011, the court certified these two opt-out remedial subclasses of black firefighters and
firefighter applicants for litigation of certain questions common to claims for individual compensatory, make-whole
relief, under Federal Rule of Civil Procedure 23(b)(3) and (c)(4). (July 8, 2011, Mem. & Order (Dkt. 665).) The
court declined to certify any subclass with regard to the issue of mitigation of damages. (June 6, 2011, Mem. &

---

1

and Defendant City of New York (the "City") have jointly moved the court to finally approve and enter the Decree in order to resolve the claims of the United States and Plaintiff-Intervenors (collectively, "Plaintiffs") for backpay and the monetary value of fringe benefits, including prejudgment interest thereon, lost by black and Hispanic applicants for the entry-level firefighter position at the New York City Fire Department ("FDNY") due to employment practices held by this court to create a disparate impact in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as amended.[2]  (Joint Mot. for Final Entry of AMRCD (Dkt. 1467).)  The court provisionally approved and entered an earlier version of the Decree— the Monetary Relief Consent Decree ("MRCD") (Dkt. 1435)—on June 30, 2014. (June 30, 2014, Order (Dkt. 1437).)  The United States has also filed revised versions of two attachments to the AMRCD—a Second Amended Attachment E, "Notice of Individual Monetary Relief Award" (Dkt. 1525-1), and a Second Amended Attachment F, "Acceptance of Individual Monetary Relief Award & Release of Claims" (Dkt. 1525-2).  In sum, the parties jointly ask that the court approve (1) Second Amended Attachments E and F; along with (2) the AMRCD; (3) Attachment A to the AMRCD, the "Amended Proposed Relief Awards List" ("APRAL") (Dkt. 1468-1), which sets forth proposed individual awards to each claimant; and (4) three other

---

Order (Dkt. 640) at 18-24.)  To any extent that the instant settlement agreement may go beyond the issues with respect to which Plaintiff-Intervenors' subclasses have been certified, Plaintiffs may still enter into the Decree on behalf of individual claimants pursuant to the United States's independent statutory authority to seek relief for the victims of employment discrimination, 42 U.S.C. § 2000e-5(f)(1), without the need for class certification.  See Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 323-326 (1980).

[2]  The court also held these employment practices to have created a disparate impact under the New York State Human Rights Law and New York City Human Rights Law, in connection with claims brought by Plaintiff-Intervenors on behalf of a class of black applicants to the FDNY.  (See Jan. 13, 2010, Mem. & Order ("Disparate Treatment Op.") (Dkt. 385).)

attachments to the AMRCD—namely, Attachments B, C, and D thereto.[3] (Joint Mot. to Amend Attachments E & F to AMRCD (Dkt. 1525).)

At a fairness hearing held October 1, 2014 (the "Fairness Hearing"), the court heard oral argument by the parties in support of final entry of the Decree, and by objecting claimants in opposition to the same and/or to their proposed individual awards. (Oct. 10, 2014, Min. Entry.) The court has also received claimants' written objections. The court has considered all of the objections and, while sustaining several individual objections, concludes that none warrant denial of final approval and entry of the Decree. Accordingly, for the reasons discussed below, the court GRANTS Plaintiffs' Joint Motion for Final Entry of Amended Monetary Relief Consent Decree, and GRANTS Plaintiffs' Joint Motion to Amend Attachments E & F to Amended Monetary Relief Consent Decree. Accordingly, the Amended Monetary Relief Consent Decree (Dkt. 1468); Attachments A through D thereto (Dkts. 1468-1 to -4), including the Amended Proposed Relief Awards List; and Second Amended Attachments E and F (Dkts. 1525-1 to -2) are hereby deemed FINALLY APPROVED AND ENTERED.

## I. BACKGROUND

The factual and procedural background of this case is extensive. The events relevant to the issues currently before the court will be summarized here; a full recount can be found in the court's previous rulings.

In 2007, the United States brought suit against the City, alleging that certain aspects of the City's policies for selecting entry-level firefighters for the FDNY violated Title VII. (Compl. (Dkt. 1).) Specifically, the United States alleged that the City's pass-fail and rank-order use of

---

[3] Attachment B to the AMRCD is the "Amended Declaration of Ed Barrero" (Dkt. 1468-2); Attachment C is a "Notice of Monetary Relief Settlement & Fairness Hearing," "Instructions for Filing an Objection Prior to the Fairness Hearing," and a blank "Objection Form" (Dkt. 1468-3); and Attachment D is a cover letter notifying each claimant of the amount of his or her proposed individual award (Dkt. 1468-4).

Written Exams 7029 and 2043 had an unlawful disparate impact on black and Hispanic candidates for entry-level firefighter positions.  (See id. ¶ 1.)  The Vulcan Society, Inc. and several individuals intervened as plaintiffs, alleging similar disparate impact claims and also alleging claims of disparate treatment on behalf of a class of black entry-level firefighter candidates, bringing all claims under federal, state, and local laws.  (See Sept. 5, 2007, Mem. & Order (Dkt. 47) (granting motion to intervene).)

Proceedings were bifurcated.  In July 2009, the court granted summary judgment in favor of the United States's and Plaintiff-Intervenors' Title VII disparate impact claims, finding the City liable.  (July 22, 2009, Mem. & Order ("Disparate Impact Op.") (Dkt. 294).)  The court also determined the practical effect of this discrimination, i.e., the total number of entry-level firefighters who would have been appointed or who would have been appointed earlier absent the discrimination, referred to as the "shortfall."  (Id. at 16-23.)  Specifically, the court concluded that 293 additional black and Hispanic applicants would have been appointed as entry-level firefighters absent the discriminatory examinations, and that 249 black and Hispanic entry-level firefighters who were appointed would have been appointed earlier—approximately 69 years earlier, in aggregate—absent the discrimination.  (Id. at 20-22, 27.)  Subsequently, in January 2010, the court granted summary judgment in favor of Plaintiff-Intervenors' various disparate treatment claims, and Plaintiff-Intervenors' disparate impact claims brought pursuant to the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").  (Jan. 13, 2010, Mem. & Order ("Disparate Treatment Op.") (Dkt. 385).)   On appeal, the Second Circuit vacated the court's summary judgment ruling only with respect to Plaintiff-Intervenors' disparate treatment claims, finding that a trial was needed to determine

whether the City had acted with discriminatory intent. See United States v. City of New York, 717 F.3d 72, 89-91 (2d Cir. 2013).

Proceeding to the remedial phase of the case, the court issued an Initial Remedial Order (Dkt. 390), setting forth a preliminary outline thereof. The Initial Remedial Order explained that Plaintiffs were entitled to two broad categories of relief: (1) prospective injunctive relief to ensure future compliance with Title VII; and (2) individual compensatory, "make whole" relief for the individual victims of the disparate impact of the City's hiring process. Over the City's objection, the court ruled that individual compensatory relief would include retroactive seniority for individual delayed-hire victims. (Id. at 22-31.) Compensatory relief would also include monetary relief and priority hiring relief. The Initial Remedial Order set forth the broad contours of eligibility for individual relief, including the existence of additional eligibility criteria for priority hiring relief as compared to monetary relief. (See id. at 15-22.) The court also held that the number of priority hires would be limited to 293 positions, because that was the shortfall number determined in the disparate impact liability opinion. (Id. at 25-27.)

In May 2012, the City sent notice and claim forms to all black and Hispanic individuals who had taken the two exams; approximately 5,000 individuals submitted claim forms seeking individual relief. (Mem. in Supp. of Joint Mot. for Provisional Entry of MRCD & Scheduling of Fairness Hr'g ("Mem. in Supp. of Provisional Entry") (Dkt. 1434) at 6.) In a series of subsequent opinions culminating in the Final Relief Order (Dkt. 1012), the court set the final parameters for determining which of these individuals were victims of the City's discriminatory practices and therefore eligible for individual relief. In August 2013, the court concluded the last of its eligibility determinations, and ultimately ruled that 1,470 claimants were eligible for

monetary relief.[4]  (See Feb. 22, 2013, Mem. & Order (Dkt. 1059); May 2, 2013, Mem. & Order

(Dkt. 1106); May 9, 2013, Mem. & Order (Dkt. 1112); June 3, 2013, Mem. & Order (Dkt. 1135);

June 7, 2013, Mem. & Order (Dkt. 1144); Aug. 9, 2013, Mem. & Order (Dkt. 1182);

Aug. 9, 2013, Order (Dkt. 1184); Aug. 19, 2013, Order (Dkt. 1190); Sept. 3, 2013, Order

(Dkt. 1195); Sept. 11, 2013, Order (Dkt. 1201); Nov. 18, 2013, Order (Dkt. 1236);

Dec. 11, 2013, Am. Mem. & Order (Dkt. 1251).)

     *Prospective Injunctive Relief*:  The court held a remedial-phase bench trial in

August 2011, addressing the need for and scope of permanent injunctive relief.  (See Findings of

Fact as to Injunctive Relief (Dkt. 741); Oct. 5, 2011, Mem. & Order (Dkt. 743).)  The court then

ordered prospective injunctive relief in a Remedial Order and Partial Judgment, Permanent

Injunction, & Order Appointing Court Monitor ("Remedial Order") (Dkt. 765).  After the Second

Circuit directed modification of certain provisions of the Remedial Order, see United States v.

City of New York, 717 F.3d at 95-99, the court issued a Modified Remedial Order and Partial

Judgment, Permanent Injunction, & Order Appointing Court Monitor ("Modified Remedial

Order") (Dkt. 1143) on June 6, 2013, which incorporated the Second Circuit's modifications as

well as proposed amendments from the appointed Court Monitor and the parties.  The parties and

the Court Monitor continue to work actively to ensure the City's compliance with the provisions

of the Modified Remedial Order.  (See, e.g., Court Monitor's Tenth Periodic Report (Dkt. 1533);

Court Monitor's EEO Report (Dkt. 1463); Court Monitor's Recruitment Report (Dkt. 1464).)

     *Individual Compensatory Relief*:  As noted above, the court's Initial Remedial Order

explained that individual victims of the City's disparate impact discrimination would be entitled

---

[4]  Four hundred thirty-six of those 1,470 claimants were also held eligible for priority hiring relief, having satisfied
the court's eligibility criteria and having passed Written Exam 2000.  (See June 13, 2013, Order (Dkt. 1147);
Nov. 18, 2013, Order (Dkt. 1235).)

to compensatory relief, including (1) monetary relief, (2) priority hiring relief, and (3) retroactive seniority.[5]  Subsequently, the court addressed priority hiring relief and retroactive seniority in greater detail.  (See, e.g., Apr. 19, 2012, Mem. & Order (Dkt. 861).)  Then, in a Final Relief Order (Dkt. 1012), which was issued in October 2012, after a four-day fairness hearing, the court set forth final guidelines governing, inter alia, priority hiring and the awarding of retroactive seniority relief.  The first 121 priority hires were appointed as probationary firefighters in July 2013 (see Court Monitor's Fifth Periodic Report (Dkt. 1198) at 2; Court Monitor's Status Report (Dkt. 1243) at 7), and additional priority hires have been appointed in subsequent classes (see Court Monitor's Eighth Periodic Report (Dkt. 1412); Court Monitor's Tenth Periodic Report).  The City began providing retroactive seniority relief, except for retroactive pension benefits, in July 2013.[6]  (See Aug. 20, 2014, Ltr. (Dkt. 1450) at 1.)

With respect to the category of monetary relief, the court ruled in the Final Relief Order that eligible claimants would be entitled to (1) wage backpay; (2) the monetary value of fringe benefits; (3) prejudgment interest on (1) and (2); and (4) for eligible black claimants only, compensatory damages for noneconomic harm.[7]  (Final Relief Order; see also Sept. 24, 2012, Mem. & Order (Dkt. 974); June 3, 2013, Mem. & Order (Dkt. 1134).)  In April 2014, the City began to make offers of judgment under Federal Rule of Civil Procedure 68 to the 293 individual

---

[5]  The City's liability for compensatory, "make whole" relief was unaffected by the Second Circuit's reversal of this court's disparate treatment summary judgment ruling, as the entitlement to compensatory relief flowed directly from the disparate impact liability.  (See Mar. 8, 2012, Mem. & Order ("Backpay Summ. J. Op.") (Dkt. 825) at 62 (noting that the outcome of the City's appeal of the disparate treatment opinion would not affect any noneconomic damage determinations).)

[6]  The City intends to award retroactive pension benefits at the same time it issues individual monetary relief awards of backpay and fringe benefits to claimants (the monetary relief that is the subject of this Memorandum and Order).  (See Aug. 20, 2014, Ltr. (Dkt. 1450) at 1.)

[7]  The United States did not assert a claim for compensatory damages for noneconomic harm; only Plaintiff-Intervenors did so.  (See Apr. 10, 2012, Ltr. (Dkt. 850) at 2 n.2.)

claimants who sought noneconomic damages (see Apr. 2, 2014, Ltr. (Dkt. 1287)), and to date, all but four of those claimants have either accepted the Rule 68 offers of judgment or otherwise settled their claims with the City, or have had their claims adjudicated by Special Masters after individual hearings. The Decree that is the subject of this Memorandum and Order seeks to resolve Plaintiffs' remaining monetary claims—those for backpay, fringe benefits, and prejudgment interest.

With respect to these claims, some additional background is in order. In September 2010, the United States, joined in part by Plaintiff-Intervenors, had moved for summary judgment regarding the City's total monetary liability for backpay, benefits, and interest. (Pl.'s Mot. for Summ. J. with Respect to Backpay & Benefits (Dkt. 534); see Pl.-Intervenors' Mem. of Law in Supp. of Mot. for Summ. J. with Respect to Class-Wide Back Pay (Dkt. 540).) The court denied Plaintiffs' motion, but held that, given that backpay for each of eight damages categories would be based on the already-determined shortfalls,[8] Plaintiffs had established the amount of pre-mitigation wage backpay owed by the City through 2010.[9] (Mar. 8, 2012, Mem. & Order ("Backpay Summ. J. Op.").) Specifically, the court found that Plaintiffs had established that the gross losses in wages were $62,202,409 for black nonhire candidates from Exam 7029; $33,754,299 for Hispanic nonhire candidates from Exam 7029; $18,193,080 for black nonhire candidates from Exam 2043; $11,403,654 for Hispanic nonhire candidates from Exam 2043; $1,015,579 for black delayed-hire firefighters from Exam 7029;

---

[8] The eight damages categories accounted for the distinct disparate impacts the court found the City's employment practices had on eight different groups of individuals: (1) black nonhire candidates from Exam 7029; (2) Hispanic nonhire candidates from Exam 7029; (3) black nonhire candidates from Exam 2043; (4) Hispanic nonhire candidates from Exam 2043; (5) black delayed-hire firefighters from Exam 7029; (6) Hispanic delayed-hire firefighters from Exam 7029; (7) black delayed-hire firefighters from Exam 2043; and (8) Hispanic delayed-hire firefighters from Exam 2043.

