UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

UNITED STATES OF AMERICA,

                  Plaintiff,

        -and-

THE VULCAN SOCIETY, INC., *for itself and on
behalf of its members,* JAMEL NICHOLSON, *and*
RUSEBELL WILSON, *individually and on behalf
of a subclass of all other victims similarly situated
seeking classwide injunctive relief;*

ROGER GREGG, MARCUS HAYWOOD, *and*
KEVIN WALKER, *individually and on behalf of a
subclass of all other non-hire victims similarly
situated;* and

CANDIDO NUÑEZ *and* KEVIN SIMPKINS,
*individually and on behalf of a subclass of all other
delayed-hire victims similarly situated,*

                  Plaintiff-Intervenors,

        -against-

THE CITY OF NEW YORK,

                  Defendant.

-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

       Before the court is the United States's Motion for an Order Requiring the City to Pay

Interest Due on Claimants' Minimum Employee Pension Contributions (the "Motion").

(Dkt. 1456.) Defendant City of New York (the "City") opposes the Motion. (City's Mem. in

Opp'n to the Mot. ("Def.'s Opp'n") (Dkt. 1460).) Plaintiff-Intervenors have submitted

memoranda in support of the United States's Motion.[1] (Pl.-Ints.' Ltr.-Br. on Interest Charges on

---

[1] Plaintiff-Intervenors do not officially join in the Motion.

1

Back Contributions from Non-Hires and Delayed Hires ("Pl.-Ints.' Mem.") (Dkt. 1451); Pl.-Ints.' Reply to Def.'s Opp'n ("Pl.-Ints.' Reply") (Dkt. 1459).) For the reasons discussed below, the Motion is GRANTED.

## I.    BACKGROUND

The court assumes familiarity with the factual and procedural background of this case, which is extensive. Only that which is immediately relevant to consideration of the Motion will be summarized here.[2]

### A.    Procedural History

In 2007, the United States brought suit against the City, alleging that certain aspects of the City's policies for selecting entry-level firefighters for the New York City Fire Department ("FDNY") violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., as amended. (Compl. (Dkt. 1).) Specifically, the United States alleged that the City's pass-fail and rank-order use of Written Exams 7029 and 2043 had an unlawful disparate impact on black and Hispanic candidates for entry-level firefighter positions. (See id. ¶ 1.) The Vulcan Society, Inc. and several individuals intervened as plaintiffs, alleging similar disparate impact claims and also alleging claims of disparate treatment on behalf of a class of black entry-level firefighter candidates, bringing these claims under federal, state, and local laws. (See Sept. 5, 2007, Mem. & Order (Dkt. 47) (granting motion to intervene).)

Proceedings were bifurcated. In July 2009, the court granted summary judgment in favor of the United States's and Plaintiff-Intervenors' (collectively, "Plaintiffs") Title VII disparate impact claims, finding the City liable. (July 22, 2009, Mem. & Order (Dkt. 294).) Subsequently, in January 2010, the court granted summary judgment in favor of Plaintiff-Intervenors' various

---

[2] A more fulsome recounting can be found in the court's previous rulings, including, most recently, the court's March 11, 2015, Memorandum & Order (Dkt. 1571), approving the Amended Monetary Relief Consent Decree (Dkt. 1252) and related items.

disparate treatment claims, and Plaintiff-Intervenors' disparate impact claims brought pursuant to the New York State Human Rights Law and New York City Human Rights Law. (Jan. 13, 2010, Mem. & Order (Dkt. 385).) On appeal, the Second Circuit vacated the court's summary judgment ruling only with respect to Plaintiff-Intervenors' disparate treatment claims, finding that a trial was needed to determine whether the City had acted with discriminatory intent. See United States v. City of New York, 717 F.3d 72, 89-91 (2d Cir. 2013).

Moving to the remedial phase of the case, the court issued an Initial Remedial Order (Dkt. 390) in January 2010, explaining that Plaintiffs were entitled to two broad categories of relief: (1) prospective injunctive relief to ensure future compliance with Title VII; and (2) individual compensatory, "make whole" relief for the individual victims of the disparate impact of the City's hiring process.[3] Over the City's objection, the court held that individual "make whole" relief would include—in addition to monetary (backpay and fringe benefits) relief and priority hiring relief—retroactive seniority for individual delayed-hire victims and non-hire victims granted priority hiring relief. (Id. at 22-31.) The court addressed retroactive seniority relief and priority hiring relief in greater detail in a subsequent Memorandum and Order dated April 19, 2012. (Dkt. 861.)

