UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

            Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

            Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

            Defendant.
-------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## <u>MONITOR'S THIRTY-FIRST PERIODIC REPORT TO THE COURT</u>

TABLE OF CONTENTS

I.      Executive Summary ................................................................................... 1

II.     Recruitment and Attrition Mitigation ...................................................... 7

        A.      Candidate Processing ...................................................................... 8

                1.      Candidate Processing to Date ............................................... 8

                2.      CPAT Testing Dispute ........................................................... 8

        B.      Attrition Mitigation ......................................................................... 9

                1.      Recent Communications and Outreach to Candidates ............ 9

                2.      Long-Range Plans ............................................................... 12

                3.      Attrition Mitigation Programs ............................................. 13

                4.      Use of Data in Attrition Mitigation Initiatives .................... 13

        C.      Analyses of the Exam 7001 Recruitment Campaign ..................... 14

                1.      After Action Report ............................................................ 16

                2.      Cost Effective Analysis ....................................................... 17

                3.      Further Recruitment Analyses Requested by the Monitor ...... 18

        D.      Assignment Issues ........................................................................ 20

        E.      Working Group .............................................................................. 22

III.    EEO ....................................................................................................... 23

        A.      EEO Staffing ................................................................................. 23

        B.      Policies, Messaging, and Training .................................................. 24

                1.      Recent EEO Messaging ....................................................... 25

                2.      EEO Communication Plans and Other EEO Messaging ........ 29

        C.      Compliance and Accountability ..................................................... 34

                1.      Officer Performance Evaluations ......................................... 34

                2.      "Workplace Professionalism" Reporting .............................. 37

        3.      Climate Survey ................................................................ 37

    D.      Investigations ................................................................ 39

        1.      Review and Recommendations Regarding Investigations ...................... 39

        2.      Monitor Report on EEO Investigations .................................... 43

        3.      EEO Database ................................................................ 43

IV.    Medical Exam-Related Issues ................................................................ 44

    A.      Stairmill Test ................................................................ 45

    B.      Medical Exam Attrition Metrics ............................................ 46

    C.      Medical Exam Messaging .................................................... 48

V.     Character Screening by the CID and PRB ................................................ 48

VI.    Firefighter Exam ................................................................ 51

VII.   Additional Issues ................................................................ 51

I.      **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from August 4, 2020, the date of the Monitor's Thirtieth Periodic Report (Dkt. # 1976), to November 1, 2020.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Overall, since the Monitor's last periodic report, for reasons related to the COVID-19 pandemic, the City's work has continued to be impeded, suspended, or adjusted to different degrees in most (though not all) areas subject to the Modified Remedial Order.  As the Monitor previously reported, all phases of the FDNY hiring process remain suspended; plans for the resumption of candidate screening and the schedule for future Academy classes remain uncertain; and candidate communications have been more limited than they would be during normal processing.  The City has recently indicated, however, that some work by City data personnel, on such projects as analysis of the City's last recruitment campaign and the results of the FDNY climate survey, may resume to a limited extent in the next few weeks.  Since June, the City has also engaged in some EEO messaging, conducted outreach and training regarding the FDNY social media policy, and continued some EEO investigation and compliance activities.

The Monitor recognizes that some delays and constraints associated with the pandemic are unavoidable, and it appreciates the City's efforts to continue work in some areas.  However, the Monitor must also reiterate that the goals of the Modified Remedial Order and the standards

the City must meet to achieve compliance are not altered by circumstances, the passage of time, or the demands that the pandemic has made on the City's resources.  While the exigencies of the pandemic may justify delays or call for adjustments in the means employed to realize the goals of the Court's Order, its ultimate requirements are unchanged.  Accordingly, the Monitor encourages the City to continue to look for ways to resume work on Monitorship initiatives and projects wherever possible.

Part II of the report summarizes recent activities relating to the FDNY recruitment and hiring process, and to the Department's engagement with candidates on the eligible list for Exam 7001 (the rank-ordered list from which candidates are called into the hiring process).  As noted above, candidate processing has remained suspended, and plans for the resumption of processing and future Fire Academy classes have not yet been determined.  In the meantime, the FDNY Office of Recruitment and Retention ("ORR") has continued to communicate with candidates in an effort to maintain their engagement and preparation.  Notable recent communications include two Webex conferences – one intended to provide candidates with information on candidate resources and processing requirements, and another offering guidance on maintaining fitness in preparation for the Academy.  These recent efforts to maintain engagement (though so far limited) are promising, and the Monitor has suggested that the City consider additional similar events, especially events targeting non-traditional candidates.  As before, the Monitor has also continued to encourage the City to develop differentiated strategies and sequences of communications for differently situated groups of candidates within the large group that has passed the CPAT.  Such a plan remains essential for the City to meet its obligation to combat attrition among non-traditional candidates, as the lengthy wait times that some candidates on the list experience are being extended still further because of the pandemic.  The Monitor has

continued to work with its experts to develop recommendations that may assist the City in formulating a satisfactory plan.

Part II also discusses the City's efforts to reduce candidate attrition, such as the Mentor program and the Fitness Awareness Program.  The City has advised the Monitor that the Mentor program resumed in mid-August, after being suspended for reasons relating to the pandemic; but the Fitness Awareness Program – a program of in-person fitness training – remains inactive because of COVID-19 concerns.

Part II also reports on the Monitor's continuing efforts to ensure that the City performs appropriate data analyses to inform its attrition mitigation efforts for Exam 7001 candidates, and that it conducts an appropriate retrospective evaluation of the Exam 7001 recruitment campaign to inform the FDNY's plans for the next campaign.  As previously reported, while some progress had been made in both of these areas before the pandemic, since March further work on relevant projects and the Monitor's recommendations has been substantially halted because of the City's decision to withdraw its data analysis personnel from work relating to the Modified Remedial Order.

Part III of the report discusses activities relating to the FDNY's EEO function.  During the reporting period, the City's activities in this area have continued to focus on messaging, investigations, and compliance initiatives, including the FDNY's response to recent national events that have placed increased focus on issues of race – heightening awareness and sensitivities both in FDNY workplaces and in public discourse.  Since the Monitor's last report, which discussed conversations that had arisen in June, Deputy Chiefs have been directed to deliver in-person messaging reinforcing the social media policy and the FDNY's prohibition of the use of hoses and other equipment against civilians at scenes of civil unrest.  The City also

rolled out a training program on the FDNY social media policy and related EEO issues, which

complements and builds upon earlier messaging regarding the policy.  More recently, in mid-

October, following discussions about firehouse climate among the Monitor and Parties, the City

issued a Department Order reminding members of the need to exercise restraint and show civility

in expressions of political opinions in the period leading up to and following the election.  The

FDNY has also continued to investigate an array of potential EEO violations linked to social

media postings that inappropriately referenced the death of George Floyd and other national

events.  The Monitor, working with its expert, has also shared guidance with the City on ways in

which senior management can respond to reports of social media or other violations to

emphasize the Department's values without compromising ongoing investigations.  As discussed

in past reports, following up on recommendations first communicated before the pandemic, the

Monitor has also continued to urge the City to develop a long-range EEO communications plan

without awaiting results of the climate survey.

        In some other areas relating to EEO, work has continued to be delayed by COVID-related

factors.  Most importantly, as noted above, work on the climate survey analysis has been

suspended since March.  On October 14, the City proposed a new plan for resuming the analyses,

and indicated that some of the analysis was already underway pursuant to the new plan.

Firehouse inspections have also remained suspended because of COVID-related concerns.

        In two important areas, EEO investigations and officer performance evaluations, the

Monitor and the City have continued to exchange communications on a series of

recommendations that the Monitor offered the City in an October 18, 2019 meeting and in

follow-up communications memorializing the meeting.  Before the Monitor's previous report,

the City had agreed in general terms to implement several of the Monitor's recommendations,

which include targeted training for investigators on issues identified by the Monitor, along with additional guidance and forms for use in the gathering and analysis of evidence.  On October 22, 2020, in response to follow-up requests from the Monitor, the City produced new and updated training materials, guidance documents, and forms related to the Monitor's recommendations, and provided some further clarifications on specific steps taken to implement them.  The Monitor is currently evaluating the City responses and accompanying materials and will continue to work with the City to verify the implementation of its recommendations.

The Monitor has also continued to engage with the City regarding the EEO metric that was added to officer performance reviews in 2018, to ensure that reviews thoroughly and accurately reflect officer performance in EEO and incorporate input from the EEO Office in all appropriate cases.  On October 22, the City responded to Monitor requests for clarification regarding the standards employed by the EEO Office in gathering and communicating information to raters for use in officer evaluations; and the Monitor is evaluating the City's responses.  On October 23, the City produced a set of data compiled from the 2019 round of officer evaluations – covering all but 120 of the approximately 1,500 reviews from the 2019 cycle; and the City has indicated that it will produce data from the remaining reviews within the next week.  (The Monitor had requested this data several months before the pandemic, but production was delayed; and then, during the pandemic, files were rendered inaccessible for a period of time because of the shutdown of FDNY offices where they were stored in hard copy form.)  The 2019 round of evaluations is the first cycle since the introduction of the EEO metric to cover a full year of officer performance.  It is also the first cycle in which all evaluations included the EEO metric, as many evaluations completed during the 2018 cycle used an outdated form that did not include the EEO metric.  Accordingly, the Monitor expects that, once

production is complete, the 2019 data set may be more informative and representative than the data available thus far (from the 2018 cycle) regarding the effectiveness of the metric.

Part IV reports on efforts to reduce disparate impact on Black and Hispanic candidates in the Medical Exam and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws.

