**COHEN & GRESSER LLP**

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
212 707 7601
mcohen@cohengresser.com

January 19, 2021

Hon. Nicholas G. Garaufis
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  *United States v. City of New York. No. 07-CV-2067(NGG)(RLM)*

Dear Judge Garaufis,

Paragraph 54 of this Court's Modified Remedial Order dated June 6, 2013 (Dkt. # 1143) (the "MRO") provides that the duties of the Court Monitor ("Monitor") include: "(c) Facilitating the Parties' resolution of any disputes concerning compliance with their obligations under this Order, and recommending appropriate action by the court in the event an issue cannot be resolved by the Parties with the Court Monitor's assistance; and (d) Proactively investigating any matters related to the Court Monitor's duties, and assisting the court to enforce any orders related to the matters set forth in this Order."  Following attempts by the Monitor to facilitate resolution, Plaintiff the United States Department of Justice ("United States" or "DOJ") and Plaintiffs-Intervenors The Vulcan Society ("Vulcan Society" or "PIs") have jointly asked the Monitor to issue a recommendation regarding their allegation that the City of New York ("City") violated the MRO by making an alleged change to the manner in which the City called candidates for the Candidate Physical Ability Test ("CPAT") that is part of the FDNY hiring process, without obtaining advance approval from the Monitor as required by Paragraph 16 of the MRO.  PIs have also requested that the Monitor make a recommendation on an additional dispute, over whether the City violated the MRO by failing to plan adequately for the alleged CPAT processing change under Paragraph 19 of the MRO (which requires the City to take all steps necessary to eliminate



policies and procedures that have or perpetuate disparate impact that is not justified by business necessity).[1]

## I.   EXECUTIVE SUMMARY

The CPAT is an important stage in the FDNY hiring process, and has long been a focus of attention by the Court, the Monitor, and the Parties, for two primary reasons.  The first of these is that the CPAT is the first stage of the hiring process, and is a point at which many candidates drop out of the process (either voluntarily or involuntarily).  The second reason is that data provided by the City appear to show that communication and preparation are likely to improve CPAT outcomes, especially for those candidates who have neither prior experience with the FDNY hiring process nor the benefit of friends and/or family who can share their own experience and guidance.

For the reasons above, preparing and encouraging candidates to appear for and pass the CPAT has the potential to significantly affect overall hiring rates for Black and Hispanic candidates.  After passing the CPAT, moreover, candidates must remain engaged with the hiring process while waiting to be called to complete the subsequent stages of candidate screening.  Among other things, they must maintain sufficient fitness to pass the FDNY medical exam, which includes a stairmill test and a timed 1.5 mile run.

As discussed more fully in a report submitted by the Court Monitor in November 2019, it became apparent by July 2019 that the City was processing many more candidates for the CPAT for the current hiring list, Exam 7001, than had been the case at a comparable time for Exam 2000.  The Court directed the Monitor to report on the reasons for this change, and to work with the Parties to attempt to resolve their dispute.

After attempts at resolution proved unsuccessful, PIs and the DOJ requested a recommendation by the Monitor on their request for a finding that the City violated Paragraph 16 of the MRO by failing to obtain approval of a change to the hiring process, or (for PIs only) Paragraph 19, by failing to diligently plan and take action to mitigate adverse impact related to the alleged change.  PIs argue that the City's decision to call so many candidates in such a short amount of time was not accompanied by the necessary planning to serve such a large group and to address the effects of longer wait times before subsequent processing steps.  The City agrees that many more candidates were called, more quickly, in Exam 7001 compared to the same time frame for Exam 2000, but denies that the City made a change or otherwise violated the MRO, and that calling candidates to take the CPAT earlier will likely be beneficial.[2]

---

[1] The DOJ's and PIs' submissions to the Monitor in support of their requests, and the City's submissions in opposition, are attached as exhibits 1-7 to this recommendation.  A list of exhibits appears on page 23, *infra*.

[2] The application before the Monitor seeks relief only on the issue of whether the City violated Paragraphs 16 (or, for the PIs only, Paragraph 19) of the MRO.  The City's Opposition ("City Opp.") seeks to introduce a number of



All Parties have advised the Monitor of their view that the Monitor should make a recommendation based on the record as presently constituted, and that no Party seeks or believes there is a need for additional discovery.

For the reasons set forth below, the Monitor recommends that the Court find that the City violated Paragraph 16 of the MRO, because the City made a change to the hiring process for Exam 7001 from the process that had been used in Exam 2000, and did not obtain the Monitor's prior approval.

As to Paragraph 19, the Monitor does not recommend a finding that the City violated Paragraph 19 of the MRO at this time, for two reasons. *First*, the City employed certain efforts to mitigate attrition in the CPAT process overall, which likely inured to the benefit of all CPAT takers, although the City did not specifically plan for and address the potential implications of the processing change. *Second*, the City retains the ability to demonstrate diligence by taking steps to eliminate disparate impact in a process that remains ongoing, and the City can and should continue to take these steps.

As a remedy for the City's violation of Paragraph 16, in addition to the finding above requested by both PIs and the DOJ, the Monitor recommends that the City be required to create a summary of the hiring process, as requested by the DOJ.  The Monitor does not recommend PIs' requested remedies of shortfall hiring or that the City be compelled to obtain a publicly-accessible CPAT training facility.  The Monitor recommends that, as requested by PIs, the City be ordered to take a number of actions to mitigate possible attrition among candidates who have passed the CPAT and are waiting to proceed to the next stages of the hiring process, and that the City be required to submit a written summary to the Monitor and Parties before proceeding to call further candidates for the CPAT, as detailed in Section V, below.

---

unrelated assertions related to a different docket entry – the City's January 14, 2020 request for a pre-motion conference (Dkt. # 1955) – and accuses PIs and the DOJ of having filed their motion to distract from the City's filing. City Opp.at 2.

The Monitor notes that the Monitor had already issued a report finding that the City appeared to have made a change, and PIs and the DOJ had already filed letters with the Court expressing strong concern about the apparent CPAT change and the City's failure to come forward with evidence to corroborate that it had previously called two classes at a time, or about any decision making process related to the change, before the City filed its pre-motion conference request. *See* Dkt. #s 1947, 1951 (DOJ arguing that "[T]he City has not yet provided data and answers evidencing the accuracy of any prior statements that it processed for two academy classes at a time for Exam 2000, as it must do if it persists with that position… Moreover, to the extent that the City did analyze the possible advantages and disadvantages of a change to CPAT processing, it has not provided any evidence to that effect. Instead, the City Response cites improvements that were designed and implemented to mitigate attrition generally, not to address issues arising from changes to CPAT processing.").  The Monitor declines to address the City's remaining arguments that are not related to whether the City violated Paragraphs 16 and 19 of the MRO, as those arguments pertain to matters beyond those fairly presented by the moving papers and requests for relief.



## II.   PROCEDURAL BACKGROUND AND FACTUAL CONTEXT

The disputes addressed here have been the subject of extensive submissions to the Monitor, as well as a prior report to the Court and subsequent correspondence by the Monitor and Parties.

During the four-year life of an eligible civil hiring list, the FDNY generally processes candidates for two Academy classes per year (one of which typically commences in summer and one that commences during the winter months).  The current hiring list is based on the results of Exam 7001, which was given as a computerized exam in 2017.

