UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA,                      :
                                               :
                   Plaintiff,                  :
                                               :
            -and-                              :
                                               :
THE VULCAN SOCIETY, INC., *for itself and on*  :
*behalf of its members*, JAMEL NICHOLSON, and  :
RUSEBELL WILSON *, individually and on behalf of a* :
*subclass of all other victims similarly situated seeking* :
*classwide injunctive relief,*                 :          **07-cv-2067 (NGG) (RLM)**
                                               :
ROGER GREGG, MARCUS HAYWOOD, and               :
KEVIN WALKER*, individually and on behalf of a* :
*subclass of all other non-hire victims similarly* :
*situated;* and                                :
                                               :
CANDIDO NUÑEZ and KEVIN SIMPKINS,              :
*individually and on behalf of a subclass of all other* :
*delayed-hire victims similarly situated,*     :
                                               :
                   Plaintiff-Intervenors,      :
                                               :
            -against-                          :
                                               :
THE CITY OF NEW YORK,                          :
                                               :
                   Defendant.                  :
------------------------------------------------------------------x

## MONITOR'S THIRTY-SECOND PERIODIC REPORT TO THE COURT

TABLE OF CONTENTS

I.      Executive Summary ................................................................................................ 1

II.     Recruitment and Attrition Mitigation ................................................................... 7

        A.      Candidate Processing ................................................................................. 8

                1.      Candidate Processing to Date and FDNY Demographics ......................... 8

                2.      CPAT Testing Dispute ................................................................................ 10

                3.      Plans for the Resumption of Processing ................................................... 10

        B.      Attrition Mitigation ................................................................................... 11

                1.      Initiatives Connected to the Resumption of Processing ........................... 11

                2.      Long-Range Plans ...................................................................................... 19

                3.      Use of Data in Attrition Mitigation Initiatives......................................... 20

        C.      Analyses of the Exam 7001 Recruitment Campaign ............................... 21

                1.      City's After Action Report and Cost-Effective Report............................. 22

                2.      Further Recruitment Analyses Requested by the Monitor and the
                        Other Parties.............................................................................................. 23

                3.      The Monitor's Data Requests .................................................................... 24

        D.      Assignment Issues..................................................................................... 25

        E.      Working Group .......................................................................................... 27

III.    EEO............................................................................................................................ 28

        A.      EEO Staffing ............................................................................................. 28

        B.      Policies, Messaging, and Training ............................................................ 29

                1.      EEO Messaging ......................................................................................... 30

                2.      CDIO Messaging ....................................................................................... 32

        C.      Compliance and Accountability................................................................ 34

                1.      Officer Performance Evaluations.............................................................. 34

                2.      "Workplace Professionalism" Reporting .................................................. 38

i

        3.      Climate Survey ........................................................................... 39

    D.     Inspections and Investigations ........................................................ 41

        1.      Inspections .................................................................................. 41

        2.      Review and Recommendations Regarding Investigations ...................... 42

        3.      Monitor Report on EEO Investigations ................................... 44

        4.      EEO Database ........................................................................... 45

IV.   Medical Exam-Related Issues ................................................................. 46

    A.     Stairmill Test ............................................................................... 46

        1.      Validation Study and Technical Report ................................... 46

        2.      Retesting of Certain Candidates ............................................. 48

    B.     Medical Exam Attrition Mitigation ................................................ 49

    C.     Medical Exam Messaging .............................................................. 51

V.    Character Screening by the CID and PRB ............................................... 52

VI.   Firefighter Exam .................................................................................. 53

VII.  Additional Issues ................................................................................ 54

I.      **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from November 2, 2020, the date of the Monitor's Thirty-First Periodic Report (Dkt. # 1990), to January 31, 2021.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Since the last report, COVID-19 has continued to impact the City's efforts to achieve compliance with the Modified Remedial Order.  Nevertheless, the City has been able to resume work in a number of important areas, though not at full capacity.  Most notably, in January 2021, the City resumed limited processing for candidates on the Exam 7001 eligible list (the rank-ordered list from which candidates are called into the hiring process) – with a view to appointing two Fire Academy classes in 2021, each of which is expected to have slightly less than half the usual number of probationary firefighters.

With the resumption of candidate processing, it is more important and more pressing than ever for the City to formulate and implement sound plans (both short-term and long-term) for communicating with candidates and keeping them engaged and prepared.  Similarly, now that the City's data analysis teams are able to resume at least some work on Monitorship projects, the Monitor expects that long-delayed and time-sensitive projects (including the climate survey and analyses of the Exam 2000 and 7001 recruitment campaigns, which are critical for planning for the next campaign) will be completed in an expeditious and timely fashion.  The Monitor plans

to work closely with the Parties to establish a timeline for the completion of essential projects and the development of plans for the next campaign.

In Part II of this report, the Monitor discusses activities relating to the City's recruitment and hiring of candidates from the Exam 7001 list.  As noted above, the City has recently announced plans to call two reduced-size Academy classes in 2021, the first of which is anticipated to begin in May.  The City has invited some 300 candidates (all of whom had passed the Candidate Physical Ability Test ("CPAT") before the pandemic) to commence or complete the post-CPAT stages of processing, including intake by the Candidate Investigation Division ("CID"), medical and psychological screening, and character review.  In light of the time frame and the disproportionate impact of COVID-19 on communities of color, before approving the resumption of processing under Paragraph 16 of this Court's Modified Remedial Order, the Monitor required the City to take steps (some of which build on existing initiatives) to ensure that non-traditional candidates are provided with the information, guidance, and resources they need to navigate and prepare for the remaining phases of screening.  Relatedly, the Monitor has also continued to urge the City to formulate a comprehensive, long-range candidate communications plan to inform and continue to maintain interest among groups of candidates who are still waiting to be called by the City, with messages tailored to differently situated groups of candidates depending on the length of their expected waits.  In addition to these developments, the City has also indicated that it is likely to ask for the Monitor's approval to extend the life of the Exam 7001 list by one year, although a final decision on the extension has not yet been reached.

Part II also reports on the Monitor's continuing efforts to ensure that the City performs appropriate data analyses to inform its attrition mitigation efforts for Exam 7001 candidates, and

that it conducts an appropriate retrospective evaluation of the Exam 7001 and Exam 2000 recruitment campaigns to inform the FDNY's plans for the next campaign.  Before the pandemic, the City prepared reports analyzing recruitment efforts and patterns of attrition; but those reports did not adequately cover important aspects of the analysis, such as cost benefit analysis and the identification of recruitment factors and candidate characteristics that tend to be predictive of success in the FDNY hiring process.  The City's own efforts to implement recommended improvements in these analyses remain on hold because its data analysis teams have been assigned substantially full-time to COVID-related projects.  But at the October 13, 2020 status conference, the City agreed that it would be helpful for the Monitor to assist with this project, and shortly thereafter the City agreed to send the Monitor data, initially requested in June 2020, that would enable the Monitor to perform at least some of the analyses.  The City produced a first tranche of the requested data on December 18, 2020 and indicated it would produce the remainder of the requested data on a rolling basis, and it has now advised the Court and Monitor that the City expects to complete production by mid-February.

Part III of the report discusses activities relating to the FDNY's EEO function.  The most notable development in this area since the last periodic report is the City's resumption of work on the analysis of the EEO climate survey, which was administered to the FDNY firefighter workforce in the fall of 2019.  Work on the analysis had begun as of February 2020 – involving cooperative efforts by the City, the Monitor, and the other Parties.  But the survey analysis was suspended in March 2020 because of the pandemic.  On October 14, 2020, the City circulated a revised analytical plan, which includes fewer opportunities for collaboration, but which the City feels will be more streamlined and yield a quicker result.  The City has committed to provide opportunities for the Monitor and other Parties to have input at decision-making points; and one

3

such discussion already occurred in December 2020, with further communications scheduled this month.  The City reports that, barring any further pandemic-related urgencies, it expects the analysis to be finalized by June 2021.

Part III also reports on recent EEO messaging and compliance initiatives.  Recent EEO-related communications include a training video reinforcing the Department's prohibition on the use of firefighting equipment against civilians during operations in circumstances of civil unrest and a Department Order (issued shortly before the recent election) reminding members of the need for restraint and civility in expressions of political opinion.  In recent communications with the chain of command, the EEO Office and the Department have also reminded officers of the need to remain vigilant in identifying and reporting evidence of EEO violations or conduct that may tend to undermine EEO climate.  As previously reported, the Monitor has encouraged the City to develop long-term EEO messaging plans even in advance of results from the climate survey, which the City has stated it plans to take into account when formulating its messaging plans.

In another area relating to EEO compliance and accountability, the Monitor has continued to review and make recommendations regarding the City's implementation of the EEO metric for officer performance reviews.  As previously reported, on October 23, 2020, the City produced to the Monitor data covering most of the officer evaluations from the 2019 cycle, which was the first cycle since the introduction of the EEO metric to cover a full year of officer performance and to include evaluations for all company officers.  However, the City has not yet completed production.  Once the production is complete, the Monitor will review and analyze the data and cross-reference it with other materials, including records of EEO investigations, to assess how the performance review system captures EEO performance and whether it reflects

4

input from the EEO Office in all appropriate cases.  In related discussions, the Monitor has also communicated suggestions to the City regarding its guidelines for identifying EEO investigations that may implicate management practices, and suggested some modifications to ensure the guidelines reach all instances where evidence might indicate a failure of supervision by company officers.  The Monitor also expects to offer further recommendations for the performance review process once production of materials from the 2019 cycle is complete and the materials have been reviewed.

Part III also reports on the Monitor's continuing efforts to evaluate the FDNY's EEO investigative practices and oversee the implementation of Monitor recommendations for their improvement.  As previously reported, on October 22, 2020, in its latest response to Monitor recommendations and requests, the City produced new and updated training materials, guidance documents, and forms related to the Monitor's recommendations, and provided some further clarifications on specific steps taken to implement them.  The Monitor responded with comments on the new materials on January 21, 2021.  The Monitor will continue to discuss its recommendations with the City, and it will continue to review EEO investigative materials to confirm that reforms are effectively implemented.  Since mid-2020, in addition to receiving City productions of investigative files from completed investigations (pursuant to a standing request), the Monitor has received weekly updates and offered comments on current and recently completed investigations on conference calls with the City.

The Monitor has also continued discussions with the City and the other Parties regarding EEO inspections.  Regular inspections by the EEO Office have been suspended since the onset of the pandemic, and the Monitor and the other Parties have repeatedly encouraged the City to find a way to perform this essential function.  The City is considering the possibility of conducting

5

virtual inspections or having officers (rather than EEO personnel) perform inspections temporarily using an EEO checklist; and it has issued oral directives reminding company officers of their responsibility to ensure that firehouses are compliant with EEO regulations.  But no alternative system of EEO inspections has yet been established.  At the January 13, 2021 status conference, the Court directed that regular in-person inspections should resume as soon as they can be performed safely.

