

**JAMES E. JOHNSON**
*Corporation Counsel*

T̄HE C̄ITY OF N̄EW ȲORK
**LAW DEPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

**ERIC EICHENHOLTZ**
*Chief, Labor and Employment Law*
Phone: (212) 356-2430
Fax: (212) 356-2439
E-mail: eeichenh@law.nyc.gov

February 8, 2021

**Via ECF**
Honorable Nicholas G. Garaufis
United States District Judge
271 Cadman Plaza East
Brooklyn, New York 11201

Re:     **USA et al. v. City of New York**
          **Civil Action No: 07 Cv. 2067 (NGG) (RLM)**

Dear Judge Garaufis:

          The City writes today to object to the Court Monitor's January 18, 2021 Report and Recommendation (the "Recommendation"). The Recommendation concerns allegations advanced by the United States and the plaintiffs-intervenors that the City has violated paragraphs 16 and (in the case of the plaintiffs-intervenors) 19 of this Court's Modified Remedial Order (the "MRO"), finds that the City violated paragraph 16 (but not paragraph 19) of the MRO and recommends the City engage in certain remedial actions to address the alleged violation. As detailed below, the Monitor's conclusions regarding the alleged violation of paragraph 16 and the remedial actions are erroneous, unsupported and even sometimes contradicted by the record.

          Perhaps most concerning, however, is the erroneous suggestion throughout the Recommendation that the City is litigating this issue to somehow avoid taking steps to adequately mitigate attrition, or that judicial intervention is necessary to compel the City to take remedial steps the Monitor is aware – and in many cases has acknowledged – that the City has already taken. We state unequivocally at the outset that, while we may have some disagreements on the technical legal issue underlying this dispute, the City is fully aligned with the Monitor and parties about the importance and need to mitigate attrition. The City has continually worked to mitigate the attrition expected in each round of the Candidate Physical Ability Test ("CPAT"), including Round 2, which is at issue in the Recommendation. The City continues to evaluate and adjust its recruiting and processing practices, and it is committed to continuing to carry out all reasonable mitigation measures in cooperation with the Monitor and the parties, whether it "wins" or "loses" this particular dispute on the merits.

For the reasons detailed below, the Court should reject the Recommendation, find that parties failed to prove that any violation of the MRO occurred, and allow the Monitor and parties to continue working cooperatively on their review of the City's attrition mitigation measures in accordance with the MRO. Regardless of the Court's findings on the merits, we also request that the Court allow the Monitor continue to work with the parties to take steps to ensure that the sort of disagreements about communications that have been endemic in this dispute are cooperatively addressed and resolved.

### A.  Background and Procedural History

The dispute underlying the Recommendation arises from the number of candidates the City called for Round 2 of the CPAT in connection with open competitive Exam 7001 for the position of Firefighter. Consistent with standard practice, all candidates with particular written exam scores (also known as Adjusted Final Average or AFA) were called simultaneously for such testing. Round 2 was held from July 16, 2019 through September 7, 2019. The test is pass/fail; candidates must complete all stages of the examination in a defined time. As usual, the CPAT consisted of two practice rounds (July 16 to August 17 and August 20 to August 29) before a final test (September 3 to September 7). Further, consistent with past practice, a candidate who passed either of the practice rounds did not have to attend any further sessions. The City chose to call in all candidates with an exam score of 101 and 100, and the other parties assert only candidates with exam score of 101 should have been called at that time. This matter has been the subject of discussion, briefing, and attempted resolution over the course of more than one year now. Because the Monitor appended the various letters and briefs to the recommendation, the City respectfully refers the Court to those documents for a full explanation of the background and arguments of the various parties.

Ultimately after four rounds of briefing, several court conferences, numerous email exchanges and discussion on several calls with the Monitor and parties, the parties found this particular dispute boiled down to a matter of roughly 49 candidates – if there were 49 fewer candidates out of the more than 3,000 candidates involved in Round 2, there would likely be no dispute at all between any of the parties. See Recommendation, Exhibit 7.

### B.  Standard of Review and the Monitor's Misapplication of Burden of Proof and His Flawed Inferences

Under the terms of paragraph 57 of the MRO, objections to the Recommendation are reviewed pursuant to Rule 53(f) of the Federal Rules of Civil Procedure. Under Rule 53(f)(3), the Court "must decide de novo all objections to findings of fact made or recommended" by the Monitor. In reviewing this matter, the Court must also be mindful that it is undisputed that the burden of proof is on the plaintiffs and plaintiffs-intervenors to prove each element necessary to prove an MRO violation by clear and convincing evidence.

In his Recommendation, while acknowledging the plaintiffs and plaintiffs-intervenors bear the burden of proof in this matter, the Monitor consistently ignored this black letter law and erroneously placed the burden of proof on the City throughout his analysis. Compare Recommendation at p. 7, with Recommendation at p. 11 (characterizing evidence as "not adequate to prove that the City did in fact process candidates for two classes at a time"

2

when the burden is on the other parties), and p. 13 (creating adverse inference against the City because it did not provide proof of a fact when it did not hold such a burden).  At no time did the Monitor hold the parties to their burden and, indeed, as detailed below, the Monitor often made factual conclusions with little to no evidence, often even ignoring facts to the contrary for which he was aware.

Additionally, the Monitor improperly took adverse inferences against the City for what the Monitor termed its "declin[ation of] the chance to engage in further discovery related to its compliance with Paragraph 16" that the Monitor recommended in his December 14, 2020 recommendation.  Recommendation at p. 11.  However the Monitor did not offer the City any discovery in that recommendation, it was only offered to the plaintiffs and plaintiffs-intervenors, and only they were given permission to propound and conduct that discovery.[1]  Clearly, it is an error – and quite disingenuous – for the Monitor to try and create a negative inference from the City not taking discovery it was never offered.

