UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

    Plaintiff,

  -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

    Plaintiff-Intervenors,

  -against-

THE CITY OF NEW YORK,

    Defendant.

------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## MONITOR'S THIRTY-THIRD PERIODIC REPORT TO THE COURT

TABLE OF CONTENTS

I.      Executive Summary ................................................................................................. 1

II.     Recruitment and Attrition Mitigation ..................................................................... 8

        A.      Candidate Processing ................................................................................... 8

                1.      Proposed Extension of the Exam 7001 List .................................... 8

                2.      Candidate Processing to Date ........................................................ 10

                3.      CPAT Testing Dispute ................................................................... 12

        B.      Attrition Mitigation ................................................................................... 13

                1.      Recent Communications and Outreach to Candidates ................... 14

                        a)      Recruitment Coordinators and Candidate Communications ........ 14

                        b)      WebEx Conferences and Fitness Training ................................... 16

                        c)      Other Programs and Initiatives .................................................... 18

                2.      Long-Term Communication Plans ................................................. 19

                3.      Use of Data in Attrition Mitigation Initiatives .............................. 22

        C.      Analyses of the Exam 7001 Recruitment Campaign ................................ 23

                1.      Overview of Analysis and Planning .............................................. 23

                2.      City's After Action Report and Cost-Effective Report ................. 24

        D.      Assignment Issues ..................................................................................... 26

        E.      Working Group ........................................................................................... 28

III.    EEO .................................................................................................................... 29

        A.      EEO Staffing .............................................................................................. 29

        B.      Policies, Messaging, and Training ............................................................ 31

        C.      Compliance and Accountability ................................................................ 35

                1.      Officer Performance Evaluations .................................................. 35

                2.      "Workplace Professionalism" Reporting ...................................... 39

i

3. Climate Survey ................................................................ 41

D. Inspections and Investigations ............................................ 43

1. Inspections ............................................................. 43

2. Review and Recommendations Regarding Investigations ......... 44

3. EEO Database ......................................................... 47

IV. Medical Exam-Related Issues ..................................................... 47

A. Stairmill Test ................................................................... 48

B. Medical Exam Attrition Mitigation ..................................... 49

C. Medical Exam Messaging .................................................. 49

V. Character Screening by the CID and PRB ...................................... 50

VI. Firefighter Exam .................................................................... 52

VII. Additional Issues ..................................................................... 52

I.     **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from February 1, 2021, the date of the Monitor's Thirty-Second Periodic Report (Dkt. # 2004), to May 26, 2021.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

In its previous report, the Monitor noted that while COVID-19 continued to impede the City's compliance efforts, work had begun to resume on several of the affected initiatives at a reduced capacity.  Monitor's Thirty-Second Periodic Report at 1.  Since then, the City has continued to ramp up its efforts in a number of areas.  These include, most notably, resumed candidate processing from the Exam 7001 eligible list (the rank-ordered list from which candidates are called into the hiring process), related outreach to candidates, and the City's analysis of the EEO climate survey.  As City employees transition back to in-office work (a process that began on May 3, 2021), the Monitor expects that the City will be better situated to resume or accelerate work on outstanding initiatives, more responsive to the Monitor's requests for information and materials, and fully prepared to regain momentum and make significant headway towards completing the long-term projects and achieving the goals that are necessary for compliance with the Modified Remedial Order.

The Monitor has worked actively with the City and the other Parties as the City has resumed candidate processing and ramped up activities, as described below.  Highlights of this

work have included frequent calls with the City and other Parties to receive updates on hiring for the first Fire Academy class since the pandemic; calls with the City concerning a variety of messaging, training and investigative initiatives; working to analyze data from the most recent recruitment campaign and the hiring process;  and calls to discuss the City's ongoing analysis of data from the FDNY workplace climate survey.  The Monitor has also continued to review and evaluate the City's activities and initiatives, and has continued to keep the City and the other Parties advised regarding the Monitor's assessment of the City's compliance in key areas of work under the Modified Remedial Order, the tasks that remain to be completed, and the goals that remain to be achieved.  To this end, on February 3 and 25, 2021, the Monitor convened conference calls with the Parties to discuss the overall status of the City's compliance and remaining tasks in key areas of the Monitorship, and to discuss plans for the City's resumption of work as its personnel return to work on Monitorship projects.

Part II of this report discusses activities relating to the City's recruitment and processing of entry-level firefighter candidates.  As previously reported, in January 2021, the City resumed processing for approximately 300 candidates from the Exam 7001 list, with plans to appoint two potentially reduced-size Fire Academy classes, one to begin in May 2021 and the other later this year.  More recently, the City has reported that it is considering appointing a full complement of candidates to the class projected to begin in the fall of this year – a decision that will be impacted by any COVID-related issues the City may encounter with the May class.  The first post-COVID Academy class was appointed on May 10, 2021, following a hiring process that was modified to incorporate social distancing and account for COVID-related constraints.  Although comprehensive analysis was difficult while processing for the class was ongoing, now that processing has ended, the City is in a position to assess candidate outcomes from each step (and

each component of each step) in the hiring process (including outcomes for Black and Hispanic candidates) – with a view to evaluating whether changes should be made, either in the hiring procedures themselves or in the City's efforts to reduce attrition among non-traditional candidates. The City has advised that it is conducting that analysis.

Also in the area of recruitment and candidate processing, on February 16, 2021, the City proposed extending the life of the Exam 7001 list for two years – from the current expiration date of February 2023 to February 2025, with two full-size classes per year going forward. The Monitor is considering the City's proposal along with comments and input provided by the other Parties – with a particular focus on the City's analysis of the potential impact of the list extension on diversity and candidate attrition.

Part II provides a detailed report on the resumed processing of Exam 7001 candidates and the City's related efforts to communicate with candidates and assist them in preparing for the candidate screening process. Before the Monitor's previous report, in connection with the City's resumption of candidate processing, the Monitor had issued a number of directives and offered additional recommendations (some of which built upon existing City initiatives) intended to ensure that the City maintain frequent, personal contact with, and provide sufficient resources for, the non-traditional candidates invited to resume processing. The City accepted some of the Monitor's recommendations, and it committed to provide candidates with information on a regular basis and to offer them frequent encouragement to attend events and appointments. But the City disagreed in some areas regarding the level or type of support that should be provided. Since the Monitor's previous report, the Monitor has held weekly conference calls with the Parties and has obtained periodic updates on candidate processing and communications – both to observe the City's implementation of the Monitor's recommendations and more generally to

gather information about the sufficiency of the City's efforts to maintain engagement and preparation among non-traditional candidates and help them navigate the hiring process following the long COVID-related hiatus.  The Monitor's evaluation of the City's efforts is ongoing, and the Monitor has requested additional categories of data showing cumulative outcomes for key groups and histories of candidate communications to aid in its continuing assessment – some of which the City has provided.  In response to past expressions of concern by the Monitor regarding the City's plans for communicating with candidates who are still waiting to be called for processing – both imminently and perhaps more than a year or two in the future – the City provided the Monitor in mid-April with a set of updated communication plans, which the Monitor has begun to evaluate and discuss with the Parties.

Part II also reports on the Monitor's continuing efforts to ensure that analyses of data from the hiring process can be used to inform the City's attrition mitigation efforts for Exam 7001 candidates, and that the City's retrospective evaluation of the Exam 7001 and Exam 2000 recruitment campaigns includes key analyses needed to inform the FDNY's plans for the next campaign.  Before the pandemic, the Monitor had offered a number of specific recommendations regarding the City's analyses of candidate attrition and the effectiveness of programs intended to mitigate attrition among candidates.  On the February 25, 2021 conference call, the City advised the Monitor that it would provide updated responses to the Monitor's recommendations and set up a demonstration of the most recently updated version of its system for tracking candidate attrition, reflecting additional changes beyond what has been demonstrated in the past.

Regarding the retrospective analyses of the Exam 7001 recruitment campaign, as previously reported, the City suggested at the October 13, 2020 status conference that the Monitor could help with data analysis in this area in light of competing public health

commitments for the City's data personnel.  Although the City circulated reports on this topic before the pandemic that incorporated data from numerous components of the campaign, the reports did not focus in depth on identifying which recruitment activities were most effective in attracting successful non-traditional candidates or in diversifying the group of candidates who achieved reachable scores on the open competitive examination.  They also failed to identify with any precision which recruitment activities proved most cost effective.  Accordingly, additional work remains to be done to generate useful guidance in strategic planning and the allocation of resources for the next campaign.  The City has now produced the majority of the information requested by the Monitor in June 2020 for this project.

Part II also reports on the Monitor's continuing efforts to verify the City's compliance with the Disparate Treatment Settlement, the Modified Remedial Order, and applicable law in initial workplace assignments for Fire Academy graduates.

Part III of the report provides an account of activities relating to the FDNY's EEO function.  As discussed at the most recent status conference, the FDNY has lost four members of its EEO investigative staff during the past year.  In the Monitor's view, for the City to preserve gains that had been made in the timely completion of EEO investigations before the pandemic, it will be important for EEO staffing to return to its pre-pandemic level.  The City reported at the conference that it is now interviewing to fill one of the currently unstaffed positions, which is a positive step towards rebuilding the full complement of investigators.  But it has not yet reported any progress regarding the other three vacancies.

Since the Monitor's last report, the City has completed the first phase of its work plan for analyzing responses to the FDNY workplace climate survey – a plan which the City streamlined and revised after work had been suspended for several months following the onset of the

pandemic.  In an update provided at the May 5, 2021 status conference, the City indicated that it now expects the analysis of the climate survey to be completed in September 2021.

In the area of EEO messaging, since the Monitor's last report the FDNY has issued posters containing updated information on the EEO Counselor program and EEO Office resources, but development of a longer-term strategic plan of EEO messaging remains on hold pending the completion of the climate survey analysis.  The City previously decided to refrain from developing a long-term plan until the results of that analysis become available and can provide additional background for the creation of the plan.

Because of delays in the City's production of relevant data, the Monitor has not yet been able to review a complete set of EEO evaluations from officer performance reviews in the 2019 cycle, which was the first year since the FDNY introduced an EEO metric to cover a full year of officer performance and to include evaluations for all company officers.  As previously reported, once the production is complete, the Monitor plans to compare the reviews with other EEO materials, to assess whether the performance review system aligns with other information about EEO performance and whether it reflects input from the EEO Office in all appropriate cases. Relatedly, the Monitor has continued discussions with the City regarding the guidelines the City uses to identify EEO investigations that may implicate a need to review management practices.

