UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

UNITED STATES OF AMERICA,

     *Plaintiff*,

   -and-

THE VULCAN SOCIETY, INC., for itself and on behalf of its members, JAMEL NICHOLSON, and RUSEBELL WILSON, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER, individually and on behalf of a subclass of all other non-hire victims similarly situated; and

CANDIDO NUÑEZ and KEVIN SIMPKINS, individually and on behalf of a subclass of all other delayed-hire victims similarly situated,

   *Plaintiffs-Intervenors*,

   - against -

THE CITY OF NEW YORK,

   *Defendant*.

-------------------------------------------------------------x

NOTICE OF APPEAL

07-cv-02067 (NGG)

 Notice is hereby given that defendant the City of New York appeals to the United States Court of Appeals for the Second Circuit from the order entered in this action on June 9, 2021 (ECF No. 2033).

Dated:  Brooklyn, New York
        August 4, 2021

                                                                         GEORGIA M. PESTANA
*Corporation Counsel*
 *of the City of New York*
100 Church Street
New York, New York 10007
nycappeals@law.nyc.gov
(212) 356-2502

By: _____
     Devin Slack
     Assistant Corporation Counsel

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

-and-

THE VULCAN SOCIETY, INC., for itself and on behalf of its members, JAMEL NICHOLSON, and RUSEBELL WILSON, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER, individually and on behalf of a subclass of all other non-hire victims similarly situated; and

CANDIDO NUÑEZ and KEVIN SIMPKINS, individually and on behalf of a subclass of all other delayed-hire victims similarly situated,

                    Plaintiff-Intervenors,

-against-

THE CITY OF NEW YORK,

                    Defendant.

**MEMORANDUM & ORDER**
**07-CV-2067 (NGG) (RLM)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff, the United States of America (or "DOJ"), and Plaintiff-Intervenors ("PIs"), the Vulcan Society and associated individual members, have alleged that Defendant, the City of New York, violated portions of the court's Modified Remedial Order ("MRO") (Dkt. 1143) when it changed the process by which the Fire Department ("FDNY") called entry-level firefighter candidates for the Candidate Physical Ability Test ("CPAT"), a part of its hiring

1

process. Pursuant to its powers under the MRO, the Court Monitor issued a recommendation ("Recommendation") (Dkt. 1999) to resolve the dispute. After a review of the parties' submissions upon which the Recommendation was based, the Recommendation, and the parties' objections to the Recommendation, the court adopts the Recommendation in accordance with this order. (*See* Recommendation; United States' Obj. to Rec. ("DOJ Obj.") (Dkt. 2005); Plaintiff-Intervenors' Obj. to Rec. ("PI Obj.") (Dkt. 2006); Def.'s Obj. to Rec. ("City Obj.") (Dkt. 2007).)

I. BACKGROUND

The court assumes general knowledge of this litigation, which has been active since the United States first alleged that the City engaged in discriminatory hiring practices of firefighters in May 2007. (Compl. (Dkt. 1).) This court subsequently found that FDNY's hiring practices resulted in a disparate impact upon and Black and Hispanic entry-level firefighter candidates, and that the use of certain candidate screening methods constituted a pattern and practice of intentional discrimination against Black candidates. (*See* Memoranda & Orders of July 22, 2009 (Dkt. 294) and January 13, 2010 (Dkt. 385).) After a bench trial to consider injunctive relief, the court issued a remedial order, and then, following appellate review in *United States v. City of New York*, 717 F.3d 72 (2d Cir. 2013), the operative MRO in June 2013.

In November 2019, the Monitor issued a status report on the City's use of CPAT, which is a physical exam that entry-level firefighter candidates must pass, along with other requirements, before matriculating to the FDNY Academy. (*See* Monitor's Status Report Regarding CPAT Testing ("CPAT Report") (Dkt. 1940).) Individual candidates are called for CPAT testing from a list of candidates who have completed the initial computer-based screening exam and scored at or above a designated level. The

City began to call candidates for CPAT from the most recent written exam, Exam 7001, in October 2018. (Recommendation at 4.)

