UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

        Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON *, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

        Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

              Defendant.

------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## MONITOR'S THIRTY-FOURTH PERIODIC REPORT TO THE COURT

TABLE OF CONTENTS

I.      Executive Summary ................................................................................ 1

II.     Recruitment and Attrition Mitigation ................................................... 8

        A.     Candidate Processing ................................................................. 9

               1.     Extension of the Exam 7001 List ................................... 9

               2.     Demographic Trends in Candidate Processing to Date ......... 11

        B.     Attrition Mitigation .................................................................. 13

               1.     Implementation of the Court's June 9 Order .................. 13

                      a)     Fitness Resources ................................................ 14

                      b)     Focus Group ........................................................ 16

                      c)     Candidate Communications ................................. 17

                      d)     Assessment of Attrition Mitigation Mechanisms ......... 18

               2.     Communications and Outreach to Candidates .............. 23

        C.     Analyses of the Exam 7001 Recruitment Campaign ............... 26

               1.     Overview of Analysis and Planning ............................... 26

               2.     City's After Action Report and Cost-Effective Report............ 27

        D.     Assignment Issues .................................................................... 30

        E.     Working Group .......................................................................... 32

III.    EEO.............................................................................................. 33

        A.     EEO Staffing............................................................................ 33

        B.     Policies, Messaging, and Training ............................................ 35

        C.     Compliance and Accountability................................................ 39

               1.     Officer Performance Evaluations................................... 39

               2.     "Workplace Professionalism" Reporting ........................ 41

               3.     Climate Survey............................................................... 42

i

D.      Inspections and Investigations ................................................................ 44

        1.      Inspections ........................................................................ 44

        2.      Review and Recommendations Regarding Investigations....................... 45

        3.      EEO Database ........................................................................ 47

IV.     Medical Exam-Related Issues........................................................................ 48

        A.      Medical Exam Attrition Metrics ................................................ 48

        B.      Medical Exam Attrition Mitigation ............................................ 50

V.      Character Screening by the CID and PRB ..................................................... 51

VI.     Firefighter Exam ........................................................................................ 52

VII.    Additional Issues........................................................................................ 53

I.     **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from May 27, 2021, the date of the Monitor's Thirty-Third Periodic Report (Dkt. # 2029), to September 20, 2021.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II of this report discusses activities relating to the City's recruitment and processing of entry-level firefighter candidates from the Exam 7001 civil service hiring list, following the resumption of candidate processing in January 2021.  Since the Monitor's previous report, the City has continued active processing for a group of 609 candidates (including 82 Black candidates and 155 Hispanic candidates) for the next Academy class, projected to begin in October 2021.  A group of approximately 1,400 additional candidates who have passed the CPAT continues to await invitations to further processing.

At the request of the Monitor and Parties, on July 9, 2021, the City provided the Monitor with the "FDNY Attrition Metrics Report," a draft compilation of metrics reflecting the outcomes from various stages of the hiring process for Exam 7001 candidates through May 10, 2021, which the City then circulated to the other Parties on July 14.  The City's preliminary cumulative figures as of May 10 reflect statistically significant disparities adverse to Black candidates in the physical section of the Medical Exam, in the Medical Exam overall, and in the character review process.  They also show statistically significant disparities adverse to Hispanic

candidates in the psychological component of the Medical Exam and in the Medical Exam overall.  While these disparities are subject to change (either diminishing or increasing) as Exam 7001 processing continues, the figures in the City's July 9 report are concerning:  the Medical Exam results continue a pattern of disparities observed in Medical Exam outcomes from the previous (Exam 2000) hiring list and from processing for the first two Academy classes drawn from the Exam 7001 list; and the disparities in the character review process also suggest, at least preliminarily, that previous reforms intended to eliminate disparate impact in this hiring step may not have been fully effective.  Accordingly, the Monitor and the Parties have continued efforts to identify and address factors underlying the disparities.  In recent weeks, the Monitor has convened two all-Party meetings to discuss the City's attrition mitigation initiatives, and the Monitor has renewed pending requests to the City to conduct further analyses of candidate attrition.

Part II also discusses the City's efforts to maintain engagement and preparation among differently situated groups of candidates – those in active processing, those who have passed the CPAT and are awaiting invitations for further processing, and those who have not yet taken the CPAT.  In a key development relating to candidate communications and attrition mitigation, on June 9, 2021, the Court issued a Memorandum and Order (the "June 9 Order") (Dkt. # 2033), adopting the Monitor's recommendation that the Court find that the City breached Paragraph 16 of the Modified Remedial Order by changing, without Monitor approval, its process for calling candidates to take the CPAT, thereby increasing the number of candidates called at one time. The acceleration in CPAT processing resulted in longer wait times for some candidates before being called for further, post-CPAT, processing; and accordingly the June 9 Order directed the City to take a series of remedial steps to provide candidates with additional fitness training

resources, to keep candidates motivated and informed regarding their position in the hiring process, and to gather and use information to optimize the City's attrition mitigation initiatives.[1] The City has begun to implement the Court's directives and has engaged in a series of consultations with the Monitor and the other Parties regarding the required initiatives.  In order to achieve compliance with the Court's June 9 Order and with the Modified Remedial Order, the City must demonstrate that it has established systems and procedures to ensure that its attrition mitigation efforts are data-driven and properly tailored for candidates at different stages of the hiring process, and that they provide candidates with sufficient resources and guidance to complete the process successfully.

Also in the area of recruitment and candidate processing, since the last Periodic Report the Monitor has exchanged communications with the City about the City's pending request to extend the term of the Exam 7001 hiring list.  After objecting to the Monitor's initial requests for additional analyses related to the likely effects of the extension, the City has proposed to hold several meetings and has agreed to provide certain information, including calculations of the selection ratio for different demographic groups in Exam 2000 and Exam 7001 to date.

In connection with preparation for the next campaign, the Monitor and Parties have also continued to work on completing retrospective analyses of the Exam 7001 recruitment campaign. Although the City circulated reports on this topic before the pandemic that incorporated data from numerous components of the campaign, those reports did not focus in depth on identifying which recruitment activities were most effective in attracting successful non-traditional candidates or in diversifying the group of candidates who achieved reachable scores on the open

---

[1] On August 4, 2021, the City filed a notice of appeal to the Second Circuit from the Court's June 9 Order (Dkt. # 2046).

competitive examination.  They also failed to identify with any precision which recruitment activities proved most cost effective.  As previously reported, after requests by the Monitor (first issued in February 2020), the City agreed at the October 13, 2020 status conference that the Monitor could help with data analysis in this area, in light of competing public health commitments for the City's data personnel.  The Monitor (assisted by the Monitor's experts) has circulated planned analyses and queries using City data fields, and has continued to work on the project to the extent feasible based on the information produced to date.  Although, as reported in the last periodic report, the City has produced the majority of the information requested by the Monitor, a number of important items remain outstanding.

At the July 15, 2021 status conference, the City for the first time notified the Court, the Monitor, and the Parties of its intent to retain a consulting firm in connection with this litigation.  On July 27, in response to a set of updates about the Monitor's analyses and a request to schedule calls for discussion of the Monitor's findings, the City stated that it expected the Monitor would hand off the analyses to the consultant in September and expressed the view that it would be wasteful to discuss the Monitor's findings in advance.  Although the Monitor was not willing to postpone the proposed discussions entirely, the Monitor reduced the plan so that it would involve one call in August (which has already taken place, attended by the Monitor's experts and counsel and experts for the other Parties, as well as representatives of the City Law Department) and a second to take place in mid- to late September to discuss the Monitor's findings since the first meeting and to learn more about the work of the City's consultant.

Part II also reports on the Monitor's continuing efforts to verify the City's compliance with the Disparate Treatment Settlement, the Modified Remedial Order, and applicable law in initial workplace assignments for Fire Academy graduates.

Part III of the report provides an update on activities relating to the FDNY's EEO function.  Since the Monitor's last report, the City has filled two of the four EEO-Office attorney positions vacated during 2020 and early 2021.  However, the City also reports that one additional attorney position has recently become vacant.  The Monitor has continued to encourage the City to fill the current vacancies as soon as possible, and the City has acknowledged the need to do so – particularly given the important role that earlier staffing increases appear to have played in improving the quality and timeliness of EEO investigations.

Since the Monitor's last report, the City has completed Phase 2 Stage 1 of its three-phase work plan for analyzing responses to the FDNY workplace climate survey – which, as discussed in prior reports, was reduced somewhat in scope from the pre-pandemic plan.  In an update provided at the July 15, 2021 status conference, the City indicated that it expects the analysis of the climate survey to be completed this fall.  The Monitor has asked the City to build in plans for communicating its findings based on the survey within the FDNY.

In the area of EEO messaging, since the Monitor's last report, the EEO Office has taken further steps to promote the role of EEO Counselors and the use of alternative dispute resolution to address workplace issues – including an online presentation describing mediation resources provided in collaboration with Center for Creative Conflict Resolution.  But development of a long-term strategic plan of EEO messaging continues to await the completion of the climate survey analysis, due to the City's decision to postpone the formulation of a long-term plan until the plan could be informed by the climate survey findings.  Part III also reports on the messaging and training activities of the FDNY's Chief Diversity and Inclusion Officer ("CDIO").  On July 22, 2021, the City reported that the CDIO had resigned her position, effective July 23, and that

the City had begun a search for her replacement.  The City has advised that until a new CDIO is hired, CDIO projects will be managed on an interim basis by other senior FDNY personnel.

The Monitor has continued efforts, discussed in prior reports, to obtain information related to the implementation of an EEO metric into FDNY performance reviews.  Following a series of delays, on June 16, 2021 the City completed production of all but ten EEO performance reviews from the 2019 cycle (covering officer performance in 2018).  The Monitor is now assessing the 2019 data and cross-referencing it with information from EEO investigations and other data and records from the relevant time frame, to assess whether the evaluations reflect all obtainable information relevant to officer performance.

Part III also reports on the Monitor's continuing evaluation of the FDNY's EEO investigative practices and on discussions regarding the implementation of Monitor recommendations for their improvement.  Since the previous report, the Monitor has received the Parties' comments on an updated draft of its report on EEO investigations, with a focus on the duration of investigations – which was circulated to the Parties on May 26, 2021.  The Monitor plans to meet with the Parties on September 30, 2021 to discuss the Parties' comments and queries relating to the report, along with other topics relating to the City's EEO investigative practices.

