UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

                Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

                Defendant.

------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## MONITOR'S THIRTY-FIFTH PERIODIC REPORT TO THE COURT

TABLE OF CONTENTS

I.    Executive Summary ............................................................................................. 1

II.   Recruitment and Attrition Mitigation ............................................................ 11

      A.    Candidate Processing ................................................................................ 11

            1.    Extension of the Exam 7001 List............................................................ 11

            2.    Demographic Trends in Candidate Processing to Date and Results of
                  the City's Analysis of Attrition in the Hiring Process for Exam 7001 ..... 14

                  a)    Demographics of Appointments from the Exam 7001 List.......... 15

                  b)    Analyses of the Hiring Process and Statistically Significant
                        Disparities ...................................................................................... 15

                  c)    Candidates in Active Processing.................................................... 16

                  d)    Current Firefighter Demographics ................................................ 17

      B.    Attrition Mitigation ................................................................................... 17

            1.    Fitness Resources ..................................................................................... 18

            2.    Candidate Communications ...................................................................... 22

            3.    Coordinators, Mentors, and In-Person Outreach ..................................... 24

            4.    Data Collection and Analysis................................................................... 27

                  a)    Post-CPAT Focus Group Ordered by Court ................................. 27

                  b)    Assessment of Attrition Mitigation Measures ............................. 30

      C.    Analyses of the Exam 7001 Recruitment Campaign ............................. 34

            1.    Overview of Analysis and Planning ......................................................... 34

            2.    City's After Action Report and Cost-Effective Report............................ 35

      D.    Assignment Issues...................................................................................... 39

      E.    Working Group ........................................................................................... 40

III.    EEO ................................................................................................................ 41

    A.    October 8, 2021 Court Conference on EEO Compliance and FDNY
        Workplace Culture ................................................................................. 41

    B.    EEO Staffing ......................................................................................... 44

    C.    Policies, Messaging, and Training ........................................................ 45

    D.    Assessment and Accountability ............................................................ 49

        1.    Officer Performance Evaluations ............................................... 49

        2.    Workplace Professionalism Reporting and Officer Accountability for
            Workplace Climate ..................................................................... 53

        3.    Climate Survey ........................................................................... 55

    E.    Inspections, Investigations, and Compliance ....................................... 60

        1.    Monitor Report on EEO Investigative Procedures and the Duration
            of Investigations ......................................................................... 60

        2.    Inspections and Monitoring ....................................................... 62

        3.    Monitor Review and Recommendations Regarding Investigations .......... 63

        4.    EEO Database .............................................................................. 66

IV.   Medical Exam-Related Issues ........................................................................... 67

    A.    Medical Exam Attrition Metrics ........................................................... 67

    B.    Medical Exam Attrition Mitigation ...................................................... 69

V.    Character Screening by the CID and PRB ........................................................ 72

VI.   Firefighter Exam ............................................................................................... 73

VII.  Additional Issues .............................................................................................. 74

I.      **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from September 21, 2021, the date of the Monitor's Thirty-Fourth Periodic Report (Dkt. # 2058), to February 8, 2022.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II of this report discusses activities relating to the City's processing of entry-level firefighter candidates from the Exam 7001 civil service hiring list, as well as analyses of the Exam 7001 recruitment campaign.  In October 2021, the City appointed 321 probationary firefighters to the second Fire Academy class to enter the Academy since the onset of the pandemic.  The class included a total of 314 open competitive candidates from the Exam 7001 list; and among those Exam 7001 appointees, 40 (12.7%) were Black, 77 (24.5%) were Hispanic, and 186 (59.2%) were white.  Since the appointment of the October Academy class, the City has continued active processing for a group of 740 candidates for the next Academy class, projected to include 320 firefighters and begin in May of 2022 – including 119 (16%) Black, 196 (26%) Hispanic, and 377 (50.1%) white candidates.

On December 16, 2021, the City provided the Monitor with a report (dated December 14, 2021) entitled "Metrics to Assess Applicant Attrition from the Hiring Process for Exam 7001" containing metrics reflecting the outcomes from various stages of the hiring process for all Exam 7001 candidates through October 26, 2021 and the appointment of the October 2021 Academy

class.  The City's cumulative figures as of October 26, 2021 reflect statistically significant disparities adverse to Black and Hispanic candidates in outcomes of the CPAT[1] and the Medical Exam, and in referrals to the PRB[2] in the character review process, along with significant disparities adverse to Black candidates in PRB disqualification outcomes.  These results are concerning and suggest that although work has been done to reduce disparities adverse to non-traditional candidates, more will be required to ensure that disparities do not persist through the remainder of processing from the Exam 7001 list.

Part II also reports on the status of the City's request for a two-year extension in the term of the Exam 7001 hiring list.  At the January 19, 2022 status conference, counsel for the United States and Plaintiffs-Intervenors advised the Court that, based on analyses provided by the City since the last report showing that the extension is not likely to exacerbate disparate impact and could produce slightly better results, they did not object to the extension – provided, however, that the City must engage in regular reporting of outcomes (including comparisons to projections the City used to support the extension), and must plan adequately to address the potentially greater risks of attrition among Black and Hispanic candidates during the two additional years that the list would be in use.  Immediately following the conference, the Court issued an order directing the Monitor to "work with all Parties to propose requirements that may be necessary to justify the list extension."  The Monitor circulated a list of proposed requirements on February 8, 2022 and has scheduled a meeting with the City and the other Parties on February 14, 2022 to discuss them.

---

[1] The Candidate Physical Ability Test

[2] The FDNY Personnel Review Board, which evaluates candidates' histories to determine whether they qualify for appointment as part of the character review step in the hiring process

Part II also discusses hiring from the Exam 7001 list to date, as well as efforts to mitigate attrition among candidates in current processing – including activities and initiatives relating to fitness preparation, communications with candidates, outreach by Mentors and Outreach Coordinators,[3] and the tracking and analysis of data on candidate attrition and the efficacy of attrition mitigation measures and outreach.  Additionally, Part II includes an account of steps the City has taken or plans to take to comply with the Court's June 9, 2021 Memorandum and Order (the "June 9 Order") (Dkt. # 2033), which required the City to provide candidates who have passed the CPAT and are waiting to be called for further processing with additional fitness training resources and encouragement, and to gather and use information to optimize the City's attrition mitigation initiatives.

Part II also includes a summary of progress since the last periodic report in retrospective analyses, by the Monitor and the City, of the Exam 7001 recruitment campaign.  As previously reported, after requests by the Monitor (first issued in February 2020), and following discussions at the October 13, 2020 status conference, the City agreed that the Monitor could help with data analysis in this area, in light of competing public health commitments for the City's data personnel.  The Monitor shared a number of analyses related to these efforts with the Parties in a series of meetings during November and December 2021.  On September 1, 2021, the City advised the Monitor that it had retained the firm of KPMG to augment the City's own after action analyses.  On November 2, 2021, the City circulated a KPMG workplan, which anticipated that KPMG would provide a draft of its report on December 1 and that, after feedback from the City and related revisions, the final report would be submitted on December

---

[3] Previous reports have referred to these staff members as "Recruitment Coordinators."  In recent discussions, the Assistant Commissioner for Recruitment and Retention has generally referred to them as "Outreach Coordinators."  References below will use the updated term or simply "Coordinators."

23, 2021.  The City subsequently explained that the report was delayed.  The City has indicated

that it expects to present the findings from that report to the Monitor and the other Parties shortly

and to schedule a meeting thereafter.  The Monitor expects to update the Court further once the

Monitor and Parties have had a chance to see KPMG's analyses – which the City has not yet

shared, pending finalization of KPMG's full report.

Part II also reports on the Monitor's continuing efforts to verify the City's compliance

with the Disparate Treatment Settlement, the Modified Remedial Order, and applicable law in

initial workplace assignments for Fire Academy graduates.

Part III of the report summarizes activities relating to the FDNY's EEO function –

including follow-up regarding the questions asked and concerns expressed by the Court at the

October 8, 2021 status conference, which was prompted by press reports regarding serious EEO

violations by FDNY personnel, related disciplinary actions, and concerns expressed by members

of the Department about FDNY culture.  As discussed at the conference, and as acknowledged

by the Fire Commissioner and the Corporation Counsel, while the City has made progress in

some areas relating to EEO compliance – including updated policies, increased staffing, and

improved data management – considerable work remains to be done to transform firehouse

culture and make FDNY workplaces truly inclusive.  Following up on the conference, on January

18, 2022, the Monitor circulated a set of recommendations for new and revived initiatives

intended to address issues with firehouse climate and EEO compliance.  The recommendations

include measures to increase senior leadership involvement in EEO messaging and compliance,

to enhance officer accountability, and to incentivize and prepare company officers to monitor

firehouse climate and manage diverse workplaces.  The Monitor has asked the City to provide

dates for a meeting in February to discuss the recommendations and any additional suggestions

from the other Parties.  The Monitor has also engaged in a series of follow-up communications

and discussions with the City to address the Court's questions regarding the EEO violations,

investigations, and disciplinary actions discussed at the conference, and regarding EEO staffing,

messaging, investigative practices, and EEO inspections.

Since the conference, the City has completed the hiring process for an additional attorney

to fill one of the EEO Office positions left vacant by departures in 2020 and 2021.  The Office

staff currently includes 14 attorneys, which is two short of its 16-attorney pre-pandemic staffing

level.  However, in a February 4, 2022 update, the City advised that two additional attorneys,

including the Deputy Director, are planning to leave the Office – which will reduce the attorney

staff to twelve.  In response to questions from the Court at the October 8 conference, the City

confirmed that it will continue efforts to fill vacant positions in the EEO Office as rapidly as

qualified candidates can be identified.

In response to the Court's questions and concerns regarding the FDNY's internal

publication of disciplinary outcomes in EEO cases, the City has confirmed that it plans to publish

more detailed, anonymized summaries of disciplinary actions in EEO cases via Department

Orders – including the rank of the person disciplined, the penalty imposed, the specific code

provision and policy violated, and a description of the conduct involved.

Part III also provides an update on the City's efforts to resume regular in-person EEO

inspections of FDNY firehouses.  As reported in the Monitor's Thirty-Second Periodic Report

(Dkt. # 2004), at the January 2021 status conference, following a series of discussions among the

Monitor and Parties about Plaintiffs-Intervenors' request that the City use an alternative means

of conducting EEO compliance inspections (such as virtual inspections), the Court directed the

City to resume inspections in person as soon as it could safely do so.  Shortly after the October 8,

2021 conference, the City advised that in-person EEO inspections would resume as soon as a COVID-19 outbreak among EEO Office staff had subsided.  But the resumption of inspections was further delayed for several weeks, as EEO staff continued to be affected by COVID.  At the January 19, 2022 status conference, the City confirmed that inspections had recently resumed.  However, in subsequent communications, the City advised that, because of staffing difficulties, inspections through the end of January were being performed only by the Assistant Commissioner, instead of by a team of three inspectors (at each inspection) as before the pandemic.  Plaintiffs-Intervenors have raised concerns that having the Assistant Commissioner perform the inspections diverts his attention from other tasks and is not sustainable.  The City responded that it expected to resume inspections with at least two inspectors (likely accompanied by the Assistant Commissioner) beginning the week of January 31, 2022 – though it was still engaged in discussions with EEO personnel regarding staffing, and its plans remained subject to COVID considerations.  The Monitor continues to urge the City to resume a full schedule of inspections as soon as possible.

Since the Monitor's last report, progress has also occurred in the area of the FDNY workplace climate survey.  From the Monitor's perspective, the upcoming phase of the survey project is a critically important one.  The City and FDNY must be able to understand the feedback that survey recipients provided, so that they can use that information going forward.  In January, the City circulated a report that the City described as the final analytic output of the Mayor's Office of Data Analytics ("MODA"), which has been principally responsible for analyzing the survey results.  As described further below, the Monitor and the other Parties raised concerns that the report was missing certain important analyses, and that the report as circulated presented the information in a way that was too dense and technical to guide FDNY

managers in understanding and benefiting from the data and insights of the survey.  The City has agreed to make some revisions to the report and to consider additional analyses.  The other Parties object to any characterization of the climate survey analysis circulated by the City in January 2022 as complete or final, absent completion of additional analyses and integration of the results of those analyses with MODA's existing work.  It appears that some disagreements may remain concerning these issues, but the Monitor is hopeful that they can be resolved through further discussions among the Monitor and all Parties; if not, the Monitor will update the Court as needed on future developments.

In addition to sharing the results of the City with FDNY management, the Monitor has also stressed the need in recent months to plan to communicate to the FDNY workforce about findings from the survey. The United States has recently stated that it will circulate a timeline for planning and executing these communications, for discussion by the Monitor and other Parties.

In the area of EEO messaging, the development of a long-term strategic plan of EEO messaging continues to await the completion of the climate survey analysis, as the City previously decided to postpone the formulation of a long-term plan until the plan could be informed by the climate survey findings.

The FDNY's Chief Diversity and Inclusion Officer ("CDIO") left the Department on July 23, 2021.  The City has advised that until a new CDIO is hired, projects that would fall within the CDIO's purview are being managed on an interim basis by other senior FDNY personnel. The Monitor has continued to request updates from the City on developments in this area.  As of this report, the City has posted a job opening to fill the CDIO position but has not specified a time frame by which the City intends to complete a new hire.

The Monitor has continued efforts, discussed in prior reports, to obtain information related to the implementation of an EEO metric in FDNY officer performance reviews. Following a series of delays, on June 16, 2021 the City completed production of all but ten EEO performance reviews from the 2019 cycle (covering officer performance in 2018).  The Monitor has assessed the 2019 data and cross-referenced it with information from EEO investigations and other data and records from the relevant time frame; and on September 29 and October 13, 2021, the Monitor sent two sets of follow-up questions and recommendations to the City based on its assessment.  The Monitor continues to await production of performance review data from the 2020 and 2021 cycles of officer evaluations.

Part III also reports on the Monitor's continuing evaluation of the FDNY's EEO investigative practices and on discussions regarding the implementation of Monitor recommendations for their improvement.  On September 30, 2021, the Monitor met with the Parties to discuss their comments on an updated draft of its report to the Court on EEO investigations, with a focus on the duration of investigations.  Following the meeting, on October 18, 2021, the Monitor circulated a summary of key points and queries to the City.  The City responded on February 4, 2022 and simultaneously provided an updated set of comprehensive data showing the duration and outcomes of EEO investigations, which the Monitor had requested.  The Monitor is currently reviewing the City's responses and the updated data with a view to finalizing and submitting the report.  Separately, on January 18, 2022, the Monitor provided the City with a memorandum summarizing comments and recommendations on the FDNY's EEO investigative practices in gathering and analyzing evidence relevant to alleged violations – as reflected in case materials produced by the City since October 2019.

