UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

               Plaintiff,

     -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

               Plaintiff-Intervenors,

     -against-

THE CITY OF NEW YORK,

               Defendant.

-------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## <u>MONITOR'S THIRTY-SIXTH PERIODIC REPORT TO THE COURT</u>

TABLE OF CONTENTS

I.      Executive Summary .................................................................................................... 1

II.     Recruitment and Attrition Mitigation ...................................................................... 11

        A.      Candidate Processing ................................................................................... 11

                1.      Extension of the Exam 7001 List ..................................................... 11

                2.      Demographic Trends in Candidate Processing to Date and Results of
                        the City's Analysis of Attrition in the Hiring Process for Exam 7001 ..... 12

                3.      Next Round of CPAT ........................................................................ 15

        B.      Attrition Mitigation ..................................................................................... 16

                1.      Fitness Resources ............................................................................. 17

                2.      Candidate Communications ............................................................. 19

                3.      Coordinators, Mentors, and In-Person Outreach ...................................... 22

                4.      Data Collection and Analysis ........................................................... 26

                        a)      Post-CPAT Focus Group Ordered by Court ............................... 26

                        b)      Assessment of Attrition Mitigation Measures ............................ 28

        C.      Analyses of the Exam 7001 Recruitment Campaign ............................................ 32

                1.      Overview of Analysis and Planning .................................................. 32

                2.      City's After Action Report and Cost-Effective Report ............................ 33

        D.      Working Group ............................................................................................ 37

III.    EEO ........................................................................................................................... 38

        A.      EEO Staffing ................................................................................................ 38

        B.      Policies, Messaging, and Training ............................................................... 40

        C.      Assessment and Accountability ................................................................... 43

                1.      Officer Performance Evaluations ..................................................... 43

                2.      Workplace Professionalism Reporting and Officer Accountability for
                        Workplace Climate ........................................................................... 46

|  |  | 3. | Climate Survey | 49 |
|  | D. | | Inspections, Investigations, and Compliance | 51 |
|  |  | 1. | Monitor Report on EEO Investigative Procedures and the Duration of Investigations | 51 |
|  |  | 2. | Inspections and Monitoring | 53 |
|  |  | 3. | Monitor Review and Recommendations Regarding Investigations | 54 |
| IV. | | | Medical Exam-Related Issues | 55 |
|  | A. | | Medical Exam Attrition Metrics | 55 |
|  | B. | | Medical Exam Attrition Mitigation | 59 |
| V. | | | Character Screening by the CID and PRB | 61 |
| VI. | | | Firefighter Exam | 62 |
| VII. | | | Additional Issues | 63 |

I.    **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from February 9, 2022, the date of the Monitor's Thirty-Fifth Periodic Report (Dkt. # 2082), to May 9, 2022.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II of this report discusses activities relating to the hiring process for entry-level firefighters from the Exam 7001 civil service hiring list and provides an update on retrospective analyses of the Exam 7001 recruitment campaign.  The City's most recent report on the hiring process for Exam 7001 (dated April 27, 2022, covering processing through the March 28 appointment of the current Academy class) continues to show statistically significant disparities in disqualifications adverse to both Black and Hispanic candidates in the Medical Exam, and it also continues to show statistically significant disparities adverse to Black candidates in both phases of the character review process (in referral to the Personnel Review Board ("PRB") and in disqualification decisions by the PRB).  An additional analysis by the Monitor also shows statistically significant disparities in disqualifications adverse to both Black and Hispanic candidates in the character review process considered as a whole (*i.e.* in the rate of disqualifications for all candidates who receive a final decision from either phase of the

process).[1]  These disparities remain concerning, all the more so because they have persisted or emerged as more candidates go through processing, and they suggest that more work is needed to ensure that the hiring process does not present unnecessary barriers to non-traditional candidates and that they are fully prepared to navigate it successfully.

Since the last periodic report, the City has continued active processing for two Academy classes – one class appointed on March 28, 2022 and the next class scheduled to begin in September 2022.  The demographics of the groups being processed for these classes are approximately 16-19% Black, 26-27% Hispanic, and 49-50% white.[2]  In addition, the Monitor and the Parties have discussed the City's request to resume administering the CPAT – along with the steps the City is required to take pursuant to the Court's June 9, 2021 Order (Dkt. # 2033) ("June 9 Order") before resuming CPAT testing.  Although all Parties and the Monitor agreed to a schedule under which analyses required by the June 9 Order would have been completed in time for key findings regarding attrition mitigation activities to be operationalized before the City begins outreach to the next round of CPAT testers, key analyses have not yet been completed, and the City is about to invite the next round of candidates to CPAT orientation without the benefit of the comprehensive assessment called for by the June 9 Order.  The Monitor is committed to ensuring that notwithstanding these challenges, the next administration of the CPAT uses data-based findings to improve upon outcomes for Black and Hispanic candidates and addresses the statistically significant adverse impact at this stage.

---

[1] The report also carries forward figures from previous reports showing statistically significant disparities adverse to Black and Hispanic candidates in outcomes from the Candidate Physical Ability Test ("CPAT") to date.

[2] Candidates called for post-CPAT processing also include some from other demographic groups.

Part II also reports on developments relating to the City's request for a two-year extension in the term of the Exam 7001 hiring list. At the January 19, 2022 status conference, based on discussions with the Monitor and the Parties, the Court indicated that it was inclined to grant the requested extension; but given the difficulty of predicting the effect of the list extension on candidate attrition, and the risk that the extension might exacerbate disparities adverse to non-traditional candidates, the Court asked the Monitor to work with the Parties to devise measures and reporting requirements intended to ensure that the City will promptly identify and take steps to remedy any such adverse impact. The Monitor circulated a list of proposed requirements on February 8, 2022, and the Parties and the Monitor have engaged in several follow-up discussions in an effort to reach agreement on a recommendation for the Monitor to submit to the Court. Those discussions have resolved all but a few issues that the Parties agree are likely to be resolved soon, and the Monitor expects to submit a recommendation to the Court within the next two weeks.

Part II also discusses the City's efforts to mitigate candidate attrition – including activities intended to encourage and improve candidates' fitness preparation, ORR[3] communications with candidates, outreach by Mentors and Outreach Coordinators, and the tracking and analysis of candidate attrition and the effectiveness of the City's attrition mitigation measures and outreach. This discussion of attrition mitigation initiatives and attrition analyses also incorporates an account of steps the City has taken or plans to take to comply with the Court's June 9 Order, which required the City to provide candidates who have passed the CPAT and are waiting to be called for further processing with additional fitness training resources and encouragement, and to gather and use information to optimize the City's attrition mitigation

---

[3] The FDNY Office of Recruitment and Retention

initiatives.  In this area, the Monitor has continued to obtain updates from ORR regarding candidate outreach efforts, to review the City's reports summarizing candidate progress at various stages of the hiring process, and to review and comment on the City's plans to survey a subset of candidates regarding their processing experience.  The Monitor has also continued to follow up on longstanding recommendations for a comprehensive, long-term plan for communications with candidates at all levels on the Exam 7001 list, for increased engagement by Outreach Coordinators, and for analyses that assess the effectiveness of attrition mitigation initiatives by examining correlations between participation in the initiatives and candidate outcomes.

Part II also includes a summary of progress since the last periodic report toward the completion of retrospective analyses, by the Monitor and the City, of the Exam 7001 recruitment campaign.  As previously reported, after requests by the Monitor (first issued in February 2020), and following discussions at the October 13, 2020 status conference, the City agreed that the Monitor could help with data analysis in this area, in light of competing public health commitments for the City's data personnel.  The City produced data to the Monitor from December 2020 through March 2022, and the Monitor shared analyses with the Parties from July 2021 to March 2022.

Since the last report, the City provided progress updates on work being performed by KPMG, which the City retained in September 2021 to augment the City's own after action and cost-benefit analyses.  Although a work plan circulated by the City in November 2021 projected that KPMG would provide a draft of its report on December 1, 2021, and that the final report would be submitted on December 23, 2021, the City subsequently explained that the report was delayed and repeatedly revised the projected delivery date.  The City circulated a copy of

KPMG's report on May 9, 2022 and proposed that the Parties and the Monitor convene to discuss the analysis on May 26, 2022.  The Monitor expects to update the Court further once the Monitor and Parties have had a chance to review and discuss KPMG's analyses.

Part III of the report summarizes recent developments relating to the FDNY's EEO function, including follow-up on Monitor recommendations, ongoing analysis of the FDNY climate survey (given to firefighters in September 2019), the vacancy in the Chief Diversity and Inclusion Officer ("CDIO") position, and ratings of EEO performance for company-level officers.  At the October 8, 2021 Court conference, the Court and the other Parties raised serious concerns regarding violations of EEO policy by FDNY members and the apparent persistence of racial biases and discriminatory sentiment in at least some quarters within the FDNY, and all Parties and the Monitor uniformly recognized the need for culture change within the Department. Since the last report, the Monitor and Parties have continued their discussions of these issues. Topics have included suggestions by the Monitor to enhance compliance, which have been raised a number of times during the Monitorship (most recently in a January 18, 2022 set of recommendations).  On April 7, 2022, the Monitor convened a virtual meeting with the Parties to discuss recommendations on these topics – including, for example, measures to increase uniformed leadership involvement in EEO messaging and compliance, to reinforce systems of officer accountability, and to train and require company officers to monitor firehouse climate and manage diverse workplaces more closely and effectively.  The Monitor is following up to obtain the City's final position regarding the adoption of various measures.  Representatives of the Vulcan Society who attended the meeting raised some ongoing concerns regarding the effectiveness of the FDNY's messaging and compliance activities, which were discussed at the meeting.

As previously reported, the City elected to postpone the creation of a comprehensive, long-term EEO messaging plan until the findings of the workplace climate survey (discussed below) become available.  The Monitor has long urged the City to begin developing that plan, especially now that the analysis of the climate survey is well under way.  The CDIO position (which is responsible for much of the Department's messaging on diversity and inclusion) has been vacant since July 2021, but the City has received applications for the position, and the Monitor has encouraged the City to fill the vacancy expeditiously.

Since the last periodic report, the City has continued efforts to bring the EEO Office attorney staff up to pre-pandemic levels, but it has continued to face challenges, with additional staff departures in the past several months.  According to the City's most recent update, EEO Office attorney staffing stands at eight attorneys – eight short of the 16 attorneys in the Office before the onset of the pandemic.  In response to questions from the Court at the October 8, 2021 conference, the City confirmed that it would continue efforts to fill vacant positions in the EEO Office as rapidly as qualified candidates can be identified.  Given that vital EEO functions, including investigations and inspections, are carried out only by attorneys, it is essential for the Office to return to its pre-pandemic staffing level as soon as possible.

Over the last few months, the FDNY's workplace climate survey has moved into a critically important phase.  As described in the last periodic report, in January, the City circulated a draft report prepared by the Mayor's Office of Data Analytics ("MODA"), which has been principally responsible for analyzing the survey results.  *See* Monitor's Thirty-Fifth Periodic Report at 57.  After the Monitor and the other Parties raised concerns (as previously described, *id*. at 57-59), the City agreed to undertake some further analyses and to allow the Monitor to undertake others.  Since those developments, experts for all Parties and the Monitor have met

regularly and agreed on a general schedule and breakdown of topics, with the goal of adding certain analyses to the report – as well as producing a report that will clearly show top-line results and identify potential action steps for FDNY management based on the data (and which can be accompanied by a more comprehensive document showing the underlying analyses in detail).

Part III also includes an update on the City's progress in resuming regular in-person EEO inspections of FDNY firehouses, which were suspended at the beginning of the pandemic in 2020. Some inspections (conducted personally by the Assistant Commissioner) resumed in February 2022, and inspections by additional EEO staff have resumed more recently. The City reports that inspections are currently taking a place on one to two days per week, at two to four locations per day, and that inspection findings are now being recorded on a newly developed digital application containing standard fields to record inspectors' observations – which the City demonstrated to the Monitor and the other Parties at the April 7, 2022 meeting.

