UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

UNITED STATES OF AMERICA,

           Plaintiff,

   -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

           Plaintiff-Intervenors,

   -against-

THE CITY OF NEW YORK,

           Defendant.

------------------------------------------------------------------x

**07-cv-2067 (NGG) (RLM)**

## MONITOR'S THIRTY-SEVENTH PERIODIC REPORT TO THE COURT [AMENDED]

TABLE OF CONTENTS

I.      Executive Summary ................................................................................................ 1

II.     Recruitment, Candidate Processing, and Attrition Mitigation ............................. 11

        A.      Candidate Processing ................................................................................ 11

                1.      Extension of the Exam 7001 List ................................................ 11

                2.      Demographic Trends in Candidate Processing to Date ............... 12

                3.      Plans and Preparations for the Next Round of CPAT ................. 14

        B.      Attrition Mitigation .................................................................................. 18

                1.      Analyses of Attrition Mitigation ................................................ 19

                        a)      The City's Reports ........................................................... 19

                        b)      Monitor's Analysis of Records from Previous Rounds of
                                CPAT Training, Practice, and Testing ............................ 22

                2.      CPAT Training, Fitness Training, and Fitness Resources .......... 25

                        a)      Pre-CPAT Candidates ...................................................... 25

                        b)      Post-CPAT Candidates .................................................... 33

                3.      Candidate Communications ........................................................ 34

                        a)      Pre-CPAT Candidates ...................................................... 34

                        b)      Post-CPAT Candidates .................................................... 38

                4.      Candidate Portal and Mentor Program ....................................... 41

        C.      Analyses of the Exam 7001 Recruitment Campaign .............................. 43

                1.      Overview of Analysis and Planning ........................................... 43

                2.      City's After-Action Report and Cost-Effective Report ............. 44

                3.      Monitor's After-Action Report ................................................... 44

                4.      KPMG's After-Action Report ..................................................... 45

        D.      Working Group ........................................................................................ 49

III.    EEO ..................................................................................................................... 50

    A.    EEO and Related Staffing ......................................................................... 51

    B.    Policies, Strategic Planning, Messaging, and Training ............................. 53

    C.    Assessment and Accountability ................................................................ 57

        1.    Officer Performance Evaluations .................................................. 57

        2.    Workplace Professionalism Reporting and Officer Accountability for Workplace Climate ...................................................................... 61

        3.    Climate Survey .............................................................................. 64

    D.    Inspections, Investigations, and Compliance ........................................... 66

        1.    Monitor Report on EEO Investigative Procedures and the Duration of Investigations ........................................................... 66

        2.    Inspections and Monitoring .......................................................... 67

        3.    Monitor Review and Recommendations Regarding Investigations .......... 67

IV.    Medical Exam-Related Issues ...................................................................... 69

    A.    Medical Exam Attrition Metrics ............................................................... 69

    B.    Medical Exam Attrition Mitigation .......................................................... 72

V.    Character Screening by the CID and PRB .................................................... 74

VI.    Firefighter Exam ......................................................................................... 77

VII.    Additional Issues ......................................................................................... 77

## I.     Executive Summary

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order during the period from May 10, 2022, the date of the Monitor's Thirty-Sixth Periodic Report (Dkt. # 2104), to August 7, 2022.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the Modified Remedial Order.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II of this report discusses activities relating to the ongoing hiring process for entry-level firefighters from the Exam 7001 civil service hiring list.  As discussed in the Monitor's previous report, the City's most recent report on the hiring process for Exam 7001 (dated April 27, 2022, covering processing through the March 28, 2022 appointment of the current Academy class) reflected statistically significant disparities in disqualifications adverse to both Black and Hispanic candidates in the Candidate Physical Ability Test ("CPAT") and the Medical Exam,[1] and it also continued to show statistically significant disparities adverse to Black candidates in the character review process.  Part II reports on the continuing efforts to mitigate these disparities – with a particular focus on the upcoming round of CPAT testing.  Part II also discusses reporting requirements related to the Court's approval of the City's request to extend the Exam 7001 hiring list by two years.  The reporting requirements are intended in part to assess the

---

[1] The medical examination conducted by the FDNY's Bureau of Health services is one of the post-CPAT screening steps in the hiring process.

effects of the extension, including longer wait times for hiring, and to promptly identify any related negative effects that could arise, so that the City can address them.

Part II also reports on the City's plans and preparations for the next round of CPAT testing ("Round 3") – including the Monitor's efforts, as directed by the Court and in consultation with the Parties, to ensure that the City provides sufficient training resources for the approximately 800 non-traditional candidates expected to be invited to testing, that it communicates with them frequently and effectively, and that its attrition mitigation efforts are informed by appropriate analyses, including the analyses required by the Court's June 9, 2021 Order (Dkt. # 2033) (the "June 9, 2021 Order"). As recounted in the Monitor's May 31, 2022 letter to the Court (Dkt. # 2109) (the "May 31 Recommendation"), the City agreed to complete certain analyses of the first two rounds of CPAT training and testing before CPAT training resumed for a third round, but it was unable to do so. In the Monitor's May 31 Recommendation (which the Court approved on June 1, 2022), the Monitor proposed a schedule that prioritized the assessment of the first two rounds of CPAT training and other attrition mitigation activities most relevant to the CPAT, as well as findings from a survey of candidates who passed the CPAT. The City has provided two reports in accordance with the schedule (on June 3 and July 11, 2022), along with additional reports requested by the Monitor on CPAT training attendance and on the City's communications with candidates; and the Monitor and the other Parties have posed a number of follow-up queries regarding the City's reports. Key findings from the reports include confirmation that attending multiple training sessions correlates with increased rates of passing the CPAT, especially for Black, Hispanic, and female candidates. Black and Hispanic candidates cited transportation to the CPAT training site on Randall's Island as a "challenge" more frequently than white candidates. No Black candidates said that transportation issues were

the main reason they did not attend training; however, it should be noted that the survey did not include candidates who had failed the CPAT.  Black and Hispanic candidates identified "work or school commitments" as the top reason they did not attend CPAT training, and at a rate more than double that of white candidates. The Monitor has also circulated findings based on the Monitor's own analysis of records produced by the City from previous rounds of CPAT training, practice, and testing.  Among other things, the Monitor's analysis identified which parts of the test have historically resulted in failures, and recommended that training focus more on these components, such as the stairmill portion of the test.  Although it would have been preferable to have the benefit of the results of the City's analyses before CPAT training resumed, the City's reports, along with the Monitor's findings, have provided the background for ongoing discussions of a number of recommended improvements in candidate preparation and communications (focusing primarily on pre-CPAT candidates).  Relatedly, Part II also reports on some improvements made by the City to its candidate portal.

Part II also includes a summary of progress since the last periodic report toward the completion of retrospective analyses, by the Monitor and the City, of the Exam 7001 recruitment campaign.  Since the last report, the City circulated an analysis of the campaign prepared by KPMG, the consultant it retained for this purpose in September 2021.  KPMG concluded, based on a literature review, that the City's prior campaign utilized many best practices, and it made additional suggestions.  As previously reported, the Monitor's expert also undertook and completed analyses of the last campaign, in part because the City's data personnel were obliged to focus on competing public-health commitments.  As previously reported, both KPMG and the Monitor's expert were constrained to some extent by the fact that the City did not keep certain data that would have facilitated cost-benefit analysis and analysis of particular advertising

3

strategies; and the City has committed to retain such data in the next campaign.  Nevertheless, these reports, as well as prior analyses completed by the City, contain information that should be helpful to guide the City's plans for the next round of recruitment.  The Monitor has asked the City to propose a date for a meeting at which the Monitor and Parties can discuss issues related to the next campaign.

The Monitor continues to request that the City move quickly to complete focus groups with current Exam 7001 firefighters, to learn from their experience with the Exam 7001 recruitment process.  The City and the Monitor are currently discussing a request from the City to conduct interviews, rather than focus groups.

Part III of the report summarizes recent developments relating to the FDNY's EEO function, including follow-up on Monitor recommendations for operational commanders to play greater roles in EEO messaging and compliance; the analysis of the FDNY climate survey (administered in September 2019); the City's progress in filling the vacancy in the Chief Diversity and Inclusion Officer ("CDIO") position; the Monitor's efforts to assess the implementation of EEO performance ratings for company-level officers; and the Monitor's continuing evaluation of the FDNY's investigative practices in EEO matters.

Since the last periodic report, the Monitor has continued to follow up with the Parties on a list of recommendations (initially circulated on January 18, 2022) intended to make FDNY workplace culture more inclusive and address the persistence of EEO violations in many FDNY workplaces.  At an April 7, 2022 meeting with the Parties regarding the recommendations, Plaintiffs-Intervenors raised concerns that the City had not implemented changes since the Court's October 2021 status conference on EEO issues, and that the City had not moved forward on the Monitor's recommendations, which focus largely on initiatives intended to ensure that

uniformed operational commanders – from company officers to senior leadership – are actively involved in and accountable for maintaining an inclusive work environment within the FDNY and ensuring compliance with EEO policies.  On June 15, 2022, following the Monitor's circulation of an updated list of recommendations, the City agreed to the majority of the Monitor's recommendations, but objected to others, and in some cases agreed with recommendations in principle or in part, but left open questions that call for further discussion. The Monitor intends to convene a further meeting with the Parties to discuss the City's responses, along with plans and timelines for implementing the Monitor's recommendations.

As previously reported, contrary to recommendations from the Monitor and the other Parties, the City chose to postpone the development of a comprehensive, long-term EEO messaging plan until the analysis of the workplace climate survey was concluded.  Given that the analysis is now largely complete and a report is being drafted, the Monitor expects the City to begin working promptly on a new long-term messaging plan, as one of several initiatives intended to address issues identified in the survey.  In the absence of a long-term strategic plan, the EEO office has continued some work on communications regarding discrete topics, including communications regarding EEO resources and the role of the EEO office, and statements reinforcing specific policies.  In response to longstanding Monitor recommendations, the EEO office has also begun to develop communications combining reaffirmations of policy with summaries of investigative and disciplinary outcomes.

The City has continued efforts to fill the CDIO position, which has been vacant for more than a year – since July 2021.  The City reports that it has reviewed applications and completed interviews for the position, and that it expects to appoint a new CDIO soon.  The CDIO position is responsible for much of the FDNY's messaging on diversity and inclusion topics; and the

Monitor expects the CDIO to play an important role in the collaborative efforts the Monitor has recommended, in which the FDNY will integrate diversity and inclusion themes into communications that focus on professionalism, unit cohesion, and the mission of the Department.

Since the last periodic report, the City has continued efforts to bring the EEO Office attorney staff up to pre-pandemic levels, but it has continued to face challenges, with two additional staff departures in the past three months. According to the City's most recent update, EEO Office attorney staffing stands at eight attorneys (including the Assistant Commissioner) – eight short of the 16 attorneys in the Office before the onset of the pandemic. The City has continued to assure the Monitor that it will continue efforts to fill vacant positions in the EEO Office as rapidly as qualified candidates can be identified. Since the last periodic report, the City has been actively seeking to fill three posts – reviewing applications and conducting interviews for one of two vacant Deputy Director positions (for which the City reports that an offer has been accepted) and two positions for attorney investigators. The EEO staff has recently been augmented by the addition of an FDNY Lieutenant, who has been detailed to the Office to assist in investigations by providing background information on workplace policies, practices, and culture.

Part III also reports on the progress in analyzing the FDNY's EEO climate survey. As previously described, in January, the City circulated a draft report prepared by the Mayor's Office of Data Analytics ("MODA"), which has been principally responsible for analyzing the survey results. *See* Monitor's Thirty-Fifth Periodic Report (Dkt. # 2082) at 57. The City agreed to work with experts for the Monitor and other Parties to complete some additional analyses and discuss a report of top-line results that will be shared with FDNY management. Since the last

periodic report, the larger group of representatives from the Monitor and the Parties has met twice (on May 10 and July 6, 2022) to discuss the expected content of the report, and MODA has been working on a comprehensive outline of the report with regular feedback on drafts from the experts group.  The City has projected that MODA will complete the top-line report by the end of August, that it will be discussed with the larger group of representatives from the Monitor and the Parties in mid-September, and that MODA will present it to management by early October. The Monitor and the Parties have agreed that a comprehensive document can be prepared afterward memorializing all the detailed underlying analyses.

Also as reported in Part III, since the last periodic report, the Monitor has continued efforts to obtain information needed to evaluate the City's implementation of an EEO metric in FDNY officer performance reviews – including data from the 2020 and 2021 cycles of reviews. Since the last periodic report, the City has added one temporary employee to the EEO staff to assist in compiling the data for production.  In its most recent update, the City projected that data from the 2020 cycle of evaluations would be provided by the end of the summer, and that data from the 2021 cycle would be produced by the end of 2022.  The EEO metric is a critical mechanism for ensuring that officers are accountable for EEO compliance and the workplace climate within their commands, that deficient management practices are identified and remedied, and that superior performance is properly recognized.  In its responses to the Monitor's recent EEO recommendations (discussed above), the City agreed that the EEO metric will be used as a factor in discretionary promotion and assignment decisions.  For the metric to serve that purpose effectively, the City must show that it accurately reflects officers' EEO performance.

The Monitor has also continued to evaluate the FDNY's investigative practices for EEO matters, and to follow up on recommendations for their improvement.  As previously reported,

on January 18, 2022, the Monitor provided the City with a memorandum summarizing comments and recommendations on the FDNY's EEO investigative practices – based on EEO case materials produced by the City since October 2019.  And the Monitor has also continued to confer with the City on bi-weekly calls regarding progress in the investigation of open EEO cases.  Since the last periodic report, the Monitor has also continued efforts to satisfy requests by the United States and Plaintiffs-Intervenors for additional information relating to the Monitor's assessment of EEO investigative practices, and the Monitor and City are negotiating the scope of redactions to a version of the Monitor's memorandum that can be shared with the other Parties while preserving the confidentiality of individual EEO cases.  The Monitor expects that this process will come to a close within the next few weeks and hopes that the final redacted version will provide the other Parties with the background needed for them to have an informed understanding of the Monitor's observations and recommendations.

Part IV reports on efforts to identify and reduce disparate impact adverse to Black and Hispanic candidates in Medical Exam outcomes and to ensure that the FDNY's medical screening process is job-related and otherwise compliant with applicable laws.

The City's April 27, 2022 report on attrition metrics, which covered hiring results for Exam 7001 through March 29, 2022, showed that the Medical Exam continues to produce statistically significant disparities adverse to Black and Hispanic Exam 7001 candidates.  On May 19, 2022, the City circulated its second report of Exam 7001 Medical Exam attrition metrics (the "May 2022 BHS Attrition Metrics Report"), providing data as of April 11, 2022 and disparate impact analyses broken down by specific Medical Exam disqualification reason.[2]  The

---

[2] We note that all references herein to the findings in the May 2022 BHS Attrition Metrics Report may require amendment; upon receiving a data update from the City on July 18, 2022, the Monitor noted

report notes that, although the majority of components did not reflect disparate impact, there continues to be disparate impact against Hispanic candidates on the Pulmonary Function Test and against Black candidates for blood pressure.  The data from Exam 7001 candidates processed to date indicate that, at least as of April 11, 2022, the stairmill test no longer causes the disparate impact seen during Exam 2000 testing.

Another important finding reflected in the report is that weight continues to be the second most common reason for medical disqualification, and the odds of Black and Hispanic candidates being disqualified for weight are much higher than the odds for white candidates (though not at the level of statistically significant adverse impact).  Weight is also the factor associated with the highest number of pending candidates who have not received a final medical outcome, with a higher percentage of Black candidates pending.  Unlike many health conditions, weight can be improved through diet and lifestyle.  Accordingly, as in prior recommendations, the Monitor encourages the City to continue to emphasize the importance of maintaining a healthy weight in its candidate communications and to consider all opportunities and means to provide candidates with resources and guidance to assist them in doing so.  In addition, the Monitor has suggested that the City ensure candidates are aware of the option to temporarily decline appointment and take time to lose weight rather than be disqualified.

