

800 Third Avenue
New York, NY 10022
+1 212 957 7600 phone
www.cohengresser.com

Mark S. Cohen
212 707 7601
mcohen@cohengresser.com

May 19, 2023

Hon. Nicholas G. Garaufis
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    <u>United States v. City of New York. No. 07-CV-2067(NGG)</u>

Dear Judge Garaufis,

      On April 19, 2023, this Court issued an order in response to Plaintiff-Intervenor The Vulcan Society's (the "Vulcan Society" or "PIs") April 10, 2023 Objection to the Monitor's CPAT Recommendation to the Court (Dkt. # 2170, "PIs' Objection"), directing the Monitor to consider the arguments raised therein and "issue an updated recommendation as needed." On April 24, 2023, the City sent a letter to the Monitor addressing the issues raised in PIs' Objection ("City Response"). Plaintiff the United States has advised that it does not object to the commencement of Round 4, subject to the agreements memorialized in the Monitor's correspondence of March 22 and 31, 2023 (Dkt. #s 2160 and 2166) (the "Monitor's Letters"). (The City's current schedule provides for CPAT testing – including practice tests – to begin on July 1 and run through September 6, 2023. CPAT training began on April 17.)

      Having considered PIs' Objection and the City Response, the Monitor respectfully again recommends pursuant to Paragraph 54(c) of this Court's Modified Remedial Order (Dkt. # 1143), that the City be permitted to call candidates from both score bands 98 and 97 for a fourth round of the Candidate Physical Ability Test ("Round 4"), subject to the agreements and commitments by the City to provide candidate support described in the Monitor's Letters, which build on prior Orders and agreements and include, among other things:

- Completing certain analyses
- Maintaining and building on the level of candidate communication that took place in the previous round of the CPAT ("Round 3"), with monthly communication plans



- Reporting to the Monitor and Parties on a bi-weekly basis about training, practice, and testing attendance and outcomes as well as candidate engagement, and monthly reporting on recruitment staffing and activities and the mentorship program

I.     **Background**

The MRO requires the City, among other things, to draft and implement a plan to "mitigate and diminish rates of voluntary candidate attrition between different steps of the City's process for the selection of entry-level firefighters," as well as to take all steps necessary to eliminate "policies and procedures that are not job related or required by business necessity and either have a disparate impact on black and Hispanic firefighter candidates or perpetuate the effects of said disparate impact."  MRO ¶¶ 11, 31, 75.  The Candidate Physical Ability Test ("CPAT") is a physical examination and one of the hiring steps in the entry level firefighter hiring process under the MRO.  MRO ¶ 11.  The CPAT, which is the first step after the written examination, historically is the hiring step at which the greatest numbers of Black and Hispanic firefighters are lost from the hiring pipeline.

Candidates are lost from the hiring process both by failing the CPAT, and by failing to appear for CPAT testing. [1]  Training for the CPAT, however, greatly increases candidates' chances of passing the CPAT.  In fact, data collected before Round 3 of the CPAT showed that candidates who attend three training sessions or more pass at rates in excess of 90 percent.  For this reason, access to training opportunities, and information about the CPAT and how to prepare for it, are extremely important.  After the CPAT, too, candidates must maintain fitness for subsequent stages of the hiring process such as the medical examination (which includes a stairmill component) and pre-Academy run, and must manage their weight within the levels needed to pass the medical.  Attrition mitigation measures such as information and training are of particular value for Black and Hispanic candidates, who remain less likely to have friends and family in the FDNY to familiarize them with the requirements of the CPAT test and other hiring steps, and encourage them to travel, for example, to training sessions on Randall's Island.

