UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

                Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated,*

                Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

                Defendant.

---------------------------------------------------------------x

**07-cv-2067 (NGG)**

## <u>MONITOR'S FORTY-THIRD PERIODIC REPORT TO THE COURT</u>

TABLE OF CONTENTS

I.    Executive Summary ..................................................................................................... 1

II.   Recruitment, Candidate Processing, and Attrition Mitigation ........................................ 12

      A.    Candidate Processing ...................................................................................... 12

            1.    Trends in Candidate Processing to Date ................................................ 12

                  a)    The City's April 18, 2024 Attrition Report ................................... 12

                  b)    CPAT Round 4 ............................................................................ 13

                  c)    March 25, 2024 Academy Class ................................................. 14

            2.    Overall Firefighter Demographics ........................................................ 14

            3.    March 13, 2024 Graduating Class ........................................................ 15

      B.    Attrition Mitigation and Candidate Processing ................................................ 16

            1.    Monitor's Analysis of Round 4 CPAT Training Attendance and
                  Testing Outcomes .............................................................................. 16

            2.    CPAT Round 5 .................................................................................... 17

            3.    Post-CPAT Attrition Mitigation ........................................................... 23

            4.    Mentor Program ................................................................................. 27

      C.    Recruitment Campaign ................................................................................... 28

            1.    Campaign Blueprint ............................................................................ 29

            2.    Reporting and Analysis of Campaign Results ........................................ 31

                  a)    Recruitment Events ..................................................................... 31

                  b)    Recruitment Engagements ............................................................ 33

            3.    Staffing ............................................................................................. 34

            4.    Symphony Talent Campaign ................................................................. 34

                  a)    Media Strategy ............................................................................ 34

                  b)    Branding Approach ...................................................................... 35

                  c)    CRM Engagement Strategy ........................................................... 36

    d) Monthly Reporting.................................................................... 36

  D. Working Group ................................................................................ 37

III. EEO............................................................................................................ 38

  A. EEO and Related Staffing ................................................................ 38

  B. Messaging and Training ................................................................... 41

    1. Leadership Academy ............................................................. 41

    2. EEO Office Messaging and Training..................................... 44

  C. CDIO Initiatives............................................................................... 46

  D. Officer Performance Evaluations...................................................... 49

  E. Inspections, Investigations, and Compliance ................................... 51

    1. Monitor Report on EEO Investigative Procedures and the Duration of Investigations ................................................. 51

    2. Inspections and Monitoring .................................................. 52

    3. EEO Investigative Practices.................................................. 53

IV. Medical Exam ........................................................................................... 54

  A. City's April 18, 2024 Attrition Metrics Report ............................... 54

  B. February 12, 2024 BHS Attrition Metrics Report of Disparate Impact in Medical Sub-Steps ................................................................ 57

  C. Monthly BHS Update re: Blood Pressure, PFT, Weight, and Stairmill .............. 58

  D. Addressing Medical Exam Attrition Holistically ................................. 61

V. Character Screening by the CID and PRB ................................................. 63

VI. Firefighter Exam ...................................................................................... 66

  A. Exam Development............................................................................ 66

  B. Bonus Points .................................................................................... 67

VII. Additional Issues..................................................................................... 68

I.      **Executive Summary**

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order (the "MRO," Dkt. # 1143) during the period from February 15, 2024, the date of the Monitor's Forty-Second Periodic Report (Dkt. # 2233), to May 16, 2024.  The report also summarizes activities relating to the implementation of the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims (the "Disparate Treatment Settlement"), which the Parties agreed would fall within the Monitor's authority as defined in the MRO.  *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II of the report discusses candidate processing for the Exam 7001 civil service hiring list.  The City's April 18, 2024 cumulative report on the hiring process for the Exam 7001 list ("Attrition Metrics Report"), like previous reports, continues to show statistically significant disparities adverse to Black and Hispanic candidates in disqualification rates for the Candidate Physical Ability Test ("CPAT")[1] and the Medical Exam,[2] as well as in the rate at which candidates are referred to the Personnel Review Board ("PRB") in the character review process.  The report also shows a statistically significant disparity adverse to Black candidates in the rate at which candidates fail to appear for CPAT testing.  As discussed in detail below, the Monitor has continued to engage with the City regarding efforts to reduce or eliminate these disparities – including measures intended to improve pass rates for Black and Hispanic candidates in the remaining round of CPAT testing and to assist them in successfully navigating post-CPAT screening, including the Medical Exam, before the Exam 7001 list expires in February 2025.

---

[1] The CPAT is administered by the Department of Citywide Administrative Services ("DCAS").

[2] Medical screening administered by the FDNY's Bureau of Health Services ("BHS")

Since the last periodic report, the City has proceeded with plans for the fifth and final round of CPAT testing for Exam 7001 candidates ("Round 5"). Training for Round 5 began on February 12, 2024, the City began orientation on April 15, 2024, and the first series of CPAT practice sessions began on May 15.[3] The practice and testing sessions will continue until July 27, with training offered through the end of testing.

Given the disparities adverse to Black and Hispanic candidates in CPAT testing outcomes for Exam 7001 to date, and the disparity adverse to Black candidates in Round 4 of the CPAT, the Monitor has emphasized that the City's efforts to provide non-traditional candidates with guidance, encouragement, and training resources should be at least equivalent to its efforts in CPAT Rounds 3 and 4. However, the City decided to reduce the number of weekly training sessions during several weeks of the training period (from March 11 to May 11) for Round 4. The City theorized that the reduced schedule would be sufficient to serve the Round 5 group of candidates (which is about half as large as Round 4), and eliminated some training times that were more thinly attended in Round 4. But the Monitor and the other Parties have expressed concerns that although the reduced schedule may provide sufficient training capacity overall, it may still prevent some Black and Hispanic candidates with scheduling conflicts from attending enough training to be assured of passing the test.

In response to those concerns, the City confirmed before the Monitor's last report that it would report on training attendance on the same weekly schedule it had followed during Rounds 3 and 4 – so that the Monitor and the Parties would be able to identify any trends suggesting that the reduced schedule was operating as a barrier to attendance in key groups. The City has provided a series of reports (although not on a weekly schedule) showing the number of training

---

[3] Candidates have three chances to pass the CPAT – two "practice" tests and a final test.

sessions attended by candidates in each demographic group.  But the latest report covers only a portion of the period in which the number of weekly sessions was reduced, and the data reported thus far is insufficient for the Monitor to evaluate the effect of the reduced schedule on rates of attendance.  It remains uncertain whether rates of multi-session attendance for Black and Hispanic candidates will rise to (or, hopefully, above) the levels achieved in Round 4, and the Monitor has asked the City to adhere to a weekly schedule for cumulative updates on training attendance going forward and to include reports showing total training attendance by demographic group for each separate week of training, which would reveal whether training attendance declined in weeks with fewer training sessions.

Part II also provides updates on efforts to retain candidates who have passed the CPAT and have proceeded or are about to proceed to the subsequent steps of the hiring process.  The City's latest updated plans for communications with post-CPAT candidates includes motivational messaging and guidance for candidates currently in processing and those who will soon enter processing for the two remaining Exam 7001 Academy classes (in the fall of 2024 and early 2025).  In addition, the City has continued to offer the Fitness Awareness Program ("FAP") and stairmill fitness programs, and it has continued to task Outreach Coordinators with personal engagement with post-CPAT candidates.  The Monitor has obtained periodic updates on these initiatives and, in particular, intends to follow Outreach Coordinator staffing and activities closely as Round 5 candidates pass CPAT and enter the post-CPAT population of candidates.

Part II also discusses the City's recruitment campaign for the next entry-level firefighter exam, Exam 4044.  The City has advised that the application period will begin on June 24, 2024, and the exam will be administered in November and December 2024.  The City publicly launched the campaign in a ceremony on May 14.

As noted in previous reports, the City's approach to the recruitment campaign was to focus initially on events and engagements that after-action analyses of the Exam 7001 campaign identified as garnering high numbers and percentages of Black and Hispanic test takers with reachable exam scores, and the City planned to adjust the event schedule based on ongoing data from the current campaign, as well as to continue to direct outreach to candidates whose information is in the FDNY recruitment unit's database because they submitted expressions of interest ("EOIs") before the current campaign.  Also as previously reported, the Monitor and the Parties have agreed to a schedule pursuant to which the City produces post-monthly reports of recruitment data two weeks after the end of each campaign month, and the Monitor and Parties meet to discuss these post-monthly reports within a week of receipt.  The Monitor's expert has continued to work with the data provided each month by the City to analyze the relative success of events and identify trends and potential adjustments.  Given the importance of timely reporting, the Court has stressed the need for sufficient staff to enter recruitment data, and the Monitor has continued to follow up on staffing.  The City reports that it is generally able to enter most data on time, with the exception of some data from delayed EOI submissions by recruiters.

As of the end of March, the City has collected a higher number and percentage of Black EOIs (50%) and a lower number and percentage of Hispanic EOIs (30%) than it projected in the blueprint (42% Black and 37% Hispanic).  The City has made adjustments to the mix of events to draw greater Hispanic participation and has communicated with the FDNY Hispanic Society as part of its effort to bring on additional Hispanic recruiters; and FDNY recruitment staff believe the Hispanic percentage will increase going forward (in part because of outreach and engagement related to the marketing campaign).  As contemplated in the planning stages, the City has collected fewer EOIs in this recruitment campaign than it had at the equivalent stage of

4

the Exam 7001 recruitment campaign.  Further top-line takeaways are noted in Part II.  The most recent post-monthly report from the City (reporting April campaign data) was provided on May 14.  The Monitor's expert circulated an analysis of the post-monthly data on May 15, which was discussed in a virtual meeting with the Parties on May 16.

The Monitor and Parties received a sampling of draft campaign materials on May 6, 2024.  The City had scheduled a meeting for May 14 with Symphony Talent, the Monitor, and the Parties to discuss these materials.  The City advised shortly before the meeting started that the City had already given Symphony Talent its final approval for much of the traditional media materials for the campaign, but the Monitor and Parties attempted to provide feedback to inform later iterations.  The Plaintiffs-Intervenors also reiterated a longstanding request to see a summary of main takeaways from focus groups conducted by the City to inform the campaign (anonymized and further redacted by the Monitor).

Part II also reports on initiatives developed by the Working Group established pursuant to the Disparate Treatment Settlement, including the inaugural class of the Fire Cadet program.

Part III of the report summarizes recent activities relating to the FDNY's EEO function. In response to the serious concerns expressed by the Court at the March 14 status conference, the City has taken several steps intended to increase EEO Office staffing (both temporarily and permanently), reduce its backlog of open investigations, and provide the resources needed to complete EEO investigations within the presumptive 90-day limit set by the City's own EEO policy.  The City has begun assigning EEO cases to three attorneys from other FDNY units, and – following up on a long-standing suggestion by the Court – to three more attorneys from the City Law Department, with plans to train two more Law Department attorneys to take on EEO cases.  The City reports that, since the March 14 conference, it has also completed hiring for a

permanent investigative attorney, who is scheduled to start work on May 28, that it has nearly completed hiring for a second attorney, that two more attorneys have accepted conditional offers, and that the City has posted one more attorney position, for which interviews are under way.  In a May 14 letter to the Court (Dkt. # 2249), the City also advised that the selection process is under way for a hybrid Reasonable Accommodation/Investigations attorney.  The City anticipates that if all these hiring processes are completed (without further attrition), it will have added six attorney positions to the EEO Office by July or August this year, and the staff of investigative attorneys not counting the hybrid position) will have been increased to nine attorneys.  The Monitor intends to follow developments in staffing, case durations, and other EEO Office activities closely to determine whether additional steps will be needed to ensure that staffing remains at the levels needed for the Office to complete investigations and all its assigned functions expeditiously and effectively.  In a May 15 Minute Order, the Court directed the Monitor to provide a further updated report on the City's progress in these areas by June 14.

Part III also reports on the leadership training program that the City has committed to conduct for all FDNY managers (including Fire, EMS, and civilian), as part of its chosen strategy to improve EEO climate and compliance.  As the City has recognized (as early as its 2013 EEO Report), the program responds to a pressing need for officers to be provided with the guidance and resources that enable them to foster and maintain an inclusive and professional workplace.  The City has presented the program as a key component of its response to workplace issues identified in the EEO climate survey.

Since the last periodic report, a working group of FDNY stakeholders led by the Chief Diversity and Inclusion Officer ("CDIO") and the Chief of Training, with some participation by the Monitor's experts, has held two further monthly meetings, completed a draft outline of topics

and key training messages, and begun developing potential case studies and scenarios for use in the training.  However, pursuant to the City's chosen approach, work on the detailed content of training materials will not begin until the City has finished engaging the vendor who is expected to work with the curriculum group to translate the concepts and illustrative scenarios into final training presentations and guidance for facilitators.  As reported by the City on May 14, the City has selected a vendor and notified the vendor of its intent to proceed.  The City advised that within the next two weeks, the vendor and senior members of the Leadership Development Working Group will convene to clarify contract deliverables.  The City anticipates that it will ask the vendor to work "at risk" pending finalization of the contract.

The City originally projected that a pilot version of the leadership training would be launched in January 2024, with the full program to be rolled out following the pilot training later in 2024.  But at the January 11, 2024 conference, the City advised that initial pilot training sessions would be pushed back to the fall of 2024, and training for all supervisors would not take place until the first quarter of 2025.  In its May 14 comments on a draft of this report, the City advised that it now plans to run the pilot program in January 2025, while still planning to roll out the full training program in the first quarter of 2025.  The postponement of the pilot heightens the concerns the Monitor previously expressed regarding earlier delays in the development of the program, which could prevent FDNY officers from receiving urgently needed guidance.  Since the last periodic report, the Monitor has urged the City to take interim steps to preview key messages and make managers aware of resources on which they can rely in managing workplace climate and conflicts.  The City has advised that it plans to conduct interim trainings for Fire Captains and a seminar for Chiefs to communicate some essential guidance while the pilot of the full leadership training program is developed.  The Monitor will continue to engage with the City

regarding these interim initiatives and report to the Court while work on the full leadership development program goes forward.

