UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

UNITED STATES OF AMERICA,

         Plaintiff,

    -and-

THE VULCAN SOCIETY, INC., *for itself and on behalf of its members*, JAMEL NICHOLSON, and RUSEBELL WILSON*, individually and on behalf of a subclass of all other victims similarly situated seeking classwide injunctive relief,*

ROGER GREGG, MARCUS HAYWOOD, and KEVIN WALKER*, individually and on behalf of a subclass of all other non-hire victims similarly situated;* and

CANDIDO NUÑEZ and KEVIN SIMPKINS, *individually and on behalf of a subclass of all other delayed-hire victims similarly situated*,

        Plaintiff-Intervenors,

    -against-

THE CITY OF NEW YORK,

               Defendant.

-------------------------------------------------------------------x

**07-cv-2067 (NGG)**

## <u>MONITOR'S FIFTIETH PERIODIC REPORT TO THE COURT</u>

**Table of Contents**

| | | | Page |
|---|---|---|---|
| I. | EXECUTIVE SUMMARY | | 1 |
| II. | ATTRITION MITIGATION INITIATIVES | | 2 |
| | A. | Overall Firefighter Demographics | 2 |
| | B. | Retention Hiring Review of Exam 7001 | 2 |
| III. | RECRUITMENT | | 9 |
| | A. | Exam 4044 Recruitment Campaign Results | 9 |
| | B. | After-Action Report | 10 |
| | C. | Discussions Regarding the Winding Down of the Monitor's Oversight of the Recruitment Process | 11 |
| IV. | FIREFIGHTER EXAM 4044 | | 11 |
| | A. | Creating the Exam 4044 List | 11 |
| | B. | Next Steps | 12 |
| V. | EEO | | 13 |
| | A. | EEO and Related Staffing and Caseloads | 13 |
| | B. | Leadership Development Program | 15 |
| | C. | Climate Survey | 16 |
| | D. | Inspections and Investigations | 20 |
| VI. | ADDITIONAL ISSUES | | 20 |

## I.      EXECUTIVE SUMMARY

This report summarizes activities relating to compliance by the City of New York (the "City") with the Modified Remedial Order (the "MRO," Dkt. # 1143), as well as to the Parties' settlement of Plaintiffs-Intervenors' disparate treatment claims, during the period from March 27, 2026, the date of the Monitor's Forty-Ninth Periodic Report (Dkt. #2347), to June 24, 2026. *See* Stipulation and Order dated June 5, 2015 (Dkt. # 1599); *see also* Memorandum & Order dated June 5, 2015 (Dkt. # 1598) at 10.

Part II provides an update on the City's attrition mitigation initiatives for entry-level firefighter candidate processing for candidates who took Exam 4044, including CPAT training and the Mentor program, as well as the City's review of its hiring from Exam 7001.  Since the Monitor's last report, the City has concluded the second Practice session of CPAT Round 1 for Exam 4044, and the Court visited the new CPAT training site in Long Island City to observe its operations.

Part III summarizes the outcome of the City's recruitment campaign to encourage candidates to sit for Exam 4044, which began in June 2023 and ran through the end of the testing period in May 2025.  It also summarizes the after-action report the City's consultant, Deloitte, is undertaking.

Part IV discusses the current status of the Exam 4044 entry-level firefighter hiring list, including publication of the list, current work on projecting the group of "reachable" candidates (those on the list who are likely to be called for processing before the list expires, based on their scores), and other post-exam analyses.

1

## II.    ATTRITION MITIGATION INITIATIVES

### A.    Overall Firefighter Demographics

On June 16, 2026, the City provided the following figures showing the current representation of Black, Hispanic, and White firefighters in the FDNY firefighter force as of June 5, 2026:

| Firefighter Force (as of 6/5/2026) | |
|---|---|
| Black | 1,107 [13.36%] |
| Hispanic | 1,690 [20.40%] |
| White | 5,060 [61.09%] |
| Asian | 253 [3.05%] |
| Native American | 23 [0.28%] |
| Other | 150 [1.81%] |
| Total | 8,283 [100%] |

### B.    Retention Hiring Review of Exam 7001

Throughout the Monitorship, the Monitor and Court have emphasized the need to use data to gain a better understanding of "what works in practice" to attract and retain qualified minority candidates in the firefighter hiring process.  As discussed in prior reports, candidate processing for Exam 7001 is complete and the City has already circulated a number of take-aways for that exam.  On March 5, 2026, the Monitor requested that the City produce a "Retention Hiring Review" for Exam 7001 similar to the one that it produced for Exam 2000 in 2018, after that exam list expired.  The Monitor also requested that the City conduct some analyses that had been discussed in the final section of the 2018 report but were not possible for Exam 2000 due to limits in the type of data that the City had collected.