[9] The City would be liable for a separate amount of aggregate backpay, to be determined at a later date, for the period of January 1, 2011, through the date the priority hires would join the FDNY. (Backpay Summ. J. Op. at 46 n.12.)

$1,228,608 for Hispanic delayed-hire firefighters from Exam 7029; $487,987 for black delayed-hire firefighters from Exam 2043; and $411,187 for Hispanic delayed-hire firefighters from Exam 2043—which amounted overall to a total aggregate sum of $128,696,803 in pre-mitigation wage backpay liability.  (Id. at 35, 45-47.)  These amounts are also illustrated in the below chart.

|  | Exam 7029 | Exam 2043 | Both Exams |
|---|---|---|---|
| Black Nonhire Candidates | $62,202,409 | $18,193,080 | $80,395,489 |
| Hispanic Nonhire Candidates | $33,754,299 | $11,403,654 | $45,157,953 |
| Black Delayed-Hire Firefighters | $1,105,579 | $487,987 | $1,503,566 |
| Hispanic Delayed-Hire Firefighters | $1,228,608 | $411,187 | $1,639,795 |
| **TOTAL** | $98,200,895 | $30,495,908 | $128,696,803 |

As noted above, these amounts were based on the numbers of shortfall nonhires and delayed hires in each damages category that resulted from the discriminatory practices at issue, which the court had previously determined in its Disparate Impact Opinion (Backpay Summ. J. Op. at 21-22, 42); and on the calculations of Dr. Siskin, the expert for the United States, regarding (1) the wages each shortfall would have earned, discounted for attrition, and (2) the wage losses from the total loss of months for the delayed hires, discounted for attrition.  (Id. at 16-45.)  In other words, the amounts set for each damages category reflected the court's determination of the numbers of black and Hispanic individuals who would have been hired, or who would have been hired earlier, in the absence of discrimination.  For example, the aggregate amount of backpay available to black claimants was set at a higher amount than that available to Hispanic claimants because the court had determined that the City's use of Written Exams 7029 and 2043 had a greater discriminatory impact on black as compared to Hispanic firefighter candidates.  (Final Relief Order at 9.)

The court also held that the City would have the chance to reduce these amounts by proving in individual proceedings that claimants had either mitigated their losses through interim employment or violated their duty to mitigate.[10] (Backpay Summ. J. Op. at 48-51.) Furthermore, the court determined that the City's liability for the loss of fringe benefits should be valued by expenses that the claimants actually incurred (specifically, health care premiums paid by claimants and their actual out-of-pocket medical expenses) (id. at 39), and set eligibility criteria for individual monetary relief (see id. at 51-57. (See also Aug. 20, 2012, Mem. & Order (Dkt. 946) (denying motion for reconsideration as to fringe benefits and noting ways claimants may prove their expenses).)

The court's Final Relief Order reiterated these findings and set forth the framework governing the individual compensatory relief claims process. It also addressed the method of allocating the $128,696,803 in pre-mitigation wage backpay among the victims of the discriminatory practices. (See Final Relief Order at 8-12; see also June 3, 2012, Mem. & Order (Dkt. 888).) Because the number of eligible claimants would likely exceed the hiring shortfalls caused by the employment practices, the aggregate backpay amount allotted to each damages category would be divided proportionately among eligible claimants in that category. Each claimant's gross award would then be reduced by a proportion—known as the "backpay reduction ratio" or "probability of hire"—of that claimant's interim earnings. This took into account the fact that claimants would likely not be receiving a full shortfall's back wages, and rather a proportional share. (See Final Relief Order at 9-10; June 3, 2012, Mem. & Order at 9-15.) After the completion of the individual proceedings, prejudgment interest would be added to each claimant's net backpay and fringe benefits awards for each year of his or her backpay

---

[10] In an August 22, 2012, Memorandum and Order (Dkt. 952), the court further outlined the parameters surrounding the City's ability to prove individual claimants' mitigation or failure to mitigate.

period, with interest compounded annually. (Final Relief Order at 12.) The court appointed four Special Masters to oversee the individual claims process. (See Mem. & Order Confirming Appointment of Special Masters (Dkt. 883); Final Relief Order at 15-17.)

The portion of the claims process dedicated to the adjudication of individual monetary relief began in earnest in April 2013. (See June 24, 2013, Report and Recommendation ("R&R") of the Special Masters (Dkt. 1150) at 3-12.) In August 2013, the parties reported that they anticipated settling the individual monetary claims, and accordingly, they sought a stay of most case-related deadlines; the court stayed generally the individual monetary claims process. (Aug. 21, 2013, Order (Dkt. 1191) (Filed Under Seal).) At that time, the parties expected that this final portion of the claims process, should it continue, would require at least an additional twelve months. (June 24, 2013, R&R of the Special Masters at 2, 8.)

The parties did reach an agreement to settle the Plaintiffs' claims for backpay and fringe benefits, including interest thereon.[11] In June 2014, the parties jointly moved the court to provisionally approve and enter the Monetary Relief Consent Decree. (Joint Mot. for Provisional Entry of MRCD & Scheduling of Fairness Hr'g (Dkt. 1433).) Submitted with the MRCD was a Proposed Relief Awards List ("PRAL") (MRCD, Attachment A (Dkt. 1435-1)), which set forth each claimant's proposed individual monetary award consistent with the allocation methodology agreed to in the MRCD. (See MRCD ¶¶ 13-14.) The court provisionally approved the MRCD on June 30, 2014. (June 30, 2014, Order.) Notice of the MRCD and PRAL was sent to the 1,470 claimants the court had previously found eligible for monetary relief, along with objection forms and instructions for presenting an objection. The 1,470 eligible claimants also received notice of the October 1, 2014, Fairness Hearing, and were

---

[11] The settlement also resolves the United States's claims for its taxable costs related to bringing the case. (Mem. in Supp. of Provisional Entry at 9.)

informed of their right to present objections in person or through counsel if they chose to do so. The parties received written objections from 101 claimants.  (See Joint Mot. for Final Entry of AMRCD at 3.)

Plaintiffs then filed the amended Decree (the AMRCD), which they jointly moved the court to finally approve and enter.  (See Joint Mot. for Final Entry of AMRCD.)  The AMRCD, as compared to the MRCD, contains a technical change regarding the entity (the City versus the court-appointed Claims Administrator) that will be issuing payments to claimants for the fringe benefits and interest portions of their awards; the change does not affect the substance of the Decree.[12]  (See Mem. in Supp. of Final Entry of AMRCD & Resp. to Objs. ("Mem. in Supp. of Final Entry") (Dkt. 1469) at 2.)  Plaintiffs also recommended that the court sustain seven of the written objections received from claimants.  (Id. at 2, 20-23.)  Plaintiffs also submitted an Amended Proposed Relief Awards List ("APRAL") (AMRCD, Attachment A (Dkt. 1468-1)), incorporating changes to the allocation of the funds to individual claimants necessitated if those seven objections are to be sustained by the court.  (Joint Mot. for Final Entry of AMRCD.)  The parties request that the court approve the APRAL as the Final Relief Awards List.  (Id.; Mem. in Supp. of Final Entry at 2.)

At the Fairness Hearing held October 1, 2014, the parties argued in support of final entry of the AMRCD, and certain claimants lodged verbal objections thereto.[13]  (Oct. 10, 2014, Min.

---

[12]  The AMRCD also included certain amended attachments.

[13]  In March 2014, Plaintiff-Intervenors and the City reached an agreement to settle Plaintiff-Intervenors' disparate treatment claims through injunctive relief (see Mar. 18, 2014, Ltr. (Dkt. 1281)), and on April 22, 2014, they jointly moved for preliminary approval and entry of the Proposed Stipulation and Order ("Intent Stipulation") (Dkt. 1291-1), to resolve those claims.  (Apr. 22, 2014, Ltr. Mot. (Dkt. 1291).)  They moved for final entry of the Intent Stipulation on September 22, 2014.  (Mot. for Final Entry of Proposed Stipulation & Order Resolving Intentional Discrimination Claims (Dkt. 1470).)  The October 1, 2014, Fairness Hearing dealt with final approval of both the AMRCD and the Intent Stipulation.  (See Oct. 10, 2014, Min. Entry.)  On February 20, 2015, the court held a supplemental fairness hearing with respect to the Intent Stipulation; the motion for final entry thereof remains pending.

Entry.)  The court received two exhibits into evidence (see Fairness Hr'g, Ex. 1 (Dkt. 1487)

(Filed Under Seal); Fairness Hr'g, Ex. B (Dkt. 1488)), and held the record open until

October 15, 2014, at 5:00 p.m., for any additional written statements in support of or in

opposition to final approval and entry of the AMRCD.  In addition to the 101 objections to the

MRCD previously submitted,[14] the court received three additional objections by that deadline.

(See Oct. 15, 2014, Ltr. (Dkt. 1491); Oct. 17, 2014, Ltr. (Dkt. 1494); Additional Written

Submissions (Dkt. 1494-1).)

       The United States has now filed newly-revised versions of two attachments to the

AMRCD—a Second Amended "Notice of Individual Monetary Relief Award," and a Second

Amended "Acceptance of Individual Monetary Relief Award & Release of Claims"—and the

parties jointly ask that the court approve these second amended attachments along with the

AMRCD, the APRAL, and the other attachments to the AMRCD.[15]  (Joint Mot. to Amend

Attachments E & F to AMRCD.)

---

[14]  These 101 written objections are filed under seal at Appendix B to the Memorandum in Support of Final Entry
(Dkts. 1469-2 (Objection-Exhibits 1-50) and 1469-3 (Objection-Exhibits 51-101)), and publicly-filed, redacted
versions are available at Dkts. 1548-1 (Objection-Exhibits 1-50) and 1548-2 (Objection-Exhibits 51-101).  When the
court cites to "Obj.-Ex. __" or "Obj.-Exs. __" herein, it refers to these written objections.  Certain of these objections
were submitted on the form that was labeled as intended for objections to the Intent Stipulation, see supra note 13;
however, the parties construed these objections as substantively challenging the Decree, and the court has
considered them in its analysis.

[15]  Upon review of Second Amended Attachments E and F, the prior versions of these documents, and the United
States's letter transmitting the amended attachments, the court agrees that the amendments are minor and reflect
only technical changes that will ultimately benefit claimants by providing additional information regarding (1)
taxation and tax withholdings of claimants' awards and (2) claimants' ability to accept or reject retroactive pension
benefits.  These amendments accordingly do not require a supplemental notice and objection period, and the court
APPROVES them for final entry in connection with the Decree.

## II.    THE DECREE

The Decree reflects the parties' agreement as to the City's aggregate liability for monetary relief for each damages category with respect to backpay, fringe benefits, and prejudgment interest.  (See Mem. in Supp. of Provisional Entry at 15-16; AMRCD at 3; id. ¶ 12.) The Decree also sets forth an allocation methodology apportioning that aggregate backpay, fringe benefits, and interest among claimants.[16]  (Mem. in Supp. of Provisional Entry at 16; AMRCD at 3.)  The PRAL, which was included as an attachment to the MRCD, was prepared by the court-appointed Claims Administrator, and shows the result of the allocation methodology as applied to each claimant.  (Mem. in Supp. of Provisional Entry at 16; see also PRAL.)  Similarly, the APRAL, which was included as an attachment to the AMRCD, was prepared by the Claims Administrator, and shows the result of the allocation methodology as applied to each claimant should the court sustain the objections of seven claimants as recommended by Plaintiffs.[17]  (Joint Mot. for Final Entry of AMRCD at 2-3; see also APRAL.)

### A.    Aggregate Amount of Monetary Relief

Under the AMRCD, the City will pay to eligible claimants a total of $80,964,657.97 in backpay; $11,091,952.25 in interest on backpay; $6,209,618.53 in fringe benefits; and $832,129.54 in interest on fringe benefits—amounting to a total settlement sum of

---

[16]  The United States and Plaintiff-Intervenors agreed upon the allocation methodology.  The City chose not to participate in negotiations over the allocation methodology, and has no objection to it.  (Mem. in Supp. of Provisional Entry at 16; AMRCD at 3.)

[17]  As previously explained, the AMRCD differs from the MRCD in two ways: (1) it incorporates an administrative change, reflecting that the City will be issuing payments to Claimants for the backpay portions of their awards, from which required withholdings will be made, and the Claims Administrator will be issuing payments to claimants for the fringe benefits and interest portions of their awards; and (2) it includes certain amended attachments.  For example, Attachment A to the AMRCD, the Amended Proposed Relief Awards List, incorporates changes to the Proposed Relief Awards List reflecting the United States and Plaintiff-Intervenors' recommendation that the court sustain the objections of seven claimants to their initial allocation of settlement funds.  (See Joint Mot. for Final Entry of AMRCD at 2-3.)  As with Second Amended Attachments E and F, see supra note 15, the court finds that these amendments do not require a supplemental notice or objection period.  They do not substantively affect the fairness of the Decree or implicate claimants' substantive interests.

$99,098,358.29. The amounts include interest accruing through the end of 2014. (AMRCD

¶ 12.) This is divided between damages categories as follows.

| Damages Category | Aggregate Backpay Amount | Interest on Aggregate Backpay Amount | Aggregate Fringe Benefits Amount | Interest on Aggregate Fringe Benefits Amount |
|---|---|---|---|---|
| **Exam 7029 Nonhire Claimants** | | | | |
| Black Exam 7029 Nonhire Claimants | $38,818,871.58 | $5,892.695.44 | $2,564,188.85 | $389,243.26 |
| Hispanic Exam 7029 Nonhire Claimants | $17,079,828.56 | $2,595,446.30 | $1,394,558.83 | $211,693.69 |
| **Exam 2043 Nonhire Claimants** | | | | |
| Black Exam 2043 Nonhire Claimants | $15,495,383.14 | $1,562,726.43 | $1,314,375.43 | $132,556.20 |
| Hispanic Exam 2043 Nonhire Claimants | $8,359,839.74 | $843,099.03 | $821,484.33 | $82,847.60 |
| **Exam 7029 Delayed-Hire Claimants** | | | | |
| Black Exam 7029 Delayed-Hire Claimants | $444,509.77 | $93,679.44 | $30,677.17 | $6,465.14 |
| Hispanic Exam 7029 Delayed-Hire Claimants | $443,638.42 | $93,495.80 | $36,121.84 | $7,612.60 |
| **Exam 2043 Delayed-Hire Claimants** | | | | |
| Black Exam 2043 Delayed-Hire Claimants | $175,039.37 | $6,212.16 | $24,600.69 | $873.08 |
| Hispanic Exam 2043 Delayed-Hire Claimants | $129,547.39 | $4,597.65 | $23,611.39 | $837.97 |
| **TOTAL** | $80,946,657.97 | $11,091,952.25 | $6,209,618.53 | $832,129.54 |

(Id.)