In October 2012, after a four-day fairness hearing, the court issued its Final Relief Order (Dkt. 1012), setting forth final guidelines governing individual compensatory relief. In the Final Relief Order, the court awarded retroactive seniority relief, consisting of retroactive competitive seniority and retroactive benefits seniority, to all delayed-hire claimants and nonhire claimants appointed as priority hires to the FDNY as an element of the make-whole relief necessary to

---

[3] The City's liability for compensatory, "make whole" relief was unaffected by the Second Circuit's reversal of this court's disparate treatment summary judgment ruling, as the entitlement to compensatory relief flowed directly from the disparate impact liability. (See Mar. 8, 2012, Mem. & Order (Dkt. 825) at 62 (noting that the outcome of the City's appeal of the disparate treatment opinion would not affect any noneconomic damage determinations).)

3

remedy the City's disparate impact discrimination. (Final Relief Order at 14-15.) Retroactive benefits seniority includes "seniority for purposes of calculating an individual's salary or other pay, pension benefits, and future accrual of leave, including vacation personal, and sick leave, as well as any other purposes for which seniority is used in determining the amount of or eligibility for employee benefits." (Id.) The City began to provide the other aspects of retroactive seniority relief to eligible claimants in July 2013, but the City has not yet awarded retroactive pension benefits. (See Aug. 20, 2014, Joint Ltr. (Dkt. 1450).)

Independently, the parties settled Plaintiffs' claims for monetary compensatory relief consisting of backpay and fringe benefits, including interest thereon, and in June 2014, the court granted the parties' joint motion for provisional approval and entry of the Monetary Relief Consent Decree ("MRCD") (Dkt. 1435) (Joint Mot. for Provisional Entry of MRCD & Scheduling of Fairness Hr'g (Dkt. 1433)). (June 30, 2014, Order (Dkt. 1437).) Subsequently, in March 2015, the court granted final approval of a slightly-amended version of the settlement agreement, the Amended Monetary Relief Consent Decree ("AMRCD") (Dkt. 1468). (See Mar. 11, 2015, Mem. & Order (Dkt. 1571).)

The Amended Monetary Relief Consent Decree provides that payments will be issued to claimants within 150 days after final entry thereof (AMRCD ¶ 39), and the City intends to award retroactive pension benefits at the same time these payments are made (Aug. 20, 2014, Joint Ltr). The Amended Monetary Relief Consent Decree further provides that the City will withhold from claimants' backpay awards all employee pension contributions for any claimants who were awarded retroactive seniority by the court. (AMRCD ¶ 39.) The City also seeks to withhold interest on the claimants' minimum employee pension contributions; meanwhile, the United

4

States and Plaintiff-Intervernors take the position that the City should be responsible for these back interest payments. This constitutes the dispute currently before the court.

### B. Retroactive Funding of Pension Benefits

When a firefighter is appointed to the FDNY, he or she becomes a member of the Fire Department Pension Fund (the "Fund"). (United States's Mem. of Law in Supp. of Mot. ("United States's Mem.") (Dkt. 1457) at 6; see also Fire Department Pension Fund Subchapter II, Summary Plan Description ("Plan Description") (United States's Mem., Attach. A (Dkt. 1457-1)) at 7.) Based on their dates of hire, all eligible claimants will be Tier II members of the Fund, and enrolled in the Improved Benefits Plan. (See Plan Description at 8; Def.'s Opp'n at 3.) The Improved Benefits Plan is a statutory plan, and the full retirement allowance is comprised generally of a City-funded pension and a separate annuity portion funded by employee contributions. (Def.'s Opp'n at 3; see also Decl. of the Actuary of the N.Y.C. Retirement Sys., Robert C. North, Jr. ("North Decl.") (Def.'s Opp'n, Attach. 1 (Dkt. 1460-1)) ¶ 4; Plan Description at 23.) See also N.Y.C. Admin. Code §§ 13-313, et seq. The court will use the colloquial term "pension" to refer to all portions of the retirement allowance, as it has done in its prior opinions, and in keeping with the Fund's name.

During a firefighter's employment, the employee and the City are both required to make contributions to the Fund. (See Plan Description at 9.) As explained above, the employee's contributions are allocated to the annuity portion of the Fund, and the City's contributions are allocated to the pension portion of the Fund. Ordinary employee contributions range from 4.3% to 8.65% of salary, depending on the employee's age of entry as a firefighter. (Def.'s Opp'n at 3; see also Plan Description at 9.) Employee contributions earn interest, at the rate of 8.25%

5

per year, compounded annually. (Plan Description at 9.) See also N.Y.C. Admin. Code §§ 13-327(a)(2), 13-313(8)(f)(C) (defining "regular interest" rate for purposes of actuarial valuation).