As recounted in previous reports, following allegations of disparate impact in the stairmill component of the FDNY medical examination, the City conducted a study to develop a new test, and considered input from the Monitor, the other Parties, and their experts.  The Fire Department's Bureau of Health Services ("BHS") began using the new stairmill test on October 17, 2019; and the City has provided updates on candidate results from the new test, which will be analyzed for disparate impact.  The City has also agreed to provide the opportunity for candidates to be tested using the new stairmill test if they were reserved or disqualified by the old stairmill test and not otherwise disqualified.  The Monitor and the Parties are continuing to analyze data from this ongoing initiative.

Part IV also reports on candidate attrition and continuing disparate impact in the Medical Exam overall, based on the City's latest attrition report (dated December 27, 2019), which included data for approximately 1,500 candidates who had taken the Exam 7001 Medical Exam or had been scheduled to do so before medical exams were suspended because of the pandemic. The attrition report includes data for all such candidates, including those who took the stairmill before the new stairmill test came into use; accordingly, it does not reflect the improvement the new stairmill test is expected to make on disparate impact.  The report also does not break out medical results by individual disqualification reason (*e.g.*, stairmill, pulmonary function testing, etc.).  This information is now captured electronically in a database developed as part of the

Monitorship. It will be necessary for the City to conduct separate analyses of each medical disqualification reason to determine not only whether the disparate impact in the stairmill test has been abated but also whether there is disparate impact in any other components of the Medical Exam. Part IV also recounts the City's work, in consultation with the Monitor and the other Parties, to update messaging related to the Medical Exam.

Part V reports on continuing communications among the Monitor and the Parties regarding the proper approach for analyzing the impact of the FDNY's character review process (conducted by the Candidate Investigation Division ("CID") and the Personnel Review Board ("PRB")). The Monitor and the Parties continue to discuss whether features of the process in addition to disqualifications (such as extended probation or delays associated with referral to the PRB) should be considered in evaluating whether the process has an adverse disparate impact on non-traditional candidates. Although currently the City may not be able to continue work on these issues because its data teams are unavailable for Monitorship projects, the Monitor has continued efforts to analyze and frame the issues for further discussion with the Parties.

Part VI discusses the Exam 7001 Technical Report produced by the City's testing experts, PSI Services LLC ("PSI"), which describes the development, administration, and analysis of the results of Exam 7001 (the open competitive exam given in September and October 2017).

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.  <u>Recruitment and Attrition Mitigation</u>

The processing of entry-level firefighter candidates has remained suspended for reasons relating to COVID-19 over the last several months, and plans for the resumption of processing

and future Academy classes have not yet been determined.  At the status conference held on October 13, 2020, the City indicated that it is considering multiple scenarios, including seeking the Monitor's approval for a one-year extension of the current eligible list.  In the interim, the FDNY has continued its efforts to stay connected with candidates, and the Monitor and the Parties have continued to discuss and evaluate its attrition mitigation initiatives, particularly with regard to non-traditional candidates.

### A.    Candidate Processing

#### 1.    Candidate Processing to Date

Because of COVID-19 constraints, candidate processing has continued to be suspended since the Monitor's last periodic report.  Accordingly, the City has generated no new candidate processing data since the figures previously reported and analyzed in the Monitor's Twenty-Ninth Periodic Report, and there have been no new Academy classes affecting the demographics of the FDNY.  As reported by the City, as of October 6, 2020, out of 8,181 total firefighters 806 (9.9%) are African-American, 1,271 (15.5%) Hispanic, and 5,811 (71%) white.

During the suspension of processing, the Monitor and the Parties have continued to discuss outstanding queries from Plaintiffs-Intervenors and the United States regarding the administration of the eligible list, including the handling of claims for bonus points and the adjustment of list numbers.

#### 2.    CPAT Testing Dispute

As previously reported, the Parties have briefed their respective positions regarding Plaintiffs-Intervenors' and the United States' requests for a finding that the City breached the Modified Remedial Order in connection with its planning for and scheduling of CPAT testing for Exam 7001 candidates, Monitor's Thirtieth Periodic Report at 10; and the Monitor is currently preparing a recommendation for the Court, which it expects to provide soon.

B.      **Attrition Mitigation**

The Monitor has continued to work with the City on maintaining communication with non-traditional firefighter candidates, encouraging them to remain informed and prepared regarding the steps in the hiring process.  Because the City has suspended candidate processing, and because its attrition mitigation programs have been either suspended or disrupted, extensive adjustments have been required in the City's communication plans.

1.      Recent Communications and Outreach to Candidates

Before the COVID-19 pandemic (and while the Department was still processing candidates), the FDNY's communications with candidates consisted largely of reminders regarding upcoming appointments and deadlines via texts, emails, and phone calls.  Since the onset of the pandemic, the City has continued to communicate with candidates via these same channels and to respond to calls, emails, and voicemails from candidates – reminding candidates regarding resources and communicating updates regarding ORR programs including the Mentor program.  At the October 13, 2020 status conference, the City also reported that it was endeavoring to contact candidates who had voluntarily attritted to encourage them to seek reinstatement to the civil service list.

For non-traditional candidates, before the pandemic, regular ORR communications were supplemented by the activities of Recruitment Coordinators, including six full-time African-American Coordinators, assigned to work with specific demographic groups.  Monitor's Thirtieth Periodic Report at 17.  But since the onset of the pandemic, the Recruitment Coordinators (all firefighters detailed to ORR) have been required to return to front-line emergency-response duties.  *Id.*  On a July 9, 2020 conference call, the City advised that a Lieutenant and two light-duty firefighters had been made available to assist in ORR activities (though not as Coordinators).  But on a September 17, 2020 conference call, the City advised

that these two firefighters would be returning to active duty and that the Department was working to identify replacement personnel to assist ORR in its recruitment activities.[1] The Monitor understands the operational need to reassign personnel from ORR to active duty; at the same time, the role of ORR in continuing its recruitment and attrition mitigation initiatives is critical to the effective recruitment of a diverse workforce for the FDNY. Accordingly, the Monitor encourages the FDNY to bring a full complement of Recruitment Coordinators back to ORR as soon as possible.

The City has conducted several virtual events and Webex conferences since mid-2020. At the October 13, 2020 status conference, the City reported that ORR had conducted a virtual event in late July featuring a probationary firefighter discussing fitness preparation for the Academy; and in September, ORR hosted two Webex conferences (on September 2 and September 16) intended to maintain ORR's connection with candidates who have passed the CPAT, and to provide them with information during the suspension of candidate processing. The City advised that, among other things, the September 2 Webex conference (targeting candidates who had passed the CPAT but not yet gone through intake) discussed candidate access to the Candidate Portal, the documents needed for CID Intake, Firefighter Candidate Resources, and the Mentorship program.[2] The September 16 Webex conference provided candidates with a detailed four-week training plan intended to increase their fitness levels, with a focus on training to prepare for the Run and the Fire Academy. The City advised that the

---

[1] On October 28, 2020, the City reported that it had identified replacements and that they had begun work. The Monitor will follow up with the City to obtain details on these new assignments.

[2] Of 1,073 candidates invited, a total of 228 attended the September 2 conference (combining attendance for two sessions); 14% of the attendees were Black, and 32% were Hispanic.

invitations for the second conference focused on non-traditional candidates likely to be processed for the next class – those with an Adjusted Final Average ("AFA") of 102 or higher who are still in processing.[3]

The Monitor views these conferences as a positive development and has encouraged the City to conduct additional similar events and intensify outreach to encourage more candidates to attend – with a particular focus on non-traditional candidates.  At the October 13 status conference, the City indicated that it planned to conduct further virtual events devoted to fitness training (though it did not specify whether those events would target non-traditional candidates). Even once the restrictions associated with the pandemic are relaxed and in-person events can resume, it appears that such virtual gatherings will remain a useful and convenient device for keeping candidates engaged and informed.

The Monitor has continued to encourage the City to adjust its communications to address the delays and uncertainties with which candidates are now contending, consistent with the Court's Findings of Fact, which expressly noted the impact that lengthy delays may have upon candidates, especially those lacking a friend or family tie to the FDNY.  *See* Findings of Fact (Dkt. # 741) at 4-7.  The Parties also continue to discuss some remaining questions regarding Plaintiffs-Intervenors' suggestion that the City make use of a texting platform to facilitate standardized responses to candidate questions interactively via text.  The City has indicated it is reluctant to use the suggested platform because the communications would not be stored in ARCS, the FDNY's candidate communications database, and because it believes its current systems for maintaining contact with candidates are sufficient.  Plaintiffs-Intervenors and the

---

[3] Of 211 candidates invited, a total of 43 attended, of whom 15 were Black, and 18 were Hispanic.

Monitor have asked a series of follow-up questions to establish whether and how ORR is capable of reviewing and responding to replies to its broadcast text messages.

        2.    <u>Long-Range Plans</u>

The Monitor has continued to urge the City to develop a comprehensive and detailed long-range plan for candidate communications, with schedules of messaging appropriate to differently situated candidates who have reached different stages in the hiring process and should expect different wait times for further processing and potential appointment. *See* Monitor's Thirtieth Periodic Report at 12-14; Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 18-19; Status Report Regarding CPAT Testing (Dkt. # 1940) ("CPAT Testing Report") at 17. As the Monitor has emphasized, the City must develop a plan "appropriately tailored to candidates who will begin processing at different times, pass through it on different schedules, and (if appointed) enter Academy classes at different times." Monitor's Twenty-Eighth Periodic Report at 18. Although the Monitor recognizes the difficulty of establishing a fully detailed calendar of communications when the schedule for the resumption of processing and future Academy classes is uncertain, the City could nevertheless outline sequences of events and communications for differently situated groups of candidates and develop messages suitable for candidates with different wait times for further processing and eventual appointment to the FDNY.