After taking the computerized exam, to proceed to be hired as an FDNY firefighter, candidates must pass the CPAT.  Candidates are called to take the CPAT in order of their adjusted final average (AFA) scores on the computerized exam.  Candidates who have the same AFA score are regarded as occupying the same score band.  *See* Declaration of FDNY Assistant Commissioner Marie Giraud dated June 15, 2020 ("Giraud Decl.") at ¶ 6.

Each Academy class contains approximately 320 trainees.  Not all candidates who are called in for evaluation pass or choose to continue the FDNY screening process, so the FDNY needs to call in more candidates than the number of hires it is seeking to make.  To assist in determining how many candidates to call, the FDNY relies on a projected "selection ratio."  The City has stated that its policy is to call all candidates within a given score band for the CPAT at the same time, even if the number of candidates in the band exceeds the number of candidates who are projected to be needed using the attrition ratio.  *Id*. at ¶ 20.

It is undisputed that for the current list – Exam 7001 – the City based its determination of how many candidates to call for the CPAT on the number of candidates that were projected to be necessary to fill two Academy classes at once.  *See* Giraud Decl. ¶32.[3]  The DOJ and PIs allege that this practice of calling enough candidates to fill two classes simultaneously (versus only the number of candidates needed to fill one class at a time) represents a change from the practice the City followed for the prior exam, Exam 2000.  This factual issue – whether or not the City made a change in Exam 7001 from the process that had been followed in Exam 2000 – is the crux of the instant dispute.

Candidates began to be called for CPAT from the Exam 7001 eligible list in October 2018.  At a status conference held on December 17, 2018, Plaintiffs-Intervenors discussed early results from the first round of Exam 7001 CPAT processing and requested that the City take additional steps to make sure that candidates attended training, as a way to mitigate attrition.  12/17/2018 Tr. at 33:3-21.  The City stated that it agreed with the importance of attrition

---

[3] For Exam 7001, the City has stated that it chose to use a 3 to 1 selection ratio, meaning that approximately 960 candidates was the number that the City estimated to be needed to fill one 320-person Academy class (and 1,920 would be the number the City sought to obtain to fill the number of candidates in two 320-person Academy classes, or 640 seats).  Giraud Decl. at ¶ 31.



mitigation and data-driven analysis, that its candidate communications plan was more robust for Exam 7001 than it had been for Exam 2000, and that it had adequate personnel doing targeted candidate outreach, including to Black candidates. *Id.* at 37:1-19. The Court issued a ruling directing the Monitor to work together with the Parties to make efficient use of candidate data and decide next steps, "so that we don't waste any time in utilizing information, which we always wanted to have, which we now have and which we need to use in a constructive, productive way." *Id.* at 38:19-24.

At the next Court conference in July 9, 2019, PIs noted that two-thirds of the relevant candidate group (*i.e.,* approximately 7,200 candidates) had already either been brought in by the City to take the CPAT in Round 1 of CPAT testing, or were scheduled to do so within the next few months, in CPAT testing Round 2. 7/9/2019 Tr. at 11:6-23. Plaintiffs-Intervenors emphasized that the situation called for quick action for candidates in Round 2. *Id.*; *see also id.* at 14:5-16:2 (*e.g.*, "[W]e are concerned about the numbers that we are seeing, and we are concerned about the timing for addressing them because by mid-September, again, the driving force, the CPAT, will be through for two-thirds of these [Exam] 7001 candidates. We lose the most candidates, as I said, at the CPAT."). The Court urged the City to consider adopting a suggestion that had been proposed both for Exam 2000 and Exam 7001, which was to offer training for the CPAT at a second location on additional dates. *Id.* at 21:18-23:8. On August 7, 2019 – two months after CPAT training began at Randall's Island, and one month before the second round of CPAT testing – the City began offering training sessions at a second location. Following the conference, the Parties engaged in a series of communications about the cause of the apparent change in processing speed.

At a status conference held in October 2019, this Court again discussed the CPAT with the Parties. PIs stated that they had been attempting to understand the cause of the increase in the number of candidates processed and trying to determine what advance planning the City had done to address the larger volume of candidates. PIs stated:

> [W]e are trying to understand how did the City plan, what pieces
> were put in place. We are not saying this was a good or bad idea.
> We are really trying to say what -- what this department needs to
> demonstrate is that when choices are made, when decisions are
> taken, there's a stop, a look at the data and a consideration for what
> do we have to put in place to make sure that this doesn't harm our
> chances of having a diverse class.

10/3/2019 Tr. at 40:8-15.

Following the October 2019 status conference, this Court directed the Monitor to provide a status report regarding "Defendant the City of New York's acceleration of CPAT testing." Minute Order dated October 4, 2019 ("Minute Order"). The Minute Order covered two topics: (1) the reason for an apparent "jump" in the number of candidates processed for the CPAT for Exam 7001 as compared to the same time frame for Exam 2000, with approximately twice as



many candidates being called for Exam 7001; and (2) the nature of the City's planning efforts related to handling and meeting the needs of this increased number of candidates, in particular with respect to mitigating attrition of minority candidates from the hiring process as part of the Department's diversity efforts. *Id.*; *see also* 10/3/2019 Transcript at 39:2-41:2.

The Monitor subsequently requested written submissions from the Parties on these topics. The City provided its submission on October 15, 2019, and the DOJ and PIs responded on October 22, 2019, with the DOJ's submission posing a number of questions to the City about its decision making process. PIs and the DOJ argued that hiring data produced by the City showed that the City had called candidates in Exam 2000 in numbers required to fill only one Academy class at a time, rather than two classes simultaneously. After review of these submissions, as well as emails and information about the hiring process provided to the Monitor and Parties over the course of the case, on November 20, 2019, the Monitor filed the Monitor's Status Report Regarding CPAT Testing ("CPAT Report") (Dkt. #1940). In that Report, the Monitor found that "[t]o the best of the Monitor's ability to determine, the City never called enough candidates to fill two classes at one time during Exam 2000 processing," and that "[t]he City does not appear to have conducted an analysis of the likely impact on attrition of the larger number of candidates who would be processed at once." CPAT Report at 8, 14.

On December 4, 2019, the City filed a letter (Dkt. #1943) requesting that this Court remand the Monitor's CPAT Report for revision. After advising the Court Monitor of their intent to do so and requesting a modification to the schedule to permit such responses (*see* 12/13/2019 Order (Dkt. # 1945)), PIs and the DOJ each submitted letters responding to the City's letter, stating that the City had not provided information to show that the City had previously called two classes at a time, and requesting further information about the City's CPAT decision making – PIs on December 19, 2019 (Dkt. # 1947) (also asking the City to acknowledge any error it might have made about whether a change had occurred and to propose a remedy), and the DOJ on December 20, 2019 (Dkt. #1951). On January 17, 2020, the Monitor filed a response (Dkt. # 1956) to the City's December 4 letter seeking remand. Shortly thereafter, at a Status Conference held January 27, 2020, the Court discussed the CPAT issue with the Monitor and Parties. During the conference, the City raised the Parties' CPAT dispute and presented on that issue, the United States and the Vulcan Society asked the Court to find that the City had breached Paragraph 16 of the MRO, and the Vulcan Society additionally sought a finding that the City had breached Paragraph 19 of the MRO. 1/27/2020 Tr. (Dkt. # 1973)[4] at 5:4-20:11, 22:8-25, 24:5-17, 27:8-13. At the end of the conference, the Court directed the Monitor to discuss with the Parties to attempt to "work through their issues," and, if not possible, for the Monitor to make a recommendation. *Id.* at 33:7-21.