Part IV reports on efforts to reduce disparate impact on Black and Hispanic candidates in outcomes of the Medical Exam and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws.

As recounted in previous reports, following allegations of disparate impact in the stairmill component of the FDNY medical examination, the City conducted a study to develop a new test, and considered input from the Monitor, the other Parties, and their experts.  The Fire Department's Bureau of Health Services ("BHS") began using the new stairmill test on October 17, 2019.  The City agreed to provide the opportunity for candidates to be tested using the new stairmill test if they were reserved or disqualified by the old stairmill test and not otherwise disqualified.  Retesting, which began prior to the pandemic, will resume soon in connection with candidate processing for the May 2021 Academy class.  The City will continue to analyze data and provide updates about the results of this ongoing initiative.  Part IV also reports on candidate attrition and the City's ongoing obligation to assess the other components of the medical screening (*e.g.*, stairmill, pulmonary function testing) and review outcomes for possible disparate impact.

Part V reports on continuing efforts by the Monitor and the Parties to devise and agree upon the proper approach for analyzing the impact of the FDNY's character review process

(conducted by the Candidate Investigation Division ("CID") and the Personnel Review Board

("PRB")) on candidates from different demographic groups.  As discussed in prior reports,

following the adoption and subsequent revisions of written guidelines by the City, the Parties and

the Monitor have continued to discuss the character review process, data showing outcomes of

the process, and disputes over the existence and significance of disparities in referrals and

outcomes.  On January 5, 2021, the Monitor circulated a memorandum to the Parties

summarizing proposals, outstanding issues, and questions relating to the analyses of the character

review process.  The Monitor plans to convene a call with the Parties to discuss and attempt to

resolve remaining disagreements regarding the appropriate endpoints, available data, and

parameters of relevant analyses.

Part VI discusses the Exam 7001 Technical Report produced by the City's testing

experts, PSI Services LLC ("PSI"), which describes the development, administration, and

analysis of the results of Exam 7001 (the open competitive exam given in September and

October 2017).

Part VII lists a range of additional issues addressed by the Monitor and the Parties during

the period covered by this report.

## II.    <u>Recruitment and Attrition Mitigation</u>

For the past several months, until recently, the processing of entry-level firefighter

candidates was suspended for reasons related to COVID-19.  In December 2020, the City

advised the Monitor and the other Parties that it had decided to resume processing beginning in

January 2021 for a limited number of candidates, and it plans to appoint two Fire Academy

classes (of reduced size) this year, with the first anticipated to begin in May.

Especially given the impact of COVID-19 on communities of color, the resumption of processing, while a welcome development, may present new challenges for non-traditional candidates.  This Court and the Monitor have urged the City to ensure that these candidates are as fully informed and prepared as possible, both for the May Academy class and for future classes.  During the pandemic, the City has engaged in outreach activities to candidates on the Exam 7001 list as described below, and the Monitor and other Parties have encouraged the City to undertake additional initiatives.

Data from the earlier, pre-COVID, rounds of candidate processing provided initial indications that some phases of the candidates screening process continue to produce a disparate impact adverse to Black and Hispanic candidates.  *See* Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 13, 79 (regarding the CPAT and the Medical Exam).  The Monitor continues to review the City's activities to ensure that it complies with its obligation under Paragraph 19 of the Modified Remedial Order, under which the City must "with reasonable diligence, take all steps necessary to eliminate all policies and procedures that are not job related or required by business necessity and either have a disparate impact on black and Hispanic firefighter candidates or perpetuate the effects of said disparate impact."

### A.    Candidate Processing

1.    Candidate Processing to Date and FDNY Demographics

Before the City's recent decision to resume processing, the screening of entry-level firefighter candidates had remained suspended for almost a year because of COVID-19 demands. *See* Monitor's Thirty-First Periodic Report at 7-8; Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 9; Monitor's Twenty-Ninth Periodic Report at 4.  Accordingly, there have been no recent Academy classes that would impact the demographic composition of the FDNY as a

whole.  As reported by the City on January 25, 2021, the FDNY force of 8,015 firefighters is now 10% African-American and 16.4% Hispanic.

The Monitor and the Parties have continued to discuss queries from Plaintiffs-Intervenors and the United States regarding the eligible list, including questions regarding claims for bonus points and adjustment of list numbers.  The queries arise in part from the Parties' interest in monitoring whether particular demographic groups were unable to prove their New York City residency.  The City has indicated that complete responses to Plaintiffs-Intervenors' and the United States' questions are delayed because the City's data analysis teams remain largely devoted to COVID-related projects.

While candidate processing was paused, the City communicated with candidates on the Exam 7001 list about the suspension.  The City also conducted eight fitness-oriented "Webex" conferences for all candidates between September 2 and December 8, 2020.  Black and Hispanic candidates were encouraged to attend by email and text, and, in November, by phone calls to those who had not yet attended a session.  Participation data from the conferences in November and December indicates that 22 of 67 Black invitees (33%), 23 of 117 Hispanic invitees (20%), and 46 of 325 white invitees (14%) attended at least one of those sessions.

In recent months, the Monitor and the Parties have also continued to discuss some remaining questions regarding Plaintiffs-Intervenors' suggestion that the City make use of a texting platform to facilitate standardized, interactive responses to candidates who reply to bulk texts from the City.  In response to Plaintiffs-Intervenors, after a series of exchanges, the City has arranged for those who respond to broadcast texts to receive automatic replies containing contact information to which they should direct any questions or follow-up communications.  For

the longer term, the City has stated that it intends to set up a texting system that can be used to receive and reply to candidate responses.

### 2.   CPAT Testing Dispute

On January 19, 2021, the Monitor filed its recommendation regarding the Plaintiffs-Intervenors' and the United States' requests for a finding that the City violated two provisions of the MRO in connection with its planning for and scheduling of CPAT testing for Exam 7001 candidates.  The Parties have been granted an extension of time for any objections to the Monitor's request, which are now due February 8, 2021.

### 3.   Plans for the Resumption of Processing

After notifying the Monitor and the other Parties in early December 2020 that it hoped to resume candidate processing, the City circulated a more detailed account of its plans on December 18, along with a set of draft documents and candidate communications for use in the renewed screening process.  All parties reviewed and commented on those communications, and the City has begun contacting candidates using the agreed upon materials.

A group of about 300 candidates has been invited to resume active processing, all of whom have previously taken and passed the CPAT.[1]  The group includes approximately 16% Black candidates and 22% Hispanic candidates.[2]  The FDNY will require all or nearly all of the

---

[1] In recent communications, the City has also advised the Monitor and the other Parties of efforts to reach out to the candidates who previously failed to report to some phases of the screening process or declined to continue, so as to invite them to rejoin the process.  As reported by the City on January 12, 12 of 78 Black candidates, 13 of 109 Hispanic candidates, and 13 of 113 white candidates invited to rejoin the process had done so.  Of the candidates that rejoined the list, six of the Black candidates, seven of the Hispanic candidates, and nine of the White candidates have list numbers that are eligible for consideration for the Spring 2021 class.

[2] Figures provided by the City on December 14, 2020 included 50 Black candidates and 66 Hispanic candidates out of a total of 303 candidates.

candidates to take or repeat the full medical examination, pursuant to a policy that requires results of medical screening to be less than one year old.  Virtually all candidates will also be required to submit updated personal information, and some candidates may need to be referred to and reviewed by the PRB based on the fully updated information in their criminal and employment histories.

Candidates who cannot resume processing immediately, or who believe they cannot prepare in time for the Medical Exam or the Academy itself, may decline appointment and resume the process at a later point in the life of the Exam 7001 eligible list; and the Monitor has encouraged the City to ensure that candidates are aware of this option, and that it keeps track of declinations as part of its analysis of candidate attrition.[3]  Although a final decision has not yet been made, the City has also indicated that it is likely to request Monitor approval to extend the term of the Exam 7001 list by a year, which will provide candidates with some additional flexibility in returning to the screening process.  With the extension, the City has said it would hope to make up (in part) for the two missed classes (and the two planned smaller classes) from Exam 7001 by adding two classes at the end of the term of the list.

**B.**     **Attrition Mitigation**

1.     Initiatives Connected to the Resumption of Processing

The City requested the Monitor's approval for the resumption of processing and the draft materials under Paragraph 16 of the MRO.  The Monitor approved the City's request, subject to certain additional conditions, on January 15, 2021.  The Monitor's conditions are primarily directed at ensuring that resources are provided for Black and Hispanic candidates in the hiring

---

[3] Candidates who fail their first stairmill attempt in the Medical Exam may, as always, re-take the test or decline appointment and resume processing at a later date.

process, and at building in mechanisms for the City to inform the Monitor about adherence to planned procedures described in the City's materials.

In support of its request for Monitor approval of the resumption of processing, the City stated its expectation that further delay might exacerbate attrition, and that continuing to process candidates further down the Exam 7001 list was likely to serve the interest of diversity by reaching diverse candidates on the list who had not yet been called.

In discussing the resumption of processing with the City, the Monitor emphasized the need to provide candidates – particularly candidates who are less likely to have friends and family within the FDNY – with information about the process, particularly regarding the importance of preparing for the physical requirements and  weight component of medical screening (including a stairmill component that differs from the CPAT stairmill) and the timed pre-Academy run.  The Monitor regards these concerns as particularly important given that candidates from communities heavily impacted by COVID-19 might be expected to experience additional difficulties preparing for the remaining phases of the process, scheduling appointments, or otherwise navigating the process on an expedited timeline.  Counsel for Plaintiffs-Intervenors expressed concerns along similar lines, and repeated a request that the City create some mechanism for candidates to reschedule medical appointments interactively online, as opposed to the current process of sending an email and waiting for another time to be offered via email, until a mutually workable time is found.

Accordingly, although the Monitor has approved the resumption of processing, the Monitor's approval is subject to the City's implementation of a number of measures intended to strengthen communications and support from the Office of Recruitment and Retention ("ORR"). The actions required by the Monitor, based in part on consultations with its experts, include

some new initiatives and others that would revive and build upon communications and programs
that were already in place before processing was suspended.  In some areas, in addition to
mandatory measures, the Monitor has offered further suggestions for the City to consider.

COVID-19 Protocols – The Monitor asked the City to provide regular confirmation that
the FDNY is in compliance with planned COVID-19 safety measures during candidate screening
and at the Academy – measures that have been described to the Monitor and the other Parties in
writing.  The Monitor has also recommended that the City consider additional measures
including frequent rapid testing for probationary firefighters at the Academy, and strongly
encouraging instructors to be vaccinated against COVID-19.  The Monitor believes that clear
assurances regarding safety measures and testing will help ensure that candidates from
communities that have been hard-hit by the virus are not deterred from continuing the process
because of COVID-related concerns.  The Monitor has also asked the City to reassure candidates
called for the May class that rescheduling their Medical Exam appointments will not hurt their
chances of success in the hiring process, though it may delay hiring for candidates who cannot
complete processing in time for the May Academy class.