We note these two fatal errors at the outset because they are recurring and undermine the entire Recommendation.  This Court should therefore reject the Monitor's improper analysis when conducting its de novo review for its own decision and Order concerning this dispute.

## C.  The Monitor's Erroneous Ruling on Key Evidence

Before reviewing the errors in the Monitor's legal and factual analysis of specific elements of the parties' claim, the City first wishes to address another overall glaring error in the Monitor's analysis of the admissibility of the City's evidence.  The Monitor reaches the inexplicable conclusion that the sworn declaration submitted outlining the City's specific processes for compliance with respect to CPAT processing for Exam 7001 and why the City understood it was compliant with the MRO is somehow inadmissible under Rule 602 of the Federal Rules of Evidence.  To do so, the Monitor makes the nonsensical assertion that the

---

[1] As the Monitor recognizes, the December 14, 2020 recommendation was jointly objected to by all parties in part because the Monitor's purported justification for recommended discovery did not make sense to any party and because, after four rounds of briefings and numerous information exchanges on this matter, the Monitor already had all necessary information to make a decision without the parties conducting formal discovery.  Our shared concern was about the lack of necessity of these formal requests and the unwarranted delay they would cause.  The Monitor's recommended creation of an interregnum of formal discovery was, and remains, quixotic and perplexing, so flawed that the Monitor withdrew it within mere hours of receiving the parties' joint objection.  Contrary to the Monitor's implication of these objections, no party suggested that the Monitor must be somehow cabined by the letter briefs and attachments thereto in making his recommendation.  Indeed, he could have – and the City certainly would have expected him to – review the entire record, including the scores of data and other information provided by the City on this matter over the past year as well as memorialized in his periodic reports.

declarant, Assistant Commissioner Marie Giraud, who made the decision as to how to process Exam 7001 CPAT Rounds 1 and 2, somehow lacks personal knowledge of *the very decision she made*.[2]

As support for this irrational notion, the Monitor claims the Giraud "[d]eclaration does not state that Assistant Commissioner Giraud had any involvement in, or first-hand knowledge of, the City's procedures with respect to calling candidates for CPAT processing prior to Exam 7001" (Recommendation at p. 12). This erroneous conclusion appears the result of a careless reading of Giraud's declaration. The Monitor takes note (Recommendation at p. 12) that paragraph 2 of the Declaration states Giraud assumed her current Assistant Commissioner title in September 2019 (after CPAT processing on Rounds 1 and 2 had begun), but the Monitor apparently failed to read the very next sentence, which confirmed Giraud was working with FDNY Human Resources prior to that date as well. Either way, the Monitor patently ignored the paragraphs of the declaration that clearly and unambiguously establish that Giraud was directly involved in (and therefore has personal knowledge of) all aspects of the decision regarding which candidates to call for Rounds 1 and 2 of Exam 7001 CPAT.[3] See e.g. Declaration of Marie Giraud ("Giraud Decl."), ¶ 18 ("I, along with personnel from [the FDNY's Office of Recruitment and Retention and with DCAS] determine the . . . [score] bands [to be called for CPAT] . . ."); ¶ 33 (acknowledging involvement in the selection of bands for CPAT Round 1); ¶ 35 (acknowledging involvement in the selection of bands for CPAT Round 2).

Thus, contrary to the Monitor's baseless claim, the declaration (along with the City's discussion of this matter at conferences, meetings and calls) establishes Giraud was a key decision maker who had first-hand personal knowledge of the process used to call Rounds 1 and 2 of the CPAT for Exam 7001. This knowledge includes the determination of whether any change must be made to the process such that Monitor approval is needed as well as the review and analysis that was conducted before the decision was made. Given the Monitor accords great weight to his erroneous evidentiary argument in rendering a decision on the merits (see

---

[2] The purpose of Giraud's declaration was to provide sworn evidence as to the processes used in Exam 7001 and the Department's understanding of whether those processes were a change. Nonetheless, contrary to the Monitor's contentions, the record clearly establishes, based on both the declaration and Giraud's statements to this Court during the January 27, 2020 conference, that Giraud reviewed and was familiar with the data from Exam 2000 and therefore a proper foundation has been laid with regard to Exam 2000 processing. See e.g. 1/27/20 Conf. Tr. at pp. 10-14.

[3] To the extent the Monitor found this unclear, he could have, as he often does, reached out to the City and quickly clarified any perceived ambiguity, rather than making such an obvious mistake as to the key evidence offered by the City. Indeed, the Giraud Declaration was submitted on June 15, 2020, which was six months before the Monitor concluded that more discovery was needed. Interestingly, during that time, no party questioned whether Giraud was qualified to provide this evidence.

Recommendation at pp. 12-13), his erroneous argument fatally undermines the Monitor's findings, particularly with respect to the alleged violation of paragraph 16 of the MRO.

**D.  The Monitor Improperly Found the City Violated Paragraph 16 of the MRO**

The City turns now to the myriad errors, both factual and legal, contained in the Recommendation regarding the specific merits of the parties' dispute.  As the Monitor stated, in order to establish a violation of any paragraph of the MRO,[4] the moving parties (here the plaintiffs and plaintiffs-intervenors) must establish: 1) the order is clear and unambiguous; 2) the proof of noncompliance is clear and convincing, and 3) the breaching party has not diligently attempted to comply in a reasonable manner.  Recommendation at p. 7, citing King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995).  As detailed below, the Monitor's conclusion that the plaintiff and plaintiffs-intervenors have satisfied any of these elements are based upon errors of both fact and law.

i.   First King Element

With regard to the first element of the King analysis, the Monitor incorrectly states that he need not analyze it because "No Party has argued that Paragraph 16 is ambiguous."  See Recommendation at p. 9.  The Monitor's facile conclusion ignores that even a cursory review of the record indicates that the City challenged the applicability of paragraph 16 to the number of candidates to be called for CPAT.  In fact, the City explicitly disputed the first element of the King analysis in its June 15, 2020 letter to the Monitor, annexed to the Recommendation as Exhibit 3.  In particular, the City specifically discussed that applicability of paragraph 16 to the circumstances herein was "inherently ambiguous and subject to interpretation."  Exhibit 3.