Part III also reports on the Monitor's ongoing evaluation of the FDNY's EEO investigative practices and discussions regarding the implementation of Monitor recommendations for their improvement.  On January 28, 2021, the Monitor sent the City a collection of comments, recommendations, and best practices based on its review of recent investigations – with a particular focus on the investigation of social-media-based violations; and on April 16, the Monitor conducted an extended call with the City to discuss those

6

recommendations as well as an earlier set of recommendations, first communicated in an October 18, 2019 meeting with the City.  The Monitor has also completed an updated draft of its report on EEO investigations, with a focus on the duration of investigations.  This draft was circulated to the Parties on May 26, 2021.

After encountering some delays relating to COVID safety procedures, the City has indicated that it expects to resume regular EEO inspections at firehouses soon.

Part IV reports on efforts to reduce disparate impact adverse to Black and Hispanic candidates in outcomes of the Medical Exam and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws.

The FDNY's Bureau of Health Services ("BHS") resumed candidate medical evaluations on February 8, 2021.  The City has been tracking and regularly updating the Monitor and other Parties about scheduling and the rates at which candidates have been reporting for testing, reserved, qualified, or disqualified – although it has not yet reported a full set of cumulative results in all categories (including final outcomes and reserved status) for all the candidates in the recent round of processing.  The City has also been providing specific information about Black candidates to Plaintiffs-Intervenors so that they can perform outreach and provide support for those candidates.

Part IV also reports on updates relating to COVID-19 that the City has made in its messaging and candidate resources.  Part IV also reports on efforts the City has made to mitigate attrition among non-traditional candidates at the Medical Exam.

Part V reports on the status of efforts by the Monitor and the Parties to devise and agree upon the proper approach for analyzing the impact of the FDNY's character review process (conducted by the Candidate Investigation Division ("CID") and the Personnel Review Board

("PRB")) on candidates from different demographic groups.  The Monitor will hold a call to discuss some outstanding disagreements in this area as soon as City data personnel in relevant areas are able to turn their attention to the issues.

Part VI discusses the Exam 7001 computer-based test ("CBT") developed, administered, and analyzed by the City's testing experts, PSI Services LLC ("PSI"), in consultation with experts for the Parties and the Monitor.

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.    Recruitment and Attrition Mitigation

The City has just finished processing candidates for the first entry-level firefighter class since the onset of the COVID-19 pandemic – which started at the Academy on May 10, 2021. As reported by the City, as of May 20, 2021, the FDNY force of 8,113 firefighters includes  806 Black firefighters (9.9%) and 1,268 Hispanic firefighters (15.6%).

### A.    Candidate Processing

#### 1.    Proposed Extension of the Exam 7001 List

On February 16, 2021, the City wrote to the Monitor, copying the other Parties, outlining the City's proposed plans for further processing of candidates from the Exam 7001 eligible list and proposing to extend the life of the list for two years – from the current expiration date of February 2023 to February 2025.  In addition to proposing the list extension, the City described further plans to conduct two classes per year for the remaining term of the Exam 7001 list, and to bring class sizes back to their normal, pre-COVID levels to the extent circumstances permit.

Under Paragraph 16 of the Modified Remedial Order, the City's proposal to extend the term of the Exam 7001 list requires the approval of the Monitor.  In support of its February 16

request for Monitor approval, the City noted that the extension would allow it to process candidates from lower-ranked (higher-list-number) portions of the Exam 7001 list than will be reached if the list expires on the date originally contemplated, and that the groups of candidates with higher list numbers have higher percentages of non-traditional candidates.  It also noted that that the City must complete retrospective analyses of the Exam 7001 recruitment campaign and formulate recruitment plans based on those analyses (which, as discussed in Part II.C.1 below and in previous reports, have been long delayed) before embarking on the campaign for the next open competitive exam; and it expressed the concern that, without an extension, there will be a "hiring gap" between the end of the Exam 7001 list and the completion of the next campaign and the subsequent exam administration – during which the City would have not access to an open competitive hiring list.

In response to the City's proposal, the United States and Plaintiffs-Intervenors have asked the Monitor to withhold approval until the City provides a more detailed analysis of the potential impact of the list extension on the diversity of Academy classes and the FDNY.  The other Parties assert that the analysis provided by the City does not consider a number of factors that may affect whether and how the diversity of different portions of the eligible list is reflected in actual hiring – including attrition during processing, the size and timing of future Academy classes, and the effect of COVID-related factors on candidate attrition over a longer proposed timeline.

The Monitor had previously advised the City that any proposal for the remainder of Exam 7001 processing or any extension of the list should be accompanied with analyses of the extension's potential impact on diversity.  The Monitor is considering the City's request and performing its own analyses, and expects to respond to the City's proposal soon.

2.      Candidate Processing to Date

On May 5, 2021, the City provided figures showing the projected composition of the first

post-COVID Fire Academy class, which began on May 10, 2021.  The class includes 130

candidates from the Exam 7001 open competitive list (along with approximately 23 promotional

candidates), broken down as follows:

- 15 Black candidates (11.5%)
- 31 Hispanic candidates (23.8%)
- 78 white candidates (60%)
- 3 Asian candidates (2.3%)
- 2 Native American candidates (1.5%)
- 1 unknown candidate (0.8%)

Plaintiffs-Intervenors noted at the May 5, 2021 status conference that these figures

indicate that Black candidates who were invited to resume processing in January were appointed

to the May Academy class at a lower rate than white candidates.[1]  Although the City has not yet

---

[1]In a December 14, 2020, message, the City reported on the number of candidates in each demographic group that it anticipated inviting for the resumption of processing.  But in an April 10, 2021 update, the City advised that those numbers included some candidates in the military who had decided to remain the military rather than rejoining the FDNY screening process.

As reported in the City's December 14, 2020  message, the racial breakdown of the military candidates at that time was as follows:

      Asian – 2
      Black  – 10
      Hispanic – 7
      White – 13

And the following was the breakdown for the remaining candidates in the pool for the resumption of processing at that time:

      Asian – 8
      Black – 40
      Hispanic – 59
      Native American – 4
      Unknown – 1
      White – 159

provided a full set of statistics showing all outcomes (and pending or reserved status) for all candidates who entered processing, the preliminary figures are concerning, and may indicate that changes in hiring procedures or additional or modified attrition mitigation measures are warranted to maintain engagement with candidates who have yet to enter processing.  Further study is needed, in part because of the difficulty of identifying significant trends in data while candidates remain in the pipeline and may still have chances to reschedule or retake steps.

In order to obtain the best possible understanding of outcomes and attrition to date, the Monitor has requested, and the City has agreed to provide, a set of cumulative figures in key categories, including the number of candidates in each group invited to each phase of screening, and numbers for those who have appeared (or failed to appear), have qualified, have been disqualified, are pending, are in reserved status (for the Medical Exam), or have declined or withdrawn.  At the May 5, 2021 status conference, the City estimated that it would take approximately two months for it to produce a full report on candidate outcomes and attrition updated through the appointment of the May 10 Academy class.  The Monitor encourages the City to expedite completion of the report to the maximum extent possible.  The Monitor has also asked to receive raw figures from the various phases of candidate processing as soon as these can be provided.  The City has previously represented that its Consolidated Candidate Tracking System and the ORR dashboard  permit real-time tracking and reporting of candidate outcomes. Accordingly, although full statistical analyses may not be available immediately, the Monitor hopes that the City will be able to produce raw data on candidate outcomes soon.  As processing

---

Using these figures as a starting point, the rates at which candidates from each group were appointed to the May class fall within the following ranges:  Black 30% - 37.5%; white 45.3% - 49.1%; Hispanic 46.9% - 52.5%.

continues, it is important for the Monitor and the Parties to perform at least an initial assessment of recent candidate attrition and to devise and implement any needed changes in the City's attrition mitigation measures and candidate outreach as soon as possible.

In a related area, Plaintiffs-Intervenors have raised concerns, based on changes in list position resulting from failures to verify bonus points,[2] that Black candidates' claims for bonus points may not have been verified and approved at the same rates or as quickly as claims by white candidates (potentially indicating, among other possible explanations, that documentation requirements were proving more burdensome for Black candidates[3]).  While the City has provided some preliminary data already on this topic, for the Monitor and the Parties to perform a fully informative analysis, it will be necessary for the City to provide data showing the status of bonus-point claims for all candidates in each demographic group who have asserted claims and entered processing.  The Monitor has requested a broader set of figures to conduct a more comprehensive and detailed assessment.

3.    CPAT Testing Dispute

As discussed in the Monitor's previous periodic reports, the Monitor summarized the Parties' positions regarding the City's process of inviting Exam 7001 candidates to take the CPAT in the Monitor's November 20, 2019 Status Report Regarding CPAT Testing (Dkt. # 1940) (the "CPAT Testing Report"), which found that the City had called candidates for the

---

[2] Bonus points for factors including New York residency and veteran status may be added to candidate examination scores and improve their positions on the hiring list.  Claims for bonus points are verified by CID following candidate intake, based on relevant documents, in specified categories, provided by the candidate or obtained from official sources by CID.

[3] Plaintiffs-Intervenors have noted that such an additional burden might be a factor if, for example, Black candidates tend to rely on forms of documentation that take longer to obtain.

CPAT more quickly for Exam 7001 than for Exam 2000.  *See* Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 8; Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 10; *see also* CPAT Testing Report at 15-16.  The CPAT Testing Report recommended certain communications and initiatives that the City could employ to address the implications of the accelerated testing.

Subsequently, the Plaintiffs-Intervenors and the United States moved for a finding that the City violated the Modified Remedial Order in connection with its processing of candidates for CPAT testing.  The Monitor filed a recommendation with the Court on January 19, 2021, and the Parties submitted their respective responses and objections to the Monitor's recommendation on February 8, 2021.  The Parties declined the opportunity to offer oral argument at the May 5, 2021 status conference, and the matter is awaiting the Court's decision.