Each FDNY Academy class contains approximately 320 trainees. (*Id.*) The City's practice is to call three times as many candidates for the CPAT as the size of the academy class it plans to fill. (Decl. of Marie Giraud ("Girard Decl.") (Dkt. 1999-4) ¶ 21.) Using that 3:1 ratio, the City called approximately 1,920 candidates from Exam 7001 to take the CPAT, in order to fill approximately 640 Academy seats—enough for two Academy classes. (*Id.* ¶ 31.) The larger number of candidates called for CPAT testing as compared to Academy seats was meant to account for attrition in the pipeline from the written exam to the Academy because, along the way, candidates withdraw or fail to meet basic requirements to join an Academy class. (*Id.* ¶¶ 21-26.) For example, between taking Exam 7001 and CPAT, candidates might have lost interest in the FDNY or found another opportunity. Even candidates who passed CPAT testing would still need to pass a medical exam before entering the Academy, including a stairmill test and a timed 1.5-mile run, in addition to other requirements such as maintaining New York City residency. (*Id.*; Recommendation at 4.)

As the Report explained, at some point the City changed its practice for calling candidates for CPAT. (CPAT Report at 8.) For Exam 7001, the City called enough candidates to fill two Academy classes at a time, but under the predecessor exam, Exam 2000, the City only called enough candidates to fill one class at a time. (*Id.*) As a result, the largest groups called for CPAT testing from the Exam 7001 list were more than twice the size of the largest groups called from the Exam 2000 list. (*Id.*) Because the City called more candidates more quickly, Exam 7001 candidates waited a maximum of 27 months between passing the CPAT and entering the Academy, whereas Exam 2000 candidates waited no more than 16 months. (*Id.* at 2.)

After substantial briefing and argument from the parties, the Monitor agreed with the DOJ and PIs that by altering its hiring process without first seeking the Monitor's approval, the City violated Paragraph 16 of the MRO, and recommended that the court enter an order so holding, along with court-ordered relief. The Monitor did not recommend that the court find that the City violated Paragraph 19, for which PIs advocated. That provision requires the City to eliminate practices that have a disparate impact on Black and Hispanic firefighter candidates. The Monitor also recommended remedies to address the breach. The City objects and argues that it did not violate the MRO at all. PIs object insofar as the Monitor did not find a violation of Paragraph 19. DOJ objects insofar as it believes any relief ordered for Black firefighter candidates should likewise be ordered for Hispanic candidates.

## II.  LEGAL STANDARD

The MRO provides that the Court Monitor shall "facilitate[e] the Parties' resolution of any disputes concerning compliance with their obligations under this Order, and recommend[] appropriate action by the court in the event an issue cannot be resolved by the Parties with the Court Monitor's assistance." (MRO ¶ 54(c).) Under Federal Rule of Civil Procedure 53(f), the court reviews the Monitor's findings of fact and conclusions of law de novo, based on the evidence as it was submitted to the Monitor. Fed. R. Civ. P. 53(f)(1)-(4). The court reviews the Monitor's procedural decisions for abuse of discretion. *Id.* at 53(f)(5).

To determine whether the City breached the MRO, the Monitor employed the legal standard for contempt of a court order as set out in *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). (*See* Recommendation at 7.) The court's de novo review follows the same analysis. To find that the City has violated the MRO under that three-factor inquiry, DOJ and PIs, as the moving

4

parties, bear the burden to show: (1) the MRO is clear and unambiguous; (2) the proof of the City's noncompliance with the MRO is clear and convincing; and (3) the City has not diligently attempted to comply with the MRO in a reasonable manner. (*Id.*)

## III. DISCUSSION

### A. MRO Paragraph 16

Paragraph 16 of the MRO provides: "The City of New York shall not take any step in any process for the selection of entry-level firefighters, or use any examination as part of such process, without first obtaining the approval of the Court Monitor (the "Monitor") through the processes specified by the Monitor . . . ." (MRO ¶ 16.) In turn, Paragraph 11 defines "[p]rocess for the selection of entry-level firefighters" as "any and all steps taken by the City of New York to hire entry-level firefighters." (*Id.* ¶ 11.) Among the "steps" explicitly set out in the non-exhaustive list in Paragraph 11 are "assessing an entry-level firefighter candidate's physical fitness or ability;" "determining that an entry-level firefighter candidate has passed or failed any examination or assessment at any stage of his or her candidacy;" "determining that an entry-level firefighter candidate possesses or does not possess the character or fitness to be an entry-level firefighter;" and "determining not to hire a [sic] an entry-level firefighter candidate for any reason including that the . . . entry-level firefighter candidate . . . does not possess the . . . fitness necessary to be an entry-level firefighter . . . ." (*Id.*)