Also in the area of EEO compliance, the Monitor has continued to receive updates regarding the City's plans for the resumption of regular workplace EEO inspections in City firehouses, in response to concerns expressed by Plaintiffs-Intervenors.  Inspections by EEO Office staff were suspended in 2020 because of safety and logistical concerns; and the Monitor has emphasized the need to resume them as soon as possible.  The City has stated that it

understands the need to resume inspections, and it has discussed plans to do so; but it has not yet been able to provide a date for the resumption of regular inspections by the EEO Office.

Part IV reports on efforts to identify and reduce disparate impact adverse to Black and Hispanic candidates in outcomes of the Medical Exam and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws. The FDNY's Bureau of Health Services ("BHS") resumed candidate medical evaluations on February 8, 2021, and began scheduling candidates for medical evaluations for the March 2022 class in September. The City has been tracking, and regularly updating the Monitor and other Parties regarding, candidate scheduling and the rates at which candidates have been reporting for testing, qualified, disqualified, or reserved. The City has also been providing specific information about Black candidates to Plaintiffs-Intervenors so that they can perform outreach and provide support for those candidates.

As noted above, the City's July 9, 2021 "FDNY Attrition Metrics Report," which covered hiring results for Exam 7001 through May 10, 2021, shows that the Medical Exam continues to produce statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates. Although the City recently stated that it would respond to requests by the Monitor and the other Parties to provide analyses showing which specific Medical Exam disqualification reasons are responsible for those disparities, the City has yet to do so.

On August 20, 2021, the Monitor circulated a memo reflecting the Monitor's analysis of individual medical disqualification reasons for Exam 2000, the exam that preceded Exam 7001. This analysis was undertaken (a) to identify which disqualification reasons were responsible for the disparate impact in that exam, (b) to help identify which specific aspects of the exam are

most likely to require targeted mitigation efforts in Exam 7001, and (c) to guide the City's own analyses of Exam 7001 Medical Exam data.

Part V reports on the status of efforts by the Monitor and the Parties to analyze the impact of the FDNY's character review process (conducted by the Candidate Investigation Division ("CID") and the Personnel Review Board ("PRB")) on candidates from different demographic groups and to address any disparate impact produced by the process. As noted above, figures provided by the City in its July 9 report on candidate processing outcomes to date from the Exam 7001 hiring list reflect a statistically significant disparity between Black and white candidates in rates of referral and in rates of qualification in the character review phase. As the Monitor has previously noted, to the extent the process is shown to have an adverse disparate impact on Black or Hispanic candidates, the City will be required either to implement reforms and initiatives that address the impact effectively or to validate the process as job-related. Accordingly, the Monitor plans to continue discussions with the City and the other Parties regarding further reforms that may be needed to mitigate disparities in character review outcomes.

Part VI discusses the Exam 7001 computer-based test ("CBT") developed, administered, and analyzed by the City's testing experts, PSI Services LLC ("PSI"), in consultation with experts for the Parties and the Monitor.

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.    Recruitment and Attrition Mitigation

As noted above, the City has asked the Monitor for approval to extend the Exam 7001 hiring list by two years beyond its original four-year term – from 2023 to 2025.  Since the Monitor's previous report, the City has also continued to process candidates for the second entry-

level firefighter class since the onset of the COVID-19 pandemic – projected to enter the Academy in October of this year.

### A.    Candidate Processing

#### 1.    Extension of the Exam 7001 List

As discussed in the Monitor's previous reports, on February 16, 2021, the City requested the Monitor's approval under the Modified Remedial Order for a two-year extension of the hiring list for Exam 7001, citing the disruption in candidate processing caused by the COVID-19 pandemic.  *See* Monitor's Thirty-Third Periodic Report at 8.  The City asserted that the extension would prevent a hiring gap and "promote diversity within the ranks of the FDNY."  In support of its request, the City pointed to earlier analyses indicating that the hiring list is more diverse at lower scores.  The City also advised that its assessment included other analyses and data previously provided to the Monitor and Parties, but it did not specify the analyses to which it referred.

In response to inquiries from the Monitor, the City confirmed in March that no specific deadline existed by which the extension had to be approved; rather, the City advised that ideally the decision would be made before the City invited an additional group of candidates to begin active processing for the fall 2021 class – so that the City would be able to notify candidates and adjust plans.  The other Parties objected that the City's reference to diversity in the list was inadequate to demonstrate that the City had diligently evaluated possible adverse impact associated with the extension, and they asked the Monitor not to approve the extension until the City has either done more analysis or, if already completed, described it more thoroughly.  The City responded that its analysis was sufficient and that it believes its attrition mitigation strategies will counteract any potential disparate impact in the rates of attrition.

On June 18, 2021, the Monitor responded to the City's request for approval, noting that the City had not identified the analyses on which it relied and questioning the City's apparent assumption that any increased diversity in groups of candidates at successively lower scores would automatically translate into increased diversity in hiring.  The City's proposal did not indicate that it had considered whether different rates of attrition for candidates of different races/ethnicities could negate any increased diversity among lower scores on the list and exacerbate adverse impact.  The Monitor requested that the City identify certain information in its possession by July 2, 2021, and provide the following information by August 1, 2021 (or another date if the City needed more time), which would have permitted a quick decision by the Monitor:  (i) identification of the analyses and conclusions with which the City claimed the Monitor and other Parties were familiar, as well as any other information the City was relying on, and how; (ii) analyses projecting the likely hiring outcomes of the extension, their effect on diversity, and any related disparate impact, taking into account past hiring outcomes and trends from Exam 2000 and Exam 7001 to date; (iii) a description of the City's plans to address any projected attrition among Black and Hispanic candidates that might result from an extension; and (iv) a discussion of any new planned attrition mitigation initiatives.

The City responded to the Monitor's June 18 letter on June 28, arguing that the Monitor's requests were unnecessary and that the requested analyses of past trends or future projections in candidate attrition need not factor into the decision on the extension; and it proposed a schedule of meetings and analyses to resolve issues, which appeared likely to extend into mid-autumn. The City proposed that the Monitor and Parties meet to discuss a revised "selection ratio" – *i.e.*, an estimate of the number of candidates the City needs to call in order to yield one hire, based on Exam 7001 hiring data to date.  A projection of the number of candidates the City will need to

call to fill two extra years of classes will allow the City to project the score it expects to reach in the event of an extension.  The City proposed to do adverse impact analyses of the list at this score.  The City proposed to then meet with the Monitor and Parties and consider requests for further analyses, subject to two limitations: (i) that the requests bear directly on the decision on extension, and (ii) that the requested analyses not be ones the City has already performed in its ongoing attrition mitigation work.

The Monitor responded to the City's June 28 proposal on July 14.  The Monitor's July l4 response requires the City to perform further analyses along the lines suggested in the City's June 28 proposal, but in a shorter period of time than the City suggested and with modifications. The Monitor and the Parties will then meet to discuss whether anything further is required before the Monitor makes a decision whether to approve the extension.

The City advised the Monitor and the Parties on August 19 that it has been proceeding as set forth in the Monitor's July 14 letter.

2.      Demographic Trends in Candidate Processing to Date

Shortly before the Monitor's last periodic report, the City completed processing for the first class to enter the Fire Academy since the start of the pandemic, which began on May 10, 2021.  The class comprised 153 entry-level firefighters, including approximately 130 candidates from the Exam 7001 open-competitive list,[2] with a demographic breakdown as follows:

- 15 Black candidates (11.5%)
- 31 Hispanic candidates (23.8%)
- 78 white candidates (60%)
- 3 Asian candidates (2.3%)
- 2 Native American candidates (1.5%)
- 1 unknown candidate (0.8%)

---

[2] The remaining 23 class members are promotional candidates.

As reported by the City, as of September 15, 2021, the FDNY firefighter force of 8,003 firefighters includes 812 Black firefighters (10.15%) and 1,278 Hispanic firefighters (15.97%).

On July 9, 2021, the City provided the Monitor with a preliminary set of cumulative attrition metrics from all Exam 7001 processing through May 10, 2021, showing voluntary attrition and candidate outcomes from several stages of the hiring process.[3]  The City's preliminary cumulative figures show statistically significant disparities adverse to Black candidates in disqualifications at several stages of the hiring process, including the physical component of the Medical Exam, the overall Medical Exam, and both phases of character review (PRB referral and disqualifications).  The figures as of May 10 also show statistically significant disparities adverse to Hispanic candidates, including disparities in the psychological component of the Medical Exam and in the Medical Exam overall.[4]  While these disparities may either increase or diminish as more Exam 7001 candidates complete processing, the figures in the City's July 9 report reflect concerning trends in candidate attrition, which call for continuing scrutiny and for continuing and enhanced efforts to keep non-traditional candidates engaged and prepared for each step in the hiring process.

As previously reported in detail, Plaintiffs-Intervenors also noted at the May 5, 2021 status conference that figures for the May 10 Academy class indicate that Black candidates who

---

[3] As discussed in detail below in Parts II.B.1.d, although this initial set of metrics includes calculations of the statistical significance of inter-group disparities, it does not include any analyses correlating rates of voluntary attrition or candidate outcomes with attrition mitigation initiatives.  It also does not include information on the specific reasons for disqualifications in the Medical Exam.

[4] According to the City's July 9 report on outcomes as of May 10, among candidates who had received a final decision on the Medical Exam, ten of 106 Black candidates (9.4%), ten of 179 Hispanic candidates (5.6%), and eleven of 488 white candidates (2.3%) had been disqualified.  On September 15, in comments on a draft of this report, the City advised that one Hispanic candidate who had previously been disqualified in the psychological component of the Medical Exam had been found qualified.

were invited to resume processing in January 2021 were appointed to the class at a lower rate than white candidates. *See* Monitor's Thirty-Third Periodic Report at 10-11 & n.1. These are obviously issues of concern and are addressed further in the discussion of attrition mitigation in Section B.

Since the appointment of the May 10, 2021 Academy class, the City has continued with processing for the next class, scheduled to begin in October. The City has projected that the October class will include approximately 320 probationary firefighters – comparable to pre-COVID classes. On May 28, 2021, the City provided a demographic breakdown of the group of 609 candidates it planned to process for the October class – which included 82 Black candidates (13.5%), 155 Hispanic candidates (25.5%), and 330 white candidates (54.2%). Based on figures provided by the City on August 11, a total of 2,084 candidates who have passed the CPAT remain eligible for appointment – including 357 Black candidates (17.1%) and 556 Hispanic candidates (26.7%). Accordingly, there are approximately 1,475 post-CPAT candidates who are projected to enter later classes (if appointed) and await further processing – including 275 Black candidates (18.6%) and 401 Hispanic candidates (27.2%).