Part IV reports on efforts to identify and reduce disparate impact adverse to Black and Hispanic candidates in Medical Exam outcomes and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws. The FDNY's Bureau of Health Services ("BHS") resumed candidate medical evaluations on February 8, 2021, and the Candidate Investigations Division ("CID") began scheduling candidates for medical evaluations for the May 2022 class in September. The City recently notified the Monitor and the other Parties that at least some January 2022 medical appointments had to be rescheduled in light of the increase in COVID-19 cases. The City has been tracking, and regularly updating the Monitor and the other Parties regarding, candidate scheduling and the rates at which candidates have been reporting for testing, qualified, disqualified, or reserved. The City has also been providing specific information about Black candidates to Plaintiffs-Intervenors so that they can perform outreach and provide support for those candidates.

As noted above, the City's December 14, 2021 report on attrition metrics, which covered hiring results for Exam 7001 through October 26, 2021, shows that the Medical Exam continues to produce statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates. In addition, as discussed in the Monitor's previous periodic report (at 49), in August 2021, the Monitor circulated an analysis of medical outcomes from processing for Exam 2000 (the preceding examination), which identified the individual disqualification reasons that had accounted for disparate impact in the Medical Exam process for Exam 2000 candidates. The City stated in August 2021 that it would respond to longstanding requests by the Monitor and the other Parties to provide similar analyses for Exam 7001 showing which specific Medical Exam disqualification reasons are responsible for the statistically significant disparities in overall medical outcomes. The purpose of such individual disqualification analysis is, among other

things, to target mitigation strategies to the specific components of the exam that are disqualifying disproportionate numbers of non-traditional candidates.  In its most recent update, however, the City indicated that it is not yet able to provide an analysis of individual disqualification reasons for the Exam 7001 Medical Examination.  To satisfy the requirements of the Modified Remedial Order, the City must establish procedures for analyzing data and making mitigation adjustments as necessary.  This is especially critical for a hiring step such as the Medical Exam, where the City knows there is disparate impact.

Part V reports on the status of efforts by the Monitor and the Parties to analyze the impact of the FDNY's character review process on candidates from different demographic groups and to address disparate impact produced by the process.  As noted above, the City's December 14, 2021 report on candidate processing outcomes from the Exam 7001 hiring list reflects a statistically significant disparity between Black and white candidates in rates of referral to the PRB and in rates of qualification in the character review phase.  Additional analyses by the Monitor also show a statistically significant disparity adverse to Black candidates in the overall character review process (based on the rate of disqualification among all candidates in each demographic group who receive any final decision from the process, including a decision by the CID not to refer the candidate to the PRB).[4]  As the Monitor has previously noted, to the extent the process is shown to have an adverse disparate impact on Black or Hispanic candidates, the City will be required either to implement reforms and initiatives that address the impact effectively or to validate the process as job-related.  Accordingly, the Monitor has requested a

---

[4] The Monitor's analysis found that the disparity between Hispanic and white candidates in the overall process was significant according to one statistical test (the 2SD test) but not another (the Fisher's Exact Test).  The City's report shows a statistically significant disparity adverse to Hispanic candidates in referrals.

meeting later this month with the City and the other Parties to discuss further reforms that may be needed to mitigate disparities in character review outcomes.

Part VI discusses the Exam 7001 computer-based test ("CBT") developed, administered, and analyzed by the City's testing experts, PSI Services LLC ("PSI"), in consultation with experts for the Parties and the Monitor.

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.     <u>Recruitment and Attrition Mitigation</u>

### A.     **Candidate Processing**

#### 1.     <u>Extension of the Exam 7001 List</u>

As discussed in the Monitor's previous reports, on February 16, 2021, the City requested the Monitor's approval under the Modified Remedial Order for a two-year extension of the hiring list for Exam 7001, citing the disruption in candidate processing caused by the COVID-19 pandemic.  *See* Monitor's Thirty-Third Periodic Report (Dkt. # 2029) at 8; Monitor's Thirty-Fourth Periodic Report at 9.  Pursuant to the Court's direction at the January 19, 2022 status conference, the Monitor has scheduled a meeting with the Parties for February 14, 2022 to discuss steps the City should be required to take in connection with the proposed extension, including measures intended to minimize the risk that the list extension will produce or exacerbate disparities in attrition adverse to Black and Hispanic candidates.

In its original request, the City asserted that the extension would prevent a hiring gap and promote diversity within the ranks of the FDNY.  In support of its request, the City stated that earlier analyses indicated that the hiring list is more diverse at the lower scores that could be reached if the list were extended.  The other Parties argued that the City's reference to diversity

in the list was inadequate to demonstrate that the City had diligently evaluated possible adverse impact associated with the extension, and they asked the Monitor not to approve the extension until the City had either done more analysis or, if it had already completed the analysis, described it more thoroughly.

As reported in the Monitor's last periodic report, on June 18, 2021, the Monitor noted that the City's proposal did not indicate that it had considered a number of factors, including possible attrition over the period of the extension and the likelihood that such attrition could negate any increased diversity at lower scores on the list. The Monitor requested that the City: (i) identify the analyses and conclusions the City was relying on; (ii) project the likely hiring outcomes of the extension, their effect on diversity, and any related disparate impact, taking into account past hiring outcomes and trends from Exam 2000 and Exam 7001 to date; (iii) describe the City's plans to address any projected possible increase in attrition among Black and Hispanic candidates that might result from an extension; and (iv) describe any new planned attrition mitigation initiatives to address this possible increase in attrition. *See* Monitor's Thirty-Fourth Periodic Report at 10.

As previously reported, the City responded to the Monitor's June 18 letter on June 28, 2021, stating that the Monitor's requested analyses were unnecessary, and proposing instead that the Monitor and Parties meet to discuss a revised "selection ratio" – *i.e.*, an estimate of the number of candidates the City needs to call in order to yield one hire, based on Exam 7001 hiring data to date – and the resulting projected score the City could expect to reach in the event of an extension. The City proposed to then perform adverse impact analyses of the list based on the resulting projected score, and to consider requests for further analyses thereafter. The Monitor responded on July 14, 2021, requiring that the City perform further analyses along the lines

suggested in the City's June 28 proposal, with modifications, and that the Monitor and the Parties would then meet to discuss whether anything further would be required before the Monitor made a decision whether to approve the extension.  Monitor's Thirty-Fourth Periodic Report at 10-11.

Since the last periodic report, the Monitor and the Parties have met twice to discuss information and analyses the City has provided in response to the Monitor's requests and the follow-up feedback from the Monitor and the other Parties.  The material provided by the City includes calculations of the selection ratios for different demographic groups in Exam 2000 and Exam 7001 to date, projections of likely future Exam 7001 selection ratios and the lowest reachable score under various assumptions, and adverse impact analyses based on the resulting projections.

At the January 19, 2022 status conference, Plaintiffs-Intervenors and the United States advised the Court that they did not object to a two-year extension of the hiring list, but they urged that the City be required to perform regular analyses of candidate attrition as processing continues, and to compare actual results to the estimates and projections of candidate attrition offered in support of the City's request.  At the conference and in correspondence regarding the list extension, the United States noted that if actual appointments from the extended list are less favorable for non-traditional candidates than the list-extension projections anticipated by the City's analyses, it will be necessary for the Parties and the Monitor to consider whether additional attrition mitigation measures are needed.  Plaintiffs-Intervenors have also recommended that, because the City has not previously had a six-year list, the City should be required to implement additional and enhanced measures to address the risk of increased attrition among non-traditional candidates as a condition for approval of the extension – especially for

candidates who are likely to be reached for CPAT testing and further processing in the fifth and sixth years of the extended life of the hiring list.

Based on the City's submissions and the Monitor's own analysis of data provided by the City, the relevant analyses of available data indicate that the extension may have a small favorable effect on Black and Hispanic representation among candidates appointed to the Fire Academy, assuming levels of attrition during the extension period do not increase for such candidates (for example, due to the longer wait associated with the extension itself).  A benefit of the two-year extension is that it would materially extend the lead time for planning the next recruitment campaign, which would allow the City to develop appropriate, data-driven strategies, targeting, and messaging for the campaign.

At the January 19, 2022 status conference, the Court indicated that it was inclined to approve the City's request for a two-year extension.  However, in light of concerns that the extension could exacerbate candidate attrition, in its subsequent Order the Court directed the Monitor to "work with all Parties to propose requirements that may be necessary to justify the list extension."  Accordingly, on February 8, 2022, the Monitor circulated a list of proposed requirements to the Parties and plans to hold a meeting with all Parties on February 14 to discuss the proposals and finalize a list of measures to be required as conditions for any approval of a list extension.

2.   Demographic Trends in Candidate Processing to Date and Results of the City's Analysis of Attrition in the Hiring Process for Exam 7001

Figures provided by the City since the last periodic report continue to show statistically significant disparities adverse to Black and Hispanic candidates in outcomes at several distinct stages of the hiring process.

a)      *Demographics of Appointments from the Exam 7001 List*

On October 28, 2021, the City provided the following figures for the demographic breakdown of open competitive candidates in the October 2021 Academy class[5]:

| | |
|---|---|
| Asian | 10 (3.2%) |
| Black | 40 (12.7%) |
| Hispanic | 77 (24.5%) |
| Native American | 1 (0.3%) |
| Unknown | 0 |
| White | 186 (59.2%) |
| Total | 314 |

On December 16, 2021, the City circulated a report on attrition metrics for Exam 7001 candidate processing as of October 26, 2021 (updated from its previous report, which covered outcomes through May 2021).  The report shows that to date 1,038 candidates have been appointed from the Exam 7001 eligible list, including 124 Black candidates (11.9%), 631 white candidates (60.8%), and 231 Hispanic candidates (22.3%).

b)      *Analyses of the Hiring Process and Statistically Significant Disparities*

Like the City's previous attrition reports, the City's December 2021 attrition metrics report provides a summary of both voluntary attrition and candidate disqualification outcomes from several stages of the hiring process, which the latest report updates through October 26, 2021.[6]  The report continues to show statistically significant disparities adverse to Black candidates in disqualifications at several stages of the hiring process thus far.  These include the

---

[5] The class also included seven promotional candidates.

[6] As discussed in detail below in Part II.B.4, although the attrition metrics report includes calculations of the statistical significance of inter-group disparities, it does not include any analyses correlating rates of voluntary attrition or candidate outcomes with attrition mitigation initiatives.  It also does not include information on the specific reasons for disqualifications in the Medical Exam.

CPAT, the Medical Exam, and both phases of character review (PRB referral and disqualifications).  The figures also show statistically significant disparities adverse to Hispanic candidates in the CPAT and the Medical Exam.

As detailed in this and previous reports, the City has taken a number of steps to retain non-traditional candidates and has implemented new measures over time, although it has also declined to adopt certain recommendations by the Monitor and other Parties.  The persistence of these disparities underscores the ongoing importance of devoting resources, creativity and commitment to narrowing the outcome gap – including measuring the effectiveness of existing initiatives and being willing to augment them where continuing disparities suggest that more is needed.

*c)      Candidates in Active Processing*

On November 10, 2021, the City provided the following breakdown of the candidates in active processing for the May 2022 class, which is expected to be a full class of approximately 320 probationary firefighters[7]:

| Asian | 46 (6.2%) |
|----------|-------------|
| Black | 119 (16.1%) |
| Hispanic | 196 (26.5%) |
| Native | 2 (0.2%) |
| White | 377 (50.1%) |
| Total | 740 |

---

[7] The City has advised that the group in current processing includes candidates with list numbers up to 3,800.

*d)*     *Current Firefighter Demographics*

On December 21, 2021 (following the appointment of the October 2021 class), the City

reported the following demographic breakdown for the FDNY firefighter force:

| Asian | 195 (2.4%) |
|-------|------------|
| Black | 834 (10.2%) |
| Hispanic | 1,318 (16.1%) |
| Native | 9 (0.1%) |
| White | 5,657 (69.2%) |
| Unknown | 157 (1.9%) |
| Total | 8,170 |

Along with the updated figures on the composition of the firefighter force, the City also

provided figures on firefighter departures from the FDNY in 2021, which also contribute to

increasing Black and Hispanic representation in the firefighter force:

| Firefighters Separated from FDNY in 2021 | |
|------------------------------------------|-------------|
| Race/Ethnicity | Count |
| African American | 15 (5.1%) |
| Asian | 5 (1.7%) |
| White | 238 (81.5%) |
| Hispanic | 32 (10.9%) |
| Undefined | 2 (0.6%) |
| Total | 292 |

## B.     Attrition Mitigation

Since the last periodic report, the Monitor has continued to review, evaluate, and provide

comments and recommendations regarding the City's efforts to mitigate attrition among Black

and Hispanic candidates.  These include the City's implementation of remedial measures

17

required by the Court's June 9, 2021 Order[8] (relating to the subset of candidates who have

passed the CPAT) and, more generally, its ongoing work on programs, communications, and

outreach intended to maintain candidate engagement and help candidates prepare for the various

phases of the screening process – throughout the period in which they wait for and undergo

processing. The discussion below summarizes the City's recent activities in major areas of

attrition mitigation and candidate outreach and provides updates regarding the status of its

compliance with the June 9 Order in each relevant area.

      1.    <u>Fitness Resources</u>

    The June 9 Order directed the City to provide candidates with fitness resources specified

as follows:

> The City is directed to make available to all Black and Hispanic candidates who
> have already passed the CPAT examination, when safety permits, an opportunity
> to maintain fitness and to practice on a stairmill at least every two weeks (whether
> at the Bureau of Health Services, through an arrangement with a gym, at a leased
> site, or any other option the City may deem suitable.)

June 9 Order at 12.