Also as reported in Part III, since the last periodic report, the Monitor has continued efforts to obtain information needed to evaluate how the inclusion of an EEO metric in FDNY officer performance reviews has functioned in practice – including data from the 2020 and 2021 cycles of reviews, along with responses to questions the Monitor previously posed (in September and October 2021) regarding reviews from the 2019 cycle. Since the last periodic report, the City has advised that it plans to bring on additional temporary staff to assist in compiling the requested data, but the Monitor continues to await production of the information from the 2020 and 2021 cycles that it needs to confirm whether this important system of officer accountability is working as intended.

The Monitor has also continued to evaluate the FDNY's investigative practices for complaints filed with the agency's EEO Office and to follow up on recommendations for their improvement.  As previously reported, on January 18, 2022, the Monitor provided the City with a memorandum summarizing comments and recommendations on the FDNY's EEO investigative practices – based on EEO case materials produced by the City since October 2019.  And the Monitor has also continued to confer with the City bi-weekly regarding progress in the investigation of open EEO cases.  Since the last periodic report, the Monitor has also asked the City whether it will agree to share with the other Parties a version of the Monitor's January 18 memorandum that has been redacted to remove identifying names and details, both to provide the other Parties with the Monitor's most recent evaluation of the City's practices and to supply at least some factual background for the observations contained in the memorandum and in previous memoranda and periodic reports.  The Monitor and Parties are awaiting the City's response, and the Monitor intends to set a deadline for resolving this issue before the next status conference.

Part IV reports on efforts to identify and reduce disparate impact adverse to Black and Hispanic candidates in Medical Exam outcomes and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws.  The City's April 27, 2022 report on attrition metrics, which covered hiring results for Exam 7001 through March 29, 2022, showed that the Medical Exam continues to produce statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates.  In response to longstanding requests by the Monitor and the other Parties to provide data and disparate impact analyses broken down by each of the specific Medical Exam disqualification reasons for Exam 7001, the City circulated a report on March 16, 2022 containing that information (the "March 2022 BHS Attrition Metrics

Report"). The report notes that although the majority of components did not reflect such impact, there is disparate impact against Hispanic candidates on the Pulmonary Function Test and against Black candidates for blood pressure.

The stairmill test was revised after a validation study that compared oxygen consumption at a given step rate with oxygen consumption on the Functional Skills Test (a test of job-related tasks used in the Academy to ensure that graduating firefighters are able to fulfill the physical requirements of the position). The data from the first candidates processed in Exam 7001 indicate that the stairmill test no longer causes the disparate impact seen during Exam 2000 testing, at least as of February 24, 2022.

Another important finding reflected in the report is that weight is the second most common reason for medical disqualification, and the odds of Black and Hispanic candidates being disqualified for weight are much higher than those of white candidates (though not at the level of statistically significant adverse impact). Weight is also the factor associated with the highest number of pending candidates who have not received a final medical outcome, with a higher percentage of Black candidates pending. Unlike many health conditions, weight can be improved through diet and lifestyle. Accordingly, as in prior recommendations, the Monitor encourages the City to continue to emphasize the importance of maintaining a healthy weight in its candidate communications and to consider all opportunities and means to provide candidates with resources and guidance to assist them in doing so. In addition, the Monitor has suggested that the City ensure candidates are aware of the option to temporarily decline appointment and take time to lose weight rather than being disqualified.

The City has been tracking, and regularly updating the Monitor and the other Parties regarding, candidate scheduling and the rates at which candidates have been reporting for testing,

qualified, disqualified, or reserved.  The City has also been providing specific information about Black candidates to Plaintiffs-Intervenors so that Plaintiffs-Intervenors can perform outreach and provide support for those candidates.

Part V reports on the status of efforts by the Monitor and the Parties to analyze the impact of the FDNY's character review process on candidates from different demographic groups and to address disparate impact produced by the process.  As noted above, the most recent analyses by the City continue to show statistically significant disparities adverse to Black and Hispanic candidates in referrals to the PRB, along with a statistically significant disparity adverse to Black candidates in disqualifications among candidates referred to the PRB.  In addition, the Monitor's own analysis, based on the City's figures, shows that there is also disparate impact adverse to both Black and Hispanic candidates in the process considered as a whole (*i.e.* in the rate of disqualifications for all candidates who receive a final decision from either phase of the process – PRB referral or PRB decisions).  Accordingly, the Monitor has sought to resume discussions with the City and the other Parties regarding further potential reforms and initiatives to address the disparate impact, and regarding the potential need for the City to validate the process as job-related if it declines to implement further reforms, or if those reforms do not sufficiently remedy the disparity.  Although the Monitor had hoped to schedule a meeting soon after the last periodic report, it was not possible to find a date that worked for all Party counsel and necessary City personnel, and the Monitor is proposing new dates.

Part VI discusses the Exam 7001 computer-based test ("CBT") developed, administered, and analyzed by the City's testing experts, PSI Services LLC ("PSI"), in consultation with experts for the Parties and the Monitor.

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.    Recruitment and Attrition Mitigation

### A.    Candidate Processing

#### 1.    Extension of the Exam 7001 List

As directed by the Court (in its Order following the January 19, 2022 status conference), the Monitor has continued discussions with the Parties regarding the City's request for a two-year extension of the Exam 7001 hiring list – to February 2025.

The City requested the Monitor's approval under the Modified Remedial Order on February 16, 2021 for a two-year extension of the hiring list for Exam 7001, citing the disruption in candidate processing caused by the COVID-19 pandemic.  *See* Monitor's Thirty-Third Periodic Report (Dkt. # 2029) at 8; Monitor's Thirty-Fourth Periodic Report (Dkt. # 2058) at 9; Monitor's Thirty-Fifth Periodic Report at 11.  At the January 19, 2022 status conference, the Court indicated that it was inclined to approve the City's request for a two-year extension. However, in light of concerns that the extension could exacerbate candidate attrition, especially among candidates processed in the last two years of an extended six-year term, in its subsequent Order the Court directed the Monitor to "work with all Parties to propose requirements that may be necessary to justify the list extension."

Accordingly, the Monitor has engaged with the Parties in an effort to reach agreement on a series of required measures to ensure that the City performs frequent analyses of candidate attrition and hiring ratios (including comparisons to the projections offered in support of its request for the extension), and that it takes steps to minimize the risk that the list extension may produce or exacerbate disparities in attrition adverse to Black and Hispanic candidates.  The

Monitor circulated an initial list of proposed requirements on February 8, 2022; the Parties offered comments on the proposals, and following a series of discussions with the Parties, on March 18, 2022 the Monitor sent the Parties a draft recommendation for the Court regarding the list extension, which included requirements for City to conduct and report on regular analyses of candidate attrition, to inform candidates about the list extension and its effect on the hiring process, and to ensure that it maintains engagement with the expanded group of candidates likely to be called for CPAT testing and post-CPAT processing if the list is extended. The Parties and the Monitor have continued to discuss the Monitor's proposals, seeking agreement on a recommendation for the Court; and the Monitor has circulated two further versions of the draft recommendations (on March 30 and April 13). The City has expressed concerns regarding some of the reporting requirements in the Monitor's proposal, asserting that the need to generate reports as requested would impose an undue burden on the City's data management resources. The Monitor and the City have continued discussions regarding the content and timing of the proposed reports in an effort to reach agreement – including a May 6, 2022 call attended by the City's data analysis personnel. The Monitor expects to be able to submit a recommendation to the Court within the next two weeks.

2.    Demographic Trends in Candidate Processing to Date and Results of the City's Analysis of Attrition in the Hiring Process for Exam 7001

The City's most recent report on candidate attrition in the Exam 7001 hiring process (dated April 27, 2022, and covering hiring outcomes through the appointment of the Academy class that began on March 28, 2022) continues to show statistically significant disparities adverse to Black candidates in the CPAT, in the Medical Exam, and in both phases of character review (PRB referral and disqualifications). The figures in the City's report also show statistically significant disparities adverse to Hispanic candidates in the CPAT and the Medical Exam. The

Monitor has made it clear to the City that it must continue efforts to eliminate disparities adverse to non-traditional candidates or validate the affected processing steps as job-related.

Recently, the City has provided figures showing the composition of the most recent Academy class at entry and upon graduation,[4] and the composition of the groups of post-CPAT candidates who were processed for the March 2022 class and who are undergoing processing for the class scheduled to begin in September 2022.  On March 31, 2022, the City provided the following table showing the demographics of probationary firefighters appointed to enter the October 2021 class[5]:

| Race/Ethnicity | No. |
| --- | --- |
| Asian | 10 (3.2%) |
| Black | 40 (12.7%) |
| Hispanic | 77 (24.4%) |
| Unknown | 1 (0.3%) |
| Native American | 1 (0.3%) |
| White | 187 (59.2%) |
| Total | 316 |

The October 2021 Academy class graduated on March 7, 2022, and out of a total of 285 graduates from the Exam 7001 list, 32 (11.2%) were Black, 67 (22.8%) were Hispanic, and 178 (62.5%) were white.[6]  On May 6, 2022, the City provided updated figures for the demographic

---

[4] The figures provided by the City for Academy classes are for Exam 7001 open competitive candidates and exclude a small number of promotional candidates.

[5] These figures differ slightly from those previously provided by the City and reported in the Monitor's previous report.  The City's March 31 figures include two additional "recycled" candidates who had originally been appointed to the previous Academy class.

[6] On March 16, 2022, the City confirmed that initial assignments for this graduating class were compliant with paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational

composition of the firefighter force.  As of April 30, 2022, out of a total of 8,192 firefighters, 859 (10.5%) are Black, 1,368 (16.7%) are Hispanic, and 5,641 (69%) are white.

On November 10, 2021, the City provided the following breakdown of the candidates then in active processing for the March 2022 class[7]:

| Race/Ethnicity | No. |
|---|---|
| Asian | 46 (6.2%) |
| Black | 119 (16.1%) |
| Hispanic | 196 (26.5%) |
| Nat. Am. | 2 (0.2%) |
| White | 377 (50.1%) |
| Total | 740 |

On April 28, 2022, the City provided the following figures for the composition of the class appointed on March 28, 2022:

| Race/Ethnicity | No. |
|---|---|
| Asian | 19 (7.3%) |
| Black | 34 (13.1%) |
| Hispanic | 67 (25.8%) |
| Nat. Am. | 2 (0.8%) |
| Unknown | 0 |
| White | 138 (53.1%) |
| Total | 260 |

needs."  The Monitor has asked the City to provide individual data showing firefighter preferences and assignments so that the Monitor can confirm the City's representation.  The City also provided disparate impact analyses showing that there was no statistically significant disparity adverse to Black or Hispanic firefighters in assignments to busy fire companies or ladder companies.

[7] The City advised that the group in processing for the May 2022 class included candidates with list numbers up to 3,800.

On April 27, 2022, the City provided the following breakdown of candidates in active processing for the September 2022 class[8]:

| Race/Ethnicity | No. |
|---|---|
| Asian | 26 (4.3%) |
| Black | 116 (19.0%) |
| Hispanic | 168 (27.5%) |
| Nat. Am. | 3 (0.5%) |
| Unknown | 0 |
| White | 297 (48.7%) |
| Total | 610 |

### 3.   Next Round of CPAT

On February 2, 2022, the City circulated a proposed schedule to begin a new round of CPAT testing, which called for CPAT administration to begin in August 2022, with information sessions and orientation commencing on May 23.[9]  The Monitor asked the City to provide the information needed for the Monitor to consider whether to approve the City's proposal – including the number of candidates the City planned to call for testing, its rationale for choosing that number, and its plans for attrition mitigation initiatives and outreach to the group of candidates it proposed to call up.  On April 19, 2022, the City responded with a compilation of information supporting its proposal, and on April 25, the City requested the Monitor's permission to begin inviting candidates to information sessions and training for the next round of CPAT testing.  On April 27, 2022, the Monitor approved the City's request, subject to a number of specified conditions that the City must fulfill before testing can begin, and which are intended to mitigate candidate attrition and promote compliance with the Court's Order of June 9, 2021.

---

[8] This group includes candidates with list numbers up to 4,600.

[9] The City has recently advised that information sessions will begin on May 16, with CPAT training to begin in the first week of June.