The City has been tracking and regularly updating the Monitor and the other Parties regarding candidate scheduling for the Medical Exam and the rates at which candidates have been reporting for testing, qualified and disqualified.  The City has also been providing specific

---

inconsistencies that may call into question some of the report's data.  The Monitor requested clarifications from the City on July 21, 2022 and is awaiting responses.  This report nevertheless summarizes the main findings of the May 2022 report, based on the belief that, while some data points may require amendment, it is unlikely that the main conclusions will change.

information about Black candidates to Plaintiffs-Intervenors so that Plaintiffs-Intervenors can perform outreach and provide support for those candidates.

The City has also been charged with providing monthly updates on qualification numbers for the four most common reasons for medical disqualification, pursuant to the list extension conditions approved by the Court on June 17, 2022. The City provided the first such update on July 18, 2022 and, as described above in footnote 2, the Monitor has asked the City for clarifications.

Part V reports on the status of efforts by the Monitor and the Parties to analyze the impact of the FDNY's character review process on candidates from different demographic groups and to address disparate impact produced by the process. The most recent analyses by the City continue to show statistically significant disparities adverse to Black and Hispanic candidates in referrals to the PRB, along with a statistically significant disparity adverse to Black candidates in disqualifications among candidates referred to the PRB. In addition, the Monitor's own analysis, based on the City's figures, shows that there is also disparate impact adverse to both Black and Hispanic candidates in the process considered as a whole (*i.e.* in the rate of disqualifications for all candidates who receive a final decision from either phase of the process – PRB referral or PRB decisions). The Monitor and Parties discussed these issues most recently at a July 28, 2022 meeting regarding further planned and potential reforms and initiatives intended to address the disparate impact, issues related to analyses of the character review process, and the potential need for the City to validate the process as job-related if further reforms do not eliminate or sufficiently mitigate the disparity.

Part VI discusses the Exam 7001 computer-based test ("CBT") developed, administered, and analyzed by the City's testing experts, PSI Services LLC ("PSI"), in consultation with experts for the Parties and the Monitor.

Part VII lists a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.   Recruitment, Candidate Processing, and Attrition Mitigation

### A.   Candidate Processing

#### 1.   Extension of the Exam 7001 List

In a June 17, 2022 Order (the "June 17 Order") (Dkt. # 2113), the Court approved the City's request for a two-year extension of the Exam 7001 eligible list – subject to requirements set forth in the Monitor's June 15, 2022 recommendation (Dkt. #2112).  The recommendation, which was filed with the consent of all Parties, requires the City to provide regular reports on candidate attrition, outreach to candidates by the Office of Recruitment and Retention ("ORR"), and attrition mitigation programs.  The June 17 Order also requires the City to formulate and execute specific plans for candidate communications and attrition mitigation programs.  As detailed in the Monitor's recommendation, the requirements include the following:

- Comprehensive reports on candidate attrition following the appointment of each Academy class, including analyses comparing hiring ratios to those projected by the City in support of its request for the extension;

- Additional, more frequent reports on attendance at training and testing, no-shows, and candidate outcomes from ongoing processing; and

- Staffing and communication plans for candidate outreach, fitness training, and attrition mitigation (including plans for specifically publicizing the list extension itself).

The required measures are intended to ensure that the City, the Monitor, and the other Parties can promptly identify, and that the City can effectively address, disparities in attrition adverse to

non-traditional candidates – especially any increase in such disparities that may result from the list extension and the unprecedented wait times that candidates appointed in years five and six of the list will experience before they are called for CPAT testing and (for those who complete the hiring process) before appointment to the Fire Academy.

The City has begun providing some of the first reports required by the Court's June 17 Order.  The Monitor plans to work with the City and the other Parties to ensure that the reports contain all the required information and are presented in an appropriately informative format, and that plans and recommendations based upon the information are promptly and effectively implemented.

2.    Demographic Trends in Candidate Processing to Date

As discussed in the Monitor's previous report, the City's most recent report on candidate attrition in the Exam 7001 hiring process (dated April 27, 2022, and covering hiring outcomes through the appointment of the Academy class that began on March 28, 2022) continued to show statistically significant disparities adverse to Black candidates in the CPAT, in the Medical Exam, and in both phases of character review (PRB referral and disqualifications).[3]  The figures in the City's report also show statistically significant disparities adverse to Hispanic candidates in the CPAT and the Medical Exam.  The Monitor has continued to emphasize that the City must sustain its efforts to eliminate disparities adverse to non-traditional candidates or validate the affected processing steps as job-related.

---

[3] Unless otherwise specified, "attrition" as used in this report means both voluntary attrition by candidates and disqualifications at all stages of the hiring process.

The current Academy class was appointed on March 28, 2022 and is expected to graduate this month.  The City previously provided the following figures for the composition of the class[4]:

Academy Class Appointed March 28, 2022

| Race/Ethnicity | No. (%) |
|---|---|
| Asian | 19 (7.3%) |
| Black | 34 (13.1%) |
| Hispanic | 67 (25.8%) |
| Nat. Am. | 2 (0.8%) |
| Unknown | 0 |
| White | 138 (53.1%) |
| Total | 260 |

On May 31, 2022, the City provided a breakdown of the group of post-CPAT candidates in active processing for the fall 2022 class.  (The City has advised that the group in current processing includes candidates with list numbers through 4,992 and that it expects the class to include candidates with list numbers up to approximately 4,800.)

---

[4] On March 16, 2022, the City confirmed that initial assignments for the previous Academy class (which graduated on March 7, 2022) were compliant with paragraph 1(d) of the Disparate Treatment Settlement, which requires the City to give "New York City residents who graduate from the Fire Academy first priority for placement into a fire company within the Division in which they live, to the extent reasonable, practicable, and consistent with operational needs."  Disparate Treatment Settlement at 4. The Monitor asked the City to provide individual data showing firefighter preferences and assignments so that the Monitor could confirm the City's representation, and the City provided the individual data on July 19, 2022.  The Monitor's review of the data raised questions regarding the interpretation and application of the home-division requirement to two categories of assignment decisions – on which the Monitor sought the opinions of the City and the Plaintiffs-Intervenors.  One of the Monitor's questions has been resolved, and discussions are continuing regarding the open issue, which affects a small category of assignments. The City also provided disparate impact analyses showing that there was no statistically significant disparity adverse to Black or Hispanic firefighters in assignments to busy fire companies or ladder companies.  The Monitor expects that the City will provide the same analyses and data for the class expected to graduate this month.

Candidates in Active Post-CPAT Processing for Fall 2022 Academy Class

| Race/Ethnicity | No. (%) |
|---|---|
| Asian | 36 (4.35%) |
| Black | 158 (19.1%) |
| Hispanic | 234 (28.3%) |
| Nat. Am. | 3 (0.36%) |
| White | 396 (47.9%) |
| Total | 827 |

On May 31, 2022, the City began CPAT training for the group of candidates expected to take the next round of CPAT testing (which consists almost entirely of candidates from the 99 score band on the Exam 7001 eligible list).  The demographic breakdown of that group is as follows:

**Candidates Preparing for Next Round of CPAT**

| Race/Ethnicity | No. (%) |
|---|---|
| Asian | 110 (5.8%) |
| Black | 374 (19.7%) |
| Hispanic | 520 (27.4%) |
| Native American | 12 (0.6%) |
| White | 885 (46.6%) |
| TOTAL | 1,901 |

On August 4, 2022, the City provided the following updated figures showing the demographic composition of the FDNY firefighter force as of that date:

845 Black (10.6%)
1347 Hispanic (16.8%)
5480 White (68.6%)
Total 7991

3.    Plans and Preparations for the Next Round of CPAT

Since the previous periodic report, the Monitor and the Parties have engaged in intensive

discussions regarding the City's plans for the next round of CPAT testing.  As previously reported, in October 2021, Plaintiffs-Intervenors requested that the City complete certain analyses of the first two rounds of the CPAT before commencing training for the third round, with lead time to consider findings when planning the third round; and the City agreed to complete analyses on a schedule that would have made them available to inform its efforts to prepare candidates for the third round of CPAT.  *See* May 31 Recommendation at 3.  On February 2, 2022, the City circulated a proposed schedule for a new round of CPAT testing for Exam 7001 candidates (the third round for the current eligible list, and the first since 2019).  Monitor's Thirty-Sixth Periodic Report at 15.  The proposal called for CPAT administration to begin in August 2022, with information sessions and CPAT training commencing on May 23, 2022.  *Id*.  In response to a Monitor request for additional details regarding the City's plans, the City provided a compilation of information supporting its proposal on April 15, 2022, and on April 25, 2022 it asked for the Monitor's approval to invite candidates to information sessions and CPAT training.  On April 27, 2022, the Monitor approved the City's request to issue the invitations, subject to several conditions that the City must fulfill before beginning actual CPAT testing (as distinct from training and related outreach).  *Id*.  Most notably, the Monitor specified that the City must complete the summary report required by the Court's June 9, 2021 Order,[5]

---

[5] The June 9 Order directed the City to take five remedial steps.  The first was to provide "a flowchart or written summary of the firefighter hiring process that enumerates each step of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step, and which unit of the FDNY has primary responsibility for each of the listed steps."  June 9 Order at 11.  The City produced materials purporting to comply with this directive on July 30, 2021.  Plaintiffs-Intervenors and the United States provided comments (on August 12 and December 13, 2021 respectively), and the Monitor circulated a series of comments on March 2, 2022.  The City circulated a further iteration of the materials addressing the Monitor's comments on May 12, 2022; and on August 1, 2022, Plaintiffs-Intervenors and the United States posed a series of further follow-up questions to the City regarding the materials and the

discussing "the effectiveness of attrition mitigation mechanisms for CPAT Rounds 1 and 2."[6]

As discussed in the Monitor's May 31 Recommendation, Plaintiffs-Intervenors and the City disagreed about whether the City should be permitted to resume CPAT training before the City had provided results of analyses for the first two rounds.  May 31 Recommendation at 4-6. After weighing the competing considerations of improved analyses versus the potential downside of delaying the start of training, the Monitor recommended that the City be permitted to begin training, but that it be directed to provide the required analyses on a schedule prioritizing the assessment of attrition mitigation efforts most relevant to CPAT training and pre-CPAT communications, so that at least some of the most relevant findings would be available to inform the City's engagement with pre-CPAT candidates for a portion of the 12-week CPAT training period.  The Court approved the Monitor's recommendation on June 1, 2022.

At the June 16, 2022 status conference and in follow-up communications with the Monitor, Plaintiffs-Intervenors asked that the City be required to report on its consideration of alternate CPAT training sites and to provide weekly reports on its communications with Black

---

City's plans.  The other four remedial steps required by the June 9 Order, which relate to the City's communications with candidates, the fitness resources it provides to candidates, and its efforts to evaluate and enhance the effectiveness of its attrition mitigation programs, are discussed below in connection with the relevant areas of attrition mitigation.

[6] Regarding the requirement for a summary report on attrition mitigation, in relevant part, the June 9 Order provides as follows:

> Before resuming administration of the CPAT to further candidates, the City is directed to submit to the Monitor and Parties a written summary discussing the effectiveness of its various attrition mitigation mechanisms for CPAT Rounds 1 and 2, the efforts that have been specifically directed to the candidates in the group who have passed the CPAT, any takeaways from the focus group, and a description of how the FDNY plans to operationalize the information contained in the report going forward.  The City should likewise continue to furnish data on disparate impacts and attrition rates for Black and Hispanic candidates.

June 9 Order at 12-13.

candidates invited to training for the upcoming round of the CPAT.[7]  Plaintiffs-Intervenors also

requested that if rates of voluntary and involuntary attrition among Black candidates exceeded

the rates for white candidates for Round 3, the City would provide those Black candidates who

failed or attrited the opportunity to train for a "do-over" CPAT at a public-transit-accessible

location.

As directed by the Court during the conference and in a June 16, 2022 Minute Order, the

Monitor consulted with the Parties and provided a report to the Court on June 23, 2022 regarding

the CPAT and related outreach and staffing issues.[8]  The Monitor has also continued to work

with the City and the other Parties to consider additional sites for CPAT training and to obtain

sufficiently informative and frequent reports from the City regarding its communications with

candidates expected to be invited to the upcoming round of CPAT testing.  On June 29, 2022, in

response to a Monitor request, the City provided a brief summary of its assessment of additional

---

[7]  As detailed in a June 20, 2022 follow-up email to the Monitor, Plaintiffs-Intervenors asked that the City be required to provide a report specifying "5 CPAT locations that are accessible to public transit and would provide Black candidates with access to the full CPAT training course and another 5 locations that could provide training on some but not all of the elements."  Plaintiffs-Intervenors further requested that "[f]or each site this report should include the FDNY's assessment: of how soon it could be made available to candidates for training, what the hours of access could be, the department's assessment of whether it should be established and the reasoning behind its determination."  With respect to candidate communications, Plaintiffs-Intervenors asked that the City be required to provide weekly reports on calls to Black candidates invited to training for CPAT Round 3, along with information on training-session attendance and engagement with the candidate portal and the Mentor program.  Plaintiffs-Intervenors asked that the City be required to add staff if the reports suggest that current ORR staffing is inadequate to maintain weekly contact with those candidates.

[8] In relevant part, the Court's Minute Order provided as follows:

> The parties also discussed the CPAT and related candidate targeting and outreach efforts.  The court DIRECTED the parties to work with the Monitor to continue their efforts in improving these areas.  The court also DIRECTED the Monitor to consult with the parties about the City's staffing plans related to outreach and the Plaintiff-Intervenor's reporting proposals.  The court DIRECTED the Monitor to provide the court with a letter and recommendations updating it on these discussions by Thursday, June 23, 2022.

training sites, stating its reasons for rejecting four sites that it had previously considered. As discussed in detail in Part II.B.2 below, the Monitor and the Parties have continued to discuss potential additional locations for CPAT training and for training focused on CPAT component events, including the stairmill.

The Monitor has also continued to engage with the Parties regarding findings and potential action items based on the City's analyses of attrition mitigation, Monitor recommendations for candidate communications, and suggestions for additional resources and guidance relating to CPAT fitness training. Relevant details are set forth in the appropriate sections below concerning attrition analyses, fitness training, and candidate communications.

On August 1, 2022, the City circulated an updated proposed plan for the resumption of CPAT testing, which calls for the City's Department of Citywide Administrative Services ("DCAS") to conduct CPAT orientation sessions beginning on October 4, 2022 and for testing to conclude on December 7, 2022. The City requested that the Monitor approve the proposed plan no later than August 26, 2022, and it proposed a schedule on which Monitor and the Parties would complete their discussions of the attrition analyses listed in the May 31 Recommendation before that date. The Monitor is considering the City's proposal and has requested additional information and clarifications from the City.

### B.    Attrition Mitigation

Since the last periodic report, the Monitor has continued to evaluate and comment on the City's efforts to mitigate attrition among Black and Hispanic candidates. Recent activities have focused mainly on ensuring that candidates are fully informed and properly prepared for the next round of CPAT testing. In addition, the Monitor has continued to receive updates on attrition mitigation programs and communications targeting candidates who have already passed the CPAT, including measures required by the Court's June 9, 2021 Order.

1.      <u>Analyses of Attrition Mitigation</u>

  *a)*  *The City's Reports*

In accordance with the schedule set forth in the Monitor's May 31 Recommendation, which the Court approved on June 1, 2022, the City provided reports on its analyses of CPAT attrition on June 3, July 11, and July 12, 2022.  The City's reports include analyses of data from previous rounds of CPAT training and testing, data on ORR communications with candidates, and responses to survey questions that the City posed to a group of post-CPAT candidates in May 2022.[9]  On June 10, 2022, the City also provided a summary of high-level plans for operationalizing findings from its analyses.  (For example, the City's plan indicated that it plans to add staff in some areas, but not specifically how many or when they will be hired, and that it plans to enhance messaging in some areas, but without yet specifying the proposed content, timing, or means of delivery.)  The City has indicated it will provide the Monitor and Parties with Part 3 of its analyses on August 10, 2022, as specified in the May 31 Recommendation.

  The reports provided by the City to date include most, but not all, of the elements listed in Appendix A to the May 31 Recommendation.  For most of the listed analyses, the City has either reported findings or stated that it is unable to do so because of a lack of relevant data.  The Monitor plans to continue to evaluate the City's reports and its responses to follow-up inquiries to determine whether its analyses comply with the requirements ordered by the Court.