The first two rounds of the CPAT for candidates on the Exam 7001 hiring list ("Rounds 1 and 2") had disparate impact adverse to Black and Hispanic candidates.  On June 9, 2021, this Court issued an order directing the City, among other things, to critically evaluate its attrition mitigation efforts before administering the CPAT to further candidates.  (Dkt. #2033, the "June 9th Order").  In lieu of holding focus groups with candidates to discuss their CPAT experiences, which was one element of the relief in the June 9th Order (*id.* at 12), the City (with the Court's consent) opted to conduct a survey of candidates who had passed the CPAT.  This survey yielded useful information about candidates' experiences, preferences, resources, and preparation for the CPAT, including the views of diverse candidates.

In June 2022, before CPAT Round 3 began, this Court set a schedule for the City to complete its analysis of the survey of candidates who had passed the CPAT, and directed the

---

[1] The City offers candidates three opportunities to pass the CPAT – two "practice" sessions and a final test.

2



City to provide detailed information to the Monitor and Parties about CPAT training and testing attendance and outcomes going forward. (Dkt. #s 2112, 2114). In September 2022, the other Parties and the Monitor suggested a number of additional measures to reduce candidate attrition in Round 3, some of which the City adopted and some of which it did not. *See, e.g.,* Dkt. #s 2127-2030. The City voluntarily adopted other measures. In Round 3, consistent with historic trends showing that attrition increases over the life of the hiring list, candidates of all demographics passed at lower rates, and more than 50 percent of candidates in all demographics did not appear for the CPAT test. The results of Round 3 did not show disparate impact, however, and City data shows that Black candidates passed at slightly higher rates than their White counterparts. City Response at 3.

## II. Round 4 Dispute

### A. History

Before beginning Round 4, the City advised the Monitor and the other Parties of its intent to call score bands 98 and 97 from the Exam 7001 list, which together include approximately 4,600 candidates – the largest candidate group called for CPAT thus far, and more than twice the number of candidates who were called for Round 3. The City emphasized its operational need to fill Academy classes. PIs and the United States questioned some aspects of the City's calculation of the need to call two bands to fill the number of seats in Academy classes through Spring 2024. PIs and the United States also pointed out that the City had not yet provided the results of certain analyses of Round 3 that had been requested by the Monitor in September 2022.

During the Monitor's discussions with the Parties, the Parties disagreed about the likely effects, from an attrition perspective, of calling the 2000-plus candidates in band 97 (all of whom would have to be called at the same time, pursuant to a City policy). The City took the position that calling a large group of candidates for CPAT is advantageous from an attrition standpoint - even if many of the candidates in the group will not be called for further processing for some time after they pass the CPAT - because being called for the first step of the process connects candidates to FDNY resources and gives them a sense of engagement. The Vulcan Society expressed concerns about whether the City had adequate staffing and other capacity to give training and support to such a large group of candidates, including, for example, whether there would be sufficient spots at training sessions, selection of dates and times to train and take the test, personnel to answer candidate questions, and calls and texts to provide information. The Parties also discussed, as they had in connection with earlier CPAT rounds, whether Black and Hispanic candidates might fail at higher rates if they trained for the CPAT, but then waited for up to a year before moving on to the next steps of the hiring process, some of which also require fitness – as opposed to training to pass the CPAT, and then moving directly on to those subsequent steps. The United States inquired whether empirical data from Exam 2000, and/or from CPAT Rounds 1 and 2, could be used to try to determine whether candidates historically fared better when called earlier or later for CPAT (*i.e.,* if they passed CPAT and then waited



before completing the remaining steps of the hiring process, or waited to take the CPAT in the first instance).  The Monitor asked the City to provide additional information regarding plans to support candidates and staff events.

On March 9, 2023, the Monitor wrote to the City and advised that although the Monitor did not object to the City proceeding to call band 98 (which contains approximately 2,000 candidates), the Monitor would not approve calling band 97 until the City had completed additional analyses requested by the Monitor.  The next day, on a telephone call among the Monitor and Parties, the Chief of Department and other senior City and FDNY personnel emphasized what they described as the FDNY's urgent operational need for more hires, as well as the logistical unfeasibility for both the FDNY and the Citywide hiring processes of conducting two successive rounds of CPAT and subsequent candidate processing in the time frames that would be required if each score band were called separately.