Part III also discusses recent activity related to the EEO messaging plan that the City filed with the Court on November 15, 2023.  Preparation of the plan was delayed for years because the City chose to await the results of the climate survey analysis so that it could tailor its messaging themes to issues identified by the survey; and since the plan was filed, there have been further delays in launching messaging initiatives as scheduled.  The first three messaging topics were scheduled for delivery in December 2023, January 2024, and April 2024, respectively.  But only the first round of messaging (on the role and function of the EEO Office) has been rolled out, with messaging issued in March.  The City has indicated that it plans to circulate an updated plan that accounts for the delays and reflects other changes in the timing and content of messaging (including some responding to comments by the Monitor and the other Parties).  But it has not yet produced an updated plan.  Several of the topics are time-sensitive (for example, regarding politics in the workplace); and some respond to urgent concerns identified in the climate survey.  The Monitor has urged the City to expedite the development and delivery of additional rounds of messaging.

In other areas relating to the FDNY's EEO function, Part III summarizes the Monitor's continuing efforts to evaluate the City's use of the EEO metric in officer performance evaluations, which was implemented in 2018.  Part III also recounts recent activities relating to a set of nine initiatives that the CDIO described in a June 1, 2023 report to the Commissioner, and which the Commissioner has approved.  The Monitor has continued to obtain updates on these initiatives, most of which have not yet been fully implemented.

Part IV reports on developments related to the Medical Exam.  In its April 18, 2024 Attrition Metrics Report, the City reports that the Medical Exam continues to produce statistically significant disparities adverse to Black and Hispanic candidates in both the physical portion of medical testing (as distinct from drug or psychological testing) and the Medical Exam overall.  Of the candidates who appeared for the Medical Exam, 79% of Black candidates, 85.9% of Hispanic candidates, and 92.5% of white candidates have been medically qualified.  Since the last attrition metrics report, produced by the City in December 2023, the gaps between the Black and Hispanic rates of qualification and the rate for white candidates have continued to worsen, with the Black qualification rate now 13.5 percentage points below the rate for white candidates and the Hispanic qualification rate now 6.6 percentage points below the white rate and showing even greater disparate impact than reported in December.

The City also reports that 9.4% of Black, 6.9% of Hispanic, and 7.2% of white candidates (all of whom previously took and passed the CPAT) have voluntarily attritted before their scheduled initial Medical Exam appointment.  *See* April 18, 2024 Attrition Metrics Report at 24. In addition to those who have attritted, the numbers and percentages of candidates whose status remains pending – because of the need for follow-up medical documentation or testing or for other reasons related to the Medical Exam – are concerning, especially this late in the life of the hiring list.  As noted in the previous periodic report, and discussed at the March 2024 status conference, candidates who remain in pending medical status, even if never disqualified outright, lose their chance to become qualified and make it to appointment before the list expires.  As of the April 18 report, there are 73 Black and 77 Hispanic candidates in pending medical status. The current Hispanic pending rate for the Medical Exam is more than one and a half times higher than the white rate, and the Black pending rate is now more than two and a half times higher than

9

the white rate.  As noted in the last report, it is critical that the City do all it can to encourage and assist Black and Hispanic candidates to remain in the Medical Exam process, including those at risk of attritting after having begun medical testing, and help the pending candidates complete the exam, because the time left in which they can make it through to the Academy is quickly slipping away.  This need is even more urgent now than it was at the time of the last periodic report.

The City has produced more detailed data about the sub-steps of the Medical Exam in reports produced on February 12 and April 19.  These reports of BHS data are discussed in greater detail in Part IV.

Part V reports on discussions of the FDNY's character review process and reforms intended to address the disparate impact produced by this step in the hiring process.  As previously reported, in December 2022, the City implemented several changes in the criteria governing referral to the PRB.  The Monitor approved these modifications on the condition that the City provide additional analyses showing the effect the changes would have had on previous referrals to the PRB and candidate outcomes.  The Monitor provided the City with a detailed request for these analyses on April 12, 2023.  But the City has not yet provided the requested analyses, although it did provide some different information on individual candidates referred to the PRB under discontinued criteria.  The Monitor is continuing to engage with the City to obtain the outstanding analyses.

Part VI discusses the City's development of the next computer-based test ("CBT"), which the City currently plans to administer in November and December 2024.  Talogy (successor to the vendor that developed Exams 2000 and 7001) will develop, administer, and analyze the results of the exam.  Experts for the Monitor and the Parties are meeting with Talogy on a

regular basis (most recently on May 16) to provide guidance and input, as they did during the development of Exam 7001.

Talogy plans to use forms previously developed for Exams 2000 and 7001 for the upcoming exam, making sufficient alterations to guard against any exposure the forms had during prior administrations.

To confirm the ongoing validity of its previous job analyses, Talogy conducted two job analysis sessions with current FDNY personnel (firefighters on April 3 and officers on April 4). Talogy shared the results of the sessions with the other experts on April 29, and the experts met to discuss them on May 2.  The Monitor and Plaintiffs-Intervenors have provided feedback, and Talogy is working to finalize the job analysis report. Talogy was scheduled to circulate the test questions, the scripts for the videos, and the testing guides for review on May 2, but the experts have not yet received those materials.  Talogy has said that it will circulate the materials and a revised schedule soon.

As previously reported, the City has increased the number of bonus points New York City residents will receive on exam scores from five points to ten points.  (The City has already done this for the NYPD exam.)  The City stated that it did not attempt to model the likely effect of the change, but acted based on an assumption that the change would be generally helpful overall, and subsequently pointed to an analysis of the projected effect on Black candidates performed by Plaintiffs-Intervenors.  The Monitor's expert performed an analysis indicating that – assuming a usual four-year list life – the effect of the extra five bonus points for Exam 7001 would have been an increase in the Black percentage of reachable candidates from 17.7% to 18.8% and in the Hispanic percentage from 26.4% to 27.4%.

Part VII describes a range of additional issues addressed by the Monitor and the Parties during the period covered by this report.

## II.   **Recruitment, Candidate Processing, and Attrition Mitigation**

### A.   **Candidate Processing**

#### 1.   Trends in Candidate Processing to Date

##### a)   *The City's April 18, 2024 Attrition Report*

The City's most recent updated Attrition Metrics Report (dated April 18, 2024) covers all candidate processing for Exam 7001 through the appointment of the March 25, 2024 Academy class, including Round 4 of CPAT testing, and it continues to show statistically significant disparities adverse to Black and Hispanic candidates in testing outcomes for the CPAT and the Medical Exam, and in the referral phase of character review (the rate of referrals to the PRB). The rate at which Black candidates called for CPAT did not appear for testing is also higher than the rate for white candidates to a statistically significant degree.  Additional analyses performed by the Monitor using the City's figures also show statistically significant disparities adverse to Black and Hispanic candidates in overall rates of qualification for the CPAT (the rate of qualification among all candidates invited for testing, including those who appear for testing and those who do not), and a statistically significant disparity adverse to Black candidates in rates of qualification among candidates who received any final decision from the character review process (either a decision by the CID not to refer them to the PRB or a final decision from the PRB, following referral, whether they were qualified for character).

b)      *CPAT Round 4*

As previously reported, on December 28, 2023, the City provided the Monitor with final updated data showing attendance and outcomes for Round 4 CPAT testing.[4]  Monitor's Forty-Second Periodic Report at 14.  Based on this data, the Monitor performed updated calculations showing the rates of attendance and outcomes for key demographic groups in Round 4 – set forth in the table below.[5]

| | CPAT Round 4 – Revised Figures | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Attended (any practice or final)[6] | Attended (passed + failed final) | Passed | Total | Overall Pass Rate | Attendee Pass Rate (any practice or final) | Attendee Pass Rate (passed + failed final) | Attendance Rate (any practice or final) | Attendance Rate (passed + failed final) |
| Black | 356 | 325 | 299 | 974 | 30.7% | 84.0% | 92.0% | 36.6% | 33.4% |
| Hispanic | 468 | 435 | 399 | 1,201 | 33.2% | 85.3% | 91.7% | 39.0% | 36.2% |
| White | 801 | 757 | 720 | 2,184 | 33.0% | 89.9% | 95.1% | 36.7% | 34.7% |

As discussed in the Monitor's previous report, the figures show statistically significant disparities adverse to both Black and Hispanic candidates compared to white candidates in attendee pass rates (using either definition of attendance).  Monitor's Forty-Second Periodic Report at 14.  The overall pass rate for Black candidates (the pass rate for all candidates invited to testing, both those who attended testing and those who did not) had exceeded the overall rate

---

[4] The City provided a data set including "DCAS's Round 4 results for all candidates" and simultaneously provided a list of a small number of promotional candidates who appeared in the DCAS data set but should not be included in Exam 7001 analyses.  The Monitor's analysis excludes the promotional candidates.

[5] The table includes minor corrections to the figures shown in the Monitor's previous report – based on a further review of the City's data.  The corrections do not affect the overall findings regarding significant disparities between groups.

[6] This table shows two different figures for attendance – one figure that counts as "attended" all candidates who attended at least one practice session or the final test, the other that counts as "attended" only those candidates who either passed the test in a practice session or attended the final test.

for white candidates in Round 3,[7] but it declined in Round 4 and dipped below the rate for whites, although the gap in overall pass rates in Round 4 was not statistically significant.  *Id*. at 14-15.  The overall pass rate for Hispanic candidates surpassed the rate for white candidates in Round 4.  *Id*. at 15.

> c)   *March 25, 2024 Academy Class*

On May 14, 2024, the City provided the following figures showing the composition of the March 25, 2024 class:

| March 25, 2024 Academy Class | |
| --- | --- |
| Asian | 8 (2.6%) |
| Black | 53 (17.0%) |
| Hispanic | 93 (29.9%) |
| Native American | 1 (0.3%) |
| White | 156 (50.2%) |
| Total | 311 |

> 2.   Overall Firefighter Demographics

Also on May 14, the City provided the following figures showing the current representation of Black, Hispanic, and white firefighters in the FDNY firefighter force, which continue to reflect increasing diversity in the firefighter force:

---

[7] As calculated by the Monitor, based on figures provided by the City, the overall pass rates in Round 3 (among all candidates invited to CPAT) were 34.3% for Black candidates, 33.3% for Hispanic candidates, and 33.9% for white candidates.  Monitor's Fortieth Periodic Report (Dkt. # 2195) at 13-14.

| Firefighter Force (as of 5/10/2024) | |
|---|---|
| Black | 990 (11.8%) |
| Hispanic | 1,591 (19.0%) |
| White | 5,453 (65.0%) |
| Total | 8,387 |

3.   <u>March 13, 2024 Graduating Class</u>

As reported by the City on May 14, the following figures show the composition at

graduation of the Fire Academy class that entered the Academy on November 6, 2023 and

graduated on March 13, 2024:

| March 13, 2024 Graduating Class | |
|---|---|
| Asian | 11(3.4%) |
| Black | 51 (15.8%) |
| Hispanic | 103 (31.9%) |
| Native American | 4 (1.2%) |
| White | 154 (47.7%) |
| Total | 323 |

As for previous classes, the City has provided information on the initial assignments for

probationary firefighters from the class to confirm its compliance with Paragraph 1(d) of the

Disparate Treatment Settlement, which requires the City to give "New York City residents who

graduate from the Fire Academy first priority for placement into a fire company within the

Division in which they live, to the extent reasonable, practicable, and consistent with operational

needs."  On May 8, the City provided a summary of initial assignments for the class.  The City

reported that 195 of the 254 City residents in the class requested priority for assignments in their

home divisions and that all but 24 of the requests were granted.  According to the City, all 24

members whose requests were denied were residents of the same division, and operational needs

15

required them to be assigned to companies in other divisions.  The City reported that no non-City residents or City residents from other divisions were assigned to the division requested by the 24 members whose requests could not be fulfilled.  The Monitor also anticipates that the City will provide detailed data showing individual assignments for the class, as it has for previous classes.[8]

**B.      Attrition Mitigation and Candidate Processing**

1.      Monitor's Analysis of Round 4 CPAT Training Attendance and Testing Outcomes

As noted in the Monitor's previous report, on January 31, 2024 the City provided the Monitor with a data compilation showing training attendance for all Round 4 candidates.  Since the last periodic report, the Monitor has performed analyses combining the training data with the data for CPAT outcomes that the City provided on December 28, 2023, in order to assess correlations between training and CPAT qualification for Round 4 candidates.[9]  Based on the Monitor's expert's analysis of the Round 4 data, attending four training sessions, on average, resulted in a 90% or higher likelihood of passing for both Black and Hispanic candidates who attended testing.  Analyses from previous rounds of CPAT testing had similarly indicated that Black and Hispanic candidates with at least three training sessions achieved a 90% pass rate.  Monitor's Twenty-Ninth Periodic Report (Dkt. # 1966) at 17-19.  The Monitor's analysis also identified the stairmill and the ceiling breach events as the components of the CPAT most commonly associated with failures.

---

[8] As for previous classes, the City's May 8 report also included analyses showing that the recent assignments reflect no disparity adverse to Black or Hispanic firefighters in assignments to busy fire companies or ladder companies.

[9] The Monitor has also considered data collected from "scantron" forms the City uses to record information from CPAT training sessions, which the City produced on January 12, 2024.