The Retention Hiring Review report provides analyses of attrition mitigation programs, results, and takeaways for the exam as a whole.  As the City noted in the Exam 2000 Retention Hiring Review report:

> The purpose of this report is to provide a comprehensive understanding of the firefighter open competitive hiring process with an emphasis on attrition and programs to mitigate attrition for the list established as a result of Exam 2000. . . . [T]his report leverages available data to identify how our retention efforts in programming and training translate into candidate hiring outcomes pertaining to qualification and attrition. In addition, the report provides preliminary insights in the role of policies and process changes applicable to Exam 2000 for their effect on outcomes.

2018 Exam 2000 Retention Hiring Review Report at 6.  The City relied on the insights in the Exam 2000 Retention Hiring Review report when planning and executing Exam 7001 candidate processing, and it will be able to extract similar insights from this report, using the data it has analyzed during the life of the list to track its progress as against prior lists and to inform its retention efforts for Exam 4044.

The City has already analyzed many of the Exam 7001 hiring outcome results (as reflected, for example, in the KPMG after-action report for the Exam 7001 recruitment campaign, the PSI Technical Report of Exam 7001 results, and attrition metrics reports produced in June 2025, all of which have been reported in previous periodic reports).  However, the complete Retention Hiring Review Report will contain a number of analyses that have not yet been done and will also integrate some of the already completed analyses into a more complete overview.  The Monitor expects that some of the analyses will be easier to perform than in the previous report (*e.g.*, the Medical Exam section will be shorter and simpler, given that fewer policy changes were made to the medical evaluation for the Exam 7001 list than for the Exam 2000 list).

The Monitor has requested one new data analysis, the undertaking of which was first recommended by the City itself in the previous report.  The Limitations section of the Exam 2000 Hiring Retention Review report states:

> This report provides a high-level descriptive summary of attrition and participation in retention programs for candidates from Exam 2000. In ideal circumstances, an evaluation of our retention programs would include modeling program participation on the likelihood of completing various steps of the hiring process while controlling for individual candidate background characteristics. These characteristics would include socio-demographic variables such as candidate education levels, household composition, marital status, number of dependents, income, savings, etc. In addition, we would incorporate variables that account for candidate suitability and job-readiness such as level of fitness, and interest in becoming a firefighter. For the analysis of Exam 2000, we do not have this information about candidates, and therefore cannot reliably perform regression analysis for the association between retention program participation and appointment/hiring outcomes. This means we cannot answer the questions of why people attrit. As a result, we are limited to performing descriptive analysis of candidate attrition and program participation. This means we can answer the questions of where and when we lose candidates, and where and when candidates opt into our programs. […]

> The aforementioned limitations may be partially alleviated by two major endeavors. In the fall of 2018, ideas42 will survey candidates from Exam 2000 who were appointed or voluntarily attrited. The Department hopes the survey will provide insight into candidates' experiences and allow it to better understand the difference between successful candidates and those who decided to discontinue the hiring process. Second, the Department collected additional information about Exam 7001 candidates through an optional anonymous survey. Administered immediately following the computer-based exam in 2017, this survey included several questions about test takers [sic] demographics.

*Id*. at 10.  Now that the City has additional information for Exam 7001, the Monitor has requested that the City include the analyses that it identified in the Limitations section but was not able to complete for Exam 2000.  The Monitor has frequently recommended that the City undertake an analysis to determine the background characteristics of successful (and unsuccessful) candidates, as described above.  And the City has frequently noted the need to determine not only where and when people attrit but *why* they attrit, as reflected above and also in its bi-yearly attrition metrics reports, which state that, "it is still important for the Department to understand why candidates may decline to complete the process. Through a separate analysis of these candidates, FDNY MAP can assess why and at what points in the process candidates voluntarily attrit."  Fire Department of New York City: Metrics to Assess Applicant Attrition

4

From the Hiring Process For Exam 7001, June 25, 2025, at 7. The City now has the information it did not have at the time of the Exam 2000 Retention Hiring Review to undertake the analyses outlined in the Limitations section. The City has agreed to produce a report containing all the analyses in the Exam 2000 report by the end of August. The City has informed the Monitor that leadership of the Bureau of Management Analysis and Planning (MAP), which had committed to doing the analysis in the Limitations section, is no longer with the Department and that the City is in the process of reviewing the requested analysis and will provide its assessment of its ability to complete that analysis within the next few months.