### B.     Allocation of Monetary Relief

Pursuant to the Decree, aggregate funds were allocated among claimants by the Claims

Administrator, according to a methodology devised by the United States and Plaintiff-

Intervenors. (AMRCD at 3.) The result of this allocation is illustrated in the PRAL and

APRAL.[18] The allocation methodology, which is discussed below, is described in greater detail

in the Declaration of Ed Barrero ("Barrero Decl.") (MRCD, Attachment B (Dkt. 1435-2)

(describing the methodology of generating the PRAL)) and the Amended Declaration of Ed

---

[18] As explained above, the APRAL reflects the result of the allocation methodology as applied to each claimant should the court sustain the objections of seven claimants to the MRCD and PRAL, as Plaintiffs recommend.

Barrero ("Am. Barrero Decl.") (AMRCD, Attachment B (Dkt. 1468-2) (describing the methodology of generating the APRAL)).

### 1. Allocation of Backpay to Nonhire Claimants

In allocating backpay among nonhire claimants, the Claims Administrator was provided with each eligible nonhire claimant's interim earnings, including: (1) the earnings listed on his or her Social Security Administration ("SSA") earnings statement; (2) any payments made by the City to the claimant for unemployment insurance or workers' compensation; and (3) any additional earnings of particular claimants who had railroad employers. (Barrero Am. Decl. ¶ 7.) The Claims Administrator averaged each nonhire claimant's annual interim earnings during the applicable backpay period (2001-2011 for Exam 7029 nonhire claimants; and 2005-2011 for Exam 2043 nonhire claimants). (Id. ¶ 8.) Nonhire claimants who failed to respond to requests for authorizations and/or information regarding their interim earnings were assumed to have earned the maximum amount of average interim earnings.[19] (Id. ¶ 9.) Nonhire claimants' average interim earnings were sorted into seven bands with respect to each exam. The earnings bands were based on average annual earnings of firefighters who were hired from the two exam lists during the relevant damages periods; each band corresponds to 15% of actual average annual earnings of firefighters hired from the respective exam list. (Tr. at 13:24-14:3.)[20] In numbers, this means that for Exam 7029, each approximately $11,500 of average interim

---

[19] Specifically, when initially performing these calculations, i.e., those reflected in the PRAL, nineteen nonhire claimants were assumed to have earned the maximum amount of interim earnings. Subsequently, five claimants—each of whom had failed to respond to a May 13, 2014, mailing inquiring whether they had worked for a railroad employer—submitted objections and/or responses that the parties recommend the court treat as objections, which demonstrate that these five claimants did not receive any earnings from a railroad employer. (Mem. in Supp. of Final Entry at 21-22.) Accordingly, Plaintiffs then had complete earnings information for these five claimants, and, consistent with Plaintiffs' recommendation that the court sustain their objections, used those claimants' actual interim earnings in calculating the backpay awards reflected in the APRAL. The APRAL therefore reflects the assumed maximum amount of interim earnings for the fourteen nonhire claimants for whom the parties still lack complete interim earnings information. (See Barrero Am. Decl. ¶¶ 3, 10.)

[20] Citations to "Tr." refer to the transcript of the October 1, 2014, Fairness Hearing.

earnings constitutes a single band; for Exam 2043, each approximately $9,200 of earnings constitutes a single band. (Barrero Am. Decl. ¶ 10; id., Ex. B.) Each interim earnings band was then allocated between one (for the greatest amount of earnings) and seven (for the least amount of earnings) points, and each claimant was allotted the number of points applicable to his or her earnings band. (Id. ¶ 10.) The Claims Administrator determined the monetary value of each point by dividing the aggregate backpay amount of each nonhire damages category by the total number of points allocated to claimants in each of those categories. (Id. ¶ 11.) Each claimant was then allotted the monetary value of his or her points. (Id.) For example, the value of one point for black Exam 7029 nonhire claimants was $25,707.86. The 50 black Exam 7029 nonhire claimants who were sorted into the minimum average annual interim earnings band—$11,390.85 or less—received seven points, so their back pay awards are therefore $179,955.04. The 23 black Exam 7029 nonhire claimants who were sorted into the maximum average annual interim earnings band—$68,345.15 or greater—each received one point, and therefore their back pay awards are $25,707.86.[21] (See id. ¶ 12; id., Ex. B.)

2.      Allocation of Backpay to Delayed-Hire Claimants

In allocating backpay among delayed-hire claimants, the Claims Administrator was provided with each delayed-hire claimant's "months of delay," which refers to the number of months between (1) the first FDNY Academy class appointed off the list of the exam for which the claimant is eligible for relief and (2) the date of the FDNY Academy class to which the claimant was in fact appointed. (Id. ¶ 13.) The Claims Administrator then determined the sum total months of delay experienced by all claimants in each delayed-hire damages category, and determined the value of each month of delay by dividing the aggregate backpay award with

---

[21] For an illustration of the results of the allocation methodology as to each nonhire damages category, see Exhibit B to the Amended Declaration of Ed Barrero.

respect to that delayed-hire damages category by the total months of delay experienced by claimants in that category.  (Id. ¶¶ 14-15.)  Each delayed-hire claimant's proposed backpay award equals the value of one month of delay multiplied by his or her specific months of delay.  (Id. ¶ 16.)  For example, black Exam 7029 delayed-hire claimants experienced a total of 2,901 months of delay.  Given the aggregate backpay amount of $444,509.77 allocated to that damages category under the AMRCD, one month of delay for these claimants is valued at $153.23.  (Id., Ex. C.)  A claimant who was delayed 12 months will therefore receive backpay in the amount of $153.23 multiplied by 12, or $1,838.76.[22]

### 3.  Allocation of Fringe Benefits

Fringe benefits as allocated under the AMRCD consist of two components.  First, all eligible claimants are provided a fixed, minimal fringe benefits award; second, in addition to the fixed award, eligible claimants who submitted a fringe benefits claim by May 9, 2014, are allocated a proportion of their claimed fringe benefits, subject to a cap.  (Id. ¶ 18.)

The fixed awards consist of a pro rata distribution to all eligible claimants of approximately 20% of the fringe benefits settlement amounts.  (Tr. at 16:11-15.)  Specifically, all Exam 7029 nonhire claimants, regardless of race, receive a fixed award of $1,400; all Exam 2043 nonhire claimants, regardless of race, receive a fixed award of $960; and all delayed-hire claimants, regardless of race or exam, receive a fixed award of $50.  (Id. ¶ 19.)

The Claims Administrator calculated the claimed fringe benefits by examining each claimant's fringe benefits claims form, and reviewing other relevant documentation submitted by

---

[22] The total months of delay and the value of one month of delay are set forth, with respect to each delayed-hire damages category, in Exhibit C to the Amended Declaration of Ed Barrero.

the claimant.[23]  (Id. ¶ 21.)  The Claims Administrator then computed both (1) the mean (average) claimed fringe benefit expenses and (2) the standard deviation of the claimed fringe benefit expenses for claimants in the three damages groups used to allocate fixed awards (Exam 7029 nonhire claimants, regardless of race; Exam 2043 nonhire claimants, regardless of race; and delayed-hire claimants, regardless of race or exam).  (Id. ¶ 22.)  The Claims Administrator set a fringe benefits cap for each damages group at the mean plus two standard deviations, i.e., the 97.5th percentile, of the amount of claimed expenses.  (Id.)  With respect to each damages category, and treating any claimants whose claimed fringe benefits were in excess of the cap as having claimed the cap, the Claims Administrator calculated the ratio of aggregate claimed fringe benefits expenses to settlement funds that remained after paying out fixed awards; these ratios were applied to each claimant's claimed expenses to determine his or her additional award.  (Id. ¶¶ 22-23.)  As an example, $2,099,388.95 fringe benefit settlement funds remained for black Exam 7029 nonhire claimants after paying out their fixed shares, and, after application of the cap, $2,943,427.50 in aggregate claimed fringe benefits expenses were claimed by this group of claimants.  Therefore, pursuant to this methodology, black Exam 7029 nonhire claimants will receive 0.713246327 of their claimed fringe benefits expenses in addition to their $1,400 fixed award.[24]  (See id., Ex. F.)

     4.   <u>Interest</u>

Finally, the Claims Administrator calculated the total interest due on the aggregate backpay and fringe benefits amounts and also allocated that interest among claimants.  (Id. ¶ 25.)

---

[23]  As the parties instructed the Claims Administrator not to seek to verify fringe benefits claimed on the fringe benefits claims forms, it reviewed other documentation only with respect to benefits that were not included in the fringe benefits claims form.  (Id. ¶¶ 20-21.)

[24]  For additional information regarding allocation of fringe benefits, see Exhibits D through F to the Amended Declaration of Ed Barrero.

The interest rate applied was the average market yield on the United States one-year constant maturity Treasury yield during the relevant damages period. (Id. ¶ 26.) As the damages period varied between damages categories, therefore, the rates also varied slightly between damages categories. (See id.) Specifically, the rates applied to each category were as follows: (1) for all Exam 7029 nonhire claimants, 1.864561 (the average market yield over a damages period of January 1, 2001, through April 25, 2014); (2) for all Exam 2043 nonhire claimants, 1.73963 (same over a damages period of January 1, 2005, through April 25, 2014); (3) for all Exam 7029 delayed-hire claimants, 1.753729 (same over a damages period of January 1, 2004, through April 25, 2014); (4) for all Exam 2043 delayed-hire claimants, 0.499455 (same over a damages period of January 1, 2008, through April 25, 2014). (Id.; see also id., Ex. G.) The interest was then compounded annually through the end of 2014, to determine the total aggregate interest. (Id. ¶ 26.) The parties agreed that interest would cease to accrue after the end of 2014. (Tr. at 16:25-17:1.)

Interest on backpay was allocated among nonhire claimants through the use of earnings bands, allocation of points, and point-per-value calculations; and among backpay claimants by determining the amount of interest associated with each month of delay. (Id. ¶ 29.) Interest on fringe benefits was allocated proportionally in relation to each claimant's total fringe benefits award as compared to the aggregate amount of fringe benefits relief awarded to all claimants in that claimant's damages category. (Id. ¶ 30.) In sum, interest was allocated among claimants proportionally based on their backpay and fringe benefits awards. (See Mem. in Supp. of Provisional Entry at 21.)

### C.    Notice of MRCD

In accordance with the provisionally-approved MRCD, the 1,470 claimants held by the court to be eligible for monetary relief, see supra pages 5-6, received notice via first-class mail and email of (1) the settlement, (2) their individual proposed monetary relief awards, and (3) the Fairness Hearing, as well as an objection form.[25]  (See Mem. in Supp. of Final Entry at 3-5; Tr. at 17:2-4.)  This notice is sufficient to ensure the fairness of the Decree because, given the posture of this case, no other individuals' interests are affected by the Decree.[26]

### D.    Notice, Acceptance, and Payment of Awards

Upon final entry of the Decree, all claimants who are provided with an award of monetary relief will be provided with notice via first-class mail and email of their awards, instructions for submitting an acceptance form, and tax forms.  (AMRCD ¶¶ 24-29.)  To receive

---

[25]  By Order issued May 16, 2013, the court ruled that no claims forms submitted after June 10, 2013, would be considered for relief.  (May 16, 2013, Order (Dkt. 1118).)  Therefore, these 1,470 claimants and the parties represent the entire universe of individuals with any interest in the Decree.

[26]  Because the Decree resolves the damages claims of certified subclasses, the court must ensure that notice of any proposed class settlement was directed "in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  The court finds that the notice that was provided satisfies Rule 23(e)'s notice requirement.  All class members who are eligible for relief pursuant to the court's prior rulings have been provided sufficient notice and an opportunity to present any objections for the court's consideration.  See Fed. R. Civ. P. 23(e)(1)-(2).

The parties suggest that the notice that was provided was also intended to comport with section 703(n) of Title VII, 42 U.S.C. § 2000e-2(n).  (See Mem. in Supp. of Final Entry at 3-5.)  Section 703(n) establishes a bar to collateral attack of any employment practice that implements, and is within the scope of, a litigated or consent judgment or order resolving an employment discrimination claim, by any person who had actual notice of the proposed order and a reasonable opportunity to present objections.  42 U.S.C. § 2000e-2(n)(1)(A)-(B).  (See also Mem. in Supp. of Final Entry at 3 n.6.)  However, the section specifically does not apply to "members of a class represented or sought to be represented in such action, or . . . members of a group on whose behalf relief was sought in such action by the Federal Government."  42 U.S.C. § 2000e-2(n)(2).  Here, the only individuals who have received notice of the MRCD are precisely these: members of a class represented in the present action, and/or members of a group on whose behalf relief is being sought by the United States.  The parties are correct that pursuant to section 703(n), the court's Final Relief Order, which set forth final parameters for individual relief and eligibility requirements, is not subject to challenge by nonparties who received notice thereof.  (See Mem. & Order Addressing Objs. to Proposed Relief Order (Dkt. 1011) at 5.)  However, section 703(n) does not itself bar nonparties from challenging the Decree.  Rather, because the instant Decree merely settles and allocates relief that the court already found appropriate in its Final Relief Order (which is itself protected by section 703(n)), the Decree does not affect the interests of nonparties; it is for that reason that they did not require notice of the MRCD.

an individual monetary award, a claimant must return an acceptance form and any required tax forms no later than 45 days after final entry; failure to do so will constitute a rejection of the offer or relief.[27]  (Id. ¶¶ 30-31.)

The City will issue payments for backpay awards; the Claims Administrator will issue payment for fringe benefits and interest awards.  (Id. ¶ 38.)  The City will withhold from claimants' backpay awards all taxes, child support liens, and employee pension contributions for any claimants who were awarded retroactive seniority by the court.[28]  (Id. ¶ 39.)  The City and Claims Administrator will issue individual monetary award payments by no later than 150 days after final entry of the Decree.  (Id.)