The City makes employer contributions to the Fund. (Plan Description at 9.) Additionally, pursuant to a program called "Increased-Take-Home-Pay" ("ITHP"), the City pays a portion of what would otherwise be employee contributions—up to 5% of the employee's gross salary—which in turn reduces the contributions made by the employee. For example, an employee subject to a 7.3% contribution rate would only actually contribute 2.3% of his or her salary; the City would cover the other 5%. (Id.; Def.'s Opp'n at 3.) Employer contributions, including ITHP payments, are allocated to the "pension" portion of the Fund, which also earns 8.25% annual interest, compounded annually. (See Plan Description at 23.) See also N.Y.C. Admin. Code § 13-313(8)(f)(C). The amount that must continue to be paid by the employee after the 5% ITHP reduction is referred to as the "minimum required contribution."[4] (Plan Description at 9.)

In order to fund a claimant's pension retroactively, the minimum employee and employer contributions must both be replaced, but this alone is insufficient; the interest that would have accrued on those contributions must also be replaced. (United States's Mem. at 6.) Accordingly, retroactively funding a claimant's pension requires four elements: (1) the minimum employee pension contribution that the claimant would have made, had the claimant been hired on his or her presumptive hire date; (2) 8.25% interest on the claimant's minimum employee contribution, compounded annually; (3) the employer contribution that the City would have made, had the claimant been hired on his or her presumptive hire date; and (4) 8.25% interest on the City's employer contribution, compounded annually. (Aug. 20, 2014, Joint Ltr.) All parties agree that

---

[4] An employee may choose to "waive" ITHP; this means that the City continues to pay the additional 5% but the employee contributes more than the minimum required contribution, which results in a greater annuity at retirement or a lump-sum, tax-deferred return of excess. (Plan Description at 9.)

claimants must pay the minimum employee contribution, and that the City must pay both the employer contribution and annually-compounded interest on the employer contribution. The current dispute concerns whether the City or claimants should be responsible for the financial burden of 8.25% annually-compounded back interest on the minimum employee contributions.

## II.    DISCUSSION

The City contends that the New York City Administrative Code ("City Code") requires claimants to pay the 8.25% statutory interest rate on their own minimum contributions. It further argues that this is not contrary to Title VII's "make whole" objective because the payments will ultimately benefit claimants, and requiring the City to pay the interest would go beyond "make whole" relief by increasing the settlement amount contemplated in the Amended Monetary Relief Consent Decree. The United States argues that the City Code does not require claimants to pay interest on their own back contributions, and that even if it were construed to do so, it would be in conflict with Title VII's purposes and therefore preempted as applied here. The United States strongly disputes that the Amended Monetary Relief Consent Decree requires the City's desired result. As discussed below, the court agrees with the United States, and GRANTS the United States's Motion. The City is ORDERED to pay the interest due on claimants' minimum employee contributions as a necessary element of the retroactive seniority granted in the Final Relief Order.

### A.    New York City Administrative Code

As noted above, the City Code governs the FDNY's pension benefit structure. The City argues that section 13-327(a)(2) of the City Code, as "consistently interpreted" by the New York City Office of the Actuary (the "Actuary") (an interpretation that the City contends the court

7

should defer to), requires claimants to pay the interest on their employee contributions. (Def.'s Opp'n at 5 & n.2 (citing North Decl. ¶¶ 5, 10).) Section 13-327(a)(2) of the City Code provides:

> Upon the basis of the tables herein authorized, and regular interest, the actuary of such board shall determine for each non-elective improved benefits plan member (as defined in subdivision four-h of section 13-313 of this subchapter) the proportion of compensation which, when deducted from each payment of his or her prospective earnable compensation prior to his or her eligibility for retirement and accumulated at regular interest upon the attainment of the minimum period of service retirement elected by him or her, shall be computed to provide, at that time, an annuity equal to twenty-five seventy-fifths of the pension then allowable to him or her for service as a member. Such proportion of compensation shall be computed to remain constant.

N.Y.C. Admin. Code § 13-327(a)(2). "[R]egular interest" is defined in another provision of the City Code as 8.25% annually-compounded interest. N.Y.C. Admin. Code § 13-313(8)(f)(C).