The Monitor will continue to work with the City to develop a satisfactory long-range plan. To that end, since the last periodic report, the Monitor has worked with its experts to develop recommendations for specific sample content tailored to different candidate groups – which it provided to the City and the other Parties on October 27, 2020. The Monitor expects the City to create a fully detailed, appropriately tailored long-range communication plan, taking the Monitor's recommendations into consideration, within no more than one month after it

determines the schedule for further candidate processing and the timing and size of future Academy classes.  In the interim, the Monitor encourages the City to continue intensive efforts to keep candidates informed and engaged as they wait for the resumption of processing.

### 3.    Attrition Mitigation Programs

Two important components of the FDNY attrition mitigation programs are the Mentor program and the Fitness Awareness Program ("FAP").  As reported by the City, the Mentor program resumed in mid-August after a period of inactivity due to COVID-related concerns; but the FAP remains suspended because of factors including social distancing concerns.

As discussed in the Monitor's previous report, before the onset of the pandemic, the Monitor made several recommendations to the City regarding the FAP.  *See* Monitor's Thirtieth Periodic Report at 16.  In particular, the Monitor recommended that the City consider modifying the FAP content and messaging – to offer more varied programming suiting the different needs of candidates with different lead times before they begin the Academy, and to ensure that candidates who are inclined to take the FAP only once do not do so too early and thereby risk losing fitness before the Academy begins.  The Monitor also recommended that the City endeavor to provide an additional training site or devise equivalent means of providing all candidates with ready access to fitness facilities and training.

### 4.    Use of Data in Attrition Mitigation Initiatives

The collection, maintenance, and analysis of data on attrition mitigation have been a consistent focus for the Monitor throughout the Monitorship.  *See, e.g.*, Monitor's Twenty-Fifth Periodic Report (Dkt. # 1877) at 22-23; Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 30-31.

In mid-2019, the Monitor recommended a series of necessary improvements in the City's analyses of patterns of candidate attrition and of the effectiveness of its programs in retaining a

13

diverse pool of candidates; the recommendations included, for example, adding categories to the data "tracker" that the City has described as the principal tool that ORR employees use to assess candidate attrition.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 16-17; Monitor's Twenty-Ninth Periodic Report at 31.  But while the City accepted the majority of the Monitor's recommendations in principle in February 2020, those improvements have not yet been implemented because City data personnel were tasked to COVID-related work.  The Monitor expects that this work will resume once the City's data analysis personnel resume work on Monitorship initiatives.

In connection with its efforts to assess and support the City's analytical capabilities, and in hopes of continuing some analytic work while City personnel were dedicated to emergency tasks, on June 4, 2020, the Monitor asked the City to provide an export of data from City databases (in spreadsheet form) in a number of categories relating to candidate processing and attrition mitigation programs.[4]  While the City initially responded that it could not supply the requested data in a comprehensive and reliable way without the assistance of data personnel, at the most recent status conference on October 13, 2020, the City indicated that it will work with the Monitor to identify areas where it would be helpful for the Monitor to be involved.

## C.   Analyses of the Exam 7001 Recruitment Campaign

The City's establishment of a sustainable process for successfully recruiting and retaining Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and

---

[4] The categories in the Monitor's request were drawn from lists of City database fields and reports previously provided by the City.

the Monitorship.  *See* Modified Remedial Order ¶¶ 31-36.[5]  For the City to accomplish that goal,

it must analyze the outcomes of its recruitment efforts to identify which initiatives are the most

productive and cost-effective means of attracting non-traditional candidates likely to achieve

reachable scores on the firefighter examination and ultimately be appointed as firefighters.  As

discussed in prior reports, the retrospective reports on the Exam 7001 campaign produced by the

City to date do not yet provide actionable insight into a number of critical topics, such as cost-

effectiveness and (in some areas) the effectiveness of the campaign in attracting successful

candidates in particular demographics.  The United States and Plaintiffs-Intervenors have

emphasized the importance of completing these analyses in time to use the results to inform the

City's strategies and tactics for the next recruitment campaign, and the Monitor is working with

the City to achieve that goal.

    As described in the Monitor's previous reports, the City provided the Monitor and the

other Parties with an initial "After Action Report" in November 2018.  The Report contained a

large volume of informative data and some analyses of the FDNY's recruitment activities; but it

omitted critical components necessary for an actionable analysis, including, among other things,

useful data about the City's budgeting, a breakout focusing on the effectiveness of specific

activities in recruiting Black and Hispanic candidates who achieved scores that were likely to be

reached during the life of the list, and an assessment of the City's digital and traditional-media

advertising campaigns.  *See* Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 22-24.

The Monitor provided the City with its comments on this first After Action Report on May 1,

---

[5] The Court specifically found that a policy or practice that "fails to adequately recruit black persons to become firefighter candidates serves to maintain and perpetuate the effects of the City's discrimination against black firefighter candidates."  Findings of Fact at 33.

15

2019; and the City advised that it would take account of those comments, along with comments

from the Parties (circulated April 30, 2019), in an expanded and revised report on its recruitment

campaign.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. #1810) at 18-19; Monitor's

Twenty-Eighth Periodic Report at 23-24.  The City provided the Monitor and the Parties with its

updated After Action Report (dated September 27, 2019) on October 2, 2019, and on October 23,

2019 it provided the Monitor and the Parties with its Cost Effective Analysis for Exam 7001

Recruitment Campaign (the "Cost Effective Analysis").  Plaintiffs-Intervenors communicated

their comments on the Cost Effective Analysis and the After Action Report on November 20 and

22, 2019, respectively; the United States added its comments on November 26, 2019.

As described in the Monitor's Twenty-Ninth Periodic Report (at 38-39), both the other

Parties and the Monitor identified numerous weaknesses and omissions in the City's reports.

The Monitor began working closely with all concerned, in consultation with its experts and

experts retained by Plaintiffs-Intervenors and the United States, to oversee the City's efforts to

address their concerns and generate useful analyses.  Although the City's availability has been

limited by COVID-19 efforts, the Monitor and other Parties continue to work with their experts

to conduct analyses and develop further questions and requests that the City will address when it

is able.

### 1.    After Action Report

As described in previous periodic reports, the City's revised After Action Report contains

improved analyses that seek to correlate recruitment contacts, applications, test-takers, and

reachable scores with factors such as geography, race, and the type and location of initial

recruiting contact.  Responding in part to the Monitor's recommendations, it expands upon the

analyses in the initial report, articulates a number of findings, and offers some more detailed

analyses.  However, the After Action Report still lacks certain information that is critical to the

core purpose of the analysis – such as, for example, analysis of the relative effectiveness of different recruitment activities, events, and types of communication in recruiting non-traditional candidates who ultimately were successful in achieving reachable scores on Exam 7001.  In order to provide useful guidance for the next campaign, the City's analysis must measure effectiveness by this key criterion – identifying events and outreach activities that most effectively increase Black and Hispanic representation in the pool of reachable candidates.

Prior to shutdown, the City had begun to perform a number of analyses requested by the Monitor, and the Monitor expects the City to resume those efforts as soon as it can make personnel available.  In the meantime, the Monitor expects to continue efforts to move analyses forward using the Monitor's own experts.

### 2. Cost Effective Analysis

The Court has also emphasized the need for the City to identify which measures are most cost-effective in terms of diverse recruitment.  As described in the Monitor's Twenty-Ninth Periodic Report (at 37-38), the City's Cost Effective Analysis also suffers from serious flaws – among them the City's failure to collect data that would allow it to attribute internal FDNY expenditures to specific recruitment activities and events (so as to calculate the cost-effectiveness of a particular event or type of event) and collection of overtime data for only some categories of personnel.  Data kept by the City's outside vendor, Hodes, is more detailed but includes only limited demographic information.

The Monitor has previously noted concerns about the City's failure to track its costs in sufficient detail, especially given the Monitor's consistent, longstanding focus on the importance of budgeting as an essential component of the after action analysis, which the City has acknowledged.  *See, e.g.*, Monitor's Eighteenth Periodic Report (Dkt. # 1734) at 3, 15-16.  The Monitor and the other Parties have made further inquiries to determine whether more precise

17

data is available, whether more useful analyses can be performed with existing data, and whether gaps in the available data can be bridged with inferences or informed estimates. Both Plaintiffs-Intervenors and the United States have identified experts to facilitate their participation in these discussions.

### 3.    Further Recruitment Analyses Requested by the Monitor

As reported in the Monitor's Twenty-Ninth Periodic Report (at 39-40), at meetings in December 2019 and January and February 2020, the Parties and the Monitor discussed possible further analyses that could be used to determine which events (defined by type, timing, and location) and which advertising methods were most successful both in attracting numbers of reachable non-traditional candidates and in increasing the percentage of non-traditional candidates in the overall pool of reachable candidates.[6] The City agreed to perform queries suggested by the Monitor and provide results on a rolling basis. The Monitor also suggested methods for gathering additional information needed for better informed analyses. For example, the Monitor proposed surveying FDNY recruitment event planners to identify a range of event costs, as well as attempting to obtain additional data from the City's advertising vendor, Hodes, showing the effectiveness of various media types and touchpoints with recruitment contacts. The Monitor also suggested that the City conduct a small number of focus groups of non-traditional Exam 7001 firefighters to learn which, if any, recruitment initiatives had influenced their decisions to take Exam 7001.

---

[6] The most successful events and techniques achieve both goals:  attracting large numbers of reachable non-traditional candidates and attracting groups of reachable candidates containing a high percentage of non-traditional candidates.