Following the conference, after efforts to resolve the issue through discussion proved unsuccessful, PIs and the DOJ requested that the Monitor set a schedule for briefing on their respective motions. Pursuant to an agreed schedule, on March 20, 2020, the DOJ and PIs made

---

[4] The transcript from the January 27, 2020 conference was filed on the Court's docket on July 24, 2020.



their opening submissions ("DOJ Opening Ltr." and "PI Opening Mem." respectively).  The City requested an extension of time for its opposition in view of the COVID-19 pandemic.  On June 15, 2020, pursuant to a revised schedule agreed to by the Monitor and Parties, the City submitted the City Opp. and supporting Giraud Decl.  On July 9, 2020, the DOJ and PIs each submitted reply papers ("DOJ Reply" and "PI Reply" respectively).  The City submitted a sur-reply on July 17, 2020 ("City Sur-Reply").[5]

On December 14, 2020, the Monitor circulated to the Parties a proposed recommendation regarding the PIs' and the DOJ's requests for findings that the City violated Paragraphs 16 and 19 of the MRO.  The Monitor recommended that the Parties: (i) engage in document and deposition discovery to augment the evidentiary record concerning the existence of reasonably diligent efforts by the City to comply with the relevant provisions of the MRO; and (ii) that the PIs provide further legal briefing on their claim of entitlement to race-conscious relief, with the City being afforded an opportunity to respond.  On January 8, 2021, the Parties timely provided the Monitor with a joint objection, advising the Monitor of their position that the record contained adequate information on which to render a recommendation, and that further briefing or discovery would be prejudicial insofar as it would delay resolution of the dispute.  In view of the Parties' collective position, the Monitor advised the Parties that the Monitor would withdraw the discovery and briefing recommendation, and would issue a recommendation on the merits, which the Monitor does now.

## III.    LEGAL STANDARD FOR DETERMINING VIOLATION OF THE MRO

Both PIs and the DOJ seek relief under the Court's inherent equitable power to enforce its orders, as well as under Paragraph 52 of the MRO, which specifically authorizes remedies for violation of the MRO.  *See* DOJ Opening Ltr. at 6-7; PI Opening Mem. at 4, 20.  Though neither PIs nor the DOJ seek a finding of contempt or imposition of monetary sanctions, both agree that the instant dispute should be governed by the legal standard applicable to contempt that is set forth in *King v. Allied Vision, Ltd*., 65 F.3d 1051, 1058 (2d Cir. 1995), which includes three factors for determining whether there has been a violation of a court order:  1) the order is clear and unambiguous; 2) the proof of noncompliance is clear and convincing, and 3) the breaching party has not diligently attempted to comply in a reasonable manner.  DOJ Opening Ltr. at 7; PI Opening Mem. at 5.  The moving parties – here, the DOJ and PIs – bear the burden of proof on each of these elements.  *See Friedman v. Self Help Cmty. Servs., Inc*., No. 11-CV-3210 (NGG)(JO), 2018 WL 3193203, at *4 (E.D.N.Y. June 28, 2018) (Garaufis, J.) ("The movant bears the burden of establishing these three factors.").

In its briefing on this dispute, the City has argued that, in addition to the three *King* factors listed above, a party alleging violation of a court order must also demonstrate a fourth factor:  bad faith.  City Opp. at 3-4 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d

---

[5] Due to a pagination error in the City Sur-Reply, pages of it are cited herein in the order they appear instead of by the number indicated on the page of the City Sur-Reply.



323 (2d Cir. 1999) and *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 136 (2d Cir. 1998)).  The City asserts that judgment must be entered in its favor, because PIs and the DOJ have not alleged that the City acted in bad faith, or, alternatively, have failed to show that "the City's alleged violation of the MRO was without a colorable basis and that the alleged violation was made in bad faith (defined as harassment or delay or other improper purposes)."  *Id.* at 3-4.

Courts of this Circuit have rejected the notion that bad faith or willfulness is a necessary element of breach or contempt of a judicial order.  *See Paramedics Electromedicina Comercial, Ltda v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) ("It need not be established that the violation was willful."); *E.E.O.C. v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir. 1985), (stating that it "is not necessary to show that defendants disobeyed the district court's orders willfully" to prove breach of a court order), *aff'd*, 478 U.S. 421 (1986); *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 128 n.2 (2d Cir. 1979) ("The fact that the prohibited act was done inadvertently or in good faith, however, does not preclude a citation for civil contempt, for the sanction is remedial in nature.").  Moreover, both cases cited by the City involved a judicial decision to impose punitive monetary sanctions for attorney or party misconduct, which are not sought in the present case.  While the City seemingly contends that a finding of violation is identical to a monetary sanction and that the same legal standard should apply, the City cites nothing to support its position, and the case law cited above is to the contrary.  Accordingly, the Monitor's analysis of alleged violations of the MRO is limited to the three factors specified in the *King* decision.

## IV.   MONITOR'S ANALYSIS

Both the DOJ and PIs allege that the City violated Paragraph 16 of the MRO when it "alter[ed] its use of the . . . CPAT[] to select entry-level firefighters from the Exam 7001 eligibility list without first obtaining the approval of the Court Monitor."  DOJ Opening Ltr. at 1; PI Opening Mem. at 4 ("The City did not seek Monitor approval for this change, as Paragraph 16 of the MRO requires.").  In addition, PIs allege that the City violated Paragraph 19 of the MRO by making that change "without prior analysis of the potential adverse impact or a plan to mitigate it."  PI Opening Mem. at 4.  The City denies that it made any change, and further denies that either Plaintiff has demonstrated an entitlement to relief.

A.   Paragraph 16

Paragraph 16 of the MRO provides that, with one exception not at issue here:

> The City of New York shall not take any step in any process for
> the selection of entry-level firefighters, or use any examination as
> part of such process, without first obtaining the approval of the
> Court Monitor (the "Monitor") through the processes specified by
> the Monitor . . . .



No Party has argued that Paragraph 16 is ambiguous.  Over the course of the Monitorship, the Monitor and Parties have consistently interpreted Paragraph 16 to require the City to obtain approval, among other circumstances, in advance of making a change from the entry-level firefighter hiring process that was followed in Exam 2000.  PI Opening Mem. at 8-10 ("[t]he City did not seek Monitor approval for this change, as Paragraph 16 of the MRO requires."); DOJ Opening Ltr. at 1-2; DOJ Reply at 1 (the City "violated Paragraph 16 . . . by altering its use of the [CPAT] to select entry-level firefighters from the Exam 7001 eligibility list without first obtaining the approval of the Court Monitor.").  *See also* City Opp. at 4 (asserting that "[T]he City has a years-long record of dutifully requesting Monitor review and approval for any change – large or small – to the application process."); City Sur-Reply at 1 ("[T]he City had no reason to seek Monitor approval ***because the City did not make any process changes when deciding whom to call for Round 2 of CPAT***.") (emphasis in original).[6]  Thus, the Monitor considers whether the City made a change to its hiring process without first obtaining the Monitor's approval.