Recruitment Coordinators – The Monitor has advised the City that Recruitment
Coordinators must have significant, one-on-one contact with Black and Hispanic candidates –
including affirmative contact initiated by Coordinators, not merely answers to candidate
questions.  The Monitor asked the City to ensure sufficient staffing to meet pre-established
targets for proactive communication with each candidate – for example, asking specific
questions regarding plans for fitness and medical preparation, following up with candidates to
check how plans are proceeding, and discussing how the candidate can resolve any difficulties
the candidate might be encountering in the process.  The Monitor's experts, including its EEO

expert and experts who are fire chiefs, advised the Monitor that this type of coaching and practical support is helpful in ordinary circumstances, and is likely to be especially so given the added challenges candidates face as a result of the COVID-19 pandemic. Plaintiffs-Intervenors have also asked the City to consider using recruitment coordinators to provide additional mentoring and personalized support, noting that a group of just 50 Black candidates presents an opportunity to get to know each candidate on a more personal basis and provide individualized support and encouragement.

As part of this approach, in order to increase the level of personal connection between Coordinators and candidates, the Monitor has also urged the City to assign Coordinators to specific demographic groups, as it did before the pandemic, establishing dedicated teams of African-American and Hispanic Coordinators.[4] The City has declined to do so, although it has agreed that for the upcoming class it will task one Black and one Hispanic Coordinator as the "primary" Coordinator for each of those groups. The City's plan is for a team of three Coordinators to focus on both Black and Hispanic candidates – answering questions (with whichever Coordinator is available at the time of the call or message responding), extending

---

[4] Before the onset of the pandemic, the ORR staff of Recruitment Coordinators included six full time Coordinators who were dedicated to outreach to Black candidates, with additional Coordinators devoted to similar outreach to Hispanic and other non-traditional candidates. Monitor's Thirtieth Periodic Report at 17; Monitor's Twenty-Ninth Periodic Report at 20. At the start of the COVID-19 crisis, the Coordinators (all of them firefighters) were removed from their roles in ORR and assigned to front-line emergency response duties. In its December messages regarding the resumption of processing, the City indicated that at least some Coordinators would be returning to ORR; and on January 7, 2021, it confirmed that three Coordinators had resumed work. In its January 29 comments on a draft of this report, the City reported that two detailed firefighters returned to ORR in November of 2020 and conducted outreach to Black and Hispanic candidates encouraging them to participate in Webex fitness sessions. The same firefighters also conducted outreach encouraging Black and Hispanic candidates to consider restoring themselves to the hiring list.

invitations to events as directed by the City, and, in specified instances, calling or texting candidates to remind them of appointments or to encourage them to reschedule appointments.  The City has stated that it believes that having a group of Coordinators is more effective than having one or more dedicated Coordinators, on the theory that the dedicated Coordinators may not be available when candidates have a need for assistance.  The City has also agreed to have staff from its Candidate Investigation Division reach out to candidates who miss intake and/or medical appointments, for this class.

The Monitor has advised the City that it intends to continue following up on this issue. The Monitor's concern is that an undifferentiated "team" approach, in which all Coordinators cover all candidates, may not be sufficient to maintain personal familiarity and contact either with non-traditional candidates who have been called for further processing, or with those further down the hiring list.  In response to the Monitor's concerns, the City has stated that it will add more Coordinators if the City determines they are needed.  The Monitor has requested that the City specify what metric it intends to use to determine whether one or more additional Coordinators are needed.  The City has stated that it is not relying on quantitative analyses or pre-set criteria, but intends to rely on the assessment of ORR managerial personnel who supervise the Coordinators.  As directed by the Court at the January 13, 2021 status conference, the Monitor will continue to work with the City to ensure that Coordinator staffing is sufficient to meet the needs of non-traditional candidates, and the Monitor has arranged for weekly calls with the City to obtain updates on Coordinator activities and more generally on the City's process of communicating with candidates.

Messaging Regarding Fitness Requirements – The Monitor has recommended that the City should re-emphasize from the outset that weight and fitness are part of the screening

15

process, and should advise candidates that even a few weeks of fitness preparation and weight loss, ideally with a stairmill component, can make a significant difference to a candidate's chances of success.  The City's draft medical exam notice will now include links to the City's existing fitness guides and videos, available on JoinFDNY and the Department's YouTube channel, which provide useful guidance and background on the fitness requirements of the Medical Exam and the Fire Academy.

Rescheduling Appointments – The Monitor has stated that rescheduling of appointments must be as flexible and as easy as possible.  Plaintiffs-Intervenors and the Monitor have also asked about the possibility of interactive, online scheduling where candidates would not need to email CID and wait for responses.  The Monitor's suggestion was intended to mitigate attrition and any risk that existing practices might disproportionately affect candidates who are unfamiliar with the FDNY hiring process, do not have friends and family encouragement, and may face practical challenges with the existing scheduling approach.  Currently, CID handles scheduling of appointments, other than follow up medical appointments, which are handled by BHS. Candidates are assigned a date and time to appear; those who wish to reschedule send an email to City staff, who respond by offering an alternate time; and the process repeats for each appointment until a workable time is found.  The City has stated that it believes this approach is appropriate, in part because job applicants do not typically have the ability to pick a time of their choosing for appointments.  Separately, in the absence of any interactive capability for candidates to schedule, the City has objected that ORR cannot schedule appointments and that CID must do so, and has also cited privacy issues that might arise if candidates were given assistance with scheduling follow up medical appointments.

16

Plaintiffs-Intervenors have argued that, whether or not the City's scheduling system is typical in other contexts, the City should make additional efforts to facilitate scheduling for non-traditional FDNY candidates.  Plaintiffs-Intervenors have observed that the pool of Black candidates differs from the pool of white candidates in factors that may be associated with more difficulty in scheduling.  (For example, noting that Black candidates have more dependents and lower-paying jobs than white candidates.)  For this reason, and more generally because of the need to mitigate attrition among non-traditional candidates, the Monitor has urged the City to ensure that ORR personnel take all practical steps to encourage and facilitate candidate rescheduling.

In response to a request by the Monitor, the City advised the Monitor that weekend and evening medical screening appointments – which would afford flexibility to those who cannot take time off from a job during weekday hours – are not feasible in light of pandemic-related demands on City medical personnel.  The Monitor understands and accommodates the needs of City medical workers in this regard.

Given that additional slots cannot be added and that the City has thus far declined to permit candidates to reschedule online, the Monitor has requested that Recruitment Coordinators provide any guidance and assistance feasible to facilitate rescheduling for Black and Hispanic candidates, as requested or required.  In follow-up communications regarding this recommendation, the City has advised that, for the group of candidates just invited to resume processing, although CID will not provide such assistance in advance of appointments, it will reach out to candidates who fail to appear for intake or Medical Exam appointments.[5]  The City

_____

[5] Plaintiffs-Intervenors have indicated that they will similarly conduct such outreach if the City provides "no-show" reports.

has also confirmed that Coordinators will contact candidates to encourage them to attend appointments.  At the Monitor's direction, Coordinators will also gather information from candidates on any barriers they encounter to scheduling and keeping appointments, and the City will endeavor to make adjustments to remove any such barriers.[6]

      Webex Conferences and Fitness Training – The City must continue to conduct Webex fitness training conferences and other fitness-maintenance programs wherever possible, and Recruitment Coordinators should encourage Black and Hispanic candidates to attend.  The Monitor also recommended that, where possible, the City explore offering outdoor training sessions in parks and other locations in zip codes where non-traditional candidates reside and where the effects of COVID-19 have been particularly severe.  At the January 13, 2021 conference, the City indicated that it was considering developing a revised version of its existing, but currently inactive, Fitness Awareness Program ("FAP"),[7] to provide in-person training with appropriate social distancing.  On January 26, 2021, the City circulated information on plans for resuming the FAP in February.  The new schedule offers three sessions per week (one on Wednesdays and two on Saturdays) conducted at the Fire Academy.  The sessions will be capped at 30 participants and include a mix of "baseline" evaluation sessions and sessions devoted to calisthenics.  The sessions are open to candidates with list numbers at or below 1800 (those

---

[6] Supplementing the City's efforts to maintain engagement with candidates, the Vulcan Society is also reaching out to Black candidates in the group invited to resume processing, using contact information provided by the City.

[7] In its regular form, the FAP is a six-session fitness training program conducted over three months by instructors who vary the intensity of training based on each candidate's individual fitness.  As originally implemented during Exam 2000 processing, the FAP was intended primarily to prepare candidates for the Academy, and each candidate took a single sequence of sessions concluding shortly before entering the Academy.  For Exam 7001 candidates, the City had expanded the program to allow candidates to take multiple sequences.

eligible for the May Academy class).  Advance registration is required; candidates may register for multiple sessions; and they may do so up to a week ahead of time.  The City reports that ORR is conducting outreach to non-traditional candidates to encourage them to register.  The Monitor intends to obtain regular updates on attendance in the revived program and any feedback or observations that ORR receives from candidates and instructors.

Especially given COVID-related restrictions on in-person group training, the web conferences, information sharing, and other virtual activities are likely to be important sources of guidance and support as candidates endeavor to build and maintain fitness for the Medical Exam and the Academy.

Support in the Academy – The FDNY Fire Academy curriculum is extremely rigorous both physically and academically – involving long hours of Academy training followed by further preparation at night.  Based on feedback from the Monitor's experts, several of whom have current and former leadership experience in fire service, as well as experience teaching students during the pandemic, the Monitor also recommended that the City make additional counseling support available to probationary firefighters in the Academy, in recognition of increased stresses on those whose families and communities may have been affected by COVID-19.  Also based on expert input, the Monitor recommended that the City provide guidance to instructors to recognize that trainees, particularly those from disproportionately impacted communities, are likely to be vulnerable to increased anxiety, health issues, and other stressors.

## 2.   Long-Range Plans

While the Monitor and the Parties have focused most urgently on communications and initiatives aimed at candidates who are resuming processing, the Monitor has also continued to call upon the City to develop a fully detailed, long-range plan for candidate communications, including messaging tailored to differently situated groups of candidates "who will begin

19

processing at different times, pass through it on different schedules, and (if appointed) enter Academy classes at different times."  Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 18-20; *see also* Monitor's Thirtieth Periodic Report at 12-14; Status Report Regarding CPAT Testing (Dkt. # 1940) ("CPAT Testing Report") at 17.  Before the last periodic report (on October 27, 2020), the Monitor had provided the City with a sample plan containing recommendations for specific content tailored to different candidate groups; and it had asked the City to formulate a satisfactory long-range plan within no more than a month of finalizing its schedule for the resumption of processing.  As soon as the City finalizes its plans for the remaining Academy classes to be drawn from the current eligible list, it should proceed to develop a complete strategic plan designed to ensure that differently situated candidates remain engaged and prepared for the screening process.  The Monitor regards the development and implementation of a satisfactory long-range plan as an essential component of the City's efforts to achieve compliance with the Modified Remedial Order in this area.