Had the Monitor carefully considered the City's argument, he would have found that the first element of the King analysis was not, in fact, met because the application of paragraph 16 in this case is far from clear.  First, there is a demonstrable lack of clarity as to what "step" in the process was actually being challenged here.  The Monitor, City and parties all seem to describe the CPAT as a "step" in the hiring process, but there is no claim that the City "began" the CPAT "step" when processing Exam 7001 without the permission the MRO requires.  Rather,

---

[4] The Monitor refused to consider whether the City was acting in good faith in deciding the declaration that the City violated paragraph 16 of the MRO.  The Monitor purportedly justified this decision by stating, "While the City seemingly contends that a finding of violation is identical to a monetary sanction and that the same legal standard should apply, the City cites nothing to support its position . . .[.]"  Recommendation at p. 8.  The City notes the other parties clearly intend to use an adverse finding to request judicial relief that, although non-monetary on the surface, is akin to monetary sanctions against the City.  Although that relief was not granted in the Recommendation, the City noted previously its anticipation that (and the United States in their brief acknowledged that) the parties will use the label of MRO violator to obtain additional sanctions against the City in the future.  These additional sanctions include, but are not limited to, extending the duration of the Monitorship, at significant monetary cost to the City, given that the City is required to pay the expenses and fees of the Monitor and the plaintiffs-intervenors.

the parties appear to be applying the language of paragraph 16, not to the beginning of a step in the hiring process (the CPAT), but to the continuation of what, in essence, is a sub-step of a sub-step (the number of candidates called at the same time in one particular round of many). The City discusses its work with the Monitor and parties with a frequency and transparency that far exceeds what the MRO actually requires, and the MRO itself has no clear delineation as to at what point a variation of the Monitor's "approval" of a step is needed under paragraph 16. Taken to its logical conclusion, the parties could argue a paragraph 16 violation for any change in implementation for any step in the process, even as minor as scheduling and rescheduling of particular candidates for any aspect of the process. Given that the parties here are challenging, and the Monitor is endorsing, the number of candidates called for CPAT, nothing would stop the parties from challenging, and the Monitor endorsing, a Paragraph 16 violation if the City called, for example, ten candidates for medical processing one day, and eleven (or nine) the next.

Thus, unlike <u>King</u>, where the defendant violated a clear and specific provision of the court's order, what the parties allege here is far murkier. It is beyond dispute that the City, in accordance with paragraph 16, sought the approval of the Monitor before it began using CPAT for Exam 7001. While the Monitor incorrectly faults the City for not being more detailed about its Round 2 plans (there is no dispute that the City provided the underlying data to the Monitor and parties), it is far from clear that the application of paragraph 16 to the specific circumstances and alleged conduct by the City in this case equated to an MRO violation.

      ii.    <u>Second King Element</u>

Turning to the second <u>King</u> element, the parties have failed to demonstrate that the City made a change to the hiring process and, in fact, the City did not. While the Monitor is correct that the City does not dispute many of the key numbers cited by the parties, the Monitor errs, much like the parties did, in attempting to reverse-engineer a change in a "step" of the process from the differences between the numbers in Exam 2000 and Exam 7001. In adopting that process, the Monitor disregarded the fact that the other parties had the burden of proving the City made a change in the process without informing the Monitor. The City respectfully refers the Court to the sworn testimony and its submissions for a detailed discussion as to why such an assumption is not proper (<u>see</u> <u>e.g.</u> Giraud Decl. ¶¶ 35-39) and reiterates that the City maintains, to the best of the City's understanding, it always viewed processing as calling candidates for two classes, notwithstanding the fact that prior processing falls short of two complete classes.

Moreover, the City maintains that the Monitor has consistently acknowledged this to be the City's practice. The Monitor disagrees, but his attempts to retreat from and reframe his prior statements in periodic reports are simply not credible and are unsupported by evidence. The Monitor acknowledged, as he must, that he understood the City's processing as processing for "two Academy classes per year." Recommendation at p. 11. However, the Monitor then attempts to argue that it is a "mischaracterization" of this statement to suggest he understood that the processing for those two classes would happen at the same time. This self-serving claim does not hold up to scrutiny. First, if the Monitor honestly believed the City did not intend to process two classes concurrently each year, he presumably would have said that the City processes candidates for each class every six months (or eight classes per list, etc.). The City respectfully submits that the obvious reason the Monitor – who is very precise with his words – characterized the City's practice on an annualized basis, two classes *per year*, is because he knew from the information the

City provided the most accurate way to characterize the City's processing was an annual cycle and that it would be inaccurate to state that the City separately processes candidates for one class every six months. The Monitor is correct that he did not add the word "simultaneously," but that word would be extraneous in context. Moreover, in the Twenty-Eighth Periodic Report, filed on October 16, 2018, before Round 2 of CPAT, the Monitor stated he understood the next "band" of candidates due to be called off the eligible list were AFAs 101 and 100 and that they had been extended invitations at that point to the Mobile Academy.