### B.  Attrition Mitigation

As discussed in detail in the Monitor's Thirty-Second Periodic Report, in approving the City's resumption of processing, the Monitor imposed a number of requirements and offered several recommendations intended to ensure that candidates (especially non-traditional candidates) resuming processing after the months-long COVID-related suspension would have the information, support, and preparation needed for them to remain engaged and successfully navigate the hiring process.  *See* Monitor's Thirty-Second Periodic Report at 11-19.  In response, as previously recounted, although it declined to implement some of the Monitor's recommendations, the City agreed to take a number of steps (some recommended, some at the City's own initiative) intended to maintain or intensify candidate outreach following the resumption of processing, and since the last periodic report the Monitor has conducted weekly conference calls with the Parties to remain current on the City's efforts and on candidate outcomes and attrition.

13

Updates in key areas are set forth below.

1.   Recent Communications and Outreach to Candidates

a)   *Recruitment Coordinators and Candidate Communications*

In connection with the resumption of processing, the Monitor emphasized that Recruitment Coordinators tasked with outreach to non-traditional candidates must maintain affirmative, significant, one-on-one contact with Black and Hispanic candidates tailored to the circumstances and needs of individual candidates – and that the City should maintain a staff of Coordinators sufficient to ensure such contact. Before the pandemic, the City assigned teams of Coordinators to specific groups (including, for example, a team of six assigned to Black candidates).[4] Since the resumption of processing in January, the City has instead used a team of three Coordinators to serve both Black and Hispanic candidates (with one Coordinator designated as the "primary" contact for each group, in response to Monitor recommendations); and the City stated it believed that level of staffing would be sufficient to provide adequate outreach and encouragement for the group of candidates in active processing for the May class. The City has reported that Coordinators reach out at least weekly to each of the non-traditional candidates currently in active processing on some topic (for example scheduling, notification of a next step, or to provide encouragement); and it reports that Coordinators have also

_____

[4] Before the onset of the pandemic, the staff of Recruitment Coordinators at ORR (the FDNY's Office of Recruitment and Retention) included six full time Coordinators who were dedicated to outreach to Black candidates, with additional Coordinators devoted to similar outreach to Hispanic and other non-traditional candidates. Monitor's Thirtieth Periodic Report at 17; Monitor's Twenty-Ninth Periodic Report at 20. At the start of the COVID-19 crisis, the Coordinators (all of them firefighters) were removed from their roles in ORR and assigned to front-line emergency response duties. On January 7, 2021, the City confirmed that three Coordinators had resumed work. And subsequently it reported that two detailed firefighters who had returned to ORR in November 2020 were also assisting in conducting outreach to Black and Hispanic candidates and encouraging them to participate in WebEx fitness sessions. The same firefighters also conducted outreach encouraging Black and Hispanic candidates to consider restoring themselves to the hiring list.

communicated with candidates regarding specific events and resources (such as WebEx conferences and Fitness Awareness Program sessions).  Coordinators have also been tasked to remind candidates about appointments, text candidates who fail to appear for intake, and to follow up with candidates who have received notices of proposed disqualification.[5]  The role of the Coordinator is particularly important for Black candidates because (based on survey data) they are less likely than white candidates to have friends and family connected to the Department.  Coordinators help to level this disparity, creating connections with Black candidates and supporting them through a complex and multi-year process.

The City also agreed to have CID staff follow up individually with candidates in active processing who failed to appear for intake.  Monitor's Thirty-Second Periodic Report at 17. Given the City's rejection of the Monitor's repeated recommendations for a system that would permit candidates to reschedule appointments online, the Monitor regards these efforts to keep candidates in contact with CID (which has sole responsibility for intake scheduling), as particularly important.

As part of the effort to track and assess the City's communications with candidates, the Monitor asked the City to provide a sample set of the detailed histories of its communications with individual non-traditional candidates since active candidate processing has resumed, as maintained in the City's ARCS database.  The Monitor understands that ARCS maintains the full history of ORR communications with a given candidate (including both broadcast phone and text

---

[5] In response to a City request to send Notices of Proposed Disqualification and Notices of Disqualification by email attachment rather than by regular mail, the Monitor and the other Parties suggested that the City supplement the email notices with calls or text messages to ensure that candidates' email addresses were current and that they would check their email and actually receive the notices. Following a series of discussions, the City agreed to have Coordinators follow up by text with candidates receiving the notices.

communications and the more individualized Coordinator communications, which the Coordinators enter manually).[6]   The City provided a sample set of histories in response to the Monitor's request on April 13, 2021; but while the samples included some categories of candidate communications, they did not include communications with Coordinators, which the City later explained would require further searches in ARCS.  On May 26, 2021, the City produced an additional compilation of information for the sample of candidates – which the Monitor is reviewing.

b)       *WebEx Conferences and Fitness Training*

In connection with the resumption of candidate processing, the Monitor highlighted the need for the City to emphasize fitness training and preparation in its messaging for candidates returning to active processing following the long COVID-related delay – and to provide sufficient fitness resources and guidance.  Monitor's Thirty-Second Periodic Report at 11-19. The City reports that it has continued to hold WebEx conferences with entry-level firefighter candidates, engaging with candidates and providing fitness training guidance while candidate processing continues.  In addition to fitness-related video conferences, ORR also hosted a live chat with the chief of Probationary Firefighter School to provide candidates with further information on what to expect in the Academy and how to prepare for it.  The City has also resumed a version of its Fitness Awareness Program ("FAP") to provide in-person training to candidates with appropriate social distancing – conducting eleven sessions at the Academy facility on Randall's Island between February 6 and April 3, 2021.  The FAP sessions were

---

[6] The City has also advised that the team of Coordinators maintains an internal spreadsheet to memorialize the content of its communications with candidates and help maintain continuity where different Coordinators reach out to a given candidate at different times.  However, that internal document has not been provided to the Monitor.

initially limited to 30 candidates (although two of the later sessions exceeded that limit), and all participants were required to register for the program in advance. ORR endeavored to maximize participation among non-traditional candidates by incorporating messaging about the sessions in outreach by Coordinators.

On April 12, 2021, at the Monitor's request, the City provided a cumulative update showing attendance at all WebEx and FAP events between October 14, 2020 and April 3, 2021. Based on the City's figures, attendance at both WebEx and FAP sessions varied widely: from a low of 16 to a high of 67 for WebEx (averaging 39.7) and from a low of 7 to a high of 34 for FAP sessions (averaging 18). Black attendance averaged 6.9 candidates for WebEx and 3.8 for FAP; Hispanic attendance averaged 9.3 candidates for WebEx and 6 for FAP. Overall, the Black and Hispanic percentages of total attendance slightly exceeded Black and Hispanic shares of the pool of potential candidates for the resumption of active processing (as disclosed by the City on December 14, 2020).[7]

The Monitor plans to examine the results from fitness-related components of candidate screening to assess whether this group of candidates has been able to maintain sufficient fitness preparation despite the challenges presented by COVID and the lack of access to in-person fitness resources and training over the past year. As COVID-related restrictions are relaxed, the

---

[7] On April 22, 2021, the City provided figures showing the number of candidates in each demographic group who had been invited to WebEx and FAP sessions: for FAP sessions, invitations had been extended to 60 Black candidates, 80 Hispanic candidates, and 178 white candidates; for WebEx sessions, invitations went to 46 Black candidates, 94 Hispanic candidates, and 321 white candidates. Combining the City's numbers for participation with its figures for invitations, it appears that a small percentage of candidates in each demographic group attended any one FAP or WebEx event. However, because the City offered multiple sessions (eleven FAP sessions and eleven WebEx conferences), and because the figures provided to date do not distinguish between new and repeat participants, the rates at which candidates from each group attended *at least one* event in each category are likely to be at least somewhat higher.

Monitor also continues to urge the City to provide regular access to in-person, hands-on training (including stairmill training) to candidates awaiting further processing.  And the Monitor will also continue to obtain and review figures for FAP attendance as the program returns to a normal footing in a post-COVID environment.

c)  *Other Programs and Initiatives*

In addition to the particular forms of candidate outreach that the Monitor emphasized in approving the resumption of processing, the City has also continued to provide updates in other areas – including two areas that have been the subject of long-running discussions among the Monitor and the Parties:  (1) the City's efforts to set up a software application for the FDNY mentorship program that would allow mentors to report contacts with mentees electronically, and (2) its progress in establishing a texting system that will permit ORR to receive and respond to text replies from candidates to the broadcast text messages sent by ORR.  The City reports that it now anticipates that work on the mentorship application will be complete in September 2021 – citing the need to allocate information technology to other projects including COVID-related tasks.  Regarding the ORR texting system, on March 8, 2021, the City provided the Monitor and the Parties with materials describing its plans for a new system that would enable ORR to enhance its capability to reply to candidate responses.  The City has indicated that once the plan receives internal approval, it will be implemented within approximately eight to ten weeks.  The City has also advised that communications using the new system will be recorded along with other candidate communications in the ARCS database.

In another initiative, the City has reported to the Monitor and the Parties on plans to begin conducting the initial, group portion of the intake process virtually – beginning with candidates for the next Academy class.  Candidates would have an approximately a two-week period to make an appointment with their investigator following the new, virtual intake.

18

2.     Long-Term Communication Plans

The Monitor has previously raised concerns about the City's planning for communication with candidates who are still waiting to be called for processing from different levels of the hiring list – particularly concerning whether longer-term plans for communicating with these candidates are sufficiently detailed and tailored to differently situated groups of candidates. Such detailed, long-term planning is particularly important given the potentially unfavorable impact of COVID-related processing delays on candidate attrition. Relatedly, the Monitor has expressed concerns that the City's staff of Recruitment Coordinators – ORR personnel assigned to maintain communications with groups of non-traditional candidates – remains well below pre-pandemic levels; and based on City reports, although Coordinators have been able to maintain frequent contact with the small group of non-traditional candidates in active processing, they have not been in regular communication with the much larger group of non-traditional candidates who have passed the CPAT but are awaiting further processing. On May 14, 2021, responding to Monitor inquiries, the City circulated a table reflecting plans to adjust the number of Coordinators based on the number of candidates in active processing – indicating, for example, that with 100 to 200 candidates in the hiring process, the City would detail three Black and three Hispanic Coordinators to ORR, and that with 200 to 300, it would add one Coordinator for each group. The Monitor has requested additional information regarding these plans, including how the City defines the target group of candidates, what provisions are made for Coordinator contact with candidates who have passed the CPAT but have not moved on to further stages of processing, and whether the plans reflect a decision to renew the practice of having dedicated teams of Coordinators for different demographic groups.