Considering the first *King* factor, the MRO unambiguously requires the City to obtain the Monitor's approval before taking any "step" in the hiring process for entry-level firefighters, which includes any decision to alter the process by which the City calls candidates for CPAT testing. CPAT is an important step in the hiring process, aimed at assessing an entry-level firefighter candidate's physical fitness or ability. It has long been a focus of this

5

litigation because it is a stage at which many candidates drop out of the process, and at which improved communication and recruitment practices could pay large dividends in terms of hiring entry-level firefighters without family and social ties to the FDNY. (Recommendation at 2.) As set out in the CPAT Report, the decision to call more candidates for CPAT testing more quickly had significant effects, increasing the maximum candidate wait time following the CPAT from an estimated 16 months to 27, and causing 2,900 candidates to be processed quickly without opportunity to study the process and make any needed improvements. (CPAT Report at 2-3.)

In its objection, the City argues that it is not clear that calling candidates for CPAT testing constitutes a "step" in the hiring process, within the meaning of the MRO, and that if the court so holds, "any step in the process, even as minor as scheduling and rescheduling of particular candidates for any aspect of the process" could be subject to pre-approval under Paragraph 16. (City Obj. at 6.) That strawman argument is unavailing. As the City's own declaration in support of its position makes clear, determining how many candidates to call for CPAT testing represented a policy decision at the Department level for how to best fill Academy classes as a whole. (Giraud Decl. ¶ 21.) Policy decisions of that magnitude, which require Monitor approval before they are altered under Paragraph 16, are readily distinguishable from the minor individual procedural steps that the City invokes. As applied to this policy decision, the MRO is unambiguous, and the first *King* factor is met.

As to the second *King* factor, the court agrees with the Monitor that the DOJ and PIs have met their burden to show, by clear and convincing evidence, that the City failed to comply with the MRO. Hiring data provided by the City show that the City called candidates for CPAT testing from Exam 7001 at a faster rate than it did for candidates from Exam 2000. (*See* Recommendation at

6

9-11.) The City asserts that the Monitor "is attempting to reverse engineer a change in a 'step' of the process from the differences between the numbers in Exam 2000 and 7001." (City Obj. at 6.) But the data are clear and no engineering is necessary to draw the conclusion that there was a change in the hiring process between Exam 2000 and Exam 7001. For Exam 7001, the City aimed to call 1,920 candidates for CPAT testing at a time—enough to yield two Academy classes of 320 per class based on the City's 3:1 ratio—when it had only ever called enough candidates to fill one Academy class at a time from the Exam 2000 list. (*Id.*) The City concedes that many more candidates were called at a time for CPAT testing from Exam 7001 than were called from Exam 2000. (*See* City Opp. to Mot. (Dkt. 1999-3) at 4-5; City Obj. at 6-7.) It claims that the same basic formula was applied to both candidate pools, but differences between the pools to which the formula was applied led to different outcomes. (*Id.*) None of the City's arguments refute the central point: the City doubled the number of candidates that it called for CPAT testing at a time and as a result, candidates took the exam more quickly, then waited longer after the exam for further processing. That is a significant change to the hiring process that was undertaken without the approval of the Monitor, violating Paragraph 16 of the MRO, and satisfying the second *King* factor.

In its most recent submission, the City argues that the Monitor has erred in its analysis of the second *King* factor by improperly shifting the burden away from the moving parties, failing to credit the declaration of FDNY Assistant Commissioner Marie Giraud, and overlooking its own previous statements about CPAT testing. (*See* City Obj. at 2-5, 6-7.) Those arguments are unpersuasive.