B.      **Attrition Mitigation**

1.      Implementation of the Court's June 9 Order

The Court issued its Memorandum & Order resolving the Parties' dispute regarding CPAT processing on June 9, 2021. The June 9 Order directed the City to take four remedial steps relating to its communications with candidates, the fitness resources it provides to candidates, and its efforts to evaluate and enhance the effectiveness of its attrition mitigation programs. The status of the City's implementation of those remedial provisions is discussed

below.[5]

### a)    Fitness Resources

The June 9 Order directed the City to provide candidates with fitness resources specified

as follows:

> The City is directed to make available to all Black and Hispanic candidates who
> have already passed the CPAT examination, when safety permits, an opportunity
> to maintain fitness and to practice on a stairmill at least every two weeks (whether
> at the Bureau of Health Services, through an arrangement with a gym, at a leased
> site, or any other option the City may deem suitable.)

June 9 Order at 12.

As described in detail in the Monitor's July 30, 2021 report to the Court (Dkt. # 2045),

after initially proposing a program of fitness training that would not have reached all the Black

and Hispanic candidates covered by the June 9 Order, the City has agreed to offer the required

training to all candidates who have passed the CPAT and remain eligible for further processing

and appointment.  The City has begun offering three two-hour training sessions each week on

alternating weeks, using five stairmills at the Fire Academy on Randall's Island.  As described

by the City, the training includes work on the stairmill along with other fitness training intended

to prepare candidates for the stairmill component of the Medical Exam.

As discussed at the July 15, 2021 status conference and in the Monitor's July 30 report,

the Monitor, Plaintiffs-Intervenors, and the United States have expressed concerns that with

---

[5] A fifth remedial provision (the first listed in the June 9 Order) directed the City to provide "a flowchart
or written summary of the firefighter hiring process that enumerates each step of the hiring process,
specifies when during the hiring process each of the enumerated steps of the hiring process described in
Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit
of the FDNY has primary responsibility for each of the listed steps."  June 9 Order at 11.  The Court
noted that the purpose of this provision is to "clarify the steps of the hiring process so that it is clear under
what circumstances the City is required to seek the Monitor's pre-approval."  *Id*. at 12.  The City produced
materials purporting to comply with this directive on July 30, 2021.  The Monitor is considering the
materials and will determine whether they fully comply with the June 9 Order.

training offered only at the Fire Academy, and not at any sites more readily accessible by public transit, the program may not serve the required group effectively.[6]  To assess these concerns, the City plans to include inquiries relating to candidates' ability and willingness to attend training at the Academy in the questions it poses to candidates in focus group discussions required by another component of the June 9 Order (discussed below).  The Monitor plans to review the responses to those questions along with participation figures for the Academy site in order to assess whether additional training sites may be needed to serve the target group identified in the Court's June 9 Order effectively.

Although the City is currently offering the newly established program to all candidates within the scope of the June 9 Order, the City has requested a modification that would allow it to exclude a small subset of candidates with Adjusted Final Averages ("AFA") below 99, which make those candidates unlikely to be reached for further processing or appointment from the current hiring list (following bonus point adjustments that dropped their scores below the scores based on which they were called for CPAT).[7]  The Court has directed the Monitor and the Parties to propose a suitable order implementing the City's requested modification, and discussions are continuing to confirm the exact terms of the proposed modification, including whether the City's proposed cutoff score for the program should be adjusted to include candidates with an AFA of 98.[8]

---

[6] The Parties' positions are set forth in more detail in the Monitor's July 30 report.

[7] As reported by the City on August 20, 2021, there are 179 candidates in this group, including 29 Black and 46 Hispanic candidates.

[8] In discussions with the Monitor and the other Parties regarding this component of the Court's June 9 Order, the City has also noted that it will not offer the program to candidates who have declined further consideration for appointment.  However, the City has also confirmed that it will continue the practice of

b)      *Focus Group*

The Court's June 9 Order further provided as follows:

> The City is directed to conduct a focus group with candidates who have passed
> the CPAT and are expected to wait before being called for further processing,
> with study design input from the Monitor's experts, in the next 30 days [by July 9]
> to assess their experience and gather suggestions to improve retention and
> preparation.

June 9 Order at 12.

On July 9, the Court granted the Monitor's and Parties' joint request for an adjournment

of the deadline for the City to comply with the focus group component of the June 9 Order, and

the Parties and the Monitor have since engaged in discussions regarding the City's plans –

including the composition, scheduling, and content of the focus group discussions, and whether

and how those discussions will be complemented by a candidate survey.

The City circulated an updated list of proposed focus group questions to the Monitor and

the Parties on July 22, 2021; the Monitor provided its comments and suggestions on August 10;

and both the other Parties also commented.  On September 3, the City provided a revised list of

focus group questions and an outline of its plans for a focus group comprising a sample of Black

and Hispanic candidates who have passed the CPAT and are awaiting further processing.  The

Monitor and the United States provided additional comments and suggestions regarding the

City's plan on September 9, and the City provided an updated list of questions and topics on

September 16.  On September 21, the City confirmed that a focus group had been conducted on

September 17.  The Monitor plans to follow up with the City to obtain an account of the

discussions and relevant takeaways.

---

reaching out to candidates in declined status at the start of each processing cycle to encourage them to
rejoin the process, and that it would offer the fitness program to any such candidates who restored
themselves to the hiring list.

c)      *Candidate Communications*

The June 9 Order also directed the City to engage in regular communications with all

post-CPAT candidates on specified topics:

> The City is directed to communicate, via the FDNY Office of Recruitment and
> Retention, not less than once a month with all Black and Hispanic candidates who
> have already passed the CPAT examination, with reasonable estimates of when
> they might be called for further steps, and encouragement to remain in the FDNY
> hiring process.

June 9 Order at 12.

The City has advised the Monitor that it will establish a formal process for verifying and

reporting to the Monitor that communications with candidates take place at least monthly.  The

City's most recent plan of motivational communications (circulated on July 14) appears to reflect

at least monthly communications with some groups of candidates over several months.  But the

timing of the messaging is not specified for all groups of candidates (defined by projected time

for potential appointment), and the plan does not appear to provide sufficient messaging for all

post-CPAT candidates for the entire period in which they will await and undergo processing.

The Monitor is seeking further clarification and additional information to confirm that the City's

communication plan complies with the Court's June 9 Order, and more broadly that it constitutes

a sufficiently extensive and properly tailored plan for communications with all the differently

situated groups of candidates for the duration of the Exam 7001 hiring list.

As discussed at length in previous reports, the Monitor has long emphasized that the City

must establish a long-term ORR[9] communication plan tailored to candidates at different stages of

processing, different positions on the list, and different wait times for further processing and

potential appointment to an Academy class.  *See, e.g.*, Monitor's Twenty-Eighth Periodic Report

---

[9] The FDNY's Office of Recruitment and Retention

(Dkt. # 1932) at 18-20; *see also* Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 12-14;

Status Report Regarding CPAT Testing (Dkt. # 1940) at 17.  Even apart from the City's

obligations under the June 9 Order, completion of such a satisfactory long-term plan is essential

for the City to demonstrate the ability to mitigate attrition among non-traditional candidates as

required by the Modified Remedial Order.  While the City's most recent plan shows some further

progress, it is not yet clear that the City has established a sufficiently comprehensive and detailed

schedule of communications for all relevant groups of candidates.

### d)   Assessment of Attrition Mitigation Mechanisms

The June 9 Order requires the City to assess the effectiveness of its attrition mitigation

programs and to present plans to "operationalize" the assessment, along with candidate feedback,

in its attrition mitigation efforts going forward.  In relevant part, the June 9 Order provides as

follows:

> Before resuming administration of the CPAT to further candidates, the City is
> directed to submit to the Monitor and Parties a written summary discussing the
> effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1
> and 2, the efforts that have been specifically directed to the candidates in the
> group who have passed the CPAT, any takeaways  from the focus group, and a
> description of how the FDNY plans to operationalize the information contained in
> the report going forward.  The City should likewise continue to furnish data on
> disparate impacts and attrition rates for Black and Hispanic candidates.

June 9 Order at 12-13.

In discussions with the Monitor and the other Parties following the June 9 Order, the City

indicated that administration of the CPAT is not projected to resume until early 2022, and it

tentatively proposed a target date of August or September for the completion of this requirement.

The Monitor requested that the City propose a specific timeline for the completion of the report,

allowing for Monitor comment and recommendations in advance of candidate orientation and

CPAT training for the next group of candidates to be invited for CPAT testing.  As noted above,

on July 9, 2021, the City provided the Monitor with a draft report showing outcomes for Exam

7001 candidates in each of the main phases of the hiring process.  However, the report did not

include any correlations of candidate outcomes with ORR communications, outreach, or attrition

mitigation initiatives; nor did it include any detailed information on the reasons for Medical

Exam disqualifications.  On July 26, the Monitor provided the City with a list of additional

analyses for the City to perform as part of an expanded assessment in accordance with the June 9

Order; and it asked the City to provide those analyses in advance of a scheduled meeting of the

Monitor and the Parties on August 20, 2021.  The City's obligations in this area under the June 9

Order overlap with its broader obligation under the Modified Remedial Order to perform

effective analyses of candidate attrition and to devise and implement data-driven attrition

mitigation measures; and most of the requested analyses, which focus on correlations between

attrition mitigation programs and candidate attrition, were already the subject of longstanding

Monitor requests for additional and improved analyses of the hiring process – first

communicated to the Parties in 2019 and 2020, and recirculated earlier this year.[10]  *See* Monitor's

Thirty-Third Periodic Report at 22-23.  As discussed in detail in the Monitor's previous report,

the City's efforts to implement the Monitor's earlier recommendations have been delayed, in

---

[10] In addition to these requests for additional analyses of candidate outcomes and correlations with attrition mitigation programs, the Monitor has also continued to request additional information on the treatment of candidates' claims for bonus points.  As discussed in the Monitor's previous report, Plaintiffs-Intervenors have raised concerns, based on changes in list position resulting from failures to verify bonus points, that Black candidates' claims for bonus points may not have been verified and approved at the same rates or as quickly as claims by white candidates.  Monitor's Thirty-Third Periodic Report at 12.  The City has provided some data on this topic.  But the Monitor has requested additional data essential to an informative analysis – including data showing the status of bonus-point claims for all candidates in each demographic group who have asserted claims and entered processing.  In the City's September 20, 2021 demonstration of the "dashboard" used by ORR to track candidate outcomes (discussed below), the City briefly presented an analysis of bonus-point claims that appeared to include at least some of the categories of information called for in the pending requests from the Monitor and the other Parties, and the Monitor expects to follow up further to obtain and review additional details in writing.

large part because the City's data management personnel have been diverted to other projects since the onset of the pandemic.  *Id*. at 22.