    As described in detail in the Monitor's July 30, 2021 report to the Court (Dkt. # 2045),

after initially proposing a program of fitness training that would not have reached all the Black

---

[8] The Court issued its Memorandum & Order resolving the Parties' dispute regarding CPAT processing on June 9, 2021.  The June 9 Order directed the City to take four remedial steps relating to its communications with candidates, the fitness resources it provides to candidates, and its efforts to evaluate and enhance the effectiveness of its attrition mitigation programs.  A fifth remedial provision (the first listed in the June 9 Order) directed the City to provide "a flowchart or written summary of the firefighter hiring process that enumerates each step of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit of the FDNY has primary responsibility for each of the listed steps."  June 9 Order at 11.  The Court noted that the purpose of this provision is to "clarify the steps of the hiring process so that it is clear under what circumstances the City is required to seek the Monitor's pre-approval."  *Id*. at 12.  The City produced materials purporting to comply with this directive on July 30, 2021.  The United States and Plaintiffs-Intervenors have provided comments, and the Monitor is considering the materials to determine what additional information the City may be required to provide to comply with this provision of the June 9 Order.

and Hispanic candidates covered by the June 9 Order, the City agreed to offer the required training to all candidates who had passed the CPAT and remain eligible for further processing and appointment.  In accordance with that commitment, the City has continued to offer three two-hour training sessions each week on alternating weeks, using five stairmills at the Fire Academy on Randall's Island, and incorporating both work on the stairmill and other fitness training intended to prepare candidates for the stairmill component of the Medical Exam.[9]

The Monitor, Plaintiffs-Intervenors, and the United States have continued to express concerns, both with respect to the fitness training required by the June 9 Order and with respect to physical preparation more generally, that the Fire Academy location may be a deterrent to wide candidate participation, because getting to Randall's Island can require significant travel time.  The City continues to maintain that the location does not deter participation.  In support of its position, the City notes that only a small number of candidates attended the alternative CPAT training site at FDNY headquarters that was established part-way through the most recent round

---

[9] Previously, the City suggested that it would be appropriate to limit the availability of the program to candidates with AFAs of 99 or above – on the ground that candidates with lower scores were not likely to be reached for further processing and potential appointment.  Monitor's Thirty-Fourth Periodic Report at 15.  However, subsequent analyses performed by the City in support of its request for an extension of the Exam 7001 list indicated that candidates with AFAs as low as 96 may be reached with a two-year extension of the list (although such estimates are necessarily uncertain).  Accordingly, the City's earlier request to limit the availability of the program by list number to avoid raising false hopes among candidates with lower AFAs has been superseded by subsequent events.

In discussions with the Monitor and the other Parties regarding this component of the Court's June 9 Order, the City has also noted that it will not offer the program to candidates who have declined further consideration for appointment.  However, the City has also confirmed that it will continue the practice of reaching out to candidates in declined status at the start of each processing cycle to encourage them to rejoin the process, and that it would offer the fitness program to any such candidates who restored themselves to the hiring list.

of CPAT training,[10] and that the five participants in the candidate focus group conducted on

September 17, 2021 (in accordance with a separate provision of the Court's June 9 Order) did

not voice complaints about the Randall's Island location.  But the evidence cited by the City is

not conclusive.  The alternative CPAT training site was not set up until the final four weeks of

the training period and did not offer an experience identical to the actual test at the Academy.  As

discussed below, the focus group included only five participants, three of whom were City

employees, making it difficult to draw conclusions about the general population of candidates.

In addition, based on the City's focus group summary shared with the Monitor and the other

Parties, the only responses to the question of whether the location of Randall's Island had been a

factor in attending or not attending CPAT training sessions were (i) one attendee's statement that

the fact that Randall's Island is far from the attendee's home supplied motivation to try harder,

coupled with the same attendee's belief that "traveling far" is "expected" as part of the firefighter

job; and (ii) another attendee's statement that Randall's Island was a good place to be.  Based on

the summary, moreover, it does not appear that the City included any questioning in the focus

group about what impact, if any, a City decision to offer alternative training locations would be

likely to have on CPAT training attendance.

In order to assess the need for additional training locations, the Monitor asked the City to

provide fully updated data on participation in the existing stairmill program and the FAP[11] and to

ask further specific questions regarding access to fitness training in the survey it plans to conduct

---

[10] Figures provided by the City on September 17, 2019 indicated that 40 candidates took advantage of training at the headquarters site – out of a total of more than 1,400 candidates who attended at least one CPAT training session at any location during the 2019 round of CPAT training.

[11] The FDNY's Fitness Awareness Program, a multi-session program of fitness training for post-CPAT candidates, is described in detail in the Monitor's previous reports.  Monitor's Thirty-Second Periodic Report at 18-19; Monitor's Thirty-Third Periodic Report at 16-17.

as a follow-up to the candidate focus group (discussed below).  The City provided figures for the fitness programs on January 10, 2022, showing the following rates of attendance:

FAP Round 5:  June - September 2021

|  | Invited | RSVP | % RSVP | Attended | % of RSVP Attended | % of Invited Attended |
|---|---|---|---|---|---|---|
| Black | 378 | 136 | 35.9% | 59 | 43.4% | 15.6% |
| Hispanic | 601 | 199 | 33.1% | 77 | 38.7% | 12.8% |
| White | 1,142 | 187 | 16.4% | 93 | 49.7% | 8.1% |

Stairmill Training:  July - December 2021

|  | Invited | RSVP | % RSVP | Attended | % of RSVP Attended | % of Invited Attended |
|---|---|---|---|---|---|---|
| Black | 377 | 100 | 26.5% | 24 | 24% | 6.4% |
| Hispanic | 607 | 130 | 21.4% | 31 | 23.9% | 5.1% |
| White | 1,129 | 116 | 10.3% | 37 | 31.9% | 3.3% |

Given that the highest rate of attendance among invitees for any of the key demographic groups in either program is 15.6% (for Black candidates in the FAP), the figures indicate substantial room for improvement in the reach of the fitness programs.  Plaintiffs-Intervenors have suggested that lower rates of attendance for the stairmill program compared to the FAP may be a function of how much travel time is required relative to the length of time that candidates will be able to spend practicing the stairmill and other tasks; but, again, the City vigorously disagrees.[12]

In discussions regarding the implementation of the June 9 Order, the City indicated generally that it has explored arrangements with various third-party gyms and fitness facilities as an additional option for candidates.  But no such arrangements have been established to date.  On a January 27, 2022 conference call, the City indicated that it was also exploring the option of

---

[12] As described by the City, in addition to the stairmill itself, the stairmill training program incorporates other stair-climbing exercises (including weighted climbing) along with squats and deadlift weight training.  The FAP puts candidates through a sequence of push-ups, sit-ups, pull-ups, a 1.5 mile run, and 40 minutes of calisthenics in addition to stairmill training.

offering stairmill training at FDNY headquarters in Brooklyn, but no specific provisions had yet

been made.  The Monitor plans to continue discussions with the City and the other Parties

regarding options for additional fitness training locations.

2.     Candidate Communications

The June 9 Order directed the City to engage in regular communications with all post-

CPAT candidates on specified topics:

> The City is directed to communicate, via the FDNY Office of Recruitment and
> Retention, not less than once a month with all Black and Hispanic candidates who
> have already passed the CPAT examination, with reasonable estimates of when
> they might be called for further steps, and encouragement to remain in the FDNY
> hiring process.

June 9 Order at 12.

The City previously advised the Monitor that it will establish a process for verifying and

reporting to the Monitor that communications with candidates take place at least monthly.

Monitor's Thirty-Fourth Periodic Report at 18.  Since the last periodic report, the City has

provided the Monitor with two updated communication plans, the first on November 15, 2021

and the second on February 3, 2022.  In an improvement on previous plans, the City's November

15, 2021 plan appeared to reflect at least monthly communications with all post-CPAT

candidates.  However, it did not clearly provide the monthly updates on candidate status and

estimated wait times required by the June 9 Order.  On January 18, 2022, the Monitor

transmitted a series of further questions and recommendations to the City regarding the

November 15 plan, including recommendations that the plan include additional updates on

anticipated processing timelines for each differently situated group of candidates.  In addition to

targeted updates specific to each group of differently situated candidates, the Monitor has

suggested generally that the messaging for all the groups identified in ORR's[13] plans should be complemented with frequent updates to all candidates projecting which list number ranges are in active processing, which ranges the City expects to invite for active post-CPAT processing at which times, and when candidates in specified ranges are projected to be appointed to Academy classes.[14]   The Monitor is currently reviewing the City's February 3, 2022 plan to determine whether it has addressed the Monitor's comments and whether it reflects compliance with the Court's June 9 Order.

In recent discussions regarding ORR communications and outreach, the City has advised that it plans to add a feature to the candidate portal showing when candidates in specific list-number groups can expect to be called for post-CPAT processing.   The City has also advised that candidates can now complete questionnaires associated with the Medical Exam via the portal in advance of their initial Medical Exam appointments.   On January 26, 2022, the City circulated a set of screenshots from the portal showing its current features, which include appointment notifications; links to candidate information and resources; an online registration form for the Mentor program; and the "Requirements and Reminder Notice" that the City sends periodically to candidates and posts on the portal to notify them regarding outstanding document requirements.   On a February 3 conference call, the Monitor and the Parties discussed these features along with other components that the City is considering adding to the portal.

---

[13] The FDNY's Office of Recruitment and Retention

[14] Although the relevant provision of the June 9 Order concerns candidates who have passed the CPAT, this type of communication regarding expectations for further processing should also be directed to candidates who have not yet been called for CPAT testing – particularly given that candidates are offered access to the candidate portal only after they have been invited to attend CPAT training.

The Monitor has encouraged the City to continue to prioritize non-traditional candidates in outreach relating to programs and events such as the FAP, stairmill-focused fitness training, and WebEx sessions.  And it has suggested that ORR's communication plans include additional messages encouraging non-traditional candidates to connect with relevant affinity groups.  The Monitor has also recommended that messaging plans include regular WebEx conferences focusing on specific topics including fitness, preparation for the Academy, and the administrative requirements of the hiring process.

The Monitor has also noted that although the Court's June 9 Order focused on messaging to post-CPAT candidates, the City must also engage in motivational messaging to pre-CPAT candidates – to manage expectations, encourage continued commitment, and publicize training resources.

In other developments relating to candidate communications, the Monitor has continued to receive updates on the rollout of a new texting system for use by ORR staff.  The new system is intended to improve ORR's ability to respond when a candidate replies to a bulk text message.  As described in recent discussions, the new system will allow Outreach Coordinators to send texts through the ARCS system employed by ORR to manage and track communications with candidates, and ARCS will preserve the history of text communications with each candidate.  Candidate responses to bulk texts will be sent to the Outreach Coordinators, who will then be able to respond via the system.  Based on the City's most recent updates, Outreach Coordinators have been trained on the system, and it is now fully operational.

### 3.    Coordinators, Mentors, and In-Person Outreach

The Monitor has continued to receive updates regarding the ORR staff of Outreach Coordinators – firefighters detailed to ORR to assist in outreach to candidates.  On November 15, 2021, in response to a Monitor request, the City provided a chart showing an updated

formula for determining the number of Outreach Coordinators assigned to maintain contact with candidates in active processing.

| # of FF Candidates in the Current Hiring Process | # of Uniform Members African American Outreach Coordinator | # of Uniform Members Hispanic Outreach Coordinator | Detailed Members Total |
|---|---|---|---|
| 1-100 | 1 | 1 | 2 |
| 100-200 | 2 | 2 | 4 |
| 200-300 | 3 | 3 | 6 |
| 300+ | 4 | 4 | 8 |

The City's most recent formula represents a reduction in Coordinator staffing requirements compared to its previous formula (circulated May 14, 2021). *See* Monitor's Thirty-Third Periodic Report at 14 & n.4.[15]  The City advised that the change in the formula for Coordinator staffing was based on the City's assessment of the stages of processing that candidates had reached.  However, the reduction raises concerns that the level of staffing may not be sufficient to maintain engagement in the target groups.  Moreover, although the City's staffing formula is based on the number of candidates in active processing, who require the most frequent outreach, the Monitor has emphasized that Coordinators should also maintain in-person outreach with the additional group of candidates who have passed the CPAT, while they await resumption of their active processing.

---

[15] Based on the City's most recent update, there are currently three African American and one Hispanic Outreach Coordinator, assisted by five light-duty firefighters (all African American).  As reported above, as November 10, 2021, the group of candidates in active processing for the May 2022 class included 119 Black candidates and 196 Hispanic candidates (out of a total of 740).

The Monitor has previously emphasized the importance of frequent, proactive communications by Coordinators and has urged the City to ensure sufficient staffing to meet pre-established targets for such proactive communication with each candidate, notably in connection with the resumption of candidate processing in early 2021.  Monitor's Thirty-Second Periodic Report at 11-19; Monitor's Thirty-Third Periodic Report at 13.  But the level of Coordinator staffing has varied (in part, recently, because of Department-wide staffing issues associated with the vaccine requirement and the surge in COVID-19 cases), and the Monitor's efforts to obtain a full account of all Coordinator communications have been unsuccessful because the City does not keep a searchable record of all Coordinator communications.[16]  Consequently, the Monitor has been unable to independently confirm that Coordinator contacts are sufficiently frequent, especially for candidates who have passed the CPAT and are simply waiting for the City to call them for further active processing.

At one point the City indicated that Coordinators communicated with candidates on a weekly basis, but more recently the City advised that communications are not always that frequent.  Monitor's Thirty-Fourth Periodic Report at 24.  The City reports that the frequency of Coordinator communications with candidates in active processing fluctuates depending on whether candidates have appointments or whether ORR is promoting a specific program like the

---

[16] In response to a series of Monitor requests, the City has previously produced reports from its ARCS database reflecting some Coordinator communications with a sample of candidates.  But the reports reflected gaps of more than a month between Coordinator communications with several of the sampled candidates.  In answers to follow-up inquiries from the Monitor's team, the City advised that reports from ARCS did not include all Coordinator communications with each of the sample candidates.  (The communications are memorialized in a July 7, 2021 email from the Monitor's team to all Parties.)  The City recently advised that text communications by Coordinators, using a new texting system, will be tracked in ARCS in such a way that the history of communications will be readily visible to Coordinators and ORR management.  But based on the information provided to the Monitor, other types of Coordinator communications appear not to be readily searchable by candidate in the ARCS system.

FAP at a given time.  And it has indicated that communications with those not in active processing occur approximately monthly – again related to specific events or invitations like the FAP.

In addition to communications with the current group of post-CPAT candidates, ORR must also make appropriate plans and provide sufficient staff for Coordinator outreach to candidates it plans to call for the next round of CPAT testing.  The City has acknowledged that the large-scale intensive activities required for these candidates will call for a substantial increase in Coordinator staffing, and the Assistant Commissioner has indicated her preference for full time detailed staff to assist her in this work.  The Vulcan Society has agreed to reach out to its membership to see if it can assist her in filling these impending needs.