### B.      Attrition Mitigation

Since the last periodic report, the Monitor has continued to evaluate and comment on the City's efforts to mitigate attrition among Black and Hispanic candidates – including the City's implementation of remedial measures required by the Court's June 9, 2021 Order (relating to the subset of candidates who have passed the CPAT), along with other programs and communications intended to ensure that candidates remain engaged and prepared throughout the screening process.

The June 9 Order directed the City to take four remedial steps relating to its communications with candidates, the fitness resources it provides to candidates, and its efforts to evaluate and enhance the effectiveness of its attrition mitigation programs.  These provisions relating to attrition mitigation activities are discussed below in each relevant area.  A fifth remedial provision (the first listed in the June 9 Order) directed the City to provide "a flowchart or written summary of the firefighter hiring process that enumerates each step of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit of the FDNY has primary responsibility for each of the listed steps." June 9 Order at 11.  The Court noted that the purpose of this provision is to "clarify the steps of the hiring process so that it is clear under what circumstances the City is required to seek the Monitor's pre-approval." *Id*. at 12.  The City produced materials purporting to comply with this directive on July 30, 2021.  Plaintiffs-Intervenors and the United States provided comments (on August 12 and December 13, 2021 respectively), and the Monitor circulated a series of comments on March 2, 2022 – asking the City to provide additional detail regarding the component steps in the process, the timing of those steps, key decisions regarding them, and which units or individuals within the FDNY are responsible for making those decisions.  The

City is preparing a further iteration of the materials addressing the Monitor's comments.

1.      Fitness Resources

The June 9 Order directed the City to provide candidates with fitness resources, as

follows:

> The City is directed to make available to all Black and Hispanic candidates who
> have already passed the CPAT examination, when safety permits, an opportunity
> to maintain fitness and to practice on a stairmill at least every two weeks (whether
> at the Bureau of Health Services, through an arrangement with a gym, at a leased
> site, or any other option the City may deem suitable.)

June 9 Order at 12.

Since the Monitor's previous periodic report, the City has continued to run a stairmill-

focused fitness training program for post-CPAT candidates – offering three two-hour training

sessions per week on alternating weeks, incorporating stairmill work and other fitness training

intended to prepare candidates for the stairmill portion of the Medical Exam.  On a February 17,

2022 conference call, responding to a request by Plaintiffs-Intervenors to offer an alternate

location, the City informed the Monitor and the other Parties that it had begun offering one of

those bi-weekly sessions at FDNY Headquarters in Brooklyn (while continuing to offer the

remaining sessions at the Fire Academy on Randall's Island).  The City has also continued to

offer its Fitness Awareness Program[10] ("FAP"), which provides a range of fitness training and

advice, to all post-CPAT candidates.[11]

On April 14, 2022, the City provided attendance figures for recent stairmill program

---

[10] The FAP is a multi-session program of fitness training for post-CPAT candidates, described in detail in
the Monitor's previous reports.  *See* Monitor's Thirty-Second Periodic Report at 18-19; Monitor's Thirty-
Third Periodic Report at 16-17.

[11] The FDNY's "mobile academy" events, discussed below in Part II.B.3, also offer some fitness-related
guidance and activities.

sessions (since the beginning of 2022) and for the most recent round of the FAP (December 2021

through February 2022).  The figures continue to reflect low rates of attendance in both the FAP

and the stairmill program.  Out of 318 Black candidates invited to the most recent round of the

FAP, 25 (7.86%) attended; of 511 Hispanic candidates invited, 30 (5.87%) attended; and of 926

white candidates invited, 54 (5.83%) attended.  These rates of attendance are lower for all groups

than the rates of attendance for the previous round of training, discussed in the Monitor's

previous report (15.6% for Black candidates, 12.8% for Hispanics, and 8.1% for whites).  *See*

Monitor's Thirty-Fifth Periodic Report at 20-21.  And although the full significance of the

figures is not clear because the City's numbers do not appear to distinguish between unique and

repeat attendance, the declining rates of participation are concerning, as they indicate that the

candidates who are currently in the hiring process and eligible for appointment are participating

at lower rates than those who were in active processing during the last round of the FAP.[12]

The City's figures show even lower rates of participation for the stairmill program – with

fewer than 4% of invitees from any demographic group attending the program, during either the

January-February or the March-April time frames.  Attendance at the FDNY Headquarters site is

below the attendance at the Academy – with only four candidates attending the HQ sessions in

January and February, and only seven attending the March-April sessions, compared to 20 at the

Academy for the March-April sessions.[13]

The recent data continues to indicate that a high percentage of candidates who have

---

[12] Given the need for candidates to maintain fitness throughout the hiring process, even candidates who
participated in an earlier round of the FAP would benefit from additional rounds of training until they
have completed processing.

[13] All seven of the attendees at the March-April HQ sessions were Black, the same number of Black
candidates who attended the Fire Academy sessions.

already passed the CPAT (including non-traditional candidates) are missing opportunities to maintain fitness and receive guidance from the FDNY regarding their level of preparedness for the Medical Exam and the Academy.[14]  The Monitor expects to continue to work with the City and the other Parties in an effort to provide candidates with additional, more accessible options for fitness training and to drive home the importance of fitness training.  As previously reported, in discussions regarding the implementation of the June 9 Order, the City indicated that it has explored arrangements with third-party gyms and fitness facilities as an additional option for candidates.  But no such arrangements have been established to date.  The Monitor has also suggested that the City consider ways of facilitating travel to the Academy – especially from areas with high concentrations of non-traditional candidates.  The City has advised that it continues to offer shuttle bus service to the Academy from FDNY Headquarters when requested by candidates.  The Monitor suggests that the City consider running similar service from additional locations.

2.     Candidate Communications

The June 9 Order directed the City to engage in regular communications with all post-CPAT candidates on specified topics:

> The City is directed to communicate, via the FDNY Office of Recruitment and Retention, not less than once a month with all Black and Hispanic candidates who have already passed the CPAT examination, with reasonable estimates of when they might be called for further steps, and encouragement to remain in the FDNY hiring process.

June 9 Order at 12.

---

[14] The figures for both the FAP and the stairmill program show somewhat higher rates of participation for Black and Hispanic candidates than for white candidates.  But they also reflect substantial room for improvement in participation among non-traditional candidates.

Since the June 9 Order was issued, the City has circulated several revised and updated candidate communication plans, on which the Monitor has offered comments.[15]  Monitor's Thirty-Fifth Periodic Report at 22-23; Monitor's Thirty-Fourth Periodic Report at 17.   Since the last periodic report, on April 13, 2022, the Monitor provided comments on the plan that the City had circulated on February 3, 2022[16] – asking the City to provide additional details and clarifications to confirm that the plan was compliant with the June 9 Order.  In response, the City produced its most recent iteration of the communication plan on April 29, 2022.  The Monitor is currently evaluating the updated plan to confirm that it includes messaging to the remaining post-CPAT candidates (those who have not yet completed processing) on the topics and with the frequency required by the June 9 Order.  However, it must be noted that the vast majority of candidates who were in the post-CPAT group in June 2021 had already entered or completed post-CPAT processing before the City produced its most recent plan.  As discussed below, the City's and the Monitor's focus must now turn to the development of a suitable, long-term, properly tailored communication plan for the large group of candidates expected to be called for CPAT and enter post-CPAT processing within the next few months.

---

[15] Apart from the specific direction provided by the June 9 Order, the Monitor has also previously made it clear that the City must develop and implement a long-term ORR communication plan tailored to candidates who have reached different stages of processing and who occupy different positions on the list, with different wait times for further processing and potential appointment to an Academy class. Monitor's Thirty-Third Periodic Report at 19-20; Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 18-20; *see also* Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 12-14; Monitor's Status Report Regarding CPAT Testing (Dkt. # 1866) at 17.  The City has produced numerous iterations of the ORR communication plan in response to the Monitor's recommendations, but to date none of have disclosed a sufficiently comprehensive plan of communications tailored to the circumstances of differently situated candidates (even without an extension of the list term).  Monitor Thirty-Third Periodic Report at 20.

[16] In response to Monitor queries, the City provided additional clarifications regarding some components of the February 3 plan on March 2, 2022.

In addition to requests for information needed to confirm compliance with June 9 Order, the Monitor has also renewed additional recommendations for the plan, which will continue to be applicable to further plans for additional groups of candidates.  The Monitor has suggested that the plan include additional messaging on fitness preparation and on the administrative requirements of the hiring process for candidates with the longest wait times among the current post-CPAT group, that it incorporate messaging for all relevant groups regarding preparation for the Fire Academy, and that it include additional messaging on how candidates can connect with affinity groups.  In addition, the Monitor's April 13 follow-up renewed recommendations for messaging targeting both pre-CPAT and post-CPAT candidates.  The Monitor also encouraged the City to continue and expand its use of WebEx conferences to provide guidance and reminders on maintaining fitness and on the administrative and documentary requirements of the hiring process – especially given the large number of candidates who will become reachable with an extension of the hiring list, but who will wait long periods to be called for the CPAT and for further processing.[17]

The Monitor has also noted that the ORR communication plan will need to be expanded to include motivational communications and information on candidate resources for pre-CPAT candidates.  The need for intensive communications will be particularly pressing if the Exam 7001 list is extended; and in discussions regarding the proposed list extension, the Monitor has emphasized that communications with all candidates, and especially with those who may wait for

---

[17] The City has continued to offer a limited number of WebEx conferences on specified topics to post-CPAT candidates.  Most recently, on January 27, 2022, it reported attendance data from three such conferences held between November 2021 and January 2022 – one on fitness topics, one on BHS procedures, and one on topics related to candidate intake.  Total attendance for each session was between 81 and 87 candidates, including 12-17 Black candidates (12-15% of those invited) and 23-31 Hispanic candidates (12-16% of those invited).

appointment until years five and six of the extended list, must include frequent updates estimating when candidates in specified list-number groups will be called for CPAT testing and for later processing steps, along with messaging highlighting fitness resources and the importance of maintaining fitness.

The Monitor has continued to receive updates on planned additions and modifications to the candidate portal, to which candidates are given access when they are invited to CPAT orientation and training.  The Monitor and the other Parties have offered the City a number of recommendations to make the portal a more user-friendly and informative resource, and the City has advised that a series of improvements are expected to be implemented by mid-June, including a more personalized home page and a reorganization and clarification of the information presented.  The City has also continued to pursue plans to add information to the portal showing when candidates in specific list-number groups can expect to be called for further processing.  It is also working on a simplified version of the "Requirements and Reminder Notice," an updated checklist of the documents and information candidates are required to provide, which is sent periodically to candidates and posted on the portal.

3.  <u>Coordinators, Mentors, and In-Person Outreach</u>

The Monitor has continued to request updates regarding the staffing of ORR, particularly with regard to Outreach Coordinators – firefighters detailed to ORR to assist in outreach to candidates.  On March 17, 2022, the City advised that ORR is currently utilizing two Black Outreach Coordinators and one Hispanic Outreach Coordinator, assisted by five additional firefighters on light duty.  On April 28, 2022, the City confirmed that it has continued to maintain this level of staffing, utilizing overtime to staff recruitment events and to provide some additional assistance in candidate outreach.

As discussed in the Monitor's previous periodic report, the Monitor remains concerned about the level of ORR staffing and whether there are enough resources to adequately maintain engagement with the candidates in active processing.  *See* Monitor's Thirty-Fifth Periodic Report at 25-26.  Coordinator staffing levels have fluctuated; the City has reduced the staffing level it deems necessary for a given number of candidates in processing[18]; and, as described by the City, the frequency of Coordinator communications with candidates in active processing is not determined by a regular schedule, but rather varies depending on whether candidates have appointments or whether ORR is promoting a specific program.  *Id*. at 26-27.  As previously noted, the City has been unable to provide detailed information on the frequency or content of Coordinator communications with individual candidates.  *Id*. at 26 & n.16.  In addition, the demands on Coordinator staffing will greatly increase when an additional group of candidates is called for CPAT training (tentatively projected to begin in late May) and ultimately for CPAT testing.  The Monitor has asked the City to provide detailed plans and commitments for Coordinator staffing and outreach for the group of candidates it plans to invite to CPAT orientation, training, and testing.  Given that the City has already begun to engage with these candidates regarding their preparation (*e.g.*, in communication regarding mobile academies, discussed immediately below), it is critical for sufficient staffing and plans to be in place.  On May 6, 2022, the City provided a brief description of its plan for Coordinator staffing for the upcoming round of CPAT training and testing.  The Monitor is evaluating the plan and expects to have follow-up questions for the City.