---

[9] As previously reported, the survey was prepared and administered by the City as a follow-up to the focus group that the City conducted to comply with the Court's June 9, 2021 Order.  Monitor's Thirty-Sixth Periodic Report at 26.  The survey contained 41 questions and was administered online from May 2 to May 15, 2022 to 375 candidates who had passed the CPAT but had not yet completed the hiring process.  The results of the survey should be viewed with recognition that only 375 respondents took the survey, all of whom took and passed the CPAT, and some of the sample sizes were quite small (*e.g.*, for women respondents), so any trends involving those groups cannot be differentiated with confidence from random chance.  Moreover, responses may have been biased because the survey was administered by the respondents' potential employer and because candidates who choose to respond to a survey may be meaningfully different than the overall group they are meant to represent.

Data and Survey Results Regarding CPAT Training and Attrition.  Findings regarding CPAT training and candidate attrition in the City's reports (the June 3, July 11, and July 12, 2022 reports, and the July 6, 2022 report on the survey) confirm that Black and Hispanic candidates who attend multiple sessions of CPAT training have higher rates of qualification in the CPAT and that the FDNY could make training even more effective for non-traditional candidates.

- Black candidates who attended five or more training sessions and Hispanic candidates who attended four or more sessions achieved qualification rates above 90%.[10]

- However, data indicate that non-traditional candidates benefitted less from training than white candidates, and had to invest more time in training:

  - Black and Hispanic candidates attended CPAT training at slightly higher rates than white candidates (56.6% for Black candidates, 54.5% of Hispanic candidates, and 45.2% of white candidates);

  - Black and Hispanic candidates who attended training attended slightly more sessions on average (3.0 compared to 2.9);

  - But among candidates who attended training, Black and Hispanic candidates had lower rates of qualification than white candidates (81.1%, 85.1%, and 93% respectively).

  - Similarly, although the rate of voluntary attrition among Black candidates was much lower among candidates who attended one training session than among those who attended none, it remained approximately 20% even for candidates who attended one session of training, higher than the rate for white candidates.[11]

The findings also suggest that the vital importance of training has still not been effectively communicated to some non-traditional candidates.

---

[10] The City's report also noted that the rate of qualification for women exceeded 90% after seven sessions. High rates of disqualification among women (who make up a disproportionately large segment of Black candidates) call for training and messaging initiatives targeting women.  And given the high number of sessions required for women to achieve a high rate of qualification, it may also be appropriate to provide women with more guidance to help them build up a base of general strength and fitness before and during CPAT training.

[11] Based on an earlier analysis by the Monitor, the voluntary attrition rate for white candidates who attended one training session was 7.1%.  Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 18.

- 39.6% of Black candidates who did not attend any training nevertheless appeared for CPAT testing, with predictably high rates of failure. These candidates made up 25.1% of all Black candidates who took the CPAT, and 37.2% of Black candidates who failed.

Some of the reported figures also suggest specific areas in which additional training and other messaging relating to CPAT preparation should be considered.

- 53% of Black candidates and 49% of Hispanic candidates surveyed (in a survey limited to CPAT passers) indicated that a better understanding of CPAT technique would have made them better prepared for the CPAT.

- 47% of Black candidates and 46% of Hispanic candidates in the survey indicated that an understanding of the strength and cardio levels needed to pass the CPAT would have made them better prepared for the test.

- Black and Hispanic candidates surveyed were also more likely than white candidates to indicate that they would have changed the fitness program to include more training opportunities.

The reported survey results also identified potential barriers to training attendance that the City should consider addressing in training schedules, in the siting of CPAT training and other fitness preparation programs, and in facilitating transportation to training sites. In a survey limited to CPAT passers –

- 67% of Black candidates and 63% of Hispanic candidates surveyed (compared to 30% of white candidates) cited work or school commitments as reasons they did not attend CPAT training;

- 17 of 36 Black candidates who responded said that transportation to Randall's Island for training was a "challenge" (although no Black candidates cited transportation challenges as the main reason they did not attend training).

The reports also included some notable findings regarding communications with candidates and outreach via the candidate portal and the Mentor program. These findings suggest areas in which ORR communications and initiatives, including the portal and the Mentor program, could engage more effectively with non-traditional candidates.

- Black and Hispanic candidates were more likely to report receiving communications via text, phone calls, and email less frequently than white candidates.[12] [13]

- Black and Hispanic candidates were more likely (26% and 21%, respectively) than white candidates (16%) to report that the FDNY's attempts to keep them informed about the mentorship program were only "poor" or "fair."

- A large percentage of candidates of all race/ethnicities reported only poor to fair communication about the stairmill program and candidate portal (greater than 14% for the stairmill; greater than 20% for the candidate portal).

- Black and Hispanic candidates were less likely to report that their Mentors provided regular check-ins and useful information than white candidates.  And Black and Hispanic candidates were more likely than white candidates to report that they received very little engagement from their Mentors and that their Mentors were only slightly helpful.

- Black candidates were more likely than white and Hispanic candidates to report that they did not participate in the stairmill program because they were not aware of it.

In survey responses reported by the City, Black and Hispanic candidates were more likely to indicate that they attended CPAT training sessions because of Mentor encouragement and because of information from the FDNY indicating that training helped people pass the CPAT.  In survey responses, Black candidates also indicated that the forms of communication with which they were most likely to interact were text messaging and communications from Mentors.

        *b)*     *Monitor's Analysis of Records from Previous Rounds of CPAT Training, Practice, and Testing*

As noted in previous reports, Plaintiffs-Intervenors had requested that the City inquire into the possibility of reviewing data from practice CPAT test sessions, to help identify which

---

[12] This finding relates only to received communications and should not be interpreted to mean that the City initiates fewer attempts at communication to these candidates, which is not the case.

[13] Texts:  24% of Black candidates, 29% of Hispanic candidates, and 37% of white candidates reported receiving texts communications at least monthly.  Phone calls:  42% of Black candidates, 44% of Hispanic candidates, 53% of white candidates reported receiving phone call communications at least monthly.  Email:  60% of Black candidates, 63% of Hispanic candidates, and 73% of white candidates reported receiving email communications at least monthly.

components of the test cause candidates to fail practice sessions so that they must return for a subsequent test.[14]  *See, e.g.*, Monitor's Thirty-Sixth Periodic Report at 31-32.  On February 25, 2022, the Monitor held a virtual meeting with representatives of DCAS to gather information and offer suggestions regarding the categories of data that the City retains from CPAT practice sessions and final tests and the form in which the data is preserved.  The DCAS personnel informed the Monitor that for previous rounds of testing, the results of practice sessions were available only on handwritten forms and that outcomes had not been retained electronically because they were "overwritten" when DCAS entered the candidate's final test result.  The City has confirmed that practice-session data will be retained in future rounds of testing, beginning with the upcoming Round 3.  The Monitor has also suggested that the City consider recording data from specific components of CPAT practice and testing sessions to attempt to identify which components drive disqualifications most frequently.[15]

In May 2022, the Monitor requested that the City produce the CPAT training Scantron forms and practice and testing evaluation forms so that they could be analyzed by the Monitor's experts.  On July 13, 2022, the Monitor circulated a summary of Exam 7001 CPAT data through May 2022, as reflected in the approximately 4,600 CPAT evaluation forms from practice and

---

[14] The City schedules candidates for two CPAT practice tests and one final test.  (The practice tests are distinct from training sessions).  If a candidate passes during a CPAT practice test, they are qualified for CPAT and do not need to appear for further CPAT testing.

[15] Disqualifications can result either from the failure to complete the CPAT in the prescribed time or from failure to perform the component "events" correctly.  At the February 25, 2022 meeting, the City advised that event-by-event data from previous rounds of testing was available only on paper checklists (for CPAT practices sessions and tests) or on "Scantron" type forms (for CPAT training sessions run by the FDNY).  Although data from the Scantron forms could technically be transferred to a database by scanning the form with an appropriate application, the City had not done so.

final tests and the approximately 6,400 training Scantron forms produced by the City. The findings of the analysis include the following:

- Black and Hispanic candidates are much more likely to fail the CPAT than white candidates (14% fail rate for Black candidates; 14% for Hispanic candidates; 7% for white candidates).[16] The results from this analysis mirror those reported in the City's April 27, 2022 Attrition Metrics Report, which showed that Black and Hispanic candidates have been disqualified by the CPAT at much higher rates than white candidates (14.5% of Black, 13.7% of Hispanic, and 8.2% of white candidates disqualified).

- The events with the highest failure rates are the stairmill, the ceiling breach and pull, and the rescue, in that order. These three events (the first, eighth, and seventh, respectively, of the eight in the course) account for approximately 80% of failures overall.

- The stairmill event accounts for 38% of CPAT failures for all candidates, but an even higher percentage for Black candidates: nearly half of the Black candidates who failed the CPAT did so on the stairmill event (48%).

- The attendance rate for training sessions is higher among those who pass than among those who fail, across all race/ethnicities and genders.

- For all races/ethnicities, the pass rate is higher, on average, as the number of training sessions goes up.

As with other analyses discussed above, these findings reinforce the importance of multiple training sessions, and they also provide guidance for the focus of training and messaging efforts. As noted in Part IV, analyses performed by the Monitor's team on Exam 2000 data found that being overweight was associated with a significantly higher risk of being disqualified on the Medical Exam stairmill test. It is likely that excess body weight, along with low fitness, is related to CPAT disqualification as well. The recommendations made with respect to preparing for the medical stairmill component also apply to CPAT testing.

---

[16] For these analyses, the Monitor reviewed results from the two practice tests and the final test, and candidates were included in the "Fail" category if they received a "Fail" or a "Disqualified" on their most recently recorded attempt, as these two results appear to have been used interchangeably on the evaluation forms.

It is critical for the City to communicate to its trainers the need to provide tailored advice and encouragement to individual candidates and to focus training on events that have the highest fail rates for non-traditional candidates.  The Scantron forms, which include many recordable data points such as the reason for failing and the completion time for the various events, have been used by the City only to record candidate name, identification number, date of training, and the candidate's self-report on the frequency of their personal fitness training.  The Monitor was therefore able to use the Scantron forms only to track training attendance.  The Monitor strongly recommends that the City begin having trainers complete the Scantron forms and that it use the Scantron scanner to track candidate progress.  Black and Hispanic candidates who are overweight and struggle during training should be advised that achieving and maintaining a healthy weight is critical to their success, and they should be counseled, where appropriate, to take advantage of the opportunity to decline and lose weight rather than being disqualified.

2.   CPAT Training, Fitness Training, and Fitness Resources

a)   *Pre-CPAT Candidates*

The City began CPAT training for the Round 3 of Exam 7001 CPAT testing on May 31, 2022.  As discussed above, the analyses recently circulated by the City (on June 3 and July 11, 2022) are consistent with prior analyses finding that attendance at multiple CPAT training sessions correlates strongly with higher pass rates, especially for Black candidates.  Accordingly, it is important for the City to make training readily available and to communicate its vital importance to non-traditional candidates.  In addition, because a high level of general fitness is also an important factor in success on the CPAT, and because some candidates face challenges in attending training sessions on Randall's Island, it is also important for the City to provide candidates with the information and resources they need to train independently at home or at fitness facilities.

Location and Timing of CPAT and Related Training.  Currently, the City is offering CPAT training only at the Fire Academy site on Randall's Island, with training sessions at 6:00 pm on four weekday evenings and at 8:00 am and 1:00 pm on Saturdays.  As reported by the City, total attendance at each session in earlier rounds of CPAT training averaged approximately 30 to 50 candidates.  The City has advised that each session is conducted by eight to ten instructors, and that each candidate performs one attempt on the complete sequence of CPAT events in each session.

In addition to CPAT training, at the Monitor's suggestion, since the June 16, 2022 conference the City has also invited pre-CPAT candidates to join stairmill fitness training sessions previously offered only to post-CPAT candidates.  The stairmill fitness program was established to comply with the Court's June 9, 2021 Order, which directed the City to make stairmill training available to post-CPAT candidates preparing for the stairmill component of the Medical Exam.[17]  Currently the program comprises four two-hour training sessions monthly – two sessions at the Academy and two at FDNY headquarters – incorporating stairmill work and other related fitness training.[18]  The City has also identified four City recreation centers equipped with stairmill machines and has encouraged candidates to use them for additional training.  The Monitor has recommended that the City supply the recreation centers with the weighted vests

---

[17] The stairmill component of the Medical Exam is different from the stairmill component of the CPAT. (The Medical Exam stairmill is approximately five minutes long and uses a 50-pound weighted vest; the CPAT stairmill is approximately three minutes long and adds 25 pounds in shoulder weights to the 50-pound vest.)  But the City has confirmed that candidates preparing for the CPAT at FDNY sites are given instruction and provided with weights appropriate for the CPAT version in the training sessions.

[18] On July 27, 2022, the City provided participation figures for the stairmill fitness program covering the May-July 2022 time frame.  The City's report does not provide separate attendance figures for pre- and post-CPAT candidates.  However, as reported by the City, the total attendance for both pre- and post-CPAT groups (overall and for each demographic group) does not exceed 10% of the candidates who have been invited to attend CPAT training.

and shoulder weights used in the stairmill component of the CPAT.  The City initially declined to do so, citing concerns that the weights might be removed from the facilities.  However, at the suggestion of Plaintiffs-Intervenors, the City has agreed to reconsider its position and examine whether weights could be provided using procedures that Plaintiffs-Intervenors report are already in place for storing and lending out sports equipment at the recreation centers.

CPAT Training Attendance Figures.  On August 3, 2022, the City provided the following updated figures for the first nine weeks of CPAT training attendance:

| Number of Sessions Attended by Race as of 8/2/2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
| Asian | 85 (77.3%) | 6 (5.5%) | 10 (9.1%) | 6 (5.5%) | 0 | 1 (0.9%) | 2 (1.8%) | 0 | 0 | 0 | 110 |
| Black | 270 (72.2%) | 29 (7.8%) | 23 (6.1%) | 12 (3.2%) | 14 (3.7%) | 10 (2.7%) | 8 (2.1%) | 6 (1.6%) | 1 (0.3%) | 1 (0.3%) | 374 |
| Hispanic | 381 (73.3%) | 32 (6.2%) | 23 (4.4%) | 25 (4.8%) | 21 (4.0%) | 14 (2.7%) | 10 (1.9%) | 5 (1.0%) | 8 (1.5%) | 1 (0.2%) | 520 |
| Native American | 11 (91.7%) | 0 | 1 (8.3%) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 |
| White | 718 (81.1%) | 65 (7.3%) | 32 (3.6%) | 20 (2.3%) | 20 (2.3%) | 9 (1.0%) | 10 (1.1%) | 7 (0.8%) | 2 (0.2%) | 2 (0.2%) | 885 |
| TOTAL | 1465 (77.1%) | 132 (6.9%) | 89 (4.7%) | 63 (3.3%) | 55 (2.9%) | 34 (1.8%) | 30 (1.6%) | 18 (0.9%) | 11 (0.6%) | 4 (0.2%) | 1901 |

These reported rates of attendance for the first nine weeks of training fall well below the rate of attendance for the full 12-week period in previous rounds of CPAT training.  As reflected in the City's June 3 and July 11, 2022 reports on attrition mitigation, 56.6% of Black candidates participated in training in previous rounds, and so far only 27.8% have done so for this round.  Among Hispanic candidates, 54.5% attended training in previous rounds, compared to only 26.7% so far in Round 3.  For white candidates, the corresponding gap is even larger –

45.2% in previous rounds vs. 18.9% in the current training sequence.[19]  Although the City's

August 3, 2022 report covers only nine of the planned 12 weeks of training, it appears unlikely

that rates of participation will reach the levels for previous rounds of training within 12 weeks.[20]

This is especially so given that many of the attendees in later sessions (those who have planned

to attend multiple sessions) are likely to have attended at least one session in the first nine weeks.

(Notably, a comparison to figures previously provided by the City for seven weeks of training

indicates that only two additional Black candidates and two additional Hispanic candidates began

training in weeks eight and nine.)