Following the call, on March 11, 2023, the Monitor sent the Parties a message saying that the Monitor's view was that the City could proceed to call candidates from both score bands.  In addition to the City's operational need, the Monitor noted that the City had provided results of a survey of candidates in the 98 and 97 score bands, which indicated that candidates in the 97 band reported higher levels of motivation to remain in the FDNY hiring process than those in the 98 score band.  The Monitor also held further discussions with the City and the other Parties.  As described briefly in the introduction to this Recommendation, the Monitor reported on these discussions, and on the City's commitments, in the Monitor's Letters and recommended that the City be permitted to proceed subject to its agreement to engage in candidate support commensurate with the support provided in Round 3, as well as to report regularly so that any areas of concern can be promptly flagged.

        B.     The Parties' Arguments

PIs' Objection raises two main arguments why the City should not be permitted to call both score bands 98 and 97.  *First,* PIs point out that the City's own projections show that it can fill classes through Spring 2024 from band 98 alone, with a surplus of 67 candidates, without calling score band 97.  They note that the City's calculations of how many candidates it needs to call to fill seats in the Academy are based on predicted rates of attrition in the hiring process ("attrition ratios") higher than any the City has used before.  PIs' Objection at 2-3.

*Second,* PIs contend that calling the candidates in score band 97 at this time has a substantial downside, because it prevents candidates in score band 97 from benefiting from possible improvements in attrition mitigation based on insights from Round 3 outcomes.  For example, PIs point out that data on the correlation between training sessions and test outcomes has not been updated to account for Round 3 outcomes, and that other data about CPAT passing

4



and failures that is newly available has not yet been examined.[2]  PIs argue that as a result of these improvements, for the first time, the City can evaluate which components of the CPAT candidates fail, and when, and "tailor its training to ensure candidates are able to practice the portions that others struggled with the most."  PIs' Objection at 3-4.  Conversely, PIs suggest that the reasons why the Black-White performance gap closed part-way through Round deserve more study before candidates in score band 97 are called, so that the FDNY can know: "(1) who appeared for the CPAT practice tests in Round 3, (2) why they attended, and (3) what hallmarks of candidate engagement were associated with positive outcomes for Black candidates."  *Id*. at 4.  PIs also argue that the mentorship program appeared to have little impact on the rate at which Black candidates appeared for CPAT in Round 3, and that the City could take time to study why and improve it, as well as build on its Round 3 communication strategy using the findings of Round 3.  Overall, PIs urge that score band 97 should not be called until the benefits of Round 3 analyses can be realized.  PIs also express doubts about the City's ability to scale up attendance at orientation and practice sessions by as much as over 100 percent of Round 3 attendance, which PIs assert could impair the FDNY's ability to offer useful tips and encouragement.  *See id*. at 6 n. 8.  PIs also request that, if the City is allowed to proceed, the Court direct the City to prioritize Black candidates who have passed the CPAT for subsequent processing, because data shows that they need more time, on average, to complete the FDNY hiring process.  *Id*. at 7-8.

In response to these points, the City reiterates its operational need.  The City argues that the margin of 67 candidates for the Spring 2024 class shown in its projections is "razor thin," and that the City's true needs could well prove to be greater than the projections forecast based on the fact that attrition increases over the life of the hiring list.  City Response at 2.  The City also notes that although the Vulcan Society questions the City's selection ratio, they do not claim that it is incorrect.  *Id.*

The City's Response does not address PIs' specific arguments about how the City could potentially use Round 3 analyses that have not yet been performed to benefit candidates in Round 4.  Instead, the City focuses on reasons why, in its view, waiting to be called for CPAT would increase attrition, instead of benefiting candidates.[3]  These reasons include that attrition historically increases with time, and that the City's survey of candidates showed continued interest among score band 97 in continuing with the FDNY hiring process.[4]  City Response at 3.