According to the City's figures for Round 4, 33.3% of Black candidates, 34.1% of Hispanic candidates, and 23.2% of white candidates attended training. But rates of multiple session attendance were substantially lower: 23.7% of Black candidates, 25.8% of Hispanic candidates, and 16.3% of white candidates attended three or more sessions. For four or more sessions, rates of attendance were 19.3% for Black candidates, 20.6% for Hispanic candidates, and 11.2% for white candidates. Many candidates attended CPAT testing (either practice testing or the final test) with fewer than three training sessions: among candidates who attended testing, 41% of Black candidates, 40.8% of Hispanic candidates, and 57.3% of white candidates had fewer than three training sessions. Ninety-four of 356 Black candidates who attended testing (26.4%) had attended no training sessions, and their pass rate was only 70.2%. Among Hispanic candidates, 113 of 468 CPAT test-takers (24.1%) had no training, with a pass rate of 71.7%.

As noted in the Monitor's previous report, the Monitor has asked the City to specify any analyses of its own that it is conducting or plans to conduct regarding Round 4 data (including CPAT outcomes and any correlations between outcomes and attrition mitigation initiatives) and to state when the City expects to complete them. But to date the City has not identified any detailed analyses it has performed with Round 4 data.

2.    CPAT Round 5

Since the Monitor's last periodic report, the City has moved forward with its plans to administer the CPAT to a fifth and final round of Exam 7001 candidates, consisting of approximately 2,000 candidates from the 96 score band. The City began offering CPAT training on February 12 and will continue to offer training through the end of CPAT testing; orientation began on April 15; the first of two series of CPAT practice sessions began May 15; and practice and testing will continue through July 27. Round 5 of CPAT testing will produce an additional group of post-CPAT candidates who will move on to post-CPAT processing for the remaining

17

Exam 7001 Fire Academy classes, one to begin in the fall of 2024 and the other projected to begin in February 2025.

As previously discussed in detail, the Monitor and the other Parties have urged the City to provide, at a minimum, substantially the same outreach and training resources for Round 5 candidates that it provided for Rounds 3 and 4.  In Round 3, Black candidates achieved a higher pass rate than white or Hispanic candidates overall, and the gap in overall pass rates between white and Hispanic candidates was smaller than in previous rounds.  Monitor's Forty-First Periodic Report (Dkt. # 2220) at 13.  The City took the position that these favorable results meant that its plans for communications and training for Round 4 should be similar to those for Round 3.  But for Round 4, the Monitor's analysis found statistically significant disparities adverse to both Black and Hispanic candidates in pass rates among candidates who appeared for testing.  Given those results, the Monitor urged the City not to reduce its efforts for Round 5 without a strong basis to believe that doing so will not worsen disparities adverse to Black and Hispanic candidates.  Monitor's Forty-Second Periodic Report at 13.  The Monitor also noted that it would be important for the City, the Monitor, and the other Parties to follow data on training attendance, testing attendance, and testing outcomes closely in order to identify any trends that might call for adjustments in the City's approach.

In most respects the City's attrition mitigation efforts – including its communications with candidates and its plans for CPAT training – resemble those in which it engaged during CPAT Rounds 3 and 4.  But the Monitor and the other Parties have remained concerned that in some areas, most notably a reduced schedule of CPAT training sessions, changes in the City's approach to training and candidate engagement may have a negative effect on the rates at which Black and Hispanic candidates appear for and pass the test.

18

Communications – Since the Monitor's previous report (on February 29 and April 19), the City has circulated two updated versions of its communication plan for Round 5 CPAT candidates[10] – listing communications in which the City has engaged and plans to engage with targeted candidates (Black, Hispanic, Asian, and women candidates) in connection with Round 5.  As previously reported, the plan includes all the categories of communication provided for candidates in Rounds 3 and 4 – email and text notification regarding CPAT orientation, training, and testing; phone outreach regarding the importance of CPAT training; email and text reminders regarding CPAT practice and testing appointments; and texts and phone calls to candidates who fail or fail to attend CPAT practice sessions.  The plans also include messages advising candidates that they may appear for CPAT training without appointments.  The City has also provided two reports (delivered on April 11) showing individual text and phone communications, which also reflect frequent communications with candidates regarding CPAT training, with an emphasis on targeted candidates.[11]

However, the Monitor remains concerned that the City's planned communications do not ensure that candidates receive clear guidance about how to reschedule CPAT practice and testing sessions, if they cannot attend on the day that DCAS assigns.  The ORR[12] communications in the City's plan, along with DCAS emails regarding rescheduling,[13] include the DCAS number for candidates to call and the times of day to call to reschedule, but they do not include clear

---

[10] The initial version of the City's plan was circulated along with its proposed Round 5 schedule in January.  Monitor's Forty-Second Periodic Report at 17-18.

[11] The City provided updated reports on individual communications on May 16, which the Monitor will review and analyze.

[12] The FDNY's Office of Recruitment and Retention

[13] The City provided a copy of DCAS's message to candidates on March 21, 2024.

instructions for the flexible rescheduling option that was available in Round 4 and a portion of Round 3 – allowing candidates to leave voice messages choosing new times for CPAT practice and testing sessions and to appear for their chosen rescheduled sessions without receiving affirmative confirmations from DCAS.  The Monitor has continued to urge the City to provide complete instructions in all its communications regarding rescheduling and asked the City to ensure, at a minimum, that full instructions are provided in DCAS's outgoing voice message. The City confirmed in a May 2 email to the Monitor and the other Parties that the DCAS outgoing message had been updated to inform candidates that they could appear for their chosen sessions without awaiting confirmation.

<u>CPAT Training</u> – As discussed above in Part II.B.1, the Monitor's analyses of data from Round 4 training and testing have confirmed findings from previous rounds that attendance at multiple training sessions (at least three or four) is associated with the highest pass rates, especially for non-traditional candidates.  The City's Round 5 CPAT training schedule provides for fewer training sessions each week than the City offered to candidates in Rounds 3 and 4. From February 12 to March 11, the schedule called for training on four evenings each week and for morning and afternoon sessions on Saturday (omitting Sunday sessions that had been offered in previous rounds).  From March 11 to May 11, the City implemented a reduced schedule, conducting training on two weekday evenings and on Saturdays.  On May 11, it resumed offering training on four weekdays and Saturday, and it will continue conducting training on that schedule until CPAT testing ends at the conclusion of testing in July.

In a February 7 meeting with the Monitor and the other Parties, the City explained that it did not believe eliminating sessions would reduce training attendance among Black and Hispanic candidates, noting that the Round 5 group of candidates is approximately half the size of Round

4, and stating that Sunday sessions and some late evening weekday sessions had been thinly attended in previous rounds and that sometimes candidates feel less motivation to attend any session if they have many sessions from which to choose.  However, the Monitor and the other Parties were (and remain) concerned that reducing the days and times when candidates can train would make it more difficult for some candidates to attend training and prevent them from attending enough sessions to prepare them for the test.

In response to the concerns expressed by the Monitor and the other Parties in the February 7 meeting and other discussions, the City confirmed that it would provide reports on training attendance on the same weekly schedule it had followed during Rounds 3 and 4 – to permit analysis of whether the reduced schedule was associated with lower rates of attendance in key groups.  Based on aggregate data, which does not break out the reduced-schedule weeks specifically, attendance rates for the first eight weeks of training appears to be roughly similar to those for a similar stage of training in Round 4 for Black candidates, and somewhat lower than the Round 4 numbers for Hispanic candidates.[14]  As of April 19, 2024, 185 of 551 Round 5 Black candidates (33.6%) had attended at least one training session, and 104 (18.9%) had attended three or more; 204 of 680 Hispanic candidates (30%) had attended at least one session, with 135 (19.9%) attending three or more; and 290 of 1,312 white candidates (22.1%) had attended at least one session, with 180 (13.7%) taking three or more.

Although the Monitor has asked the City to provide reports showing total training attendance by demographic group for each separate week of training – which would show whether training attendance declined in weeks with fewer training sessions – the City has

---

[14] As reported by the City, as of June 13, 2023 (about eight weeks into Round 4 training), 32.4% of Black candidates had attended some training, and 19.8% had attended three or more sessions.  The corresponding figures for Hispanic candidates were 33.8% and 21.9%; for whites, 22.0% and 11.8%.

provided only aggregated data for all weeks combined.[15]  Based on the figures reported to date, it remains uncertain whether rates of multi-session attendance for Black and Hispanic candidates will rise to (or, hopefully, above) the levels achieved in Round 4; and the data reported thus far is insufficient for the Monitor to evaluate the effect of the reduced schedule on rates of attendance.

As training continues, it is vital for the City to continue to communicate the importance of attending multiple training sessions to candidates, and to monitor and report training attendance frequently, so that the City, the Monitor and the Parties can promptly identify and try to address any negative trends in attendance.  Given the disparities adverse to Black and Hispanic candidates in Round 4 testing outcomes, given the disparity adverse to both Black and Hispanic candidates in all CPAT testing outcomes for Exam 7001 to date, and given that many Black and Hispanic candidates in Round 4 attended testing with fewer than the recommended number of training sessions (or no sessions at all), the City must make all possible efforts to encourage and facilitate training attendance among non-traditional candidates.  The City must also resume providing reports on training attendance on the same weekly schedule that applied in Rounds 3 and 4; and now that CPAT practice has begun, the City must also provide the Monitor and the other Parties with at least weekly reports on attendance and outcomes in practice and testing – so that the Monitor and the Parties can identify and address any trends adverse to Black and Hispanic candidates.

In addition, as discussed in the Monitor's previous report, the fact that many candidates still attend CPAT testing without having attended the number of training sessions historically associated with success on the test, even though the City has adopted the Monitor's suggestion to

---

[15] The reports the City provided on April 19 included a spreadsheet showing dates of attendance for some, but not all of the training sessions that candidates had attended.

specifically communicate the number of sessions associated with increased pass rates, tends to suggest that the time needed to travel to the FDNY's training location on Randall's Island may be an impediment to attending multiple sessions.  The City previously indicated that a new training site was in development but would not be available before the expiration of the Exam 7001 list.  The Monitor has made clear that the City must complete the remaining steps for establishing the new site as soon as possible and ensure that it is ready, at a minimum, before the first round of CPAT training for candidates from the next open competitive examination.

Additional Training Resources – The City previously confirmed that other training resources in addition to CPAT training (including stairmill training sessions and access to stairmills in City recreation centers) would continue to be available on the same terms the City offered in Round 4.  Monitor's Forty-Second Periodic Report at 19.  It also confirmed that it would continue to offer shuttle service to the CPAT training site on Randall's Island from FDNY Headquarters in Brooklyn and from an upper Manhattan location.  *Id*.

Rates of participation in the stairmill training program remain low.  On April 11, 2024, the City circulated an updated report showing participation in the program since October 2022.  According to the City's report, 10.3% of Black candidates invited to the program, and fewer than 10% of Hispanic and white invitees, have attended stairmill training, which serves both pre-CPAT and post-CPAT candidates.

3.     Post-CPAT Attrition Mitigation

On May 14, 2024, the City reported the current demographic breakdown of the approximately 724 candidates who have passed the CPAT and remain eligible for appointment to the next two Fire Academy classes (in the fall of 2024 and early 2025), which will be the last classes drawn from the Exam 7001 hiring list.  A total of 623 candidates are in active processing for the fall 2024 class, in demographic percentages as follows:

23

| ELIGIBLE FOR FALL 2024 CLASS (Candidates with list numbers of 11,103 or below) | | |
|---|---|---|
| ETHNICITY | COUNT | % |
| Asian | 19 | 3.0% |
| Black | 126 | 20.2% |
| Hispanic | 171 | 27.4% |
| Native American | 2 | 0.3% |
| White | 305 | 49.0% |
| Grand Total | 623 | 100.0% |

A further 101 candidates will enter processing later for the 2025 class, with the following

breakdown:

| ELIGIBLE FOR WINTER 2025 CLASS (Candidates with list numbers between 11,103 and 13,035) | | |
|---|---|---|
| ETHNICITY | COUNT | % |
| Asian | 2 | 2.0% |
| Black | 8 | 7.9% |
| Hispanic | 25 | 24.8% |
| Native American | 1 | 1.0% |
| White | 52 | 51.5% |
| Grand Total | 101 | 100.0% |

Once Round 5 of CPAT testing is completed, assuming rates of attrition comparable to

Rounds 3 and 4, several hundred additional candidates will join the post-CPAT pool of

candidates considered for appointment to the final Exam 7001 Academy class in early 2025.

The Monitor has continued to obtain information and make recommendations regarding

the City's attrition mitigation efforts for these groups of candidates.

Training Programs – The City has continued to offer post-CPAT candidates a stairmill-

focused fitness training program as well as its Fitness Awareness Program ("FAP").[16]  The FAP resumed on January 16, 2024 following a period of inactivity since October 2023 – with training offered to all candidates who have passed the CPAT and remain eligible for appointment to the Fire Academy.  The FAP schedule circulated by the City on April 9 calls for monthly sequences of assessment and training sessions in each month from May through July 2024.  Previous analyses have found a strong association between the FAP and success in achieving appointment to the Fire Academy, but figures from previous sequences of training have indicated low levels of attendance (approximately 20% or lower) for all demographic groups.[17]  *See, e.g.*, Monitor's Forty-Second Periodic Report at 24.  The Monitor has continued to encourage the City to promote participation aggressively.

As noted above, the City's most recent report on stairmill training (covering cumulative figures from October 2022 through April 11, 2024, for both pre- and post-CPAT candidates) continues to reflect low rates of participation for all demographic groups, with attendance rates at or below 10% of candidates invited to training for all demographics.

Candidate Communications – The City provided ORR's most recent updated communication plans on April 19, 2024 – including its current plan for communications relating to post-CPAT processing targeting candidates who have already passed the CPAT and those who will pass in Round 5.  With the expiration of the Exam 7001 list approaching (in February 2025) and only two Academy classes remaining to be filled, all the current post-CPAT candidates have

---

[16] The FAP is a multi-session program of fitness assessment and training for post-CPAT candidates, described in detail in the Monitor's previous reports.  *See* Monitor's Thirty-Second Periodic Report (Dkt. # 2004) at 18-19; Monitor's Thirty-Third Periodic Report (Dkt. # 2029) at 16-17.