CPAT Training. Following the written examination, the Candidate Physical Ability Test ("CPAT") is the next step in entry-level candidate processing. As the Monitor has previously discussed, the CPAT has been a significant source of candidate attrition in the past, with Black and Hispanic firefighter candidates failing at higher rates than White candidates. Familiarity with the demands and logistics of the hiring process – such as that often possessed by those who have friends and family already in the FDNY – can help candidates increase their chances of passing. For that reason, the Monitorship has consistently focused on increasing and improving the information available to candidates about what the CPAT will entail, and encouraging preparation both in terms of general fitness, and in terms of familiarity with specific skills and techniques for passing.

The FDNY offers candidates three opportunities to attempt the CPAT (two Practice sessions and one Final test), and candidates can pass on any one of the three attempts. The FDNY also offers training on the same equipment that is used in the Practice sessions and Final test. Training has been shown to greatly increase the odds of passing the CPAT, particularly for Black and Hispanic candidates, but multiple training sessions are needed to gain that benefit.

5

Throughout the Monitorship, the City has offered training for the CPAT at the FDNY Academy on Randall's Island.  Plaintiffs-Intervenors suggested that offering one or more locations to practice for the CPAT in addition to the site offered on Randall's Island would increase access to CPAT preparation, especially for candidates who might not fully appreciate the value of being able to train on these specific skills.  In 2020, the FDNY advised that it was seeking a second site, but it would not be available for Exam 7001.  The FDNY committed to having a second site available before CPAT training began for Exam 4044, as the Monitor previously reported.  *See, e.g.,* Monitor's Forty-Fifth Periodic Report (Dkt. # 2281), at 4-5.

The new site, which is conveniently located in Long Island City near major subway lines and is where the CPAT is also administered, opened in early 2026.  The first round of CPAT training for Exam 4044 began in mid-February 2026.  On April 9, 2026, the Court, Monitor, and Plaintiffs-Intervenors attended an in-person tour of the facility, where FDNY trainers gave a demonstration of the equipment and discussed their commitment to encouraging and training candidates, and emphasized the difference in outcomes that training can make.  At that demonstration, the FDNY also announced that it had expanded availability of the training center during evening and weekend hours, as well as drop-in availability without need to pre-register for a specific session.  The Commissioner of the FDNY personally attended and expressed support for the training staff and the goals of the training facility.  At the status conference held on April 23, 2026, the Court praised the facility's having been opened and complimented the facility and the commitment of the trainers.

During the period since the last periodic report, the City has reported results of attendance and pass/fail outcomes for CPAT Practices every two weeks.  The second Practice

6

period for Round 1 ended on June 9, 2026.  Based on the Monitor's analysis, some notable trends through the end of Practice 2 appear to be as follows:

- The Long Island City training site appears to have been very successful.  Over the 14 weeks of training, the pattern of attendance is as follows (reflecting candidates who attended any session; this may include the same individual attending more than one session):

    Randall's Island training site:  sessions were attended by 377 Black candidates, 296 Hispanic candidates, 19 candidates who answered "two or more races," and 630 White candidates.

    Long Island City training site:  sessions were attended by 540 Black candidates, 475 Hispanic candidates, 23 candidates who answered "two or more races," and 755 White candidates.

- The total number of Black candidates who have passed the CPAT through Practice session 2 is higher for Round 1 of the Exam 4044 CPAT than was true through two practices for Round 1 of Exam 7001 CPAT (212 versus 186).

- Of those invited to CPAT, 64.5% of White candidates, 60.1% of Hispanic candidates, and 58.7% of Black candidates have passed the CPAT in Round 1 through two practices.  This compares to pass rates of 63.1%, 56.7%, and 52.4% at the equivalent point in Round 1 of the CPAT for Exam 7001.