### E.    Service Awards

The Decree provides for service awards of $15,000 to each of the seven individually-named Plaintiff-Intervenors, separate and apart from any monetary or other relief to which they may be entitled, as well as a $50,000 service award to the Vulcan Society, Inc., which is to be used to "forward its not-for-profit mission."  (Id. ¶ 46.)

### F.    Costs and Attorneys' Fees

Under the Decree, the City bears all costs incurred by the Claims Administrator in its implementation of the Decree, including the costs of all notification procedures.  (Id. ¶ 50.)

---

[27]  Claimants who show good cause for failing to meet the 45-day deadline must submit their acceptance and tax forms within 75 days after final entry of the Decree.  (AMRCD ¶ 35.)

[28]  The City will pay the employer portion of pension contributions and taxes thereon; these will not be withheld from the individual monetary awards.  The parties dispute whether individual claimants or the City should be held responsible to pay taxes on the employee pension contribution.  They have submitted this dispute to the court (see United States's Mot. for Order Requiring City to Pay Interest Due on Claimants' Minimum Employee Pension Contributions (Dkt. 1456); Pl.-Intervernors' Ltr.-Br. on Interest Charges on Back Contributions from Non-Hires and Delayed Hires (Dkt. 1459)); an order resolving this dispute will issue separately, on a future date.

The City will reimburse the United States $150,000 in taxable costs pursuant to 28 U.S.C. § 1920. Otherwise, the United States will bear its own attorneys' fees and all expenses related to the Decree. (Id. ¶¶ 51-52.)

The Decree does not include a provision of attorneys' fees to counsel for Plaintiff-Intervenors. Instead, it provides that Plaintiff-Intervenors and the City will negotiate in good faith regarding a payment of attorneys' fees and costs; if they are unable to agree, the dispute will be submitted to the court. (Id. ¶ 53.)

## III.    LEGAL STANDARD

In reviewing a consent decree or settlement that resolves a pattern and practice action brought by the United States under Title VII, and that includes the claims of a certified class or classes, courts consider whether the proposed decree is lawful, fair, reasonable, adequate, not the product of collusion, and consistent with the public interest.[29] See, e.g., United States v. North Carolina, 180 F.3d 574, 581 (4th Cir. 1999); United States v. N.Y.C. Bd. of Educ., 85 F. Supp. 2d 130, 157 (E.D.N.Y. 2000), vacated and remanded on other grounds by Brennan v. N.Y.C. Bd. of Educ., 260 F.3d 123 (2d Cir. 2001); United States v. New Jersey, Nos. 88-CV-5087 (WGB), 88-CV-4080 (MTB), 87-CV-2331 (HAA), 1995 WL 1943013, at *9-11 (D.N.J. Mar. 13, 1995); Vulcan Soc'y of Westchester Cnty., Inc. v. Fire Dep't of White Plains, 505 F. Supp. 955, 961-62 (S.D.N.Y. 1981); see also Fed. R. Civ. P. 23(e)(2).

---

[29]  The Second Circuit recently held in SEC v. Citigroup Global Markets, Inc., 752 F.3d 285, 294 (2d Cir. 2014), that "the proper standard for reviewing a proposed consent judgment involving an enforcement agency requires that the district court determine whether the proposed consent decree is fair and reasonable, with the additional requirement that the 'public interest would not be disserved' in the event that the consent decree involves injunctive relief," and rejected the district court's inclusion of "adequacy" in the standard it had applied. However, even assuming that the SEC v. Citigroup Global Markets, Inc. standard would apply in a Title VII case brought solely by the United States and not involving any certified class, Federal Rule of Civil Procedure 23(e) must also be satisfied here, and therefore this court must find that the Decree is "fair, reasonable, and adequate" in order to approve it. Fed. R. Civ. P. 23(e)(2).

The Second Circuit instructs that "voluntary compromises of Title VII actions enjoy a presumption of validity" and "should therefore be approved 'unless . . . [they] contain[] provisions that are unreasonable, unlawful, or against public policy.'"  Kirkland v. N.Y. State Dep't of Corr. Servs., 711 F.2d 1117, 1128-29 (2d Cir. 1983) (quoting Berkman v. City of New York, 705 F.2d 584, 597 (2d Cir. 1983)) (alterations in Kirkland).  This court will thus consider whether any objection to the Decree "has sufficient merit to overcome the presumption of validity accorded to the relief agreement."[30]  (See Mem. & Order Addressing Objs. to Proposed Relief Order (Dkt. 1011) at 6.)  It is the objectors' burden to establish that the Decree should not be approved.  See United States v. New Jersey, 1995 WL 1943013, at *11 ("Once a district court has provisionally approved a consent decree resolving a Title VII action, . . . the decree becomes presumptively reasonable, so that an individual who objects to entry of the decree 'has a heavy burden of demonstrating that the decree is unreasonable.'" (quoting Williams v. Vukovich, 720 F.2d 909, 921 (6th Cir. 1983))).  A district court's approval of a Title VII settlement agreement is reviewed for abuse of discretion.  Kirkland, 711 F.2d at 1129.

To be approved, the settlement agreement must be both substantively and procedurally fair.  McReynolds v. Richards-Cantave, 588 F.3d 790, 803-04 (2d Cir. 2009).  With respect to procedural fairness, the Second Circuit has directed the district court to "pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel . . . possessed the necessary experience and ability, and have engaged in

---

[30]  In connection with the issuance of the Final Relief Order, the court also applied a standard set forth in Kirkland v. New York State Department of Correctional Services, 711 F.2d 1117, 1132 (2d Cir. 1983)—specifically, the court decided it was appropriate to "review[] objections and ultimately ask[] whether the proposed remedies were (1) 'substantially related to the objective of eliminating the alleged instance of discrimination' and (2) did not 'unnecessarily trammel the interests of affected third parties.'"  (Mem. & Order Addressing Objs. to Proposed Relief Order (Dkt. 1011) at 6 (quoting Kirkland, 711 F.2d at 1132).)  Because the court has already determined that monetary relief consisting of backpay and fringe benefits satisfies this standard (see id. at 6-7), the court need not apply it again here.  Instead, the court will consider whether the Decree and award allocation are fair, reasonable, adequate, lawful, not the product of collusion, and consistent with the public interest, and whether any objection has sufficient merit to overcome the presumption of validity.

the discovery, necessary to effective representation of the class's interests." Id. at 804 (alteration and internal quotation marks omitted).

In determining whether a consent decree is substantively fair, the Supreme Court has held that courts should "weigh[] the plaintiff's likelihood of success on the merits against the amount and form of relief offered in the settlement." Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981); see also Kirkland, 711 F.2d at 1129. Courts in the Second Circuit frequently look to the nine Grinnell factors, or an appropriate subset thereof, in assessing proposed class action settlements; the Second Circuit has endorsed the propriety of consideration of those factors in class actions alleging discrimination. See Plummer v. Chem. Bank, 668 F.2d 654, 659 (2d Cir. 1982). These factors include: "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in the light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974) (internal citations omitted).

IV.    DISCUSSION

A.    Fairness and Adequacy of the Decree

As explained in detail above, this action has a complicated procedural history, and its remedial phase alone has involved a number of aspects. The Decree, which is the subject of the court's current consideration, deals only with wage backpay, fringe benefits (medical expenses), and interest thereon. It does not deal with priority hiring, retroactive seniority, compensatory

damages for noneconomic harm, or any injunctive relief and/or ongoing monitoring by the court and the court-appointed Monitor, nor does it impact in any way the court's prior rulings regarding those aspects of relief.  The Decree itself is comprised of two main features: (1) the parties' agreed-upon aggregate settlement amounts as to backpay, fringe benefits, and interest, with respect to each damages category; and (2) a methodology allocating these aggregate amounts to eligible, individual claimants.  For the reasons discussed below, the court finds the Decree to constitute a fair, reasonable, and adequate resolution of Plaintiffs' claims for individual monetary relief as to backpay, fringe benefits, and interest thereon—one which is lawful, not the product of collusion, and consistent with the public interest.

        1.      The Decree

Typically, when assessing the fairness and adequacy of a proposed consent decree, the court would balance the apparent merits of the plaintiff's case against the settlement offer.  See Carson, 450 U.S. at 88 n.14 (1981); Kirkland, 711 F.2d at 1129.  Many of the Grinnell factors also speak to such a balancing approach.  See Grinnell, 495 F.2d at 463 (factors the court should consider include, inter alia: "(4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; . . . (8) the range of reasonableness of the settlement fund in the light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation" (internal citations omitted)).  But as the parties note, Plaintiffs have already prevailed on the merits:  This court found the City's pass-fail and rank-order use of Written Exams 7029 and 2043 to violate Title VII's disparate impact provisions.  Additionally, the court has already determined that the total (maximum) amount of the City's liability for wage backpay,

prior to reduction for mitigation through interim earnings or claimants' failure to mitigate their damages, is approximately $128 million.

Accordingly, when assessing the Decree generally, including the overall agreed-upon settlement amounts, the court will consider pursuant to the balancing methodology: (1) whether the backpay settlement amount approximates the $128 million figure less claimants' mitigation and failure to mitigate; (2) whether the fringe benefits and interest settlement amounts approximate what claimants would receive in aggregate should the claims process continue; and (3) should the settlement amounts in fact equal a lesser number, whether the circumstances warrant that result in light of the other Grinnell factors.  The parties represent that the approximately $81 million in total backpay, as well as the smaller aggregate backpay amounts allotted to each damages category, represent their best estimates of what the City's total backpay liability would be after the completed claims process assessed claimants' interim earnings and failure to mitigate, less an approximately 15% discount for settlement.  (See Mem. in Supp. of Provisional Entry at 15; Tr. at 20:19-24, 21:19-25.)  Similarly, the approximately $6.2 million in aggregate fringe benefits and $12 million in total prejudgment interest under the settlement also represent "an approximately fifteen percent discount from the parties' best estimates of the City's total exposure if the parties had continued to litigate Claimants' individual monetary relief."  (Mem. in Supp. of Provisional Entry at 15.)

Upon consideration of the other Grinnell factors, the court finds that this approximately 15% discount from the City's likely post-mitigation liability is fair, reasonable, and adequate.  Absent this settlement, resolving claimants' individual monetary claims would take at least another year.  (Id. at 9.)  Resolving these claims presently will speed relief to claimants who have been waiting years for relief—these claimants took the unlawful exams twelve and fifteen years

ago, and the case has been pending in this court for eight years. Increased speed is therefore desirable.[31] Additionally, avoiding the continued use of the claims process eliminates a material burden on claimants, who would be subjected during that process to additional discovery, individual hearings before Special Masters, motions to dismiss for failure to comply with discovery requests, and motions to reduce awards for failure to mitigate damages. (Id. at 15; see also, e.g., June 24, 2013, R&R of the Special Masters; Aug. 22, 2012, Mem. & Order (Dkt. 952).) The increased speed of recovery and the elimination of additional discovery and other burdens to claimants—not to mention the savings of time and expense as to the court, the parties, and the Special Masters—weighs in favor of approval of the Decree. See Grinnell, 495 F.2d at 463 (the court should consider: (1) "the complexity, expense and likely duration of the litigation" and (3) "the stage of the proceedings and the amount of discovery completed").

Furthermore, the court considers the generally positive response by claimants to the Decree. See id. (factor (2): "the reaction of the class to the settlement"). Written objections were submitted by 102 claimants, and one additional claimant who did not submit a written response appeared at the Fairness Hearing. However, four of the written objection forms contained substantively positive statements regarding the Decree. (See Obj.-Exs. 13, 22, 27, 98.)[32] Therefore, in the court's calculation, only 6.7% of eligible claimants

---

[31] The parties also note that "the greater the amount of time that passes in the case, the greater the risk that deserving Claimants will become unreachable due to changes in their contact information that are not communicated to the parties or the claims administrator." (Mem. in Supp. of Provisional Entry at 15 n.11.)

[32] As discussed below, one of these four claimants requests that his race be adjusted on the parties' records to reflect that he identifies as black, not Hispanic, and the court is granting this request. See infra pages 54-55. (See also Obj.-Ex. 13 at MRCD_OBJ_000054.) However, this claimant also responds that he has no objection to the Decree, so the court takes this claimant to provide a positive statement, overall, in favor of the Decree. (Id. at MRCD_OBJ_000052.) As previously noted, supra note 14, these Objection-Exhibits are filed at Dkts. 1469-2, 1469-3, 1548-1, and 1548-2.

(98 out of 1,470), a relatively small percentage, have in fact objected to the Decree. This also weighs in favor of final approval and entry.

The final <u>Grinnell</u> factor—"the ability of the defendants to withstand a greater judgment"—weighs neither in favor of nor against final approval. <u>Grinnell</u>, 495 F.2d at 463 (factor (7)). It is true that the City <u>could</u>, as a practical matter, withstand a greater judgment. However, as the City's liability is funded by the public by way of tax dollars, there is also some interest to the public in minimizing unnecessary expense. Therefore, this factor is ultimately neutral.

Other criteria for final approval of the Decree are also satisfied. The Decree is both lawful and consistent with the public interest, as it implements individual relief that the court has already found appropriate pursuant to Title VII. (<u>See</u> Mem. & Order Addressing Objs. to Proposed Relief Order; Aug. 20, 2012, Mem. & Order; Backpay Summ. J. Op.) There is nothing to suggest that the Decree is the product of collusion or otherwise procedurally tainted. In fact, quite to the contrary: Counsel to all parties are experienced and extremely well-informed regarding the issues in this case—and notably, claimants' interests are protected in connection with this settlement by the United States[33] as well as by counsel for two different subclasses— and have engaged in fierce litigation for nearly a decade. <u>See</u> <u>McReynolds</u>, 588 F.3d at 804. Notably, attorneys' fees to subclass counsel are not resolved by the Decree, further reducing any concern of collusion.

---

[33] Certain courts have suggested that the presence of a governmental participant weighs in favor of finding a proposed settlement agreement to be fair and reasonable. <u>See</u> <u>Officers for Justice v. Civil Serv. Comm'n of City and Cnty. of San Francisco</u>, 688 F.2d 615, 625 (9th Cir. 1982); <u>United States v. State of New Jersey</u>, 1995 WL 1943013, at *11. The presence of the United States in this action and its role in negotiating the instant settlement, with its interest in protecting the rights of all claimants, both black and Hispanic, makes the court only more comfortable with the Decree.

2.     Allocation Methodology

The prior analysis does not consider the Decree's allocation methodology.  Neither the Carson general balancing approach nor the Grinnell factors provide much guidance with respect to the court's review of this methodology, so the court will instead assess whether the methodology is, in a general sense, lawful, consistent with the public interest, fair, reasonable, and adequate with respect to individual claimants.  Ultimately, the court finds that these criteria are met, in large part because of the allocation methodology's consistency with prior court rulings as to individual relief.