As a matter of plain language, there is nothing contained in section 13-327(a)(2) to even suggest, much less mandate, that an employee pay back interest on any owed employee contributions. To the contrary, the provision merely indicates that the Actuary should take into consideration the interest that will accrue when calculating the employee contributions necessary to provide a fully-funded pension upon retirement. Therefore, the court does not independently construe section 13-327(a)(2) to require the City's desired result; additionally, the court does not defer to the Actuary's interpretation, for at least three reasons. First, by the Actuary's own words, its statutory duties do not appear to extend to making this purported interpretation. (See North Decl. ¶ 6(b) (noting that the Actuary's statutory duties include merely determining the required minimum employee contributions, and failing to attest to any duties relating specifically to the payment of interest on those contributions).) See also N.Y. Admin. Code § 13-313(8)(f)(C) (same). Second, even if deference to the Actuary's stated interpretation were otherwise appropriate, the court would not grant such deference here because it is an

8

unreasonable interpretation of section 13-327(a)(2), for the reason previously stated—that there is nothing within the text of this provision that lends itself to such an interpretation. Finally, as discussed below, even if section 13-327(a)(2) could be construed consistently with the City's approach, such construction would conflict with Title VII's remedial purpose and thus would be preempted by the federal statute.

The North Declaration, submitted by the City in support of its Opposition, also references a different provision of the City Code, N.Y.C. Admin. Code § 13-315(j)(5)-(10).[5] (See North Decl. ¶ 12.) This provision is somewhat more on point, as it deals with deficiencies in employee contributions to the Fund, and the repayment of those deficiencies. See N.Y.C. Admin. Code § 13-315(j)(5)-(10). Section 13-315(j)(5)-(9) provides as follows:

> (5) For the purpose of payment of a contribution rate deficiency or any part thereof to the pension fund by an improved benefits plan member who is subject to such a deficiency, such deficiency shall be deemed to consist of:
>
>> (i) the amount thereof, without regular interest thereon, if such member completed his or her minimum period for service retirement before becoming an improved benefits plan member; or
>>
>> (ii) the amount thereof, plus regular interest and special interest, if any, thereon, from his or her date of commencement of contributions as an improved benefits plan member (as defined in subdivision nineteen of such section) 13-313 to (A) the date of completion of his or her minimum period for service retirement, or (B) the date of payment, if such member becomes an improved benefits plan member before completion of his or her minimum period for service retirement.
>
> (6) For the purpose of payment of a contribution rate deficiency or any parts thereof to the pension fund by an improved benefits plan discontinued member who is subject to such deficiency, such deficiency shall be deemed to consist of the amount thereof, plus regular interest and special interest, if any, thereon from the date of

---

[5] For reasons unclear, the City's opposition memorandum does not itself reference this section of the City Code.

commencement of contributions as an improved benefits plan member, as applicable to such member, to and including the date next preceding the date of payment.

(7) No contribution rate deficiency which includes regular interest and special interest, if any, thereon as provided for by paragraphs five and six of this subdivision j shall be deemed paid unless the amount thereof, together with such regular interest and special interest, if any, is paid in full to the pension fund.

(8) Subject to the provisions of paragraphs five, six and seven of this subdivision, each improved benefits plan member who is subject to a contribution rate deficiency may, at any time while he or she is a member, at his or her election pay to the pension fund the amount of such deficiency or so much thereof as remains unpaid.

(9) Subject to the provisions of paragraph five of this subdivision, at any time before the date of required commencement plan discontinued member who is subject to a contribution rate deficiency, he or she may at his or her election pay to the pension fund the amount of such deficiency or so much thereof as remains unpaid.

N.Y.C. Admin. Code § 13-315(j)(5)-(9) (emphases added).

Additionally, section 13-315(j)(10) of the City Code states that "[t]he board shall adopt rules and regulations governing the payment of a contribution rate deficiency or the unpaid portion thereof in lump sum, in periodic installments or in such other manner as the board shall prescribe; provided, however, that such rules and regulations shall not conflict with the provisions of paragraphs five to nine, inclusive, of this subdivision j." N.Y.C. Admin. Code § 13-315(j)(10). In his Declaration, Robert C. North, Jr., the Actuary of the New York City Retirement Systems, avers that rules established pursuant to section 13-315(j)(10) by the Fund's Board of Trustees require that whenever an FDNY employee fails to make a required contribution to the Plan or delays contribution, the employee must make the interest payments

necessary to correct any deficiency resulting from those delayed or unmade employee contributions. (North Decl. ¶ 12.)