The City provided initial sets of responses, and the Parties and Monitor met in early March to discuss next steps in recruitment analysis, including plans for weekly meetings to work through recruitment analyses and to provide insight and advice for the next campaign. Unfortunately, as previously reported, the Monitor and Parties were unable to conduct any calls after the March 6 meeting before the City advised that it needed to suspend work on recruitment data-analysis planning because of the pandemic.  Monitor's Twenty-Ninth Periodic Report at 40-41

Although the bulk of the City's recruitment work is suspended while its data personnel devote their time and efforts to COVID-19 tasks, the Monitor and the other Parties have continued to analyze data previously received from the City and to seek ways to estimate the City's past recruitment costs.  While the Monitor and other Parties understand that the City may not be able to respond immediately, all agree that there is a pressing need to create a data-driven strategic plan before the next recruitment campaign, and the City has agreed that the Monitor and other Parties should continue to work together and to send requests to the City, even if the City is unable to respond at once.  With that understanding, the United States and Plaintiffs-Intervenors sent requests to the City on March 20 and April 28, 2020 respectively, and the Monitor sent a second set of requests on March 25.

On May 15, the Monitor and Parties participated in a conference call on which Assistant Commissioner Nafeesah Noonan and other ORR personnel answered questions from the Monitor and the other Parties about various recruitment activities and processes.  Topics included descriptions of the various recruitment event types referred to in the After Action Report; advertising for these events; how the number, timing, and location of events, and recruiter staffing decisions, are determined; what event information is tracked (*e.g.*, event duration,

number of recruiters, and their race/ethnicity and experience); where the data is entered; who has access to the data; and database coding and query capabilities.

On June 4, 2020 the Monitor sent the City a request for data that the Monitor's data experts intend to use to begin critical analyses that need to be performed before the next recruitment cycle begins.  The Monitor's understanding, based on data dictionaries, database descriptions, and representations made by the City, is that most if not all of the requested data can be pulled on a near-automatic basis.  As noted above, following the Court conference on October 13, 2020, the City has agreed to work with the Monitor to identify some areas for the Monitor's data analysis. Most recently, on October 22, 2020, the United States' expert provided additional recommendations aimed at highlighting the usefulness of additional analyses and related reference materials.

### D.    Assignment Issues

As discussed in the Monitor's previous periodic reports, in September 2017 Plaintiffs-Intervenors raised issues regarding the City's compliance with Paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs."  As previously reported, following attempts to confirm details of past assignments, the Monitor directed the City to establish systems that would reliably memorialize the specific reasons for denying home division requests from New York City residents; and the City subsequently prepared revised guidelines for probationary firefighter appointments intended to ensure that requests for home-division assignments would be given proper priority and that the specific reasons for denials would be recorded.  *See* Monitor's Twenty-Eighth Periodic Report at 25.  The City and the Monitor have exchanged proposed drafts of the guidelines in an effort to eliminate a

20

small number of ambiguities and disagreements, with the City providing its most recent draft on

August 25, 2020.  The Monitor plans to provide further comments shortly and expects that any

remaining differences will be resolved soon.

In addition, as discussed in detail in previous reports, in the same correspondence

Plaintiffs-Intervenors raised allegations of disparate impact in firefighter assignments to

particular types of fire company – including assignments to engine and ladder companies and to

busier fire companies.  *See* Monitor's Thirtieth Periodic Report at 29; Monitor's Twenty-Fourth

Periodic Report (Dkt. # 1861) at 18-19.  On July 16, 2018, the Monitor remanded the issues to

the FDNY EEO Office with instructions to report to the Monitor on the outcome of the

investigation within 120 days.  Monitor's Twenty-Eighth Periodic Report at 25-26.  After

protracted delays, on May 24, 2019, the City provided the Monitor with the report of its

investigation, which addressed a portion of Plaintiffs-Intervenors' allegations but did not

describe any investigation or findings regarding the Plaintiff-Intervenors' claims of

discriminatory disparities in assignments.[7]  *Id*.  (On August 29, 2019, the City also provided a

one-paragraph summary of its investigation of the company-assignment issue to the Plaintiffs-

Intervenors and the United States.  *Id*.)

In an October 3, 2019 letter identifying disputed issues, Plaintiffs-Intervenors asserted

that the City's investigation regarding fire company assignments failed to demonstrate its ability

to conduct adverse impact analyses and "take steps to remedy adverse impact that may be

identified," and they asserted that Priority Hire candidates who were assigned to engine

---

[7] The City assumed, for the purposes of the report, that the asserted disparity existed.

companies and less busy companies are entitled to relief.  Since that time, the Parties have engaged in discussions to attempt to resolve the dispute.

The City has confirmed that it conducted assignments for the most recent Academy class in accordance with its current guidelines, that it reviewed the assignments for compliance with the home division requirement, and that it conducted disparate impact analyses of assignments to identify any disparities in assignments to the types of companies that Plaintiffs-Intervenors had alleged to be preferable.  *See* Monitor's Thirtieth Periodic Report at 30-31.  The Monitor requested two related categories of records from the City in June 2020: (1) records and analyses relating to home-division requests and assignments for the most recent Academy class, and (2) analyses of data from the same class to identify any disparate impact in assignments to different categories of fire company.  On October 22, 2020, the City produced (to the Monitor but not to the other Parties) a set of figures showing assignments to different fire-company categories, which the Monitor is reviewing; but to date the City has not yet provided the requested records relating to home-division requests and assignments, although it has committed to do so.

### E.    Working Group

The City's work on initiatives relating to the Working Group established under the Disparate Treatment Settlement – and the Monitor's oversight over these initiatives – have continued to be largely suspended because of the COVID-19 emergency and the uncertainties associated with further candidate processing and future Academy classes.  The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).  The City's initiatives under the Working Group Committee consist primarily of the FDNY Fire Cadet program and the FDNY Explorers program.  The City reports that the timeline for further work on the Cadet

22

program is contingent on the scheduling of the next promotional firefighter exam, which remains

to be determined, and that the Explorer program remains suspended because of COVID-19

constraints.

## III.   EEO

### A.     EEO Staffing

As noted in the Monitor's previous periodic report, based on information provided by the

City, the FDNY EEO Office currently includes 13 attorneys (including the Assistant

Commissioner, two Deputy Directors, Investigative Attorneys and contract attorneys) and six

non-attorney staff, and its current team of 13 attorneys is three short of the 16 attorneys it fielded

when fully staffed.[8]  *See* Monitor's Thirtieth Periodic Report at 32-33; Monitor's Twenty-Ninth

Periodic Report at 47; Monitor's Twenty-Eighth Periodic Report at 28.  According to recent

updates from the City, while the EEO Office has requested permission to fill the vacant

positions, the City has not yet taken further steps to do so; and it has not indicated when it

expects to seek applicants and proceed with hiring.

The City has advised that efforts to fill the investigator positions are on hold because of

the City's financial position, which has prompted a broad review of staffing requirements across

City agencies.  While the Monitor recognizes that the City is facing serious fiscal challenges

associated with COVID-19, it has continued to urge the City to proceed as expeditiously as

---

[8] Because the investigative work of the EEO Office is conducted entirely by its attorneys, the number of
attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively.  As
previously reported, the other (non-investigative) work of the EEO Office staff is supplemented by the
activities of EEO Counselors – firefighters and officers who act as liaisons between the firefighter force
and the EEO Office, as part of a program initiated in 2018.  *See* Monitor's Twenty-Ninth Periodic Report
at 47.  The team of Counselors includes 35 firefighters and officers (of whom 22 are white, 11 Black, 1
Asian, and 1 Hispanic).

possible to bring the staff of EEO Office attorneys back up to its full 16-attorney strength.  As discussed in detail in the Monitor's previous report, the increase in EEO Office attorney staffing, completed in 2019, was an essential component of the City's efforts to remedy serious deficiencies in its EEO investigative function.  Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's Twenty-Fourth Periodic Report at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eight Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase).  Notably, the City's most recent report indicates that the average investigator caseload is 9-10 cases, which appears to reflect a slight increase from the range of 5-10 cases that the City reported in September 2019, when the EEO Office was at full strength.

In this area as in others, the City's financial constraints do not alter or diminish its duties under the Modified Remedial Order – in this case the duty to establish an effective system of EEO compliance and investigations.  Given the critical role that attorney investigators play, not only in investigations but also in EEO inspections and training, the City should prioritize efforts to bring the EEO Office back to full strength, notwithstanding fiscal considerations.

### B.      Policies, Messaging, and Training

The Monitor has continued to receive updates and engage in consultations with the City regarding the FDNY's EEO-related messaging, including internal messaging and training on the Department's social media policies and on fire operations at scenes of civil unrest.  However, as previously reported, the Department's efforts to develop EEO messaging based on the climate survey have remained on hold, as the analysis of survey data has been suspended since the onset of the COVID-19 emergency.  As noted above, the Monitor has (both before and after the pandemic) urged the City to develop long-term messaging even in the interim.

1.    Recent EEO Messaging

As discussed in detail in the Monitor's previous report, recent national events and incidents within the FDNY (including several potential violations of the Department's EEO and social media policies) have accentuated the need for effective messaging on EEO-related topics, Monitor's Thirtieth Periodic Report at 35.  Over the past 90 days, the City has continued work on a number of messaging and training initiatives prompted in part by these events.

On August 21, 2020, the City advised the Monitor that a new training module on the social media policy, developed with input from the Monitor, had been launched on the Department's online training platform, its "Learning Management System."  All FDNY fire operations and EMS personnel have been directed to take the training, with attendance verified by the online system; and as of October 13, 2020, the City reported that more than 8,000 fire operations personnel had viewed the training presentation.[9]  As previously discussed, the training makes clear that FDNY rules on the use of social media apply to conduct on and off duty, and to statements made under assumed online identities.  It also emphasizes that the First Amendment does not protect race-based harassment or disparagement that damages the reputation of the Department and compromises its ability to fulfill its mission.  The guidance also puts members on notice that the consequences for violations can include termination.  In addition to the training presentation, as previously noted, the Department has also recently re-issued a set of FAQs on the policy, Monitor's Thirtieth Periodic Report at 37; and since the last periodic report, it has also deployed Deputy Chiefs to reinforce key messages about the policy in personal visits to firehouses.

---

[9] The City reports that it expects to roll the training out to civilian employees shortly.