      1.  <u>Existence of a Change</u>

In the Monitor's CPAT Report, the Monitor explained that, based on hiring data provided by the City, it appeared that there were at least two, related differences between the City's CPAT processes in Exam 2000 and Exam 7001.  CPAT Report (Dkt. # 1940) at 7-10.  *First*, the Monitor found that in Exam 2000 the City called the number of candidates it expected would be needed to fill one Academy class at a time, but in Exam 7001 the City called enough candidates to fill two Academy classes simultaneously.[7]  *Id.*  *Second*, the Monitor also found that the data showed that (with the exception of the very highest bands on the list which contained few candidates and were aggregated), the City had called candidates from just one score "band" on the list at a time in Exam 2000, while it called two score bands at a time in Exam 7001.  *Id.*  The Parties' submissions focus primarily on the first change; that is, calling candidates simultaneously for two classes at one time.[8]

In their applications for relief, the DOJ and PIs cite data produced by the City to the Monitor and Parties regarding the class sizes and bands called in Exam 2000 and Exam 7001, respectively.  DOJ Opening Ltr. at 3-4; PI Opening Mem. at 8-10.  This data appears to show that in Exam 2000, the City called the number of candidates at one time that were estimated to be

---

[6] *See also, e.g.,* Monitor's Sixteenth Periodic Report (Dkt. # 1694) at 28 ("On May 13, 2016, the Monitor approved a set of revised provisional guidelines for the CID and PRB."); Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 44 ("Plaintiffs-Intervenors contend that the FDNY's decision [about mask issue] constitutes a change in the hiring process for firefighter candidates (and therefore must be approved by the Monitor"….").

[7] Again, in both scenarios, the number of candidates called was not identical to the number of seats per class (or two classes), but was instead a multiple of that number based on the 3:1 selection ratio.

[8] These two issues are two sides of the same coin, in that the number of candidates to be called at one time is a determinant of which bands the City will call.



needed to fill one Academy class, and did not call enough candidates to fill two classes at one time as occurred in Exam 7001.  *See* DOJ Opening Ltr. at 3-4 (referencing and incorporating analyses set forth in October 22, 2019 letters from PIs and DOJ to the Monitor, in PIs' 12/19/2019 Letter to the Court (Dkt. # 1947), and in DOJ's 12/20/2019 Letter to the Court (Dkt. # 1951), discussing numbers called by the City for Exam 2000, and comparing those figures to class numbers for Exam 7001).  The City contends, however, that PIs and the DOJ are mistaken.

*First,* the City characterizes the DOJ and PIs' position as nothing more than "speculation and conjecture."  City Opp. at 4.  The City argues that the DOJ and PIs "confuse a change in the outcome of the process with a change in the process itself."  *Id.*  (asserting that PIs and the DOJ "reverse engineered" the existence of a change from the disparity in numbers of candidates called for each exam); *see also* City Sur-Reply at 1.

The problem with this first argument by the City is that it does not accurately characterize the substance of the DOJ and PIs' submissions.  The DOJ and PIs rely on historical data about the number of candidates who were called at one time in Exam 2000 and Exam 7001, not mere inference from the total numbers of candidates called to take the CPAT in each exam.

For example, it is undisputed that at the beginning of processing for Exam 7001, the City estimated that it needed to call 1,920 candidates – that is, the number of candidates needed to fill two Academy classes of 320 seats, using a 3:1 selection ratio.  Giraud Decl. at ¶ 31.  The DOJ points out, however, that the City never called at one time any group for Exam 2000 that even began to approach the 1,920 candidates needed to fill two classes.

> Prior to the first Exam 2000 academy class on July 29, 2013 (but after the January 2013 all-promotional academy class), the City called 530 Exam 2000 candidates for CPAT.  The City called around 800 Exam 2000 candidates between the first and second (January 2014) and second and third (July 2014) Exam 2000 academy classes, and then only 31 candidates between the third and fourth (December 2014) academy classes.  Based on this data, we do not understand the City's assertion that it called enough candidates for two classes at a time during Exam 2000 CPAT processing.

DOJ Opening Ltr. at 4.  Moreover, although the City asserts that part of the difference between the two exams should be attributed to inclusion of promotional and priority candidates in the Exam 2000 groups (City Opp. at 5), the DOJ cites data showing that the City still called only the estimated number of candidates needed to fill one class at a time for Exam 2000, even when the effect of promotional and priority candidates is taken into account.

> Even looking at total candidate processing (including Exams 2000 [and the promotional and priority hiring lists] 2500, and 001) during the same time period, it does not appear that the City called enough candidates to fill two academy



> classes at a time, as it only called 868 candidates prior to the July 2013 class . . .
> [and] [u]sing an attrition ratio of 3:1 and a desired academy class size of 320, one
> would expect 960 candidates to have been called for a single class . . . .

*Id*. The figures cited by DOJ above come directly from Exam 2000. They cannot be said to have been "reverse engineered" from the difference in outcomes between Exam 2000 and Exam 7001, as the City contends. Importantly, in Opposition to the PI and DOJ's motion, the City does not challenge the correctness of the PI and DOJ's figures, or attempt to offer any countervailing data or calculations to rebut the DOJ and PIs evidentiary showing that, based on historical data, the City called candidates for one class at a time in Exam 2000. The City also declined the chance to engage in further discovery related to its compliance with Paragraph 16.

*Second,* the City repeats a mischaracterization of the Monitor's periodic reports, which the Monitor has previously corrected. As in its December 2019 letter to the Court, the City asserts that "multiple Periodic Reports acknowledge that the City processed for two classes at a time" for Exam 2000. City Sur-Reply at 3 n.4 (citing City 12/4/2019 Letter (Dkt. # 1943) at 5 (citing periodic reports)). This is false. The references on which the City seeks to rely reflect that "the City processed candidates to fill two Academy classes *per year* – not that those classes were *processed at the same time*." Monitor 1/17/2020 Letter (Dkt. #1956) at 5-7 (emphasis added); *see also id*. at 6 n.8 (explaining both of the two periodic reports cited by the City "discuss processing two classes per year, not processing two classes at the same time").

*Third,* the City proffers a lengthy defense of the reasoning underlying its decision to call candidates in AFA score band 100, arguing that the City might not have had a sufficient margin of error above the minimum candidate target number it had determined was necessary to fill two classes– again, 1,920 – had it not done so. City Opp. at 5-6 (citing Giraud Decl.). But as the Giraud Declaration makes clear, the 1,920 figure off which the City worked in assessing its candidate needs and making the decision to call score band 100 was based on the assumption that the City should call candidates to fill two classes simultaneously. Giraud Decl. ¶¶ 31-35. The issue before the Monitor is whether calling the number of candidates needed to fill two classes simultaneously was a change – not whether the City was or was not appropriately conservative in calculating its margin of error *after* it had changed from a one-class goal to a two-class goal. The City's reasons for calling two classes at a time for Exam 7001 are irrelevant to the question here, which is whether doing so was a change from the City's prior practice.

*Fourth,* in support of the proposition that there was no change, the City cites Assistant Commissioner Giraud's statement that: "It is my understanding that, in the past, the FDNY had processed candidates for two classes at a time. We continued that process for Exam 7001." Giraud Decl. ¶ 32; City Opp. at 4-5. The City asserts that the Giraud Declaration "makes clear" that "[t]he analysis the City used, including the approximate processing ratio, and processing for two classes at a time, has remained constant." City Opp. at 4-5.