3.    Use of Data in Attrition Mitigation Initiatives

As previously reported, in mid-2019, the Monitor recommended a series of essential improvements in the City's analyses of patterns of candidate attrition and of the effectiveness of its programs in retaining a diverse pool of candidates; the recommendations included, for example, adding categories to the data "tracker" that the City has described as the principal tool that ORR employees use to assess candidate attrition.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 16-17; Monitor's Twenty-Ninth Periodic Report at 31.  The City accepted most of the Monitor's recommendations in principle in February 2020; but they have not yet been implemented because City data personnel were tasked to COVID-related work.  The Monitor expects that this work will resume once the City's data analysis personnel resume work on Monitorship initiatives.

20

At the October 13, 2020 status conference, the City agreed to comply with longstanding Monitor requests for data relating to candidate processing and attrition mitigation programs. The Monitor had requested several categories of such information so that it could conduct its own analyses of candidate outcomes and the effect of the City's attrition mitigation initiatives – analyses which the City has not performed since its data analysis personnel have been fully immersed in COVID-related tasks. As discussed below in Part II.C.3, the City began providing data to the Monitor on a rolling basis on December 18, 2020. However, based on an initial review by the Monitor, the data produced thus far is not yet sufficient to enable the Monitor to perform new analyses, and the City does not expect to complete its production of responsive data until mid-February. The Monitor will continue to follow up with the City to obtain the requested data and, ultimately, to confirm the implementation of its recommendations for the City's analyses of candidate attrition.

C.      **Analyses of the Exam 7001 Recruitment Campaign**

The City's establishment of a sustainable process for successfully recruiting and retaining Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and the Monitorship. *See* Modified Remedial Order ¶¶ 31-36. The Court specifically found that a policy or practice that "fails to adequately recruit black persons to become firefighter candidates serves to maintain and perpetuate the effects of the City's discrimination against black firefighter candidates." Findings of Fact (Dkt. # 741) at 33. The Court has also emphasized the need for the City to identify which measures are most cost-effective for diverse recruitment. For the City to accomplish these goals, it must analyze the outcomes of its recruitment efforts to identify which initiatives are the most productive and cost-effective means of attracting non-traditional candidates likely to achieve reachable scores on the firefighter examination and ultimately be appointed as firefighters. As described in the Monitor's previous reports, the retrospective

21

reports on the Exam 7001 campaign produced by the City to date have not yet identified the recruitment activities that most effectively increase Black and Hispanic representation in the pool of reachable candidates.  The Monitor and other Parties have emphasized the importance of completing these analyses in time to use the results to inform the City's strategies for the next recruitment campaign.  The City has assured the Court, the Monitor, and the other Parties that the next recruitment cycle will not begin until these analyses have been completed and incorporated into a completed plan of action.

    1. City's After Action Report and Cost-Effective Report

    As described in the Monitor's previous reports, the City provided the Monitor and the other Parties with an initial retrospective report of the effectiveness of the Exam 7001 recruitment campaign (the "After Action Report") in November 2018.  The Monitor and the other Parties provided comments on May 1 and April 30, 2019, respectively.  The City responded with an updated After Action Report on October 2, 2019, and it produced its "Cost Effectiveness Analysis" on October 23, 2019.  As described in previous periodic reports, the City's revised After Action Report contains improved analyses that seek to correlate recruitment contacts, applications, test-takers, and reachable scores with factors such as geography, race, and the type and location of initial recruiting contact; but the report still lacks analyses critical to the core purpose of the report – such as, for example, analyses of the relative effectiveness of different recruitment initiatives in recruiting reachable non-traditional candidates.  *See* Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 22-24.

    As described in the Monitor's Twenty-Ninth Periodic Report (at 37-38), the City's Cost Effective Analysis also suffers from serious flaws – among them the City's failure to collect data that would allow it to attribute internal FDNY expenditures to specific recruitment activities and events (so as to calculate the cost-effectiveness of a particular event or type of event).  Data kept

by the City's outside vendor, Hodes, is more detailed but includes only limited demographic information.  The Monitor has previously noted concerns about the City's failure to track its costs in sufficient detail, especially given the Monitor's consistent, longstanding focus on the importance of budgeting as an essential component of the after action analysis, which the City has acknowledged. *See, e.g.*, Monitor's Eighteenth Periodic Report (Dkt. # 1734) at 3, 15-16. The United States and Plaintiffs-Intervenors communicated their comments on the revised reports in November 2019.

> 2.   Further Recruitment Analyses Requested by the Monitor and the Other Parties

As reported in the Monitor's Twenty-Ninth Periodic Report (at 39-40), at meetings in December 2019 and January and February 2020, the Parties and the Monitor discussed further analyses that could be used to determine which events (defined by type, timing, and location) and which advertising methods were most successful both in attracting large numbers of reachable non-traditional candidates and in increasing the percentage of non-traditional candidates in the overall pool of reachable candidates.  Although the City did not capture cost information that would enable a full cost-benefit analysis, the Monitor proposed some ways to attempt to recreate some of the missing information.  The Monitor also suggested that the City conduct a small number of focus groups of non-traditional Exam 7001 firefighters to learn which, if any, recruitment initiatives had influenced their decisions to take Exam 7001.

After the City provided some initial data, the Parties and Monitor met in early March 2020 to discuss next steps in recruitment analysis, including plans for weekly meetings to work through analyses and to provide insight and advice for the next campaign.  Both Plaintiffs-Intervenors and the United States identified experts to facilitate their participation in these discussions.  Unfortunately, as previously reported, the Monitor and Parties were unable to

conduct any calls after the March 6, 2020 meeting, as the City advised shortly thereafter that it

needed to suspend work on recruitment data-analysis planning because of the pandemic.

Monitor's Twenty-Ninth Periodic Report at 40-41.

On May 15, 2020, the Monitor and Parties participated in a conference call on which

Assistant Commissioner Nafeesah Noonan and other ORR personnel answered questions from

the Monitor and the other Parties on a number of topics such as descriptions of the various

recruitment event types referred to in the After Action Report; advertising for these events; how

the number, timing, and location of events, and recruiter staffing decisions, are determined; what

event information is tracked (*e.g.*, event duration, number of recruiters, and their race/ethnicity

and experience); where the data is entered; who has access to the data; and database coding and

query capabilities.  The information obtained on the call will inform the further work by the

Monitor and the Parties relating to the recruitment analyses.

### 3.   The Monitor's Data Requests

On June 4, 2020, given the unavailability of City resources due to the pandemic, the

Monitor sent the City a request for data (identified by database field) so that the Monitor's

experts could continue work on critical analyses in advance of the next recruitment cycle.

Following the Court conference on October 13, 2020, the City agreed that it could be helpful for

the Monitor to conduct this work.  On December 18, 2020, the City produced a portion of the

requested data to the Monitor, but the City has not yet provided sufficient data to permit the

Monitor to begin the planned analyses.  The City has stated that the production will be complete

by mid-February.  Plaintiffs-Intervenors and the United States have expressed their desire to

provide input and be kept abreast of data analyses the Monitor will conduct when that data is

produced.  The Monitor expects to share its plans for analysis with the Parties and to consider

suggestions from the Parties' counsel and their respective experts.

24

A significant amount of analytical work remains before a blueprint for the next recruitment campaign can be completed.  In addition, because the City has not yet proposed a schedule for that campaign or the next examination, key target dates for the process of analysis and planning remain to be determined.  The Monitor has encouraged the City to resolve remaining questions regarding scheduling as expeditiously as possible and will continue to the work with the Parties to establish a firm timeline for the remaining work.

      **D.**    **Assignment Issues**

As discussed in the Monitor's previous periodic reports, in September 2017 Plaintiffs-Intervenors raised issues regarding the City's compliance with Paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs."  As previously reported, following attempts to confirm details of past assignments, the Monitor directed the City to establish systems that would reliably memorialize the specific reasons for denying home-division requests from New York City residents; and the City subsequently prepared revised guidelines for probationary firefighter appointments intended to ensure that requests for home-division assignments would be given proper priority and that the specific reasons for denials would be recorded.  *See* Monitor's Twenty-Ninth Periodic Report at 42-43. The City and the Monitor have exchanged a series of proposed drafts of the guidelines in an effort to fulfil the goals of the Intent Settlement, with the Monitor providing its most recent draft on December 16, 2020. Plaintiffs-Intervenors have confirmed that the Monitor's draft is

acceptable,[8] and the Monitor is awaiting confirmation from the City that its most recent revisions resolve the outstanding point of contention.

In addition, as discussed in detail in previous reports, in the same 2017 correspondence Plaintiffs-Intervenors raised allegations of disparate impact in firefighter assignments to particular types of fire company – including assignments to engine and ladder companies and to busier fire companies. *See* Monitor's Thirtieth Periodic Report at 29; Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 18-19. On July 16, 2018, the Monitor remanded the issues to the FDNY EEO Office with instructions to report to the Monitor on the outcome of the investigation within 120 days. Monitor's Twenty-Eighth Periodic Report at 25-26. After protracted delays, on May 24, 2019, the City provided the Monitor with the report of its investigation, which addressed a portion of Plaintiffs-Intervenors' allegations but did not describe any investigation or findings regarding the Plaintiffs-Intervenors' claims of discriminatory disparities in assignments.[9] *Id*. at 25-26. (On August 29, 2019, the City also provided a one-paragraph summary of its investigation of the company-assignment issue to the Plaintiffs-Intervenors and the United States. *Id*. at 26.)

In an October 3, 2019 letter, Plaintiffs-Intervenors asserted that the City's investigation regarding fire company assignments failed to demonstrate its ability to conduct adverse impact analyses and "take steps to remedy adverse impact that may be identified," and they asserted that Priority Hire candidates who were assigned to engine companies and less busy companies are

---

[8] Plaintiffs-Intervenors have also expressed a concern that, as the guidelines require, the City should continue to analyze probationary firefighter assignments to ensure that they conform to the guidelines, the Disparate Treatment Settlement, and applicable law.

[9] The City assumed, for the purposes of the report, that the asserted disparity existed.

entitled to relief.  Since that time, the Parties have engaged in discussions to attempt to resolve the dispute.