Thus, it is clear that not only did the City report its plans to the Monitor, but that the Monitor was clearly aware of those plans well before the City began its processing of CPAT Round 2. Any alleged dispute regarding the import of these facts is immaterial and, given the burden of proof, should be resolved in favor of the City when analyzing whether the City should be formally found to have violated the MRO.

iii.   Third King Element

With respect to the third <u>King</u> element, that element required the parties to prove that the City failed to diligently attempt to comply with the MRO in a reasonable manner. The Monitor's analysis turns this law on its head by requiring the exact opposite – that the City prove it *did* diligently comply. <u>See</u> Recommendation at pp. 13-14 (noting the City's alleged failure to prove that it complied).

Perhaps most importantly, however, the Monitor completely ignored the dozens of other occasions in which the City has fully complied with paragraph 16 of the MRO when it made alterations to the step of the hiring process. While the City does not concede any violation here, even assuming the City did not request approval on this one occasion under these decidedly unclear circumstances, that one occasion must be measured against the dozens of other occasions over the course of almost nine years that the City did comply, as confirmed by the Monitor's periodic reports to this Court. The Monitor does not point to any law – and the City is not aware of any – to support that on one occasion of dozens over the course of almost nine years the City failed to seek Monitor approval is somehow evidence of a lack of reasonable diligence.[5]

Similarly astonishing is the assertion by the Monitor that the City "has not argued that it had in place any method or plan to confirm whether any of its processes were changes and therefore to ensure compliance with Paragraph 16 as a general matter. The City also has not described any effort on its part to investigate whether the use of the CPAT in Exam 7001 was a change from its use for Exam 2000." Recommendation at p. 16. First, the Monitor has, once again, improperly placed the burden of proof on the City. Moreover, the Monitor seems to ignore that the process he is attempting to fault the City for not describing is actually established *by the Monitor*. <u>See</u> Modified Remedial Order ("MRO") ¶ 22 (requiring the  Monitor – not the City – to "adopt a schedule that requires the City of New York to notify the Monitor and the Parties . . .

---

[5] While the City noted this fact in its briefing with respect to the second element, it applies with equal force to the third <u>King</u> element.

before commencing any step in a process for the selection of entry-level firefighters."), ¶ 23 (permitting the Monitor to set the "terms and conditions of pre-decisional disclosure for Court Monitor approval").[6]

Presumably, the Monitor is well aware that he has regularly promulgated directives regarding identification and seeking approval of changes to the hiring process and that City complies with those directives in the manner the Monitor requires.  The City arranges for information to be provided and meetings to be held before all steps of the hiring process begin where the City not only explains its plans, but subjects key decision makers to inquiry by the Monitor and parties.  The Court has stated, of the consistent prior compliance with paragraph 16 of the MRO, "we've had a very good effort by the parties to communicate with each other in advance of any steps that were taken."  1/27/20 Conf. Tr. at p. 34.

The Monitor is well aware of the City's compliance practices with regard to candidate processing and test development, outlined and detailed over the course of hundreds of calls and in person meetings with key City personnel, from the Fire Commissioner on down, that the Monitor has requested pursuant to these provisions.  The Monitor's awareness of these practices is outlined in great detail through the Monitor's periodic reports, which demonstrate awareness of the City's compliance efforts and processes, often down to granular aspects.  The Monitor can and should have taken judicial notice of those activities when resolving this dispute.  To say now that the Monitor can discount those activities because the City did not specifically "describe" each one in a particular round of its briefing is without a shred of support.

Additionally, contrary to the conclusions of the Monitor, as detailed in the City's discussion concerning the alleged violation of MRO paragraph 19 below, there is ample evidence that the City both recognized potential adverse consequences to calling score band 100 for Round 2 of CPAT and provided data showing that the City successfully mitigated these effects to the extent possible with respect to Black and Hispanic Round 2 CPAT takers.

Again, as set forth in the City's briefing and in its December 3, 2019 letter to this Court, the City provided all of the information necessary for the Monitor to understand the City's plans for Round 2 of CPAT during frequent in-person recruitment and attrition mitigation meetings and in numerous written communications both before and after those meetings.  The Monitor claims that he noted in his November 2019 report to this Court that the City failed to identify a "communication" provided to the Monitor that explained the desire to call score bands 101 and 100 for Round 2 of CPAT.  However, a cursory review of the City's December 3, 2019 response and presentation to this Court makes clear the City identified multiple written communications to the Monitor, including a spreadsheet of candidates and a written

---

[6] To this end, the Monitor talks about the City's change in the Candidate Investigation Division ("CID") personnel as if he were unaware it had occurred and has no knowledge of the facts and circumstances.  Indeed, the City actively spoke with the Monitor about this change in personnel, the reasons therefor and followed up on several occasions to address concerns of the Monitor and/or parties.

communication plan, made in advance of a lengthy meeting held on February 14, 2019 on the topic of recruitment.  In addition, there are several communications made following that meeting and prior to commencing Round 2 of CPAT that contained the information about how the City intended to call candidates for Round 2 of CPAT.  We affirmed these facts during the January 27, 2020 conference with this Court.  See 1/27/20 Conf. Tr. at pp. 14-16.

Despite the City's efforts since the Monitor's November 2019 report to point out *multiple* communications to the Monitor in which the City notified the Monitor of its plans prior to Round 2 of CPAT, the Monitor's Recommendation is evasive on when and how he was aware of the City's plans.  The Recommendation obliquely declares that it became "apparent *by* July 2019" that the City was processing candidates for CPAT at a higher rate than for the last exam. See Recommendation, at 2 (emphasis added).  Even this admission alone demonstrates that the Monitor had ample time to demand that the City alter the Round 2 testing schedule before the round began in mid-July 2019.