The Monitor has previously made clear that the City must develop and implement a long-term ORR communication plan tailored to candidates who have reached different stages of

processing and who occupy different positions on the list, with different wait times for further processing and potential appointment to an Academy class.  Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 18-20; *see also* Monitor's Thirtieth Periodic Report at 12-14; CPAT Testing Report at 17.  Completion of such a satisfactory long-term plan is essential for the City to demonstrate its ability to mitigate candidate attrition as required by the Modified Remedial Order.  As discussed in previous reports, the City has provided several iterations of ORR's communication plan that were neither sufficiently detailed nor sufficiently extensive to meet this requirement.  *See, e.g.*, Monitor's Thirtieth Periodic Report at 12.

In an attempt to provide the City with additional guidance in producing a satisfactory plan, on October 27, 2020, the Monitor provided a set of detailed recommendations, which included numerous sample communications for several different categories of candidates based on their positions on the eligible list and in the hiring process.  The sample communications included messages incorporating and re-purposing several of the existing FDNY videos and other online materials that the City had previously prepared.

On April 10 and 12, 2021 the City circulated two separate plans to the Monitor and the other Parties:  (1) a plan of motivational and fitness-oriented messaging incorporating some of the Monitor's recommendations and (2) an updated iteration of the more general plan of ORR communications that it had previously produced.  The motivational messaging plan includes adapted versions of several of the Monitor's recommended communications and groups them into sets of messages to be sent to candidates at specified times before their potential appointment to an Academy class or before specified stages of processing.  The general plan, like those the Monitor previously reviewed, provides sequences of messages for large groups of candidates defined by list number ranges; and although it includes some references to motivation

messaging, it consists primarily of invitations and reminders regarding processing events (such as intake and Medical Exams) and programs such as the FAP.  As described by the City, the general plan is focused on candidates for whom processing is either active or imminent, and the latest entries in the general plan are scheduled for October to December 2021.  The City has indicated that the plan of motivational messaging is intended to be repeatable for groups of candidates as they arrive at the specified stages of processing.

Although the addition of the motivational messaging plan appears to represent some improvement in concept over the messaging plans the City previously provided, based on the Monitor's initial review, it is not clear that the two plans provide a full schedule of properly tailored messaging for all candidates who have already passed the CPAT and are awaiting or undergoing further processing.  The Monitor has sought further clarification from the City regarding the contours of the candidate groups described in the new plans; additional detail regarding the listed communications; how the two plans are integrated; and how the City plans to address messaging for candidates who will still be awaiting potential appointment beyond the end of this year.  Some elements of the City's communication plan are likely to remain undetermined until the full schedule of future processing (including the potential extension of the list) has been finalized.  But even before that point, the City's communications can anticipate some of the differing needs of candidates regarding their preparation for the screening process (including, for example, candidates' efforts to maintain fitness and assemble required documents).  Once the full schedule of future processing and Academy classes has taken shape, the Monitor expects the City to build upon and finalize a complete and fully detailed plan of communications.

3.      Use of Data in Attrition Mitigation Initiatives

As previously reported, in mid-2019, the Monitor recommended a series of material improvements to the City's analyses of patterns of candidate attrition and of the effectiveness of its programs in retaining a diverse pool of candidates.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 16-17; Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 31. The recommendations included changes and additions to the City's retrospective analyses and reports regarding candidate processing, along with proposals relating to ORR's process of continually assessing and adjusting attrition mitigation initiatives.  Monitor's Twenty-Seventh Periodic Report at 16-17; Monitor's Twenty-Ninth Periodic Report at 31.  The City accepted most of the Monitor's recommendations in principle in February 2020, and on April 27, 2020, the Monitor followed up with further specific recommendations, building upon its earlier guidance, regarding particular categories of analyses.

The City has not yet responded to the Monitor's most recent set of detailed recommendations or demonstrated its implementation of the recommendations it previously accepted to the Monitor or the other Parties.  The City has not generated any comprehensive retrospective attrition reports since February 2020 – both because of the suspension of candidate processing after that point and because the City's data personnel have been assigned to other tasks since the onset of the pandemic.  And its efforts to add recommended categories of data to the system that ORR uses to assess candidate attrition were also on hold until recently – along with plans for the City to demonstrate the system to the Monitor once it is updated.  In May 25, 2021 comments on a draft of this report, the City advised that work on data system enhancements had resumed, and the Monitor looks forward to obtaining more information on the City's progress and plans for a demonstration.

On the February 25, 2021 conference call reviewing outstanding requirements for compliance with the Modified Remedial Order, the City indicated that it would provide an update on its positions regarding the Monitor's recommendations and the pending suggestions from the other Parties, endeavor to implement any of those it has accepted but not already integrated, and arrange for a demonstration of its attrition tracking system with updated additional categories of data by April 30, 2021. The City has not yet provided the full update the Monitor requested. But as soon as it does so, the Monitor intends to convene a discussion to resolve any outstanding issues and finalize an updated plan for the City's analysis and monitoring of candidate outcomes and attrition.

### C.   Analyses of the Exam 7001 Recruitment Campaign

#### 1.   Overview of Analysis and Planning

The City's establishment of a sustainable process for successfully recruiting and retaining Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and the Monitorship. *See* Modified Remedial Order ¶¶ 31-36. The Court specifically found that a policy or practice that "fails to adequately recruit black persons to become firefighter candidates serves to maintain and perpetuate the effects of the City's discrimination against black firefighter candidates." Findings of Fact (Dkt. # 741) at 33. The Court has also emphasized the need for the City to identify which measures are most cost-effective for diverse recruitment. For the City to accomplish these goals, it must analyze the outcomes of its recruitment efforts to identify which initiatives are the most productive and cost-effective means of attracting non-traditional candidates likely to achieve reachable scores on the firefighter examination and ultimately be appointed as firefighters. As described in the Monitor's previous reports, the retrospective reports on the Exam 7001 campaign produced by the City to date, while they contained some useful analyses, have not yet identified the recruitment activities that most effectively increased

Black and Hispanic representation in the pool of reachable candidates.  The Monitor and all

Parties have emphasized the importance of completing these analyses in time to use the results to

inform the City's strategies for the next recruitment campaign.  The City has assured the Court,

the Monitor, and the other Parties that the next recruitment cycle will not begin until these

analyses have been completed and incorporated into a completed plan of action.  The City noted

"the need to ensure sufficient analysis and planning prior to the commencement of the

recruitment campaign for the next exam" as one of the grounds for its request for the Monitor's

approval to extend the list.  The schedule the City proposed in the extension request would give

the City approximately two years to complete the analysis and plan the next campaign, which

would begin in April 2023.

### 2.   City's After Action Report and Cost-Effective Report

As described in the Monitor's previous reports, the City provided the Monitor and the

other Parties with an initial retrospective report of the effectiveness of the Exam 7001

recruitment campaign (the "After Action Report") in November 2018 and an updated version on

October 2, 2019, following comments from the Monitor and the other Parties.  The City

produced its "Cost Effectiveness Analysis" on October 23, 2019.  As described in previous

periodic reports, the City's reports contain a number of useful analyses:  for example, the City's

revised After Action Report contains improved analyses that seek to correlate recruitment

contacts, applications, test-takers, and reachable scores with factors such as geography, race, and

the type and location of initial recruiting contact.  However, the reports still do not include some

analyses that are critical to the core purpose of the report – such as, for example, analyses of the

relative effectiveness of different recruitment initiatives in recruiting reachable non-traditional

candidates.  *See* Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 22-24.  Also as

previously reported, after further work on the reports had been interrupted by the pandemic,

Monitor's Twenty-Ninth Periodic Report at 40-41, the City agreed that it could be helpful to have the Monitor and Monitor's experts perform some of the analysis, and it agreed to produce data that the Monitor had previously requested to support that work.  Monitor's Thirty-Second Periodic Report at 24.

The City made data productions on December 18, 2020 and February 15 and March 4-5, 2021.  A preliminary review of the combined productions indicates that the City has produced the majority of what was requested, and the Monitor has alerted the City to the missing information and has asked a number of follow-up questions.  The Monitor has also noted that the City has not yet produced the Exam 7001 Optional Survey data, which the Monitor's experts intend to use in their analyses.  As the Monitor has indicated to the City before, while the Monitor also expects to conduct focus groups with active firefighters, it is understood that these may not be possible until COVID-19 risks are no longer an issue.

On February 5 and February 10, 2021, the Monitor circulated to the Parties two documents describing the first set of recruitment-related analyses the Monitor plans to perform with the data requested from the City, and outlining the Monitor's analytic approach and the general principles that will guide the analyses.  The documents provide examples to illustrate the kinds of analyses the Monitor intends to undertake in the first instance; but, as explained to the Parties, these examples are by no means exhaustive and will be refined based on observed results and suggestions from the Plaintiffs-Intervenors and the United States, who have expressed their desire to be kept abreast of the Monitor's analyses and to provide the input of their experts.  The United States provided some feedback on April 19, and a first call to discuss the materials the Monitor had previously circulated and provide the Parties with an opportunity to provide feedback and ask questions took place on May 18, 2021.  The Monitor will circulate a plan

supplying more information about the upcoming stages of the Monitor's work and additional opportunities for Party input.

### D.     Assignment Issues

The Monitor has continued to address issues relating to compliance with Paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs."  Following attempts to confirm details of past assignments after Plaintiff-Intervenors raised this issue in September 2017, the Monitor directed the City to establish systems that would reliably memorialize the specific reasons for denying home-division requests from New York City residents; and the City prepared and employed revised guidelines for probationary firefighter appointments, intended to ensure that requests for home-division assignments would be given proper priority and that the specific reasons for denials would be recorded.  *See* Monitor's Twenty-Ninth Periodic Report at 42-43.  As previously recounted in detail, the Monitor proposed revisions in the City's guidelines, and the City and the Monitor exchanged a series of communications and drafts regarding the proposed revisions.  Monitor's Twenty-Ninth Periodic Report at 42-43; Monitor's Thirty-First Periodic Report at 20-21.  The Monitor provided its most recent draft on December 16, 2020.  Monitor's Thirty-Second Periodic Report at 25.  And since the last periodic report, the City has accepted the Monitor's most recent revisions.[8]

---

[8] The Monitor's understanding is that for assignments from each of the first two Exam 7001 Academy classes, the City employed the version of the new guidelines that it had most recently proposed as of the graduation date for the class.