First, the Monitor properly assigned the burden to DOJ and PIs, the moving parties, and based its decision on the evidence they proffered. (Notably, that evidence comes from the City.) The

7

Monitor then considered whether the evidence cited by the City controverted the moving parties' evidence and concluded that it did not. (*See* Recommendation at 11-13.) In a clear-and-convincing-evidence analysis, evaluating the strength of a non-moving party's rebuttal evidence in light of the moving party's evidence is appropriate and is not the same as shifting the burden to the non-moving party.

Second, contrary to the City's objection, the Monitor made an appropriate decision to credit the moving parties' evidence over the testimony of Assistant Commissioner Giraud. Giraud testified that: "It is my understanding that, in the past, the FDNY had processed candidates for two classes at a time. We continued that process for Exam 7001." (Giraud Decl. ¶ 32.) The Monitor found that Giraud's testimony as to prior FDNY practices was not admissible under Federal Rule of Evidence 602 because her declaration "[did] not contain facts that demonstrate a foundation of personal knowledge that the City called two classes at a time in Exam 2000." (Recommendation at 12.) The court agrees with the Monitor that Giraud's statement, made without indication that she had firsthand knowledge of the FDNY's hiring practices in place before she assumed her role in September 2019, does not controvert the plain and undisputed data and analyses supporting the moving parties' claims.[1]

Finally, the City claims that the Monitor's prior Periodic Reports contradict its current finding and show the Monitor's knowledge that the City has always called two classes for CPAT testing at a time. (City Obj. at 6-7 (citing Monitor's Twenty-Third Periodic

---

[1] The court does not take a position as to whether Giraud's statement "is not admissible evidence" as the Monitor held. (Recommendation at 12.) Even if her statement is admissible, in light of all of the evidence, even when viewed in the light most favorable to the City, the court holds that the moving parties have made a clear and convincing showing that the City failed to comply with the MRO.

8

Report (Dkt. 1844) at 43-44; Monitor's Twenty-Sixth Period Report (Dkt. 1896) at 36, 64).) Those reports simply do not say what the City claims. First, the Monitor's prior statement that the FDNY holds two Fire Academy classes per year, an undisputed fact, does not show that the Monitor believed candidates for those two classes were called simultaneously. There is no logical connection between those statements; how many classes are called per year and when those classes are called are two distinct facts. Second, the Periodic Reports upon which the City relies pertain only to Exam 7001, not Exam 2000, and therefore cannot be probative of anything that compares the processes around the two exams.

As to the third *King* factor, whether the City has diligently attempted to comply with the MRO in a reasonable manner, the court finds that the City failed to make any attempt to comply with the unambiguous command of the MRO because it never sought any form of pre-approval from the Monitor. The City maintains either that the MRO is ambiguous or, in any event, that it has complied with it. Those mistaken beliefs cannot constitute a defense to a breach of the MRO under the third *King* factor. *See E.E.O.C. v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178 (2d Cir. 1985) (stating that it "is not necessary to show that defendants disobeyed the district court's orders willfully" to prove civil contempt of a court order), *aff'd*, 478 U.S. 421 (1986). The City argues persuasively that it has been generally compliant with the MRO, that its breach was made in good faith, and that the evidence was available for the Monitor to discover the change in policy more quickly, had it put the pieces together. (*See* City Obj. at 7-10.) But none of that speaks to the issue at hand: The City did not comply with the MRO because it did not seek the Monitor's approval before it made a significant change to the entry-level firefighter hiring process.

9

For those reasons, the court concludes based on its de novo review that the moving parties have sufficiently carried their burden on all three *King* factors and that the City breached Paragraph 16 of the MRO.

### B. MRO Paragraph 19

Paragraph 19 of the MRO provides that:

> The City of New York shall, with reasonable diligence, take all steps necessary to eliminate all policies and procedures that are not job related or required by business necessity and either have a disparate impact on black and Hispanic firefighter candidates or perpetuate the effects of said disparate impact.

(MRO ¶ 19.) No party asserts that Paragraph 19 is ambiguous. Thus, the analysis turns on whether PIs have shown by clear and convincing evidence that the City's conduct constituted a breach.