The City was unable to complete any additional analyses for the August 20, 2021 meeting, and its data analysis personnel were unable to attend.  Subsequently, the Monitor and the Parties scheduled a follow-up meeting for September 20.  The Monitor renewed the previous requests for analyses relating to attrition mitigation programs and added requests for information and analyses that had been discussed in the August 20 meeting.  Among other topics, at the August 20 meeting the Monitor and the Parties discussed whether the City could determine how many candidates appear for either one or two CPAT practice sessions but fail to appear for a subsequent session or for the final test, determine the reasons they fail to appear, and develop additional measures to ensure that as many candidates as possible take advantage of all three opportunities to pass the test.  In addition, the Monitor asked the City to collect and analyze additional data relating to candidates in pending status in the Medical Exam and to examine the reasons for which candidates are pending.  Such information could provide useful guidance to ORR in following up with pending candidates (for example, where remediable conditions such as weight may be preventing candidates from qualifying), and it may also provide needed insight into the prospects for current pending candidates and whether disparities in outcomes by race/ethnicity will persist or grow.

At the September 20, 2021 meeting, the City provided a demonstration of the data "dashboard" used by ORR to track candidate outcomes and to review correlations between candidate outcomes and some of the FDNY's main attrition mitigation initiatives.  As demonstrated, the dashboard is capable of displaying candidate outcomes (including voluntary attrition, qualifications, and disqualifications) for each major step in the hiring process broken

down by demographic group; and it can also display correlations between outcomes and candidate participation in some (though not all) of the City's attrition mitigation programs and resources such as CPAT training, the Fitness Awareness Program ("FAP"), and the candidate portal.  The dashboard also permits users to see the individual candidate records underlying cumulative figures in selected categories (e.g., all candidates in a given demographic group who are pending at a given hiring step) – a feature that could potentially assist ORR in identifying and targeting candidates for follow-up communications specific to their circumstances.  The City reported that the dashboard receives data from the underlying "CIDApp" data management system in near real time, and that analyses of candidate outcomes and correlations with attrition mitigation programs are performed at least every two weeks – as part of bi-weekly consultations between data analysis personnel and ORR.  More extensive analyses, incorporating assessments of statistical significance, are performed after the appointment of each Academy class.

As demonstrated at the September 20 meeting, the current dashboard enables several analyses and correlations that were not available (or at least were not demonstrated) in the version the City demonstrated to the Monitor and the other Parties in December of 2019.  *See* Monitor's Twenty-Ninth Periodic Report (Dkt. #1966) at 33-34.  And the current version appears to support several analyses of the type long recommended by the Monitor – potentially allowing ORR to assess the effectiveness of a number of attrition mitigation programs by observing correlations between candidate participation and hiring process outcomes.

Nevertheless, even as updated, the dashboard does not yet support analyses correlating outcomes with all the FDNY's attrition mitigation initiatives and communications:  the Mentor program is omitted; and at this point the dashboard does not incorporate or provide for analysis of data relating to ORR outreach and communications with candidates.  In addition, in part

21

because the Assistant Commissioner for ORR was unable to attend the meeting, the City has not yet provided a specific update regarding the ways in which ORR uses the dashboard and other data resources to inform and guide its initiatives.  The Monitor plans to seek additional information in these areas in follow-up communications and in a further meeting with the City, and it expects the City to include specific accounts of analyses performed and actions taken in response to those analyses in its summary report pursuant to the Court's June 9 Order.  The Monitor also plans to offer a number of follow-up recommendations for specific adjustments in the dashboard analyses presented briefly on the call.

In addition to the dashboard demonstration, following up on topics from the August 20 meeting, the City advised that its current data management systems do not show whether candidates who failed to appear for the final CPAT test had previously failed one or both of the previous practices sessions – as only the final result is retained.  The City also advised that, in part because of concerns regarding the privacy of medical data, the ORR dashboard does not include data on the specific reasons underlying candidates' medical disqualifications or the reasons for their pending status for the Medical Exam.  While the exclusion of this type of detailed data from the dashboard may limit ORR's ability to target pending candidates for outreach specific to their conditions, the Monitor believes that the City should engage intensively with these candidates and track the success of its efforts in their outcomes.  In addition, even though specific medical information may not be maintained on the dashboard for regular access by ORR, the City should perform analyses of the specific reasons for Medical Exam outcomes and ensure that its communications with candidates include information and guidance reminding and assisting candidates to address remediable physical conditions (*e.g.*, weight) that may reduce their chances of qualifying for appointment.

2.      Communications and Outreach to Candidates

The Monitor has continued to receive updates on the City's communications with candidates and ongoing attrition mitigation programs.  The City has continued to reach out to candidates by various means including email and text messages to provide information on processing and appointments, to promote ORR programs such as the FAP and the fitness resources offered pursuant to the Court's June 9 Order, and to communicate "Worth the Wait" and other motivational messaging in ORR's messaging plan.

On a June 10, 2021 conference call, the City provided an update on its implementation of a texting system intended to improve its ability to respond to candidate replies to bulk text messages.  The City advised that work on the new system would begin in July and take approximately eight to ten weeks to complete.  The new texting system addresses concerns expressed by the other Parties and the Monitor regarding effective communication with candidates who reply to text notifications regarding appointments and ORR programs.  *See* Monitor's Thirty-Third Periodic Report at 18; Monitor's Thirty-Second Periodic Report (Dkt. # 2004) at 9-10; Monitor's Thirtieth Periodic Report at 14-15.

Recruitment Coordinators – ORR has continued to employ Recruitment Coordinators to engage with non-traditional candidates; and Coordinators have communicated with candidates by text and phone regarding appointment reminders, training opportunities, and ORR programs.  On May 14, 2021, in response to inquiries from the Monitor, the City circulated a table reflecting plans to adjust the number of Coordinators for each group of non-traditional candidates based on the numbers of Black or Hispanic candidates in active processing (*e.g.*, one African-American Coordinator for 1-50 Black candidates in active processing, two Coordinators for 50-100, three for 100-200).  The City's updated plan calls for two African-American Coordinators and three

23

Hispanic Coordinators for the current groups of candidates in active processing[11]; and according to the City's most recent update (on a September 2, 2021 call), ORR is currently operating with a team of five Coordinators, one Hispanic and four Black.  Among these, the single Hispanic Coordinator and one of the Black Coordinators focus on their respective demographic groups, and the remaining Coordinators divide their time between Black and Hispanic candidates on an "as needed" basis.[12]  This represents an increase over the total of three Coordinators for both groups that the City employed during processing for the May class.  However, the Monitor remains concerned that Coordinator communications, especially with candidates who are not in active processing, may not be sufficiently frequent to ensure that as many candidates as possible remain engaged and prepared.  Although the City had previously indicated that Coordinators reach out to all candidates in active processing at least weekly, in recent discussions and related disclosures, it has advised that communications are less frequent for many candidates, depending on their position in the hiring process and other factors.  Coordinator communications focus on promoting ORR programs and providing reminders for appointments; consequently, among candidates in active processing, candidates receive more frequent calls and texts when they are scheduled for appointments and during registration periods for the FAP or other programs, and candidates who miss appointments receive additional follow-up calls; but candidates with no

---

[11] The group of candidates currently in active processing includes 82 Black candidates and 155 Hispanic candidates.

[12] In an earlier update on August 5, the City advised that ORR was then employing a team of seven Coordinators.  Two of those seven have since returned to firefighting duties, and ORR is seeking two replacements (one Black and one Hispanic) to bring the Coordinator team back up to seven members.  On the September 2, 2021 call, the City advised that two of the five firefighters currently acting as Coordinators are devoted to candidate communications on a full-time basis, while the remaining three also perform other ORR tasks.  ORR expects that the two additional Coordinators it plans to bring on will focus entirely on candidate outreach.

upcoming or missed appointments are contacted less frequently.  For candidates who are not in active processing, contacts are still less frequent:  the City estimates that Coordinators reach out to these candidates approximately monthly to encourage them to participate in programs such as the FAP and the newly instituted stairmill fitness training program.  Given that these candidates have the longest wait times between CPAT and potential appointment, the Monitor believes they are an important target audience for the Coordinators and that more frequent contacts are warranted.

The City has noted that Mentors are expected to maintain weekly contacts with candidates.  However, by definition, these efforts do not reach candidates who are not enrolled in the Mentor program.  Based on figures the City provided on August 11, 2021, although the program is available to all post-CPAT candidates, many candidates do not enroll:  73% of Black candidates and 73% of Hispanic candidates in the post-CPAT group have enrolled in the Mentor program, but 27% of the candidates in each group have not done so.[13]  A total of 1,445 candidates were reported to be participating in the Mentor program, including 704 white, 262 Black, 406 Hispanic, and 90 Asian.  Sixty-seven percent of white candidates in the post-CPAT group are in the program.

WebEx Conferences and Fitness Training – The City reports that it has continued to hold WebEx conferences with entry-level firefighter candidates, engaging with candidates and providing fitness training information while candidate processing continues.  The City has also continued to hold a version of the FAP to provide in-person training to candidates with

---

[13] It should also be noted that in at least some cases, the fact that a candidate is not participating in the Mentor program may itself indicate that the candidate is less likely to follow through on the hiring process and may require additional outreach to sustain his or her commitment.

appropriate social distancing.[14]  The Monitor has continued to obtain updates on attendance for these programs, including demographic breakdowns for groups of candidates.  According to the data provided to the Monitor by the City on June 14, 2021, of 91 Black candidates invited to attend initial "baseline" FAP sessions in June, 17 (19%) attended; 21 of 171 Hispanic invitees (13%) and 32 of 349 white invitees (9%) also attended.  In the same update, the City reported that 26 of 83 Black invitees (31%), 49 of 155 Hispanic invitees (32%), and 66 of 337 white invitees (20%) attended the most recent WebEx conference in June.  The Monitor will continue to receive and analyze data requested from the City regarding these programs.