### 4. Data Collection and Analysis

#### a) Post-CPAT Focus Group Ordered by Court

The Court's June 9 Order provided as follows:

> The City is directed to conduct a focus group with candidates who have passed
> the CPAT and are expected to wait before being called for further processing,
> with study design input from the Monitor's experts, in the next 30 days [by July 9]
> to assess their experience and gather suggestions to improve retention and
> preparation.

June 9 Order at 12.

Following a joint request by the Parties and the Monitor for an adjournment of the deadline for the City to comply with the focus group component of the June 9 Order, the Parties and the Monitor engaged in a series of discussions regarding the City's plans for the content and administration of the focus group, which was ultimately conducted on September 17, 2021.  *See* Monitor's Thirty-Fourth Periodic Report at 16.

The City circulated a report of its findings from the focus group on October 18, 2021.  As noted in part in relevant sections above, the participants expressed a desire for more frequent,

specific updates (including notifications on the candidate portal) regarding where they stand in the hiring process and the anticipated timeline for further processing.  They also expressed favorable opinions of the content of both CPAT training and the FAP, suggesting that the City should consistently make fitness training sessions available to all candidates and offer sessions at additional times.  As the City has noted in response to concerns expressed by the Monitor and the other Parties, none of the five focus group participants identified the Randall's Island location of CPAT training as a factor that had prevented them from attending CPAT training.  As described above, however, the City received just two responses to the question of whether the location was a factor at all, and the focus group members were not asked what effect, if any, offering other locations might have on candidate attendance at training.[17]

Although the focus group elicited some informative comments from the participants, the usefulness of the findings is likely somewhat limited.  The group was small, as only five candidates participated (out of 15 whom the City reported had initially expressed interest); most candidates in the group were in their 30s (and thus likely to have been close to the maximum permissible age of 29 when they began the application process); and three of the five participants were current City employees, and thus presumably more likely than most candidates to be familiar with City hiring processes.  On January 14, 2022, the Monitor sent the City a memorandum detailing these concerns (among others) regarding the structure and administration of the focus group.

In keeping with an earlier proposal by the City to conduct a survey in lieu of a focus group, the City has continued to pursue the idea of a broader survey of candidates regarding their experiences in the hiring process, and regarding ORR communications and programs.  During

---

[17] The City's report includes no responses on this topic from the other three participants.

discussions about the focus group, the City noted a number of questions that it believed would be better deferred to a survey.  The City also agreed to use the survey to attempt to gain additional, more representative data about candidates' views of travel to Randall's Island.  The Monitor recommended that the survey be run by a third party or by a City agency other than ORR (to encourage candid responses regarding ORR programs and communications), and that it be conducted on an anonymous basis.  The Monitor cited research indicating that these practices are likely to generate higher response rates as well as more candid responses, compared to surveys where candidates believe a prospective employer can access the responses, and the United States also recommended that the City conduct the survey anonymously to encourage honest responses. The City has decided to allow ORR to administer the survey (rather than a third party or another agency), using the same modes of communication that ORR uses to solicit other candidate information, such as sign-ups for processing appointments and ORR programs.  The City has stated that the survey will be conducted "confidentially" but not anonymously, and it has indicated that in some cases ORR may tie responses back to respondents in order to understand the individual experiences underlying responses.

On January 10, 2022, the City circulated a work plan for the survey, which indicated it intended to limit the survey to 30 questions, but which did not provide dates for drafting or completing the survey.  The plan indicated that the survey would be sent to a sample of candidates who have not yet been called for further processing after passing the CPAT.  On January 25, 2022, the Monitor sent the City a set of comments, questions, and suggestions regarding the City's plan – including a recommendation for extending the survey sample to include all post-CPAT candidates, a request that the City provide dates for the proposed delivery and analysis of the survey, and a request to describe planned uses of the survey data.  On

February 2, 2022, the City circulated a draft of the survey, and the Monitor expects to provide the City with comments on the draft survey within the next several days.  On February 7, the United States circulated feedback on the City's plan, including a recommendation that the City find ways to increase the survey sample size in the ways the Monitor recommended, such as by opening the survey to a larger cohort than originally contemplated.  The City has indicated that it expects to follow up shortly with further responses to the Monitor's January 25 questions and comments, to the extent they have not been addressed by the draft survey.

### b)   *Assessment of Attrition Mitigation Measures*

Since candidate processing resumed following the pandemic-related suspension, the City has produced two reports showing outcomes for Exam 7001 candidates in each of the main phases of the hiring process – the first on July 9, 2021 (for processing though the appointment of the May 2021 class) and the second dated December 14, 2021 (covering processing for Exam 7001 candidates through October 26 and the appointment of the October 2021 class).[18]  Both reports show voluntary attrition and rates of qualification and disqualification for candidates in the principal phases of the screening process, along with assessments of the statistical significance of disparities between groups in qualification.  However, neither report includes any correlations of candidate outcomes with ORR communications, outreach, or attrition mitigation initiatives; nor do the reports include any detailed information on the reasons for Medical Exam disqualifications.  The reports also do not include calculations of statistical significance for disparities in voluntary attrition.

---

[18] The City produced two earlier reports on Exam 7001 processing, dated June 17, 2019 and Dec 27, 2019.

On July 26, 2021, and in a further follow-up message on October 27, 2021, the Monitor provided the City with a list of additional analyses for the City to perform as part of an expanded assessment in accordance with the June 9 Order.[19]  The Monitor's recommendations include suggestions for analyses correlating voluntary attrition and candidate outcomes with specific ORR programs and communications, analyses of specific reasons for medical disqualifications, and additional analyses of the character review process.  As previously reported, following up on suggestions by the Plaintiffs-Intervenors, at an August 20, 2021 meeting with the Parties, the Monitor also asked the City to explore whether it could determine how many candidates appear for either one or two CPAT practice sessions but fail to appear for a subsequent session or for the final test, determine the reasons they fail to appear, and develop additional measures to ensure that as many candidates as possible take advantage of all three opportunities to pass the test. Monitor's Thirty-Fourth Periodic Report at 20.  The Monitor plans to meet with representatives of DCAS on February 25, 2022 to pursue these and other inquiries regarding DCAS record-keeping and analysis.  Also at the August 20, 2021 meeting, the Monitor asked the City to collect and analyze additional data relating to candidates in pending status in the Medical Exam and to examine the reasons for which candidates are pending – both to provide guidance to ORR in outreach to pending candidates and to identify any patterns in the outcomes for candidates who are pending for particular reasons.  *Id.*

At a September 20, 2021 meeting, the City provided a demonstration of the data "dashboard" used by ORR to track candidate outcomes and to review correlations between candidate outcomes and some of the FDNY's main attrition mitigation initiatives.  Monitor's

---

[19] As discussed in the Monitor's previous report, these recent compilations of recommendations consisted largely of longstanding recommendations, many dating back to at least 2019.

Thirty-Fourth Periodic Report at 20.  As demonstrated at the September 20 meeting, the current dashboard appears to support several (but not all) of the analyses long recommended by the Monitor – potentially allowing ORR to assess the effectiveness of a number of attrition mitigation programs by observing correlations between candidate participation and hiring process outcomes.  *See* Monitor's Thirty-Fourth Periodic Report at 20-21.

In further discussions since the September 20 meeting, the Monitor has sought additional information regarding the ways in which ORR uses the dashboard to guide outreach to individual candidates, and to assess and adjust its attrition mitigation programs and communications. Plaintiffs-Intervenors have also asked the City to explain whether and how ORR uses the dashboard to identify correlations between attrition and indicators of candidate engagement (including sign-ups for the candidate portal and the Mentor program).  The City has reported that ORR management uses the dashboard whenever it wishes to identify individual candidates who may be in need of further outreach or assistance, and that ORR has employed the dashboard to examine the effectiveness of certain communications (bulk texts or email messages) in prompting specific candidate actions (such as sign-ups for the candidate portal).  The City has also indicated generally that ORR looks for patterns or common factors among candidates who encounter difficulties in the process and require further outreach or assistance.  But the Monitor has not yet been provided with any records of data analyses, or other internal memoranda or assessments, used to identify groups of candidates for additional outreach or to modify the content or targeting of ORR messaging; and the City has stated that its consultation of the database consists of viewing by management that is done on an as-needed basis.[20]

---

[20] On a recent conference call, the Assistant Commissioner for ORR also described some other instances in which feedback gathered directly from candidates (as distinct from analyses of dashboard data) has prompted adjustments in communications and programs.

The June 9 Order requires the City to assess the effectiveness of its attrition mitigation programs and to present plans to "operationalize" the assessment, along with candidate feedback, in its attrition mitigation efforts going forward.  In relevant part, the June 9 Order provides as follows:

> Before resuming administration of the CPAT to further candidates, the City is directed to submit to the Monitor and Parties a written summary discussing the effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1 and 2, the efforts that have been specifically directed to the candidates in the group who have passed the CPAT, any takeaways  from the focus group, and a description of how the FDNY plans to operationalize the information contained in the report going forward.  The City should likewise continue to furnish data on disparate impacts and attrition rates for Black and Hispanic candidates.

June 9 Order at 12-13.

In discussions with the Monitor and the other Parties following the June 9 Order, the City indicated that administration of the CPAT was not projected to resume until early 2022, and it tentatively proposed a target date of August or September 2021 for the completion of this requirement.  The Parties and the Monitor agreed on a provisional timeline for the City to obtain input from the Monitor and the other Parties and generate the required summary analysis.  But subsequently, in part because of COVID-related concerns, the City indicated that its tentative plan for the next administration of the CPAT would need to be revised.  On a January 6, 2022 conference call with the Monitor and the other Parties, the City advised that it was continuing to work on a new proposed schedule for CPAT administration and the analysis required by the June 9 Order, and that it expected to circulate a proposal soon.  On February 2, 2022, the City circulated a new proposed schedule with dates for CPAT testing, training, and related outreach, which includes a proposed timeline for completing the analyses required by the June 9 Order. The Monitor is reviewing the City's proposed schedule and plans to continue discussions with the City to set a firm timeline for completion of this requirement of the Court's Order.

C.      **Analyses of the Exam 7001 Recruitment Campaign**

1.      Overview of Analysis and Planning

The City's establishment of a sustainable process for successfully recruiting and retaining

Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and

the Monitorship.  *See* Modified Remedial Order ¶¶ 31-36.  The Court specifically found that a

policy or practice that "fails to adequately recruit black persons to become firefighter candidates

serves to maintain and perpetuate the effects of the City's discrimination against black firefighter

candidates."  Findings of Fact (Dkt. # 741) at 33.  The Court has also emphasized the need for

the City to identify which measures are most cost-effective for diverse recruitment.  For the City

to accomplish these goals, it must analyze the outcomes of its recruitment efforts to identify

which initiatives are the most productive and cost-effective means of attracting non-traditional

candidates likely to achieve reachable scores on the firefighter examination and ultimately be

appointed as firefighters.

As described in the Monitor's previous reports, while the retrospective reports on the

Exam 7001 campaign produced by the City to date contained some useful analyses, they did not

identify which recruitment activities most effectively increased Black and Hispanic

representation in the pool of candidates with scores likely to be reached during the life of the

exam list (assuming the standard four-year term).  Monitor's Twenty-Ninth Periodic Report

(Dkt. # 1966) at 37.  As the Monitor and all Parties have emphasized, it is essential for the City

to complete these analyses in time to use the results to inform the City's strategies for the next

recruitment campaign, and the City has acknowledged that they are a critical pre-requisite for

that campaign.  In July 2021, the City advised the Court that it was hiring an outside consultant,

KPMG, to assist with this work.

34

The schedule the City proposed in its list-extension request projected that the next campaign (assuming a two-year extension) would begin in April 2023, with the next examination taking place in the summer of 2024.  The Parties and the Monitor have estimated that planning for the next campaign will require approximately eleven months once the after action analyses of the Exam 7001 campaign are completed.  The Monitor, Court and other Parties have obtained the City's assurances that the next recruitment cycle will not begin until these analyses have been completed and incorporated into a comprehensive plan of action.  The City noted "the need to ensure sufficient analysis and planning prior to the commencement of the recruitment campaign for the next exam" as one of the grounds for its request for the Monitor's approval to extend the list.

### 2.  City's After Action Report and Cost-Effective Report

As described in the Monitor's previous reports, the City provided the Monitor and the other Parties with an initial report on the effectiveness of the Exam 7001 recruitment campaign (the "After Action Report") in November 2018 and an updated version on October 2, 2019, following comments from the Monitor and the other Parties.  Monitor's Twenty-Ninth Periodic Report at 36.  The City separately provided its "Cost Effective Analysis" on October 23, 2019. *Id*.  Also as described in previous periodic reports, while the City's reports contained a number of useful analyses, they did not include critical investigations of the relative effectiveness of different initiatives in recruiting reachable non-traditional candidates.  *Id* at 37.  The City also did not collect or preserve important categories of information related to costs, which the City acknowledged placed limits on the analysis of which expenditures provided the greatest return on investment.  *Id*. at 38.

Following discussions at the October 2020 Court conference, the City agreed with the Monitor and the Court that it would be helpful for the Monitor and the Monitor's experts to

complete a meaningful part of the after action analysis while the City was understandably occupied with pandemic demands, and the City agreed to produce data the Monitor requested to support that work.  Monitor's Thirty-Second Periodic Report at 24.

The Monitor performed and shared several preliminary analyses with the Parties between February 2020 and July 2021, and the United States and Plaintiffs-Intervenors, as well as their experts, provided input and requested specific additional analyses at various points in the process.

At the July 15, 2021 status conference, the City stated that it was planning to retain a consulting firm to assist with the City's own after action analyses; and on September 1 the City advised that it had retained the firm of KPMG for that purpose.  On November 2, the City circulated a KPMG workplan in which KPMG stated that it would perform "a synthesis of the FDNY's existing or considered recruitment practices and data analyses, including cost analysis and analysis of the outcomes of recruiting initiatives in terms of promoting diversity within the FDNY's firefighter recruits."  The workplan reported that the City and KPMG had their "kick-off" meeting in August 2021 and that KPMG would provide the City with "an analysis of both the cost effectiveness . . . and cost efficiency . . . of recruiting initiatives with respect to promoting diversity in FDNY firefighter recruits."

On November 3, 2021, the Monitor and Parties had a call to meet the KPMG team. KPMG stated that it had not yet accessed City data, but that it had begun some review of literature (though not yet drawn any conclusions that it was prepared to share).