---

[18] The City reported that this reduction occurred because some candidates in processing had reached stages where the City determined they required less frequent contacts.

In connection with its plans to resume CPAT testing, the City began to invite candidates to "mobile academy" events – live events that offer demonstrations of some elements of the CPAT test and offer information and guidance to candidates.  As reported by the City on an April 14, 2022 conference call, however, candidate responses to invitations for the first round of mobile academy events were insufficient to justify holding the events.  The City reported that some candidates contacted said that they did not expect to be called for testing soon; and other candidates indicated that they did not believe they needed to maintain fitness continuously.  Although anecdotal, these reported responses appear to underscore the importance of clear and frequent communications regarding the need for candidates to assess and maintain physical fitness while they wait for the next step in the hiring process.  The feedback may also suggest that more frequent and/or different communications may be needed to sustain candidates' focus on their fitness.  On May 6, 2022, the City provided attendance figures for mobile academy events held on April 22 and 30, 2022.  Out of 367 Black candidates invited to take part, 19 (5.2%) attended, along with 15 of 512 Hispanic invitees (2.9%) and 18 of 866 white invitees (2.1%).

In other developments relating to candidate outreach, the City has advised the Monitor and the Parties that ORR's new texting system for communicating with candidates is now operational, and that the Outreach Coordinators are using the texting system in their outreach to candidates.[19]  Further, the City has advised that the Mentor application, which was developed to help provide information about mentor activities, officially launched on March 30, 2022.

---

[19] In its May 5, 2022 comments on a draft of this report, the City advised that Coordinators are using the system as a secondary tool "when necessary (*i.e.*, when they are unable to reach a candidate by phone or cell text)."  The Monitor plans to follow up with the City regarding this update, as it appears to suggest that Coordinators may not be taking maximum advantage of the new system's capacity to retain a continuous record of communications by different team members with each candidate.

According to the City, Mentors have been trained on the application and have been using it to make weekly reports on their communications with mentees.  The Monitor expects to follow up to obtain reports from the system as soon as it has been in use for long enough to gather information on a meaningful sample of Mentor interactions with candidates.

On April 27, 2022, the City reported figures showing, for candidates in active processing for the upcoming class, how many candidates in each demographic group had logged into the portal and/or signed up for the Mentor program[20]:

| Race | In Mentor Not Portal | On Portal Not Mentor | On Portal In Mentor | Not Mentor Not Portal | Total Portal | Total Mentor | Total |
|---|---|---|---|---|---|---|---|
| Asian | 1 (3.8%) | 1 (3.8%) | 22 (84.6%) | 2 (7.7%) | 23 (88.5%) | 23 (88.5%) | 26 |
| Black | 17 (14.7%) | 17 (14.7%) | 79 (68.1%) | 3 (2.6%) | 96 (82.8%) | 96 (82.8%) | 116 |
| Hispanic | 12 (7.1%) | 16 (9.5%) | 138 (82.1%) | 2 (1.2%) | 154 (91.7%) | 150 (89.2%) | 168 |
| Nat. Am. | 1 (33.3%) | 0 | 2 (66.7%) | 0 | 2 (66.7%) | 3 (100%) | 3 |
| White | 41 (13.8%) | 29 (9.8%) | 217 (73.1%) | 10 (3.4%) | 246 (82.8%) | 258 (86.9%) | 297 |
| Total | 72 | 63 | 458 | 17 | | | 610 |

These figures indicate that Black candidates in the active processing group are participating in the Mentor program at a lower rate than white candidates, while the rates at which the two groups have logged into the portal are approximately equal.  Overall, 68.1% of Black candidates in this group have engaged with both the Mentor program and the portal.  Given the important roles that these initiatives are intended to play in maintaining candidates' engagement, it will be important for the City to pursue additional outreach to encourage more Black candidates to participate.

---

[20] Percentages and the "Total Portal" and "Total Mentor" columns have been added to the table provided by the City.

4. <u>Data Collection and Analysis</u>

a) *Post-CPAT Focus Group Ordered by Court*

The Court's June 9 Order provided as follows:

The City is directed to conduct a focus group with candidates who have passed the CPAT and are expected to wait before being called for further processing, with study design input from the Monitor's experts, in the next 30 days [by July 9] to assess their experience and gather suggestions to improve retention and preparation.

June 9 Order at 12.

As discussed in prior reports, the Monitor and the Parties have engaged in a series of discussions regarding the focus group the City conducted following the June 9 Order. *See* Monitor's Thirty-Fifth Periodic Report at 27-28. As previously recounted, the Monitor expressed several concerns regarding the structure and administration of the focus group, and the limited informative value of the response it obtained. *Id*. at 28. Before conducting the focus group, the City had initially proposed a survey as an alternative, and following the focus group, it has opted to do a supplementary survey of candidates who passed the CPAT. Despite the Monitor's suggestion that a third party conduct the survey, the City has elected to have ORR administer the survey (rather than a third party or another agency), using the same modes of communication that ORR routinely uses to solicit other candidate information. Monitor's Thirty-Fifth Periodic Report at 29. The City has previously advised that the survey will be conducted "confidentially" but not anonymously, and it has indicated that in some cases ORR may tie responses back to respondents in order to understand the individual experiences underlying responses. *Id*.

The timing of the survey is also a concern. In June 2021, following issuance of the Court's June 9 Order, the City proposed to substitute a survey for the focus group of post-CPAT candidates that the Order required, to get feedback about how best to retain candidates in the

26

hiring process both before and after the CPAT.  While the Monitor and Court retained the focus group requirement, all Parties agreed that it would be useful to conduct a survey, and the City stated that it wished to incorporate focus group takeaways into the survey.  The Monitor and Parties also discussed that the survey would, among other things, seek data about whether transit to Randall's Island may deter some candidates from participating in CPAT training or testing, as Plaintiffs-Intervenors have alleged but the City contests.  On November 15, 2021, following the City's focus group (with which the Monitor expressed concerns, as described above), the Monitor asked the City to provide a plan for the candidate survey, emphasizing the time needed to give the survey, complete the survey analysis, and identify takeaways at least a month in advance of beginning to message to candidates about CPAT (which was then projected to begin in February 2022).

On November 24, 2022, the City stated that it expected to be able to provide a survey plan the following week.  On January 10, 2022, the City circulated a survey plan that generally laid out the City's intended steps of the survey, and intent to limit it to 30 questions, but did not provide the questions or dates on which the steps would occur.  The Monitor provided comments on January 25, 2022, and asked for the City to specify the dates on which items listed on the schedule would take place by January 31, 2022.  The City circulated a set of proposed questions on February 2, 2022 (but did not provide dates), and the Monitor and other Parties provided comments on the questions and format of the proposed survey by February 15, 2022.  On April 19, 2022, the City sent a version of the survey that the City stated was in final form and already being programmed for delivery – rejecting the majority of the Monitor and other Parties' comments based on the City's disagreement with their merit or necessity.  The City also provided dates.  On May 2, 2022, the City advised on a call with the Monitor and Parties that it

would not be able to complete the survey analysis in advance of resuming the CPAT, though it may try to make some use of the data to inform plans before analysis is complete.

Given the importance of incorporating meaningful levels of candidate feedback in the report on attrition mitigation required by the June 9 Order, which must be completed before the next administration of the CPAT (as discussed below), the Monitor will continue to follow up and obtain updates on the City's plans to gather and utilize information from the survey.

b)      *Assessment of Attrition Mitigation Measures*

The Monitor has continued to follow up on longstanding recommendations to improve how the City analyzes patterns of candidate attrition.  As discussed in the Monitor's previous reports, while the City's reports on candidate outcomes from Exam 7001 processing include figures on voluntary attrition and disqualifications for each of the principal phases of the hiring process (including calculations of statistical significance for inter-group disparities in disqualifications), they lack several features that the Monitor has long recommended and regards as essential to inform the City's efforts to mitigate attrition.  The missing elements include, most notably, calculations of statistical significance for disparities in voluntary attrition, additional analyses of the character review process, and analyses correlating candidate outcomes with the City's attrition mitigation initiatives.  *See* Monitor's Thirty-Fifth Periodic Report at 31.

Rigorous analysis of candidate attrition and the effectiveness of the City's programs and communications is essential for the City to ensure that its attrition mitigation efforts are effective in assisting non-traditional candidates and in navigating the hiring process successfully – especially given the persistence of statistically significant disparities between groups in multiple stages of the hiring process.  The need for such analyses is also likely to be heightened by the requested extension of the Exam 7001 list, which will present the City with unprecedented challenges in maintaining candidate engagement.

28

The Court's June 9 Order specifically directed the City to assess and report on the effectiveness of its attrition mitigation mechanisms:

> Before resuming administration of the CPAT to further candidates, the City is directed to submit to the Monitor and Parties a written summary discussing the effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1 and 2, the efforts that have been specifically directed to the candidates in the group who have passed the CPAT, any takeaways from the focus group, and a description of how the FDNY plans to operationalize the information contained in the report going forward. The City should likewise continue to furnish data on disparate impacts and attrition rates for Black and Hispanic candidates.

By the terms of the Order, the City cannot be permitted to begin the next round of CPAT testing until the required summary report has been completed – along with a description of plans to operationalize its findings.

On February 2, 2022, as part of its proposed schedule to begin a new round of CPAT testing, the City circulated a plan for the development of the report, including interim deadlines for input from the Monitor and the Parties and related consultations. The schedule, to which the Monitor and the other Parties agreed, called for the City's analysis and report to be completed by April 29, 2022, before any outreach would begin for the next round of CPAT testing. However, the City was delayed in providing responses to the Monitor's and the other Parties' recommendations for analyses to be included in the report; and, as a result, although the City is about to begin outreach to the new round of candidates, the report has not been completed. The Parties and the Monitor are engaged in discussions to ensure that essential analyses are performed as soon as possible – so that they can be operationalized in the City's attrition mitigation efforts for the maximum period of time before CPAT administration takes place.

On February 25, 2022, the City circulated a message commenting on a series of recommendations offered by the Monitor and the other Parties for analyses to be included in the

summary report required by the June 9 Order.[21]  Because it remained unclear whether the City

had committed to accept the recommendations, on March 16, 2022, the Monitor followed up

with a chart compiling the recommendations in simplified form, with a request that the City

specify whether it would accept each recommendation.  The United States and Plaintiffs-

Intervenors provided comments on the chart on March 21, 2022, and the City circulated its

responses to the list of recommendations on May 2, 2022.  The City's responses rejected several

of the Monitor's recommendations and appeared to reflect a disagreement regarding the scope of

the analysis required by the June 9 Order.  The Monitor is continuing to follow up with the

Parties in efforts to resolve these issues, and the Monitor has requested information about the

City's timeline for compliance with the June 9 Order to be able to provide the Court with an

update shortly after this report is filed.

 The City has asserted generally that ORR regularly consults its data "dashboard"

(described in detail in the Monitor's previous reports, *see* Monitor's Thirty-Fifth Periodic Report

at 31-32), to keep abreast of candidate attrition and the areas of the hiring process where it is

occurring.  The City has stated that management reviews the dashboard on a bi-weekly basis and

as needed to address specific concerns, and that it uses the dashboard to identify individual Black

and Hispanic candidates for additional outreach (for example, those with imminent or missed

appointments).

 While the dashboard is clearly a useful tool for ORR, the Monitor has discussed with the

City the need for the Monitor to obtain more information about how it is used – in order to verify

---

[21] The Monitor's recommendations (most of which had been offered in earlier communications dating back to 2019) were provided in a July 26, 2021 message, and in a further follow-up message on October 27, 2021.  The United States and Plaintiffs-Intervenors provided their recommendations (some of which also echoed earlier requests) on February 9, 2022.

what analyses are being conducted and to offer timely recommendations for further analyses or action in response to findings.  While a main purpose of reviewing the database is to review hiring data for any indications that changes in approach might be needed to mitigate attrition, the Monitor has not yet been provided with any records of ORR data analyses used to identify groups of candidates for additional outreach or to modify the content or targeting of ORR messaging based on dashboard results.  As described by the City, there is no list showing the recurring analyses that ORR conducts, or the frequency with which particular analyses are conducted, and it would be burdensome or impossible to recreate for the Monitor the specific screen views that ORR examines.  The Monitor has begun discussions with the City about possible solutions to the need to gain more insight into the fluid review process the City has described.