Although the implications of these figures for eventual disparities in outcomes are

difficult to assess, the apparent declines in training attendance among non-traditional candidates

are very concerning given the crucial importance of multiple-session attendance for Black and

Hispanic candidates.  Especially for non-traditional candidates, lower rates of attendance at

training have correlated with lower rates of qualification on the CPAT; and although the City's

August 3, 2022 figures show disparities in training attendance favoring Black and Hispanic

candidates, it is not clear whether or how much that current advantage in training (if it persists)

---

[19] Among Black candidates and Hispanic candidates, the rate of attendance to date in Round 3 is 49% of the rate of attendance in previous rounds; for whites, the rate of Round 3 attendance is 41.8% of the rate of attendance in previous rounds.

[20] As discussed above in Part II.A, on August 1, 2022, the City proposed a schedule for CPAT testing according to which testing would not conclude until December 7, 2022.  The City has confirmed that it will continue CPAT training until the last date of testing.  Accordingly, under the City's proposed schedule, CPAT training would remain available for substantially more than 12 weeks.  If the City's proposed schedule is approved, the extended training period will provide additional time for more candidates to attend training, and the City has also suggested that more candidates will be motivated to attend training once a definite schedule of testing has been set.  But the extent to which these factors will raise rates of attendance is uncertain.  In addition, if the training period is extended, candidates who have already joined multiple training sessions may need to attend more sessions closer to the testing date to ensure that they maintain fitness and their familiarity with CPAT techniques.

will reduce the disparities in CPAT outcomes adverse to non-traditional candidates.[21]  As reflected in the City's June 3 and July 11, 2022 reports, Black candidates were disqualified at higher rates in previous CPAT rounds even though they attended training at higher rates than white candidates; and among candidates who did not attend training but still appeared for the CPAT, the qualification rate was higher for white candidates (89.5% compared to 81.4% for Black candidates).  Earlier analyses by the Monitor also indicate that Black and Hispanic candidates need to attend more sessions than white candidates to raise their CPAT qualifications rates to the same level as their white counterparts.  *See* Monitor's Twenty-Ninth Periodic Report at 18 (showing higher qualification rates for white candidates than for Black or Hispanic candidates at each of several levels of attendance:  one, two, three, or three or more sessions).

To address the low rates of CPAT training attendance among non-traditional candidates, the City must take all possible steps to improve access to training for these candidates, inform them about the vital importance of training, and provide them with the resources and guidance that will help them supplement CPAT training with appropriate CPAT-focused fitness training at home or at public facilities.  The Monitor has made several recommendations, discussed below, for expanded access to training (including additional sites, sessions, and transportation options) and for improved outreach and communications regarding the CPAT.  The Monitor urges the City to adopt these measures and do everything it can to increase training attendance among non-traditional candidates.

---

[21] As the above figures show, the rate of training participation for Black candidates exceeds the rate for white candidates by a greater percentage than in previous rounds of training.  In previous rounds, the rate of training among white candidates was 79.9% of the rate among Black candidates; thus far in the current round of training, the rate for whites is 68% of the rate for Black candidates.

Potential Additional CPAT Training Sites.  Plaintiffs-Intervenors have long urged the

City to establish one or more additional CPAT training sites in locations more readily accessible

by public transit than the Fire Academy on Randall's Island.  Plaintiffs-Intervenors cite data

from the City's survey in support of this request, in which 17 of 36 Black candidates who

responded said that transportation to Randall's Island for training was a "challenge"; and they

note that, among candidates who identified transportation to Randall's Island as a challenge,

Black candidates also cited lack of private transportation and the cost of Uber or other car

services as barriers at higher rates than white candidates.  The City disputes that the location is a

barrier, however, pointing out that none of the Black candidates who responded to the survey

(which included only those who had passed the CPAT) identified the Randall's Island training

location as the main reason they did not attend training.  The City also asserts that Randall's

Island offers superior preparation and that candidates prefer Randall's Island over other

locations, citing low attendance at stairmill training sessions at FDNY and at an alternate CPAT

training site (at FDNY Headquarters) that was established part-way through training for the

previous round of CPAT testing.

The City has offered a variety of reasons that the additional sites it has considered in the

past are infeasible in its view:  for example, a location at Fort Totten was rejected because of

limited access to public transportation; DCAS's CPAT testing site in Long Island City was

rejected because the City was concerned about potential damage to the equipment used for the

test and because of conflicts with the scheduling of other tests administered by DCAS; a

firehouse site identified as "Old Rescue 2" in Crown Heights, Brooklyn was rejected because it

reportedly would require extensive renovation to be serviceable and could not be made ready in

time to be used for the current round of training; and the concept of training in City public

schools was rejected altogether because testing equipment could not be left in school buildings and because of the limited hours available for training and access to buildings.  The City has also stated that it does not have enough trained instructors to run CPAT training at an additional site, such as FDNY Headquarters, without reducing the number of sessions offered at Randall's Island.

Additional Measures to Improve Training and Communications Other than Alternate Sites.  Given the FDNY's position regarding alternative CPAT training sites, the Monitor has made several recommendations, including those discussed below.

*Accessibility of Training*.  The Monitor has recommended that the City increase the number of stairmill training sessions at FDNY Headquarters, and that it consider providing shuttle service to CPAT training from additional locations – focusing on neighborhoods with high concentrations of Black and Hispanic candidates.[22]  Currently, the City offers shuttle service from FDNY Headquarters in Brooklyn and from a location in Harlem.

The Monitor has also recommended that the City consider adjusting its schedule of CPAT training sessions at the Academy to accommodate candidates who may not be able to get to 6:00 pm training sessions there from jobs that end at or around 5:00 pm.  The City has declined to begin training any later, because of concerns that later times may not be viable for candidates with commitments later in the evening, but it has agreed to inform candidates that, while they should attend the entire session to obtain the most benefit, late arrivals are not turned away.

---

[22] In support of the recommendation, the Monitor provided the City with a list of zip codes where the largest numbers of Black and Hispanic candidates in the 99 score band (the group invited for Round 3 CPAT training) reside.

31

*Instructional Material*.  The Monitor has also recommended that the City develop and disseminate additional online video content showing exercises (such as step training) that will help candidates build strength in key areas, especially for the stairmill test.  The Monitor has also suggested that the City provide a concise, user-friendly guide to the CPAT including links to the fitness guidance (both text and video) that it has already created.  The Monitor has provided the City with a draft document highlighting the keys to success on the CPAT, which the City is considering.

The Monitor has also suggested more specific guidance to candidates on (1) the levels of fitness required for the CPAT and (2) a program of fitness training designed to achieve them.  In response, the City circulated a sample fitness guide including detailed instructions on interval training that it plans to send to Round 3 candidates.  The City has also confirmed that it will advise CPAT training instructors to focus attention on the techniques required for the CPAT events that the Monitor's analysis has found to be associated with the most CPAT failures, including the stairmill, the ceiling breach, and the rescue.  And it has confirmed that it will disseminate additional messaging emphasizing the importance of avoiding excess body weight.

The Monitor has also suggested that the City provide outreach and guidance specifically addressing the training needs of women candidates, who are a disproportionately large segment of Black candidates.[23]

*Targeting Communications*.  In addition to recommendations on the content of communications, the Monitor has also offered suggestions regarding increased targeting of communications relating to CPAT training.  As discussed in detail in Part II.B.4 below, figures

---

[23] A Monitor analysis of candidates with adjusted final average scores of 99 on the Exam 7001 list indicated that approximately 15% of Black candidates in that band were women, compared to 6% of white candidates in the same band.

provided by the City show that the percentages of Black and Hispanic candidates who have signed up for either the Mentor program, the candidate portal, or both exceed the percentages of the same demographic groups who have attended CPAT training.[24]  The candidates who have signed up for the portal or the Mentor program have demonstrated at least some continuing interest in becoming firefighters, and the disparity between portal/Mentor sign-ups and training attendance may suggest that many Black and Hispanic candidates who intend to take the CPAT have not yet attended a single training session.  The Monitor has urged the City to reach out aggressively to candidates in this group, including by encouraging Mentors to communicate the importance of training to their mentees, and the City has indicated that it plans to do so.

b)   <em>Post-CPAT Candidates</em>

Since the Monitor's previous periodic report, the City has continued to run a stairmill-focused fitness training program for post-CPAT candidates, as described above.  The City has also continued to offer its Fitness Awareness Program[25] ("FAP"), which provides a range of fitness training and advice, to all post-CPAT candidates.  These programs are intended to help candidates who have already passed the CPAT to maintain their fitness and prepare for the post-CPAT components of the hiring process that require physical fitness – including the stairmill and weight-requirement components of the Medical Exam, and the pre-Academy run.

Figures provided by the City before the Monitor's last periodic report reflected low attendance at both the FAP and the stairmill training program.  Fewer than 10% of candidates

---

[24] Approximately 46% of both Black and Hispanic candidates have signed up for at least one of the programs.

[25] The FAP is a multi-session program of fitness training for post-CPAT candidates, described in detail in the Monitor's previous reports.  <em>See</em> Monitor's Thirty-Second Periodic Report at 18-19; Monitor's Thirty-Third Periodic Report at 16-17.

invited to the programs chose to attend.  The Monitor plans to work further with the City to develop additional fitness options for these candidates (potentially including stairmill training at recreation centers similar to the training that the City is now making available to pre-CPAT candidates).[26]

        3.    <u>Candidate Communications</u>

        a)    *Pre-CPAT Candidates*

The Monitor has continued to receive and evaluate updates from the City regarding its efforts to engage with the approximately 800 Black and Hispanic candidates expected to be invited to the next round of CPAT testing.

<u>City's May 6, 2022 Communications Plan.</u>  On May 6, 2022, the City circulated a communication plan indicating that it intended to add three Black and Hispanic firefighters to ORR staff, working five-hour shifts from 4:00 to 9:00 pm on three evenings per week, to encourage Black and Hispanic candidates to attend CPAT training.  Their work supplements the efforts of ORR's nine regular civilian staff members.

<u>Targeted Outreach to Candidates.</u>  As previously discussed, the Monitor and the other Parties have expressed concerns that this level of staffing would be insufficient to maintain engagement with the large group of Black and Hispanic candidates (more than 800) invited to training.  In discussions following the June 16, 2022 status conference, the City agreed to provide reports on ORR's communications with candidates showing its calls to Black and Hispanic candidates and the outcomes of those calls (*e.g.*, whether the calls were picked up, and whether the candidates contacted took the action encouraged by the call, such as signing up for

---

[26] As noted above in footnote 17, on July 27, 2022, the City provided participation figures for the stairmill fitness program covering the May-July 2022 time frame. But the City's report does not provide separate attendance figures for pre- and post-CPAT candidates.

CPAT training).  The City delivered its first such report on July 13, 2022 and the second on July 27, 2022.  The July 27, 2022 report lists communications from April 12, 2022 through July 18, 2022, along with the purpose or type of each call (*e.g.*, calls regarding mobile academy events, CPAT information sessions, CPAT training, stairmill training, and the Mentor program).  It also shows the outcomes of calls placed to Black and Hispanic candidates, including whether the call resulted in a "competed dialog" or whether the candidate signed up for a CPAT training session.  And it shows for each call whether the recipient has attended CPAT training.  As reflected in the July 27, 2022 report, the City attempted calls regarding CPAT training to a total of 300 Black candidates and 400 Hispanic candidates between May 26 and July 15, 2022 (including one sequence of calls promoting CPAT training in June, another in July, and additional calls directed to candidates who were "no-shows" to CPAT training[27]).  Results from these calls specifically regarding CPAT training include the following:

- 30 calls to Black candidates resulted in completed dialogs (with 30 unique candidates), and a further 61 calls (with 57 unique candidates) resulted in a sign-up for training.[28]

- 51 calls to Hispanic candidates resulted in completed dialogs (with 48 unique candidates), and 55 calls (with 52 unique candidates) resulted in a sign-up for training.[29]

---

[27] In the June sequence of calls promoting CPAT training, calls were placed to 180 Black candidates and 260 Hispanic candidates; in the July sequence of calls promoting CPAT training, calls were placed to 261 Black candidates and 346 Hispanic candidates.  Regarding CPAT training no-shows, calls were placed to 27 Black candidates and 48 Hispanic candidates.  The City made a total of over 5,000 predictive-dialer calls in these categories.  The City's report shows multiple call attempts to most candidates for each purpose, with the majority of calls going to answering machines.

[28] The Monitor has asked the City to confirm whether calls identified as resulting in a scheduled training session also involve a completed conversation.

[29] Among Black candidates, 77 calls on all topics (to 64 unique recipients) resulted in completed dialogs, and 155 calls on all topics (to 89 unique recipients) resulted in CPAT training sign-ups.  Among Hispanic candidates, 152 calls on all topics (to 114 unique recipients) resulted in completed dialogs, and 161 calls on all topics (to 103 unique recipients) resulted in CPAT training sign-ups.

The Monitor plans to conduct further analyses and request additional information from the City to determine whether the City's phone outreach efforts should be augmented.

The Monitor has asked the City to provide records for additional categories of communications so that the Monitor and the other Parties can evaluate the full range of ORR's communications with Black and Hispanic candidates in the Round 3 CPAT group.  The City's initial report does not include calls received *from* candidates (for example, in response to ORR voice messages),[30] and it does not include communications by text.  The Monitor has asked the City to provide records of these communications in addition to outgoing calls from ORR. Regarding text messaging, given survey findings indicating a preference for text communications among Black candidates (discussed above in Part II.B.1), the Monitor has encouraged the City to ensure that ORR's efforts to reach candidates via phone calls are complemented with text messaging, and the Monitor will continue to seek reports on ORR's text communications with candidates.[31]

June 8 Communications Plan.  The Monitor has also continued to review plans provided by the City outlining its projected schedule of broadcast text and email communications with large groups of candidates at various stage of processing.  The City provided its most recent

---

[30] As discussed in the Monitor's June 23, 2022 letter to the Court, in order to collect and produce outgoing call records as quickly and comprehensively as possible, the City arranged to make all outgoing calls via a predictive dialer.  Calls from the predictive dialer are entered automatically in ORR's ARCS data management system.  Information on incoming calls must be entered into the system manually. Accordingly, the Monitor understands that the City may not be able to produce incoming call data on the same schedule as records of outgoing calls.  Nevertheless, even if delayed, the incoming-call data will help the Monitor evaluate the effectiveness of the City's outreach.  The Monitor is continuing discussions with the City regarding the content and timing of reports on incoming calls.

[31] Supplementing the City's efforts, to date the Vulcan Society has been in contact with over 250 Black candidates whom the City reported had yet to attend a CPAT training session.

version of the plan on June 8, 2022, and the Monitor circulated comments and follow-up requests

regarding the plan on August 1, 2022.

- Regarding the group of candidates in score band 99, who are projected to take the next round of CPAT testing, the plan provides generally for messages regarding CPAT preparation, information sessions, and the Mentor program, and it references messaging on the importance of attending as many sessions as possible.  It also indicates that CPAT workout videos would be pushed out by text in the June-July 2022 time frame.  But the messages are listed in general categories across long time frames (May-August 2022 for messaging re the CPAT training program and June-July 2022 for the workout videos).  The Monitor has asked the City to provide samples of the specific messages that have been and will be communicated, and to specify the frequency with which they are delivered in the listed time frames.

- For groups of candidates expected to be invited to later rounds of CPAT testing, the plan includes messages regarding CPAT training and information sessions in the period leading up to the projected testing dates, but almost no messaging regarding fitness training in the months preceding invitations to training.[32]  The Monitor has recommended that the City add intensive messaging on fitness preparation in the months leading up to CPAT invitations for each group of candidates expected to be called for CPAT – encouraging candidates to establish a base of fitness before beginning CPAT training and providing them with advice on training techniques and routines.

- The Monitor has suggested that fitness messaging include communications targeting women candidates (who make up a higher percentage of Black candidates than of white candidates) with encouragement and guidance on achieving and maintaining the required levels of strength and aerobic fitness.

- The Monitor has also continued to recommend that messaging to candidates awaiting CPAT call-ups should include processing updates with estimates of the dates on which different groups of candidates can expect to be invited to take the CPAT.  The City has indicated that it plans to provide updates of this type after it has the results of the upcoming round of CPAT testing.[33]

---

[32] The plan includes a general message encouraging candidates to review information on the JoinFDNY candidate resources page and the candidate portal to "help prepare for the medical exam, including the new Stairmill test."  The City's plan indicates that the message was sent to all candidates in or above the 95 score band in April of 2022, and is scheduled to be sent to candidates in the 98 band in October 2022.  But the plan includes no messaging specifically urging candidates to build fitness for the CPAT, or directing them to training resources, in the months before they are called for the test.