---

[2] Some of this data emerged through review of hard copy documents by the Monitor, and other data is available due to an agreement by the City, at the Monitor's request, to change its recordkeeping practices or convert certain recordkeeping to electronic form.

[3] For example, in response to PIs' argument that delaying score band 97 would afford candidates additional time to train, the City Response states that band 97 candidates can train now.  This response seems to miss PIs' point, which is that, if candidates from score band 97 are deferred, they will have an *additional* four to five months in which to train, compared to if they are called for CPAT now.

[4]The City also states that it shared findings by its consultant, ideas42, "that indicate it would be preferable to show concrete interest in candidates and progress toward their goal of being hired by having them take CPAT now."  City



The City also points to the fact that Round 3 results did not show adverse impact on Black and Hispanic candidates. The City argues that the elimination of disparate impact in Round 3 "show[s]" the effectiveness" of the City's attrition mitigation efforts, that the City has shared its training and staffing plans, and that the City "is confident" that for the same reasons, "those candidates who are interested in training opportunities will have ample opportunity to participate." *Id.*[5]

The City Response only briefly touches on PIs' request to adopt a schedule that would afford Black candidates more time from the CPAT to beginning an Academy class. The City's prior opposition to PIs' position construed PIs' proposal as a request to call Black candidates from score band 97 for the CPAT earlier than White candidates, which the City asserts "would run counter to Civil Service law, antidiscrimination laws, and all past practices." Letter from City dated March 23, 2023 (Dkt. # 2162). PIs respond that they are asking only to adopt a schedule that would allow more time *after* the CPAT, which they allege would be consistent with candidates proceeding to complete the hiring process in varying order once they have passed the CPAT. PIs' Objection at 3-4.

## III. Monitor's Analysis

### A. City's Need to Call Both Bands

The Vulcan Society and the City disagree regarding whether the City's projected surplus of 67 candidates is sufficient to avoid what the City has asserted would be dire operational consequences should its calculations prove to have been off by more than that amount. Not only has the City emphasized its need to hire firefighters, but it has cited reasons why it is reasonable to base its projections on estimates of candidate attrition that are higher than those that the City used to plan how many candidates to call for CPAT at earlier stages of the Exam 7001 list. As the City notes, attrition increases with time. In Round 3, fewer than 50 percent of candidates in all demographics appeared for the CPAT, suggesting that around that number or even fewer may appear in Round 4. In this instance, based on the severity of the consequences the City has said will ensue in the event of a shortfall, the Monitor believes that deference must be given to the

---

Response at 3. As the Monitor understands it, ideas42 recommended the value of showing candidates concrete interest and progress toward their goals, which the City argues supports the decision to call candidates for CPAT earlier, but did not comment on CPAT timing specifically.

[5] The City also refers to a statement by the Monitor that "because wait times have been skewed by the pandemic, the Monitor's expert does not believe that any further analysis would be likely to show that a delay in calling the 97 band would improve outcomes for non-traditional candidates." City Response at 2 (citing Monitor's Thirty-Ninth Periodic Report (Dkt. # 2162), at 22). The Monitor's statement in this regard was intended to refer to further analysis of empirical information about past wait times and the effect of delay (such as the question that the United States had posed about whether it was possible to glean any trend from historical pass rates among candidates who had waited longer or shorter times to be called for CPAT).



City's determination that it must call two bands at this time, and that it cannot wait to complete analyses of Round 3 before calling candidates from score band 97.

                B.        <u>The Importance of Completing Analyses and Candidate Support</u>

The Monitor strongly agrees with the importance of continued efforts to support Black and Hispanic candidates who do not have friends and family networks to encourage them to remain in the process and help prepare them to pass CPAT and the other stages of the hiring process. The Monitor does not believe, however, that calling both score bands requires sacrificing either the benefits of the analyses that the PIs identify in their Objection, or robust candidate support.