[17] The City circulated a report on FAP participation on May 16, which shows attendance rates of 22% for Black and Hispanic invitees and 14.5% for white invitees.  But the report does not clearly indicate the period it covers.  The Monitor will seek clarification from the City.

already entered or will soon enter active processing for the remaining Academy classes, and Round 5 candidates will enter active processing for the fall 2024 and winter 2025 classes as soon as they pass the CPAT.  Accordingly, the City's updated plan includes messages targeting candidates for whom processing is either in progress or imminent – including processing updates, motivational messaging, fitness guidance, and guidance regarding the administrative requirements of the hiring process.

As noted in the Monitor's periodic reports, previous plans for communications with post-CPAT candidates included little or no messaging tailored for candidates facing long wait times before they would be called for entering active post-CPAT processing (CID intake, the Medical Exam, and character review).  Monitor's Thirtieth Periodic Report (Dkt. # 1976) at 11-12; Monitor's Thirty-Eighth Periodic Report (Dkt. # 2139) at 47-48; Monitor's Forty-Second Periodic Report at 18-19.  Now that post-CPAT processing is either in progress or imminent for all the remaining Exam 7001 candidates who have passed or will pass the CPAT, those concerns are largely moot.  But to the extent that the processing timelines for different groups of candidates continue to require different messaging tailored to their situations, the City's most recent plan now appears to provide some of the tailored messaging the Monitor had recommended.[18]

Outreach Coordinators – Since the last periodic report, the City has continued to represent that ORR Outreach Coordinators communicate with all post-CPAT candidates at least monthly (and more frequently for those in active processing) to deliver appointment reminders or

---

[18] In addition to updated communication plans, the City has also continued to provide reports on individual text and phone communications with candidates, which the Monitor has continued to review. The reports circulated on April 11 reflect communications with post-CPAT candidates regarding CID intake and the Medical Exam, along with some communications regarding stairmill training and the FAP. The City circulated an updated report on May 16, which the Monitor will review and analyze.

other information, accompanied by encouragement to remain in the process.  On December 27,

2023, the City advised that ORR then had two firefighters serving as full time Outreach

Coordinators and a further five firefighters who assist on an overtime basis "as needed," and the

City reported that firefighters working on overtime would assist with Coordinator outreach.  The

City has reported no changes in Coordinator staffing since that time.  As noted in the Monitor's

previous report, the level of Coordinator staffing is concerning, given that it is substantially

below levels from previous years.  Monitor's Forty-Second Periodic Report at 27 & n.19.  Based

on the City's figures for the demographic breakdown of post-CPAT candidates (shown above),

the Coordinators currently serve a total of 135 Black candidates and 196 Hispanic candidates.

Those numbers will increase considerably once Round 5 candidates pass the CPAT, and the

Monitor will continue to seek updates on Coordinator staffing and activities to confirm that

staffing is sufficient to maintain engagement with the entire population of Black and Hispanic

post-CPAT candidates.

4.   <u>Mentor Program</u>

Before the Monitor's previous report, the Monitor had expressed concerns regarding the

apparent rate at which Mentors had failed to attempt to make contact with their mentees, based

on the City's December 20, 2023 report.  In response, the City provided some assurances

regarding the procedures it employs to follow up when reports indicate either that Mentors have

not contacted mentees or that mentees have not responded.  The Monitor urged the City to

promptly identify Mentors' failures to make contact with mentees, expedite Mentor-mentee

reassignments where needed, and ensure that Mentors maintain frequent contact with mentees.

Since then, the Monitor has continued to seek updated reports regarding Mentor assignments and

activities, including any instances in which Mentors have failed to reach out to their assigned

mentees.  After multiple requests, the City provided a report containing some information about

27

Mentor contacts on April 25.  But the report did not include essential information needed to assess the level of contacts, including the number of instances in which Mentors had failed to attempt to communicate with mentees and the number of mentees with whom contact had been made (information which had been included in the City's December 20, 2023 report).  The Monitor is engaging with the City to obtain the necessary information.[19]

## C.    Recruitment Campaign

The City's establishment of a sustainable process for successfully recruiting and retaining Black and Hispanic firefighter candidates is a central goal of the MRO and the Monitorship.  *See* MRO ¶¶ 31-36.  The Court specifically found that a policy or practice that "fails to adequately recruit black persons to become firefighter candidates serves to maintain and perpetuate the effects of the City's discrimination against black firefighter candidates."  Findings of Fact (Dkt. # 741) at 33.  As the Court and the Monitor have emphasized from the outset, the City must continue to use data-driven analyses of its recruitment efforts to identify the most productive and cost-effective means of attracting Black and Hispanic candidates likely to achieve reachable scores on the firefighter examination and ultimately be appointed as firefighters.  *See, e.g.,* Monitor's Recruitment Report to the Court (Dkt. #1464) at 40-44; Monitor's Fifteenth Periodic Report (Dkt. #1669) at 5 (compiling additional citations).

The Monitor submitted a report to the Court on July 19, 2023 (the "July 19 Report") (Dkt. # 2191) that included a number of conditions for the Monitor's approval of the commencement of the campaign, as contemplated by Paragraphs 11 and 16 of the MRO.  The

---

[19] On April 29, the City provided a pdf report that appears to show all Mentor contacts with all mentees in individual listings by mentee – which could be used to count up the requested totals.  The Monitor has asked the City either to provide the data in a searchable format or to provide an update of the summary information it included in its December 20, 2023 report.

conditions include the following:  campaign results, as outlined in the City's campaign "blueprint" and elsewhere, will be promptly reviewed by the City each month and shared with the Monitor and the other Parties for review and input; in the event the City falls short of its target metrics, it will adjust its strategies and resources expeditiously, based on the data it has gathered and analyzed; and the City must provide a description of the initial campaign strategy, branding approach, and advertising "creative" materials the FDNY plans to use within two weeks of their development with Symphony Talent.[20]  *See, e.g.*, July 19 Report at 2, 8.  These areas of activity are discussed below.

The Monitor learned on May 14 – via a report in the digital version of the Brooklyn Daily Eagle[21] – that the City publicly launched the campaign earlier that day, in a ceremony conducted by Commissioner Laura Kavanagh.[22]

       1.    Campaign Blueprint

The campaign blueprint includes, among other things, a timeline; a general strategy for field events and candidate engagements; projections for events to be held each month; targets for numbers and percentages of diverse EOIs, filers, test-takers, and reachable candidates; data retention plans; an outline of tasks the City expects Symphony Talent to undertake; and plans for

---

[20] Other conditions include the City's agreement to (a) have sufficient resources in place and pre-scheduled meetings with Symphony Talent to evaluate and respond expeditiously to any negative trends that are revealed once the filing period begins; (b) be prepared to adjust its strategies and resources depending on the productivity of various campaign approaches and initiatives, including, if warranted, by adding events to the calendar and by having Symphony Talent make adjustments to its own efforts; and (c) provide the Monitor and the other Parties with weekly reports of the numbers and demographics of exam filers once the filing period opens (tracking separately the numbers and demographics of filers who self-recruited, filers who were legacy EOIs, and filers who submitted EOIs during the campaign).

[21] *See* https://brooklyneagle.com/articles/2024/05/13/fdny-set-to-launch-new-diversity-recruitment-campaign/.

[22] The ceremony can be viewed at: https://www.youtube.com/watch?v=1JIF9WGeNCs.

monthly meetings with the Monitor and the other Parties to discuss the City's progress and results.

Timeline – Although the blueprint projected a March-May 2024 filing period and a July-August 2024 test administration period, the application period is now scheduled to begin on June 24, and the City currently anticipates that the exam will be administered in November and December 2024.

Strategy – As previously reported, the blueprint describes a general approach of emphasizing events that after-action analyses of the Exam 7001 campaign identified as garnering Black, Hispanic, and women test takers with reachable exam scores, with adjustments to be made to this emphasis, based on new data as it becomes available.  The blueprint includes a schedule of the types and number of field events projected to be run each month between the launch of the campaign and the end of the filing period.  The blueprint also outlines the City's hopes for interest from legacy EOIs – candidates who filled out EOIs in the last campaign or between campaigns – who are more diverse than the projected total population of filers.

Targets – As previously reported, the blueprint contains the following targets:  1,090 field events;[23] 33,150 EOIs; EOIs to be 42% Black and 37% Hispanic; filers to be 30% Black and 27% Hispanic (out of an unprojected total number of filers); test-takers to be 28% Black and 27% Hispanic (out of an unprojected total number of test-takers); and the reachable candidate pool to be 21% Black and 27% Hispanic.[24]

---

[23] The City's strategy calls for fewer events than it ran in the Exam 7001 recruitment campaign.

[24] As noted in previous reports, the City has not projected the total numbers of filers or test-takers because it does not know how many people will file to take the test without having indicated their intention to do so by filing an EOI.  In the past, this pool of "self-recruits" has been less diverse than the EOI-filing pool. The success of the campaign will depend not only on the number and percentage of diverse EOIs the City

<u>Monthly Assessments</u> – The blueprint states that the City will provide monthly assessments to gauge its progress against its goals.  The success of the various field events each month – in terms of numbers of EOIs and their demographic percentages – will be measured against the City's target numbers and percentages, and adjustments will be made to increase the frequency of those events (by type and location) and engagements that have performed above the targets and reduce the frequency of those that have underperformed.

2.      <u>Reporting and Analysis of Campaign Results</u>

The Monitor and the Parties are following a schedule pursuant to which the City circulates post-monthly data reports two weeks after the end of each campaign month, the Monitor's expert uses the data to conduct analyses of campaign results and trends, and the Monitor and Parties meet to discuss these reports within three weeks of the end of the campaign month.  The most recent post-monthly data report was provided by the City on May 14, the Monitor's analysis was circulated on May 15, and the report and analysis were discussed on May 16.

a)      *Recruitment Events*

As previously reported, the City's reports include the date, type, and borough for each event the City has run, and the number of EOIs collected at each, by gender and race/ethnicity.[25] The City produces the data in an electronic format that allows the Monitor's expert to generate a

---

converts to test-takers but also on the number and percentage – as yet unknown and unprojected – of diverse self-recruits who take the test.

[25] The City is not including data about the costs relating to campaign events in the post-monthly reports but has circulated a week's worth of sample data so that the Monitor and the other Parties can assess whether the City is tracking sufficient data to permit a meaningful cost-effectiveness analysis at the conclusion of the campaign.  This will hopefully avoid the problems with missing data that sharply limited the scope of the cost-effectiveness analysis of the Exam 7001 campaign.  After clarifying some anomalies with the City on an April 18, 2024 call, the Monitor's expert confirmed that the City had produced the requested data.  The other Parties are continuing their assessments.

report that shows the relative success of event types, boroughs, and times of day on a monthly basis; trends based on cumulative report data; and comparisons to the Exam 7001 campaign. The Monitor circulates these expert reports along with a list of top takeaways to the Parties, and these have provided the context for the post-monthly report calls.

The topline takeaways from the Monitor's expert's most recent report (dated May 15, 2024 and based on the City's data for April, as reported in the City's May 14 post-monthly report) are as follows:

- The number and percentage of Black EOIs continue to be above the blueprint's projections, and the number and percentage of Hispanic EOIs continues to be below the blueprint projections.  (The blueprint percentage projection was 42% Black and 37% Hispanic; as of the end of April, the EOIs collected were 49% Black and 30% Hispanic.) The City is aware of the lower-than-projected number and percentage of Hispanic EOIs, and it has increased event types and locations where it has seen higher numbers and percentages of Hispanic EOIs.  There has been a small, gradual rise in the overall percentage of Hispanic EOIs and a related gradual downward trend in the Black percentage, as the City pivots toward events that are better for Hispanic recruitment, bringing the percentages incrementally closer to the blueprint projections.  (The percentages in April were 47% Black and 31% Hispanic.)  As previously reported, the City also projects from prior exam data that there will ultimately be a higher rate of engagement from Hispanic EOIs over time and that the Hispanic conversion rate (meaning those who not only fill out EOIs but also go on to take the test) will be higher than the Black conversion rate.

- Although, as of the end of April, the City had collected 3,393 more EOIs than the blueprint goal through April, the overall number of EOIs to date continues to be well below what it was for Exam 7001 at the same point in the campaign.  The numbers of EOIs per event are similar, but there have been fewer events overall than over the same period for Exam 7001.  These results were anticipated by the City in the blueprint and reflect its strategy, based on analyses of the Exam 7001 campaign, to gather fewer EOIs overall than it did during the Exam 7001 campaign, with a greater emphasis on engaging legacy EOIs.

- On average, the number of EOIs per event (across all races/ethnicities) decreased slightly in April, after having seen slight increases over the previous few months.  These trends roughly mirror the trends seen during the Exam 7001 campaign, but the current average number of EOIs per event is lower than during the Exam 7001 campaign.  Nevertheless, the City ran 212 events in April, which more than in previous months and well above the blueprint goal of 60 events for April.

b)      *Recruitment Engagements*

The City has said it hopes to persuade legacy EOIs whose information was in the FDNY database before the campaign began to take the current test by starting tutorials earlier, inviting them to events, and communicating with them frequently.  The City sent invitations to tutorials and/or mobile academies to the approximately 72,000 individuals in this group in the summer and early fall of 2023.  But it did not run tutorials in September, November, or December 2023, and has held only twenty-three this year.  The City has stated that it plans to hold more frequent tutorials going forward.  The following are topline takeaways about the City's engagement efforts to date:

- As previously reported, only a small fraction of the approximately 72,000 legacy EOIs invited to a tutorial or mobile academy as of March 31 have responded, and even fewer (1,944) have attended a session.