- Fewer people across all demographics have passed in total, however, than was the case at a similar point in Exam 7001 (1,075 versus 1,439), but fewer people were invited to the round in general (1,746 versus 2,437).

As of the end of Practice 2, the percentage of candidates from all demographics who do not show up to train for the CPAT is somewhat higher than it was at the end of Round 1 of Exam 7001.  At the end of Practice 2, the rate was approximately 40%, which is higher than the total Exam 7001 no-show rate (broken down by demographic, approximately 35% of White candidates, 32% of Black candidates, and 34% of Hispanic candidates did not show up).

In total, 63.7% of Black candidates, 59.4% of Hispanic candidates, 57.1% of candidates of two or more races, and 59.8% of White candidates attended one or more CPAT training sessions in Round 1 of Exam 4044 (at either location) as of the end of Practice 2.  Of those

7

invited to CPAT training, 113 of 361 Black candidates (31.8%) attended four or more sessions, 97 of 404 Hispanic (24.9%), 3 of 28 candidates identified as two or more races (10.7%), and 185 of 777 White candidates (25.7%).  This is a positive development that indicates that at least some candidates have absorbed the message that attending multiple training sessions increases the likelihood of passing and are finding the training sites accessible enough to be able to attend multiple times.

Mentor Program.  The City has committed to analyzing data related to the Mentor Program every two months and advising the Parties if more than 20% of mentees have mentors who have not attempted to contact them.  The City has also committed to collecting qualitative data via surveys to program participants on a quarterly basis.

As of June 19, 2026, there are 1,542 candidates from Exam 4044 who have become mentees in the Mentor Program, and all have been matched with a mentor.  Of the 1,542 mentees, there are 635 White, 320 Black, 59 Two or More Races, 307 Hispanic, 61 Asian, 4 American Indian/Alaska Native, 4 Native Hawaiian/Pacific Islander, and 152 Unknown.  As of June 19, 2026, 146 mentees (9.47%) have had no attempted contact from their mentor.

Plaintiffs-Intervenors have asked the City to provide more than just no-contact numerical data and demographic breakdowns.  In particular, Plaintiffs-Intervenors have asserted the importance of gaining more qualitative information, especially since this is a new life-cycle of a revamped program, and given the Monitor's past recognition that mentors play a key role in supporting candidates during CPAT training and testing.  *See, e.g.*, Monitor's Forty-Second Periodic Report (Dkt. # 2233) at 27.  Plaintiffs-Intervenors have requested periodic reporting on compliance with the Standard Operating Procedures, evaluations of program effectiveness, mentee/mentor survey findings, and identification of any vacancies in program management.

8

The City has rejected Plaintiffs-Intervenors' request, but advised that Deloitte will include some of the early data from the Exam 4044 class of mentees in its forthcoming analysis of the Mentor Program, which is expected to include qualitative analyses.

Data Issue.  As discussed in prior reports, the optional survey at the end of Exam 4044 used demographic categories that allowed candidates to provide more information (if they chose to do so) (the "exam survey data") than the demographic categories from which candidates could select when they registered to take the Examination (the "filing data").  The exam survey data is more complete than the filing data, and, in particular, could supply more precise demographic information for a large group of candidates (up to 25 percent of the total Exam 4044 list) who either chose not to provide their race or ethnicity or were not able to fully do so when filing, but did in the optional survey.  The City has agreed to have Deloitte use the exam survey data in its analysis of the Mentor Program but has not agreed to use that data for other reports, as Plaintiffs-Intervenors have requested.  The Monitor and Parties are continuing to discuss this issue and will update the Court as discussions progress.

## III.    RECRUITMENT

### A.    Exam 4044 Recruitment Campaign Results

The City's recruitment campaign to encourage age-eligible candidates to apply to be entry-level firefighters, attend exam tutorials, and take Exam 4044 ran from June 2023 through the end of the testing period in May 2025.  As previously reported, a total of 33,934 applicants filed to take Exam 4044, of whom 26% were Black, 27% were Hispanic, and 37% were White. A total of 21,762 test-takers went on to take the exam, of whom 23.43% were Black, 28.21% were Hispanic, and 40.27% were White.[1]  Exam results are discussed in Part IV, below.