*a.     Assignment of Claimant into Damages Category*

All claimants were assigned to one of the eight damages categories, based on (1) the race identified on his or her claim form; (2) the court's determination of the examination for which the claimant is eligible for relief; and (3) the court's determination regarding the claimant's status as a nonhire or delayed-hire claimant.  (Mem. in Supp. of Provisional Entry at 16-17.) Claimants eligible for relief on the basis of both Exam 7029 and Exam 2043 were assigned to the Exam 7029 damages category, in order to compensate them for the entire time period during which they suffered damages.  (Id. at 17.)  This is lawful, appropriate, fair, and reasonable as consistent with the court's prior rulings, including the directive in the Final Relief Order that each claimant must be placed into the appropriate damages category as the first step in the individual claims process.  (See Final Relief Order at 10-11; see also Backpay Summ. J. Op. (holding that each damages category suffered a discrete loss); June 3, 2012, Mem. & Order at 4, 9, 13 (same); Nov. 18, 2013, Order (Endorsed Ltr.) (Dkt. 1235) (noting that claimants identify as either black or Hispanic on their claims forms).)  See also supra pages 5-6 (noting court's eligibility determinations).

Between May 2012 and June 2014, during the individual claims process, the parties collected information regarding eligible claimants' interim employment earnings, and claimants submitted individual claims for lost fringe benefits. (Mem. in Supp. of Provisional Entry at 8.) Specifically, the United States obtained interim earnings information, as reflected in claimants' Social Security Administration ("SSA") earnings statements, for all but one claimant; the parties were unable to determine this claimant's interim earnings because he did not submit an executed authorization form for his SSA statements despite numerous attempts to reach him. (<u>Id.</u>) Additionally, the City identified unemployment insurance and workers' compensation payments that it made to claimants who had worked for the City; and the parties obtained railroad earnings information for claimants who indicated they worked for a railroad employer, because those earnings were not included on SSA earnings statements. (<u>Id.</u> at 8-9.) At the time they moved for provisional entry of the MRCD, the parties believed that eighteen claimants had failed to respond to discovery requests by the City or a May 13, 2014, mailing inquiring as to railroad employment; accordingly, they lacked complete interim earnings information from nineteen total claimants (those eighteen claimants plus the one claimant who failed to execute his SSA authorization form). (<u>See</u> Mem. in Supp. of Final Entry at 21.)

As explained above, pursuant to the Decree's allocation methodology, the Claims Administrator was provided with interim earnings data with respect to each eligible nonhire claimant, and it averaged each nonhire claimant's annual interim earnings over the backpay period. Nonhire claimants' average annual interim earnings were sorted into seven earnings bands for each exam. Each earnings band was allocated between one and seven points; each claimant was allotted the number of points applicable to his or her earnings band; and then each

claimant received his or her proportion of the total backpay amount allotted to each damages category based on the total number of points assigned. See supra Part II.B.1. Claimants for whom the parties lacked complete information as to interim earnings were assumed to have earned the maximum amount of interim earnings, and assigned to the one-point earnings band. (Mem. in Supp. of Provisional Entry at 18; Mem. in Supp. of Final Entry at 21.)

This allocation methodology meets the relevant standard for approval. The court's prior rulings made clear that in a litigated resolution of the monetary claims, mitigation of the City's damages due to claimants' interim earnings (or their failure to mitigate) would have to be determined on individual bases. (See, e.g., Backpay Summ. J. Op. at 36-37, 45-46, 48-51; June 3, 2012, Mem. & Order at 9-14; June 6, 2011, Mem. & Order (Dkt. 640) at 18-25.) The point-value system appropriately uses individual claimants' earnings data, consistent with this interest in individual determination, while at the same time sufficiently simplifying the process in order to allow the settlement to proceed, and thus alleviating the burdens that a full claims process would place on claimants. See supra Part IV.A.1. (See also, e.g., Tr. at 25:11-26:1.) The point values that were assigned to the earnings bands approximate the ratios of awards that claimants could have been expected to receive if the individual claims process had gone through to its conclusion. (Mot. for Provisional Entry at 19; Tr. at 13:19-23.) Specifically, because the earnings bands were based on the average annual earnings of actual firefighters hired off the applicable exam, as were the aggregate settlement amounts, the earnings bands approximated the claimants' percentage mitigation. (Mot. for Provisional Entry at 18-19.) In other words, if the parties had continued to litigate, the backpay award for a claimant with 75% mitigation would have been half that of a claimant with 50% mitigation; the backpay award for a claimant with 25% mitigation would have been three times that of a claimant with 75% mitigation. (Id. at 19.)

Plaintiffs represent that the earnings bands and point values were "chosen in order to maintain this award ratio for Claimants as closely as possible." (Id.) Indeed, under the point-value methodology, a claimant with 25% mitigation received 6 points, and a claimant with 75% mitigation received 2 points—as such, the 25% mitigation claimant does in fact receive a backpay award three times that of the 75% mitigation claimant. (See id. (chart of earnings bands for nonhire claimants).)

Additionally, the settlement's treatment of claimants who did not respond to discovery requests is appropriate. As the court explained at a May 7, 2014, status conference, it would be unfair to other claimants (claimants who did fulfill their discovery obligations) to overcompensate claimants who did not do so with a windfall to which they were not entitled, as that windfall would reduce the amount of all other claimants' awards. (May 7, 2014, Status Conf. Tr. at 10:5-25.)

Thus, based on the point-value system's close approximation of what claimants would receive in a full, litigated claims process, and the benefits that inhere from avoiding the continuation of such a process, the court finds the backpay allocation to nonhire claimants to be fair, reasonable, adequate, lawful, and consistent with the public interest.

c. *Allocation of Backpay to Delayed-Hire Claimants*

Plaintiffs explain that the parties were "in the midst of gathering information to enable such individualized determinations on the backpay and fringe benefits, when [they] agreed in principal to settle these claims," and thus they lacked complete interim earnings information for delayed-hire claimants at the time of settlement. (Tr. at 23:4-7, 26:2-3.) Therefore, the allocation of backpay settlement funds to delayed-hire claimants does not take into account

interim earnings. Instead, delayed-hire claimants in each damages category were allocated backpay proportionately based on their individual months of delay.

A pro rata allocation based on months of delay is consistent with the court's prior decisions (June 3, 2012, Mem. & Order at 12; Final Relief Order at 9, 11-12), and it is both equitable and legally appropriate (June 3, 2012, Mem. & Order at 12). Ingram v. Madison Square Garden Ctr., Inc., 709 F.2d 807, 812 (2d Cir. 1983) (finding that the "fairer procedure" where qualified claimants outnumber lost job openings is to "compute a gross award for all the injured class members and divide it among them on a pro rata basis"); see also Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 161 n.6 (2d Cir. 2001) (approving of class-wide computation of monetary relief where the number of qualified class members exceeds the number of openings lost to the class), overruled in part by Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011). Moreover, the allocation methodology's failure to account for individual claimants' actual interim earnings—which would have occurred had the claims process gone through to its litigated conclusion—does not prevent the court from approving the Decree. By allocating funds based on claimants' months of delay, the settlement accounts for individual circumstances to a reasonable (and significant) degree, while also accounting for the current posture of the claims process and the interest in easing burdens to claimants. Accordingly, the court approves this methodology.

### d. Allocation of Fringe Benefits

In prior rulings, the court held that the City's fringe benefits liability would be valued by the health care premiums and out-of-pocket medical expenses actually incurred by eligible claimants, and which they would not have incurred had they been on the City's health insurance plan. (Backpay Summ. J. Op. at 39-40; Aug. 20, 2012, Mem. & Order (Dkt. 946) at 1.) The

court also noted that although claimants would have to prove their actual expenses, documentary evidence might not necessarily be required to do so.  (Aug. 20, 2012, Mem. & Order at 3-4.)

In January 2013, claimants were first notified that they may be eligible to receive compensation for expenses paid for health insurance and medical care, and they were advised that they should gather and organize documentation in order to prove such expenditures.  (See Mem. in Supp. of Final Entry at 26; id., App'x E at 1.)  On December 2, 2013, during the individual claims process, claimants were sent a Fringe Benefits Claims Form, setting a February 3, 2014, deadline for return of the form.  (See, e.g., Obj.-Ex. 57 at MRCD_OBJ_000453.)  Finally, in April 2014, claimants were given another chance to submit a claim for fringe benefits and were informed that no additional materials would be accepted after May 9, 2014.  (See Mem. in Supp. of Final Entry, App'x E at 2-4; see also Mem. in Supp. of Provisional Entry at 9.)

As described in greater detail above, the Decree allocates the aggregate fringe benefits settlement amounts via two components:  All claimants receive a pro rata distribution of approximately 20% of the fringe benefits settlement; and claimants who submitted fringe benefits claims forms and/or additional documentation prior to May 9, 2014, receive a proportion of their claimed expenses, subject to a cap set at the 97.5th percentile of claimed expenses.  The parties explain that they instituted this "two-pronged approach" in order to maintain consistency with the court's ruling that fringe benefits must be calculated on an individualized basis, based on actually-incurred expenses, "while also recognizing that the fringe benefits claims process was interrupted by the settlement agreement reached in this case."  (Tr. at 16:16-21; see also Mem. in Supp. of Provisional Entry at 20-21.)  The court agrees that this approach strikes an appropriate balance between adherence to the court's prior directives, including individualized

treatment, and enjoyment of the benefits of the settlement process, including avoidance of a full,

litigated claims process.  Additionally, the use of the claimed expenses cap ensures that sufficient

funds remain in the pool to compensate appropriately all individuals who submitted such a claim;

and the parties' instruction that the Claims Administrator not verify information on submitted

claims forms, supra pages 18-19 and note 23, eases a burden on claimants, and is consistent with

prior court directives.  (See Aug. 20, 2012, Mem. & Order at 3-4.)  Accordingly, the court

approves this portion of the allocation methodology under the applicable standard.

<em>e.     Calculation and Allocation of Interest</em>

The court's prior rulings held that prejudgment interest, at a rate equal to the average

United States one-year constant maturity Treasury yield, would be added to each claimant's net

backpay and fringe benefits awards for each year of his or her backpay period, and compounded

annually.  (June 3, 2012, Mem. & Order at 11, 15; Final Relief Order at 11-12; see also 28

U.S.C. § 1961(a).)  The Decree's calculation of interest on aggregate settlement amounts is fully

in keeping with this ruling (see Mem. in Supp. of Provisional Entry at 21), and as the Decree

allocates these aggregate interest amounts proportionally to claimants based on their backpay and

fringe benefits awards (id.), see also supra Part II.B.4 (describing interest calculation and

allocation), the allocation is both consistent with the court's prior Orders and equitable.

**B.     Objections**

As noted above, 103 claimants submitted written objections to the Decree (four of which

were substantively favorable) and/or to their proposed individual awards, and/or spoke in

opposition thereto at the Fairness Hearing.  For the reasons discussed below, the court

SUSTAINS objections by seven claimants: objections by claimants 200000216, 200000323,

200000459, 200000896, and 200000431 regarding the use of their actual average annual interim

earnings, versus assumed maximum interim earnings, in the calculation of their backpay awards; claimant 200000337's objection regarding the discrepancy between the race indicated on his claim form and that used by Plaintiffs in calculating his individual award; and claimant 200007062's objection requesting the withdrawal of his claim. The court OVERRULES all other objections. As the court is sustaining the same seven objections that Plaintiffs recommend be sustained, the court APPROVES the Amended Proposed Relief Awards List as the Final Relief Awards List.

1. <u>Settlement Amounts and Overall Allocation</u>

a. *Settlement Amounts*

Eight claimants submitted objections that appear to challenge either the aggregate settlement amount of $99,098,358.29 or the per-damages-category sub-aggregate amounts. (Obj.-Exs. 7, 9, 33, 41, 54, 71, 90, 92.) Specifically, claimant 200000214 objects to the total settlement amount's being lower than the approximately $128 million, not accounting for mitigation, that the court held the City liable to pay in wage backpay through the end of 2010. (Obj.-Ex. 7.) Several claimants appear to object that backpay amounts do not account for items such as overtime, vacation or holiday pay, and potential promotions. (Obj.-Exs. 9, 54, 90; <u>see also</u> Obj.-Ex. 33 ("Not enough back pay.").) Three of these claimants object to the use of damages categories and/or the distinctions being made between them: Claimant 200006382 contends that Exam 2043 should not receive less than Exam 7029 (Obj.-Ex. 92; Tr. at 89:15-24 (Sonera)); claimant 200002572 argues that claimants should not be categorized, because all were equally discriminated against (Obj.-Ex. 71); and claimant 200001140 objects that it is a violation of the Equal Protection Clause to distinguish between claimants on the basis of race (Obj.-Ex. 41).

None of these objections provides grounds for the court to reject the Decree. The $128 million figure was a pre-mitigation number; under applicable law and the court's prior Orders, should the claims process proceed absent settlement, the City will be permitted to prove that claimants mitigated their damages or failed to do so—and the total amount of aggregate backpay would thus likely be substantially reduced. (<u>See</u> Backpay Summ. J. Op. at 48-49; June 3, 2012, Mem. & Order; Aug. 22, 2012, Mem. & Order.) Furthermore, as explained above, the settlement reflects an approximately 15% discount off the City's expected total liability, a discount that the court finds fair, reasonable, and adequate, given the desirability of speeding recovery and avoiding the continuation and completion of a burdensome claims process. Additionally, as the court explained in its prior rulings, each damages category has experienced a discrete economic loss as a result of that category's unique hiring shortfall. (June 3, 2012, Mem. & Order at 9, 13.) Therefore, it is appropriate that the settlement draw distinctions between damages categories to reflect these distinct losses. Moreover, the Decree's use of damages categories does not draw distinctions based on race, but rather based on claimants' status as victims of the City's discrimination. (<u>See</u> Mem. & Order Addressing Objs. to Proposed Relief Order at 8 (drawing these distinctions in providing "make-whole" relief does not implicate the Equal Protection Clause (citing <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 374 n.61 (1977); <u>Acha v. Beame</u>, 531 F.2d 648, 656 (2d Cir. 1976))).) Finally, the aggregate settlement amounts, like the $128 million in maximum total backpay, which serves as a ceiling from which to assess the settlement, do account for overtime, specialty, and non-entry level pay. (<u>See</u> Tr. at 102:4-17; Backpay Summ. J. Op. at 29.) Accordingly, these objections are OVERRULED.

b.       *Allocation Generally*

Several claimants raise objections regarding the allocation of aggregate settlement funds. Five claimants argue that the settlement funds should be distributed evenly between all claimants or raise similar contentions.  (Obj.-Exs. 41 ("[A]ll of the rejected candidates were equally damaged in reputation stature and good standing in their communities."), 71 ("It didn't affect one person more than the other.  We were all affected . . . ."), 73; see also Obj.-Exs. 38 (suggesting that nonhire claimants should not receive greater awards than delayed-hire claimants), 92 (arguing that claimants eligible on the basis of Exam 2043 should not receive lower awards than those eligible due to Exam 7029); see also Tr. at 89:15-24 (Sonera).)  It is equitable and appropriate that, as between nonhire and delayed-hire claimants eligible for relief in connection with the same exam, and all else being equal, nonhire claimants receive a greater individual award.  Having never been hired by the FDNY, nonhire claimants experienced a greater loss in wages than those claimants who were eventually appointed.  Similarly, Exam 7029 claimants generally experienced a greater loss than Exam 2043 claimants, because they took the discriminatory exams years earlier.  For these reasons, as well as those explained directly above (e.g., the court's findings that each damages category experienced a discrete economic loss as a result of that category's unique shortfall, and that it is therefore appropriate for the settlement to draw distinctions reflecting these different losses), these objections are OVERRULED.