As a general matter, the Board of Trustees's interpretation of this provision is not entirely unreasonable, as the provision specifically defines the contribution rate "deficiency" to include the unpaid (or delayed-paid) employee contributions and the 8.25% annually compounding interest thereon, and it contemplates that the employee may pay that defined "deficiency" back to the Fund. N.Y.C. Admin. Code § 13-315(j)(5), (7)-(8); see also id. § 13-313(8)(f)(C). Accordingly, the Board of Trustees's rules may well be reasonable and appropriate under the typical circumstances in which employees make late contributions to their FDNY pensions (what could be termed "retroactive" contributions), and the interest that did not—but should have—accrued on those contributions must be replaced.

Indeed, it makes perfect sense that if an employee were, due to that employee's conduct, to fail to make minimum contributions for some period of time while employed at the FDNY, that employee would be responsible for replacing the non-accrued interest to correct the deficiency. In such a circumstance, the employee's failure to make contributions caused the deficiency in interest. Fund paperwork specifically contemplates that a deficiency may result from an employee's choice not to pay minimum contributions, or to take a loan from his or her pension funds. (See Plan Description at 23 (noting that "shortages may result from a contribution rate deficiency, any prior loans, unpaid loans, and/or nonpayment of contributions, i.e., 138-B regulation"); id. at 10 (explaining that an employee may make an "138-B election" and accordingly choose not to make any pension contributions in order to further increase take-home pay).)[6]

---

[6] Other similar circumstances may arise when an employee "buys back" retroactive pension credits due to his or her affirmative conduct. (See Plan Description at 11 (discussing "buyback credit").) For example, employees who were

However, the current situation is markedly different, and the court does not construe section 13-315(j)(5)-(9) or the Board of Trustees's rules to require payment of back interest by claimants. Notably, it is not clear that a "contribution rate deficiency," as defined in the City Code, or in regular parlance, can be said to exist here. The provision specifically defines the deficiency as including "the amount thereof, plus regular interest . . . from his or her date of commencement of contributions as an improved benefits plan member . . . ." N.Y.C. Admin. Code § 13-315(j)(5)(ii). Claimants have not yet commenced making contributions to the Plan. As a matter of ordinary language, it is unclear that any deficiency can exist where the retroactive portion of the pension does not, and will not, exist until the City finally awards the court-ordered retroactive pension benefits.

Moreover, in the court's view, claimants receiving retroactive seniority have neither failed to make payment nor delayed payment of their required contributions (cf. North Decl. ¶ 12), since they were never given the opportunity to make such payments, having not been hired by the City due to the discriminatory exams. As the United States correctly explains, "[t]he cause of the 'deficiency' is key. Here, it is the City, not the claimant, who caused the 'deficiency' in the claimant's pension." (United States's Reply at 6 (internal scare quotes added).) Accordingly, the court will look to Title VII to determine where to place the responsibility for payment of back interest on claimants' pension contributions.[7] But as with section 13-327(a)(2), and as discussed below, even were the court to construe this section of the

eligible for membership in any New York City or New York State retirement system but did not become members of such system may "buy back" pension credit for the time that was formerly eligible. (Plan Description at 12.)

[7] Cf. Dunn v. City of New York, 164 N.E.2d 709 (N.Y. 1959) (looking to New York State military law that granted accelerated retirement date for Fund members with military service in order to determine whether those members should pay actuarial cost of their additional years of service credit). Although the City cites Dunn in support of its position (Def.'s Opp'n at 5), the case does not support the City's desired result; however, it does support a proposition that the proper answer to the instant dispute is found in the statute that provides the basis for claimants' retroactive benefits.

City Code to require claimants to pay the interest at issue, it would find Title VII to preempt that result.

## B.    Title VII and "Make Whole" Relief

The court ordered the relief at issue in this dispute—retroactive pension benefits for all delayed-hire and priority hire claimants—in its Final Relief Order, as relief that is "necessary to fulfill the court's duty to remedy the City's proven past wrongs." (Oct. 26, 2012, Mem. & Order (Dkt. 1011) at 9; see also Final Relief Order at 14-15.) As the court has explained in the many remedial orders issued in this case, including in its October 26, 2012, Memorandum & Order issued contemporaneously with the Final Relief Order, Title VII's purpose is to make victims whole for injuries suffered because of unlawful employment discrimination. (See Oct. 26, 2012, Mem. & Order at 8.) See also Albemarle Paper Co. v. Moody, 422 U.S. 405, 418 (1975) ("It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination."). Indeed, "[r]etroactive seniority, along with job offers and back pay, is one of the three basic components of 'make whole' relief in hiring discrimination cases," and accordingly, there is a "presumption in favor of awarding retroactive seniority to remedy violations of Title VII." (Oct. 26, 2012, Mem. & Order at 13 (citing Wrenn v. Sec'y, Dep't of Veterans Affairs, 918 F.2d 1073, 1076 (2d Cir. 1990); Franks v. Bowman Transp. Co., 424 U.S. 747, 767-69 n.41 (1976)).)