In addition to messaging on the social media policy, the Department has also continued to develop and issue messaging on interactions with the public in situations of civil unrest.  In the past 90 days, in firehouse visits by Deputy Chiefs, the Department has reiterated guidance issued in June and July 2020 (both in response to concerns raised by Plaintiffs-Intervenors and as part of the Department's own plans) regarding its prohibition on using hoses or other equipment on civilians.  The Department also continues to work on a training video (discussed in the Monitor's previous report) combining guidance on operational safety in circumstances of civil unrest with themes of diversity and inclusion and the Department's commitment to serving diverse communities.  *Id*. at 41.

While the Department has taken several appropriate steps to communicate guidance on this issue, Plaintiffs-Intervenors have noted that the first FDNY message reaffirming its policy was not issued until several days after the City became aware of reports that two FDNY officers may have condoned the use of hoses against civilians in some circumstances.  As the Court noted at the October 13 status conference, it is important for the FDNY to ensure it possesses a rapid response capability for such cases – so that it can issue corrective messaging quickly and decisively in response to misconduct or misinformation that could cause immediate harm to the Department's reputation, workplace climate, and/or relations with the community.

In other messaging relating to recent and upcoming events, on October 8, 2020, the FDNY issued a Department Order advising members to exercise caution regarding potentially divisive political expression in the workplace – particularly in connection with the imminent national election.  The Order states in part,

> The Department reminds all members, during this time of heightened political debate, to be mindful of making comments or engaging in conduct that creates dissension and division within our workplace, tends to bring the Department into disrepute, or is otherwise disruptive to the discipline and good order of the

Department.  While at work, unqualified trust and reliance on each other is the critical foundation in the fulfillment of our mission.  Acting in any manner that undermines this trust hurts our ability to accomplish our shared mission.

All members have a right to free speech; however, the workplace is generally not the appropriate place for political expression.  Those rights must be exercised with the utmost discretion, respect and consideration for each other to promote efficiency and avoid disruption of the valuable services the Department provides.  All members are reminded that social or political language, or conduct that is demeaning, dehumanizing, hurtful or offensive, or has the effect of excluding others, regardless of social or political affiliation, may constitute violations of Department policies.

The Order also reminds members of FDNY conflict of interest rules prohibiting members from using their positions or City property or equipment for political expression or advocacy.  The Department's attempt to pre-empt workplace tensions and conflicts with its October 8 Order is a sensible step.

In an area related to the Department's October 8 Order, as well as other EEO policies, the FDNY has historically conducted firehouse inspections to assess compliance and identify violations that may occur.  But since the onset of the pandemic, the EEO Office has suspended in-person firehouse inspections based on safety concerns.  Accordingly, it is essential for the FDNY to develop alternative means of ensuring that workplaces comply with EEO policies.  At the status conference held on October 13, 2020, the Assistant Commissioner for EEO reported that discussions with operational leadership were in progress to develop a virtual inspection capability.  But although the need for such as capability has been apparent since in-person inspections were halted, it was not clear that this capability would be in place before the election.  In the absence of inspections (virtual or in-person), the City has indicated that guidance would be offered to FDNY commanders on the need for vigilance regarding conduct, displays, or expressions that could have an adverse effect on workplace climate.  The Monitor has

encouraged the City to ensure that commanders receive appropriate guidance and to pursue its efforts to develop a system of virtual inspections.

In recent discussions of FDNY workplace climate and the potential for recent events to heighten tensions, Plaintiffs-Intervenors have raised concerns regarding the effect on workplace climate of political and racial content in certain cable news programming and have suggested that the City consider measures to try to prevent one channel or source from dominating the programming choices. The City has declined to take that step, in part on the asserted grounds that any such measures would not be effective, given that members have personal devices on which to view or share content, and in part on asserted First Amendment concerns. But as Plaintiffs-Intervenors have noted, firehouse televisions are capable of impacting workplace climate notwithstanding the availability of personal devices; and in response to the City's position, the Monitor has suggested that the City should consider issuing guidance, consistent with the October 8 Order, encouraging firefighters and officers to be alert to and avoid potentially offensive or divisive content. Such guidance would be consistent with the City's decision not to control access to particular channels, and it would serve the Department's clear legitimate interest in supporting workplace climate and camaraderie.

In another development related to EEO messaging, on September 8, 2020 the FDNY announced that it was renaming its highest award for bravery (previously the James Gordon Bennett Medal) to the Chief Peter J. Ganci Medal. Bennett, a newspaper publisher who endowed the award in 1869, was an ardent racist and segregationist; and the change was made both to repudiate Bennett and his racist past and so that the medal would be named for an FDNY member rather than for an outside benefactor. Chief Ganci was the highest ranking member of the Department to be killed on September 11, 2001.

28

While the Department's recent EEO-related messaging has been a positive development, the Monitor remains concerned that the City be proactive and quick to make the most of opportunities to reaffirm messages of inclusion and remind members of key policies in response to specific events and reports.  In the current environment of heightened sensitivity to racial issues, it is particularly important for the FDNY to respond decisively to incidents that threaten to cast doubt on its commitment to diversity and inclusion within the Department and/or its dedication to serving diverse communities.  As the Monitor has previously noted, while it may not be appropriate for the City to comment specifically on pending investigations, the FDNY can and should nevertheless respond to public reports of violations with robust affirmation of Department policy – including zero tolerance for discrimination towards fellow firefighters and the public – and clear statements regarding the potential disciplinary consequences of any violation.  Even where the Department concludes that alleged or publicly reported conduct does not constitute a violation of policy, the Department should be sensitive to public perceptions and endeavor to allay concerns that might damage its reputation in the eyes of its members, potential recruits, and the general public.

2.    EEO Communication Plans and Other EEO Messaging

As previously reported in detail, the City has not yet developed a comprehensive, long-term EEO messaging plan with specific provisions for communicating a variety of EEO messaging through a full range of channels to a variety of audiences – despite longstanding recommendations from the Monitor and the other Parties.  Monitor's Thirtieth Periodic Report at 40; Monitor's Twenty-Ninth Periodic Report at 48-49; Monitor's Twenty-Eighth Periodic Report at 30.  Before the onset of COVID-19, the City had committed to developing such a plan, which it stated would be guided by the results of the climate survey.  Monitor's Thirtieth Periodic Report at 40.  The Monitor encouraged the City to develop messaging in the interim without

29

waiting for the survey.  With work on the climate survey analysis suspended since the earliest days of the pandemic (as discussed in Part III.C.3), no further progress has been made on the messaging plan; and even if work on the climate survey data resumes soon, findings will not be available for use in formulating a messaging strategy for many weeks.  In the meantime, the Monitor expects the City to proceed with communications outlined in the brief, high-level plans it previously provided.  The recent messaging regarding the social media policy addressed the first topic in those plans; and the Monitor understands that the next topic focuses on the role of the EEO Office and the resources it provides.  As previously discussed, in addition to information on EEO Office functions and the availability of EEO resources, the Monitor has recommended that this round of messaging incorporate general reports on the activities of the office – including, for example, information on the number of complaints investigated within specified periods, and general information on outcomes including findings and disciplinary action.  Monitor's Thirtieth Periodic Report at 41.

The Monitor also continues to encourage the City to revive and pursue other EEO messaging initiatives, including its program of "voice announcement messaging" (video announcements delivered at firehouses), which was initiated in September 2018, but for which no additional content has been delivered in the two years since it was first launched.  *See* Monitor's Twenty-Ninth Periodic Report at 51.  The leadership video discussed above, incorporating operational messages with diversity inclusion themes, appears to represent a first step in reviving the "voice announcement messaging" program.  The Monitor encourages the City to continue with regular video and other messaging from senior operational leadership on EEO-related topics.

In addition to messaging produced by the EEO Office, the Monitor has also continued to receive updates from the City on the messaging and training activities of the Department's Chief Diversity and Inclusion Officer ("CDIO").  Before the Monitor's last periodic report, the City had provided a list of current and planned CDIO activities, along with a variety of materials associated with several of the initiatives; and on October 7, 2020, the City provided a further update regarding several CDIO projects and some additional materials.

In part as previously reported, the materials provided by the City include posters, screen-savers, and other items associated with a "We Are FDNY" campaign (rolled out in July) depicting racially diverse members of the Department.  They also include a number of diversity and inclusion newsletters and sets of training materials on diversity and inclusion themes. Planned trainings include presentations on topics such as "authentic trust," racial justice, micro-aggressions, and inclusive leadership; and the City has provided some draft or partial materials on these subjects.[10] CDIO activities have also included a series of virtual "Courageous Conversations" with FDNY personnel on diversity issues.

Based on the City's most recent update, the majority of these planned trainings are still in development, with progress delayed by the COVID-19 emergency and/or by technical issues:  a training video on "authentic trust" (which appears to have been substantially completed) was scheduled to be rolled out in August but was delayed by technical issues and has not yet been presented; the City's materials include the first of several planned training modules on racial

---

[10] In its October 28 comments on a draft of this report, the City referenced other initiatives including a "CDIO Mobile Messaging Unit," staffed by firefighters, which delivers EEO messaging and education to firehouses, and a team of "inclusion advocates" – FDNY officers "trained to support the goals of the CDIO Office."  The Monitor expects to make further inquiries to learn more about the activities of these additional communications initiatives and the content they deliver.

justice issues, developed by a third-party vendor, but additional modules remain to be produced; and several trainings on other topics are on hold because of COVID-19 delays.  The only diversity and inclusion training initiative on the City's July 7 list that appears to have been finalized is a training presentation on "Positive and Effective Leadership" (although this training has not yet been administered to FDNY fire operations officers).[11]

While general messaging is of some value, the Monitor has encouraged the City to deliver EEO messaging that is tailored to the experience and needs of the FDNY, and that is seen as a part of training for the firefighter job – not presented as a separate program of messaging appended to operational training.  For the CDIO's activities to make an effective contribution to the FDNY's overall messaging, messaging should be relevant to the specific concerns and issues that arise in the FDNY, and should be coordinated with the FDNY EEO Office.