The "understanding" referenced in the Giraud Declaration is not adequate to prove that the City did in fact process candidates for two classes at a time before Exam 7001, however,



because it is not accompanied by the necessary evidence of personal knowledge or any description of the basis for that understanding.  Federal Rule of Evidence 602 provides that a fact witness "may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  *See also Baity v. Kralik*, 51 F. Supp. 3d 414, 419–20 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Bernstein v. Vill. of Wesley Hills*, 95 F. Supp. 3d 547, 559 (S.D.N.Y. 2015) ("While the Court does not doubt that A. Zaks is aware of at least some of the assertions in his Affirmation, they remain inadmissible if not based on personal knowledge."), *aff'd*, 644 F. App'x 42 (2d Cir. 2016).  The Giraud Declaration does not contain facts that demonstrate a foundation of personal knowledge that the City called two classes at a time in Exam 2000.

In particular, the Declaration does not state that Assistant Commissioner Giraud had any involvement in, or first-hand knowledge of, the City's procedures with respect to calling candidates for CPAT processing prior to Exam 7001.  The Declaration indicates that Assistant Commissioner Giraud assumed her present role, in which she has responsibility over the FDNY's Candidate Investigations Division, in September 2019, Giraud Decl. ¶ 2,[9] which was more than two years after the CPAT was completed for Exam 2000.  Nor does the Declaration supply a description of sources that Assistant Commissioner Giraud may have consulted, if any, to form an understanding regarding what the City's practice had been prior to her assumption of her current role.  *Cf. Peters v. Molloy Coll. of Rockville Ctr.*, No. CV 07-2553 (DRH) (ETB), 2010 WL 3170528, at *2-3 (E.D.N.Y. Aug. 10, 2010) (holding averments of declaration admissible without personal knowledge, where the declaration referred to "expressly reference[d]" documents and deposition transcripts produced in discovery and attached to declaration and it was "clearly identifiable" which portions of the declaration were based on such information).

Absent some foundation indicating that Assistant Commissioner Giraud's understanding of what occurred in Exam 2000 is based on personal experience or, at a minimum, observation of records or similar sources, her Declaration is not admissible as evidence of the City's hiring practice in Exam 2000.  *See, e.g., Cooley v. Penguin Gr. (USA) Inc.*, 31 F. Supp. 3d 599, 603 n.12 (S.D.N.Y. 2014) ("His 'understanding,' however, was not said to rest on personal knowledge.  . . .  Accordingly, Psihoyos's 'understanding' is not properly considered here."); *Payne v. Huntington Union Free Sch. Dist.*, 219 F. Supp. 2d 273, 279 (E.D.N.Y. 2002) ("Merely being 'aware' of purported facts is a far cry from having ... personal knowledge."); *Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 (2d Cir. 1980) ("Schwimmer's affidavit, hearsay in all material respects, states that on the basis of information obtained from other Sonam dealers and the Sonam salesmen servicing his account, he understood from the inception of his franchise that

---

[9] Assistant Commissioner Giraud states that prior to September 2019, she was the Human Resources and Labor Relations Counsel for the FDNY, Giraud Decl. ¶ 2, but her Declaration does not indicate that she was involved in calling candidates for the CPAT before she occupied that role.  *See id.*  ¶ 3 (stating that "[m]y duties in my *current* role include overseeing the processing of firefighter candidates . . . .") (emphasis added).



the forms required to be submitted for reimbursement of advertising expenses never were expected to reflect the true amounts expended." (footnote and internal quotation marks omitted)).

In January 2020, the Monitor noted that "the City has never suggested that it has additional information to submit on the point of whether the data show that the City called two classes at a time in Exam 2000, either before the Report, in the City Letter itself, or in the frequent calls the Monitor and Parties have had since the other Parties raised the questions referenced in the Report." Monitor 1/17/2020 Letter (Dkt. # 1956) at 7. Nevertheless, the City chose not to offer any data of its own to prove that it did call the number of candidates needed to fill two classes at the same time, based on its attrition ratio, for Exam 2000. *See Pillsbury Co. v. Upper Crust Prod. Co.*, No. 98-CV-6114, 2004 WL 63980, at *7 (W.D.N.Y. Jan. 6, 2004) (finding contempt where "it was no secret" that movant was relying on test results to support contempt motion, yet "despite ample opportunity to do so," contemnor never submitted alternate data to support its defense), *aff'd,* 132 F. App'x 396 (2d Cir. 2005). At most, the City offered a general statement of "understanding," unaccompanied by indicia of firsthand knowledge, that the City did call two classes at a time prior to Exam 7001. This is not sufficient to overcome historical hiring figures that show that the City did not call two classes at once in Exam 2000, the hiring cycle immediately before Exam 7001. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (court need not accept version of facts that is contradicted by the record); *Matteo v. Kohl's Dep't Stores, Inc.*, No. 09 Civ. 7830 (RJS), 2012 WL 760317, at *7 (S.D.N.Y. Mar. 6, 2012) (court should not credit assertions contradicted by evidence in the record). Again, the Monitor notes that the City agreed that the record was complete, and despite many opportunities to do so, did not seek to provide any additional information that might have bolstered the record with respect to the basis of Assistant Commissioner Giraud's understanding, or other information to show that the FDNY that it had called candidates to fill two Academy classes at a time for Exam 2000. The inescapable conclusion is that the City had no further evidence to offer that would have been helpful to it on this point.

The DOJ's and PIs' figures show that the City did not call enough candidates to fill two classes simultaneously for Exam 2000, and the City has offered no admissible evidence to rebut the DOJ's and PIs' numbers. It is undisputed that the City chose to call enough candidates to fill two classes at a time for Exam 7001. As such, the Monitor concludes that Plaintiffs have met their burden to prove by clear and convincing evidence that the City made a change.

### 2. Proof of Noncompliance

As noted above, the City has maintained throughout that it did not make any change in calling candidates for the CPAT. Consistent with that position, the City does not contend that it submitted any change to the Monitor for approval.

Nevertheless, the City argues that it met its obligations under the MRO by giving "notice" to the Monitor and other Parties through piecemeal disclosures that could have been combined with public information, and that the Monitor and Parties' lack of objection should be construed as approval. *E.g.,* City Opp. at 3 n. 1. The Monitor has previously addressed these



arguments, noting that "The City did not identify any communication . . . where, in response to the Monitor's and Parties' many requests for information and opportunity to provide contemporaneous feedback, the City stated that it intended to process over 5,000 candidates from the Exam 7001 list by September 2019." CPAT Report (Dkt. # 1940) at 13-14; Monitor 1/17/2020 Letter (Dkt. # 1956) at 5 (stating that the City's apparent belief that "sending documents containing data points without context or explanation sufficed as 'notice' . . . reflects a fundamental misunderstanding of the MRO, the Monitorship process, and the City's obligations to disclose its attrition mitigation plans in a manner that facilitates meaningful evaluation, consultation, and discussion").

Insofar as the City's arguments are intended to be construed as some sort of waiver or estoppel position, moreover, the Monitor noted in January 2020 that the City had not supplied any legal authority that would support transposing those concepts to a remedial order. *Id.* The City still has not done so.

In any event, the City's "notice" argument is a red herring. Paragraph 16 of the MRO requires the City to "first obtain the approval" of the Monitor, not that the City give the Monitor sufficient information to claim the Monitor was put on notice. Here, it is undisputed that the Monitor never approved the change that is the subject of the instant dispute, and the Monitor accordingly recommends a finding that the second prong of the *King* test has been met.