More recently, the City has confirmed that it conducted assignments for the two most recent Academy classes in accordance with its current guidelines, that it reviewed the assignments for compliance with the home-division requirement, and that it conducted disparate impact analyses of assignments to identify any disparities in assignments to the types of companies that Plaintiffs-Intervenors had alleged to be preferable.  *See* Monitor's Thirtieth Periodic Report at 30-31.  To confirm the City's representations, the Monitor requested two related categories of records from the City in June 2020: (1) records and analyses relating to home-division requests and assignments for the most recent Academy class, and (2) analyses of data from the same class to identify any disparate impact in assignments to different categories of fire company.  On October 22, 2020, the City produced (to the Monitor but not to the other Parties) a set of figures showing assignments to different fire-company categories.  The figures were produced to the other Parties on December 10, 2020.  Based on the Monitor's review, the City's figures show no statistically significant disparate impact adverse to Black or Hispanic candidates.  Regarding the Monitor's other request – for records and statistics relating to the home-division requirement – the City has not yet provided its data or analyses, but has represented that it will do so shortly.

### E.    Working Group

The City's work on initiatives relating to the Working Group established under the Disparate Treatment Settlement – and the Monitor's oversight over these initiatives – have continued to be largely suspended because of the COVID-19 emergency and the uncertainties associated with further candidate processing and future Academy classes.  The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that

will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).  The City's initiatives under the Working Group Committee consist primarily of the FDNY Fire Cadet program and the FDNY Explorers program.  The City reports that the timeline for further work on the Cadet program is contingent on the scheduling of the next promotional firefighter exam, which remains to be determined.  The Explorer program remains suspended in its in-person form because of COVID-19 constraints. But the City reports that it is exploring the use of virtual post meetings and orientation sessions to select new Explorers for the program.

## III.   EEO

### A.   EEO Staffing

As noted in the Monitor's previous two periodic reports, the FDNY EEO Office currently includes 13 attorneys (including the Assistant Commissioner, two Deputy Directors, Investigative Attorneys and contract attorneys) and six non-attorney staff, and its current team of 13 attorneys is three short of the 16 attorneys it fielded when fully staffed.[10]  *See* Monitor's Thirty-First Periodic Report at 23; Monitor's Thirtieth Periodic Report at 32-33; Monitor's Twenty-Ninth Periodic Report at 47; Monitor's Twenty-Eighth Periodic Report at 28. According to the most recent updates from the City, while the EEO Office has requested permission to fill the vacant positions, efforts to do so are on hold because of the City's financial position, which has prompted a broad review of staffing requirements across City agencies.  The

---

[10] Because the investigative work of the EEO Office is conducted entirely by its attorneys, the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively.  As previously reported, the other (non-investigative) work of the EEO Office staff is supplemented by the activities of EEO Counselors – firefighters and officers who act as liaisons between the firefighter force and the EEO Office, as part of a program initiated in 2018.  *See* Monitor's Twenty-Ninth Periodic Report at 47.

Monitor recognizes the City's fiscal challenges associated with COVID-19; however, given the important role that staffing increases have played in improving the functioning of the EEO Office, the Monitor continues to encourage the City to bring the staff of EEO Office attorneys back up to its full 16-attorney strength as soon as possible. *See* Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's Twenty-Fourth Periodic Report at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eight Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase). Since the reduction in investigative staff, the average investigator caseload in the EEO Office has fluctuated. In July 2020, the City reported a caseload of 10-15 cases per investigator, higher than the range of 5-10 cases that the City reported in September 2019, when the EEO Office was at full strength. Monitor's Thirtieth Periodic Report at 34. As most recently reported by the City, the average investigator caseload is 5-8 cases. The Monitor will continue to obtain updates from the City on investigator caseloads, other factors affecting investigator workload, and EEO Office staffing.

**B.     Policies, Messaging, and Training**

The Monitor has continued to receive updates and consult with the City regarding the FDNY's EEO messaging. Since the last periodic report, the Department's EEO Office has continued to issue messaging on some specific topics. But longer-term and more comprehensive messaging plans remain on hold because the City previously decided to wait to generate a long-range, strategic EEO messaging plan until its analysis of the climate survey is completed. As previously noted, the Monitor has (both before and after the pandemic) urged the City to develop long-term messaging even before obtaining the results of the climate survey analysis. *See*, *e.g.*, Monitor's Thirty-First Periodic Report at 24, 29-30.

       1.    <u>EEO Messaging</u>

In the months before the Monitor's last report, the FDNY had issued a number of EEO communications on specific topics prompted by recent national events and incidents within the Department.  Monitor's Thirty-First Periodic Report at 25-27.  The messaging included a new compulsory training module on the social media policy, developed with input from the Monitor and distributed via the Department's online Learning Management System; and the City reports that the module has now been viewed by substantially all fire operations personnel.  The training was also reinforced by Deputy Chiefs in personal visits to firehouses.  Monitor's Thirty-First Periodic Report at 25.  Communications issued during the summer of 2020 also included Department communications and messaging from Deputy Chiefs emphasizing the FDNY's prohibition on the use of hoses and other equipment on civilians during operations in circumstances of civil unrest.  And on October 8, 2020, in anticipation of the November election, the Department issued an order advising members to exercise caution regarding potentially divisive political expression in the workplace and reminding members of FDNY conflict-of-interest rules prohibiting members from using their positions, or City property or equipment, for political expression or advocacy.  Monitor's Thirty-First Periodic Report at 26-27.  The City reports that in the ensuing weeks, the EEO Office received and responded to feedback and inquiries from the chain of command regarding specific expressions and displays and provided additional guidance in specific cases.  On January 13, 2021, following events at the Capitol on January 6th, the Fire Commissioner issued a statement that, among other things, reminded current and former members of the Department of the need to represent the values of the FDNY, including equity.  The City has also indicated that it expects EEO Counselors to play a role in fielding inquiries regarding workplace climate issues, and it has advised the Monitor of plans to distribute a poster publicizing the EEO Counselor program with an updated list of Counselors.

In a related area, the Monitor and the Parties have also continued to discuss messaging and policies regarding the effect on workplace climate of political and racial content in certain cable news programming.  *See* Monitor's Thirty-First Periodic Report at 28.  The City has cited First Amendment and practical reasons for refraining from imposing a general restriction on programming; and the Monitor has previously suggested that the City should consider issuing guidance, consistent with the October 8 Order, encouraging firefighters and officers to be alert to and avoid potentially offensive or divisive content.  *Id*.

Since the Monitor's last periodic report, the City has released a training video (discussed in the Monitor's previous reports) combining guidance on operational safety in circumstances of civil unrest with themes of diversity and inclusion and the Department's commitment to serving diverse communities.  Monitor's Thirty-First Periodic Report at 26; Monitor's Thirtieth Periodic Report at 41.  The City provided the Monitor with a copy of the video on November 9, 2020, after advising that it had been posted on the FDNY's "DiamondPlate" online platform.  The video is in two parts:  the first restates the Department's policy against the use of hoses and other equipment on civilians, discussing the historical origins of the policy during the civil rights movement of the 1960s; the second is an operational case study drawing lessons on safe operations from FDNY experiences during a night of civil disturbances in a Bronx neighborhood this past summer.  The City has confirmed to the Monitor that the two videos will be shown together as part of a single firehouse drill, and it has also agreed to report to the Monitor with confirmation that such drills have been conducted across the FDNY.

The Department's recent communications on EEO policies represent progress in fostering positive messaging, and as noted above the City has stated that it plans to develop longer range plans after the climate survey analysis is complete.  The Monitor also continues to encourage the

City to publicize the investigative activities of the EEO Office and the numbers and outcomes of EEO investigations, including making members aware of instances where discipline is imposed (with appropriate regard for confidentiality concerning individual identities and other details of pending investigations). Monitor's Thirtieth Periodic Report at 41. The Monitor and the other Parties have also urged the City to respond to public reports of misconduct by affirming the Department's commitment to diversity and inclusion and its rejection of conduct that violates these principles, without breaching confidentiality or prejudicing investigations. Monitor's Thirty-First Periodic Report at 29.

Also as discussed in earlier reports, the Monitor continues to encourage the City to pursue other EEO messaging initiatives, including its program of "voice announcement messaging" (video announcements delivered at firehouses), which was initiated with a single video in September 2018 (Monitor's Twenty-Ninth Periodic Report at 51), but which was then inactive for approximately two years. The recent release of the leadership video discussed above, incorporating operational messages with diversity inclusion themes, and the recent rollout of the "Authentic Trust" video developed by the Chief Diversity and Inclusion Officer (discussed below), appear to represent a revival of this type of messaging. The Monitor encourages the City to continue with regular video and other messaging from senior operational leadership on EEO-related topics.

        2.    CDIO Messaging

In addition to messaging generated by the EEO Office, the Monitor has also continued to obtain updates from the City on the recent messaging and training activities of the Department's Chief Diversity and Inclusion Officer ("CDIO") – following up on lists and materials discussed in detail in previous reports. *See* Monitor's Thirty-First Periodic Report at 31; Monitor's Thirtieth Periodic Report at 41-43.

Based on the City's most recent update (provided to the Monitor on January 25, 2021), the majority of the CDIO's planned trainings and other communications are still in development, but the City has made some progress in finalizing and disseminating training modules and presentations discussed in previous reports.  *See* Monitor's Thirty-First Periodic Report at 31-33. The CDIO's "Authentic Trust" training was rolled out to all FDNY members – presented as a drill in all firehouses from September 28, 2020 through October 2, 2020 – and was made available on the FDNY Learning Management System  as required training for all FDNY employees.  The CDIO's "Positive and Effective Leadership" training  has also been developed as a video webinar for LMS, with an anticipated roll-out to Fire and EMS officers in the second quarter of 2021.  The Monitor has asked the City to provide a complete and final version of the materials used in this presentation for the Monitor's review.

In addition to items listed in previous reports, the City's most recent update also references "Racial Inclusion Training," which the City projects will be rolled out to Fire and EMS officers in the second quarter of this year on the LMS platform.[11]  The Monitor also requests that the City produce the materials from this training.