Moreover, several of the specific written communications provided by the City to the Monitor prior to beginning CPAT Round 2 conclusively pushes the timeline back even further than the Monitor intimates in his letter.  An email[7] from the City to the Monitor and parties dated June 21, 2019, references a meeting the Monitor, parties, and City held the day earlier.  It was at this meeting – at the latest – that the Monitor and parties allegedly grasped what the City had previously explained – that CPAT would include AFA 100.  The June 21, 2019 email identified by race the number of candidates who had been invited to CPAT information sessions, and the total number was 2,967.[8]  Thus, the written record shows that the Monitor and parties were aware of the size of the candidate pool for Round 2 by (at the very latest) June 21, 2019.

In a separate email, also dated June 21, 2019, the City provided the dates for CPAT Round 2, and an attachment to that email stated that the first CPAT Round 2 Practice Tests would be held on July 16, 2019 – just under one month later.  Thus, although the size of the group to be given CPAT was known and CPAT testing would not begin for another month, leaving ample time for any necessary corrective action prior to the City proceeding, no party, including the Monitor, raised any concern.

Moreover, in the first June 21, 2019 email, expressly at the plaintiffs-intervenors' request, the City provided the names of Black candidates who would be in Round 2.  The City did this based on the plaintiffs-intervenors' representation that they would assist in outreach to Black

---

[7] Because many of these communications described herein contain pre-decisional and personal candidate information, they are not submitted with this letter but will be provided to the Court for *in camera* inspection should the Court so request.

[8] :  A separate email gives a slightly different number of Round 2 candidates due to the fact that processing is not static and therefore there are slight fluctuations in the numbers over time.  The City also notes that candidate attendance is voluntary at both the Information sessions and at subsequently-held DCAS Orientation sessions.

Round 2 candidates.   The Monitor's recent letter to the Court, in fact, seeks to minimize the City's provision of this information to the plaintiffs-intervenors, but does so in a way that illustrates that the Monitor (or the parties) had time to object to the size of Round 2 *before* testing began.   See Recommendation, at p. 18 (the Monitor argued that "sharing information with the Vulcan Society to allow it to provide encouragement to candidates. . . . appear[s] to have been in place even *before* the City called candidates for Round 2 of the CPAT") (emphasis added).[9]

In short, there is no reasonable dispute that the Monitor and parties had information about the size of this pool in ample time to insist upon any necessary changes to Round 2 to avoid an MRO violation.  Neither the Monitor, nor any party, has offered this Court any explanation for why they waited to raise this issue until after the City began CPAT Round 2, and the ongoing, self-serving claim that they somehow did not know about the City's plans in advance is simply not tenable.[10]

For these reasons, the City continues to assert with ample support in the record – although we recognize the Monitor and parties dispute it – that the manner in which the City was conducting CPAT Round 2 was disclosed specifically on multiple occasions orally and in writing and no objections were voiced by the Monitor or any party regarding how to proceed.  Further, the size of the scoring bands was (and is) a matter of public record.  Certainly the Monitor and parties were aware that the City planned to send CPAT Round 2 invitations to candidates in both scoring bands 101 *and* 100 before those invitations were sent, if not at the February 14 meeting, then through the communications plan.  The Recommendation improperly ignores all these facts – all of which demonstrate the City's openness and desire to continue its excellent record of MRO compliance – as if they did not exist.

Accordingly, the parties failed to satisfy their burden as to all elements of the King test and the Monitor's conclusion to the contrary is rife with factual and legal errors.  Upon *de novo* review, this Court should reject the Monitor's conclusions and find the plaintiffs and plaintiffs-intervenors failed to meet their burden of establishing the City violated paragraph 16 of the MRO.

---

[9] In contrast to the Monitor's dismissive remarks, the plaintiffs-intervenors, while asking the City to do more, did acknowledge their "appreciat[ion of] the *new steps* that the department has taken *between* round one and round two, to do more outreach."  7/9/19 Conf. Tr. at p. 14 (emphasis added).

[10] In addition, a Court conference was held approximately three weeks after the June 2019 meeting and emails discussed above, and one week before Round 2 began.  At that conference, the plaintiff-intervenors acknowledged their awareness of the size of the CPAT Round 2 candidate pool.  Tellingly, despite being fully aware of the imminent commencement of CPAT Round 2, no party, including the Monitor, claimed the City had failed to comply with Paragraph 16 of the MRO.  7/9/19 Conf. Tr., at  11.

**E.  The Monitor Misconstrued the City's Compliance with Paragraph 19 of the MRO**

The Recommendation is somewhat unclear as to the Monitor's position with respect to paragraph 19 of the MRO.  The Monitor says the Court should not find the City violated paragraph 19 "under the standard for contempt," but nonetheless makes erroneous findings regarding the extensive record and evidence of compliance with paragraph 19 of the MRO.  Further, the Monitor recommends relief that supposedly flows from an alleged violation of paragraph 19 of the MRO.  The Monitor also suggests that paragraph 19 of the MRO requires an investigation by the City when there is no such provision or requirement.  While the Monitor ultimately found in favor of the City – at least as a technical matter – his analysis so thoroughly disregards both the evidence presented and belittles the City's efforts under paragraph 19, calling the City a "failure," that the City is compelled to object to the Monitor's paragraph 19 analysis as well.

Once again, the Monitor's analysis is flawed insofar as it the Monitor improperly assigned the City the burden of proof regarding this issue.  Indeed, it appears that the Monitor is contending that all the plaintiffs-intervenors need to do to prove a lack of reasonable diligence is to have their counsel say that it is so.  See Recommendation at p. 17.  The Monitor concludes that the City has "fallen short" in this regard and that the City was a "failure" when it comes to mitigating disparate impact with respect to paragraph 19 of the MRO.  Id. at p. 19.  There is simply no basis, evidentiary or otherwise, for the Monitor's conclusions.  Instead, there is ample evidence, completely disregarded by the Monitor, that the City *did* engage in reasonable diligence and attrition mitigation measures, and that those measures were clearly successful.