In the same 2017 correspondence, Plaintiffs-Intervenors raised allegations of disparate impact in firefighter assignments to particular types of fire company – including assignments to engine and ladder companies and to busier fire companies.  *See* Monitor's Thirtieth Periodic Report at 29; Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 18-19.  As described in the Monitor's Twenty-Eighth Periodic Report at 25-26, following correspondence with the Monitor and investigative action by the FDNY EEO Office, certain aspects of the dispute remained unresolved.  Since the last periodic report, the City and Plaintiffs-Intervenors have advised the Monitor that a resolution had been agreed upon – with the City committing to provide Plaintiffs-Intervenors with disparate impact analyses regarding the initial assignments of probationary firefighters to the types of company at issue.

To verify the City's implementation of the updated assignment guidelines, confirm its compliance with the Disparate Treatment Settlement, and assess its analyses of disparate impact in assignments, in June 2020 the Monitor requested that the City provide (1) records and analyses relating to home-division requests and assignments for the most recent Academy class, and (2) analyses of data from the same class to identify any disparate impact in assignments to different categories of fire company.  The City provided the Monitor with a set of figures on October 22, 2020 showing no statistically significant disparate impact adverse to Black or Hispanic candidates in assignments to different fire-company categories for the first two Exam 7001 Academy classes, and it produced the same figures to the other Parties on December 10, 2020.  The City responded to the Monitor's other request – relating to the home-division requirement – on February 25, 2021, producing information on the preferences and division assignments for Black and Hispanic firefighters in the most recent Academy class.  While the data provided by the City appears to show that the vast majority of the listed assignments are

compliant with the home-division requirement, the Monitor has posed follow-up questions and requested additional information (in a March 10 message) regarding some assignments and has asked for clarification and confirmation of some of the information in the City's production. The Monitor has also asked the City to produce the same categories of information relating to division assignments from the first Exam 7001 Academy class.

     **E.    Working Group**

The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters." Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e). The City's initiatives under the Working Group Committee – consisting primarily of the FDNY Fire Cadet program and the FDNY Explorers program – have remained suspended due to the COVID-19 emergency. The City previously reported that the timeline for further work on the Cadet program was contingent on the scheduling of the next promotional firefighter exam, which remains to be determined, and that the Explorer program had been suspended because of COVID-19 constraints. *See* Monitor's Thirty-First Periodic Report at 22-23. On May 25, 2021, the City reported that the Explorer Program has resumed utilizing virtual meetings and plans to pilot in-person meetings at two Posts by June 2021. The Monitor will continue to provide oversight over these initiatives once the circumstances permit their safe resumption.

The City advised the Monitor and the other Parties of plans to create the EMS Trainee program in a Working Group meeting in November 2016 and indicated that the program would potentially create a pathway into the FDNY, and into the firefighter title, for Explorers, graduates of the FDNY High School, and diverse candidates generally. Monitor's Eighteenth Periodic Report (Dkt. # 1734) at 18. However, in response to recent requests for demographic data on the EMS Trainee program, the City stated that it did not intend to rely on the EMS Trainee program

as a Working Group initiative or as a component of its recruitment initiatives for the firefighter title under the Modified Remedial Order, and it declined on that basis to provide the requested data – asserting that the program is therefore not subject to evaluation as a component of the City's compliance with the Settlement or the Modified Remedial Order.  To the extent the City does not intend to cite the EMS Trainee Program as an initiative relevant to such compliance, the Monitor accepted the City's position for the purposes of the recent requests for information. However, especially given that promotions from EMS necessarily affect the demographics of Fire Academy classes and the firefighter force, data from the program may nevertheless provide relevant background for the Department's recruitment efforts; and the City has agreed that the Monitor may require data from the EMS Trainee Program where such data may provide useful context in planning future recruitment efforts or assessing the comparative effectiveness of different initiatives that may be considered for entry-level firefighter recruitment.

## III.   EEO

### A.   EEO Staffing

As most recently reported by the City, the FDNY EEO Office currently includes 12 attorneys (including the Assistant Commissioner, one Deputy Director, Investigative Attorneys and contract attorneys) and six non-attorney staff, and its current team of 12 attorneys includes four fewer attorneys than the 16 it included when fully staffed.[9]  As previously noted, three investigator attorneys left the office in 2020.  *See* Monitor's Thirty-Second Periodic Report at 28.

---

[9] Because the investigative work of the EEO Office is conducted entirely by its attorneys, the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively.  As previously reported, the other (non-investigative) work of the EEO Office staff is supplemented by the activities of EEO Counselors – firefighters and officers who act as liaisons between the firefighter force and the EEO Office, as part of a program initiated in 2018.  *See* Monitor's Twenty-Ninth Periodic Report at 47.

And since the last periodic report, the City has advised the Monitor that one of the two Deputy

Directors in the EEO Office left the post.  The EEO Office has requested permission to fill the

vacant positions, and at the May 5, 2021 status conference, the Assistant Commissioner for EEO

reported that applications were being accepted for one of them.

The Monitor recognizes that financial constraints may limit the City's ability to take

immediate action to fill all the vacant positions; however, given the important role that staffing

increases have played in improving the functioning of the EEO Office, the Monitor has

continued to encourage the City to bring the staff of EEO Office attorneys back up to full

strength as soon as possible.  *See* Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's

Twenty-Fourth Periodic Report at 36 (noting the expectation that increased staffing would

reduce the duration of EEO investigations); Monitor's Twenty-Eight Periodic Report at 45

(noting some improvement in the duration of cases following the 2018 staffing increase).  The

Court also expressed concerns regarding the reduction in EEO staffing at the May 5 status

conference.

As previously reported, since the reduction in investigative staff, the average investigator

caseload in the EEO Office has fluctuated.  In July 2020, the City reported a caseload of 10-15

cases per investigator, higher than the range of 5-10 cases that the City reported in September

2019, when the EEO Office was at full strength.  Monitor's Thirtieth Periodic Report at 34.  As

most recently reported by the City, the average investigator caseload is 5-8 cases.  (Figures

provided by the City indicate that the total number of EEO matters, and cases requiring two or

more interviews, declined slightly in 2020 following year-over-year increases in the two

previous years, which may have helped to offset the effect of staff reductions on caseloads.)

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor

has postponed filing a report on EEO investigative procedures and the duration of EEO

investigations to observe and account for the effect of increased staffing and revised practices –

requesting and receiving a series of updated data sets from the City, and providing a series of

drafts of the report (including recommendations) to the City and the other Parties.[10]  On January

25, 2021, the City provided the Monitor with its most recent set of updated and supplemented

responses to a series of requests for information relevant to the report, and on May 26, 2021, the

Monitor circulated an updated draft of the report to the Parties for comment.

### B.      Policies, Messaging, and Training

On March 23, 2021, FDNY issued a Department Order containing a statement from the

Commissioner and the Chief of Department in response to recent incidents of anti-Asian bias and

violence.  The statement emphasized that "hatred, bigotry, and prejudice cannot be tolerated

against anyone," and that FDNY values "support the condemnation and denouncement of racism,

xenophobia, and other types of prejudice against Asian Americans and Pacific Islanders"; and it

---

[10] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its
staffing, its investigative procedures, and its performance in the completion of EEO investigations – with
a particular focus on the duration of investigations as measured against the presumptive 90-day time limit
for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant
part, the Court's Order stated as follows:

> The court monitor is respectfully DIRECTED to provide the court with a report on the New York
> City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should
> address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the
> staffing of the office has changed over time; and (3) the speed with which the office investigates
> and resolves complaints.

In addition to the topics specified in the Court's November 17, 2017 Order, the report includes a
discussion of data produced by the City, in response to the Court's direction at the March 13, 2018 status
conference, showing the rates at which complainants and respondents in EEO investigations have been
reassigned to desk duty, and the durations of those assignments.

31

urged FDNY employees to "continue to treat our members and serve our city with the compassion, empathy, and respect that uplifts all races, ethnicities, nationalities, and creeds." The statement closed with a request to "do our part to be the role models of inclusion that are so desperately needed and stand with solidarity against anything less."  The Monitor has expressed to the FDNY that this messaging (which follows other similar Department statements on diversity and EEO compliance, issued since mid-2020), represents a strong example of the "tone at the top" that the Monitor has encouraged the FDNY to communicate.  The Monitor encourages the City to continue to disseminate messages of this type, not only in response to external events but also in response to internal developments as needed, and more generally as an endorsement of the value of diversity within the FDNY workforce.[11]

Since the last periodic report, the City has also released posters and engaged in some additional messaging described below.  As previously noted, the Monitor has (both before and after the pandemic) urged the City to develop long-term messaging plans even before obtaining the results of the climate survey analysis, which the City has stated it intends to use in formulating its messaging strategies.  *See*, *e.g.*, Monitor's Thirty-First Periodic Report at 24, 29-30.  Consistent with earlier guidance from the Court, the Monitor has also encouraged the City to gather information confirming that EEO messages are delivered effectively and whether they are well received.  Monitor's Twenty-Sixth Periodic Report at 30.

---

[11] In its May 25, 2021 comments on a draft of this report, the City advised that the FDNY's Chief Diversity and Inclusion Officer ("CDIO") has also disseminated a virtual book and tool kit, via the Department's online DiamondPlate platform, addressing anti-Asian and Pacific Islander Bias and Discrimination, which includes the Fire Commissioner's statement.  As reported by the City, the CDIO has also focused recent discussions in the "Courageous Conversations" series on topics related to Asian Americans and Pacific Islanders.