PIs point to data showing that CPAT results for Black candidates are "uniformly worse" among candidates called from Exam 7001 than they were for candidates called from Exam 2000. (*See* PI's Opening CPAT Mem. (Dkt. 1947) at 3-4.) Given the data, PIs argue that there was an adverse impact against Black candidates in the Exam 7001 hiring processes and, accordingly, Paragraph 19 required the City to employ reasonable diligence to consider those impacts and take steps to mitigate them. (*See* PI Obj. at 4-5.) The City counters that outcomes were worse for all candidates called from Exam 7001, and in fact, attrition rates for Black candidates increased less than for White candidates. (*See* City Opp. (Dkt. 1999-3) at 7-9.) In addition, the City points to numerous efforts that it has undertaken to mitigate attrition for Black and Hispanic candidates, which it credits for the comparatively smaller attrition rates in those cohorts. (*Id.* at 9.)

The court agrees with the Monitor that under the MRO, before the City makes a significant change to CPAT processing policies,

it must engage in an analysis of how that change will affect Black and Hispanic candidates in the FDNY hiring process overall. (*See* Recommendation at 18.) Whether or not this particular change had a disparate impact on Black and Hispanic candidates does not bear on whether the City met that requirement. However, the court adopts the Monitor's recommendation and declines to find a violation of Paragraph 19 at this time. It is clear that the City has taken some steps to identify and mitigate adverse effects of CPAT processes on Black and Hispanic candidates, and with some success. More importantly, in this factual context, the City's alleged violation of Paragraph 19 closely mirrors its clear violation of Paragraph 16, for which remedies are in order. The court therefore denies PIs' request for a finding that the City violated Paragraph 19, with leave to renew upon a demonstration of the City's continued failure to take steps to mitigate disparate impact resulting from the change to CPAT candidate processing.

### C. Remedies

Under Paragraph 52 of the MRO and its inherent equitable powers, the court may order relief for the City's breach of Paragraph 16. Having reviewed the recommendations of the Monitor, as well as the materials submitted by all parties, the court adopts the Monitor's remedial recommendation, as well as the suggestion of the DOJ that the remedies apply to both Black and Hispanic candidates. As such:

- The City is directed to produce a flowchart or written summary of the firefighter hiring process that enumerates each step of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit of the FDNY has primary responsibility for each of the listed steps. The court does not agree with the City that the audit chart produced in

11

May 2020 would make this request duplicative. (*See* City Obj. at 14.) The purpose of the summary document is to clarify the steps of the hiring process so that it is clear under what circumstances the City is required to seek the Monitor's pre-approval and to avoid another dispute like this one.
- The City is directed to make available to all Black and Hispanic candidates who have already passed the CPAT examination, when safety permits, an opportunity to maintain fitness and to practice on a stairmill at least every two weeks (whether at the Bureau of Health Services, through an arrangement with a gym, at a leased site, or any other option the City may deem suitable.)
- The City is directed to communicate, via the FDNY Office of Recruitment and Retention, not less than once a month with all Black and Hispanic candidates who have already passed the CPAT examination, with reasonable estimates of when they might be called for further steps, and encouragement to remain in the FDNY hiring process.
- The City is directed to conduct a focus group with candidates who have passed the CPAT and are expected to wait before being called for further processing, with study design input from the Monitor's experts, in the next 30 days to assess their experience and gather suggestions to improve retention and preparation.
- Before resuming administration of the CPAT to further candidates, the City is directed to submit to the Monitor and Parties a written summary discussing the effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1 and 2, the efforts that have been specifically directed to the candidates in the group who have passed the CPAT, any takeaways from the focus group,

12

and a description of how the FDNY plans to operationalize the information contained in the report going forward. The City should likewise continue to furnish data on disparate impacts and attrition rates for Black and Hispanic candidates.

The parties should immediately confer to develop a plan and timetable to comply with the court-ordered relief and be prepared to discuss it at the next status conference, currently scheduled for July 15, 2021. The City must provide the Monitor with regular and ongoing updates as to its progress on each part of the relief ordered here.

## IV. CONCLUSION

For the foregoing reasons, the court ADOPTS the Monitor's finding that the City breached Paragraph 16 of the MRO and ORDERS appropriate relief in accordance with this Memorandum and Order.

SO ORDERED.

Dated:    Brooklyn, New York
            June 9, 2021

                                            /s/ Nicholas G. Garaufis
                                            NICHOLAS G. GARAUFIS
                                            United States District Judge