### C.      Analyses of the Exam 7001 Recruitment Campaign

#### 1.      Overview of Analysis and Planning

The City's establishment of a sustainable process for successfully recruiting and retaining Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and the Monitorship.  *See* Modified Remedial Order ¶¶ 31-36.  The Court specifically found that a policy or practice that "fails to adequately recruit black persons to become firefighter candidates serves to maintain and perpetuate the effects of the City's discrimination against black firefighter candidates."  Findings of Fact (Dkt. # 741) at 33.  The Court has also emphasized the need for the City to identify which measures are most cost-effective for diverse recruitment.  For the City to accomplish these goals, it must analyze the outcomes of its recruitment efforts to identify which initiatives are the most productive and cost-effective means of attracting non-traditional

---

[14] A detailed description of the FAP appears in the Monitor's previous reports.  *See* Monitor's Thirty-Third Periodic Report at 16-18; Monitor's Thirty-Second Periodic Report at 18-19 & n.7.  The FAP is separate and different from the fitness program mandated by the Court's June 9 Order.  The two programs are being offered concurrently.

candidates likely to achieve reachable scores on the firefighter examination and ultimately be appointed as firefighters.

As described in the Monitor's previous reports, while the retrospective reports on the Exam 7001 campaign produced by the City to date contained some useful analyses, they have not yet identified the recruitment activities that most effectively increased Black and Hispanic representation in the pool of reachable candidates. The Monitor and all Parties have emphasized the importance of completing these analyses in time to use the results to inform the City's strategies for the next recruitment campaign. The City has assured the Court, the Monitor, and the other Parties that the next recruitment cycle will not begin until these analyses have been completed and incorporated into a comprehensive plan of action. The City noted "the need to ensure sufficient analysis and planning prior to the commencement of the recruitment campaign for the next exam" as one of the grounds for its request for the Monitor's approval to extend the list. The schedule the City proposed in the extension request projected that the next campaign (assuming a two-year extension) would begin in April 2023.

### 2.    City's After Action Report and Cost-Effective Report

As described in the Monitor's previous reports, the City provided the Monitor and the other Parties with an initial report of the effectiveness of the Exam 7001 recruitment campaign (the "After Action Report") in November 2018 and an updated version on October 2, 2019, following comments from the Monitor and the other Parties. The City provided its "Cost Effective Analysis" on October 23, 2019. As described in previous periodic reports, the City's reports contain a number of useful analyses. For example, the City's revised After Action Report contained improved analyses that seek to correlate recruitment contacts, applications, test-takers, and reachable scores with factors such as geography, race, and the type and location of initial recruiting contact. However, the reports still did not include some analyses that are

27

critical to their core purpose – such as, for example, analyses of the relative effectiveness of different recruitment initiatives in recruiting reachable non-traditional candidates.  *See* Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 22-24.

At the October 2020 Court conference, the City agreed with the Monitor and the Court that it would be helpful for the Monitor and the Monitor's experts to complete a meaningful part of the after action analysis while the City was understandably occupied with pandemic demands, and the City agreed to produce data the Monitor had previously requested to support that work. Monitor's Thirty-Second Periodic Report at 24.  The City made data productions on December 18, 2020, February 15, March 4-5, and May 19 and 25, 2021 and has produced the majority of what was requested; but a number of items remain outstanding, some of which the Monitor has been requesting for more than a year.  The Monitor has kept the Parties informed with respect to analyses performed to date and those that are in progress, and the United States and Plaintiffs Intervenors, as well as their experts, have provided input at numerous points in the process.

At the July 15, 2021 status conference, the City stated that it was planning to retain a consulting firm to assist with analyses related to this litigation.

On July 26, the Monitor circulated to the Parties

- a set of preliminary findings, based on data the City produced in 2020;

- a list of the items still missing from the City's data production, a number of which had been – and remain – outstanding for many months, including the Exam 7001 Optional Survey data;

- a small number of follow-up requests relating to analyses the other Parties requested or which ongoing analyses had shown are necessary for the completion of the Monitor's work; and

- a schedule for the final steps in the Monitor's recruitment data analysis plan, including three proposed calls with the Parties to take place in August and September, to discuss (1) the finding circulated by the Monitor on July 26; (2) the analyses the Monitor will share

shortly after the last datasets requested have been produced by the City; and (3) overall data analysis takeaways and suggestions for the next campaign.

On July 27, the City responded that, while it did not take issue with the Monitor's experts' sharing their insights with the Parties, the City's retention of a consulting firm to assist with its own recruitment data analyses would make the three calls the Monitor proposed for reporting on findings wasteful, given the City's expectation that similar calls will take place when its consultant completes its work. The City proposed that there be just one meeting about the Monitor's work, in early to mid-September, during which the consultant would also provide an update on the progress of its work. The City further stated that the City would prioritize providing data access to its consultant over the Monitor's follow-up requests.

On August 4, the Monitor responded, stating that the Monitor looks forward to working with the City's consultant and requesting that the City disclose the scope of work the consultant is expected to perform. The Monitor disagreed, however, that discussions about the after action analyses should wait until the City is able to share the consultant's work, noting that most of the Monitor's data analytic work is nearly complete. To take the City's objections into account, however, the Monitor proposed a revised work plan that eliminated one meeting, kept one meeting in August to discuss and provide feedback on the materials circulated by the Monitor on July 26, and proposed a second meeting in mid- to late September to discuss the Monitor's further findings and to learn more about the work of the City's consultant. The Monitor explained that updating the Parties in August with respect to what the Monitor had done and making full use of the Monitor's existing knowledge base before the September meeting would avoid delay and ensure that progress on the after action analysis continued while the City's consultant did the work on which the City proposed to inform the Monitor and other Parties in

early to mid-September.  The August call proposed by the Monitor on July 26 took place on August 17, with all Parties participating.

On September 1, the City advised that it had retained the firm of KPMG, and it has provided a general description of the engagement, stating that KPMG is working with the FDNY to review its recruitment-related databases and to construct after-action analyses beyond those contained in its previous reports.  While the Monitor expects that further work on the after action analyses will transition to the City and its consultant, the Monitor's experts will, of course, provide whatever help the City's consultants request in their efforts to complete the City's own analyses.  And following the proposed September meeting, the Monitor expects that the City will also continue to provide information as needed, both to enable the Monitor to perform whatever work may be needed to monitor the City's after action analysis efforts and to carry out the Court's January 2020 Order to mediate the Parties' dispute concerning the sufficiency of after action analysis as a prerequisite to the next campaign.

As noted in previous periodic reports, while the Monitor had requested that the City make a small number of active firefighters available for focus groups to discuss their experience with the Exam 7001 recruitment campaign, the Monitor held off on pursuing that request during the height of the initial wave of COVID-19 infections.  Now that many firefighters are vaccinated and the City's operations have, to a suitable extent, recovered, the Monitor has repeated its request to hold these focus groups and will follow up with the City to make sure they take place, either with or without the input of the City's new consultant.

### D.    Assignment Issues

The Monitor has continued to address issues relating to compliance with Paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the

Division in which they live, to the extent reasonable, practicable, and consistent with operational needs." Following attempts to confirm details of past assignments after Plaintiff-Intervenors raised this issue in September 2017, the Monitor directed the City to establish systems that would reliably memorialize the specific reasons for denying home-division requests from New York City residents. Accordingly, with input from the Monitor and the other Parties, the City prepared revised guidelines for probationary firefighter appointments, intended to ensure that requests for home-division assignments would be given proper priority and that the specific reasons for denials would be recorded. *See* Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 42-43; Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 20-21; Monitor's Thirty-Third Periodic Report at 26.

To verify the City's implementation of the updated assignment guidelines and confirm its compliance with the Disparate Treatment Settlement, in June 2020 the Monitor requested that the City provide records and analyses relating to home-division requests and assignments for the most recent graduating Academy class. The City responded to the Monitor's request on February 25, 2021, producing information on the preferences and division assignments for Black and Hispanic firefighters in the most recent class to graduate from the Academy (in March 2020). Monitor's Thirty-Third Periodic Report at 27. While the data provided by the City appeared to indicate that the majority of assignments complied with the home-division requirement, the Monitor posed follow-up questions and requested additional information (in a March 10 message) regarding some assignments and asked for clarification and confirmation of some of the information in the City's production. On July 22, 2021, the City provided the Monitor and the other Parties with a summary of assignments from the most recent graduating class, in which it acknowledged that a small number of assignments had failed to comply with

the home-division requirement because of confusion in the application of the guidelines.  The City reported that it has since provided additional guidance clarifying and reinforcing the procedures required to ensure compliance, and in an August 11 message, the Monitor posed further follow-up questions regarding the treatment of some specific assignments.  The Monitor has also asked the City to produce the same categories of information relating to division assignments from the first Exam 7001 Academy class.

In a September 8, 2021 message, in light of the City's previous non-compliance, Plaintiffs-Intervenors asked the Monitor to review in advance the assignments for the class expected to graduate from the Academy later this month – to verify their compliance with the home-division requirement before they are finalized and disclosed.  While the Monitor does not believe such advance review by the Monitor is necessary, it has directed the City to review all assignments internally, verify that they comply with Paragraph 1(d) of the Disparate Treatment Settlement, and provide appropriate assurances to the Monitor before they are disclosed.  The Monitor has also directed the City to provide specific information on operational reasons given for any denial of a home-division request, and to ensure that all those responsible for assignments are provided with the guidelines that the City, the Monitor, and the other Parties have developed and agreed upon to ensure compliance with the home-division requirement.

### E.    Working Group

The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).  The Monitor has continued to receive updates on the two principal Working Group initiatives – the FDNY Fire Cadet program and the FDNY Explorer's program, which have been described in detail in previous reports.  *See* Monitor's Fourteenth Periodic Report (Dkt. # 1651) at 13-14;

Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 11-12; Monitor's Nineteenth Periodic Report (Dkt. # 1761) at 17-18.  The City previously reported that the timeline for further work toward the launch of the Fire Cadet program was contingent on the scheduling of the next promotional firefighter exam, which remains to be determined, *see* Monitor's Thirty-First Periodic Report at 22-23; and the City reports that those efforts remain suspended.  On September 15, 2021, the City reported that the Explorer Program has resumed utilizing virtual meetings and plans to pilot in-person meetings at two Posts by June 2021.

## III.   EEO

The Monitor has continued to work with the City, in consultation with the other Parties, on a range of issues and initiatives relating to EEO messaging, compliance, and investigations. The Monitor has scheduled a meeting with the Parties on September 30, 2021 to review the status of several EEO initiatives and to address a number of queries from the United States and Plaintiffs-Intervenors regarding EEO compliance and investigative practices.