At the November 3 meeting, the Parties and the Monitor also discussed the Monitor's Exam 7001 Recruitment Campaign After-Action Analysis, circulated to the Parties shortly before the call.  At the request of Plaintiffs-Intervenors and the United States, the Monitor

performed some additional analyses that were requested on the November 3 call and conducted a follow-up presentation of findings to all Parties on December 2, 2021.  The Parties and the Monitor have scheduled a meeting on February 10, 2022 for a third presentation of the Monitor's analyses and to respond to further questions from Plaintiffs-Intervenors.[21]

The Monitor's Exam 7001 Recruitment Campaign After-Action Analysis includes data-driven insights and recommendations, based on the data produced by the City in response to the Monitor's requests.  These analyses generally estimate the effectiveness of the City's Exam 7001 recruitment campaign, based on the number and percentages of non-traditional reachable candidates correlated with or associated with various Exam 7001 recruitment strategies.  The strategies examined by the Monitor include the advertising campaign; FDNY recruitment events; Mobile Academy events and exam tutorials; ORR communications; filing period extensions; and engagements and reminders at each step in the process.  The Monitor's focus was on areas of inquiry that can lead to actionable insights to help guide the City's planning for the next campaign.  For example, the Monitor has sought to determine the relative effectiveness and efficiency of recruitment events by characteristics such as event type, borough, date, and staffing, and to draw actionable insights (*e.g.*, which event types and event locations were most successful) where the data are clear enough to provide them.

The November 2, 2021 KPMG workplan anticipated that KPMG would provide a "draft report of literature review findings, logic model and data analysis to the FDNY and OMB for

---

[21] On February 4, 2022, after the Monitor provided a draft of this report to the Parties for comment pursuant to the Monitor's general practice, the City inserted a comment in the draft noting for the first time that it "has discovered numerous data errors" in connection with the Monitor's analyses.  The City has not indicated whether these errors are in the data the City itself has provided to the Monitor or in one of the numerous analyses the Monitor has provided between February 2020 and December 2021.  The Monitor will work with the City to make sure that the data and analyses in the after action report are correct.

finalization" on December 1, 2021 and that, after feedback from the City and related revisions, the final report would be submitted on December 23, 2021.  On a February 3, 2022 conference call, the City indicated that it expected to circulate the report in time to hold a meeting in the first week of March to discuss KPMG's findings with the Monitor and the other Parties.  In response to the Monitor's request, the City has declined to share KPMG's analysis or any interim work prior to the final report – stating that the analyses were still being quality checked.[22]

While the City has primary responsibility for completing its own after action and cost effectiveness analyses and creating a blueprint for the next campaign, the Monitor and the Monitor's experts will, of course, provide whatever help the City or its consultants request.  And the Monitor expects that the City will also continue to provide the Monitor with data and information as needed, to enable the Monitor to perform whatever work may be needed to complete its own analyses, to monitor the City's analytical work, and to carry out the Court's January 2020 Order to mediate the Parties' dispute concerning the sufficiency of after action and cost effectiveness analyses as a prerequisite to the next campaign.

As noted in previous periodic reports, while the Monitor had requested that the City make a small number of active firefighters available for focus groups to discuss their experience with the Exam 7001 recruitment campaign, the Monitor held off on pursuing that request during the

---

[22] The analyses in the Monitor's after action report focus on the City's success in attracting reachable candidates among whom the percentage of non-traditional candidates was high.  The Monitor's assumption, based on the timing of KPMG's later-performed analyses, was that, if KPMG chose to run some of the analyses developed by the Monitor, it would use hires – rather than reachable candidates – as the relevant group of successful candidates.  At the time of the City's productions to the Monitor, there had not yet been enough hires to provide sufficient data with respect to that cohort.  Now that sufficient information is available showing candidates' progress through hiring, current analyses should focus on the City's success in recruiting non-traditional candidates who go on to be hired, as that is the most meaningful metric for planning the next campaign.  The Monitor shared this view with the City on January 25, 2022 and has learned that KPMG has not done analyses in this way, but that it will now do so, based on the Monitor's request.

height of the initial wave of COVID-19 infections.  Now that all active duty firefighters are required to be vaccinated and the City's operations have, to a suitable extent, recovered, the Monitor has repeated its request to hold these focus groups and will follow up with the City to make sure they take place.

     **D.**    **Assignment Issues**

The Monitor has continued to address issues relating to compliance with Paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs."  In light of the City's history of non-compliance with this requirement (discussed in detail in the Monitor's previous reports[23]), the Monitor required the City to take several steps to ensure and verify compliance with respect to assignments for the most recent class to graduate from the Academy.  The Monitor directed the City to review all assignments internally, verify that they complied with Paragraph 1(d) of the Disparate Treatment Settlement, and provide appropriate assurances to the Monitor before they were disclosed.  The Monitor also directed the City to provide specific information on operational reasons given for any denial of a home-division request, and to ensure that all those responsible for assignments are provided with the guidelines that the City, the Monitor, and the other Parties have developed and agreed upon to ensure compliance with the home-division requirement.

On September 27, 2021, the City provided confirmation that assignments for the most recent graduating class were compliant with the home-division requirement.  The City advised

---

[23] *See* Monitor's Thirty-Fourth Periodic Report at 30-32; Monitor's Twenty-Ninth Periodic Report at 41-43; Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 20-22; Monitor's Thirty-Third Periodic Report at 26-28.

that all New York City resident graduates had been assigned to home divisions (with two exceptions for candidates who requested assignments outside their home divisions[24]).

Addressing other concerns previously raised by Plaintiffs-Intervenors regarding disparities in assignments to different types of fire company (as discussed in detail in previous reports[25]), on October 1, 2021 the City also provided to the Monitor and the other Parties disparate impact analyses showing no disparate impact adverse to Black or Hispanic candidates in assignments to busy fire companies or to ladder companies compared to engine companies.

### E.   Working Group

The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).  The Monitor has continued to receive updates on the two principal Working Group initiatives – the FDNY Fire Cadet program and the FDNY Explorer's program, which have been described in detail in previous reports.  *See* Monitor's Fourteenth Periodic Report (Dkt. # 1651) at 13-14; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 11-12; Monitor's Nineteenth Periodic Report (Dkt. # 1761) at 17-18.  The City previously reported that the timeline for further work toward the launch of the Fire Cadet program was contingent on the scheduling of the next promotional firefighter exam, which remains to be determined, *see* Monitor's Thirty-First Periodic Report at 22-23; and the City reports that those efforts remain suspended.  On February 4, 2022, the City reported that the Explorer Program has resumed regular in-person meetings

---

[24] One exception was for the class valedictorian and the other for the legacy of an FDNY member who died in the line of duty.

[25] *See*, e.g., Monitor's Twenty-Fourth Periodic Report at 18-19; Monitor's Twenty-Ninth Periodic Report at 44-45.

and/or community service for six of the eight Posts.  The City reports that the other two Posts recently have not been active because of Department staffing needs; students' aging out, graduating or moving; and the ongoing unpredictability of the pandemic.  The City advises that those Posts are in the process of replenishing both explorers and advisors.

## III.   EEO

### A.   October 8, 2021 Court Conference on EEO Compliance and FDNY Workplace Culture

On October 8, 2021, the Court convened an in-person conference with the Parties and the Monitor devoted principally to EEO topics, including concerns raised by a recent *New York Times* report regarding serious violations of EEO policy in FDNY workplaces.

As the Fire Commissioner and the Corporation Counsel acknowledged at the October 8 conference, although the City has made progress toward compliance with the Modified Remedial Order – increasing the diversity of its workforce, updating its EEO policies, and improving its collection and management of data – recent events show that considerable work remains to be done and that there is still a "hard road . . . ahead" in the City's efforts to "turn . . . around" FDNY workplace culture and ensure that all FDNY firehouses are not merely diverse but also inclusive work environments.  Oct. 8, 2021 Tr. at 32-34 (quoting the Corporation Counsel).  As proceedings at the conference reflected, all Parties, the Court, and the Monitor agree that the necessary reforms in firehouse culture will require a robust and consistent commitment by FDNY officers and senior leadership, including personal and direct involvement in EEO messaging and compliance initiatives.  Following up on the concerns and commitments discussed at the conference, on January 18, 2022, the Monitor circulated to the Parties a set of recommendations for new and revived initiatives intended to address issues with firehouse culture and EEO compliance.  The recommendations include specific steps for involving senior

leadership in EEO messaging and compliance, enhancing officer accountability, and ensuring that firehouse-level officers take proactive steps to monitor firehouse climate and manage diverse workplaces.  The Monitor has asked the City to provide dates later this month for a meeting to discuss the recommendations and any additional comments or suggestions from the other Parties.

At the October 8 conference, the Court directed a series of specific questions to the City regarding the investigations and disciplinary actions undertaken in response to the reported violations, including whether and how the FDNY's responses to the violations had been publicized within the Department and communicated to the Monitor.  It also posed several additional general questions regarding the procedures and practices the FDNY employs to detect, investigate, and discipline EEO violations; EEO Office staffing; the EEO climate survey; EEO messaging and training; and the role of FDNY leadership in EEO messaging and compliance initiatives.  In an October 20, 2021 letter to the Monitor and the other Parties, the City provided a series of responses to the Court's questions from the October 8 conference, and on December 7, the Monitor responded to points raised in the City's letter and asked a series of follow-up questions, to which the City responded on January 18, 2022.  Since the October 8 conference, the City has also responded to separate Monitor requests for information and materials relating to disciplinary actions in several specific recent EEO matters.  On November 30, 2021, Plaintiffs-Intervenors raised several questions with respect to the City's October 20, 2021 letter.  The Monitor expects to discuss these questions, along with any other follow-up queries and issues arising from the October 8 conference, at the same meeting later this month that the Monitor has asked the City to schedule for discussion of the Monitor's recommended initiatives regarding FDNY culture and EEO compliance.

In response to the Court's questions regarding disciplinary actions in recent cases, the City acknowledged that, as of the date of the conference, it had not yet responded to a July 26, 2021 Monitor request for information on disciplinary measures in a list of cases that included those referenced in the *New York Times* report.[26]  The City provided the requested information shortly after the conference, and it has promised to provide the Monitor with prompt updates on disciplinary actions in EEO cases going forward.

In follow-up discussions with the City regarding disciplinary actions in recent cases, the City has noted that its ability to seek a full range of possible penalties for misconduct is constrained by statute.  The list of disciplinary sanctions that the Department may impose consists of (1) reprimand, (2) loss of up to ten days' pay, and (3) dismissal.[27]  Any penalties more severe than ten days' pay and less severe than dismissal can be imposed only by stipulation with the respondent.  The Monitor has previously recommended that the City consider seeking a change in the law to provide it with greater flexibility in sanctioning misconduct.

In response to renewed recommendations from the Monitor since the October 8 conference, the City has confirmed that in future it intends to publish somewhat more detailed summaries of disciplinary actions in EEO cases via Department Orders.  Future Department

---

[26] Pursuant to standing Monitor requests, since 2017, the City has provided the Monitor with closing memoranda reporting the factual findings of EEO Office investigations in EEO matters that involve fire operations personnel, that concern alleged violations based on race, ethnicity, retaliation, or priority hire status, and that are identified by the City as requiring substantial investigation.  Monitor's Twenty-Second Periodic Report (Dkt. # 1821) at 7; Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 39-41; Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 44 & n.27.  And since mid-2020, the Monitor has also received updates in regular conference calls with the City regarding the progress of EEO Office investigations – including updates on interim suspensions and other operational action taken in response to alleged violations.  However, neither the reports of factual findings nor the recent phone conference updates had included full information on the disciplinary sanctions imposed where violations were found substantiated.

[27] *See* N.Y. City Administrative Code Section 15-113.

Orders will include more specific and comprehensive information than the FDNY has generally included in previous Orders – identifying the rank of the person disciplined, the penalty, the specific code provision and policy violated, and (most significantly) a description of the conduct involved.  The descriptions will also be placed on the FDNY's online DiamondPlate platform.

The City's response to the Court's additional questions regarding EEO staffing, the climate survey, EEO messaging, and EEO inspections, and other EEO compliance initiatives are discussed below in the relevant sections of this report.

### B.    EEO Staffing

As most recently reported by the City, the FDNY EEO Office currently includes 14 attorneys (the Assistant Commissioner, one Deputy Director, nine Investigative Attorneys, one Intake Attorney, one Disability Rights Coordinator, and one Training Coordinator) and six non-attorney staff.  However, on a February 4, 2022 conference call, the City advised the Monitor that the Deputy Director and one Investigator plan to leave the Office; and these departures will reduce the attorney staff to twelve.  The Assistant Commissioner advised that he would seek authorization to fill the newly vacated positions.  The City has hired one new attorney since the last periodic report, and it has continued efforts to fill positions left vacant by departures in 2020 and 2021.  In response to questions from the Court at the October 8, 2021 conference, the City indicated that it intended to fill the remaining open positions, and bring EEO attorney staffing up to its pre-pandemic level of 16 attorneys, as soon as qualified candidates can be identified.[28]

---

[28] As previously reported, the non-investigative work of the EEO Office staff is supplemented by the activities of EEO Counselors – firefighters and officers who act as liaisons between the firefighter force and the EEO Office, as part of a program initiated in 2018.  *See* Monitor's Twenty-Ninth Periodic Report at 47.

Because the investigative work of the EEO Office is conducted entirely by its attorneys (along with their other responsibilities such as inspections and training), the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively; and staffing increases completed in 2018 played an important role in improving the functioning of the EEO Office.  *See* Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 33; *see also* Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eighth Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase).

In September 2019, when the EEO Office had 16 attorneys, the City reported that the average caseload for investigators was 5-10 cases.  Monitor's Thirtieth Periodic Report at 34.  As most recently reported by the City (on February 4, 2022), the average investigator caseload is approximately eight cases – ranging from three cases (for one recently hired attorney) to eleven. The City reports that the Deputy Director has direct supervisory responsibility for all investigations, with broad oversight from the Assistant Commissioner, and that each also has primary responsibility for a small number of additional EEO matters – typically matters requiring guidance or counseling rather than a full investigation.

Since the implementation of a COVID vaccine mandate for FDNY members, some EEO Office staff, including the Assistant Commissioner, have been required to assist in evaluating requests for exemptions from the requirement; but the City has advised that no investigative attorneys have been asked to do so.