In an additional area related to data retention and analysis, Plaintiffs-Intervenors had requested that the City inquire into the possibility of reviewing data from practice CPAT test sessions, to help identify which components of the test cause candidates to fail practice sessions so that they must return for a subsequent test.[22]  On February 25, 2022 the Monitor held a virtual meeting with representatives of the Department of Citywide Administrative Services ("DCAS") to gather information and offer suggestions regarding the categories of data that the City retains from CPAT practice sessions and final tests, and the form in which the data is preserved.  The DCAS personnel informed the Monitor that for previous rounds of testing, the results of practice sessions are available on handwritten forms, but that outcomes had not been retained electronically because they were "overwritten" when DCAS entered the overall result of the final test.  However, DCAS indicated that it would be possible to retain the result of each practice

---

[22] If a candidate passes during a CPAT practice test, the result is treated as a final passing test result.

session separately in future – data which may be valuable in guiding CPAT training and related

outreach.  In subsequent discussions, the City has confirmed that practice-session data will be

retained in future rounds of testing, beginning with the upcoming round.  The Monitor has also

suggested that the City consider recording data from specific components of CPAT practice and

testing sessions to attempt to identify which components drive disqualifications most

frequently.[23]

### C.    Analyses of the Exam 7001 Recruitment Campaign

#### 1.    Overview of Analysis and Planning

The City's establishment of a sustainable process for successfully recruiting and retaining

Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and

the Monitorship.  *See* Modified Remedial Order ¶¶ 31-36.  The Court specifically found that a

policy or practice that "fails to adequately recruit black persons to become firefighter candidates

serves to maintain and perpetuate the effects of the City's discrimination against black firefighter

candidates."  Findings of Fact (Dkt. # 741) at 33.  The Court has also emphasized the need for

the City to identify which measures are most cost-effective for diverse recruitment.  For the City

to accomplish these goals, it must analyze the outcomes of its past recruitment efforts to identify

which initiatives are the most productive and cost-effective means of attracting non-traditional

candidates likely to achieve reachable scores on the firefighter examination and ultimately be

appointed as firefighters.

---

[23] Disqualifications can result either from the failure to complete the CPAT in the prescribed time or from failure to perform the component tasks correctly.  At the February 25 meeting, the City advised that component-by-component data from previous rounds of testing was available only on paper checklists (for CPAT practices sessions and tests) or on "Scantron" type forms (for CPAT training sessions run by the FDNY).  Although data from the Scantron forms could technically be transferred to a database by scanning the form with an appropriate application, the City has not done so.  In recent weeks the Monitor and the City have discussed arrangements for the Monitor to obtain and analyze the practice-session and training forms from previous CPAT rounds.

As described in the Monitor's previous reports, while the retrospective reports on the Exam 7001 campaign produced by the City to date contained some useful analyses, they did not identify which recruitment activities most effectively increased Black and Hispanic representation in the pool of candidates with scores likely to be reached during the life of the exam list (assuming the standard four-year term).  Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 37.  The Monitor and all Parties are in agreement that the City must complete these analyses in time to use the results to inform the City's strategies for the next recruitment campaign, and the City has acknowledged that they are a critical pre-requisite for that campaign. As noted above, the City has hired an outside consultant, KPMG, to assist with this work.

The schedule the City proposed in its list-extension request projected that the next campaign (assuming a two-year extension) would begin in April 2023, with the next examination taking place in the summer of 2024.  The Parties and the Monitor have estimated that planning for the next campaign will require approximately eleven months once the after action analyses of the Exam 7001 campaign are completed.  The Monitor, the Court, and the other Parties have obtained the City's assurances that the next recruitment cycle will not begin until these analyses have been completed and incorporated into a comprehensive plan of action.  The City noted "the need to ensure sufficient analysis and planning prior to the commencement of the recruitment campaign for the next exam" as one of the grounds for its request for the Monitor's approval to extend the list.

### 2. City's After Action Report and Cost-Effective Report

The Monitor has continued to work with the City and the other Parties on tasks and issues relating to the after action analysis of the Exam 7001 recruitment campaign, which the City must complete before it can embark on the recruitment campaign for the next open competitive examination.

As described in the Monitor's previous reports, the City provided the Monitor and the other Parties with an initial report on the effectiveness of the Exam 7001 recruitment campaign (the "After Action Report") in November 2018 and an updated version on October 2, 2019, following comments from the Monitor and the other Parties.  Monitor's Twenty-Ninth Periodic Report at 35-36.  The City separately provided its "Cost Effective Analysis" on October 23, 2019.  *Id*. at 36.  Also as described in previous periodic reports, while the City's reports contained a number of useful analyses, they did not include critical investigations of the relative effectiveness of different initiatives in recruiting reachable non-traditional candidates.  *Id.* at 37.  The City also did not collect or preserve important categories of information related to costs, which the City acknowledged placed limits on the analysis of which expenditures provided the greatest return on investment.  *Id*. at 38.

Following discussions at the October 2020 Court conference, with the City's agreement, the Monitor's expert developed analyses based on information provided by the City, which were shared with the Parties from July 2021 to February 2022.  The United States and Plaintiffs-Intervenors, as well as their experts, provided input and requested specific additional analyses at various points in the process.  In response to further questions from Plaintiffs-Intervenors, the Monitor gave a third presentation on February 10, 2022, and circulated the results of further analyses on March 2, 2022.  The City provided the Monitor with comments and questions regarding this analysis on May 4, 2022.

The Monitor's Exam 7001 Recruitment Campaign After-Action Analysis includes data-driven insights and recommendations, based on the data produced by the City in response to the Monitor's requests.  These analyses generally estimate the effectiveness of the City's Exam 7001 recruitment campaign, based on the number and percentages of non-traditional reachable

candidates correlated with or associated with various Exam 7001 recruitment strategies.  The strategies examined by the Monitor include the advertising campaign; FDNY recruitment events; mobile academy events and exam tutorials; ORR communications; filing period extensions; and engagements and reminders at each step in the process.  The Monitor's focus was on areas of inquiry that can lead to actionable insights to help guide the City's planning for the next campaign.  For example, the Monitor sought to determine the relative effectiveness and efficiency of recruitment events by characteristics such as event type, borough, date, and staffing, and to draw actionable insights (*e.g.*, which event types and event locations were most successful) where the data are clear enough to provide them.

The analyses in the Monitor's after action report focus on the City's success in attracting reachable candidates among whom the percentage of non-traditional candidates was high.  The Monitor's assumption, based on the timing of KPMG's later-performed analyses, was that, if KPMG chose to run some of the analyses developed by the Monitor, it would use hires – rather than reachable candidates – as the relevant group of successful candidates.  At the time of the City's productions to the Monitor, there had not yet been enough hires to provide sufficient data with respect to that cohort.  Now that sufficient information is available showing candidates' progress through hiring, analyses should focus on the City's success in recruiting non-traditional candidates who go on to be hired, as that is the most meaningful metric for planning the next campaign.  The Monitor shared this view with the City on January 25, 2022 and learned that KPMG had not done analyses in this way, but that it would do so, based on the Monitor's request.

KPMG has been working since September 2021 on an analysis being prepared under the City's direction.  The November 2, 2021 KPMG work plan anticipated that KPMG would

provide a "draft report of literature review findings, logic model and data analysis to the FDNY and OMB for finalization" on December 1, 2021 and that, after feedback from the City and related revisions, the final report would be submitted on December 23, 2021. On a February 3, 2022 conference call, the City indicated that it expected to circulate the report in time to hold a meeting in the first week of March to discuss KPMG's findings with the Monitor and the other Parties. In response to the Monitor's request, the City declined to share KPMG's analysis or any interim work prior to the final report, stating that the analyses were still being quality checked. The City subsequently explained that the report was delayed again. On March 31, 2022, the City said it would circulate KPMG's report in about three weeks. The report was ultimately provided to the Monitor and the other Parties on May 9, 2022. The City has proposed that the Parties and the Monitor convene to discuss the report on May 26. The Monitor expects to update the Court further once the Monitor and Parties have had a chance to review and discuss KPMG's analyses.

While the City has primary responsibility for completing its own after action and cost effectiveness analyses and creating a blueprint for the next campaign, the Monitor and the Monitor's experts will, of course, provide whatever help the City or its consultants request. And the Monitor expects that the City will also continue to provide the Monitor with data and information as needed – to enable the Monitor to perform whatever work may be needed to complete its own analyses, to monitor the City's analytical work, and to carry out the Court's January 2020 Order to mediate the Parties' dispute concerning the sufficiency of after action and cost effectiveness analyses as a prerequisite to the next campaign.

On February 14, 2020, the Monitor requested that the City make a small number of active firefighters available for focus groups to discuss their experience with the Exam 7001 recruitment campaign, and the Monitor provided the City with a detailed description of the

intended focus group on March 9, 2020.  The Monitor held off on pursuing that request during the height of the initial wave of COVID-19 infections, but once all active-duty firefighters were required to be vaccinated and the City's operations had recovered to a suitable extent, the Monitor repeated the request, noted it in periodic reports, and asked for dates on several occasions, most recently in messages regarding recruitment data sent on January 11 and 25, 2022, and on February 2 and 4, 2022.  The Monitor has also included an item reflecting that the "Monitor has asked the City… to provide dates for focus groups" in the list of "issues, inquiries and requests" that is circulated before the Monitor's bi-weekly calls with the Parties.  The Monitor expects to provide an update on focus group scheduling at the next status conference.

### D.    Working Group

The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).  The Monitor has continued to receive updates on the two principal Working Group initiatives – the FDNY Fire Cadet program and the FDNY Explorer's program, which have been described in detail in previous reports.  *See* Monitor's Fourteenth Periodic Report (Dkt. # 1651) at 13-14; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 11-12; Monitor's Nineteenth Periodic Report (Dkt. # 1761) at 17-18.  The City previously reported that the timeline for further work toward the launch of the Fire Cadet program was contingent on the scheduling of the next promotional firefighter exam, which remains to be determined, *see* Monitor's Thirty-First Periodic Report at 22-23; and the City reports that those efforts remain suspended.  On May 5, 2022, the City reported that the Explorer Program has resumed regular in-person meetings and/or community service for all of its eight Posts.

### III.   <u>EEO</u>

The Monitor has continued to work with the City, and to consult with the other Parties, on several initiatives relating to EEO messaging, compliance, and firehouse culture – including measures intended to address the serious concerns regarding EEO violations and FDNY culture discussed at the October 8, 2021 Court conference on EEO topics, which was prompted by press reports of serious violations of EEO policy in FDNY workplaces.  A summary of the October 8, 2021 conference and the City's responses to the Court's questions at the conference appears in the Monitor's Thirty-Fifth Periodic Report at 41-43.  As all Parties, the Court, and the Monitor acknowledged at the conference, considerable work remains to be done for the City to reform the workplace culture of the FDNY and ensure that its work environment is consistently inclusive.

As previously reported, on January 18, 2022, the Monitor circulated a set of recommendations, many of which had been suggested previously – including specific steps to enlarge the role of senior and mid-level uniformed leadership in EEO messaging and compliance, along with recommendations that the FDNY train and require firehouse-level officers to monitor firehouse climate attentively and manage diverse workplaces effectively.

The Monitor and the Parties held a virtual meeting on April 7, 2022 to discuss EEO issues.  A number of the Monitor's recommendations are discussed below in the specific areas of EEO messaging and compliance to which they apply.  At the meeting, the Vulcan Society urged the Monitor to seek clarity from the City as soon as possible regarding whether it will or will not adopt these recommendations, so that the conversation can progress depending on the responses.