[33] The June 8, 2022 plan includes updates identifying the group of post-CPAT candidates expected to be processed for the next Academy class, but no longer-term projections for post-CPAT processing and no projections indicating when different groups of pre-CPAT candidates are expected to be invited to take the CPAT.

In addition to these recommendations, the Monitor notes that the City's June 8, 2022 plan does not include any communications later than January 2023 with pre-CPAT candidates regarding the hiring process.  The Monitor has repeatedly urged the City to develop and implement a long-term ORR communication plan tailored to candidates who have reached different stages of processing and who occupy different positions on the list, with different wait times for CPAT, further processing and potential appointment to an Academy class.  *See* Monitor's Thirty-Sixth Periodic Report at 20; Monitor's Thirty-Third Periodic Report (Dkt. # 1844) at 19-20; Monitor's Twenty-Eighth Periodic Report (Dkt. # 1932) at 18-20; see also Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 12-14; Monitor's Status Report Regarding CPAT Testing (Dkt. # 1866) at 17.  The Monitor continues to urge the City to establish a long-term plan with a full range of processing updates, motivational messaging, and fitness guidance tailored for all the differently situated groups of candidates it anticipates calling off the Exam 7001 list.

### b)      *Post-CPAT Candidates*

The City's June 8, 2022 plan includes communications targeting candidates who have already passed the CPAT or are expected to pass future rounds of CPAT testing.  For these candidates, the plan includes administrative communications concerning appointments for the CID[34] intake process and the Medical Exam, along with invitations to the FAP and the stairmill training program.  As previously reported, on April 29, 2022 the City also provided the latest iteration of its plan for motivational communications with post-CPAT candidates, which includes messages of encouragement, some fitness-related messaging, and projections of post-CPAT processing for different groups of candidates.  Monitor's Thirty-Sixth Periodic Report at 20.  The

---

[34] The FDNY's Candidate Investigation Division

plan is the City's latest of several attempts to show compliance with the messaging requirements of the Court's June 9, 2022 Order, which provides, in relevant part,

> The City is directed to communicate, via the FDNY Office of Recruitment and Retention, not less than once a month with all Black and Hispanic candidates who have already passed the CPAT examination, with reasonable estimates of when they might be called for further steps, and encouragement to remain in the FDNY hiring process.

June 9, 2021 Order at 12.  The latest plan appears to include messaging to the remaining post-CPAT candidates (those who have not yet completed processing) on the topics and with the frequency required by the June 9 Order.  It also provides some messaging intended for candidates expected to pass the CPAT in the upcoming Round 3.  However, as noted in the Monitor's previous report, the vast majority of candidates who were in the post-CPAT group in June 2021 had already entered or completed post-CPAT processing before the City produced its most recent plan.  Monitor's Thirty-Sixth Periodic Report at 20.  Further, the latest iteration of the plan includes no messaging later than April of 2023, and it does not provide for communications tailored to groups of candidates who will wait to begin processing beyond that time.  The Monitor has emphasized that the City must develop a suitable, long-term, properly tailored motivational communication plan for differently situated candidates within the large group expected to be called for CPAT and enter post-CPAT processing within the next few months.

In addition to the City's plans for text and email communications with post-CPAT candidates, the Monitor has also continued to receive updates on the work of ORR's staff of Outreach Coordinators – firefighters detailed to ORR to engage with candidates in post-CPAT stages of processing.  In a June 8, 2022 message, the City advised that the current group of Coordinators included three Black firefighters (two full-duty and one light-duty), and one full-duty Hispanic firefighter.  The City's update indicated that Coordinator efforts are also supported

by three additional light-duty firefighters who also perform other tasks.  As reported by the City, the Coordinators focus their communications on Black and Hispanic candidates in active processing – those whose list numbers have become eligible for intake processing by CID and for the Medical Examination.  Coordinators are tasked with ensuring that candidates are informed and prepared for their intake appointments, and they encourage candidates to attend (or continue attending) the FAP and stairmill fitness training programs.  The City reports that Coordinators reach out weekly to candidates with scheduled intake and Medical Exam appointments, and every 30 days to candidates who are in pending status for the Medical Exam. Coordinators also encourage candidates to attend training for the pre-Academy run, and they reach out to candidates who fall off the active eligible list but are eligible to be restored – to inquire whether they are interested in returning to the active list.[35]

The Monitor continues to believe that in addition to these contacts with candidates in active processing, Coordinators should also be asked to engage with Black and Hispanic post-CPAT candidates who have not yet been invited for intake or the Medical Exam.  Currently, the Monitor understands that few candidates, if any, fall into this category.  But once the next round of CPAT testing is completed, there will be a new group of CPAT passers, some of whom will not immediately enter active processing.  Coordinator outreach should extend to all post-CPAT Black and Hispanic candidates, including those who may have long wait times before entering

---

[35] In addition to text and email communications and the efforts of Outreach Coordinators, the City has also reported on further use of WebEx conferences to communicate with post-CPAT candidates.  On August 4, 2022, the City reported that it planned to hold two such conferences – on August 5 and 7, 2022. The Monitor has previously encouraged the City to continue and expand the use of WebEx conferences to provide information on the hiring process and guidance on fitness training.  Monitor's Thirty-Sixth Periodic Report at 21.  The Monitor intends to follow up with the City to obtain more information about the August 5 and 7 conferences and any plans for further similar events.

further processing, and the City should provide sufficient Coordinator staffing to maintain engagement with this entire group.

### 4.   Candidate Portal and Mentor Program

On June 16, 2022, the City confirmed that it had completed a series of modifications to the candidate portal.  These include making the "Home" tab of the portal more individualized, along with a reorganization of other tabs to present information more clearly and in a format that aligns more closely with the sequence of steps in the hiring process.  They also include changes intended to present information on reminders and requirements more clearly, along with new features that will allow candidates to see when the Department has received required documents and when their background investigation is complete.  The Monitor has also recommended that the portal include processing updates showing when candidates in specific list-number groups can expect to enter specific phases of processing.  Currently the portal includes information identifying the group of candidates currently in active post-CPAT processing, but it does not provide any additional estimates or projections.  The City has indicated that it plans to add more information once the upcoming round of CPAT testing is complete and the City knows how many new candidates have passed the CPAT and are available to begin later stages of processing.

The City has also continued to provide updates on the rollout of an application developed to track Mentor contacts with mentees.  The application was launched on March 30, 2022, and the City previously reported that Mentors have been trained on the application and have been using it to make weekly reports on their communications with mentees.  Monitor's Thirty-Sixth Periodic Report at 25.  However, the City has advised that reporting tools that would enable the application to generate reports based on the Mentors' input have yet to be developed, and the City has not yet provided a timeline for completion of that work.

On August 3, 2022, the City provided the following figures showing sign-ups for the portal and Mentorship programs among candidates expected to be invited to the next round of CPAT testing (and already invited to CPAT training), broken down by demographic group:

| | Active on Portal, Not Mentorship | On Mentorship, Not Portal | Active in Both Mentorship and Portal | Not on Portal, Not on Mentorship | TOTAL |
|---|---|---|---|---|---|
| Asian | 15 (13.6%) | 12 (10.9%) | 21 (19.1%) | 62 (56.4%) | 110 |
| Black | 34 (9.1%) | 63 (16.8%) | 75 (20.0%) | 202 (54.0%) | 374 |
| Hispanic | 65 (12.5%) | 79 (15.2%) | 94 (18.1%) | 282 (54.2%) | 520 |
| Native American | 1 (8.3%) | 0 | 3 (25.0%) | 8 (66.7%) | 12 |
| White | 118 (13.3%) | 90 (10.2%) | 151 (17.1%) | 526 (59.4%) | 885 |
| TOTAL | 233 (12.3%) | 244 (12.8%) | 344 (18.1%) | 1080 (56.8%) | 1901 |

The City's figures indicate that only about 46% of Black and Hispanic candidates have signed up for either the portal or the Mentorship program. Only 20% of Black candidates and 18.1% of Hispanic candidates are participating in both programs. The figures suggest strongly that the City should engage in more outreach to persuade candidates to sign up for these programs.

As previously reported, figures for post-CPAT candidates provided April 27, 2022 indicated that 68% of Black candidates were signed up for both the Mentor program and the portal. Given that these candidates had by definition already passed the CPAT and moved on to later phases of processing, this figure also suggested that additional efforts were needed to encourage candidates to sign up. *See* Monitor's Thirty-Sixth Periodic Report at 25.[36]

---

[36] On August 4, 2022, the City reported that it planned to hold a "Mentor/Mentee Day" at the Fire Academy on August 6, 2022, with invitations to all mentees who had already been matched with a Mentor and to all candidates in the 99 score band.

C.     Analyses of the Exam 7001 Recruitment Campaign

1.     Overview of Analysis and Planning

The City's establishment of a sustainable process for successfully recruiting and retaining

Black and Hispanic firefighter candidates is a central goal of the Modified Remedial Order and

the Monitorship.  *See* Modified Remedial Order ¶¶ 31-36.  The Court specifically found that a

policy or practice that "fails to adequately recruit black persons to become firefighter candidates

serves to maintain and perpetuate the effects of the City's discrimination against black firefighter

candidates."  Findings of Fact (Dkt. # 741) at 33.  As the Court and Monitor have emphasized

from the very outset, as a foundational tool for accomplishing these goals, the City must use –

and must demonstrate that it has processes to ensure the ongoing use of – data-driven analyses of

the outcomes of its past recruitment efforts to identify which initiatives are the most productive

and cost-effective means of attracting non-traditional candidates likely to achieve reachable

scores on the firefighter examination and ultimately be appointed as firefighters.  *See, e.g.,*

Monitor's Recruitment Report to the Court (Dkt. #1464) at 40-44; Monitor's Fifteenth Periodic

Report (Dkt. #1649) at 5 (compiling additional citations).

In its February 21, 2021 request for an extension of the Exam 7001 list (at 1), the City

noted "the need to ensure sufficient analysis and planning prior to the commencement of the

recruitment campaign for the next exam" as one of the grounds for its request for the Monitor's

approval to extend the list.  The schedule the City proposed in its list-extension request projected

that the next recruitment campaign (assuming a two-year extension) would begin in April 2023,

with the next examination taking place in the summer of 2024.  As noted in previous reports, the

Parties and the Monitor have estimated that planning for the next campaign will require

approximately eleven months once the after-action analyses of the Exam 7001 campaign are

completed.  *See*, *e.g*., Monitor's Thirty-Sixth Periodic Report at 33.  Unless the City has already

43

begun this planning, this schedule will need to be changed or expedited.  As noted in multiple previous reports, the Monitor, the Court, and the other Parties have obtained the City's assurance that "the next recruitment cycle will not begin until the requested analyses have been completed *and incorporated into a comprehensive plan of action*."  Monitor's Thirty-Third Periodic Report at 24 (emphasis added); *see also* Monitor's Thirty-Fourth Periodic Report (Dkt. # 1861) at 27; Monitor's Thirty-Fifth Periodic Report at 35.  The Monitor emphasizes that the City will not be permitted to embark on its next recruitment campaign if it has not developed a satisfactory recruitment plan that incorporates and accounts for findings from the after-action analyses and assessments conducted by the City, its consultants, and the Monitor.

### 2.    City's After-Action Report and Cost-Effective Report

As described in the Monitor's previous reports, the City provided the Monitor and the other Parties with an initial report on the effectiveness of the Exam 7001 recruitment campaign (the "After-Action Report") in November 2018 and an updated version on October 2, 2019, following comments from the Monitor and the other Parties.  Monitor's Twenty-Ninth Periodic Report at 35-36.  The City separately provided its "Cost Effective Analysis" on October 23, 2019.  *Id*. at 36.  While the City's reports contained a number of useful analyses, they did not include critical investigations of the relative effectiveness of different initiatives in recruiting reachable non-traditional candidates.  *Id.* at 37.  The City also did not collect or preserve important categories of information related to costs, which the City acknowledged placed limits on the analysis of expenditures and returns on investment.  *Id*. at 38.

### 3.    Monitor's After-Action Report

As previously reported, following discussions at the October 2020 Court conference, with the City's agreement, the Monitor's expert developed analyses based on information provided by the City.  Monitor's Thirty-Sixth Periodic Report at 34.  The Monitor discussed after-action

analyses with the Parties in a series of reports and meetings from July 2021 to July 2022.  The

Monitor's assessment includes analyses of the relative effectiveness of several components of the

recruitment campaign in reaching non-traditional candidates – including FDNY recruitment

events; mobile academy events and exam tutorials; ORR communications; filing period

extensions; and engagements and reminders at each step in the process.  The Monitor's focus

was on areas of inquiry that can lead to actionable insights to help guide the City's planning for

the next campaign.  For example, the Monitor sought to determine the relative effectiveness and

efficiency of recruitment events by characteristics such as event type, borough, date, and

staffing, and to draw actionable insights (*e.g.*, which event types and event locations were most

successful) where the data were clear enough to provide them.

### 4.   KPMG's After-Action Report

As noted above, in September 2021, the City retained KPMG to augment the City's own

after-action and cost-benefit analyses.  The KPMG report, circulated by the City on May 9, 2022,

provides a review of comments from the Monitor, the United States, and Plaintiffs-Intervenors; a

literature review of recruitment processes for public and private entities, including other public

safety organizations; a program evaluation logic model; and various analyses of the City's data.

KPMG generally concluded, based on a literature review, that the FDNY employed a

number of previously identified best practices – including early, targeted outreach; diverse

recruitment teams and events; streamlining the hiring process and auditing it for disparate

impact; assigning mentors with similar background or identity; and an inclusive climate.  KPMG

also included a logic model (somewhat like a flow chart) showing in general terms how an

organization can relate possible "inputs" (available resources, such as outreach budget and staff),

suggested outcomes (program goals), and evaluation questions (queries to explore effectiveness).

In terms of data analysis, as was unfortunately the case for both the Monitor's and MAP's[37] prior analyses, KPMG's analysis was restricted to varying extents by gaps and limitations in the City's data, particularly data that the City's outside advertising vendor has not made available and cost data that the City did not keep, despite having been requested to do so. *See, e.g.,* KPMG Report at 54-55 (noting that the City did not maintain many data points needed to develop particular actionable recruitment insights, including "LCP"[38] demographic information, more complete cost and hours information for recruiters for each outreach event, recruitment training hours per staff, frequency and type of mentor engagements, and results of post-hire candidate surveys"). The lack of detailed data regarding the costs of specific recruitment events and initiatives has limited (and in some instances prevented) the cost-effectiveness component of the analyses.

For the most part, KPMG's findings are in line with prior findings by the Monitor and City, although there are some key differences between KPMG's data analyses and those of MAP and the Monitor. First, because KPMG began its work after enough candidates had achieved final hiring outcomes for those outcomes to be included in the analysis, the Monitor asked the City to have KPMG focus its analyses on which recruitment activities were most likely to recruit candidates who ended up being hired, as opposed to candidates who achieved reachable scores on the written examination.

Second, whereas the Monitor and MAP included data for all candidates in most of their analyses, some of KPMG's analyses focused on a much smaller pool of candidates: those who

---

[37] The FDNY's Bureau of Management Analysis and Planning

[38] An LCP (lead capture) is a record capturing details from a potential lead, collected from a web page form. During the Exam 7001 recruitment campaign, LCPs were collected by the vendor the City engaged to conduct its digital campaign.

took the Exam 7001 optional survey administered by the City in 2019 and were able to be matched back to their recruitment ID number.  Analyzing the data for these candidates allowed KPMG to include some useful data points (*e.g.*, education level) in its analyses.  But because only 15% of individuals who filed to take the exam completed the optional survey, the sample size for the KPMG report was much smaller than the overall applicant pool, which may have affected the extent to which the analyses are representative of or applicable to the broader applicant or candidate population.  For example, there are likely to be meaningful differences between candidates who opt to take an optional survey and those who do not.