At the Monitor and the other Parties' request, the City has agreed to report, in some cases bi-weekly and others monthly, on training and testing attendance and outcomes, communications with candidates, and staffing in key areas including mentoring. The City has advised, as reported in the Monitor's Letters, that it is prepared to take additional steps, including adding practice or testing sessions, providing candidates with flexible rescheduling, and facilitating their attendance at a full series of practice and testing sessions.

The Monitor will continue to discuss with the City and the other Parties how the City can maintain levels of personal interaction with candidates comparable to those achieved during Round 3. Regarding training – which is a critical component of CPAT success – the Monitor and the other Parties will receive reports that should identify whether training attendance is falling short of expectations.

The Monitor also agrees that, after having engaged in efforts to ensure that data is collected and stored, that data should now be analyzed to help better understand the CPAT, including but not limited to what may have been correlated with improved results in Round 3, and how to replicate those results for as much of Round 4 as feasible.[6] Even in the period since PIs filed their objection, however, a number of the analyses that PIs suggest have been conducted or have begun and are currently in progress. The Monitor has completed and circulated analyses showing correlations between candidate outcomes and different levels of training, participation in the Mentor program, and use of the candidate portal, along with a preliminary analysis of which CPAT components were associated with candidate failures in Round 3; this analysis remains ongoing. As PIs' Objection states, PIs have also provided analyses breaking down outcomes between the first CPAT practice session and the second from Round 3. To the extent that these analyses may be useful to inform attrition efforts for Round 4, the City will be able to

---

[6] The City adopted some additional measures in Round 3 that had not been in place for Round 2, and the extent to which these changes impacted outcomes, and which had the greatest impact, deserves further examination. The City added stairmill practice opportunities (in some cases at the urging of the Monitor and the other Parties), but, according to the City, candidates have not yet widely availed themselves of these initiatives. Over the course of Round 3 training and testing, the City also added Sunday training sessions, and made the scheduling process for CPAT training and practice sessions easier.



benefit from them for most of the Round 4 training and testing period.  Additional analyses can still be completed, both before Round 4 begins and after it is underway.

        C.        <u>Changes to Band 97 Processing Timeline</u>

The Vulcan Society raises the concerning prospect that Black candidates will continue to lag in the time that it takes from passing the CPAT to entering an Academy class.  Many factors can affect the speed at which a candidate completes the FDNY hiring process, including medical information, criminal background investigation consideration, etc.  Each of these factors implicates different City policies and practices.

The Monitor has worked with the Parties to identify ways to streamline the FDNY hiring process, particularly where (as in the area of criminal background checks) delays may result from practices that fall disproportionately on minority populations.  The Monitor has also discussed with the City the effect of policies that have not been shown to be related to or necessary for the firefighting job, and the City has made some adjustments, as with the validation of the stairmill portion of the medical examination and some aspects of the character review process.  As in these other areas, it is possible that post-CPAT policies and practices could be improved to reduce causes of delay that are not job related or justified by business necessity.

It is not clear from PIs' Objection what schedule would address the concerns they have raised.  Neither the Vulcan Society nor the City provided legal authorities relevant to this complex issue.  At this time, the Monitor does not have a sufficient record to make a recommendation about this aspect of the Vulcan Society's requested relief.

**IV.**        **<u>Recommendation</u>**

For the reasons set forth above, the Monitor respectfully recommends that the Court:

APPROVE the City proceeding to call Exam 7001 score bands 98 and 97 for Round 4 of CPAT, subject to the commitments and requirements set forth in the Monitor's Letters of March 22 and 31, 2023, respectively (Dkt. #s 2160 and 2166).

DENY the Vulcan Society's request to call Black candidates ahead of other candidates for post-CPAT processing, without prejudice to renewal on a more complete record.

                        Respectfully submitted,

                        /s/

                        Mark S. Cohen
                        Court Monitor