- Of the 1,502 individuals who have attended a tutorial, 614 (41%) are Black, 707 (47%) are Hispanic, and 46 (3%) are white.  Of the Black individuals invited to tutorials, 1.7% have attended; those figures for Hispanic and white individuals are 2.4% and 3.3%, respectively.

- The Hispanic attendance rate at tutorials is above average, while the Black attendance rate is below average.

Given the continuing low rate of response to the City's engagement efforts so far, it remains difficult to assess the continued interest of the legacy EOI group.  The City continues to report the number of legacy EOI candidates to whom the City has reached out (by email, phone, and/or text) who have advised the FDNY that they are no longer interested in becoming firefighters.  The City's position is that, unless a candidate responds "no" or affirmatively directs the City to stop engaging, the candidate is still interested and should be engaged during the campaign; but the extent to which these candidates remain sufficiently interested to become test-takers remains unknown.  The City has stated that it will focus more on evaluating EOI engagement after it has more engagement data – including both responses to communications

33

and further participation in the tutorials and mobile academies it plans to hold with greater frequency leading up to the exam – and after the work of the City's advertising vendor (which will include inviting candidates to provide information about themselves that the FDNY can use to communicate with them) has begun.

### 3.   Staffing

At the October 2023 status conference, the Court directed the Monitor to provide reports on the timeliness with which EOIs are being entered into the City's data system, in part to ensure that the City's post-monthly reports are accurate.  The City has reported that its post-monthly reports generally include the majority of EOI data, except for some EOIs submitted late or incomplete by recruiters, and the reports are generally produced on time, give or take one or two days.

### 4.   Symphony Talent Campaign

The City's marketing vendor, Symphony Talent, has developed a media strategy (where and when to place ads), a related branding approach (what the ads/outreach actually consist of), and a customer relationship management (CRM) plan to engage potential candidates.

#### a)   *Media Strategy*

The media strategy calls for the creation and placement of ads and other forms of outreach in various formats/media.  The objectives of these forms of outreach differ, with some designated "top-of-funnel" (meant to drive general awareness) and others "lower-funnel" (meant to drive specific actions, such as filing for the exam).  Symphony Talent has incorporated media that are intended to reach a range of audiences, including digital kiosks, billboards, palm cards, and subway posters placed across a variety of zip codes covering neighborhoods with different demographic mixes of population, including zip codes with high Black and Hispanic representation.  The plan also includes ads on Spanish language radio stations.

Symphony Talent also plans to market on Meta, the parent company of Facebook and Instagram, to drive general awareness of the FDNY's recruitment campaign among a broad audience across the New York metro area.[26]  Symphony Talent is also considering whether ads could fruitfully be targeted to candidates with specific interests (such as fitness) using available targeting methods on sites like Facebook.

> b)  *Branding Approach*

The overall tagline of the campaign is "All Heroes Welcome."  The ads feature photographs of actual firefighters shown in uniform (including firefighters from different demographic groups), along with their affiliation (*e.g.*, ladder or engine number), and positive statements about them and the FDNY.  The City provided mock-ups of the creative materials on May 6, 2024, and it has just informed the Monitor that it considers these to be final versions, the submission of which the Monitor made a condition for approval of the campaign.  *See* July 19 Report at 8.  Symphony Talent projects that these ads will appear from now into August.

The creative materials shared on May 6 consist of a pdf document with images and/or descriptions of the various permutations of the ads that will make up the marketing campaign. These include the copy for the voice-overs for radio ads; images of the various outdoor ads that will appear in transit kiosks, etc.; images of the various digital ads; and images of the ads that will appear in printed periodicals.  The materials note which target audience each variant is meant to appeal to (*e.g.*, "Black" or "Hispanic").  An example of a programmatic video ad was

---

[26] Plaintiffs-Intervenors have expressed concern about including Meta advertising in the campaign strategy, and about the geographic criteria Symphony Talent will use, both of which will allow the campaign to reach a great number of target individuals but will also risk reaching high numbers of non-target individuals.

shown to the Parties during the meeting with Symphony Talent on May 14, along with ads that will appear on Meta social networks.

### c) CRM Engagement Strategy

Symphony Talent has also shared its plans to engage potential test-takers who choose to provide contact information to the agency's Customer Relationship Management system. Candidates will receive email and SMS messaging through the end of the testing period. Messaging content will change based on the status of the specific candidate (for example, whether they have filed or not) and the amount of time remaining before test administration. Symphony Talent has provided a high-level description of the various types of messages and their objectives and has described the expected cadence of message delivery, also at a high level.

### d) Monthly Reporting

The blueprint calls for Symphony Talent to make monthly presentations regarding its progress to the Monitor and other Parties, and it has agreed to report on the results of each of its efforts and to discuss possible pivots and updates. This is consistent with the Court's long-time goal of assessing which methods of outreach are most effective and most cost-effective at garnering a diverse group of entry-level firefighters. Reports will include metrics by type of media/channel (*e.g.*, how many people have been reached via social media posts, posters), showing the FDNY's reach to candidates based on the type of outreach, broken down by race/ethnicity and gender when possible.

In addition, the Monitor has asked to receive copies of any documents generated for special purpose calls between the City and Symphony Talent, including those that relate to the review of creative concepts and/or social strategy presentations.

### D.    Working Group

The Working Group Committee was established pursuant to the Disparate Treatment Settlement with the goal of "creat[ing] educational and other opportunities that will enhance the ability of New York City students to pursue careers as New York City firefighters."  Proposed Stipulation and Order (Dkt. # 1291-1) ¶ 1(e).[27]  The Monitor has received periodic updates on the two principal Working Group initiatives – the FDNY Fire Cadet program and the FDNY Explorer program, which have been described in detail in previous reports.  *See* Monitor's Fourteenth Periodic Report (Dkt. # 1651) at 13-14; Monitor's Seventeenth Periodic Report (Dkt. # 1714) at 11-12; Monitor's Nineteenth Periodic Report (Dkt. # 1761) at 17-18.

On July 25, 2023, the City reported that the initial Fire Cadet class had begun on June 5, 2023.  As of May 14, 2024, Fire Cadets had completed over 11 months of program activities.  The period ended with a total of 86 Cadets, after one separated from the program. (One of the Cadets transitioned to the FDNY Fire Academy as a probationary firefighter.)  The class includes 20 Black Cadets (23%), 37 Hispanic Cadets (43%), and 35 white Cadets (40%).  All 86 Cadets filed their applications to take the Promotion to Firefighter exam with DCAS.  The Fire Cadet Academy has begun providing concentrated test preparation as part of the curriculum.

As previously reported by the City, there are 13 "Cadet Cadre" members assigned to provide ongoing guidance and training to Fire Cadets – preparing them to eventually become probationary firefighters.  Staffing also includes 25 Cadet Advisors, who are assigned to approximately four Cadets each and are required to make at least one contact per week with each of their Cadets.

---

[27] As noted above, the Parties agreed that the Disparate Treatment Settlement would fall within the Monitor's authority as defined in the MRO.  *See* Stipulation and Order dated June 5, 2015; *see also* Memorandum & Order dated June 5, 2015 at 10.

The City also reports that as of May 13, 2024, the Explorer Program is operating with several posts, totaling 48 participants. FDNY will be adding approximately 25 Explorer recruits to the program during summer 2024.

## III.   EEO

### A.      EEO and Related Staffing

EEO Office – As most recently reported by the City, the FDNY EEO Office currently includes the following personnel:

Managing Attorneys (2)

1 Assistant Commissioner
1 Deputy Director

Attorneys (7)[28]

4 Investigations Attorneys
1 RA Attorney (handling requests for accommodations)
1 Intake Attorney
1 Training Coordinator

Non-Attorneys (2)

1 Office Manager
1 Analyst

The current EEO Office staff of nine attorneys thus remains seven attorneys short of its pre-pandemic level of 16 attorneys, and one Deputy Director short of its pre-pandemic roster.[29] The staff of four investigators remains four short of the eight investigators handling cases in mid-2019.  *See* Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 24.

---

[28] The City's policy is to have the investigative work of the EEO Office conducted entirely by attorneys (along with other responsibilities such as firehouse inspections and EEO training).

[29] The pre-pandemic roster included contract attorney positions, some of which were made permanent.

As discussed in detail in the Monitor's April 26, 2024 Report on EEO Office staffing (Dkt. # 2246) and in the City's April 12 and May 14 letters to the Court (Dkt. # 2244 and 2249), in response to the Court's direction to take steps to remedy deficiencies in EEO staffing, the City has begun assigning EEO cases to attorneys from other FDNY units and to attorneys in the City Law Department.  As reported in the City's May 14 letter, the City has begun assigning EEO cases to three attorneys from other FDNY units, and to three more attorneys from the City Law Department, with plans to train two more Law Department attorneys to take on EEO cases.  The temporary assignment of Law Department attorneys is a measure the Court proposed on a number of occasions, beginning at the September 8, 2022 status conference and, most recently, at the status conference on March 14, 2024.

The City reports that, since the March 14 conference, it has completed hiring for a permanent investigative attorney, who is scheduled to start work on May 28; that it has nearly completed hiring for a second attorney; that two more attorneys have accepted conditional offers; and that the City has posted one more attorney position, for which interviews are under way.  In its May 14 letter to the Court, the City also advised that the selection process is under way for a hybrid Reasonable Accommodation/Investigations attorney.  The City anticipates that if all these hiring processes are completed (without further attrition), it will have added six attorney positions to the EEO Office by July or August this year, and the staff of investigative attorneys (not counting the hybrid position) will have been increased to nine attorneys.

As reflected in the Monitor's April 26 report and in periodic reports, long-running deficiencies in EEO Office staffing have been associated with long delays in completing investigations, with 38.9% of all matters initiated in 2023, and 80% of 2023 complaints, taking more than 90 days to complete.  The City stated in its April 12 letter to the Court that it had

closed 30 cases since March 14, and projected that it would close approximately 40 more cases before the scheduled May 20, 2024 status conference.  In its May 14 letter, the City reported that since the March 14 conference, it had closed 70 cases (15 complaints and 55 inquiries), including 34 matters that were more than 90 days old (13 complaints and 21 inquiries).  This represents a significant increase in the rate of closings, and the Monitor has discussed with the City the need to ensure that as it works to clear the backlog of cases, all causes of action and relevant evidence receive thorough consideration.  The Monitor has asked the City to expedite its production of EEO investigative files pursuant to the Monitor's standing request, so that the Monitor can remain current in the evaluation of the City's investigative practices.

As most recently reported by the City on May 14, 2024, the average investigator caseload for the EEO investigative attorneys is 15.5 cases, and 26 cases have been assigned to five other EEO attorneys and supervisors.

CDIO Office – As reported by the City on May 14, 2024, in addition to the CDIO himself, the CDIO Office includes a Senior Director, two "Diversity and Inclusion Managers," a Program Manager, and a CDIO Aide.

EEO Counselors – More than a year ago, the City advised the Monitor that the FDNY's team of EEO Counselors (firefighters and officers whose role is to act as liaisons between the firefighter force and the EEO Office) had experienced significant attrition.  Monitor's Thirty-Eighth Periodic Report at 72.  As most recently reported by the City, there are currently 33 Counselors.  In August 2023, the Assistant Commissioner advised that he had received preliminary approval to post and interview for enough additional Counselors to bring the total number up to 40 – ten fewer than the pre-pandemic team.  But approval for the additional positions has not yet been confirmed.

BITs Staffing – The Monitor has also continued to seek updates on staffing and caseloads in the Bureau of Investigations and Trials ("BITs"), which handles the disciplinary phase of EEO cases where the EEO Office has substantiated violations.  As reported by the City on May 14, 2024, the BITs staff includes an Assistant Commissioner, a Deputy Director, four Associate Disciplinary Counsels, one Department Advocates, two Emergency Medical Technicians, one paramedic, and five EMS Lieutenants.

**B.      Messaging and Training**

1.      Leadership Academy

The City has continued work on a "leadership academy" or "leadership development program" intended to train FDNY officers and supervisors in leadership principles and skills needed to cultivate and maintain a professional and inclusive workplace.  The CDIO and the FDNY Chief of Training have continued to meet with the curriculum development group (comprising representatives of FDNY bureaus, affinity groups, and labor unions), which has been tasked with developing topics, messages, and case studies for use in the training – with the most recent meetings held on March 11 and April 22.  Representatives of the Monitor and the Monitor's experts have also continued to attend and participate in the discussions and content development.  The group completed a draft outline of training themes before the last periodic report; and the two most recent meetings have focused on the development of ideas for case studies illustrating key training themes.  Group members have also finalized materials for use in recruiting training facilitators from FDNY membership and have continued to develop the process for recruiting and selecting facilitators.  However, according to the City's plans, work on the detailed content of the training materials will not begin until the City has finished engaging a vendor to work with the curriculum development group to translate the thematic outline and case study concepts into training presentations and guidance for facilitators.

41

As reported by the City on May 14, the City has selected a vendor and notified the vendor of its intent to proceed.  The City advised that within the next two weeks, the vendor and senior members of the Leadership Development Working Group will convene to clarify contract deliverables.  The City anticipates it will ask the vendor to work "at risk" pending finalization of the contract.

According to the City's most recent update, the City now plans to select and train program facilitators during the fall of 2024, roll out a pilot version of the leadership training for a sample group of supervisors in January 2025, and launch the program for the full population of FDNY supervisors later in the first quarter of 2025.  The City's plan to run the pilot program in January 2025 reflects a further postponement of the launch date for the pilot – which was originally planned for January 2024 and then pushed back to the fall of this year.  *See* Monitor's Forty-Second Periodic Report at 45-46; and the postponement raises concerns that the launch of the full program (which was originally scheduled for 2024) may also be further delayed.  Given the importance of the program in addressing continuing issues in FDNY workplaces, the City must make all possible efforts to adhere to the current schedule.