---

[1] As discussed in multiple previous Reports, the City gathered Exam 4044 demographic data using somewhat different race/ethnicity categories than were used during previous exams.  The City also used different categories on

### B.        After-Action Report

In consultation with the FDNY's Office of Recruitment and Retention ("ORR"), the City's consultant, Deloitte, is preparing an after-action report on the Exam 4044 recruitment campaign.  The Monitor and Parties have agreed that the City's after-action report will contain, at a minimum, all the analyses that were contained in the Exam 7001 after-action report prepared for the City by its then-vendor, KPMG (except the analysis might not include the Vulcan Society's tutorial program, since production of that data has been delayed).  The final Exam 7001 after-action report incorporated feedback from Plaintiffs-Intervenors, the United States, and the Monitor.  As described in previous reports, Deloitte will analyze recruitment activity from the end of the Exam 7001 campaign through the analysis of test scores, with a focus on identifying which strategies, decisions, activities, and events were most fruitful in yielding Black and Hispanic candidates with scores the City is likely to reach as it calls candidates off the Exam 4044 hiring list ("reachable candidates").  This will include, for example, an evaluation of how the City's strategic decision to recruit fewer test-takers for Exam 4044 than it did for Exams 2000 and 7001 – in an effort to recruit candidates who would actually achieve reachable scores on the Exam, rather than simply taking a volume approach – has affected the list.  The analysis should also include an assessment of the impact of the City's tutorial program and an assessment of the effect of increasing residency bonus points from five to ten.  Also, as previously noted, the report will include a cost-benefit analysis of each recruitment initiative, such as events, tutorials, and various modes of advertising.  Plaintiffs-Intervenors have expressed concern with the digital

---

the Exam 4044 application and on the exam.  The race/ethnicity data provided in this report is based on data approaches agreed to among the Monitor and Parties and discussed in prior reports to reconcile these somewhat differing categories.  These approaches allow the data to be expressed using the Black, Hispanic, and White categories adopted in the MRO and in the Monitor's previous reporting.

marketing for the Exam 4044 recruitment campaign and have raised a number of questions that they would like the City to have Deloitte address.  One of the purposes of the after-action report is to provide insight into running a successful recruitment campaign for the next exam.  The City anticipates that it will circulate the report in late July or early August.

### C.    Discussions Regarding the Winding Down of the Monitor's Oversight of the Recruitment Process

The Monitor and Parties have continued discussions about certain topics integral to the gradual transition from oversight by the Monitor to the Department and City's implementation and analysis of improved procedures, respectively – or what the Parties have commonly referred to as the "winddown" of the Monitorship.  Most recently, the Monitor and Parties held a virtual meeting on May 19, 2026.[2]  The Monitor expects the Parties to continue to discuss these issues further.

### IV.    FIREFIGHTER EXAM 4044

Administration of Exam 4044 ran from January 31 to May 10, 2025.  As noted above, 21,762 test-takers took the exam, of whom 23.43% were Black, 28.21% were Hispanic, and 40.27% were White.

### A.    Creating the Exam 4044 List

After exam administration ended in May 2025, the City's testing vendor, Talogy, began the process of creating the Exam 4044 list, in consultation with experts for the Monitor and Plaintiffs-Intervenors.  The list was published on January 27, 2026.

In consultation with experts for the Monitor and Plaintiffs-Intervenors, Talogy is preparing its Technical Report, which will describe the process of developing, administering,

---

[2] The Monitor and Parties have engaged in active discussions regarding the winddown process, including data reporting and disclosure and processes that will be in effect during the winddown.  Due to the ongoing and candid nature of these discussions, the Monitor is not reporting the details of individual positions, but expects to update the Court as significant agreements are reached.

scoring, and analyzing the results of the exam. As it has done for past exams, Talogy will project the size and demographic composition of the Exam 4044 reachable group, and it will perform disparate impact analyses on those projections. The City is still finalizing the assumptions Talogy should use when making its projections. The City has estimated, however, based on Exam 7001 experience and the number of projected Exam 4044 classes, that it will reach down to candidates with an Adjusted Final Average score of 94. Based on the demographic categories provided by candidates on the exam survey and the categorization methodology described in multiple previous periodic reports, the City estimates that, if that score is reached, the total reachable group will consist of approximately 22.53% Black, 28.77% Hispanic, and 39.02% White candidates. These figures are subject to change, based on the City's ongoing discussions relating to the assumptions to be used, as noted above. The City does not yet have a deliverable date for the report.