One claimant who was appointed to the FDNY in July 2013 as a priority hire objects that priority hires should receive greater awards than nonhire claimants.  (Obj.-Ex. 40.)  Specifically, claimant 200001113 explains that he "believe[s] those that have been hired as priority hires proved that they should have been as of the original test, and therefore should be paid a higher percentage than those who have not been hired or made it through FDNY's process . . . ."  (Id.

(emphasis in original).)  But the differences in economic loss experienced by nonhire claimants versus delayed-hire claimants are not echoed as between nonhire claimants who have been successful in their bids to become priority hires at the FDNY versus those who have not. Furthermore, the monetary relief eligibility criteria requires claimants to have been qualified for appointment to the FDNY at the time they took the exams; the eligibility criteria for priority hiring relief, however, requires that these individuals be presently qualified for appointment. Therefore, a claimant's failure to qualify for priority hiring relief does not mean that the claimant would not or should not have been appointed at the time of the original examination.  Instead, the eligibility criteria set for monetary relief was meant to ensure that all claimants who would receive such relief were, in fact, qualified for appointment at the former time. Claimant 20000113's objection is therefore OVERRULED.

Finally, six claimants object on the basis that the allocation methodology is non-transparent or confusing.  (Obj.-Exs. 21, 71, 73, 80, 81, 85; see also Tr. at 88:2-17 (Guest).)  The court disagrees.  Although the allocation methodology is complex, it is not opaque; Plaintiffs' filings in support of entry of the Decree explain the methodology and its rationale in sufficient detail (as does the instant Memorandum and Order).  Accordingly, these objections are OVERRULED.

### 2.    Backpay Allocation Methodology

#### a.    *Backpay Awards' Failure To Equal What Claimants Would Have Earned as Firefighters*

The vast majority of objections are, in sum and substance, that individual awards do not equal what claimants would have earned as firefighters.  Certain delayed-hire claimants object that their backpay awards do not equal what they would have earned as firefighters during their respective months of delay.  (Obj.-Exs. 1, 10, 24, 34, 36, 38, 42, 51, 55, 56, 58, 59, 62, 66, 71,

72, 74, 76, 79, 80, 83, 84, 85, 86, 87, 88, 90, 91, 94, 95, 97, 99; Additional Written Submissions (Dkt. 1494-1) at 1-4; see also Tr. at 70:5-21 (Duarte), 86:19-23 (Waite).)  Others object on the grounds that their awards do not equal what they would have earned during their months of delay minus their actual interim earnings.  (Obj.-Exs. 20, 43, 70, 101; Tr. at 87:13-88:12 (Guest); 91:2-18 (Roldan).)

Similarly, a number of nonhire claimants submitted objections that their backpay awards do not equal what they would have earned during their damages period, or the same minus interim earnings.  (Obj.-Exs. 4, 6, 7, 16, 18, 44, 49, 54, 57, 61, 67; see also Tr. at 66:24-67:9 (Velez).)  One nonhire claimant contends that "[a]t minimum, the award should equal the amount a fireman makes annually as per their current contract multiplied by the twelve years it took to settle this lawsuit."  (Obj.-Ex. 100.)  Certain claimants, both delayed hires and nonhires, argue further that their backpay awards should take into account all premium, holiday, vacation, sick, overtime, top grade, promotional, and other specialty pay that they lost out on during the time they were not working as firefighters.  (Obj.-Exs. 20, 37, 45, 48, 51, 65, 71, 72, 75, 81, 84, 85, 87; see also Tr. at 71:13-20 (Foster).)

Again, none of these objections provides a basis for the court to deny final entry of the Decree.  Claimants are neither entitled to individual backpay awards that equal what they would have earned as firefighters, nor what they would have earned as firefighters less actual interim earnings, because the number of eligible claimants far exceeds the number of shortfall positions. The City cannot be held liable for more than the amount of injury it inflicted, which is what would occur if all eligible claimants were to receive backpay in the amount that they would have earned as firefighters.  (See June 3, 2012, Mem. & Order at 6 ("[T]he measure of the compensation that injured persons should receive should 'be equal to the injury' that the City's

actions inflicted." (citing <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 418 (1975))); <u>see also</u> <u>id.</u> at 7.)  Indeed, even if the claims process were to proceed through to its conclusion, the salary that would have been earned by the 293 shortfall hires—the total amount of pre-mitigation backpay lost to nonhire claimants—would be split between the 995 nonhire claimants who were found eligible for monetary relief.[34]  (<u>See</u> <u>id.</u> at 9.)  Similarly, the salary that was lost to the 249 shortfall delays during their hypothetical months of delay would be split among the 475 delayed-hire claimants who were found eligible for monetary relief.  (<u>See</u> <u>id.</u> at 12.)  Furthermore, as noted above, the aggregate settlement amounts from which claimants' backpay awards are derived do, in fact, account for overtime, specialty, and non-entry level pay.  <u>See</u> <u>supra</u> Part IV.B.1.a.  (<u>See also</u> Tr. at 102:4-17.)  Accordingly, these objections are OVERRULED.

### b.  Interim Earnings Methodology

Five claimants have objected that interim earnings should not be considered when calculating backpay awards.  (Obj.-Exs. 5, 29, 35, 41, 60.)  For example, claimant 200001025 writes that by taking interim earnings into account, he is being "hurt for making more money" (Obj.-Ex. 35), and claimant 200001920 states that the same is unfair because if he had been hired by the FDNY, he would not have had to settle for his current job (Obj.-Ex. 60).  These objections are OVERRULED.  As discussed above, if the claims process were to continue, claimants' awards would be reduced by their interim earnings and/or by their failure to mitigate damages.

---

[34]  Even more specifically, the shortfall salary amounts attributable to each nonhire damages category (114 black Exam 7029 shortfall nonhires; 62 Hispanic Exam 7029 shortfall nonhires; 72 black Exam 2043 shortfall nonhires; and 45 Hispanic Exam 2043 shortfall nonhires) would need to be split by eligible claimants within that category, even before a reduction for interim earnings or failure to mitigate.  (<u>See</u> June 3, 2012, Mem. & Order at 5-6; Backpay Summ. J. Op. at 5-6, 7-8.)  The shortfall salary amounts attributable to each delayed-hire damages category (68 black Exam 7029 firefighters who were delayed in their start dates, leading to a total of 20.03 years of lost wages; 86 Hispanic Exam 7029 firefighters who were delayed in their start dates, leading to a total of 23.11 years of lost wages; 44 black Exam 2043 firefighters who were delayed in their start dates, leading to a total of 14.08 years of lost wages; and 51 Hispanic Exam 2043 firefighters who were delayed in their start dates, leading to a total of 12.36 years of lost wages) too would need to be split by eligible claimants within that category.  (<u>See</u> Backpay Summ. J. Op. at 6-7, 41-42.)

Title VII imposes a duty on victims of discrimination to mitigate their damages; the City would be permitted to prove mitigation and reduce its liability. (See Backpay Summ. J. Op. at 48-49; June 3, 2012, Mem. & Order; Aug. 22, 2012, Mem. & Order.)

Claimant 200002056 objects to the placement of nonhire claimants' average interim earnings into earnings bands and the use of the point system in determining nonhire claimants' individual backpay awards. (Ex. 67; Additional Written Submissions (Dkt. 1494-1) at 5-8; Tr. at 67:10-22 (Velez); Fairness Hr'g, Ex. 1.)[35] This claimant is correct that the court's prior rulings held that interim earnings would be calculated on individual bases. However, as discussed above, the court finds that the point-value system appropriately accounts for individuals' interim earnings—and indeed closely approximates the ratios of aggregate backpay liability that individual claimants would receive in a fully litigated claims process—while at the same time alleviating the burden to claimants of such a process, and allowing for enjoyment of the benefits of settlement. Accordingly, this objection is OVERRULED.

        3.    Individual Backpay Awards

        *a.*    *Interim Earnings Calculation: Individual Delayed-Hire Claimant*

Claimant 200000901, a delayed-hire claimant, objects to the way his interim earnings were purportedly used in calculating his backpay award. (Obj.-Ex. 31 (arguing that the claimant's military base pay only, and not combat, hostile fire, or "BAH" pay, should be taken into consideration in calculating his interim earnings).) But interim earnings were not used to calculate this claimant's backpay award. As described above, delayed-hire claimants' backpay awards were calculated pro rata, based on claimants' months of delay. Accordingly, this claimant's objection is OVERRULED.

---

[35] One delayed-hire claimant also appears to object to the use of interim earnings bands (see Tr. 91:4-5 (Roldan)); however, as explained above, interim earnings were not used to calculate backpay awards for delayed-hire claimants and as such, neither were earnings bands. This objection is accordingly OVERRULED.

b.	*Interim Earnings Calculations: Individual Nonhire Claimants*

Eight nonhire claimants raise issues regarding the specific calculations of their own average annual interim earnings.  (Obj.-Exs. 8, 12, 14, 15, 30, 46, 53, 57.)  Three of these objections lack merit.  Claimant 200001293 appears to contend that income he used to attend school during his damages period should not be included in his average annual interim earnings (Obj.-Ex. 46); claimant 200001806 argues that his interim earnings should have been calculated by reference to his net, not gross, annual earnings (Obj.-Ex. 57); and claimant 200001689's objection is unclear (Obj.-Ex. 53).  First, the allocation methodology does not discount any claimant's interim earnings for any type or category of expenses, so the failure to do so for claimant 200001293's tuition expenses is not unfair.  Indeed, discounting interim earnings for certain types of expenses (such as schooling) would require both a great deal more information from all claimants and determinations by either the parties or the court as to what types of expenses warrant such treatment.  This would involve additional time and complication, thus divesting the settlement of many of its benefits, and would not necessarily result in a more equitable result; as there is no readily evident way to determine which types of expenses would deserve such discounting, this would likely result in somewhat arbitrary determinations.  Second, all claimants' interim earnings were calculated on a gross income basis; the treatment of claimant 200001806's interim earnings on this same basis was therefore fair and equitable.[36]  Finally, claimant 200001689's objection is unclear; it therefore provides no basis for the court to consider a recalculation of this claimant's award.  These three objections are therefore OVERRULED.

The remaining five claimants in this category submitted objections, or responses that Plaintiffs recommend that court treat as objections, to the effect that their backpay awards should

---

[36]  And as the parties note, the court used gross firefighter income to calculate aggregate backpay amounts, and the parties used claimants' gross income to estimate the City's likely total liability after a fully litigated claims process.  (See Mem. in Supp. of Final Entry at 24 (citing Backpay Summ. J. Op. at 29, 43).)

not have been calculated assuming they had earned the maximum average annual interim earnings during their damages periods.  (Obj.-Exs. 8, 12, 14, 15, 30; see Mem. in Supp. of Final Entry at 20-22.)  Plaintiffs also recommend that the court sustain these objections.[37]  (Mem. in Supp. of Final Entry at 20-22.)  As discussed above, at the time Plaintiffs sought provisional entry of the MRCD and filed the PRAL with the court, they lacked complete interim earnings information for nineteen claimants, including the five claimants at issue (claimants 200000216, 200000323, 200000459, 200000896, and 200000431).  Specifically, Plaintiffs believed that these five claimants had failed to respond to the City's discovery requests or to a May 13, 2014, mailing inquiring whether they had worked for a railroad employer.  (Id. at 21.)  However, one of these claimants (claimant 200000431) objected that he had not failed to respond to the discovery requests; upon receiving the objection, Plaintiffs realized that this claimant had in fact timely responded to the discovery request and indicated that he had not worked for a railroad employer.  (Id. at 21-22; see Obj.-Ex. 14.)  Accordingly, claimant 200000431's objection is SUSTAINED.

The other four claimants submitted objection forms and/or returned responses to the May 13, 2014, mailing inquiry—but only after the May 23, 2014, deadline set by the mailing— confirming that they had not worked for a railroad employer, and that the interim earnings information held by the parties was therefore complete as to them.  Claimants 200000216 and 200000459 returned their forms on July 7, 2014, and July 11, 2014, respectively.  (Mem. in Supp. of Final Entry at 22; Obj.-Exs. 8, 15.)  Claimants 200000323 and 200000896 returned their forms on July 28, 2014, and August 12, 2014, respectively, along with their timely objections to the Decree. (Obj.-Exs. 12, 30.)  Although these responses were submitted after the May 23, 2014, deadline set by the May 13, 2014, mailing inquiry, three factors lead the court to excuse

---

[37]  The City does not oppose this position.  (See Mem. in Supp. of Final Entry at 1.)

this delay and sustain these claimants' objections. First, the May 13, 2014, mailing inquiry set a relatively short deadline (10 days); second, the court-approved notice sent to these claimants regarding the Decree and their proposed individual awards informed them that should they "provide the outstanding requested information regarding . . . interim earnings, the Court may agree to provide . . . an increased backpay award" (see MRCD, Attachment D (Dkt. 1435-4) at 2-3); and third, given the significant consequences to these claimants of assuming maximum interim earnings—indeed, the difference to some of these claimants in using actual earnings versus assumed maximum earnings is the difference between receiving the greatest versus least number of points, and results for all of them in an approximately $100,000 to $150,000 difference in backpay award—fairness warrants that the court sanction the use of their actual interim earnings. Accordingly, these objections are SUSTAINED.