The principle behind "make whole" relief is that the court should unwind events and place the victims of unlawful discrimination, if at all possible, in the situation (financial and otherwise) that they would have occupied at present if the discrimination had never occurred. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 372 (1977) ("After the victims have been identified, the court must, as nearly as possible, 'recreate the conditions and relationships

13

that would have been had there been no' unlawful discrimination." (quoting Franks, 424 U.S.

at 769)); Franks, 424 U.S. at 764 ("[F]ederal courts are empowered to fashion such relief as the

particular circumstances of a case may require to effect restitution, making whole insofar as

possible the victims of racial discrimination in hiring.); Albemarle, 422 U.S. at 418-19 ("The

injured party is to be placed, as near as may be, in the situation he would have occupied if the

wrong had not been committed." (internal quotation marks and citation omitted)). As the

Supreme Court has explained, "the district court has not merely the power but the duty to render

a decree which will so far as possible eliminate the discriminatory effects of the past . . . ."

Albemarle, 422 U.S. at 418 (internal quotation marks and citation omitted).

Once this principle is taken into consideration, the proper resolution of the instant dispute

is clear. If claimants had been hired as of their presumptive hire dates, they would have made

their minimum employee contributions on the required dates, and those contributions would have

accrued statutory interest as part of the Fund. The employees would have had no financial

responsibility with respect to the 8.25% annually-compounding interest on their contributions.

The City's discrimination is the cause of the delay in the contributions, and therefore also the

resulting lack of accrued interest thereon, not any actions by claimants. Accordingly, to place

claimants in the position they would have occupied but for the City's discrimination, they must

be provided retroactive pension benefits, and they must be required to pay into their pensions

only the same payments that they would have made had they been hired earlier—in other words,

only the minimum employee contributions. The City must cover the unaccrued interest.

The City's argument that requiring the City to pay these interest amounts would exceed

"make whole" relief because the interest payments will provide a benefit to claimants is

unavailing. (Def.'s Opp'n at 6-8.) The City argues that because the interest on employee

14

contributions is held in an annuity fund (along with the employee contributions), and these funds are "available for the member to use by way of an available loan," and "if the member's account is more than fully funded at retirement, the excess funds will function as an increased annuity payment at retirement," the interest equates to a benefit to claimants. (Id. at 7.) But the City misconstrues the relevant inquiry. Whether the interest that accrues in claimants' pensions "benefits" claimants is beside the point. The relief is intended to be a "benefit"—by ordering retroactive benefits seniority, the court ordered that eligible claimants enjoy the benefits, including pension benefits, that come along with FDNY employment.

The victims of discrimination are entitled to receive the same pension benefits that they would have received absent the discrimination. Therefore, what matters for present purposes is that absent the City's discrimination, this interest would have accumulated on claimants' minimum employee contributions within the Fund, and accordingly, claimants would have had the benefit of accessing these funds in the form of a loan, or of receiving an increased annuity payment on any excess funds at retirement, without having to make the additional interest payments. Similarly, firefighters who were not the victims of the City's discrimination in this case—firefighters who have been paying into their pensions since they were appointed—also receive the benefit of the interest that accrues on their employee contributions, without having to bear the burden of paying the amount of that interest. Accordingly, as a matter of "make whole" relief, it is the City that must pick up the tab on these interest payments—payments that, but for its discrimination, would not have to be retroactively made.

Additionally, although the court does not find that the City Code requires otherwise, it notes that Title VII's "make whole" purpose would preempt an interpretation of the City Code that did, as applied to the circumstances of this case. "Under the Supremacy Clause of the

15

Constitution, state and local laws that conflict with federal law are 'without effect.'" N.Y. SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 103-04 (2d Cir. 2010) (per curiam) (quoting Altria Grp., Inc. v. Good, 555 U.S. 70 (2008)). Pursuant to "conflict" preemption, a state or local law will be implicitly preempted by a federal statute if the "state [or local] requirement 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Medtronic, Inc. v. Lohr, 518 U.S. 470, 507 (1996) (Breyer, J., concurring in part and concurring in the judgment) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)); see also, e.g., United States v. Locke, 529 U.S. 89, 109 (2000); SMSA, 612 F.3d at 104. The Supreme Court has "oft-repeated" that "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case." Medtronic, 518 U.S. at 485 (opinion of the Court) (internal quotation marks and citations omitted); see also, e.g., Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992).