As noted in the Monitor's previous report, some of the CDIO's recent and planned communications touch upon worthwhile messages that the Monitor has long recommended (such as the link between diversity and the operational mission of the Department), although to date those messages have not appeared consistently or prominently in the FDNY's messaging to its workforce as a whole.  Monitor's Thirtieth Periodic Report at 43.  The training video on authentic trust connects themes of diversity and inclusion to operational effectiveness, *id*.; and based on the materials provided by the City, the training presentation on effective leadership also appears to address some similar issues – linking concepts of inclusiveness and mutual respect to

---

[11] According to an October 19 update from the City, the presentation has been administered to civilian leadership within the Department but not yet to uniformed officers in either fire operations or EMS. According to the City's October 28 comments, the presentation is intended as part of an annual series of materials on leadership that the CDIO makes available at the Fire Officers Management Institute (FOMI) each year.

effective management.[12]  These materials represent some progress towards delivering EEO messaging as part of an integrated FDNY workplace culture.

In its October 28 comments on a draft of this report, the City described the CDIO projects and materials identified to date as part of a larger "inclusive culture strategy," incorporating six inclusive culture tenets (Authentic Trust, Supportive Relationships, Excellent Training, Positive Motivation, Community Engagement, and Dedicated Success), which are in turn based on the FDNY core values (Honor, Bravery, Service, Safety, Preparedness, Dedication, and Equity). And the City indicated that these tenets were identified after consultations between the CDIO and FDNY personnel including both firefighters and officers.

While this "inclusive culture strategy" appears promising in some respects, and while the "Authentic Trust" video, which addresses the first of its themes, properly attempts to link diversity messaging to the mission of the FDNY, the vast majority of the strategy's component themes have not yet been developed; and given the broad terms in which the strategy is framed, it remains to be seen whether and how the specific messaging developed by the CDIO in the subsequent phases of this strategy will integrate EEO themes with the Department's operational effectiveness.  Many of the materials provided in the City's recent updates are focused on general themes such as racial justice, empathy, and personal growth, without consistently explaining how these concepts should be analyzed or applied in the context of the FDNY, its mission, and its workplaces.  The Monitor is consulting with its experts and will follow up further with the City to ensure that the CDIO's work is effectively integrated into a sound

---

[12] In its October 7 update, the City provided an extensive online "flipbook" associated with this training. In response to a follow-up query from the Monitor, the City indicated that a power-point similar to this online resource was used in the training.

strategic messaging plan in which it complements messaging by the EEO Office and is calculated to impact FDNY workplace culture.

### C.     Compliance and Accountability

#### 1.     Officer Performance Evaluations

The Monitor has continued to communicate with the City regarding the implementation of the EEO metric added to officers' performance reviews in 2018.[13]  After lengthy delays, recounted in detail in the Monitor's previous report,[14] on October 23, 2020, the City provided the Monitor with a compilation of data from the 2019 cycle of officer performance reviews, which evaluated officer performance during 2018.  The compilation included data from all but 120 officers' evaluations from the 2019 cycle, and the City indicated it would complete the production within approximately the next week.  As requested by the Monitor, the compilation includes officers' EEO ratings, along with workplace and demographic information for the officers.[15]  It did not include officers' overall performance ratings, which the Monitor had requested for comparison with EEO ratings; and the Monitor has renewed its request for this category of data.  As previously discussed, the 2019 cycle of reviews is the first to cover a full year of officer performance for all Lieutenants and Captains in the Department.  Monitor's Thirtieth Periodic Report at 45.  It is also the first cycle in which all evaluations included the EEO metric, as many evaluations completed during the 2018 cycle used an outdated form that

---

[13] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[14] Monitor's Thirtieth Periodic Report at 44-45.  The City's production was repeatedly postponed before the pandemic, and then further delayed because of COVID-related restrictions on access to the paper files on which evaluations are maintained.  *Id*. at 45.

[15] The materials included no personal identifying information and were not shared with the other Parties.

did not include the EEO metric.  *See* Monitor's Twenty-Ninth Periodic Report at 53.

Accordingly, the Monitor expects that the newly produced data (once the set is complete) may

offer the first genuinely informative opportunity for the Monitor to assess the effectiveness of the

EEO metric in accurately reflecting officer performance.  As with its review of data from the

2018 cycle, the Monitor plans to cross-reference evaluation data with information from EEO

complaints and inquiries to assess whether and how information obtained in EEO investigations

was reflected in officer ratings.  As requested by the Monitor, the City has also produced

materials reflecting EEO Office input for the evaluations, which the Monitor will include in its

analysis.  The Monitor continues to believe, and the City has recognized, that for the metric to be

an effective tool – both to hold officers accountable for any neglect of EEO-related obligations

and to ensure that they receive credit for superior EEO performance – it is essential for the EEO

Office to be an active participant in the review process and to provide input wherever it has

access to information relevant to an officer's EEO performance (including his or her

communication of EEO messages, relevant information from firehouse inspections, failures to

report violations or potential violations, failures to cooperate with the EEO Office, or negligent

oversight and supervision of firefighters within his or her command).  *See* Monitor's Twenty-

Sixth Periodic Report at 33; Monitor's Twenty-Seventh Periodic Report at 29; Monitor's

Twenty-Eighth Periodic Report at 35.

Since the last periodic report, the Monitor has also continued to follow up with the City

on a series of recommendations for the performance review process.  The recommendations, first

discussed at an October 18, 2019 meeting between the Monitor and the City, and memorialized

in a December 11, 2019 memorandum to the City, have been discussed in a series of subsequent

communications, recounted in detail in the Monitor's previous report, Monitor's Thirtieth

Periodic Report at 46-48; and the City responded to the Monitor's most recent set of follow-up queries and requests on October 22, 2020.[16]  The Monitor's recommendations, developed in consultation with its experts and based on a review of best practices, included (1) a suggestion that the EEO Office incorporate reviews of management supervisory practices relevant to EEO compliance in its investigations of alleged or potential EEO and hazing violations – using investigations as opportunities to evaluate officer practices and to identify either superior performance or areas for improvement, and (2) a suggestion that the FDNY consider providing additional, detailed guidance on the distinction between satisfactory and superior reviews under the EEO metric.  In its most recent set of follow-up queries (July 27), the Monitor requested further clarification from the City regarding the criteria used to determine whether investigations of management practices are indicated in connection with EEO investigations.  The Monitor is reviewing the City's most recent response.

The Monitor expects to complete its analysis of 2019 performance review data and the City's responses to the Monitor's recommendations by early December (assuming the City completes its data production as projected) and will communicate its findings to the City, along with any further recommendations to ensure that evaluations fully and accurately reflect EEO performance, and that they operate as an effective mechanism of officer accountability.

The Monitor has continued to work with the Parties in an effort to resolve some continuing disagreements regarding the extent to which and the form in which the City will share performance review data and related analyses with the other Parties.  As an interim step, the

---

[16] The Monitor's December 11, 2019 memorandum was shared with the United States and Plaintiffs-Intervenors on January 24, 2020, but the subsequent communications regarding the Monitor's recommendations have been conducted by the Monitor and the City without the other Parties.

Parties had agreed that the City would share a set of statistical analyses, and that the other Parties would consider whether additional analyses are needed and whether they wish to request more granular data.  The City produced the statistical summary on January 2, 2020 – disclosing the number of officers at each rank and in each race/ethnicity who received each rating (Superior, Satisfactory, Unsatisfactory).  The United States responded with follow-up queries on April 15, 2020, requesting additional analyses correlating factors such as race and years of service with ratings, and requesting additional information on EEO Office input in the evaluations and the evaluation of officers connected to EEO complaints and inquiries.  The City responded on July 2, rejecting the requests; and the United States responded further on August 21.  As the Court directed at the October 13 status conference, the Monitor is continuing to work with the Parties to determine the appropriate categories of information for the City to disclose to the other Parties.

2.    *"Workplace Professionalism" Reporting*

The Monitor has continued to follow up on inquiries and requests for production relating to the City's workplace professionalism reporting program, in which officers meet regularly with their superiors to discuss issues (including EEO issues) affecting workplace professionalism. Monitor's Twenty-Seventh Periodic Report at 30-31.  According to the City's most recent update (received October 15, 2020), to date the system has not yet generated any reports from the required meetings within the scope of the Monitor's standing request for all Workplace Professionalism records reflecting EEO or hazing concerns.  Monitor's Twenty-Ninth Periodic Report at 57-58.

3.    Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters.  The City worked

closely with the Monitor and the other Parties, through multiple calls and drafts circulated within a small working group, to create an Analytics Plan and a schedule for analysis of the survey data, to be conducted by the Mayor's Office of Data Analytics ("MODA"). *Id*. On February 20, the City circulated an updated version of a prior Analytics Plan developed through these discussions, which divided the analysis into ten phases with completion deadlines for the successive phases between February 7 and June 19, 2020.[17] *Id.* at 49-50.

As provided in the Analytics Plan, on February 21 the City circulated a data review summary report prepared by MODA. The report noted that there were 4,562 complete and partial responses to the survey and that all 49 FDNY numbered battalions and Special Operations Command ("SOC") units and all demographic groups are represented in the survey data. MODA also reported that there did not appear to be significant survey response anomalies. Work on the climate survey was suspended at the end of February 2020 because of a relocation of the MODA office and the subsequent COVID-19 pandemic. Monitor's Thirtieth Periodic Report at 50.