### 3. Whether City Made Reasonable Efforts to Comply

The City denies that it made a change, and has taken the position that it was the City's "understanding" that it was not making any change, so there is no question that the City did not make any express effort to seek approval of a change. In its Sur-Reply, however, the City alludes for the first time to the possibility that any failure to seek approval might have been a product of mistake. The relevance of such a mistake, in the City's view, is that no violation of the MRO could have occurred if the City was operating on a mistaken assumption. The City argues that:

> Since the City only wished to continue its past practices, there was no obligation to seek Monitor approval. At best . . . presumably as a result of a complete change of Candidate Investigation Division ('CID') management, the City was mistaken about what its past practice actually was. Even if true, that sort of mistake would not constitute a violation of paragraph 16 because, again there was no desire on the part of the City to make any change to its processes and therefore no obligation to seek Monitor approval.

City Sur-Reply at 3.

Again, willfulness or intent to violate the MRO is not an element of the legal standard governing this motion. *See E.E.O.C. v. Local 638,* 753 F.2d at 1178; *Vuitton et Fils,* 592 F.2d at



129 n.2 (stating that civil contempt may be found even where the violation was inadvertent).
Thus, the City's late-raised arguments regarding the possibility of some kind of "mistake" that
negates a "desire on the part of the City to make a change" do not preclude a violation.

PIs concede, however, that the City could avoid a finding of violation and demonstrate
reasonable diligence by showing that the City engaged in "diligent and energetic efforts to
comply in a reasonable manner" with a court order.  PI Opening Mem. at 5-6 (*citing Chao v.
Gotham Registry, Inc.,* 514 F.3d 280, 293 (2d Cir. 2008)).  *See also Manhattan Indus. v. Sweater
Bee by Banff, Ltd.,* 885 F.2d 1, 4 (2d Cir. 1989) (stating that diligence requires a "a thorough,
considered plan of attack on compliance…" that "would have prevented the problems that
occurred" (ellipsis in original; citation and internal quotation marks omitted)).  A court should
consider  "whether the defendant in the face of the requirements of a court order has neglected to
marshal its own resources, to assert its own authority, and to demand needed results from
subordinate individuals and agencies."  *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, No.
09CV3312PKCVMS, 2014 WL 12834210, at *3 (E.D.N.Y. June 27, 2014) (quotations omitted).
The Monitor therefore considers whether the City has demonstrated that a mistake, assuming
there was one, occurred notwithstanding the City's existence of reasonably diligent effort
overall.

The City's Opposition to the PI's and DOJ's motion for a finding of violation does not
describe "diligent and energetic" efforts to comply with Paragraph 16 regarding approval of a
change to the CPAT.  Nor does the City describe that it had in place a "thorough, considered plan
of attack on compliance" that would have prevented any error about whether it was making a
change.  The City's Sur-Reply refers in passing to a "complete change of Candidate
Investigation Division ('CID') management," *id*. at 3, but the City has submitted no evidence of
such change or other information about how it might fit within a broader pattern of diligence.
Without evidence of measures the City had instituted to comply, the Monitor has no basis to find
that the City exercised reasonable diligence overall regarding the CPAT, or that failure to obtain
approval in this instance is not indicative of a lack of diligence on the City's part to exercise
caution when changing the CPAT process.  *See Fendi Adele S.R.L. v. Burlington Coat Factory
Warehouse Corp.*, No. 06 CIV. 0085 (LBS), 2007 WL 2982295, at *4 (S.D.N.Y. Oct. 10, 2007)
("A lapse in corporate memory is simply not a valid defense to Burlington's failure to be
reasonably diligent in carrying out the terms of the 1987 Consent Injunction."); *Shady Records,
Inc. v. Source Enters., Inc.*, 351 F. Supp. 2d 64, 72 (S.D.N.Y. 2004) (party subject to order had
obligation to "ensure that all its employees understood the terms of the order and the importance
of complying, and that all reasonable steps would be taken to prevent" disclosure in violation of
the relevant order).

Moreover, the suggestion that the City inadvertently omitted to advise the Monitor of a
change because it failed to realize that a change had occurred is difficult to reconcile with the
fact that even after the change had been called to the City's attention, the City continued (and
still continues) to deny that any change occurred.  *See Zino Davidoff SA v. CVS Corp.*, No. 07
Civ. 15332 (RJS), 2008 WL 1775410, at *11-13 (S.D.N.Y. Apr. 17, 2008) (considering, among
other factors relevant to contempt, diligence of efforts to remedy any non-compliance); *see also*



DOJ Opening Ltr. at 7 (arguing that the City "has supplied no evidence of its diligence in the face of other evidence that it could have stopped, or at least paused, CPAT processing when the issue of the change was brought to its attention by Plaintiffs-Intervenors prior to the start of Round 2 of Exam 7001 CPAT processing in July 2019."); PI Opening Mem. at 11 ("In refusing to acknowledge that there was a change to the hiring process, the City has made no attempt to cure it").

In sum, while the City asserts that it did not believe it had to request approval because it did not believe it had made a change to the firefighter selection processes, the City has not argued that it had in place any method or plan to confirm whether any of its processes were changes and therefore to ensure compliance with Paragraph 16 as a general matter. The City also has not described any effort on its part to investigate whether the use of the CPAT in Exam 7001 was a change from its use for Exam 2000, once the issue had been called to its attention by opposing counsel and the Monitor and Court, except to state that one of its personnel had an "understanding" that a change had not occurred. The City had reason to know that its diligence was at issue, and had multiple opportunities to address the issue and augment the record.

Based on the foregoing, the Monitor concludes that there is clear and convincing evidence that the City did not exercise reasonable diligence to comply with Paragraph 16 of the MRO in regards to having made a change to processing for the CPAT. The Monitor therefore recommends that the Court find that the City violated Paragraph 16 with respect to advance approval of a change to the CPAT for Exam 7001.

B.      Paragraph 19

Paragraph 19 of the MRO provides that:

> The City of New York shall, with reasonable diligence, take all steps necessary to eliminate all policies and procedures that are not job related or required by business necessity and either have a disparate impact on black and Hispanic firefighter candidates or perpetuate the effects of said disparate impact.

Thus, like the third prong of the *King* standard, Paragraph 19 requires the Monitor to make a recommendation regarding whether the City acted with reasonable diligence to satisfy its obligations as set forth in the MRO. PIs contend that the City failed to do so, whereas the City asserts that it complied in full.

At the outset, the Monitor observes that PIs and the City differ to some extent in their framing of the Paragraph 19 dispute. According to PIs, "the relevant 'policy or procedure' … is the policy and procedure by which the City calls candidates for the CPAT, provides training to such candidates, and takes steps to reduce attrition at this critical stage." PI Reply at 3. PIs point to data showing that in Round 1 of the CPAT, Black candidates fared worse in comparison to whites than they had done in Exam 2000 CPAT testing overall; that there was adverse impact



against Black candidates in the rates at which the first group of Exam 7001 candidates were ultimately appointed to the Academy; and that this adverse impact was more pronounced than the adverse impact seen in Exam 2000 Academy appointments overall.