As noted in previous reports, the Monitor has expressed concerns that many of the CDIO's communications focus on general themes of diversity, equity, and emotional intelligence

---

[11] In response to follow-up inquiries from the Monitor, the City has also explained that the "Mobile Messaging Unit," which the City listed in a previous update on CDIO activities, distributes materials including brochures, newsletters, and infographics to firehouses – including items from the "We Are FDNY" campaign discussed in previous reports.  The Monitor had also requested additional details on the activities of the "Inclusion Advocates" mentioned in the City's previous discussion of CDIO activities. *See* Monitor's Thirty-First Periodic Report at 31.  In its January 25 update and in comments on a draft of this report, the City responded that the Inclusion Advocates currently consist of 14 members of Fire, EMS, and Prevention, including a Chief, five Captains, four Lieutenants, two Paramedics, a Firefighter, and a CPAT Fitness Trainer, and that they work with the CDIO on a variety of initiatives, including the development of training, messaging, mentoring, and holding space for "courageous conversations" with members on diversity and inclusion topics.

without consistently linking their themes to the specific context of the FDNY.  *See* Monitor's Thirty-First Periodic Report at 33.  In response to concerns expressed by the Monitor in previous reports, the City has indicated that the CDIO consults with the EEO Office in developing messaging, including materials to be rolled out in 2021.  The Monitor agrees this is helpful, and intends to pursue more information about the EEO Office's contributions; the Monitor also continues to urge the City to tailor messaging to the FDNY operational context.  The Monitor expects to continue to work with the City to ensure that the CDIO's work contributes to an appropriately targeted strategic plan of EEO communications.

C.     **Compliance and Accountability**

1.     Officer Performance Evaluations

The Monitor has continued to work with the City, in consultation with the other Parties, regarding the implementation of the EEO metric added to officers' performance reviews in 2018.[12]  As previously reported, on October 23, 2020, the City provided the Monitor with a compilation of data from all but 120 evaluations from the 2019 cycle of officer performance reviews, which assessed officer performance during 2018.[13]  At the time, the City indicated that it would complete the production within approximately the next week.  Monitor's Thirty-First Periodic Report at 34.  However, data from the remaining 120 evaluations has not yet been produced.  As soon as the full set of data is provided, the Monitor will proceed with its analysis

---

[12] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[13] The 2019 cycle of reviews is the first to cover a full year of officer performance for all Lieutenants and Captains in the Department.  Monitor's Thirtieth Periodic Report at 45.  It is also the first cycle in which all evaluations included the EEO metric, as many evaluations completed during the 2018 cycle used an outdated form that did not include the EEO metric.  *See* Monitor's Twenty-Ninth Periodic Report at 53.

of the evaluation data, including cross-referencing with information from EEO complaints and inquiries – to determine whether and how information obtained in EEO investigations was reflected in officer ratings, and to confirm whether potential failures of supervisory responsibility are considered and reflected in the ratings.

The Monitor had requested that overall performance ratings be included with the EEO performance metric, but the City has clarified to the Monitor and the other Parties that no overall rating exists, and that officers receive non-EEO ratings in numerous separate categories of operational and administrative performance.  To provide the Monitor with a basis for comparison, the City has agreed, however, to the Monitor's request to gather and provide statistical data on the number and rate of unsatisfactory ratings in non-EEO categories.

As requested by the Monitor, the City has also produced materials reflecting EEO Office input for the evaluations, which the Monitor will include in its analysis.[14]  The Monitor continues to believe that for the metric to be an effective tool of officer accountability, the EEO Office must be an active participant in the review process and provide input wherever it has access to information (both favorable and unfavorable) relevant to an officer's EEO performance (including his or her communication of EEO messages, proactive efforts to foster a strong EEO climate, relevant information from firehouse inspections, failures to report violations or potential violations, cooperation or failures to cooperate with the EEO Office, or negligent oversight and supervision of firefighters within his or her command).  *See* Monitor's Twenty-Sixth Periodic Report at 33; Monitor's Twenty-Seventh Periodic Report at 29; Monitor's Twenty-Eighth Periodic Report at 35.

---

[14] The materials include no personal identifying information and were not shared with the other Parties.

Since the last periodic report, the Monitor has also continued to follow up with the City

on a series of recommendations for the performance review process.  The Monitor's

recommendations, first discussed at an October 18, 2019 meeting between the Monitor and the

City, and memorialized in a December 11, 2019 memorandum to the City, have been discussed

in a series of subsequent communications, recounted in detail in a previous report.  Monitor's

Thirtieth Periodic Report at 46-48.[15]  They included (1) a suggestion that the EEO Office

incorporate reviews of management supervisory practices relevant to EEO compliance in its

investigations of alleged or potential EEO and hazing violations – using investigations as

opportunities to evaluate officer practices and to identify either superior performance or areas for

improvement, and (2) a suggestion that the FDNY consider providing additional, detailed

guidance on the distinction between satisfactory and superior reviews under the EEO metric.  In

its most recent response to the Monitor's follow-up queries (October 22, 2020), the City further

explained the criteria it uses to determine whether investigations of management practices are

warranted in connection with EEO investigations.  Specifically, the City indicated that it would

undertake such investigations where the nature, severity, number, and/or circumstances of

alleged violations indicate that supervisors should have been aware of the alleged conduct or that

they did not take appropriate steps to ensure compliance.  The City has advised that relevant

indicia may include (1) an officer's failure to report a violation; (2) an acute incident or series of

acute incidents that are of sufficient severity to indicate the potential absence of effective

supervision; (3) statements or obvious evidence of poor climate indicating a failure to address

---

[15] The Monitor's December 11, 2019 memorandum was shared with the United States and Plaintiffs-Intervenors on January 24, 2020, but the subsequent communications regarding the Monitor's recommendations have been conducted between the Monitor and the City without the other Parties.

potential EEO or bullying/hazing issues, (such as improper postings, defaced photos, or gear- or food-tampering); (4) statements or evidence indicating an officer discouraged the use of official Department processes, such as EEO; and (5) improper delegation of supervisory roles to non-supervisors that has led to EEO violations or instances of bullying/hazing.  The City also confirmed that it plans to provide additional guidance to raters regarding the criteria to be applied in distinguishing satisfactory from superior EEO ratings.  The Monitor has commented on the City's list of factors, and plans to offer any additional recommendations that may arise following assessment of the full data set from the 2019 cycle.

The Monitor has continued to work with the Parties in an effort to resolve continuing disagreements regarding the types of performance review data and analyses that the City will share with the other Parties.[16]  Since the last report, the Monitor convened a call on December 15, 2020 to address the dispute, and the Parties have made progress toward clarifying the scope of available data and resolving the outstanding issues.[17]  In light of the City's recent clarification (discussed above) that there is no single overall performance rating encompassing non-EEO categories, the United States and Plaintiffs-Intervenors have withdrawn their request for an account of non-EEO ratings.

On December 30, 2020, responding to the United States' request that the City analyze trends in EEO performance based on race, gender and years of service, as well as any trends in particular workplaces or commands within the FDNY, the City advised that it would "create a

---

[16] Previous communications relating to the dispute are recounted in detail in the Monitor's previous report.  Monitor's Thirty-First Periodic Report at 36-37.

[17] The Monitor circulated a memo to the Parties memorializing the December 15, 2020 discussions on January 12, 2021.

list of officers involved in EEO matters, along with their race, gender and start date by obtaining

this information from the EEO database" and that "EEO will annually review these to spot any

trends or issues that exist."  The City also advised that the EEO Office "will also use this as part

of its already-existing process to confirm [that officers] are receiving ratings commensurate with

their performance."  The City's December 30, 2020 message appears encouraging.  But it does

not clearly indicate the extent to which the planned analyses will be disclosed to the Monitor or

the other Parties.  The City's statement also does not specify whether the EEO Office's review of

EEO ratings for officers involved in EEO matters will include all officers involved in the matter

(as complainants, respondents, or witnesses) or whether it will be more limited (*e.g.*, to officers

who are found to have committed violations).  The Monitor will follow up to seek clarification,

and it will continue to work with the Parties on any remaining disputed items.

2.    *"Workplace Professionalism" Reporting*

The Monitor has continued to gather information and make recommendations relating to

the City's workplace professionalism reporting program, in which officers meet regularly with

their superiors to discuss issues (including EEO issues) affecting workplace professionalism.

Monitor's Twenty-Seventh Periodic Report at 30-31.  According to the City's most recent update

(received January 25, 2021), to date the system has not yet generated any reports from the

required meetings within the scope of the Monitor's standing request for all Workplace

Professionalism records reflecting EEO or hazing concerns.  *See* Monitor's Twenty-Ninth

Periodic Report at 57-58.

The absence of such reports (apparently even from officers in companies where EEO

violations occurred) raises questions as to whether the system is functioning as intended.  The

City has previously suggested that officers who become aware of EEO issues may be reporting

them to the EEO Office only, rather than via the Workplace Professionalism system.  The

Monitor has suggested that the FDNY re-emphasize the scope of workplace professionalism reporting requirements as part of its current effort to ensure officer oversight of EEO compliance and climate – both in connection with routine operational supervision and "walk-throughs" and in more formal EEO inspections that officers may conduct while the EEO Office inspections remain suspended because of COVID-19 concerns.

        3.      Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters.  The City worked closely with the Monitor and the other Parties, through multiple calls and drafts circulated within a small working group, to create an Analytics Plan and a schedule for analysis of the survey data, to be conducted by the Mayor's Office of Data Analytics ("MODA").  *Id*.  On February 20, 2020, the City circulated a final draft of the ten-phased Analytics Plan developed through these discussions, with deadlines for each phase.  This Analytics Plan had a completion date of June 2020.[18]  *Id.* at 49-50.

On February 21, 2020, the City circulated a data review summary report prepared by MODA.  The report identified the number of complete and partial responses to the survey and noted that all 49 FDNY numbered battalions and Special Operations Command ("SOC") units are represented in the survey data.  MODA also reported that there did not appear to be significant survey response anomalies.

---

[18] The deadlines in this Analytics Plan could not be met because City resources had to be diverted to COVID-19 efforts starting in February 2020.

Work on the climate survey was suspended at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic.  Monitor's Thirtieth Periodic Report at 50.

On October 14, 2020, the City sent the Monitor and the other Parties a new proposal and timeline for survey analysis, indicating that analytic work had already commenced in order to take advantage of what the City anticipated would be a relative lull in COVID-19 demands before the winter months.  The new analysis plan breaks the City's work into three longer phases and includes fewer opportunities for direct input from the Monitor and other Parties.  While MODA will have less frequent contact with the Monitor and the other Parties, it will maintain a record of its discretionary judgment calls at key junctures, which can be reviewed by the group if necessary, and the City will afford the other Parties and the Monitor opportunities for input. Although the City's proposal differs in timing and relative allocation of work, the Monitor expects that the City's analysis will incorporate the essential elements of the prior plan, and has requested that the City specifically identify substantive areas of difference, if any, between its proposed analytic approach and the schedule of analyses to which it had previously committed.[19] Meetings of the analytics group will be scheduled when needed, with at least one per phase.