The Monitor concludes that "[t]he record does not show that the City took adequate steps to marshal its resources and develop a plan to combat potential adverse impact in advance of making a change in the form of calling two classes at once for the CPAT." Recommendation at p. 18.  Putting aside, once again, that the Monitor improperly shifted the burden of proof to the City and that the Monitor has found as a fact that the City processes for two classes each year, the Monitor does not explain how he reached this conclusion, does not define what "adequate" steps would be, and appears to have ignored the clear evidence in the record regarding the success of the remedial measures the City did take.

Contrary to the Monitor's baseless conclusion, there is ample evidence in the record in this regard.  The Giraud Declaration, as well as the explanations provided by both Assistant Commissioner Giraud and Assistant Commissioner Nafeesah Noonan to this Court, makes plain that the City examined relevant data and understood prior to calling Round 2 of CPAT: (1) the CPAT, while job related and consistent with business necessity, was a major source of attrition for Black and Hispanic candidates, (2) based on the data from Exam 2000, attrition increased lower down the list, and (3) calling candidates with a score of 101 and 100 would bring a large group of candidates and there would be a risk of greater attrition and that adverse impact could result.[11]   Contrary to the baseless statements on page 18 of the

---

[11] Indeed, the City believed that calling this larger cadre could potentially enhance diversity in hiring because of the larger number of Black and Hispanic candidates lower in the list. Continued…

Recommendation, the record makes clear that this analysis was performed by the City *before* Round 2 of CPAT and that there were *bona fide* additional attrition mitigation measures put into place that were different than those used for Round 1.  See Recommendation, Exhibit 7 (listing additional, new remedial measures), 12/3/19 letter to the Court (same) and 1/27/20 Conf. Tr. at pp. 16-17 ("and **as would be anticipated from past exams**, the firefighter title, **we know that there will be additional attrition** as we move into the latter hiring bands, so with this consideration, recruitment considered an in-person attrition mitigation program **nine months prior** to those candidates in round two being called off that band") (emphasis added).[12]

Thus, it is clear, and beyond dispute, that the City "analyze[d] the likely effects of the [alleged] change, and develop[ed] a plan to mitigate any potential negative impacts" ***prior*** to beginning Round 2.  Recommendation at p. 17.  The plaintiffs-intervenors did not cite any evidence to the contrary and the Monitor's conclusion otherwise in the Recommendation is completely without basis.  In addition to these efforts, the City undertook yet more new attrition mitigation efforts after Round 2 began, including efforts recommended by the Monitor and the Court, which the Monitor completely disregards.  For example, the City created an alternative CPAT training location site at FDNY headquarters at great expense to the City based on the supposition, discussed at the July 9, 2019 conference with this Court, that such a site *might* increase the number of people who went to training, concurrently with expansion of its fitness awareness program.  See City's 7/12/19 letter to the Court; see also footnote 9, supra (at Court conference, plaintiff-intervenors acknowledge some of the City's outreach efforts that were put in place between Rounds 1 and 2 of the CPAT).

As noted in the City's papers, and acknowledged by the Monitor, the statistics confirm that these attrition mitigation efforts had a positive impact on mitigating CPAT attrition with respect to Black and Hispanic candidates.  See Recommendation at p. 17, Exhibit 7 at p. 9.  This evidence (and acknowledgement) completely undermines the baseless conclusion of the Monitor that City's efforts were a "failure" that has "fallen short."  Tellingly, the Monitor could not cite to a single piece of evidence to establish this inadequacy or articulate a single attrition mitigation measure that the City could have taken but did not, or any specific identification of what additional "resources" the City "failed" to marshal.

---

Moreover, although we had no way of knowing this at the time, had the City not called candidates in the 100 score band, CPAT processing would have needed to resume sooner, resulting in the COVID-19 pandemic having a greater impact on hiring than it currently does.

[12] In addition, these analyses are often explained to the Monitor in prodigious detail at in-person meetings.  This dispute has revealed multiple examples of occasions where the City conveyed information to the Monitor at these meetings, but the Monitor ultimately denied receiving such information, or mischaracterized it.  The City has, on multiple occasions, made suggestions to the Monitor's team on how to work together to eliminate this communication gap.  The Monitor has agreed to consider the City's suggestions and develop a method for better memorializing the information presented by the City at these meetings.  We appreciate the Monitor's willingness to consider these process improvements.

The Monitor's negative aspersions on the City's efforts here are entirely subjective and appear to be based on an unsupportable presumption against the City that any efforts it devises on its own are inherently inadequate, rather than an objective review of the data and evidence supporting the adequacy of the City's efforts. These aspersions are not only unjustified, they are demoralizing to the many dedicated City employees, including Black and Hispanic Firefighters who work tirelessly to conduct outreach to Black and Hispanic candidates and mitigate attrition within those populations. Accordingly, this Court should reject them.

**F.  The Monitor Fails to Justify Why the Recommended Relief Is Necessary**

Finally, the Monitor requests the Court order several remedial measures, but fails to establish that any of them are in any way necessary. In making his Recommendation, the Monitor neither acknowledges the significant work of the City, nor provides any meaningful analysis as to why, in light of existing efforts, additional, Court-ordered relief is needed. The omission by the Monitor of these questions from his analysis is disturbing and creates a false narrative that the City is a recalcitrant party when it clearly is not.[13] The Monitor simply bases his recommendations on a conclusion that the Court has the power to order the relief requested. However, simply because the Court *has* the power to order something that was requested, does not necessarily follow that the Court *should* order that relief.