In plans outlined in August and December 2019, the City advised the Monitor that it intended to issue materials focused on the role of the EEO Office as the next planned installment in a schedule of quarterly EEO messaging, which was to include posters, online messaging, and in-person messaging.[12]  Monitor's Twenty-Ninth Periodic Report at 49.  Since the Monitor's last periodic report, the FDNY EEO Office has issued two new posters about EEO resources.  One poster reminds members of guidance and assistance available from the EEO Office.  Another publicizes the EEO Counselor program and lists the current roster of 47 EEO Counselors, which includes 23 white counselors, 16 Black counselors, six Hispanic counselors, and two Asian counselors.  Twenty-nine of the 47 Counselors work in fire operations, including nine Black Counselors, three Hispanic, and one Asian.  Among the Counselors in fire operations, seven are firefighters, and 22 are officers of ranks ranging from Lieutenant to Deputy Chief.  The Monitor encourages the City to follow through on additional elements of the messaging initiative, which should include not only the materials that the City has said it is developing for its DiamondPlate online system, but also, to the extent possible, in-person communications by the EEO Office and/or operational commanders.  As the Monitor has previously noted, the delivery of EEO messaging by operational commanders is an important component of a comprehensive EEO messaging plan; and the Department's recent messaging campaign regarding its social media and EEO policies included in-person communications by Deputy Chiefs.  The City should continue to integrate such communications in its EEO communication initiatives.

---

[12] As discussed in the Monitor's previous reports, the brief plan the City provided in August 2019, even as supplemented by a December 2019 letter, did not include specific subject matters for later rounds of communication and did not articulate a comprehensive messaging strategy or describe the content of planned messaging over the long term.  Monitor's Twenty-Ninth Periodic Report at 6, 49.

The Monitor also continues to encourage the City to publicize the investigative activities of the EEO Office and the numbers and outcomes of EEO investigations, and information on instances where discipline is recommended or imposed (with appropriate regard for confidentiality concerning individual identities and other details of pending investigations). Monitor's Thirtieth Periodic Report at 41.

The City has indicated that it plans to issue further communications regarding the role of Counselors in the near future and hopes to expand their role to include identifying workplace issues and situations that may be effectively addressed by alternative dispute resolution mechanisms – including counseling or more formal mediation facilitated by the OATH Center for Creative Conflict Resolution, which has been chosen as the conflict resolution resource for New York City government.  The EEO Office has worked with the Vulcan Society to develop hypothetical examples (which it has shared with the Monitor) of workplace conflicts and concerns in which alternative dispute resolution techniques can be used to head off potential EEO violations and foster a favorable EEO climate.  The City has advised the Monitor that it plans to work those examples and other alternative dispute resolutions materials into upcoming EEO messaging, and that some of the hypotheticals may also be integrated into future EEO training.  One of these scenarios presents an issue discussed in the Monitor's recent reports – focusing on workplace conflicts that may be prompted by the political and racial content in certain cable news programming.  *See* Monitor's Thirty-First Periodic Report at 28.  The Monitor looks forward to evaluating additional materials.

The Monitor has also continued to follow up on the FDNY's distribution of materials encouraging diversity and inclusion as part of FDNY training.  In particular, the Monitor has asked the City to confirm that operational commanders throughout the Department have shown a

training video (discussed in the Monitor's previous reports) combining guidance on operational

safety in circumstances of civil unrest with themes of diversity and inclusion and the

Department's commitment to serving diverse communities.  Monitor's Thirty-First Periodic

Report at 26; Monitor's Thirtieth Periodic Report at 41.  The video has been posted on the

FDNY's "DiamondPlate" online platform at least since November 2020; and the City previously

indicated that it would be shown to members as part of firehouse drills. The Monitor has sought

confirmation that the drills have taken place.  As noted in the Monitor's Thirty-Second Periodic

Report at 32, these drills (along with an "Authentic Trust" training video released by the CDIO

in September 2020) represent a revival of the FDNY's program of "voice announcement

messaging" which was initiated with a single video in September 2018 (Monitor's Twenty-Ninth

Periodic Report at 51), but which was then inactive for approximately two years.  The Monitor

continues to encourage the City to issue regular video and other messaging from senior

operational leadership on EEO-related topics.

In its May 25, 2021 comments on a draft of this report, the City provided further

information on other recent messaging activities run by the CDIO.  As reported by the City, the

CDIO's "Mobile Messaging Unit" has continued to distribute materials to FDNY workplaces

during the pandemic, including the CDIO Diversity and Inclusion Brochure, copies of CDIO

newsletters, and Racial Inclusion and Equity infographics.  The City also reported that the CDIO

has distributed "virtual books" on a variety of topics via the DiamondPlate platform.  The

Monitor intends to request and review those materials and evaluate the extent to which they

contribute to an effective overall program of EEO messaging.

C.    **Compliance and Accountability**

1.    <u>Officer Performance Evaluations</u>

The Monitor has continued efforts, in consultation with the Parties, to ensure that the

EEO metric added to officers performance reviews in 2018[13]  provides accurate assessments of

officers' EEO performance (including both unsatisfactory and superior performance), and in

particular that evaluations reflect input from the EEO Office in all appropriate cases, which the

Monitor has emphasized as essential to an effective evaluation process.  *See* Monitor's Twenty-

Sixth Periodic Report at 33; Monitor's Twenty-Seventh Periodic Report at 29; Monitor's

Twenty-Eighth Periodic Report at 35; Monitor's Thirty-Second Periodic Report at 34-37.

However, the Monitor's assessment of officer evaluations to date has been constrained by

the fact that the City has not yet completed its production of requested data from reviews

completed in 2019 – the first cycle in which all reviews for Lieutenants and Captains employed

the EEO metric and covered a full year of performance.  Monitor's Thirtieth Periodic Report at

45; Monitor's Twenty-Ninth Periodic Report at 53-54.  As previously reported, on October 23,

2020, the City provided the Monitor with data from all but 120 evaluations from the 2019 cycle,

which assessed officer performance during 2018, and it projected that the remaining data would

be provided within the next week.  Monitor's Thirty-First Periodic Report at 34.  But the balance

of the data remains outstanding.[14]  Most recently, at the May 5, 2021 status conference, the City

advised that it would produce the remaining data from the 2019 cycle within 30 days, and that

data from the 2020 cycle would be provided by September this year.  The City has also been

asked to produce materials reflecting EEO Office input for the evaluations, and it has produced

---

[13] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[14] The Monitor has also asked the City for explanations and/or corrections to address a number of apparent anomalies in the City's initial production of data from the 2019 cycle.

some such materials from the 2019 cycle, which the Monitor will include in its analysis.[15]

    As previously discussed, once the full set of data is produced, the Monitor plans to complete an analysis of the evaluation data, including cross-referencing with information from EEO complaints and inquiries – to determine whether the evaluations properly reflect information obtainable in EEO investigations, including potential failures of supervisory responsibility.  Monitor's Thirty-Second Periodic Report at 34-35.

    Since the last periodic report, the Monitor has also continued to follow up with the City regarding previous recommendations for the performance review process – including (1) that the EEO Office incorporate reviews of management practices relevant to EEO compliance in its investigations of alleged or potential EEO and hazing violations and (2) that the FDNY consider providing additional, detailed guidance on the distinction between satisfactory and superior reviews under the EEO metric.[16]  As recounted in detail in the Monitor's previous report, in its most recent response to the Monitor's recommendations and follow-up queries (October 22, 2020), the City explained the criteria it uses to determine whether investigations of management practices are warranted in connection with EEO investigations – indicating that it would undertake such investigations where the nature, severity, number, and/or circumstances of alleged violations indicate that supervisors should have been aware of the alleged conduct or that they did not take appropriate steps to ensure compliance.  Monitor's Thirty-Second Periodic

---

[15] The materials include no personal identifying information and were not shared with the other Parties.

[16] The recommendations were first discussed at an October 18, 2019 meeting between the Monitor and the City, and memorialized in a December 11, 2019 memorandum to the City.  *See* Monitor's Thirtieth Periodic Report at 46-48.  The Monitor's December 11, 2019 memorandum was shared with the United States and Plaintiffs-Intervenors on January 24, 2020, but the subsequent communications regarding the Monitor's recommendations have been conducted between the Monitor and the City without the other Parties.

Report at 36-37.  The City advised that relevant indicia may include (1) an officer's failure to report a violation; (2) an acute incident or series of acute incidents that are of sufficient severity to indicate the potential absence of effective supervision; (3) statements or obvious evidence of poor climate indicating a failure to address potential EEO or bullying/hazing issues (such as improper postings, defaced photos, or gear- or food-tampering); (4) statements or evidence indicating an officer discouraged the use of official Department processes, such as EEO; and (5) improper delegation of supervisory roles to non-supervisors that has led to EEO violations or instances of bullying/hazing.  *Id*. at 36-37.  Before the previous report (on January 21, 2021) the Monitor provided comments suggesting some limited adjustments broadening these criteria (eliminating the requirements that incidents be "acute" or that evidence of poor climate be "obvious" to trigger scrutiny).  In subsequent discussions on an April 16, 2021 call, the City confirmed that the criteria require investigation in all cases where evidence indicates that a manager should have known about a potential violation or related deficiencies in workplace EEO climate.

Also in response to the Monitor's recommendations, the City has indicated that it has provided more precise guidance to raters to help them distinguish between "satisfactory" and "superior" EEO ratings – specifying that officers should be acknowledged "for exceptional EEO-related performance, such as proactively exercising leadership in creating a climate that is inclusive and welcomes diversity; creating an atmosphere promoting EEO; and demonstrating a consistent history of responding sensibly and sensitively to EEO issues should they arise."

In related discussions, the Monitor has continued to work with the Parties in an effort to resolve remaining disagreements regarding the types of performance review data and analyses

that the City will share with the other Parties.[17]  As previously reported, the Monitor convened a

call on December 15, 2020 to address the dispute; and on December 30, 2020, responding to

requests by the United States discussed on the call, the City advised that it would "create a list of

officers involved in EEO matters, along with their race, gender and start date by obtaining this

information from the EEO database" and that "EEO will annually review these to spot any trends

or issues that exist."  The City also advised that the EEO Office "will also use this as part of its

already-existing process to confirm [that officers] are receiving ratings commensurate with their

performance."  Subsequently, both the Monitor and the United States have sought clarification

regarding the City's plans[18] – including whether the EEO Office's review of EEO ratings for

officers involved in EEO matters will include all officers involved in each matter (as

complainants, respondents, or witnesses) or whether it will be more limited (*e.g.*, to officers who

are found to have committed violations).  And the Monitor and the Parties have also continued to

discuss whether and how certain categories of data and analyses can be provided to the United

States and Plaintiffs-Intervenors without disclosing individual evaluations.

2.    *"Workplace Professionalism" Reporting*

The Monitor has continued to gather information relating to the City's workplace

professionalism reporting program, in which officers meet regularly with their superiors

(monthly at most levels of command) to discuss issues (including EEO issues) affecting

---

[17] Previous communications relating to the dispute are recounted in detail in the Monitor's most recent reports.  Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report at 36-37.