### A.   EEO Staffing

As most recently reported by the City, the FDNY EEO Office currently includes 13 attorneys (including the Assistant Commissioner, one Deputy Director, Investigative Attorneys and contract attorneys) and six non-attorney staff.  Because of several departures in 2020 and 2021, the current EEO Office team of 13 attorneys includes three fewer attorneys than the 16 it included when all its attorney positions were filled.[15]  As previously noted, three investigator attorneys left the office in 2020, and one of the two Deputy Directors resigned earlier this year.

---

[15] As previously reported, the non-investigative work of the EEO Office staff is supplemented by the activities of EEO Counselors – firefighters and officers who act as liaisons between the firefighter force and the EEO Office, as part of a program initiated in 2018.  *See* Monitor's Twenty-Ninth Periodic Report at 47.

*See* Monitor's Thirty-Second Periodic Report at 28; Monitor's Thirty-Third Periodic Report at 29-30.  Since the last periodic report, the City has hired two investigator attorneys to fill vacant positions.  However, it has also reported the departure of an additional attorney with responsibility for accommodation requests.  Because the investigative work of the EEO Office is conducted entirely by its attorneys, the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively.  Based on the City's most recent reports, the EEO Office attorney staff currently includes the Assistant Commissioner, one Deputy Director, eight Investigative Attorneys, one Intake Attorney, one Disability Rights Coordinator, and one Training Coordinator.

As discussed in previous reports, staffing increases completed in 2018 have played an important role in improving the functioning of the EEO Office.  *See* Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eighth Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase).  And the Monitor has accordingly continued to encourage the City to fill the current vacancies in the EEO Office staff as soon as possible.  Since the reduction in investigative staff, the average investigator caseload in the EEO Office has fluctuated.  In September of 2019, when the EEO Office had a full complement of 16 attorneys, the City reported that the average caseload for investigators was 5-10 cases.  Monitor's Thirtieth Periodic Report at 34.  As most recently reported by the City (on July 10, 2021), the average investigator caseload is 8-10 cases.

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor has postponed filing a report on EEO investigative procedures and the duration of EEO

investigations to observe and account for the effect of increased staffing and revised practices –

obtaining a series of updated data sets from the City, and circulating a series of drafts of the

report (including recommendations) to the City and the other Parties.[16]  On May 26, 2021, the

Monitor circulated an updated draft of the report to the Parties for comment.  The Parties have

since provided comments and posed a number of questions relating to the City's practices and

the Monitor's findings; and as noted above, the Monitor has scheduled a meeting with the Parties

on September 30, 2021 to discuss the report and the Parties' comments.

### B.    Policies, Messaging, and Training

Since the last periodic report, the Monitor has continued to receive bi-weekly conference-

call updates on the work of the EEO Office, including investigations (discussed below) and

messaging activities.  Recent messaging and outreach efforts have focused on an initiative

intended to promote the use of alternative dispute resolution mechanisms in appropriate cases to

address workplace EEO issues, and the EEO Office has continued to implement plans to offer an

ADR program in collaboration with the OATH Center for Creative Conflict Resolution

("CCCR").  On June 25, 2021, the City provided the Monitor with a copy of a slide deck

---

[16] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its
staffing, its investigative procedures, and its performance in the completion of EEO investigations – with
a particular focus on the duration of investigations as measured against the presumptive 90-day time limit
for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant
part, the Court's Order stated as follows:

> The court monitor is respectfully DIRECTED to provide the court with a report on the New York
> City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should
> address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the
> staffing of the office has changed over time; and (3) the speed with which the office investigates
> and resolves complaints.

In addition to the topics specified in the Court's November 17, 2017 Order, the report includes a
discussion of data produced by the City, in response to the Court's direction at the March 13, 2018 status
conference, showing the rates at which complainants and respondents in EEO investigations have been
reassigned to desk duty, and the durations of those assignments.

describing ADR resources and the benefits of the ADR process, which has been made available on the Department's DiamondPlate online communication platform.  In mid-July, the EEO Office convened a meeting of EEO Counselors with representatives of CCCR, at which Counselors received further guidance and information regarding the ADR process and situations in which it may be effective.  The availability of conflict resolution services was also publicized in an August 27, 2021 Department Order.  As previously reported, the City has indicated that it plans to issue further communications regarding the role of Counselors in connecting members to ADR resources and in identifying workplace issues and situations that may be effectively addressed by ADR.  Monitor's Thirty-Third Periodic Report at 34.

The Monitor has also continued to obtain updates regarding the development and distribution of training materials on diversity and inclusion topics by the EEO Office and the CDIO.  On July 22, 2021, the City advised the Monitor that the CDIO had resigned her position, effective July 23, and that the City had begun the search for her replacement.  The City has advised that until a new CDIO is hired, CDIO projects will be managed on an interim basis by other senior civilian FDNY personnel.

The Monitor has continued to seek confirmation that operational commanders throughout the Department have shown a training video (discussed in the Monitor's previous reports, and posted on DiamondPlate in November 2020) combining guidance on operational safety in circumstances of civil unrest with themes of diversity and inclusion and the Department's commitment to serving diverse communities.  *See* Monitor's Thirty-First Periodic Report at 26; Monitor's Thirtieth Periodic Report at 41.  In addition, since the last periodic report, in a series of responses to Monitor requests, the City has provided the Monitor with an updated account of

36

recent and planned CDIO activities, along with additional materials associated with CDIO trainings and messaging.

As reported by the City, recent CDIO initiatives include an online video training module on "Positive and Effective Leadership," which has been placed on the FDNY's Learning Management System ("LMS").  The City reports that the training is currently available to FDNY senior leadership, and that it will be offered to all FDNY managers and officers following viewing by senior leadership.  The first of a five-part series of online trainings on "Racial Justice and Healing," produced by an external vendor, has also been made available to senior leadership via LMS, and the City reports that the second training in the series will be rolled out in the fall of 2021.  The City has also reported on updated plans for further installments in its series of trainings on "tenets of inclusion."  The first training in the series, on "Authentic Trust," was presented to members online in the fall of 2020; the second, on "Supportive Relationships," is planned for the fall of 2021, with the remaining installments projected at annual intervals from 2022 to 2025.  The City has also confirmed that the CDIO's "Mobile Messaging Unit" has continued to distribute messaging materials to FDNY workplaces in 2021; and the CDIO has also continued to conduct a series of "courageous conversations" on various topics relating to diversity and inclusion.

The Monitor has previously noted that some CDIO materials and communications appeared to focus on general themes of racial justice and emotional intelligence without clearly connecting them to FDNY workplaces or the operational mission of the Department.  In response, the City has provided a general assurance that the CDIO "works closely with uniformed members in the creation of all training content including with Operations and the Bureau of Training," and the materials most recently provided by the City do include

appearances by some uniformed personnel who attempt to connect messages of inclusion with their own experiences.  Nevertheless, some materials (including the "Racial Justice and Healing" and the "Positive and Effective Leadership" trainings) continue to present abstract messages without consistently articulating their relevance to the EEO issues that arise in FDNY workplaces or to operational effectiveness.  The Monitor believes that future communications should focus more specifically on fire operations personnel and on issues and concerns that tend to arise in FDNY firehouses, and the Monitor will continue to review materials as the City produces them to assess how effectively they connect diversity and inclusion messaging to the mission of the Department and the experiences of firefighters.

As discussed in previous reports, the City has postponed development of a long-range plan for EEO-Office communications until responses from the EEO workplace climate survey have been fully analyzed.  Monitor's Thirty-Second Periodic Report at 29; Monitor's Thirty-First Periodic Report t 29-30.  The Monitor has urged the City to devise and implement an interim schedule of EEO messaging even without the benefit of the climate survey findings, and it encourages the City to work expeditiously to produce a long-term plan as soon as those findings become available.  The Monitor also continues to encourage the City to resume a consistent schedule of EEO messaging by operational commanders.

The Department's 2020 messaging campaign regarding its social media and EEO policies included in-person communications by Deputy Chiefs; and as noted in previous reports, the Monitor believes such in-person messaging by operational commanders is an essential component of effective EEO communications.  The Monitor also continues to urge the City to continue to pursue the program of "voice announcement messaging" that was initiated with a single video in September 2018 (Monitor's Twenty-Ninth Periodic Report at 51), but which was

then inactive for approximately two years.  The recent training videos on operations during civil

unrest and on "Authentic Trust" represent a revival of this initiative, and the Monitor encourages

the City to develop and distribute frequent additional messaging in this category (in addition to

the annual video messages projected to be offered in the CDIO's series on "tenets of inclusion").

### C.  Compliance and Accountability

#### 1.  Officer Performance Evaluations

The Monitor has continued working with the City to confirm whether the EEO metric

added to officers' performance reviews in 2018[17] accurately reflects officers' EEO performance,

and whether evaluations take proper account of input from the EEO Office.  Following

prolonged delays (recounted in detail in previous reports[18]), on June 16, 2021 the City completed

production of all but ten EEO performance reviews from the 2019 cycle, which was the first

cycle since the FDNY introduced an EEO metric that covered a full year of officer performance

(2018) and included evaluations for all company officers.[19]  The City advised that the June 16

production also remedied anomalies that the Monitor had identified in a previous production of

data from the 2019 cycle.  The Monitor is now assessing the 2019 data and cross-referencing it

with information from EEO investigations from the relevant time frame in order to determine

whether the evaluations reflect proper consideration of findings and evidence relevant to officer

performance.  The Monitor has also asked the City to produce a full set of performance review

---

[17] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Sixth Periodic Report at 32; Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[18] *See* Monitor's Thirtieth Periodic Report at 44-45; Monitor's Thirty-First Periodic Report at 34; Monitor's Thirty-Second Periodic Report at 34; Monitor's Thirty-Third Periodic Report at 36.

[19] The data information to the Monitor includes no personal identifying information and was not shared with the other Parties.

data and communications from the 2020 cycle.[20]

In related discussions, the Monitor has continued to work with the Parties to resolve remaining disagreements regarding the types of performance review data and analyses that the City will share with the other Parties.[21]  As previously reported, in the course of discussions regarding the City's analyses and communications relating to performance review data, the City advised that it would "create a list of officers involved in EEO matters, along with their race, gender and start date by obtaining this information from the EEO database" and that "EEO will annually review these to spot any trends or issues that exist."  Monitor's Thirty-Third Periodic Report at 39.  The City also advised that the EEO Office "will also use this as part of its already-existing process to confirm [that officers] are receiving ratings commensurate with their performance."  *Id*.  As previously reported, the Monitor and the United States have sought clarification regarding the City's plans[22] – including whether the EEO Office's review of EEO ratings for officers involved in EEO matters will include all officers involved in each matter (as complainants, respondents, or witnesses) or whether it will be more limited (*e.g.*, to officers who are found to have committed violations).  *Id*.  The Monitor has asked the City to respond to

---

[20] As previously reported, the Monitor communicated a series of recommendations to the City regarding the performance review process in October of 2019.  Monitor's Thirty-Third Periodic Report at 46 n.24; Monitor's Thirty-Second Periodic Report at 36-37.  Evaluations from the 2020 cycle are the first set of evaluations those recommendations could affect – covering performance in 2019 and (for Captains) a portion of 2020.