### C.      Policies, Messaging, and Training

The Monitor has continued to engage with the City regarding the messaging activities of the EEO Office.  As previously reported, the City has postponed development of a long-range

plan for EEO Office communications until the analysis of the EEO workplace climate survey is completed.  Monitor's Thirty-Second Periodic Report at 29; Monitor's Thirty-First Periodic Report at 29-30.  With the climate survey analysis approaching completion (as discussed in Part III.D.3 below), the Monitor expects the City to move expeditiously to develop a long-term EEO communication plan that takes account of survey findings and that specifies strategic goals, key messages, target audiences, channels of communication, and persons responsible for delivering specific messages.  In recommendations following up on the October 8, 2021 conference, the Monitor has re-emphasized that the plan should include communications by senior leadership (for example, in a continued program of video messaging[29]), in-person messaging by operational commanders, and mechanisms for gathering and assessing feedback from members.  As discussed by the Court, the Parties, and the Monitor at the October 8 conference, FDNY officers and senior leadership must take an active role in efforts to reform the Department's workplace culture and send a strong message of inclusion; and the FDNY must confirm that those messages are communicated effectively.

For the City to achieve the necessary reforms in FDNY culture, it will also be necessary for the new CDIO (and those carrying out the role in the interim) to communicate a message of inclusion and connect that message effectively to the operational mission of the Department; and

---

[29] As discussed in previous reports, the City initiated a program of "voice announcement messaging" with a video message from senior leadership in September 2018 (Monitor's Twenty-Ninth Periodic Report at 51), but the program was then inactive for approximately two years.  Training videos on operations during civil unrest and on "Authentic Trust" (presented in 2020) appeared to represent a revival of this initiative, and the City previously indicated that CDIO planned to roll out additional videos on an annual basis, in a series focusing on "tenets of inclusion."  Monitor's Thirty-Fourth Periodic Report at 36-37.  However, in an update provided February 8, 2022, the City indicated that the next video in this series is not expected to be rolled out until late summer 2022.  The Monitor has encouraged the City to develop and distribute frequent additional messaging in this category.  *Id*. at 38.  It has also continued to seek confirmation from the City that the FDNY is capable of verifying attendance at firehouse video presentations.

the City's EEO messaging plan should include and account for messaging produced by the CDIO.  In the January 18, 2022 recommendations, the Monitor recommended that the work of the CDIO and the EEO Office be coordinated and integrated more closely – to ensure that the messaging remains relevant to FDNY workplaces and to eliminate duplication.  Currently, messaging from the EEO Office focuses principally on compliance and on recognizing and responding to violations; and (as noted in previous periodic reports) although some CDIO presentations have connected values of diversity and inclusion to an operational context, much of the CDIO messaging has emphasized abstract concepts of diversity and inclusion.  *See* Monitor's Thirty-Fourth Periodic Report at 37-38.  As the Monitor has recommended, EEO messaging should continue to cover both legal compliance and general values and norms, and it should also address the neglected area in between these subject matters – practical messaging and training for firefighters and officers on maintaining a professional firehouse culture.

The City was required to create the CDIO position under the Disparate Treatment Settlement, and the CDIO plays a key role in efforts to turn around the Department's EEO culture and instill values of inclusiveness in FDNY workplaces.  As previously reported, on July 22, 2021, the City advised the Monitor that the CDIO had resigned her position, effective July 23, and that the City had begun the search for her replacement.  On a January 6, 2022 conference call, the City confirmed that the vacant position had been posted, and shortly thereafter it provided the Monitor with a copy of the posting.  The Monitor will continue to seek updates on the City's progress in filling the CDIO position and continues to urge the City to fill the vacant post as soon as possible.  The City has advised that until a new CDIO is hired, CDIO projects are being managed on an interim basis by other senior civilian FDNY personnel.  Monitor's Thirty-Fourth Periodic Report at 36.

Based on the City's account of CDIO activities before the Monitor's last periodic report, recent CDIO initiatives include an online video training module on "Positive and Effective Leadership," which had been made available to senior leadership on the FDNY's online Learning Management System ("LMS") before the last periodic report, and which was scheduled to be offered to all FDNY managers and officers following viewing by senior leadership.  In a February 8, 2022 update, the City advised that this presentation remained available to executive staff on LMS but had not yet been rolled out to managers and officers.

CDIO projects also include a five-part series of online trainings on "Racial Justice and Healing," produced by an external vendor.  The second installment of the series was scheduled to be rolled out to senior leadership in the fall of 2021.  However, as of the City's February 8 update, although the training had been placed on LMS, it had not yet been presented to senior leadership as planned.  The City also provided an update on plans for further installments in its series of trainings on "tenets of inclusion."  The first training in the series (a module on "Authentic Trust") was presented to members online in the fall of 2020; and the second, on "Supportive Relationships," was previously planned for the fall of 2021 (with further installments to be rolled out annually from 2022 to 2025).  However, the City advises that the "Supportive Relationships" training has been pushed back to late summer 2022.  These delays in CDIO projects highlight the need for the Department to bring on a new CDIO as expeditiously as possible, and for the new CDIO to move forward promptly both with existing projects and with new initiatives.

As discussed above, in response to concerns expressed by the Court at the October 8, 2021 conference, the City has agreed to publish summaries of outcomes and disciplinary actions in EEO cases via Department Orders – including details (in anonymized form) connecting

48

specific policies and violations to specific disciplinary sanctions.[30]  In recommendations following up on the October 8 conference, the Monitor has suggested that the publication of disciplinary actions should include not only EEO matters but also cases of hazing and other conduct detrimental to workplace climate and professionalism.  The Monitor has also renewed an earlier recommendation that the EEO Office include summary messaging about its investigative and enforcement activities in communications regarding the role of the EEO Office – informing members of the cumulative numbers of investigations and their outcomes.  The Monitor has also re-emphasized previous recommendations for prompt and decisive communications in response to reports of misconduct.  As the Monitor has noted in previous reports, and as Plaintiffs-Intervenors noted at the January 19, 2022 conference, even where allegations may be inaccurate or reflect misperceptions, it is important for the FDNY to respond promptly by reinforcing its commitment to diversity and inclusion and to the rules or policies alleged to have been violated, and by re-emphasizing that the potential disciplinary consequences for violations are severe. Monitor's Twenty-Seventh Periodic Report at 27; Monitor's Thirty-First Periodic Report at 29; Jan. 19, 2022 Tr. at 17-18.

### D.    Assessment and Accountability

#### 1.    Officer Performance Evaluations

The Monitor has continued efforts to confirm whether the EEO metric added to FDNY officer performance reviews in 2018[31] accurately reflects officers' EEO performance, and

---

[30] In some previous instances, the Department has issued general statements in Department Orders noting that members have been disciplined for violations of EEO policy, but previous notifications have not included detailed descriptions of the policy violated or the conduct constituting the violation.

[31] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 32; Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

whether evaluations take account of input from the EEO Office in all appropriate cases.  As previously reported, following extensive delays (recounted in detail in previous reports[32]), on June 16, 2021 the City completed production of all but ten EEO performance reviews from the 2019 cycle, which was the first cycle since the FDNY introduced an EEO metric that covered a full year of officer performance (2018) and included evaluations for all company officers.[33] Following a review and analysis of the data, the Monitor has posed and continues to discuss a series of follow-up questions to the City.  In a September 29, 2021 message, the Monitor asked the City to explain why its data contained three EEO ratings for each officer rather than one; and why, for approximately 100 officers, the three ratings were not consistent.  The City has confirmed that there should be only one rating for each officer, and that the inconsistencies reflect mistakes by raters who entered different ratings on the three separate forms on which checkboxes for the ratings appear.  At a September 30, 2021 meeting with the Monitor and the other Parties on EEO topics, the City advised that the guidance to raters has been clarified and that forms were being revised to prevent confusion.  The Monitor has also asked the City to explain how "mixed" ratings are used or interpreted for the Department's internal purposes (*i.e.* what rating officers with both "superior" and "satisfactory" ratings will be deemed to have achieved).  The Monitor has also asked the City to specify when the revised guidance and forms became effective (specifically whether they were in use for the 2020 cycle of ratings).

In an October 13, 2021 message, the Monitor posed additional questions to the City and offered additional comments regarding performance evaluations for officers in several specific

---

[32] *See* Monitor's Thirtieth Periodic Report at 44-45; Monitor's Thirty-First Periodic Report at 34; Monitor's Thirty-Second Periodic Report at 34; Monitor's Thirty-Third Periodic Report at 36.

[33] The information provided to the Monitor includes no personal identifying information and was not shared with the other Parties.

workplaces associated with alleged and/or substantiated EEO violations, where EEO investigative records contain evidence potentially relevant to officers' management practices and EEO performance.  The Monitor has asked the City to confirm and/or explain some of the ratings associated with these workplaces and EEO matters (including some instances where ratings appear to be missing from the data set), and the Monitor has also identified several EEO cases from the relevant time frame as examples of the type of case where the EEO investigation should include inquiries regarding officer conduct and management practices, and where the EEO Office should provide input for officer evaluations based on those inquiries.  As discussed in detail in previous reports, in response to Monitor recommendations at an October 18, 2019 meeting (memorialized in a December 11, 2019 memo to the City), the City agreed to ensure that the EEO Office would examine management practices and provide input for officer evaluations in all appropriate cases, including all cases where evidence indicates that a manager should have known about a potential violation or related deficiencies in workplace EEO climate.  Monitor's Thirty-Third Periodic Report at 37-38; Monitor's Thirty-Second Periodic Report at 36-37.  The Monitor plans to continue to evaluate the City's implementation of the EEO performance metric, with a focus on EEO Office involvement, as additional data becomes available.  The Monitor has asked the City to produce a full set of performance review data and documentation of EEO input from the 2020 and 2021 cycles.[34]  But to date the City has not produced data from those sets of evaluations.  The Monitor plans to set a deadline for the City to produce the requested data.

In related discussions, the Monitor has continued to work with the Parties to resolve

---

[34] Evaluations from the 2020 cycle (covering performance in 2019 and (for Captains) a portion of 2020) will be the first set of evaluations that could reflect the Monitor's October 2019 recommendations.  And reviews from the 2021 cycle (covering performance in 2020 and a portion of 2021) are the first set covering a full year of officer performance following those recommendation.

remaining disagreements regarding the types of performance review data and analyses that the City will share with the other Parties.[35]  As previously reported, in discussions regarding the City's analyses and communications relating to performance review data, the City advised that it would "create a list of officers involved in EEO matters, along with their race, gender and start date by obtaining this information from the EEO database" and that "EEO will annually review these to spot any trends or issues that exist."  Monitor's Thirty-Third Periodic Report at 39.  The City also advised that the EEO Office "will also use this as part of its already-existing process to confirm [that officers] are receiving ratings commensurate with their performance."  *Id*.  Also as previously reported, the Monitor and the United States have sought clarification regarding the City's plans – including whether the EEO Office's review of EEO ratings for officers involved in EEO matters will include all officers involved in each matter (as complainants, respondents, or witnesses) or whether it will be more limited (*e.g.*, to officers who are found to have committed violations).  *Id*.  The Monitor had asked the City to respond to outstanding queries and requests (summarized in the Monitor's May 4, 2021 memorandum to the Parties) in advance of a September 30, 2021 meeting on EEO topics, but the questions remain pending.  Following the September 30 meeting, on October 18, 2021, the Monitor circulated an updated memorandum summarizing takeaways and outstanding questions, and the Monitor has asked the City to respond to the outstanding queries.  In the same memorandum, the Monitor also provided the Parties with the results of several analyses of performance ratings – showing the rates at which officers of different ranks, different levels of experience, and from different racial and ethnic

---

[35] Previous communications relating to the dispute are recounted in detail in the Monitor's most recent reports.  Monitor's Thirty-Fourth Periodic Report at 40 n.21; Monitor's Thirty-Third Periodic Report at 38-39; Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report at 36-37.

groups had received ratings in each category ("satisfactory," "superior," and "unsatisfactory").[36] The Monitor has also asked the City to provide the other Parties with cumulative figures showing the ratings for officers in workplaces associated with EEO investigations.[37]

2.    Workplace Professionalism Reporting and Officer Accountability for Workplace Climate

The Monitor has continued to engage with the City regarding the FDNY's workplace professionalism reporting program, in which officers meet periodically with their superiors (monthly at most levels of command) to discuss issues (including EEO issues) affecting workplace professionalism.  *See* Monitor's Twenty-Seventh Periodic Report at 30-31; Monitor's Twenty-First Periodic Report (Dkt. # 1803) at 26-27.  According to the City's most recent update (provided on January 18, 2022), to date the system has not generated any reports within the scope of the Monitor's standing request to produce all Workplace Professionalism records reflecting EEO or hazing concerns.  *See* Monitor's Twenty-Ninth Periodic Report at 57-58.

The Monitor has previously expressed concerns that the absence of such reports (apparently even from officers in workplaces connected to EEO violations) suggests that the system is not functioning as intended – either as a way of facilitating consultations within the chain of command or as a system of accountability that would incentivize officers to monitor

---

[36] Based on the Monitor's calculations, Captains tended to receive "superior" ratings at a somewhat higher rate than Lieutenants; more senior officers (Lieutenants with 18 or more years of service and Captains with 24 or more years of service) received superior ratings at higher rate than more junior officers of the same rank; Black officers received "superior" ratings at a higher rate than whites, and white officers at a higher rate than Hispanic officers (although the differences in rates between demographic groups were not statistically significant).

[37] The Monitor has asked the City to state (1) the number of ratings in each category (Satisfactory, Unsatisfactory, or Superior) for officers in workplaces where there were EEO complaints or inquiries and (2) whether the EEO Office provided input for the evaluations of those officers.

workplace climate.  Monitor's Thirty-Second Periodic Report at 38-39.  At the October 8, 2021

conference, the Court also expressed concerns and asked questions regarding the system's

apparent failure to generate reports within the scope of the Monitor's standing request –

particularly in light of the workplace climate issues reflected in the incidents discussed at the

conference.  In its October 20, 2021 response to the Court's questions, the City suggested, as it

has previously, that the EEO issues are not reported via the Workplace Professionalism reporting

system because officers are required to report them to the EEO Office:

> The purpose of the Workplace Professionalism policy is to require the chain of
> command to discuss matters in the firehouse of potential concern regarding
> workplace professionalism. . . . [W]hile EEO is an element of what is discussed in
> this quarterly reporting, this quarterly reporting was never intended to be a vehicle
> to report EEO matters. Rather, . . . any EEO policy violation *must* be reported
> directly by a supervising officer to the EEO Office promptly . . . .

October 20, 2021 Response from City at 8 (emphasis in original).