### A.     **EEO Staffing**

As most recently reported by the City, the FDNY EEO Office currently includes eight attorneys (the Assistant Commissioner, five Investigative Attorneys (one of whom is on long-term leave), one "RA" attorney (assigned to handle requests for accommodations), and one

Training Coordinator.  The current EEO office staff is thus eight attorneys short of its pre-pandemic level of sixteen attorneys, and both of the two Deputy Director positions in the Office's pre-pandemic roster are currently vacant.  The staff of five investigators is three short of the eight investigators handling cases in mid-2019.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 24.  In response to questions from the Court at the October 8, 2021 conference, the City indicated that it intended to fill the remaining open positions and bring EEO attorney staffing up to its pre-pandemic level as soon as qualified candidates can be identified.  However, as most recently reported, the City is actively seeking to hire attorneys for only three of the vacancies:  the City has advised that interviews for the Deputy Director position are expected to take place this month, and it has begun to receive applications for two investigator positions.  The Assistant Commissioner has also sought permission to fill an additional investigator position.

As discussed in previous reports, because the investigative work of the EEO Office is conducted entirely by its attorneys (along with their other responsibilities such as inspections and training), the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively; and staffing increases completed in 2018 played an important role in improving the functioning of the EEO Office.  *See* Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's Twenty-Fourth Periodic Report (Dkt. # 1861) at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eighth Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase).  Among cases initiated in 2019 and identified by the City as requiring substantial investigations, three of twelve cases required more than 90 days to

complete.  For the same category of cases initiated in 2021, as of April 21, 2022, eleven of thirteen cases (including two open cases) exceeded 90 days in duration.[24]

In September 2019, when the EEO Office had sixteen attorneys, the City reported that the average caseload for investigators was five to ten cases.  Monitor's Thirtieth Periodic Report at 34.  As most recently reported by the City (on May 5, 2022), the average investigator caseload is twelve – ranging from eleven to fourteen.

Given the evident impact of staffing levels on the ability of the EEO Office to complete investigations in a timely fashion, the Monitor strongly encourages the City to bring attorney investigator staffing up to pre-pandemic levels as soon as possible.

## B.     Policies, Messaging, and Training

As previously reported, the City has postponed development of a long-range plan for EEO Office communications until the analysis of the EEO workplace climate survey is complete. Monitor's Thirty-Second Periodic Report (Dkt. # 2004) at 29; Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 29-30.  The Monitor expects the City to proceed promptly to develop a long-term EEO communication plan, which should specify strategic goals, key messages, target audiences, channels of communication, and persons responsible for delivering specific messages. Monitor's Thirty-Fifth Periodic Report at 46.  The Monitor has also suggested continuation of past initiatives to involve leadership in communications (for example, in a continued program of video messaging[25]), in-person messaging by operational commanders, and mechanisms for

---

[24] Among nineteen cases initiated in 2020, twelve exceeded 90 days in duration.

[25] As discussed in previous reports, the City initiated a program of "voice announcement messaging" with a video message from senior leadership in September 2018 (Monitor's Twenty-Ninth Periodic Report at 51), but the program was then inactive for approximately two years.  Training videos on operations during civil unrest and on "Authentic Trust" (presented in 2020) appeared to represent a revival of this initiative,

gathering and feedback from members and confirming that messages are delivered forcefully and effectively.  During the April 7, 2022 meeting, the Vulcan Society suggested that messaging integrate content about managing and working within a diverse workforce with other regular communications and training, to make sure it receives equal attention and is not misperceived as peripheral or low-priority.

The Monitor has continued to encourage the City to fill the CDIO position, which has been vacant since July 23, 2021, as soon as possible.[26]  As discussed in previous reports, the City has advised that until a new CDIO is hired, CDIO projects are being managed on an interim basis by other senior civilian FDNY personnel.  Monitor's Thirty-Fourth Periodic Report at 36.

As discussed in the Monitor's previous report, in response to concerns expressed by the Court at the October 8, 2021 conference, the City agreed to publish summaries of outcomes and disciplinary actions in EEO cases via Department Orders – including details (in anonymized form) connecting specific policies and violations to specific disciplinary sanctions.[27]  Monitor's Thirty-Fifth Periodic Report at 48-49.  In response to recommendations from the Monitor following up on the October 8 conference, the City has confirmed that publication of disciplinary actions will include not only EEO matters but also cases of hazing and other conduct detrimental

---

and the City previously indicated that CDIO planned to roll out additional videos on an annual basis, in a series focusing on "tenets of inclusion."  Monitor's Thirty-Fourth Periodic Report at 36-37.  However, in an update provided on February 8, 2022, the City indicated that the next video in this series was not expected to be rolled out until late summer 2022.  Monitor's Thirty Fifth Periodic Report at 46.  The Monitor has encouraged the City to develop and distribute frequent additional messaging in this category. *Id*. at 38.  It has also continued to seek confirmation from the City that the FDNY is capable of verifying attendance at firehouse video presentations.

[26] The City was required to create the CDIO position under the Disparate Treatment Settlement.

[27] In some previous instances, the Department has issued general statements in Department Orders noting that members have been disciplined for violations of EEO policy, but previous notifications have not included detailed descriptions of the policy violated or the conduct constituting the violation.

to workplace climate and professionalism – in similar summary form.  The City has also indicated, in response to longstanding Monitor recommendations, that the EEO Office will issue periodic summaries of its investigative and enforcement activities – informing members of the cumulative numbers of investigations, their status and outcomes, and the types of violations involved.  The City has advised that it intends to include a summary of this kind in messaging that the EEO Office is preparing on EEO resources and the role of the EEO Office.  The Monitor expects to review draft materials for this round of messaging as soon as the City can make them available, and to gather more information from the City on how, and by whom, the messages will be communicated.

The Monitor has also continued to emphasize the need for prompt and decisive communications in response to reports of misconduct.  Especially where allegations are publicly reported or where they circulate widely within the Department, it is important for the FDNY to respond promptly by reaffirming its commitment to diversity and inclusion, and by reminding members that violations, if established, will result in disciplinary action.  In some cases, even where allegations have not been widely reported, it may be appropriate for the Department to engage in supplementary messaging or counseling re-emphasizing relevant policies in affected workplaces.  In some previous instances, the City has issued Department Orders and statements reinforcing policies in response to reports of violations.  Monitor's Thirtieth Periodic Report at 35-39.  And in regular discussions with the Monitor regarding open EEO investigations, the City has also advised that in some cases the EEO Office has provided supplementary counseling on selected policies concurrently with its investigation of the alleged violation.  Plaintiffs-Intervenors have also suggested that in appropriate cases the FDNY should engage in messaging based on the findings of EEO investigations before the disciplinary process is complete – for

42

example, by using an anonymized summary of the misconduct to highlight and reinforce the policy at issue.

The Monitor has continued to encourage the City to respond decisively to reports of violations in appropriate cases even while investigations are in progress and before the disciplinary process is complete.  The Monitor will continue to gather reports from the City on its case-by-case decision-making with respect to this type of messaging.

## C.  Assessment and Accountability

### 1.  Officer Performance Evaluations

The Monitor has continued efforts to examine how reviewers used the EEO metric that was added to FDNY officer performance reviews in 2018,[28] and whether evaluations take account of input from the EEO Office in all appropriate cases.  But those efforts have continued to be impeded by delays in obtaining essential information from the City.  The City has yet to produce evaluation data from the 2020 and 2021 cycles of officer performance reviews; and the City has yet to respond to related questions from the United States and Plaintiffs-Intervenors regarding the performance review process and outcomes.

As discussed in the Monitor's prior report, the City produced all but ten performance reviews for the 2019 review cycle on June 16, 2021.  That was the first cycle since the FDNY introduced an EEO metric that covered a full year of officer performance (2018) and included evaluations for all company officers.[29]  Monitor's Thirty-Fifth Periodic Report at 50 & n.33.

---

[28] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 32; Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[29] The information provided to the Monitor includes no personal identifying information and was not shared with the other Parties.

Through a series of communications, the Monitor confirmed with the City that the 2019 reviews contained multiple ratings where there should be only one per officer, and the City informed the Monitor and the other Parties that relevant guidance and forms had been revised to prevent confusion in future evaluations. *Id.* at 50. Before the last periodic report, the Monitor asked the City to specify when the revised guidance and forms became effective (specifically whether they were in use for the 2020 cycle of ratings), and to explain how "mixed" ratings from previous cycles will be interpreted for the Department's internal purposes (*i.e.* what rating officers with both "superior" and "satisfactory" ratings will be deemed to have achieved). *Id.* Those questions remain pending.

As previously reported, on October 13, 2021, the Monitor asked the City a number of questions about performance evaluations for officers in several workplaces that were associated with alleged and/or substantiated EEO violations, where EEO investigative records contain evidence potentially relevant to officers' management practices and EEO performance. *Id.* at 50-51. The Monitor asked the City to confirm and/or explain some of the ratings associated with these workplaces (including some instances where ratings appear to be missing from the data set), and the Monitor also identified several cases as representative examples of the type of case where EEO investigations should assess officer conduct and management practices, and where performance evaluations by raters should be informed by EEO Office input based on that assessment. This City responded to the Monitor's October 13, 2021 message on April 28, 2022, and the Monitor is reviewing the City's response.

To date, the City has not yet produced a full set of performance review data and

documentation of EEO input from the 2020 and 2021 cycles.[30]  Since the last periodic report, the

Monitor has repeatedly asked the City to specify a projected delivery date for these records, but

the City has not done so.  On a March 11, 2022 conference call with the Monitor, the City

advised that it planned to hire three temporary employees to complete the data entry needed for

the City to produce the requested compilations of data for these cycles, and that it would be able

to state a projected delivery date as soon as they began work; but the planned hiring has been

delayed, and no projection has yet been provided.[31]

The City also has not yet responded to questions that have been outstanding for several

months – summarized in the Monitor's previous reports – regarding its procedures for analyzing

patterns in officer performance and the types of performance review data and analyses that the

City will share with the other Parties.[32]  *See* Monitor's Thirty-Fifth Periodic Report at 51-52.

The Monitor has also asked the City to provide the other Parties with cumulative figures showing

the ratings for officers in workplaces associated with EEO investigations.[33]  But that request also

remains pending.

---

[30] Evaluations from the 2020 cycle (covering performance in 2019 and (for Captains) a portion of 2020) will be the first set of evaluations that could reflect the Monitor's October 2019 recommendations.  And reviews from the 2021 cycle (covering performance in 2020 and a portion of 2021) are the first set covering a full year of officer performance following those recommendations.

[31] The City has advised that for future cycles of evaluations, raters will enter their ratings electronically, and ratings data will be retained and managed in a databased that will allow it to be cross referenced with information on officer demographics and years of service.

[32] Previous communications relating to the dispute are recounted in detail in the Monitor's most recent reports.  Monitor's Thirty-Fourth Periodic Report at 40 n.21; Monitor's Thirty-Third Periodic Report at 38-39; Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report at 36-37.

[33] The Monitor has asked the City to state (1) the number of ratings in each category (Satisfactory, Unsatisfactory, or Superior) for officers in workplaces where there were EEO complaints or inquiries and (2) whether the EEO Office provided input for the evaluations of those officers.

Given the central role the EEO performance metric is intended to play in ensuring that FDNY company officers are accountable for EEO compliance and effective management of diverse workplaces within their commands, the City's continuing failure to provide information essential for the Monitor to determine whether the metric is functioning as intended is very concerning.  Although the Monitor recognizes that some of the work required to produce relevant data is labor intensive, and that some delays were caused by the pandemic, such factors do not account for delays of almost two years (for the 2020 cycle) and almost a full year (for the 2021 cycle) in producing the relevant data for 1,500 performance reviews.  The Monitor continues to urge the City to complete its responses to outstanding questions and requests for production as soon as possible.  The Court Monitor will need to obtain the requested data and documentation from the 2020 and 2021 cycles before the next periodic report.  If necessary, the Monitor will order the City to provide the requested material pursuant to Paragraph 62 of the Modified Remedial Order and will seek the Court's intervention.