The third significant difference between the reports is that the Monitor and the Monitor's expert examined the data event by event, focusing on the race/ethnicity of attendees by both number and proportion.  KPMG, by contrast, examined the data candidate by candidate, to discern which events successful Black and Hispanic candidates had attended.  This led the reports to define success differently.  The Monitor's analysis defined the success of an event for recruitment purposes not only by the number of reachable Black and Hispanic candidates recruited by that event, but also by the relative proportion of Black and Hispanic candidates within the total group of candidates recruited at a given event – *i.e.* whether the group recruited at the event included a higher or lower percentage of non-traditional candidates.  KPMG's methodology, by contrast, determined success based on the attendance of successful Black and Hispanic attendees per event, without consideration of whether an event drew in a large number of white attendees as well.

The Monitor continues to believe that the FDNY should consider both the number and the proportion of Black and Hispanic candidates that result from a given effort in determining which recruitment approaches to pursue.  Based on past experience, many candidates from

47

populations that have longstanding ties to the FDNY apply for entry level firefighter positions with little to no encouragement by the FDNY.  In striving to make the FDNY population more representative of the community that the FDNY serves, it is necessary to draw in applicants from other communities not only in larger numbers but in larger percentages.

The Monitor and the other Parties circulated comments and questions about the KPMG report on June 13-14, 2022.  The Monitor and the Parties participated in a call with KPMG on June 22, 2022 during which the other Parties asked a number of questions on several topics, including plans to operationalize the information and recommendations in the KPMG report, the role KPMG and/or the report will play in the development of the next campaign, and the timeline for developing and executing the campaign.  The Monitor has asked the City for an update on its current activities and plans.

Focus Groups / Interviews.  As reported in previous periodic reports, on February 14, 2020, the Monitor requested that the City make a small number of active firefighters available for focus groups to discuss their experience with the Exam 7001 recruitment campaign, and the Monitor provided the City with a detailed description of and questions for the intended focus groups on March 9, 2020.  As previously reported, the Monitor held off on pursuing that request during the height of the initial wave of COVID-19 infections, but once all active-duty firefighters were required to be vaccinated and the City's operations had recovered to a suitable extent, the Monitor repeated the request.  Monitor's Thirty-Sixth Periodic Report at 36-37.  Since the last periodic report, the City has taken the position that it would prefer interviews to focus groups and that it would like its vendor, ideas42, to conduct the interviews.  The proposed timeline would have ideas42 submit its report to the City at the end of November.  The Monitor has agreed in principle to the City's preferred approach and extended timeline for a report, on the

condition that the Monitor and its experts have input into the questions and either participate in or be among those who observe the interviews. It is also possible that the Monitor will conduct its own focus groups. Discussions between the Monitor and the City on all these points are ongoing.

      <u>Next Steps on Data Gathering and Analysis.</u> While the City has primary responsibility for completing its own after-action and cost effectiveness analyses and creating a blueprint for the next campaign, the Monitor and the Monitor's experts will, of course, provide whatever help the City or its consultants request. And the Monitor expects that the City will also continue to provide the Monitor with data and information as needed to enable the Monitor to perform whatever work may be needed to complete its own analyses, to monitor the City's analytical work, and to carry out the Court's January 2020 Order to mediate the Parties' dispute concerning the sufficiency of after-action and cost effectiveness analyses as a prerequisite to the next campaign. The Monitor and all Parties agree that the City must complete these analyses in time to use the results to inform the City's strategies for the next recruitment campaign, and the City has acknowledged that they are a critical pre-requisite for that campaign and that the Monitor and Parties will have opportunities to provide input as the City develops the campaign plan.

      **D.**    **Working Group**

      The Working Group Committee was established with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters." Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e). The Monitor has continued to receive updates on the two principal Working Group initiatives – the FDNY Fire Cadet program and the FDNY Explorer program, which have been described in detail in previous reports. *See* Monitor's Fourteenth Periodic Report (Dkt. # 1651) at 13-14; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 11-12; Monitor's Nineteenth Periodic

Report (Dkt. # 1761) at 17-18.  The City previously reported that the timeline for further work toward the launch of the Fire Cadet program was contingent on the scheduling of the next promotional firefighter exam, which remains to be determined, *see* Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 22-23; Monitor's Thirty-Sixth Periodic Report at 37.  The City reports that it has nevertheless been able to resume some efforts connected to the program, including training recruiters and conducting outreach events.  The City previously reported that the Explorer Program had resumed regular in-person meetings and/or community service for all of its eight Posts, Monitor's Thirty-Sixth Periodic Report at 37; and in an August 4, 2022 update it reported that those activities continue.

## III.   **EEO**

The Monitor has continued to work with the City, in consultation with the other Parties, on initiatives relating to EEO messaging, compliance, and investigations.  Recent activities have included discussions of several measures intended to ensure that FDNY uniformed leadership at all levels are equipped to manage diverse workplaces effectively and that they play an active role in cultivating and maintaining a professional and inclusive climate within their commands.

As noted in the Executive Summary, following a series of discussions, on June 15, 2022 the City agreed in principle to adopt a number of the Monitor's recommendations to improve EEO climate and accountability, while objecting or reserving its position on other recommendations.  Several of the specific recommendations are discussed below in the areas of EEO messaging and compliance to which they apply.  The Monitor plans to convene a further meeting with the City and the other Parties to establish specific steps and a timeline for the implementation of those to which the City has agreed, and to discuss the City's concerns regarding the recommendations to which it has objected.

50

## A.      EEO and Related Staffing

EEO Office.  The City continues to make efforts to address the shortfall in EEO staffing described in previous periodic reports, which has important implications for, among other things, the City's ability to conduct thorough and timely investigations of alleged EEO violations.

As most recently reported by the City, the FDNY EEO Office currently includes eight attorneys (the Assistant Commissioner, four Investigative Attorneys, one intake attorney, one "RA" attorney (assigned to handle requests for accommodations), and one Training Coordinator. The current EEO office staff is thus eight attorneys short of its pre-pandemic level of 16 attorneys, and both of the two Deputy Director positions in the Office's pre-pandemic roster are currently vacant (although a candidate for one of the Deputy Director positions just accepted an offer and is expected join the staff soon).  The staff of four investigators is four short of the eight investigators handling cases in mid-2019.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 24.

Since the last periodic report, the City has been actively seeking to hire attorneys for three of the vacancies.  Its offer to a candidate for the Deputy Director position was just accepted, and it is currently conducting interviews for two investigative attorney positions.  The City has advised that additional vacant positions will be posted as soon these three positions have been filled, and it has continued to assure the Monitor that it intends to fill the remaining open positions and bring EEO attorney staffing up to its pre-pandemic level as quickly as qualified candidates can be identified.

In addition to the staff of attorney investigators, the EEO Office has recently brought on an FDNY Lieutenant, who has been detailed to the Office to assist in providing investigators with background information for their investigations – including information on firehouse practices, terminology, and culture.

Because the investigative work of the EEO Office is conducted entirely by its attorneys (along with their other responsibilities such as firehouse inspections and EEO training), the number of attorneys on staff is a major factor in its ability to investigate EEO matters promptly and effectively; and staffing increases completed in 2018 played an important role in improving the functioning of the EEO Office and shortening the duration of investigations.  *See* Monitor's Thirtieth Periodic Report at 33; *see also* Monitor's Twenty-Fourth Periodic Report at 36 (noting the expectation that increased staffing would reduce the duration of EEO investigations); Monitor's Twenty-Eighth Periodic Report at 45 (noting some improvement in the duration of cases following the 2018 staffing increase).  Among cases initiated in 2019 and identified by the City as requiring substantial investigations, three of 12 cases required more than 90 days to complete.  For the same category of cases initiated in 2021, as of July 19, 2022, 12 of 15 cases reported to the Monitor exceeded 90 days in duration.[39]

In September 2019, when the EEO Office had 16 attorneys, the City reported that the average caseload for investigators was five to ten cases.  Monitor's Thirtieth Periodic Report at 34.  As most recently reported by the City (on August 4, 2022), the average investigator caseload is 14 (taking into account cases that will be reassigned, in part because of the separation of an additional attorney within the preceding few days).  The City reports that some cases have been reassigned to the reasonable accommodation request attorney, training coordinator and Assistant Commissioner to make up for the loss of staff and coverage.

The City has acknowledged that reduced staffing levels have prevented the EEO Office from completing investigations in a timely fashion.  The Monitor encourages the City to return attorney investigator staffing at least to pre-pandemic levels as soon as possible.

---

[39] Among 19 cases initiated in 2020, 12 exceeded 90 days in duration.

CDIO Vacancy.  The Monitor has continued to encourage the City to fill the CDIO position, which has been vacant since July 23, 2021, as soon as possible.  The CDIO has an important role in efforts to make FDNY culture more inclusive, and it is concerning that the position has remained vacant for more than a year. [40]  As discussed in previous reports, the City has advised that until a new CDIO is hired, CDIO projects are being managed on an interim basis by other senior civilian FDNY personnel.  Monitor's Thirty-Fourth Periodic Report at 36.

### B.    Policies, Strategic Planning, Messaging, and Training

Officer Involvement.  The Monitor has long emphasized, based on a review of best practices and the views of the Monitor's and City's experts, the importance of the involvement by senior uniformed leadership in messaging and other EEO efforts.  The Monitor's January 18, 2022 recommendations (and the subsequent, condensed list of recommendations circulated May 4, 2022) included a proposal that the FDNY establish an EEO working group bringing together top-level uniformed and civilian leadership, including operational commanders, the Fire Commissioner, the CDIO, and the EEO Assistant Commissioner.  The goal of the working group would be to develop messaging, specifically including messaging that integrates themes of diversity and inclusion with those of professionalism, leadership, and the mission of the FDNY. It is hoped that the working group would also develop training initiatives, discuss issues relating to EEO climate and workplace culture, and assess progress in addressing EEO-related issues. The City has agreed in principle to establish the working group, and the Monitor expects to engage further with the City in the near term regarding its composition and the implementation of the Monitor's proposal.

---

[40] The City was required to create the CDIO position under the Disparate Treatment Settlement, which the City entered into with Plaintiffs-Intervenors, and Plaintiffs-Intervenors have also voiced serious concern that the position has remained unfilled.

In its recent responses to the Monitor's May 4, 2022 summary of pending EEO recommendations, the City advised that the Assistant Commissioner planned to conduct periodic meetings with Deputy and Battalion Chiefs regarding EEO-related topics; and in recent discussions, the Assistant Commissioner confirmed to the Monitor that he has begun regular consultations with Division commanders to discuss issues relating to EEO climate, compliance, and messaging.  The Assistant Commissioner has also engaged in discussions with FDNY officers to "workshop" planned messaging regarding the role of the EEO Office (discussed below).

Long-Range Communications Plan.  As previously reported, the City has postponed development of a long-range plan for EEO Office communications until the analysis of the EEO workplace climate survey is complete.  Monitor's Thirty-Second Periodic Report (Dkt. # 2004) at 29; Monitor's Thirty-First Periodic Report at 29-30.  Now that the climate survey analysis is nearly complete and a report is being drafted, the Monitor expects the City to proceed promptly to develop a long-term EEO communication plan, as one of the key action items to address issues identified in the survey.  Informed by the climate survey, the plan should specify strategic goals, key messages, target audiences, channels of communication, and persons responsible for delivering specific messages.  Monitor's Thirty-Fifth Periodic Report at 46.  As reflected in the Monitor's May 4, 2022 list of recommendations, the Monitor has also suggested the continuation of past initiatives:  involving senior leadership in communications (for example, in a continued program of video messaging[41]); in-person messaging by operational commanders; and

---

[41] As discussed in previous reports, the City initiated a program of "voice announcement messaging" with a video message from senior leadership in September 2018 (Monitor's Twenty-Ninth Periodic Report at 51), but the program was then inactive for approximately two years.  Training videos on operations during civil unrest and on "Authentic Trust" (presented in 2020) appeared to represent a revival of this initiative,

mechanisms for gathering feedback from members and confirming that messages are delivered forcefully and effectively.  The City has agreed in principle to the Monitor's recommendations in this area.

 Additional Messaging Initiatives.  In the absence of a long-term strategic messaging plan, the EEO Office has continued to work on a limited number of smaller messaging projects addressing discrete EEO-related topics.  In recent discussions, the City has updated the Monitor on revived plans to issue messaging regarding EEO resources and the role of the EEO Office.  Consistent with longstanding Monitor recommendations, the City has advised that the messaging will include a general summary of its investigative and enforcement activities as well as the cumulative numbers of investigations, their status and outcomes, and the types of violations involved.  The City has indicated that it expects to complete drafts of the materials for this initiative shortly, and the Monitor looks forward to reviewing the materials as soon as they can be provided.

 In response to an issue raised by Plaintiffs-Intervenors regarding public reports of an individual engaged in public protests wearing gear identified with the FDNY,[42] the City has advised that it plans to issue a statement reinforcing Department policy regarding the use of

---

and the City previously indicated that CDIO planned to roll out additional videos on an annual basis, in a series focusing on "tenets of inclusion."  Monitor's Thirty-Fourth Periodic Report at 36-37.  The Monitor has encouraged the City to develop and distribute frequent additional messaging in this category.  Monitor's Thirty-Fifth Periodic Report at 38.  The Monitor has also continued to seek confirmation from the City that the FDNY is capable of verifying attendance at firehouse video presentations.  In its August 4, 2022 comments on a draft of this report, the City reported that the CDIO Office has continued to issue regular monthly messaging, host celebrations with affinity groups, and create training content.  The City also reported that the CDIO Office is moving forward with its "We Are FDNY" multi-media campaign and projects the next iteration will be released this fall.  The Monitor plans to seek further information on these training and messaging initiatives and request copies of relevant materials.

[42] The reported incident involved an individual unaffiliated with the FDNY engaging in an anti-abortion protest while wearing clothing bearing FDNY markings.

FDNY uniforms, equipment, or other gear associated with the Department in connection with public protests and political advocacy, including statements on issues of race and gender.  As discussed in previous reports, the Monitor has continued to encourage the City to respond decisively in appropriate cases to reports of violations of policy, even while investigations are in progress and before the disciplinary process is complete.  Plaintiffs-Intervenors have also urged the City to issue messaging regarding EEO  Office findings substantiating violations before the disciplinary process is concluded.[43]

In regular discussions with the EEO Assistant Commissioner, the Monitor has continued to receive updates regarding the Department's messaging connected to EEO cases.  As explained by the City, the content and target audience for such messaging depends on the nature of the case.  Factors include whether the conduct at issue provides an instructive example for use in reinforcing policy messages; the need to maintain the confidentiality of complainants, respondents, and proceedings; and whether messaging or supplementary training is best focused on the workplace concerned or on a broader, potentially Department-wide audience.  The Monitor will continue to gather reports from the City on its case-by-case decision-making with respect to this type of messaging.

The City has also advised that it plans to include anonymized references to investigations and disciplinary actions, along with cumulative descriptions of EEO investigative activities, in future communications reemphasizing specific EEO policies.  It issued the first such statement (regarding sexual harassment policy) in July and has advised the Monitor that the next planned communication will cover policies regarding social-media-based violations.

---

[43] When an EEO investigation substantiates an alleged violation, the case is referred to the FDNY's Bureau of Investigations and Trials ("BITS") for disciplinary proceedings.

C.    **Assessment and Accountability**

1.    Officer Performance Evaluations

The Monitor has continued efforts to evaluate the implementation of the EEO metric that was added to FDNY officer performance reviews in 2018,[44] and to determine whether the EEO Office provides input for officer evaluations in all appropriate cases.  But those efforts have been hampered by the City's continuing failure to produce essential information pursuant to longstanding Monitor requests.  The City still has not produced evaluation data from the 2020 and 2021 cycles of officer performance reviews; and it still has not responded to related questions from the United States and Plaintiffs-Intervenors regarding the performance review process and outcomes.

2019 Review Cycle.  As discussed in the Monitor's prior reports, the City produced all but ten performance reviews for the 2019 review cycle on June 16, 2021.  That was the first cycle since the FDNY introduced an EEO metric that covered a full year of officer performance (2018) and included evaluations for all company officers.[45]  *See*, *e.g.*, Monitor's Thirty-Fifth Periodic Report at 50 & n.33.  The City has confirmed that the 2019 reviews contained multiple ratings where there should have been only one per officer, and that relevant guidance and forms had been revised to prevent confusion in future evaluations.  *Id*. at 50.  In a September 29, 2021 message, the Monitor asked the City to specify when the revised guidance and forms became effective (specifically whether they were in use for the 2020 cycle of ratings).  The Monitor also

---

[44] The metric was first introduced for Lieutenants' reviews in February 2018, and later in 2018 as a component of performance reviews for Captains.  Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 32; Monitor's Twenty-Fourth Periodic Report at 32; Monitor's Twenty-Third Periodic Report (Dkt. # 1844) at 29.