In addition to work on the main leadership development program, the Monitor has also continued to urge the City to implement key guidelines and deliver essential leadership training messages before the launch of the pilot training and the rollout of the full program in 2025.  At a meeting with the Monitor's team and experts on April 22, the CDIO and the Chief of Training outlined and discussed plans for some interim training measures.  The CDIO reported that he has been working with the Deputy Commissioner and Chief Legal Officer for the FDNY (formerly Assistant Commissioner for EEO) and the Chief of Department on a training for Fire Captains intended to provide essential guidance, advice, and resources on leadership topics.  The City

expects the training to be launched in June in collaboration with operational leadership.  In addition, following up on recommendations from the Monitor's experts, the group also discussed plans for the FDNY to conduct a leadership seminar for Chiefs, to be led by the Chief of Operations, which will also provide a preview of key themes from the leadership development program.  Given that the full leadership development program will not be launched until the first quarter of 2025 (assuming the City adheres to its current schedule), it is important for the City to implement these interim training measures expeditiously and ensure that they communicate essential training messages effectively.  The Monitor will continue to seek updates on the preparation and rollout of these initiatives.

The Monitor has also continued to urge the City to expedite other steps – including new rules, guidelines, and messaging – to complement leadership training initiatives.  The Monitor has encouraged the City to prioritize and accelerate components of its EEO messaging plan (discussed below) that focus on the mission-critical nature of diversity, the role of EEO as a resource for officers, and the key role of leadership in managing firehouse conflicts and climate. As noted in previous reports, the Monitor has pressed the City to finalize, issue, and publicize a set of new guidelines that clarify the role of senior firefighters and emphasize that officer responsibilities for addressing workplace conflicts and maintaining an inclusive and professional workplace climate are non-delegable.[30]  Also as previously noted, the Monitor has continued to follow up on long pending recommendations that officers be provided with guidance on "house

---

[30] The City provided the Monitor with a draft of the guidelines on August 14, 2023, on which the Monitor provided comments on September 29, 2023.  Monitor's Forty-First Periodic Report at 57-58.

rules"; that the FDNY require firehouse group chats to include (and be monitored by) officers[31];
that Deputy Chiefs include EEO and workplace professionalism topics in regular operational
inspections and related discussions; and that the Department make it clear to operational
commanders that failures to identify and report on conduct detrimental to workplace climate
(through the Workplace Professionalism reporting system and other channels) will have adverse
professional consequences. *See* Monitor's Forty-First Periodic Report at 54-55.

The Monitor has also encouraged the City to follow through on plans for a new iteration
of the climate survey to obtain an updated assessment of workplace climate and leadership.

### 2.   EEO Office Messaging and Training

The Monitor has continued to urge the City to follow through expeditiously and
intensively on the high-level, summary EEO communication plan that it filed with the Court on
November 15, 2023 – responding to the Court's order following the October 2023 status
conference.  The one-page plan the City filed on November 15, 2023 provided brief topic
summaries for ten messaging initiatives[32] scheduled to be rolled out over approximately the next

---

[31] The Monitor has repeatedly urged the City to enforce its existing policy requiring that FDNY-related
social media groups be registered with the Department.  The Monitor has recommended that groups
comprising most or all FDNY members in a given workplace and used for work-related communications
be registered with the Department and monitored by officers.  Monitor's Fortieth Periodic Report at 67.
In its February 12, 2024 comments on a draft of the Monitor's previous report, the City asserted that such
a requirement would not be lawful and several asserted grounds.  The Monitor will continue to discuss the
issue with the City.

[32] The ten listed messaging topics are

- Roles, Processes and Activities of the EEO Office and BITs
- EEO Compliance is Mission Critical
- EEO Misconceptions and Myths
- Leaders and EEO
- Politics and Divisiveness within the Workplace
- EEO, Effective Workplace Communication and Conflict Resolution
- Recognizing and addressing Incivility and Bullying

two years, beginning in December of 2023.  The first three messaging topics were scheduled for delivery in December 2023, January 2024, and April 2024.  But the City is already behind schedule, as only the first round of messaging (on the role and function of the EEO Office) has been issued – with messaging rolled out in March.  As previously reported, the Monitor and the other Parties provided comments on drafts of the first round of messaging materials.  Monitor's Forty-Second Periodic Report at 48-49.  The Monitor has requested, but has not yet received, copies of the final messaging content.

On a March 7 conference call with the Monitor and the other Parties, the City indicated that it would circulate an updated plan before the March 14 status conference, which would account for the delays and potentially include changes in the order in which message topics would be covered.  But the City has not yet circulated the update.  The City also previously agreed to circulate drafts of materials for each topic as they are prepared, *see* Monitor's Forty-Second Periodic Report at 49, but it has not yet circulated any drafts for upcoming rounds of messaging.

The delays in updating and implementing the messaging plan and in preparing drafts are very concerning.  The City postponed development of the plan for years while it awaited completion of the climate survey analysis (which was completed as of March 2023), and several of its component messaging initiatives are intended to address urgent, continuing issues that the survey identified – such as persistent "misconceptions and myths" regarding the increased diversity of the FDNY (including false assertions that standards and performance have declined).

---

- Fairness in the Workplace
- Responding to Misconduct in the Workplace and the Prohibition against Retaliation
- Social Media Rights and Prohibitions

One of the messaging units is intended to provide guidance regarding political issues in the workplace in connection with this year's election.  It is important for messaging on these themes to be delivered promptly and effectively.  The Monitor has also asked the City to confirm what steps it is taking to ensure that members are receiving messages and that operational leadership, including mid-level commanders, are involved in delivering them.  The Monitor has previously suggested that the City require Department Orders to be read at roll call, *see* Monitor's Forty-Second Periodic Report at 49, and has continued longstanding recommendations that the FDNY to use officers to communicate key messages (as it has for some previous EEO messaging initiatives).  *See*, *e.g.*, Monitor's Twenty-Seventh Periodic Report at 25.

In addition to the messaging listed in the City's long-range plan, in recent weeks the EEO Office has also issued discrete reminders and updates regarding specific EEO policies and resources – a Department Order and presentation on mediation resources, and a Department Order reinforcing anti-harassment policy, which included an anonymized summary of a recent EEO case and disciplinary action.  (The Monitor had provided comments on drafts of both communications.)

Since the last periodic report, the Monitor provided further comments on the City's draft of an updated EEO training presentation.  The City had provided a draft to the Monitor on December 20, 2023, and the Monitor had responded with some initial comments and asked the City to provide additional details regarding the guidance for training staff who would lead discussion of training scenarios.  The City provided the trainer notes on February 23, and the Monitor followed up with additional comments on February 29.

### C.    CDIO Initiatives

The Monitor has continued to encourage the City to follow up on recommendations made by the CDIO in a June 1, 2023 report and approved by the Fire Commissioner – including

46

messaging initiatives, policy reforms, organizational changes, and other measures intended to improve FDNY culture, leadership, and accountability.  *See* Monitor's Fortieth Periodic Report at 54-56; Monitor's Forty-First Periodic Report at 48-51.  The City has taken some further steps toward the reforms recommended by the CDIO; but most remain to be fully implemented, and some have not yet moved beyond the early stages of development, with essential details remaining to be determined.

As discussed in the Monitor's previous report and below in Part VI.B, the City has implemented a change in examination bonus points for the next open competitive exam, raising the number of points for New York City residents from five to ten (acting on the CDIO's recommendation that the City consider "expanded pipeline credits" for candidates as a strategy to increase diversity).  *See* Monitor's Forty-First Periodic Report at 48-49; Monitor's Forty-Second Periodic Report at 63-64.

As discussed above, the City has also continued to pursue initiatives in messaging and leadership training (areas discussed in two more of the CDIO's recommendations) which are in progress but delayed and incomplete.

The City reports that it has also held initial meetings of the "Leadership Advisory Council" recommended by the CDIO.  As described by the City, the Council consists of FDNY leadership and additional stakeholders selected by the Fire Commissioner, tasked with making recommendations and tracking progress in initiatives relating to the Department's diversity, equity, and inclusion goals.  Monitor's Forty-Second Periodic Report at 52.  The City reports that in April 2024, a meeting was held with internal stakeholders to discuss, among other things, the purpose and functionality of the group.  The next meeting to continue those discussions will be held in June 2024.

On March 12, in response to a Monitor request pending for several months, the City provided the Monitor with a draft disciplinary matrix that the City previously advised it had prepared to implement the CDIO's recommendation to "develop and implement disciplinary guidelines that are equitable, consistent, free of undue influence, and clearly communicated to and understood by all levels of the Department." Monitor's Forty-First Periodic Report at 49. The Monitor has reviewed the draft matrix in consultation with the Monitor's experts and sent the City a set of comments on May 14.

The CDIO's recommendation for a new "Professional Standards Division" that would combine and coordinate the investigative and disciplinary work of the EEO Office and BITs is still in the research and planning stage. As noted in the Monitor's two previous reports, the City has indicated that it expects to complete research regarding best practices for the Professional Standards Division in June 2024. The Monitor encourages the City to complete the research on schedule and move ahead expeditiously with implementing the CDIO's recommendation, and as noted in previous reports, the Monitor continues to urge the City to use its plans for the Professional Standards Division as an opportunity to implement needed reforms in BITs procedures to improve the timeliness, consistency, and transparency of BITs investigations. *See* Monitor's Fortieth Periodic Report at 71; Monitor's Forty-First Periodic Report at 50; Monitor's Forty-Second Periodic Report at 51. The Monitor also hopes that the findings and plans produced by the City's research will respond to the Monitor's pending requests for additional details regarding the proposal, including the following:

- specifics on the employment data that will be tracked by the Professional Standards Division
- plans to establish new procedures for BITs to align with EEO procedures
- plans for a central repository of complaints and disciplinary matters.

Relatedly, since the last periodic report, the Monitor continued to pursue a request (originally sent July 10, 2023) for the City to produce an updated account of dates of referral and dates of disciplinary action for EEO cases referred to BITs since the beginning of 2021.  On May 14, 2024, the City provided a summary of the number of cases referred to BITs since January 1, 2021 and the status and outcomes of those cases – but without reporting dates of referral or closing dates.  As reported by the City, the EEO Office referred 74 cases to BITs between January 1, 2021 and January 30, 2024.  Of the 74 total referrals, 54 cases have been closed and 20 remain open.  The 54 closed cases were resolved as follows:  Responded resigned or retired (5); Respondent received a penalty involving forfeiture of pay, probation and/or suspension (and in some cases transfer or counseling) (42); Respondent received a command discipline (3); Respondent was removed from their Command (1); Respondent required to attend training/counseling (1); case dismissed at Step 1 hearing (1); Respondent deceased prior to completion of case (1); and case administratively closed (1).  The Monitor plans to follow up further with the City to obtain the previously requested information regarding the dates of referral, closing dates, and the duration of BITs cases.

Two additional CDIO recommendations (for revised and updated transfer policies and a new "Risk Management Unit) remain in the early stages of development.  The City reports that it expects to complete research regarding best practices for Risk Management Unit in June 2024.

### D.    Officer Performance Evaluations

As previously reported in detail, based on the materials provided by the City to date (including data through the 2021 cycle of officer evaluations), the Monitor has not been able to confirm that the EEO metric consistently reflects officers' EEO performance and their support for the mission of the EEO Office, or that the system is informed by input from the EEO Office in all appropriate cases.  Monitor's Forty-First Periodic Report at 52-53; Monitor's Fortieth

periodic Report at 61-62.

The Monitor is still awaiting production of evaluation data and related materials from the 2022 and 2023 performance review cycles, pursuant to the Monitor's standing request.  The Monitor hopes that these materials will provide a further, updated picture of the functioning of the evaluation system.  Since the Monitor's last periodic report, the City has repeatedly indicated that production of these materials is imminent, but the Monitor has not yet received the materials from either cycle of reviews – or the related materials showing EEO Office input for the evaluations, which are also subject to the Monitor's standing request.  If the outstanding data and materials are not produced before the next status conference (scheduled for June 20), the Monitor will consider appropriate remedial action including seeking an order from the Court.

The Monitor also continues to await responses to several other questions and requests, which the Monitor has repeatedly renewed in regular communications with the Parties and which have long been pending, including the following:

- Two follow-up questions regarding reviews from the 2019 cycle, originally posed in an October 13, 2021 message (*see* Monitor's Thirty-Seventh Periodic Report (Dkt. # 2119) at 58);

- Questions first posed more than two years ago regarding the City's procedures for analyzing patterns in officer performance and the types of performance review data and analyses that the City is prepared to share with the other Parties[33] (*see* Monitor's Thirty-Fifth Periodic Report (Dkt. # 2082) at 51-52); and

---

[33] Previous communications relating to these issues are recounted in detail in previous reports.  Monitor's Thirty-Fourth Periodic Report (Dkt. # 2058) at 40 n.21; Monitor's Thirty-Third Periodic Report at 38-39; Monitor's Thirty-Second Periodic Report at 37; Monitor's Thirty-First Periodic Report (Dkt. # 1990) at 36-37.

- The Monitor's request that the City provide the other Parties with cumulative figures showing the ratings for officers in workplaces associated with EEO investigations. *See* Monitor's Thirty-Fifth Periodic Report at 53.[34]

As previously reported, on December 5, 2022, responding to a Monitor recommendation, the City stated that it intended to issue a "buckslip" to advise officers that EEO ratings and EEO performance will be factors in discretionary promotion and assignment decisions, but the communication still has not yet gone out to FDNY personnel.  The Monitor has repeatedly reminded the City to follow through on its plan to issue the notification, but it has not yet done so.