### B.    Next Steps

The City anticipates that the first Academy class to include Exam 4044 candidates will begin in the fall of 2026. As previously reported, the City has committed to keeping reachable Black and Hispanic candidates engaged over the often-lengthy period between list publication and when the candidate must appear for CPAT and subsequent processing. At Plaintiffs-Intervenors' request, the City provided the Vulcan Society with contact information for the Black candidates who have been called for CPAT training. The City has agreed to continue providing notifications and reminders for post-exam milestones and candidate processing steps and access to the candidate portal, the mentor and fitness awareness programs, and stairmill training.

12

## V.   <u>EEO</u>

### A.   **EEO and Related Staffing and Caseloads**

The City has continued its efforts to increase the staff of the EEO Office, but investigation attorney numbers have remained stagnant since the last periodic report.

<u>EEO Office</u>.  In 2019, the EEO Office consisted of 16 attorneys, 8 of whom were Investigations Attorneys, as well as two Deputy Directors and one Assistant Commissioner.  *See, e.g.*, Monitor's Twenty-Seventh Periodic Report (Dkt. # 1910) at 24.  As of June 18, 2026, the FDNY EEO Office includes the following attorney staff:

<u>Managing Attorneys (1)</u>

1 Assistant Commissioner

<u>Attorneys (9)</u>
6 Investigations Attorneys
1 "Hybrid" Attorney (splitting time between handling EEO investigations and requests for reasonable accommodations)
1 Training Coordinator
1 Disability Rights Coordinator

The City has advised the Monitor that the EEO Office has hired three new investigative attorneys with start dates in May, June, and July.  Two of the three attorneys have already started, and the remaining attorney is scheduled to begin in July.  Additionally, the City has advised that on June 18, 2026, the Office of Management and Budget approved the candidate for the EEO Director, who is scheduled to start on July 20.  The City has stated that there are two postings for investigative attorney positions.  As discussed in prior reports and noted at the most recent status conference with the Court, the staffing retention issues in the EEO Office have continued to persist, requiring a search for alternative or longer-term solutions.  Since the last periodic report, the City has advised the Monitor and the Parties that it is considering at least one potential option to address the EEO Office staffing issues, and that further discussion will be

13

needed.  The Monitor expects that the City will continue to provide updates on its hiring efforts until achieving staffing at levels that demonstrate sustained ability to meet the needs of the Department and its members.  The Monitor requests that the City provide an update to the Court regarding this option (and any others it is considering) before or at the next Court conference.

As reported by the City on June 19, 2026, the EEO Office caseload for the past 365-day period was as follows:

| | All | Complaint | Inquiry |
|---|---|---|---|
| Opened Previous 365 Days | 251 | 80 | 171 |
| Closed Previous 365 Days | 255 | 77 | 178 |
| Average Days Pending | 104.88 | 129.09 | 68.14 |

With respect to the current EEO Office caseload, the City has provided the following data:

| | All | Complaint | Inquiry |
|---|---|---|---|
| Pending | 73 | 44 | 29 |
| Pending 90 Days or Under | 36 | 15 | 21 |
| Pending Over 90 Days | 37 | 29 | 8 |

EEO Counselors.  As previously reported, training of EEO counselors began on October 8, 2025 with the goal of completing training for all 70 counselors by end of fall 2025.  The City previously advised that two training sessions were held for the EEO counselors, one on October 14, 2025 and another on November 19, 2025.  As of March 20, 2026, a total of 48 EEO counselors have been trained.  The City has advised that, since the launch of the program, the EEO Office has received approximately six referrals from EEO counselors.  Plaintiffs-Intervenors have expressed that the City should make more robust use of the EEO counselors.

14

**B.     Leadership Development Program**

The Leadership Development Program ("LDP") launched on January 13, 2025 with the goal of training the full population of FDNY officers and supervisors (3,624 people, including Fire Prevention, Fire Operations, EMS and civilians) by the end of 2025.  Of the 3,624 FDNY members, 2,434 are Fire Officers.  Although the LDP is not an equal employment or diversity training program *per se*, the Monitor has underscored the role of management accountability in helping to foster a workplace conducive to compliance with equal employment opportunity laws. The results of both FDNY workforce climate surveys also corroborated a connection between positive perceptions of leadership and positive perceptions of firehouse work climate.  The City advised at the February 5, 2026 status conference that 88.87% of fire officers (2,220) had completed the training, with LDP sessions resuming in April 2026, prioritizing those fire officers who have yet to complete the training.  The City also advised that training for facilitators resumed in April.