### c. Calculation of Months Delay: Delayed-Hire Claimants

Two delayed-hire claimants raise issues regarding the months-of-delay figures that were used to calculate their individual backpay awards. (Obj.-Exs. 76, 77.) First, claimant 200003152 states that he "was on both 7029 and 2043 lists. [I]t says months of delay is 23 months. It[']s actually 7 years." (Obj.-Ex. 76.) This objection is OVERRULED. Although claimant 200003152 took both exams (see Mem. in Supp. of Final Entry at 25), he was found eligible by this court only with respect to Exam 2043, and he did not object to that determination. (See June 6, 2013, R&R of Special Master Cohen (Dkt. 1145-1); Aug. 9, 2013, Mem. & Order.) Accordingly, the 23 months-of-delay figure used to calculate claimant 200003152's individual backpay award is correct.[38]

---

[38] Claimant 200003152 was actually hired by the FDNY on April 11, 2006 (see APRAL at 34); the first FDNY Academy class was hired with respect to Exam 2043 on May 25, 2004.

Second, claimant 200003312 objects that he was actually appointed to the FDNY on July 29, 2013, yet his months of delay (44) were calculated as though he had been appointed several years earlier, on January 20, 2008. (Obj.-Ex. 77.) Claimant 200003312 presents unique factual circumstances, which caused Special Master Cohen to recommend that the court hold claimant 200003312 eligible pursuant to an equitable exception, although he had originally concluded that claimant 200003312 did not meet the eligibility criteria set forth by the court; the court adopted this recommendation. (Apr. 18, 2013, R&R of Special Master Cohen (Dkt. 1098-3); June 7, 2013, Mem. & Order.)

Specifically, Special Master Cohen explained in his Report and Recommendation that claimant 200003312 took and passed Exam 2043. (Apr. 18, 2013, R&R of Special Master Cohen at 7.) However, before he completed the hiring process, claimant 200003312 was called to active duty by the United States Marine Corps; when he completed his military service, he took and passed the physical exam, and was inserted into the Exam 2043 eligible list, with list number 4882.5. (Id.) The City represented that with this list number, claimant 200003312 would have been considered for appointment to the January 2008, class, had he not been on active military duty at that time. (Id.) Due to his military service, the claimant was first considered for the January 2009, class, to which he was offered a position; however, before he was able to begin at the Fire Academy, the City cancelled the January 2009, class due to budgetary reasons. (Id.) Claimant 200003312 did not meet the definition of either "Nonhire Claimant," because he passed Exam 2043 and did not receive a list number higher than 5646, or "Delayed-Hire Claimant," because he was never in fact appointed as an entry-level firefighter; however, had it not been for claimant 200003312's military service combined with the City's cancellation of the January 2009, class, he would have met the definition of "Delayed-Hire

Claimant." (Id. at 8.)  Accordingly, Special Master Cohen recommended, and the court agreed, that claimant 200003312 be granted monetary relief and retroactive seniority as a delayed-hire claimant.  (Id.; June 7, 2013, Mem. & Order.)  Due to the unusual circumstance, claimant 200003312 was also granted priority hiring relief, as he had never actually been appointed as entry-level firefighter ((Apr. 18, 2013, R&R of Special Master Cohen (Dkt. 1098-3); June 7, 2013, Mem. & Order), and he was ultimately appointed to the July 2013, class as a priority hire.  (Mem. in Supp. of Final Entry at 26.)

The parties explain in their memorandum that claimant 200003312 was assigned an appointment date of January 20, 2008, for purposes of calculating his delayed-hire backpay award, because that would have been his appointment date had it not been for his military service.  (Id.)  The court agrees that January 20, 2008, is the appropriate hire date for the calculation of this claimant's backpay award, as the further delay experienced by claimant 200003312 beyond January 20, 2008, is attributable to claimant 200003312's military service, and not solely to the City's discrimination.[39]  Accordingly, claimant 200003312's objection is OVERRULED.

---

[39]  The parties also contend that to calculate this claimant's backpay award using his actual July 2013, appointment date would "unfairly dilute[] the aggregate settlement amount to the detriment of the other Delayed-Hire Claimants in his damages category."  (Mem. in Supp. of Final Entry at 26.)  Although the court finds the parties' other rationale sufficient, the court also notes that claimant 200003312's 44-month delay is, aside from five claimants who were hired in July 2008, and who thus experienced 49 months of delay, the longest period of delay experienced by Exam 2043 delayed-hire claimants.  (See generally APRAL.)  To calculate this claimant's award using a July 2013, appointment date, would correspond to approximately 110 months of delay, or 2.66% of the total months of delay (4,134, including the additional months that would be attributable to this claimant) experienced by those in this claimant's damages category (Hispanic Exam 2043 delayed-hire claimants).  (See Am. Barrero Decl., Ex. C.)  Additionally, this would result in his receiving 2.5 times the backpay award of other claimants in his damages category who were called for appointment on January 20, 2008.  As the further delay experienced by claimant 200003312 beyond January 20, 2008, is attributable to claimant 200003312's military service, and not solely to the City's discrimination, such inconsistency between individuals who are similarly situated, in relevant part, would be inappropriate.

4.      Fringe Benefits

Four claimants raise objections regarding their individual fringe benefits awards, and request that their individual fringe benefits awards be increased to account for additional medical expenses.  (Obj.-Exs. 17, 39, 46, 57.)  Claimant 200001078 objects that he "filed a claim for medical expenses and it[']s not calculated into my settlement."  (Obj.-Ex. 39.)  This appears to relate to a $5,800.00 LASIK bilateral eye surgery.  (Id. at MRCD_OBJ_000288.)

Claimant 200001293 "request[s] additional $13,000 for charges accrued by overnight hospital stay for both C-section child births . . . ."  (Obj.-Ex. 46.)  Claimant 200000471 also requests that various additional medical expenses, which he acknowledges were untimely submitted, be incorporated into the calculation of his award.[40]  (See Obj.-Ex. 17 at MRCD_OBJ_000087; see also Tr. at 93:4-16, 94:8-19 (Darby).)  Claimant 200001806 submits a spreadsheet claiming an additional $50,460.51 in out-of-pocket medical expenses.  (Obj.-Ex. 57 at MRCD_OBJ_000433.)

Plaintiffs contend that these objections should be overruled on the grounds that the additional expenses were untimely submitted.  (See Mem. in Supp. of Final Entry at 26-27.)  Specifically, claimant 200001078's additional expenses were submitted on May 28, 2014; claimant 200001293's additional expenses were submitted in August 2014; and claimant 200000471's additional expenses were submitted in July and August 2014.  (Id. at 27.)  It appears that claimant 200001806's additional expenses were submitted on August 14, 2014.  (Obj.-Ex. 57 at MRCD_OBJ_000433.)

---

[40]  The court also notes that claimant 20000471 appears to believe that his proposed fringe benefits award consists only of the fixed share (see Obj.-Ex. 17 at MRCD_OBJ_000089); however, his proposed fringe benefits award also includes claimed actual medical expenses timely submitted by this claimant—the fixed award for Exam 2043 nonhire claimants, including claimant 200000471, is $960, see supra Part II.B.3, and his proposed fringe benefits award is greater than that amount.  (See APRAL at 8.)

49

The court agrees with Plaintiffs. Claimants were originally notified in January 2013, that they may be eligible to receive compensation for expenses paid for health insurance and medical care, and advised at that time that they should gather and organize documentation in order to prove such expenditures. (See Mem. in Supp. of Final Entry at 26; id., App'x E at 1.) Moreover, claimants were sent a Fringe Benefits Claims Form, which stated clearly that the deadline for returning the form and claiming such expenses was February 3, 2014 (see, e.g., Obj.-Ex. 57 at MRCD_OBJ_000453); and, in April 2014, after the original deadline had passed, claimants were given yet another chance to submit a claim for fringe benefits, and were informed via email and postcard that no additional materials would be accepted after May 9, 2014 (see Mem. in Supp. of Final Entry, App'x E at 2-4). Although these claimants were given an additional, three-month grace period to submit materials after the original deadline passed, they failed to do so. Indeed, they were originally notified of the need to collect information in support of fringe benefits claims over fifteen months before the final May 9, 2014, deadline.

The claimants have presented no explanation that justifies or excuses the failure to meet the final deadline.[41] (See, e.g., Obj.-Ex. 17 at MRCD_OBJ_000087 (noting that the claimant "came across" the documentation "by chance"); Tr. at 93:4-16 (Darby).) Moreover, the three factors that led the court to sustain the objections of five claimants regarding the calculation of their backpay awards assuming that they had earned the maximum average annual interim earnings during their damages periods, supra Part IV.B.3.b, are not present here. As explained directly above, claimants were given a great deal of time to collect the information at issue; claimants were never notified that additional fringe benefits claims submitted as objections may

---

[41] Additionally, the spreadsheet submitted by claimant 200001806 conflicts with that claimant's prior sworn statement. This claimant submitted a fringe benefits form that was received by the Claims Administrator on January 27, 2014, in which he responded that he had paid $0 in premiums and $0 in out-of-pocket medical expenses in each of the years 2001-2013. (Obj.-Ex. 57 at MRCD_OBJ_000456-68.) He certified under the penalty of perjury that these responses were true and correct. (Id. at MRCD_OBJ_000468.)

be considered by the court; and a substantially smaller amount of money is at issue, such that failing to award these claimants their additional expenses will not result in patent unfairness. Accordingly, the court OVERRULES these four claimants' objections.

### 5. Deductions from Individual Awards

Claimant 200001975 objects to the withholding of employee pension contributions and interest thereon from her individual award. (Obj.-Ex. 63 ("I do not think that the settlement is fair or adequate if I have to pay out to the employer that discriminated against me in the first place pension and interest.").) The court held that eligible priority hires and delayed-hire claimants would be entitled, as part of retroactive seniority relief, to retroactive pension benefits. (Final Relief Order at 14-15; Apr. 19, 2012, Mem. & Order.) That relief is, as a general matter, outside the scope of the Decree. As noted above, the City began to provide other aspects of retroactive seniority relief in July 2013; it has not yet begun to award retroactive pension benefits, and but it intends to do so at the same time it issues claimants' individual monetary relief awards pursuant to the Decree. See supra page 7 and note 6. (See also Aug. 20, 2014, Ltr.)

During a firefighter's employment, both the employee and the City are required to make contributions to the FDNY pension fund. (United States's Mem. in Supp. of Mot. for Order Requiring City to Pay Interest Due on Claimants' Minimum Employee Pension Contributions ("Mem. in Supp. of Pension Interest Mot.") (Dkt. 1457) at 6).) According to the City, retroactive funding of a claimant's pension requires four elements: (1) the minimum employee pension contribution that the claimant would have made had the claimant been hired on his or her presumptive hire date; (2) interest on the claimant's minimum employee contribution; (3) the employer contribution the City would have made had the claimant been hired on his or her

presumptive hire date; and (4) interest on the City's employer contribution. (Aug. 20, 2014, Ltr; see also Mem. in Supp. of Final Entry at 28.) The City agrees that it must pay the employer contribution and interest thereon, so only the employee pension contribution and interest thereon are at issue here.

Notably, the parties dispute who—the individual claimant or the City—should be required to pay into the pension system the back interest on the minimum employee contribution, and the United States has moved for an order requiring the City to do so. (United States's Mot. for Order Requiring City to Pay Interest Due on Claimants' Minimum Employee Pension Contributions (Dkt. 1456).) This is not resolved by the Decree, and the court will determine in a separate decision whether the City or claimants must pay this interest. If the court determines that the City is responsible for such interest, those amounts will not be withheld from claimants' backpay awards; if the court determines that claimants are instead responsible, such withholding will be appropriate. Accordingly, this portion of Claimant 200001975's objection is OVERRULED.

The Decree does, however, provide that individual awards to claimants granted retroactive seniority will be reduced by employee pension contributions. (See Mem. in Supp. of Final Entry at 28-29; AMRCD ¶ 39.) This is appropriate. Title VII make-whole relief is intended to place claimants "as near as may be, in the situation [they] would have occupied" had there been no discrimination. Albemarle Paper Co. v. Moody, 422 U.S. 405, 418-19 (1975) (internal quotation marks and citation omitted); Ingram v. Madison Square Garden Ctr., Inc., 709 F.2d 807, 811 (2d Cir. 1983) ("In fashioning a remedy for employment discrimination, 'the court must, as nearly as possible, recreate the conditions and relationships that would have been had there been no unlawful discrimination.'" (quoting Int'l Bhd. of Teamsters v. United States, 431

U.S. 324, 372 (1977))). It is not intended to make victims more (or less) than whole. (Backpay Summ. J. Op. at 39 (citing Teamsters, 431 U.S. at 364).) Had delayed-hire claimants or priority hires been hired earlier, in the absence of discrimination, they would have been required to make minimum employee contributions to the FDNY pension fund, in the form of regular paycheck deductions. (Mem. in Supp. of Pension Interest Mot. at 6, 10; Tr. at 29:5-17.) Therefore, it is appropriate that claimants who receive retroactive pension benefits have their minimum employee contributions withheld. Additionally, claimants will have an opportunity to reject an award of retroactive pension benefits, and any claimant who does so will avoid having the employee contributions withheld. (Mem. in Supp. of Final Entry at 29.) Accordingly, the remaining portion of claimant 200001975's objection is OVERRULED.

Similarly, two claimants raise issues regarding the taxation of their individual awards. (Obj.-Exs. 47, 48.) These objections do not provide grounds for the court to deny final entry of the Decree, as the Internal Revenue Code requires employers to withhold income and FICA taxes from Title VII backpay awards, whether awarded by judgment or settlement. Noel v. N.Y. State Office of Mental Health Cent. N.Y. Psychiatric Ctr., 697 F.3d 209 (2d Cir. 2012). Accordingly, these objections are OVERRULED.

6.      Other Objections to Individual Awards

A number of claimants submitted objections regarding their individual awards more generally. Eleven claimants object that their individual awards are too low when compared to the total settlement amount of approximately $99 million, or compared to other claimants' awards, or generally (without explanation). (Obj.-Exs. 1, 21, 32, 33, 42, 52, 56, 58, 64, 78, 93.) As discussed above, the court finds the allocation methodology utilized in the calculation of claimants' awards to be fair and reasonable, and these claimants have provided no basis for

finding that the calculation of their individual awards was flawed in any way.  Accordingly, these objections are OVERRULED.