The Supreme Court has specifically held that making victims whole, and facilitating "the most complete relief possible," was part of Congress's intent in enacting Title VII. See Albemarle, 422 U.S. at 419 ("The 'make whole' purpose of Title VII is made evident by the legislative history."); id. at 420 ("Congress's purpose . . . was . . . to make possible the 'fashion(ing) (of) the most complete relief possible.'" (quoting 118 Cong. Rec. 7168 (1972)) (alterations in original)). Accordingly, a municipal law that prevented the court from fashioning the most complete "make whole" relief possible—which in this case, includes providing claimants with the pension benefits to which they would have been entitled absent the City's discrimination, and requiring them to pay only the same contributions that they would have been required to pay in that "but-for" world—would be subject to conflict preemption by Title VII. Cf. Teamsters, 431 U.S. at 347 ("Franks made clear . . . that retroactive seniority may be

16

awarded as relief from an employer's discriminatory hiring and assignment policies even if the seniority system agreement itself makes no provision for such relief.").

### C. Amended Monetary Relief Consent Decree

The City's final argument is also unavailing. The City contends that requiring the City to pay the interest on claimants' employee contributions would "increase the settlement amount of [the Amended Monetary Relief Consent Decree] well above the $98 million the parties agreed upon" because the Amended Monetary Relief Consent Decree "permits the City to withhold employee pension contributions from claimants' back-pay awards." (Def.'s Opp'n at 6.) The City contends, therefore, that the amounts of claimants' contributions are "inextricably tied to the parties' negotiated settlement," and that the interest payments thereon are as well. (Id.)

The United States argues that this provision was included in the Amended Monetary Relief Consent Decree for administrative purposes only—to provide a mechanism for withholding minimum employee contributions (which all parties agree must be paid by claimants) and notifying claimants of those withholdings. (United States's Reply at 3.) The United States asserts, moreover, that this was not a negotiated provision, that it was only included because the City represented that it was required by law to withhold these contributions from claimants' backpay awards, and that it was not tied to the aggregate settlement amounts in any way. (Id. at 3-4.) Furthermore, "the United States expressly declined to include interest in such provisions, based on its position that Title VII requires the City, not the claimants, to pay the interest due on claimants' employee pension contributions." (Id. at 4.) Accordingly, the United States contends that retroactive seniority, ordered by the court in the Final Relief Order, is not affected by the parties' settlement of backpay and fringe benefits.

The court agrees with the United States. The Amended Monetary Relief Consent Decree, which the court approved on March 11, 2015, expressly provides that the agreement "resolve[s] the claims of the United States and the Plaintiffs-Intervenors regarding the total amounts and allocation of back pay and fringe benefits to the black and Hispanic applicants for the entry-level firefighter position at the FDNY who were harmed by the use of the exams held to be discriminatory." (AMRCD at 3.) Moreover, at the Fairness Hearing held regarding the Amended Monetary Relief Consent Decree, and in the motion papers supporting entry thereof, the United States repeatedly characterized issues relating to retroactive pension benefits as generally outside the scope of the agreement, and represented that the instant dispute arose only when the parties were memorializing their agreement on the backpay and fringe benefits claims, and drafting the administrative positions. (See Oct. 1, 2014, Fairness Hr'g Tr. at 27:9-38:11, 29:5-17, 101:24-102:3; Mem. in Supp. of Final Entry of AMRCD and Response to Objections ("Mem. in Supp. of AMRCD") (Dkt. 1469) at 29.) For its part, the City also characterized the Amended Monetary Relief Consent Decree as settling only backpay and fringe benefits claims; and it never contradicted the United States's Fairness Hearing statements that retroactive pension benefits were outside its scope, or opposed the positions stated in the United States's briefing on the topic. (See Oct. 1, 2014, Fairness Hr'g Tr. at 31:9-32:5, 104:20-105:17; Mem. in Supp. of AMRCD at 1.)