On May 21 the City informed the Monitor and other Parties that MODA was continuing to devote its resources almost entirely to the COVID-19 response but that it would endeavor either to resume work on the climate survey analysis before the scheduled September conference with the Court[18] or, at the least, to provide by that time a date on which it would resume work. *Id*. As noted in the Monitor's Thirtieth Periodic Report, the Monitor had anticipated that, once work resumed, a further 18 to 20 weeks would be needed to complete all the analyses and reports contemplated by the plan. *Id*. On a recent conference call, the City told the Monitor and other

---

[17] As discussed below, these deadlines could not be met because City resources had to be diverted to COVID-19 efforts.

[18] The conference was adjourned to October 13, 2020.

Parties that, because of COVID-19 and continued necessary related delays, the City wanted to alter the schedule and analyses previously worked out between the Monitor and the Parties, in particular by reducing the number of phases at which the Monitor and other Parties would weigh in on MODA's analyses and streamlining the analyses performed.  The City argues that these adjustments are important because data analysis resources will continue to be scarce and because the data is becoming increasingly outdated as the pandemic continues to make analysis difficult. The City sent the Monitor and Parties a revised analysis and timeline proposal on October 14, 2020, which the Monitor and Parties are reviewing.  The City indicated that some aspects of analytic work are already in process.  The Monitor and Parties have scheduled a November 5 call to discuss the proposal and will be joined by their respective experts, including the United States' expert, Dr. Nishii, who helped to develop the survey instrument and implementation plan.

Following the completion of the analytical phase, the City's subsequent crucial task will be to develop a plan of action based on the results, including but not limited to a comprehensive, strategically coherent plan of EEO messaging, as discussed above.

**D.    Investigations**

1.    Review and Recommendations Regarding Investigations

The Monitor has continued to review materials from FDNY EEO investigations that the City has identified as requiring substantial investigative activity in fire suppression matters[19] – offering comments intended to identify needed improvements in the FDNY EEO Office's

---

[19] In an initial, retrospective production of multiple cases, provided in 2017, and more recently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has also provided the Monitor with some full investigative files in addition to intake and closing documents.  A summary of the City's productions of EEO case materials appeared in the Monitor's Twenty-Seventh Periodic Report at 39-41.

investigative practices.[20]  Monitor's Thirtieth Periodic Report at 51 & n.32.  As previously reported, although more recent EEO case materials reflect some improvements in the diligence and thoroughness of investigations, the Monitor has continued to observe important deficiencies in recent cases and discuss them with the City.  Monitor's Twenty-Seventh Periodic Report at 39-40; Monitor's Twenty-Eighth Periodic Report at 44; Monitor's Twenty-Ninth Periodic Report at 64-65.  The Monitor provided an extensive review of continuing concerns and comments on underlying cases at an October 18, 2019 meeting, and has offered additional comments on more recent cases in a series of calls with the City.[21]

Similarly, although the duration of EEO investigations has generally been reduced since the increase in EEO investigator staffing (which, as noted above, was completed in 2019), some cases continue to exceed the presumptive 90-day limit established by City policy; and given the small number of cases each year that call for substantial investigations (based on the City's disclosures),[22] further review will be required to determine whether this favorable trend is durable.  The need for continuing review is especially apparent in view of the recent reduction in EEO investigator staffing, which may make it more difficult for the City to sustain improvements in the quality and duration of investigations.

---

[20] The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

[21] Although COVID-related concerns have prevented the EEO Office from conducting in-person interviews, its investigative activities have continued, and the Monitor has continued to receive updates.

[22] The City produced materials from eleven cases initiated in 2019.  Thus far it has produced materials from five cases initiated in 2020, and has advised the Monitor of two additional investigations in progress from which the Monitor expects to receive records.

Most recently the Monitor has continued to follow up with the City regarding recommendations it offered at its October 18, 2019 meeting with the City on EEO topics.[23]  The recommendations addressed recurring issues the Monitor had identified in EEO investigative practices, including the need for more consistent and rigorous analysis of motive in mixed-motive cases, for more systematic analyses of witness credibility, and for greater consistency and thoroughness in identifying potential violations and sources of evidence.  Monitor's Twenty-Ninth Periodic Report at 65.  As previously noted in detail, the Monitor proposed that specific discussions of these issues be included in updated investigator training materials (which the City had reported it was then developing) and in the regular updates on legal and practice issues that investigators receive from the Assistant Commissioner.  *Id*.  The Monitor also suggested that the City adopt forms and procedures to regularize the process of gathering and analyzing evidence and the preparation of investigative memoranda.  *Id*.

In subsequent correspondence, the City agreed to incorporate the issues identified by the Monitor in new training modules for EEO investigators and confirmed that those issues have been emphasized in recent discussions with investigators.  Monitor's Thirtieth Periodic Report at 52.  After initially objecting to the Monitor's recommendation for forms and checklists to aid in the gathering and analysis of evidence, the City has also agreed to utilize new or revised forms for investigative plans, credibility analyses, and investigative memoranda.  *Id*. at 52-53.  On October 22, 2020, after a series of Monitor requests, the City produced a set of revised investigator training materials and forms, along with responses to several follow-up queries.[24]

---

[23] The Monitor memorialized its recommendations in a memorandum to the City on December 11, 2019, which was provided to the other Parties on January 24, 2020.

[24] The materials were provided to the Monitor but not to the other Parties.

The Monitor is currently reviewing the newly produced materials.  The Monitor also plans to continue its review of investigative materials to track the effect of the recommended changes.[25]

Since the last periodic report, in addition to its process of reviewing investigative materials, the Monitor has also received regular updates on EEO investigations focused on an array of recent potential violations – including potential violations of FDNY policies via social media.  As the Monitor has noted, such violations present unique investigative challenges (because of the difficulty of identifying potential violators) and are capable of inflicting particularly grave harm on workplace climate and the reputation of the Department (because of their broad potential circulation).  Responding to Monitor concerns, the FDNY has made some improvements in its approach to investigating this type of violation:  for example, the City has confirmed that the Department requires employees to produce social media postings and information that have a sufficient nexus with the workplace, impact it negatively, and implicate the EEO Policy; and it has represented that investigators are prepared to draw adverse inferences against parties and witnesses who fail to cooperate with EEO investigations of social-media-based violations.  Monitor's Thirtieth Periodic Report at 53-54.  But this category of investigations remains challenging.  Once the current group of pending cases has concluded, the Monitor plans to work with the City to memorialize the lessons and best practices that emerge from the investigations.

---

[25] During the COVID-19 emergency, the Monitor suspended the process of contacting a selection of complainants to gather information regarding their experiences with the EEO Office, as discussed in previous reports.  *See* Monitor's Twenty-Fourth Periodic Report at 37.

2.      Monitor Report on EEO Investigations

The Monitor has continued work on its report on FDNY EEO investigations, pursuant to the Court's order.[26]  As stated in the Monitor's previous report, in consultation with the Court, the Monitor has postponed filing the report to observe and account for the effect of increased staffing and revised practices on the conduct and duration of EEO investigations – requesting and receiving a series of updated data sets from the City, and providing a series of drafts of the report (including recommendations) to the City and the other Parties.  Since the last periodic report, on October 6, 2020, the City provided the Monitor with its most recent set of updated and supplemented responses to a series of requests for information relevant to the report, which the Monitor is reviewing and considering for inclusion in the final report.

3.      EEO Database

Shortly before the Monitor's last periodic report, the City advised the Monitor that it had made several modifications to the FDNY EEO investigations database, addressing some

---

[26] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its staffing, its investigative procedures, and its performance in the completion of EEO investigations – with a particular focus on the duration of investigations as measured against the presumptive 90-day time limit for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant part, the Court's Order stated as follows:

> The court monitor is respectfully DIRECTED to provide the court with a report on the New York City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the staffing of the office has changed over time; and (3) the speed with which the office investigates and resolves complaints.

In addition to the topics specified in the Court's November 17, 2017 Order, the report includes a discussion of data produced by the City, in response to the Court's direction at the March 13, 2018 status conference, showing the rate at which complainants and respondents in EEO investigations have been reassigned to desk duty, and the duration of those assignments.

longstanding Monitor recommendations.  Monitor's Thirtieth Periodic Report at 55-56.[27]  As described by the City, the modifications include new fields for a range of interim actions and for some specific types of potential violations.  The Monitor has not yet had an opportunity to review these changes or to verify that the City has the capacity to effectively track and connect (with the database or otherwise) all the findings and remedial actions associated with a given matter, including those generated by BITs[28] and other units in addition to the EEO Office.  Nor has the City yet shown that it has appropriate mechanisms for tracking EEO Office input in performance evaluations, or for cross-referencing inspections and evaluations with other EEO activities (such as targeted messaging and training) in a given workplace.  Monitor's Twenty-Ninth Periodic Report at 63-64.

## IV.   Medical Exam-Related Issues

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the hiring step with the highest Exam 2000 disqualification rate.  *Id*. at 46.  The Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.  *Id*. at 45-46.

---

[27] Detailed accounts of the development of the database, its features, previous modifications, and related communications appear in previous reports.  *See*, *e.g.*, Monitor's Twenty-Ninth Periodic Report at 62-64; Monitor's Twenty-Seventh Periodic Report at 36-38; Monitor's Twenty-Sixth Periodic Report at 40; Monitor's Twenty-Fourth Periodic Report at 36-37.

[28] The Bureau of Investigations and Trials, the Department's disciplinary unit, prepares charges, conducts investigations, and prosecutes disciplinary cases for violations of Department policy including hazing and workplace violence.   It also imposes discipline in EEO cases investigated by the EEO Office and thus cooperates with the EEO Office in enforcing EEO policies within the Department.