Despite these trends, PIs contend, the City "proceeded with CPAT testing of far more candidates than it had before . . . without prior analysis of the potential adverse impact or a plan to mitigate it." PI Opening Mem. at 4.[10] PIs point to a statement by the City to the effect that processing nearly 3,000 candidates at one time for the CPAT was "a challenge in itself." *Id.* at 14 (quoting 7/9/2019 Tr. at 9:3-4); *see also id.* at 14-15 (arguing that the City administered the CPAT to a large volume of candidates without any "meetings, analyses, memos or other efforts . . . to address the problem"). The gist of PIs' claim is that Paragraph 19 requires that before implementing a change to a process that has had or appears likely to have adverse impact – particularly a change that could at least conceivably contribute to worsening such impact – the City must analyze the likely effects of the change, and develop a plan to mitigate any potential negative impacts.

For its part, the City contends that candidate outcomes for Round 2 of the CPAT as of June 2020 refute any contention that the City failed to use best efforts to mitigate attrition from the CPAT. City Opp. at 7-9. Specifically, the City highlights that although attrition for all reasons (including failure and discontinuation) increased among all demographic groups between the first and second CPAT testing rounds (which is not unexpected), Black and Hispanic attrition increased less than white attrition. The City infers from this that, if anything, calling a larger number of candidates for CPAT led to "*less* negative" results in terms of minority attrition. City Opp. at 9.

The Monitor agrees that, examined solely through the lens of comparative rates of attrition between Round 1 and Round 2 of the CPAT, it does not appear that calling a larger cohort of candidates was more detrimental to Black and Hispanic candidates than it was for white candidates. But this is only one part of a broader inquiry. Based on the same data on which the City relies, Black and Hispanic attrition outcomes for the CPAT (including both voluntary attrition and CPAT failure) were worse overall in Round 2 than in Round 1 (though only to a slight extent for Hispanic candidates). *See* City Opp. at 8. The City's data also appears to corroborate PIs' contention that part-way through the Exam 7001 list, the gap in total attrition at the CPAT stage between Black and white candidates is higher than the gap that existed at the end of the entire Exam 2000 list. *See* PI Opening Mem. at 14.

---

[10] The City acknowledges in its Opposition that "plaintiffs-intervenors do not actually seem to be challenging the use of the CPAT or claim that the City's decision not to 'eliminate' the CPAT . . . violates Paragraph 19." City Opp. at 7. Nevertheless, in its Sur-Reply, the City addresses this hypothetical claim. City Sur-Reply at 6. Based on the Monitor's review, PIs' motion does not raise any contention that use of the CPAT protocol, *per se*, violates the MRO, as distinguished from the policies and procedures the City uses to call and prepare candidates for the CPAT. Accordingly, the Monitor's recommendation does not reach that issue.



Moreover, the Monitor agrees with PIs that compliance with Paragraph 19 required the City not only to seek to avoid disparate impact in rates of passing the CPAT test, but to give due consideration to effects that a change related to the CPAT could have on the FDNY hiring process overall. The City has consistently argued that calling candidates and having them engage earlier with the FDNY will ultimately prove beneficial – and all Parties acknowledge that they do not know whether the change will ultimately prove to be for the better or worse. There are possible downsides as well, however, to having candidates pass the CPAT and then wait months (or in some cases, over a year) before they are eligible to take the medical exam and enter the Academy. *See* 1/27/2020 Tr. (Dkt. # 1973) at 28:4-14 (PIs' counsel noting, in connection with potential remedies, that "the time has increased between when they were fit and when they will need to be fit"). These downsides required consideration before the City proceeded with a change. *See United States v. City of N.Y.*, No. 07-CV-2067 (NGG) (RLM), 2011 WL 4639832, at *12 (E.D.N.Y. Oct. 5, 2011) (Order Granting MRO) (City must "comprehensively re-assess its policies and practices" and "analyze the evidence showing the effect of those policies and practices").

In rebuttal of PIs' contentions that the City failed to evaluate and plan adequately for this potential downside of calling such a large group of candidates, the City offers nothing more than an unsworn assertion that "the City was cognizant it was processing a larger group and employed numerous <u>additional</u> attrition mitigation efforts." City Opp. at 9 (emphasis in original).[11] The City offers no detail about when it decided to implement any of these "additional" measures, a number of which (such as sharing information with the Vulcan Society to allow it to provide encouragement to candidates) appear to have been in place even before the City called candidates for Round 2 of the CPAT and therefore could not have been adopted as part of an effort to remediate any potential increase in attrition that might result from calling a larger number of candidates or from an increase in candidate waiting times between the CPAT and subsequent steps in the hiring process.

It is possible that discovery might have shed further light on this issue and garnered more evidence of diligence on the City's part. The Monitor is mindful, however, that all Parties, including the City, have taken the position that the Monitor's recommendation should be based on the record as its stands.

The record does not show that the City took adequate steps to marshal its resources and develop a plan to combat potential adverse impact in advance of making a change in the form of calling two classes at once for the CPAT. Nevertheless, the Monitor declines to recommend that the Court find at this time that the City has violated Paragraph 19 of the MRO under the standard applicable to civil contempt.

---

[11] The Monitor notes that FDNY Assistant Commissioner Nafeesah Noonan also provided a description of the City's decision to engage in some additional preparation and engagement for Round 2 candidates prior to taking the CPAT, in recognition of the fact that candidate attrition increases over time as the City progresses to later AFA score bands. Transcript of Status Conference, Jan. 27, at 16-17.



"[E]fforts to comply with the [prior court] order, while not complete, are sufficient to escape a contempt order." *Najera-Borja v. McElroy*, No. 89 CV 2320, 1995 WL 151775 at *5 (E.D.N.Y. Mar. 29, 1995). While the City may have fallen short in its planning for and consideration of the specific change of calling two classes at a time, the City has made some efforts to identify and mitigate disparate impact related to the CPAT process overall.

Critically, moreover, the processing and hiring procedure for of candidates who have already passed the CPAT is not yet complete, and it is not yet too late for the City to exercise reasonable diligence in mitigating attrition among Round 2 candidates who have passed the CPAT and are waiting (or may have just been called) to proceed to the next steps of candidate processing. The remedies discussed below are designed in part to ensure that the City fulfills its obligations under the Paragraph 19 of the MRO in connection with the CPAT and post-CPAT attrition mitigation efforts.

Accordingly, the Monitor recommends that the Court deny PIs' request for a finding of violation of Paragraph 19, with leave to renew that request upon a demonstration of the City's continued failure to take steps to mitigate disparate impact specifically among this group.

## V.    REMEDIES

This Court has power to award remedies for breach of the MRO under both Paragraph 52 of the MRO and its inherent equitable power. In addition to their joint request for a finding that the City violated Paragraphs 16 (and, for PIs only, a finding that the City violated Paragraph 19), both Parties seek certain additional relief. The Monitor's recommendations in this regard follow.

### A.    Further Relief Requested by the DOJ

The DOJ requests that the City be required to "accurately memorialize all steps in its entry-level firefighter selection process and to produce that memorialization to the other Parties and the Court Monitor for review and comment before finalization." (DOJ Opening Ltr. at 1, 5-6.). The Monitor recommends that the Court award relief along the lines the DOJ has requested. Given the potential breadth of the task, however, the Monitor recommends that this request be granted in slightly modified form.

The Monitor recommends that the City be required to produce a flow chart or written summary of the firefighter hiring process, for review and comment before finalization, that enumerates steps of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit of the FDNY has primary responsibility for each of the listed steps.