---

[19] In its January 29, 2021 comments on a draft of this report, the City indicated that MODA's analyses may not include all the analyses the Parties had previously specified in the analytical plan to which the Parties agreed before the pandemic.  The City stated that it will perform those analyses that, in the City's opinion, are "appropriate based on the review of the data, ensuring that all relevant and substantive analyses will still be conducted . . . ."  In response, the Monitor asked the City to identify specifically any of the original analyses that it does not intend to perform.  The City declined to do so, stating that "[n]o further clarification of the City's position should [] be needed" and referring the Monitor to earlier correspondence, which the City asserted (incorrectly) provided the necessary clarification.  The Monitor will continue to press the City to provide an objectively based response, which identifies specific analyses as needed to enable a meaningful comparison of the original plan and the City's revised approach. Separately, as noted, all Parties and the Monitor have agreed that when the City decides to make independent judgment calls following certain analyses ("iterative analysis"), City analytic personnel working on the survey will maintain a log of judgment calls and assumptions for reference.

As noted in the Monitor's Thirtieth Periodic Report, the Monitor had anticipated that, once work resumed, a further 18 to 20 weeks would be needed to complete all the analyses and reports contemplated by the plan.  *Id*. at 50.  The Monitor expects that, under the new analytic plan, the climate survey analysis will be completed by June 2021.

Following the completion of the analytical phase, the City's next crucial task will be to develop a plan of action based on the results, including but not limited to a comprehensive, strategically coherent plan of EEO messaging using the results of the analysis.  The Monitor also plans to discuss with the City any main findings or action items related to the survey and what follow-up communications are anticipated to the FDNY workforce.

## D.    Inspections and Investigations

### 1.    Inspections

As previously reported, since the onset of the pandemic, the EEO Office has suspended in-person firehouse inspections because of safety concerns.  Monitor's Thirty-First Periodic Report at 27.  At the status conference held on October 13, 2020, the Assistant Commissioner for EEO reported that discussions with operational leadership were in progress to develop an alternative inspection capability, *id*.; but to date, no such capability has been established.  The City has advised the Monitor that, as a temporary measure, it is working with FDNY operations on revised inspection forms that would incorporate EEO-related items in regular operational inspections performed by the chain of command.  But no such arrangement has yet been made. In the continuing absence of any formal inspection system, the Department has reminded commanders that (pursuant to an existing regulation provided to the Monitor) regular operational "walk-through" inspections are also intended to reveal any indicia of EEO violations or potential violations in the workplace.  The fact that the City has not yet set up an alternative system of EEO inspections during the months that have elapsed since regular inspections were suspended

41

is concerning, and the Monitor encourages the City to continue its efforts to develop an

alternative approach.  Plaintiffs-Intervenors have also continued to advocate for the resumption

of firehouse inspections and expressed their understanding that these inspections contribute to a

professional and welcoming firehouse climate.  At the January 13, 2021 status conference, the

Court noted that in-person inspections should resume as soon as it is safe to conduct them.

2.    Review and Recommendations Regarding Investigations

The Monitor has continued to assess and offer comments on EEO investigations

identified by the City as requiring substantial investigative activity in fire suppression matters.[20]

Monitor's Thirtieth Periodic Report at 51 & n.32.  Over the past several months, partly in

response to a series of troubling incidents and social media posts by FDNY members relating to

the death of George Floyd and subsequent protests, the Monitor has intensified its efforts to

ensure that EEO matters are investigated thoroughly and promptly – receiving weekly phone

updates from the City regarding ongoing investigations, reviewing final memos and complete

files from several completed investigations, and offering comments on an ongoing basis in the

weekly calls.  Based on its review of recent investigative materials, on the regular updates

obtained from the City, and on related consultations with experts, the Monitor has assembled a

compilation of best practices, focusing on the investigation of social media violations, which it

has provided to the City.  As discussed in detail in prior reports, the investigation of social-

media-based violations is both particularly challenging and particularly important in the current

_____

[20] In an initial, retrospective production of multiple cases, provided in 2017, and more recently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has also provided the Monitor with some full investigative files in addition to intake and closing documents.  A summary of the City's productions of EEO case materials appeared in the Monitor's Twenty-Seventh Periodic Report at 39-41.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

environment, given the considerable potential for social media conduct to undermine EEO climate.  The list is intended to serve as a supplement to the guidance contained in the existing FDNY EEO Investigation Manual and as part of the Monitor's more general ongoing review and comment on EEO investigative practices.

The City also has developed some materials in response to recommendations the Monitor offered in October 2019.[21]  The recommendations targeted the need for more consistent and rigorous analysis of mixed-motive cases, for more systematic analyses of witness credibility, and for improvements in identifying potential violations and sources of evidence.  Monitor's Twenty-Ninth Periodic Report at 65.  As previously discussed in detail, the Monitor proposed that the EEO Office provide investigators with supplementary training in key areas and that it provide additional forms and guidelines to ensure thoroughness and consistency in the gathering and weighing of evidence and in memorializing investigative findings.  *Id.*

On October 22, 2020, after a series of follow-up communications and requests from the Monitor, the City provided the Monitor with a set of new and revised investigator training materials on key topics, along with forms and instructions intended to implement the Monitor's recommendations.[22]  The new training materials and forms generally appear to provide appropriate guidance, and the Monitor has sent the City some further suggestions.[23]

---

[21] The Monitor memorialized these recommendations in a memorandum to the City on December 11, 2019, which was provided to the other Parties on January 24, 2020.

[22] The materials were provided to the Monitor but not to the other Parties.

[23] During the COVID-19 emergency, the Monitor suspended the process of contacting a selection of complainants to gather information regarding their experiences with the EEO Office, as discussed in previous reports.  *See* Monitor's Twenty-Fourth Periodic Report at 37.  The Monitor intends to renew that process as soon as circumstances permit.

Since the increase in EEO investigator staffing in mid-2018, both the duration and the substantive quality of investigations have shown some signs of improvement.  However, among cases initiated in 2019 and 2020 (at least among the substantial investigations from which the City has provided materials), a significant percentage continued to exceed the presumptive 90-day limit – though some delays in 2020 were likely exacerbated because of the pandemic, which prevented in-person witness interviews and compelled the EEO Office to develop alternative approaches.  The Monitor also continues to note some deficiencies and inconsistencies in investigative practices – including failures to identify and investigate all aspects of EEO violations (for example, where a single communication could constitute harassment based on multiple protected classifications), and failures to follow-up on all relevant allegations and leads that arise in the course of an investigation.  For these reasons, because the number of substantial investigations each year is small,[24] and because the COVID-19 pandemic impeded the progress of some investigations in 2020 (potentially skewing any assessment of case duration), further scrutiny is needed to confirm whether favorable trends will continue and whether the City's implementation of the Monitor's recommendations will have the desired effects.

3.   Monitor Report on EEO Investigations

The Monitor has continued work on its report on FDNY EEO investigations, pursuant to the Court's order.[25]  As stated in the Monitor's previous reports, in consultation with the Court,

---

[24] The City provided the Monitor with materials from eleven cases initiated in 2019 and from 8 initiated in 2020.

[25] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its staffing, its investigative procedures, and its performance in the completion of EEO investigations – with a particular focus on the duration of investigations as measured against the presumptive 90-day time limit for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant part, the Court's Order stated as follows:

the Monitor has postponed filing the report to observe and account for the effect of increased

staffing and revised practices on the conduct and duration of EEO investigations – requesting

and receiving a series of updated data sets from the City, and providing a series of drafts of the

report (including recommendations) to the City and the other Parties.  On January 25, 2021, the

City provided the Monitor with its most recent set of updated and supplemented responses to a

series of requests for information relevant to the report, which the Monitor has begun to analyze.

     4.    <u>EEO Database</u>

As previously reported, the City has advised the Monitor that it has made several

modifications to the FDNY EEO investigations database, addressing some longstanding Monitor

recommendations.  Monitor's Thirtieth Periodic Report at 55-56; Monitor's Thirty-First Periodic

Report at 43-44.[26]  As described by the City, the modifications include new fields for a range of

interim actions and for some specific types of potential violations.  The Monitor has not yet had

an opportunity to review these changes or to verify that the City has the capacity to effectively

track and connect (with the database or otherwise) all the findings and remedial actions

---

The court monitor is respectfully DIRECTED to provide the court with a report on the New York City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the staffing of the office has changed over time; and (3) the speed with which the office investigates and resolves complaints.

In addition to the topics specified in the Court's November 17, 2017 Order, the report includes a discussion of data produced by the City, in response to the Court's direction at the March 13, 2018 status conference, showing the rate at which complainants and respondents in EEO investigations have been reassigned to desk duty, and the duration of those assignments.

[26] Detailed accounts of the development of the database, its features, previous modifications, and related communications appear in previous reports.  *See*, *e.g.*, Monitor's Twenty-Ninth Periodic Report at 62-64; Monitor's Twenty-Seventh Periodic Report at 36-38; Monitor's Twenty-Sixth Periodic Report at 40; Monitor's Twenty-Fourth Periodic Report at 36-37.

associated with a given matter, including those generated by BITs[27] and other units in addition to

the EEO Office; the mechanisms for tracking EEO Office input in performance evaluations; or

systems for cross-referencing inspections and evaluations with other EEO activities (such as

targeted messaging and training) in a given workplace.  Monitor's Twenty-Ninth Periodic Report

at 63-64.  The Monitor has asked the City to offer a suitable demonstration of the database with

the new features as soon as practicable.

## IV.   Medical Exam-Related Issues

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the

Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the step in

the hiring process with the highest Exam 2000 disqualification rate.  *Id*. at 46.  The Medical

Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.  *Id*. at

45-46.

### A.     Stairmill Test

The stairmill test component of the Medical Exam is meant to ensure that candidates

possess sufficient cardiopulmonary fitness to perform safely as firefighters.

#### 1.     Validation Study and Technical Report

After Plaintiffs-Intervenors challenged the stairmill component of the FDNY medical

screening as a source of unlawful disparate impact, the City hired PSI, an outside vendor, to

evaluate the test.  In October 2020, PSI circulated the final version of its validation report,

entitled "Development and Validation of a Bureau of Health Services Stairmill Test for FDNY

---

[27] The Bureau of Investigations and Trials, the Department's disciplinary unit, prepares charges, conducts investigations, and prosecutes disciplinary cases for violations of Department policy including hazing and workplace violence.   It also imposes discipline in EEO cases investigated by the EEO Office and thus cooperates with the EEO Office in enforcing EEO policies within the Department.

Entry-level Firefighters," on October 12, 2020.  The Monitor has previously reported on the process that led to the report.  Monitor's Twenty-Eighth Periodic Report at 50-54**.**  BHS has been using the new stairmill test since October 17, 2019.  It is similar in many respects, though not identical, to the stairmill test protocol historically used by BHS – with the most significant change being that BHS no longer uses heart rate as a criterion for qualification.