Had the Monitor properly acknowledged the City's existing efforts and analyzed the request for the relief in light of those efforts, he would have realized the relief ordered is both unnecessary and duplicative because of what the City has already done on its own and with ongoing input from the Monitor and parties. The City remains committed to working with the Monitor and parties to closely review the outcomes of the candidates and implement additional remedial measures if needed. The Monitor provides no record evidence, nor any legal basis to explain why this Court must order the City to engage in specific remedial activities when it has clearly and unambiguously been willing to work with the Monitor and parties to do just that. Indeed, had COVID-19 not disrupted CPAT testing, we would have been implementing those measures even during the briefing of this dispute.

Additionally, the Monitor, in ignoring the City's existing efforts, is requiring useful work completed by the City to be re-done for no reason. This duplicative work is completely unwarranted, particularly with the challenges the City faces during a once-in-a-

---

[13] The Monitor claims that the City's decision to continue to object to what it believes is an erroneous conclusion that it violated the MRO somehow demonstrates recalcitrance or an unwillingness to obey the dictates of the MRO. See Recommendation at p. 15 (questioning the City's sincerity regarding compliance because "even after the change had been called to the City's attention, the City continued (and still continues) to deny that any change occurred."). The Monitor does not seem to appreciate that the City can both seek to assert its legal position on the merits here while still being fully committed and motivated, regardless of the outcome of this dispute, to doing everything within the City's reasonable ability to ensure the most non-traditional candidates succeed.

century pandemic.  This Court should not adopt a recommendation that downplays and even ignores the work the City has already done and/or orders the City to preform wasteful duplicate work at taxpayer expense.

To illustrate these points, the City provides its detailed position on each of the recommended remedies below, including a discussion on how each recommended remedy duplicates work the City has done or is doing.  The specific details below, nearly all of which the Monitor is clearly aware of, highlights the absurdity of claiming Court-ordered relief is needed and confirms the City's demonstrated willingness and dedication to mitigate attrition and to remediate the issues at the heart of this dispute without the need for judicial intervention.

i.      Remedy A

The Monitor was either unaware or failed to note, with respect to this recommendation, that the City has already, without any requirement by the Monitor or the Court, begun implementing the relief requested by the United States in the Monitor's recommended Remedy A.  Following the January 27, 2020 conference with this Court, the City heeded the Court's directive to try and formulate a resolution to this dispute.  As a result, the City held a series of cooperative, problem solving oriented calls with the parties and, eventually, the Monitor.  These calls allowed the City to remediate some issues but ultimately, despite good faith efforts of all parties, the parties were unable to resolve the entire core underlying dispute.

As part of that dialogue, the United States raised their request to confirm that all steps in the hiring process were adequately documented.  The City agreed that this dispute exposed a possible gap in applicable documentation with regard to how candidates are called off the list for CPAT, which would be resolved through memorializing the process the City used here, as well as any subsequent modifications to that process that were made after discussions with the Monitor and the parties.  The City further agreed that in order to avoid future disputes of this nature, it would, in turn, agree to conduct an audit of all steps in the hiring process to determine if there were any other gaps in documentation.

The City conducted that audit in May 2020.  On May 11, 2020, the City provided the results of the audit to the other parties (but not the Monitor, as the parties were still negotiating to fully resolve this matter and the Monitor would be called on to adjudicate the dispute).  As a result of that audit, the City also confirmed that other than the statutory processes, the CPAT manual designed by a third party, and the City's Personnel Rules and Regulations ("PRR"), which did not require Monitor approval, each and every one of the processes was approved by the Monitor after extensive review and revision by all parties.  The one gap that existed is the process used to "batch" candidates together to be called for CPAT and Intake, which the City proposed to reduce to writing and was ultimately included as part of the Giraud Declaration.

| Process Step | Writing(s) |
| --- | --- |
| Written Exam Administration | DCAS NOE (Notice of Exam), City PRR, PSI (an outside vendor) Reports |
| CPAT Administration | DCAS NOE, CPAT Manual |

| List Composition and Order | DCAS NOE, City PRR |
|---|---|
| Calling Candidates for CPAT/Intake | *to be written* |
| Intake Process | Intake Packet, CID Guidelines, RAP sheet guide |
| Medical Exam | Medical Scheduling Letter, BHS (Bureau of Health Services) Guidance Document |
| Medical Exam (continued) | FAQs, Videos (stairmill, PFT, overall process) |
| Character | CID (Candidate Investigation Division) Guidelines, PRB (Personnel Review Board) Guidelines |
| Run | BHS Guidance Document |

In light of the City's voluntary efforts thus far, we respectfully submit that a Court order here is unwarranted. We would be happy to review this chart with the Monitor and confirm whether he agrees the findings of the City's May 2020 audit are accurate. If he does not, we will be willing to augment the work we have already done. Moreover, while the Monitor proposed a slightly different approach, we ask that the Court direct the Monitor to work cooperatively with the City to augment its existing work rather than requiring the City to waste its resources by starting over with a different approach.

ii.   Remedy B

As discussed in detail above, the Monitor's discussion of Remedy B is devoid of any discussion of how the City's existing efforts to support Black (or Hispanic) candidates are deficient or why these particular proposals are best suited to provide that support. See 1/27/20 Conf. Tr. at pp. 19-20 (describing recruitment and support initiatives). A full analysis and comparison of each recommendation to the work the City has already done shows the extent to which the City has already worked to maximize its capacity and efficiency for supporting Black and Hispanic candidates, as well as the extent to which the Monitor disregarded these efforts in his analysis.

First, the Monitor proposes that candidates be given access to a stairmill to practice by the City. The City already had done this this, albeit in several different ways, in the past, and stairmill access will continue to be offered in some form. For example, FDNY's Office of Recruitment and Retention ("ORR") has, in the past, given access to stairmill equipment at FDNY headquarters for candidate practice and, on other occasions, has partnered with gyms to allow members to train at the gym. Additionally, as the Court is aware, in July, 2019, the City moved equipment into the Auditorium at FDNY headquarters in order to create an alternative, more public transit-friendly, training site for CPAT at the request of the Court, the Monitor and the parties, which also allowed for additional stairmill training.