[18] The Monitor circulated a memorandum on January 12, 2021 memorializing the discussions on the December 15, 2020 call with the Parties, identifying open issues, and posing follow-up queries; the United States provided comments on the Monitor's memo on March 4, 2021, and the Monitor circulated a further update on May 4, 2021 summarizing the status of discussions and requesting that the City respond to several outstanding queries.

workplace professionalism.  *See* Monitor's Twenty-Seventh Periodic Report at 30-31; Monitor's

Twenty-First Periodic Report (Dkt. # 1803) at 26.  According to the City's most recent update

(received May 26, 2021), to date the system has not yet generated any reports from the required

meetings that would qualify for production pursuant to the Monitor's standing request to produce

all Workplace Professionalism records reflecting EEO or hazing concerns.  *See* Monitor's

Twenty-Ninth Periodic Report at 57-58.

As the Monitor has previously noted, the absence of such reports (apparently even from

officers in companies where EEO violations occurred) raises questions as to whether the system

is functioning as intended.  Monitor's Thirty-Second Periodic Report at 38-39.  The City has

previously suggested that officers who become aware of EEO issues may be reporting them to

the EEO Office only, and omitting to report them via the Workplace Professionalism system.

The Monitor previously suggested that the FDNY re-emphasize the scope of workplace

professionalism reporting requirements as part of its current effort to ensure officer oversight of

EEO compliance and climate – both in connection with routine operational supervision and

"walk-throughs" and in more formal EEO inspections that officers have conducted while the

EEO Office inspections have remained suspended because of COVID-19 concerns.  *Id.*  In

particular, officers should be reminded that the workplace professionalism reporting system is

intended to encompass interpersonal conflicts and workplace climate issues that may not rise to

the level of an EEO violation and that in many instances it may be appropriate for an officer to

consult with the EEO Office regarding an issue *and* to report the issue via the workplace

professionalism system.  The Monitor plans to have further discussions with the City in the near

term to discuss ways of ensuring that the reporting system plays an appropriate and effective role

in officer accountability and in transmitting information relevant to EEO compliance through the chain of command.

        3.     <u>Climate Survey</u>

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters.  The City created a ten-phase analytics plan and a schedule for analysis of the survey data to be conducted by the Mayor's Office of Data Analytics ("MODA"), in consultation with the Parties and with input from the United States' and the Monitor's experts.  The analysis was anticipated to be completed by June 2020.[19]  *Id.* at 49-50.

On February 21, 2020, the City circulated a data review summary report prepared by MODA.  The report identified the number of complete and partial responses to the survey and noted that all 49 FDNY numbered battalions and Special Operations Command ("SOC") units are represented in the survey data.  MODA also reported that there did not appear to be significant survey response anomalies.  Work on the climate survey was suspended, however, at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic.  Monitor's Thirtieth Periodic Report at 50.

On October 14, 2020, the City sent the Monitor and the other Parties a new proposal and timeline for survey analysis, indicating that analytic work had already commenced in order to take advantage of what the City anticipated would be a relative lull in COVID-19 demands before the winter months.  The new analysis plan breaks the City's work into three longer phases and includes fewer built-in opportunities for direct input from the Monitor and other Parties.  The

---

[19] The deadlines in this analytics plan could not be met because City resources had to be diverted to COVID-19 efforts starting in February 2020.

plan contemplates that MODA may have less frequent contact with the Monitor and the other Parties, but provides that MODA will maintain a record of its discretionary judgment calls at key junctures, which can be reviewed by the group if necessary, and that it will afford the other Parties and the Monitor opportunities for input. Although the City's proposal differs in timing and relative allocation of work, the Monitor and the Parties agreed to work with the City pursuant to the revised plan, and the Monitor expects that the City's analysis will incorporate the essential elements of the prior plan. The plan contemplates that meetings of the analytics group will be scheduled when needed, with at least one meeting per phase.

Since the last periodic report, the group has met twice, on February 10 and March 23. MODA has completed Phase 1 and has circulated plans for Phase 2. The Monitor and other Parties have provided feedback in emails and during calls, and MODA continues to provide responses and to share some of the results of its analyses. MODA has had several direct conversations with the United States' expert, and the Monitor and the Monitor's experts spoke separately with MODA on May 10, 2021.

As noted in the Monitor's Thirtieth Periodic Report, the Monitor anticipated that, once work resumed, MODA would need a further 18 to 20 weeks to complete all the analyses and reports contemplated by the plan. *Id*. at 50. The Monitor and the Parties had previously projected a June 2021 delivery date for the final results. However, at the May 5, 2021 status conference, the City advised the Court that it now expects the analysis to completed in September 2021.

Following the completion of the analytical phase, the City's next crucial task will be to develop a plan of action based on the results, including but not limited to a plan for communicating the results to FDNY members; a comprehensive, strategically coherent plan of

EEO messaging using the results of the analysis; and a plan for a second survey to assess progress in addressing any issues identified in the first. The Monitor also plans to discuss with the City any main findings or action items related to the survey and what follow-up communications to the FDNY workforce are anticipated.

### D.   Inspections and Investigations

1.   Inspections

In discussions with the Monitor and the other Parties in March, and with urging from the United States and Plaintiffs-Intervenors, the City advised that it was planning to resume regular EEO compliance inspections at firehouses by EEO Office staff in mid-April – following a long suspension since the onset of the pandemic. Plans for the resumption of inspections have encountered some delays as some remaining logistical and safety issues are addressed, but the City has assured the Monitor that it expects to resolve these difficulties and restart inspections soon.

As previously reported, in recent months, the Department attempted to address the need to evaluate and ensure workplace compliance by reminding company and battalion officers of existing regulations that require regular operational "walk-through" inspections to identify any indicia of EEO violations or potential violations in the workplace. The guidance was communicated first in an informal reminder via the chain of command and then in a February 4, 2021 Department Order. The City also made arrangements for Deputy Chiefs to incorporate EEO considerations in their annual inspections – adding a reference to EEO to the standard forms used in those inspections. While these initiatives came too late to address the need for an alternative approach to EEO inspections in 2020, and while the resumption of regular inspections will alleviate the immediate need that prompted them, the Monitor views them as positive developments for the longer term and encourages the City to continue to remind operational

43

commanders of their important role in identifying and reporting EEO violations and related

workplace conditions.

The Monitor expects to receive and assess updated reports on the outcomes of inspections

– both those conducted by the Deputy Chiefs and the regular inspections performed by EEO

Office personnel once they resume.

2.     Review and Recommendations Regarding Investigations

The Monitor has continued to review and comment on EEO investigations identified by

the City as requiring substantial investigative activity in fire suppression matters.[20]  Monitor's

Thirtieth Periodic Report at 51 & n.32.  In addition, since mid-2020, the Monitor has received

approximately weekly phone updates from the City regarding ongoing investigations and offered

comments and recommendations based in part on those updates – including a compilation of best

practices, focusing on the investigation of social media violations, which the Monitor provided to

the City on January 28, 2021.  Monitor's Thirty-Second Periodic Report at 42.  The compilation

was intended both to memorialize practices that the City had already developed and employed in

the recent investigations and to offer Monitor recommendations for further enhancements.  On

April 16, 2021, the Monitor convened a more extensive call with the City to discuss the recent

recommendations, along with follow-up requests and queries relating to the City's

implementation of earlier recommendations regarding EEO investigative practices – first

---

[20] In an initial, retrospective production of multiple cases, provided in 2017, and more recently in
response to a December 12, 2018 request and an April 8, 2020 reminder, the City has provided the
Monitor with full investigative files for some cases.  For others, the City's production has been limited to
intake documents and final memoranda.  Summaries of the City's productions of EEO case materials
appeared in the Monitor's Twentieth Periodic Report at 44 and in the Monitor's Twenty-Seventh Periodic
Report at 39-41.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as
the Modified Remedial Order does not provide for such relief.

communicated to the City in an October 18, 2019 meeting, and discussed in detail in earlier reports. *See, e.g.*, Monitor's Twenty-Ninth Periodic Report at 65.  Since the last periodic report, the Monitor has also resumed efforts (suspended at the onset of the pandemic) to interview selected complainants from closed cases to learn about their experiences with the EEO Office.

Since the FDNY's adoption of a new EEO Investigation Manual in late 2016, the substantive quality of its EEO investigations has generally improved; and in response to the Monitor's comments and recommendations, the City has taken several steps to improve investigative practices – including supplementary training for investigators in specific areas suggested by the Monitor.  Nevertheless, the Monitor has also continued to observe and discuss with the City some deficiencies in substantive investigative practices – including some instances where investigators have not identified and investigated all the potential violations associated with alleged conduct, followed up on potential violations brought to light in witness testimony, or provided clear and consistent credibility assessments.  As previously noted, for these reasons, and because the number of substantial investigations each year is small,[21] further scrutiny is needed to confirm whether favorable trends will continue and whether the City's implementation of the Monitor's recommendations will have the desired effects.

After the increase in EEO investigator staffing in mid-2018, the duration of the FDNY's EEO investigations also generally improved, with a higher percentage of cases completed within 90 days.  But case durations rose again during the 2020 pandemic year[22]; and even among cases

---

[21] As of May 5, 2021, the City had provided the Monitor with materials from eleven cases initiated in 2019 and from 17 initiated in 2020; and the cases vary in complexity – with different cases presenting the opportunity for the Monitor to evaluate different investigative practices and techniques.

[22] Some delays in mid-2020 were likely due at least in part to the pandemic, which impeded witness interviews until the FDNY developed adapted procedures and established a virtual interview capability.

initiated in late 2018 and 2019 (after the staffing increase but before the pandemic), approximately 25% of cases requiring substantial investigation lasted more than 90 days.[23] Further review is needed to confirm whether the improvement in case duration observed in 2019 will resume and whether the City will achieve the goal of completing investigations within 90 days in all but exceptional cases.