[21] Previous communications relating to the dispute are recounted in detail in the Monitor's most recent reports.  Monitor's Thirty-Third Periodic Report at 38-39; Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report at 36-37.

[22] The Monitor circulated a memorandum on January 12, 2021 memorializing the discussions on the December 15, 2020 call with the Parties, identifying open issues, and posing follow-up queries; the United States provided comments on the Monitor's memo on March 4, 2021, and the Monitor circulated a further update on May 4, 2021 summarizing the status of discussions and requesting that the City respond to several outstanding queries.

outstanding queries and requests (summarized in the Monitor's May 4, 2021 memorandum to the Parties) in advance of the planned September 30 meeting on EEO topics, and the Monitor expects to discuss, and hopes to resolve, any outstanding issues at the meeting.

2.     *"Workplace Professionalism" Reporting*

The Monitor has continued to gather information relating to the City's workplace professionalism reporting program, in which officers meet regularly with their superiors (monthly at most levels of command) to discuss issues (including EEO issues) affecting workplace professionalism.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 30-31; Monitor's Twenty-First Periodic Report (Dkt. # 1803) at 26-27.  According to the City's most recent update (provided September 21, 2021), to date the system has not yet generated any reports within the scope of the Monitor's standing request to produce all Workplace Professionalism records reflecting EEO or hazing concerns.  *See* Monitor's Twenty-Ninth Periodic Report at 57-58.

As the Monitor has previously noted, the absence of such reports (apparently even from officers in companies where EEO violations occurred) raises questions as to whether the system is functioning as intended.  Monitor's Thirty-Second Periodic Report at 38-39.  The City has previously suggested that in some cases officers may be omitting to report EEO issues via the Workplace Professionalism system but reporting them to the EEO office.  The Monitor previously suggested that the FDNY re-emphasize the scope of workplace professionalism reporting requirements as part of its efforts to ensure officer oversight of EEO compliance and climate – both in connection with routine operational supervision and "walk-throughs" and in more formal EEO inspections that officers have conducted while the EEO Office inspections have remained suspended because of COVID-19 concerns.  Monitor's Thirty-Second Periodic Report at 38-39.  As discussed in the Monitor's previous report, the Monitor has encouraged the

City to remind officers that the workplace professionalism reporting system is intended to encompass interpersonal conflicts and workplace climate issues apart from EEO violations, and that in many instances it may be appropriate for an officer to consult with the EEO Office regarding an issue *and* to report the issue via the workplace professionalism system. The Monitor plans to have further discussions with the City at the September 30 meeting to consider ways of ensuring that the reporting system captures all the required information and that officers are accountable for failures to communicate relevant issues up the chain of command.

    3.    Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters. The City created a ten-phase analytics plan and a schedule for analysis of the survey data to be conducted by the Mayor's Office of Data Analytics ("MODA"), in consultation with the Parties and with input from the United States' and the Monitor's experts. The analysis was anticipated to be completed by June 2020. *Id.* at 49-50. But the deadlines in this initial analytics plan could not be met because City resources had to be diverted to COVID-19 efforts starting in February 2020. Pursuant to a revised plan, based on the City's most recent projection, the analysis is now expected to be completed in the fall of this year.

On February 21, 2020, the City circulated a data review summary report prepared by MODA. The report identified the number of complete and partial responses to the survey and noted that all 49 FDNY numbered battalions and Special Operations Command ("SOC") units are represented in the survey data. MODA also reported that there did not appear to be significant survey response anomalies. Work on the climate survey was suspended, however, at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic. Monitor's Thirtieth Periodic Report at 50.

On October 14, 2020, the City sent the Monitor and the other Parties a new proposal and timeline for survey analysis, indicating that analytic work had already commenced in order to take advantage of what the City anticipated would be a relative lull in COVID-19 demands before the winter months.  The new analysis plan divided the City's work into three longer phases and included fewer built-in opportunities for direct input from the Monitor and other Parties.  The plan contemplated that MODA may have less frequent contact with the Monitor and the other Parties, but provided that MODA would maintain a record of its discretionary judgment calls at key junctures, which can be reviewed by the group if necessary, and that it would afford the other Parties and the Monitor opportunities for input.  Although the City's proposal differed in timing and relative allocation of work, the Monitor and the Parties agreed to work with the City pursuant to the revised plan, and the Monitor expects that the City's analysis will incorporate the essential elements of the prior plan.  The plan contemplated that meetings of the analytics group would be scheduled when needed, with at least one meeting per phase.

On June 2, 2021, after consulting with the Monitor and the other Parties, MODA circulated its "Phase 2 Amended Scoping Plan," and the group discussed it on a call on June 24. MODA circulated its "Presentation of Results from Phase 2 Stage 1" on July 28, and the Parties participated in a call on July 29 to discuss that presentation.  The Monitor and other Parties continue to provide feedback in emails and during calls, and MODA continues to provide responses and results.  On August 6, MODA estimated that it would provide a scoping document for Phase 2, Stage 3 two weeks later.  The City recently advised that its lead analyst on the climate survey project is no longer working for the City and has said that it will soon provide an update on the implications of his departure for the project.

Following the completion of the analytical phase, the City's next crucial task will be to develop a plan of action based on the results, including but not limited to a plan for communicating the results to FDNY members; a comprehensive, strategically coherent plan of EEO messaging using the results of the analysis; and a plan for a second survey to assess progress in addressing any issues identified in the first.  The Monitor and the other Parties also plan to discuss with the City any main findings or action items related to the survey and what follow-up communications to the FDNY workforce are anticipated.

### D.    Inspections and Investigations

#### 1.    Inspections

Counsel for Plaintiffs-Intervenors have previously urged the City to resume regular EEO inspections, which were suspended for all of 2020 because of the pandemic.  As noted in the Monitor's last periodic report, on February 4, 2021 the City issued a Department Order reminding company and battalion officers of existing regulations that require regular operational inspections to report evidence of EEO violations or potential violations in the workplace.  Monitor's Thirty-Third Periodic Report at 43.  The City also directed Deputy Chiefs to incorporate EEO considerations in their annual inspections.  *Id.*  The City acknowledges, however, that these measures, while helpful, are not a substitute for in-person inspections by EEO staff.

The Monitor has encouraged the City to complete arrangements for the resumption of regular EEO inspections as soon as possible.  The City initially planned to restart inspections in April, and it has developed a proposed set of procedures for a revived inspection program; but more recently the City has raised concerns about the resumption of inspections based on the Delta variant of COVID-19.

44

2.      Review and Recommendations Regarding Investigations

The Monitor has continued to review and evaluate EEO investigations identified by the

City as requiring substantial investigative activity in fire suppression matters,[23] and has

continued to discuss recent and current investigations with the City in bi-weekly conference calls

with the Assistant Commissioner for EEO.  As previously reported, on January 28, 2021 the

Monitor provided the City with a compilation of comments and best practices focusing on the

investigation of social media violations – both to memorialize practices that the City had already

implemented in the recent investigations and to offer Monitor recommendations for further

improvements.  Monitor's Thirty-Second Periodic Report at 42-43.  In the ongoing review of

case materials and in communications with the City, the Monitor has also continued to evaluate

the City's implementation of earlier Monitor recommendations for improved investigative

practices and for related training and guidance for investigators – including recommendations for

improved analysis of witness credibility and mixed-motive cases.[24]  The Monitor expects to

provide the City with a summary of its assessments of recent cases in advance of the planned

September 30 meeting with the Parties on EEO topics.  As noted in previous reports, although

investigative practices have improved since the Department issued a new EEO Investigation

Manual in 2016, the Monitor has continued to observe recurring deficiencies in some areas,

---

[23] In an initial, retrospective production of multiple cases, provided in 2017, and more recently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has provided the Monitor with full investigative files for some cases.  For others, the City's production has been limited to intake documents and final memoranda.  Summaries of the City's productions of EEO case materials appeared in the Monitor's Twentieth Periodic Report (Dkt. # 1744) at 30-31 and in the Monitor's Twenty-Seventh Periodic Report at 39-41.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

[24] The Monitor's recommendations were first communicated to the City at an October 2019 meeting and further memorialized in a December 11, 2019 memorandum to the City, which was shared with the United States and Plaintiffs-Intervenors on January 24, 2020.

including some instances where investigations failed to follow up on evidence of potential

violations, and others where analyses of credibility and motives either failed to account for

relevant factors or gave undue weight to irrelevant considerations.  For these reasons, and

because the number of substantial investigations each year is small,[25] further review will be

required to for the City to demonstrate the ability to conduct appropriately thorough and rigorous

investigations.

As previously noted, after the increase in EEO investigator staffing in mid-2018, the

duration of the FDNY's EEO investigations also generally improved, with a higher percentage of

cases completed within 90 days.  But case durations rose again during the 2020 pandemic year[26];

and even among cases initiated in late 2018 and 2019 (after the staffing increase but before the

pandemic), approximately 25% of cases requiring substantial investigation lasted more than 90

days.[27]  Further review is also needed to confirm whether the improvement in case duration

observed in 2019 will resume and whether the City will achieve the goal of completing

investigations within 90 days in all but exceptional cases.  As discussed above, the Monitor has

received comments from the Parties on an updated draft of its report on the duration of EEO

investigations, and the Monitor plans to discuss the Parties' comments and follow-up queries,

among other topics, at the planned September 30 meeting.

---

[25] The City has provided the Monitor with materials from eleven cases initiated in 2019 and from 17 initiated in 2020; and the cases vary in complexity – with different cases presenting the opportunity for the Monitor to evaluate different investigative practices and techniques.

[26] Some delays in mid-2020 were likely due at least in part to the pandemic, which impeded witness interviews until the FDNY developed adapted procedures and established a virtual interview capability.

[27] Among the matters for which the City has produced materials to the Monitor as of September 10, 2021, three of eleven initiated in 2019 and ten of 17 from 2020 exceeded the 90-day limit.  Among cases initiated from July 1, 2018 through the end of 2019, six of 19 exceeded 90 days in duration.