However, as discussed in previous reports (and as noted in the Monitor's December 7,

2021 reply to the City), the City's reference to the mandatory reporting system fails to explain

the absence of Workplace Professionalism reports on EEO and hazing issues for at least two

reasons:  (1) as the City's response itself acknowledges, the workplace professionalism reporting

system is intended to encompass interpersonal conflicts and workplace climate issues apart from

and in addition to EEO violations; and (2) even with respect to EEO issues, in many instances it

may be appropriate for an officer to consult with the EEO Office regarding an issue *and* to report

that issue via the workplace professionalism system.  Monitor's Thirty-Fourth Periodic Report at

41-42.

In recommendations following up on the October 8, 2021 conference, the Monitor has

suggested that the City take additional steps to ensure that the Workplace Professionalism

reporting program operates effectively; and the Monitor has also proposed a number of

additional initiatives intended to ensure that officers proactively monitor firehouse climate and

take affirmative steps to cultivate and maintain an inclusive workplace.  The Monitor's

recommendations (circulated to the Parties on January 18, 2022) include the following:

- The Department should continue and enhance the initiative in which Deputy Chiefs are required to incorporate EEO inspections and inquiries regarding workplace climate in regular firehouse visits.  It should also expand the program to include regular operational visits by Battalion Chiefs – requiring officers to certify that inspections have been conducted and inquiries have been made with company-level officers.

- The Department should require Lieutenants and Captains to monitor and report on treatment and development of probationary firefighters, including periodic check-ins with "probies."

- Commanders should be trained to be watchful for any discriminatory or harassing treatment that occurs under the pretext of training or "paying dues."

  o Monitoring should extend to historical areas of conflict such as meals, handling of mutuals, and house rules.

  o Officers must take an active role in the formulation and enforcement of any "house rules," and it must be made clear that they are accountable for any discriminatory rules or discrimination in enforcement.

- Officers should also be required to keep records of all breaches of policy and actions taken to address them in firehouse logs – including, *e.g.*, unauthorized displays, unauthorized clothing items.

- The FDNY should consider using personnel-related data systems and records as an "early warning" system to flag officers from firehouses with above-average numbers of transfers, complaints, illnesses, or other behaviors that could indicate a personnel management issue.

As discussed above, the Monitor expects to discuss the January 18 recommendations,

along with any additional input from the other Parties, at a meeting with the Parties later this

month, for which the City has been asked to offer dates.

### 3.   Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City

launched its long-pending workplace climate survey of all FDNY firefighters.  The City created

a ten-phase analytics plan and a schedule for analysis of the survey data to be conducted by the Mayor's Office of Data Analytics ("MODA"), in consultation with the Parties and with input from the United States' and the Monitor's experts. The analysis was anticipated to be completed by June 2020. *Id*. at 49-50. Work on the climate survey was suspended, however, at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic.

As reported in previous periodic reports, on October 14, 2020, the City sent the Monitor and the other Parties a new proposal and timeline for survey analysis, indicating that analytic work had already commenced in order to take advantage of what the City anticipated would be a relative lull in COVID-19 demands before the winter 2020 months. The new analysis plan divided the City's work into three longer phases and included fewer built-in opportunities for direct input from the Monitor and other Parties. The plan contemplated that although MODA would have less frequent contact with the Monitor and the other Parties, MODA would maintain a record of its discretionary judgment calls at key junctures, which could be reviewed by the group if necessary, and would afford the other Parties and the Monitor opportunities for input. Although the City's proposal differed in timing and relative allocation of work, the Monitor and the Parties agreed to work with the City pursuant to the revised plan, and, as reported in previous periodic reports, the Monitor expected that the City's analysis would incorporate the essential elements of the prior plan.

Between December 2020 and July 2021, the Monitor and the Parties met on four calls to discuss MODA's ongoing work pursuant to the City's new, streamlined plan, as described in previous reports. *See, e.g.*, Monitor's Thirty-Fourth Periodic Report at 43. Plaintiffs-Intervenors engaged an expert to participate in these discussions.

56

On August 6, 2021, MODA estimated that it would provide a scoping document setting out the project's objectives for Stage 3 of Phase 2 in two weeks' time.  In September, however, the City advised that its lead analyst on the climate survey project was no longer working for the City and that MODA would provide the scoping document on October 15.  In early October, citing the Court's emphasis on the need to complete the survey analysis as well as the City's desire to begin sharing the results of the survey with FDNY management, the City stated that it would like to alter the order of the plan steps and have MODA provide the FDNY with a Phase 3 deliverable (which was intended under the workplan to be the final report shared with FDNY management) within thirty to forty-five days thereafter (*i.e.* by the end of November).  The City proposed to postpone interim check-ins with the Monitor and the other Parties until after a preliminary Phase 3 report was provided to the Department.

The Monitor suggested that instead of eliminating opportunities to provide feedback before findings were shared, the City accelerate the schedule and include dates for check-in calls within a day or two of each accelerated deliverable.  MODA produced a number of interim analyses; and, at the Monitor's urging, the Monitor and the Parties had a number of calls, including some with only MODA and the Monitor's and the Parties' experts participating, so that the Monitor and the other Parties could convey their input before the City completed its report. The Monitor's expert has also performed analyses, both independently and in cooperation with the City's and the other Parties' experts.

As noted above in the executive summary, on January 17, 2022, the City circulated a report that it described as the final analytic output of the Mayor's Office of Data Analytics (MODA).  After the other Parties and Monitor raised concerns about the need to include further analyses and streamline the report, the City agreed to make internal revisions to MODA's report

and to have MODA participate in another expert meeting scheduled for February 10, at which additional analyses and revisions (to be performed by MODA or the Monitor's expert) can be proposed, following which some further analysis and discussion will occur and the report will be further revised.  The City has agreed to defer sharing the survey results with FDNY management pending this process.[38]

In response to a request made by the Monitor in connection with finalizing this periodic report, the City has clarified that the City's view is that its revised report will not necessarily include all the supplemental analyses that may be requested or performed (though it remains possible that it will do so).  The City also clarified that it does not wish the revision process to remain open ended, and that it expects to provide approximately another month from this filing date for further discussion.

The other Parties have emphasized the importance of including all necessary analyses in the report that is to be shared with FDNY management.  The United States takes the position that these further analyses will illuminate how the City could address EEO issues in the Department, and that the final report should include both the analyses and an explanation of EEO issues and possible remedies to address them.

Plaintiffs-Intervenors agree generally with the United States, and have urged in particular that the City must include all of the analyses described in an analytic plan for the climate survey project that was created by the United States' expert in January 2020, and which was agreed to by all Parties at that time.  The City disagrees that this analytic plan remains applicable, in light

---

[38] The City proposed sharing MODA's report in the interim, however, with MAP, the FDNY's Management and Data Analytics group.  The other Parties have requested that the City follow up in writing to explain what MAP would be doing and the reasoning behind sharing the information with MAP in advance of FDNY leadership.

of the City's adoption of a different workplan in October 2020 (which the City acknowledges was over some objections by the Monitor and Parties). Plaintiffs-Intervenors further emphasize that in view of recent changes to FDNY senior management, it is important for the City to inform incoming Department leadership of the goals of the survey in connection with sharing findings. Both Plaintiffs-Intervenor and the United States take the position that the MODA report circulated by the City in January 2022 should not be characterized as a final or complete analysis of survey responses, and that completion of the analysis requires supplementation and revision.

The Monitor agrees that most (if not all) of the analyses requested by the United States and Plaintiffs-Intervenors should be performed. The Monitor strongly believes that any report that is to be shared with FDNY management for purposes of informing leadership about the findings of the survey and developing responsive actions (including crafting an EEO communication plan based on the survey as the FDNY has said it plans to do) must clearly convey to management what the survey showed about FDNY climate and workforce perceptions and concerns. The MODA report that was shared with the Monitor was not yet, in the view of the Monitor and the Monitor's experts, the type of practical reference needed to accomplish that goal.

As noted above, although the City does not necessarily agree with the other Parties or Monitor that changes are required, it has already begun the process of revising MODA's report and has agreed to discuss further revisions. It is very likely, in the Monitor's view, that as the Parties and their experts discuss these issues in the near term, at least some areas of disagreement will narrow or be eliminated. The Monitor will advise the Court if disputes require resolution or action is needed to move forward with what all Parties agree is an extremely important phase of the survey project overall.

The Monitor has emphasized during the survey process and in prior periodic reports the importance of communicating with the workforce about the findings of the survey, as a matter of best practice, to encourage participation in future surveys and to provide assurance that attention is being paid to survey feedback.  To that end, as urged by the Monitor, the City has expressed its intention to develop a plan for publicizing takeaways from the survey within the Department, concurrently with the process of completing the survey analysis and accounting for input from the Monitor and the other Parties.  The United States is planning to circulate a timeline for this work to the Monitor and other Parties for review.

### E.   Inspections, Investigations, and Compliance

1.   Monitor Report on EEO Investigative Procedures and the Duration of Investigations

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor has postponed filing a report on EEO investigative procedures and the duration of EEO investigations to observe and account for the effect of increased staffing and revised practices – obtaining a series of updated data sets from the City, and circulating a series of drafts of the report (including recommendations) to the City and the other Parties.[39]  On May 26, 2021, the Monitor circulated an updated draft of the report to the Parties for comment.  The Parties provided comments and posed a number of questions relating to the City's practices and the

---

[39] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its staffing, its investigative procedures, and its performance in the completion of EEO investigations – with a particular focus on the duration of investigations as measured against the presumptive 90-day time limit for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant part, the Court's Order stated as follows:

The court monitor is respectfully DIRECTED to provide the court with a report on the New York City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the staffing of the office has changed over time; and (3) the speed with which the office investigates and resolves complaints.

Monitor's findings; and the Monitor held a meeting with the Parties on September 30, 2021 to discuss the report and the Parties' comments. The City provided answers at the meeting to several questions from the Monitor and the other Parties, and in an October 18, 2021 follow-up document, the Monitor asked the City to respond to some additional questions that remained open (including some posed by the other Parties). On November 10, 2021, the Monitor also asked the City to provide an updated set of data on the durations and outcomes of EEO investigations. On February 4, 2022, the City sent the Monitor responses to the queries and requests in the October 18, 2021 follow-up, along with an updated set of EEO case data and responses to several outstanding requests for information on specific EEO cases.[40] The Monitor is proceeding to review the new data and the City's responses; and assuming no further information or clarification is required, the Monitor expects to finalize the report accounting for the City's update and the Parties' comments.

As previously noted, after the increase in EEO investigator staffing in mid-2018, the duration of the FDNY's EEO investigations generally improved, with a higher percentage of cases completed within 90 days. But case durations rose again during the 2020 pandemic year and in 2021[41]; and even among cases initiated in late 2018 and 2019 (after the staffing increase but before the pandemic), approximately 25% of cases requiring substantial investigation lasted

---

[40] The Monitor anticipates that the City will also provide the other Parties with the updated case data and its responses to the Monitor's October 18, 2021 follow-up queries.

[41] Some delays in mid-2020 were likely due at least in part to the pandemic, which impeded witness interviews until the FDNY adapted procedures and established a virtual interview capability. For cases initiated in 2020, the City has produced materials from 18 matters (including one with a 2021 case number) that it identified as requiring substantial investigation, nine of which substantiated violations. Eleven of those 18 matters took more than 90 days to complete. Based on the City's most recent update, out of twelve cases initiated in 2021 and requiring substantial investigation, four substantiated violations, one has been administratively closed, and five remain open. Of those twelve cases, eight have taken more than 90 days to complete.

more than 90 days.  The Monitor will continue to review data and materials produced by the City to determine whether the City can demonstrate the ability to consistently complete investigations in a timely manner.

2.      Inspections and Monitoring

Immediately following the October 8, 2021 conference on EEO topics, the City notified the Monitor that the EEO Office would resume regular firehouse inspections as soon as a COVID-19 outbreak among EEO staff had subsided.  Although COVID-related health issues continued to delay the resumption of inspections for several more weeks, at the January 19, 2022 status conference, the City confirmed that inspections had recently resumed.  In subsequent communications, the City advised that initially, because of staffing issues, inspections were being performed only by the Assistant Commissioner, rather than by three-inspector teams as they were before the pandemic.  In a January 28, 2022 message to the Monitor and the other Parties, the City indicated that inspections were expected to resume with at least two inspectors beginning the week January 31, 2022, likely accompanied by the Assistant Commissioner, though the City was still engaged in discussions with EEO personnel regarding staffing.  The Monitor continues to urge the City to resume inspections with pre-pandemic frequency and with pre-pandemic staffing levels as soon as possible.

The Monitor has continued to recommend that the City consistently and rigorously enforce its existing policy requiring that social media groups be registered with the Department if they create the appearance of being affiliated with or sponsored by the FDNY, and prohibiting the creation of such sites without registration.  In its January 28, 2021 recommendations to the City regarding the investigation of social-media-based EEO violations, the Monitor urged the City to specify that any messaging or social media group that includes all or most employees in a given unit (e.g., company, house, battalion) and that is used in any way for work-related

communications is subject to this rule, must be registered, and must include at least one officer

from the relevant unit (who would be required to report any potential EEO violations in the

group).  Given the central role of social media and messaging groups in firehouse

communications and culture, and given their potential to serve as platforms for offensive or

harassing conduct, the Monitor views enhanced enforcement of this policy as an important step

in improving EEO compliance.

### 3.   Monitor Review and Recommendations Regarding Investigations

The Monitor has continued to review and evaluate EEO investigations identified by the

City as requiring substantial investigative activity in fire suppression matters,[42] and has

continued to discuss recent and current investigations with the City in bi-weekly conference calls

with the Assistant Commissioner for EEO.