> 2. <u>Workplace Professionalism Reporting and Officer Accountability for Workplace Climate</u>

The Monitor has continued to engage with the City regarding initiatives intended to ensure that officers take proactive steps to monitor their areas of supervision and foster a professional and inclusive workplace climate in FDNY firehouses, and that they are held accountable for any failures to identify and report on conduct or conditions that damage workplace culture or are conducive to breaches of policy.  Among other initiatives, the Monitor has continued efforts to ensure that the existing Workplace Professionalism reporting system is used as intended – *i.e.* that officers report all appropriate issues through the system, and that they are accountable for failures to do so.  The Monitor and the Parties have also continued to discuss

a set of additional proposals by the Monitor following up on the October 8, 2021 conference on EEO topics.

As previously reported, the Workplace Professionalism system is intended to require officers to report up the chain of command on issues including EEO compliance, hazing, and other unprofessional behaviors within their commands – and to memorialize their reports in written records. *See* Monitor's Twenty-Seventh Periodic Report at 30-31. The City agreed to produce any workplace professionalism reports involving EEO or hazing concerns. *See* Monitor's Twenty-Ninth Periodic Report at 57-58. To date, however, the City has represented that no such reports have been generated. As previously noted, the absence of such reports (apparently even from officers in workplaces connected to EEO violations), together with ongoing expressions of concern by the Vulcan Society, raises doubts about whether the system is functioning as intended – either as a way of facilitating consultations within the chain of command or as a system of accountability that would incentivize officers to monitor workplace climate.

As summarized the Monitor's previous report, in a set of January 18, 2022 recommendations following up on the October 8, 2021 conference, the Monitor proposed that the City issue renewed guidance to ensure that the Workplace Professionalism reporting program operates effectively. And at the April 7, 2022 meeting regarding the Monitor's recommendations, the City indicated that it was preparing to engage in supplementary communications with officers to remind them to report issues in all appropriate circumstances. The Monitor has asked the City to provide any new instructions as soon as they are developed, and the Monitor plans to follow up further to ensure that officers receive sufficient guidance and are held accountable for compliance with the reporting system's requirements.

The Monitor has also continued to follow up on a number of additional proposed initiatives (most recently captured in the set of recommendations sent to the City on January 18), which are intended to ensure that officers proactively monitor firehouse climate and take affirmative steps to cultivate and maintain an inclusive workplace.  As previously reported, the Monitor's recommendations included the following:

- The Department should continue and enhance the initiative in which Deputy Chiefs are required to incorporate EEO inspections and inquiries regarding workplace climate in regular firehouse visits.  It should also expand the program to include regular operational visits by Battalion Chiefs – requiring officers to certify that inspections have been conducted and inquiries have been made with company-level officers.

- The Department should require Lieutenants and Captains to monitor and report on treatment and development of probationary firefighters, including periodic check-ins with "probies."

- Commanders should be trained to be watchful for any discriminatory or harassing treatment that occurs under the pretext of training or "paying dues."

    - Additional care should be paid in connection with historical areas of conflict such as meals, handling of mutuals, and house rules.

    - Officers must take an active role in the formulation and enforcement of any "house rules," and it must be made clear that they are accountable for any discriminatory rules or discrimination in enforcement.

- To help promote a culture of accountability, existing policies should be enforced and violations should be recorded according to FDNY policy– including, *e.g.*, unauthorized displays, unauthorized clothing items.

- The FDNY should consider using personnel-related data systems and records as an "early warning" system to flag officers from firehouses with above-average numbers of transfers, complaints, illnesses, or other behaviors that could indicate a personnel management issue.

*See* Monitor's Thirty-Fifth Periodic Report at 55.

Also in the area of firehouse monitoring and compliance, the Monitor has continued to recommend that the City enforce its existing policy requiring that FDNY-related social media groups be registered with the Department.  As previously reported, in a set of January 28, 2021

recommendations to the City regarding the investigation of social-media-based EEO violations, the Monitor recommended that any messaging or social media group that includes all or most employees in a given unit (*e.g.*, company, house, battalion) and that is used in any way for work-related communications must be registered, and must include at least one officer from the relevant unit (who would be required to report any potential EEO violations in the group).  The Monitor intends to continue to discuss this recommendation with the City along with the Monitor's other pending recommendations regarding EEO compliance and culture.

3.    Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters.  The City created a ten-phase analytic plan and a schedule for analysis of the survey data to be conducted by the Mayor's Office of Data Analytics ("MODA"), in consultation with the Parties and with input from the United States' and the Monitor's experts.  The analysis was anticipated to be completed by June 2020.  *Id*. at 49-50.  Work on the climate survey was suspended, however, at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic.

Following adjustments to the original schedule and a number of meetings with the Monitor, the other Parties, and their experts, *id.,* in January 2022, the City circulated a draft report prepared by the Mayor's Office of Data Analytics (MODA).  The report described a number of quantitative findings based on the data; but it did not contain several analyses that had previously been discussed, and it did not provide a full analysis of implications for the FDNY climate, or of the ways in which the data could be used to develop actionable steps.  The Monitor and the United States strongly believe that any report shared with FDNY management for purposes of informing leadership about the findings of the survey and developing responsive

actions (including crafting an EEO communication plan based on the survey as the FDNY has said it plans to do) must clearly convey to management the goals of the survey and what the survey showed about FDNY climate and workforce perceptions and concerns.

After the other Parties and the Monitor raised concerns about the need to include further analyses and streamline the report, the City agreed to have MODA participate in meetings with the Monitor, the other Parties, and their experts, at which additional analyses and revisions (to be performed by MODA or the Monitor's expert) could be proposed, following which some further analysis and discussion would occur and the report would be further revised.  The City has deferred sharing the survey results with FDNY management pending this process.

The Monitor and the Parties and their respective experts met with MODA on March 1 and March 22 to discuss which analyses from the United States' expert's original December 2019 Analytics Plan and from the City's plans should be included in the City's report, and it was agreed that the Monitor's experts would help MODA complete some of the required analyses. The experts are currently having calls every other week to discuss analytic results, and the Monitor has added two more of its experts to help complete the project in a timely manner.  The experts have been working on these analyses, and a meeting with the larger group was held on May 10 to discuss the analyses and make plans to finalize a document showing top-line results and potential action steps.  The City has agreed that this document, once completed, will be the report circulated to management, and that subsequently a comprehensive document can be prepared memorializing all the detailed underlying analyses.

The Monitor has emphasized during the survey process and in prior periodic reports the importance of communicating with the workforce about the findings of the survey, as a matter of best practice, to encourage participation in future surveys and to provide assurance that attention

is being paid to survey feedback.  To that end, as urged by the Monitor and the other Parties, the City has expressed its intention to develop a plan for publicizing takeaways from the survey within the Department, concurrently with the process of completing the survey analysis and accounting for input from the Monitor and the other Parties.

### D.    Inspections, Investigations, and Compliance

#### 1.    Monitor Report on EEO Investigative Procedures and the Duration of Investigations

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor has postponed filing a report on EEO investigative procedures and the duration of EEO investigations to observe and account for the effect of increased staffing and revised practices – obtaining a series of updated data sets from the City, and circulating a series of drafts of the report (including recommendations) to the City and the other Parties.[34]  On May 26, 2021, the Monitor circulated an updated draft of the report to the Parties for comment.  The Parties provided comments and posed a number of questions relating to the City's practices and the Monitor's findings; and the Monitor held a meeting with the Parties on September 30, 2021 to discuss the report and the Parties' comments.  The City provided answers at the meeting to several questions from the Monitor and the other Parties, and in an October 18, 2021 follow-up document, the Monitor asked the City to respond to some additional questions that remained

---

[34] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its staffing, its investigative procedures, and its performance in the completion of EEO investigations – with a particular focus on the duration of investigations as measured against the presumptive 90-day time limit for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant part, the Court's Order stated as follows:

> The court monitor is respectfully DIRECTED to provide the court with a report on the New York City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the staffing of the office has changed over time; and (3) the speed with which the office investigates and resolves complaints.

open (including some posed by the other Parties).  On November 10, 2021, the Monitor also asked the City to provide an updated set of data on the durations and outcomes of EEO investigations.  On February 4, 2022, the City sent the Monitor responses to the queries and requests in the October 18, 2021 follow-up, along with an updated set of EEO case data and responses to several outstanding requests for information on specific EEO cases.  On April 5, 2022, Plaintiffs-Intervenors circulated a set of follow-up questions regarding the City's responses and other follow-up topics from the September 30, 2021 meeting.  Among those follow-up questions were queries regarding the EEO Office's coordination with the FDNY's Bureau of Investigations and Trials ("BITS"), which is responsible for determining the discipline associated with EEO violations substantiated by the EEO Office.  Both the United States and Plaintiffs-Intervenors previously expressed their interest in and belief in the importance of that topic.  The Monitor has asked the City to respond to Plaintiffs-Intervenors' questions in writing.

The Monitor has reviewed the updated data on EEO matters provided by the City on February 4, 2022; and, to the extent possible, the Monitor has cross-referenced the new data with materials and information on recent specific cases provided by the City.  The Monitor plans to finalize the report accounting for the City's update, the Parties' comments, and (where relevant, and as soon as the City responds) the City's responses to Plaintiffs-Intervenors recent questions.

As noted above in Part III.A, after the increase in EEO investigator staffing in mid-2018, the duration of the FDNY's EEO investigations generally improved, with a higher percentage of cases completed within 90 days.  But case durations rose again during 2020 and in 2021.  The Monitor will continue to review data and materials produced by the City to determine whether the City can demonstrate the ability to consistently complete investigations in a timely manner.

2.    Inspections and Monitoring

The Monitor has continued to obtain updates from the City on the resumption of regular EEO inspections, which were suspended at the start of the pandemic.  As previously reported, shortly after the October 8, 2021 Court conference on EEO topics, the City advised that it intended to resume regular EEO inspections as soon as possible.  Following a series of further delays associated with COVID-19 outbreaks in the EEO Office, some inspections (conducted personally by the Assistant Commissioner) resumed in February 2022, and inspections by additional EEO staff have resumed more recently.  The City circulated an inspection protocol (including COVID-related safety measures in addition to inspection procedures) on March 2, 2022, and it reports that inspections are taking place on one to two days per week,[35] at two to four locations each day.

At the April 7, 2022 meeting with the Monitor and the Parties, the City also provided a demonstration of a new database to be used to record EEO inspections.  The application provides a checklist of inspection steps and the firehouse locations to be inspected, along with fields for recording inspectors' findings and actions taken – all of which will be recorded in an inspection database.  The new database appears likely to be a helpful tool in efforts to monitor EEO compliance and identify issues that need to be addressed.

---

[35] The City has advised that this schedule matches the frequency with which the EEO Office conducted inspections before the pandemic.

3.      Monitor Review and Recommendations Regarding Investigations

The Monitor has continued to review and evaluate EEO investigations identified by the City as requiring substantial investigative activity in fire suppression matters,[36] and has continued to discuss recent and current investigations with the City in bi-weekly conference calls with the Assistant Commissioner for EEO.

On January 18, 2022, the Monitor provided the City with a detailed summary of comments and recommendations based on the Monitor's review of EEO case materials produced by the City since late 2019 – identifying several continuing deficiencies in EEO investigative practices and offering recommendation to address them.  Monitor's Thirty-Fifth Periodic Report at 63-64.  The January 18 memorandum is the latest in a series of memoranda and discussions in which the Monitor has identified EEO investigative practices where improvements continue to be needed.  *See* Monitor's Thirty-Fifth Periodic Report at 63-64 (summarizing the history of Monitor communication regarding investigative practices).  In response to an earlier set of recommendations – a January 2021 Monitor memorandum regarding the investigation of social-media-based violations – the Assistant Commissioner for EEO has prepared a supplementary training presentation for investigators on best practices for gathering and analyzing evidence in this category of cases.  The City provided the Monitor with a copy of the presentation on March 25, 2022, and the Monitor plans to offer comments shortly.