[45] The information provided to the Monitor includes no personal identifying information and was not shared with the other Parties.

asked the City to explain how "mixed" ratings from previous cycles will be interpreted for the Department's internal purposes (*i.e.* what rating officers with both "superior" and "satisfactory" ratings will be deemed to have achieved).  *Id*.  The City provided its response on an August 4, 2022 conference call with the Monitor and the other Parties.

As previously reported, on October 13, 2021, the Monitor asked the City several questions about performance evaluations for officers in several workplaces that were associated with alleged and/or substantiated EEO violations, and where EEO investigative records contain evidence potentially relevant to officers' management practices and EEO performance.  *Id*. at 50-51.  The Monitor asked the City to confirm and explain some of the ratings associated with these workplaces, including some instances where ratings appear to be missing from the data set.  The Monitor also identified several cases as representative examples of the type of case where EEO investigations should assess officer conduct and management practices, and where performance evaluations by raters should be informed by EEO Office input based on that assessment.

The City responded to the Monitor's October 13, 2021 message on April 28, 2022.  The City's responses resolved the majority of the Monitor's requests for information, and the City promised to follow up regarding two items that remain outstanding.  Based on the Monitor's review of the records from the 2019 cycle and the City's responses to the Monitor's queries, the rating process for that cycle did not incorporate input from the EEO Office regarding officers' management practices in all appropriate cases.  Once the City produces records from later review cycles, the Monitor hopes they will reflect more extensive EEO Office involvement, in accordance with Monitor recommendations, and that officer conduct and management practices are fully evaluated in all cases.

Record-Keeping and Data Analysis Practices.  To date, the City still has not produced a

full set of performance review data and documentation of EEO input from the 2020 and 2021 cycles.[46]  Since the last periodic report, the Monitor has continued to ask the City to specify a projected delivery date for these records, but the City has been unable to do so.  On a March 11, 2022 conference call with the Monitor, the City advised that it planned to hire three temporary employees to complete the data entry needed for the City to produce the requested compilations of data for these cycles, and that it would be able to state a projected delivery date as soon as they began work; but to date only one such temporary employee has been hired, and that employee did not begin work until July.[47]  On recent conference calls with the Monitor's team, the City indicated that it was reallocating some personnel to assist the EEO Office in compiling and producing the requested information, and that it intends to complete production of information from the 2020 cycle of evaluations by the end of the summer.  On an August 4, 2022 conference call, the City advised that would produce data from the 2021 cycle by the end of 2022.  If the City does not produce data from the 2020 cycle as projected, the Monitor will ask the Court to set definite dates for production of data from the 2020 and 2021 cycles, to be enforced by appropriate sanctions.

The delays in the City's production of performance review data are in part due to the Department's practice of maintaining the performance review records only on paper, and separately from other data, such as officers' demographic information and years of seniority, that the Monitor has requested.  These record-keeping practices have meant that performance review

---

[46] Evaluations from the 2020 cycle (covering performance in 2019 and, for Captains, a portion of 2020) will be the first set of evaluations that could reflect the Monitor's October 2019 recommendations.  And reviews from the 2021 cycle (covering performance in 2020 and a portion of 2021) are the first set covering a full year of officer performance following those recommendations.

[47] The City advised the Monitor of the new hire on July 15, 2022.

data must be compiled and cross-referenced with demographic and seniority data manually.  The City has advised that for future cycles (beginning with 2023), the City has set up a system that will allow raters to enter their ratings electronically, and that will permit ratings to be retained and managed in a database in which they can be cross-referenced digitally with information on officer demographics and years of service.  In recent discussions, the City also confirmed that the system will retain records of EEO Office input regarding officer ratings.[48]

The City has not yet responded to questions that have been outstanding for several months – summarized in the Monitor's previous reports – regarding its procedures for analyzing patterns in officer performance and the types of performance review data and analyses that the City will share with the other Parties.[49]  *See* Monitor's Thirty-Fifth Periodic Report at 51-52.  The Monitor has also asked the City to provide the other Parties with cumulative figures showing the ratings for officers in workplaces associated with EEO investigations.[50]  But that request also remains pending.

Importance of Constructive Use of EEO Metric.  Effective use of the EEO metric in officer evaluations is one of the most important and potentially powerful tools in the City's

---

[48] Although the new system was not ready for use in time for the 2022 cycle of evaluations (which was completed in June), the City expects that its cross-referencing feature will facilitate the production of data from the 2022 cycle:  although staff will need to transcribe the 2022 ratings into the system manually, once they have done so, the system will cross-reference ratings automatically with information on demographics and seniority.

[49] Previous communications relating to these issues are recounted in detail in the Monitor's most recent reports.  Monitor's Thirty-Fourth Periodic Report at 40 n.21; Monitor's Thirty-Third Periodic Report at 38-39; Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report at 36-37.

[50] The Monitor has asked the City to state (1) the number of ratings in each category (Satisfactory, Unsatisfactory, or Superior) for officers in workplaces where there were EEO complaints or inquiries and (2) whether the EEO Office provided input for the evaluations of those officers.  *See* Monitor's Thirty-Fifth Periodic Report at 53.

efforts to ensure that FDNY company officers are accountable for EEO compliance and the workplace climate within their commands.  The City has agreed to the Monitor's recommendation (one of the measures in the Monitor's January 18, 2022 and May 4, 2022 lists) that the FDNY advise officers that EEO ratings and EEO performance will be factors in discretionary promotion and assignment decisions.  For such a system to be effective, the EEO metric must reliably capture both superior and deficient EEO performance.  To date the City has not demonstrated that the metric can do so, and until the City completes its responses to outstanding questions and requests for production, the Monitor will be unable to verify that this essential accountability mechanism is functioning as intended.  The Monitor continues to urge the City to complete its responses to outstanding questions and requests for production as soon as possible.

2.  Workplace Professionalism Reporting and Officer Accountability for Workplace Climate

The Monitor and the City have continued to discuss measures intended to ensure that officers cultivate and maintain a professional and inclusive work environment, and that they identify, report, and respond appropriately to potential EEO violations and other conduct or workplace conflicts potentially detrimental to workplace climate.  The City has agreed in principle to several of the Monitor's recommendations in this area, but objected to others in whole or part.  For example, the Monitor recommended that (1) Deputy Chiefs and Battalion Chiefs incorporate EEO topics and related conditions and conduct in the subjects covered in regular firehouse visits and operational inspections,[51] (2) Lieutenants and Captains be trained and

---

[51] This would continue and expand a practice the City adopted during the pandemic-related suspension of regular firehouse inspections by EEO Office staff.  During the height of the pandemic, Deputy Chiefs were asked to include EEO-related subject matter in their regular operational visits.  The City's June 15, 2022 responses to the Monitor's recommendations did not clearly state the City's view on this recommendation, and the Monitor intends to request clarification from the City.

required to monitor and report on treatment of probationary firefighters, and (3) company officers should be trained to be watchful for discriminatory or harassing conduct that occurs in areas historically associated with conflicts and misconduct, such as training, firehouse meals, and the establishment and enforcement of so-called "house rules." [52]  In its responses, the City has generally agreed that officers should be trained to be aware of the vulnerability of probationary firefighters, of historical problem areas, and of the potential for rules to be discriminatory either facially or as applied.  The City has also agreed to the Monitor's recommendation (in the Monitor's May 4, 2022 list) for officer training on "effective management of a diverse and inclusive workplace – including training on recognizing and resolving interpersonal conflicts, maintaining awareness of workplace climate, and proactive steps and techniques to create and maintain an inclusive workplace environment."  However, the City has not clearly agreed to all the Monitor's specific recommendations for officers to monitor, report on, and be accountable for misconduct in problem areas.  The Monitor plans to engage further with the City to clarify the City's position, consider any objections, and discuss implementation of the proposals to which the City agrees.  The City has agreed that training should include instruction on "reporting requirements and [the] prohibition of abdicating supervisor responsibilities, particularly as they relate to EEO-related climate issues."  As noted above, the City has also agreed that EEO ratings

---

[52] The Monitor proposed the following general guidance on the use of house rules:
- Rules should not change terms or conditions of employment (for example, by requiring involuntary payments or unpaid work) or conflict with Department policy or the terms of collective bargaining agreements.  (While it may be appropriate for rules to govern areas like contributions to the meal or house funds, it must be clear that participation in house events or fundraising is voluntary unless required by the terms of employment or Department policy.)
- Rules should not be used to delegate officers' responsibilities to senior members on a semi-official basis.  The officer is ultimately responsible.
- Seniority should be based on Department, not house, seniority.  This prevents house rules from disadvantaging transfers or firefighters with retroactive seniority.

and success/failure in EEO performance will be factors in discretionary promotion and assignment decisions.

As a key component of these recommendations for enhanced monitoring and reporting requirements, the Monitor has also proposed that the City issue renewed guidance to officers to ensure they use the existing Workplace Professionalism reporting system to report conduct, conditions, or workplace conflicts that may constitute or be conducive to violations of law or policy. Monitor's Thirty-Sixth Periodic Report at 46. As discussed in previous reports, the Workplace Professionalism system is intended to require officers to report up the chain of command on issues including EEO compliance, hazing, and other unprofessional behaviors within their commands, and to memorialize their reports in written records. *See* Monitor's Twenty-Seventh Periodic Report at 30-31. However, at least as of the Monitor's last periodic report, the system had generated no reports relating to EEO or hazing issues, even from workplaces associated with substantiated violations of EEO policy. Monitor's Thirty-Sixth Periodic Report at 47. At the April 7, 2022 meeting regarding the Monitor's recommendations, the City indicated that it was preparing to issue supplementary communications to officers reminding them to report issues in all appropriate circumstances. The Monitor asked the City to provide any new instructions as soon as they are developed, and the Monitor plans to follow up further to ensure that officers receive sufficient guidance and are held accountable for compliance with the reporting system's requirements.

The existing Workplace Professionalism reporting system is the logical mechanism for the reporting required by the Monitor's recommendations for increased officer involvement in and accountability for the EEO climate within their commands. The City has confirmed that

reports of EEO and other violations will be cross-referenced with Workplace Professionalism reports to confirm whether issues and conditions were observed and reported.

In addition to the recent list of measures intended to enhance accountability and compliance proposed on January 18 and May 4, 2022, the Monitor has also continued to pursue a longstanding recommendation that the City enforce its existing policy requiring that FDNY-related social media groups be registered with the Department.  As previously reported, in a set of January 28, 2021 recommendations to the City regarding the investigation of social-media-based EEO violations, the Monitor recommended that any messaging or social media group that includes all or most employees in a given unit (*e.g.*, company, house, battalion) and that is used in any way for work-related communications must be registered, and must include at least one officer from the relevant unit (who would be required to report any potential EEO violations in the group).  The Monitor has continued to discuss this recommendation with the City.

### 3.   Climate Survey

As reported in the Monitor's Thirtieth Periodic Report (at 49), in October 2019, the City launched its long-pending workplace climate survey of all FDNY firefighters.  In consultation with the other Parties and with input from the United States' and the Monitor's experts, the City created an analytic plan and a schedule for analysis of the survey data to be conducted by MODA.  The analysis was anticipated to be completed by June 2020.  *Id*. at 49-50.  Work on the climate survey was suspended, however, at the end of February 2020 because of a relocation of the MODA office and the subsequent onset of the COVID-19 pandemic.

Following adjustments to the original schedule and several meetings with the Monitor, the other Parties, and their experts, *id*., in January 2022, the City circulated a draft report prepared by MODA.  After the other Parties and the Monitor raised concerns about the need to include further analyses and streamline the report to effectively highlight key findings from the

survey, the City agreed to have MODA participate in meetings with the Monitor, the other Parties, and their experts.

The Monitor and the Parties and their respective experts met with MODA on March 1 and March 22, 2022 to discuss which analyses from the United States' expert's original December 2019 Analytics Plan and from the City's plans should be included in the City's report, and it was agreed that the Monitor's experts would help MODA complete some of the required analyses. The experts had calls at least every other week to discuss analytic results, and the Monitor added more of its experts to the team to help complete the project in a timely manner. Meetings with the larger group were held on May 10, 2022 to discuss the analyses and on July 6, 2022 to make plans to finalize a document showing top-line results and potential action steps. MODA has been working on a comprehensive outline of this document, to which the experts have been providing regular feedback. The latest version was circulated on July 18, 2022; experts for the Monitor and Plaintiffs-Intervenors provided their feedback on July 26, 2022, and the United States' expert is expected to provide comments shortly. The City has agreed that the document, once completed, will be the report circulated to FDNY management, and that subsequently a comprehensive document can be prepared memorializing all the detailed underlying analyses.

The City has projected that MODA will complete the top-line report by the end of August, that it will be discussed with the larger group of representatives from the Monitor and the Parties in mid-September, and that MODA will present it to management by early October.

**D.    Inspections, Investigations, and Compliance**

1.    Monitor Report on EEO Investigative Procedures and the Duration of Investigations

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor has postponed filing a report on EEO investigative procedures and the duration of EEO investigations to observe and account for the effect of changes in staffing and revised practices. Toward that end, the Monitor has obtained a series of updated data sets from the City and circulated a series of drafts of the report and recommendations to the City and the other Parties.[53] As recounted in detail in the Monitor's previous report, over the past several months the Monitor and the Parties have engaged in a series of communications regarding the Monitor's most recent draft of the report (circulated to the Parties on May 26, 2021), and regarding several rounds of follow-up questions directed to the City by the other Parties and the Monitor.  Monitor's Thirty-Sixth Periodic Report at 51-52.  The City responded to the most recent set of queries from Plaintiffs-Intervenors on June 1, 2022, and the Monitor is preparing an updated version of the report accounting for the City's responses and updated data on EEO investigations.

As noted above in Part III.A, after the increase in EEO investigator staffing in mid-2018, the duration of the FDNY's EEO investigations generally improved, with a higher percentage of cases completed within 90 days.  But case durations rose again during 2020 and in 2021 with

---

[53] Pursuant to the Court's November 17, 2017 Order, the report covers the FDNY EEO Office, its staffing, its investigative procedures, and its performance in the completion of EEO investigations – with a particular focus on the duration of investigations as measured against the presumptive 90-day time limit for investigations set forth in the City's EEO guidelines and the FDNY's own EEO Policy.  In relevant part, the Court's Order stated as follows:

> The court monitor is respectfully DIRECTED to provide the court with a report on the New York City Fire Department's Equal Employment Opportunity ("EEO") Office.  This report should address, in particular, (1) how the EEO Office investigates and resolves complaints; (2) how the staffing of the office has changed over time; and (3) the speed with which the office investigates and resolves complaints.

continuing deficiencies in staffing and the corresponding increase in investigator caseloads.  The Monitor will continue to review data and materials produced by the City to determine whether the City can demonstrate the ability to consistently complete investigations in a timely manner.

2.     <u>Inspections and Monitoring</u>

The Monitor has continued to obtain updates from the City on the resumption of regular EEO firehouse inspections, which were suspended at the start of the pandemic.  Shortly before the last periodic report, the City advised that inspections had resumed on one to two days per week,[54] at approximately two to four locations each day.  As discussed in the Monitor's previous report, the City has begun using a new digital application to record EEO inspections.  Monitor's Thirty-Sixth Periodic Report at 53.  The application provides a checklist of inspection steps and the firehouse locations to be inspected, along with fields for recording inspectors' findings and actions taken – all of which will be recorded in an inspection database.

3.     <u>Monitor Review and Recommendations Regarding Investigations</u>

The Monitor has continued to evaluate the FDNY's investigative practices in EEO matters by reviewing investigative materials produced by the City[55] and engaging in bi-weekly conference calls with the EEO Assistant Commissioner regarding open cases.

---

[54] The City has advised that this schedule matches the frequency with which the EEO Office conducted inspections before the pandemic.