      **E.**      **Inspections, Investigations, and Compliance**

      1.      <u>Monitor Report on EEO Investigative Procedures and the Duration of Investigations</u>

As stated in the Monitor's previous reports, in consultation with the Court, the Monitor previously postponed filing a report on EEO investigative procedures and the duration of EEO investigations to observe and account for the effect of changes in staffing and revised practices. As discussed in Part III.A above in connection with EEO Office staffing, on April 26 the Monitor filed a report regarding the history of EEO staffing and case durations over the course of the Monitorship.  And in a May 15 Minute Order, the Court directed the Monitor to submit a further update by June 14 on the City's efforts to augment EEO staffing and improve its performance in the prompt completion of EEO cases.  The Monitor expects to provide further updates for the Court going forward (either in periodic reports or in separate special-purpose reports) regarding the City's progress in bringing EEO staffing up to a sufficient level and reducing the duration of EEO cases.  As noted above in Part III.C, the Monitor is still awaiting

---

[34] When first issued, that request referred to evaluations from earlier cycles of reviews.  The Monitor has updated the request to include data from the 2020 and 2021 cycles.

an updated account of dates of referral and dates of disciplinary action for EEO cases referred to BITs since the beginning of 2021.  Once that information is provided, the Monitor also expects to update the Court regarding the impact of BITs procedures and practices on the resolution of EEO cases.

2.     Inspections and Monitoring

As of May 14, 2024, the City reported that the EEO Office is currently conducting approximately two to three firehouse inspections per month.  Since January 2024, the City has inspected 44 fire companies, a rate it reports is significantly higher than 2023.  As noted above, the Monitor has continued to follow up with the City regarding a longstanding recommendation that operational commanders, including Deputy Chiefs and Battalion Chiefs, include EEO-related topics in regular operational inspections and related discussions with company officers. In recent discussions, the City reported that the Assistant Commissioner for EEO has met with Chiefs regarding plans for such expanded inspections, but to date the Monitor's recommendation has not been implemented.

As previously reported, in discussions of the expanded data analyses recommended in the CDIO's June 1, 2023 report to the Commissioner, the Monitor encouraged the City to reconsider including analyses of personnel data in the enhanced and expanded data analyses that the CDIO recommended in his June 1 report.  *See* Monitor's Fortieth Periodic Report at 68.  More broadly, as stated in previous reports, the Monitor has also previously noted that the City must establish and operate systems for regularly analyzing relevant data to identify disparate impact in both the hiring process and post-hiring employment decisions.  *See, e.g.*, Monitor's Twenty-Sixth Periodic Report (Dkt. # 1896) at 35-36.

3.  EEO Investigative Practices

The Monitor has also continued to evaluate the FDNY's EEO investigative practices – reviewing investigative materials produced by the City and conducting bi-weekly conference calls with the EEO Assistant Commissioner regarding open cases.  *See* Monitor's Thirty-Eighth Periodic Report at 88-89 & n.70, 71 (recounting the history of the City's productions of case materials).

The City has continued to produce some investigative materials since the Monitor provided the City with a January 18, 2022 set of recommendations on investigative practices.[35] Monitor's Forty-First Periodic Report at 59.  However, for several cases, City has provided final memoranda summarizing EEO Office findings, which the Monitor has reviewed, but has not yet provided full investigative files called for by the Monitor's standing request.[36]  The Monitor's ability to comment on the memoranda, which typically summarize selected facts gathered in the investigation and the reasons for the investigator's conclusion, is significantly limited without the information contained in the underlying files.  The Monitor has asked the City to expedite the process of preparing files for production – prioritizing files based on the Monitor's initial review of final memoranda – so that the Monitor can consider them in the evaluation of overall investigative practices and continue identifying any recurring grounds for concern.  The City has produced several files in recent weeks, but some remain outstanding.  The Monitor plans to

---

[35] For several cases, the City has provided final memoranda summarizing EEO Office findings, which the Monitor has reviewed, but it has not yet provided full investigative files called for by the Monitor's standing request.

[36] The "full" files include investigator notes, copies of documentary evidentiary materials gathered, and communications with parties and witnesses.  They also include summaries of witness interviews, but in most cases do not include transcripts of witness interviews:  interviews are transcribed in investigations that the EEO Office conducts jointly with BITs, but not in investigations conducted by EEO only.

provide the City with an updated set of written comments and recommendations regarding EEO investigative practices once the remaining files have been provided and analyzed.  As noted in previous reports, although recent cases have reflected some improvement in investigative practices, the Monitor has continued to observe further instances of some of the same deficiencies in investigative practices that were discussed in the Monitor's January 2022 memorandum.  *See* Monitor's Fortieth Periodic Report at 70-71; Monitor's Thirty-Ninth Periodic Report (Dkt. # 2163) at 74.  And the Monitor has discussed some of those issues in regular calls with the City regarding EEO topics.

## IV.   **Medical Exam**

### A.   **City's April 18, 2024 Attrition Metrics Report**

In every Exam 7001 attrition metrics report, beginning with the December 2019 report and including the most recent Attrition Metrics Report, dated April 18, 2024, the City has reported statistically significant adverse impact against Black and Hispanic candidates in the Medical Exam.  The City's April 18 metrics show that, of the candidates who appeared for the Medical Exam, 79% of Black candidates, 85.9% of Hispanic candidates, and 92.5% of white candidates have been medically qualified to date.  The City reports that these figures show disparate impact against both Black and Hispanic candidates.  *Id*. at 24-25.  Since the previous (December 14, 2023) attrition metrics report, the disparities in qualification rates have worsened for both Black and Hispanic candidates, with the Black qualification rate now 13.5 percentage points below the white rate and the Hispanic qualification rate 6.6 percentage points below the white rate and both showing even greater disparate impact than five months before.

Of the 552 Black and 860 Hispanic candidates who have made it to the Medical Exam step, only 395 (71.6%) and 688 (80%), respectively, have emerged as qualified.  Another 32

Black and 36 Hispanic candidates have received a disqualification decision.  The remainder
(including 125 Black and 136 Hispanic candidates) – all of whom were successfully recruited to
take the exam, achieved AFA scores of 97 and above, waited a long time (sometimes many
years) to take the CPAT, passed it, and are very close to the end of the qualification process – are
part of the increasingly high percentages of Black and Hispanic candidates who have either
voluntarily attritted from or are pending at the Medical Exam.

The City reports that 9.4% of Black, 6.9% of Hispanic, and 7.2% of white candidates
have voluntarily attritted before their scheduled initial Medical Exam appointment.  The City
reports that this indicates disparate impact in voluntary attrition from the Medical Exam.[37]  *Id.* at
24-25.

In addition to those who have voluntarily attritted, the numbers and percentages of
pending candidates are also concerning, especially with the expiration of the hiring list
approaching.  As noted in the previous periodic report, at the expiration of the Exam 2000 list,
the candidates who remained in pending medical status (*i.e.* had appeared for their initial medical
appointments but did not yet have a final determination that they were qualified or not qualified)
were never disqualified outright, but they lost the chance to *become* qualified, and any who
*would* have been qualified did not make it to appointment in time.  Based on data provided by
the City on April 18, 2024, the Hispanic pending rate (9.6%) for the Medical Exam overall is
more than one and a half times higher than the white rate (5.4%), and the Black pending rate
(14.6%) is now more than two and a half times as high as the white rate.  There are 73 Black and
77 Hispanic candidates in pending medical status.  In comments to a draft of this report, the City

---

[37] The Monitor has previously advised the City that the Monitor questions whether the data supports this
conclusion, but the City has not responded to the Monitor's comment and continues to report the same
information without explanation or changes to address the issues raised by the Monitor.

stated that an upcoming attrition mitigation report focusing on BHS-specific attrition is expected to show lower pending rates, based on the City's planned re-classification of the data discussed in Section IV.C, where the City will adjust the figures that it previously reported as "pending" by removing candidates who were disqualified at other steps while their medical status remained unresolved.

It is urgent that the City work to prevent Black and Hispanic candidates from leaving the hiring process before taking the Medical Exam, to help them prepare for success at their initial appointments, and to help the growing number of them who are still pending to become qualified.  The City notes that it sends reminders to candidates who have been in pending status for more than thirty days and that ORR conducts outreach in connection with the Medical Exam, including encouragement to participate in the FAP and one-on-one communications from outreach coordinators, although (as the City explained in response to the Court's questions at the most recent status conference) for HIPAA and privacy reasons, ORR personnel do not know why any specific candidate is in pending medical status and therefore cannot discuss with the candidate how to resolve their "pending" status, unless the candidate themselves discloses it. The Vulcan Society has also requested help from the City to contact Black firefighters who are in "pending" status to encourage them to follow up with BHS if necessary to determine the reasons for their pending status and try to resolve any outstanding issues.  The Monitor intends to work with the City before the scheduled June 20 conference to determine whether there are additional, more targeted steps that can be taken to help these candidates before the list expires, and to develop a plan of action.

**B.     February 12, 2024 BHS Attrition Metrics Report of Disparate Impact in Medical Sub-Steps**

The City provides reports to the Monitor and other Parties that analyze whether there is disparate impact in qualification rates for each sub-step of the medical examination.  The BHS Attrition Metrics report of medical sub-step data as of December 2023 was produced on February 12, 2024, after a delay the City advised it required in order to perform a "deeper dive" analysis that would result in more accurate reporting.  When the report was produced, the City explained that it had found errors in its prior reporting to the Monitor and Parties, caused by the City's mis-entry or misclassification of information.  The main finding of the February 12 report was that there is adverse impact against Black and Hispanic candidates in the Pulmonary Function Test ("PFT") sub-step, but – correcting prior reporting by the City – no adverse impact in the other sub-steps of the Medical Exam, including the Weight test (which the City reported had disparate impact in previous reports) and the Stairmill test (for which the numbers in the City's monthly updates frequently showed disparate impact).

The Monitor has identified numerous data and/or analysis inconsistencies in the February 12 report produced after the "deep dive," which require further clarification.  For example, as noted above, the City states that only the PFT sub-step of the medical exam has disparate impact.[38]  Elsewhere in the same report, however, the report states that there is also adverse impact against Black candidates in the Stairmill sub-step (*id*. at 5).  The February 12 report provides overall (as opposed to step by step) physical exam numbers that are identical to the overall numbers the City reported in the December 2023 FDNY Attrition Metrics Report, which

---

[38] *See* February 12, 2024 email cover for the February 12 report and page 24 of the report itself for an analysis showing disparate impact in the PFT, and pages 28 and 30 for analyses of the Weight and Stairmill tests showing no disparate impact.

conflicts with the City's statement that the February 12 report included numbers that corrected previous reporting errors. The City highlights a "key finding" of the report that over 90% of candidates who had begun the Medical Exam process had been qualified as of December 6, 2023 (*id*. at 5), but a later table (*id*. at 12) shows that 87% of candidates had been qualified. The City also states that it has provided a table that breaks down the reasons for which candidates are pending (*id*. at 27), but no such table is provided. The Monitor has also noted inconsistencies between the February 12 report and an update covering many of the same sub-steps that was provided by the City on April 19, discussed below. For example, the February 12 report showed 20 disqualifications at the PFT-sub-step and states that the PFT is causing disparate impact adverse to both Black and Hispanic candidates, but the April 19 update (which is cumulative of the data reported in February) reports that no one from any demographic group has been disqualified for PFT at all.

The City has indicated that the next BHS report, due in May, will further clarify its medical exam data, and the Monitor will wait to see whether that report answers the questions raised by the reports it provided in February and April.

### C.     Monthly BHS Update re: Blood Pressure, PFT, Weight, and Stairmill

Pursuant to the list extension conditions approved by the Court in its June 17, 2022 Order, the City must provide monthly updates on the four specific disqualification reasons that have historically been most associated with disparate impact in the Medical Exam (Blood Pressure, PFT, Weight, and Stairmill). The January 2024 update, like many before it, indicated that there was disparate impact against Black and Hispanic candidates in the PFT and against Black candidates in the Stairmill and Weight tests (the updates have also sometimes shown disparate impact against Hispanic candidates for Weight). The City did not produce monthly update reports in February or March but did provide a report on April 19, 2024.

Whereas previous reports had divided candidates into three classifications – Qualified, Disqualified, and Pending – the April 19 report added two further classifications:  Discontinued and FTC ("failure to cooperate").  The City has not clarified exactly what these two new categories mean,[39] especially with respect to how certain candidates have been moved out of the previously used three categories into these new categories and how these changes have affected calculations of disparate impact and pending rates.  The City has promised further explanation in reports due in May.  Neither of the new classifications, however, would move candidates into the Qualified category, and both could draw numbers out of the Disqualified and/or Pending categories, thereby affecting calculations of disparate impact and comparative rates of pending status, making it more difficult to get a holistic view of the effect the Medical Exam has on overall attrition.[40]  The City has indicated that it will provide more clarification in the next BHS

---

[39] On April 19, the City provided the following definitions along with the report: "Discontinued - Candidates that failed or voluntarily attritted from another station.  FTC – Candidates that failed to cooperate or appear for a specified station."

[40] Historically, a candidate received an FTC designation if the candidate failed to schedule or report for a follow-up test.  When there were only three categories (qualified, disqualified, pending) for the BHS reports, the City would have had to place FTC candidates into either the disqualified or pending categories.  During Exam 2000, FTC candidates were deemed to have been disqualified.  If the City's deeper dive involved moving candidates who had failed to appear for follow-up Weight testing or Stairmill testing out of the disqualified category and into a new, separate FTC category, one result could be that analyses no longer show disparate impact, even if Black and Hispanic candidates are not being qualified at higher rates.