On June 2, 2026, the Department shared data on the results of the surveys administered to LDP facilitators and participants at the end of each training.  Overall, 75 percent of participant FDNY managers had a positive view of the program's relevance to their everyday work experience, with approximately 15 percent neutral and 10 percent negative, with similar patterns for expected likelihood of using the skills covered.  Approximately 67 percent rated themselves "very satisfied" or "satisfied" with the course content, with 22 percent neutral and 10 percent negative, and similar or slightly higher numbers for the program's success at strengthening skills such as promoting a positive workplace, leading authentically, and managing conflicts compassionately.  About 18 percent of attendees responded "yes" to a question about whether they would have liked more information, clarification or discussion beyond what was covered in the session.  In addition, Plaintiffs-Intervenors have requested that the City create a final

15

assessment, including key takeaways, feedback from participants, and plans for future programs. As previously reported, the City is undertaking changes to the program based on the feedback collected, and the Monitor and Plaintiffs-Intervenors will be responding to those changes with any additional recommendations. The City has further advised that the registration for the administration of the next cycle of LDP training opened on June 8, 2026, and the first session for this next cycle will take place later this month.

### C.    Climate Survey

As reported in the Monitor's previous periodic report, the 2025 Climate Survey was conducted from May 30 to June 27, 2025. The survey had a 57% response rate across all demographics, after adjustments from an earlier reported rate of 63%. In December 2025, the City provided the Parties with Deloitte's analysis of survey results (the "Climate Survey Analysis"). The Climate Survey Analysis incorporated all analyses of the prior climate survey, which was analyzed by the Mayor's Office of Data Analysis, with input from the Monitor and Parties' experts.

During the February 5, 2026 status conference, the City advised the Court that it was pleased with the survey results. The City highlighted that of 12 identified themes, 7 were indicative of a positive climate. The City noted, however, that although overall numbers for responses indicating experiencing or witnessing incidents of incivility or harassment had gone down, that was not the case for minority respondents. The City also acknowledged that the survey responses showed a negative trend in perceptions of the FDNY EEO Office.

On April 17, 2026, the Monitor provided the Parties with its comments regarding the Climate Survey Analysis and messaging based on survey results. Plaintiffs-Intervenors previously provided comments on February 13, 2026. The Monitor flagged the need to examine any future insights that could be gleaned as to the reason for the 6 percent change in response

16

rates.  The Monitor noted that a high percentage of respondents (41%) did not disclose demographic information, which limits the value of the survey as an indicator of the experiences of different groups in the FDNY workplace.  The Monitor made some recommendations to contextualize the survey responses taking into account battalion groupings (where responses would be expected to cluster to some extent based on similarity of work experience, and thus conflict with an assumption of random distribution in the survey response pool).

The Monitor highlighted the finding that firefighter respondents of two or more races and Black firefighter respondents were more likely to report incivility and harassment compared to White respondents, with Black and Hispanic respondents being three times as likely to report such incidents. The Monitor noted that, although the City's summary of survey findings discusses a particular statistical measure in connection with whether differences in survey responses between Black respondents and other response groups might be attributable to factors other than race or ethnicity, which were listed in the summary, that statistical measure (which differs from the 2019 survey analysis) measures correlation, and is not indicative of causation. The Monitor suggested that the City should also consider the possibility that race or ethnicity may be a factor causing differences in response patterns.  The City indicated that it will give consideration to this in the post-survey initiatives, about which the Monitor expects to continue to report.

The Monitor also noted the persistence in the survey responses of factually inaccurate beliefs that FDNY standards have been lowered, or that inclusivity efforts are divisive.  The Monitor recommended that messaging address these misperceptions. The Monitor also recommended further study into levels of reported mistreatment following having reported violations of EEO policy.