### 7.  Eligibility Category

Claimant 200000095, who took both Written Exam 2043 and 7029, asks the court to reconsider its decision holding him eligible with respect to only Exam 2043.  (Obj.-Ex. 2; see Jan. 22, 2013, R&R of Special Master Cohen (Dkt. 1044-1); Feb. 22, 2013, Mem. & Order; May 2, 2013, Mem. & Order.)  Pursuant to the Final Relief Order, a claimant is only eligible for relief in connection with each examination if he satisfied "mandatory, minimum qualifications at the time [he] applied for a position of entry-level firefighter," which included the requirement that he had "obtained citizenship by four years after the date of the establishment of the relevant eligible list:  the relevant eligible list for Exam 7029 was established on November 15, 2000; and the relevant eligible list for Exam 2043 was established on May 5, 2004."  (Final Relief Order at 7.)  Claimant 200000095 was held not eligible for relief in connection with Exam 7029 because he had not yet received citizenship by the necessary date.  (See Obj.-Ex. 2.) Claimant 200000095 did not file an objection with Special Master Cohen or the court at the time that he was informed of this eligibility determination; he did not seek an equitable exception to the eligibility criteria.  Therefore, claimant 200000095's objection is OVERRULED.

Claimant 200000337 has informed the court that his notice of award listed him as a Hispanic claimant, but he identifies as black, not Hispanic.  (Obj.-Ex. 13 at MRCD_OBJ_000054.)  An examination of the claim form originally submitted by this claimant in this action illustrates that he did, in fact, indicate his race as black.  (Id. at MRCD_OBJ_000057.)  The United States reports that the discrepancy is due to an administrative error on its part.  (Mem. in Supp. of Final Entry at 23.)  Notably, the Special

Master's recommendation finding claimant 200000337 to be eligible for relief, which was adopted by the court, did not mention his race; it referenced only the exam eligibility recommendation. (Jan. 22, 2013, R&R of Special Master Cohen; Feb. 22, 2013, Mem. & Order; May 2, 2013, Mem. & Order.) Accordingly, as claimant 200000337's failure to raise this issue earlier is due to no fault on his part, the court instructs the United States to correct its error at this time. Claimant 200000337's objection is SUSTAINED; he shall be awarded relief as a black Exam 2043 nonhire claimant. Additionally, Plaintiffs' request that claimant 200000337 be moved from the Hispanic Priority Hire List to the Black Priority Hire List (Mem. in Supp. of Final Entry at 23) is GRANTED; the court hereby MODIFIES its June 13, 2013, Order Approving Priority Hires Lists (Dkt. 1147, as modified by Dkt. 1235) accordingly. Plaintiffs are also DIRECTED to see that claimant 200000337 receives notice documents regarding Plaintiff-Intervenors' Injunctive Relief and Nonhire Victim Subclasses, and that he is permitted to submit a compensatory damages claim should he wish to do so.

8.     <u>Objections Outside Scope of the Decree</u>

The majority of the remaining objections fall outside the scope of the Decree, as explained below. Therefore, they provide no basis for denial of final approval and entry thereof.

*a.*     *Priority Hiring Process*

Four claimants raise objections relating to the priority hire process. (Obj.-Exs. 3, 28, 50, 87.) Claimant 200000107 objects that when he took the original exam, he was younger and in better shape, and would have had no problem passing the physical tests; however, now, he is having a difficult time with those requirements to entry to the Fire Academy. (Obj.-Ex. 3.) Claimant 200000861 appears to contend that he was not provided legally required accommodations for a disability when he took Exam 2000 in connection with the priority hiring

process.  (Obj.-Ex. 28; Oct. 15, 2014, Ltr. (Dkt. 1491).)  Claimant 200001461 objects that he feels that the FDNY is biased against priority hire candidates, or that the priority hiring process has been unfair due in part to his being older than when he originally took the discriminatory exam.  (Obj.-Ex. 50; Tr. at 63:23-66:2 (Patrick).)  Claimant 200005610, a delayed-hire claimant, objects that priority hire candidates did not have to obtain 30 college credits, as he states was required in connection with his appointment off the Exam 2043 list.  (Obj.-Ex. 87.)

These objections are all outside the scope of the agreement that is currently under consideration.  Criteria governing eligibility for priority hiring relief, and the rationale underlying that criteria, has been set forth by the court in its previous orders (e.g., Final Relief Order at 12-14; Mem. & Order Addressing Objs. to Proposed Relief Order at 6-7, 10-11; Initial Remedial Order at 19-21), and is affected in no way by the Decree.  Nor do other complaints related to the priority hiring process, such as allegations of bias in the FDNY, affect the court's contemplation of the Decree; these types of issues should be brought to the attention of the Court Monitor, who oversees the implementation of priority hiring relief and the Modified Remedial Order.  As these objections are not relevant in the present context, they are OVERRULED.

### b.    Retroactive Seniority

Twelve claimants raise objections relating to retroactive seniority relief.  (Obj.-Exs. 6, 20, 29, 45, 48, 65, 69, 81, 85, 87; Additional Written Submissions (Dkt. 1494-1) at 1-4; Tr. at 91:19-24 (Roldan).)  The majority of these claimants object, in substance, that the Decree does not provide compensation for pension contributions and other seniority lost as a result of their delayed hiring or failure to have been hired.  (Obj.-Exs. 6, 20, 29, 45, 48, 65, 69, 81, 87; Additional Written Submissions (Dkt. 1494-1) at 1-4; see also Tr. at 71:4-13 (Foster).)  Claimant 200001359, who is a nonhire claimant, writes that he "should be eligible to qualify for

a vested pension calculated by the amount of years I was awarded by the court." (Obj.-Ex. 48.) Claimant 200005403 asks whether he will receive retroactive seniority under the Decree. (Obj.-Ex. 85.)

As with priority hiring relief, retroactive seniority relief is outside the scope of the Decree. The court separately ruled that delayed-hire claimants and nonhire claimants awarded priority hiring relief would receive both retroactive "benefits seniority," which includes, inter alia, seniority for purposes of calculating an individual's salary or other pay, pension benefits, and future accrual or leave, and retroactive "competitive seniority," which includes seniority that is used for, inter alia, transfers, special assignments, promotions, and layoffs/recall. (Final Relief Order at 14-15.) Accordingly, these claimants are, independent of the Decree, receiving effective compensation for various types of seniority lost due to the City's discrimination. And the court's determination that nonhire claimants who are not ultimately hired as priority hires will not receive such relief is not presently up for reconsideration; nor is it related to the Decree in any way. In sum, these objections are outside the scope of the Decree, and they are OVERRULED.

<em>c.     Compensatory Damages for Noneconomic Harm</em>

Four claimants raise objections relating to compensatory damages for noneconomic loss. (Obj.-Exs. 7, 57, 85; Tr. at 99:3-13 (Calzado).) For example, claimant 200001806 states that he "object[s] to Hispanic claimants not being eligible to [receive] compensatory damages," and that to distinguish between black and Hispanic claimants is itself discrimination. (Obj.-Ex. 57.) Similarly, one claimant stated at the Fairness Hearing that he felt it was unfair that Hispanic claimants were not eligible to receive compensatory damages awards. (Tr. at 99:3-13 (Calzado).) Claimant 200005403 appears to object that he had not yet received payment from

the City in connection with the offer of judgment he accepted on his compensatory damages claim.[42]  (Obj.-Ex. 85.)

First, the court notes that only black claimants are eligible for noneconomic damages because only Plaintiff-Intervenors (who represent subclasses of black firefighters and firefighter applicants), and not the United States (who brought claims on behalf of both black and Hispanic candidates), sought such damages in this action.  (See Apr. 10, 2012, Ltr. at 2 n.2.)  Moreover, claimants' noneconomic damages claims are in no way addressed by the Decree; instead, these claims are being resolved on individual bases through Rule 68 offers of judgment and individual hearings before the Special Masters.  See supra pages 7-8.  Noneconomic damages are outside the present scope, and accordingly, these objections are OVERRULED.

### d.      Punitive Damages

One claimant objects on the grounds that the Decree does not provide relief in the form of punitive damages.  (Obj.-Ex. 48.)  Punitive damages are outside the scope of the Decree; no claims for punitive damages are settled thereby.  Indeed, punitive damages are not available for disparate impact Title VII liability; rather, they are available only in the case of intentional discrimination.  See 42 U.S.C. § 1981a(a)(1).  Accordingly, this objection is OVERRULED.

### e.      Miscellaneous Objections Outside Scope of the Decree

The court has also received a number of objections to additional miscellaneous issues that are outside the scope of the current settlement agreement.

A number of these are related to intangible losses that claimants feel are attributable to the City's discrimination, such as the lost opportunity to have fulfilled one's dreams, or to have

---

[42]  As claimant 200000403's objection is dated August 3, 2014 (Obj.-Ex. 85), and the court approved payment to claimant 200000403 in connection with his acceptance of the City's Rule 68 offer of judgment on August 14, 2014 (see Aug. 14, 2014, Order (Dkt. 1448); Notice (Dkt. 1348)), the court assumes that payment has now been made.  If claimant 200000403 has not yet received payment on his compensatory damages offer of judgment, he should contact the Claims Administrator to follow up on this issue.

worked for the City.  (Obj.-Exs. 23, 36, 37, 47, 60, 82, 92.)  Other claimants note that they suffered embarrassment, settled for a less desirable job, lost recreational or family time that was spent doing overtime as a result of having a less remunerative career, were unable to qualify for a mortgage and purchase a home, or live in a less desirable neighborhood than might have been possible if hired as a firefighter.  (Obj.-Exs. 37, 47, 57, 60; Tr. at 74:19-75:1 (Holder).)  One delayed-hire claimant objects that she accrued student loan debt in connection with the pursuit of a master's degree, a degree she would not have pursued had she been hired by the FDNY earlier.  (Obj.-Ex. 63; Tr. at 59:15-60:2, 60:19-24, 62:2-18 (Whyte); see also Tr. at 75:2-6 (Holder).)  Another claimant notes that he paid higher interest on consumer debt and student loans due to lack of access to a credit union, and he seeks reimbursement for the difference.  (Obj.-Ex. 57.)

As statements outside the scope of the Decree, none of these provide the court with a basis for denying final approval and entry thereof, and they are all OVERRULED.

### 9.  Positive Responses

Four claimants submitted objection forms that include, in substance, statements in support of the settlement agreement.  (Obj.-Exs. 13 ("At this time no objection thank you[.]"), 22 ("Not an objection at this time[.]"), 27 ("I'm in agreement with the amount I am supposed to receive[]."), 98 ("Basis of my objection: None – I accept[].").)  As positive statements, these do not provide any reason for the court to reject the Decree.

### 10.  Blank Forms and Unclear Objections

Four objection forms were blank (Obj.-Exs. 11, 19, 26, 68), and the court is unable to determine the basis for the objections submitted by three additional claimants (Obj.-Exs. 25, 82, 89 ("My story needs to be heard.  List # 1947 2043 Exam.")).  These provide no basis for the court to reject the Decree; they are OVERRULED.

11.    Request To Withdraw Claim

Claimant 200007062, a delayed-hire claimant, filed an objection seeking to withdraw his claim for relief, and asking that he have no further involvement with the case.  (Obj.-Ex. 96 ("I DO NOT want any back pay . . . nor any months added for delay . . . . I DO NOT want my name associated whatsoever with this lawsuit, [and wish to] have my name removed from any involvement pertaining to this case.").)  The court sees no reason not to permit claimant 200007062 to withdraw his claim; accordingly, claimant 200007062's objection is SUSTAINED.  Additionally, in accordance with the claimant's wishes, the City shall revoke any retroactive seniority already granted and shall not award retroactive pension benefits to claimant 200007062.  Plaintiffs are further DIRECTED to see that the Claims Administrator replies to claimant 200007062's email, confirming that the court has granted his request, and attaching a copy of this Memorandum and Order.  However, claimant 200007062's objection does not provide any grounds for the court to deny final approval and entry of the Decree.

C.    **Service Awards**

Case law supports the award of incentive, or service, awards to class representatives, if "related to the personal risk incurred by the [class representative] or any additional effort expended by the [class representative] for the benefit of the lawsuit."  Dupler v. Costco Wholesale Corp., 705 F. Supp. 2d 231, 245 (E.D.N.Y. 2010) (citing Parker v. Time Warner Entm't Co., 631 F. Supp. 2d 242, 279 (E.D.N.Y. 2009)); see also Roberts v. Texaco, Inc., 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  The Decree provides service awards of $15,000 to each of the seven individual Plaintiff-Intervenors and a $50,000 award to the Vulcan Society.  Plaintiff-Intervenors have dedicated their time and effort over a significant number of years in pursuit of this litigation—indeed, the Vulcan Society, Candido Nunez, Roger Gregg, and Marcus Haywood

filed the original EEOC complaints that formed part of the basis for the United States's initiation

of the lawsuit in 2002 and 2005, respectively. (<u>See</u> July 17, 2007, Ltr. Mot. to Intervene

(Dkt. 19).) As all Plaintiff-Intervenors have expended sufficient time and effort in the

prosecution of this action to justify these awards, and no objections have been lodged, the court

APPROVES the service awards.

## V.    CONCLUSION

Accordingly, for the reasons discussed above:

- Objections filed by claimants 200000216, 200000323, 200000459, 200000896, 200000431, 200000337, and 200007062 to the Monetary Relief Consent Decree and/or Proposed Relief Awards List are SUSTAINED. Additionally, Plaintiffs' request that claimant 200000337 be moved from the Hispanic Priority Hire List to the Black Priority Hire List is GRANTED; the court hereby MODIFIES its June 13, 2013, Order (Dkt. 1147, as modified by Dkt. 1235) accordingly. Plaintiffs are DIRECTED to see that claimant 200000337 receives notice documents regarding Plaintiff-Intervenors' Injunctive Relief and Nonhire Victim Subclasses, and that he be permitted to submit a compensatory damages claim should he wish to do so.

- All other objections are OVERRULED; and

- Plaintiffs' Joint Motion for Final Entry of Amended Monetary Relief Consent Decree (Dkt. 1467) and Plaintiffs' Joint Motion to Amend Attachments E & F to Amended Monetary Relief Consent Decree (Dkt. 1525) are GRANTED. The Amended Monetary Relief Consent Decree (Dkt. 1468), Attachments A through D thereto (Dkts. 1468-1 to -4), and Second Amended Attachments E & F

(Dkts. 1468-1 and -2) are hereby deemed FINALLY APPROVED AND

ENTERED.  The Amended Proposed Relief Awards List (Dkt. 1468-1) is

APPROVED as the Final Relief Awards List.

SO ORDERED.

/s Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
Dated: Brooklyn, New York
March 11, 2015

United States District Judge