In approving the Amended Monetary Relief Consent Decree, the court also viewed the agreement as resolving solely backpay and fringe benefits claims; it characterized retroactive seniority as generally outside the scope of the agreement, and noted that the current dispute—whether claimants or the City must pay the back interest on the minimum employee contribution—was not resolved by the agreement. (Mar. 11, 2015, Mem. & Order at 25-26, 52-

53.) Indeed, if the parties had not settled the backpay and fringe benefits claims, the City would be liable for up to $128 million in backpay in addition to all other court-ordered relief, including claimants' retroactive pension benefits. The settlement's reduction of that maximum amount to $81 million in aggregate backpay does not reduce the City's liability with respect to retroactive seniority relief, which was court-ordered and not affected by the settlement. (See id. at 26-27 (discussing the court's determination as to maximum backpay liability and the ultimate resolution of claimants' backpay claims pursuant to the Amended Monetary Relief Consent Decree).) In sum, the operative terms of the Amended Monetary Relief Consent Decree, dealing with backpay and fringe benefits, do not bear on the court-ordered retroactive pension benefits, and the paragraph providing that employee contributions will be withheld from backpay awards does not illuminate whether claimants or the City must pay the interest on those contributions. (See AMRCD ¶ 39.) Accordingly, nothing contained in the Amended Monetary Relief Consent Decree alters the court's determination that this dispute should be resolved pursuant to Title VII's "make whole" principle and purpose.[8]

### D. Plaintiff-Intervenors' Windfall Argument

In two letter briefs, Plaintiff-Intervenors raise an additional argument in support of the United States's position. Plaintiff-Intervenors argue that the City has, "in a sense, enjoyed an enormous and presumably unexpected financial windfall because only roughly fifty percent (50%) of the 293 short-fall hires ordered by the Court will actually become firefighters." (Pl.-Ints.' Mem. at 2.) Accordingly, the City is "being relieved of its total pension costs, including its own interest payments, on the other 140 projected priority hires who will not be appointed."

---

[8] Nor does the City's "ordinary practice in settlement agreements" have any relevance here. (See Def.'s Opp'n at 5.) What the City pushes for in negotiations, and what a plaintiff may agree to in another settlement or settlements (whether out-of-court or judicially approved), provide no basis for an argument that these parties agreed to the City's proposal in the Amended Monetary Relief Consent Decree (and the court has found that they did not), and do not bear on what is proper Title VII relief.

19

(Id.) The City responds that the remaining priority hire slots are not being left unfilled—rather, they will be filled with other open-competitive candidates appointed from Exam 2000, and the City will in fact be making the employer contributions and interest payments for these newly-appointed firefighters. (Def.'s Opp'n at 8.) Plaintiff-Intervenors note that the City's obligation with respect to open-competitive candidates is only for employer contributions going forward, whereas, had the slots been filled by priority hires, the City would also be paying retroactive employer contributions (and interest thereon) back to the presumptive hire dates. The City is therefore saving eight to ten years' worth of retroactive employer contributions in the amount of 5% of salary, plus 8.25% annually-compounding interest, on approximately 150 salaries. (Pl.-Ints.' Reply at 1-2 (citing North Decl. for 5% figure).) This savings, they note, is "far greater than the dollar amount of back interest on the 2.5% minimum contribution which the City seeks to impose upon the priority hires." (Id. at 2.)

This "savings" to the City is, in the court's view, less important to the determination at hand than Title VII's "make whole" principle. However, the court does recognize that another purpose of the Title VII remedy is to force employers to internalize the cost of their past discrimination in order to encourage compliance. See Albemarle, 422 U.S. at 417-18, 421. Accordingly, although the court's determination here does not depend on the fact that fewer than 293 claimants will likely become priority hires, the court does note that these circumstances only buttress the conclusion that the result is an equitable one. Additionally, to the extent that the court should take into consideration that the City will make these interest payments with public funds (see Def.'s Opp'n at 5), the overall financial burden placed on the City is certainly diminished because of these circumstances.[9]

---

[9] Conversely, the burden that would be placed on claimants if the court were to rule in the City's favor on this motion would be a large one. Claimants' individual backpay awards will represent only a portion of what they

20

## III. CONCLUSION

Accordingly, for the reasons discussed above, the United States's Motion for an Order Requiring the City to Pay Interest Due on Claimants' Minimum Employee Pension Contributions is GRANTED. The City is hereby ORDERED to pay the interest due on claimants' minimum employee contributions as a necessary element of the retroactive seniority granted in the Final Relief Order.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      April *16*, 2015

NICHOLAS G. GARAUFIS
United States District Judge

---

would have earned as firefighters. (See, e.g., Mar. 11, 2015, Mem. & Order at 41-42.) And the interest that is being paid on those awards is far less than the Fund's 8.25% annually-compounded amount—rather, claimants will receive interest of approximately 0.5% to 1.86%, compounded annually, depending on damages category. (See id. at 20 (citing Am. Decl. of Ed Barrero (AMRCD, Attach. B (Dkt. 148-2)) ¶ 26 & Ex. G).)