A.      **Stairmill Test**

The stairmill test component of the Medical Exam is meant to ensure that candidates possess adequate cardiopulmonary fitness to perform safely as firefighters.  Because the stairmill test had not been validated and statistical analyses indicated that it had a disparate impact, the City hired the vendor PSI to evaluate the test.  After conducting a study developed with input from the Monitor's and the other Parties' experts, the City selected a stairmill test protocol to screen candidates that is substantially the same as the stairmill test protocol historically used by BHS, but which no longer uses the heart rate criterion that was believed to be responsible for the disparate impact.  BHS has been using the new stairmill test since October 17, 2019.  The Stairmill Technical Report regarding PSI's study has been reviewed by the Monitor and all Parties, and comments have been provided to PSI, with some open issues remaining.  PSI recently circulated its final report, and the Monitor and Parties are reviewing it.

As noted in earlier reports, the City has also provided the opportunity for certain Exam 7001 candidates who took the old stairmill test to be tested again using the new test.  Some of that testing took place before the pandemic, and testing will continue once candidates can again be seen at BHS.  Candidates who may avail themselves of this retesting option are those who were reserved by the old stairmill test, including those who failed to return after being reserved, and those who were disqualified by the old stairmill test and were not otherwise disqualified.  The City most recently reported on the interim results of its retesting progress on June 23, 2020.  As of that time, approximately one third of those retested had passed the new stairmill test, and the rest were in other status categories, including, *inter alia,* some who were waiting to be tested, some who had not responded to the offer to retest, and some who were disqualified for reasons not related to the stairmill test.  The Monitor and Parties have continued discussions about retesting for Exam 7001 candidates who did not pass the old stairmill test, including those who

subsequently declined appointment (removing themselves temporarily from the hiring process) without having taken the new test.

The Parties have recommended that the City communicate with all candidates still eligible to retest, including those who have declined from the medical process, to advise them that (1) if they return to or continue in the firefighter selection process, they will be tested with the new stairmill protocol implemented since they last took the test, (2) the new test does not include heart rate as a passing criterion, (3) there are FAQs and a new video about taking the new stairmill test, and (4) they have various methods for getting more information or answers to questions. The Monitor agrees with this recommendation. The United States has pressed for a response to the recommendation, but the City has stated that it wants to wait to respond until medical testing has restarted. The Parties and the Monitor continue to discuss this issue.

In addition, the Monitor and the Parties will continue to review Exam 7001 stairmill qualification data to determine whether there is continuing disparate impact in this component of the Medical Exam.

### B.   Medical Exam Attrition Metrics

As reported in the Monitor's Twenty-Ninth Periodic Report (at 69), in its December 27, 2019 report "Fire Department of New York City:  Metrics to Assess Applicant Attrition From the Hiring Process For Exam 7001" (the "December 2019 Report"), the City provided medical testing data for the first groups of Exam 7001 candidates, as of November 12, 2019. The December 2019 report reflects that the Exam 7001 Medical Exam voluntary attrition rate continued to be higher for Black candidates than for white candidates, and the rate at which candidates remained pending – *i.e.*, without a final medical result – was also higher for Black and Hispanic candidates than for white candidates (45%, 41.8%, and 35%, respectively). Monitor's Twenty-Ninth Periodic Report at 71.

46

The December 2019 Report provided data for the Medical Exam overall, and separately for physical testing and psychological testing.  The disparate impact analyses included in the report reveal that, as of November 12, 2019, there was statistically significant disparate impact in the Medical Exam qualification rate:  physical testing had a disparate impact against Black candidates, and psychological testing had a disparate impact against Hispanic candidates.  As previously reported, the data in the report shows that, had the City not removed pending candidates from its calculation of the four-fifths rule, the analysis would have shown that, as of November 12, 2019, Black candidates were qualified at only 79% of the rate at which white candidates had been qualified, and Hispanic candidates were qualified at 84% of the rate for white candidates.  Monitor's Twenty-Ninth Periodic Report at 71.

The City has not provided data showing which Medical Exam disqualification reasons were responsible for the disparate impact the City reported as of November 12, 2019, though the Electronic Medical Record database developed as a part of the Monitorship would permit such an analysis.  The City has indicated its belief that the new stairmill test – implemented in October 2019, one month before the "as of" date of the December 2019 Report – will reduce such disparate impact in candidates tested after October 2019, but the City has not provided data to determine whether the disparate impact observed was caused entirely by the old stairmill protocol.  An analysis by disqualification reason must be undertaken as soon as the City's analytic resources are no longer devoted exclusively to the COVID-19 crisis, and should be included in all future attrition analyses.  It is also crucial that the City continue its efforts to focus its attention on reducing voluntary attrition from the Medical Exam and on helping Black and Hispanic candidates move from pending status to qualified status.  Tailored mitigation strategies will need to be implemented if the Medical Exam continues to have any negative impact on

Black and Hispanic representation in Academy classes.  The Monitor also intends to discuss with the City the expected impacts, if any, of the pandemic on candidate health.

### C.      Medical Exam Messaging

The City has confirmed that, as in the past, candidates who do not pass the Medical Exam within one year of beginning it must take the entire exam again.  This policy has always been part of the Medical Exam process, but will likely affect more candidates from this list than usual, because of the pandemic and the cancellation of Academy classes for which candidates were being processed.  The City continues to remind candidates in post-CPAT messaging about the physical requirements evaluated during the Medical Exam, to help ensure that candidates understand the need to maintain their physical fitness, even after they pass the CPAT.  City-provided messaging and resources include an instructional video about the stairmill test, a document outlining all the steps of the Medical Exam, and Medical Exam FAQs, all posted online.  Before the pandemic, the City was also finalizing scripts, for which the Monitor and the other Parties had provided input, for two further Medical Exam instructional videos (one for the Pulmonary Function Test and one for the Medical Exam overall).  The Monitor expects that these further resources will be made available before BHS resumes medical testing.

## V.      <u>Character Screening by the CID and PRB</u>

The Parties and the Monitor, with their expert consultants, have continued to consider the character review portion of the FDNY's hiring process, its impact on hiring from different

demographic groups, and whether further reforms may be required to address disparities in outcomes.[29]

As noted in previous reports, if analyses of Exam 7001 hiring show that the character review process has an adverse disparate impact on Black or Hispanic candidates, the City will be required either to make further effective changes in the process or to validate the existing process as job-related. *See, e.g.*, Monitor's Twenty-Sixth Periodic Report at 56. Also as previously discussed, the City contends that disqualification is the only cognizable form of adverse impact produced by the character review process, while the Monitor believes that analyses of disparate impact should also consider other factors, including whether candidates are hired unconditionally or with extended probation. Monitor's Twenty-Ninth Periodic Report at 77; Monitor's Thirtieth Periodic Report at 61-62.

As previously recounted in detail, the Monitor's analysis of Exam 2000 data pursuant to the Modified Remedial Order, which requires analysis of all FDNY hiring policies and practices that have disparate impact or perpetuate the effects of such impact, identified a number of significant disparities between groups in relevant outcomes and effects – including a disparity in the rates at which Black and white candidates were either (1) disqualified or (2) hired with extended probation (combining the percentages for both results). *See* Monitor's Twenty-Ninth

---

[29] As previously reported in detail, beginning in 2012, in consultation with the Monitor and the other Parties, the City issued a series of guidelines for the CID and PRB; additional modifications to the guidelines were issued in mid-2016. Monitor's Sixteenth Periodic Report (Dkt. # 1694) at 29-31; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 29-30. As noted in prior periodic reports, the revisions were agreed upon by the Parties with the understanding that they might be subject to additional changes based on further analysis. *Id*. at 30. The City has implemented some procedural changes in the character review process since the 2016 revisions, along with minor changes in the criteria for PRB referral, Monitor's Twenty-Ninth Periodic Report at 74, 78; but it has declined to make further changes recommended by the Monitor. *Id*. at 78.

Periodic Report at 74-75.  The Monitor's analysis of the relevant portion of the Exam 2000 data

showed disparities in disqualifications for Black and Hispanic candidates compared to white

candidates, though the sample size of candidates in the relevant period of processing was too

small to support a definitive conclusion on this point.  *See* Monitor's Twenty-Fifth Periodic

Report at 59-60.  Results to date for Exam 7001 candidates also continue to reflect significant

disparities between groups in referrals.[30]  Although the City's reports to date from Exam 7001

processing have not identified a statistically significant disparity in disqualifications between

groups, the City does not dispute that continuing analysis is needed to detect any disparities that

may emerge.  Further, as previously noted, in addition to adverse effects produced directly by

referrals to the PRB and PRB decisions (including not only disqualifications but also, for

example, any material delays in appointment to the Academy), the Monitor and the Parties must

also determine (to the extent possible) whether administrative burdens or other aspects of the

current character review process contribute to disparities in voluntary attrition by deterring or

discouraging candidates from staying in the hiring process.

The details of the prior correspondence among the Monitor and the Parties on these issues

have been recounted previously, along with the results of the City's analysis of candidate

processing to date.  Monitor's Twenty-Ninth Periodic Report at 76-77.  (There have been no

additional results from candidate processing since the onset of COVID-19.)  Before the current

public health emergency, the Monitor had planned a meeting with all Parties to address

unresolved issues and had circulated a list of outstanding issues and follow-up queries for the

Parties.  Subsequently, the Monitor received responses from all Parties to those queries

---

[30] The City's reports to date have not reported extended probation as a separate outcome.

(following some delay associated with COVID-19).  The Monitor has continued its analysis, accounting for the Parties' input, and plans to circulate a revised summary of outstanding issues shortly, which will provide the agenda for a further effort to reach agreement on the targets and methods for analysis of the character review process.

## VI.   Firefighter Exam

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test ("CBT") for the position of entry-level firefighter. Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.   Additional Issues

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order; and

- Performing the remaining duties of the Special Master appointed by the Court in its Order filed May 22, 2012 (Dkt. # 883).  The Court assigned these duties to the Monitor in an order dated August 17, 2016.

Dated:   November 2, 2020
          New York, New York

 

_____
/s/
Mark S. Cohen