B.     Further Relief Requested by PIs

PIs request that the Monitor explicitly reject the City's argument that it gave adequate notice of a change, and that "moving forward, the City notify the Monitor and Plaintiff-Intervenors of potential changes in clear and explicit terms that identify the change and do so in communication that is distinct from the regular back and forth between parties." PI Opening Mem. at 19.  The Monitor has rejected the City's notice argument.  The Monitor agrees that requests for approval under Paragraph 16 of the MRO should be clearly demarcated as such, but does not believe that going forward the City requires further formal direction in this regard.

PIs also ask the Monitor to recommend relief intended to address three distinct types of harm.  Though not described in detail in their moving papers, PIs' request for relief tracks the three categories of relief laid out in a letter to the Monitor dated January 21, 2020, which PIs submitted in support of their request for a finding that the City violated the MRO in connection with the CPAT ("PI Relief Ltr.").

*First*, PIs seek what they refer to as "shortfall hiring," which would require the City to provide twelve weeks of training and the opportunity to retake the CPAT to Black candidates who failed or did not previously take it, until the Exam 7001 CPAT pass rate for Black candidates equals the pass rate of white candidates in Round 2.  *Id*. at 3-4.  *Second*, PIs request that the role of the FDNY Diversity Advocate be expanded to provide additional outreach and support geared at retaining and maintaining the fitness of the approximately 400 Black candidates among those who passed the CPAT between October 2018 and September 2019, many of whom would have experienced longer than usual wait times – even had there been no pandemic – before being called for the remaining phases of the hiring process than had the City called only enough candidates to fill one class at a time.  PIs state that the goal of this additional support would be to use the additional wait time in a manner that is beneficial, instead of allowing it to possibly become a detriment.  *Id*. at 4.  *Third*, PIs ask that before the City proceeds to calling candidates for Round 3 of the CPAT, the City be required to engage in a "deliberative process" designed to identify and eliminate any policies and procedures related to CPAT that have or perpetuate disparate impact on Black candidates, such as by conducting focus groups.  *Id*. at 5.

Race-conscious relief may be appropriate where shown to be justified by the facts.  *See, e.g., Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 445, 447 (1986).  PIs do not accompany their request for relief, however, with any legal argument about why such relief in the form of shortfall hiring would be appropriate here, and declined to provide additional briefing to address the causal nexus between the City's conduct and this portion of their requested relief.  Beyond the not-insignificant fact that the City had not yet implemented the capability to leave phone messages for candidates, PIs do not point to anything specific about the timing of Round 2 testing that would tend to suggest that more Black candidates would have taken and passed the CPAT had the City not proceeded in the manner that it did.  For that reason, the Monitor does not recommend an award of shortfall hiring.



Nor, by the same reasoning, does the Monitor recommend that the Court order the City to provide "a regularly-available, public transit accessible facility for CPAT training," as PIs request.  PI Relief Ltr. at 5.  The Monitor strongly agrees that the City should locate such a facility as part of its efforts to mitigate attrition under the MRO, and has discussed this regularly with the City.  In the context of the instant request, however, the Monitor does not believe that PIs have shown that ordering the City to provide additional CPAT training opportunities for candidates in future is sufficiently closely tied to failure to plan for or engage in attrition mitigation for a group of candidates who have already taken the CPAT.

The opposite is true of the PIs' second request for relief, which seeks additional support for the approximately 400 Black candidates who have already taken and passed the CPAT.  Had the City sought advance approval from the Monitor to call two classes at a time instead of one, the Monitor undoubtedly would have pressed the City to explain before approval whether the City had analyzed the potential for increased disparate impact and how the City planned to mitigate attrition among the resulting group of Black candidates who would have a potentially lengthy waiting period between passing the CPAT and subsequent steps of the hiring process. *See* CPAT Report (Dkt. # 1940) at 16 ("The City cannot proceed as it has – testing the remaining candidates in a large group or groups on an accelerated schedule – without affording the Monitor and the other Parties time to analyze the effect its practices have had to date.  The City's continuing its prior practice without input will be regarded by the Monitor as a failure in its decision-making process that must be reported to the Court.  For those candidates who have already taken the CPAT, the Monitor will follow the same data-driven approach for the steps of the hiring process that remain.").

Examples of outreach and support that PIs propose include sessions at FDNY Headquarters where candidates could mingle with minority firefighters and test their fitness on the stairmill, giving candidates information about when they are likely to be called for further processing, communication, assistance with obtaining necessary documentation such as driving and residency materials, and help with scheduling appointments.  PIs ask that these efforts be tracked in a database that can interface with FDNY recruitment databases.  PI Relief Ltr. at 4.

The Monitor recommends that the Court grant, in part, PIs' request for relief intended to ensure support for the approximately 400 Black candidates who have passed the CPAT and are waiting, or have already waited and been called for the next Academy class, to proceed to the next steps of candidate processing or to the Academy.

The Monitor therefore recommends that the Court order as follows:

- The City should make available to these candidates, when safety permits, an opportunity to maintain fitness and to practice on a stairmill at least every two weeks (whether at BHS, through an arrangement with a gym, at a leased site, or any other option the City may deem best);



- The City shall communicate not less than once a month with these candidates, with reasonable estimates of when they might be called for further steps, and encouragement to remain in the FDNY hiring process; [12]

- The City shall conduct a focus group with candidates who have passed the CPAT and are expected to wait before being called for further processing, with study design input from the Monitor's experts, in the next 30 days to assess their experience and gather suggestions to improve retention and preparation;

- Before resuming administration of the CPAT to further candidates, the City shall submit to the Monitor and Parties a written summary discussing the effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1 and 2, the efforts that have been specifically directed to the candidates in the group of approximately 400 who have passed the CPAT, any takeaways from the focus group, and a description of how the FDNY plans to operationalize the information contained in the report going forward.

Respectfully Submitted,

/s/

Mark S. Cohen
**Court Monitor**

---

[12] PIs' request for relief envisions potential roles for the FDNY Diversity Advocate and the African American Recruitment Coordinator(s).  *See* PI Relief Ltr. at 4-5.  Subsequent to the Parties' briefing, the City advised the Monitor and Parties that the City intends to reduce or eliminate the position of African American Coordinator, in favor of a team of coordinators who are available to all candidates.  While the PIs' suggestions seem sensible, the Monitor leaves it to the City to propose reasonable staffing in the first instance to accomplish the relief that the Monitor recommends should be ordered by the Court.



<u>Attached Exhibits</u>:

Exhibit 1 -- Plaintiffs-Intervenors' Memorandum of Law in Support of Request for a Finding that the City Violated Paragraphs 16 and 19 of the Modified Remedial Order (March 20, 2020) ("PI Opening Mem.")

Exhibit 2 – Letter from the United States to the Court Monitor requesting a finding that the City violated Paragraph 16 of the Modified Remedial Order (March 20, 2020) ("DOJ Opening Ltr.")

Exhibit 3 – Letter from the City to the Court Monitor in opposition to the United States' and Plaintiffs-Intervenors' requests (June 15, 2020) ("City Opp.")

Exhibit 4 – Declaration of Marie Giraud in Support of the City's Response (June 15, 2020) ("Giraud Decl.")

Exhibit 5 -- Plaintiffs-Intervenors' Reply to New York City (July 9, 2020) ("PI Reply")

Exhibit 6 – United States' Letter Reply Brief in support of its request (July 9, 2020) ("DOJ Reply")

Exhibit 7 – City's Sur-Reply in opposition to the requests (July 17, 2020) ("City Sur-Reply")