On January 8, 2021, the United States wrote a letter to the City noting its position that the study cannot be considered a validation of the new test as applied to open-competitive candidates.  The United States relied for its position on study limitations that PSI acknowledged in its report, with the primary limitation noted by the United States being the study's reliance on EMS promotional candidates.[28]

The United States again confirmed its position – with which the Monitor and the other Parties agree – that there is no objection to the City's use of the new stairmill test in medical screening.  However, the Monitor, United States, and Plaintiffs-Intervenors have emphasized that the City must continue to track and analyze the results of the new stairmill protocol in the ongoing screening of Exam 7001 candidates, to promptly identify and address any disparate impact that may emerge against Black and/or Hispanic candidates.

---

[28] The United States cited the following facts about the study as the bases for its position:  the use of promotional instead of open competitive candidates; the small racial and ethnic subgroup sample sizes; ongoing statistically significant disparate impact found against Black candidates processed last on the Exam 2000 eligibility list when their Stairmill results were re-analyzed with the heart rate criterion removed as a disqualifying factor; and the potential differences in Stairmill results between candidates processed last on an eligibility list (*i.e.* candidates from the Exam 2000 list whose results were re-analyzed) and candidates processed from the top of an eligibility list (*i.e.* Exam 7501 promotional candidates).

2.      Retesting of Certain Candidates

As noted in earlier reports, the City has also provided the opportunity for certain Exam 7001 candidates who took the old stairmill test to be tested again using the new test.  Some of that retesting took place before the pandemic, and retesting will continue once candidates can again be seen at BHS.  Candidates who may avail themselves of this retesting option fall into one of the following categories:  (1) those who failed to return for follow-up stairmill testing after being reserved by the old stairmill test; (2) those who were disqualified for failure to appear or to produce documents after being reserved by the old stairmill test (there are two candidates in this category); and (3) those who declined after being reserved by the old stairmill test and who have not yet restored themselves to the civil service list for Exam 7001 (there are 24 candidates in this category). The City reported on the interim results of its retesting progress on January 5, 2021.[29] As of that time, of the 92 candidates reserved on the old stairmill test, at least 42% had been retested, and 92% of these had passed.  The 92 candidates are currently in various status categories, including, *inter alia,* some who have been appointed, some who will be called for further processing for the May 2021 class, some who may be called for later classes (if the City reaches their list numbers), some who have temporarily declined, and some who were disqualified for certain reasons not related to the stairmill test.

As mentioned above, because of the pandemic and the cancellation of Academy classes for which candidates were being processed, virtually all of the candidates considered for retesting will have to take the whole Medical Exam again, including the new stairmill test.

---

[29] On January 21, 2021 the City circulated a small update with respect to one candidate; that update did not alter the information provided here.

B.      **Medical Exam Attrition Mitigation**

As reported in the Monitor's Twenty-Ninth Periodic Report (at 69), in its December 27, 2019 report "Fire Department of New York City:  Metrics to Assess Applicant Attrition From the Hiring Process For Exam 7001" (the "December 2019 Report"), the City provided medical testing data for the first groups of Exam 7001 candidates, as of November 12, 2019.  The December 2019 report reflects that the Exam 7001 Medical Exam voluntary attrition rate continued to be higher for Black candidates than for white candidates, and that the rate at which candidates remained pending – *i.e.*, without a final medical result – was also higher for Black and Hispanic candidates than for white candidates (45%, 41.8%, and 35%, respectively). Monitor's Twenty-Ninth Periodic Report at 71.

The December 2019 Report provided data for the Medical Exam overall, and separately for physical testing and psychological testing.  As of November 12, 2019, the report showed that there was statistically significant disparate impact in the Medical Exam qualification rate: physical testing had a disparate impact against Black candidates, and psychological testing had a disparate impact against Hispanic candidates.  As previously reported, had the City not removed pending candidates from its calculations, the analysis would have shown that, as of November 12, 2019, Black candidates were qualified at only 79% of the rate at which white candidates had been qualified, and Hispanic candidates were qualified at 84% of the rate for white candidates. Monitor's Twenty-Ninth Periodic Report at 71.

The City has not provided data showing which specific Medical Exam disqualification reasons were responsible for the disparate impact the City reported as of November 12, 2019. The Electronic Medical Record database developed as a part of the Monitorship should permit such an analysis; and the Monitor expects that such analysis will occur, once the City's data analysis resources are not devoted nearly exclusively to pandemic-related issues.

49

The City has indicated its belief that the new stairmill test – which was implemented only one month before the end of the time period covered by the December 2019 Report – will reduce or eliminate disparate impact in the Medical Exam among candidates tested after October 2019. The City has not provided data to the Monitor, however, to show that the disparate impact observed was caused entirely by the old stairmill protocol.  An analysis by disqualification reason must be undertaken as soon as the City's analytic resources are no longer fully occupied with COVID-related tasks, and should be included in all future attrition analyses.  In addition, the Monitor and the Parties will continue to review Exam 7001 stairmill qualification data, including the data for retesting candidates, to determine whether there is continuing disparate impact in this component of the Medical Exam.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-traditional candidates from the Medical Exam and on helping such candidates move from pending status to qualified status.  But this requirement has taken on even greater importance now, as the effects of the pandemic have fallen and continue to fall disproportionately on Black and Hispanic communities.  Tailored and flexible strategies and policies will need to be implemented to account for this disproportionate hardship, and the City must do all it can to mitigate any negative impact of the Medical Exam on Black and Hispanic representation in Academy classes.  Several of the Monitor's recommendations relating to the City's resumption of candidate processing (discussed in Part II above) are intended to address this need.

The Monitor has asked the City to track pandemic-related attrition data in the hiring process, and such data may prove particularly relevant with respect to the Medical Exam.  The Monitor's purpose in requesting such tracking is to permit meaningful comparison of prior candidate processing cycles with processing that occurs during the pandemic.

## C.      Medical Exam Messaging

As described in Part II.B.1, the City has continued its efforts to help candidates maintain their physical fitness in anticipation of the Medical Exam.  In addition to initiatives described above, City messaging and resources include an instructional video about the stairmill test, a document outlining all the steps of the Medical Exam, and Medical Exam FAQs, all posted online.  Before the pandemic, the City was also finalizing scripts for two further Medical Exam instructional videos (one for the Pulmonary Function Test and one for the Medical Exam overall), for which the Monitor and the other Parties had provided input.

For candidates being called for processing in anticipation of the May 2021 Academy class, including those who are retesting pursuant to the new stairmill protocol and whose list numbers are below 1800, the City has edited the notice advising candidates of their Medical Exam appointments to highlight the need to maintain fitness and informing them of changes to the stairmill test.  The City is also providing information about virus-related precautions the City is undertaking, and those it expects candidates to undertake, during Medical Exam visits.

The United States has asked the City to communicate separately, on an individualized basis, with the limited number of reserved candidates described in Part IV.A.2 above.  The United States' concern is that this group may ignore general communications and lose fitness before they receive the medical notice advising them about the opportunity to take the new stairmill test because of the deterrent effect that may have resulted from the candidates' failure of the old stairmill test, given their lack of awareness of the new stairmill test.  The United States has requested that the City engage in targeted messaging that informs these reserved candidates that (1) if they return to or continue in the firefighter selection process, they will be tested with the new stairmill protocol implemented since they last took the test; (2) the new test does not include heart rate as a passing criterion; (3) FAQs and a new video about taking the new stairmill

test are available; and (4) various other methods are also available (including calling the City directly) for getting more information or answers to questions.  The City has agreed to such individualized messaging for reserved candidates who: (1) were disqualified for failing to show or produce documents after being reserved on the stairmill test; or (2) declined after being reserved by the old stairmill test and who have not yet restored themselves to the list.  For the remainder of the reserved candidates who have not otherwise been disqualified, the City believes that adequate notification will occur through these candidates' general access to the Candidate Portal and the JoinFDNY website, and that they will be provided with more specific information when it is closer to the time for their Medical Examination.  The United States and the City are still discussing whether they can reach agreement on whether and how the remaining reserved candidates will receive targeted messaging related to the new stairmill test.

## V.      Character Screening by the CID and PRB

The Parties and the Monitor, with their expert consultants, have continued to consider the character review portion of the FDNY's hiring process, its impact on hiring from different demographic groups, and whether further reforms may be required to address disparities in outcomes.[30]  Since the last periodic report, the Monitor's work has continued to focus on identifying and refining the analyses that should be conducted to assess the impact of the

---

[30] As previously reported in detail, beginning in 2012, in consultation with the Monitor and the other Parties, the City issued a series of guidelines for the CID and PRB; additional modifications to the guidelines were issued in mid-2016.  Monitor's Sixteenth Periodic Report (Dkt. # 1694) at 29-31; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 29-30.  As noted in prior periodic reports, the revisions were agreed upon by the Parties with the understanding that they might be subject to additional changes based on further analysis.  *Id*. at 30.  The City has implemented some procedural changes in the character review process since the 2016 revisions, along with minor changes in the criteria for PRB referral, Monitor's Twenty-Ninth Periodic Report at 74, 78; but it has declined to make further changes recommended by the Monitor.  *Id*. at 78.

character review process and evaluate intergroup disparities in candidate outcomes and attrition. On January 5, 2021, the Monitor circulated a memorandum to the Parties summarizing proposals, outstanding issues, and questions relating to the analyses of the character review process. The Monitor plans to convene a call with the Parties to discuss and resolve remaining disagreements regarding the appropriate endpoints, available data, and possible methods for conducting the analyses. In particular, as previously discussed, the City contends that disqualification is the only cognizable form of adverse impact produced by the character review process. The Monitor's memorandum discussed the need to examine other aspects of the hiring process, such as differences, if any, in rates of unconditional hiring and hiring with extended probation. Monitor's Twenty-Ninth Periodic Report at 77; Monitor's Thirtieth Periodic Report at 61-62.[31] The Monitor also believes that the evaluation of the character review process should include analyses of its effect on delays in processing and candidate attrition, as proposed by Plaintiffs-Intervenors, which is one of the topics discussed in the January 5, 2021 memo.

The Monitor has asked the City to propose dates and times for the call as soon as relevant personnel become available.

## VI.    Firefighter Exam

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test ("CBT") for the position of entry-level firefighter. Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and

---

[31] Also as discussed in previous reports, the Monitor's position is based in part on indications from analyses of outcomes for Exam 2000 candidates and for those Exam 7001 candidates who have completed the character review process to date. *See* Monitor's Thirtieth Periodic Report at 62; Monitor's Twenty-Ninth Periodic Report at 74-75; Monitor's Twenty-Fifth Periodic Report (Dkt. # 1877) at 59-60.

their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.   **Additional Issues**

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order; and

- Performing the remaining duties of the Special Master appointed by the Court in its Order filed May 22, 2012 (Dkt. # 883).  The Court assigned these duties to the Monitor in an order dated August 17, 2016.

Dated:   February 1, 2021
        New York, New York


                                          /s/
                                   Mark S. Cohen

54