With respect to gym membership, there are currently no gyms offering the kind of partnership that the City had in the past. However, the City remains committed to allowing use of stairmill equipment a few times a month for training prior to the resumption of CPAT training, provided that it can be accommodated under current COVID-19 protocols. We will update the Monitor concerning our efforts in this regard. Moreover, as the Monitor was made aware, the

City made improvements to its Fitness Awareness Program ("FAP") to better support these candidates through the process.

With regard to the second recommendation, the Monitor should be aware, yet did not advise the Court, that ORR reaches out to candidates at least one time per month.  We can confirm that we will continue to communicate with candidates that have completed CPAT at least once a month.  As part of this outreach, candidates are provided quarterly updates about current candidate processing, with candidates closer to being processed given more specific estimates about when they are expected to be reached.  Candidates farther down the list are not given these specific estimates out of concern that the uncertainty would cause those estimates to become misleading.

Next, the Monitor recommends this Court order the City to conduct focus groups with candidates in processing who have passed CPAT, but the Monitor ignores[14] the fact that the City has already held numerous focus groups with prior candidates through one of the City's consultants, ideas42, a social and behavioral design consulting group, in October of 2018 and April of 2019 to improve candidate processing and messaging.  These focus groups included female, Black and Hispanic Firefighters and Officers.

Based on the feedback, ideas42 made several recommendations that the City implemented to enhance candidate engagement and to address stereotype bias (that non-traditional candidates feel they do not belong).  These enhancements included sessions prior to CPAT that are conducted by Black, Hispanic and/or female Firefighters explaining how the various training efforts and the FDNY mentorship program helped them.  A planning card was developed to help candidates hold themselves accountable to participating in ORR's attrition mitigation programming as well as continue an individualized fitness regimen.  Candidates also have a discussion regarding what motivated them to take the Firefighter exam and what they hope to accomplish.  ideas42 designed this reflection activity to create awareness of the "why" that will carry candidates through the process.

The proposed focus groups in the Recommendation would largely duplicate this work without any explanation as to why the data already gathered is insufficient.  It would also

---

[14] The Monitor is well aware of these efforts.  Indeed, the City briefed the Monitor about the ideas42 focus groups and process improvements both orally and in writing on multiple occasions.  Assistant Commissioner Noonan explained the effort in detail and distributed copies of the fitness planning card as an example of the enhancements resulted from these focus groups at a June 20, 2019 meeting in which she briefed the Court Monitor and parties about the City's attrition mitigation efforts – the same June 20, 2019 meeting previously discussed in this letter as occurring a month before Round 2 began. Assistant Commissioner Noonan described these changes and provided an update on the City's implementation of the changes at a February 5, 2020 meeting with the Court Monitor in response to specific inquiries about how the FDNY planned to enhance their communication and engagement of this larger group of CPAT passers.

require the Monitor's consultants to duplicate the focus group design process, which is both wasteful and unnecessary.

With regard to the fourth recommendation that the City provide a "written summary" about the effectiveness of attrition mitigation, the City provides regular updates and analysis regarding attrition mitigation as well as regular data updates in the manner the Monitor dictates. Thus, it is puzzling why the Monitor would believe the Court would need to order the City to provide this sort of information. If the Monitor wishes the information presented in a different way than present, the City would be happy to discuss alternative methods and determine cooperatively with the Monitor which proposal is the most efficient and effective way to provide such information. After conferring with the Monitor the City will adjust its presentation to the agreed-upon parameters without the need of a formal court order.

For these reasons, the City's efforts absent Court order eviscerate the Monitor's suggestion that Court-ordered relief is required herein. All parties, and the aims of the MRO, are best served when this Court allows the Monitor and parties to cooperatively discuss and resolve these issues without judicial intervention. Thus, this Court should reject the Monitor's unnecessary recommended relief and allow the City to continue its ongoing efforts, cooperatively and with the input of the Monitor, to mitigate attrition.

## G. Conclusion

It is unfortunate that a dispute like this one overshadows years of cooperation between the parties and the Monitor on the important work of attrition mitigation and reforming the FDNY hiring processes, along with overshadowing the undeniable accomplishments that has resulted from that work. To be clear, the City does not make these objections out of some desire to get away with inferior hiring practices or to somehow avoid accountability and improvement. To the contrary, the City has worked to minimize attrition and other adverse effects of CPAT testing and is committed to continuing to do so regardless of the outcome of this dispute. The City continues to provide information about these efforts for Monitor review, and it will continue to consider and implement all reasonable practices to mitigate attrition. Ultimately, the difference of opinion here appears to be as small as 49 out of almost 3,000 candidates. Differences of opinion about the details of how to best accomplish our shared goals will occur from time to time. However, it is clear all parties are fully aligned on the importance of the work, and share a firm commitment to get it done.

Nor, in making these objections, is the City suggesting to this Court that it is infallible or that its actions were perfect. What the City did not do, however, was commit an MRO violation, nor is it proper to invite all the collateral consequences to the City that result from the parties' intended use of their hoped-for finding that the City allegedly violated the MRO on this one occasion.

Because the parties failed to establish, by clear and convincing evidence, that the City violated paragraphs 16 and 19 of the MRO with regard to Round 2 of CPAT testing, this Court should reject the Monitor's Recommendation, in part, and deny the parties' request to declare the City violated any provision of the MRO.

We thank the Court for its consideration of these objections.

Respectfully submitted,

Eric Eichenholtz
Assistant Corporation Counsel

cc:  Court Monitor Cohen and Counsel of Record (by e-mail)