In related discussions, the United States and Plaintiffs-Intervenors have asked the City to provide them with additional information and materials relating to the Monitor's recommendations and the City's efforts to improve investigative practices. The pending requests were discussed at the May 5, 2021 status conference, and the City committed to providing the other Parties with the new training materials and forms developed in response to the Monitor's 2019 recommendations. The United States indicated that it was not seeking disclosure of full investigative files. The Monitor and the Parties are also continuing to discuss possible ways in which the United States and Plaintiffs-Intervenors might be provided with more detailed accounts of the Monitor's assessments of investigative practices and the cases on which they are based, subject to the protections of the Protective Order entered by the Court in this case, which permits disclosure on an "attorneys eyes only" basis where needed.[24]

---

[23] Among the matters for which the City has produced materials to the Monitor as of May 5, 2021, three of eleven initiated in 2019 and ten of 17 from 2020 exceeded the 90-day limit. Among cases initiated from July 1, 2018 through the end of 2019, six of 19 exceeded 90 days in duration.

[24] As noted above, the Monitor's October 2019 recommendations (which included proposals relating to officers performance reviews in addition to investigations), were memorialized in a December 11, 2019 memorandum to the City, which was shared with the United States and Plaintiffs-Intervenors on January 24, 2020. The January 24, 2020 memo included an account of the deficiencies and areas for improvement that the Monitor had identified in its review of investigative materials, without disclosing details of individual cases.

3. EEO Database

As previously reported, the City has advised the Monitor that it has made several modifications to the FDNY EEO investigations database, addressing some longstanding Monitor recommendations.  Monitor's Thirtieth Periodic Report at 55-56; Monitor's Thirty-First Periodic Report at 43-44.[25]  As described by the City, the modifications include new fields for a range of interim actions and for some specific types of potential violations.  The Monitor has not yet had an opportunity to review these changes or to verify that the City has the capacity to effectively track and connect (with the database or otherwise) all the findings and remedial actions associated with a given matter (including those generated by BITs[26] and other units in addition to the EEO Office); that it effectively tracks EEO Office input in performance evaluations; or that it possesses appropriate systems for cross-referencing inspections and evaluations with other EEO activities (such as targeted messaging and training) in a given workplace.  Monitor's Twenty-Ninth Periodic Report at 63-64.  The Monitor continues to request that the City offer a suitable demonstration of the database with the new features as soon as practicable.

## IV.  **Medical Exam-Related Issues**

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the step in

---

[25] Detailed accounts of the development of the database, its features, previous modifications, and related communications appear in previous reports.  *See*, *e.g.*, Monitor's Twenty-Ninth Periodic Report at 62-64; Monitor's Twenty-Seventh Periodic Report at 36-38; Monitor's Twenty-Sixth Periodic Report at 40; Monitor's Twenty-Fourth Periodic Report at 36-37.

[26] The Bureau of Investigations and Trials, the Department's disciplinary unit, prepares charges, conducts investigations, and prosecutes disciplinary cases for violations of Department policy including hazing and workplace violence.   It also imposes discipline in EEO cases investigated by the EEO Office and thus cooperates with the EEO Office in enforcing EEO policies within the Department.

the hiring process with the highest Exam 2000 disqualification rate. *Id*. at 46. The Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates. *Id*. at 45-46.

### A.    Stairmill Test

The stairmill test component of the Medical Exam is meant to ensure that candidates possess sufficient cardiopulmonary fitness to perform safely as firefighters. After Plaintiffs-Intervenors challenged the stairmill component as a source of unlawful disparate impact, the City hired PSI, an outside vendor, to evaluate the test. PSI circulated the final version of its validation report, entitled "Development and Validation of a Bureau of Health Services Stairmill Test for FDNY Entry-level Firefighters," on October 12, 2020. The Monitor has previously reported on the process that led to the report. Monitor's Twenty-Eighth Periodic Report at 50-54**.** BHS has been using the new stairmill test since October 17, 2019.

As noted in earlier reports, the City has also provided the opportunity for certain Exam 7001 candidates who took the old stairmill test to be tested again using the new test, and it has engaged in targeted outreach to ensure such candidates are aware of this opportunity. Some of that retesting took place before the pandemic, and retesting has continued now that candidates are once again being seen at BHS. Because of the pandemic and the cancellation of Academy classes for which candidates were being processed, virtually all of the candidates considered for retesting will have to take the whole Medical Exam again, including the new stairmill test. The Monitor, United States, and Plaintiffs-Intervenors have emphasized that the City must continue to track and analyze the results of the new stairmill protocol in the ongoing screening of Exam 7001 candidates, to promptly identify and address disparate impact that may emerge against Black and/or Hispanic candidates.

48

### B.      Medical Exam Attrition Mitigation

BHS resumed candidate medical evaluations on February 8, 2021.  The City has been

tracking and regularly updating the Monitor and other Parties about scheduling and the rates at

which candidates have been reporting for testing and have been either reserved, qualified, or

disqualified.  The City has been providing specific information about Black candidates to

Plaintiffs-Intervenors so they can perform outreach and provide support for those candidates.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-

traditional candidates from the Medical Exam and on helping such candidates move from

pending status to qualified status.  But this requirement has taken on even greater importance

now, as the effects of the pandemic have fallen and continue to fall disproportionately on Black

and Hispanic communities.  Tailored and flexible strategies and policies will need to be

implemented to account for this disproportionate hardship, and the City must do all it can to

mitigate any negative impact of the Medical Exam on Black and Hispanic representation in

Academy classes.  Several of the Monitor's recommendations relating to the City's resumption

of candidate processing (discussed in Part II above) are intended to address this need.

The Monitor has asked the City to track pandemic-related attrition data in the hiring

process, and such data may prove particularly relevant with respect to the Medical Exam.  The

Monitor's purpose in requesting such tracking is to permit a meaningful comparison of prior

candidate processing cycles with processing affected by the pandemic.

### C.      Medical Exam Messaging

As described in Part II.B.1, the City has continued its efforts to help candidates maintain

their physical fitness in anticipation of the Medical Exam.  In addition to initiatives described

above, City messaging and resources include instructional videos about the stairmill and the

Pulmonary Function Test, a document outlining all the steps of the Medical Exam, and Medical

Exam FAQs, all posted online.  The City has updated a number of its processes and messaging resources in response to the pandemic, including changes in the notice advising candidates of their Medical Exam appointments to highlight the need to maintain fitness and to inform candidates of changes in the stairmill test.  The City is also providing information about virus-related precautions that the City is undertaking, and those it expects candidates to undertake, during Medical Exam visits; and it is now providing COVID-19 testing during the medical evaluation, and including questions about the candidate's exposure to the virus in the medical questionnaire.  The City has also updated the medical FAQs, the medical questionnaire, and the Candidate Discharge Report and has created a shorter version of the Pulmonary Function Test video to be watched at the time of test (the full video remains available on JoinFDNY and the Candidate Portal).  Before the pandemic, the City was also finalizing a script for a video on the Medical Exam overall, for which the Monitor and the other Parties provided input.

## V.    Character Screening by the CID and PRB

Since the last periodic report, the Monitor's and the Parties' further efforts to resolve outstanding issues relating to the analysis of disparate impact in the character review process (and potentially identify further remedies for any persistent disparities) have been largely inactive because the City's data analysis personnel, who are essential participants in the relevant discussions, have continued to be tasked with other projects, including work relating to the pandemic.[27]  On January 5, 2021, the Monitor circulated a memorandum to the Parties

---

[27] As previously reported in detail, beginning in 2012, in consultation with the Monitor and the other Parties, the City issued a series of guidelines for the CID and PRB; additional modifications to the guidelines were issued in mid-2016.  Monitor's Sixteenth Periodic Report (Dkt. # 1694) at 29-31; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 29-30.  As noted in prior periodic reports, the revisions were agreed upon by the Parties with the understanding that they might be subject to additional changes based on further analysis.  Monitor's Seventeenth Periodic Report at 30 n.4.  The City has

50

summarizing proposals, outstanding issues, and questions relating to the analyses of the character review process – which have also been summarized in previous reports. *See, e.g.,* Monitor's Thirty-Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's Thirtieth Periodic Report at 61-63.  As previously outlined, as soon as the necessary City personnel become available, the Monitor plans to convene a call with the Parties to discuss and resolve remaining disagreements regarding the appropriate endpoints, available data, and possible methods for conducting the analyses. The Monitor is hopeful that those discussions can take place soon – potentially as part of the broader discussion with the City (described above) regarding the analysis of candidate attrition in all phases of the hiring process.[28]

In discussions regarding recent candidate processing, the City advised the Monitor and the other Parties that it has taken steps intended to ensure that PRB referral does not prevent a candidate from being admitted to an Academy class for which the candidate is otherwise qualified.  In previous discussions of the character review process, one of the concerns expressed by the Monitor and the Parties is that in some instances a candidate might miss appointment to the next available Academy class because he or she had been referred to the PRB but not yet received a decision from the board.  To address those concerns, the City has indicated that if necessary it convenes a special, additional PRB meeting shortly before each Academy class to

_____

implemented some procedural changes in the character review process since the 2016 revisions, along with minor changes in the criteria for PRB referral, Monitor's Twenty-Ninth Periodic Report at 74, 78; but it has declined to make further changes recommended by the Monitor.  *Id*. at 78.

[28] As noted above in Part II.B.3, in discussions on February 25, 2021, the City indicated it would respond to pending recommendations and state its position on outstanding issues regarding attrition analyses (including analyses of character review process), endeavor to implement those it accepts, and arrange for a demonstration of its attrition tracking system with updated features by April 30, 2021.  Once the City has provided its responses, the Monitor and the Parties will discuss any outstanding issues at a meeting on a date to be determined.

issue decisions on any candidates who have passed all other phases of screening and are eligible for appointment to the upcoming class.  This appears to be a favorable step with respect to one of the potential adverse effects associated with the character review process.  The Monitor intends to seek additional information on its operation and effect.

## VI.   <u>Firefighter Exam</u>

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test ("CBT") for the position of entry-level firefighter. Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.   <u>Additional Issues</u>

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order; and

- Performing the remaining duties of the Special Master appointed by the Court in its Order filed May 22, 2012 (Dkt. # 883).  The Court assigned these duties to the Monitor in an order dated August 17, 2016.  In particular, since the Monitor's previous periodic report, in consultation with the Parties, the Monitor is overseeing the termination of the claims administrator's role, which will occur June 30, 2021, as described in the Monitor's March 31, 2021 recommendation (Dkt. # 2018), so ordered by the Court on April 8, 2021.

Dated:   May 27, 2021
New York, New York

_____
/s/
Mark S. Cohen