Also at the September 30 meeting, the Monitor expects to discuss pending requests by the United States and Plaintiffs-Intervenors for more detailed accounts of the Monitor's assessments of investigative practices and the cases on which they are based.  Since the Monitor's last periodic report, the City has provided the other Parties with copies of the new training materials and forms developed in response to the Monitor's 2019 recommendations.  At the meeting, the Monitor intends to discuss ways in which the United States and Plaintiffs-Intervenors can be provided with additional information underlying the Monitor's recommendations and its evaluation of the City's practices.

Since the last periodic report, the Monitor has also continued the Monitor's initiative (suspended at the onset of the pandemic and revived earlier this year) to interview selected complainants from closed cases to learn about their experiences with the EEO Office.

### 3.    EEO Database

The City has previously advised the Monitor that it has made several modifications to the FDNY EEO investigations database, addressing several Monitor recommendations.  Monitor's Thirtieth Periodic Report at 55-56; Monitor's Thirty-First Periodic Report at 43-44.[28]  As described by the City, the modifications include new fields for interim actions and for some specific types of alleged conduct.  The Monitor expects the City to provide a demonstration of the updated database at the upcoming September 30 meeting.  More generally, the Monitor continues efforts to verify whether the City has the capacity to effectively track and connect (with the database or otherwise) all the findings and remedial actions associated with a given

---

[28] Detailed accounts of the development of the database, its features, previous modifications, and related communications appear in previous reports.  *See*, *e.g.*, Monitor's Twenty-Ninth Periodic Report at 62-64; Monitor's Twenty-Seventh Periodic Report at 36-38; Monitor's Twenty-Sixth Periodic Report at 40; Monitor's Twenty-Fourth Periodic Report at 36-37.

matter (including those generated by BITs[29] and other units in addition to the EEO Office); that it effectively tracks EEO Office input in performance evaluations; and that it possesses appropriate systems for cross-referencing inspections and evaluations with other EEO activities (such as targeted messaging and training) in a given workplace.  Monitor's Twenty-Ninth Periodic Report at 63-64.  The Monitor intends to discuss all these capabilities with the City at the upcoming meeting.

## IV.   Medical Exam-Related Issues

### A.      Medical Exam Attrition Metrics

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the step in the hiring process with the highest Exam 2000 disqualification rate.  *Id*. at 46.  The Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.  *Id*. at 45-46.  According to the City's July 9, 2021 "FDNY Attrition Metrics Report," Medical Exam outcomes continue to reflect statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates – including disparities adverse to both Black and Hispanic candidates in the Medical Exam overall, disparities adverse to Black candidates in the physical section of the Exam, and disparities adverse to Hispanic candidates in the psychological section.  The report shows the cumulative number of Exam 7001 Medical Exam disqualifications among candidates with final decisions as of May 10, by race/ethnicity:  eleven of 488 white candidates (2.3%), ten

---

[29] The Bureau of Investigations and Trials, the Department's disciplinary unit, prepares charges, conducts investigations, and prosecutes disciplinary cases for violations of Department policy including hazing and workplace violence.   It also imposes discipline in EEO cases investigated by the EEO Office and thus cooperates with the EEO Office in enforcing EEO policies within the Department.

of 179 Hispanic candidates (5.6%), and ten of 106 Black candidates (9.4%) had been disqualified by the Medical Exam as of May 10, 2021.[30]

The Monitor has asked the City to perform and report on analyses of Exam 7001 Medical Exam results at the level of individual disqualification reasons, and the Monitor continues to encourage the City to address these disparities with targeted, data-driven mitigation strategies. The City has recently indicated that it is in the process of performing the requested analyses at a deeper level.

On August 20, 2021, the Monitor circulated a memo reflecting the Monitor's analysis of Exam 2000 Medical Exam data. The Monitor's analysis shows that there was disparate impact in the Exam 2000 Medical Exam adverse to both Black and Hispanic candidates for seven BHS disqualification reasons, including for stairmill testing, failure to cooperate with stairmill testing, failure to complete or provide the results of follow-up lab testing, pulmonary issues, and weight.[31] The Monitor's experts also performed statistical analyses on the subset of Exam 2000 candidates who began the Medical Exam process after January 1, 2016; this subset of candidates was broken out to provide a more precise view of rates of disqualification in the period after the City had implemented many of the changes it made to address disparate impact in Medical Exam qualification rates in the early years of the Monitorship. (These changes were described in numerous periodic reports from 2014 and 2015 and included instituting several adjustments to the stairmill test, offering required follow-up medical testing free of charge, scheduling follow-up testing, and providing candidates with more information about the exam, in the form of a

---

[30] The report also shows that the Medical Exam results of 51% of white candidates, 57% of Hispanic candidates, and 58% of Black candidates were pending as of May 10, 2021.

[31] One further disqualification reason, failure to cooperate with tuberculosis testing, had a disparate impact against only Black candidates.

guidance document, an FAQ document, and videos demonstrating various aspects of the exam.)
Based on the small sample available, this analysis indicated that, in the post-January 2016
period, there was no longer disparate impact against Hispanic candidates for any of the
disqualification reasons relating to the physical evaluation.  However, disparate impact persisted
in post-January 2016 testing against Black candidates for stairmill testing, failure to cooperate
with stairmill testing, pulmonary issues, weight, and failure to cooperate with tuberculosis
testing.

### B.    Medical Exam Attrition Mitigation

Issues surrounding the City's efforts to help candidates maintain physical fitness between
CPAT and the Medical Exam are described in Part II above.  The City has been tracking (and
regularly updating the Monitor and the other Parties regarding) the scheduling of Medical
Examination appointments and the rates at which candidates have been reporting for testing and
have been either reserved, qualified, or disqualified.  The City has been providing specific
information about Black candidates to Plaintiffs-Intervenors so they can perform outreach and
provide support for those candidates.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-
traditional candidates from the Medical Exam, on preparing such candidates to pass the Exam,
and on helping them to move from pending status to qualified status.  But this requirement has
taken on even greater importance now, as the effects of the pandemic have fallen and continue to
fall disproportionately on Black and Hispanic communities.  Tailored and flexible strategies and
policies will need to be implemented to account for this disproportionate hardship, and the City
must do all it can to mitigate any negative impact of the Medical Exam on Black and Hispanic
representation in Academy classes.  The importance of these efforts is also heightened by the
long wait times that some candidates will experience between passing the CPAT and appearing

50

for the Medical Exam – in part as a consequence of the City's decision to call candidates for

CPAT testing at an accelerated rate.  The Monitor has asked the City to track pandemic-related

attrition data in the hiring process, and such data may prove particularly relevant with respect to

the Medical Exam.  The Monitor's purpose in requesting such tracking is to permit a meaningful

comparison of prior candidate processing cycles with processing affected by the pandemic.

## V.     <u>Character Screening by the CID and PRB</u>

Since the last periodic report, as part of their overall assessment of candidate attrition and

processing outcomes, the Monitor and the Parties have resumed discussions of outstanding issues

relating to the analysis of disparate impact in the character review process.[32]  The City's July 9,

2021 report on candidate attrition included analyses of outcomes from the character review

process for Exam 7001 candidates through May 10, 2021.  These latest figures show statistically

significant disparities between Black and white candidates and between Hispanic and white

candidates in the rates at which candidates are referred to the PRB.  Among candidates referred

to the PRB, the City's analysis also shows a statistically significant disparity in rates of

disqualification between Black and white candidates.[33]  Based on a further analysis performed by

the Monitor using the City's figures, there is also a statistically significant disparity between

---

[32] As previously reported in detail, beginning in 2012, in consultation with the Monitor and the other Parties, the City issued a series of guidelines for the CID and PRB; additional modifications to the guidelines were issued in mid-2016.  Monitor's Sixteenth Periodic Report (Dkt. # 1694) at 29-31; Monitor's Seventeenth Periodic Report at 29-30.  As noted in prior periodic reports, the revisions were agreed upon by the Parties with the understanding that they might be subject to additional changes based on further analysis.  Monitor's Seventeenth Periodic Report at 30 n.4.  The City has implemented some procedural changes in the character review process since the 2016 revisions, along with minor changes in the criteria for PRB referral, Monitor's Twenty-Ninth Periodic Report at 74, 78; but it has declined to make further changes recommended by the Monitor.  *Id*. at 78.

[33] Four of 36 Black candidates referred to the PRB (11.1%) were disqualified, compared to one of 73 white candidates (1.4%).

Black and white candidates in the rates at which all candidates in each group who receive any final decision from the character review process (either a no-referral decision or a final decision from the PRB following referral) are deemed qualified as to character.[34]

As previously reported, on January 5, 2021, the Monitor circulated a memorandum to the Parties summarizing proposals, outstanding issues, and questions relating to the analyses of the character review process – which have also been summarized in previous reports. *See, e.g.,* Monitor's Thirty-Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's Thirtieth Periodic Report at 61-63.  The Monitor expects to include discussion of outstanding issues and questions as part of the broader discussion with the City (described above) regarding the analysis of candidate attrition in all phases of the hiring process.  In addition, given the statistically significant disparities in outcomes to date, the Monitor expects to resume discussions with the Parties regarding further reforms in relevant standards and procedures, and/or improvements in outreach and guidance, that may be necessary to address the adverse impact of the character review process on non-traditional candidates.  The Monitor has previously made it clear that if analyses show that the process has a disparate impact adverse to Black or Hispanic candidates, the City will be required either to make further changes in the process (and show they are effective in eliminating disparate impact) or to validate the process as job-related.  *See, e.g.*, Monitor's Twenty-Ninth Periodic Report at 79.

## VI.    Firefighter Exam

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test ("CBT") for the position of entry-level firefighter.

---

[34] An additional separate analysis by the Monitor also found a statistically significant disparity between Black and white candidates in the rates at which they were either (1) disqualified or (2) hired with extended probation (combining the percentages for both outcomes).

Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.   **Additional Issues**

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order; and

- Performing the remaining duties of the Special Master appointed by the Court in its Order filed May 22, 2012 (Dkt. # 883).  The Court assigned these duties to the Monitor in an order dated August 17, 2016.  In particular, since the Monitor's previous periodic report, in consultation with the Parties, the Monitor has overseen the termination of the claims administrator's role, which occurred June 30, 2021, as outlined in the Monitor's March 31, 2021 recommendation (Dkt. # 2018), so ordered by the Court on April 8, 2021.

Dated:   September 21, 2021
         New York, New York

_____
              /s/
          Mark S. Cohen