On January 18, 2022, the Monitor provided the City with a detailed summary of

comments and recommendations based on the Monitor's review of EEO case materials produced

by the City since late 2019.  The January 18 memorandum followed up on earlier discussions

and communications in which the Monitor had identified deficiencies and offered

recommendations regarding EEO investigative practices.  As previously reported, in a June 6,

2017 letter memorandum, the Monitor provided the City with a set of comments and

recommendations based on the Monitor's review of investigative files from cases dating back to

2014 – which the City had provided in a retrospective production completed on March 3,

---

[42] In an initial, retrospective production of multiple cases, provided in 2017, and subsequently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has provided the Monitor with full investigative files for some cases.  For others, the City's production has been limited to intake documents and final memoranda.  Summaries of the City's productions of EEO case materials appeared in the Monitor's Twentieth Periodic Report (Dkt. # 1744) at 30-31 and in the Monitor's Twenty-Seventh Periodic Report at 39-41.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

2017.  Monitor's Twentieth Periodic Report at 30.  At an October 2019 meeting with the City, the Monitor made several recommendations for improved investigative practices and for related training and guidance for investigators, which were memorialized in a December 11, 2019 memorandum.[43]  Monitor's Twenty-Ninth Periodic Report at 55.  Later, on January 28, 2021, the Monitor provided the City with a memorandum focusing on the investigation of social media violations – both to memorialize helpful practices that the City had employed in investigating a series of 2020 social media incidents (which were the topic of regular communications with the Monitor) and to communicate the Monitor's recommendations for further improvements.  *See* Monitor's Thirty-Second Periodic Report at 42-43.  The Monitor's January 18, 2022 memorandum covers cases produced by the City since the October 2019 meeting, and it expands upon and supplements the recommendations contained in the January 2021 set of Monitor recommendations.  The memorandum also provides detailed examples from specific cases supporting the Monitor's general observation in recent periodic reports regarding continuing deficiencies in EEO investigative practices.

As discussed in part in previous reports, although the investigative practices of the EEO Office have improved since the Department issued a new EEO Investigation Manual in 2016, and in particular since the City began implementing the Monitor's October 2019 recommendations, the Monitor has continued to observe deficiencies in some areas, including some instances where investigations neglected to follow up on evidence of potential violations; some where investigators failed to gather or properly consider all available, relevant evidence; and others where analyses of credibility and motives either failed to account for relevant factors or gave undue weight to irrelevant considerations.  The Monitor will continue to review and

---

[43] The memorandum was shared with the United States and Plaintiffs-Intervenors on January 24, 2020.

comment on EEO investigative materials going forward – to evaluate the City's implementation of the Monitor's recommendations, and more broadly to evaluate the City's ability to consistently conduct appropriately thorough and rigorous investigations.  On a February 4, 2022 conference call, the Assistant Commissioner for EEO advised the Monitor that he plans to conduct a training presentation for investigators addressing some of the Monitor's recommendations regarding the investigation of social-media-based violations and to discuss related investigative practices in conferences with the EEO investigator team.  The Monitor has asked to review the training materials as soon as they can be provided.

In connection with the continuing evaluation of EEO investigative practices, the Monitor has also continued to address pending requests by the United States and Plaintiffs-Intervenors for more insight into the Monitor's assessments of investigative practices and the cases on which they are based – including the factual context for general observations such as those in the preceding paragraph.  The Monitor's January 18, 2022 memorandum to the City includes summaries of the facts underlying the Monitor's comments, and the Monitor has asked whether the City will consent to sharing the Monitor's memorandum with counsel for the United States and Plaintiffs-Intervenors – on an attorneys'-eyes-only basis, subject to the operative protective order, and with party names omitted.  The Monitor has also asked the City to share with the other Parties' counsel copies of the case materials referenced in the Monitor's January 2022 memorandum and copies of the materials underlying the Monitor's 2019 comments on investigative practices (again with party names redacted) – or state its specific objections to doing so.

The Monitor has also continued the Monitor's initiative (suspended at the onset of the pandemic and revived in 2021) to interview selected complainants from closed cases to learn about their experiences with the EEO Office.

4.  EEO Database

At a September 30, 2021 meeting, the City gave a demonstration of the current version of the EEO case management database, which now incorporates several features the Monitor had previously recommended, including new data fields for interim actions (such as the detailing or reassignment of complainants and respondents), EEO referrals to BITs,[44] disciplinary outcomes, and specific categories of alleged misconduct.

At the meeting, Plaintiffs-Intervenors raised some additional questions regarding the database and the classification of EEO matters.  Specifically, Plaintiffs-Intervenors asked the City to specify how matters are classified when an investigation determines that a violation occurred but the perpetrator cannot be identified.  Such cases appear to occur infrequently (based on the Monitor' review of case materials produced by the City).  But as the City acknowledged, when they do occur, they should not be classified merely as "unsubstantiated" – both because such a classification would fail to capture the fact that a violation occurred and because it would suggest to the complainant that the allegation of a violation was not credited.  At the meeting and in the Monitor's October 18, 2021 follow-up communication, the Monitor suggested that the City devise an additional category of outcome appropriate for such cases and propose a corresponding revision in the relevant policy and instructions for use of the database; and in its

---

[44] The Bureau of Investigations and Trials, the Department's disciplinary unit, prepares charges, conducts investigations, and prosecutes disciplinary cases for violations of Department policy including EEO violations, hazing and workplace violence.  Where an EEO Office investigation finds a substantiated violation, it typically refers the matter to BITs, which investigates and prosecutes the disciplinary phase of the case.

February 4, 2022 response, the City advised the Monitor that such cases would be classified as "Substantiated – Unidentified Perpetrator."  Plaintiffs-Intervenors also asked whether inspections that identify violations or potential violations are classified as EEO matters and recorded in the database.  At the meeting, the City advised that such classifications would be determined on a case-by-case basis.  The Monitor asked the City to specify the criteria used to determine how inspections are classified, and the other Parties joined in that request.  In its February 4 response, the City advised that if an inspection finds material that implicates the EEO Policy, an inquiry or case review will be conducted to determine the scope and extent of the violations, and that the review, and any subsequent investigation, will be reflected in the EEO database.

## IV.   Medical Exam-Related Issues

### A.    Medical Exam Attrition Metrics

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the step in the hiring process with the highest disqualification rate among Exam 2000 candidates.  *Id*. at 46.  The Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.  *Id*. at 45-46.  On August 20, 2021, the Monitor circulated a memo reflecting the Monitor's analysis of Exam 2000 Medical Exam data provided by the City.  The Monitor's analysis showed that there was disparate impact in the Exam 2000 Medical Exam adverse to both Black and Hispanic candidates for seven BHS disqualification reasons, including for stairmill testing, failure to cooperate with stairmill testing, failure to complete or provide the results of follow-up lab testing, pulmonary issues, cardiac issues, tuberculosis, and weight.[45]  Despite

---

[45] One further disqualification reason, failure to cooperate with tuberculosis testing, had a disparate impact against Black candidates.

repeated requests from the Monitor, the City has not provided the Monitor and the other Parties with a similar analysis of Exam 7001 medical data.

The City's December 14, 2021 "FDNY Attrition Metrics Report" shows the cumulative number of Exam 7001 Medical Exam disqualifications by race/ethnicity among candidates with final decisions:  14 of 711 white candidates (2%), 12 of 278 Hispanic candidates (4.3%), and 11 of 161 Black candidates (6.8%) had been disqualified by the Medical Exam as of October 26, 2021.  The City reported that these Medical Exam outcomes continue to reflect statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates[46] – including disparities adverse to both Black and Hispanic candidates in the Medical Exam overall, disparities adverse to Black candidates in the physical section of the Exam, and disparities adverse to Hispanic candidates in the psychological evaluation.[47]

The City argued in comments to a draft of the last periodic report that its reports of disparate impact in the Medical Exam should be viewed with caution because of the "very small number of candidates disqualified."  The Monitor notes that the problem with a small sample in statistical analyses is that statistically significant differences may *not* appear until the sample is larger; there is no such interpretive problem when a small sample *does* reveal statistically significant disparities.  Furthermore, the City's report of statistically significant disparate impact

---

[46] Disparities in the same outcomes were reported in the City's July 2021 and December 2019 reports on candidate attrition.  *See* Monitor's Thirty-Fourth Periodic Report at 48-49; Monitor's Twenty-Ninth Periodic Report at 70.

[47] It should be noted that (a) the number of candidates who were disqualified by the psychological exam – three Hispanic candidates and one white candidate – have not changed since the City's last attrition metrics report and (b) while two of the statistical tests using these numbers showed disparate impact against Hispanic candidates on the psychological evaluation, the third statistical test – the Fisher's Exact – did not show statistical significance, and this third test is arguably the most appropriate test to use when such small numbers are at issue.

in current medical testing is consistent with previous findings reported by the City and the Monitor, as noted above.

The City has similarly argued that the number of disqualifications for each possible medical disqualification reason is too small to yield reliable results, but, despite the Monitor's requests, the City has not yet provided a full analysis of Exam 7001 Medical Exam results at the level of individual disqualification reasons to determine which aspect(s) of the Medical Exam are responsible for the overall disparate impact shown in the City's attrition metrics reports.  Nor has the City responded to the Monitor's analysis of this data for Exam 2000.

Importantly, the City also has not reported whether the new stairmill test still has disparate impact, despite the fact that the previous stairmill test was shown to have disparate impact and that this was one of the reasons the development of a new stairmill test was undertaken.  The Monitor and the other Parties have clearly indicated the need for an analysis of individual Medical Exam disqualification reasons and of the new stairmill test results in particular.

It is critical that the City conduct and share all the analyses outlined in this section and that it develop and carry out targeted action to address the disqualification reasons that are driving the disparate impact the City continues to report.  Plaintiffs-Intervenors have recently asked the Monitor to consider prohibiting further use of the Medical Exam if this analysis cannot be completed and reviewed before the City begins processing candidates for the Fall Academy class.

### B.    Medical Exam Attrition Mitigation

The City has been providing regular reports to the Monitor and the other Parties about the scheduling of Medical Exam appointments and the rates at which candidates have been reporting for testing and have been either reserved, qualified, or disqualified.  The City has been providing

specific information about Black candidates to Plaintiffs-Intervenors so they can perform outreach and provide support for those candidates.

ORR personnel do not have access to specific reasons for medical disqualifications because of what the City has described as HIPPA and general privacy concerns. Thus, ORR is not able to provide candidates with encouragement or support specific to the reasons for disqualification or pending status to assist them in resolving any delays or other issues that may be related to supplying medical documentation or obtaining medical clearance.

The City's analytics group, MAP, analyzes attrition from the hiring process on a class-by-class basis, and the City has advised that, when attrition metrics reports show disparate impact in the overall Medical Exam, MAP analyzes each station to determine the sources of disparity, and then multiple other bureaus, including ORR, CID, and BHS, devise methods to ameliorate these disparities. However, the City has not shared the results of any of these further analyses, and it has neither identified which disqualification reasons are driving the disparate impact it reports in the Medical Exam nor described the manner in which the other bureaus coordinate with each other to devise, implement, and track the effectiveness of targeted mitigation strategies. The City must task a specific person or group of persons who can provide strategic oversight to implement and report on data-driven attrition mitigation programs for non-traditional candidates in the Medical Exam.

Among the medical disqualification reasons shown in the Monitor's August 20, 2021 report to have had a disparate impact adverse to both Black and Hispanic candidates, there are some – notably the stairmill test and weight – that the City could address with better preparation, training, and communication with non-traditional candidates. The City has implemented programming intended to address these issues, including widening the scope of candidates

eligible for FAP, implementation of the stairmill fitness program, and additional fitness messaging, but it has not provided evaluations showing whether these programs have actually had an effect on disparate impact.  The City has stated that it will continue to analyze the medical data and remediate where possible, but a critical first step is to identify which specific medical disqualification reasons are driving disparate impact and to develop, implement, and track the success of interventions.  To satisfy the requirements of the Modified Remedial Order, the City must have a plan in place that allows it to analyze Medical Exam data and make mitigation adjustments as necessary, especially in a hiring step that it knows has disparate impact.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-traditional candidates from the Medical Exam, on preparing such candidates to pass the Exam, and on helping them to move from pending status to qualified status.  But this requirement has taken on even greater importance now, as the effects of the pandemic have fallen and continue to fall disproportionately on Black and Hispanic communities.  Tailored and flexible strategies and policies need to be developed and implemented to account for this disproportionate hardship, and the City must do all it can to mitigate any negative impact of the Medical Exam on Black and Hispanic representation in Academy classes.  The importance of these efforts is also heightened by the long wait times that some candidates will experience between passing the CPAT and appearing for the Medical Exam.  The Monitor has also asked the City to track pandemic-related attrition data in the hiring process, and such data may prove particularly relevant with respect to the Medical Exam.  The Monitor's purpose in requesting such tracking is to permit a meaningful comparison of prior candidate processing cycles with processing affected by the pandemic.

## V.    Character Screening by the CID and PRB

The City's December 14, 2021 reports on candidate attrition included analyses of outcomes from the character review process for Exam 7001 candidates, covering processing through the appointment of the October 2021 Academy class.  These latest figures (like those in the City's previous report) show statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which candidates are referred to the PRB.  Among candidates referred to the PRB, the City's analysis also shows a statistically significant disparity in rates of disqualification between Black and white candidates.[48]  Based on a further analysis performed by the Monitor using the City's figures, the figures also continue to show a statistically significant disparity between Black and white candidates in the rates at which all candidates in each group who receive any final decision from the character review process (either a no-referral decision or a final decision from the PRB following referral) are deemed qualified as to character.[49]

As previously reported, on January 5, 2021, the Monitor circulated a memorandum to the Parties summarizing proposals, outstanding issues, and questions relating to the analyses of the character review process – which have also been summarized in previous reports.  *See, e.g.,* Monitor's Thirty-Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's Thirtieth Periodic Report at 61-63.  The Monitor expects to include discussion of outstanding issues and questions as part of the broader discussion with the City (described

---

[48] Six of 52 Black candidates referred to the PRB (9.4%) were disqualified, compared to two of 105 white candidates (1.7%).

[49] An additional separate analysis by the Monitor also found a statistically significant disparity between Black and white candidates in the rates at which they were either (1) disqualified or (2) hired with extended probation (combining the percentages for both outcomes).

above) regarding the analysis of candidate attrition in all phases of the hiring process; and the Monitor has included recommendations regarding analyses of the character review process in the larger set of recommendations for additional analyses circulated to the City and the other Parties. In addition, given the statistically significant disparities in outcomes to date, the Monitor expects to resume discussions with the Parties regarding further reforms in relevant standards and procedures, and/or improvements in outreach and guidance, that may be necessary to address the adverse impact of the character review process on non-traditional candidates. The Monitor has previously made it clear that if analyses show that the process has a disparate impact adverse to Black or Hispanic candidates, the City will be required either to make further changes in the process (and show they are effective in eliminating disparate impact) or to validate the process as job-related. *See, e.g.*, Monitor's Twenty-Ninth Periodic Report at 79.

## VI.    **Firefighter Exam**

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test for the position of entry-level firefighter. Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process. The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018. The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.  **Additional Issues**

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order.

Dated:   February 9, 2022
New York, New York

/s/
Mark S. Cohen

74