---

[36] In an initial, retrospective production of multiple cases, provided in 2017, and subsequently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has provided the Monitor with full investigative files for some cases.  For others, the City's production has been limited to intake documents and final memoranda.  Summaries of the City's productions of EEO case materials appeared in the Monitor's Twentieth Periodic Report (Dkt. # 1744) at 30-31 and in the Monitor's Twenty-Seventh Periodic Report at 39-41.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

In connection with the evaluation of EEO investigative practices, the Monitor has also continued efforts to resolve pending requests by the United States and Plaintiffs-Intervenors for more information regarding the Monitor's assessments of investigative practices and the factual context and cases on which they are based.  The City has continued to object to sharing copies of case materials with the other Parties.  But in response to a request from the Monitor, it has indicated that it may consent to sharing a redacted copy of the Monitor's January 18, 2022 memorandum with the United States and Plaintiffs-Intervenors.  The Monitor has provided the City with a redacted copy of the January 18 memorandum and asked the City to confirm whether it consents to sharing the redacted document with the other Parties, or whether it proposes further redactions.  The Monitor and Parties are awaiting the City's response, and the Monitor intends to set a deadline for resolving this issue before the next status conference.

## IV.   Medical Exam-Related Issues

### A.   Medical Exam Attrition Metrics

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the Medical Exam, administered by the City's Bureau of Health Services ("BHS"), was the step in the hiring process with the highest disqualification rate among Exam 2000 candidates.  *Id*. at 46.  The Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.  *Id*. at 45-46.  On August 20, 2021, the Monitor circulated a memo reflecting the Monitor's analysis of Exam 2000 physical evaluation data provided by the City.  The Monitor's analysis showed that there was disparate impact in the Exam 2000 Medical Exam adverse to both Black and Hispanic candidates for seven BHS disqualification reasons, including for stairmill

testing, failure to cooperate with stairmill testing, failure to complete or provide the results of follow-up lab testing, pulmonary issues, cardiac issues, tuberculosis, and weight.[37]

The City's December 2019 Attrition Metrics Report, the first such report to include assessments of statistical significance for inter-group disparities in outcomes, revealed statistically significant adverse impact against Black and Hispanic candidates.  Monitor's Twenty-Ninth Periodic Report at 70.  Each subsequent report, including the City's April 27, 2022 "FDNY Attrition Metrics Report," has continued to reflect statistically significant disparities adverse to Black and Hispanic candidates in the Medical Exam.  The April 27, 2022 report shows the cumulative number of Exam 7001 Medical Exam disqualifications by race/ethnicity among candidates with final decisions as of March 29, 2022, immediately following the appointment of the current Academy class:  as of that date 19 of 812 white candidates (2.3%), 17 of 336 Hispanic candidates (5.1%), and 14 of 192 Black candidates (7.3%) had been disqualified by the Medical Exam.

Although the Medical Exam has been known for several years to produce significant disparities adverse to Black and Hispanic candidates, the City only recently produced a report (in response to a longstanding Monitor request) analyzing the specific medical reasons that cause candidates to be disqualified.[38]  The City's March 2022 BHS Attrition Metrics Report provides an analysis of the Exam 7001 medical data by individual medical disqualification reason, as of

---

[37] One further disqualification reason, failure to cooperate with tuberculosis testing, had a disparate impact against Black candidates.

[38] The City has asserted that while the request for this analysis was longstanding, its failure to provide a report for several years did not reflect a failure to review this data internally and take action.  Plaintiffs-Intervenors have requested that the Monitor review the City's internal processes for compliance with Paragraph 19 of the Modified Remedial Order.  The Monitor is weighing Plaintiffs-Intervenors' request and anticipates responding in the coming weeks.

February 24, 2022.[39]  The report notes that there is disparate impact against Black and Hispanic candidates on the Pulmonary Function Test and against Black candidates for blood pressure. The stairmill test was revised after a validation study that compared oxygen consumption at a given step rate with oxygen consumption on the Functional Skills Test (a test of job-related tasks used in the Academy to ensure that graduating firefighters are able to fulfill the physical requirements of the position).[40]  Based on results to date, the extensive, collaborative efforts expended by the City, the other Parties, and the Monitor to modify and validate the stairmill test appear to have had a favorable effect on inter-group disparities.  The data from the first candidates processed in Exam 7001 indicate that the stairmill test no longer causes the disparate impact seen during Exam 2000 testing, at least as of February 24, 2022.

The report notes that "previous adverse impact analysis for exams 2000, 2500 and 0001 found evidence of adverse impact in the weight exam for both Black and Hispanic candidates. Evidence for adverse impact is not present[] for exam 7001."  March 2022 BHS Attrition Metrics Report at 5.  Although there is improvement in the different rates of qualification for weight by race/ethnicity, it is nevertheless the second most common reason for medical disqualification, and the analysis of BHS data only considers the first 1,570 candidates tested through February 24, 2022.  Results presented in Tables 25 and 26 of the report indicate that the odds of Black candidates being disqualified for weight are 4.38 times higher than those of white candidates,

---

[39] The report also includes the data from the City's December 14, 2021 FDNY Attrition Metrics Report, which, as noted in the previous periodic report, showed that there was disparate impact against Black candidates in the overall physical portion of the exam as of October 2021.  This disparate impact is also seen in the more recent April 27, 2022 report.

[40] The Monitor has previously provided detailed descriptions of the validation process used by the City, in consultation with experts for the Monitor and the other Parties.  *See* Monitor's Twenty-Eighth Periodic Report at 50-54; Monitor's Twenty-Ninth Periodic Report at 66-67.

and the odds for Hispanic candidates are 3.61 times higher than for white candidates, although this currently affects a relatively small number of candidates. *Id*. at 26-27. Weight is also associated with the highest number of pending candidates: 11 Black (5.1%), 5 Hispanic (1.3%), and 14 white (1.6%).[41] The elevated odds of disqualification for weight for Black and Hispanic candidates make it likely that, as more candidates are processed over the next four or more years, the statistical threshold for adverse impact will be reached. Although not currently statistically significant, the disparities in disqualifications for weight are concerning, and the City must continue to gather and analyze data in this medical component as processing continues and reaches a larger sample of candidates. Further, Black and Hispanic candidates are disqualified at the CPAT in greater numbers than white candidates, and it is likely that weight, along with low fitness, is related to CPAT disqualification. Analyses performed by the Monitor's team on Exam 2000 data to better understand predictors of stairmill disqualification found that being overweight was associated with a significantly higher risk of being disqualified on the stairmill test. Thus, based on current trends in the BHS data and a strong theoretical linkage with CPAT, attrition mitigation efforts are required to help Black and Hispanic candidates (a) achieve and maintain a healthy and qualifying weight throughout the hiring process and (b) take advantage of the opportunity to decline and lose weight rather than being disqualified.[42]

---

[41] Unlike other medical conditions, candidates disqualified for weight can work to reach the necessary weight threshold and resume processing.

[42] Plaintiffs-Intervenors have raised a concern that the City's analyses to date exclude those who decline appointment. Plaintiffs-Intervenors have encouraged the City to review the demographics of those who utilize this option to see if there are disparities in usage that might reflect a need for more guidance or information among some candidates.

### B.      Medical Exam Attrition Mitigation

The City has been providing regular reports to the Monitor and the other Parties about the scheduling of Medical Exam appointments and the rates at which candidates have been reporting for testing and have been either reserved, qualified, or disqualified.  The City has been providing specific information about Black candidates to Plaintiffs-Intervenors so they can perform outreach and provide support for those candidates.

As previously reported, the City has reported that ORR personnel do not have access to specific reasons for medical disqualifications because of what the City has described as HIPAA and general privacy concerns.  Thus, ORR is not able to provide individual candidates with encouragement or support specific to the reasons they have been disqualified or are in pending status to assist them in resolving any delays or other issues that may be related to supplying medical documentation or obtaining medical clearance.  And without knowing the disqualification reason, it is hard for ORR to advise candidates about the potential benefits of declining.

The City's analytics group, MAP, analyzes attrition from the hiring process on a class-by-class basis, and the City has advised that, when attrition metrics reports show disparate impact in the overall Medical Exam, MAP analyzes each station to determine the sources of disparity, and then multiple other bureaus, including ORR, CID, and BHS, devise methods to ameliorate these disparities; but the City has not described the manner in which the other bureaus coordinate with each other to devise, implement, and track the effectiveness of targeted mitigation strategies.  The City must task a specific person or group of persons who can provide strategic oversight to implement and report on data-driven attrition mitigation programs for non-traditional candidates in the Medical Exam.  The City has implemented programming intended to address fitness, including widening the scope of candidates eligible for FAP, implementation of

the stairmill fitness program, and additional fitness messaging, but it has not provided evaluations showing whether these programs have actually had an effect on disparate impact. The City has stated that it will continue to analyze the medical data and remediate where possible, but a critical first step is to develop, implement, and track the success of interventions. To satisfy the requirements of the Modified Remedial Order, the City must have a plan in place that allows it to make mitigation adjustments as necessary, especially in a hiring step in which it has found disparate impact. As discussed above, it is also important for both Medical Exam outcomes (and, likely, CPAT outcomes) that the City explore additional ways in which it can address the higher incidence of being overweight among non-traditional candidates, through better preparation, training, and communication, particularly with these candidates.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-traditional candidates from the Medical Exam, on preparing such candidates to pass the Exam, and on helping them move from pending status to qualified status. But this requirement has taken on even greater importance now, as the effects of the pandemic have fallen and will continue to fall disproportionately on Black and Hispanic communities. Tailored and flexible strategies and policies need to be developed and implemented to account for this disproportionate hardship, and the City must do all it can to mitigate any negative impact of the Medical Exam on Black and Hispanic representation in Academy classes. The importance of these efforts is also heightened by the long wait times that some candidates will experience before they appear for the Medical Exam – especially if the City's request for an extension of the Exam 7001 list is approved. The Monitor has also asked the City to track pandemic-related attrition data in the hiring process, and such data may prove particularly relevant with respect to

the Medical Exam.  The Monitor's purpose in requesting such tracking is to permit a meaningful comparison of prior candidate processing cycles with processing affected by the pandemic.

## V.      Character Screening by the CID and PRB

The City's April 27, 2022 report on candidate attrition continues to show statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which candidates are referred to the PRB.[43]  Among candidates referred to the PRB, the City's analysis also showed a statistically significant disparity in rates of disqualification between Black and white candidates.[44]  A further analysis performed by the Monitor using the City's figures also has also found statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which all candidates in each group who receive any final decision from the character review process (either a no-referral decision or a final decision from the PRB following referral) are deemed qualified as to character.[45]

Given these disparities, the Monitor has asked the City and the other Parties to resume discussions regarding further reforms in the character review process, and/or improvements in the guidance provided to candidates, to address the adverse impact of the character review

---

[43] Among candidates who have entered the character review process and received decisions regarding referral, 81 of 178 Black candidates (45.5%), 106 of 319 Hispanic candidates (33.2%), and 136 of 793 white candidates (17.2%) have been referred to the PRB.

[44] Among candidates referred to the PRB, 8 of 75 Black candidates (10.7%), 5 of 99 Hispanic candidates (5.1%), and 3 of 132 white candidates (2.3%) have been disqualified.

[45] An additional separate analysis by the Monitor also found a statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which they were either (1) disqualified or (2) hired with extended probation.  (The analysis combined the percentages for both outcomes in each group and then compared the combined figures between groups – *e.g.*, percentage of Black candidates with either outcome vs. percentage of white candidates with either outcome).

process on non-traditional candidates.  The Monitor has previously emphasized that if analyses show that the process has a disparate impact adverse to Black or Hispanic candidates, the City will be required either to make further changes in the process (and show they are effective in eliminating disparate impact) or to validate the process as job-related.  *See, e.g.*, Monitor's Twenty-Ninth Periodic Report at 79.  The Monitor expects that these discussions will include additional outstanding proposals, issues, and questions relating to the analyses of the character review process – which have also been summarized in previous reports.  *See, e.g.,* Monitor's Thirty-Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's Thirtieth Periodic Report at 61-63.  In addition to analyses focusing on character review outcomes, the Monitor also expects that discussion will consider proposed approaches to analyzing the effect of the character review process and related procedures and requirements on voluntary attrition.

The Monitor has also included recommendations regarding analyses of the character review process in the larger set of recommendations for additional analyses circulated to the City and the other Parties, discussed above in Part II.B.4.

## VI.    **Firefighter Exam**

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test for the position of entry-level firefighter.  Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.  <u>Additional Issues</u>

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order.

Dated:   May 10, 2022
       New York, New York



                           Mark S. Cohen