[55] In response to a standing request from the Monitor, the City produces investigative material from EEO cases that (1) involve fire suppression personnel, (2) investigate allegations based on race or retaliation, and (3) are identified by the City as requiring substantial investigative activity.  In an initial, retrospective production of multiple cases, provided in 2017, and subsequently in response to a December 12, 2018 request and an April 8, 2020 reminder, the City has provided the Monitor with full investigative files for some cases.  For others, the City's production has been limited to intake documents and final memoranda.  Summaries of the City's earlier productions of EEO case materials appeared in the Monitor's Twentieth Periodic Report (Dkt. # 1744) at 30-31 and in the Monitor's Twenty-Seventh Periodic Report at 39-41.  For the majority of cases completed in the past year, the City has thus far produced only final memoranda, and the Monitor is awaiting production of full files.  The Monitor's comments are not intended to prescribe outcomes in individual cases, as the Modified Remedial Order does not provide for such relief.

As previously reported, on January 18, 2022, the Monitor provided the City with a detailed summary of comments and recommendations based on the Monitor's review of EEO case materials produced by the City since late 2019.  Monitor's Thirty-Fifth Periodic Report at 63-64.  The summary identified several continuing deficiencies in EEO investigative practices and offered recommendation to address them.  *Id*.  Since then, on bi-weekly calls with the City on EEO topics, the Monitor has continued to offer comments on investigative practices, based on materials produced by the City, and to receive updates regarding ongoing EEO matters – including active investigations and other efforts to address issues in the affected workplaces through mediation, counseling, and other non-disciplinary mechanisms.  Since the last periodic report, on May 20, 2022, the Monitor also offered comments on a supplementary training presentation for investigators on best practices for gathering and analyzing evidence in cases arising from social media activity – a presentation prepared by the EEO Office in response to an earlier (January 2021) set of Monitor recommendations.

The Monitor has also continued efforts to resolve longstanding requests by the United States and Plaintiffs-Intervenors for more information regarding the Monitor's assessments of the FDNY's EEO investigative practices and the cases on which they are based.  As discussed in the Monitor's previous report, although it continues to object to sharing case materials with the other Parties, the City has indicated that it would be prepared to share a redacted version of the Monitor's January 18, 2022 memorandum with the other Parties.  The Monitor provided the City with a redacted copy of the January 18, 2022 memorandum on April 4, 2022 and asked the City to confirm whether it would consent to sharing the redacted document with the other Parties, or whether it would propose further redactions.  The City responded on June 15, 2022, proposing several additional redactions, some of which remove factual context relevant to the Monitor's

recommendations.  In a further revised version provided to the City on July 28, 2022, the

Monitor proposed that the City reconsider some of its proposed redactions and suggested

alternative, generalized text to substitute for some passages that the City's redactions removed.

The Monitor has asked the City to state its position on the most recent proposal by August 12,

2022 and plans to circulate a final redacted version to the other Parties, with any further changes

to which the City agrees, shortly after the City responds.  The Monitor hopes that the final

redacted version will provide the other Parties with the background needed for them to have a

satisfactory understanding of the Monitor's observations and recommendations.

## IV.   Medical Exam-Related Issues

### A.     Medical Exam Attrition Metrics

As noted in the Monitor's Twenty-Eighth Periodic Report, the City has reported that the

Medical Exam administered by the City's Bureau of Health Services ("BHS") was the step in the

hiring process with the highest disqualification rate among Exam 2000 candidates.  *Id*. at 46.  The

Medical Exam also had a disparate impact adverse to Black and Hispanic Exam 2000 candidates.

*Id*. at 45-46.  The Monitor's August 2021 analysis of data provided by the City showed that there

was disparate impact in the Exam 2000 Medical Exam adverse to both Black and Hispanic

candidates for seven BHS disqualification reasons, including for stairmill testing, failure to

cooperate with stairmill testing, failure to complete or provide the results of follow-up lab

testing, pulmonary issues, cardiac issues, tuberculosis, and weight.[56]

The City's December 2019 Attrition Metrics Report also revealed statistically significant

adverse impact against Exam 7001 Black and Hispanic candidates.  Monitor's Twenty-Ninth

---

[56] One further disqualification reason, failure to cooperate with tuberculosis testing, had a disparate
impact against Black candidates.

Periodic Report at 70.  Each subsequent report, including the City's most recent, dated April 27,

2022, has continued to reflect statistically significant disparities adverse to Black and Hispanic

candidates in the Medical Exam.  The April 27, 2022 report shows the cumulative number of

Exam 7001 Medical Exam disqualifications by race/ethnicity among candidates with final

decisions as of March 29, 2022, immediately following the appointment of the current Academy

class:  as of that date, 19 of 812 white candidates (2.3%), 17 of 336 Hispanic candidates (5.1%),

and 14 of 192 Black candidates (7.3%) had been disqualified by the Medical Exam.

On May 19, 2022, the City circulated its latest BHS Attrition Metrics Report,[57] providing

data and disparate impact analyses as of April 11, 2022, broken down by specific Medical Exam

disqualification reason.[58]  Trends from the previous report, dated March 16, 2022, continue:

Hispanic candidates are qualified at lower rates and disqualified at higher rates than white

candidates, and Black candidates are qualified at still lower rates and disqualified at still higher

rates.  While the qualification rate has increased for all groups, it has increased more for white

candidates and least for Black candidates.  The disqualification rate has also increased for all

groups (both qualification and disqualification rates can rise if the pending rate goes down) but

least for white candidates.  The pending rate (*i.e.* the percentage of candidates who have begun

medical processing but have not yet received a final qualification or disqualification result) has

decreased for all groups and for white candidates the most.  The report notes that there is

---

[57] This report focuses on the Medical Exam, as distinct from the City's more comprehensive attrition reports covering all phases of the hiring process, of which the April 27, 2022 report was the most recent.

[58] As noted above, references to the findings in the May 2022 BHS report may require amendment; upon receiving a data update from the City on July 18, the Monitor noted inconsistencies that may call into question some of the report's data.  The Monitor requested clarifications from the City on July 21 and is awaiting responses.  This report nevertheless summarizes the main findings of the May 2022 report, based on the belief that, while some data points may require amendment, it is unlikely that the main conclusions will change.

disparate impact against Hispanic candidates on the pulmonary function test and against Black candidates for blood pressure.[59]

Based on results to date, the extensive collaborative efforts expended by the City, the other Parties, and the Monitor to modify and validate the stairmill test appear to have had a favorable effect on inter-group disparities.  The data from the first candidates processed in Exam 7001 indicate that the stairmill test no longer causes the disparate impact seen during Exam 2000 testing, at least as of April 11, 2022.

The report notes that "[p]revious adverse impact analysis for exams 2000, 2500 and 0001 found evidence of adverse impact in the weight exam for both Black and Hispanic candidates. Evidence for adverse impact is not present in weight for exam 7001."  May 2022 BHS Attrition Metrics Report at 5.  Although there is improvement in the different rates of qualification for weight by race/ethnicity, it is nevertheless the second most common reason for medical disqualification, and the analysis of BHS data only considers the first 1,579 candidates tested through April 11, 2022.  Results presented in Tables 24 and 25 of the report indicate that the odds of Black candidates being disqualified for weight are 4.28 times higher than those of white candidates, and the odds for Hispanic candidates are 3.63 times higher than for white candidates, although this currently affects a relatively small number of candidates.  *Id*. at 26-27.  Weight is also associated with the highest number of pending candidates:  17 Black (7.4%), 8 Hispanic (2.1%), and 24 white (2.6%).[60]

---

[59] The City notes that five Hispanic candidates (1.3%) of those tested for pulmonary function were disqualified and that two Black candidates (0.9%) of those tested for blood pressure were disqualified.

[60] Unlike other medical conditions, candidates disqualified for weight can work to reach the necessary weight threshold and resume processing.

The elevated odds of disqualification for weight for Black and Hispanic candidates make it likely that, as more candidates are processed over the remaining years of the extended list, the statistical threshold for adverse impact will be reached.  Although not currently statistically significant, the disparities in disqualifications for weight are concerning, and the City must continue to gather and analyze data in this medical component as processing continues and reaches a larger number of candidates.  Further, Black and Hispanic candidates are disqualified at the CPAT at higher rates than white candidates, and it is likely that weight, along with low fitness, is related to CPAT disqualification.  Analyses performed by the Monitor's team on Exam 2000 data to better understand predictors of stairmill disqualification found that being overweight was associated with a significantly higher risk of being disqualified on the stairmill test.  Thus, based on current trends in the BHS data and a strong theoretical linkage with CPAT, attrition mitigation efforts are required to help Black and Hispanic candidates (a) achieve and maintain a healthy and qualifying weight throughout the hiring process and (b) take advantage of the opportunity to decline and lose weight rather than be disqualified.[61]

### B.      Medical Exam Attrition Mitigation

The City has been providing regular reports to the Monitor and the other Parties about the scheduling of Medical Exam appointments and the rates at which candidates have been reporting for testing and have been either qualified or disqualified.  The City has been providing specific information about Black candidates to Plaintiffs-Intervenors so they can perform outreach and provide support for those candidates.

---

[61] Plaintiffs-Intervenors have raised a concern that the City's analyses to date exclude those who decline appointment.  Plaintiffs-Intervenors have encouraged the City to review the demographics of those who utilize this option to see if there are disparities in usage that might reflect a need for more guidance or information among some candidates.

As previously reported, the City has reported that ORR personnel do not have access to specific reasons for medical disqualifications because of what the City has described as HIPAA and general privacy concerns.  Thus, the City has asserted that ORR is not able to provide individual candidates with encouragement or support specific to the reasons for which they have been disqualified or are in pending status to assist them in resolving any delays or other issues that may be related to supplying medical documentation or obtaining medical clearance.  Unless a candidate chooses to share the specific disqualification reason, it is hard for ORR to advise candidates about the potential benefits of declining and to help address other pertinent issues.

The City's analytics group, MAP, analyzes attrition from the hiring process on a class-by-class basis, and the City has advised that, when attrition metrics reports show disparate impact in the overall Medical Exam, MAP analyzes each station to determine the source(s) of disparity, after which multiple other bureaus, including ORR, CID, and BHS, devise methods to ameliorate these disparities.  However, the City has not described the manner in which the other bureaus coordinate with each other to devise, implement, and track the effectiveness of targeted mitigation strategies.  The City must task a specific person or group of persons who can provide strategic oversight to implement and report on data-driven attrition mitigation programs for non-traditional candidates in the Medical Exam.  In addition, the City has implemented programming intended to address fitness, including widening the scope of candidates eligible for FAP, implementation of the stairmill fitness program, and additional fitness messaging, but it has not provided evaluations showing whether these programs have actually had an effect on disparate impact.

The City has stated that it will continue to analyze the medical data and remediate where possible, but a critical first step is to develop, implement, and track the success of interventions.

To satisfy the requirements of the Modified Remedial Order, the City must have a plan in place that allows it to make mitigation adjustments as necessary, especially in a hiring step in which it has found disparate impact. As discussed above, it is also important for both Medical Exam outcomes (and, likely, CPAT outcomes) that the City explore additional ways in which it can address the potentially higher incidence of being overweight among non-traditional candidates, through better preparation, training, and communication.

It has always been crucial for the City to focus on reducing the voluntary attrition of non-traditional candidates from the Medical Exam, on preparing such candidates to pass the Exam, and on helping them move from pending status to qualified status. But this requirement has taken on even greater importance now, as the effects of the pandemic have fallen and will continue to fall disproportionately on Black and Hispanic communities. Tailored and flexible strategies and policies need to be developed and implemented to account for this disproportionate hardship, and the City must do all it can to mitigate any negative impact of the Medical Exam on Black and Hispanic representation in Academy classes. The importance of these efforts is also heightened by the long wait times that some candidates will experience before they appear for the Medical Exam, especially given the approval of the extension of the Exam 7001 list. The Monitor has also asked the City to track pandemic-related attrition data in the hiring process, and such data may prove particularly relevant with respect to the Medical Exam. The Monitor's purpose in requesting such tracking is to permit a meaningful comparison of prior candidate processing cycles with processing affected by the pandemic.

## V.    **Character Screening by the CID and PRB**

The City's April 27, 2022 report on candidate attrition continued to show statistically significant disparities between Black and white candidates and between Hispanic and white

candidates in the rates at which candidates are referred to the PRB.[62]  *See* Monitor's Thirty-Sixth Periodic Report at 61.  Among candidates referred to the PRB, the City's analysis also showed a statistically significant disparity in rates of disqualification between Black and white candidates.[63]  *Id*.  A further analysis performed by the Monitor using the City's figures has also found statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which all candidates in each group who receive any final decision from the character review process (either a no-referral decision or a final decision from the PRB following referral) are deemed qualified as to character.[64]  *Id*.

Given these disparities, the Monitor has resumed discussions with the Parties regarding further potential reforms in the character review process, along with improvements in the guidance provided to candidates, to address the adverse impact of the character review process on non-traditional candidates.  The Monitor convened a meeting with the Parties on these topics on July 28, 2022.  Topics at the meeting included outstanding proposals for reforms in standards and procedures, along with issues relating to the analyses of the character review process – which have been summarized in previous reports.  *See, e.g.,* Monitor's Thirty-Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's Thirtieth Periodic Report at 61-63.  In addition to analyses and reforms focusing on character review outcomes, the

---

[62] Among candidates who have entered the character review process and received decisions regarding referral, 81 of 178 Black candidates (45.5%), 106 of 319 Hispanic candidates (33.2%), and 136 of 793 white candidates (17.2%) have been referred to the PRB.

[63] Among candidates referred to the PRB, 8 of 75 Black candidates (10.7%), 5 of 99 Hispanic candidates (5.1%), and 3 of 132 white candidates (2.3%) have been disqualified.

[64] An additional separate analysis by the Monitor also found a statistically significant disparities between Black and white candidates and between Hispanic and white candidates in the rates at which they were either (1) disqualified or (2) hired with extended probation.  (The analysis combined the percentages for both outcomes in each group and then compared the combined figures between groups – *e.g.*, percentage of Black candidates with either outcome vs. percentage of white candidates with either outcome).

Monitor and the Parties also discussed proposed approaches to analyzing and addressing the effect of the character review process (including related procedures and requirements) on voluntary attrition.

At the meeting, the City described several changes it plans to make in the criteria used to determine whether candidates should be referred to the PRB, and it presented several findings from analyses by its consultant, KPMG, assessing the potential impact of those planned changes on rates of referral among different demographic groups.  It is hoped that the City's proposed changes in the process will reduce disparities in PRB referrals and outcomes adverse to non-traditional candidates.  During the meeting, the City also circulated a set of analyses that KPMG has conducted on correlations between PRB referral and processing times, and between referral and voluntary attrition.  The City plans to provide the Monitor and the other Parties with further details of its planned revisions to referral criteria and related analyses in the near term; and the Monitor plans to convene another meeting devoted to the character review process and the City's proposals within the next several weeks.

As the Monitor has previously emphasized, if analyses continue to show that the process has a disparate impact adverse to Black or Hispanic candidates, and if further reforms do not eliminate or sufficiently reduce those disparities, the City will be required to validate the process as job-related.  *See, e.g.*, Monitor's Twenty-Ninth Periodic Report at 79.  Accordingly, in addition to the implementation and assessment of further changes in the standards and procedures for character review, the Monitor also expects that future discussions will include possible approaches to the validation process.

## VI.   <u>Firefighter Exam</u>

Pursuant to Paragraph 7 of the Modified Remedial Order, the Monitor is charged with overseeing the computer-based test for the position of entry-level firefighter.  Consistent with the provisions of the Modified Remedial Order, the City and its testing consultant PSI have continued to work in coordination with the Monitor, the other Parties, and their respective experts to analyze and report on the examination process.  The Monitor continues to be assisted by its testing expert, Dr. Shane Pittman.

The Exam 7001 scores were released on June 13, 2018.  The City established the Exam 7001 list on February 27, 2019, and the first class drawn from the list entered the Academy on May 13, 2019.

## VII.   <u>Additional Issues</u>

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the Modified Remedial Order.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the Modified Remedial Order or Disparate Treatment Settlement;

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the Modified Remedial Order.

Dated:   August 8, 2022
            New York, New York


                                                            /s/
                                              _____
                                                      Mark S. Cohen