A similar issue arises in connection with the Discontinued designation.  The Monitor believes the City says a candidate is "discontinued" for a sub-step when that candidate is no longer in the testing process for that sub-step because the candidate has already been disqualified by another sub-step.  For example, a candidate may be deemed "discontinued" for Weight if the candidate was pending for both Weight and Stairmill but was subsequently disqualified on the Stairmill.  The candidate would then be moved from pending in Stairmill to disqualified for Stairmill, and from pending in Weight to discontinued for Weight.  The problem is that, while the disqualification for Stairmill will be counted in disparate impact analyses of the Stairmill, the candidate has also been functionally disqualified by the Weight exam, having tried to pass it and having failed to do so, but that functional disqualification will not be included in either

attrition metrics report and monthly update, both due in May, and the Monitor will wait to see whether those reports provide clarity with respect to the City's classification and what conclusions to make about the City's analyses.

In the interim, the Monitor has performed preliminary analyses with the data reported in the April 19 update. First, using only the data in the City's Qualified and Disqualified categories, there is no finding of statistically significant disparate impact in the Blood Pressure, Weight, and Stairmill tests (though the numbers are extremely close to showing such impact for Black candidates). As noted above, the data indicate that no one from any demographic group was disqualified for PFT, but that data is clearly incorrect – the City has reported twenty instances of candidate disqualification for the PFT and that the PFT has a disparate impact adverse to both Black and Hispanic candidates. February 12, 2024 BHS Attrition Metrics Report at 23-24. The disqualification numbers reported for both Weight and Stairmill in the April 2024 monthly report are notably higher than those reported in the cumulative February BHS Attrition Report; it is unclear whether there has been a significant, recent increase in disqualifications in the intervening months or perhaps the misclassifications the City says it has corrected have not been corrected within the BHS data systems. Second, using the Qualified category and a combination of the Disqualified and FTC categories (which, until the City provides more

---

disparate impact analyses of the Weight test, or even in the rate at which candidates remain pending for Weight. It makes that candidate's inability to pass the Weight test disappear from analyses.

.

context, appears to be a reasonable way to analyze disqualification data for impact), there is a finding of disparate impact against Black candidates in the Weight and Stairmill tests.[41]

### D. Addressing Medical Exam Attrition Holistically

As the Monitor noted in the last periodic report, the negative impact of the Weight and Stairmill tests (and thus the Medical Exam overall) is not being fully appreciated by looking only at disparate impact analyses.  This will be even more true if the City's new classifications work to move candidates who were previously deemed "disqualified" or "pending" into the new, separate "discontinued" and "FTC" categories.  Medical data analyzed after the expiration of Exam 2000 showed that very few candidates who were disqualified for the Stairmill had exhausted all opportunities to retest and had, rather, "voluntarily attritted" by failing to return for retesting.  Although the Monitor does not have access to parallel Exam 7001 data, and it is possible that this kind of attrition is less prevalent because of attrition mitigation efforts the City has undertaken, it stands to reason – especially in light of the City's FTC category, which is defined as "candidates that failed to cooperate or appear for a specified station" – that some candidates who are unsuccessful in their initial attempts to pass the Stairmill and Weight tests voluntarily attrit at some point, rather than continuing to come back to take tests they cannot (or believe they cannot) pass.  For example, candidates who do not pass the Weight test on a first or second attempt but never return for further permitted weigh-ins are not considered "disqualified," they are considered to have voluntarily attritted.[42]  These candidates, despite

---

[41] As to the PFT, as stated before, there is an apparent anomaly in the data, because the City's February 12 report showed 20 candidate disqualifications for the PFT sub-step and stated that the PFT has a disparate impact adverse to both Black and Hispanic candidates, but the April 19 update, covering the same period, shows zero disqualifications for the PFT sub-step.

[42] Perhaps some or all of these candidates will now be classified as FTC, instead.  We expect the City will clarify all these categories in its May reports.

having failed to qualify on the Stairmill or for Weight, are not included in the count of disqualified candidates, and they are not included in disparate impact analyses, which lowers the perceived impact of these tests on qualification and the success rate of Black and Hispanic candidates.  This same issue is also presented for candidates who enter declination after having begun the Medical Exam; it is possible that some candidates decline – as they are advised to do – because they cannot pass one of the medical sub-steps, but their failure to pass is not factored into the analyses that indicate what impact a medical sub-step is having on candidate qualification.

It is critical that the City view its data holistically, regardless of any new system of status classification, so that it will continue to address the full landscape of reasons for which Black and Hispanic candidates are not getting through the Medical Exam at the same rates as white candidates.  The City must continue its efforts to lessen not only the disparities in candidates who are determined by BHS to be medically disqualified, but also the other ways – including pending status and voluntary attrition – in which the Medical Exam has served as a barrier to the Academy for reachable Black and Hispanic Exam 7001 candidates.  The City must continue to urge Black and Hispanic candidates to appear for their initial Medical Exam appointments via the personal engagements performed by Outreach Coordinators and otherwise, to use the medical and fitness resources and guidance the City has made available to them (including the FAP and stairmill fitness programs), to appear for follow-up tests provided by the City free of charge, to take advantage of their opportunities to retest on the Stairmill and Weight tests, and not to give up before exhausting all their chances to pass.  The City should use all further resources it can tap to provide guidance or programs that could help improve results, possibly by including

nutritional, weight loss, and other advice in counseling given to candidates.[43]  It must develop

new strategies to help Black and Hispanic candidates pass the Stairmill test and/or attain a

qualifying weight and thereby move out of pending status into qualification.

## V.   <u>Character Screening by the CID and PRB</u>

The City's April 18, 2024 Attrition Metrics Report continued to show statistically

significant disparities between Black and white candidates and between Hispanic and white

candidates in the rates at which candidates are referred to the PRB.  Among candidates referred

to the PRB, the City's analysis shows no statistically significant disparities in rates of

disqualification between demographic groups.  However, a further analysis performed by the

Monitor using the City's figures continued to find statistically significant disparities between

Black and white candidates in the rates at which all candidates in each group who receive any

final decision from the character review process (either a no-referral decision or a final decision

from the PRB following referral) were deemed qualified as to character.[44]

As described in prior reports, in 2022 the Monitor and the Parties discussed outstanding

proposals for reforms in standards and procedures, along with issues relating to analyses of the

character review process.  *See* Monitor's Thirty-Seventh Periodic Report at 75; Monitor's Thirty-

Second Periodic Report at 52-53; Monitor's Thirty-First Periodic Report at 48-51; Monitor's

---

[43] The Monitor notes that, after the last periodic report noted the urgency of resolving the status of candidates in pending status, Plaintiffs-Intervenors asked the City to provide them with a list of the names of Black candidates in pending status so that the Vulcan Society could help the candidates complete the Medical Exam, and the City has been providing that information.

[44] An additional separate analysis by the Monitor also continued to find a statistically significant disparity between Black and white and between Hispanic and white candidates in the rates at which they were either (1) disqualified or (2) hired with extended probation.  (The analysis combined the percentages for both outcomes in each group and then compared the combined figures between groups – *i.e.* the percentage of Black candidates with either outcome vs. the percentage of white candidates with either outcome.)

Thirtieth Periodic Report at 61-63.  The Monitor approved the City's proposal to change several of the criteria governing referral to the PRB, on the condition that the City provide additional analyses to show the projected net effect of the changes on inter-group disparities in candidate referrals and PRB outcomes.  Monitor's Fortieth Periodic Report at 76-77.  On April 12, 2023, following discussion, the Monitor provided the City with a detailed request listing specific analyses that the Monitor requested the City to conduct.  *See id.* at 77 (summarizing analyses).  As of this report, over a year later, although the City has provided information for some of the candidates referred to the PRB under discontinued criteria, it still has not provided the requested analyses.[45]

On April 4, 2024, the City provided detailed information on 10 candidates who had been referred to the PRB at least in part based on discontinued criteria and who had been disqualified, and the City has since confirmed that its April 18 Attrition Metric Report reflects changes in status for the 10 candidates.  (Before the Monitor's last report, the City had advised that the PRB had reconsidered those candidates and rescinded nine of the 10 disqualifications.)  The data provided by the City appears to indicate that three of the 10 candidates would not have been referred to the PRB under the current criteria.  However, the detailed data the City provided did not include demographic information, and the City still has not provided the complete analysis the Monitor requested of the effect of the changes on PRB referrals for all candidates and all character review outcomes.  The Monitor is engaging with the City to obtain the outstanding information and analyses.

---

[45] Given the passage of time, the Monitor has also asked the City to provide analysis of candidate outcomes since the City modified the referral criteria.

In addition to disparities in disqualifications, the Monitor also continues to emphasize that the City must perform and provide analyses of the rates at which candidates in different demographic groups are hired with extended probation, which, as the Monitor has repeatedly noted, constitutes a material burden on firefighters' terms of employment and exposes them to summary termination.  The City's two most recent Attrition Metrics Reports incorporate some analyses that include extended probation rates for only the sub-set of candidates who received negative character review outcomes (*i.e.,* the rate of extended probation among the group of candidates who were either disqualified or hired with extended probation).  But, as the Monitor pointed out in discussing the City's December 2023 report (*see* Monitor's Forty-Second Periodic Report at 61-62), the City's analyses omit candidates who were approved by the PRB without stipulations or never referred to PRB, and do not attempt to evaluate whether there is any disparity in the rates at which candidates were disqualified or given extended probation in the character review process as a whole.

The Monitor also plans to continue discussions with the City and the other Parties regarding ways to identify, analyze, and address any disparities in voluntary attrition attributable to the character review process – either because of the administrative and procedural requirements it imposes on candidates or because of the deterrent effect it may have on candidates with complicated criminal or employment histories.

As the Monitor has previously emphasized, if analyses continue to show that the process, even with the latest reforms, has a disparate impact adverse to Black or Hispanic candidates, the City will be required to validate the process as job-related.  *See, e.g.*, Monitor's Thirty-Seventh Periodic Report at 76; Monitor's Twenty-Ninth Periodic Report at 79.

## VI.    **Firefighter Exam**

Pursuant to Paragraph 7 of the MRO, the Monitor is charged with overseeing the development of examinations to screen entry-level firefighter candidates.  The City currently plans to administer the next open-competitive exam in November and December 2024.

### A.    **Exam Development**

For Exam 7001, the City's testing consultant, PSI Services LLC ("PSI") – in consultation with experts for the Monitor and the other Parties – developed forms of the computer-based test that, based on data analysis, were "equivalent" to one another and to the previously-validated CBT used for Exam 2000.  The City is currently working with Talogy (PSI's successor) to develop the upcoming exam, Exam 4044.  Talogy will also administer and analyze the results of the exam.

In August 2023, the City circulated a schedule projecting that Talogy would complete its confirmation of previous job analyses by November 2023; develop and pilot test four new forms of the validated exam (including questions, narration, video production) by September 2024; and assemble and publish the final forms by October 2024.  The schedule included time for the Monitor and the other Parties to provide input.

On October 26, 2023, the City held a meeting with DCAS, Talogy, the Monitor, the other Parties, and their respective experts to provide an overview of the exam development process.  Talogy noted that the Exam 7001 forms took two years to develop, that there was insufficient time to develop entirely new forms before the upcoming administration period, and that Talogy

66

would instead be using forms previously developed for Exams 2000 and 7001, making minor alterations to guard against any exposure the forms had during previous administrations.[46]

As they did during the development of Exam 7001, experts for the Monitor and the other Parties have been meeting with Talogy for updates and discussions, most recently on May 16.

To confirm the ongoing validity of its previous job analyses, Talogy conducted two job analysis sessions with current FDNY personnel (firefighters on April 3 and officers on April 4). Talogy shared the results of the sessions with the other experts on April 29, and the experts met to discuss them on May 2. The Monitor and Plaintiffs-Intervenors have provided feedback, and Talogy is working to finalize the job analysis report. Talogy was scheduled to circulate the test questions, the scripts for the videos, and the testing guides for review on May 2, but the experts have not yet received those materials. Talogy has said that it will circulate the materials and a revised schedule soon and that the current delay will not affect the timing of the exam. The experts also plan to discuss the method of use and scoring of the exam.

**B.    Bonus Points**

The City has increased the number of bonus points New York City residents will receive on exam scores from five points to ten points, as it has done on the NYPD exam. At the September meeting where the City first advised the Monitor of the change, the Monitor asked the City for its analysis of the effect the increase in points is projected to have on the racial/ethnic mix of reachable candidates from the next exam. *See* Monitor's Forty-First Periodic Report at 48-49. However, the City did not perform an analysis of the effect this change could have on the composition of the next class. The City stated it was relying on an analysis performed by

---

[46] Talogy plans to use portions of two of the Exam 7001 forms for the cognitive questions and the Exam 2000 form for the non-cognitive questions, all with sufficient changes to make cheating impossible.

Plaintiffs-Intervenors that projects the possible effect of the change, even though that analysis included only the projected effect on Black candidates and was performed after the City had already made the change.  As in other areas of the Monitorship, the Monitor has told the City that it should attempt to model and understand the effect of changes to the hiring process before adopting such changes.  In the case of bonus points, the size of projected effects – whether positive or negative – is relevant to hiring planning as a whole.  Because the City did not, the Monitor's expert performed an analysis and found that – assuming a usual four-year list life – the effect of the extra five bonus points for Exam 7001 would have been an increase in the Black percentage of reachable candidates from 17.7% to 18.8% and in the Hispanic percentage from 26.4% to 27.4%.

**VII.   <u>Additional Issues</u>**

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the MRO.  During the period covered by this report, these activities have included the following:

- Discussions regarding individual candidates who are or claim to be entitled to relief under the Court's Orders, including their interactions with the FDNY, documents they have received, and their rights and remedies;

- Addressing questions and disagreements among the Parties regarding the status of specific candidates and other issues that are not addressed elsewhere in this report and that fall within the MRO or Disparate Treatment Settlement; and

- Frequent calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the MRO.

Dated:   May 17, 2024
         New York, New York



/s/

Mark S. Cohen