17

The Monitor also made additional recommendations – including methodological and messaging considerations – to build upon the Department's work in the hope that the survey will continue to be a valuable tool for understanding the culture of the FDNY going forward.  On May 14, 2026, the City responded to some of the Monitor's comments, indicating where it believed some of the concerns had already been addressed through data in the report and agreeing to incorporate other aspects of the feedback into future analyses and post-survey initiatives.  Plaintiffs-Intervenors have identified issues raised by themselves or the Monitor that the City has yet to address and have asked that the City provide a complete response.  The City has advised that it is currently working on a reply to all outstanding comments and will provide it before the next Court conference.

As previously reported, in response to some negative trends identified by the Climate Survey Analysis, the City has formed the Climate Survey Initiatives Working Group.  On April 17, 2026, the City shared with the Monitor and Plaintiffs-Intervenors a list of proposed initiatives to address areas of concern, which includes measures to promote increased firefighter visibility into EEO statistics and complaint resolution times, promotion of the role of affinity groups by the Department, and a variety of messages for different FDNY audiences aimed at encouraging awareness of ongoing high standards and leveraging love of the Department to promote positivity.  The City subsequently shared the plan with the rest of the affinity organizations within the Department and provided a "comment period" during which all organizations were invited to make recommendations regarding particular content for each initiative, as well as given the opportunity to nominate individuals to participate in various initiatives where appropriate.

18

On May 29, 2026, Plaintiffs-Intervenors shared their feedback on the proposed climate survey initiatives and recommended additional initiatives to address other areas of concern identified in the Climate Survey Analysis.  Plaintiffs-Intervenors provided feedback on the themes of the proposed messaging, and urged the City to adopt a number of remedial measures suggested by the City's vendor, Deloitte, and from the 2019 climate survey report.  Plaintiffs-Intervenors have also raised several specific measures, and identified two process-oriented needs: (i) methods of evaluation with metrics so that progress can be tracked and changes made when needed; and (ii) an engagement strategy with leaders paving the way for organizational change and with frontline members' active participation.

On June 9, 2026, Plaintiffs-Intervenors followed up on issues regarding the climate report raised by the Monitor and Plaintiffs-Intervenors to which the City has not yet responded. Plaintiffs-Intervenors noted their belief that the high number of respondents who did not provide demographic information is likely to skew the results of the survey in comparing different groups' experiences.  Plaintiffs-Intervenors also identified issues in need of action planning by the City, including training and counseling in response to the battalion-level data in the report; conducting pulse surveys and other interim methods of information-gathering as recommended in the report; counteracting concerns expressed by some survey respondents that they would be unfairly subjected to EEO complaints; and an explanation of why the report largely excluded data and analysis for Hispanic firefighters.  Plaintiffs-Intervenors agreed with the need to focus on negative perceptions of diversity and on incidents of retaliation and asked for additional information on the City's plans to address these issues.  The City has advised that it is in the process of preparing a response to all recommendations provided by Plaintiffs-Intervenors.

19

D.    **Inspections and Investigations**

As of June 22, 2026, the EEO Office has conducted inspections of 118 fire companies (out of approximately 350).  As previously reported, the City advised that inclement weather and major snowstorms significantly impacted the EEO Office's ability to conduct inspections at the start of the year, but that the EEO Office started increasing inspections in March 2026.  The City has continued to provide the Monitor with materials regarding its investigations, once completed, and the Monitor has continued to review and provide the City with feedback on these matters.

VI.    **ADDITIONAL ISSUES**

On an ongoing basis, the Parties and the Monitor consider a range of issues and perform an array of additional tasks relating to enforcement of the MRO.  Over the past several months, these activities have included the following:

- Addressing questions and disagreements among the Parties regarding issues that are not addressed elsewhere in this report and that fall within the MRO or Disparate Treatment Settlement; and

- Calls, meetings, and correspondence with the Parties regarding the full range of issues related to implementation of and compliance with the MRO.

Additionally, Chief Diversity and Inclusion Officer Dr. Kwame Cooper resigned effective December 1, 2025.  The City has advised that the CDIO position has been retitled as the Chief Professionalism Officer ("CPO"), and that the Department posted the CPO position on May 19, 2026.  The Parties have been engaged in discussions about the scope of the CPO's role to reflect current and anticipated needs and conditions, and will be engaging with the Monitor in that process.

Dated:    June 25, 2026
         New York, New York

/s/
_____
Mark S. Cohen

20